# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### C.A. 16-56057

---

### SKIDMORE ET AL.

*Michael Skidmore, Trustee for the
Randy Craig Wolfe Trust
Plaintiff-Appellant*

v.

### LED ZEPPELIN ET AL.

*Defendants-Appellees*

---

## PLAINTIFF-APPELLANT MICHAEL SKIDMORE'S
## EXCERPTS OF THE RECORD
## VOLUME II OF XI

---

(Music copyright infringement, on appeal from the final Order dated June 23, 2016 of the Honorable R. Gary Klausner, of the United States District Court for the Central District of California.  The case was docketed in the Central District at 15-cv-03462)

---

FRANCIS ALEXANDER, LLC
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyers for Appellant Skidmore*

## EXCERPTS OF THE RECORD: VOLUME II of XI
(137 – 422)

06/14/2016    Transcript for June 14, AM (*Doc. No. 275*)........................................................ 137

06/14/2016    Transcript for June 14, PM (*Doc. No. 283*) ........................................................ 234

06/15/2016    Transcript for June 15, AM (*Doc. No. 276*)........................................................ 336

1          **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3          **HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE**

4                          - - - -

5


6    MICHAEL SKIDMORE, AS TRUSTEE FOR  )
     THE RANDY CRAIG WOLFE TRUST,      )
7                                      )
                       PLAINTIFF,      )
8                                      )
          vs.                          )     No. CV 15-03462-RGK
9                                      )
     LED ZEPPELIN; JAMES PATRICK PAGE; )
10   ROBERT ANTHONY PLANT; JOHN PAUL   )
     JONES; SUPER HYPE PUBLISHING,     )
11   INC.; WARNER MUSIC GROUP CORP.,   )
     PARENT OF WARNER/CHAPPELL MUSIC,  )
12   INC.; ATLANTIC RECORDING          )
     CORPORATION; RHINO ENTERTAINMENT  )
13   COMPANY,                          )
                                       )
14                     DEFENDANTS.     )
     _____

15

16          **REPORTER'S TRANSCRIPT OF JURY TRIAL**

17          **DAY 1, VOLUME 1; PAGES 1 TO 97**

18              **TUESDAY, JUNE 14, 2016**

19                   **9:04 A.M.**

20              **LOS ANGELES, CALIFORNIA**

21

22    _____

23          SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
             Official Reporter, U.S. District Court
24                  255 East Temple Street
                  Los Angeles, CA  90012
25                    213.894.5949

2

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE**
**RANDY CRAIG WOLFE TRUST:**

      FRANCIS ALEXANDER, LLC
      BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
      280 N. PROVIDENCE ROAD, SUITE 1
      MEDIA, PENNSYLVANIA  19063
      215.500.1000

      KULIK GOTTESMAN & SIEGEL, LLP
      BY:  GLEN L. KULIK, ATTORNEY AT LAW
      15303 VENTURA BOULEVARD, SUITE 1400
      SHERMAN OAKS, CALIFORNIA  91403
      310.557.9200


**FOR DEFENDANT LED ZEPPELIN:**

      PHILLIPS NIZER, LLP
      BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
      666 FIFTH AVENUE
      NEW YORK, NEW YORK  10103
      212.977.9700


**FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:**

      LAW OFFICES OF PETER J. ANDERSON, PC
      BY:  PETER J. ANDERSON, ATTORNEY AT LAW
      100 WILSHIRE BOULEVARD, SUITE 2010
      SANTA MONICA, CALIFORNIA  90401
      310.260.6030

      PHILLIPS NIZER, LLP
      BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
      666 FIFTH AVENUE
      NEW YORK, NEW YORK  10103
      212.977.9700


///

///

///

```
1   APPEARANCES OF COUNSEL (CONTINUED):

2

3   FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING
    CORPORATION, RHINO ENTERTAINMENT COMPANY:
4
         LAW OFFICES OF PETER J. ANDERSON, PC
5        BY:  PETER J. ANDERSON, ATTORNEY AT LAW
         100 WILSHIRE BOULEVARD, SUITE 2010
6        SANTA MONICA, CALIFORNIA  90401
         310.260.6030
7

8

9   ALSO PRESENT:

10       NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

11       BRAD COHEN, WARNER MUSIC GROUP

12       SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

13       KEVIN SEGAL, TRIAL TECHNICIAN

14       DAN MORENO, TRIAL TECHNICIAN

15

16

17                    I N D E X

18

19  PROCEEDINGS:                                    PAGE:

20  Discussion outside the presence of the           4
    prospective jurors
21
    Jury voir dire                                   17
22
    Pre-instructions to the jury                     87
23

24

25
```

4

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, JUNE 14, 2016

 2                           9:04 A.M.

 3                            - - - -

 4        (Outside the presence of the prospective jurors:)

 5        THE CLERK:  Calling calendar item No. 1, case

 6   No. Civil 15-3462-RGK, Michael Skidmore versus Led Zeppelin,

 7   et al.

 8        Counsel, please state your appearances.

 9        MR. MALOFIY:  Good morning, Your Honor.  May it please

10   the Court, Attorney Francis Malofiy on behalf of plaintiff,

11   Michael Skidmore, as trustee of the Randy Craig Wolfe Trust.

12   Here with me today is local counsel, Mr. Kulik, along with my

13   office, Francis Alexander, LLC, and A.J. Fluehr.

14        THE COURT:  Thank you, Counsel.

15        MR. ANDERSON:  Good morning, Your Honor.  Peter

16   Anderson on behalf of defendants Jimmy Page, Robert Plant,

17   Warner/Chappell Music, Atlantic Recording, and Rhino

18   Entertainment.  Also with me is Helene Freeman of the Phillips

19   Nizer firm, who represents the individual defendants.

20        THE COURT:  Okay.  Thank you, Counsel.

21        This is just pretrial.  We're going to be starting the

22   trial as soon as we get the jury down here, and that's going to

23   be probably quarter of 9:00, but I do want to go -- or excuse

24   me, quarter of 10:00.  I do want to go over a few things with

25   you before we get started, though, just as a reminder.
```

5

```
 1        First of all, on the motions in limine, most of those we
 2   gave you tentatives on.  Those tentatives are going to be --
 3   most of those are going to be permanent.
 4        Remember, counsel on both sides, motions in limine are all
 5   tentative insofar as they're normally motions on evidentiary
 6   issues.  Depending on what comes up during the trial, something
 7   may or may not become relevant, and those motions may change,
 8   but until they do, those -- the rulings on these motions will
 9   be in effect.
10        On the plaintiff's motions in limine, the first motion in
11   limine, as to the validity of the Trust, will be granted.
12        The second motion in limine, as to who owns the copyright,
13   will be denied.
14        The third motion in limine will also be denied.
15        As to the defendants' motions in limine, the first motion
16   in limine will be granted.
17        The second motion in limine will be granted with the --
18   with the caveat that it could -- that the testimony about books
19   and interviews and newspapers, et cetera, might come in for
20   impeachment purposes, but for impeachment purposes only.
21        The third motion in limine will also be granted.  As we
22   know, we're limiting this to the transcripts of the copyright,
23   1967 transcription.
24        The fourth motion in limine has been corrected, but it
25   will be granted, but we have to make sure that the testimony is
```

6

```
1   not relying on unprotected performance elements, but other than
2   that, it's -- it can come in, but as far as unprotected
3   performance elements, that will be granted.
4        Fifth motion in limine will be granted.
5        Sixth will be granted.
6        Seventh will be granted.
7        Eighth will be granted.
8        Ninth will be granted as to extraterritorial profits, but
9   it will be denied as far as -- excuse me, it will be denied as
10  far as extraterritorial profits, but it will be granted as to
11  the limitation period.
12       The tenth motion in limine will be granted with the
13  exception of Larry Knight.  All the others, it will be granted
14  to, as to, but as to Larry Knight, he can testify.
15       As to motion in limine No. 12, that will be granted or
16  denied, depending.  The Wolfe -- or excuse me, Knight can
17  testify as to observations he made of Wolfe and Jimmy Page in
18  1973.  He can testify as to observations and impressions he had
19  at that time, but he cannot testify as to statements that were
20  made at that time.
21       Number 12 is granted.
22       Number 13, granted.
23       Number 14 is granted.
24       Second thing I wanted to talk to you about is witness
25  list.  I've gotta make sure that every day that you present a
```

7

1  witness list of the witnesses you're going to call that day to

2  the Court. I don't care if you present it to the other side,

3  but to the Court, in the order that you're going to be calling

4  them, so we know what witnesses are coming up.

5      Make sure that you have enough witnesses available so that

6  you don't run out of time. As we talked last time we were here

7  for the pretrial, if you run out of time and say, "Well, I need

8  half hour to get my witness in," that's okay, but that comes

9  off the time that we've given you to try the case. So you

10  always want to make sure that you have witnesses as backups.

11      It should be noted for the parties and also for the --

12  anybody in the audience out there, cell phones are not

13  permitted in the courtroom. We permit them in the courtroom as

14  long as they've been powered off, but if they're not powered

15  off, and you have a cell phone that is not powered off in your

16  possession, it will be confiscated and not returned to you

17  until the end of the day. So if you come on in, that's fine,

18  you can bring your cell phone, but power it off. If you want

19  to use it, just step out in the hallway, power it on and use it

20  there. But while you're in the courtroom, it's not allowed to

21  have any cell phones or any type of recording, electronic

22  equipment that is powered on in the courtroom.

23      Let me go through -- and we went through this last time.

24  This is just briefly to remind you, because we talked about it

25  a little bit last time, some of the rules of court, just as a

8

```
 1   reminder.  When you make an objection, that's okay, you can
 2   make them where you are.  You don't have to go to the podium to
 3   make them, but do stand if you're going to make objections.  Do
 4   not argue objections.  You can state your reason for the
 5   objection and leave it at that.  There are no bench conferences
 6   during the trial.  If you have to put anything on the record,
 7   we can do that the next time we break as far as the jury is
 8   concerned and the jury's out of here.  We can put it on the
 9   record at that time.
10       All evidence is presented through the clerk, never
11   directly to the witnesses themselves.
12       Always talk from the lectern.  Don't walk around the
13   courtroom.  We need you to talk from the lectern so that the
14   reporter can hear what you're saying, so that you're in front
15   of the mic all the time.  Remember, the reporter has to
16   transcribe down everything that's said in court.
17       I've told you also last time, almost anything that both
18   sides agree on, as long as it doesn't affect the timing of the
19   court, almost anything you agree on, I'll go along with.  So
20   before you bring something to the Court, talk to each other
21   first of all and see if you can agree on it and work it out
22   before you bring it to the Court.  If you have an issue you
23   have to bring to the Court, almost always I will have you brief
24   that issue so the other attorney has an opportunity to respond
25   to that issue before I decide it.  Very little will be decided
```

9

```
1    just from the seat of my pants here in the court where you get
2    up and say, well, I have this problem or I have this problem.
3    I'll probably tell you, brief it, let the other side respond to
4    it, and then I'll make the decision on it.
5        Also, during the trial, I don't think we have a problem
6    with this, but never refer to anybody by first name.  Everybody
7    should have the dignity and respect to be able to be addressed
8    by their last name.  So if you have somebody, the name is not
9    Sam or Jim or whatever it is.  Always address them by last
10   name.
11       I talked to you last time about how important it is for
12   the Court to make sure there's civility between the attorneys,
13   and I'm not going to go over that again, because that's the one
14   area that you can really get in trouble on.  But I don't expect
15   any problems.  I expect both sides to be very professional that
16   way.  And if you're not, and if you violate court rules, you'll
17   be corrected and looking at sanctions or looking at contempt,
18   and you may even be corrected in front of the jury.  And we
19   don't want to get into that.  We want a good trial on both
20   sides.
21       I talked to you about time.  Remember that starting
22   tomorrow -- today is kind of strange because we have to bring
23   the jury in and impanel them, so it's going to be a little bit
24   loose that way, but starting tomorrow, we start 8:30 every
25   morning.  Not 8:32 or 8:33.  If you're not here at 8:00
```

10

1    o'clock, when you do get in at 8:31 or 8:32, you're going to

2    find the jury in the box and everybody sitting here in the

3    courtroom waiting for you, and that's an embarrassing

4    situation. So make sure that you're here right by 8:30. And

5    as I tell the jury, be here a few minutes early so you don't

6    run into any problems.

7         We go from 8:30 to 11:30, with a break in there. We break

8    for lunch from 11:30 till 1:00. We come back at 1:00 and go

9    from 1:00 until 4:00. So you have a three-hour block in the

10   morning, three-hour block in the afternoon. We will start

11   right on time at 1:00 and also at 8:30. We will end right on

12   time also, at 11:30 or 4:00 o'clock.

13        Again, as I said last time, if you're in the middle of a

14   question at 4:00 o'clock, I'll be telling you remember that

15   question, because we're not going to cover it at this time. At

16   4:00 o'clock, the jury will be able to be released to make any

17   appointments they want or have anybody pick them up that they

18   want.

19        And I've talked to you about time limits, ten hours per

20   side.

21        I think that pretty much covers what we talked at the last

22   pretrial, the last time we were in here.

23        The jury should be coming down about -- about quarter --

24   well, we're going to try for quarter of 10:00, 9:45, and we'll

25   start up at that time. Okay?

11

```
1          Yes, Counsel.

2              MR. ANDERSON:  Yes.  May I address a few matters --

3              THE COURT:  Sure.

4              MR. ANDERSON:  -- briefly?

5          Your Honor, on motion in limine No. 4, Your Honor provided

6      plaintiff leave to file, or serve, rather, amended expert

7      reports that --

8              THE COURT:  Right, which was done.

9              MR. ANDERSON:  They were, but we raised in the trial

10     brief that the expert, their amended expert reports still talk

11     about the "Taurus" sound recording.

12             THE COURT:  Sorry?

13             MR. ANDERSON:  They still talk about the "Taurus"

14     sound recording.  They are not limited, as the Court directed,

15     to the "Taurus" deposit copy.

16             THE COURT:  I've already told you what they can

17     testify to.  If they testify to something outside that area, I

18     expect an objection, and if appropriate, it will be sustained

19     by the Court.

20             MR. ANDERSON:  Okay.  Thank you.

21         And we also renewed and will have a pending *Daubert* on the

22     three experts who -- now that we've had the chance to depose

23     them, they each testified they're not musicologists, they don't

24     have graduate degrees, they didn't follow the Ninth Circuit

25     rules.
```

12

```
1          THE COURT:  Okay.  Counsel, bring that up when the
2    witnesses are called.  Keep in mind the Court's not real
3    sympathetic to arguments when counsel comes in and says, "Well,
4    we just took this deposition," or, "We just took" -- you had
5    plenty of time for discovery.  Much of this should have been
6    done a long time ago, and if it's not, the Court's not real
7    sympathetic to last-minute motions because of something that's
8    been newly discovered.  But make it at the time that the
9    testimony is offered, and I'll be happy to rule on it.
10         MR. ANDERSON:  Just to clarify, we had to -- there
11   were amended reports.  The Court ordered these people to appear
12   for deposition.  That's why it was last-minute.
13         THE COURT:  Okay.
14         MR. ANDERSON:  The last thing, Your Honor, if I may,
15   the gentleman to my left, Mr. Bricklin, is one of plaintiff's
16   expert witnesses.
17         THE COURT:  Okay.
18         MR. ANDERSON:  My understanding is that, as a witness
19   who is going to testify in the case, that he is properly
20   excluded during the --
21         THE COURT:  Only if that motion's made.  It hasn't
22   been made yet from either side.
23         MR. ANDERSON:  Okay.
24         THE COURT:  If motion is made to exclude witnesses,
25   they'll be excluded, most probably.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00148**

13

```
 1              MR. ANDERSON:  Okay.  Thank you.

 2              THE COURT:  Unless they're a party to the case.

 3              MR. ANDERSON:  He's not a party.  May I make an oral

 4    motion to exclude him?

 5              THE COURT:  I'm sorry?

 6              MR. ANDERSON:  May I make an oral motion to exclude

 7    from the courtroom during testimony any witness who is not

 8    actually testifying?

 9              THE COURT:  Okay.  That will be granted, from both

10    sides.

11              MR. ANDERSON:  Thank you, Your Honor.  And includes

12    Mr. Bricklin?

13              THE COURT:  Counsel, I just said it's granted.

14              MR. ANDERSON:  Thank you, Your Honor.

15              THE COURT:  I don't know if it includes him or not.  I

16    don't know if he's going to be a witness or not.  I just made

17    an order that any witnesses that will be testifying will be

18    excluded while they're not testifying.

19              MR. ANDERSON:  Thank you very much, Your Honor.

20              THE COURT:  Anything else?

21              MR. MALOFIY:  Yes, Your Honor.

22              THE COURT:  Yes.

23              MR. MALOFIY:  There are a couple issues that plaintiff

24    feels necessary to address with the Court for further argument

25    on the motions in limine.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

14

```
 1        One of the issues --

 2            THE COURT:  Counsel, I've ruled on the motions

 3   in limine.  Those rulings have been made.  Next issue.

 4            MR. MALOFIY:  Yes.

 5            THE COURT:  I'm not revisiting that issue.  We've

 6   given you plenty of time to make your motion, to argue it, to

 7   submit argument to the Court.  I've read those.  Those rulings

 8   have been made.  Next issue.

 9            MR. MALOFIY:  Respectfully, Your Honor, we understand

10   them to be tentative, and for that reason, we did file a

11   further brief, which was --

12            THE COURT:  Counsel, that was stricken, as you know,

13   for not following the court rules on it.  But I did read it,

14   and it would not have changed my opinion on that motion in

15   limine.

16            MR. MALOFIY:  Very well.

17        As it relates to Dr. Ferrara, one of the defendants'

18   experts, Dr. Ferrara is conflicted in this case.  Furthermore,

19   he did a prior analysis of "Stairway to Heaven" and also

20   "Taurus."

21            THE COURT:  What are you going to be requesting?

22            MR. MALOFIY:  We're requesting he's stricken

23   completely from the case or --

24            THE COURT:  Put it in writing, Counsel, have the other

25   side a chance to respond to it, and I'll take a look at it.
```

15

1        MR. MALOFIY:  We did file it by motion, and it was

2    taken off the calendar, the docket, and so I'm raising it by

3    oral motion respectfully here.

4        THE COURT:  No, Counsel.  I'm telling you at this

5    time, make it again.  I'll decide whether to look at it or not.

6    If it was rejected because it wasn't timely made, it wasn't

7    timely made.  That's the attorney's problem.

8        MR. MALOFIY:  I understand that, Your Honor.  Our

9    position was that it just became -- it just became an issue a

10   week ago, and so --

11       THE COURT:  Bring it up again, and I'll find out

12   whether or not the Court will consider it.  If I do consider

13   it, I will also consider the opposition to it, and I'll make a

14   ruling at that time.  Okay?

15       MR. MALOFIY:  As far as the request for judicial

16   notice, there was an issue as to whether or not the ownership

17   of the copyright "Taurus" is owned by the Trust or someone

18   else.  Defendants made an issue of whether or not the Trust has

19   ownership of the copyright.  We have alleged all along we have.

20   It's never been disputed for 20 years.  We ask for judicial

21   notice of the Ventura County court records, which

22   indicate that --

23       THE COURT:  Is there an objection, Counsel?

24       MR. ANDERSON:  If I may.

25       THE COURT:  No, I'm just asking if there's an

16

```
 1    objection to it.

 2              MR. ANDERSON:  Yes, Your Honor, and we filed

 3    opposition --

 4              THE COURT:  If there is, put it in writing, allow the

 5    other side to respond it, and I'll make a ruling on it.

 6              MR. ANDERSON:  Thank you, Your Honor.

 7              THE COURT:  Okay.

 8              MR. MALOFIY:  One other issue.

 9              MR. KULIK:  Your Honor, the Universal Music Group

10    responded to a subpoena this morning and lodged a series of

11    objections, refusing to produce documents that we subpoenaed

12    from them.  How and when can we resolve that issue with the

13    Court?

14              THE COURT:  Just -- anytime you think something is

15    inappropriate or you want a ruling on something, put it in

16    writing, let the other side object to it if they wish, and I'll

17    rule on it.

18              MR. KULIK:  Okay.  Thank you.

19              THE COURT:  I'm just not going to do things

20    spontaneously up here without giving both a chance to take a

21    look at the motions and decide whether or not they want to

22    object or not.  So put it in writing.  I'm more than happy to

23    take a look at it.  Okay?

24              MR. MALOFIY:  Thank you, Your Honor.

25              THE COURT:  Okay.  Anything else?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

17

1          MR. ANDERSON:  No, Your Honor.  Thank you.

2          THE COURT:  Okay.  We'll start, hopefully, quarter of

3   9:00 with -- or quarter of 10:00 with voir dire.

4          THE CLERK:  All rise.

5       (Recess held from 9:19 a.m. to 10:12 a.m.)

6       (In the presence of the prospective jurors:)

7          THE CLERK:  Calling calendar item No. 1, case

8   No. Civil 15-3462-RGK, Michael Skidmore versus Led Zeppelin,

9   et al.

10      Counsel, please state your appearances.

11         MR. MALOFIY:  May it please the Court, may it please

12  defense counsel, and please the jurors, Attorney Francis

13  Alexander Malofiy with the law firm Francis Alexander,

14  representing the plaintiff in this matter, Michael Skidmore, as

15  trustee for the Randy Craig Wolfe Trust.

16         THE COURT:  Thank you, Counsel.

17         MR. ANDERSON:  Good morning, Your Honor.  Peter

18  Anderson for defendants Jimmy Page, Robert Plant, Atlantic

19  Recording Corporation, Warner/Chappell Music, and Rhino

20  Entertainment.  And with me is Helene Freeman of Phillips

21  Nizer, who represents the individuals.

22         THE COURT:  Thank you, Counsel.

23      Both sides ready for trial?  Both sides ready for trial?

24         MR. ANDERSON:  Yes, Your Honor.

25         MR. MALOFIY:  Yes, Your Honor.

18

```
 1           THE COURT:  Okay.  Thank you, Counsel.  Why don't you
 2   have a seat.
 3       Ladies and gentlemen, you've been sworn in as jurors.
 4   We're going to start calling the names of jurors, and the first
 5   person who's called, if you'd please come forward, go to the
 6   back row and go all the way down to the end and fill up that
 7   back row first, so you get the first eight jurors there.  And
 8   then the ninth juror, if you'd take the first seat in the
 9   second row and fill that up.  And as soon as we have the 14
10   jurors in the box, we'll talk to you a little bit further.
11       Go ahead.
12           THE CLERK:  Jasper Domingo, D-o-m-i-n-g-o.
13       John Magee, M-a-g-e-e.
14       Grace Vela, V-e-l-a.
15       Julio Cienfuegos, C-i-e-n-f-u-e-g-o-s.
16       Mark DiSarro, D-i-S-a-r-r-o.
17       Michael Heinesh, H-e-i-n-e-s-h.
18       Margaret Duenez, D-u-e-n-e-z.
19       Kevin Skinner, S-k-i-n-n-e-r.
20       Sherri Clark, C-l-a-r-k.  Robin Sherri Clark.
21       Marilyn Miller, M-i-l-l-e-r.
22       Kalli Norimoto, N-o-r-i-m-o-t-o.
23       Desalyn Stevenson, S-t-e-v-e-n-s-o-n.
24       Ven-Li Ma.
25       And Loreto Fabrigas, F-a-b-r-i-g-a-s.
```

19

```
 1              THE COURT:  Okay.  Ladies and gentlemen of the jury,
 2   we have the 14 people in the box up here, and we have 16 or 17
 3   other people out there.  I'm going to be asking questions of
 4   the jurors that are seated here in the box, and as I ask them
 5   questions, I'm going to ask you out there to pay just as much
 6   attention to what the questions are and what your answers would
 7   be to those questions.  We're going to be talking directly to
 8   the 14.  I'm not going to be talking to you right now.  So you
 9   might say, "Well, why do I have to pay attention if you're not
10   going to ask me questions?"  Well, the reason is, is that you
11   may be called at any point to come and take the place of one of
12   the jurors up here, and rather than go through every single
13   question we've asked everybody else, which could take hours, we
14   would like to be able to ask you general questions, like:  Have
15   you heard all the questions?  Would your answer be different to
16   this or that?  And you can't answer that unless you've been
17   listening to the questions and thinking about what your answers
18   would be.  So I'm going to ask you to work just as hard as the
19   jurors up here, in the 14 up here.  And if you can't see
20   something or you can't hear something, you're still part of
21   this entire panel, raise your hand.  It's important that you
22   see and hear everything.  Okay?  Any problems with that, jurors
23   out there?
24        I can't get any reaction.
25        Any problems at all with the jurors out there?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

20

```
 1            MULTIPLE PROSPECTIVE JURORS:  No.

 2            THE COURT:  Okay, great.

 3       Okay.  Ladies and gentlemen, the case before the Court

 4   today is Michael Skidmore versus Led Zeppelin, et al.  This

 5   case involves a -- this is a copyright infringement case

 6   involving two musical compositions.  The plaintiff is Michael

 7   Skidmore, as trustee for the Randy Craig Wolfe Trust, who

 8   contends that the song "Stairway to Heaven," recorded by the

 9   group Led Zeppelin, infringes on a copyright in a composition

10   called "Taurus" by Randy Wolfe and the group Spirit.

11       The defendants include two of the members of the

12   Led Zeppelin, one being Jimmy Page and the other being Robert

13   Plant, and three companies involved with the Red Zeppelin --

14   Led Zeppelin catalog.  Those companies are Warner/Chappell

15   Music, Atlantic Recording Corporation, and Rhino Entertainment

16   Company.

17       At this time I'm going to have you -- have introduced by

18   the parties, the witnesses they intend to call and the parties

19   themselves, and I'm going to ask you to listen very carefully,

20   because when they're through, I'm going to ask you whether or

21   not you have any personal contact or knowledge with any of

22   these people.

23       So at this time, counsel, if you could introduce the

24   parties that are involved in the case and any potential

25   witnesses that you might have.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00156**

21

```
 1        MR. MALOFIY:  Your Honor, I believe we handed off our
 2    witness list, and so just give me a moment to see if I can
 3    locate a second one.
 4        THE COURT:  Sure.  Sure.
 5        MR. MALOFIY:  Thank you.
 6        THE COURT:  There you go.  Okay.
 7        MR. MALOFIY:  May I take it from the podium,
 8    Your Honor?
 9        THE COURT:  Please.  Please.
10        MR. MALOFIY:  Would Your Honor like me to read all the
11    ones that plaintiff intends to offer, or just the ones in our
12    case in chief?
13        THE COURT:  Any witness you feel -- or any person you
14    feel may be a witness in this case, because I have to know
15    whether or not the jury knows any of them.
16        And remember, ladies and gentlemen, they're going to name
17    off a lot of witnesses.  They may or may not call these
18    witnesses, but they may be called, and so that's why we have to
19    find out if you know any of these witnesses.
20        Go ahead.
21        MR. MALOFIY:  Would you like me to read just them, the
22    name --
23        THE COURT:  Yeah.
24        MR. MALOFIY:  -- alone?
25        THE COURT:  Yeah, that's fine.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00157**

1        MR. MALOFIY:  All right.

2        Good morning, jurors.  Thank you for being here.  I

3   introduced myself briefly earlier on.  I hope you heard me.  I

4   know you were standing behind me.

5        We have a number of witnesses here on our witness list.

6   Our first witness is Michael Skidmore, who is the plaintiff in

7   this matter, as trustee for the Randy Craig Wolfe Trust.

8        Can you please stand.

9        MR. SKIDMORE:  Hi.

10        MR. MALOFIY:  Our next witness is Mark Andes.

11   You can sit.

12   Our next witness is Jay Ferguson.

13        THE COURT:  Just go through the names, Counsel.  I'll

14   ask them afterwards if they know any of them.

15        MR. MALOFIY:  Okay.

16        Bruce Pates, Tracy Longo, Andrea Wolfe Baum, Janet Wolfe,

17   Marla Wolfe Randall, Linda Mensch, David Waterbury, Larry

18   Knight, Paul Franklin, Barry Hansen, Michael R. Lee, Robert

19   Lee, Alexander Stewart, Erik Johnson, Brian Bricklin, Kevin

20   Hanson, Michael Einhorn, Dennis Somach, Robert Coit, Terry Lynn

21   Moore, Dave McKenna.

22        We have corporate defendants from the UK which we do not

23   believe will be at issue here.

24        THE COURT:  Okay.

25        MR. MALOFIY:  For safeguard, should I read them in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    case?

2           THE COURT:  Not unless you think they're going to be

3    witnesses that you will be calling.

4           MR. MALOFIY:  We have persons most knowledgeable, Your

5    Honor, so should I list it just in case?

6           THE COURT:  No.  I just want to know if they know the

7    names of the people.

8           MR. MALOFIY:  All right.

9       Flames of Albion Music, Limited.  Succubus, Limited.  Sons

10   of Binion, or Eninion, Limited.  Super Hype Tapes, Limited.

11   Classicberry, Limited.  Trolcharm, Limited.  JPJ

12   Communications, Limited.  WB Music Corp.  David Woerhaye.

13   Rhino Entertainment Company.  Atlantic Recording Corporation.

14      Individual defendants, should I read them as well,

15   Your Honor?

16          THE COURT:  No.  They'll take care of that themselves.

17   You're not going to be calling them, are you?

18          MR. MALOFIY:  Oh, yes, we will.

19          THE COURT:  They'll introduce their own witnesses.

20          MR. MALOFIY:  Okay.  Very well, Your Honor.

21      Jeremy Blietz, Warner/Chappell Music, Inc., Joan Hudson,

22   David L. Oleksow.  Excuse me.  David L. Oleksow.  Lou Adler,

23   Hollenbeck Music, Ode Records, Penny A. Castle, Brad Tolinski,

24   Greg DiBenedetto, Mike Ware.  I'm not sure if I said this name,

25   William Ruhlmann.

24

```
1              THE COURT:  Okay.

2              MR. MALOFIY:  Your Honor, I believe that is all that's

3    on the witness list.  The other ones are defendants' witnesses,

4    which --

5              THE COURT:  Okay.  Thank you, Counsel.

6              MR. MALOFIY:  Thank you, Your Honor.

7              THE COURT:  Counsel, if you would also introduce your

8    parties and any witnesses that have not already been mentioned.

9    We don't have to mention them twice.

10             MR. ANDERSON:  Right.  Thank you very much, Your

11   Honor.

12        My clients, our clients, are James Patrick Page, also

13   known as Jimmy Page, and Robert Plant, who are here at counsel

14   table.  Also, Warner/Chappell Music, Atlantic Recording

15   Corporation, and Rhino Entertainment Company.

16        I should probably -- although they're not witnesses,

17   should I identify the party rep -- the corporate defendants'

18   representatives who are present?

19             THE COURT:  Not necessarily.

20             MR. ANDERSON:  Okay.  Thank you, Your Honor.

21        In terms of witnesses who I don't believe counsel

22   mentioned, we will also have John Paul Jones, Dr. Lawrence

23   Ferrara, Rob Mathes.  I believe counsel misstated his name:

24   Jeremy Blietz.  David Woerhaye, Quinn Wolfe and Tim Gardner.

25             THE COURT:  Okay.  Thank you very much, Counsel.
```

25

```
 1          MR. ANDERSON:  Thank you.

 2          THE COURT:  Okay.  Ladies and gentlemen, we have had

 3    the attorneys introduce to you who's involved in the case and

 4    potential witnesses.  Might as well put you a little bit at

 5    rest.  From listening to the potential witnesses, it sounds

 6    like you're going to have an awful lot of people testifying and

 7    a long trial.

 8          Any of you have any plans through September?

 9          (Laughter.)

10          THE COURT:  I'm only joking.  This case will take

11    about four to five days.  We've already talked with the

12    attorneys and all.  There are time frames in which it will be

13    tried.  So it will be tried within -- it will be to you within

14    four to five days.

15          The witnesses they have listed and I've asked them to

16    mention are potential witnesses they may or may not call.  So I

17    wanted to put your mind at rest in case anybody has any travel

18    plans out in the future or anything else.

19          Okay.  We've had all these people introduced to you, we've

20    told you what the case is about, and the reason we do that is

21    so can I ask this next question.  Does anybody have any

22    personal knowledge or connection with anybody whose names have

23    been mentioned here, or anything about this case at all?  Can

24    you raise --

25          One person.  And before I get to you -- and I'll save that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    just for a second.  Before I get to you, I notice you're the

2    only one that raised your hand.  Nobody else did anything.

3        So let me ask you, how many -- how many jurors have sat on

4    jury trials where it's actually gone to deliberation?  Can you

5    raise your hand.

6        Okay.  Very few.  Two or three of you have.  So let me

7    talk to you before I get back to that.

8        There are two ways we can voir dire a jury.  One is, we

9    can ask every single juror every single question that may be

10   pertinent, and we will be here till September if we do that.

11   The other one is, we can ask a lot of the questions as group

12   questions and find out from the group, and we can do it with

13   one question rather than 14 different questions.  So when I ask

14   you a group question like that, you're going to have to -- in

15   order for it to work, you're going to have to indicate what

16   your response would be.  If you sit over there and say nothing,

17   then we have to go through individually.  So if we ask you a

18   group question, you known, either say yes, no, raise your hand,

19   jump up, whatever, let me know what your answer would be to the

20   question.  Also to let me know you're not just over there

21   sleeping.  Let me know what your response would be, and then we

22   can do this much quicker as far as group questions.

23       Does that sound reasonable to everybody?

24           MULTIPLE PROSPECTIVE JURORS:  Yes.

25           THE COURT:  Okay.  Let me ask it one more time.  Is

27

```
 1    there anybody on the jury that has any contact with or

 2    connections with or relationships with anybody in this case

 3    that has been mentioned to you, any of the witnesses, or

 4    anything about this case?

 5        One person raised their hand.  Anybody else?

 6            MULTIPLE PROSPECTIVE JURORS:  No.

 7            THE COURT:  Got almost all of you.  One more time.

 8    Anybody else?

 9            MULTIPLE PROSPECTIVE JURORS:  No.

10            THE COURT:  Okay.  Perfect.

11        Let me talk to you, juror No. 5.  You've got the mic?

12            PROSPECTIVE JUROR:  Yeah.

13            THE COURT:  By the way, as we go through this, I'm

14    going to ask everyone to speak with the mic, because the

15    reporter has to take down everything that's said in court, and

16    sometimes it's hard to hear you if you don't have the mic.

17        Who do you have a relationship, or what is there about the

18    case?

19            PROSPECTIVE JUROR:  It's indirectly, but I know

20    Led Zeppelin's music.  You know, I'm a fan.

21            THE COURT:  Okay.

22            PROSPECTIVE JUROR:  So, and I'm very, very much a fan.

23            THE COURT:  We'll get to that in just a second.  Those

24    will be questions down the road.  I want to know right now if

25    there's any personal contact or relationship with anybody.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

28

1          PROSPECTIVE JUROR:  None.

2          THE COURT:  Okay.  We have -- and we will get to this

3    question later.  We have a case here that involves performers,

4    celebrities that you may or may not know, performances that you

5    may or may not know, and we'll talk about that later.  I just

6    want to know if you have any personal connection with anybody

7    involved or the facts in this case.

8        Okay.  I probably should mention to you what your duty is

9    as jurors so that you'll understand why we're asking these

10   questions.

11       Your duty as a juror is really twofold.  Your first duty

12   is, determine what the facts of the case are.  Well, how you

13   are going to do that?  You've already told me you don't know

14   anything about this case.  Well, the law is very clear.  They

15   say you must determine what the facts of the case are from, and

16   only from, the evidence that's received here in court.

17       Well, that may help a little bit, but the next question

18   is, well, what's evidence?  The law again tells you, evidence

19   is going to be three things.  It's going to be the testimony of

20   people here in court under oath, exhibits that have been

21   received into evidence, and anything the attorneys have agreed

22   to or stipulated to.  Those three things, and only those three

23   things, you are to use to determine what the evidence is.  The

24   evidence only comes from those three things.

25       The second duty you're going to have is to apply the law

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

29

1    that I give to you at the end of the case.

2        Most of the questions we're going to be asking you will

3    pertain to those two functions that you have to do.

4        Now, when I talk about evidence, it sounds a little

5    subtle, but I should talk to you a little bit about finding

6    what the facts are from the evidence.

7        How many of you have -- and again, I need responses.  How

8    many of you have worked a jigsaw puzzle, where you put pieces

9    together?

10       Okay, that's what I thought.  Everybody has.  You know

11   when you do that, what you do is, you throw all the pieces down

12   on a table, and you put the box top up there and you start

13   putting it together.

14       Nobody's asking you what's on that box top.  We're asking

15   you, what do the pieces of evidence, when they're put together,

16   show?  You know, you might have had the wrong pieces put in the

17   box, and it may have a dog up there on the box top, and you may

18   have a boat down there that you're putting together.

19       I know it's technical, but for instance, in a trial,

20   nobody's asking what happened on a certain date, at a certain

21   time, at a certain place.  They're asking what does the

22   evidence show happened at a certain time, at a certain place,

23   at a certain date.  So it's kind of a technical distinction,

24   but what the jury is charged with is telling us what does the

25   evidence show.  And it's very objective.  It's not what you

1   want it to show; it's what does the evidence show.  And then

2   once you determine what the evidence shows, we'll ask you to

3   apply the law at the end of the case.

4       Now, in applying the law, it's applying the law that I

5   give to you at the end of the case.  You may agree with it, you

6   may disagree with it.  If you don't like it, go to Sacramento

7   or go back to Washington, D.C. and change it, whatever, but you

8   must apply the law that I give to you at the end of the case.

9   It's very important that you do this, because we have to have

10  one standard that everything can be judged by.  If I asked you

11  what the law should be, I'd get 14 different responses.

12  Everyone has their own view of what it should be.  But we have

13  to have one standard that we judge these cases by.

14      Sometimes we have judges that sit on juries, and I've

15  gotta ask them the same thing:  Can you follow the law that I

16  give to you at the end of the case whether you agree with it or

17  not?  And of course, they know and understand, and they'll say,

18  "Sure, I can.  I'll apply the law that you give me that

19  controls this case whether I agree with it or not."

20      So those are the two functions that you have to do as

21  jurors, and most of the questions we're going to be asking you

22  will pertain to those two functions:  If you can determine the

23  evidence and the facts of this case solely from the evidence

24  and not from anything outside that nobody's had an opportunity

25  to cross-examine or look at, but solely from the evidence you

31

```
1  receive here in court, and then apply the law that I give to
2  you at the end of the case and come up with a result, whether
3  we like it or not.
4      I can't tell you the number of cases where I've had to
5  come in with decisions contrary to what I would like the
6  decision to be, what I want it to be.  Nobody's asking what you
7  want.  It's very humbling experience, being a jury.  Nobody
8  cares what you think.  What we care is what you determine the
9  facts of the case are and apply the law to it and let the cards
10 fall where they may.
11     Okay.  Now that I've gone on and bored you for a few
12 minutes on a little bit of procedural and background history,
13 let me break from what I said before as far as asking you
14 questions as a whole and ask you some individual questions, and
15 then we'll get back to the panel questions.  We're going to go
16 through each juror, starting with juror No. 1, and the
17 questions are really that easy.  They're not that hard to
18 figure out the answers to.  Most of you will be able to do it.
19 The first question is what is your name; the second question is
20 what city do you live in; third question what is your
21 occupation; and the fourth question is going to be, is there
22 anybody that lives at home with you that works outside of the
23 home, who has an occupation outside the home.  Then I might ask
24 some follow-up questions.  If I do, don't take any of those
25 questions personally.  It's to understand what your answers
```

32

```
1    would be, but it's also to kind of instruct and educate the
2    jury as to different issues.  So if I talk to you about any
3    personal questions other than those four, don't be offended one
4    way or the other.
5         Okay.  Juror No. 1, can we have your occupation?
6              PROSPECTIVE JUROR:  Project manager.
7              THE COURT:  And your name?
8              PROSPECTIVE JUROR:  Jasper Domingo.
9              THE COURT:  And project manager for --
10             PROSPECTIVE JUROR:  Southern California Gas Company.
11             THE COURT:  Okay.  And what area do you live in?
12             PROSPECTIVE JUROR:  Covina.
13             THE COURT:  Okay.  And is there anyone that works
14   outside the home that you live with?
15             PROSPECTIVE JUROR:  My wife does.
16             THE COURT:  Okay.  And what type, what occupation?
17             PROSPECTIVE JUROR:  She works as a financial banker.
18             THE COURT:  Financial banker.  Okay.
19        Anything we should know about you as far as any background
20   or information you might have that would affect your ability to
21   be fair to both sides here?
22             PROSPECTIVE JUROR:  Not that I know of.
23             THE COURT:  Okay.  You heard what your duty was, and
24   that was to determine the facts only from the evidence received
25   here in court and not from anything else you may have heard
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00168**

33

```
1    outside.  Can you do that?
2              PROSPECTIVE JUROR:  Yeah.
3              THE COURT:  Okay.  And you can apply the law that I
4    give to you at the end of the case?
5              PROSPECTIVE JUROR:  Yes.
6              THE COURT:  Okay.  That's all we can ask you.
7    Sometimes when I ask that question, people will say, "Can I be
8    fair?  Well, I'll try."  Well, that's all we can ask,
9    obviously, is you can try.  But that's exactly what we're
10   looking for, if you can tell us what the facts are and apply
11   the law to it.
12        So you're telling me you'd be a good juror?
13             PROSPECTIVE JUROR:  I think so.
14             THE COURT:  Okay.  Okay.  Why don't you pass over to
15   the next juror, juror No. 2.
16        Can we have your name, please?
17             PROSPECTIVE JUROR:  John Magee.
18             THE COURT:  And occupation?
19             PROSPECTIVE JUROR:  I am an owner of a transportation
20   network company.
21             THE COURT:  Okay.  And is there -- what city do you
22   live in?
23             PROSPECTIVE JUROR:  Reseda.
24             THE COURT:  Is there anyone in the home that works
25   outside the home?
```

34

```
 1              PROSPECTIVE JUROR:  No.
 2              THE COURT:  Okay.  You know, you don't know anything
 3    about the case yet, but anything that you can think about that
 4    would cause you problems being a fair juror in this case?
 5              PROSPECTIVE JUROR:  No.
 6              THE COURT:  Okay.  We'll get back to more general
 7    questions later, but why don't you pass it over to juror No. 3.
 8        Name?
 9              PROSPECTIVE JUROR:  Grace Vela.
10              THE COURT:  And where do you live?
11              PROSPECTIVE JUROR:  I live in Whittier.
12              THE COURT:  Occupation?
13              PROSPECTIVE JUROR:  I work for the Norwalk Superior
14    Court, in the criminal department.
15              THE COURT:  Okay.  And anyone that works outside the
16    home that lives with you?
17              PROSPECTIVE JUROR:  No.
18              THE COURT:  Okay.  Anything that you can think of that
19    would cause you not to be a fair juror?
20              PROSPECTIVE JUROR:  No.
21              THE COURT:  You mentioned that you worked in superior
22    court.
23              PROSPECTIVE JUROR:  Yes.
24              THE COURT:  I know it's criminal, but you sometimes
25    are exposed to the law, et cetera.  If there's something that
```

35

```
 1    we instruct you here is the law that seems counter to something

 2    you've heard in the past, you can put that out of your mind and

 3    follow the law that I give you?

 4              PROSPECTIVE JUROR:  Yes, Your Honor.

 5              THE COURT:  Okay.  Thank you very much.

 6         Next juror.  Can we have your name?

 7              PROSPECTIVE JUROR:  Julio Cienfuegos.

 8              THE COURT:  And what city do you live in?

 9              PROSPECTIVE JUROR:  Monrovia.

10              THE COURT:  Occupation?

11              PROSPECTIVE JUROR:  CNC machinist.

12              THE COURT:  I'm sorry?

13              PROSPECTIVE JUROR:  CNC machinist.

14              THE COURT:  Okay.  And anyone that works outside the

15    home that you live with?

16              PROSPECTIVE JUROR:  My wife.

17              THE COURT:  And what type of work does she do?

18              PROSPECTIVE JUROR:  Quality inspector.

19              THE COURT:  Okay.  From what you've heard so far, is

20    there any reason you feel you could not be a fair juror in this

21    case?

22              PROSPECTIVE JUROR:  Probably my English.  I don't know

23    if it's good enough for this type of --

24              THE COURT:  Well, if there's something that comes

25    up -- obviously, you have passed those qualifications.  If
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

36

```
1    there's something that comes up where you don't understand
2    something, will you raise your hand and let us know?
3              PROSPECTIVE JUROR:  I will.
4              THE COURT:  Okay.  Thank you very much.
5         Next juror.  Can we have your name, please?
6              PROSPECTIVE JUROR:  Mark DiSarro.
7              THE COURT:  And your occupation?
8              PROSPECTIVE JUROR:  Motion picture/television special
9    effects man.
10             THE COURT:  Okay.  And what city do you live in?
11             PROSPECTIVE JUROR:  Burbank.
12             THE COURT:  And what -- anyone in the home that works
13   outside the home?
14             PROSPECTIVE JUROR:  My wife is a hair stylist.
15             THE COURT:  Okay.  You mentioned before that -- and
16   I'm assuming that there may be many people in the jury that
17   have heard of these bands and know the music and maybe even
18   love the music and maybe even love the performance.  The
19   question is, we're not being asked if we like anybody or not.
20   We're being asked, listen to the evidence and tell us what it
21   says.  And you think you can do that?
22             PROSPECTIVE JUROR:  I don't.
23             THE COURT:  Why?
24             PROSPECTIVE JUROR:  My love for these two guys here is
25   just -- it's -- it's --
```

37

```
 1        THE COURT:  Let me back you up now.  I don't want to
 2   get into your love for these two people.
 3        PROSPECTIVE JUROR:  It's very strong.
 4        THE COURT:  Okay.
 5        PROSPECTIVE JUROR:  Yeah.
 6        THE COURT:  But I don't want to get into that, because
 7   that's really not important in this trial.
 8        PROSPECTIVE JUROR:  I've also heard --
 9        THE COURT:  Excuse me.  Excuse me.  Let me talk to you
10   a little bit.  And as I said before, I'm talking to all the
11   jurors, and I want to make sure they understand this, too.
12   It's not whether or not you like the performance and not
13   whether you like the people.  It's not whether or not you're
14   fascinated with them and you want them to always win.  The
15   question is, can you put that aside and be fair to both sides?
16   And I guess you're saying you cannot.
17        PROSPECTIVE JUROR:  I could make an attempt to in good
18   faith, but I --
19        THE COURT:  It'd be very hard for you to?
20        PROSPECTIVE JUROR:  You know, I've heard the piece of
21   music in question already.
22        THE COURT:  So it would be hard for you to, then?
23        PROSPECTIVE JUROR:  Yeah.
24        THE COURT:  And what might also be hard for you is
25   that, if you have heard all the music, you may have made
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

38

```
 1   judgments already as to what it was, and it would cause -- it
 2   would be very difficult to present it new to you and not let
 3   those biases and prejudices come in.  Would that be accurate?
 4         PROSPECTIVE JUROR:  That's correct, Your Honor.
 5         THE COURT:  Okay.  Now, putting that aside -- and I
 6   understand, being a good juror, you're saying, "I would try my
 7   best, but I think it would be very difficult, I might not be
 8   able to do it."  Second question is, putting that aside, is
 9   there anything about the industry that you're in, because it's
10   a similar industry, that would cause you problems?
11         PROSPECTIVE JUROR:  Maybe not so much the industry
12   that I'm in, but I'm also a guitar player and was in a band
13   back in the '80s, so I have that tie to the music myself.
14         THE COURT:  Okay.
15         PROSPECTIVE JUROR:  Yeah.
16         THE COURT:  And all that would make it difficult for
17   you?
18         PROSPECTIVE JUROR:  Under the circumstances, yeah.
19         THE COURT:  Okay.
20         PROSPECTIVE JUROR:  Yeah.
21         THE COURT:  Okay.  Let me pass it over to the next
22   juror.
23         PROSPECTIVE JUROR:  Mike Heinesh.
24         THE COURT:  Okay.  And your occupation?
25         PROSPECTIVE JUROR:  I own a employment agency.
```

39

```
 1            THE COURT:  And what city do you live in?

 2            PROSPECTIVE JUROR:  Redondo Beach.

 3            THE COURT:  And anyone that works outside the home?

 4            PROSPECTIVE JUROR:  No.

 5            THE COURT:  How about you?  Anything about your

 6    background?  Anything -- what we want to get is --

 7            PROSPECTIVE JUROR:  I love Led Zeppelin, too, but I

 8    think I could be fair.

 9            THE COURT:  That's the question.

10            PROSPECTIVE JUROR:  Yes.  Yes, sir.

11            THE COURT:  The question isn't whether we like

12    somebody or not; it's can you tell us what the evidence said.

13    If it doesn't come in, into evidence, you can't bring it in.

14    You can't say, "Well, let me tell you what I know."  You have

15    to just base it on the evidence and tell us what the evidence

16    says.

17            PROSPECTIVE JUROR:  I believe I can.

18            THE COURT:  Okay.  So you could be fair to both sides?

19            PROSPECTIVE JUROR:  Yes, sir.

20            THE COURT:  So if you're sitting on either side of the

21    table, you'd say, "I may like the results, I may not, but both

22    of you are going to get a fair trial"?

23            PROSPECTIVE JUROR:  Yes, sir.

24            THE COURT:  Okay.

25        Okay.  Next juror.
```

40

```
1              PROSPECTIVE JUROR:  My name is Margaret Duenez.

2              THE COURT:  Okay.  And the city that you live in?

3              PROSPECTIVE JUROR:  I live in Walnut.

4              THE COURT:  Okay.  Occupation?

5              PROSPECTIVE JUROR:  I'm a licensed clinical social

6    worker.

7              THE COURT:  And anyone that you live with that works

8    outside the home?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Okay.  How about you?  You've heard all

11   the questions we're asking.  You know what some of the problems

12   are.  Is there anything you should call to our attention as to

13   why you would not be a good juror?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  You think you could be fair to both sides?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Okay.  And you think you could be

18   objective and just let the cards fall where they may; all

19   you're doing is telling us what the evidence said?

20             PROSPECTIVE JUROR:  That's correct, Your Honor.

21             THE COURT:  Okay.  Next juror.

22        Sir?

23             PROSPECTIVE JUROR:  I'm Ron Skinner.

24             THE COURT:  Okay.  And city?

25             PROSPECTIVE JUROR:  Santa Barbara, California.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

41

```
1            THE COURT:  Occupation?

2            PROSPECTIVE JUROR:  I work at the Museum of Natural

3   History.

4            THE COURT:  And anybody in the home that works outside

5   the home?

6            PROSPECTIVE JUROR:  My wife.

7            THE COURT:  What type of work?

8            PROSPECTIVE JUROR:  She works at a low-income housing

9   facility.

10           THE COURT:  Okay.  Again, you got a flavor for what

11  we're interested in in this case, and question is, is there

12  anything that might affect you that would prevent you from

13  being fair and objective and just telling us what the evidence

14  says, whether you like it or not?  Is there anything out there

15  that would prevent you from being a good juror?

16           PROSPECTIVE JUROR:  I think that I can be a good

17  juror, but in full disclosure I should say that "Stairway to

18  Heaven" was the first song that I ever learned to play on the

19  guitar, so --

20           THE COURT:  Okay.

21           PROSPECTIVE JUROR:  But I think I can be fair.

22           THE COURT:  Okay.  Of course, we're not asking you

23  whether you like "Stairway to Heaven" or not.  A lot of people

24  have heard the music.  I understand that.  A lot of people love

25  the music.  I understand that.  That's not the question.  And
```

42

```
1    you hit it right on the head.  The question is, can you be
2    fair?  If you were sitting on the defense side or if you were
3    sitting on the plaintiff side, would you say, hey, you know,
4    they would get a fair jury, or a fair trial from me?  I'd be
5    satisfied with 12 -- or eight people like you on this trial?
6             PROSPECTIVE JUROR:  Yes.
7             THE COURT:  Okay.  That's all we ask.
8        Now, biggest problem is, can you get that mic all the way
9    down to juror No. 9?
10            PROSPECTIVE JUROR:  Good morning.  My name is Robin
11   Clark.
12            THE COURT:  Okay.  And your occupation?
13            PROSPECTIVE JUROR:  Correctional officer.
14            THE COURT:  And the city that you live in?
15            PROSPECTIVE JUROR:  Grover Beach.
16            THE COURT:  Anybody that works outside of the home?
17            PROSPECTIVE JUROR:  No.
18            THE COURT:  Okay.  How about you?  Is there
19   anything -- other than you might love the particular music in
20   this case, is there anything about this case that would bother
21   you?
22            PROSPECTIVE JUROR:  No.
23            THE COURT:  You think you could be fair to both sides?
24            PROSPECTIVE JUROR:  Yes.
25            THE COURT:  See, that's really what we're looking for.
```

43

```
1    We're not saying if you were the defendant or the plaintiff

2    would you like jurors like you on the case.  We're not saying

3    that.  We're saying, if you were the defendant or the

4    plaintiff, would you be satisfied that people like you would

5    give you a fair trial?  And you're saying yes?

6                 PROSPECTIVE JUROR:  Yes.

7                 THE COURT:  Okay.

8          Okay.  Next juror.

9                 PROSPECTIVE JUROR:  I'm Marilyn Miller from Whittier.

10                THE COURT:  Okay.  And occupation?

11                PROSPECTIVE JUROR:  I'm recently retired from staff at

12   Cal State Fullerton.

13                THE COURT:  Okay.  And is there anyone in the home

14   that works outside the home?

15                PROSPECTIVE JUROR:  My son works at Starbucks.

16                THE COURT:  Okay.  Anything about this case that you

17   think you should call to our attention?

18                PROSPECTIVE JUROR:  No.

19                THE COURT:  You know what we're looking for and you

20   think you could be a good juror for both sides?

21                PROSPECTIVE JUROR:  I think so.

22                THE COURT:  Okay.  Next juror.

23                PROSPECTIVE JUROR:  Hi.  I'm Kalli Norimoto from Santa

24   Monica.

25                THE COURT:  Okay.  And occupation?
```

44

```
1          PROSPECTIVE JUROR:  Enrichment program coordinator.

2          THE COURT:  Okay.  Anybody in the home that works

3     outside the home?

4          PROSPECTIVE JUROR:  No.  Just me.

5          THE COURT:  I hate to be redundant, but you've heard

6     all the questions, you know what we're looking for.  You can

7     help us better than anybody else.  You know yourself better

8     than anybody else.  Anything about you that would cause you not

9     to be a good juror on both sides?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  You think you could be fair to both sides?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Okay.  And you're not predetermined how

14    it's going to come out one way or the other?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Okay.  Next juror.

17         PROSPECTIVE JUROR:  Desalyn Stevenson from Lakewood.

18         THE COURT:  Okay.  And occupation?

19         PROSPECTIVE JUROR:  Retired aerospace engineer.

20         THE COURT:  You didn't have to say "retired."  That

21    always bothers me.  But very envious.

22       How about anyone in the home that works outside the home?

23         PROSPECTIVE JUROR:  Yes.  A terminal operator for All

24    Plains American Pipeline.

25         THE COURT:  Oh, okay.  Anything about this case or
```

45

```
 1   anything about the people involved in the case that would cause
 2   you problems being a fair and good juror?
 3            PROSPECTIVE JUROR:  No.
 4            THE COURT:  Okay.  You think that if you're on the
 5   plaintiff's side that you'd say, "Hey, I'll get a fair trial
 6   from people like this"?
 7            PROSPECTIVE JUROR:  Definitely.
 8            THE COURT:  And if you were the defendant, you'd say
 9   the same thing?
10            PROSPECTIVE JUROR:  Yes.
11            THE COURT:  That's all we can ask.
12       Next juror.
13            PROSPECTIVE JUROR:  Hi.  My name is Ven-Li.
14            THE COURT:  Okay.  And city?
15            PROSPECTIVE JUROR:  Live in L.A.
16            THE COURT:  And what's your occupation?
17            PROSPECTIVE JUROR:  I flier distributor.
18            THE COURT:  Okay.
19            PROSPECTIVE JUROR:  Distribute fliers for hair salon.
20            THE COURT:  Is there anybody else in the home that
21   works outside the home?
22            PROSPECTIVE JUROR:  No.
23            THE COURT:  And how about you?  Could you be fair to
24   both sides?
25            PROSPECTIVE JUROR:  Yeah.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

46

```
 1            THE COURT:  Anything about your background that we
 2   should know about?
 3            PROSPECTIVE JUROR:  No, but I read the news a lot.
 4            THE COURT:  Okay.
 5        And I'm assuming that some of you may have read about this
 6   case in the newspaper.
 7        Have you read about this case in the newspaper?
 8            PROSPECTIVE JUROR:  I don't remember good.
 9            THE COURT:  Okay.  Well, if you don't remember, then
10   it probably would not affect you on this trial.
11            PROSPECTIVE JUROR:  Oh, okay.
12            THE COURT:  Okay.  Next juror.
13            PROSPECTIVE JUROR:  Hi.  I'm Loreto Fabrigas.
14            THE COURT:  Okay.  And city that you live in?
15            PROSPECTIVE JUROR:  Long Beach.
16            THE COURT:  And occupation?
17            PROSPECTIVE JUROR:  I'm a sales porter in a
18   dealership.
19            THE COURT:  Okay.  And anyone in the home that works
20   outside the home?
21            PROSPECTIVE JUROR:  No.
22            THE COURT:  Okay.  How about you?  Is there anything
23   we should know about, about you hearing this case that would
24   affect your ability to be a good juror?
25            PROSPECTIVE JUROR:  Yeah.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

47

```
1          THE COURT:  Okay.  Would you be a good juror in a case
2   like this?
3          PROSPECTIVE JUROR:  I think so, sir.  I think yes.
4          THE COURT:  Okay.  Would you lean one way or the
5   other, or could you be fair to both sides?
6          PROSPECTIVE JUROR:  Oh, both side.
7          THE COURT:  Okay.
8      Okay.  Let me ask some general questions, and we'll get
9   the microphone where appropriate to you.
10     Other than what we've already talked about -- I don't want
11  to repeat what we've already discussed with individual jurors,
12  but is there anybody else, other than, I think it was juror
13  No. 5, that's involved in the music business or entertainment
14  business, other than juror No. 5?
15         PROSPECTIVE JUROR:  No.
16         THE COURT:  Okay.  Or have any close friends or
17  relatives that are involved in that business?  Nobody?
18     Yes, sir.
19         PROSPECTIVE JUROR NO. 6:  My mom's a singer, but more
20  of a novice thing.  Her and her husband have a little group,
21  but nothing, nor would it bear --
22         THE COURT:  Can you think of any reason that would
23  affect your opinion one way or the other?
24         PROSPECTIVE JUROR NO. 6:  No, I don't think so.
25         THE COURT:  Thank you very much.
```

48

```
1        Does anybody write music or musical compositions?
2            PROSPECTIVE JUROR NO. 3:  I used to.
3            THE COURT:  Okay.  Juror No. 3.  Okay.  And you have
4    written musical compositions or music before?
5            PROSPECTIVE JUROR NO. 3:  Well I was in a band, and we
6    used to put music together.
7            THE COURT:  Okay.  But have you ever published
8    anything or recorded anything that --
9            PROSPECTIVE JUROR NO. 3:  We recorded, yes.
10           THE COURT:  You recorded.
11           PROSPECTIVE JUROR NO. 3:  Mm-hmm.
12           THE COURT:  Have you ever gotten a trademark or
13   copyright on your works?
14           PROSPECTIVE JUROR NO. 3:  No.
15           THE COURT:  You never got that involved with it?
16           PROSPECTIVE JUROR NO. 3:  No.  It was only like a side
17   project.  We didn't -- we weren't that involved in it.  But we
18   did play, like, in the area.
19           THE COURT:  Okay.  If anything triggers in your mind
20   how you used to do it or something that you saw how it was
21   done, can you leave that out of this trial, unless it's
22   evidence, and only go on the evidence you hear in trial?
23           PROSPECTIVE JUROR NO. 3:  Yes, Your Honor.
24           THE COURT:  Okay.  Thank you.
25       Does anybody have any training or experience or have close
```

1    friends or relatives that have had training and experience,

2    education, special knowledge of music or musicality?

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  Okay.  Let's talk a little bit about

5    infringement or trademarks.  This case is alleging that a

6    trademark was infringed by production of music.

7        So let me ask you, does anybody have any training or

8    experience in trademarks?  I don't care if it's music or if

9    it's a piece of clothing or a gadget.  Anybody have any

10   experience with trademarks or copyrights or registration of

11   trademarks and copyrights?  Anybody have any experience along

12   those lines?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  Any knowledge in it?

15       Okay.  This may have already been covered by this last

16   question, but does anybody have any knowledge or training or

17   experience with lawsuits that involve allegations of trademark

18   infringement or copyright infringement?

19           MULTIPLE PROSPECTIVE JURORS:  No.

20           THE COURT:  Okay.  Now, let's go to the question that

21   juror No. 5 mentioned before.

22       I'm assuming that many of you may have heard some of the

23   music here, and many of you may like it, I mean, some of you

24   may dislike it but have strong -- music can move you, like

25   movies can, et cetera.

50

```
1        Does anybody have any really strong feelings about any,
2   any of the bands here, the parties here, or the music they've
3   done that you feel might affect you in this trial?
4        Other than juror No. 5.  We've talked to you.
5              MULTIPLE PROSPECTIVE JURORS:  No.
6              THE COURT:  Anybody else?
7        Now, you may love the music, you may really love the
8   music, but that wouldn't affect you one way or the other; is
9   that correct?  Anybody at all?
10             MULTIPLE PROSPECTIVE JURORS:  Correct.
11             THE COURT:  Okay.  Has anybody sued or been sued
12  within the last ten years in court?  Other than domestic, you
13  know, divorce cases.  Anybody at all?  Sued or been sued in the
14  last ten years?
15             MULTIPLE PROSPECTIVE JURORS:  No.
16             THE COURT:  Yes, sir.
17             PROSPECTIVE JUROR NO. 8:  I was sued, but we mediated
18  it, so it didn't go to court.
19             THE COURT:  And that was not a suit involving anything
20  like this?
21             PROSPECTIVE JUROR NO. 8:  No.
22             THE COURT:  Did that leave you with any impressions
23  one way or the other that might hinder you in this case?  You
24  know, justice system is no good, or why even talk about it, or
25  anything like that?
```

51

```
 1            PROSPECTIVE JUROR NO. 8:  No, I don't think.
 2            THE COURT:  Okay.  So that would not affect you in
 3   this trial?
 4            PROSPECTIVE JUROR NO. 8:  Correct.
 5            THE COURT:  Okay.  Anybody have any knowledge,
 6   training, or experience in the area of law?  Been to law
 7   school, had a close friend or relatives that have been to law
 8   school that talked to you about what they've learned?  Anybody
 9   here?
10       Okay.  Let me start with, and work our way down, juror
11   No. 8.
12            PROSPECTIVE JUROR NO. 8:  My dad was an attorney his
13   whole career, and my brother's a police captain.
14            THE COURT:  Okay.  Well, one's talking about law,
15   one's talking about law enforcement.  They're a little bit
16   different, but that's okay.  Anything that they told you that
17   might contradict or be not in line with what we say here, can
18   you leave it out of this trial unless you hear it here in this
19   trial?
20            PROSPECTIVE JUROR NO. 8:  Sure.
21            THE COURT:  Okay.  And that would cause you no
22   problems at all hearing this case?
23            PROSPECTIVE JUROR NO. 8:  No.
24            THE COURT:  Okay.  Let's pass it down to the next
25   person that's had contact with law.
```

52

```
 1          PROSPECTIVE JUROR NO. 6:  I'm sorry, I have to back up

 2   one question.

 3          THE COURT:  Sure.

 4          PROSPECTIVE JUROR NO. 6:  I was sued, but then I went

 5   to mediation over a discrimination.

 6          THE COURT:  Okay.  And nothing like this case?

 7          PROSPECTIVE JUROR NO. 6:  Nothing at all.

 8          THE COURT:  Can you think of anything that happened in

 9   that proceeding or anything else that would cause you problems

10   hearing this case?

11          PROSPECTIVE JUROR NO. 6:  No.

12          THE COURT:  Okay.  See, I don't know if -- you know,

13   maybe if you were the plaintiff in that case, that you'd side

14   with the plaintiff here, or the defendant, you'd side with

15   the -- none of that would affect you one way or the other?

16          PROSPECTIVE JUROR NO. 6:  No.

17          THE COURT:  Okay.  And how about law background?  Do

18   you have any of that?

19          PROSPECTIVE JUROR NO. 6:  No.

20          THE COURT:  Okay.  Let's pass it to the next person

21   that's had law background.

22       Juror No. 3.

23          PROSPECTIVE JUROR NO. 3:  I just deal with a lot of

24   the cases, different from family law, civil, criminal at the

25   superior court, so I have some knowledge --
```

53

```
 1            THE COURT:  Well, obviously, yeah.
 2            PROSPECTIVE JUROR NO. 3:  Yes.
 3            THE COURT:  And we kind of talked about that.  There's
 4   nothing that you heard that you'd bring into this case unless
 5   you hear it here?  You'd follow the law that I give you?
 6            PROSPECTIVE JUROR NO. 3:  Yes, Your Honor.
 7            THE COURT:  Okay.  And you don't see that causing you
 8   any problems at all?
 9            PROSPECTIVE JUROR NO. 3:  No.  No problems at all.
10            THE COURT:  Okay.  How about the front row?  Anybody
11   that's had any connection with law, study of law, education,
12   friends, relatives that are in law?
13       Okay.  Has anybody ever been accused or have accused
14   somebody else of stealing your idea or your concept or anything
15   that you've produced?  Anybody in the jury at all?
16            MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side
17   to side.)
18            THE COURT:  Okay.  Let's talk a little bit about this
19   case, because my understanding is there has been some publicity
20   on the case.  There has been -- in the news sometimes they've
21   talked about the case.
22       Is there anybody here that has heard or read about this
23   case so far that --
24       Okay.  Obviously, juror No. 5 -- or 6 I guess it is has.
25   Is that right?  One, two, three, four, five.  Juror No. 5.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00189**

54

```
1        Anybody else?
2              PROSPECTIVE JUROR NO. 3:  I've heard of it in the --
3              THE COURT:  Okay.  And a lot of people have.  I guess
4    my question to you, and to anybody else that has read any of
5    these articles or anything, can you leave out what you read and
6    base this just on what you hear here in court?
7              PROSPECTIVE JUROR NO. 3:  Yes.
8              THE COURT:  Can you also, ma'am?
9              PROSPECTIVE JUROR NO. 10:  Yes.
10             THE COURT:  Okay.
11             PROSPECTIVE JUROR NO. 10:  And I heard it on the way
12   in here this morning, the music and the publicity, and then I
13   see publicity outside, or cameras and stuff.
14             THE COURT:  When you heard it on the radio coming in,
15   did they mention that you were going to be a juror?
16             PROSPECTIVE JUROR NO. 10:  No, of course not.
17             THE COURT:  Okay.
18             PROSPECTIVE JUROR NO. 10:  No, but I thought --
19             THE COURT:  I was just kidding.
20             PROSPECTIVE JUROR NO. 10:  -- wouldn't that be a kick?
21             THE COURT:  I was just kidding.
22        Again, anything that you might have heard outside of
23   court, even if you've talked to friends or relatives or anybody
24   that may have mentioned this case, can you leave out anything
25   they said or anything that you may have read and determine this
```

55

```
1    case solely on the evidence you receive here in court?
2              PROSPECTIVE JUROR NO. 10:  Yes.
3              THE COURT:  You can do that?
4              PROSPECTIVE JUROR NO. 10:  (Nodded head up and down.)
5              MULTIPLE PROSPECTIVE JURORS:  (Nodded heads up and
6    down.)
7              THE COURT:  Anybody else?
8              PROSPECTIVE JUROR NO. 3:  Yes.
9              THE COURT:  Okay.  One of the things I want to mention
10   to you, and I'll mention this to you during the instructions,
11   but one of the things that you will be told is that you, at the
12   end of the -- well, at the beginning of the case, is that if
13   you're picked as a juror, you're not to discuss this case with
14   anybody during the course of the trial; you're not to let
15   anybody discuss the case with you.  And this involves family
16   members, this involves employers, whatever.  You can tell them
17   you're on a case and you'll tell them all about the case in
18   about five days, but during the case you can't talk to them
19   about the case.  And we understand why this is true, because we
20   don't want outside information or outside opinions to filter
21   into the jury.  You understand that?
22             MULTIPLE PROSPECTIVE JURORS:  Yes.
23             THE COURT:  Anybody have any problem understanding
24   that you can't talk to anybody about the case?
25             MULTIPLE PROSPECTIVE JURORS:  No.
```

56

```
1           THE COURT:  There's another thing I want to mention to
2    you if you're picked as a juror, and even right now, if we
3    break and you go outside and somebody comes up to talk to you
4    about the case, in fact, if you're picked as a juror, if
5    anybody comes up and talks to you at all that's involved in the
6    case, you can't talk to them.  If they say good morning to you,
7    you can't say good morning back.  You may say, "Well, that's
8    silly.  Why can't I say good morning?"  That's because if
9    you're a party to the case and you see somebody on the other
10   side talking to one of the jurors, you may not know what
11   they're saying, but it just doesn't look right, and it doesn't
12   give you confidence in the system.  So you're not allowed to
13   talk to anybody involved in this case during the trial.
14           If somebody approaches you, your obligation is to let the
15   Court know immediately that somebody has talked to you.  There
16   may be no harm, there may not be no harm, but you let the Court
17   know immediately, because if you don't, or if you do talk to
18   people about the case outside the court, it may result in you
19   being excused and a whole mistrial, and the whole case would
20   have to start over again.
21           So any of you have any problem with that?
22           MULTIPLE PROSPECTIVE JURORS:  No.
23           THE COURT:  Okay.  How about jury duty?  How many of
24   you -- I think two, but maybe there were more, that have had
25   jury experience before, where you've deliberated on a case?
```

1          Okay.  Let me start with the back row first.

2          Juror No. 7, I believe it is -- or 8 -- or 6.  I'm sorry.

3               PROSPECTIVE JUROR NO. 6:  It was criminal trial

4     involving car theft.

5               THE COURT:  Okay.  And that's the only trial you've

6     been on?

7               PROSPECTIVE JUROR NO. 6:  Correct.

8               THE COURT:  Were they able to reach a verdict in that

9     case?

10              PROSPECTIVE JUROR NO. 6:  No.

11              THE COURT:  Does that give you any feeling --

12    sometimes people get very discouraged and say there's no reason

13    to even deliberate anymore, or was it just the facts of that

14    case that caused it to be a hung jury?

15              PROSPECTIVE JUROR NO. 6:  It was -- well, to be

16    honest, I was kind of the holdout.  I was the guy that --

17              THE COURT:  Okay.  Do you feel that a jury can never

18    reach a decision?

19              PROSPECTIVE JUROR NO. 6:  No.  They just didn't prove

20    their case in my eyes.

21              THE COURT:  So it was the facts of that particular

22    case?

23              PROSPECTIVE JUROR NO. 6:  Correct.

24              THE COURT:  Okay.  Now, that is a criminal case.

25              PROSPECTIVE JUROR NO. 6:  Correct.

58

```
1          THE COURT:  In a criminal case, the burden of proof is
2    the prosecution must prove their case beyond a reasonable
3    doubt.  Very high standard.  And if they don't, they lose.
4        This is a civil case.  And here, by and large, the
5    standard of proof is by a preponderance of the evidence.  Case
6    of the two parties come in, and if one party can convince you
7    by 51 percent, they take all the marbles and go home.  It's
8    tipping of the scales.  Far different than beyond a reasonable
9    doubt.  Do you understand that?
10         PROSPECTIVE JUROR NO. 6:  Thank you.  Yes.
11         THE COURT:  Okay.  Okay.  And you'd have no problem
12   applying a different standard to this one than you did in the
13   criminal case?
14         PROSPECTIVE JUROR NO. 6:  I'd be fine with that.
15         THE COURT:  Okay.  Anybody else on jury?  Front row?
16     Okay.  Let's pass it down there to juror No. 13.
17     Okay.  Can we have -- how many trials have you been on?
18         PROSPECTIVE JUROR NO. 13:  This is second time.
19         THE COURT:  And was the first one a criminal or a
20   civil?
21         PROSPECTIVE JUROR NO. 13:  I guess is criminal.
22         THE COURT:  Okay.  Same questions as to the gentleman
23   before you.  You understand it's a different burden of proof
24   here, that all they have to do is prove their case by a
25   preponderance of the evidence in a civil case, not beyond a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00194**

59

```
 1    reasonable doubt?  You understand that?
 2            PROSPECTIVE JUROR NO. 13:  Yes, do.
 3            THE COURT:  No problem applying that standard here?
 4    You can do that?
 5            PROSPECTIVE JUROR NO. 13:  Yes.
 6            THE COURT:  Okay.
 7         Okay.  Next juror.
 8            PROSPECTIVE JUROR NO. 12:  Yes.
 9            THE COURT:  Okay.  How many cases?
10            PROSPECTIVE JUROR NO. 12:  Three.
11            THE COURT:  I kind of thought you had more than one
12    case.  Okay.  Were they criminal or civil?
13            PROSPECTIVE JUROR NO. 12:  Criminal and one civil.
14            THE COURT:  Okay.  Well, then, you definitely
15    understand the difference in the burden of proof, and you'd
16    have no problem understanding this is by a preponderance of the
17    evidence here?
18            PROSPECTIVE JUROR NO. 12:  Yes.
19            THE COURT:  Okay.  Any of those cases similar to this?
20            PROSPECTIVE JUROR NO. 12:  No.
21            THE COURT:  Were they able to reach verdicts in those
22    cases?
23            PROSPECTIVE JUROR NO. 12:  Yes.
24            THE COURT:  Okay.  And nothing about those cases that
25    you'd bring into this case?
```

60

```
1              PROSPECTIVE JUROR NO. 12:  No.

2              THE COURT:  Okay.  Next juror, if you can pass it

3    down.  I think there's --

4              PROSPECTIVE JUROR NO. 10:  Mine was a civil case in

5    Orange County, a citizen's arrest at Huntington Beach.

6              THE COURT:  A citizen's arrest.  Was that a --

7              PROSPECTIVE JUROR NO. 10:  Against a police officer.

8              THE COURT:  Okay.  So this was a civil rights case?

9              PROSPECTIVE JUROR NO. 10:  Yes.

10             THE COURT:  Okay.  Nothing similar to this?

11             PROSPECTIVE JUROR NO. 10:  Nothing.

12             THE COURT:  But it was a civil case, which was

13   preponderance of the evidence.

14             PROSPECTIVE JUROR NO. 10:  Right.

15             THE COURT:  So it would be the same standard.  Do you

16   understand that?

17             PROSPECTIVE JUROR NO. 10:  Yes.

18             THE COURT:  Okay.  Nothing about that case you'd bring

19   into this case?

20             PROSPECTIVE JUROR NO. 10:  No.

21             THE COURT:  They were able to reach a verdict in that

22   case?

23             PROSPECTIVE JUROR NO. 10:  Yes.

24             THE COURT:  Okay.  Okay.  You know, we've been asking

25   a lot of questions here.  I'm going to be talking to the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00196**

61

```
1   attorneys over here at the side bench in just a second.  Before
2   I do, I want to ask just -- you know, again, revisit that one
3   basic principle that we've been talking about, and that is, do
4   all of you feel that you can decide this case only on the
5   evidence that's received here in court, and you could determine
6   the facts only from the evidence received here in court and not
7   from anything outside?
8           MULTIPLE PROSPECTIVE JURORS:  Yes.
9           THE COURT:  Can you apply the law at the end of the
10  case to that evidence, whether you like it or not?
11          MULTIPLE PROSPECTIVE JURORS:  Yes.
12          THE COURT:  And can everybody understand that you're
13  not here to get a particular verdict one way or the other;
14  you're going to let the cards fall where they may?  If one side
15  wins, they win; if they lose, they lose.  Even though you may
16  like them or hate them, that's the way it is.  Everybody?
17          MULTIPLE PROSPECTIVE JURORS:  Yes.
18          THE COURT:  Okay.  Then I guess the last question I'm
19  going to ask is what I've asked some of the jurors.  If you
20  were the defendant on this side, would you be satisfied that
21  people like you would give you a fair trial?  Anybody that
22  wouldn't be?
23       Okay.  If you're the plaintiff, would you be satisfied?
24          MULTIPLE PROSPECTIVE JURORS:  (Nodded heads up and
25  down.)
```

62

```
1          THE COURT:  Okay.  I'm going to be talking to the

2    attorneys over here.  You may not realize it, but we'll be

3    whispering over here, and that's because we really don't want

4    you to hear what we're talking about.  So can I have your

5    promise not to try to read lips or eavesdrop or anything?  I

6    can tell you right now, you'd be bored to death with what we're

7    talking about and has nothing to do with what your duties are,

8    but I'm going to ask you to be quiet during it so we can

9    discuss it over here, but please, you know, ignore what we're

10   doing, and we'll be back to you in just a few minutes.  Okay?

11        Okay.  Can I have the attorneys over at the side bench,

12   please.

13        (Proceedings at sidebar:)

14          THE COURT:  Counsel, if you could identify who you

15   are, because -- just turn to the mic here.  So if you could

16   identify who you are when you make the objections.

17        The first question I have for both sides, is there any

18   challenges for --

19          MS. FREEMAN:  Sorry, Your Honor.

20          THE COURT:  Is there any challenges for cause, first

21   of all, keeping in mind challenges for cause go to all 14?

22   Peremptories go to the first eight.  Any challenges for cause?

23          MR. MALOFIY:  Number 5, Your Honor.

24          THE COURT:  Okay.

25          MR. MALOFIY:  And we also have -- No. 5 indicated he's
```

63

```
 1    a fan.  He loves --
 2            THE COURT:  I'm sorry, No. 5 --
 3            MR. MALOFIY:  Indicated he's a fan and he loves
 4    Led Zeppelin.  Same with No. 6.  He said he loves Led Zeppelin.
 5    "Love" is a strong word.
 6            THE COURT:  Okay.  Supposed to be a good word.
 7        First of all, those are the two that you --
 8            MR. MALOFIY:  Yes, Your Honor.
 9            THE COURT:  Any objections to those two?
10            MR. ANDERSON:  On No. 6, I mean, I thought he was very
11    clear that he could be fair.
12            THE COURT:  Any challenges for cause on your side?
13            MS. FREEMAN:  No.
14            THE COURT:  The Court is going to grant the challenge
15    for cause on No. 5, not on No. 6.  I think 6 has indicated he
16    would be fair even though he does love one of the parties.
17        So No. 9 goes into No. 5's position.
18        So then the next question is, on the first eight here, are
19    there any peremptory challenges?  Both sides have -- both sides
20    have four.  For the first eight.
21            MR. MALOFIY:  For the first eight?  Number -- do you
22    want to give them to all or --
23            THE COURT:  No, just one, just one at a time.
24            MR. MALOFIY:  Number 2.
25            THE COURT:  Number --
```

64

```
1              MR. MALOFIY:  Two.

2              THE COURT:  Two.  Got it.

3        Number 10 goes into No. 2's place.

4        So the peremptory now is with the defense.

5              MR. ANDERSON:  And I'm sorry, which one did he

6    exercise?

7              THE COURT:  Number 2.  So we have No. 9 went into 5,

8    No. 10 went into No. 2.

9              MR. ANDERSON:  We'll pass, Your Honor.

10             THE COURT:  Okay.  Peremptory is with the plaintiff.

11             MS. FREEMAN:  Oh, wait, no.  Number 9.  Peremptory on

12   No. 9.

13             THE COURT:  Okay.

14             MR. ANDERSON:  My fault.

15             THE COURT:  Okay.  Number 9.

16       Okay.  Peremptory's back with the plaintiff.

17             MR. MALOFIY:  Yes.  Number 3.

18             THE COURT:  Number 3?

19             MR. MALOFIY:  Just to make it -- it's 3, correct?

20             THE COURT:  Yes.  Superior court.  She was the one

21   that worked for --

22             MR. MALOFIY:  Yes, Your Honor.

23             THE COURT:  Okay.  So No. 12 goes into that position.

24       Peremptory's back with the defense.

25             MR. ANDERSON:  We'll pass again, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00200**

65

```
 1              THE COURT:  Hmm?

 2              MR. ANDERSON:  We'll pass again.

 3              THE COURT:  You passed the first time.

 4              MR. ANDERSON:  No, it was --

 5              THE COURT:  Okay.  Forgot.

 6         Okay.  Peremptory back with the plaintiff.

 7              MR. MALOFIY:  I'm sorry.  It'd be No. 6.

 8              THE COURT:  Okay.  Number 6 is out, and 13 goes into

 9    6's position.

10         Peremptory is with the defense.

11              MS. FREEMAN:  Peremptory on No. 13.

12              THE COURT:  Okay.  Thirteen is excused, and No. 14

13    goes into No. 6's position.

14         And peremptory is with the plaintiff, understanding that

15    the plaintiff has one left, and the defendant has two left.

16              MR. MALOFIY:  One second, Your Honor.

17              THE COURT:  Sure.

18              MR. MALOFIY:  Number 8, Your Honor.

19              THE COURT:  Eight?

20              MR. MALOFIY:  Yeah.

21              THE COURT:  Will be excused.

22         And we're going to go back and get eight more jurors and

23    bring them in, and we'll continue at that time.

24         (In the presence of the prospective jurors:)

25              THE COURT:  Okay.  Ladies and gentlemen, I'm going to
```

66

```
 1    ask you at this time, if I call your number, if you'd please
 2    stand up.
 3         Juror No. 3, juror No. 2, juror No. 5, juror No. 6, juror
 4    No. 8, and juror No. 13.
 5         Now, is that right?  I'm sorry.  One, two, three, four,
 6    five, six -- and juror No. 9.  One, two, three, four, five,
 7    six, seven.
 8         Okay.  At this time, you're excused to go back to the jury
 9    room.  Love to keep you, but you're excused at this time to go
10    back to the jury room, and they may need you on another trial,
11    but thank you very much for being with us.
12         As they leave, ladies and gentlemen, we're going to bring
13    in seven new jurors, but before I do that, I've gotta rearrange
14    the jury a little bit.
15         Juror No. 10 -- now, let me see how I can do this so it
16    doesn't inconvenience everybody.  Well, I guess I can't.
17    You're to go all the way back to juror No. 2's position.  So
18    you're now going to be juror No. 2.
19         No, no.  Juror No. 10.  So you stay where you are.  Yeah.
20         I think you're going to have to go around, unfortunately.
21         In fact, you know, it may work out, if you remember your
22    numbers, just to stand over here, because the next one's going
23    to be juror No. 12 to go all the way back to seat No. 3.
24         Juror No. 11, you're going to go back to seat No. 5.  And
25    juror No. 14, you're going to go back to seat No. 6.
```

67

```
1        Okay.  Kind of reminds you of the Mad Hatter's tea party,
2   doesn't it, going around?
3        Okay.  If the first juror whose name is called would
4   please come up and take seat No. 8, and then the remaining
5   jurors, as your name is called, fill in the first row, starting
6   at the far end.
7        Okay.
8            THE CLERK:  Marquel Peyton, P-e-y-t-o-n.
9        John Forbes, F-o-r-b-e-s.
10       Marco Davila, D-a-v-i-l-a.
11       Russell Mohun, M-o-h-u-n.
12       Marisol Gonzalez, G-o-n-z-a-l-e-z.
13       Daniel Alcheh, A-l-c-h-e-h.
14       Faline Madrigal, M-a-d-r-i-g-a-l.
15           THE COURT:  Okay.  Ladies and gentlemen, I am talking
16  to the seven new jurors that have just come up.  I promised you
17  that if you took the places of anybody in the jury, I'd ask you
18  the following question, so let me ask it now.
19       Is there anything that you've heard so far, the seven of
20  you, is there anything that you've heard so far that you should
21  call to our attention as far as your ability to be a good
22  juror?
23           MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side
24  to side.)
25           THE COURT:  Okay.  Then let me go through the
```

68

```
 1   individual questions, starting with juror No. 8, first of all.
 2       Can we have your name, please?
 3           PROSPECTIVE JUROR:  Marquel Peyton.
 4           THE COURT:  And can we have your occupation?
 5           PROSPECTIVE JUROR:  Account manager.
 6           THE COURT:  And the location that you live in?
 7           PROSPECTIVE JUROR:  Valley Village.
 8           THE COURT:  And anyone that works outside the home?
 9           PROSPECTIVE JUROR:  No.
10           THE COURT:  Okay.  You've heard a lot of questions
11   that we've been asking.  You've been paying attention out
12   there.  Is there anything that you can think of that would
13   cause you not to be a fair and impartial juror in this case?
14           PROSPECTIVE JUROR:  No, although I want to disclose
15   that my dad's a homicide detective.
16           THE COURT:  I don't think this case is going to
17   involve homicide, but you never know at jury trials until you
18   get to the end, but, no, that's not going be an issue in this
19   case.  It's going to be a civil case.  But thank you for
20   divulging that.
21       I'm assuming that would not affect you one way or the
22   other in determining whether or not there was infringement or
23   damages?
24           PROSPECTIVE JUROR:  No.
25           THE COURT:  Okay.  Now, can you get that microphone
```

69

```
 1    all the way down to juror No. 9.

 2         Okay.  Juror No. 9, can we have your name?

 3              PROSPECTIVE JUROR:  John Forbes.

 4              THE COURT:  And the location that you live in?

 5              PROSPECTIVE JUROR:  Whittier.

 6              THE COURT:  Occupation?

 7              PROSPECTIVE JUROR:  I'm a licensed clinical social

 8    worker.

 9              THE COURT:  Okay.  Is there anyone in the home that

10    works outside the home?

11              PROSPECTIVE JUROR:  My wife.

12              THE COURT:  Okay.  What type of work?

13              PROSPECTIVE JUROR:  She's also a licensed clinical

14    social worker.

15              THE COURT:  Okay.  Again, all the questions we've

16    asked, is there anything, any reason at all why you feel you

17    could not be a good juror for both sides?

18              PROSPECTIVE JUROR:  I think I can.  I work with people

19    with HIV and AIDS, and I know how important this case is to you

20    guys, and it's about a song, and I deal with life situations.

21              THE COURT:  Okay.

22              PROSPECTIVE JUROR:  And this case is about five days,

23    and I think I'd be doing a disservice to my clients.

24              THE COURT:  Okay.  Well, everyone that serves jury

25    duty is -- you're in for ten days on it, so time would not be a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00205**

70

```
 1    factor on it.  I apologize for that, but we can't excuse you
 2    for time.  So my question is, as a juror, would you be fair to
 3    both sides and not prejudiced against either side?
 4              PROSPECTIVE JUROR:  I think I can.
 5              THE COURT:  Okay.  You'd do the best you could.  If
 6    for some reason you couldn't, would you raise your hand and let
 7    us know that --
 8              PROSPECTIVE JUROR:  Sure.
 9              THE COURT:  -- "I've gotten to the point where I can't
10    be fair anymore"?  Would you do that for us?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  Okay.  Thank you very much.
13         Juror No. 10.
14              PROSPECTIVE JUROR:  Marco Davila, Santa Barbara.
15              THE COURT:  Okay.  And occupation?
16              PROSPECTIVE JUROR:  Technology director for a
17    semiconductor company.
18              THE COURT:  And anyone in the home that works outside
19    the home?
20              PROSPECTIVE JUROR:  Yes.  My spouse, my wife.
21              THE COURT:  Okay.  What --
22              PROSPECTIVE JUROR:  Project manager for an aerospace
23    defense company.
24              THE COURT:  Okay.  And what area do you live in?
25              PROSPECTIVE JUROR:  Santa Barbara.
```

71

```
 1            THE COURT:  Santa Barbara.  Oh, that's right.  Okay.
 2       How about you?  Is there anything about you or your
 3    background or anything else we should know about that would
 4    cause you not to be a good juror in a case like this?
 5            PROSPECTIVE JUROR:  Education, I'm an engineer, so I
 6    can be impartial and --
 7            THE COURT:  So you can be analytical --
 8            PROSPECTIVE JUROR:  Yes, Your Honor.
 9            THE COURT:  -- as an engineer, let the facts go where
10    they might, "I'm not going to be imposing my views one or the
11    other, I'll just tell you objectively what it is"?
12            PROSPECTIVE JUROR:  That's correct, Your Honor.
13            THE COURT:  Good.  Okay.  Thank you very much.
14       Next juror.  Name?
15            PROSPECTIVE JUROR:  Russell Mohun.
16            THE COURT:  Okay.  And occupation?
17            PROSPECTIVE JUROR:  I'm an elementary schoolteacher.
18            THE COURT:  And where do you live?
19            PROSPECTIVE JUROR:  In Palmdale.
20            THE COURT:  And anybody that works outside the home?
21            PROSPECTIVE JUROR:  Yes, my wife.  She's also an
22    elementary school librarian.
23            THE COURT:  Okay.  Same school?
24            PROSPECTIVE JUROR:  No.
25            THE COURT:  Oh, that's good.  Okay.
```

72

```
1          How about you?  Anything about your background, anything
2    that we should know about you that --
3               PROSPECTIVE JUROR:  No.  About 16 months ago, I was on
4    a trial jury.  It was a criminal trial.
5               THE COURT:  Okay.
6               PROSPECTIVE JUROR:  And we did -- we did reach a
7    verdict.
8               THE COURT:  And that was a -- nothing about that case
9    that is similar to this case?
10              PROSPECTIVE JUROR:  No, not at all.
11              THE COURT:  And you wouldn't bring anything in that
12   case into this case?
13              PROSPECTIVE JUROR:  No, Your Honor.
14              THE COURT:  And you'd have no problem with the
15   different burden of proof?
16              PROSPECTIVE JUROR:  Yes, no problem at all.
17              THE COURT:  Perfect.  See, you have been listening.  I
18   appreciate it.
19          Next juror.
20              PROSPECTIVE JUROR:  Marisol Gonzalez Zamar.  I'm a
21   legal secretary at a debt collection law office.  I live in
22   Encino.  My husband works at USC.
23              THE COURT:  Doing what?
24              PROSPECTIVE JUROR:  He's a project assistant.
25              THE COURT:  Okay.  How about you?  Is there anything
```

73

```
1   about you that would cause you not to be a good juror in a case
2   like this?
3           PROSPECTIVE JUROR:  No.
4           THE COURT:  Okay.  You mentioned a legal assistant.
5           PROSPECTIVE JUROR:  Yes.
6           THE COURT:  Okay.  You may, and I'm sure you do, get
7   exposed to law and things people tell you.  Anything that
8   you've heard about the law that's not given to you in this
9   case, can you leave it out of this case?
10          PROSPECTIVE JUROR:  Yes, I can, Your Honor.
11          THE COURT:  Decide it just on what we tell you the law
12  is?
13          PROSPECTIVE JUROR:  Yes, I can, Your Honor.
14          THE COURT:  Okay.  And you think you can be fair and
15  impartial to both sides?
16          PROSPECTIVE JUROR:  Yes.
17          THE COURT:  Okay.  Thank you.
18      Next juror.
19          PROSPECTIVE JUROR:  Daniel Alcheh.
20          THE COURT:  Okay.  And --
21          PROSPECTIVE JUROR:  Don't hate me, but I'm a composer
22  and songwriter.  I work in this industry.
23          THE COURT:  "Don't hate me"?  What have I said?
24          PROSPECTIVE JUROR:  I'm joking.
25          THE COURT:  Okay.  So you are -- well, I guess it
```

74

1    causes more questions, doesn't it?

2         PROSPECTIVE JUROR:  Yes.

3         THE COURT:  Okay.  Well, let me get to that in just a

4    second.  Anyone in the home that works outside the home?

5         PROSPECTIVE JUROR:  No.

6         THE COURT:  Okay.  And you live where?

7         PROSPECTIVE JUROR:  Burbank.

8         THE COURT:  In Burbank.  Okay.  Well, you know the

9    questions I'm going to be asking, then.

10        PROSPECTIVE JUROR:  Mm-hmm.

11        THE COURT:  Whether or not you're in that occupation

12   or not, the question, it really comes down to, whatever

13   occupation you're in, can you be objective enough to just tell

14   us what the facts say and apply the law to it and not bring in

15   outside information that you know about?

16        PROSPECTIVE JUROR:  I think so.

17        THE COURT:  Okay.  And do you have any leanings one

18   way or the other as to either side in this case?

19        PROSPECTIVE JUROR:  Absolutely not.

20        THE COURT:  And if you're on either side, you can say,

21   "Hey, I'm a composer, but I could give you a fair trial"?

22        PROSPECTIVE JUROR:  Absolutely, yeah.

23        THE COURT:  Okay.  As a composer -- I'm going to be

24   asking you a lot of questions now, because you opened up the

25   door.

75

```
 1          PROSPECTIVE JUROR:  Sure, sure, sure.
 2          THE COURT:  As a composer, have you ever gotten into
 3   copyrighting songs?
 4          PROSPECTIVE JUROR:  Absolutely.
 5          THE COURT:  Okay.  And you've gone through that
 6   process of copyrighting, the protections, et cetera?
 7          PROSPECTIVE JUROR:  Mm-hmm.
 8          THE COURT:  Again, anything that you got into as far
 9   as that law goes and as far as the process of copyrighting,
10   it's kind of tough, but what you have to say is, "Hey, unless
11   you tell me here in court, I don't assume it's true; I can't
12   bring in things from the outside that aren't subject to
13   cross-examination or anything else."
14          PROSPECTIVE JUROR:  No.
15          THE COURT:  "I'm going to go just on what the facts
16   say."  You can do that?
17          PROSPECTIVE JUROR:  Yeah, I think so.
18          THE COURT:  Okay.  So you're really telling me you
19   could be -- composer or not, you --
20          PROSPECTIVE JUROR:  Best juror.
21          THE COURT:  I'm sorry?
22          PROSPECTIVE JUROR:  Yeah, I'm joking.  Yes,
23   absolutely.
24          THE COURT:  You can be fair to both sides?
25          PROSPECTIVE JUROR:  Yes.
```

76

```
 1              THE COURT:  Okay.  Next juror.
 2              PROSPECTIVE JUROR:  Faline Madrigal from Walnut.
 3              THE COURT:  Okay.  And occupation?
 4              PROSPECTIVE JUROR:  I'm a office assistant at
 5   Aerospace Systems.
 6              THE COURT:  Okay.  Anyone in the home that works
 7   outside the home?
 8              PROSPECTIVE JUROR:  My father, my mother.
 9              THE COURT:  And what type of work do they do?
10              PROSPECTIVE JUROR:  My father's an owner of a
11   automotive shop.
12              THE COURT:  Okay.
13              PROSPECTIVE JUROR:  And my mother's a receptionist at
14   a nursery home.
15              THE COURT:  Okay.  You've heard everything we've been
16   asking.  What is there about you that would cause you problems
17   being a good juror in this case?
18              PROSPECTIVE JUROR:  Nothing.
19              THE COURT:  You feel you could be fair to both sides?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  Listen to both sides and tell us just what
22   the evidence says, whether you like it or not?
23              PROSPECTIVE JUROR:  Yes.
24              THE COURT:  Okay.  And you could arrive at a verdict?
25   Even if you don't particularly care for the verdict, if the
```

77

1   facts and the law support it, you could tell us what that

2   verdict is?

3           PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Let the cards fall where they may?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Okay.  Okay.  Thank you.

7       Some general questions.  Let me go through these again.

8   If I've talked with the jurors about these specific areas or

9   questions, we don't have to bring them up again, but if it

10  triggers anything in your mind, please let me know.

11      Is there any of the seven of you that you yourself or

12  friends have been employed in the music industry?  Other than

13  the ones we've already talked about.

14          MULTIPLE PROSPECTIVE JURORS:  No.

15          THE COURT:  Okay.  Well, anybody that writes or

16  produces music or musical compositions other than the juror

17  that's already talked to us?  Anybody else?

18          MULTIPLE PROSPECTIVE JURORS:  No.

19          THE COURT:  Anybody has any training, experience,

20  knowledge in the music industry or about musicality?

21          MULTIPLE PROSPECTIVE JURORS:  No.

22          THE COURT:  Okay.  And, of course, you have, right?

23          PROSPECTIVE JUROR NO. 13:  (Nodded head up and down.)

24          THE COURT:  Okay.  Anybody that's had -- and, again,

25  juror No. 13 already has talked about this, but anybody else

```
 1    has any knowledge, experience or training in filing copyrights

 2    or trademarks or anything like that?

 3            MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side

 4    to side.)

 5            THE COURT:  Okay.  Or knowledge or experience with

 6    lawsuits involving copyright or trademark?

 7            MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side

 8    to side.)

 9            THE COURT:  Juror No. 13, have you had any lawsuits or

10    been involved with lawsuits involving trademarks or

11    infringement?

12            PROSPECTIVE JUROR NO. 13:  No.

13            THE COURT:  Okay.  Thank you.

14        Any of you been accused of or accused somebody else of

15    stealing any of your ideas or compositions or any works that

16    you've performed?

17            MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side

18    to side.)

19            THE COURT:  Okay.  Any of you been sued or sued

20    somebody else in the last ten years?

21            PROSPECTIVE JUROR NO. 12:  Yes.

22            THE COURT:  Okay.  Juror No. 12, what type of lawsuit

23    was that?

24            PROSPECTIVE JUROR NO. 12:  I was recorded, and I sued

25    Mercury Insurance for recording my voice without my consent.
```

79

```
 1              THE COURT:  Okay.  And did that go to a lawsuit?

 2              PROSPECTIVE JUROR NO. 12:  It did.  It did.  I had a

 3  case number, so it did.

 4              THE COURT:  Okay.  Okay.  Is there anything about that

 5  that you'd bring into this case?

 6              PROSPECTIVE JUROR NO. 12:  No.

 7              THE COURT:  I mean, those are different facts.

 8              PROSPECTIVE JUROR NO. 12:  Yeah.  No.

 9              THE COURT:  You could completely leave that out of

10  this and just --

11              PROSPECTIVE JUROR NO. 12:  Yes.

12              THE COURT:  In that case, you were suing somebody else

13  for recording your works?

14              PROSPECTIVE JUROR NO. 12:  Yes.  Recording my voice.

15              THE COURT:  Your voice?

16              PROSPECTIVE JUROR NO. 12:  Mm-hmm.

17              THE COURT:  And recording your voice for -- not

18  musical?

19              PROSPECTIVE JUROR NO. 12:  No, not musical.

20              THE COURT:  Okay.

21              PROSPECTIVE JUROR NO. 12:  Just in general.

22              THE COURT:  Okay.  And you'd leave that out of this

23  entirely?

24              PROSPECTIVE JUROR NO. 12:  Yes.

25              THE COURT:  Okay.  Anybody had any experience,
```

80

1  training or education in law, or have any close friends or

2  relatives that are in law, that you talk to them about their

3  cases, anything?

4  　　　　MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side

5  to side.)

6  　　　　THE COURT:  We've talked a little bit about these

7  participants in this trial, some being well-known, and song's

8  being well-known.

9  　　Does anybody have any strong feelings as to the songs

10  involved, the band, the performers, that would cause you not to

11  be fair and impartial?

12  　　　　MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side

13  to side.)

14  　　　　THE COURT:  Okay.  Anybody feel that "because of my

15  strong feelings one way or the other, I'd lean more one way

16  than the other"?  Anybody feel like that?

17  　　　　MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side

18  to side.)

19  　　　　THE COURT:  Okay.  Any of you read or heard about this

20  case in the newspapers or news media or anything?

21  　　　　PROSPECTIVE JUROR NO. 13:  Just a mention.

22  　　　　THE COURT:  Some of you have, okay.

23  　　Well, I guess the question is, can you leave it out of

24  this trial, what you've heard, and not assume anything that you

25  saw in the news or read in the papers or heard from other

81

```
 1   people is true, unless it comes in in this case?  Anybody have
 2   any problem with that?
 3           MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side
 4   to side.)
 5           THE COURT:  Okay.  We already talked to one juror
 6   about jury duty.  Anybody else have jury duty other than that
 7   one person?
 8       Okay.  And what type of trial was it?
 9           PROSPECTIVE JUROR NO. 8:  Civil.
10           THE COURT:  And was it a case similar to this?
11           PROSPECTIVE JUROR NO. 8:  No.
12           THE COURT:  Were they able to reach a verdict?
13           PROSPECTIVE JUROR NO. 8:  Yes.
14           THE COURT:  Okay.  We got the microphone to him just
15   about the time I was going to stop asking questions.
16       Were they able to reach a verdict?
17           PROSPECTIVE JUROR NO. 8:  Yes.  Yes.
18           THE COURT:  Okay.  And anything that you might have
19   heard in that case as far as the facts, anything you might have
20   heard in that case as far as what the law is, you'd leave out
21   of this case unless you hear it here?
22           PROSPECTIVE JUROR NO. 8:  Yes.
23           THE COURT:  Okay.  So important that you don't say,
24   "Hey, ladies and gentlemen, we didn't hear it in evidence, but
25   let me tell you how it really works."  I mean, we can't do
```

82

```
1   that.  You understand that?

2          PROSPECTIVE JUROR NO. 8:  Yes.

3          THE COURT:  Okay.  Well, let me ask you again.  You

4   know what we're looking for.  We've asked hundreds of

5   questions.  The bottom line is, is there any reason, anything

6   at all that would make you lean one way or the other or not be

7   absolutely fair to both sides in this case, of the seven of

8   you?

9          MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side

10  to side.)

11         THE COURT:  Okay.  Some of you didn't shake your head

12  one way or the other.  Let me ask it again.  Anybody that feels

13  that they might not be able to be fair to both sides?

14         MULTIPLE PROSPECTIVE JURORS:  (Shook heads from side

15  to side.)

16         THE COURT:  Okay.

17     Okay.  Counsel, why don't you come over to the side bench.

18     (Proceedings at sidebar:)

19         THE COURT:  Any challenges for cause, first of all, of

20  those seven, for cause?

21         MR. KULIK:  No, Your Honor.

22         MR. ANDERSON:  No, Your Honor.

23         THE COURT:  I didn't think so.

24     Okay.  Defense has two left, so...

25         MS. FREEMAN:  Can I consult with my --
```

83

```
 1              THE COURT:  Sure.
 2              MR. ANDERSON:  Thank you, Your Honor.
 3         (Defense counsel confer privately.)
 4              THE COURT:  Is she co -- she's co-counsel?
 5              MR. KULIK:  Yes.  But she's from New York, so we give
 6    her a pass.
 7              THE COURT:  Off the record.
 8         (A discussion was held off the record.)
 9              MR. ANDERSON:  We pass, Your Honor.  Thank you for
10    your patience.
11              THE COURT:  Okay.  We're going to go ahead and swear
12    them in.  What I'm going to do is, I'm going to give the jurors
13    a short break.  Then when we come back, we'll give them
14    pre-instructions.  It will take like 5, 10 minutes.  And then
15    we won't get into opening statements until afternoon, because
16    that gives you a chance to see where you're going.  Hopefully,
17    you've have one or two witnesses after opening statement today,
18    because we don't want lag time there.  I don't want it coming
19    off your time, so make sure you have witnesses.
20              MR. MALOFIY:  We have witnesses.
21         So there is going to be eight jurors, Your Honor?
22              THE COURT:  Going to be eight jurors.  And if we
23    excuse two, we will still have six.  You need six to be --
24              UNIDENTIFIED SPEAKER:  (Unintelligible.)
25              THE COURT:  I would assume opening statements --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00219**

84

```
1            MR. MALOFIY:  Six and two alternates.

2            THE COURT:  I would think about 20 minutes, but I'm

3    going to give you half hour each.

4            MR. MALOFIY:  One thing, using exhibits --

5            THE COURT:  Counsel, you don't need this on the

6    record.

7        (Discussion held off the record at sidebar.)

8        (In the presence of the prospective jurors:)

9            THE COURT:  Okay.  Ladies and gentlemen, I'm going to

10   have the eight jurors in the back row, the eight of you, if

11   you'd please stand up at this time and be sworn in as the

12   jurors.

13           THE CLERK:  Please raise your right hand.

14       (The jury was duly sworn.)

15           THE CLERK:  Please be seated.

16           THE COURT:  Okay.  If the jurors in the front row

17   could please stand up, and those six jurors plus the other

18   jurors that are out there in the audience, I'm going to be

19   excusing you at this time.  I want to thank you very much for

20   being with us.  As I said to the another jurors, wish we could

21   keep you here, but you have to go back, because they may have

22   other cases for you, but I do want to excuse you at this time

23   and thank you very much for your participation.

24       If you leave, if you leave quietly, because we'll still be

25   in session.
```

85

1          (The excused jury panel exited the courtroom.)

2          THE COURT:  Ladies and gentlemen, I'm going to be

3    breaking for a very short break, 10, 15 minutes.  Then I'm

4    going to come back, and I'm going to read you some

5    pre-instructions, take 5, 10 minutes on it, and then we'll

6    break for lunch, and then we'll come back in at 1:30 and go

7    from 1:30 till 4:00.  Now, that's today.  Let me talk to you a

8    little bit about timing.

9          Starting tomorrow and every day after tomorrow, let me

10   tell you about what the time frame is.  A lot of courts go from

11   9:00 until 4:30.  We don't do that here.  We go from 8:30 until

12   4:00.  The reason we do is, because all the jurors have told us

13   it makes a big difference if you get out at 4:00 as opposed to

14   4:30 as far as traffic and buses and everything else.  So you

15   can be guaranteed at 4:00 o'clock you'll be out of here.  In

16   fact, I've told the attorneys, if they're halfway through a

17   question at 4:00 o'clock, I'll stop them and say remember your

18   question, reask it tomorrow.  We don't keep the jury past 4:00

19   o'clock.  So you can depend on that as far as making

20   arrangements for being picked up and all.  That's on one side.

21         On the other side, we're going to hold you just as

22   responsible for being here at 8:30.  Not 8:32 or 8:33.  In

23   fact, I'm going to be telling you come in at 8:15, so in case

24   you run into traffic or any other problems.  We start right at

25   8:30.  And we don't want to be sitting here waiting for you to

86

1  come in and have you walk in while the jury's just sitting here

2  waiting, looking at -- you don't want to be that embarrassed on

3  it.  You have to be here so we can start right at 8:30.  And we

4  will be going from 8:30 until 11:30, which is three hours, and

5  we'll give you a break in there.  At 11:30 until 1:00, we're

6  recessing for lunch, and from 1:00 until 4:00, we'll have a

7  three-hour session with a 15-minute break, and then we break

8  loose right at 4:00 o'clock.  So you can depend on that time

9  schedule on it.

10      I'm going to be breaking at this time very shortly, come

11  back and read those instructions, and then we'll break for

12  lunch.  But I do want you to remember, anytime we break, I'll

13  be giving you -- I'll try to remember to give you, and if I

14  don't, remember it yourself, that you're not to discuss this

15  case among yourselves during these breaks.  You're not to

16  discuss the case among yourselves or with anybody else or form

17  or express any opinions about the matter until you retire to

18  the jury room.

19      Well, think about that.  That sounds a little crazy.  Why

20  can't you form or express any opinions about this matter?

21  You're trying the case.  You should be able to form opinions.

22      Well, jury trials are very unique, and the whole concept

23  of a jury trial is that you listen to all the evidence, and

24  then you go back into the jury room and you listen to all the

25  other jurors before forming an opinion.  If you form it out

87

1    here before you talk to the other jurors, you may be reluctant

2    to change it, et cetera.  The whole concept is, listen here,

3    talk to the other jurors, and then form your opinion.  That's

4    why we don't want forming of any opinion until you get back to

5    the jury room.

6          And I'm just going to stress one more time how important

7    it is that you realize that you can't talk to anybody outside

8    this court about this case until it's concluded.

9          With that, any questions that you have?  If not, we'll

10   take a 10-, 15-minute break, come back in and do jury

11   instructions at that time.

12         We'll be in recess.

13              THE CLERK:  All rise.

14         (Jury out.)

15              THE CLERK:  Court is in recess.

16         (Recess held from 11:33 a.m. to 11:50 a.m.)

17         (In the presence of the jury:)

18              THE COURT:  Okay.  Ladies and gentlemen, as I

19   mentioned, I'm going to give you some pre-instructions at this

20   time.  So if you'd listen carefully to them, please.

21         You are now the jury in this case, and it's my duty to

22   instruct you on the law.  It is your duty to find the facts

23   from all the evidence in this case.  To those facts, you will

24   apply the law that I give you.  You must follow the law that I

25   give to you whether you agree with it or not, and you must not

88

1   be influenced by any personal likes, dislikes, opinions,

2   sympathy, or prejudice.  That means that you must decide this

3   case solely on the evidence before you.  You will recall that

4   you took an oath to do so.

5       At the end of the trial, I'll give you the final

6   instructions.  It is the final instructions that will govern

7   your duties.

8       Please do not read into these instructions or anything

9   that I may say or do that I have an opinion regarding the

10  evidence or what your verdict should be.

11      To help you follow the instructions, I will give you a

12  brief summary of the positions of the parties.

13      The plaintiff asserts that the defendant infringed a

14  copyright in a musical composition known as "Taurus."  The

15  plaintiff has the burden of proving this claim.

16      The defendant denies these claims and also contends that

17  those claims are barred by certain affirmative defenses.  The

18  defendant has the burden of proving those affirmative defenses.

19      The plaintiff denies the defendant's affirmative defenses.

20      When a party has a burden of proof on any claim or

21  affirmative defense by a preponderance of the evidence, it

22  means that you must be persuaded by the evidence that the claim

23  or affirmative defense is more probably true than not true.

24      You should decide this case as to each defendant

25  separately.  Unless otherwise stated, the instruction applies

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00224**

1    to all the parties.

2        Evidence that you may consider in deciding what the facts

3    are consist of, as I said before, the sworn testimony of

4    witnesses, the exhibits that are admitted into evidence, and

5    any facts that the lawyers have agreed to or stipulated to.

6        In reaching a verdict, you may consider only the testimony

7    and exhibits received into evidence.  Certain things are not

8    evidence, and you may not consider them in deciding what the

9    facts are.  And I'll list them for you.

10        Arguments and statements of the attorneys are not

11    evidence.  The lawyers are not witnesses.  What they may say in

12    their opening statements, closing arguments, or at other times

13    is intended to help you interpret the evidence, but it's not

14    evidence.  If the facts as you remember them differ from the

15    way the attorneys stated them, your memory controls.

16        Question or objection by the lawyers are not evidence.

17    Attorneys have the duty to their client to object when they

18    believe a question is improper under the rules of evidence.

19    You should not be influenced by the objection or the Court's

20    ruling on it.

21        Testimony that is excluded or stricken or that you have

22    been instructed to disregard is not evidence and must not be

23    considered.  In addition, some evidence may be received for a

24    limited purpose.  And if I instruct you to consider it for a

25    limited purpose, you must do so, and you may not consider the

1    evidence for any other purpose.

2        Anything that you may see or hear when the court is not in

3    session is not evidence.  You are to decide this case solely on

4    the evidence received during this trial.

5        Evidence may be either direct or circumstantial.  Direct

6    evidence is direct proof of a fact, such as the testimony of a

7    witness about what that witness personally saw or heard or did.

8    Circumstantial evidence is proof of one or more facts from

9    which you can find another fact to be true.

10        You should consider both kinds of evidence.  The law makes

11    no distinction between the weight to be given to either direct

12    or circumstantial evidence.  It is for you to decide how much

13    weight is to be given to any evidence.

14        There are rules of evidence that control what can be

15    received into evidence.  When a lawyer asks a question or

16    offers an exhibit into evidence and the lawyer on the other

17    side thinks that it is not permitted by the rules of evidence,

18    that lawyer may object.  If I overrule the objection, the

19    question may be answered or the exhibit received.  If I sustain

20    the objection, the question may not be answered and the exhibit

21    not received.  Whenever I sustain an objection to a question,

22    you must ignore that question and must not guess as to what the

23    answer might have been.

24        Let me give you an example of that.  You've all heard the

25    example of, "Have you stopped beating your wife?"  Well, that's

91

just assuming that someone beat their wife.  That doesn't mean

that they did.  And so anytime a question is asked, you're not

to assume anything is true.  The question only gives meaning to

the answer as it comes out.

Does that make sense to all of you?

MULTIPLE JURORS:  (Nodded heads up and down.)

THE COURT:  Okay.  Sometimes I may order that the

evidence be stricken from the record and that you disregard or

ignore that evidence.  That means that you must decide this

case -- you must not consider the stricken evidence for any

purpose.

In deciding the facts of this case, you may have to decide

which testimony to believe and which testimony not to believe.

You may believe everything a witness says, or part of it, or

none of it.

In considering the testimony of a witness, you may take

into account the opportunity and the ability of that witness to

see or hear or know the things testified to; the witness's

memory; the witness's manner while testifying; the witness's

interest in the outcome of the case, if any; the witness's bias

or prejudice, if any; whether other evidence contradicts the

witness's testimony; the reasonableness of the witness's

testimony in light of all the other evidence; and any other

fact that bears on believability.

Sometimes a witness may say something that is not

1  consistent with something else that he or she has said.

2  Sometimes witnesses will give different versions of what

3  happened.  People often forget or make mistakes in what they

4  remember.  Also, two people may see the same event but remember

5  it differently.  You may consider these differences, but do not

6  decide the testimony is untrue just because it differs from

7  other testimony.

8       However, if you decide that a witness has deliberately

9  testified untruthfully about something important, you may

10  choose not to believe anything that witness says.

11       On the other hand, if you think the witness has testified

12  untruthfully about some things and has told the truth on

13  others, you may accept that part that you feel is true and

14  ignore the rest.

15       The weight of the evidence as to any fact does not

16  necessarily depend on the number of witnesses who have

17  testified.  What is important is how believable the witnesses

18  were and how much weight you think the testimony deserves.

19       I'll now say -- and I've talked to you about this before,

20  but I'll now say a few words about the conduct of the jurors.

21       First, keep an open mind throughout this trial and do not

22  decide what the verdict should be until you and your fellow

23  jurors have completed your deliberations at the end of the

24  case.

25       Second, because you must decide this case based on the

93

1    evidence received in this trial and on my instructions as to

2    the law that applies, you must not be exposed to any other

3    information about the case or as to the issues it involves

4    during the course of your jury duty.

5        Thus, until the end of the case or unless I tell you

6    otherwise, do not communicate with anyone in any way and do not

7    let anybody else communicate in any way with you about the

8    merits of this case or anything to do with it.  This includes

9    discussing the case in person, in writing, by phone, or

10   electronic means via e-mail, text messaging, or other Internet

11   chat rooms, blogs, websites, or social media.  This applies to

12   communication with your fellow jurors until I give you the case

13   for your deliberation, and it applies to communication with

14   everyone else, including your family members, your employer,

15   the media or press, and the people involved in this trial,

16   although you may notify your family that you -- and your

17   employer that you have been seated in a jury in this case.  But

18   if you are asked or approached in any way about the jury

19   service or anything to with this case, you must respond that

20   you have been ordered not to discuss this matter, and report it

21   to the Court immediately.

22       Because you will receive this -- all the evidence and

23   legal instructions properly before you, you may consider -- or

24   that you need to return a verdict, don't watch or listen or

25   read any news media accounts or commentary about this case or

94

1    anything to do with it.  Do not do any research, such as

2    consulting dictionaries, searching the Internet, or using other

3    reference materials, and do not make any investigation in any

4    other way or try to learn anything about the case outside of

5    what is presented in this court.

6        The law requires these instructions to ensure that the

7    parties have a fair trial based on the same evidence that each

8    party has an opportunity to address.  A juror who violates

9    these restrictions jeopardizes the fairness of the proceedings,

10   and a mistrial could result that would require the entire

11   proceedings to start all over.

12       If any juror is exposed to any outside information, please

13   notify the Court immediately.

14       If there are any news media accounts or commentaries about

15   this case or anything to do with it, you must ignore them.  You

16   must not read, watch, or listen to any news media accounts or

17   commentary about this case or anything to do with it.  The case

18   must be decided by you solely and exclusively on the evidence

19   that you receive in this case and on the instructions that

20   apply at the end of the case.

21       If any juror is exposed to any outside information, please

22   notify the Court immediately.

23       Now, I urge you to pay close attention to the trial

24   testimony as it's given.  During your deliberations, you will

25   not have a transcript of the testimony.  Now, in that regard,

95

1    if you wish, you may take notes to help you remember the

2    evidence.  If you do take notes, please keep them to yourselves

3    until you and your fellow jurors go to the jury room to decide

4    this case.  Do not let note-taking distract you.

5         When you leave, your notes should be left in the

6    courtroom.  No one will read those notes.  They will be

7    destroyed at the conclusion of the case.

8         Whether or not you take notes, you should rely on your own

9    memory of the evidence.  Notes are only to assist your memory.

10   You should not be overly influenced by your notes or those of

11   your fellow jurors.

12        Now, the trial's going to proceed in the following ways as

13   soon as we get back from lunch:

14        First, each side will make an opening statement.  An

15   opening statement is not evidence.  It's simply an outline to

16   help you understand what the parties expect the evidence will

17   show.  A party is not required to make an opening statement.

18        The plaintiff will then present evidence, and counsel for

19   the defendant may cross-examine.  Then the defendant will

20   present evidence, and counsel for the plaintiff may

21   cross-examine.

22        After the evidence has been presented, I will instruct you

23   on the law that applies to this case, and the attorneys will

24   make their closing arguments.  After that, you'll go back to

25   the jury room to deliberate and reach a verdict.

```
 1        Is there any questions that you might have?

 2        Okay.  I'm going to excuse you for lunch.  Have a pleasant

 3   lunch.  When you come back in at 1:30, we will start.

 4        Now, don't get confused.  Tomorrow we come back in at

 5   1:00.  Different schedule tomorrow, and I'll talk to you about

 6   that before we break.  But when you come back in, we'll go

 7   right into the opening statements, and then we'll start the

 8   presentation of the evidence.

 9        Any questions you might have?

10        Okay.  We'll be in recess.

11        (Jury out.)

12            THE CLERK:  Court is in recess.

13

14        (Lunch recess commenced at 12:02 p.m.)

15

16        (Afternoon proceedings under separate cover.)

17

18

19                        --o0o--

20

21

22

23

24

25
```

97

```
 1                        CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  JUNE 14, 2016

11

12

13

14                  /S/ SANDRA MACNEIL

15            Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3       HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                    – – –

5                                      )
   MICHAEL SKIDMORE, AS TRUSTEE FOR    )
6  THE RANDY CRAIG WOLFE TRUST,        )
                                       )
7                     PLAINTIFF,       )
                                       )
8           vs.                        )  No. CV 15–03462–RGK
                                       )
9  LED ZEPPELIN; JAMES PATRICK PAGE;   )
   ROBERT ANTHONY PLANT; JOHN PAUL     )
10 JONES; SUPER HYPE PUBLISHING,       )
   INC.; WARNER MUSIC GROUP CORP.,     )
11 PARENT OF WARNER/CHAPPELL MUSIC,    )
   INC.; ATLANTIC RECORDING            )
12 CORPORATION; RHINO ENTERTAINMENT    )
   COMPANY,                            )
13                                     )
                      DEFENDANTS.      )
14 _____)

15

16           REPORTER'S TRANSCRIPT OF

17             JURY TRIAL DAY 1

18         VOLUME II, PAGES 98–199

19         TUESDAY, JUNE 14, 2016

20                1:28 P.M.

21         LOS ANGELES, CALIFORNIA

22

23      CINDY L. NIRENBERG, CSR 5059, FCRR
          U.S. Official Court Reporter
24           255 East Temple Street
             Los Angeles, CA 90012
25           *www.msfedreporter.com*

99

```
 1   APPEARANCES OF COUNSEL:

 2


 3   FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE
     RANDY CRAIG WOLFE TRUST:
 4
          FRANCIS ALEXANDER, LLC
 5        BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
          280 N. PROVIDENCE ROAD, SUITE 1
 6        MEDIA, PENNSYLVANIA  19063
          215-500-1000
 7
          KULIK GOTTESMAN & SIEGEL, LLP
 8        BY:  GLEN L. KULIK, ATTORNEY AT LAW
          15303 VENTURA BOULEVARD, SUITE 1400
 9        SHERMAN OAKS, CALIFORNIA  91403
          310-557-9200
10

11

12   FOR DEFENDANT LED ZEPPELIN:

13        PHILLIPS NIZER, LLP
          BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
14        666 FIFTH AVENUE
          NEW YORK, NEW YORK  10103
15        212-977-9700

16
     FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:
17
          LAW OFFICES OF PETER J. ANDERSON, PC
18        BY:  PETER J. ANDERSON, ATTORNEY AT LAW
          100 WILSHIRE BOULEVARD, SUITE 2010
19        SANTA MONICA, CALIFORNIA  90401
          310-260-6030
20
          PHILLIPS NIZER, LLP
21        BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
          666 FIFTH AVENUE
22        NEW YORK, NEW YORK  10103
          212-977-9700
23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    APPEARANCES OF COUNSEL (CONTINUED):

2

3    FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING
     CORPORATION, RHINO ENTERTAINMENT COMPANY:
4
          LAW OFFICES OF PETER J. ANDERSON, PC
5         BY:  PETER J. ANDERSON, ATTORNEY AT LAW
          100 WILSHIRE BOULEVARD, SUITE 2010
6         SANTA MONICA, CALIFORNIA  90401
          310-260-6030
7

8

9

10   ALSO PRESENT:

11        NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

12        BRAD COHEN, WARNER MUSIC GROUP

13        SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

14        KEVIN SEGAL, TRIAL TECHNICIAN

15        DAN MORENO, TRIAL TECHNICIAN

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3   PLAINTIFF'S WITNESSES:                    PAGE

4   JANET WOLFE

5      DIRECT BY MR. KULIK                    143

6      CROSS BY MR. ANDERSON                  160

7

8   JAY FERGUSON

9
       DIRECT BY MR. MALOFIY                  164
10
       CROSS BY MR. ANDERSON                  181
11
       REDIRECT BY MR. MALOFIY               194
12

13

14

15  FURTHER PROCEEDINGS                       PAGE

16  OPENING STATEMENT BY MR. MALOFIY          103

17  OPENING STATEMENT BY MR. ANDERSON         128

18

19

20

21

22

23

24

25
```

102

```
 1            LOS ANGELES, CALIFORNIA; TUESDAY, JUNE 14, 2016

 2                          1:28 P.M.

 3                         - - - - -

 4       (Jury in at 1:28 P.M.)

 5            THE COURT:  The record will reflect that all the

 6  jurors are in their respective seats in the jury box.

 7            After opening statement, if you -- because we're

 8  going to have witnesses testifying from here, if it's more

 9  convenient for the jury to put four and four so you're down

10  closer to here (indicating) that's, fine, or if you want to

11  stay right where you are, that's fine.  Just let the bailiff

12  know, okay?

13            Okay.  We're ready now for the presentation of the

14  opening statements.  I talked to you a little bit before lunch

15  break about that.  The opening statements are what attorneys

16  feel the evidence is going to show.  It's not evidence, as I

17  told you before; it's what they think the evidence is going to

18  show.

19            It's very instrumental for you to listen carefully to

20  that, because it gives you a guideline so you can understand,

21  as the evidence comes in bit by bit, what the significance is

22  and where it's going.  So I'm going to ask you to listen very

23  carefully, but remember as you're listening to it, it's not

24  evidence.  The evidence comes from the witnesses here in court.

25            Any questions you might have?  You ready to go?
```

103

```
 1          Okay.  Counsel, would you like to make an opening
 2   statement?
 3          MR. MALOFIY:  Yes, Your Honor.  Thank you.
 4          May it please the Court, may it please defense
 5   counsel, may it please Mr. Jimmy Page, Mr. Robert Plant,
 6   Atlantic Recording Corporation, and Rhino Records.  May it also
 7   please you, ladies and gentlemen of the jury.
 8          My name is Francis Alexander Malofiy with the law
 9   firm of Francis Alexander, and I have the great privilege and
10   pleasure in representing plaintiff in this matter, Michael
11   Skidmore, as trustee for the Randy Craig Wolfe Trust.
12          With me here, who's not seated at the table, is also
13   my other half of my law firm, Mr. A.J. Fluehr.  I'm not sure if
14   he's here right now, but I also have my co-counsel, California
15   lawyer Mr. Glen Kulik.
16          This case is a case about copyright infringement.
17   You've heard a little bit about it.  And to sum this up in six
18   words, you can go back to the first Bible and it said, "In the
19   beginning God created...."
20          Copyright goes back a long way, and the basis of
21   copyright is really simple.  It gives credit to creation, but
22   it does not give credit to copying.  And that's a huge
23   distinction which has traveled with us 2,000 years, and it's
24   really the basic tenet of what this is all about.
25          We're going to be talking about terms in this case,
```

1    "access" and "substantial similarity," and those things are

2    elements which we have to prove in order to win our case.  I'm

3    sharing with you those words now so later on when I come back

4    to them, you have a placeholder to know what I'm talking about.

5         This case can also be summarized in six words:  Give

6    credit where credit is due.  And that's why we're here today,

7    because there is a dispute.

8         There is a dispute between the Trust who owns a

9    copyright in a song called "Taurus" and a dispute between

10   Mr. Page and Mr. Plant and the corporations that represent him

11   or that also have interest in the song "Stairway to Heaven."

12   It's your job to figure out this dispute with the facts that we

13   show you, and we'll talk a little bit more about that.

14        Let me provide to you a brief statement -- really a

15   brief statement about, I guess, the facts in this case and the

16   people involved.

17        In the summer of 1967, Randy Craig Wolfe, also known

18   as Randy California, who was discovered by Jimi Hendrix, was a

19   founding member of the eclectic rock band Spirit, who pioneered

20   the psychedelic rock sound.  They were very popular in the West

21   Coast and during that time they were also popular throughout

22   the United States, as well as on the other side of the Atlantic

23   in the United Kingdom and London.

24        The band fused a sort of jazz, including rock,

25   including many different styles, to create a very distinct

105

1    sound that many other musicians of the time, including Jimi

2    Hendrix, including Mr. Page, including Mr. Plant and John Paul

3    Jones, all emulated and all appreciated and all followed. And

4    they even owned their records, saw them perform live, and even

5    many, many years ago, before Led Zeppelin was the great band it

6    was, Mr. Plant and Mr. Page even covered the music of Spirit

7    and the band members of that band. That band was a defining

8    band, but today it's not as well known as it once was.

9          In 1968, Spirit released its self-titled album. That

10   album was named, obviously, *Spirit*. It was a top 40 billboard

11   charting album. It had songs on it that were singles, and

12   there was a unique 2-minute-and-37-second instrumental titled

13   "Taurus."

14         "Taurus" was not a song with vocals on it, it was

15   strictly an instrumental. It was a song that was very near and

16   dear to the heart of Randy California, who is no longer here

17   with us today. That's why the Trust is here, who owns the

18   copyright, and we'll share a little bit about that with you

19   later.

20         But this was a song that Randy California had written

21   for his love of his life, a woman by the name of Robin, and he

22   wrote this song because that was her astrological sign.

23         Anyone who hears the song "Taurus" can instantly

24   recognize this very delicate, very unique acoustic guitar which

25   is plucked in a certain way with a certain mood and feel, and

106

1    it was a composition that, little did anyone know, would fall

2    into the lovely hands of Mr. Jimmy Page, who then used it for

3    the introduction of "Stairway to Heaven."

4          This first half of "Stairway to Heaven," as we'll

5    define it -- the first 2 minutes and 14 seconds isn't the whole

6    song.  The whole song is 8 minutes long.  It's a very long

7    song.

8          But no one gets past the first few pages of the book

9    unless it's really good, because you pick up a book and you

10   read the first page or two, and if you don't like it, you put

11   it down and you never look at it again and it sits on the shelf

12   and it collects dust.

13         MR. ANDERSON:  Excuse me, Your Honor.  I hate to

14   interrupt, but -- objection.  Argument.

15         THE COURT:  Overruled.  I'm giving him latitude for

16   opening statements.

17         MR. ANDERSON:  Okay.  Thank you, Your Honor.

18         THE COURT:  Okay.

19         MR. MALOFIY:  Now, this song, "Taurus," has a very

20   unique Part A.  Part A is a very delicate guitar part, and it

21   draws the listener in and it's a very unique composition.

22         And if you look at this song -- and we're going to

23   hear it and we're going to play it and we're going to compare

24   it, and you're going to see that.  And you're going to see our

25   experts, our musicological experts, discuss the significance of

107

1  the song, the musicological elements, the things that make it

2  creative, the things that make it distinct, the things that

3  make it unique.  And that's going to happen later on in the

4  case after we establish certain fact witnesses to lay the

5  foundation of what we're talking about.

6          But the part that we're talking about that's at issue

7  here is not the 2 minutes and -- not after 2 minutes and 14

8  seconds, we're focused on the first 2 minutes and 14 seconds.

9          It's from our perspective, plaintiff's perspective,

10 the perspective from our musicological experts, that these are

11 the most distinct, iconic, important part of the song, and no

12 one is going to listen to 2 minutes and 14 seconds unless the

13 song is really good and it draws that listener in.

14         So our focus as far as our claim of infringement is

15 not some of the masterful work that Mr. Jimmy Page had done in

16 the later half of the song, but it's focused on the first half.

17 And that's where this claim arises from.

18         Let me talk about qualitative importance of the song

19 and quantitative importance.  Think of it like this.  You have

20 an 8-minute song.  The first 2 minutes and 14 seconds, if you

21 do a simple division, you can figure out how much percentage it

22 is.  But on a qualitative aspect, it's how much quality does

23 those 2 minutes and 14 seconds have to the whole piece.

24         It's our position -- and you may hear it and you may

25 know it, "Stairway to Heaven."  It's likely everyone in this

1  room knows it.  But when you hear those first iconic notes of

2  "Stairway to Heaven," it's instantly recognizable, everyone

3  knows what it is and everyone knows what that song means, and

4  it means different things to different people.

5        If you hear the Part A in "Taurus," it's going to be

6  you to determine whether or not they're substantially similar

7  based on a musicological analysis, which we'll talk about.

8        It's called the extrinsic test, where musicologists

9  talk about the actual elements of the musical composition, but

10 then there is also the intrinsic test, where you, as jurors,

11 get to say, "Hey, that sounds similar."

12       That's what it comes down to.  It's almost like a

13 taste test, do these things taste the same, do these things

14 sound the same.

15       We're going to break it down in steps.  We're going

16 to have incredible experts come in here, some incredible

17 session musicians, and we're going to illustrate those parts

18 which are substantially similar, which are distinct, which are

19 unique, and which are misappropriated from this lesser-known

20 song, "Taurus."

21       And I want to be clear.  We've heard a lot, even in

22 the picking of the jury, and everyone -- well, many of them not

23 only said did they appreciate Led Zeppelin, but they were fans

24 and they loved them.  And we just ask as plaintiffs that you --

25 if you do know the song --

1          THE COURT:  I do want to step in and say -- because

2    counsel is correct.  It's not argument, it's presentation of

3    what you feel the evidence will present.

4          MR. MALOFIY:  Yes, Your Honor.  I'll move forward.

5    Thank you.

6          THE COURT:  Okay.

7          MR. MALOFIY:  Let's talk about the pink elephant.

8          We've already discussed that the pink elephant in the

9    room is that "Stairway to Heaven" is one of the most iconic

10   rock songs of all time.

11         The pink elephant in the room is that Led Zeppelin

12   was one of the most incredible rock bands of all time, and they

13   had a very fabled career and they've done tremendous things

14   during their lifetime.  Our issue is in where they picked up

15   this piece of music.

16         But to take it back, we sort of have to go in this

17   time capsule, because there was a time when no one knew who

18   Led Zeppelin was, when if Jimmy Page or Robert Plant walked

19   down the street, no one would recognize them, and they were

20   just 19- and 20- and 21-year-old kids in the UK who were trying

21   to make music.

22         And they made music, and they did so a certain way.

23   They played other people's music, they covered music, and then

24   they tried to make it their own.  But sometimes they didn't get

25   as far as needed to to claim it as their own composition.

110

```
1          In the early days of Led Zeppelin, all they played
2    was covers.  They didn't play original music, they played other
3    people's music.
4          In the early days of Led Zeppelin, and Jimmy Page in
5    particular -- who is a masterful guitar player.  I wouldn't
6    take that credit away from him, but he was a session musician.
7          And by nature, what that means, a session musician is
8    not a songwriter.  A session musician is someone who goes in
9    and plays other people's music.  And a session musician is
10   someone who doesn't write their own music, but plays other
11   people's music, and sometimes they have their own performance
12   elements to make it their own.
13          You're also going to hear in this course how
14   Led Zeppelin had a definable songwriting process, and their
15   definable songwriting process was to take music they
16   appreciated, that they liked, to cover that music as a cover
17   tune or as a cover band, and then try to change it
18   stylistically to make it their own.  Sometimes they crossed
19   that bar and sometimes they didn't, but this case is about what
20   they did here.
21          Back in our time capsule -- and we're talking about
22   the mid '60s, the late '60s -- Led Zeppelin wasn't a household
23   name, but Spirit was.  And Spirit was a band here in California
24   who everybody knew.  Jimi Hendrix knew.  Jimi Hendrix played
25   with Randy California.  He was part of -- the only -- I think
```

111

1    the only person who ever traded the twin lead and played with

2    Jimi Hendrix for three months in Greenwich Village playing five

3    sets a night.

4           Other masterful guitar players and musicians

5    recognized Randy California, who wrote this composition,

6    "Taurus," and one of those masterful guitar players was not

7    Jimi Hendrix, but it was also Jimmy Page.

8           And although Jimmy Page -- and through the course of

9    this case, you'll hear that his declarations say he doesn't

10   know who Spirit is, he doesn't -- he's not familiar with their

11   music, he doesn't recall ever hanging out with them, he doesn't

12   recall opening for them.  And he did this and signed this under

13   oath, and we're going to show you that in the course of this

14   case.  But what you're going to find out is that under heavy

15   questioning in his deposition, he had to break down and admit,

16   yes, he liked Spirit in the '60s; yes, he liked Spirit in the

17   '70s; yes, he liked Spirit in the '80s; and as he sat there in

18   the UK just a couple months ago, he had to admit he liked them

19   to this day.

20          And not only did he like them, but he broke down and

21   he had to admit he even knows the names of their songs.  He

22   started rattling them off.  "Fresh Garbage."  "I Got a Line on

23   You."  "Mechanical World."  "1984."

24          And you're going to see his deposition played, or

25   perhaps we'll bring him up live, and that's what the evidence

1    is going to show.

2           The evidence is also going to show that there's

3    quotes from Mr. Page himself where he talks at length about

4    bands he appreciated, and he's going to tell you how in the

5    late '60s and early '70s, how he appreciated Spirit; how he not

6    only appreciated their albums, plural, but he appreciated their

7    performances.

8           Now, he's going to tell you as he takes the stand or

9    through deposition testimony that he has no recollection

10   whatsoever, and it's your job to use your tools, credibility,

11   to figure out is that a convenient truth or is that a

12   convenient statement or is that the truth in and of itself.

13   And that's what you have to do as jurors.

14          There's two Jimmy Pages in this case that you'll find

15   out.  There's the Jimmy Page in 1970 and the late '60s who

16   appreciated Spirit, who very much liked Spirit, who recognized

17   their music, and there's the Jimmy Page today who has no

18   recollection whatsoever, and then you have the Jimmy Page in

19   heavy questioning who had to admit that, yes, he does know the

20   band intimately well.

21          Now, Mr. Plant is also going to take the stand,

22   either by deposition testimony or possibly put him up live, and

23   you're going to hear how he was hanging out with members of

24   Spirit, where they were drinking together and playing Snooker

25   at Mother's Club in Birmingham, and how he was having such a

113

1    good time with many of the members of the band Spirit, Mark

2    Andes, who's going to be here today; John Locke, he's no longer

3    with us.  He won't be here today.

4          You're going to hear from Jay Ferguson, who's still

5    here today, who was the tambourine man -- that was actually a

6    official job and title of bands in the '60s -- and he was also

7    the singer.

8          And you're going to hear how these guys interacted

9    with Mr. Page and Mr. Plant, how they met Mr. Page and

10   Mr. Plant, how they were a circle of friends, and you're going

11   to hear how Mr. Page and Mr. Plant appreciated this band on an

12   intimate level.

13         Not only did they appreciate them on an intimate

14   level, they took their music, a different song, not the one

15   here today, "Fresh Garbage," different song, and they played it

16   16 times live in their concerts.

17         Now, here's the interesting thing, which you're going

18   to learn from the evidence.  You're going to find out that

19   "Fresh Garbage" was on the same record as "Taurus," and "Fresh

20   Garbage" was Track Number 1 and Track -- excuse me -- "Fresh

21   Garbage" was Track Number 1 and "Taurus" was Track Number 4 on

22   the same side.

23         And you're going to hear Jimmy Page tell you how he

24   has it in his record collection, but he listened to the first

25   song, but turned his ears off for the fourth song and never

114

1   heard that one.

2          And that's the song that's at issue here, because

3   it's so distinct, unique, iconic, and infringed, from our

4   perspective, and I think the evidence will show that to you.

5          Just going back to the Mother's Club, where Robert

6   Plant was at, he had a horrible accident that night and he did

7   wreck his -- I believe it was an Aston Martin or a Jaguar that

8   evening after they did, I guess, have fun, do what young men do

9   who are in rock bands after hours.

10         But in any case, what you're also going to hear is

11  that Robert Plant does not know the band Spirit, does not

12  remember Spirit, does not know Mark Andes, never hung out with

13  Mark Andes.  We haven't even -- excuse me.  We even have

14  pictures of Mr. Plant drinking and hanging out with Mark Andes

15  even at a later date.

16         Mark Andes is going to take the stand.  You can gauge

17  him for his credibility, his honesty.  He's going to say he

18  knows Robert Plant well.  He's going to say he was in bands

19  that Robert Plant was familiar with.  Heart.

20         He's going to say he hung out with him.  He's going

21  to tell you how he hung out with him in the late '60s.  He's

22  going to tell you how he hung out with him in -- December 26,

23  1968, Led Zeppelin's first show on U.S. soil.  You're going to

24  hear about how they interacted.

25         You're also going to hear about how even on their

115

1    first show on U.S. soil, Jimmy Page and Robert Plant and

2    Led Zeppelin were covering "Fresh Garbage" and, as Mr. Page

3    likes to say, chip in a wink, the bands they like, to say,

4    "Hey, we're in the know.  We know what's cool.  We know the

5    music that's hot."

6          And the music that was hot was Spirit, because in

7    1968, December 26, 1968, the first show on U.S. soil, which

8    Robert Plant's going to testify was an exciting time for him,

9    it was like a dream, that Led Zeppelin, that was their first

10   show, but Spirit was like their 300th show, and Spirit was the

11   band who this band, Led Zeppelin, wanted to open for.

12         Well, look, fast forward a few years -- maybe not

13   even a few years, maybe a year -- and there's no denying that

14   Robert Plant is an incredible frontman.  There's no denying

15   that he's charismatic.

16         He'll probably get on the stand or we're going to see

17   him in his deposition.  There's no denying that there was a

18   magic in this group, but what we are denying is that where they

19   took this 2 minutes and 14 seconds was not an original

20   composition, but it was a lifted composition from a

21   lesser-known song today called "Taurus."

22         Couple other pink elephants in the room I'm just

23   going to have to address.

24         You know, this is a song that was written in 1968 and

25   it's floating in everyone's head, "Well, why is this suit

116

1    happening now?  Why now?"  It's really simple.  I'll tell you

2    why it's happening now.  Because there was a change in the law

3    in 2014 which allowed a case to be brought by an owner of a

4    copyright so long as there was continuing infringement or so

5    long as there was infringement that happened in the last three

6    years.

7            You're going to hear a lot about damages and things

8    like that.  It's not the focus of my opening because that's

9    going to be the focus of an economist, a very good economist,

10   and he's going to tell you actually what this song made and how

11   much it's worth.  And Robert Plant and Jimmy Page are well

12   aware of how much it made and what it's worth.  And their

13   corporate defendants, Atlantic Records and Rhino and

14   Warner/Chappell, they're well aware of the significance of the

15   song and how much it's worth.  But I'll leave that to the

16   experts to talk about.

17           From our perspective, I said in the beginning, give

18   credit where credit's due.  It's always been about credit, and

19   that's what this case is about as I stand here today and that's

20   what this case is going to be about when you deliberate and

21   when you make up your mind, and we'll ask that you put

22   plaintiff in the position he should be in had he been credited

23   with being the writer of that song.

24           Now, he's no longer with us today.  He died.  We're

25   not going to get into that right now at this part of the case,

117

```
1    and part of that is -- it may influence your decision, might
2    have a passionate appeal, and that's okay because we don't need
3    to do that.  We can stand on the facts in this case.
4         But why this case was brought now is there was a
5    change in the law, and as a fiduciary, Mr. Michael Skidmore had
6    an absolute duty to bring the case because if he didn't, he
7    wouldn't be doing that which he had to do in representing the
8    Trust and the interests of the Trust.
9         You're also going to hear about things from members
10   of Randy Wolfe's family.  In fact, Mick Skidmore is also from
11   London -- excuse me, Michael Skidmore, Mr. Skidmore.  I know
12   him as Mick, I apologize.  And you're going to hear how he was
13   one of the biggest fans of Spirit, how he loved Spirit, how he
14   appreciated Spirit.
15        And you're going to hear also from family members of
16   Randy Wolfe, his sisters, and they're going to tell you about
17   how when Randy died, the ownership of all his intellectual
18   property went to his mother, Bernice.  And then with Ventura
19   County, they set up a trust, and eventually the Trust received
20   all of the intellectual property, including his copyrights.
21        And at the time, you know, the mother and the family
22   wanted to do the best thing that they could for the Trust.  And
23   it's not a -- in doing the right thing for the Trust, it was to
24   set up certain goals.  It was to preserve, promote, perpetuate
25   the spirit of Randy California.
```

118

```
1          And after they called many different people and

2     discussed it with many different people, the family members,

3     the mother, the sisters, other relatives, and friends of the

4     band who you're going to hear from, they all said, "There's a

5     gentleman called Michael Skidmore, who is a journalist, and

6     he's probably the biggest fan of Spirit, and if anyone is going

7     to promote and preserve this man Randy California's legacy and

8     memory, it would be him." And that's why he is the plaintiff,

9     and I give him a lot of credit.

10          Let me just move to access and -- excuse me. Let me

11    move to access and substantial similarity. We talked about

12    access. What does that mean? Is that -- did Mr. Jimmy Page

13    and Mr. Robert Plant have access to the song "Taurus"? Of

14    course they did. He owned their album, you know? He played

15    with them live. He opened for them. He heard about them on

16    the radio. He hung out with these guys.

17          To prove the element of access, it's was there a mere

18    possibility of access, and here there's more than a mere

19    possibility of access. The guy owns the guy's record. The guy

20    played his songs in concert.

21          You're going to hear about how there was no other

22    rock band Jimmy Page or Robert Plant covered, none other than

23    Spirit and a lesser-known band NRBQ, which may or may not be a

24    rock band. However, they did cover a lot of other musicians,

25    mostly Mississippi black Delta blues players. We might get
```

119

1   into that later on in this case, and it's something just to

2   think about.

3           To be fair to Led Zeppelin, to be fair to Jimmy Page,

4   to be fair to Robert Plant, there's performers like Elvis

5   Presley who never wrote a song, but was an amazing performer

6   and had such an incredible way of articulating music and

7   evoking emotion that maybe no one else since him has been able

8   to do that.  Maybe Michael Jackson, maybe Robert Plant emulated

9   to a degree, but those are performers and then you have

10  songwriters.

11          You know, when you think about Elvis Presley "Hound

12  Dog" or Elvis Presley -- or Jerry Lee Lewis "Great Balls of

13  Fire," they didn't write those songs.  They're performers,

14  incredible performers, incredible musicians.  Jimmy Page,

15  Robert Plant, incredible performers, incredible musicians, but

16  they covered other people's music and tried to make it their

17  own.

18          Now, let's go to -- let's go to a couple of things.

19  I'm just going to identify shows that these guys played

20  together at.  When I say "these guys," I mean Led Zeppelin and

21  the band Spirit.

22          Their first show on U.S. soil was December 26, 1968,

23  in Denver, Colorado.  That's a show where Led Zeppelin opened

24  for Spirit.  That's a show where the song "Taurus" was played.

25          You're going to hear about that from Mark Andes,

 1    who's going to take the stand, who was a life-long musician,

 2    played in Canned Heat, played in Spirit, played in Jo Jo Gunne,

 3    played in Firefall, and played in the band Heart, who Robert

 4    Plant's very familiar with.

 5            You're also going to hear about a show that occurred

 6    at the Atlanta Pop Festival in '69, as well, where they played

 7    together.  In fact, Led Zeppelin followed Spirit in that

 8    concert, and you're also going to hear about interactions

 9    between Robert Plant and Jimmy Page and the members of Spirit,

10    especially Mark Andes, who's going to take the stand.

11            They also played together at Texas International Pop

12    Festival.  They also played together -- or there's evidence

13    they may have played together or they were on the bill at three

14    other shows, the Detroit Speed Press, Northern California Pop

15    Festival, and also the Seattle Pop Festival.

16            Now, when we talk about substantial similarity, I'm

17    shifting the focus away from access to whether or not these

18    pieces are substantially similar.  And what I'd like to do is

19    to give you some framework of what substantial similarity

20    means.

21            But before I do that, I'm going to pull up certain

22    videos and I'm going to play them for you.  And the first video

23    is going to be Part A of "Stairway to Heaven" being played on

24    the acoustic guitar.

25            Don't cue that up just yet.  Give me a second.

121

```
1            THE COURT:  And, counsel, you have about five more

2    minutes on opening statements.

3            MR. MALOFIY:  Okay.  Let's cue it up right away then.

4            MR. ANDERSON:  Your Honor, counsel handed me just

5    before he took the lectern a list of exhibits that he plans on

6    playing.  I don't think any of them are on the joint exhibit

7    list.

8            THE COURT:  I don't know if they are or not.  Okay.

9            MR. MALOFIY:  I tried to --

10           THE COURT:  Okay.  There's no problem.  If you

11   mention something or produce something in opening statement

12   that is not produced into evidence during the trial, it's

13   grounds for a mistrial.  So there's no problem.

14           If it's going to be received into evidence, that's

15   fine; if it's not going to be received into evidence, it's

16   grounds for mistrial.

17           MR. MALOFIY:  We did exchange this with counsel and

18   counsel did not exchange his documents with us even as I stand

19   here today.

20           THE COURT:  Counsel, I'm not going to get into that

21   at this time --

22           MR. MALOFIY:  Understood, Your Honor.

23           THE COURT:  -- but you do have about five more

24   minutes.

25           MR. MALOFIY:  Yes.
```

122

```
1            Play "Stairway to Heaven" Part A for the jury.

2            I think we're having a technical issue.

3            Do we have to turn the monitors on or something?

4       (The Court and clerk confer off the record.)

5            THE COURT:  Okay.  Counsel, the monitor is on now.

6            TECHNOLOGIST:  It's not on.

7       (Counsel and technologist confer off the record.)

8            THE COURT:  Gotta love technology, counsel.

9            TECHNOLOGIST:  I don't even hear or see on the

10      screen, but it's playing on the second monitor right now.

11           THE COURT:  It's the connection or something.  But we

12      can proceed with opening statement and you can play it during

13      evidence.

14      (Counsel and technologist confer off the record.)

15           MR. MALOFIY:  Well, I'm going to talk to you about

16      what's substantially similar, and it will come out during the

17      course of this trial.  I wish I could play it for you right

18      now.  Apparently, that's not happening for tech issues, and I

19      apologize for that.  I very much would like you to see this.

20           With that being said, let me talk to you about

21      substantial similarity.  What we have in this song called

22      "Stairway to Heaven" is a Part A.  It's a descending chromatic

23      line, used in music before, but if it's used in original and

24      creative ways, it's protectable.

25           The descending chromatic line in "Stairway" -- excuse
```

123

1    me -- in "Taurus" is used in an original and creative way,

2    which makes it protectable expression.

3          The descending chromatic line in "Stairway to Heaven"

4    also was used in a very similar -- substantial similar way to

5    "Taurus's" song.  And that's what's important here.  And when

6    you hear it, you can be the judge, but this descending line was

7    used in an original, creative way.

8          The reason it's original and creative is that -- is

9    two part.  One is that the chromatic line as it is followed

10   does not go to the fifth.  Just remember that.

11         It starts on the A, it doesn't go to the A, it

12   doesn't go to the fifth.  And that's what creates a very unique

13   chord progression which keeps the listener wanting more.

14         There's going to be prior art which defendants are

15   going to play and all those songs go to the fifth, and neither

16   "Stairway" nor "Taurus" go to the fifth.

17         Now, that's musicological terms.  I'm sharing them

18   with you now so when our experts talk about them, you know what

19   they're talking about.

20         Besides that, there's something called these three

21   note pairs.  And it's not because our experts say the three

22   note pairs are important, it's because defendants' own experts,

23   who were paid nearly a hundred thousand dollars for their

24   opinion, found these three note pairs in "Stairway to Heaven"

25   and said the AB -- that's one pair -- BC, C to F-sharp, are the

124

1   most memorable and distinct parts of Part A of "Stairway to

2   Heaven."

3          And what's interesting is that although he was paid

4   80-plus thousand dollars for his opinion, when he analyzed the

5   music and the sheet music of "Taurus," he decided to take the

6   whole upper staff and discount it and not look at any of those

7   notes, take 58 percent of the notes, throw them away, just

8   consider the bottom staff.

9          And when we look at music, there's two staffs.  We

10  have a treble clef and a bass clef.  Their expert knocked out

11  the whole treble clef, but he focused on the treble clef or the

12  ascending line in "Stairway to Heaven," and that ascending line

13  was an AB, BC, C to F-sharp pair.

14         In this case, when I questioned their experts heavily

15  and I showed them the sheet music and I instructed them to

16  circle the first AB pair in the "Taurus" music, they were able

17  to do it.  And when I said, "Now circle the BC pair," they were

18  able -- they circled it, both -- both their experts.  And when

19  I said, "Circle the C to F-sharp pair," they were able to

20  circle it.

21         And it was those three note pairs which allow and

22  create a very unique ascending line in "Stairway to Heaven"

23  which is also present in "Taurus," but the difference is when

24  they provided their 200-page report, instead of looking at both

25  staves of music, the treble clef and the bass clef, they

125

1   decided to strike the whole treble clef and say it's not

2   important.  Well, obviously it wasn't important because it led

3   to a conclusion that the two songs were substantially similar.

4          I wish I could play you that audio clip right now or

5   even the video clip.  I'm not able to do so.  I'm very upset by

6   that.  I'm not going to show that.  However, let me talk about

7   a few other things before I wrap up.

8          Throughout the course of this case, defendants tried

9   to bust the Trust at every step they could.  They failed.

10         THE COURT:  Counsel, that's argument.

11         MR. MALOFIY:  All right.  I was going to show what

12  the evidence is going to show, Your Honor.

13         THE COURT:  You can tell us what the evidence is

14  going --

15         MR. MALOFIY:  The evidence is going to show that

16  throughout -- in this case, the defendants tried to bust the

17  Trust.  It didn't work.

18         The evidence is going to show that defendants tried

19  to say that Randy California didn't own the copyright.

20         Defendants -- in this case, the evidence is going to

21  show that defense counsel, both Mr. Anderson and Mr. Freeman

22  [sic], worked with Universal Music Group and Rondor Music and

23  plaintiff's publisher to try to extinguish plaintiff of the

24  copyright in "Taurus" and did so most recently.

25         And we're going to bring them on the stand and we're

126

```
1   going to question them as to these issues, because it was

2   underhanded, it was duplicitous, and it should have never

3   happened.

4        And you're going to hear about that.  And you're

5   going to hear why their expert, Dr. Ferrara, had done a

6   musicological analysis for Universal Music Group and then

7   Universal Music Group tried to extinguish the Trust of its

8   copyright.  Those are also things you're going to hear about.

9        Now, let me just stay focused on a couple of things.

10       The most memorable and distinct pairs or what makes

11  "Stairway" unique is the AB, BC, C to F-sharp pair.  You're

12  going to hear about that.  What makes it unique is it doesn't

13  go to the fifth.  You're going to hear about that, and you're

14  also going to see that.  What also makes it unique and distinct

15  is the composition itself is done in a very unique and creative

16  way.

17       We'll have pictures and other things to show you.

18  We'll talk about damages later, but for the most part, that

19  sums it up.

20       I'm going to give one last-ditch effort to see if I

21  can get this audio or video to play.

22       (Counsel and technologist confer off the record.)

23       MR. MALOFIY:  I apologize, Your Honor.  I apologize

24  to the jury.

25       THE COURT:  Okay.  Counsel, we'll go on.  You can
```

127

```
 1   present it then when you present the evidence and play it for
 2   them at that time.
 3           Thank you very much, counsel.
 4           MR. MALOFIY:  Thank you, Your Honor.
 5           I guess we had to do it the old-fashioned way without
 6   the tech, but I promise you we will get this sorted out, and I
 7   thank you for your patience.  We'll just have to keep you
 8   wanting.
 9           THE COURT:  Okay.  Thank you, counsel.
10           Counsel, opening statement.
11           TECHNOLOGIST:  Here we go.
12           THE COURT:  You have it working now?
13           MR. MALOFIY:  If I could, I would very much
14   appreciate being able to play that, Your Honor.
15           THE COURT:  If it's working right now, you can play
16   it.
17           MR. MALOFIY:  Thank you, Your Honor.
18           Sorry for the cliffhanger.
19           This is "Stairway to Heaven," Part A, as performed by
20   our session guitarist and expert in this case, who will take
21   the stand later on in this case.
22           "Stairway to Heaven," Part A.
23           Can you play that?
24       (Playing of videotape.)
25           MR. MALOFIY:  And now we're going to play you what is
```

128

```
 1    in the bass clef of the "Taurus" deposit copy.
 2              Play that.
 3         (Playing of videotape.)
 4              MR. MALOFIY:  And now if we let it go.
 5              Play that together.
 6         (Playing of videotape.)
 7              MR. MALOFIY:  Now, those were the two pieces played
 8    together.  If we focus on --
 9              THE COURT:  Counsel, you're going to have to wrap it
10    up.  You're way over your time limit.  You've been able to play
11    it for them.  You've already argued it.  Let's go ahead.
12              MR. MALOFIY:  Two minutes, Your Honor?
13              THE COURT:  No.
14              MR. MALOFIY:  Okay.  Very well.  Thank you.  I
15    appreciate it.  Thank you for your patience.
16              THE COURT:  Counsel.
17              MR. ANDERSON:  Thank you, Your Honor.
18              Forty-five years ago, Jimmy Page and Robert Plant
19    wrote some of the greatest songs in rock and roll history.  One
20    of those songs is "Stairway to Heaven," and now almost half a
21    century later, they're being sued over it.
22              My name is Peter Anderson.  With me is Helene
23    Freeman, and we're honored and proud to represent Mr. Page and
24    Plant, and I'm honored and proud to represent Warner/Chappell
25    Music, Atlantic Recording Company, and Rhino Entertainment.
```

129

```
1              I'd like to introduce Nathan Osher, who is the
2     representative of Warner/Chappell, and with him is Brad Cohen,
3     who is here on behalf of Atlantic and Rhino.
4              This is the only time that I'll be able to talk to
5     you directly until the end of the case and after all of the
6     evidence is in.
7              The statements that I am making to you, like the
8     statements that Mr. Malofiy made to you, are promises.  They're
9     promises of what the evidence is going to show.  And when we're
10    finished at the end of this week or early next week, I'm going
11    to ask you who kept their promises and which promises weren't
12    kept.
13             Now, we can't all talk at the same time.  We can't
14    just throw a bunch of evidence at you.  We have to do this in a
15    series.  Plaintiff is going to put on his evidence and then
16    we're going to put on ours.
17             There are two sides to every story, and as Judge
18    Klausner told you, it's very important that you keep an open
19    mind.  Do not make a decision until you are actually
20    deliberating and you've heard all of the evidence.
21             It wouldn't be fair to make a decision based on just
22    what you've heard from the plaintiff without hearing the
23    evidence that we have.  We have evidence and we have witnesses
24    that are very, very important, and we want you to keep an open
25    mind until you actually have the opportunity to hear them.
```

130

1        Now, what I'm going to try and do is sort of

2   summarize the evidence for you -- summarize -- give you an idea

3   of the high points, just as the judge said.

4        And first and foremost, the high point is that

5   "Stairway to Heaven" was written by Jimmy Page and Robert Plant

6   and them alone, period.

7        The evidence will show -- and both of them will

8   testify -- the evidence will show the process that they went

9   through in creating it.

10        You'll hear from John Paul Jones, the only other

11   surviving member of Led Zeppelin, who was there at the time

12   during rehearsals, and you'll hear recordings where you'll see

13   the process, you'll hear the process, of this song being made.

14        Now, the evidence will also show that Mr. Skidmore

15   and the Trust don't own the "Taurus" copyright.  You will hear

16   that -- you will see from certified court records, perhaps even

17   from the testimony of Mr. Skidmore and from documents produced,

18   that the copyright is actually owned by a company called

19   Hollenbeck Music.

20        Hollenbeck Music is a company owned by Lou Adler, who

21   is a titan in the music industry, and Hollenbeck has owned the

22   copyright in the "Taurus" composition since 1967, when it was

23   registered with the United States Copyright Office.

24        In all that time, and despite having the ability to

25   file a lawsuit, Hollenbeck and Mr. Adler never filed a lawsuit.

131

```
1    Randy Wolfe never filed a lawsuit.
2              Now, as counsel said, he did pass away, and there is
3    a trust that got the rights to some of his royalties.  And
4    that's the basis, the evidence will show, that Mr. Skidmore is
5    now, almost half a century later, claiming the ability to file
6    a lawsuit for copyright infringement over "Stairway to Heaven."
7              The evidence will also show how the Trust got those
8    rights.  Randy Craig -- Randy Wolfe, excuse me, died in the
9    1990s and he had no wife and he had one son named Quinn Wolfe.
10             Under the very court records that counsel was
11   alluding to, the royalty rights that the Trust now has were
12   supposed to go to Quinn, to Quinn Wolfe, Randy's only son and
13   his only heir.
14             The evidence will show tragically that Quinn Wolfe's
15   own grandmother used the Trust to keep Randy's son -- Randy
16   Wolfe's son -- excuse me, Your Honor -- from getting those
17   royalty rights.  That is important to one of the defenses that
18   the defendants have.  It's called unclean hands, and it's when
19   you get some property and then you try to sue on it, but you
20   got it in an improper way.
21             Now, another important defense is independent
22   creation.  And what that means is that Mr. Page and Mr. Plant
23   created "Stairway to Heaven" independently, without resort to
24   "Taurus" and without copying anything in "Taurus."
25             The evidence will show that -- well, actually, I
```

1   should start with this.  We have a challenge here.  We are

2   talking about events that were 45 years ago.  Forty-five years

3   is, obviously, a long time, and witnesses have died.

4          Randy Wolfe has died, John Bonham has died, members

5   of Spirit have passed away.  Documents have been lost in the

6   nearly half century that has passed.  But enough evidence

7   remains, and we intend to produce it, to show that history

8   cannot be rewritten and that "Stairway to Heaven" was, in fact,

9   created by Jimmy Page and Robert Plant.

10          Now, the evidence is going to show that the bands --

11   the paths of the bands Led Zeppelin and Spirit very

12   infrequently crossed.  We're talking about maybe three times.

13   And the evidence is going to show from those people that are

14   still alive that there is no real convincing evidence at all

15   that "Taurus" was ever performed at any of those occasions

16   where the two groups appeared.

17          That's important, because the question is copyright

18   requires copying, and if "Taurus" was not performed at these

19   concerts, all of the concerts that we're talking about are

20   basically irrelevant.

21          The -- and there's a reason why "Taurus" wasn't

22   performed.  You'll hear that when a group tours, as Spirit

23   tours, it tours to support the album that it has just released.

24   It plays songs from that album.

25          And you will hear evidence that the typical set list,

133

1    the list of songs that Spirit played, did not include "Taurus."

2    It included their hit songs and the songs that were on their

3    latest album.

4              Now, we heard Mr. Skidmore's counsel mention a

5    called -- a song called "Fresh Garbage."  You will hear

6    evidence that "Fresh Garbage" was on what's called a

7    compilation album that was popular in England in the late

8    1960s.

9              A compilation album is an album that compiles

10   different songs from different groups.  They are completely

11   unrelated.  "Fresh Garbage" in this compilation album -- when

12   it appeared in this compilation album was not a Spirit release.

13   It had only "Fresh Garbage" plus it had songs from Paul

14   Butterfield and other groups.

15             We know that album existed not only because Mr. Plant

16   will testify to it, but I expect that Mr. Skidmore will

17   testify, being an Englishman, that he also knew about this

18   compilation album.

19             "Taurus," the song that matters, was not on the

20   compilation album.  Led Zeppelin knew about the song "Fresh

21   Garbage" because of the compilation album, not because of

22   hearing it anywhere else, and, in fact, "Taurus" was not played

23   on the radio because it was never released as a single.

24             Now, counsel talked about covers, and I should

25   explain that when a group covers another group, it means that

134

1  they play a song from another group, and in most circumstances

2  that is completely lawful.

3          When Elvis Presley, when he was alive, gets up and

4  plays in Las Vegas and plays a song that, you know, someone

5  else wrote, that's completely lawful. And, in fact, Spirit

6  repeatedly covered bands by playing the Beatles, Bob Dillon,

7  and other songs in concerts. There's nothing wrong with that.

8          There is nothing wrong if Led Zeppelin had decided to

9  perform the entirety of "Fresh Garbage." And they never did

10 that, by the way. What happened was that -- the evidence will

11 show that what happened was they played a medley called "As

12 Long as I Have You" that included a short bass riff of a few

13 seconds in that medley. That's all that we're really talking

14 about. Someone heard "Fresh Garbage" in England and liked the

15 bass riff and so it was used in a medley.

16         Now, Mr. Skidmore's counsel also referred to the fact

17 that Mr. Page, in the course of this litigation, testified that

18 he now has the first Spirit album.

19         The evidence will show that Mr. Page has a collection

20 of thousands of albums that have accumulated over the years,

21 that people have left in his house, that his daughter left

22 behind when she grew up and moved out, and that there is no

23 evidence at all that the fact that he has a Spirit album now

24 means he had it 40 years ago or 45 or 50 years ago.

25         All that Mr. Page's testimony tells you is that he is

135

1    an honest person, and he admitted having an album even though

2    counsel would raise it in an opening statement.

3           We expect that the preponderance of the evidence will

4    show that Mr. Page and Mr. Plant did not hear "Taurus" until

5    decades later and after they -- long after they wrote "Stairway

6    to Heaven."

7           There is another important issue, though, which is

8    that the -- whether the portion that plaintiff contends was

9    copied is even copyrightable.  What you will learn in the

10    course of this case and what Judge Klausner, I expect, will

11    instruct you is that copyright only protects the original

12    material added by someone who created the work.

13           Counsel has alluded to a descending chromatic line.

14    A descending chromatic line, as baffling as that may sound, is

15    actually something that appears in all kinds of songs.  It goes

16    back centuries.

17           A chromatic scale is -- we've all seen pianos and

18    black and white keys.  A chromatic scale is simply playing all

19    of the keys, and a chromatic -- descending chromatic line is

20    such a commonplace thing that it actually has another term in

21    music, which is called minor line cliché, the "cliché" being

22    the important part.

23           Minor line clichés and descending chromatic lines

24    appear in all kinds of works.  They appear in the Beatles, in

25    "Michelle," for example.  And, coincidently or not, "Michelle"

136

1  came out before "Taurus" and the Beatles were a favorite group

2  of Randy California -- Randy Wolfe and the band Spirit.  They

3  covered Beatles songs.

4        Randy Wolfe did not have to pay the Beatles to use a

5  descending chromatic scale.  He did not have to pay anyone else

6  who had previously used a descending chromatic scale in order

7  to use one in "Taurus."

8        Now, there -- I do expect you'll hear evidence from

9  plaintiff's expert or experts about two notes, A and B,

10  appearing in one place, and other pairs of notes appearing in

11  other places, and evidence from our expert that when they are

12  in the right place, they create something special.

13        And that something special is what Mr. Page did with

14  this chromatic scale.  He did something different, something

15  completely different from "Taurus."

16        He has the descending chromatic line and ascending

17  notes.  What plaintiff -- the evidence will show that what

18  plaintiff is now talking about, those notes are in the wrong

19  place in "Taurus."  They don't sound the same, and you will

20  hear that for yourself.

21        Now, you will hear things that you may think are

22  similar, but the issue here and the evidence will show that any

23  similarities are not because of anything that Randy Wolfe did,

24  they are because of basic musicological devices, music devices,

25  things like arpeggios, which even plaintiff's experts agree are

137

1    completely commonplace; things like descending chromatic

2    scales, which one of plaintiff's experts agrees is completely

3    commonplace.  These things are not protectable.

4         In fact, one of the things that's been pointed out by

5    plaintiff's experts is, basically, Do Re Mi.  That appears in

6    both songs.

7         Now, one of the people that you will hear from is a

8    nationally renowned musicologist named Dr. Lawrence Ferrara.

9         Dr. Ferrara will take you through the music.  He

10   teaches at the New York University's music school, and he will

11   carefully explain and take us through the music and explain why

12   the claimed similarities are similarities only in things that

13   aren't protectable.

14        He will take us through the music and demonstrate, I

15   expect very forcibly, that those kinds of things have appeared

16   in music for decades, popular songs that -- in fact, some of us

17   may even recognize them -- going back to songs that were

18   popular in the 1700s, in the 1600s.

19        In the course of this case, the evidence will show

20   that plaintiff's claims have sort of changed.  Initially, we

21   will show you a document that Mr. Skidmore claimed that the

22   entirety of "Stairway to Heaven" was copied from "Taurus," and

23   we've seen that shrink to the first 2 minutes and 14 seconds.

24        Counsel has played something for you.  What we'd like

25   to play now is the first 2 minutes and 14 seconds of "Stairway

138

1    to Heaven."

2         *(Playing of audiotape.)*

3              MR. ANDERSON:  Thank you.

4              And now we'd like to play for you -- counsel played

5    what he described as the bass clef from the "Taurus" deposit

6    copy.  The "Taurus" deposit copy is what is copyright- -- is

7    the copyrighted work here.

8              In 1967, the evidence will show Mr. Hollenbeck --

9    excuse me, Mr. Adler's company, Hollenbeck, deposited with The

10   United States Copyright Office a one-page sheet of music.  That

11   is the copyrighted work.

12             And what we are about to play is Dr. Lawrence

13   Ferrara's performance of that sheet music.

14             This is the copyrighted work.

15        *(Playing of audio recording.)*

16             MR. ANDERSON:  That is the work that the plaintiff

17   contends was copied to make "Stairway to Heaven."

18             Now, we expect that you'll hear witnesses not only as

19   to the issue of copying, but as to the defenses that the

20   defendants have.  I've mentioned two of them.  One is unclean

21   hands; the other one is independent creation.

22             There are a couple of other ones that I just want to

23   briefly mention.  One is that if you decide any of that was

24   copied in "Stairway to Heaven," that the copying was so minor

25   it's insubstantial, and it doesn't -- it's what's called a

139

1    de minimis use.

2           And the other is that if you decide that any portion

3    of that was used to create a new and different work that was

4    musically a different message, something completely different,

5    which I -- well, I won't go on with that other than to say

6    you've heard it and you will hear more of it.  That is what the

7    law calls a fair use.

8           We expect that that will not -- those defenses won't

9    come into play, because we think the evidence is very clear

10   that there was no copying in the first place.

11          Now, I also don't want to spend too much time on

12   damages and the profits that Mr. Skidmore seeks in this case

13   from "Stairway to Heaven."  We expect that, with the evidence,

14   that you'll never get that far, that you'll determine that

15   there was no copying.

16          But I do want to mention the people you'll -- at

17   least some of the people you'll hear from.

18          You will hear from employees of Warner/Chappell and

19   of Rhino Entertainment, not retained experts, not people who

20   are paid to come in and testify as to financials and economics.

21   And these witnesses are people like Jeremy Blietz, whose name I

22   mentioned before, and David Woerhaye.

23          Now, if you do get to the issue of profits, you'll be

24   instructed, I expect, to decide what portion of profits are

25   attributable to the "Taurus" composition you heard and what

140

```
 1   profits are attributable to the other things that counsel
 2   admits are fantastic and marvelous in "Stairway to Heaven,"
 3   things like all of the other music in the remaining six minutes
 4   of that epic song, things like the performances of Jimmy Page,
 5   who counsel says -- acknowledged is a great and talented
 6   musician.  Things like the lyrics.  There were no lyrics in the
 7   "Taurus" recording or "Taurus" -- excuse me, the "Taurus"
 8   deposit copy, no lyrics at all.  The lyrics were -- in
 9   "Stairway to Heaven" were important, are important, and they
10   were created by Robert Plant.
11          So you'll have this allocation issue if you get to
12   the issue of profits, and one of the witnesses who will testify
13   to that that you'll hear is Rob Mathes.
14          Rob Mathes is an Emmy-winning musical director,
15   arranger, professional guitarist who initially, after leaving
16   the Berkeley School of Music, played with Chuck Mangione.  He
17   has either played with or arranged music for everyone from
18   Sting to Aretha Franklin to Bruce Springsteen.  He is the --
19   was the musical director of the Kennedy Center Honors.  He
20   arranged and musically directed the inaugural concert
21   celebration for President Obama.
22          He will talk about how that song is made up of
23   multiple important parts, how it builds, and how it has a --
24   its appeal and its essence from all these different things
25   coming together, and he'll be able to talk about not only
```

141

1    parts, but the entirety of "Stairway to Heaven" and how it

2    stands as a monumental work of music, a monumental achievement

3    by these two gentlemen (indicating).

4              Now, you've been --

5              THE COURT:  About five minutes, counsel.

6              MR. ANDERSON:  Just wrapping up, Your Honor.  Thank

7    you.

8              You've been very patient and I just want to remind

9    you of three things.

10             Again, please keep an open mind.  We have evidence,

11   too.  Wait to hear from us.

12             Second, nobody owns common musical elements.  If you

13   hear things, then the next question -- that you think are

14   similar, the next question is, "Well, what are those?  Are

15   those common musical elements?  Are they Do Re Mi or are they

16   something that's original?"  And you'll hear from experts who

17   will talk about that.

18             And the third thing is Mr. Skidmore does not own the

19   copyright and his Trust does not own the copyright in the

20   "Taurus" musical composition.  Hollenbeck owns it and has never

21   filed a lawsuit.

22             Thank you for your attention, thank you for your

23   service in this case, and thank you for taking the time to

24   listen to me.

25             THE COURT:  Thank you, counsel.

142

```
 1              Ladies and gentlemen, we're going to break at this
 2    time, about 15 minutes, and when you come on back, we'll go
 3    right into the evidence.
 4              Remember the admonishment not to discuss the case
 5    among yourselves or with anybody else or form or express any
 6    opinions about the matter until it's submitted to you and you
 7    retire to the jury room.
 8              We'll take about 15 minutes and we'll see you back
 9    then.
10              We'll be in recess.
11              THE CLERK:  All rise.
12         (Jury out at 2:36 P.M.)
13         (Recess taken 2:36 to 2:53 P.M.)
14         (Jury in at 2:53 P.M.)
15              THE COURT:  Okay.  The record will reflect that all
16    of the members of the jury are in their respective seats in the
17    jury box.
18              And we've heard the opening statement.  Now we're
19    getting into what we talked about before, what the evidence is
20    that you're to use to determine what the facts of the case are.
21    And the evidence, as you know, comes from the mouths of
22    witnesses or exhibits or anything that's agreed to and only
23    from that area.
24              So at this time we're about ready to hear that
25    evidence by -- through the mouths of the witnesses.
```

143

```
1            Counsel, do you want to call your first witness.

2            MR. KULIK:  Thank you, Your Honor.

3            The plaintiff will call Janet Wolfe to the stand.

4            THE COURT:  Okay.

5            THE CLERK:  Please raise your right hand.

6            Do you solemnly swear that the testimony you shall

7    give in the cause now before this Court shall be the truth, the

8    whole truth, and nothing but the truth, so help you God?

9            THE WITNESS:  Yes, I do.

10           THE CLERK:  Please be seated.

11           Please state your full name and spell your last name

12   for the record.

13           THE WITNESS:  My name is Janet Wolfe, and my last

14   name is spelled W-O-L-F-E.

15           THE COURT:  Okay.  Counsel, you may inquire.

16           MR. KULIK:  Thank you, Your Honor.

17                        JANET WOLFE,

18                having been first duly sworn,

19                  testified as follows:

20                  DIRECT EXAMINATION

21   BY MR. KULIK:

22   Q.   Good afternoon.

23   A.   Good afternoon.

24   Q.   Where do you live at the present time?

25   A.   I live in Ventura, California.
```

144

```
 1    Q.    And what do you do for a living?

 2    A.    I'm a horse trainer.

 3    Q.    How long have you been a horse trainer?

 4    A.    Around 40 years.

 5    Q.    Are you related to Randy Craig Wolfe?

 6    A.    Yes, I am.

 7    Q.    How are you related?

 8    A.    He was my brother.

 9    Q.    What is the age difference between the two of you?

10    A.    He was three years older than me.

11    Q.    Did Randy have any other siblings?

12    A.    Yes, he did.

13    Q.    And who were those siblings?

14    A.    My older sister Andrea and my younger sister Marla.

15    Q.    And how much older or younger than Randy are they?

16    A.    My older sister Andrea is a year younger than Randy and

17    Marla is seven years younger than Randy.

18    Q.    As children, were you and Randy close?

19    A.    Very close.

20    Q.    As adults, were you and Randy close?

21    A.    Yes.

22    Q.    Did you ever perform with Randy?

23    A.    Yes, I did.

24    Q.    Would you please describe what you did with Randy

25    professionally.
```

145

A.   I recorded with him on some albums, but we grew up singing

together since we were children.

Q.   Did you grow up in a musical family?

A.   Yes, we did.

Q.   Would you describe that, please.

A.   My mother was a classical pianist and she also played

guitar, and my uncle, Ed Pearl, owned a famous club in Los

Angeles called the Ash Grove on Melrose Avenue.  So we had

musicians in our home all the time.

     And Randy was a musical child prodigy and he would

get lessons from these people as a child, because they came to

our home for dinner and also for staying over while they were

performing at the Ash Grove.

Q.   And what kind of musicians are you talking about?

A.   Blues musicians, folk music, bluegrass, rhythm and blues.

Q.   Did you ever record on any of Randy's albums?

A.   Yes, I did.

Q.   Can you tell me which albums, please?

A.   I recorded on his 1972 album called *Kapt. Kopter and the

Twirly Birds*, which was his tribute album to his dear friend

Jimi Hendrix.

Q.   Anything else?

A.   Yes.

Q.   What else?

A.   In 1989, I recorded with him on his *Rapture in the Chamber*

146

```
 1   albums.

 2   Q.   Any other recordings?

 3   A.   Yes, I did.

 4   Q.   What other recordings?

 5   A.   I recorded an old blues song with him in October of 1996

 6   by Blind Lemon Jefferson called "On Your Bond."

 7   Q.   And did you record other songs that were just never

 8   released?

 9   A.   Yes, I did.

10   Q.   I'd like to direct your attention, please, to 1966.

11        At the beginning of the year, where was your family

12   living?

13   A.   We were living in Santa Monica, California.

14   Q.   At some point that year, did the family travel outside of

15   California?

16   A.   Yes, we did.

17   Q.   And where did you go?

18   A.   We went to New York.

19   Q.   And when you say "we," who went?

20   A.   My stepfather, Ed Cassidy; my mother, Bernice Pearl; my

21   brother, Randy California -- well, Randy Wolfe then; my sister

22   Andrea; and my sister Marla.

23   Q.   What was the purpose of the trip to New York?

24   A.   My stepfather, Ed Cassidy, was a jazz drummer, and he felt

25   that there was no jazz scene out in Los Angeles, so he thought
```

147

```
 1    it would be better in New York for him.
 2    Q.    Do you approximately -- do you remember approximately when
 3    the family went to New York?
 4    A.    In spring -- in the spring of 1966.
 5    Q.    And when you were in New York, where did you live?
 6    A.    We lived in Queens in a basement apartment.
 7    Q.    At some point while you were in New York, did Randy meet
 8    someone who would become influential in his career?
 9    A.    Yes, he did.
10    Q.    Who did he meet?
11    A.    He met Jimi Hendrix.
12    Q.    How did that occur?
13    A.    Randy's one guitar was lost in shipping when we were going
14    to New York, and my mother took us to Manny's guitar store in
15    New York City and he was playing guitar there, and a man walked
16    up to him and picked up a guitar and started playing with him.
17    Q.    Were you present?
18    A.    Yes.
19    Q.    And who was that man?
20    A.    Jimi Hendrix.
21    Q.    What was the age difference between Randy and Jimi
22    Hendrix?
23    A.    Approximately nine years.
24    Q.    How old was Randy at the time?
25    A.    He had just turned 15.
```

148

```
1    Q.    What month was his birthday?

2    A.    February.

3    Q.    And when did you go to New York again?

4    A.    Early spring.

5    Q.    How long did the family remain in New York?

6    A.    Through the summer.

7    Q.    During the summer, did Randy play music with Jimi Hendrix?

8    A.    Yes, he did.

9    Q.    Can you describe what they did together?

10   A.    They played at the Cafe Wha? in Greenwich Village in New

11   York.

12   Q.    How often?

13   A.    Seven nights a week.

14   Q.    Did you attend some of those shows?

15   A.    Yes, I did.

16   Q.    Now, there's been some reference during the course of the

17   trial to the name Randy California.

18         Could you tell me, who is Randy California?

19   A.    Well, that's the name that Jimi Hendrix gave my brother in

20   his band, because there were two Randys in the band and one of

21   them was from Texas and the other one was from California, my

22   brother.  So the moniker stuck throughout his life.

23   Q.    At the end of summer, what happened to your brother and

24   his performing with Jimi Hendrix?

25   A.    A famous British rock musician named Chas Chandler of the
```

149

```
1    Animals discovered Jimi and asked him to come to England with
2    him, and Jimi wanted to take my brother Randy with him.  And
3    Jimi called my mother and my mother said no because he was only
4    15 years old.
5    Q.   What did the family do at that point at the end of the
6    summer?
7    A.   We decided to go back to California.
8    Q.   And where did you return to California?  Where did you
9    live?
10   A.   Ojai, California.
11   Q.   Is that in Ventura County?
12   A.   Yes, it is.
13   Q.   That -- and what did Randy do at that time?
14   A.   He enrolled in high school.
15   Q.   What grade was he in?
16   A.   Tenth or 11th grade.
17   Q.   Did he meet somebody that fall that had an influence on
18   his life?
19   A.   Yes, he did.
20   Q.   Who was that?
21   A.   Robin.
22   Q.   And who was Robin?
23   A.   She was the love of his life.
24   Q.   Did they go to school together?
25   A.   Yes, they did.
```

150

```
1    Q.   And did they eventually get married?

2    A.   Yes, they did.

3    Q.   Before they were married, did Robin live with your family?

4    A.   Yes, she did.

5    Q.   Were she and Randy close?

6    A.   Very close.

7    Q.   That fall of 1966, did Randy write any music?

8    A.   Yes, he did.

9    Q.   What songs did he write?

10   A.   He wrote a song called "Taurus."

11   Q.   And where did the name "Taurus" come from?

12   A.   It was Robin's astrological sign and he was madly in love

13   with her.

14   Q.   And so he wrote the song for her?

15   A.   Yes, he did.

16   Q.   Had Randy ever played in a band before other than Jimi

17   Hendrix's band?

18   A.   Yes, he did.

19   Q.   By the way, what was Jimi Hendrix's band called at that

20   time?

21   A.   Jimmy James and the Blue Flames.

22   Q.   Prior to that time, did Randy play in a band?

23   A.   Yes, he did.

24   Q.   What was the name of that band?

25   A.   The Red Roosters.
```

151

```
 1    Q.    And who were the members of the band?

 2    A.    There was Ed Cassidy, my stepfather; my brother Randy;

 3    Mark Andes; Jay Ferguson; and Mike Fondiler.

 4    Q.    Now, in the fall of 1966 after meeting Robin and writing

 5    "Taurus," did Randy form another band?

 6    A.    Yes, he did.

 7    Q.    And when did he form that band?

 8    A.    Early '67.

 9    Q.    What was the name of the band at the time?

10    A.    Spirits Rebellious.

11    Q.    And did they eventually change the name?

12    A.    Yes, they did.

13    Q.    To what?

14    A.    Spirit.

15    Q.    Now, during the first half of 1967, did the band perform

16    anywhere?

17    A.    Yes, they did.

18    Q.    And where did they perform?

19    A.    They performed at my uncle's club, the Ash Grove, on

20    Melrose Avenue.

21    Q.    How often?

22    A.    Every Monday night.

23    Q.    Did you attend those performances?

24    A.    Yes, I did.

25    Q.    Was Robin present?
```

152

```
 1    A.    Yes, she was.

 2    Q.    Was the rest of your family present?

 3    A.    Yes, we were.

 4    Q.    Did the band, during the first six months of 1967, perform

 5    the song "Taurus" in your presence?

 6    A.    Yes, they did.

 7    Q.    How often?

 8    A.    Every time I attended.

 9    Q.    And why is that?

10    A.    Because Robin was there and that's Randy's love song to

11    Robin.

12    Q.    Do you know how Spirit got its first record deal?

13    A.    Yes, I do.

14    Q.    And how did that occur?

15    A.    The band would practice at our house on Bay Street in

16    Santa Monica at least three to four nights a week, and one

17    night there was a knock on our door and there were three people

18    standing at the door and they said they heard the music and

19    they loved it.

20          And the first man introduced himself as Brian Berry,

21    the brother of Jan Berry, who is half of a surf group called

22    Jan and Dean, and the other two people were Doug and Donna

23    Wallich -- they were brother and sister -- and they made

24    friends with our family and became good friends.

25    Q.    Were you present when they knocked on the door that night?
```

153

1    A.    Yes, I was.

2    Q.    And how did that lead to a record deal?

3    A.    Brian said he loved the group and he wanted to introduce

4    them to Lou Adler.

5    Q.    Who was Lou Adler?

6    A.    He was a record producer that owned his own label.

7    Q.    Do you recall approximately when Spirit signed their

8    record deal with Lou Adler?

9    A.    In the fall of 1967.

10   Q.    And how old was your brother?

11   A.    He was 16.

12   Q.    After the record deal was signed, do you recall what the

13   band did next?

14   A.    Yes, I do.

15   Q.    And what did they do?

16   A.    They started touring to promote their album.

17   Q.    Did they tour a lot over the next couple of years?

18   A.    Yes, they did.

19   Q.    Did you ever see the band perform in 1968 and 1969?

20   A.    Yes, I did.

21   Q.    On how many occasions?

22   A.    Many occasions.

23   Q.    Can you give me some better estimate than that?

24   A.    Every time they performed in California, we were there.

25   Q.    And why is that?

154

1  A.    Because my mother was -- music was her life and Randy was

2  her life, and wherever my mother went -- wherever Randy went,

3  she went, and wherever she went, we all went with her.

4  Q.    What are some of the venues that you can recall seeing

5  Spirit play at in 1968 and 1969?

6  A.    They played a lot at the Whiskey a Go Go on Sunset

7  Boulevard in Hollywood and the Golden Bear they played a lot in

8  Huntington Beach.

9         I saw them at Santa Monica Civic and, in Northern

10 California, saw them at the Fillmore West and several rock

11 festivals.

12 Q.    And at any time when you saw the band perform in 1968 and

13 1969, did they perform "Taurus"?

14 A.    Yes.

15 Q.    How often did they perform "Taurus" while you were

16 present?

17 A.    As far as I can recall, every time.

18 Q.    And why is that?

19 A.    Because Robin was with our family and we all went

20 together, and he made a point of playing that song for her.

21 Q.    Did you ever see Spirit perform outside of California in

22 1968 or 1969?

23 A.    Yes.

24 Q.    Where did you see them perform outside of California?

25 A.    We went to Boston with them -- Boston, Massachusetts, and

155

1    to New York and to Florida.

2    Q.   Did Robin accompany Randy elsewhere with the band while

3    they were performing around the country?

4    A.   Yes.

5    Q.   Was she regularly going to those concerts with Randy?

6    A.   Yes.

7    Q.   Now, in 1970, did you continue to see the band perform as

8    often?

9    A.   No.

10   Q.   Why not?

11   A.   They went on their first European tour and we didn't go

12   with them.

13   Q.   And when the tour was over, did something happen to Randy?

14   A.   Yes.

15   Q.   What happened to Randy?

16   A.   He had a bad accident with his horse.

17   Q.   And what happened to him?

18   A.   He cracked his head open.

19   Q.   And did he go to the hospital for a period of time?

20   A.   Yes.  He was in intensive care.

21   Q.   And at some point shortly after that, did one of his close

22   friends die?

23   A.   Yes.

24   Q.   And who was that?

25   A.   Jimi Hendrix.

156

1    Q.    Did Randy and Jimi Hendrix remain close friends until Jimi

2    Hendrix died?

3    A.    Yes.

4    Q.    And what happened to the band Spirit around that time?

5    A.    They disbanded.

6    Q.    After Spirit disbanded, what did Randy do?

7    A.    He continued to play music.

8    Q.    For how long?

9    A.    Until the end of his life.

10   Q.    Can you tell me approximately how many albums Randy

11   released in his life for one record label or another?

12   A.    Twenty or more.

13   Q.    And how many songs do you think he recorded?

14   A.    Hundreds, if not thousands.

15   Q.    Now, I'd like to direct your attention to the year 1996.

16           You indicated previously that you recorded a song, a

17   blues song, with Randy in October of that year?

18   A.    Yes.

19   Q.    And was that song ever released?

20   A.    After my brother's death, it was on an album.

21   Q.    When did your brother die?

22   A.    January 2, 1997.

23   Q.    And how did he die?

24   A.    He drowned on Molokai, Hawaii.

25   Q.    What was he doing there?

157

```
 1    A.    He was swimming and visiting my mother.

 2    Q.    Is that where your mother lived at that time?

 3    A.    My mother had moved back to Hawaii.

 4    Q.    And was his body ever found?

 5    A.    No.

 6    Q.    Now, can you tell me more about the relationship between

 7    your mother and Randy?

 8    A.    They were extremely close.  My mother put all her energy

 9    and love into my brother to help him develop his musical

10    talents, and she acted as sort of behind-the-scenes manager for

11    his career.

12    Q.    Now, are you familiar with the Randy Craig Wolfe Trust?

13    A.    Yes, I am.

14    Q.    What is the Randy Craig Wolfe Trust?

15    A.    It was my mother's mission to create a legacy for my

16    brother, and it benefits charity.

17    Q.    And do you know Mr. Skidmore?

18    A.    Yes, I do.

19          MR. ANDERSON:  Your Honor, the motion in limine -- I

20    apologize, but the motion in limine -- one of the motions in

21    limine deals with this subject that was granted.

22          THE COURT:  You have to tell me which motion,

23    counsel.

24          MR. ANDERSON:  Absolutely, Your Honor.

25          Your Honor, it was Defendants' Motion in Limine
```

158

```
 1    Number 8.
 2              THE COURT:  I'm not so sure, counsel, where he is
 3    going on that question.  I'm going to find out where he is
 4    going with his question.
 5              MR. KULIK:  I'm moving on, Your Honor.
 6              THE COURT:  Okay.
 7    BY MR. KULIK:
 8    Q.    How many times before today have you met Mr. Skidmore?
 9    A.    Two or three times.
10    Q.    And when is the last time you met him before today?
11    A.    Before my mother died.
12    Q.    When did your mother die?
13    A.    Seven years ago.
14    Q.    Can you tell me, who is Mr. Skidmore?
15    A.    He was a friend of my brother's and he became a very close
16    friend to my mother.
17    Q.    Were you involved at all in setting up the trust?
18    A.    No.
19    Q.    Are you a beneficiary of the trust?
20    A.    No.
21    Q.    Do you have any relationship with the trust whatsoever?
22    A.    No, I don't.
23    Q.    If the plaintiff wins any money in this case, is any of
24    that money yours?
25    A.    No, it's not.
```

159

```
 1    Q.    Nonetheless, do you support the filing of this case?

 2    A.    Yes, I do.

 3              MR. ANDERSON:  Objection.

 4              THE COURT:  Sustained.

 5    BY MR. KULIK:

 6    Q.    Are you here today under subpoena?

 7    A.    Yes.

 8    Q.    And why are you here?  Why are you testifying?

 9    A.    Because when we lost my brother --

10              THE COURT:  I'm assuming she's under subpoena,

11    counsel.  That's probably why she's here.

12    BY MR. KULIK:

13    Q.    Did you offer to testify?

14              MR. ANDERSON:  Objection.  Relevance.

15              THE COURT:  Sustained.  It wouldn't be relevant.

16    BY MR. KULIK:

17    Q.    During the course of your brother's lifetime, did you ever

18    talk to him about Led Zeppelin and "Stairway to Heaven"?

19    A.    Yes, I did.

20    Q.    On how many occasions?

21    A.    Many.

22    Q.    And why was that?

23    A.    It was something that upset him for many, many years.

24    Q.    And why did you try to talk to him about it?

25    A.    Because I wanted him to do something about it.
```

160

```
 1   Q.   And why did you want him to do something about it?
 2            MR. ANDERSON:  Objection.  Relevance and hearsay.
 3            THE COURT:  Sustained.  It would not be relevant why
 4   she wanted him to do something.  Sustained.
 5            MR. KULIK:  I have nothing further at this time,
 6   Your Honor.
 7            THE COURT:  Cross-examination?
 8            MR. ANDERSON:  Yes, Your Honor, just briefly.
 9                         CROSS-EXAMINATION
10   BY MR. ANDERSON:
11   Q.   Ms. Wolfe, how old were you in 1966?
12   A.   I was 14.
13   Q.   When were you born, what year?
14   A.   Actually, I was 12.  I'm sorry.
15   Q.   I'm sorry?
16   A.   I was born in '54.
17   Q.   So how old were you in --
18   A.   I was 12.  I'm sorry.
19   Q.   That's okay.  I just want this to be clear.
20            How old were you in 1966?
21   A.   I was 12.
22   Q.   Okay.  Thank you.
23            You said that your brother and others played at the
24   Ash Grove on Mondays.
25   A.   Yes.
```

161

```
 1   Q.   And the Ash Grove, I take it, was your father's club?

 2   A.   My uncle, Ed Pearl's, club.

 3   Q.   Thank you.

 4        And was the club closed on -- to the public on

 5   Mondays?

 6   A.   No.  He opened it for them to have a venue to play at.

 7   Q.   Okay.  And I understand from counsel that before this

 8   lawsuit was filed, you were -- you were a personal friend of

 9   Mr. Kulik?

10   A.   I know his wife.

11   Q.   And when did -- well, what was Robin's last name?

12   A.   Norton.

13   Q.   And when did Randy Wolfe and Robin Norton break up?

14   A.   It was around 1972.

15        MR. ANDERSON:  Thank you very much.

16        That's all I have, Your Honor.

17        THE COURT:  Redirect in that area?

18        MR. KULIK:  Nothing, Your Honor.

19        THE COURT:  Okay.  Thank you, counsel.

20        You may step down.

21        THE WITNESS:  Thank you, Your Honor.

22        THE COURT:  May this witness be excused?  Any

23   objection?

24        MR. ANDERSON:  No objection, Your Honor.

25        THE COURT:  Okay.  You're free to go.  Thank you very
```

```
 1    much for coming in.
 2              THE WITNESS:  Thank you, Your Honor.
 3              THE COURT:  Next witness.
 4              MR. MALOFIY:  Your Honor, we'd like to play the video
 5    trial testimony of Mr. Ware, which was taken in the UK --
 6              THE COURT:  Okay.
 7              MR. MALOFIY:  -- a couple weeks ago.
 8              THE COURT:  Okay.
 9              MR. MALOFIY:  Any objection, counselor?
10              MR. ANDERSON:  Pursuant to the local rules, we had
11    noted the objections in the transcript, which counsel said he
12    had deposited with the Court.
13              THE COURT:  Okay.  Just a second.
14         (The Court and clerk confer off the record.)
15              THE COURT:  Okay.  Counsel, you wish to read this
16    deposition into evidence at this time?
17              MR. MALOFIY:  We would like to play the video
18    deposition.
19              THE COURT:  You want to play it?
20              And are there objections to particular parts of it?
21              MR. ANDERSON:  Yes, Your Honor.  Actually, to be
22    clear -- I apologize -- we do not object to -- generally to the
23    playing of the DVD.  The witness is unavailable.  However,
24    there are objections to particular parts.
25              Counsel also, when he handed it to me today, added
```

163

1  some additional parts, but I think we can live with that to

2  avoid complicating things.

3          THE COURT:  Okay.

4          MR. ANDERSON:  But there are objections in the

5  margin.

6          THE COURT:  Okay.  I'll have to take a look at the

7  objections, so let's call another witness while we're waiting.

8          MR. MALOFIY:  Okay.  Very well.  I'll have to summon

9  Jay Ferguson from the hallway, Your Honor.

10         THE COURT:  You bet.  Thank you.

11         MR. MALOFIY:  One moment.

12         THE COURT:  While he's doing that, counsel, are the

13 objections the parts that you put in red?

14         MR. ANDERSON:  The defendants' are in black; the red

15 is plaintiff's designations.

16         THE COURT:  Okay.  Thank you.

17         MR. ANDERSON:  Absolutely, Your Honor.

18         THE CLERK:  Sir, step forward.  Please raise your

19 right hand.

20         Do you solemnly swear that the testimony you shall

21 give in the cause now before this Court shall be the truth, the

22 whole truth, and nothing but the truth, so help you God?

23         THE WITNESS:  So help me God.

24         THE CLERK:  Please be seated.

25         Sir, please state your name, spell your last name for

164

```
 1    the record.
 2               THE WITNESS:  Jay, J-A-Y, Ferguson, F-E-R-G-U-S-O-N.
 3               THE COURT:  Thank you.
 4               Counsel, you may inquire.
 5          MR. MALOFIY:  Thank you.
 6                         JAY FERGUSON,
 7                    having been first duly sworn,
 8                      testified as follows:
 9                       DIRECT EXAMINATION
10    BY MR. MALOFIY:
11    Q.   Mr. Ferguson, are you a California local resident?
12    A.   I am.
13    Q.   All right.  And how long have you lived in California?
14    A.   Born and raised here.  Born in 1947, Burbank, California.
15    Q.   All right.  And have you stayed in California your whole
16    life?
17    A.   All my life.
18    Q.   All right.  As far as growing up and your interests and
19    hobbies, what were they, sir?
20    A.   I grew up in the San Fernando Valley, so I was a surfer
21    and a skater, loved going to the beach.  Pretty much average
22    stuff for a kid.
23    Q.   And then at some point, did you have -- did you acquire an
24    interest in music of some sort?
25    A.   I did.  My mother was very musical, so all the kids in my
```

165

```
1    family were assigned an instrument and mine was piano.

2    Q.   And when did you start taking up the piano as an

3    instrument?

4    A.   I took lessons from the age of 7 to 12.

5    Q.   And did you continue with the piano as you grew older?

6    A.   You know, I got away from it and I fell in love with folk

7    music, and I got a five-string banjo and I was playing

8    bluegrass banjo.

9         And then I got caught up in the British invasion and

10   I started playing tambourine.

11   Q.   Was tambourine an official position in a band during those

12   years?

13   A.   Oh, yeah, it was an honorable thing to do.

14   Q.   Now, before I go into -- further into your background, can

15   you tell the jury, are you still a musician to this day?

16   A.   I am.  I've been a professional musician my whole life,

17   first in bands, then as a composer for films, and recently, the

18   last 15 years, for television.  Probably best known for two

19   shows -- my last two shows, which were The Office and the show

20   I'm doing currently, which is NCIS LA.

21   Q.   Now, let me roll back to your early years in California.

22        What was the first band you were in?

23   A.   It was probably called the Western Union, with Mark Andes

24   on bass.  It was a high school band.

25   Q.   And is -- Mark Andes, was he also a member of the band
```

166

1    Spirit?

2    A.   Yes, he was.

3    Q.   Okay.  Now, how long did that band last?

4    A.   Oh, I'd say maybe a year and a half.

5    Q.   And thereafter did you then form another band or join

6    another band?

7    A.   I did.

8    Q.   And what was that band?

9    A.   That was the Red Roosters, which was a kind of precursor

10   to Spirit, with one member being different.

11   Q.   Who was the members of the Red Roosters?

12   A.   Ed Cassidy, Mark Andes, Randy California/Randy Wolfe, and

13   myself, and then Mike Fondiler was the other member.

14   Q.   Now, how old were you at the time when you formed this

15   band, the Red Roosters?

16   A.   I was probably 18.

17   Q.   And how old was Randy California at the time?

18   A.   He could have been 15 easily.

19   Q.   Was he younger than the rest of the group?

20   A.   He was definitely younger.

21   Q.   Even though he was younger, was he proficient in being

22   able to keep up and play with the older cats in the band?

23   A.   More than proficient.  He was a prodigy.  He was a natural

24   and he learned from some of the blues masters from the Ash

25   Grove, and he could -- he could just play beautifully on

167

```
 1  guitar.
 2  Q.    I see.
 3         Now, eventually the Red Roosters, I believe you said,
 4  segued into this band called Spirit; is that correct?
 5  A.    Correct.
 6  Q.    And who were the members of the band Spirit?
 7  A.    Mark Andes, Ed Cassidy, Randy California/Randy Wolfe, John
 8  Locke, and myself.
 9  Q.    Now, when you use the term "Randy California/Randy Wolfe,"
10  why are you making the distinction?
11  A.    Randy Wolfe was his given name and Randy California was
12  his nickname, which was given him by Jimi Hendrix.
13  Q.    Was Randy California and Jimi Hendrix close friends?
14  A.    I assume so.  They were in New York at the time.  I wasn't
15  there, but he was Jimi's second guitar player.
16  Q.    I see.
17         Is it your understanding that after he left New York,
18  he then came back to California to form and play with the band
19  members of Spirit?
20  A.    Correct.
21  Q.    All right.  Now, tell me a little bit about Spirit.
22         In the late '60s -- I believe you formed in '66; is
23  that correct?
24  A.    Um-hmm.
25  Q.    Were you a hot item in Southern California and on the West
```

168

```
 1   Coast music scene?

 2   A.   We became that.  We started, as everybody else does,

 3   playing open mic nights.  We played the Ash Grove and we got a

 4   following, and pretty soon Monday night was our night every

 5   week.  And that's when our following really picked up.

 6   Q.   Now, when you say your following picked up, were you

 7   playing regularly with the band Spirit?

 8   A.   Yes.

 9   Q.   And did you have fans?

10   A.   We did have fans.

11   Q.   And before you signed, do you recall any songs that were

12   written prior to signing with Lou Adler?

13   A.   Songs we were playing before that signing?

14   Q.   Right.

15   A.   Pretty much the entire first album.  Every song on there

16   was being played and worked up live, plus others that never got

17   on the record.

18   Q.   Let me direct your attention to a particular tune by the

19   name of "Taurus."

20           Are you familiar with that song?

21   A.   I am.

22   Q.   Why are you familiar with the song "Taurus"?

23   A.   I played in the band that did shows, and "Taurus" was

24   performed by Randy California.  It was always a great moment in

25   every show, and we recorded it and it was on our first record.
```

169

1   Q.   Now, was this a -- is it your understanding that Randy had

2   written the song on his own and by himself?

3   A.   Correct.

4   Q.   And did anyone else or any other members of the band write

5   that song?

6   A.   No.

7   Q.   On the first album, was that the only song he had written

8   or did he also work on other songs with the team?

9   A.   That was the only song he wrote on that album.  Second

10  album, he wrote quite a few.

11  Q.   Okay.  And the second album, there was a number of hit

12  songs he had written, correct?

13  A.   Correct.

14  Q.   Let me move -- let me stay on the first album before we

15  get to the second album.

16          On the first album -- do you know when Randy wrote

17  "Taurus" specifically?

18  A.   No.  I -- it was one of the early songs that we worked up

19  prior to our signing, and so I can't give it an actual date.

20  Q.   Is it --

21  A.   It would be early '67 at the latest.

22  Q.   Is it accurate to say that it was written before any

23  contracts with Lou Adler or Hollenbeck Music?

24  A.   It is accurate.

25  Q.   Now, can you share with me the importance of "Taurus" in

170

```
 1   Spirit's music or their live set.
 2                MR. ANDERSON:  Objection.  Vague and ambiguous and
 3   lacks foundation.
 4                THE COURT:  Overruled.
 5                THE WITNESS:  "Taurus" was a real special moment.  It
 6   was -- you know, on one hand it was a palate cleanser, because
 7   we were playing this loud raucous music and suddenly we would
 8   come down to this very personal kind of moment, and it was
 9   beautiful and it was a different style of music than anything
10   else we played in the show.
11   BY MR. MALOFIY:
12   Q.   Do you have a recollection in the early years of Spirit,
13   '66, '67, '68, if "Taurus" was played regularly at live shows?
14   A.   I would say yes.  I don't know if it was played at every
15   show, but quite often.
16   Q.   Was this considered a song that was part of the songs that
17   are being performed regularly by Spirit?
18   A.   On a regular basis, yes.
19   Q.   And as you sit here today, you don't have a photographic
20   memory where you can remember dates and times, but you -- your
21   memory tells you that it was played regularly, correct?
22   A.   Correct.  I would say not every show, but I would say
23   probably more than half, majority.
24   Q.   Thank you.
25                I think you testified earlier on that "Taurus" was
```

171

1   part of the first album, the self-titled album by Spirit called

2   *Spirit*, correct?

3   A.   Correct.

4   Q.   Now, was there also another song on the same side of the

5   album that you're familiar with because you had written it?

6   A.   I'm trying to imagine which side and which side, but are

7   you talking about "Fresh Garbage"?

8   Q.   I am.

9   A.   Correct.

10  Q.   Now, can you share with the jury the importance of the

11  song "Fresh Garbage"?

12  A.   It was the first song that we recorded with Lou Adler, and

13  it was sort of a signature song in that it reflected the style

14  of the band, which was a combination of rock, jazz, folk, and

15  blues, and we tried to put that in one song.

16  Q.   Was this song, "Fresh Garbage," a popular song that made

17  its way around the United States, the UK, and throughout the

18  world?

19  A.   I would say so.

20  Q.   And why do you know that?

21  A.   We got a lot of radio play.  There was one instance in the

22  City of Salt Lake where they did a battle of the songs and it

23  won the battle, beating out "Hey Jude."

24  Q.   Do you recall it being played on the radio here and in the

25  UK?

172

```
1   A.   I can't testify to the radio in the UK, but it was played

2   here.

3   Q.   Did you -- strike that.

4        Are you familiar with albums being sold in the United

5   States, the UK, and Germany?

6   A.   Yes.  Our product was available all places.

7   Q.   And did you tour with the first lineup of Spirit

8   throughout the world?

9   A.   Yes, but I would limit that to Canada and Europe,

10  including the UK.

11  Q.   Would that include Scandinavia and also mainland Europe?

12  A.   Yes.

13  Q.   How many tours of the UK did you do prior to 1971?

14  A.   That was our only tour that I was on.

15  Q.   All right.  Do you know how many shows you played?

16  A.   No.  I was part of a general European tour and I would

17  guess maybe four to five.

18  Q.   Okay.  Now, let me -- let me direct your attention to

19  defendants in this case, Mr. Robert Plant and Jimmy Page.

20        Do you know these individuals?

21  A.   I know of them, yes.

22  Q.   Have you ever met them?

23  A.   I've met Robert Plant -- Jim- -- Robert Plant.

24  Q.   And do you recall when you had met Robert Plant?

25  A.   It was part of the UK tour and we were playing in
```

173

```
1    Birmingham and it was a club called Mother's, and he came to
2    see the band.  We were flattered and I met him before we played
3    the show.  It was sort of a meet-and-greet.
4    Q.   And do you recall what year that was?
5    A.   That would be 1970.  I think late '70.
6    Q.   Now, prior to meeting Mr. Robert Plant in 1970 at Mother's
7    Club for a concert that you were performing there with Spirit,
8    did you happen to have another occasion where you met him prior
9    to that, sir?
10   A.   We played on the same bill, but I didn't personally meet
11   him, no.
12   Q.   Do you recall a December 26, 1968, show in Denver,
13   Colorado?
14   A.   I do.
15   Q.   Do you recall which band opened for the band Spirit?
16   A.   It was Led Zeppelin.
17   Q.   And is Jimmy Page and Robert Plant members of
18   Led Zeppelin?
19   A.   Yes.
20   Q.   Or should I more accurately say were they members of the
21   band Led Zeppelin?
22   A.   They were and continue to be.
23   Q.   Okay.  Do you recall any interactions you had with either
24   member -- or any members of the band in 1968?
25   A.   No.
```

174

```
 1   Q.   Okay.  Now, moving forward, is it your testimony your
 2   remembrance of any interaction with the band occurred in the UK
 3   in 1970?
 4   A.   No.  People were saying that they attended our show in
 5   London at the Lyceum --
 6   Q.   Okay.
 7   A.   -- but I do not recall seeing them or talking with them.
 8   Q.   Did you have an understanding of whether or not
 9   Led Zeppelin or the members of Led Zeppelin were fans of
10   Spirit?
11   A.   I was told they were.
12   Q.   Do you have any facts to indicate that they were familiar
13   with songs you had written?
14   A.   I have no facts or direct quotes, no.
15   Q.   Well, let me ask it more specifically.
16            Did you have any understanding of whether or not they
17   covered any of your music?
18   A.   Yes.  They specifically covered my song "Fresh Garbage."
19   Q.   All right.  Now, have you ever had an opportunity to hear
20   any of the "Fresh Garbage" tracks which they copied?
21   A.   Someone sent me a recording taken at one of their
22   concerts, and I listened to it and it was there.
23   Q.   Was it evident to you that it was your song "Fresh
24   Garbage"?
25   A.   No doubt.
```

175

```
 1    Q.    And was it just a little couple-second clip or was it a

 2    little bit more substantial than that?

 3    A.    It was substantial.

 4          That song is based on this riff, much in the way that

 5    "Satisfaction" is based on that riff.  It drives the entire

 6    song.  It's played on the record by bass guitar and piano all

 7    simultaneously, so it's a very recognizable piece.

 8    Q.    Now, when you say it's not just a bass riff, are you

 9    indicating that it was played on multiple instruments as part

10    of this composition which you've shared as this unique riff?

11          MR. ANDERSON:  Objection.  Leading.

12          THE COURT:  Up to this point, it's close, but I'm

13    going to overrule the objection.

14          THE WITNESS:  It was played by multiple instruments.

15    BY MR. MALOFIY:

16    Q.    Did it last for more than just a few seconds or was it

17    repeated over and over again as part of a song?

18    A.    It was repeated over and over.  It was -- it opened the

19    song; it ended the song.

20    Q.    Do you believe that Jimmy Page and Robert Plant

21    independently created this riff called "Fresh Garbage"?

22    A.    No.

23    Q.    Do you believe they had access to your work?

24          MR. ANDERSON:  Objection.  Calls for a legal

25    conclusion.
```

176

```
 1              THE COURT:  Sustained.

 2   BY MR. MALOFIY:

 3   Q.   Do you believe that they were familiar with your work?

 4   A.   I -- it was necessary for them to play it, yes.

 5   Q.   Okay.  Let me move forward to some other issues.

 6              Do you know how many times Led Zeppelin played your

 7   song "Fresh Garbage" in concert?

 8   A.   No, I don't know the exact number.  I was told it was

 9   something like a dozen, but I'm not sure.

10              MR. ANDERSON:  Move to strike as hearsay.

11              THE COURT:  Sustained.  It will be stricken.

12   BY MR. MALOFIY:

13   Q.   Do you recall Led Zeppelin ever performing "Fresh Garbage"

14   in -- December 26, 1968, in Denver, Colorado, when they opened

15   for your band as -- to chip a wink to your success?

16   A.   I do not --

17              MR. ANDERSON:  Objection.  Leading.  Lacks

18   foundation.

19              THE COURT:  Sustained.

20              Why don't you ask it again, counsel, without leading.

21   BY MR. MALOFIY:

22   Q.   When you were in -- when you were performing as Spirit on

23   December 26, 1968, do you recall whether or not Jimmy Page and

24   Robert Plant performed your song "Fresh Garbage" as part of

25   their set?
```

177

```
 1   A.    I do not recall hearing their show, so no.

 2   Q.    Okay.  Thank you.

 3         Do you recall the specifics of your meet-and-greet

 4   with Robert Plant in Mother's Club in 1970 in the UK?

 5   A.    Like I said, it was short, but as we entered the club, he

 6   was there and we met him and introduced ourselves.  And I think

 7   at that point I went back -- backstage to prepare for the show.

 8   Q.    So is it fair to say that this occurred, this interaction,

 9   prior to the start of the show?

10   A.    Absolutely.

11   Q.    Were you part -- did you participate in any interaction

12   after the show or do you have any recollection of participating

13   in anything after the show?

14   A.    Myself, I left and went back to the hotel, so I did not

15   participate.

16   Q.    Do you recall whether or not there were other people at

17   the club when you were there or did Mr. Plant come to see you

18   and meet you prior to the start of the show?

19         MR. ANDERSON:  Objection.  Compound and leading.

20         THE COURT:  Overruled.

21         THE WITNESS:  He appeared to be alone.

22   BY MR. MALOFIY:

23   Q.    Do you remember if he told you that he appreciated your

24   music?  Was there pleasantries exchanged or do you remember

25   what the tone or the purpose of his communications to you were?
```

178

```
1          MR. ANDERSON:  Objection.  Compound.

2          THE COURT:  Sustained.

3   BY MR. MALOFIY:

4   Q.   What, if anything, do you recall Mr. Plant sharing with

5   you when he met you?

6   A.   I really don't recall specifics, but it was just, like I

7   said, a meet-and-greet where we just kind of shook hands and

8   said, "It's great to have you here," something like that.

9   Q.   Very well.

10         Do you recall other shows -- or strike that.

11         Are you familiar with other shows where you shared

12   the bill with Led Zeppelin?

13   A.   We did the Denver show in '68 and we did three pop

14   festivals together in '69.

15   Q.   And would this be the Texas Pop Festival?

16   A.   I'm thinking of Texas, Seattle, Atlanta, and I think there

17   was one called the Northern California Pop Festival.

18   Q.   Now, as you sit here today, is it accurate that you don't

19   have an independent recollection of those shows, other than the

20   Denver show?

21   A.   I have a distinct recollection of the Atlanta show.

22   Q.   Okay.  And at the Atlanta show, do you recall any

23   interactions with the band Led Zeppelin or no?

24   A.   Well, it's a vivid memory because we played immediately

25   before them, so it was very exciting.  It was a great festival,
```

179

```
1   but no personal interaction, no.

2   Q.   That you recall of; is that --

3   A.   That I recall.

4   Q.   Okay.  Did your relationship with Randy California and the

5   band Spirit sort of break up in the early '70s?

6   A.   It did.  Mark Andes and myself left the band in early

7   1971.

8   Q.   Okay.  And did you go on to play in other bands after

9   that?

10  A.   We did.  We formed a band called Jo Jo Gunne, and that ran

11  for about four years.

12  Q.   Were you signed on that label?

13  A.   We were signed to David Geffens' label.

14  Q.   And after that, did -- were you also successful as a

15  musician in other --

16  A.   I, at that point, became a solo artist, and I had four

17  records released.  I had my biggest hit, which is called

18  "Thunder Island," which was Number 4 nationally.  So that was

19  sort of the peak of my personal career.

20  Q.   And then you went on to become -- to work with film score,

21  as you shared earlier on, correct?

22  A.   I did.  I was very fortunate to have a chance to write

23  songs for this film called "Terminator," which became a hit,

24  and from there I went into scoring.

25          And in the '90s, I ended up moving into the
```

180

```
 1   television world, where I am now.

 2   Q.   As Randy progressed from his early years, when he was

 3   younger than all of you and as he remained younger than you,

 4   but did his talents continue to grow as far as a guitar player?

 5   A.   Yeah.  He never stopped learning or inventing, so I would

 6   say they continued to grow.

 7   Q.   And you referred to him earlier on as a prodigy.

 8            Do you have any other thoughts to share as far as his

 9   talents and abilities as a guitarist?

10   A.   Just, like I said, always experimenting, always

11   experimenting with sound, with effects, with reversing guitars,

12   layering guitars, using distortion, tape delay.  Always an

13   interesting player.

14   Q.   Was the guitar part in "Taurus," did that always remain

15   the same over the years?

16   A.   My memory is the core part did remain the same.

17   Q.   Are you familiar with Led Zeppelin's "Stairway to Heaven"?

18   A.   I am.

19   Q.   Are you familiar with the first half or what I'll define

20   as the first 2 minutes and 14 seconds?

21   A.   I am.

22   Q.   Is it your belief that "Stairway to Heaven" and "Taurus"

23   are substantially similar?

24            MR. ANDERSON:  Objection.  Calls for --

25            THE COURT:  Sustained.  That's a jury determination.
```

181

```
 1   BY MR. MALOFIY:

 2   Q.   Do you believe that they're similar?

 3           THE COURT:  Sustained.  That's a jury decision.

 4           Ladies and gentlemen, that's something that you're

 5   going to be asked to decide.  Witnesses can't do that job for

 6   you.  They can't say, "I think it is or it is not."

 7           Okay.

 8           MR. MALOFIY:  I have no further questions of this

 9   witness.

10           THE COURT:  Okay.  Cross.

11                      CROSS-EXAMINATION

12   BY MR. ANDERSON:

13   Q.   Good afternoon, Mr. Ferguson.

14   A.   Good afternoon.

15   Q.   What was the first album that Spirit released with Lou

16   Adler's Ode Records?

17   A.   It was called Spirit.

18   Q.   And when was that released?

19   A.   Beginning of 1968.

20           MR. ANDERSON:  Okay.  And if we could display the

21   timeline.

22   BY MR. ANDERSON:

23   Q.   If you look on the monitor, you should see -- the one in

24   front of you, I believe.

25   A.   It's actually blank.  Oh, here we go.
```

182

```
1    Q.   Bear with us for just a second.

2              When was the first album released?

3    A.   Early 1968.

4    Q.   Okay.  And --

5              MR. ANDERSON:  There we go.  The first one, please.

6    BY MR. ANDERSON:

7    Q.   Okay.  Do you see that, the timeline?

8    A.   I do.

9    Q.   And do you see under the heading "January 1968, *Spirit*

10   album released"?

11             Is that consistent with your recollection?

12   A.   Absolutely.

13   Q.   And the songs that are listed under that heading, is that

14   consistent with your recollection of the songs that were

15   included in that album?

16   A.   Yes.

17   Q.   And what was the next album that was released -- the next

18   Spirit album?

19   A.   It was called *The Family That Plays Together*, which was

20   released later in 1968.

21   Q.   Okay.

22             MR. ANDERSON:  And if we could go to the next one.

23   BY MR. ANDERSON:

24   Q.   Is that next entry consistent with your recollection of

25   the release of *The Family That Plays Together*?
```

183

```
 1    A.    It is.

 2    Q.    And is the listing of songs under that consistent with

 3    your recollection of what was included in that second album?

 4    A.    Yes.

 5    Q.    And is it correct that that second album was Spirit's

 6    breakthrough album?

 7    A.    Correct.

 8    Q.    And are you familiar with the phrase touring in support of

 9    an album?

10    A.    Oh, yes.

11    Q.    And what does that mean, sir?

12    A.    You were encouraged by the record company and on your own

13    to get on the road to perform to increase interest in the

14    record and increase sales.  It was a very promotional idea.

15    Q.    And when you toured in support of an album, did you play

16    at concerts the songs that were included in your newly released

17    album?

18    A.    Yes.  That was part of the point.

19    Q.    Right.

20          And were there tent pole songs, songs that Spirit

21    generally played at all concerts?

22    A.    Yes.

23    Q.    And what were the tent pole songs that Spirit generally

24    played at all concerts?

25    A.    Definitely "I Got a Line on You," "Fresh Garbage,"
```

184

```
 1   "Mechanical World," "Elijah," looking at this list, "All the
 2   Same," and quite often "Taurus."
 3   Q.   Okay.  And what --
 4         THE COURT:  Before you go on, counsel, can you
 5   brighten that up at all?
 6         THE WITNESS:  That's better.
 7         THE COURT:  And I don't know if you want to blow it
 8   up any or not.  If you can, it may be easier for the jury to
 9   see.
10         There you go.  Okay.
11         MR. ANDERSON:  Thank you very much, Your Honor.
12   BY MR. ANDERSON:
13   Q.   Do you recall your deposition was taken in this action?
14   A.   I do.
15   Q.   And do you recall that when -- and you provided testimony
16   under oath at your deposition.  Do you remember that?
17   A.   Provided testimony what?
18   Q.   Under oath.
19   A.   Oh, yes.
20   Q.   And do you recall that when you identified the tent pole
21   songs that Spirit regularly performed at your deposition, you
22   did not include "Taurus," did you?
23   A.   I may not have.  I said, as I said, quite often "Taurus,"
24   but the other ones, always.
25   Q.   "Taurus" was not one of the tent pole songs, was it?
```

185

```
 1   A.   No.

 2   Q.   And when did you leave Spirit?

 3   A.   January 1971.

 4   Q.   And you don't know whether "Taurus" was played in Denver

 5   in December of 1968, do you?

 6   A.   I do not know for certain.

 7   Q.   And when I asked you at your deposition, you said you

 8   didn't know, correct?

 9   A.   Correct.

10   Q.   In fact, what I asked you at your deposition, isn't it

11   true that out of the over hundred occasions that Spirit

12   performed, you could only identify one performance where

13   "Taurus" was played?

14   A.   I may have said that.

15   Q.   And that was under oath at your deposition --

16   A.   Okay.

17   Q.   -- right?

18   A.   I said okay.

19   Q.   What is a single in the record industry?

20   A.   A single is a song that's chosen out of the album to be

21   pressed onto a 45 and to be put out for radio play on AM radio.

22   Q.   Okay.  And what was the single -- is there usually a

23   single per album -- or was there in the 1960s?

24   A.   Yes.  You couldn't release one without the other.

25   Q.   All right.  And do you know what songs were on the single
```

186

1    that was released with the first Spirit album?

2    A.    No.

3    Q.    You talked about "Fresh Garbage."

4    A.    Um-hmm.

5    Q.    And isn't it correct that the portion of "Fresh Garbage"

6    that you heard in the recording of Led Zeppelin's live

7    performance of a medley was the bass riff?

8    A.    Yes.

9    Q.    And separate from how many times the bass riff was

10   played -- well, first of all, tell us, what do you mean by a

11   bass riff?

12   A.    Well, bass riff -- bass riff is a little misleading,

13   because the bass starts the riff, but guitar joins and

14   keyboards join.  So it's an entire band playing this riff.

15   Q.    How long -- and then the bass riff repeats?

16   A.    Repeats.  It repeats throughout the vocal part of the song

17   and then there is an instrumental break, sort of jazz like in

18   terms of improvisation, then it returns to this bass riff and

19   finishes the song.

20   Q.    How long was the bass riff before it repeated?  Two

21   measures?  One measure?

22   A.    It was, I would say, maybe eight measures before the vocal

23   came in.  It develops.

24   Q.    So your testimony is that the single bass riff varies over

25   eight measures?

187

```
 1   A.    No.  It repeats.
 2   Q.    Okay.  And my question, sir, is before it repeats, how
 3   long is it?  Is it one measure that repeats, half a measure
 4   that repeats?
 5   A.    Well, let me count.
 6         It's eight beats, two measures.
 7   Q.    So this bass riff was two measures long?
 8   A.    Correct.
 9   Q.    Okay.  And did Spirit ever perform in live concerts songs
10   by other groups?
11   A.    I think early on, we did.  We did "Hey Joe" from -- by
12   Hendrix.  I remember that one specifically.
13   Q.    Do you also recall the group Spirit, when you were a
14   member of the band, performed Beatles songs in concert?
15   A.    I'm sure we did.
16   Q.    And it was your understanding that was completely lawful?
17   A.    At the time, yes.
18   Q.    Okay.  And did you get -- well, strike that.
19         If we could, what was the next album that Spirit
20   released?
21   A.    It was called Clear, released in 1969.
22   Q.    And does the information on the screen, the labeling of
23   October 1969 for the Clear album release and the titles of the
24   tracks on that album, is that accurate?
25   A.    Yes.
```

188

```
 1    Q.   Was "I Got a Line on You" on the prior album, was that
 2    released as a single?
 3    A.   Yes.
 4    Q.   Did "I Got a Line on You" become a tent pole song, as
 5    well?
 6    A.   It was probably our biggest.
 7    Q.   Is it correct that by the end of 1969, Ode Records had
 8    released three Spirit albums?
 9    A.   Correct.
10    Q.   Just briefly about Mother's Club, where was Mr. Plant when
11    you went over to have this meet-and-greet with him?
12    A.   My recollection is that we walked into the club through
13    the front door and he was there, which -- you'd call it the
14    back of the club looking towards the stage.
15              I think there were some pillars or a wall, and he was
16    just sort of there maybe leaning against the wall or the pillar
17    very casually.
18    Q.   At the back of the club opposite the stage where Spirit
19    was going to perform?
20    A.   Right.  You would call it the back if you were in the club
21    looking at the stage, but it was the first thing you came to
22    through the front door, in my memory.
23    Q.   And can you give us your best estimate now of how long the
24    club was from the back where Mr. Plant was to the front where
25    Spirit was performing?
```

189

```
 1    A.   I would say looking at this room, maybe this room plus 10
 2    feet.
 3    Q.   And how much -- how long would --
 4              THE COURT:  Counsel, for the record, about 50 feet.
 5              MR. ANDERSON:  Okay.  Thank you very much, Your
 6    Honor.  Judicial notice.  I appreciate that.
 7    BY MR. ANDERSON:
 8    Q.   Bear with me for a second.  And I apologize, I just lost
 9    my train of thought with the information, but that's fine.
10              What is a tour in your -- in the 1960s, what was a
11    tour?
12    A.   A tour is a continuous string of dates, as opposed to one
13    night here, one night there.  You pretty much are traveling
14    constantly between shows.
15    Q.   And did Spirit and Led Zeppelin ever tour together?
16    A.   No.
17    Q.   And at your deposition, you testified that you had no
18    recollection of performing in Denver with Vanilla Fudge and
19    Led Zeppelin, right?
20    A.   I remember the bill.  I do not remember the show very
21    clearly.
22    Q.   When you say "the bill," what do you mean?
23    A.   When you are a band and you're going to play, you look at
24    who's playing with you.  And I knew of Led Zeppelin.  I was a
25    fan of theirs before they came over and I was a fan of Vanilla
```

190

1   Fudge, so this bill was pretty important to me.

2   Q.   But you're not saying that there was actually a billing in

3   front of the club that had those names on it?

4   A.   Well, it was a concert, as opposed to a club, and I don't

5   remember if there was a marquee or not.

6   Q.   You mentioned the Northern California Folk Rock Festival.

7         Isn't it true that at your deposition, you testified

8   that you had no recollection about that festival?

9   A.   Specifically, the festivals would be multiple days, and I

10  do not remember if we played on the same day as Led Zeppelin,

11  for instance.

12  Q.   And you referred to performing in Seattle, I believe.

13  A.   Um-hmm, the Seattle Pop Festival.

14  Q.   And what year was that?

15  A.   '69.  1969.

16        MR. ANDERSON:  And if we could have Exhibit 312.

17        THE CLERK:  Counsel, are you moving it into evidence

18  or just for demonstrative?

19        MR. ANDERSON:  At this point, I haven't moved for its

20  admission.

21        THE COURT:  Okay.  Any objection to it being

22  published?

23        MR. MALOFIY:  One moment, Your Honor.

24        No objection, Your Honor.

25        THE COURT:  Okay.  You may publish it.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**00326**

191

```
 1   BY MR. ANDERSON:
 2   Q.   Do you recall Exhibit 312?
 3        (The exhibit was displayed on the screen.)
 4            THE WITNESS:  Oh, do I recall this?
 5   BY MR. ANDERSON:
 6   Q.   Yes, sir.
 7   A.   I'm sorry.  I thought you were speaking to someone else.
 8            I do recall this show.
 9   Q.   And do you recall testifying at your deposition that that
10   was a typical set list for the songs that Spirit performed in
11   concerts at the time?
12   A.   For the most part.  There are maybe three or four songs
13   that had been changed in and out per show, but all of those are
14   familiar.
15   Q.   And that is what they typically played at the time in
16   1970?
17   A.   Typically, but not constantly.  This lineup of songs would
18   be constantly evolving, actually changing.
19   Q.   And at the Seattle Pop Festival, you testified, isn't it
20   true, that you didn't recall who else was there?
21   A.   No, but in reviewing a history of our touring,
22   Led Zeppelin apparently was at that show -- or at that
23   festival.
24   Q.   Yes, but you have no recollection of that, correct?
25   A.   No, not specifically.
```

192

```
1    Q.   And isn't it also true that you have no recollection of
2    Led Zeppelin performing at the Texas Pop Festival?
3    A.   Exactly.  The same situation.  I knew they were on the
4    bill, did not see them perform.
5    Q.   And I apologize for jumping around a bit.
6              MR. ANDERSON:  If we could have Exhibit 320.
7              THE COURT:  Are you moving it into evidence or for
8    demonstrative purposes?
9              MR. ANDERSON:  For demonstrative purposes.
10             THE COURT:  Any objection?
11             MR. MALOFIY:  No objection.
12             THE COURT:  Okay.  You may publish.
13        (The exhibit was displayed on the screen.)
14   BY MR. ANDERSON:
15   Q.   Do you recognize Exhibit 320?
16   A.   I don't know if I've seen this handbill before.  I
17   recognize the elements, I recognize the picture.
18             If you could pull back a bit so I could see the rest
19   of the -- this looks to be an advertisement for the December
20   show in Denver.
21   Q.   And at the top where it says The Family That Plays
22   Together --
23   A.   Correct.
24   Q.   -- that's the title of the second album, the breakout
25   album?
```

193

```
1   A.    Correct.

2   Q.    And do you recognize -- you said you recognized the

3   picture.  Where do you recognize it from?

4   A.    That's the back of the album.

5   Q.    Was Spirit and Mr. Wolfe, Randy Wolfe, were they fans of

6   the Beatles?

7   A.    Were they fans of what?

8   Q.    The Beatles.  Excuse me.

9   A.    Oh, yeah, we all were big fans.

10  Q.    In the course of your career, have you been misquoted in

11  articles?

12  A.    Undoubtedly.

13  Q.    Okay.  If you could just give me a moment.

14        MR. ANDERSON:  I believe that's all the questions

15  that I have for this witness.  Thank you, Your Honor.

16        No.  No, I don't.  Sorry.  I spoke too quickly.

17  BY MR. ANDERSON:

18  Q.    How were you familiar with Led Zeppelin before Denver?

19  A.    I was an Anglophile record collector and listener, and so

20  I knew of their work in Britain before it was released in the

21  United States, and I just -- you know, I loved the band.  Big

22  fan.

23  Q.    And do you have any personal knowledge of performances of

24  Led Zeppelin in 1969?

25  A.    Personal knowledge?  Only the shows that we did together,
```

194

```
 1   which were the festivals.
 2            MR. ANDERSON:  Okay.  Thank you, Your Honor.
 3            THE COURT:  Thank you.
 4            Redirect?
 5            MR. MALOFIY:  Yes.  A few minutes, Your Honor.  I
 6   know we're getting close to 4 o'clock.
 7            THE COURT:  That's okay.  We'll go up until 4:00 and
 8   we'll break at 4:00.
 9            MR. MALOFIY:  Okay.  I just know this witness is from
10   Santa Barbara.  I wanted to get him knocked out today, but --
11            THE COURT:  If you do it by 4:00.
12                     REDIRECT EXAMINATION
13   BY MR. MALOFIY:
14   Q.   A few things to clear up.
15            In your direct testimony, you said it wasn't just a
16   riff, it was a bass riff, guitar, and also piano.
17            Do you recall that?
18   A.   Correct.
19   Q.   And when Mr. Anderson came on here, he characterized it as
20   solely a bass riff.
21            Do you recall that?
22   A.   No.  The bass began the riff, but the entire band played
23   it.
24   Q.   All right.  So to be clear, this was not just a bass riff,
25   it was more than a bass riff.  It was a full composition with
```

195

```
 1    full instrumentation, correct?

 2    A.   Yes.

 3              MR. ANDERSON:  Objection.  Leading.

 4              THE COURT:  Overruled.

 5    BY MR. MALOFIY:

 6    Q.   Now, couple things.

 7              Mr. Anderson came up here.  He showed you a

 8    picture -- I believe it was 346 exhibit [sic] -- and it had a

 9    set list, and he said, "Was this typical of your set list in

10    1970?"

11              Do you recall that?

12    A.   Correct.

13    Q.   And you said some songs got changed in and out, correct?

14    A.   Correct.

15    Q.   Now, to be clear, "Taurus," the song we're talking about

16    that you discussed in your direct, was a song that you said was

17    played often in '66, '67, and '68 --

18    A.   Yes.

19    Q.   -- and '69; is that correct?

20    A.   Yes.

21              MR. ANDERSON:  Objection.  Leading.

22              THE COURT:  Overruled.

23    BY MR. MALOFIY:

24    Q.   So the typical set list in '66, '67, '68, and '69 did

25    include "Taurus," correct?
```

196

```
 1   A.    Yeah.

 2   Q.    Okay.  Now, a few other things to address.

 3         It was asked were you fans -- was Spirit and Randy

 4   fans of the Beatles and you said yes, correct?

 5   A.    Um-hmm.

 6   Q.    Do you dispute ever hearing the music of the Beatles?

 7   A.    No.

 8   Q.    Right.  And do you understand that Mr. Page and Mr. Plant

 9   dispute ever hearing your music or knowing "Fresh Garbage" --

10   or, excuse me, knowing Spirit as a band?

11   A.    I'm hearing about it now.

12   Q.    Yeah.  All right.  Now, did people suggest to you over the

13   years that there are similarities or they sounded the same,

14   "Taurus" and "Stairway to Heaven"?

15   A.    Quite often.

16   Q.    Let me move to a couple examples.  I'd like to play

17   example 6-A, "Fresh Garbage" by Led Zeppelin, after the release

18   by Spirit.

19         THE COURT:  Counsel, if you're going to be asking

20   questions about it, we can end now, because it's 3:59.

21         MR. MALOFIY:  Literally got a minute, Your Honor.

22      (Playing of audio recording.)

23   BY MR. MALOFIY:

24   Q.    Do you recognize that song?

25   A.    Yes.
```

197

```
 1    Q.   Is that your song?

 2    A.   Yes.

 3              MR. ANDERSON:  Objection.

 4    BY MR. MALOFIY:

 5    Q.   Is that "Fresh Garbage"?

 6    A.   Yes.

 7              THE COURT:  Overruled.

 8    BY MR. MALOFIY:

 9    Q.   All right.  Now, lastly, could we play 205-A?

10              THE COURT:  Counsel, I'm sorry.  It's 4 o'clock.

11    We're going to break at this time.

12              Ladies and gentlemen, remember the admonishment not

13    to discuss the case among yourselves or with anybody else, or

14    form or express any opinions about the matter until it's

15    submitted to you and you retire to the jury room.

16              I'm going to excuse you at this time.

17              We're going to have you come back in tomorrow morning

18    at quarter after 8:00.  We'll start right at 8:30 at that time.

19              Okay.  Counsel, you are standing.

20              MR. KULIK:  Just getting ready, Your Honor.

21              THE COURT:  Okay.  You're anticipating.

22              Okay.  So the jury will be excused at this time.

23    We're going to be breaking at this time and we'll see you back

24    at quarter after 8:00 tomorrow morning.

25              And the witness will be ordered back also, because we
```

198

1    have more direct and more recross.

2              Okay.  We'll be in recess.

3              THE CLERK:  All rise.

4         *(Evening recess taken 4:01 p.m.)*

5                        --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

199

```
 1
 2
 3                            CERTIFICATE
 4
 5       I hereby certify that pursuant to Section 753,
 6   Title 28, United States Code, the foregoing is a true and
 7   correct transcript of the stenographically reported
 8   proceedings held in the above-entitled matter and that the
 9   transcript page format is in conformance with the
10   regulations of the Judicial Conference of the United States.
11
12   Date: JUNE 14, 2016
13
14
15
16
17                     /s/  Cindy L. Nirenberg, CSR No. 5059
18                          Official Court Reporter
19
20
21
22
23
24
25
```

200

1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

3       **HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE**

4                        **- - - -**

5

6    **MICHAEL SKIDMORE, AS TRUSTEE FOR  )**
     **THE RANDY CRAIG WOLFE TRUST,        )**
7                                        **)**
                          **PLAINTIFF,    )**
8                                        **)**
         **vs.                           )     No. CV 15-03462-RGK**
9                                        **)**
     **LED ZEPPELIN; JAMES PATRICK PAGE; )**
10   **ROBERT ANTHONY PLANT; JOHN PAUL    )**
     **JONES; SUPER HYPE PUBLISHING,      )**
11   **INC.; WARNER MUSIC GROUP CORP.,    )**
     **PARENT OF WARNER/CHAPPELL MUSIC,   )**
12   **INC.; ATLANTIC RECORDING           )**
     **CORPORATION; RHINO ENTERTAINMENT   )**
13   **COMPANY,                           )**
                                         **)**
14                        **DEFENDANTS.        )**

15

16          **REPORTER'S TRANSCRIPT OF JURY TRIAL**

17          **DAY 2, VOLUME 1; PAGES 200 TO 286**

18             **WEDNESDAY, JUNE 15, 2016**

19                   **8:31 A.M.**

20             **LOS ANGELES, CALIFORNIA**

21

22      _____

23          **SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR**
          **Official Reporter, U.S. District Court**
24              **255 East Temple Street**
              **Los Angeles, CA  90012**
25                 **213.894.5949**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE**
     **RANDY CRAIG WOLFE TRUST:**

4
              FRANCIS ALEXANDER, LLC
5             BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
              280 N. PROVIDENCE ROAD, SUITE 1
6             MEDIA, PENNSYLVANIA  19063
              215.500.1000
7
              KULIK GOTTESMAN & SIEGEL, LLP
8             BY:  GLEN L. KULIK, ATTORNEY AT LAW
              15303 VENTURA BOULEVARD, SUITE 1400
9             SHERMAN OAKS, CALIFORNIA  91403
              310.557.9200
10

11   **FOR DEFENDANT LED ZEPPELIN:**

12            PHILLIPS NIZER, LLP
              BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
13            666 FIFTH AVENUE
              NEW YORK, NEW YORK  10103
14            212.977.9700

15

16   **FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:**

              LAW OFFICES OF PETER J. ANDERSON, PC
17            BY:  PETER J. ANDERSON, ATTORNEY AT LAW
              100 WILSHIRE BOULEVARD, SUITE 2010
18            SANTA MONICA, CALIFORNIA  90401
              310.260.6030
19
              PHILLIPS NIZER, LLP
20            BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
              666 FIFTH AVENUE
21            NEW YORK, NEW YORK  10103
              212.977.9700

22

23   ///

24   ///

25   ///

202

```
 1   APPEARANCES OF COUNSEL (CONTINUED):

 2

 3   FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING
     CORPORATION, RHINO ENTERTAINMENT COMPANY:
 4
            LAW OFFICES OF PETER J. ANDERSON, PC
 5          BY:  PETER J. ANDERSON, ATTORNEY AT LAW
            100 WILSHIRE BOULEVARD, SUITE 2010
 6          SANTA MONICA, CALIFORNIA  90401
            310.260.6030
 7

 8

 9   ALSO PRESENT:

10          NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

11          BRAD COHEN, WARNER MUSIC GROUP

12          SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

13          DAN MORENO, TRIAL TECHNICIAN

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

203

```
1                          I N D E X

2

3    PLAINTIFF'S WITNESSES:                         PAGE

4    JAY FERGUSON

5       REDIRECT EXAMINATION (CONTINUED) BY MR. MALOFIY    205

6       RECROSS-EXAMINATION BY MR. ANDERSON              228

7

     MICHAEL WARE
8
        (VIA VIDEO-TAPED DEPOSITION TESTIMONY)          240
9

10   MARK ANDES

11      DIRECT EXAMINATION BY MR. MALOFIY               255

12

13

14   DEFENDANTS' WITNESS:                            PAGE

15   JAY FERGUSON (OUT OF ORDER)

16      DIRECT EXAMINATION BY MR. ANDERSON             235

17

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///
```

204

*E X H I B I T S*

| TRIAL EXHIBIT NUMBER: | MARKED FOR I.D. PAGE: | RECEIVED IN EVIDENCE PAGE: |
|---|---|---|
| 305 | -- | 209 |
| 313 | -- | 212 |
| 314 | -- | 214 |
| 316 | -- | 218 |
| 318 | -- | 220 |
| 319 | -- | 221 |
| 320 | -- | 223 |
| 321 | -- | 224 |
| 2950 | -- | 253 |
| 2951 | 254 | -- |
| 2952 | 254 | -- |
| 2953 | 254 | -- |
| 2954 | -- | 253 |
| 2955 | -- | 253 |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00340**

205

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, JUNE 15, 2016

 2                          8:31 A.M.

 3                          - - - -

 4       (In the presence of the jury:)

 5              THE COURT:  Okay.  Ladies and gentlemen, I hope you

 6     had a pleasant evening last night and are bright-eyed and

 7     bushy-tailed and ready to start the day.

 8         The record will reflect that all the members of the jury

 9     are in their respective seats.  The witness is on the witness

10     stand.

11         And, Counsel, we were examining?

12              MR. MALOFIY:  Yes, Your Honor.

13              THE COURT:  We were still on redirect.

14              MR. MALOFIY:  Yes, Your Honor.

15              THE COURT:  Okay.  You may continue.

16              THE CLERK:  Mr. Ferguson, I'll just remind you, you're

17     still under oath.  Thank you.

18              MR. MALOFIY:  Thank you, Your Honor.

19              THE COURT:  Mm-hmm.

20                  JAY FERGUSON, PREVIOUSLY SWORN,

21               CALLED AS A WITNESS BY THE PLAINTIFF,

22                  REDIRECT EXAMINATION (CONTINUED)

23     BY MR. MALOFIY:

24     Q.  Mr. Ferguson, thank you for coming back today.  I know you

25     live in Santa Barbara, and I appreciate you being here.
```

206

```
 1          Just to recap or just to kind of end up with the last
 2    question I believe we were talking about, it was
 3    "Fresh Garbage," a song you had written.  Do you recall that?
 4    A.    Correct.
 5    Q.    And if I got your testimony correct, it's a song you had
 6    written while you were with Spirit, correct?
 7    A.    Correct.
 8    Q.    Now, when Mr. Anderson was questioning you on redirect, he
 9    tried to state that it was just the bass riff that was pulled,
10    and I believe your testimony was, it was more than that.
11          Can you share with the jury, to recap, what was actually
12    taken from your song, "Fresh Garbage," sir?
13    A.    That riff began on the bass, but the rest of the band
14    joined in, and it was the entire core of the song, and I was
15    trying to characterize it on the level of the Rolling Stones'
16    "Satisfaction," where that riff is key to the song.
17    Q.    Now, there was also questioning by defense counsel that it
18    was only a very small part of the song.
19          Did you ever listen to "Fresh Garbage" and did you ever
20    make a determination of how long that that riff extended for?
21    A.    No.
22    Q.    All right.
23          MR. ANDERSON:  Objection.
24          MR. MALOFIY:  Could we play Exhibit 6A?
25          MR. ANDERSON:  Objection, relevance.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00342**

207

```
 1              THE COURT:  Sustained.
 2              MR. MALOFIY:  It was played already.
 3              THE COURT:  I know it was.
 4              MR. MALOFIY:  Oh.
 5              MR. ANDERSON:  If he'd have objected at that time, I
 6    would have sustained it then.
 7         (Audio/video started abruptly and stopped.)
 8              MR. MALOFIY:  Sorry about that, Your Honor.
 9              THE COURT:  No problem.
10    BY MR. MALOFIY:
11    Q.   All right.  Did you ever hear recordings of
12    "Fresh Garbage" performed by Led Zeppelin?
13    A.   I did.  I was given a tape.  It was taken from a concert.
14    They played a live show, and in the middle of the tape they
15    start playing "Fresh Garbage."
16    Q.   And was it more than just a few seconds, or was it -- was
17    it something more substantial than that?
18    A.   I would have to go back and review, but I thought it went
19    on for much more than a few seconds.
20    Q.   Was it minutes?
21    A.   Maybe a minute or two.
22    Q.   Okay.  Did you have a copyright in that musical
23    composition?
24    A.   It was copyrighted.
25    Q.   And was it protectable elements of music that you had
```

208

```
 1    written?
 2             MR. ANDERSON:  Objection, lacks foundation, calls for
 3    legal conclusion.
 4             THE COURT:  Sustained.
 5    BY MR. MALOFIY:
 6    Q.   Let me move forward to a couple other issues and a couple
 7    other things defense counsel was asking you about.
 8         There was testimony as to whether or not you played
 9    certain shows.
10         I'd like to pull up Exhibit 305.
11             THE CLERK:  Okay.  Before you publish that, are you
12    moving it to be introduced into evidence?
13             MR. MALOFIY:  Yes.
14             THE COURT:  Okay.  Any objection?
15             MR. ANDERSON:  Your Honor, I need to see what 305 is.
16    Counsel didn't provide it.
17             THE COURT:  I'm sorry, Counsel?
18             MR. MALOFIY:  That's absolutely false.
19             MR. ANDERSON:  I'm sorry, Your Honor.
20             THE COURT:  Is there an objection on it, I said?
21             MR. ANDERSON:  If I could have a moment just to look
22    at it.
23             THE COURT:  Okay.
24             MR. ANDERSON:  Thank you.
25         Counsel, do you have that?
```

209

```
 1            MR. MALOFIY:  Yeah, come on.  Yeah, I'll help you.

 2            MR. ANDERSON:  Just relevance, Your Honor.

 3            MR. MALOFIY:  Let me show you where it's at.

 4            MR. ANDERSON:  I found it.

 5            MR. MALOFIY:  You sure?

 6            MR. ANDERSON:  Yes.

 7            MR. MALOFIY:  You got it?  Okay, good.

 8            THE COURT:  Overruled.

 9        You may continue, Counsel.

10            MR. MALOFIY:  Thank you.

11        (Received in evidence, Trial Exhibit 305.)

12            MR. MALOFIY:  Can we pull up 305?

13            MR. MORENO:  Yes.

14        (Exhibit was displayed on the screen.)

15   BY MR. MALOFIY:

16   Q.   Do you recognize this poster from the Northern California

17   Pop Festival?

18   A.   I do.

19   Q.   And why do you recognize that poster?

20   A.   Well, we played the show, and the poster was visible then,

21   and I've seen it in collectible sites online since.

22            MR. MALOFIY:  Now, for the orientation of the jury --

23   for the orientation of the jury, can we blow up the first two

24   lines of text after the big image in the middle of the page.

25        Can you blow that up any bigger?  That'd be great if we
```

210

```
 1  can.
 2  Q.   Okay.  Now, can you see the printed text there on the
 3  screen, Mr. Ferguson?
 4  A.   Yes.
 5  Q.   And what does that printed text -- does that printed text
 6  indicate bands that played on that show?
 7  A.   Yes, it does.
 8           MR. ANDERSON:  Objection, hearsay.
 9           THE COURT:  Overruled.
10  BY MR. MALOFIY:
11  Q.   And what bands -- do you see the band Led Zeppelin listed
12  there --
13  A.   I do.
14  Q.   -- on that poster?
15  A.   Yes.
16  Q.   And do you also see another band that you were a part of?
17  A.   Yes.
18  Q.   And what band is that?
19  A.   That is misspelled, Spirit.
20  Q.   Okay.  Let me ask you this.  Can you read through just
21  those first couple lines of bands that are listed in that
22  poster?
23  A.   From the top, The Jimi Hendrix Experience, Jefferson
24  Airplane, Chambers Brothers, Led Zeppelin, Eric Burdon, Spirit.
25  Q.   All right.  Pull back to full size.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

211

1     Can you read the rest of the bands that are listed on that

2  sheet?

3     And can we blow up all the text underneath the image for

4  the orientation of the jury.

5          THE COURT:  Well, Counsel, the document speaks for

6  itself, so they could read it themselves rather than his

7  reading it to them.

8          MR. MALOFIY:  It was only for purposes of the record

9  and because it's hard to read.  That's the only reason, Your

10  Honor.

11          THE COURT:  The document speaks for itself.  It's in

12  evidence.  It will be part of the record.

13          MR. MALOFIY:  All right.

14  Q.   Is it fair to say that Jimi Hendrix Experience,

15  Led Zeppelin, Canned Heat, Muddy Waters, Santana, and some of

16  the other members -- some of the other bands on that list were

17  contemporaries of yours during those late '60s?

18  A.   Yes.

19  Q.   And are these bands you played with regularly?

20  A.   Fairly often, yes.

21  Q.   All right.  Now, let me move to another exhibit.  I know

22  Mr. Anderson was asking you about concerts you've played.

23     Let's pull up -- let's pull up Exhibit 313.

24          THE CLERK:  Before you publish that, are you moving it

25  into evidence?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00347**

212

```
 1              MR. MALOFIY:  I would like to.  This is all --

 2              THE COURT:  Would you like to move it into evidence?

 3              MR. MALOFIY:  Yes, Your Honor.

 4              THE COURT:  Any objection?

 5              MR. ANDERSON:  No, Your Honor.

 6              THE COURT:  It may be received.  It may be published.

 7              MR. MALOFIY:  Thank you.

 8         (Received in evidence, Trial Exhibit 313.)

 9              MR. MALOFIY:  Could we blow up the top there, because

10    I'm not sure if Mr. Ander- -- excuse me, Mr. Ferguson can read

11    that.  I know I can't.

12         (Exhibit was displayed on the screen.)

13    BY MR. MALOFIY:

14    Q.   Can you take a moment to review that news article.

15    A.   I've seen this before.

16    Q.   Now, on this news article, can you read the title of it

17    for the purpose of the record.

18    A.   "Rock," quotation, "Concert is Real Groovy."

19    Q.   Now, the first paragraph there says, "Barry Fey did it

20    again at the Auditorium Arena.  Vanilla Fudge, Spirit and

21    Living Sound."  Do you see that?

22    A.   Umm, first -- are you talking about the first paragraph?

23    Q.   Yeah.  I believe I read it correctly.

24    A.   Vanilla Fudge, Spirit and Led Zeppelin.

25    Q.   Oh, I'm sorry.
```

213

```
1    A.    Not "Living Sound."

2    Q.    You know what, I apologize, and thank you for correcting

3    me.  The way the line is drawn on this copy led me to believe

4    that the sentence was broken.  Thank you for the clarification.

5    Let me try that one more time.

6          Does the first paragraph say, "Barry Fey did it again, a

7    great rock concert at the Auditorium Arena Thursday night with

8    the Vanilla Fudge, Spirit and Led Zeppelin in colorful living

9    sound"?

10   A.    Correct.

11   Q.    Did I get it right this time?

12   A.    You got it.

13   Q.    All right.  Now, does this -- does this article, does this

14   reference an event that occurred where you had performed with

15   Led Zeppelin?

16   A.    It does.

17   Q.    All right.  What event was that?

18   A.    It was a show in Denver the end of 1968.

19   Q.    Okay.  And was this, from your understanding,

20   Led Zeppelin's first show on U.S. soil?

21   A.    Yes.

22   Q.    And is this the show where they opened for you?

23   A.    Yes.

24   Q.    All right.  Let's pull back to full-size original.  That's

25   good.
```

214

```
 1          Now, let me pull up another exhibit, Exhibit 314.  I would
 2   like to move it into evidence as well.
 3          Are we able to turn that for the orientation of the jury?
 4   No?
 5              THE COURT:  Excuse me.  Any objection, Counsel?
 6              MR. ANDERSON:  To the extent it's offered for the
 7   truth of the assertions, hearsay, Your Honor.
 8              THE COURT:  Overruled.
 9          (Received in evidence, Trial Exhibit 314.)
10              MR. MALOFIY:  I'm sorry.  For the orientation of the
11   jury, we can't orient this to make it a little easier to read,
12   so we'll have to maybe orient our heads a little bit.  I'll do
13   my best to read what's there to make it easier.
14   Q.   It says, "Atlanta Pop, greatest musical fair ever,
15   approximately 120,000 hip people trekked to the Atlanta Raceway
16   last week for the Atlanta International Pop Festival of two
17   days of solid sound, sweat and suffering."
18          It goes on, in the fifth paragraph, to identify the bands
19   that performed there.  Can you go to the fifth paragraph as
20   best you can, count it out, and tell me what's written.
21   A.   You know, it's basically unreadable, I'm sorry.
22   Q.   What's that?
23   A.   It's basically unreadable.
24   Q.   Okay.
25   A.   Unless you blow it up.
```

215

```
1        Okay, there you go.
2   Q.   Excuse me.  And I'm looking at -- I wish I had a laser.  I
3   didn't bring my laser.
4             THE COURT:  Okay, Counsel, let me help you out a --
5             THE WITNESS:  I can read this.
6             THE COURT:  Counsel, let me help you out a little bit.
7   It's in evidence, Counsel.  Do you want him to see the original
8   copy?
9             MR. MALOFIY:  You know what, let me just read it, and
10  you can just --
11            THE WITNESS:  I can read it at this resolution.
12            THE COURT:  Okay.
13  BY MR. MALOFIY:
14  Q.   You can or can't?
15  A.   Yeah, I can.
16  Q.   Okay.  Can you read me that paragraph.  I believe it
17  starts with --
18            THE COURT:  Counsel --
19  BY MR. MALOFIY:
20  Q.   -- "Saturday's lineup."
21            THE COURT:  Counsel, slow down a little bit.  We have
22  the exhibit.  We have an exhibit book.  He can look at it.  He
23  doesn't have to turn sideways.  If you'd like him to look at
24  the original exhibit, you can.  If you'd like him to.
25            MR. MALOFIY:  May I do that, Your Honor?
```

216

```
 1              THE COURT:  Sure.

 2              MR. MALOFIY:  Thank you.  I'm sorry.

 3              THE COURT:  No problem.

 4              MR. MALOFIY:  I didn't want to burden the staff.

 5              THE COURT:  As she's pulling it up, if you'd like to

 6     handle other matters, you can.

 7              THE WITNESS:  I can read this, if that saves time.

 8              THE COURT:  Okay.  Well, go ahead and read it, then.

 9              THE WITNESS:  Okay.

10         "Saturday's lineup included Spirit, Led Zeppelin, Blood,

11     Sweat & Tears, CTA, Joe Cocker, Janis Joplin" --

12         Want me to continue?

13              MR. MALOFIY:  Yes.

14              THE COURT:  That's it.

15              THE WITNESS:  -- "plus peak performances by

16     Sweetwater" --

17              THE COURT:  I'm sorry, Counsel.  We could spend all

18     kind of days talking about things that aren't relevant.  You

19     mentioned Spirit, you've mentioned Led Zeppelin.  I think

20     that's enough.  Go ahead.

21     BY MR. MALOFIY:

22     Q.   And do you recall performing at the Atlanta Pop Festival

23     with Led Zeppelin?

24     A.   I do.

25     Q.   And I'm not sure if you testified to it earlier on or not,
```

217

```
 1  but do you remember in what order, or do you remember if you
 2  were -- if you performed in close order at that festival?
 3          MR. ANDERSON:  Objection.
 4          THE WITNESS:  Absolutely.  It was a very memorable
 5  afternoon.
 6          THE COURT:  Excuse me.
 7          MR. ANDERSON:  Objection, vague and ambiguous.  I
 8  think beyond the scope of the prior examination.
 9          THE COURT:  Overruled.
10          THE WITNESS:  It was a memorable afternoon.  We
11  followed -- Spirit followed Janis Joplin and The Holding
12  Company, which was a great act, and immediately after us,
13  Led Zeppelin came on the stage.  So it was very exciting.
14  BY MR. MALOFIY:
15  Q.  I see.  Did you have an opportunity to watch their
16  performance?
17  A.  A little bit from the side.
18  Q.  Okay.  Do you recall whether or not they were watching
19  your performance?
20  A.  I do not recall.
21  Q.  Was it customary to watch bands that you were playing with
22  or appreciated that either preceded you or followed you at
23  these concerts?
24          MR. ANDERSON:  Objection, leading.
25          THE COURT:  Sustained.  Sustained.
```

218

```
1            MR. MALOFIY:  Oh.
2   Q.   When you were performing at concerts, did you have an
3   opportunity to watch the bands that performed before or after
4   you?
5   A.   Yes, you did.
6            MR. ANDERSON:  Objection.
7            THE COURT:  Overruled.
8   BY MR. MALOFIY:
9   Q.   Can you repeat that answer, sir?
10  A.   Yes, you did have that opportunity.
11  Q.   Okay.  Let me go to Exhibit 316.
12       I'd like to move that into evidence as well.  It was
13  exchanged with counsel.
14            MR. ANDERSON:  No objection, Your Honor.
15            THE COURT:  Be received.
16       (Received in evidence, Trial Exhibit 316.)
17       (Exhibit was displayed on the screen.)
18  BY MR. MALOFIY:
19  Q.   Do you recognize this poster for a show?
20  A.   I do.
21  Q.   Why do you recognize it?
22  A.   We played this pop festival.
23  Q.   And for the orientation of the jury, can we blow up -- can
24  you read me the date that appears on that poster.
25  A.   Sunday, July 27, 1969.
```

219

```
1    Q.    And does this indicate the day that you -- does this
2    indicate the bands that were supposed to play on that day?
3    A.    Correct.
4    Q.    And can you read me -- do you recognize the band you
5    performed in on the left side of that -- of that picture?
6    A.    Spirit performed on that day.
7    Q.    And almost directly to the right, on that same day, who
8    else does it indicate was supposed to perform?
9    A.    Led Zeppelin performed on that same day.
10   Q.    Do you have any independent recollection of that concert?
11   A.    Honestly, no.
12   Q.    Okay.  Thank you.  But you do recall perform -- you do
13   believe you performed there, correct?
14   A.    Oh, I know we performed there, yes.
15   Q.    All right.  Let me move forward to next exhibit, 318.
16         THE CLERK:  Counsel, before they're published, they
17   need to be moved into evidence.
18         MR. MALOFIY:  I'm sorry.
19         THE COURT:  Would you like to move it into evidence at
20   this time?
21         MR. MALOFIY:  I would, Your Honor.
22         THE COURT:  Any objection?
23         MR. ANDERSON:  Just hearsay to the extent it's offered
24   for the truth.
25         THE COURT:  Okay.  It will be received.
```

```
1            (Received in evidence, Trial Exhibit 318.)

2            (Exhibit was displayed on the screen.)

3    BY MR. MALOFIY:

4    Q.    Do you recognize this poster?

5    A.    I do.

6    Q.    Have you seen it during the course of the last many years?

7    A.    Umm, probably.

8    Q.    Okay.  And what does this poster indicate?

9    A.    This looks like an alphabetical listing of the bands that

10   played at this pop festival.

11   Q.    And do you recognize the band that you performed with in

12   those late '60s years?

13   A.    Yes.  Spirit is on this list.

14   Q.    And do you also recognize another band that Mr. Page and

15   Mr. Plant were part of in those late '60s years?

16   A.    Yes.  Led Zeppelin is on this list.

17   Q.    Okay.  Do you have an independent recollection seeing

18   Led Zeppelin perform at the show?

19   A.    Honestly, no.

20   Q.    Okay.  Is it your belief that you performed, or Spirit

21   performed on that date --

22   A.    Yes.

23   Q.    -- at that concert?

24         Okay.  Let me move forward to 319, Texas International Pop

25   Festival poster and news articles which was used in the
```

221

```
 1   deposition of Mr. Ferguson.
 2           MR. ANDERSON:  You moving it?
 3           MR. MALOFIY:  Any objection, Counsel?
 4           MR. ANDERSON:  I was waiting for you to move for its
 5   admission, but no objection, Your Honor.
 6           THE COURT:  It will be received.
 7           MR. MALOFIY:  Yeah, move it into evidence.  Thank you.
 8           THE COURT:  Okay.  It will be received.
 9           MR. MALOFIY:  Thank you.
10       (Received in evidence, Trial Exhibit 319.)
11       (Exhibit was displayed on the screen.)
12   BY MR. MALOFIY:
13   Q.   Do recognize this poster?
14   A.   I do.
15   Q.   And why do you recognize this poster?
16   A.   I actually have this poster, and we played at this pop
17   festival.
18   Q.   And was this a pop festival in Texas?
19   A.   It was.
20   Q.   Now, what was the date of this pop festival?
21   A.   Two days.  August 30th, 31st -- oh, three days, I'm sorry.
22   August 30th, 31st, September 1st.  This would be 1968 -- '9,
23   I'm sorry.
24   Q.   Now, with the listing of bands there, there's a number of
25   bands.  Janis Joplin, Sly & the Family Stone --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

222

```
1   A.    Mm-hmm.
2   Q.    -- Led Zeppelin, Spirit, a number of others, Sam & Dave.
3         Do you recognize -- do you recall playing with
4   Led Zeppelin on the show, in this concert?
5   A.    I recall our performance vividly.  We were followed by
6   Sly & the Family Stone, and we stuck around and watched his
7   whole show.
8   Q.    And why did you stick around and watch that show?  Did you
9   appreciate --
10  A.    We were big fans, and we had the opportunity to be there.
11  Q.    Understood.
12        Do you have an independent recollection of whether or not
13  Led Zeppelin performed on that day?
14  A.    I don't.
15  Q.    But you --
16  A.    I assume they did, because had they not, it would have
17  been news that we would have all shared.
18        MR. ANDERSON:  Objection, move to strike as
19  speculation.
20        THE COURT:  That last part will be stricken.
21        MR. MALOFIY:  All right.  Now, could we blow it up,
22  could we pull it back, the original?  Thank you.
23  Q.    Now, these are also additional bands listed here.  Are
24  these all, a number of them, Crosby, Stills, Nash, B.B. King,
25  and all these other names, Janis Joplin, are these
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00358**

223

```
 1    contemporaries of your -- of the time, of people you performed
 2    with?
 3    A.   Yes.
 4              MR. ANDERSON:  Objection, relevance.
 5    BY MR. MALOFIY:
 6    Q.   And at these pop festivals --
 7              THE COURT:  Excuse me.  Sustained.  The answer will be
 8    stricken.
 9         Next question.
10              MR. MALOFIY:  Yes.  Let me move to the next exhibit,
11    320.
12         For all my exhibits I'm calling, Your Honor, I don't know
13    if it would make it easier just to say that I'd like to move
14    them into evidence, unless there's an objection.
15              THE COURT:  If there's no objection, they can come in.
16    If there is -- well, if there is an objection, we have to hear
17    it, though, and I don't know if you want each one mentioned
18    individually or not.
19              MR. ANDERSON:  I -- each exhibit mentioned
20    individually --
21              THE COURT:  Okay.  Let's do it individually.
22              MR. ANDERSON:  But I do not object to this exhibit.
23              THE COURT:  Okay.  It will come in.
24         (Received in evidence, Trial Exhibit 320.)
25         (Exhibit was displayed on the screen.)
```

224

1    BY MR. MALOFIY:

2    Q.   I think you were questioned about this exhibit earlier on

3    by Mr. Anderson, defense counsel, correct?

4    A.   Mm-hmm.

5    Q.   And you said you recognized this, correct?

6    A.   I do.

7    Q.   And is this a poster when you performed on December 26th,

8    1968, in Denver, Colorado?

9    A.   Yes.

10   Q.   All right.  And is this a show that Led Zeppelin also

11   performed at?

12   A.   Yes.

13   Q.   And this is the show that Led Zeppelin opened for you?

14   A.   Yes.

15   Q.   Okay.  Let me go to Exhibit 321.

16        MR. ANDERSON:  No objection, Your Honor.

17        THE COURT:  It will be received.

18        (Received in evidence, Trial Exhibit 321.)

19        (Exhibit was displayed on the screen.)

20        MR. MALOFIY:  Now, could we blow up the top there,

21   with the date and the heading, for the orientation of the jury.

22   Q.   Can you read that top line.

23   A.   "Led Zeppelin vocalist, Robert Plant, was hurt in a road

24   crash on Saturday returning from Mothers Club" --

25   Q.   Let me go before the news extra.  I'm referring to the

225

1    date itself.

2    A.    Oh, okay.  "Melody Maker, February 7, 1970."

3    Q.    Thank you.

4          Now, could we pull back the original and can we blow up

5    the first paragraph.

6          Are you able to read that, Mr. Ferguson?

7    A.    "Led Zeppelin vocalist Robert Plant was hurt in a road

8    crash on Saturday returning from Mothers Club Birmingham, where

9    he had been to see Spirit."

10   Q.    All right.  Is this the time you had the opportunity to

11   meet Robert Plant in the United Kingdom when you were

12   performing as Spirit at the Mothers Club?

13   A.    Yes.

14   Q.    And does this indicate and is this consistent with the

15   facts as you understand them, that he was at the concert on

16   that day?

17   A.    Oh, yes.

18          MR. ANDERSON:  Objection.

19          MR. MALOFIY:  Thank you.

20          MR. ANDERSON:  That's fine, Your Honor.  Thank you.

21          THE COURT:  Okay.

22   BY MR. MALOFIY:

23   Q.    Did you ever know -- did Robert Plant ever call you after

24   the concert and let you know he got in a car accident?

25   A.    No.  It was just in the news.

226

```
 1    Q.    All right.  Thank you for that clarification.

 2    A.    Could I request some water?

 3    Q.    Sure.

 4          THE COURT:  We'll get it for you.

 5          THE WITNESS:  Okay.  Thanks.

 6          THE COURT:  Next question.

 7    BY MR. MALOFIY:

 8    Q.    Do you know who Michael Skidmore is?

 9    A.    Yes.

10    Q.    Who is Michael Skidmore?

11    A.    He's been a longtime Firit -- Spirit fan and collector,

12    and he manages the Randy California Trust.  He also has been

13    instrumental in gathering old recordings, unreleased

14    recordings, and creating new releases of vintage Spirit

15    material.

16    Q.    Is Michael Skidmore a good guy or a bad guy?

17          MR. ANDERSON:  Objection.

18          THE COURT:  Sustained.

19    BY MR. MALOFIY:

20    Q.    Do you like Michael Skidmore?

21    A.    Yes, I do.

22          MR. ANDERSON:  Objection.

23          THE COURT:  Sustained.

24          THE WITNESS:  Thank you.

25          THE COURT:  Sustained.  Those are improper questions.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00362**

227

```
 1   Next question, Counsel.
 2            MR. MALOFIY:  Just to show bias, that's the only
 3   reason.
 4            THE COURT:  Sustained.
 5            MR. MALOFIY:  Understood.
 6   Q.   In all the years that you've been involved in Spirit, or
 7   even after, has anyone ever disputed the validity of the Trust?
 8            MR. ANDERSON:  Objection, Your Honor.
 9            THE COURT:  Sustained.
10   BY MR. MALOFIY:
11   Q.   Are you aware of anyone who has claimed ownership to the
12   "Taurus" copyright now other than the Trust?
13            MR. ANDERSON:  Objection, Your Honor.
14            THE COURT:  Overruled.
15            THE WITNESS:  No.
16   BY MR. MALOFIY:
17   Q.   Do you claim ownership of the "Taurus" copyright?
18   A.   No.
19   Q.   Has any other band member or surviving member of Spirit
20   claimed ownership of the "Taurus" copyright?
21   A.   To my knowledge, no.
22   Q.   And do you recognize Michael Skidmore and the Trust as the
23   owner of that copyright?
24            MR. ANDERSON:  Objection, Your Honor.
25            THE COURT:  Sustained.  Doesn't make any difference if
```

228

1    he does or not.  Next question.

2    BY MR. MALOFIY:

3    Q.    Do you dispute if the Trust owns the copyright?

4             MR. ANDERSON:  Objection, Your Honor, relevance.

5             THE COURT:  Sustained.

6             MR. MALOFIY:  I'll move forward.

7         No further questions.  Thank you.

8             THE COURT:  Okay.  Recross.

9             MR. ANDERSON:  Thank you, Your Honor.

10                         **RECROSS-EXAMINATION**

11   BY MR. ANDERSON:

12   Q.    Mr. Ferguson, I believe you testified yesterday that you

13   acknowledge that it was perfectly lawful for Led Zeppelin, in

14   concerts, to play the bass riff from "Fresh Garbage," correct?

15   A.    That was my understanding, yes.

16   Q.    And in fact, Spirit played entire songs by the Beatles and

17   others, correct?

18   A.    Correct.

19   Q.    And it would have been perfectly lawful for Led Zeppelin

20   to pay -- to play the entire "Fresh Garbage" from beginning to

21   end at a concert; isn't that true?

22   A.    True.

23   Q.    Counsel asked you if you own the copyright in the

24   composition "Fresh Garbage."  Isn't it true that Hollenbeck

25   Music owns the copyright in the musical composition?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

229

```
 1   A.    Well, I have the writer's copyright.  They have the

 2   publisher's copyright.

 3   Q.    And what do you mean by the writer's copyright?

 4   A.    In the world of music, for every two pennies that come in

 5   as a royalty, performance royalty or sales royalty on a song,

 6   one penny goes to the writer, one penny goes to the publisher.

 7   Q.    Isn't it correct what you're telling me and what you mean

 8   is that Hollenbeck and Performance Rights societies pay you a

 9   songwriter royalty for the musical composition "Fresh Garbage"?

10          MR. MALOFIY:  Objection, Your Honor.

11          THE COURT:  Overruled.

12      Is that what your understanding was?

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.

15   BY MR. ANDERSON:

16   Q.    You've stated that Led Zeppelin opened for Spirit in

17   December of 1968 at the Denver arena.  Was Spirit the headliner

18   at that concert?

19   A.    You know, we did a couple of shows with Vanilla Fudge, and

20   we were co-headliner in that one show they would finish the

21   show, the next show we would do that.  I believe we finished

22   that show.

23   Q.    Your belief today is that Vanilla Fudge played after

24   Led Zeppelin and before Spirit?

25   A.    I think so.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

230

1    Q.    Counsel asked you about the Northern California Folk Rock

2    Festival in San Jose in May of 1969.  Isn't it true that at

3    your deposition you testified you don't recall anything about

4    that festival?

5    A.    No.  No clear memory of that.  It was during a string of

6    several shows.

7    Q.    And counsel showed you a poster of that show.  Isn't it

8    true that you have no knowledge as to whether Led Zeppelin

9    performed at the Northern California Folk Rock Festival?

10   A.    I did not see them perform.

11   Q.    Isn't it also true that you have no recollection of

12   Led Zeppelin performing at the Texas Pop Festival?

13   A.    Did not see them perform.

14   Q.    And in fact -- well, strike that.

15        Counsel asked you one question, or two, about the Atlanta

16   Pop Festival.

17   A.    Mm-hmm.

18   Q.    Isn't it true that Led Zeppelin and Spirit were never on

19   the same stage in Atlanta?  At the same time.

20        MR. MALOFIY:  Objection, vague and ambiguous.

21        THE COURT:  Overruled, with the caveat, only if you

22   remember or if you know.  He just asked you a question.  We

23   don't want you to speculate.  If you have some personal

24   knowledge of that.

25        THE WITNESS:  Personally, I don't know if we were on

231

```
1    the stage at the same time.  We obviously did not perform at
2    the same time.  Physically it was possible.
3    BY MR. ANDERSON:
4    Q.   Isn't it true that at your deposition a few months ago,
5    you testified that Led Zeppelin performed after Spirit and that
6    the groups and the individuals who made up the groups were
7    never on the stage at the same time?
8    A.   That doesn't sound accurate to me.
9         MR. ANDERSON:  Your Honor, if we could play page 329,
10   line 8, to 330, line 12, of the deposition, the videotaped
11   deposition of Mr. Ferguson.
12        MR. MALOFIY:  Do you have the --
13        MR. ANDERSON:  Give this back to you.
14        MR. MALOFIY:  Can you repeat that, please?
15        MR. ANDERSON:  Yes, absolutely.  329, line 8, to 330,
16   line 12.
17      (Video played.)
18        MR. ANDERSON:  I believe we may have a technical
19   problem for a second.  My apologies, Your Honor.
20        THE COURT:  Okay.
21      (Video played.)
22        MR. ANDERSON:  Thank you.
23   Q.   Do you recall, you've testified about the occasion when
24   you had --
25        Thank you, Counsel.
```

232

```
1        -- when you had a meet-and-greet, a short introduction,
2   with Robert Plant at Mothers Club?
3   A.   I do.
4   Q.   And isn't it the case that after that short meet-and-greet
5   at the back of Mothers Club, you then, and Mr. Andes, went to
6   get ready to perform?
7   A.   Correct.
8   Q.   And isn't it the case that that night at Mothers Club, you
9   never saw Mr. Plant again, did you?
10  A.   Myself, no.
11  Q.   Okay.  And you didn't -- while you were performing, you
12  couldn't see him; isn't that true?
13  A.   I don't think we could see into the crowd, no.
14  Q.   Do you recall testifying that in 1968, 1969 and 1970, that
15  girlfriends and wives of the Spirit band members did not
16  generally travel with the band to performances by Spirit?
17  A.   In general, no.
18  Q.   That's your recollection, that --
19  A.   It is.
20  Q.   -- they didn't?
21       And isn't it the case that you do not recall any
22  girlfriends or wives of Spirit band members accompanying Spirit
23  to the Atlanta Pop Festival?
24  A.   I could not be certain if that happened or not.  I know in
25  my case, no.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00368**

233

1    Q.   And the same with the Seattle Pop Festival.  Isn't it

2    correct that you have no recollection of girlfriends or wives

3    of band members of Spirit attending the Seattle Pop Festival?

4    A.   No recollection if they were there or not there.

5    Q.   And isn't it actually also your recollection, at least as

6    of your deposition, that there were no girlfriends of any

7    members of Spirit at the Denver performance in December of

8    1968?

9    A.   Was that something I said in the deposition?

10   Q.   Yes, sir, it was.

11   A.   Umm, as I sit here now, I have no recollection if anyone

12   was there or not there.  It was likely they were not.

13   Q.   And you talked about a requirement between performances of

14   different groups at a venue, that the -- of an equipment

15   change, and you -- let me ask you.  For example, when you

16   performed as Spirit with another group, did you use their

17   drums?

18   A.   Very rarely.

19   Q.   Okay.  So is it correct that roadies, as you referred to

20   it -- well, what are roadies?

21   A.   Roadies are the people that travel with the band that

22   handle the equipment and load on and load off.

23   Q.   Okay.  And so when there's a performance by, for example,

24   Spirit, in 1969 through 1971, did you have roadies to handle

25   your equipment?

234

```
 1   A.    Yes, we did.

 2   Q.    And was it necessary between the performances of bands

 3   that the roadies came out and basically took down the previous

 4   band's drums, guitars, amps, and whatever other equipment, and

 5   the roadies of the next band set up the equipment for that

 6   band's performance?

 7   A.    That's correct.

 8   Q.    And what's your recollection as to the general time that

 9   it took for -- between the performances of two bands where the

10   roadies were setting up or dismantling equipment?

11         MR. MALOFIY:  Objection, vague and ambiguous.

12         THE COURT:  Sustained, and outside the scope --

13         MR. MALOFIY:  Yes.

14         THE COURT:  -- of the recross, or redirect.

15         MR. ANDERSON:  Okay.  Your Honor, we have this witness

16   under subpoena.

17         THE COURT:  That's right.

18         MR. ANDERSON:  And I just wanted a little leeway so we

19   don't have to ask him to come back tomorrow and the day after.

20         THE WITNESS:  Thank you.

21         THE COURT:  Counsel, technically it's outside the

22   scope of the redirect, so it would not be admissible at the

23   time, but if you want to agree on it, you can take him on as

24   your own witness.

25         MR. MALOFIY:  The only issue I have, Your Honor, it's
```

235

```
 1   which show.  He's saying -- I don't want Mr. Ferguson --

 2          THE COURT:  No, no, that's not the issue.  The issue

 3   is, is that he wants to go into things that you did not go into

 4   on redirect, and he would like to do it as his own witness

 5   rather than call him later in the trial.

 6          MR. MALOFIY:  And being respectful to Mr. Ferguson's

 7   schedule and that he lives three hours away, I'll agree to do

 8   that.  I would --

 9          THE COURT:  You've got a chance to recross on it,

10   then.

11          MR. MALOFIY:  Right.  I just -- if there's any

12   demarcation where he's getting into new material, it might be

13   helpful for him to state that just so we know where we're at.

14          THE COURT:  Okay.

15     Counsel.

16          MR. ANDERSON:  Thank you, Your Honor.

17                     DIRECT EXAMINATION

18   BY MR. ANDERSON:

19   Q.  As you're sitting here now, what is your best estimate of

20   how long it took, in this time period of 1968 through '71, for

21   this equipment change to occur between two performing bands?

22          MR. MALOFIY:  Objection.  Which show?

23          THE COURT:  Sustained.

24     If you could focus in on what show you're talking about.

25          MR. ANDERSON:  Okay.  I was asking general practice,
```

236

```
1    Your Honor.
2              THE COURT:  Okay.  In general, then.
3              MR. ANDERSON:  Yes.
4    Q.   As a general practice, what's your best estimate of how
5    long it took in 1969 through 1971 for this equipment change to
6    occur?
7              MR. MALOFIY:  Objection.  Speculative, vague and
8    ambiguous, Your Honor.
9              THE COURT:  Overruled.
10             THE WITNESS:  In those days, they changed equipment
11   quicker than they do now.  My guess would be 15 to 20 minutes.
12             THE COURT:  Okay.
13   BY MR. ANDERSON:
14   Q.   Thank you.  And do you recall testifying at your
15   deposition that Randy California named the "Taurus" composition
16   "Taurus" after -- as a tribute to his bandmates who he cared
17   about and who -- some of whom were -- had the astrological sign
18   of Taurus?
19             MR. MALOFIY:  Objection.  He's using the deposition to
20   lead instead of to cross-examine.
21             THE COURT:  But it's -- overruled.  It's not
22   cross-examining, Counsel.  He's taking him as his own witness
23   now so that he doesn't have to call him later in the trial.
24   That's what we've agreed on, that he can take him as his own
25   witness.
```

237

```
1          MR. MALOFIY:  Understood, Your Honor.  The issue
2   plaintiff has, respectfully, is that he's using the deposition
3   not to impeach him but to actually, to phrase all the questions
4   from the deposition rather than asking the question live --
5          THE COURT:  I understand.
6          MR. MALOFIY:  -- and then --
7          THE COURT:  I understand.
8          MR. MALOFIY:  -- false answer --
9          THE COURT:  I understand, Counsel.
10     Why don't you ask directly the question.  Then you can use
11  it as impeachment if you want.
12         MR. MALOFIY:  Thank you, Your Honor.
13  BY MR. ANDERSON:
14  Q.   Is it your understanding, sir, that Randy California named
15  the musical composition "Taurus" as a tribute to the band
16  members of Spirit?
17  A.   There were three Taurus -- Taurians in his life:  His
18  girlfriend, Ed Cassidy the drummer, and myself.  I was never
19  sure which one he was specifically talking about or if it was
20  all of us.
21         THE COURT:  Okay.
22  BY MR. ANDERSON:
23  Q.   Okay.  And Ed Cassidy was Mr. Wolfe's stepfather?
24  A.   Correct.
25  Q.   He was -- do you know, was he the second or third husband
```

238

1    of Bernice Pearl?

2    A.    I believe he was the second.

3         MR. ANDERSON:  Okay.  Thank you.  That's all the

4    questions I have.

5         THE COURT:  Okay.  Counsel, would you like to

6    cross-examine in that area?

7         MR. MALOFIY:  Nothing further, Your Honor.  Thank you.

8         THE COURT:  Thank you, Counsel.

9    May this witness then be excused to go back to --

10   Santa Barbara?

11        THE WITNESS:  Yes.

12        THE COURT:  -- Santa Barbara?

13        MR. ANDERSON:  Yes, Your Honor.  Thank you.

14        THE COURT:  Okay.  Thank you very much for coming in.

15        THE WITNESS:  Thank you, Your Honor.

16        THE COURT:  You're excused at this time.

17   Okay.  Next witness.

18        MR. MALOFIY:  Your Honor, because the Court had ruled

19   on certain objections on Mr. Ware's designations, we just need

20   a few minutes.  I don't know if it would be beneficial to take

21   a break right now, but we need the testimony of Mr. Ware in

22   this order.  So with the Court's indulgence.

23        THE COURT:  Counsel, if you want to take some time,

24   that's fine, but it comes off your time.

25        MR. MALOFIY:  That's fine.  I'd like to do that, Your

239

```
 1   Honor.  It comes off my time.  I will do that.

 2            THE COURT:  Okay.  How long do you want?

 3            MR. MALOFIY:  Ten minutes, Your Honor.

 4            THE COURT:  Okay.  We will be in recess for about 10

 5   minutes, and we'll bring you back in at that time and we'll

 6   continue at that time.

 7            MR. MALOFIY:  Thank you.

 8            THE COURT:  Thank you.

 9            THE CLERK:  All rise.

10       (Recess held from 9:12 a.m. to 9:24 a.m.)

11       (In the presence of the jury:)

12            THE COURT:  Okay.  The record will reflect the jurors

13   are all present and the recess is over.

14       Counsel, do you wish to call your next witness?

15            MR. MALOFIY:  Yes, Your Honor.

16       Plaintiff's next witness is Michael Ware.  He was a fact

17   witness.  He lives in the UK, and the Court allowed us to go to

18   the United Kingdom, England, and get his video testimony to be

19   played live for this jury.

20            THE COURT:  Okay.  Thank you, Counsel.

21            MR. MALOFIY:  Thank you.

22            THE COURT:  And before you start playing, again,

23   ladies and gentlemen, let me just remind you, a deposition is

24   testimony that is taken under oath before trial, and when it's

25   introduced at trial, it is to be taken by you as if that person
```

240

```
1    was testifying live here in trial.  Okay?

2         (Portions of the video-taped deposition of

3         Michael Ware were played in open court.)

4         (Video was paused.)

5              MS. FREEMAN:  Your Honor, this was -- the objection

6    was sustained as to --

7              THE COURT:  What line to what line?

8              MS. FREEMAN:  Lines 17, 18 --

9              THE COURT:  Page?

10             MS. FREEMAN:  -- to 17 --

11             THE COURT:  Page?

12             MS. FREEMAN:  -- 23.

13             THE COURT:  I'm sorry, page?

14             MS. FREEMAN:  Page 17.

15             THE COURT:  Yes.

16             MS. FREEMAN:  Lines 18 to 23.

17             MR. MALOFIY:  They are cut out.  We were playing

18   the -- well, excuse me.  They were cut out.

19             MS. FREEMAN:  You -- it was just played.

20             MR. MALOFIY:  No.  It started at line 20 -- at line

21   24, which is not cut out, Ms. Freeman.

22             MS. FREEMAN:  Okay.

23             MR. MALOFIY:  Yeah.  Sure.

24             MR. ANDERSON:  Thank you, Your Honor.

25             MS. FREEMAN:  Thank you.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00376**

241

```
1            THE COURT:  You may proceed.  Thank you very much,
2   Counsel.
3        (Video resumed play.)
4            THE COURT:  Can you cut it off at this time, please.
5            MR. MALOFIY:  Yes, Your Honor.
6        (Video stopped.)
7            THE COURT:  Ladies and gentlemen, we're going to break
8   at this time for a 15-minute break.  We'll come back and finish
9   the deposition at that time.
10       Remember the admonishment not to discuss the case among
11  yourselves or with anybody else or form or express any opinions
12  about the matter until it's submitted to you and you retire to
13  the jury room.
14       And I'm going to ask when you leave, if you leave quietly,
15  because I'm going to have to talk with the attorneys.  In fact,
16  we're going to clear the courtroom.  I just want to talk to the
17  attorneys about some procedural problems before you come back,
18  okay?
19           THE CLERK:  All rise.
20       (Jury out.)
21           THE COURT:  Okay.  The record will reflect the jurors
22  have left.
23       And ladies and gentlemen, at this time I'm going to ask
24  the people that are in the audience, if you could leave the
25  courtroom for a few seconds.  I want to talk about procedural
```

242

```
1   matters with the attorneys for a second.

2           MR. MALOFIY:  You want us to approach, Your Honor?

3           THE COURT:  No, that's okay.  I'm going to clear the

4   courtroom, so that won't be necessary.

5           THE CLERK:  Counsel, you may be seated.

6           THE COURT:  Parties can stay, also.

7       (Audience out.)

8           THE COURT:  Okay.  The record will reflect that the

9   public has left the courtroom, also.

10      And counsel, this is nothing other than I just wanted to

11  talk to you procedurally and help both sides a little bit so

12  that nobody's caught off guard.

13      We've almost finished one day of testimony.  And take this

14  with the right spirit.  I'm not criticizing anybody, because I

15  feel that you are the architects as to how you present your

16  case, and there's more to putting on a case than just the bare

17  bones.  You have to create the meat on the bones.  You have to

18  create the atmosphere.  Whatever you feel is appropriate.  The

19  way you want to present your case is up to you.  You're the

20  architects on it.  But I do want you to remember that you both

21  have 10 hours on it, and the majority of what has come in so

22  far has not necessary -- has not been necessary.  But it's

23  okay.  It paints the picture, it creates an atmosphere, and

24  that's all well and good.  I'm not criticizing that at all.

25  But I want people to realize that it's not going to be a reason
```

243

```
1   to delay the time and push the time off.  It will be 10 hours,

2   and when the 10 hours is up, you're through questioning.  That

3   10 hours goes or counts against you anytime you're talking

4   either on cross-examination or direct examination.  I will get

5   the number of minutes that are left out to you at the end of

6   the day.  If you have any questions during the day, ask the

7   court clerk.  She'll ask me, and I'll tell you what you have

8   left.  I want to make sure everybody's aware of what they have

9   left.

10       Now, with that -- and keep in mind, not a criticism.  I

11  just want to let everybody know that when it comes to the 10

12  hours, from what I've seen so far, it will not be extended.

13  That will be the 10 hours.  And a lot of times people don't

14  believe me, but that's the 10 hours and that's when you stop

15  questioning.

16       Now, that being said, let me ask you a question.  This

17  last deposition testimony, the cross, was this presented by the

18  plaintiff totally?

19           MR. MALOFIY:  No, it was, Your Honor --

20           THE COURT:  You both agreed on it?

21           MR. MALOFIY:  There was portions we designated, and

22  then opposing counsel had designated additional portions.

23           THE COURT:  Okay.  That's fine.  I just wanted to make

24  sure.

25           MR. ANDERSON:  Designated some portions which we --
```

244

```
1              THE COURT:  The cross-examination is --
2              MR. ANDERSON:  That they included in theirs.
3              THE COURT:  I'm sorry?
4              MR. ANDERSON:  We designated some portions, but
5     plaintiff has included it in theirs, so I don't think we're
6     going to be adding anything.
7              THE COURT:  Okay.  I just want to say that those,
8     whatever the minutes were, would come across -- come off your
9     time, because it was cross-examination.
10             MR. MALOFIY:  Right, but --
11             THE COURT:  Yeah.
12             MR. ANDERSON:  Well, but --
13             MR. MALOFIY:  What Mr. Anderson had said is not
14    entirely accurate.  We identified certain sections, then they
15    identified sections.
16             THE COURT:  Okay.
17             MR. MALOFIY:  Because -- then we -- then we
18    additionally added certain sections to give context to the
19    sections they had.
20             THE COURT:  I'm just telling you, up to this time --
21    and in the future, let me know who's presenting it, but at this
22    time, because it appears to the Court the first part has been
23    plaintiff's testimony, the second part has been
24    cross-examination, so I'm going to count it that way up till
25    now.
```

245

```
1              MR. MALOFIY:  Thank you.

2              THE COURT:  But in the future, if you present

3    deposition and it includes cross-examination, make sure the

4    Court knows whether or not you want the cross-examination or

5    not.

6              MR. MALOFIY:  Thank you.

7              MR. ANDERSON:  Your Honor, just to clarify, there's

8    cross-examination testimony at the deposition that we did not

9    offer, and if the Court --

10             THE COURT:  Well, then, Counsel, let me ask you,

11   because up to this time, that's how I'm treating it, but if you

12   don't want to offer the rest of it, then we'll cut off the

13   deposition right now.

14             MS. FREEMAN:  No, Your Honor.  If I may.  What was

15   played, a large part of it, was not what we ourselves were

16   offering in.

17             THE COURT:  I know.  What I'm saying, Counsel, is, up

18   to this time, you haven't notified the Court, so I couldn't

19   make that call.  Up to this time, I'm treating the

20   cross-examination that was made during the deposition against

21   the defendants' time, but from here on in, let me know if you

22   want it, because if you don't -- for instance, the rest of

23   this, if you don't want it in, isn't going to come in.  We have

24   another 20 minutes probably here.

25             MS. FREEMAN:  There was some here that was played on
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

246

```
 1    my examination --
 2              THE COURT:  Talking about --
 3              MS. FREEMAN:  -- which we did not request to be --
 4              THE COURT:  Counsel, I'm talking about from this point
 5    forward.
 6              MS. FREEMAN:  Oh, okay.
 7              THE COURT:  So my question is, is do you want to offer
 8    the rest of the deposition from this point forward?  If not, if
 9    only the plaintiff does, then it comes off their time.
10              MR. ANDERSON:  Okay.  Thank you.  Could we, when we
11    resume, or could we let the Court know so --
12              THE COURT:  Well, let counsel know, because he's going
13    to have to make a decision --
14              MR. ANDERSON:  Absolutely.
15              THE COURT:  -- whether or not he wants it on his time
16    or not.
17              MR. ANDERSON:  I just --
18              THE COURT:  You can think about it.
19              MR. ANDERSON:  -- don't want to keep Your Honor while
20    we look at this.
21              THE COURT:  You can think about it, but in the future,
22    let me know beforehand so we can do this beforehand, okay?
23              MR. ANDERSON:  We were actually surprised that they
24    were playing the material we designated.
25              THE COURT:  Okay.  Well, and I can understand that,
```

247

```
 1    because there's a lack of communication.  Now we know how we're
 2    going to proceed from here on in.
 3            MR. ANDERSON:  Thank you very much, Your Honor.
 4            MR. MALOFIY:  Thank you, Your Honor.
 5            THE COURT:  Thank you very much.
 6        We'll be in recess.
 7            THE CLERK:  All rise.
 8        Court is in recess.
 9        (Recess held from 10:10 a.m. to 10:28 a.m.)
10        (In the presence of the jury:)
11            THE COURT:  Okay.  The record will reflect that all
12    the jurors are in their respective seats in the jury box.
13        Counsel.
14            MS. FREEMAN:  Yes, Your Honor.  We have designations
15    that are our designations, and we would --
16            THE COURT:  Okay.
17            MS. FREEMAN:  We would play another seven minutes and
18    30 seconds.
19            THE COURT:  Okay.  Is there anything else -- other
20    than the seven minutes that the defense wants to play, anything
21    else that the plaintiff wants to play off that?
22            MR. MALOFIY:  I just would like to look at the
23    designations for a moment more.
24            THE COURT:  Sure.
25        Do you want to show him the designations on it?
```

248

```
 1        Okay.  So the remainder of this is going to be
 2   cross-examination presented by the defense?
 3             MR. MALOFIY:  One moment, Your Honor.
 4             THE COURT:  Sure.
 5             MR. MALOFIY:  Just confirming one issue.
 6        We're going to allow it to continue as it's cut for
 7   reasons that it would be -- it would lose context.
 8             THE COURT:  So you want to continue as your
 9   presentation?
10             MR. MALOFIY:  Except for the ones that they've
11   identified, which we contain -- we have their designations
12   included --
13             THE COURT:  That's okay.  Finish your presentation,
14   and then they can put their presentation on, but we can't be
15   continuous.  One's going to be cross-examination, one's going
16   to be direct.  So however you what to do it.
17             MR. MALOFIY:  Perhaps I can make it easier.  Of the
18   rest of the testimony, we've identified with counsel that they
19   have seven minutes, and we have the rest.
20             THE COURT:  Okay.
21             MR. MALOFIY:  Is that fair?
22             THE COURT:  Sure.
23             MR. MALOFIY:  Thank you.
24        Is it seven minutes, Ms. Freeman?
25             MS. FREEMAN:  It's actually seven minutes and 30
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00384**

249

1    seconds.

2              THE COURT:  Okay.

3              MR. MALOFIY:  Thank you.

4              THE COURT:  Seven minutes and 30 seconds, okay.  Thank

5    you, Counsel.

6              MR. MALOFIY:  Thank you.

7         May we have permission to play?

8              THE COURT:  Oh, sure, go ahead.  Please.

9              MR. MALOFIY:  Thank you, Your Honor.

10        (Video deposition of Michael Ware resumed play.)

11        (Video paused.)

12             MR. ANDERSON:  Objection.  They've included a portion

13   of -- that relates to a motion in limine that was granted.

14             MR. MALOFIY:  Your Honor, these designations were

15   provided to counsel.  We've honed through them now repeatedly.

16   I'm not sure if they --

17             THE COURT:  Well, let's proceed, and again, any type

18   of prejudicial testimony towards drugs or drinking or anything

19   would be out, okay?

20             MR. MALOFIY:  Okay.

21             MR. ANDERSON:  Thank you, Your Honor.

22             MR. MALOFIY:  In that instance --

23             THE COURT:  With that admonition, I think you can go

24   ahead.

25             MR. MALOFIY:  Mr. Anderson --

250

```
 1              THE COURT:  And ladies and gentlemen, let me just help
 2      you out.  If there's any type of reference to, you know, have
 3      you taken drugs or did you drink, those are questions that are
 4      very many times asked of any witness to see what their ability
 5      to recall and observe what's going on.  You're not to assume
 6      that anybody had any drinks or drugs or anything else unless it
 7      comes out that way.  In this case, there's no indication of
 8      drugs or drinking that is in evidence.
 9          Okay.  Go ahead, Counsel.
10              MR. ANDERSON:  Your Honor, if I could just clarify?
11              THE COURT:  Yes.
12              MR. ANDERSON:  What we're talking about is page 68,
13      line 17-20, where counsel talks about a ruling of this Court.
14      It's not the question, it's counsel's state- --
15              THE COURT:  68 to --
16              MR. ANDERSON:  Page 68, line 17 to 20.  It's not --
17      it's counsel's statements about --
18              THE COURT:  Well, that should go out.  That should go
19      out.
20              MR. ANDERSON:  Thank you, Your Honor.
21              MR. MALOFIY:  I've no objection, Your Honor.  That's
22      fine.  We --
23              THE COURT:  I understand.
24              MR. MALOFIY:  No objection.
25              THE COURT:  No problem.
```

251

```
1              MR. MALOFIY:  Okay.  We just need one second.
2              THE COURT:  Yeah, I believe we started page 69, line
3     18.
4              MR. MALOFIY:  Conforming to Your Honor's request.  I
5     do want the Court to know that we did have that marked as a
6     designation.  The Court did rule on it.  It wasn't taken out.
7     So we played it as it was approved by the Court.
8              THE COURT:  No problem.
9              MR. MALOFIY:  Just to be fair and be clear on the
10    record.
11        Proceed?
12             THE COURT:  Yes.
13             MR. MALOFIY:  Thank you, Your Honor.
14        (Video resumed play.)
15        (Video stopped.)
16             MS. FREEMAN:  Your Honor?
17             THE COURT:  Yes.
18             MS. FREEMAN:  I would like to offer in evidence two
19    exhibits from the deposition:  2950 and 2955.  The problem is,
20    the --
21             THE COURT:  Counsel, is there any objection to those?
22             MR. MALOFIY:  I'm just taking a look right now,
23    Your Honor.
24             THE COURT:  Sure.
25             MS. FREEMAN:  Oh, and -- wait.  And 2954.  2950, 2954,
```

252

```
 1   and 2955.  The problem that I --
 2            THE COURT:  And these were shown to and referred to in
 3   the deposition?
 4            MS. FREEMAN:  Yes.  In fact --
 5            THE COURT:  Okay.  Counsel, is there any -- I'm sorry.
 6   Counsel, is there any objection?
 7            MR. MALOFIY:  Give me a second to review this.
 8            MS. FREEMAN:  Your Honor --
 9            THE COURT:  Let's find out if there's an objection
10   first.
11        Any objection, Counsel?
12            MR. MALOFIY:  One second.  I just want to look at the
13   exhibits to be sure, Your Honor.
14            THE COURT:  Okay.
15            MR. MALOFIY:  2951, no objection to moving it into
16   evidence.  No --
17            MS. FREEMAN:  That's not the one I moved.  I moved
18   2950, 2954, and 2955.
19            MR. MALOFIY:  29- -- what was the last one?
20            MS. FREEMAN:  -55.
21            MR. MALOFIY:  Yes.
22        We also have exhibits we want to enter in.  Usually we
23   would go first.
24            THE COURT:  Okay.  But you have no objection to
25   theirs?
```

253

```
 1            MR. MALOFIY:  I'm looking at them right now.

 2        No issue with 2950.  No issue with 2954.

 3            MS. FREEMAN:  Your Honor --

 4            THE COURT:  Is there another one?

 5            MR. MALOFIY:  2955.  No issue with 2955.

 6            THE COURT:  Okay.  Those three will be received.

 7            MS. FREEMAN:  Your Honor --

 8            THE COURT:  Now, under one condition.  They were

 9    referred to -- everybody agrees they were referred to and shown

10    in the deposition?

11            MS. FREEMAN:  Yes, Your Honor.

12            THE COURT:  Okay.  They'll be received.

13        (Received in evidence, Trial Exhibits 2950, 2954, 2955.)

14            MS. FREEMAN:  Your Honor, there was just one problem

15    with 2950.  The court reporter's transcription that has the

16    original bound exhibit, in duplicating it, the court -- it was

17    shrunk so that it is no longer legible.  I have the legible

18    copy that I was given by Mr. Malofiy at the deposition.

19            THE COURT:  Work it out with counsel at the next

20    break, and if you want to substitute that, that's fine, but see

21    if you can work it out at the next break.

22            MS. FREEMAN:  Thank you.

23            MR. MALOFIY:  If it's what was used at the deposition,

24    I have no objection, but I'll just take a look it beforehand.

25            THE COURT:  Okay.
```

254

```
 1        MR. MALOFIY:  We have additional exhibits we need to
 2   put in.  2951, 29- –– 2951, and also 29- –– –50 we already have
 3   in there.  –54, we have.  2952 were referred to and used in the
 4   deposition, and –53.
 5        THE COURT:  Okay.
 6      (For identification, Trial Exhibits 2951, 2952, 2953.)
 7        MR. MALOFIY:  Any objection, Counsel?
 8        MS. FREEMAN:  Yes, I object.  The *Billboard* charts,
 9   the witness could not ––
10        THE COURT:  Okay.  We'll take this up, Counsel –– we
11   don't want to waste the jury time arguing back and forth.
12   We'll take it up at one of the breaks with the jury and we'll
13   decide it at that time.
14      Okay.  Counsel, you want to call your next witness?
15        MR. MALOFIY:  Yes, I do, Your Honor.
16      The next witness will be –– will be Mark Andes.  Let me
17   grab him very quickly.
18        THE COURT:  Yes, please.
19      (The witness entered the courtroom.)
20        MR. MALOFIY:  Mr. Andes, if you could take the seat
21   over there.  That's the witness chair.
22        THE CLERK:  Good morning, Mr. Andes.  Right here to be
23   sworn, please.  Can you raise your right hand.
24      Do you solemnly swear the testimony that you are about to
25   give in the matter now before the Court shall be the truth, the
```

255

```
 1   whole truth, and nothing but the truth, so help you God?

 2            THE WITNESS:  I do.

 3            THE CLERK:  Thank you.  You may be seated.  You can

 4   adjust the microphone as you need to.

 5        May I please ask that you state your full name for the

 6   record and spell your last name.

 7            THE WITNESS:  Mark Christopher Andes, A-n-d-e-s.

 8            THE CLERK:  Thank you.

 9            THE COURT:  Okay.  You may inquire, Counsel.

10            MR. MALOFIY:  Thank you.

11        MARK ANDES, CALLED AS A WITNESS BY THE PLAINTIFF,

12                    DIRECT EXAMINATION

13   BY MR. MALOFIY:

14   Q.   Mr. Andes, thank you for being here.  I know you had to

15   wait from the other day, and I appreciate you taking the stand

16   here today.

17        Where do you live, sir?

18   A.   Houston, Texas.

19   Q.   And how long have you lived in Houston, Texas?

20   A.   Eight years.

21   Q.   Now, was there a time when you lived in California?

22   A.   Yes.

23   Q.   And how long did you live in California for?

24   A.   Probably 20 years.

25   Q.   All right.  Do you consider California your home?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00391**

256

```
 1   A.   I do.

 2   Q.   And can you tell me what years you lived, or was it your

 3   adolescent or later years when you were in California?

 4   A.   We moved to California when I was a young boy, two years

 5   old, and I stayed there until -- probably I moved away to live

 6   in 1973 or '4.

 7   Q.   Now, did you at a young age become involved in music?

 8   A.   Yes.

 9   Q.   And was there other people in your family that were

10   involved in music or art?

11   A.   Yes.

12   Q.   Who was that?

13   A.   My father and my brother.

14   Q.   What do they do?

15   A.   My father was an actor.  My brother's an artist and a

16   guitarist, musician as well.

17   Q.   All right.  What's your father's name?

18   A.   Keith.

19   Q.   Heath?

20   A.   Keith Andes.

21   Q.   I see.  Now, at some point did you become involved in

22   bands in the -- or western -- bands in California?

23   A.   Yes.

24   Q.   In West Coast music.

25        Can you name the bands that you were involved in, from the
```

257

```
1    earliest ones, going through, I guess, as it progressed.
2    A.    Well, my bands in high school, we had -- I had a band
3    called the Marksmen, and I was in Canned Heat right out of high
4    school.  I was 17 when I graduated from high school in 1965.
5    Q.    The band Canned Heat, were they a famous band?
6    A.    Not at that point, but -- but they became famous.
7    Q.    Can you name any of their songs that are famous?
8    A.    Yeah.  "Going Up The Country."
9    Q.    Is that the "I'm on the road again"?
10   A.    Yeah.
11   Q.    Okay.  I see.  Did they play Woodstock?
12   A.    Actually, that's a different song.  They did that as well.
13   Q.    Okay.  Sorry.
14   A.    "Going Up The Country" has the flute part.
15   Q.    Oh.  Did Canned Heat play Woodstock?
16   A.    Yes.
17   Q.    Were you at Woodstock?
18   A.    No.
19   Q.    What was the next band after Canned Heat that you were
20   part of?
21   A.    It was a band called the Red Roosters.
22   Q.    And how long were you in the Red Roosters for?
23   A.    Maybe a year or two, I would say.
24   Q.    And then after the Red Roosters, did you then become
25   involved in another band in the West Coast/L.A. music scene?
```

258

```
 1   A.    Yes.

 2   Q.    What band was that?

 3   A.    The Western Union.

 4   Q.    And then -- how long were in The Western Union for?

 5   A.    Oh, a year and a half or so.

 6   Q.    And then after The Western Union, what was the next band

 7   that you became involved with?

 8   A.    Spirits Rebellious.

 9   Q.    And was that a predecessor to Spirit?

10   A.    Yes.

11   Q.    Was it comprised of the same members, or was there some

12   change in the lineup?

13   A.    Same members.

14   Q.    Now, how old were you when you were part of this initial

15   lineup of Spirit?

16   A.    I guess 18.

17   Q.    And how old were the other members of the band?

18   A.    Randy was the youngest.  He was probably 16 at that time.

19   Jay was -- is a year older than I.  And John Locke was older

20   than Jay.  Maybe he was in his early 20s.  And Ed Cassidy was

21   in his 40s.

22   Q.    I see.  Now, you had mentioned Randy California was the

23   youngest member of that group; is that correct?

24   A.    Correct.

25   Q.    And he was 16 at the time?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00394**

259

```
1    A.    Yes.
2    Q.    Was he able to perform and keep up with the older members
3    of the band?
4    A.    Oh, yes.  Yes.
5    Q.    Can you share with the jury a little bit about
6    Randy California as far as a musician and a guitar player.
7    A.    I would call him a child prodigy, really.
8    Q.    Did you recognize other -- did other musicians and artists
9    recognize him as a great guitar player?
10   A.    Yes.
11          MR. ANDERSON:  Object.
12          THE COURT:  Overruled.
13   BY MR. MALOFIY:
14   Q.    Can you name some guitarists that were inspired by or --
15          THE COURT:  That would be sustained.
16          MR. MALOFIY:  Okay.
17          THE COURT:  Yeah.
18   BY MR. MALOFIY:
19   Q.    Do you know guitar players that Randy California was close
20   with?
21   A.    Yes.
22   Q.    Can you name some?
23          THE COURT:  Counsel, I don't want to cut you off.  You
24   can bring those people in and they can testify if they were
25   inspired by him, but he can't testify to that.
```

260

```
 1        So go ahead, next question.
 2            MR. MALOFIY:  Sure.
 3   Q.   Was Jimi Hendrix friends with Randy California?
 4   A.   Yes.
 5   Q.   All right.  Did you know Jimi Hendrix?
 6   A.   Yes.
 7   Q.   Did you guys ever spend time together?
 8   A.   Yes.
 9   Q.   Did you have an understanding whether or not Randy
10   California ever played with Jimi Hendrix?
11   A.   Yes.
12   Q.   And what's your understanding of that, those facts?
13   A.   Randy and Cass moved, and the rest of the family, moved to
14   New York for a period of time, and -- and it was during that
15   period that Randy met Jimi at Manny's Music.
16   Q.   And did they eventually play music together during that
17   summer?
18   A.   Yes.
19   Q.   And what's your understanding of their relationship during
20   that summer?
21   A.   I think it was very close.
22   Q.   At some point did Randy California return to Cal -- well,
23   Randy California return to California.  Let me get to -- let me
24   stop that question and let me go to, do you know why
25   Randy California is called Randy California rather than his
```

261

```
 1   birth name, Randy Wolfe?

 2   A.    I do.

 3   Q.    Why is that?

 4   A.    There were two Randys in Jimmy James and the Blue Flames,

 5   so Jimmy, to keep the names straight, said, "Oh, you're

 6   Randy California," and it stuck.

 7   Q.    I see.  When you say Jimmy James and the Blue Flames,

 8   you're referring to Jimmy Page -- Jimmy James' or

 9   Jimi Hendrix's band before Jimi Hendrix -- Jimi Hendrix's

10   Experience?

11   A.    Yes, sir.

12   Q.    Okay.  Now, after that summer of playing with Jimi

13   Hendrix, did Randy return to California?

14   A.    Yes.

15   Q.    And is that when you, along with Jay Ferguson, along with

16   Ed Cassidy, John Locke, form this band Spirit?

17   A.    Yes.

18   Q.    Now, can you tell me a little bit about the band Spirit in

19   those early years, what type of music you were playing and also

20   the relative success of it in this California area.

21         MR. ANDERSON:  Objection, vague and ambiguous.

22         THE COURT:  Why don't you restate the question,

23   Counsel.

24   BY MR. MALOFIY:

25   Q.    Can you share with the jury the early years of Spirit?
```

262

```
 1   Can you do that?

 2   A.   Yes, I can.

 3              MR. ANDERSON:  Objection, calls for a narrative.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  The band began -- Jay and I were

 6   determined to work with Randy, and when we heard that the

 7   family had come back to California, we straightaway sought him

 8   out.  And I remember Randy and Cass had a jazz trio, and Jay

 9   and I went to see them perform, and we took Randy aside and

10   said, "Randy, we want to put a band together with you, and

11   it'll be really good.  It's going to be a rockin' band."

12         And he said, "Well, I would like that too, but I have to

13   have John and Cass with me.  I won't play music unless those

14   guys are with me."

15         So that's when the jazz and the rock and blues thing that

16   I represented and Jay represented merged and then created the

17   unusual dynamic of having a jazzy rock thing that hadn't

18   happened before.

19   BY MR. MALOFIY:

20   Q.   Was this -- could it be characterized as a psychedelic

21   rock sound of the West Coast?

22              MR. ANDERSON:  Objection, vague and ambiguous.

23              THE COURT:  Overruled.

24              THE WITNESS:  I would say that it definitely was

25   psychedelic, but I -- it was more of a jazz rock, and I guess
```

263

```
 1   the modern term would be called progressive or a fusion-type
 2   band, but that was -- that's a term that happened later, so...
 3   BY MR. MALOFIY:
 4   Q.   Now, you said you played here in California.  Can you
 5   share with the jury places you played in those early years.
 6   A.   Oh, yeah.  We played -- well, our home was the Ash Grove.
 7   Randy's uncle owned the Ash Grove.  And we played Bido Lito's.
 8   We played various love-ins.  And we played Topanga Corral and
 9   various venues like that.  Street.  We did a lot of benefits.
10   The Wolfes were very, very -- they were activists, and we
11   played really interesting cause -- for causes and stuff around
12   L.A.
13   Q.   When you say "love-ins," can you share with the jury what
14   that term means for those who may not know?
15   A.   They were gatherings.  You know, people would, you know,
16   they would create these gatherings where music was there, and
17   there would be stage set up, and it would be very, very
18   free-form.  I think maybe a lot of them are pop -- free.
19   Sometimes there was a small charge to get in, but it was just a
20   big gathering of people.
21   Q.   Was the band Spirit a popular band in those late -- in
22   '66, '67, '68?
23   A.   Oh, yes.  Yes.
24   Q.   Was your music sold all throughout the United States?
25   A.   Yes, sir.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

264

```
 1              MR. ANDERSON:  Objection, lacks foundation.
 2              THE COURT:  Overruled.
 3    BY MR. MALOFIY:
 4    Q.   Was your record sold all throughout the United States?
 5    A.   Yes.
 6    Q.   Did you see your records in record stores?
 7    A.   Yes, sir.
 8    Q.   Did you hear your records being played on the radio?
 9    A.   Yes, I did.
10    Q.   Did you have chart-top -- did you have singles which
11    charted in the Billboards?
12    A.   Yes, sir.
13    Q.   Do you know, as you stand here today, if any of the
14    records Spirit had went gold?
15    A.   Yes.
16    Q.   Was it more than one?
17    A.   No.
18    Q.   One record?
19    A.   One record went gold.
20    Q.   Okay.  Now, do you know how many singles from the band
21    Spirit were played on the radio?  Let me strike that.
22    A.   Yeah.
23    Q.   I'm not sure if that was a clear question.
24         Do you know how many songs which were singles were played
25    on the radio that Spirit had performed?
```

265

```
 1              THE COURT:  That you heard played on the radio.
 2              THE WITNESS:  Okay.  Four.
 3   BY MR. MALOFIY:
 4   Q.   Okay.  Can you name those.
 5   A.   "Mechanical" -- "Mechanical World" was the first single.
 6   "Got a Line on You," and -- let me think.  I'm sorry.  It just
 7   flew out of my mind.  I'll have --
 8              THE COURT:  That's okay.  Next question.
 9              THE WITNESS:  Sorry.
10   BY MR. MALOFIY:
11   Q.   Was "Mechanical World" on the first album?
12   A.   Yes, sir.  Yes, it was.
13   Q.   Okay.  Now, let's talk about the first album for a moment.
14   The first album, do you recall the first song of the first
15   album?
16   A.   Do I recall what?
17   Q.   The first song of the first album.
18   A.   Not -- no.
19   Q.   Was "Fresh Garbage" on the first album?
20   A.   It was.
21   Q.   Okay.  Do you know a song by the name of "Taurus"?
22   A.   I do.
23   Q.   Was that also on the first album by Spirit?
24   A.   It was.
25   Q.   Let me talk a little bit about the song "Taurus."  Who
```

266

```
 1   wrote "Taurus"?

 2   A.    Randy.

 3   Q.    Did anyone ever claim that they wrote "Taurus," anyone

 4   other than Randy?

 5   A.    Not to my knowledge.

 6   Q.    Was "Taurus" written before the contract with Lou Adler

 7   and Hollenbeck Music or after?

 8   A.    Before.

 9   Q.    Do you know how old Randy was when he wrote "Taurus"?

10         MR. ANDERSON:  Objection, lacks foundation.

11         THE COURT:  Overruled.

12      If you know.  If you know, you may answer.

13         THE WITNESS:  17.

14   BY MR. MALOFIY:

15   Q.    Is this -- do you know how -- do you have any facts about

16   how Randy felt about the song?

17         MR. ANDERSON:  Objection, vague and ambiguous.

18         THE COURT:  Sustained.  It'd be calling for

19   speculation.

20   BY MR. MALOFIY:

21   Q.    Did Randy play this song often when he performed with

22   Spirit?

23         MR. ANDERSON:  Objection, vague and ambiguous.

24         THE COURT:  Overruled.

25         THE WITNESS:  Yes.
```

267

```
 1    BY MR. MALOFIY:

 2    Q.   Okay.  As to the song "Taurus," was this song an important

 3    song to Randy?

 4    A.   Very much so.

 5    Q.   And why is that?

 6    A.   It was written for Robin, who was his girlfriend.

 7    Q.   And can you describe the main instrument in the song

 8    "Taurus."

 9              MR. ANDERSON:  Objection, irrelevant.

10              THE WITNESS:  It's guitar.

11              THE COURT:  Overruled.

12              THE WITNESS:  Guitar.

13    BY MR. MALOFIY:

14    Q.   Is there also another instrument that's less important in

15    the composition?

16              MR. ANDERSON:  Objection, irrelevant, leading.

17              THE COURT:  Sustained.  It is irrelevant.

18    BY MR. MALOFIY:

19    Q.   Do you know if Randy wrote "Taurus" on a guitar or another

20    instrument?

21    A.   He wrote it on guitar.

22    Q.   Is that the instrument he played and performed?

23    A.   Yes.

24    Q.   Was that his instrument of choice?

25    A.   Yes.
```

268

```
1    Q.    Did the guitar part that Randy wrote in "Taurus" ever
2    change from performance to performance or year to year?
3              MR. ANDERSON:  Objection, lacks foundation.
4              THE COURT:  To the extent you know.
5              THE WITNESS:  Well, he wrote it on an acoustic guitar,
6    but that -- but we could easily, during a set, perform it on
7    the electric.  If it was part of a segue, he wouldn't have time
8    to change, so we would just play the song and go right into
9    another song, so -- but it was mainly guitar, whether it was an
10   acoustic or an electric.
11   BY MR. MALOFIY:
12   Q.    And do you know in those early years if "Taurus" was a
13   song that was -- when I say early years, I'm referring to '66,
14   '67, '68 and '69.  Was "Taurus" a song that was played
15   regularly as part of Spirit's live set?
16             MR. ANDERSON:  Objection.  Oh, never mind.
17             THE COURT:  Overruled.
18             THE WITNESS:  Yes.
19   BY MR. MALOFIY:
20   Q.    And do you recall, do you have distinct memories of it
21   being performed in concert?
22   A.    Yes.
23   Q.    Do you have a distinct memory of whether or not Spirit --
24   excuse me, strike that.
25             Do you have a memory as to whether or not "Taurus" was
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00404**

```
 1   played on December 26th, 1968, in Denver, Colorado?

 2   A.   It's my recollection that we did.

 3   Q.   And is the December 26th, 1968, also the show where

 4   Mr. Page and Mr. Plant opened for Spirit?

 5   A.   Yes.

 6   Q.   And to be clear, it was Led Zeppelin's first show on U.S.

 7   soil, correct?

 8   A.   That's my understanding, yes.

 9   Q.   Did you meet the members of the band, Mr. Jimmy Page and

10   Mr. Robert Plant, Mr. John Paul Jones and Mr. John Bonham, at

11   that show on December 26, 1968?

12   A.   I would say that we didn't meet formally.  My friend,

13   Toby Roberts, introduced us at some point, but I don't recall

14   being introduced to those guys, but we were in the same areas

15   and interacted.

16   Q.   At that point in time, do you know how many shows Spirit

17   had played before Led Zeppelin opened up for them?

18            MR. ANDERSON:  Objection, vague and ambiguous.

19            THE COURT:  Overruled.

20            THE WITNESS:  Are you referring to that year or --

21   BY MR. MALOFIY:

22   Q.   Was it hundreds, or was it --

23            THE COURT:  Well, during the period of time that you

24   were familiar with them, that you were playing with them.

25            THE WITNESS:  Oh, we played probably a couple of
```

270

```
 1   hundred shows from '67, so for over a couple of years, we
 2   probably did hundreds of shows.
 3            MR. ANDERSON:  Move to strike as nonresponsive.
 4            THE COURT:  Sustained.
 5       He is asking how many shows did you play before the
 6   Denver.
 7            THE WITNESS:  The Denver show?
 8            THE COURT:  Yeah.  An estimate, if you can.
 9            MR. MALOFIY:  That was his answer, I believe, Your
10   Honor.
11            THE COURT:  I'm sorry?
12            MR. MALOFIY:  I believe the answer was responsive.
13            THE COURT:  I took the answer as being those were the
14   shows that you played totally.  Let's just ask it again, then.
15       How many shows did Spirit play before the Denver concert,
16   that you remember?
17            THE WITNESS:  Okay.  In that tour or -- or that year?
18            THE COURT:  Anytime before that -- anytime before that
19   Denver concert.
20            THE WITNESS:  So we probably played hundreds of shows.
21            THE COURT:  Okay.  Okay.
22            THE WITNESS:  Up -- you know.
23            THE COURT:  Up until that time?
24            THE WITNESS:  Correct.
25            THE COURT:  Okay.  Fine.
```

271

```
 1        Next question.
 2   BY MR. MALOFIY:
 3   Q.   At that time were you touring throughout the
 4   United States?
 5   A.   Yeah, we sure were.
 6   Q.   All right.  And were you playing venues in virtually every
 7   major city in the United States?
 8   A.   Yes, we were.
 9   Q.   And was your songs being played on the radio all over the
10   United States?
11   A.   Yes.  Well, yeah.  Yes.
12   Q.   And your records were being sold in stores all throughout
13   the United States?
14   A.   Yes.
15   Q.   You were signed to a major label at the time, correct?
16   A.   Yes.
17   Q.   And was there also music distributed all throughout -- or
18   was it distributed in the UK?
19   A.   Yes.
20   Q.   Do you know if it was distributed in Europe as well?
21   A.   Yes.
22   Q.   Did you tour and play in the UK and in Europe with the
23   band Spirit, the first lineup?
24   A.   Yes.
25   Q.   Besides this first show, December 26, 1968, in Denver,
```

1  Colorado, where Mr. Jimmy Page and Mr. Robert Plant had opened

2  for Spirit with the band Led Zeppelin, did you play any other

3  shows together with them?

4  A.   I -- yes, we did.

5  Q.   Do you recall which shows, as you sit here today, you

6  played with them together?

7          MR. ANDERSON:  Objection, vague and ambiguous.

8          THE COURT:  Overruled.

9      If you know.

10         THE WITNESS:  There were five major festivals we

11  played together.  There was the -- well, actually, four

12  festivals that came after the Denver show.  So we played -- do

13  you want me to list the shows as I remember them?

14  BY MR. MALOFIY:

15  Q.   Yes, if you could.  I'm going to just take a moment to

16  address my --

17  A.   I might not have the chronological -- chronologic order

18  correct, but we played the Texas International Pop Festival.

19  We played the Atlanta Pop Festival.  And I think there was the

20  Northern California Folk Festival or Folk Rock Festival.

21  Q.   So to be clear, we had the Denver, Colorado show in

22  December 26, 1968, correct?

23  A.   Correct.

24  Q.   And then you mentioned a Texas Pop Festival; is that

25  correct?

273

```
 1    A.    Correct.

 2    Q.    And also an Atlanta Pop Festival and Northern California

 3    festival?

 4    A.    Yes, sir.

 5    Q.    Okay.  Was there a Seattle festival as well?

 6    A.    Yes.  Yep, yep.

 7    Q.    Do you remember whether or not you shared the bill with

 8    Led Zeppelin at the Seattle Pop Festival?

 9              MR. ANDERSON:  Objection, vague and ambiguous.

10              THE COURT:  Overruled.

11              THE WITNESS:  Well, we -- I recall them being on the

12    bill, but unlike some of these things, we didn't hear them, we

13    didn't see them perform, but on the other shows, we did.

14    BY MR. MALOFIY:

15    Q.    I see.  Now, to be clear --

16          Can we pull up, and it may take a second.  Can we pull

17    up -- and before you do it, yeah, make sure -- 313, which we

18    already -- I believe we already -- was admitted into evidence

19    in this case.

20              THE CLERK:  It is in evidence, yes.

21              MR. MALOFIY:  Thank you.

22              THE COURT:  It may be published.

23          (Exhibit was displayed on the screen.)

24    BY MR. MALOFIY:

25    Q.    Do you see this on the screen there, Mr. Andes?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00409**

274

```
1    A.    I do.

2    Q.    All right.  And it says, "Rock concert is real groovy."

3    Do you see that?

4    A.    I do.

5    Q.    All right.  And this refers to a concert that occurred.

6    It says, "Barry Fey did it again, a great rock concert at the

7    Auditorium Arena Thursday night with the Vanilla Fudge, Spirit,

8    and Led Zeppelin in colorful living sound."  Do you see that?

9    A.    I do.

10   Q.    Have you ever seen this article before?

11   A.    Yes.

12   Q.    All right.  And is this consistent with your testimony

13   that you performed and Led Zeppelin had opened for you on the

14   show?

15   A.    Yes.

16   Q.    All right.  Let me go to Exhibit 319, which I believe was

17   already admitted into evidence.

18         THE CLERK:  Yes.

19         MR. MALOFIY:  So we can -- you can go right to publish

20   it.

21       (Exhibit was displayed on the screen.)

22   BY MR. MALOFIY:

23   Q.    Have you ever seen this poster before?

24   A.    Oh, yes.

25   Q.    All right.  And is it -- what is this poster?
```

275

```
1   A.   It's advertising the Texas International Pop Festival.

2   Q.   Now, there's a number of bands listed here.  We see --

3   well, let me do this.  Let's blow up this portion for

4   orientation and for the benefit of the jury.

5   A.   Thank you.

6   Q.   Were these contemporaries of yours that you performed at

7   this pop festival?

8   A.   Yes, they are.

9   Q.   All right.  And is Spirit listed there?

10  A.   It is.

11  Q.   All right.  And is Led Zeppelin also listed on this bill?

12  A.   Yes.

13  Q.   And you also have your prior band, Canned Heat, listed on

14  this as well; is that right?

15  A.   Right.  Yes.

16  Q.   And bands like Crosby, Stills, Nash & Young, bands --

17  B.B. King, Janis Joplin, Sam & Dave, are these bands and were

18  these contemporaries of yours at the time?

19  A.   Yes.

20  Q.   Okay.  Do you have an independent recollection of the

21  Texas Pop Festival?

22  A.   I do.

23  Q.   Do you remember Led Zeppelin being there?

24  A.   I -- well, no, actually, I don't.

25  Q.   Okay.  Do you remember Spirit performing there?
```

276

```
 1   A.    I do.

 2   Q.    Okay.  Let me go to my next exhibit, Exhibit 314.  314.

 3         Can we -- we did -- I believe we used this already.  Could

 4   we publish this to the jury?

 5            THE COURT:  Yes.

 6         (Exhibit was displayed on the screen.)

 7   BY MR. MALOFIY:

 8   Q.    I know it's sideways, but do you recall performing at the

 9   Atlanta Pop Festival?

10   A.    Yes, I do.

11   Q.    Do you recall having interactions with Jimmy Page or

12   Robert Plant at the -- or any members of Led Zeppelin at the

13   Atlanta Pop Festival?

14   A.    Yes.

15   Q.    What's your recollection?

16   A.    In these festivals, there's large common areas, unlike

17   stadium shows where there -- groups have their separate

18   quarters.  We'd mill about and socialize and run into each

19   other, and we were all hanging out backstage.

20   Q.    All right.  Do you recall hanging out backstage with

21   Robert Plant and also Jimmy Page at this show?

22   A.    Well, it -- I wouldn't say that we were hanging out

23   together, but we were all interacting and in this kind of

24   contained area, so...

25   Q.    Did you know who Robert Plant and Jimmy Page were?
```

277

1    A.   Yes.

2    Q.   And did they know who you were?

3    A.   Yes.

4          MR. ANDERSON:  Objection, calls for speculation.

5          THE COURT:  It does.  Sustained.

6    BY MR. MALOFIY:

7    Q.   Did you guys exchange commendations about each other's

8    music?

9          MR. ANDERSON:  Objection, vague and ambiguous.

10         THE COURT:  Overruled.

11         THE WITNESS:  Yes.  We -- as I -- my memory of

12   interacting with these gentlemen was that it was very

13   supportive, mutually respectful and -- and that, like.

14   BY MR. MALOFIY:

15   Q.   Understood.

16   A.   Like --

17   Q.   Very well.  Now, do you recall the song "Fresh Garbage"?

18   A.   Yes.

19   Q.   Was that a song by Spirit?

20   A.   Yes.

21   Q.   Did you at any point learn that Led Zeppelin performed

22   this song in concert many times?

23   A.   I -- yes, I heard -- I heard that they had.

24   Q.   I see.  Now, let me do something.  Let me move to

25   December -- excuse me, let me move to 1970.  Did you have an

278

```
 1   opportunity to perform in the UK at Mothers Club?

 2   A.   We sure did.

 3   Q.   Okay.  Can you tell me a little bit about your performance

 4   at Mothers Club or anything that occurred on that day.

 5   A.   I just remember it being a small club, packed, and I think

 6   we had a great show.  And Jimmy Page and Robert Plant were

 7   there.  And I think it was generally a success.  I think we

 8   were excited about how we played and the success of it.

 9   Q.   Do you recall whether or not there was a meet-and-greet in

10   the beginning and then also time spent with Mr. Plant

11   afterwards?

12           MR. ANDERSON:  Objection, leading.

13           THE COURT:  Overruled.

14           THE WITNESS:  I do.

15   BY MR. MALOFIY:

16   Q.   And what is your recollection?  Was there a meet-and-greet

17   in the beginning?

18   A.   That's my memory.

19   Q.   And did the members of Led Zeppelin meet and greet you?

20   A.   Well, they were interacting with -- with -- yes, I --

21   yeah, you would say that, yeah.

22   Q.   Now, can you tell me a little bit about the concert

23   itself.  Do you remember how long it was?

24   A.   No.

25   Q.   Do you remember what happened after the concert, if you
```

279

```
 1    had any time to interact with any members of Led Zeppelin?
 2    A.   Well, we -- yes.  We finished the performance, and as I
 3    recall, there was another, like a pub-like area that had
 4    snooker tables in another section of the building.
 5    Q.   When you say "snooker," for those who don't know, what is
 6    snooker?
 7    A.   It's like pool but different.
 8    Q.   Is it like pool that they play in the UK with maybe a
 9    smaller table and smaller balls?  Am I correct?
10    A.   Yeah, more holes, yeah.  It's like golf on the links
11    rather than a course.
12    Q.   I see.  Now, did you have the opportunity to play snooker
13    with Mr. Plant on that evening?
14    A.   Yeah, we hung out and -- yes.
15    Q.   Was it -- well, did you have a fun time?
16    A.   We had a blast.
17    Q.   All right.  Were you drinking?
18    A.   Oh, yeah.
19    Q.   I won't ask what else you were doing.
20         Is your memory with him clear and distinct?
21    A.   Oh, yes.  Yeah.
22    Q.   Yeah.  Was it apparent that he was enjoying your company?
23    A.   Yes.
24    Q.   All right.  Now, who else was there?  Which other members
25    of Spirit were at this show?  Or at -- excuse me.  I imagine
```

280

```
 1    all the members of Spirit were at the show.
 2         This afterparty you were having with Mr. Plant, what other
 3    members of the band was at the afterparty with Mr. Plant?
 4              MR. ANDERSON:  Objection, leading.  And "afterparty"
 5    has a specific meaning.
 6              THE WITNESS:  Yeah.
 7              MR. MALOFIY:  Oh, I'm sorry.  Thank you, Counselor.
 8              THE COURT:  Go ahead.
 9              THE WITNESS:  It was more spontaneous.
10    BY MR. MALOFIY:
11    Q.   This spontaneous gathering with Mr. Plant afterwards?
12    A.   We just sort of wound up in this pub area, and it was just
13    kind of spontaneous.  We just found ourselves there and
14    enjoying each other, and we were trying to figure out how to
15    play snooker.
16    Q.   Now, who else was there particularly?  Can you name them?
17    A.   Well, from Spirit?
18    Q.   Yes.
19    A.   Randy and John and myself.
20    Q.   Was Jay there?  Mr. Ferguson.  Excuse me.
21    A.   I don't recall --
22    Q.   All right.
23    A.   -- Mr. Ferguson being there.
24    Q.   Do you remember -- do you know how long it took?  Were you
25    hanging out for a half hour?  An hour?
```

281

```
 1    A.    I don't know.

 2    Q.    Maybe longer?

 3    A.    Maybe.  It could have been longer, but, yeah, at least an

 4    hour, I'll say.

 5    Q.    And is it accurate to say that you saw Mr. Plant there for

 6    the meet-and-greet in the beginning of the show, and then he

 7    was also there at the end of the show while you were drinking

 8    and playing snooker?  Correct?

 9    A.    That's my memory.

10    Q.    Do you have a distinct memory of whether or not he was in

11    the audience?

12    A.    No.  I don't recall.

13    Q.    Fair enough.  You believe him to be in -- you believe him

14    to be there because he was at the beginning of the show and at

15    the end of the show.

16    A.    Right.

17    Q.    Is that a fair statement?

18    A.    Yes.

19    Q.    Okay.  Let me --

20          Are we going to break -- Your Honor, with all due respect,

21    are we going to break hard at 11:30?  Okay.

22              THE COURT:  And Counsel, for the sake of counsel and

23    also the jury, sometimes that clock is right, sometimes it's

24    wrong.  We go off the computer clock here on my screen.  So

25    we'll let you know when it's 11:30.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00417**

282

```
 1          MR. MALOFIY:  One second.  Can we pull up --
 2   Q.   Did you have an understanding that Mr. Plant got in an
 3   accident that evening after you were drinking and having a good
 4   time at Mothers?
 5   A.   Yes.
 6   Q.   And what's your understanding on that?
 7   A.   Well, I was shocked, and I -- I read it in Rolling Stone,
 8   actually, so it wasn't -- I mean, I found it out like everybody
 9   else, and I was very concerned and felt bad that that had
10   happened to him, so I...
11   Q.   I'm going to play you a song, or a part of a song.  I
12   would ask you if you could identify it.
13        We had played this before in the opening, Your Honor.
14          THE COURT:  Okay.
15          MR. MALOFIY:  We didn't get through it all because the
16   time limitation and the technical issue.
17          MR. ANDERSON:  Could counsel please identify it?
18          MR. MALOFIY:  Yes.  It was -- it was part A,
19   "Stairway," 524-V.
20        Yes.  Play it, yeah.
21        (Video played.)
22          MR. MALOFIY:  Hold on one second.
23   Q.   Do you recognize that song?
24   A.   Yes, I do.
25   Q.   And what is that?
```

283

```
 1   A.    That would be "Stairway to Heaven."

 2   Q.    Okay.  Now --

 3          MR. ANDERSON:  Could you please identify --

 4          MR. MALOFIY:  532-V.

 5          MR. ANDERSON:  I apologize, Your Honor.

 6          THE COURT:  No problem.

 7          MR. ANDERSON:  I'm sorry, if counsel could -- rather

 8   than exhibit number, if he could identify what it is being

 9   played.

10          THE COURT:  Okay.

11          MR. MALOFIY:  Well, I'll identify it -- well, I was

12   going to ask the witness to identify what's being played rather

13   than me lead him that way.

14          THE COURT:  Okay.  Either way.  I don't care.

15          MR. MALOFIY:  Yeah.  Can we play it.

16       (Video played.)

17          MR. MALOFIY:  Pause it there.

18   Q.    Can you identify that --

19   A.    Yes, sir.

20   Q.    -- composition?

21         Who is that?

22   A.    "Taurus."

23   Q.    Do they sound the same to you, sir?

24   A.    They do.

25   Q.    Have you heard over the years that those two compositions
```

284

```
1    are the same?
2            MR. ANDERSON:  Objection.  I believe that is not a
3    performance of the "Taurus" deposit copy, Your Honor.  Maybe we
4    could take that up --
5            THE COURT:  They're going to have to prove that up to
6    the jury, whether it is or is not.
7    BY MR. MALOFIY:
8    Q.   Was that -- could you answer the --
9         Could you read back the last question for the witness.
10        (Reporter read the question as follows:)
11            "QUESTION:  Have you heard over the years
12            that those two compositions are the same?"
13        THE COURT:  That would be hearsay.
14        Next question.
15            MR. MALOFIY:  Okay.
16   Q.   I'm going to go to another -- and do you recognize that as
17   the guitar part, part A, of "Taurus"?
18   A.   Yes.
19   Q.   Okay.  Now I'm going to go --
20        THE COURT:  Now, you recognize that as what you heard
21   played; is that correct?  The issue here is what the sheet
22   music is, not what was played.  But you recognize it from
23   hearing it played before; is that correct?
24        THE WITNESS:  Correct.
25        THE COURT:  Okay.
```

285

```
 1        Okay.  Ladies and gentlemen, we're going to break at this
 2   time.  It's 11:30.  So remember the admonishment not to discuss
 3   the case among yourselves or with anybody else or form or
 4   express any opinions about the matter until it's submitted to
 5   you and you retire to the jury room.
 6        Have a pleasant lunch.  See you back in at -- by 1:30,
 7   okay?  Thank you.
 8             THE CLERK:  1:00 o'clock?
 9             THE COURT:  I'm sorry?
10             THE CLERK:  1:00 o'clock.
11             THE COURT:  I'm sorry.  1:00 o'clock, not 1:30.  I
12   made a mistake.  Everybody with me now?
13             THE WITNESS:  Yes, sir.
14             THE COURT:  1:00 o'clock.  Okay.
15        Thank you, Counsel.
16             THE CLERK:  All rise.
17
18        (Lunch recess commenced at 11:31 a.m.)
19
20        (Afternoon proceedings under separate cover.)
21
22
23                          --o0o--
24
25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

286

```
 1                         CERTIFICATE

 2

 3         I hereby certify that pursuant to Section 753,

 4    Title 28, United States Code, the foregoing is a true and

 5    correct transcript of the stenographically reported proceedings

 6    held in the above-entitled matter and that the transcript page

 7    format is in conformance with the regulations of the

 8    Judicial Conference of the United States.

 9

10    Date:  JUNE 15, 2016

11

12

13

14              /S/ SANDRA MACNEIL

15          Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA