# United States Court of Appeals
# For the Ninth Circuit

C.A. 16-56057

---

Skidmore et al.

*Michael Skidmore, Trustee for the*
*Randy Craig Wolfe Trust*
*Plaintiff-Appellant*

v.

Led Zeppelin et al.

*Defendants-Appellees*

---

# Plaintiff-Appellant Michael Skidmore's
# Excerpts of the Record
# Volume IV of XI

---

(Music copyright infringement, on appeal from the final Order dated June 23, 2016 of the Honorable R. Gary Klausner, of the United States District Court for the Central District of California.  The case was docketed in the Central District at 15-cv-03462)

---

Francis Alexander, LLC
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyers for Appellant Skidmore*

## EXCERPTS OF THE RECORD: VOLUME IV of XI
(719 – 984)

06/16/2016    Transcript for June 16, PM (*Doc. No. 285*) .......................................................... 719

06/17/2016    Transcript for June 17, AM (*Doc. No. 278*)........................................................ 861

583

1       UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3      HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4              – – –

5                              )
     MICHAEL SKIDMORE, AS TRUSTEE FOR   )
6    THE RANDY CRAIG WOLFE TRUST,       )
                                        )
7               PLAINTIFF,     )
                                        )
8          vs.                 ) No. CV 15-03462-RGK
                                        )
9    LED ZEPPELIN; JAMES PATRICK PAGE;  )
     ROBERT ANTHONY PLANT; JOHN PAUL    )
10   JONES; SUPER HYPE PUBLISHING,      )
     INC.; WARNER MUSIC GROUP CORP.,    )
11   PARENT OF WARNER/CHAPPELL MUSIC,   )
     INC.; ATLANTIC RECORDING           )
12   CORPORATION; RHINO ENTERTAINMENT   )
     COMPANY,                           )
13                                      )
               DEFENDANTS.     )
14   _____)

15

16      REPORTER'S TRANSCRIPT OF JURY TRIAL

17      DAY 3, VOLUME II, PAGES 583-723

18      THURSDAY, JUNE 16, 2016

19              1:01 P.M.

20         LOS ANGELES, CALIFORNIA

21

22

23      CINDY L. NIRENBERG, CSR 5059, FCRR
           U.S. Official Court Reporter
24           255 East Temple Street
             Los Angeles, CA 90012
25           *www.msfedreporter.com*

584

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE
     RANDY CRAIG WOLFE TRUST:
4
             FRANCIS ALEXANDER, LLC
5            BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
             280 N. PROVIDENCE ROAD, SUITE 1
6            MEDIA, PENNSYLVANIA  19063
             215-500-1000
7
             KULIK GOTTESMAN & SIEGEL, LLP
8            BY:  GLEN L. KULIK, ATTORNEY AT LAW
             15303 VENTURA BOULEVARD, SUITE 1400
9            SHERMAN OAKS, CALIFORNIA  91403
             310-557-9200
10

11

12   FOR DEFENDANT LED ZEPPELIN:

13           PHILLIPS NIZER, LLP
             BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
14           666 FIFTH AVENUE
             NEW YORK, NEW YORK  10103
15           212-977-9700

16

     FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:
17
             LAW OFFICES OF PETER J. ANDERSON, PC
18           BY:  PETER J. ANDERSON, ATTORNEY AT LAW
             100 WILSHIRE BOULEVARD, SUITE 2010
19           SANTA MONICA, CALIFORNIA  90401
             310-260-6030
20
             PHILLIPS NIZER, LLP
21           BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
             666 FIFTH AVENUE
22           NEW YORK, NEW YORK  10103
             212-977-9700
23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

585

1    **APPEARANCES OF COUNSEL (CONTINUED):**

2

3    **FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING**
     **CORPORATION, RHINO ENTERTAINMENT COMPANY:**

4
          LAW OFFICES OF PETER J. ANDERSON, PC
5         BY:  PETER J. ANDERSON, ATTORNEY AT LAW
          100 WILSHIRE BOULEVARD, SUITE 2010
6         SANTA MONICA, CALIFORNIA  90401
          310-260-6030
7

8

9

10   ALSO PRESENT:

11        NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

12        BRAD COHEN, WARNER MUSIC GROUP

13        SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

14        KEVIN SEGAL, TRIAL TECHNICIAN

15        DAN MORENO, TRIAL TECHNICIAN

16

17

18

19

20

21

22

23

24

25

586

```
1                    I N D E X

2

3    PLAINTIFF'S WITNESSES:              PAGE

4    KEVIN HANSON

5        DIRECT BY MR. MALOFIY           590

6        CROSS BY MR. ANDERSON           624

7        REDIRECT BY MR. MALOFIY         632

8        RECROSS BY MR. ANDERSON         634

9

10   ALEXANDER STEWART

11       DIRECT BY MR. MALOFIY           636

12       CROSS BY MR. ANDERSON           678

13       REDIRECT BY MR. MALOFIY         698

14

15   MICHAEL JEFFREY SKIDMORE

16       DIRECT BY MR. MALOFIY           701

17

18

19

20

21   FURTHER PROCEEDINGS                 PAGE

22   DISCUSSION HELD OUTSIDE PRESENCE OF JURY  711

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**00722**

```
 1                          E X H I B I T S

 2    TRIAL EXHIBITS               MARKED   ADMITTED

 3    527-V                                   602

 4    5011                                    656

 5    5061                                    664

 6    2704                                    670

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

588

```
1              LOS ANGELES, CALIFORNIA; THURSDAY, JUNE 16, 2016

2                            1:01 P.M.

3                            - - - - -

4        (Jury in at 1:01 P.M.)

5              THE CLERK:  Please be seated.  Come to order.

6              THE COURT:  Okay.  The record will reflect that all

7    the members of the jury are in their respective seats in the

8    jury box.

9              And, counsel, you want to call your next witness.

10             MR. MALOFIY:  Yes, I do.  Your Honor, our next

11   witness is an expert witness, Kevin Hanson, who's here to

12   perform with the guitar and also discuss aspects specific to

13   the musicology composition --

14             THE COURT:  Okay.

15             MR. MALOFIY:  -- embodied in the deposit copy and

16   "Stairway to Heaven."

17             THE COURT:  Okay.  Want to call him?

18             MR. MALOFIY:  Yes, I do.  One moment, Your Honor.

19             MR. ANDERSON:  Is this -- Your Honor, Mr. Hanson is

20   the subject of -- within the subjects of the motion in limine

21   Number 4 and the Daubert motion, and we have challenged his

22   qualifications.

23             If it's going to be something other than just playing

24   the deposit copy -- the gentleman can play guitar, but in terms

25   of analysis, substantial similarities, we do challenge his
```

589

```
 1    qualifications.

 2           THE COURT:  Okay.  Go ahead.  You may call him.

 3           MR. MALOFIY:  Yes.  Our next witness is going to be

 4    Mr. Kevin Hanson.

 5           THE OFFICER:  He's out in the hall.

 6           MR. MALOFIY:  Oh --

 7           THE OFFICER:  Sure.

 8           MR. MALOFIY:  I can do it.

 9           THE OFFICER:  That's all right.

10           MR. MALOFIY:  All right.

11           THE CLERK:  Please raise your right hand.

12           Do you solemnly swear that the testimony you shall

13    give in the cause now before this Court shall be the truth, the

14    whole truth, and nothing but the truth, so help you God?

15           THE WITNESS:  I do.

16           THE CLERK:  Please be seated.

17           Sir, please state your name and spell your last name

18    for the record.

19           THE WITNESS:  Kevin Hanson, H-A-N-S-O-N.

20           THE COURT:  Okay.  You may inquire.

21           MR. MALOFIY:  Your Honor, may I approach the

22    witness --

23           THE COURT:  Yes.

24           MR. MALOFIY:  -- with his guitar or could I

25    alternately suggest for him to be seated at a better viewpoint
```

```
 1    with the jury if he's going to use the guitar to demonstrate?
 2              THE COURT:  They don't have to view him.
 3              You can play it up there?
 4              THE WITNESS:  (No audible response.)
 5              THE COURT:  Okay.  Let's play it up here then.
 6              MR. MALOFIY:  I just wanted -- for the purpose of
 7    seeing his fingering, both left and right hand.  Thank you.
 8              THE COURT:  Okay.
 9              Okay.  You may inquire.
10                        KEVIN HANSON,
11                   having been first duly sworn,
12                      testified as follows:
13                      DIRECT EXAMINATION
14    BY MR. MALOFIY:
15    Q.   Mr. Hanson, thank you for being here.  Please tell the
16    jury where you live.
17    A.   I live in Philadelphia, Pennsylvania.
18    Q.   And where did you grow up?
19    A.   I grew up in Washington state.
20    Q.   And then thereafter, did you move to the East Coast?
21    A.   I moved to the East Coast after my first year at college
22    in Bellingham, Washington.
23    Q.   Can you tell the jury a little bit about your background
24    musically?
25    A.   Sure.  I started playing trumpet in the fourth grade when
```

591

1    I was nine years old.  At the age of ten, I got my first guitar

2    and was very obsessed with it.  I practiced all the time and

3    was fortunate enough to have the opportunity to be cast into

4    different settings that allowed me to play different styles of

5    music, including jazz, rock, blues, R&B.

6    Q.   Now, how long did you study the guitar prior to going to

7    college?

8    A.   That would have been eight years.

9    Q.   Do you know how many lessons you took by different

10   teachers of the guitar?

11   A.   Amongst all the various teachers, probably a hundred

12   lessons.

13   Q.   Okay.  Now, at some point, did you continue with your work

14   as a guitarist?

15   A.   Yes.  Well, I never stopped.  When I moved to

16   Philadelphia, I went to Temple University to study jazz music,

17   and after my first year of college, the band that I had

18   recently joined was offered a record deal from Interscope

19   Records, which basically occupied my career for the next ten

20   years with touring and recording albums for the label.

21   Q.   Were you signed to a major?

22   A.   We were signed to Interscope Records.

23   Q.   Did you tour throughout the United States?

24   A.   We toured non-stop for about two and a half years.

25   Q.   In doing so, did you have music that charted in the

592

1    *Billboard* charts?

2    A.   Yes, we did.   There was a song that I wrote called "Wait"

3    that got to number 16 on the modern rock *Billboard* chart.

4    Q.   And during that time, did you further perfect your skills

5    as a guitarist and a musician?

6    A.   Yes.   I was always practicing, always trying to become

7    more familiar with different types of music, and always trying

8    to push myself as a songwriter, as well.

9    Q.   Did your getting signed and performing for ten years

10   intercede with your education, your formal education, in music

11   school?

12   A.   It interrupted my education completely, yes.

13   Q.   Okay.   Now, what genres are you experienced in and are you

14   masterful in?

15   A.   Jazz; rock; I play a lot of R&B; I've played extensively

16   reggae music; I studied classical guitar.

17          I'm a reading musician, so I have the opportunity to

18   perform with the Chamber Orchestra of Philadelphia, Opera

19   Philadelphia, many different contexts.

20   Q.   How many sessions do you do a year as far as being a

21   session musician?

22   A.   Recording sessions?

23   Q.   Yeah.

24   A.   Anywhere between 50 and 75.

25   Q.   How many recording sessions have you done in the course of

593

1    your career?  Hundreds?

2    A.    Hundreds.

3    Q.    Has your guitar performance and has your guitar playing

4    been featured in -- with some of the top artists of today?

5    A.    Yes.  In the past ten years, I've performed with Jay Z,

6    Beyoncé, Mary J. Blige, Pharrell, Lil' Kim, Talib Kweli.

7              I've recorded quite a bit with The Roots, and I've

8    got songwriting credits with The Roots, with Usher, Jill Scott,

9    Vivian Green.

10   Q.    And have you also performed live with some of these

11   artists?

12   A.    Yes.  All that I just mentioned except for -- no, I've

13   performed live with all of them, actually.

14   Q.    All right.  Have you ever been on national television on

15   any of the late-night shows?

16   A.    Yes.  The band that I was in the '90s, Huffamoose, that

17   was signed to Interscope Records performed on the Conan O'Brien

18   show.

19   Q.    Did you perform with The Roots on any of these shows, as

20   well?

21   A.    I was featured as the guitar player with The Roots in a

22   documentary called *Fade to Black*, which was Jay Z's concert at

23   Madison Square Garden.

24             Also, I was in the house band of what was called

25   Illadelphonics, which is really the roots for Dave Chappelle's

1    *Block Party* documentary.

2    Q.   Now, in the course of your career as a session musician,

3    as -- in the course of your career as an artist and as a person

4    who wrote and recorded music, did you have a strong

5    understanding of music theory?

6    A.   Yes.  I studied music theory from a very young age.  To

7    familiarize myself with the chord structures in many jazz

8    songs, I had to figure out the components that made up the

9    harmonic structures of these tunes.

10           And also I would pick apart songs that I was

11   learning, whether it was pop music, reggae music, a lot of

12   Beatles songs.

13   Q.   I see.  Now, are you also familiar with compositional

14   elements embodied in musical score?

15   A.   Oh, yes.  Yes, definitely.

16   Q.   And are you familiar with terms like "tempo" and "rhythm"

17   and "key" and "chord progressions" and "sequences," "cadences,"

18   and things like that?

19   A.   Yes.

20   Q.   And do you use those -- are you familiar with those terms

21   and are -- do you incorporate that into your music on a daily

22   basis?

23   A.   Oh, most definitely.

24   Q.   All right.  Are you able to compose sheet music?

25   A.   Yes.

595

```
 1    Q.    Are you able to read and write sheet music?

 2    A.    Yes.

 3    Q.    Have you had the opportunity to look at the "Taurus"

 4    deposit copy in this case?

 5    A.    Yes, I have.

 6    Q.    Is it your opinion that the "Taurus" deposit copy is

 7    substantially similar to "Stairway" -- to "Stairway to Heaven"?

 8    A.    Yes.

 9              MR. ANDERSON:  Objection.  Objection, Your Honor,

10    both foundational as to qualifications and it's not in the form

11    that the Court --

12              THE COURT:  Overruled.  In this particular matter,

13    you can testify in that manner.

14              His qualifications are subject to cross-examination

15    and wait as to any other expert.

16              Go ahead.

17              MR. MALOFIY:  I'd like to offer him as an expert

18    witness in the areas of music theory, also musicological

19    analysis specific to guitar compositions and more generally,

20    and also offer him as an expert to demonstrate specific

21    musicological components which are embodied in the "Taurus"

22    deposit copy, as well as the "Stairway to Heaven" album

23    recording, if I may, Your Honor.

24              MR. ANDERSON:  Just for the record, Your Honor.  I --

25              THE COURT:  You objected to that.
```

596

1       MR. ANDERSON:  And on the Daubert issue -- that we
2  requested a Daubert hearing.
3       THE COURT:  That's correct, and the Court is going to
4  find that he does qualify as an expert.
5       Go ahead, counsel.
6       MR. MALOFIY:  Thank you.
7  BY MR. MALOFIY:
8  Q.  Now, what I'd like to do is I'd like to first play for you
9  certain audio -- certain video exhibits where -- which you had
10 performed in.
11      Do you recall recently putting together video
12 exhibits for the time of trial?
13 A.  Yes.
14 Q.  All right.  Now, I don't -- I'm not going to identify what
15 they are.  I want you to identify them for the jury by using
16 your ears.
17      Can you do that for me?
18 A.  Yes.
19 Q.  All right.
20      MR. MALOFIY:  Now, the first one, counsel, is 524-V.
21 It was already used and admitted into evidence.
22      *(Counsel confer off the record.)*
23      MR. MALOFIY:  Is that queued up, Mr. Moreno?
24      And let's make sure it's present on the screen.
25      *(Counsel confer off the record.)*

597

```
1            (Playing of videotape.)
2                 MR. MALOFIY:  Your Honor, there's no issue to
3       publishing it.  It was used prior to in the course of these
4       proceedings.
5                 THE COURT:  Okay.
6                 Is that you on the screen?
7                 THE WITNESS:  Yes.
8                 THE COURT:  Okay.
9                 MR. MALOFIY:  I'm just waiting for this one to wake
10      up.
11                Okay.  Thank you.
12                Can we play this video clip for the jury and for the
13      witness.
14            (Playing of videotape.)
15      BY MR. MALOFIY:
16      Q.   Do you recognize that piece of music?
17      A.   Yes, I do.
18      Q.   What is that piece of music, sir?
19      A.   That is the A section of "Stairway to Heaven."
20                THE COURT:  And for the record, let's call -- refer
21      to that as Clip 1, because you're going to play the next clip,
22      too.  So Clip 1 is the "Stairway to Heaven"?
23                MR. MALOFIY:  Yes, Part A.
24      BY MR. MALOFIY:
25      Q.   Was that you performing that?
```

598

1   A.    Yes.

2   Q.    Did you perform that accurately?

3   A.    Yes.

4   Q.    Okay.  Now, I want to play you another clip, 532-V.

5              Can you tell me what composition you hear?

6              And when you recognize what it is, you can just nod

7   your head, and I'll ask you the question at the end.

8              So when you immediately recognize it, just nod your

9   head and then let it play through so then I can ask you

10  questions when it's done.

11             THE COURT:  We'll refer to this as Clip 2.

12             MR. ANDERSON:  Objection, Your Honor.  This is

13  identified in plaintiff's supplemental list as the sound

14  recording, the -- a version or live performance of the sound

15  recording.

16             MR. MALOFIY:  It's not, Your Honor.  Respectfully,

17  this is Part A.  It's embodied in the deposit copy because it

18  appears both in the album recording and in the deposit copy.

19             THE COURT:  Let me ask -- let me ask you this.  Did

20  you play the second clip?

21             THE WITNESS:  Yes.

22             THE COURT:  And did you play the notes just from the

23  deposit copy?

24             THE WITNESS:  I played the notes that are embodied in

25  the deposit copy.

599

```
1          THE COURT:  Nothing more?  Because all we're looking
2   for is the deposit copy and whether or not the deposit copy is
3   infringed, not whether or not any production infringed.
4          THE WITNESS:  There's no additional production other
5   than a solo performance on the guitar.
6          THE COURT:  Of what was in the deposit copy only?
7          THE WITNESS:  Of notes that are embodied in the
8   deposit copy.
9          THE COURT:  Okay.
10          MR. ANDERSON:  Your Honor, it is listed as the
11  "Taurus" -- this is plaintiff's own exhibit list -- "Taurus"
12  album, and I think the witness is not answering directly the
13  question.
14          THE COURT:  Well, I'll try it one more time.  I
15  thought he was and maybe I didn't ask the question correctly.
16          MR. MALOFIY:  May I respond?
17          THE COURT:  No.
18          MR. MALOFIY:  Understood.
19          THE COURT:  In this particular case, we are looking
20  for just the deposit copy, and if you are just playing the
21  notes from the deposit copy, fine.  If you're playing notes
22  that are not in that deposit copy that may be in some
23  production or something else, we want to know that.
24          So the question is are the notes that you're playing
25  here just the notes in the deposit copy, and you hesitated.
```

```
1              THE WITNESS:  There are additional notes that are

2    embodied in the deposit copy, but not as the deposit copy would

3    read.

4              THE COURT:  That are not protected by the deposit

5    copy.

6              THE WITNESS:  Well, that's --

7              THE COURT:  Okay.  Objection so far is sustained,

8    counsel.  You can play notes of the deposit copy only.  And if

9    you want him to play them here in court, he can do that.

10             MR. MALOFIY:  Could I play him the audio example and

11   ask him whether or not these notes are embodied in the deposit

12   copy?

13             THE COURT:  No, no.  Why put it in front of the jury

14   if it's not admissible?

15             MR. MALOFIY:  Your Honor, it's not the sound

16   recording we're playing, and I know defense counsel has made

17   that issue.  It's the -- just the protectable elements, which

18   are embodied in the deposit copy of "Stair-" --

19             THE COURT:  My ruling is that you can play the notes

20   from the deposit copy only, okay?

21             MR. MALOFIY:  Let me go to --

22             THE COURT:  And you can do that here in court if

23   you --

24             I'm assuming you'll be able to do that, can't you,

25   from looking at the deposit copy?
```

601

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  I would think so.  Okay.

 3              And if you want to do it here in court, that's fine.

 4   BY MR. MALOFIY:

 5   Q.   Can you -- can you play the Exhibit 527-V?

 6              MR. MALOFIY:  There's no objection, right?

 7              MR. ANDERSON:  Assuming this is as represented in

 8   your list, there's no objection.

 9              THE COURT:  No objection.

10              MR. ANDERSON:  I believe this is what was played

11   earlier as the --

12              MR. MALOFIY:  Yeah, I don't want to be identifying it

13   for the --

14              THE COURT:  Counsel, go ahead.

15              MR. ANDERSON:  Oh, sorry.

16              MR. MALOFIY:  Yeah.  I mean, every time --

17         (Playing of videotape.)

18   BY MR. MALOFIY:

19   Q.   Do you recognize that piece of music?

20   A.   Yes.

21   Q.   What is that piece of music?

22   A.   That is the bass clef of the copyright deposit of

23   "Taurus."

24   Q.   Now, does the copyright -- does the copyright or the

25   "Taurus" deposit copy --
```

602

1          THE COURT:  Counsel, before you get to that question,

2     what is that exhibit marked as?  Because it hasn't been

3     introduced yet.  It was just for demonstration.  I think you

4     wanted to introduce it now.

5          MR. MALOFIY:  Yeah.  It's 527-V, Your Honor.  It

6     is --

7          THE COURT:  527-V?

8          MR. MALOFIY:  It is the "Taurus" deposit copy, the

9     bass clef.

10          THE COURT:  That's okay.  I just wanted to identify

11     the exhibit.

12          And you're moving it into evidence at this time?

13          MR. MALOFIY:  Yes, Your Honor.  Thank you.

14          THE COURT:  Okay.  It will be received.

15     *(Trial Exhibit 527-V admitted into evidence.)*

16     BY MR. MALOFIY:

17     Q.   Now, did you perform that piece of music?

18     A.   Yes.

19     Q.   And to be clear, that's the "Taurus" deposit copy, the

20     bass clef or the lower clef on that piece of music, correct?

21     A.   Correct.

22     Q.   And is it also Part A that you're performing there?

23     A.   Yes.

24     Q.   All right.  Now, to be clear, is the "Taurus" deposit copy

25     comprised of one staff of music or two staffs of music, often

603

```
 1    referred to as staves?

 2    A.    Two staffs.

 3    Q.    Okay.  Now, would that be the treble clef on top and the

 4    bass clef on the bottom?

 5    A.    That's correct.

 6          MR. MALOFIY:  Could we pull up the "Taurus" deposit

 7    copy, 2058.

 8          We're just pulling it up on our machine.

 9          A little bit of a trial tech issue.  The Court's

10    indulgence.

11       (The exhibit was displayed on the screen.)

12    BY MR. MALOFIY:

13    Q.    All right.  Do you see that Exhibit 2015 that's before

14    you?

15    A.    Yes.

16    Q.    If it's hard to read, please ask me to blow it up, okay?

17    A.    It's okay.

18    Q.    All right.  Have you seen this before?

19    A.    Yes, I have.

20    Q.    What is this?

21    A.    This is the "Taurus" copyright deposit.

22    Q.    Okay.  Now, are you able to read this music as a session

23    musician, as someone who's studied music for 30-plus years?

24    A.    Yes.

25    Q.    Is it easy for you to read this music?
```

604

1   A.   This particular music does not lay well on the guitar, so
2   I had to work out some fingerings for it to be able to play it
3   clearly.
4   Q.   Can you read it clearly, though?
5   A.   Yes.
6   Q.   And can you understand the rhythm which is indicated on
7   this deposit copy?
8   A.   Yes.
9   Q.   And can you recognize the duration of the notes based on
10  this deposit copy?
11  A.   Yes.
12  Q.   Now, can you also confirm the song structure of this
13  deposit copy?
14  A.   Yes.  It's -- the form is AAB.
15  Q.   And then does it repeat AAB?
16  A.   Yes.  So in its entirety, you could call it AAB AAB.
17  Q.   What is the song structure of "Stairway to Heaven" Part
18  A -- excuse me, "Stairway to Heaven," the first 2 minutes and
19  14 seconds?
20  A.   AAB.
21  Q.   And does it repeat again?
22  A.   Yes.  So it would be the same, AAB AAB.
23  Q.   All right.  Now, does the A section repeat two more times
24  in "Stairway to Heaven"?  Is it AAB AAB AA in "Stairway"?
25  A.   Yes, it continues with the A sections.

605

1    Q.    Okay.  In "Stairway to Heaven," does the A section occur

2    for six of eight times in that Part 1 of the song, the

3    introductory 2 minutes and 14 seconds?

4    A.    That's correct.

5    Q.    And the other part we're referring to is Part B, correct?

6    A.    Yes.

7    Q.    And -- okay.  Now, are the parts of the composition

8    between "Stairway to Heaven" and "Taurus," are the parts that

9    are similar the 2 minutes and 14 seconds in the "Stairway to

10   Heaven"?

11   A.    Yes, they are similar.

12   Q.    Okay.  Now, from your perspective, if you look at this

13   "Taurus" deposit copy --

14         MR. MALOFIY:  And can we blow up -- for the

15   orientation of the jury, can we blow up the first -- the first

16   two staves?

17   BY MR. MALOFIY:

18   Q.    Do you see that?

19   A.    Yes.

20   Q.    Now, am I correct that that upper staff of music is the

21   treble clef?

22   A.    That's correct.

23   Q.    What's the lower clef there?

24   A.    That's the bass clef.

25   Q.    All right.  Now, I see a little "C" after each one of

606

1    those symbols.

2    A.    Um-hmm.

3    Q.    What does that mean, that little "C"?

4    A.    That "C" stands for common time or what we would call 4/4

5    time.

6    Q.    Now, if you look at this piece of music -- and we're

7    looking at the first line for the ease of understanding what

8    the sheet music says -- would you agree or do you hear, when

9    you play this, two melody lines?

10   A.    Yes.  I hear a lower part in the bass clef and then,

11   independent of that, a treble clef line with two distinct

12   melodies occurring simultaneously.

13   Q.    Now, to be clear, is the bottom clef, the bass clef, when

14   you say -- that's the lower clef underneath?

15   A.    Correct.

16   Q.    And is the upper -- is the treble clef the one that's

17   above?

18   A.    That's correct.

19   Q.    Now, when you separate out these two melody lines, is it

20   easier for someone without a trained ear to hear the

21   significance of the two melody lines?

22   A.    It would be easier --

23              MR. ANDERSON:  Objection.

24              THE COURT:  Sustained.  Sustained.  It's calling for

25   speculation.

607

```
 1    BY MR. MALOFIY:
 2    Q.   In order to illustrate the two melody lines, do you
 3    believe, as an expert, it would be better to illustrate the
 4    treble clef and then the bass clef separately?
 5              MR. ANDERSON:  Objection.  Outside the claimed
 6    expertise.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  Yes, I think that it would be easier to
 9    hear them independently.
10    BY MR. MALOFIY:
11    Q.   As -- with a trained ear, are you able to hear those just
12    listening to it through on your own?
13    A.   Yes.
14    Q.   All right.  Now, if you look at the bass clef, can you
15    play that --
16              MR. MALOFIY:  Or can we -- can we play that for the
17    jury?
18              THE COURT:  Okay.
19              THE WITNESS:  Would you like me to perform it or --
20              MR. MALOFIY:  I may do it that way if technologically
21    it's more difficult.  So let me just see what we can do here.
22              527-V.  Can we play that?
23              THE COURT:  Yes.
24              MR. MALOFIY:  Thank you.
25              (Playing of videotape.)
```

608

1    BY MR. MALOFIY:

2    Q.    And to be clear, that's you performing the bass clef of

3    the "Taurus" deposit copy, correct?

4    A.    Correct.

5    Q.    Now, how would you describe what we just heard for the

6    jury?

7            THE COURT:   You lost me on that question.

8    BY MR. MALOFIY:

9    Q.    How would you describe what we just heard musicologically?

10           To break down that melody, how would you describe

11   that to a jury?

12           MR. ANDERSON:   Objection, Your Honor.  It's vague,

13   it's ambiguous --

14           THE COURT:   I'm not too sure how -- what do you mean

15   "How do you describe it"?  You can describe it as loud -- I

16   don't know.

17   BY MR. MALOFIY:

18   Q.    Can you describe the musicological elements of that melody

19   line and what's happening?

20           THE COURT:   Okay.

21           THE WITNESS:   I would describe --

22           MR. ANDERSON:   Excuse me.  If I may, Your Honor.

23           THE COURT:   Yes.

24           MR. ANDERSON:   This is -- all of this questioning is

25   outside the scope of his expert report, the ones that the Court

609

1   allowed.  This was never disclosed to us.

2           MR. MALOFIY:  That's -- I'll wait for Your Honor to

3   allow me to speak.

4           MR. ANDERSON:  The report is Exhibit 3 to our trial

5   brief.

6           THE COURT:  And, again, this is something that should

7   have been brought up before trial.  My question is, is this in

8   the expert report --

9           MR. MALOFIY:  I believe --

10          THE COURT:  -- the second report?

11          MR. MALOFIY:  These are things that he played and

12  performed, so we're going to illustrate it.  And we do have his

13  report, which we submitted, and he was deposed in this case at

14  length as to all these issues.

15          THE COURT:  And the question is, is it in his report

16  or is it something outside of his report?

17          MR. MALOFIY:  We believe the comparative analysis is

18  contained in his report, but --

19          THE COURT:  At page?

20          MR. MALOFIY:  -- with the Court's --

21          THE COURT:  At page?

22          MR. MALOFIY:  With the Court's indulgence, one

23  moment.

24          THE COURT:  Sure.

25          MR. MALOFIY:  Because I know there were a few reports

610

1    that were submitted on behalf of plaintiff.

2              THE COURT:  We're talking about the last report.

3              MR. MALOFIY:  Specifically the last one, correct,

4    Your Honor?

5              THE COURT:  Yep, you got it.

6              MR. MALOFIY:  One moment.

7              Yes.  It starts -- it starts on page 2, "Comparative

8    analysis of compositional elements as embodied in the deposit

9    copy lead sheet of 'Taurus' and sound recordings of 'Taurus'

10   and 'Stairway to Heaven.'"

11             All three were analyzed.  He can discuss the deposit

12   copy independently, which we are doing right now.

13             MR. ANDERSON:  That is the heading, but -- and I

14   would defer to Your Honor -- I don't see any analysis in it.

15   He just says they're similar.

16             THE COURT:  But, counsel, what page is the analysis?

17   Because that's what his expertise are.  Is there some analysis

18   in the report?

19             MR. MALOFIY:  Yes.

20             THE COURT:  At what page?

21             MR. MALOFIY:  Page 2, page 3 -- and I can identify

22   them for Your Honor if you'd like or I can read them.

23             THE COURT:  Page 2 and 3.  Give counsel a chance to

24   take a look at it.

25             MR. MALOFIY:  Page 4.  And then the videos -- the

611

1  initial videos are identified on page 5, Your Honor.

2          MR. ANDERSON:  And my point is that the questions

3  that are being asked of this witness at this time aren't within

4  the report.  That's my point.

5          THE COURT:  Well, I'm going to allow him to testify

6  on it and -- with the understanding that when I read the report

7  at the next break, I may very well strike it.

8          MR. ANDERSON:  Thank you, Your Honor.

9          MR. MALOFIY:  Thank you, Your Honor.

10         THE WITNESS:  I would describe this bass clef melody

11  as containing the components of a chromatic descending line in

12  conjunction with an arpeggiated figure.  And I can illustrate

13  that if you'd like.

14  BY MR. MALOFIY:

15  Q.   Yes, can you please do that for the jury.

16  A.   The chromatic descending line in this case would sound

17  like this.

18      (Witness playing guitar.)

19          The arpeggiated figure in conjunction that sits on

20  top of this sounds like this.

21      (Witness playing guitar.)

22          So it's those two components that comprise this bass

23  clef.

24          THE COURT:  Okay.  Next question.

25  ///

612

```
 1   BY MR. MALOFIY:
 2   Q.   Now, to be clear, is this chromatic line, combined with
 3   the notes in this chord progression and the way it's being
 4   picked or identified rhythmically in the "Taurus" deposit copy,
 5   is that used in an original and creative way?
 6   A.   Yes.
 7   Q.   And is that also a -- is that also the same or
 8   substantially similar to the chromatic line and chord
 9   progression in "Stairway to Heaven" rhythmically in the way
10   that that descending line is used?
11   A.   Yes, it is.
12   Q.   Now, it's more than just a -- more than just a chromatic
13   line in the deposit copy, correct?
14   A.   Correct.
15   Q.   And is what makes it original the way it incorporates the
16   rhythm and also the arpeggiation of the bass clef?
17   A.   That's accurate, yes.  It's the descending line in
18   conjunction with the arpeggiated component that gives it its
19   distinct original sound.
20   Q.   Additionally, is it unique and distinct because there is a
21   treble clef in this composition "Taurus" deposit copy?
22            MR. ANDERSON:  Objection.  Leading.
23            THE COURT:  Overruled.
24            THE WITNESS:  Yes, that's true.
25   ///
```

613

```
1    BY MR. MALOFIY:

2    Q.   And when you say the ascending line, are the notes --

3    well, share with the jurors what is unique about the ascending

4    line in the "Taurus" deposit copy.

5    A.   The ascending line has -- would you like me to play it in

6    its entirety first?

7    Q.   I would like you to focus on the actual note pairs that

8    are memorable and distinct.

9    A.   The note pairs in the "Taurus" deposit copy would sound

10   like this.

11        (Witness playing guitar.)

12   Q.   Now, to be clear, is that first note pair, was that A to

13   B?

14   A.   Yes.

15   Q.   Is the second note pair B to C?

16   A.   Yes.

17   Q.   Is the third note pair C to F-sharp?

18   A.   Yes, it is.

19   Q.   Now, in "Stairway," we heard Mr. Page testify that there

20   is a descending chromatic line and what makes it unique is the

21   ascending line on top.

22        Can you play for the jury the ascending line of

23   "Stairway to Heaven" which makes it memorable and distinct?

24   A.   Yes.

25        (Witness playing guitar.)
```

614

1    Q.   Is that also AB for the first pair?

2    A.   Um-hmm.

3    Q.   Is that a yes?

4    A.   Yes.

5    Q.   Is it BC for the second pair?

6    A.   Yes.

7    Q.   And C to F-sharp in the third pair?

8    A.   Yes.

9    Q.   Now, did you have an opportunity to review defendants'

10   musicological analysis, Dr. Lawrence Ferrara?

11   A.   Yes, I did.

12   Q.   And did he indicate a three note pair which caused

13   "Stairway to Heaven" to be memorable and distinct and the most

14   important parts?

15   A.   Yes.

16   Q.   And what did he define as the most memorable and distinct

17   part of "Stairway to Heaven" of the Part A?

18   A.   That would be the note pairs, A to B, B to C, and C to

19   F-sharp.

20   Q.   For the benefit of the jury, can you please play those

21   note pairs one more time, first the note pairs AB, BC -- excuse

22   me, AB, BC, C to F-sharp in the "Taurus" deposit copy, and then

23   take a brief moment and then play the three note pairs, AB, BC,

24   C to F-sharp, in "Stairway to Heaven."

25   A.   Yes.

615

1    Q.    Thank you.

2    A.    Here's "Taurus."

3          (Witness playing guitar.)

4                And here's "Stairway to Heaven."

5          (Witness playing guitar.)

6    Q.    Now, are those the exact same notes?

7    A.    Yes, they are.

8    Q.    And is the second and third pair played exactly at the

9    same place with the exact same notes?

10   A.    Rhythmically, they are placed -- yes, the second and third

11   pairs are placed in the same place.

12   Q.    Is the first pair slightly off?

13   A.    Yes, the rhythm is slightly different.

14   Q.    Is it substantially similar?

15   A.    In my opinion, it is.

16   Q.    And do you believe what makes "Taurus" unique is this

17   three note pair in the ascending line AB, BC, C to F-sharp, and

18   is that also contained in "Stairway to Heaven" Part A, AB, BC,

19   C to F-sharp?

20   A.    That's correct.

21   Q.    And is that consistent with defendants' own expert,

22   Dr. Lawrence Ferrara, who also indicated that in his report?

23   A.    Yes, it is.

24   Q.    As a musician, is it easy for you to hear those three note

25   pairs and recognize them as memorable and distinct parts of

616

1  both compositions?

2          MR. ANDERSON:  Objection.

3          THE COURT:  Sustained.

4          MR. MALOFIY:  One moment, Your Honor, with the

5  Court's indulgence.

6          THE COURT:  Sure.

7  BY MR. MALOFIY:

8  Q.  Do you agree that the chord progression is virtually

9  identical for the first five chords of "Taurus" and "Stairway

10  to Heaven"?

11  A.  Yes, I do.

12          MR. ANDERSON:  Objection.  Leading.

13          THE COURT:  Overruled.  The answer will remain.

14  BY MR. MALOFIY:

15  Q.  Tell the jurors what the first five chords are in

16  "Stairway to Heaven."

17  A.  With the most modern naming and nomenclature, it would be

18  A minor, A minor 9 major 7, A minor 7, to D.

19  Q.  And is that substantially similar to the chord progression

20  in the "Taurus" deposit copy?

21  A.  Yes, it is.

22  Q.  Do you -- in the way that the descending line is used in

23  both pieces, the "Taurus" deposit copy and also "Stairway to

24  Heaven" Part A, does that descending chromatic arpeggiated

25  chord progression that moves through those first five chords

617

1   make it unique and memorable in the way it's used?

2   A.   Please repeat the question.

3   Q.   Sure.  Does "Stairway to Heaven" and "Taurus" use a

4   chromatic descending line in an original and creative way?

5   A.   Yes.

6   Q.   That's the question.

7   A.   Yes.

8   Q.   In looking at the "Taurus" deposit copy, do you have an

9   understanding of whether or not it was written for one

10  instrument or two instruments?

11  A.   Looking at the deposit copy, it appears as though it was

12  written for two independent voices.  Whether or not those would

13  be played on two instruments is subjective, but there are two

14  distinct melodies written.

15  Q.   And is that the ascending line and the descending line?

16  A.   Correct.

17  Q.   Now, do you come to that conclusion because you've tried

18  to perform the composition as embodied in the deposit copy?

19  A.   Yes.  If you -- if you were to look at that deposit copy,

20  you would most likely assume it was written for piano left hand

21  in the bass clef and the right hand in the treble clef,

22  although it could be played -- because there's no designation

23  of the instrumentation, it could be played by two separate

24  instruments.

25           For the guitar, some work has to be done

618

 1    fingering-wise to manipulate those two melodies simultaneously.

 2    Q.   Now, did you have an understanding or did you ever learn

 3    on what instrument "Taurus" was composed on?

 4             MR. ANDERSON:  Objection.  Relevance.

 5             THE COURT:  Sustained.

 6    BY MR. MALOFIY:

 7    Q.   Do you have an understanding of whether or not the

 8    upper -- the treble melody in the "Taurus" deposit copy was

 9    written for an electric piano and the bottom bass clef was

10    written primarily for the guitar?

11             MR. ANDERSON:  Objection.  Relevance.  Calls for

12    speculation.

13             THE COURT:  Sustained.

14    BY MR. MALOFIY:

15    Q.   Does the "Taurus" deposit copy indicate instrumentation?

16    A.   No, it does not.

17    Q.   And does the "Taurus" deposit copy indicate tempo?

18    A.   No.

19    Q.   But it does indicate rhythm?

20    A.   Yes.

21    Q.   Is the way that the notes are played rhythmically between

22    "Stairway to Heaven" and the "Taurus" deposit copy

23    substantially similar?

24    A.   Yes.

25    Q.   Do you agree that "Taurus" begins with an arpeggiated

619

1   A minor figure in the 8th notes on notes A, C, and E, as does

2   "Stairway to Heaven"?

3            MR. ANDERSON:  Objection.  Leading.

4            THE COURT:  Sustained.

5   BY MR. MALOFIY:

6   Q.   Do you agree that there's something that's unique and

7   memorable in the way that "Stairway to Heaven" and "Taurus"

8   deposit copy do not go to the fifth?

9            MR. ANDERSON:  Objection.  Relevance.

10           THE COURT:  Overruled.

11           THE WITNESS:  That is true.  Both compositions do not

12  go to the fifth degree of the key of A minor.

13  BY MR. MALOFIY:

14  Q.   Is that unusual?

15  A.   Typically, the descending line would go to the fifth.

16  Q.   And in both "Taurus" and "Stairway to Heaven," neither of

17  those compositions go to the fifth, correct?

18  A.   Correct.

19  Q.   And is that a unique and memorable way of resolving the

20  descending line or what would be called a cadence?

21  A.   In my opinion, it is.

22  Q.   From a musicological standpoint, in looking at the

23  compositional elements embodied in both the sound -- excuse

24  me -- embodied in the "Stairway to Heaven" album recording and

25  the "Taurus" deposit copy, do you believe that this Part A is

620

```
 1   substantially similar?

 2   A.   Yes, I do.

 3   Q.   Do you believe that they're strikingly similar?

 4   A.   To my ear, they're -- they have a striking similarity.

 5   Q.   Do you see a benefit, as an expert, in hearing the two

 6   works performed together?

 7   A.   Definitely.

 8           MR. ANDERSON:  Objection.  Lacks foundation.

 9           THE COURT:  Sustained.

10           MR. ANDERSON:  It's also within the motion on

11   mash-ups.

12           THE COURT:  Sustained.

13   BY MR. MALOFIY:

14   Q.   In playing two works in unison, are you able to determine

15   whether or not they are compatible and not dissonant?

16   A.   Yes.

17           MR. ANDERSON:  Objection.  Lacks foundation.

18   Relevance.  Outside the scope of his claimed expertise.

19           THE COURT:  Sustained.  Excuse me.  As to the last

20   question, overruled.

21           THE WITNESS:  Yes.  I think if you were comparing two

22   pieces of music and they were played simultaneously, that would

23   be a very strong indication of whether they were similar

24   because if there were not similarities, they would sound very

25   discordant.
```

621

```
 1   BY MR. MALOFIY:

 2   Q.   Have you ever listened to "Stairway to Heaven" and the

 3   "Taurus" deposit copy together?

 4   A.   Yes, I have.

 5   Q.   And do they sound -- are they discordant or are they in

 6   unison?

 7   A.   The --

 8        MR. ANDERSON:  Objection.  I believe he's going to

 9   the extrinsic test.

10        THE COURT:  Overruled.

11        THE WITNESS:  To my ear, they sound like they are one

12   piece of music when played together.

13        MR. MALOFIY:  For the orientation of the jury, may we

14   play the video clip which shows this as a demonstrative example

15   to show the jury that the "Taurus" deposit copy, when played

16   with "Stairway to Heaven" album recording, are virtually

17   indistinguishable?

18        THE COURT:  Counsel, this was the one that was shown

19   in opening statement?

20        MR. MALOFIY:  Yes, it is, Your Honor.

21        MR. ANDERSON:  Can we have the exhibit number,

22   please?

23        MR. MALOFIY:  Yes.  One moment.

24        THE COURT:  Exhibit number?

25        MR. MALOFIY:  Yes.  527-V.
```

622

1          THE COURT:  Okay.

2          MR. MALOFIY:  Oh, I'm sorry.  We're playing for the

3    orientation of the jury "Stairway to Heaven" first and then the

4    "Taurus" deposit copy and then the unison.

5          THE COURT:  Again, you already -- you've already

6    played the first two.

7          MR. MALOFIY:  Oh, okay.  We can do that.  We can move

8    right to that.

9          THE COURT:  Yep.

10          MR. MALOFIY:  I've just got to cue it up.  One

11    moment, Your Honor.

12          MR. ANDERSON:  If we could have an exhibit number,

13    please.  Thank you.

14          MR. MALOFIY:  527-V.

15          MR. ANDERSON:  Are you sure?  That's the bass clef

16    one.

17          MR. MALOFIY:  That's how we have it in our system.

18          MR. ANDERSON:  Okay.

19          MR. MALOFIY:  We have it as a sequence.

20          MR. ANDERSON:  Sorry, Your Honor.

21          THE COURT:  Okay.

22          MR. MALOFIY:  With the Court's indulgence.

23          *(Playing of videotape.)*

24    BY MR. MALOFIY:

25    Q.   To your ears and with your knowledge, are those two pieces

623

```
 1   of music substantially similar?

 2   A.    Yes.

 3   Q.    Are they strikingly similar?

 4   A.    They bear a striking similarity to my ear, yes.

 5   Q.    Do they play -- do they play together as one piece of

 6   music?

 7   A.    Yes.

 8   Q.    Are they discordant in any way?

 9   A.    No.

10   Q.    Do you believe Chim Chim-Eree [sic] is closer to "Stairway

11   to Heaven" than "Taurus" is?

12   A.    No.

13         MR. MALOFIY:  No further questions.

14   BY MR. MALOFIY:

15   Q.    Oh, do you hold all of your opinions to a professional

16   degree of musicological and musician certainty?

17   A.    Absolutely.

18   Q.    And does anything that the defense provided you in

19   rebuttals, reports, or any of their reports sway your opinions

20   that you hold in any way?

21   A.    No.

22   Q.    How confident are you in your opinions which you've

23   expressed to this Court and this jury?

24   A.    Very confident.

25         MR. MALOFIY:  Thank you, Mr. Hanson.
```

624

1          THE COURT:  Okay.  Cross.

2          MR. ANDERSON:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MR. ANDERSON:

5   Q.   Good afternoon, Mr. Hanson.

6   A.   Good afternoon.

7   Q.   Is it correct that this is the first time in your life

8   that you've ever been retained as an expert witness?

9   A.   Yes, it is.

10  Q.   And is it correct you never completed college?

11  A.   That is true.

12  Q.   Is it also true that you've never taken any musicology

13  classes?

14  A.   That's difficult to answer, as musicology is defined as

15  a -- the study of music.  So I've taken many music classes.

16          Specifically toward a degree in musicology, several

17  of the classes I've taken would be a prerequisite to finish

18  that course -- that degree course.

19  Q.   Do you recall I took your deposition a few weeks ago?

20  A.   Yes.

21  Q.   And do you recall that you testified you had never taken

22  any musicology classes?

23  A.   My understanding was that the question was pointed toward

24  have I taken classes toward a degree in musicology.

25  Q.   Have you ever taken a class on comparative musicological

625

```
1    analysis?
2    A.    No.
3    Q.    Do you have a degree in musicology?
4    A.    No, I do not.
5    Q.    Have you authored any publications in the field of
6    musicology?
7    A.    No, sir.
8    Q.    Are you a member of the American Musicological Society?
9    A.    No.
10   Q.    Are you a member of the Society for Music Theory?
11   A.    No.
12   Q.    Are you a member of any musicological society?
13   A.    No.
14   Q.    Are you a musicologist by profession?
15   A.    No.
16   Q.    Have you ever been asked to perform a musicological
17   analysis of two compositions to determine whether they are a
18   substantial similarity of copyrightable expression?
19   A.    Have I been asked --
20   Q.    Have you ever, before this case, been asked to perform a
21   musicological analysis of two musical compositions to determine
22   whether there is substantial similarity of copyrightable
23   expression?
24   A.    On my own, I have.  I've not been asked, but I've done it
25   in my own study.
```

626

```
 1   Q.   You and counsel, Mr. Malofiy, are personal friends?

 2   A.   Yes.

 3   Q.   And both "Stairway to Heaven" and the "Taurus" deposit

 4   copy have a descending chromatic line?

 5   A.   That's correct.

 6   Q.   And a descending chromatic line is a commonplace musical

 7   device that goes back hundreds of years; is that right?

 8   A.   That's right.

 9   Q.   Did Randy Wolfe invent the descending chromatic line?

10   A.   No.

11   Q.   And isn't it true that descending chromatic lines were

12   common in music before Mr. Wolfe wrote "Taurus," including in

13   "Michelle" by the Beatles, "Cry Me a River," "My Funny

14   Valentine," and "A Taste of Honey"?

15   A.   Yes, they exist in all of those compositions.

16   Q.   You testified that the rhythm of "Stairway to Heaven" --

17   well, strike that.

18        Isn't it the case that in your musicological

19   analysis -- or in your analysis, you did not identify anything

20   in the "Taurus" deposit copy that is not original?

21   A.   Can you repeat the question?

22   Q.   Yes.  In your musicological -- or your analysis of the

23   compositions, did you identify and disregard any portions of

24   the compositions that are not original?

25   A.   No.
```

627

1  Q.   And so you treated the entirety of the "Taurus" deposit

2  copy as an original in all respects?

3  A.   Yes.  And to answer, I think, more completely that in this

4  case, the descending chromatic line, in conjunction with the

5  other arpeggiated figures in the ascending melody, cannot be

6  alienated and that they are one -- they -- combined -- combined

7  they form one piece of original music.

8  Q.   Is it true, sir, that in your analysis, you did not

9  disregard any aspects of the music of the "Taurus" deposit copy

10 that is commonplace or trite or not original?

11         MR. MALOFIY:  Objection.  Asked and answered.

12         THE COURT:  Overruled.  Well, I think he has.  I

13 think he said -- your answer was you did not; is that correct?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.

16         THE WITNESS:  Yes.

17 BY MR. ANDERSON:

18 Q.   What's a pitch?

19 A.   A pitch is a fixed degree of music that has no duration to

20 it.

21 Q.   A tone without any indication of duration or how long it's

22 going to last?

23 A.   Correct.

24 Q.   Isn't it true that the durations of the pitches in

25 "Taurus" and "Stairway to Heaven" in the -- what you've

628

1    described as Part A of "Stairway to Heaven" don't line up note

2    for note?

3    A.    The overall rhythm, as we just heard, is identical, if you

4    listened to the piece in their entirety, in that there are

5    consistent 8th notes that happen throughout those first five

6    chords.  So if you're looking at it from a purely rhythmical

7    basis, they are identical.

8    Q.    And isn't it the case that a series of 8th notes is

9    commonplace in music?

10   A.    You could call it commonplace.

11   Q.    Given that "Taurus" and "Stairway to Heaven" are both in a

12   minor key and have a descending chromatic line, wouldn't you

13   expect them to share many of the same pitches?

14   A.    If you claim that the descending chromatic line starts on

15   the tonic and descends.  But a chromatic descending line

16   doesn't necessarily have to start on the tonic.

17   Q.    Do you agree that Dr. Ferrara, the defendants' expert, is

18   a qualified musicologist?

19   A.    Yes.

20           MR. MALOFIY:  Objection.

21           THE COURT:  Overruled.

22   BY MR. ANDERSON:

23   Q.    And do you agree that Dr. Ferrara's piano performance of

24   the "Taurus" deposit copy is correct?

25   A.    Yes.

629

1   Q.   And do you agree that Rob Mathes' guitar performance of

2   the "Taurus" deposit copy is correct?

3   A.   Yes.

4   Q.   You mentioned chords.  Do you agree that the chords in the

5   "Taurus" deposit copy and the chord sequence are commonplace?

6   A.   If you looked at them generically, yes, they would be

7   commonplace.  But because of the way that they're performed

8   with the two separate melodies, they're not commonplace.

9             MR. ANDERSON:  Move to strike the portion about

10  performance.

11            THE COURT:  Second part will be stricken.

12  BY MR. ANDERSON:

13  Q.   You talked about -- or what Mr. Malofiy referred to as

14  pairs of notes, AB, BC, and CF [sic].

15            Is it your view that the notes AB are original and

16  unique to "Taurus"?

17  A.   Because of their rhythmic grouping, yes.  Two notes played

18  next to each other I wouldn't call original unless they have a

19  rhythm ascribed to them, in which case they have an identity.

20  Q.   And there is no identity here, correct?  The pairs of

21  notes that Mr. Malofiy asked you about actually are in

22  different places, right?

23  A.   The first note pair is offset.  The second two note pairs

24  occur rhythmically identically.

25  Q.   Do you recall at the beginning of your questioning by

630

```
 1    Mr. Malofiy, he was careful to have -- to not tell you what the
 2    recordings he was going to play were so that you would have to
 3    identify them by ear.
 4            Do you recall that?
 5    A.   Yes.
 6    Q.   And you had no problem at all distinguishing between
 7    "Stairway to Heaven" and the "Taurus" deposit copy, did you?
 8    A.   No, I did not.
 9    Q.   You're being compensated -- or you're being paid to
10    testify in this case?
11    A.   Yes.
12    Q.   By the plaintiff?
13    A.   Yes.
14    Q.   If I have read this handwriting correctly, my next
15    question is if you could please play the "Taurus" treble clef
16    over your recording of the "Taurus" bass clef.
17            So if counsel -- because I don't believe that's
18    something --
19        (Counsel confer off the record.)
20            MR. ANDERSON:  Oh, okay.  My apologies.  We do have
21    this one.
22            THE COURT:  Exhibit number?
23            MR. ANDERSON:  I'm a little confused because I think
24    it's 527-A -- or it might be V, because when counsel identified
25    527-V before, that was two guitars playing.
```

631

```
 1            MR. MALOFIY:  Mr. Anderson, which one is it?

 2            MR. ANDERSON:  The recording of Mr. Hanson playing

 3    the "Taurus" bass clef.  And so what I'm going to ask him to do

 4    is we --

 5        (Counsel confer off the record.)

 6    BY MR. ANDERSON:

 7    Q.   Well, while they're doing that, let me ask you to do this.

 8            Do you have Exhibit 2058 still available to you or

 9    should we call that up?

10    A.   It's not on the screen.

11    Q.   Thank you.

12            MR. ANDERSON:  So if we can call that up.

13        (The exhibit was displayed on the screen.)

14    BY MR. ANDERSON:

15    Q.   And, sir, could you please perform the "Taurus" deposit

16    copy, both clefs at the same time, on guitar?

17    A.   Sure.  This screen is enlarged so as not to show the

18    entire -- there you go.

19        (Witness playing guitar.)

20            Would you like me to play the next section?

21    Q.   Do you see any similarity at all between the next section

22    and the remainder of the "Taurus" deposit copy and "Stairway to

23    Heaven"?

24    A.   No, sir.

25    Q.   Okay.  And if you would just bear with me one second.
```

632

```
 1         (Counsel confer off the record.)

 2              MR. ANDERSON:  Thank you very much, Mr. Hanson.

 3    That's all the questions I have.

 4              THE COURT:  Okay.  Redirect.

 5              MR. MALOFIY:  One moment.

 6         (Counsel confer off the record.)

 7                     REDIRECT EXAMINATION

 8    BY MR. MALOFIY:

 9    Q.   You're a professor of music, correct?

10    A.   Yes, sir.

11    Q.   You teach students at a university, correct?

12    A.   Yes.

13    Q.   You teach them about music theory?

14    A.   Yes.

15    Q.   You teach them about the structure of music?

16    A.   Yes, I do.

17    Q.   You teach them about tempo and rhythm and cadence and

18    resolves and chord progressions and all that stuff, right?

19    A.   All of the above, yes.

20    Q.   All right.  And you can teach on many different

21    instruments, correct?

22    A.   Yes.

23    Q.   And are you an expert musician on more than one

24    instrument?

25    A.   Yes.
```

633

```
 1    Q.   Do you play piano?

 2    A.   Yes.

 3    Q.   You play guitar?

 4    A.   Yes.

 5    Q.   I think you said at one point you played trumpet, right?

 6    A.   A long time ago.

 7    Q.   All right.  Have you taught hundreds of students guitar?

 8    A.   Oh, yes.

 9    Q.   Thousands?

10    A.   Yeah, in the thousands.  I've been teaching since I was a

11    kid, since I was 15, so --

12    Q.   Couple of things.

13              You had mentioned that you're my friend.  And I don't

14    mean to minimize that in any way, but do I eat dinner with your

15    family?

16    A.   No.

17    Q.   Have I ever met your wife?

18    A.   I don't think you have.

19    Q.   Have I ever met your kids?

20    A.   No.

21    Q.   All right.  Do we know each other because before I wore a

22    suit, I was involved in the Philadelphia music scene?

23              THE COURT:  Counsel, why don't you just ask the

24    question rather than talking and testifying.

25              MR. MALOFIY:  Oh.
```

634

```
 1              THE COURT:  You asked a question and then you started

 2    talking.  What was the question again?

 3    BY MR. MALOFIY:

 4    Q.   Do we know each other from the Philadelphia music scene?

 5    A.   I first met you because you hired me as a session

 6    guitarist on some songs that you were working on for a personal

 7    project I think 14 years ago.

 8    Q.   All right.  Before I used to wear the suit?

 9    A.   Before you wore a suit --

10    Q.   All right.

11    A.   -- yes.

12              MR. MALOFIY:  Thanks.  No further questions.

13              THE COURT:  Okay.  Thanks, counsel.

14              Recross.

15              MR. ANDERSON:  Very briefly, yes.  Thank you.

16                        RECROSS-EXAMINATION

17    BY MR. ANDERSON:

18    Q.   This university that you teach at, what's the name of it?

19    A.   University of the Arts in Philadelphia.

20    Q.   Does it have a doctoral program there, postgraduate

21    doctoral program?

22    A.   Not a doctorate program.

23    Q.   And do you have tenure there?

24    A.   Tenure is no longer offered at the University of the Arts.

25    Q.   I'm sorry.  Sir, do you have tenure there?
```

```
 1  A.    No.  Do I have tenure?  No, sir.

 2          MR. ANDERSON:  Thank you.

 3          THE COURT:  Okay.  You may step down.  Thank you very

 4  much for coming in.

 5          Okay.  Next witness.

 6          MR. MALOFIY:  Your Honor, may Mr. Hanson remain in

 7  the room for the rest of the day if he has a seat available?

 8          THE COURT:  Is he going to be testifying anymore?

 9          MR. ANDERSON:  It is possible.

10          THE COURT:  Okay.  Then he's going to have to wait

11  outside.

12          MR. MALOFIY:  Okay.

13          Our next witness, I need to jump out in the hallway,

14  Your Honor.

15          THE COURT:  Next witness is, counsel?

16          Next witness is?

17          MR. MALOFIY:  Dr. Alexander Stewart.

18          THE COURT:  Thank you.

19          THE CLERK:  Please raise your right hand.

20          Do you solemnly swear that the testimony you shall

21  give in the cause now before this Court shall be the truth, the

22  whole truth, and nothing but the truth, so help you God?

23          THE WITNESS:  I do.

24          THE CLERK:  Please be seated.

25          Sir, please state your name and spell your last name
```

636

```
1    for the record.
2              THE WITNESS:  Alexander Stewart, S-T-E-W-A-R-T.
3              THE COURT:  You may inquire, counsel.
4              MR. MALOFIY:  Thank you, Your Honor.
5                       ALEXANDER STEWART,
6                having been first duly sworn,
7                    testified as follows:
8                     DIRECT EXAMINATION
9    BY MR. MALOFIY:
10   Q.   Dr. Stewart, thank you for being here.
11             You don't live on the West Coast, do you?
12   A.   No, I don't.
13   Q.   And where's home?
14   A.   Burlington, Vermont.
15   Q.   Now, when I use the term "Dr. Stewart," what does the
16   "Dr." in front of your name mean?
17   A.   It means I have a terminal degree, sometimes called a
18   Ph.D.
19   Q.   And what is your Ph.D. in, sir?
20   A.   It's in music, but with a concentration in
21   ethnomusicology.
22   Q.   Are you a musicologist?
23   A.   Yes, sir.
24   Q.   Have you been admitted as a musicologist in many courts?
25   A.   In -- yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00772**

1    Q.   Have you ever been precluded as a musicologist?

2    A.   No.

3    Q.   Now, where are you currently employed?

4    A.   The University of Vermont.

5    Q.   And do you have any specific -- strike that.

6         Are you a full professor, a tenured professor?

7    A.   Yes, I am.

8    Q.   Now, do you have a specific genre?  Are you a director of

9    a specific program there?

10   A.   I am the jazz studies coordinator and I am also director

11   of Latin American and Caribbean studies.

12   Q.   Now, what degrees specifically have you earned?

13   A.   Besides the Ph.D., I have a master of music in jazz and

14   commercial music from Manhattan School of Music, a bachelor of

15   fine arts from Long Island University in music education.

16   Q.   Now, what awards or grants have you received in the area

17   of music?

18   A.   Well, one I think I'm most proud of is a Fulbright

19   fellowship that allowed me to spend a year in Mexico

20   researching traditional Mexican music.

21        I've also received awards and grants from my

22   university for interdisciplinary studies and classes and so

23   forth.

24   Q.   What is this Fulbright fellowship?  What is that, for

25   those who don't know?

638

1   A.   It's sponsored by the U.S. government.  A senator from

2   several decades ago, William Fulbright, began the program, and

3   it allows scholars to go and spend time abroad and promote

4   understanding between the United States and other countries,

5   but also do research there.

6   Q.   And is that a hard grant or fellowship to receive?

7   A.   I think it's pretty tough to get one, yeah.

8   Q.   All right.  Now, have you any recent publications in the

9   area of music or musicological studies?

10  A.   Yes.  Just in the last couple years, I've published three

11  articles.

12  Q.   Do you recall what those three articles are particularly?

13  A.   Yes.  One was on James Brown and Fela Kuti, and it was

14  published in the *American Studies Journal*.

15          Another was on traditional Mexican music from the

16  Costa Chica, which is an area in the southern part of Mexico,

17  and that was in the *Latin American Music Review*.

18          And then a third one was in the journal of the

19  University of Missouri Kansas City Law Review, and it was an

20  article on sampling disputes.

21  Q.   Are you or have you been in the past active in any of the

22  scholarly music societies?

23  A.   Yes.  I've been active in quite a few.

24          My home base was really the Society for

25  Ethnomusicology, or the SEM, but in recent years I've been

639

1   spending more and more time at the American Musicological

2   Society annual meetings and conferences.

3          But I've also been a member of the Society for

4   American Music, the Society for Music Theory, the American

5   Studies Association, and the Latin American Studies

6   Association.

7   Q.   If you don't pay your fee for the year, do sometimes these

8   memberships lapse?

9   A.   Yeah.  I can't maintain memberships in all these -- all

10  these societies, so I basically move around a bit and I don't

11  renew my membership in every one of them every year.

12         This coming year, I'm going to be probably going to

13  the American Musicological Society meeting, so I recently

14  renewed my membership in that society.

15  Q.   Understood.

16         What instrument do you play?

17  A.   Saxophone is my main instrument.

18  Q.   And are you proficient in playing the saxophone?

19  A.   I like to think so.

20  Q.   Have you played with some of the great musicians of our

21  time?

22  A.   Yes.  I've had the privilege of playing with some very

23  esteemed musicians, such as I toured for quite a few years with

24  Lionel Hampton and then with -- got to perform with Dizzy

25  Gillespie, recorded with Wynton Marsalis, and I've also played

1  with figures from the popular music field like Frankie Valli

2  and Ray Charles.

3  Q.    Okay.  Do you also do session work on occasion?

4  A.    Some, yeah.

5  Q.    As a professor at the University of Vermont, do you teach

6  music theory and all of these musical things, such as tempo and

7  cadence and chord progressions and notes and rhythm and things

8  that make music memorable and distinct and unique?

9  A.    Yes.

10 Q.    And do you do that on a daily basis when you're at least

11 in session?

12 A.    Pretty much, yes.

13 Q.    Have you ever testified before?

14 A.    Yes.

15 Q.    More than one time?

16 A.    Twice.

17 Q.    All right.  What were the results?

18 A.    The side I testified --

19         MR. ANDERSON:  Objection.

20         THE COURT:  Sustained.  It would be irrelevant.

21         You were qualified twice to testify as an expert,

22 right?

23         THE WITNESS:  Yes, sir.

24         MR. MALOFIY:  We'll pass over this -- the results.

25 ///

641

```
 1   BY MR. MALOFIY:

 2   Q.   Dr. Stewart, in your comparison of "Taurus" and "Stairway

 3   to Heaven," did you find any substantial similarities?

 4   A.   Yes, I did.  I found what I would break down into five

 5   categories, significant similarities.

 6           First of all, the minor chromatic line --

 7   Q.   Well --

 8   A.   -- and the chord --

 9   Q.   -- before I -- let me interrupt you just to break it down

10   and to be more specific for the jury.

11           Where did you find these similarities, in what parts

12   of the two songs?

13   A.   In the opening guitar passage of "Stairway to Heaven" --

14   Q.   Is that --

15   A.   -- and the opening section of "Taurus."

16   Q.   Is that the first 2 minutes and 14 seconds of "Stairway to

17   Heaven"?

18   A.   Yes.

19   Q.   All right.  And are you considering, for purposes of your

20   analysis, things after the first 2 minutes and 14 seconds or

21   are you focused on the first 2 minutes and 14 seconds?

22           MR. ANDERSON:  Objection.  Compound.

23           THE COURT:  Overruled.

24           THE WITNESS:  I focused primarily on the first

25   2 minutes and 14 seconds.
```

642

1        When I began my work, I, of course, looked at the

2   entire work from beginning to end and spent quite a bit of time

3   doing that but then determined that my efforts were best

4   focused on that opening part.

5   BY MR. MALOFIY:

6   Q.   And your opinions as to substantial similarity are on this

7   first 2 minutes and 14 seconds, correct?

8   A.   Yes, sir.

9   Q.   All right.  Now, is there a particular section of that

10  first 2 minutes and 14 seconds which you see as substantially

11  similar?  Is there a Part A and a Part B or how do you define

12  it?

13  A.   Well, I would -- I labeled it Section A.  You could call

14  it Part A.  It's the kind of -- what I would call the iconic

15  guitar passage at the beginning of the piece of "Stairway."

16  Q.   Is it memorable?

17  A.   Yes, sir.

18  Q.   Is it distinct?

19  A.   Yes.

20  Q.   Is it instantly recognizable when you hear those first

21  opening notes?

22           MR. ANDERSON:  Objection.  Outside the scope of

23  his --

24           THE COURT:  Sustained as to the answer of that

25  question.

643

BY MR. MALOFIY:

Q.   Can you name that tune by just listening to the first

couple notes?

          MR. ANDERSON:  Objection.  Same objection.

Relevance, outside the scope of his expertise.

          THE COURT:  Yeah, we don't want to go back to prior

TV shows, counsel.

          MR. MALOFIY:  Yes, Your Honor.

BY MR. MALOFIY:

Q.   Let me go to the five areas or musicological components

which you've identified as being substantially similar.

          Can you share with this jury what they consist of?

A.   Yes.  And I think the -- they're going to require a bit

more kind of explanation what each of these are, but just in

general terms, the first is what is called a minor chromatic

line and the associated chords that go along with that line.

          The second is the durations that these pitches that

are part of the minor chromatic line -- durations, the amount

of time that each lasts.

          Thirdly, the melody that is placed over this

descending chromatic line.  And please bear with me.  You know,

I'm going to try to explain some of these terms a little

better.  But the melody is comprised of a combination of

arpeggios, which I'll also explain, and these two-note pairs

that I think you may have been hearing about, A to B, B to C,

644

1    and C to F-sharp.

2            And then also the rhythm of these passages is

3    virtually identical.  It's a steady flow of 8th notes, and 8th

4    notes in this meter are basically subdividing each beat into

5    two.

6            So if we're in 4/4, one, two, three, four, it would

7    be one and two and three and four and, or if I clap the 8th

8    notes, it's one, two, three, four [clapping].  So those rhythms

9    are exactly the same in both of these passages.

10           And then, finally, the pitch collection in both of

11   the passages is identical for the first two measures, so I

12   think it's -- out of 43 pitches, there are no different pitches

13   heard at all between the two measures.

14           So those are the five categories of similarities that

15   I think are really significant in terms of these two passages.

16   Q.   In looking at any of the examples that defendants provided

17   as so-called claimed prior art, did any of these five -- or did

18   these five similarities -- substantial similarities, did they

19   occur in this other prior art that you analyzed?

20   A.   There was no other prior art that they supplied that had

21   all five of these characteristics.  In fact, I think the most

22   that any one of these songs or pieces of music had was three of

23   these five.

24           And they supplied an awful lot of material to look

25   at, so I think they spent a lot of time looking for other

645

1    pieces of music that would have the same kinds of similarities

2    as "Taurus" and "Stairway," and in my view, not one of them

3    even came close.

4    Q.   And is that -- is that significant, from a musicological

5    perspective in looking at the prior art, to determine whether

6    or not these unique five similarities have occurred in anything

7    prior to "Taurus"?

8              MR. ANDERSON:  Objection.  It's leading as to unique

9    similarities.  The witness didn't testify that the similarities

10   were unique.  It's argumentative.

11             THE COURT:  Do you feel the similarities are unique?

12             THE WITNESS:  I feel that in combination they are.

13             THE COURT:  Okay.  Go ahead.  You may ask the

14   question, counsel.

15             MR. MALOFIY:  Could we read back the question?

16             THE COURT:  No.  Why don't you state it again.

17             MR. MALOFIY:  Oh, it was a long one.  I'll do my

18   best.

19   BY MR. MALOFIY:

20   Q.   In all of the prior art that the defendants had

21   provided -- I think it was 65 songs or plus -- to try to

22   indicate that these -- that there was prior art which contained

23   what they've identified as common elements that were used in

24   prior art, did any of them have the five similarities which

25   you've just identified?

646

```
 1    A.    No.

 2    Q.    Is that significant?

 3    A.    In my view, yes.

 4    Q.    Okay.  Were there any additional similarities between

 5    "Taurus" deposit copy and "Stairway to Heaven," Dr. Stewart?

 6    A.    Yes.  If we move away for a minute from these two passages

 7    that we've been talking about, you know, the iconic guitar part

 8    in "Stairway," and if you look at the songs more generally, I

 9    think you see commonalities in the form or structure of the

10    piece.

11            And also, in the beginning of the vocal melody --

12    Q.    Let's break it down --

13    A.    -- that begins with, "There's a lady who's sure," et

14    cetera.

15    Q.    Let's break it down.  When you said -- I think you

16    referred to the structure of the first part of "Stairway."

17            What is the structure of "Stairway to Heaven," the

18    first part, the 2 minutes and 14 seconds?

19    A.    Well, if we call that guitar part -- the instrumental part

20    that opens the song -- an A section or Part A, it repeats

21    twice.

22            Then there's a new section that we would call B.

23            Now, when we're -- when musicologists analyze the

24    form of a piece of music, they assign letters to each part of

25    the music that is similar.
```

647

1    And so, you know, in music, repetition is a very

2 powerful device, so very few pieces of music just have new

3 stuff coming at you all the time.  They generally repeat

4 sections of music, and that is a very powerful device in music.

5    So when we're analyzing the form or the overall

6 structure of a piece of music, we look where these repeating

7 sections occur, and when they're the same or very closely

8 similar, we give them the same letter.

9    So we're calling the opening guitar part letter A.

10    And then there's a section that is a little different

11 that we're going to call letter B that is twice as long as

12 letter A.  It's eight measures long.

13    So since the first part repeats, we're able to call

14 it AA, and then it moves to a B section, and then it repeats

15 back to the opening A section again.

16    And it's just kind of a shorthand, a way of talking

17 about the form of the piece of music.

18 Q.   Could I just summarize it?

19    Is "Stairway to Heaven" AAB AAB AA the song structure

20 in the first 2 minutes and 14 seconds?

21 A.   Yes.  In terms of the underlying musical content, yes.

22 Q.   And is "Taurus" deposit copy AAB AAB?

23 A.   Yes, sir.

24 Q.   Okay.  Now, you mentioned, "There's a lady who's sure...."

25    Is that vocal melody in "Stairway to Heaven" also

648

```
1    present in the deposit copy of "Taurus"?

2    A.   Yes.  It's the same pitches that are found in the treble

3    clef staff or the upper staff of the deposit copy of "Taurus."

4    It begins the same way.

5    Q.   And is that not performed by the guitar, but rather

6    performed by Mr. Plant singing, correct?

7    A.   In "Stairway," yes.

8    Q.   Okay.  I'm going to ask you some specifics in regards to

9    some of the things we talked about.

10            MR. MALOFIY:  Can we pull up Exhibit 5051.

11        (Counsel confer off the record.)

12            MR. ANDERSON:  No objections, Your Honor.

13            THE COURT:  Okay.

14            THE CLERK:  Counsel, I'm sorry.  Was it 5051?

15            MR. MALOFIY:  Yes, Ms. Williams.

16        (The exhibit was displayed on the screen.)

17   BY MR. MALOFIY:

18   Q.   Dr. Stewart, do you recognize these transcriptions?

19   A.   Yes.  They're taken from my report.

20   Q.   And could you explain how a musicologist would analyze

21   these two pieces?

22   A.   Well, they show all of the elements of each song as they

23   would be performed or they would be sounded on one staff of

24   music.

25            So I think you can -- you can see -- even if you
```

1  don't read music, you can kind of see the overall contour,

2  and -- anyway, these are the representations of those two

3  passages, the one from "Taurus" and the one from "Stairway," in

4  musical notation.

5  Q.   Is it -- I'm not sure we have a smart screen up there for

6  you.  If you touch that screen, does it make a mark on the

7  board?

8  A.   Did that do anything?

9  Q.   Yeah, it did.  There's a little dot.

10        MR. MALOFIY:  I hate to ask a trial technology

11  question, but do we use a pencil on that screen or does he use

12  his finger?

13        THE COURT:  Use his finger.

14        MR. MALOFIY:  His finger.

15  BY MR. MALOFIY:

16  Q.   Can you circle the notes that are the same from the

17  "Taurus" deposit copy lead sheet and the Example 3 and then

18  Example 4 below, "Stairway to Heaven" Section A?

19  A.   Yeah, but it's -- okay.

20        Well, that's sort of a difficult proposition.

21        It's going to take quite a long time.

22  Q.   Okay.  Is there a better way to illustrate that?

23  A.   Well, I think the best thing to do is to show the elements

24  that I've been talking about in the two compositions --

25  Q.   Okay.  Well --

650

1  A.   -- first of all, the descending chromatic line and then

2  the melodic pairs that we were talking about earlier.

3  Q.   All right.  So we can bring this down and you want to --

4  we'll focus on the chromatic descending line.

5       Would that exhibit help you in your testimony in any

6  way?

7  A.   Well, they're -- these are going to be dealt with in some

8  of the exhibits coming up, so --

9  Q.   Okay.  Let's go to the minor chromatic line.  You

10  identified this as one thing that's unique and memorable.

11      Can you share why the minor chromatic line is used in

12  a unique and memorable way?

13  A.   You know, the minor chromatic line is something that's

14  been used in music for quite a long time, and like a lot of the

15  building blocks of music, the challenge for any composer is to

16  use it in a new and creative way, an original and creative way.

17      And I think that in both of these works, "Taurus" and

18  "Stairway," the composers -- at least in "Taurus," the composer

19  found a way to use it in a way that is unlike other works that

20  use this line.

21      And one of the things that's very different is

22  instead of going through all six pitches of the chromatic line,

23  all the way to the E, which is where, typically, this

24  progression goes, and as we'll see in all the other examples of

25  pieces of music that the defense has come up with, they always

651

1    pass through E, or the fifth note of the scale, before they go

2    back to the beginning again.

3           So one of the important ways that I think that you

4    see this similarity between these two works is that they both

5    do this very unusual thing.  In fact, I don't know any other

6    pieces that do it, and the defense hasn't come up with any that

7    do treat this line the way that they do.

8           MR. MALOFIY:  Can we take a moment and pull up

9    Exhibit 501, the chromatic line?  It's the first page.

10          MR. ANDERSON:  I'm sorry.  I don't recognize this

11   from his report.

12          MR. MALOFIY:  This one.

13          MR. ANDERSON:  Again, I don't recognize it from his

14   report.

15          MR. MALOFIY:  These were all produced to you as

16   exhibits to be used at trial.

17          MR. ANDERSON:  I'm sorry.  I don't believe I've ever

18   seen this before.

19          Counsel says it was produced to us, but I don't

20   recall seeing this.  It's not part of Dr. Stewart's report.

21          THE COURT:  Is that in the report?

22          MR. MALOFIY:  He talks about it in the report and

23   it's also -- it was produced to counsel as a demonstrative --

24          THE COURT:  I'm not worried about whether it was

25   produced, I'm wondering whether or not it was testified to in

652

```
 1    the report.
 2              MR. MALOFIY:  Yes.
 3              THE COURT:  And the witness can't tell you because he
 4    doesn't know what it is yet.
 5              MR. MALOFIY:  We can ask him if he's -- if you want
 6    to do it, Your Honor, or I -- if you want me to do it.
 7              THE COURT:  You can do it.
 8    BY MR. MALOFIY:
 9    Q.   Did you in your report discuss the basic -- this chromatic
10    line, Dido's Lament, and the six chromatic pitches?
11    A.   Absolutely, yes.
12              MR. MALOFIY:  May we use the demonstrative aid?
13              THE COURT:  Yes.
14              MR. MALOFIY:  Thank you.
15              Can we blow that up for the orientation and for the
16    benefit of the jury?  Maybe even blow it up to just this.
17         (The exhibit was displayed to the jury.)
18    BY MR. MALOFIY:
19    Q.   Can you walk the jury through this exhibit and share why
20    it is -- what it shows unique or memorable in this chromatic
21    line on "Taurus" and "Stairway"?
22    A.   Yes.  First of all, I think I should define what
23    "chromatic" is in music.
24              Chromatic scale is the scale that contains all 12
25    pitches that are in an octave.  So if you're familiar with a
```

653

1  piano keyboard, for example, there are seven white keys and

2  five black keys, so that means there are 12 different keys with

3  different pitches before you then repeat the same series of

4  pitches.

5          So you have the white keys, which are A through G, A,

6  B, C, D, E, F, G, and then -- that's seven, and then you have

7  the five black keys.  Now, if you put all these together, you

8  end up with 12; 7 plus 5 is 12.  So the chromatic scale is a

9  scale that uses all 12 pitches.

10         And the vast majority of musical composition,

11  especially in the popular field, don't use a lot of

12  chromaticism, so it's somewhat unusual, but certainly there are

13  numerous songs that use chromatic scales.  I'm not saying that

14  there aren't.

15         THE COURT:  Ladies and gentlemen, we're going to stop

16  at this time because it's time for your break.

17         It is 2:30.  We're going to break for 15 minutes.

18         Remember the admonishment not to discuss the case

19  among yourselves or with anybody else or form or express any

20  opinions about the matter until it's submitted to you and you

21  retire to the jury room.  We'll see you back in in 15 minutes.

22         THE CLERK:  All rise.

23      *(Jury out at 2:31 P.M.)*

24      *(Recess taken 2:31 to 2:45 P.M.)*

25      *(Jury in at 2:45 P.M.)*

654

1          THE COURT:  Okay.  The record will reflect that all

2    the members of the jury are in their respective seats in the

3    jury box.  The witness is on the witness stand and we are in

4    direct.

5          You may continue, counsel.

6          MR. MALOFIY:  Thank you, Your Honor.

7    BY MR. MALOFIY:

8    Q.   I believe we were talking about this chromatic line.

9          I believe the last question I asked you was whether

10   or not "Taurus" and "Stairway to Heaven" don't follow the

11   traditional chromatic line and you said that's accurate, they

12   don't; is that correct?

13   A.   That's correct.  And as this exhibit shows, Dido's Lament,

14   which goes back to the 17th Century, composed by Henry Purcell,

15   it goes to the E, which you can see is marked in green, but

16   "Taurus" and "Stairway" never go to the E before they go back

17   to A.

18   Q.   And just for the orientation of the jury --

19          And I don't have a laser pointer here.  Or I might

20   somewhere.  Maybe I do.

21          MR. MALOFIY:  Do we use laser pointers in this court,

22   Your Honor?

23          THE COURT:  Yes.

24          MR. MALOFIY:  It's not working.  I'll use my finger,

25   the old-fashioned way.

655

BY MR. MALOFIY:

Q.   Just to walk through the jury here, you're referring to "Lament" as going from A to G-sharp to G to F-sharp to F and then E before it goes back to the A (indicating); is that correct?

A.   Yes.  And E is the next chromatic pitch down in that scale and the F pulls very strongly to that E.

Q.   And if I'm correct, in "Taurus," it does not go to the E and in "Stairway" it also does not go to the E (indicating) before it resolves back to the A, correct?

A.   Correct.

Q.   And in all of the prior art that defendants had provided, the 200-page reports and the -- I don't know, many, many audio examples of prior art, they didn't -- there was no example to indicate the same unusual cadence as it resolves back to the A without going through to the fifth before it goes to the tonic?

A.   Yes.  If you look at the next exhibit which I prepared, which is derived entirely from their reports, it shows that none of their examples --

         MR. MALOFIY:  Let's pull up that exhibit, Exhibit 5011.  One second.

         MR. ANDERSON:  This is not something that was produced, but I have no objection, Your Honor.

         THE COURT:  Okay.  It will be received.

         *(Trial Exhibit 5011 admitted into evidence.)*

656

```
 1        (The exhibit was displayed on the screen.)

 2             MR. MALOFIY:  Thank you, Mr. Anderson.

 3             MR. ANDERSON:  You're welcome, sir.

 4             THE WITNESS:  Okay.  Just to go through this very

 5   quickly -- or I'm sorry.  Yes, I need a --

 6   BY MR. MALOFIY:

 7   Q.   Not too quickly, because I don't think anyone can see it.

 8   Why don't we just take it --

 9             MR. MALOFIY:  Your Honor, could you ask the jury if

10   they can see it?

11             THE COURT:  I'm sorry?

12             MR. MALOFIY:  Could you ask the jury if they can see

13   it?

14             THE COURT:  If the jury can't see or hear anything,

15   I'm expecting you to raise your hands.

16             Okay.  Go ahead.

17   BY MR. MALOFIY:

18   Q.   Now, can you share with the jury what this sheet shows

19   which you put together?

20   A.   Okay.  This shows all of the examples of so-called prior

21   art that the defense experts came up with.

22             And as you can see, there's a green on each and every

23   one of them, which --

24   Q.   Let me step through it.

25   A.   Um-hmm.
```

657

1  Q.   On the left-hand side here, you have names of songs, and

2  is it correct that the first two (indicating) --

3          THE COURT:  Counsel, as I indicated at the beginning

4  of the trial, everyone has to speak from the podium.

5          MR. MALOFIY:  Okay.  I'll work off a paper exhibit --

6          THE COURT:  Okay.

7          MR. MALOFIY:  And I'll try to -- give me that laser

8  again.  Oh.  Yeah, it's not working.  Okay.

9  BY MR. MALOFIY:

10 Q.   If you go through this example, your example, and you go

11 through, on the left-hand side, it lists a number of songs; is

12 that correct?

13 A.   Yes.

14 Q.   And -- give me one moment there.

15          And it has "Taurus" and "Stairway" listed first, then

16 "Dido's Lament," "Michelle," "Walking My Baby Back," "Don't

17 Mean a Thing," "Chim Chim-eree" [sic], "Cry Me a River," "How

18 Insensitive," "To Catch a Shad," "What Are You Doing for the

19 Rest of Your Life," "My Funny Valentine," "Spring is Near," and

20 then a number of others.

21          In that first -- in the first -- that first list, in

22 looking at the six chromatic pitches, in all that prior art

23 that defendants had referenced, do they all go to the fifth,

24 which is the E, in that progression?

25 A.   They do.  They all pass through an E, every one of them,

658

1  before they go back and begin the cycle again on A.

2  Q.  And is what makes --

3  A.  You can see it in the green highlighting.

4  Q.  And the green is the E that it passes through before it

5  goes to the A, correct?

6  A.  That's correct.  And only "Stairway" and "Taurus" don't

7  have any of the green marking there.

8  Q.  And is that what creates the listener wanting feel for the

9  chord to step down to the next half step, which is the fifth of

10  that tonic?

11         MR. ANDERSON:  Objection.  Relevance and also

12  leading.

13         THE COURT:  Overruled.

14         THE WITNESS:  Yeah, the expectation.

15         You know, composers kind of thrive on creating

16  expectations and then sometimes doing unexpected things with

17  them.  So the expected thing would be to go to the E and then

18  go back to the A, but only "Taurus" and "Stairway" don't do

19  that out of all these examples.

20  BY MR. MALOFIY:

21  Q.  And then some of the other examples that they do have,

22  even the ones that they provided which were -- which were

23  released after "Taurus," also go to the E before it goes back

24  to the first or the tonic, correct?

25  A.  Correct.

659

1   Q.   All right.  And also the other music which they had

2   identified -- then the previous ones released after "Taurus,"

3   which we just discussed are "Thoughts" and "She's Lonely," the

4   other ones, the partial chromatic line, it's only four less

5   chromatic notes and it also does not go to the fifth, correct?

6   A.   Correct.  And I think we need to move to the next page on

7   the exhibit to show that.

8   Q.   Oh, I'm sorry.  I thought we were on the next page.  Thank

9   you for directing me and the trial tech.

10   A.   So there are a few that are highlighted in yellow because

11   they don't even have five chromatic pitches.  One only has four

12   and the other two only have three, so they're not even close in

13   any way to "Taurus" and "Stairway."

14          And then finally at the bottom, the last few don't go

15   back to A minor, they don't go back to the original key,

16   because the progression, this chromatic line, is actually

17   leading into a different relative major key.  So they don't

18   need to go to E because they're not even going back to A.

19   Q.   So is it accurate that all of the 65-plus songs the

20   defendants produced in this case with their experts, none of

21   them went to the fifth before going back?  None of them went to

22   the fifth in the cadence or in the resolve, correct?

23   A.   All of them went to the fifth or the E before they

24   resolved back to A.

25   Q.   Thank you for correcting me.  I misspoke.

660

1          Now, let me move forward to the chords.  You said

2     that "Taurus" and "Stairway to Heaven" have similar harmonies

3     or chords.

4          Just briefly describe what a chord is.

5     A.   A chord is two or more pitches being sounded

6     simultaneously or two or more notes.

7     Q.   And in your analysis, are there chord and harmony

8     similarities in the two pieces of work?

9     A.   Yes.  They are virtually identical, just a few very small

10    differences.  And I think the next exhibit, which is taken from

11    my report, illustrates that pretty well.

12          MR. MALOFIY:  Can we pull up 5031.

13        *(Counsel confer off the record.)*

14          MR. MALOFIY:  Your Honor, may we publish it to the

15    jury and move it into evidence, as well?  Thank you.

16        *(The exhibit was displayed on the screen.)*

17          THE COURT:  I think it's already published.

18          Go ahead.

19          THE WITNESS:  You skipped one.  This is Dr. Ferrara's

20    harmony comparison.

21          MR. MALOFIY:  I'm sorry.  5021.

22          THE WITNESS:  I don't -- yes, actually, I do have the

23    numbers here.

24          MR. MALOFIY:  5021.  I was looking at the wrong one.

25    It's this one, Mr. Anderson.  It's from his report.

661

1        MR. ANDERSON:  It's fine.  Thank you, Your Honor.

2            *(The exhibit was displayed on the screen.)*

3        THE WITNESS:  Yeah.  So this is taken from my report.

4    And without going into endless details on this, you can see

5    that the labels of the chords is essentially the same, just

6    some very minor differences.

7    BY MR. MALOFIY:

8    Q.   And is this chart representative of the harmony or the

9    chords which are similar and -- substantially similar in both

10   "Taurus" deposit copy and "Stairway to Heaven"?

11   A.   Yes, they are.

12   Q.   Okay.  Now, if we go forward to melody, can you discuss

13   melody as it relates to both these pieces of work, "Taurus"

14   deposit copy, as well as "Stairway to Heaven"?

15   A.   Well, did you want to look at Dr. Ferrara's harmony, too?

16   Q.   Well, if that would be helpful, we could do that.

17   A.   I think --

18        THE COURT:  Let's have one attorney here.  You

19   conduct the case and he'll answer the questions.

20   BY MR. MALOFIY:

21   Q.   Would it be beneficial to also review Exhibit 5031, which

22   I previously pulled up?

23   A.   Yes, sir.

24   Q.   Okay.

25        MR. MALOFIY:  Any objection, Mr. Anderson?

662

1      MR. ANDERSON:  No.  That's fine.  Thank you.

2      *(The exhibit was displayed on the screen.)*

3      MR. MALOFIY:  And can we blow that up for the

4  orientation of the jury, please.

5      THE WITNESS:  So once again, it's essentially the

6  same harmony of Dr. Ferrara's analyzed as I did.

7  BY MR. MALOFIY:

8  Q.   So in other words, Dr. Ferrara, defendants' expert, and

9  your report also identify the same chords and harmony which are

10 substantially similar in both pieces of work?

11 A.   Yes, sir.

12 Q.   And is the difference in your opinion and Dr. Ferrara's

13 opinion is that he -- his opinion says that there is prior art

14 and your opinion says that there is no prior art for the

15 reasons you so stated as to the things which were unique, which

16 you had referenced earlier on?

17     MR. ANDERSON:  Objection.  Vague.  Ambiguous.

18 Argumentative.

19     THE COURT:  Overruled.

20     THE WITNESS:  Yes.

21 BY MR. MALOFIY:

22 Q.   Now, if we go to discuss melody, the next section, can you

23 tell the jurors what melody is?

24 A.   Melody is a succession of pitches that form a coherent

25 whole, and they're usually set to rhythms, as well.  A melody

663

```
 1   is set to rhythms -- not usually, it is set to rhythm, as well.

 2   And that's the basic definition, a succession of pitches or

 3   notes.

 4   Q.   Do you notice something in the melody of "Taurus" and

 5   "Stairway to Heaven" that are the same?

 6   A.   Yes.

 7   Q.   And what is that?

 8   A.   Well, as I mentioned in the five substantial similarities

 9   between "Taurus" and "Stairway," the melody is comprised of

10   these arpeggios or broken chords, which are basically the notes

11   from those harmonies that we just saw in the last two exhibits

12   and these very distinctive pairs of notes that are also

13   interwoven in with the arpeggios.

14   Q.   Now, did you have an example in your report which

15   indicates and shows the -- these linking notes, AB, BC, C to

16   F-sharp?

17   A.   Yes, Example 6 from my report.

18         MR. MALOFIY:  Can we pull up 5061.

19         Mr. Anderson.

20         MR. ANDERSON:  This is from his report?

21         MR. MALOFIY:  Yes, it is.

22         MR. ANDERSON:  Thank you.

23      (The exhibit was displayed on the screen.)

24         MR. MALOFIY:  Publish it and move -- I believe his

25   whole report is moved in, Your Honor.
```

664

```
 1            THE COURT:  Okay.  If it hasn't been moved in, it
 2    will be received --
 3            MR. MALOFIY:  Thank you, Your Honor.
 4            THE COURT:  -- 5061.
 5            MR. ANDERSON:  Your Honor, that report also deals
 6    with the sound recording, the so-called performance elements.
 7    I do not believe --
 8            THE COURT:  I didn't think you wished to introduce
 9    the entire report, just this one.
10            MR. ANDERSON:  Yes, but counsel just suggested and
11    moved to introduce the entire report.
12            THE COURT:  Oh, no, no, no, no, just this one
13    example.
14            MR. MALOFIY:  Okay.  I'll do them one at a time.
15            THE COURT:  Okay.
16       (Trial Exhibit 5061 admitted into evidence.)
17    BY MR. MALOFIY:
18    Q.   Now, can we -- it says here in the title -- can you read
19    what it says next to Example 6?
20    A.   It says:  "Ferrara's 'most creative and memorable' part of
21    'Stairway' melody also found in 'Taurus.'"
22    Q.   Now, if you look there --
23            MR. MALOFIY:  Can we blow up the two staves, the one
24    of "Taurus" and the one of "Stairway"?
25    ///
```

665

```
 1    BY MR. MALOFIY:
 2    Q.   Can you see that?
 3    A.   Yes.
 4    Q.   Can you circle the AB pair in the "Taurus" deposit copy?
 5    A.   They're already bracketed, but I'll try.
 6    Q.   Well, so the jury can understand where you're pointing to.
 7    A.   Oh, yeah, this works pretty cool.
 8         A to B, B to C -- oh, see, I'm not that good.  How do
 9    you erase the circle?
10         THE COURT:  You tap the --
11         He wants to erase the circle, so do you want to tap
12    that for him?
13         THE WITNESS:  Oh, they're all gone now.  This is why
14    I didn't really want to try and circle a zillion notes.
15    BY MR. MALOFIY:
16    Q.   And now you're circling the same AB, BC, C to F-sharp pair
17    that's apparent as the ascending line of "Stairway," correct?
18    A.   Yes.
19    Q.   And so is it accurate that the second pair, BC and C to
20    F-sharp, on the "Taurus" deposit copy and also "Stairway"
21    composition are the exact same notes in the exact same place
22    rhythmically?
23    A.   Yes.  As can be seen, they're located at exactly the same
24    place in terms of where they are in the meter, where they are
25    rhythmically.
```

666

```
 1   Q.   Is that because -- and I -- I'm going to try this
 2   myself -- because they line up exactly?  That's the second pair
 3   (indicating)?
 4   A.   Um-hmm.
 5   Q.   And is this the third pair, the C to the F-sharp, because
 6   that, too, lines up exactly (indicating)?
 7   A.   Yes.
 8   Q.   And if we go earlier to the first pair, you would admit
 9   that it's slightly off, correct --
10   A.   Yes, it's --
11   Q.   -- the A pair, the A to B.
12   A.   It's a beat earlier.
13   Q.   All right.  And that's what we're referring to right
14   there, correct (indicating)?
15   A.   Yes.
16   Q.   Now, are these three note pairs memorable and distinct
17   parts of "Stairway" and also "Taurus"?
18   A.   Yes.
19   Q.   And is this what makes that ascending line unique and
20   distinct and used in an original and creative way?
21   A.   Yes.  It's the combination of the chord tones or arpeggios
22   in these three note pairs that, again, Dr. Ferrara, in three
23   different places in his report, calls them the most creative
24   and memorable part of "Stairway."
25   Q.   And he's referring to the whole "Stairway" 8 minutes
```

1    and -- roughly 8 minutes long, correct?

2    A.   I'm not sure if he is.  He's -- he may be only referring

3    to this opening section.  I can't really speak.

4    Q.   And is that the first 2 minutes and 14 seconds?

5    A.   Yes.

6    Q.   Okay.  Now --

7         MR. MALOFIY:  Can we pull this down and can we pull

8    up 2058.  Oh.  Thank you.

9         *(The exhibit was displayed on the screen.)*

10   BY MR. MALOFIY:

11   Q.   Now, you recognize this, correct?

12   A.   Yes.

13   Q.   This is the "Taurus" deposit copy lead sheet, correct?

14   A.   Yes.

15   Q.   Now, if you look here, can you also circle the AB, BC, C

16   to F-sharp pair?

17   A.   Yes (indicating).

18   Q.   And this is written on two separate staffs of music,

19   rather than one staff of music, correct?

20   A.   Yes.

21   Q.   Okay.  Now, when Dr. Ferrara analyzed this deposit copy,

22   did he disregard the entire treble clef of the deposit copy?

23   A.   Yes.  His analysis omitted the entire staff, the treble

24   clef, which is more than 55 percent of the notes.

25   Q.   And when Dr. Ferrara produced a 200-page report and

668

1   disregarded the entire treble clef, is it the treble clef which

2   has the AB, BC note pairs?

3   A.   Correct.

4   Q.   And then the C to F-sharp is in the bass clef, correct?

5   A.   Yes, spelled as G-flat here, but G-flat and F-sharp are

6   the same thing.  It's called inharmonic.

7   Q.   Did you have an opportunity to be at Dr. Ferrara's

8   deposition when I deposed him?

9   A.   Yes, I did.

10  Q.   And when I presented this deposit copy lead sheet to him

11  and I asked him to circle the three note pairs, did you have an

12  opportunity to review the exhibit which he circled on the three

13  note pairs?

14  A.   Yes, I did.

15  Q.   And did he circle the AB, BC, C to F-sharp pairs that you

16  just circled?

17  A.   He circled it on the deposit copy.  I think it's the same

18  as mine.  He also circled them on his own examples from his

19  report.

20  Q.   And he -- and he admitted that the AB, BC, C to F-sharp

21  pair is what makes "Stairway to Heaven" unique and memorable,

22  correct?

23          MR. ANDERSON:  Objection, Your Honor.

24  Mischaracterizing the testimony of another witness.

25          THE COURT:  Overruled.  In his report, did he?

669

 1          MR. ANDERSON:  No.  He's referring to -- excuse me.

 2   He's referring to the deposition testimony of another.

 3          THE COURT:  Oh, sustained.

 4   BY MR. MALOFIY:

 5   Q.   In his report, did he identify these pairs as the most

 6   memorable, distinct pairs?

 7   A.   Yes.  I think that we could -- it might be good to read

 8   what he said about them, even, if there's time.

 9          THE COURT:  Again, let counsel go ahead and present

10   the case.

11          MR. MALOFIY:  I'll --

12          THE WITNESS:  Sorry.  Sorry, Your Honor.

13          MR. MALOFIY:  We'll handle that in the

14   cross-examination of Dr. Ferrara.  We'll just continue at this

15   point.

16          THE COURT:  That's the way it should be.

17          MR. MALOFIY:  Thank you, Your Honor.  Just wrapping

18   up with this witness.  Give me a moment.

19          THE COURT:  Sure.

20          MR. MALOFIY:  With the Court's indulgence, one

21   moment.

22          Could we pull up 2704, which is the exhibit from

23   Dr. Ferrara's deposition, the deposit copy, which he marked.

24          Any objection?

25          MR. ANDERSON:  I don't see a 2704.  Oh, found it.

670

```
 1              Based on -- assuming counsel's representation is

 2    correct, I don't object to --

 3              THE COURT:  Okay.

 4              MR. ANDERSON:  -- that exhibit.

 5              MR. MALOFIY:  May I publish it and move it into

 6    evidence?

 7         (The exhibit was displayed on the screen.)

 8         (Trial Exhibit 2704 admitted into evidence.)

 9              THE COURT:  Yes.

10    BY MR. MALOFIY:

11    Q.   Do you recognize this deposit copy lead sheet?

12    A.   Yes, sir.

13              MR. MALOFIY:  And can we -- for the benefit of the

14    jury, can we enlarge the first treble clef and bass clef of

15    that piece of music.

16    BY MR. MALOFIY:

17    Q.   Now, in the first part there, right here, did -- I can't

18    do this.  Maybe I can do this -- did Dr. Ferrara circle the A

19    to B first note pair in the ascending line?

20    A.   Yes.  He circled the first pair and labeled it "A to B."

21    Q.   And right here, for the orientation of the jury, where I'm

22    circling, did Dr. Ferrara also circle the BC note pair

23    (indicating)?

24    A.   Yes, sir.

25    Q.   And then did Dr. Ferrara also, during his deposition, take
```

671

1    the deposit copy lead sheet and, under questioning, circle the

2    C to F-sharp pair (indicating)?

3    A.   Yes, and he so labeled them.

4    Q.   Thank you.  Now, let me move to -- let me move to Exhibit

5    5091.

6        *(Counsel confer off the record.)*

7             MR. ANDERSON:  Based on counsel's representation,

8    that's fine.

9             THE COURT:  You might want to clear the screen, too.

10            MR. MALOFIY:  Oh, yeah.

11            THE COURT:  There you go.

12       *(The exhibit was displayed on the screen.)*

13   BY MR. MALOFIY:

14   Q.   To be clear, is this exhibit -- was this also in your

15   report, but you used highlighting to make it more distinct?

16   A.   I believe so.

17   Q.   Okay.  And can you share with the jury what this shows?

18   Because it might be a little bit difficult to understand unless

19   you parse through it very quickly.

20   A.   Yeah.  I tried to put it in a graphic representation, just

21   because not -- a lot of people don't read music, so if it's in

22   music notation it's harder to understand.  But it's just

23   another way of presenting that same evidence.  You have the AB

24   highlighted in blue --

25   Q.   Well, let me do this.  To be clear, this top line is

672

1  "Taurus," correct?

2  A.    Yes.

3  Q.    And then this bottom here is "Stairway," correct

4  (indicating)?

5  A.    Correct.

6  Q.    Now, in the top portion of "Taurus," you're indicating

7  this AB pair (indicating), correct?

8  A.    Yes.

9  Q.    And then you're also indicating here the BC (indicating)?

10  A.    Yes.

11  Q.    And then the C to F-sharp (indicating)?

12  A.    Yes.

13  Q.    And on "Stairway," can you circle it for the jury where

14  the AB, BC, C to F-sharp pair is?

15  A.    (Indicating).  And the yellow indicates the arpeggio

16  notes, the notes that are parts of the chords.

17  Q.    And are these substantially similar in both songs,

18  "Stairway to Heaven" and the "Taurus" deposit copy lead sheet?

19  A.    Yes.

20  Q.    Now let's go to pitch collections.

21        Can you tell the jury what pitch collections are?

22  A.    A pitch collection is a mode of analysis where you take

23  all the different pitches that are present in a musical

24  composition and you catalog them and --

25  Q.    Have you used this approach or this analysis before?

```
 1    A.    Yes.

 2    Q.    And has it been written about or -- have you or other

 3    people written about this in journals -- musicological

 4    journals?

 5    A.    Yes.  I published an article in the Journal of Jazz

 6    Studies and it's also in my book that I wrote for the

 7    University of California Press.

 8              MR. MALOFIY:  Can we pull up Exhibit 5111.

 9         (Counsel confer off the record.)

10              MR. ANDERSON:  Again, accepting counsel's

11    representation that this is in the last report and relates to

12    the deposit copy.

13              THE COURT:  Okay.

14              MR. MALOFIY:  Yes.

15              MR. ANDERSON:  Thank you.

16              THE COURT:  Go ahead.

17         (The exhibit was displayed on the screen.)

18    BY MR. MALOFIY:

19    Q.    Can we blow up the top portion of this page for the

20    benefit of the jury?

21    A.    I think there was a -- well --

22    Q.    What's that, Dr. Stewart?

23    A.    I think there was a -- this doesn't really show the pitch

24    collections.  Well, it's okay.

25              Yeah.  There was another exhibit.  Okay.
```

674

```
1    Q.    Let's use this exhibit --

2    A.    Yes.

3    Q.    -- only because we are pressed for time and that's --

4    A.    This would suffice fine.

5    Q.    Okay.  Fair enough.

6              Can we focus on this exhibit and can you talk about

7    what this pitch inventory is?

8    A.    Yeah.  So in the first measure, there are six different

9    pitches in "Taurus" and six different pitches, the same

10   pitches, in "Stairway," and they are A, B, C, E, and G-sharp.

11   Q.    So in both first measures, the pitches are exactly the

12   same?

13   A.    Yes.  And that was one reason why I didn't want to try to

14   circle every single pitch a few minutes ago.

15   Q.    You mean earlier on when I asked you to look at the two

16   lines of music, "Stairway" and "Taurus," and I asked you to

17   circle them, you said it would be a mess, it would be

18   difficult, is that because every pitch is the same in "Taurus"

19   and "Stairway"?

20   A.    There are no different pitches, correct.

21   Q.    And do these pitches also occur roughly the same

22   percentage of times?

23   A.    Yes.  As you can see, the A occurs 21.5 percent of the

24   time and in "Stairway" it's 22 percent, and so on down the

25   list.  The proportions are roughly the same.
```

1    Q.    And are there also similarities in the second measure?

2    A.    The second measure is the same thing.  There are seven

3    different pitches in each of the measures, no different pitches

4    between the two compositions.

5            So you have a total, if you add up all of these

6    occurrences, of 43 different pitches between the two

7    compositions.  And out of those 43 notes -- you have a total of

8    43 notes and there are not -- there's not a single different

9    pitch between them.

10            MR. MALOFIY:  One moment.

11   BY MR. MALOFIY:

12   Q.    Can you think of a quick recap of the five elements in the

13   musicological analysis which clearly indicate to you that there

14   is substantial similarities between these two pieces of work

15   and what makes these two pieces of work unique -- used in a

16   unique, creative, and original way?

17   A.    Yes.  First of all, there's the descending chromatic line

18   in minor that we looked at first and the way that only "Taurus"

19   and "Stairway" use it exactly the same way --

20   Q.    And to be clear, the minor chromatic line is the chord

21   progression that moves in the key of A minor down and avoids

22   the fifth before it resolves back to the first or the tonic,

23   correct?

24   A.    Well, the chromatic line is what the chords are built on,

25   but, yes, essentially.

676

1    Q.    And is there also another melody line which is unique, the

2    ascending line?

3    A.    Yeah, the ascending line that includes A to B, B to C, and

4    C to F-sharp.

5    Q.    And that's what defense counsel identified as the most

6    memorable and distinct part -- not defense counsel -- defense

7    exhibit, Dr. Ferrara, references as the most memorable and

8    distinct part of that ascending line?

9    A.    I think his exact words were "most memorable and creative

10   part."

11   Q.    Thank you.

12         And what other parts or elements are substantially

13   similar that are unique and distinct which caused you to

14   conclude that both pieces, "Stairway to Heaven" and the

15   "Taurus" deposit copy lead sheet, are substantially similar?

16   A.    Well, the durations of the notes in the chromatic line are

17   exactly the same between the two compositions, two beats each

18   on the first four pitches of the chromatic line and then four

19   beats on the F and then returning back to A in the fourth

20   measure.

21         There was also the rhythm of the melody and -- the

22   melody that's comprised of the note pairs and the arpeggios,

23   which is in a steady 8th note rhythm, one and two and three and

24   four and a one, two, three, four (clapping).  So that's exactly

25   the same.

677

```
 1              And the fifth one was the pitch collections that we
 2     just looked at.
 3     Q.    Do you hold all your opinions to a professional degree of
 4     musicological certainty?
 5     A.    Yes.
 6     Q.    Do you hold them to a professional degree of music theory
 7     certainty?
 8     A.    Yes.
 9     Q.    And are you confident in your opinions and your
10     conclusions and what you shared with this jury here today?
11     A.    Yes.
12     Q.    All right.  And is there anything at all in defendants'
13     expert reports, the rebuttal reports, or anything produced in
14     this case to challenge or to cause you to change any of your
15     opinions here today?
16     A.    No.
17     Q.    And is it your opinion that there's no prior art which has
18     these unique and distinct elements which you've identified that
19     capture all those elements and that those five elements which
20     you've identified are unique and distinct to "Stairway to
21     Heaven" and the "Taurus" deposit copy lead sheet?
22     A.    Yes.
23              MR. MALOFIY:  Okay.  I have no further questions of
24     this witness.
25              THE COURT:  Cross-examination.
```

678

1    MR. ANDERSON:  Thank you, Your Honor.

2                        CROSS-EXAMINATION

3    BY MR. ANDERSON:

4    Q.   Good afternoon, Dr. Stewart.

5    A.   Good afternoon, Mr. Anderson.

6    Q.   Good to see you again.

7         Let's start, if we can, with Exhibit 509, plaintiff's

8    demonstrative, and if we could talk about what you've

9    identified as pairs of notes that appear in both the "Taurus"

10   deposit copy and "Stairway to Heaven."

11        If we look at the first line of this chart -- and I

12   take it you prepared this chart?

13   A.   Yes, sir.

14   Q.   And if we look at the first line, you have the heading

15   "Measure One" and "Measure Two."

16        And I take it the first group of, I guess it's eight

17   entries, is the first measure?

18   A.   Yes, because there are eight 8th notes in a measure.

19   Q.   Right.  And the beat, you -- which -- on the left-hand

20   margin you have a heading "Beat," and I take it there's 1 and

21   then plus and then 2 plus.  That's the number of beats?  That's

22   how you identify beats?

23   A.   Yeah.  And musicians would typically count that as one and

24   two and three and four and.

25   Q.   That's the 8th notes that you were talking about, right?

679

1    A.    Eighth note pulse.

2    Q.    And an 8th note pulse is commonplace in music, isn't it?

3    A.    I wouldn't say it's -- well, it depends on how you define

4    "commonplace."  Is it found in other works?  Yes.

5    Q.    Randy Wolfe didn't invent the 8th note pulse, did he?

6    A.    No.

7    Q.    So if we look at the -- let's say the first half measure,

8    in "Taurus" you find -- oh, by the way, are these pitches or

9    notes?

10   A.    Well, they're really both, because, you know, the way that

11   they're placed on this grid indicates where they occur in the

12   meter and the rhythmic basis behind them.

13          So they're really both, pitches and notes.

14   Q.    Do you have a preference as to how I describe them,

15   pitches or notes?

16   A.    Not really.

17   Q.    Okay.  If I understand, what you're telling everyone and

18   the jury is that in "Taurus" in the first, let's say, half

19   measure, the notes are A, B, C, A; is that correct?

20   A.    Yes.

21   Q.    And in the first half of "Stairway to Heaven" in the first

22   measure, the notes are C, E, A; is that correct?

23   A.    Yes.

24   Q.    And if we look -- if we step back and look at a bigger

25   picture, the notes in the first measure of "Taurus" are A, B,

680

```
 1   C, A, E, C over B, A, B?

 2   A.   Yes.

 3   Q.   And if we look at the first measure of "Stairway," it's C,

 4   E, A, B, E, C, D, right?

 5   A.   Yes.

 6   Q.   And wouldn't you agree that those sequences of notes are

 7   different?

 8   A.   Yes, but the point here is that we have a combination of

 9   chord tones or arpeggios and then these pairs of notes that

10   Dr. Ferrara I think correctly identified as the most creative

11   and memorable part of the melody.

12            So, really, if you -- the chord tones are just --

13            THE COURT:  You've answered the question.

14            Counsel.

15            MR. ANDERSON:  Thank you, Your Honor.

16            THE COURT:  If your counsel wants you to embellish,

17   he'll ask you further questions.

18            MR. ANDERSON:  Thank you very much, Your Honor.

19   BY MR. ANDERSON:

20   Q.   Let's talk about why you're calling these pairs.

21            For example, in Measure 1 in the first beat -- two

22   beats, I guess, you have AB.

23            Does the AB in "Taurus" stand alone, separate from

24   any other music or notes?

25   A.   Well, to me, a pair is a succession of pitches.
```

```
 1    Q.    Okay.  So what you're really saying is there's a B

 2    following an A, and you're saying that's a pair?

 3    A.    Yes.

 4    Q.    And -- but there's also a C following the B in "Taurus,"

 5    but in a different place in "Stairway" there's an E following

 6    the AB; isn't that true?

 7    A.    I'm sorry.  You lost me there.

 8    Q.    Sure.  If you look at "Stairway," you see you've put in

 9    blue what you're calling pairs, two notes in sequence that are

10    preceded and followed by different notes in these two

11    compositions, aren't they?

12    A.    Yes.

13    Q.    And would you agree that you could just as equally say

14    that there's a triplet rather than pairs in "Taurus" of ABC and

15    in "Stairway" there's a triplet of A, B, E?

16    A.    Well, you wouldn't refer to it as a triplet, because

17    musically that means something else.

18    Q.    Well, but there are three notes in the first measure of

19    "Stairway," A, B, E -- well, actually, let's do it this way.

20          In the first measure of "Stairway," there are four

21    notes, E, A, B, E, and in the first measure of "Taurus," there

22    are four notes, A, B, C, A (indicating).

23    A.    If you wanted to be looking at units different than the

24    pairs, but I think the pairs, as we've already heard, they

25    stick out in terms of their melodic significance.  They can be
```

682

1   heard as a melody kind of within a melody.

2   Q.   And if one wanted to just go through and try to identify

3   two notes that happened to follow in sequence, sometimes in

4   different places in these compositions, you could call them

5   pairs, right?

6   A.   You could.

7   Q.   And if we look at the -- the second measure of "Taurus," I

8   think we see sort of the same kind of thing going on.  The

9   second measure begins with a C and there's a space.

10          Does that mean there's no note sounding at that point

11  (indicating)?

12  A.   In the "Taurus" deposit copy, that's correct.

13  Q.   And if we look directly below that on "Stairway," in the

14  second beat of the -- well, the second half of the first beat,

15  I suppose, of the second measure, there is a note sounding.

16  There's an E, right (indicating)?

17  A.   Well, actually, both of them have a note sounding during

18  that time.  So -- what you're seeing here is the different

19  staffs, or staves, are separated on a different line, but if

20  you were listening to this, it wouldn't sound any different in

21  "Taurus."  You wouldn't hear necessarily that one was in one

22  staff or another.

23  Q.   If you were listening to this, sir, and you were looking

24  at the second half of the first beat in "Taurus" on the second

25  measure, would you hear an E note?

683

1    A.   I'm sorry.  Could you repeat that?

2    Q.   Yes.  And I'm going from your graph here.

3         If you were listening to this music and you were

4    looking at the second half of the first beat and at the

5    beginning of the second measure -- let's just ask, what note

6    would you hear there?

7    A.   You would hear a C.

8    Q.   Okay.  And why didn't you put a C there?

9    A.   Why did I put a C there?

10   Q.   Why didn't you?  I'm looking at something that appears to

11   be -- it's circled by this kind gentleman, so I don't have to

12   try and do it by my finger.  There's a blank, and I'm asking

13   you --

14        THE COURT:  I think you asked him what was the first

15   note in the second measure and he said a C.  Are you asking him

16   what the second note of -- in the second measure is?

17        MR. ANDERSON:  That's fine.  Let's do it that way.

18   BY MR. ANDERSON:

19   Q.   What's the second note?

20   A.   In the second measure of "Taurus" deposit copy?

21   Q.   Yes.

22   A.   C.

23   Q.   Okay.  And in the same position in "Stairway to Heaven,"

24   what's that note?

25   A.   It's an E, which is exactly spelling the chord, the

684

```
 1   underlying chord, which has been identified as C major over G.
 2   Q.   Okay.  And let's just go --
 3           MR. ANDERSON:  Not that small.  Thank you.
 4   BY MR. ANDERSON:
 5   Q.   Let's go, for example -- sorry.
 6           In the -- is it fair to say -- I'm sorry.
 7           Is it fair to say in your analysis that -- well, why
 8   don't you just tell us.  I think that would be easier.
 9           What are the sequence of pitches or notes in the
10   second measure of "Taurus"?
11   A.   You begin with a C and G.  And then the next 8th note
12   slot, the "and" of 1, has a C and an E.
13           Beat 2, again with chord tones highlighted in yellow,
14   A, E in "Taurus," C in "Stairway."
15           The next 8th note slot, which would be the "and" of
16   2, you have an E in "Taurus" and a C, and then in "Stairway"
17   immediately below you have a C.
18           On Beat 3, you have a D and an F-sharp in "Taurus"
19   deposit copy and an F-sharp, F-sharp in "Stairway to Heaven."
20           The "and" of 3, you have a C in "Taurus" and a D in
21   "Stairway."  And since this is a D chord with F-sharp in the
22   bass, again, these are basically the notes of the chord in
23   yellow.
24           Beat 4 is C, E, and A -- C and E in "Taurus" and A in
25   "Stairway."
```

685

```
 1            And then finally, the last 8th note slot of the
 2   measure is A in "Taurus," C and -- A and C in "Taurus" and
 3   F-sharp in "Stairway."
 4   Q.   And so, for example, if we look -- and thank you very much
 5   for doing that.  That was helpful.
 6            If you look at, for example, the first measure of
 7   "Taurus" and the first measure of "Stairway," the -- what you
 8   describe as pairs by picking out a B followed by A, that
 9   appears in different parts of the measure, correct?
10   A.   The A and B?
11   Q.   Yes.
12   A.   Yeah, that's the only one that doesn't line up.
13   Q.   Right.  And is it your opinion that the sequence of notes
14   AB is original and protectable?
15   A.   By itself, no.
16   Q.   Is it your opinion that the sequence of notes BC is
17   original and protectable?
18   A.   Taken in isolation, no.
19   Q.   And is it your opinion that C and F-sharp are original and
20   protectable?
21   A.   In isolation, again, no.
22   Q.   And let's just change subjects for a second.
23            I understand you're -- you have a doctorate of -- in
24   ethnomusicology?
25   A.   Yes.  Well --
```

686

```
1    Q.    And --
2    A.    Actually, I'm sorry.  It's a doctorate in music with a
3    concentration in ethnomusicology.
4    Q.    Thank you.
5              And you teach at the University of Vermont?
6    A.    Yes.
7    Q.    Does the University of Vermont have a doctoral program?
8    A.    No, it does not.  Well, in music or you mean -- it does
9    have doctoral programs.
10   Q.    Yes, but in music.  Thank you.
11   A.    No.
12   Q.    Have you ever held any positions at the American
13   Musicological Society?
14   A.    I've been very active in various study groups, such as the
15   popular music study group.  No, I've not held any official
16   position.
17   Q.    Have you ever been on the editorial board of any scholarly
18   journal in music?
19   A.    I have reviewed tons of articles as a service for these
20   different journals, you know, because they're peer reviewed,
21   and so they ask scholars like myself to review things and --
22   when they're submitted for publication.
23             So in that sense, I'm kind of acting in conjunction
24   with the editorial board, because they ask me to do this, but
25   I've not served officially as an editor.
```

687

1  Q.   And just so we have a clean answer, if I could ask again,

2  have you ever been on the editorial board of any scholarly

3  journal in music?

4  A.   No.

5  Q.   Let me just run down some of the cases that you've

6  identified as cases in which you served as an expert witness.

7          Bridgeport Music versus Dimension Films.  Bridgeport

8  Music versus Universal Music and Atomic Dog.

9          MR. MALOFIY:  Objection.  Outside of direct.

10         MR. ANDERSON:  He --

11         THE COURT:  Overruled.

12         MR. ANDERSON:  Thank you, Your Honor.

13 BY MR. ANDERSON:

14 Q.   Notorious BIG and the Ohio Players.  Kernel Records versus

15 Timothy Mosley.  Phenom versus William Adams.  Salsoul versus

16 Madonna.  Marino versus Usher.

17         And that's -- that's a --

18         THE COURT:  Are these trials that you say he's

19 testified in?

20         MR. ANDERSON:  These are cases that he identified as

21 cases in which he was retained as an expert witness.

22         THE COURT:  Okay.  Because he had testified earlier

23 he only testified in two cases; is that correct?

24         THE WITNESS:  That's correct.

25         THE COURT:  These are other cases, you're saying,

688

```
 1   that -- so you're going as to his background?
 2           MR. ANDERSON:  Right, and I'm --
 3           THE COURT:  Go ahead.
 4           MR. ANDERSON:  And here's the clencher.
 5   BY MR. ANDERSON:
 6   Q.   In all of those cases, isn't it true that you represented
 7   the plaintiff?
 8   A.   In all the ones that you just named?
 9   Q.   Yes.
10   A.   Yes.  There are other cases that I've worked on.
11   Q.   And in applying your musicological methodology, isn't it
12   correct that you do not think it is essential to disregard
13   commonplace or non-original material?
14           MR. MALOFIY:  Objection.  Vague and ambiguous.
15           THE COURT:  Do you understand the question?
16           THE WITNESS:  Yes, I think I did.
17           THE COURT:  You may answer it.
18           THE WITNESS:  No, I don't think that one does
19   disregard that material, because it's part of the composition.
20   And when non-protectable elements are combined in creative and
21   original ways, they can rise to the level of protectable
22   expression.
23           MR. ANDERSON:  Move to strike everything after, "No,
24   I don't think it's -- I don't disregard."
25           THE COURT:  He answered the question.
```

689

```
 1            MR. ANDERSON:  Okay.  Thank you, Your Honor.
 2   BY MR. ANDERSON:
 3   Q.   Prior to being contacted by Mr. -- well, I'm sorry.  Let
 4   me start that a little differently.
 5            Do you play saxophone professionally?
 6   A.   Yes, sir.
 7   Q.   And have you played in New York?
 8   A.   Yes.
 9   Q.   Prior to Mr. Malofiy ever contacting you, had you ever
10   heard of Randy California or Randy Wolfe?
11   A.   Well, probably, because as a kid, I was aware of the group
12   Spirit.  But, no, I would have not had any recollection of that
13   name.  It would have been kind of forgotten, I think, by me.
14   Q.   Do you recall that at your deposition when I asked you
15   that question, you told me you had never heard of Randy
16   California?
17   A.   Then -- I mean, if I said that, then I wasn't trying to
18   evade anything.  I don't have a recollection of knowing that
19   name, but I do know that I was aware of Spirit.  So I probably
20   had read that name on an album cover at some point, but, no, I
21   don't remember it until this case came along.
22   Q.   Thank you, sir.
23            Do you know Dr. Lawrence Ferrara?
24   A.   Yes, I do.
25   Q.   And do you consider him a qualified and respected
```

690

```
 1   musicologist?
 2   A.   I think most of his work is within the field of copyright,
 3   at least the work that I'm familiar with, and I think that
 4   looking at his CV, he's not really been publishing scholarly
 5   materials or articles for quite some time.  But I think he is a
 6   respected musicologist, particularly in the field of copyright.
 7   Q.   Do you recall testifying at your deposition that you
 8   consider him a qualified and respected musicologist?
 9   A.   And I agree with that now.
10   Q.   Do you agree that there -- I'm sorry.
11          Do you agree that there's nothing wrong, when you're
12   doing a musicological analysis, for the -- for you to rely on
13   transcriptions rather than memorizing the music that you're
14   analyzing?
15   A.   No, I don't think there's a problem with that.
16   Q.   And if I understand correctly, in your review of the
17   "Taurus" deposit copy, you found no substantial similarities
18   between "Taurus" and -- the deposit copy and "Stairway to
19   Heaven" after what you described as Part 1 of "Stairway to
20   Heaven," the first 2 minutes and 14 seconds?
21   A.   I find no substantial similarities.
22   Q.   Do you agree that looking at the entirety of "Stairway to
23   Heaven," it builds dramatically and speeds up as it goes along?
24          MR. MALOFIY:  Objection.
25          THE COURT:  Overruled.
```

1          THE WITNESS:  Well, I think most pieces of music

2    build dramatically or they would be pretty boring, but

3    "Stairway" is somewhat unusual in that it speeds up.

4    BY MR. ANDERSON:

5    Q.   And the "Taurus" deposit copy doesn't speed up, does it?

6    A.   A piece of paper can't really speed up, no.

7    Q.   And the answer is?

8    A.   No.

9    Q.   And the last six minutes of "Stairway to Heaven" are very

10   different from the "Taurus" deposit copy, correct?

11   A.   Yes.

12   Q.   And musicologically, they're very different in many ways;

13   isn't that right?

14          MR. MALOFIY:  Objection.  Vague and ambiguous.

15          THE COURT:  Overruled.

16          Basically, the last six minutes are different; is

17   that correct?

18          THE WITNESS:  Correct.

19          THE COURT:  Okay.

20   BY MR. ANDERSON:

21   Q.   Both "Taurus" and "Stairway to Heaven" have a descending

22   chromatic line?  That's your testimony?

23   A.   Yes.

24   Q.   And that's a commonplace musical device; wouldn't you

25   agree?

692

```
1   A.   Again, I'm kind of concerned of how you define
2   "commonplace," because if that means not unusual or very common
3   and prevalent, then I don't think it's commonplace.  I think
4   it's heard in other works, but it's relatively rare in popular
5   music.
6           I mean, of course there are numerous examples, but
7   most pieces of music, the vast majority, would not have a
8   chromatic line --
9   Q.   Did --
10  A.   -- especially in popular music.
11  Q.   Was Randy California the first person to use a descending
12  chromatic line in music?
13  A.   No.
14  Q.   And you're familiar with the phrase "a minor line cliché"?
15  A.   I know of it as a sort of cliché from the Berklee College
16  of Music that is not really used by a lot of other
17  musicologists.
18  Q.   Well, isn't it -- isn't it -- oh, I'm sorry.  Did I cut
19  you off?
20  A.   Yeah.  I was just going to say that in the field of jazz
21  studies, where I'm really active as a scholar and as a teacher
22  and a performer, I've noticed over the years that Berklee --
23  not the university in California, but the Berklee College of
24  Music in Boston -- has kind of developed its own terminology
25  for a lot of things, and they are not necessarily in use by a
```

693

1    lot of musicians who are not associated with Berklee.

2    Q.   Is the Berklee School of Music one of the preeminent

3    schools of music in the United States?

4    A.   I don't want to criticize another institution, so I don't

5    know how to answer that.

6    Q.   Do you agree that the -- well, isn't it your

7    understanding, sir, that a descending chromatic line is just

8    one example of a minor line cliché?

9    A.   Well, again, I don't use that term, "cliché" -- "minor

10   line cliché."  It's not a term that I've heard anywhere except

11   from Berklee alumni.  And, in fact, I've never even heard them

12   use it before.  So -- I'm sorry, what's your question?

13   Q.   Well, let me put it this way.

14        Don't you -- do you recall a few weeks ago testifying

15   when I took your deposition that a descending chromatic line is

16   one example of a minor line cliché?

17   A.   Well, if I said that, I was adopting their terminology for

18   a moment.

19        But one of the things I don't like about the term

20   "cliché" is that it kind of suggests a very kind of trite and

21   uncreative approach to music.

22        I mean, I like to just call it a descending minor

23   line that is available to musicians to use in creative and

24   original ways.  If you -- you kind of disparage it right away

25   if you start calling it a cliché.

694

```
 1   Q.   Do you agree that Randy California likely was familiar
 2   with works that had descending line -- descending chromatic
 3   lines?
 4             MR. MALOFIY:  Objection.  Speculation.
 5             THE COURT:  Sustained.
 6   BY MR. ANDERSON:
 7   Q.   By definition, are descending minor lines in a minor key?
 8   A.   Not necessarily.
 9   Q.   Are descending minor lines usually in a minor key?
10   A.   Well, I've never taken a survey of the frequency of its
11   appearance.  I don't think I can answer that.
12   Q.   Okay.  Is a minor key a common key included in 1960s
13   popular music?
14   A.   I'm sorry.  Repeat, please.
15   Q.   I'm sorry.  I apologize.
16   A.   No, no, no.
17   Q.   Is a minor key -- was it commonplace in 1960s popular
18   music?
19   A.   It's been common in all music for a long, long time.
20   Q.   So in your opinion, is there any meaningful similarity in
21   the fact that both the "Taurus" deposit copy and "Stairway to
22   Heaven" are in a minor key?
23   A.   There is some significance that they're in the same minor
24   key, A minor.  Taken by itself, it would not be something that
25   would be that significant if there weren't a lot of other
```

695

1   similarities.

2   Q.   What does the phrase "chord progression" mean?

3   A.   Chord progression is a series of chords, usually -- kind

4   of a synonymous term for that would be a harmony -- a harmonic

5   progression or harmony.

6   Q.   The specific chord progression heard in the first 2

7   minutes and 14 seconds of "Stairway to Heaven," is that heard

8   in other compositions?

9   A.   Yes.

10  Q.   And --

11  A.   Well, let me qualify that in terms of -- yeah, I think I

12  can just say yes.

13  Q.   And you've referred to arpeggios as broken chords.

14        Are arpeggios -- were arpeggios common in 1960s

15  popular music?

16  A.   Yes.

17  Q.   And do you agree that the presence of arpeggios is not a

18  substantial similarity between "Stairway to Heaven" and the

19  "Taurus" deposit copy?

20  A.   What would be significant is if the arpeggios contain the

21  same pitches or, you know, the same expression.  But the mere

22  presence of arpeggios, of course not.

23  Q.   And when you break a chord -- let's say you've got a chord

24  of three notes.  Those three notes could be played in different

25  sequences than a broken chord in another song?  Do you follow

696

```
 1    that?
 2    A.   Yes, I do.  I think I understand you.  Yes.
 3    Q.   And do you believe that the B section of the "Taurus"
 4    deposit copy is relevant to this case and any inquiry into the
 5    claim of infringement?
 6    A.   Only in terms of its structural role in the piece in terms
 7    of forming this longer almost bridge-like section after the two
 8    A sections, you know, with the AAB form.
 9    Q.   Do you find any musical similarity, chords, notes,
10    pitches, in the B section of the "Taurus" deposit copy?
11    A.   No.
12    Q.   You referred to -- is it Dido or Dido's Lament?
13    A.   I believe it's pronounced Dido's --
14    Q.   Okay.
15    A.   -- but that might not be the Latin pronunciation.
16    Q.   Okay.  And that's a --
17    A.   British pronunciation, probably.
18    Q.   My apologies.  I thought you were done.
19         That's a 17th Century composition?
20    A.   Yes, sir.
21    Q.   And you've referred to -- to the fact that there is a
22    difference between the descending chromatic line in that Lament
23    and "Taurus" and "Stairway to Heaven," and the difference is --
24    is that the Dido's Lament is like one note longer than where
25    the "Stairway to Heaven" and "Taurus" end?
```

697

1    A.    It's not just that it's one note; it's what that note is,

2    which is the next note in the chromatic scale, which leads very

3    naturally back to the beginning in terms of the kind of

4    standard cadence or chord progression in western music, which

5    would be five to one or E back to A.

6    Q.    In your report, did you cite any article that defines a

7    descending chromatic line as you've just referred to it, E back

8    to A?

9    A.    I don't think your question really -- an article that

10   specifically discusses a chromatic line that goes to E or

11   doesn't go to E and goes back to A?

12   Q.    Right.

13   A.    No.

14          MR. ANDERSON:  Bear with me for just a second.

15       *(Counsel confer off the record.)*

16          MR. ANDERSON:  Thank you for your patience.  My

17   apologies, Your Honor.

18          THE COURT:  Sure.  No problem.

19          MR. ANDERSON:  That's all the questions I have for

20   this witness.  I'm finished.  I'm done.

21          THE COURT:  Okay.  Redirect?

22          MR. MALOFIY:  Yeah, briefly.

23          THE COURT:  Sure.

24

25   ///

698

```
 1                    REDIRECT EXAMINATION

 2   BY MR. MALOFIY:

 3   Q.   Mr. Anderson was asking you questions about these discrete

 4   parts of music, like is there anything unique about arpeggios

 5   in and of itself.  Do you remember that?

 6             And basically, he was asking a question, is there

 7   anything discrete about an arpeggio in a vacuum with nothing

 8   else in context with it.

 9             Do you remember that?

10   A.   Yes.

11   Q.   And you answered him, "No, there's nothing unique about an

12   arpeggio in a vacuum," correct?

13   A.   In isolation.

14   Q.   In isolation.

15   A.   Um-hmm.

16   Q.   But when you have two songs, "Stairway to Heaven" and

17   "Taurus," which are in the same key of A minor, and when you

18   have two songs that have similar rhythms, and when you have two

19   songs that have a nearly identical song structure, AAB, AAB,

20   and when you have two songs that have similar harmonies, and

21   when you have two songs that have an ascending line with unique

22   AB, BC, C to F-sharp pairs, and then on the -- and then on the

23   descending line having a similar chord progression arpeggiated

24   in a unique way, and then when you have an acoustic guitar as

25   the lead central instrument --
```

1          MR. ANDERSON:  Objection, Your Honor, that's a

2   performance element, an acoustic guitar.  There's nothing --

3          THE COURT:  Sustained.  As to acoustic guitar, it's

4   sustained.

5   BY MR. MALOFIY:

6   Q.  And then when you have, additionally, a cadence where the

7   music resolves and skips the fifth and goes back to the tonic,

8   and when you have rhythmic phrasings which are very similar,

9   and then when you have double time and the way the rhythm is

10   composed in later parts, now, when you take all those things,

11   all those musical elements, and you put them all together, is

12   that significant?

13   A.  Yes.

14   Q.  And is that what leads you to further believe, in addition

15   to the five things which you've identified, it's all these

16   additional elements that discretely have no meaning, but

17   together they make this thing -- they make the comparison of

18   "Stairway to Heaven" and the "Taurus" deposit lead sheet

19   substantially similar and very unique when you take it in

20   context, correct, sir?

21          MR. ANDERSON:  Objection.  Leading.  Vague and

22   ambiguous.

23          THE COURT:  Overruled.

24          THE WITNESS:  Yes, basically.  I think that there are

25   some elements that you named that, even by themselves, rise to

700

1   the level of protectable expression.

2          But, yeah, the basic point here is that you don't

3   take things in isolation, because if you break down any kind of

4   musical expression into a small enough piece, then you're going

5   to find it all over the place.  You know, it's when you put

6   stuff together that it becomes unique and original.

7   BY MR. MALOFIY:

8   Q.   If I took the letter "W" in and of itself, it's just a

9   letter, correct?

10  A.   Um-hmm.

11  Q.   If I take the letter "O" and above, it's -- in and of

12  itself, it's just a letter, correct?

13          MR. ANDERSON:  Objection.  Argument.

14  BY MR. MALOFIY:

15  Q.   And when I take a --

16          THE COURT:  Sustained.  Sustained.

17          That's a great argument, but you can make it during

18  argument.

19          MR. MALOFIY:  All right.  I think the jury got it.

20  Thank you.

21          No further questions.

22          THE COURT:  Okay.  Counsel?

23          MR. ANDERSON:  No questions, Your Honor.

24          THE COURT:  Okay.  You may step down.  Thank you very

25  much, sir.

701

```
 1              THE WITNESS:  Thank you, Your Honor.

 2              THE COURT:  Okay.  Next witness.

 3              MR. MALOFIY:  Our next witness is going to be

 4    plaintiff in this matter, Michael Skidmore.

 5              THE COURT:  Okay.  Sir.

 6              THE CLERK:  Please raise your right hand.

 7              Do you solemnly swear that the testimony you shall

 8    give in the cause now before this Court shall be the truth, the

 9    whole truth, and nothing but the truth, so help you God?

10              THE WITNESS:  Yes, I do.

11              THE CLERK:  Sir, please state your name, spell your

12    last name for the record.

13              THE WITNESS:  Yes.  Michael Jeffrey Skidmore,

14    S-K-I-D-M-O-R-E.

15              THE COURT:  Okay.  You may inquire.

16                   MICHAEL JEFFREY SKIDMORE,

17                having been first duly sworn,

18                   testified as follows:

19                   DIRECT EXAMINATION

20    BY MR. MALOFIY:

21    Q.   How are you doing, Mr. Skidmore?  Are you all right?

22    A.   Fine, thank you.

23    Q.   All right.  Now, I know you as Mick and I'm going to try

24    to refer to you as Mr. Skidmore and Michael Skidmore.  If I

25    make a mistake, I apologize, but I will do my best.  Please
```

1   forgive me.

2           Can you tell me how you became involved in the Randy

3   Craig Wolfe Trust?

4   A.   Yes.  Basically, I was a fan of Spirit going back to the

5   '60s, and over the years I enjoyed their music and I became a

6   journalist.  I wrote articles about them in multiple countries.

7           I eventually did interviews of Randy and other

8   members of the band.  I got to be friends with the band,

9   friends with some of their family members.

10          And after Randy passed away, I was helping assist

11  with getting unreleased material released.

12  Q.   Now, is it safe to say that you've been a fan of the band

13  Spirit for 30, 40 years?

14  A.   Yeah.  Probably since 1969.

15  Q.   All right.  I notice an accent in your voice.

16          Are you from here originally, the U.S.?

17  A.   No.  I'm from London, England.

18  Q.   All right.  So you're from England even though your name's

19  Mick?

20  A.   Correct.

21  Q.   Okay.  So, now, did you listen to music while you were in

22  the UK?

23  A.   Constantly.  Growing up, I listened to tons of things.

24  Q.   And were you into rock and roll music?  I still see you

25  have long hair.

703

```
1   A.   Totally.

2   Q.   All right.  And were you -- did you hear Spirit on the

3   radio when you were in London, I guess when you were a young

4   man?

5   A.   Yes.

6   Q.   And did you hear the first album played on the radio in

7   London?

8   A.   Some of the tracks, yes.

9   Q.   And did you hear the second album played on the radio?

10  A.   Again, some of the tracks.

11  Q.   And the third album?

12  A.   Maybe one or two tracks.

13  Q.   Was the fourth album Dr. Sardonicus?

14  A.   Correct.  That was the most popular album.

15  Q.   And those are all -- those are all records that Mr. Jimmy

16  Page has in his collection as he sits here today, correct?

17  A.   That's what I recall he said, yes.

18  Q.   Did some of these four albums have charting songs?

19       MR. ANDERSON:  Objection.  Lacks foundation.  It's

20  hearsay.

21       THE COURT:  Sustained.

22  BY MR. MALOFIY:

23  Q.   Did you ever see charts that represented where songs

24  placed when you were in the UK as a youth?

25  A.   Yeah.  I used to read all the -- all the newspapers and
```

704

1   magazines.  I used to buy them on a regular basis.

2   Q.   And as -- in being a journalist and writing for rock and

3   roll and bands and things of that nature, did you pay attention

4   to where bands were charting?

5   A.   Absolutely.

6   Q.   Was Spirit, as a band, a charting band?

7           MR. ANDERSON:  Objection.  Hearsay.

8           THE COURT:  Sustained.

9   BY MR. MALOFIY:

10  Q.   Did you have an opportunity to read any chart which

11  indicated Spirit being a charting band?

12          MR. ANDERSON:  Objection.  Hearsay.

13          THE COURT:  Sustained.

14  BY MR. MALOFIY:

15  Q.   Did you see Spirit albums, the first, second, third, and

16  fourth album -- which were all released prior to what date,

17  sir?

18  A.   Probably 1970.

19  Q.   Okay.  So the first four albums were released between '67

20  and '70?

21  A.   Correct.

22  Q.   Okay.  And this was all before "Stairway to Heaven" -- at

23  least -- well, "Stairway to Heaven" was allegedly written,

24  right?

25  A.   Yes.

```
 1    Q.   Okay.  Now, did you see the first four albums in stores in
 2    the UK being sold when you were there as a youth?
 3    A.   I have to have done, because I bought them.
 4    Q.   What's that?
 5    A.   I said I have to have done, because I bought them.
 6    Q.   All right.  At what point did you leave the UK and come
 7    here?
 8    A.   I'm sorry.  Repeat the question.
 9    Q.   When did you come over to the States from London?
10    A.   1982.
11    Q.   All right.  Now, was Spirit a band that was popular in the
12    rock circles in London from the late '60s to the late 70s?
13              MR. ANDERSON:  Objection.  Lacks foundation.
14              THE COURT:  Sustained -- oh, no overruled.
15    Overruled.
16              THE WITNESS:  I would say popular.  I went to see
17    them a number of concerts where they sold out.
18              I went to see the 1973 concert that Larry Knight
19    mentioned where they got their record seven encores.
20              I saw them open up for The Police -- I mean, headline
21    over The Police five years later where the -- you know, same
22    thing, five, six encores, packed house.
23              So, yes, I would say they were very popular.
24    BY MR. MALOFIY:
25    Q.   And you remained a fan all throughout the years, correct?
```

706

```
 1   A.    To this day.
 2   Q.    I'm just looking back at the clock, that's all.
 3              Now, you mentioned you were at the concert in '73
 4   where there was the seven encores, which broke the record,
 5   correct?  Where was that at, the Rainbow?
 6   A.    The Rainbow Theater.
 7   Q.    Now, you didn't happen to go to the after party, did you?
 8   A.    Not then.
 9   Q.    Okay.  You didn't happen to meet Mr. Page, did you?
10   A.    (No audible response.)
11   Q.    Okay.  Now, did you see Mr. Larry "Fuzzy" Knight perform
12   in 1973 on that stage at the Rainbow?
13   A.    Yes.
14   Q.    All right.  And did you see the other members of Spirit,
15   including Randy and Cass?
16   A.    Yes.
17   Q.    Now, did you know Randy, Cass, and the other members of
18   Spirit?
19   A.    Yes.
20   Q.    And do you know Mark Andes and do you know Jay Ferguson,
21   both of whom testified here today -- well, in the last couple
22   days?
23   A.    Yes.  Yes, very well.
24   Q.    Okay.  And you also knew Randy before he passed?
25   A.    Yes, very well.
```

707

1   Q.   And you also met -- you knew Ed Cassidy and John Locke

2   before they passed?

3   A.   Yes.

4   Q.   Okay.  Were you friends and close with all these people?

5   A.   Some more than others, but, yeah, I'm -- yeah.  Depends

6   what you define as friendship.  I was friends with all of them

7   and had an ongoing relationship, yes.

8   Q.   Did you write about Spirit in magazines?

9   A.   Yes.

10  Q.   Did you also write about other bands and did you break

11  other bands in -- throughout the world?

12  A.   Yeah, in --

13          MR. ANDERSON:  Objection.  Vague and ambiguous.

14          THE COURT:  Overruled.

15          THE WITNESS:  No.  Actually, I had a column on

16  unknown bands called -- in *Relix Magazine.*

17          THE REPORTER:  Called what?

18          THE WITNESS:  *Relix Magazine.*  R-E-L-I-X.

19          THE REPORTER:  No, the name of the article.

20          THE WITNESS:  Oh, "Too New To Be Known."  I'm sorry.

21  "Too New To Be Known."

22  BY MR. MALOFIY:

23  Q.   Did you break a band called Phish to the mainstream?

24  A.   Yes.  I wrote the first national article on Phish.

25  Q.   And Phish became a hugely popular band?

1  A.   Yes.  They were just one of the bands in that column I

2  mentioned.

3  Q.   All right.  Are there other bands in the UK that you wrote

4  about and appreciated?

5  A.   Oh, yes, loved.

6  Q.   Can you just name a couple for the jury?

7        MR. ANDERSON:  Objection.  Relevance.

8        THE COURT:  Sustained.

9        You're wasting a huge amount of time.  Sustained.

10       MR. MALOFIY:  I'll move forward, Your Honor.

11 BY MR. MALOFIY:

12 Q.   How did you become involved in the Trust after you were a

13 fan?

14 A.   Just because I was trying to help.  I had written some

15 articles.  I actually wrote the obituary for Randy, and I was

16 in touch with his mother and over time developed a friendship.

17 I helped her try to place unreleased material with record

18 labels.

19       From being a journalist, I had contacts, and, you

20 know, eventually I started putting the albums together myself

21 because nobody wants you to send them a bunch of tapes, they

22 want a finished product.  So I had to learn how to do mastering

23 and editing.

24       And I took on that basically as a labor of love, so I

25 could promote Randy's music and continue his legacy.

709

```
1    Q.   Did you do this because you appreciated Spirit and Randy

2    on a deep personal level?

3    A.   Yeah.

4              MR. ANDERSON:  Objection.  Leading.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yeah, perhaps more than anybody.  I've

7    spent 15 years doing it.

8    BY MR. MALOFIY:

9    Q.   I don't know.  We heard testimony from Bruce Pates.  He

10   might -- he may also like him quite a bit.

11   A.   Well, I'll concede that one.

12   Q.   Besides you and Bruce Pates, did you realize that the only

13   other person who had six Spirit albums in this room would have

14   been Jimmy Page?

15             MR. ANDERSON:  Objection.  Argumentative.

16             THE COURT:  Sustained.

17   BY MR. MALOFIY:

18   Q.   Was today the first day you realized how much of a fan

19   Jimmy Page was of Spirit?

20             MR. ANDERSON:  Objection, Your Honor.  Argumentative.

21             THE COURT:  Sustained.

22             MR. MALOFIY:  I'll move forward.

23   BY MR. MALOFIY:

24   Q.   Who owns -- who owns the copyright for "Taurus"?

25             MR. ANDERSON:  Objection.  Calls for a legal
```

1    conclusion.

2           THE COURT:  As to who owns the copyright, sustained.

3           Let me just ask you a couple of questions and then

4    we're going to break.

5           Are you the executor of the Trust?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  Okay.  And is it your position that the

8    intellectual property rights of Mr. Wolfe are in that Trust?

9           THE WITNESS:  Yes, absolutely.

10          THE COURT:  Okay.  We'll break at this time.

11          MR. MALOFIY:  Thank you, Your Honor.

12          THE COURT:  Ladies and gentlemen, we're going to --

13   I'm sorry.  We're going to break until tomorrow.

14          You can watch the NBA game tonight, but, again, we

15   don't want you thinking or deliberating about this case during

16   this break.  So remember the admonishment not to discuss the

17   case among yourselves or with anybody else or form or express

18   any opinions about the matter until it's submitted to you.

19          You may retire to the jury room.  We'll see you back

20   in tomorrow.  We'll start right at 8:30.

21          As you leave, if you'd leave quietly.

22          I'm going to ask the people in the audience if you'd

23   leave quietly also, because we're going to be having a

24   conference to talk about some logistical things with the

25   attorneys.  Thank you.

711

```
 1            THE CLERK:  All rise.

 2      (Jury out at 4:00 P.M.)

 3            THE CLERK:  Anybody who is not a party to the action

 4    needs to leave the courtroom.

 5            THE COURT:  I'm going to say it one more time.

 6            Anybody that's not a party to this case, will you

 7    please step outside of the courtroom.  I want to talk to the

 8    attorneys about logistics for tomorrow's proceedings.

 9            It has nothing to do with the trial, so I'm going to

10    ask you, please, to step out.

11            Ladies and gentlemen, it's got nothing to do with the

12    trial.  There's nothing that needs to --

13            Okay.

14      (The following was heard outside the presence of the

15      jury.)

16            MR. MALOFIY:  Your Honor, we're not familiar with

17    some of the other counsel in the room, and I'm not sure who

18    they are.  Would it be -- would it be prudent for them to

19    identify themselves?

20            THE COURT:  No, it's not necessary.  The Court knows

21    who -- who's here and who's not.

22            MR. MALOFIY:  Thank you.

23            THE COURT:  They're officers of the Court or with the

24    Court.

25            MR. MALOFIY:  Understood.
```

712

1          THE COURT:  Okay.

2          Okay.  In this matter, again, I want to talk to you,

3  because it's really getting down to the wire and I just want to

4  make sure everybody knows.  I'm going to go through it very,

5  very clearly.

6          There are less than -- well, just barely over 60

7  minutes left, which is just barely over an hour.  I'm going to

8  round it off to 70 minutes so that the plaintiff has 70

9  minutes.

10          The defense has 474 minutes.

11          And I just want to make sure that everybody

12  understands.  Does everybody understand that once your time is

13  up, you cannot ask any more questions, either on direct or

14  cross-examination, of any witness?

15          Counsel, do you understand that?

16          MR. ANDERSON:  Yes, I do, Your Honor.

17          THE COURT:  Counsel, do you understand that?

18          MR. MALOFIY:  I do understand it, Your Honor.  And

19  it's a complicated trial and we're doing the best we can as

20  plaintiff.

21          THE COURT:  That's okay, counsel.  As I said, you can

22  put it on the way you want, but as far as what I said in the

23  beginning, as far as giving you more time, it's not going to

24  happen because I said if you put the case on efficiently and

25  effectively -- this case has dragged.  You've gotten into

713

1   testimony that is completely irrelevant.

2        I haven't interrupted because I told you I wasn't

3   going to unless somebody else made an objection. There has

4   been delays because of bringing up exhibits or finding

5   witnesses or it was not well prepared that way. It has not

6   been presented efficiently and effectively, and so it doesn't

7   demand more time.

8        Give you an example. On this last witness, the only

9   two significant questions that were asked of Mr. Skidmore the

10   Court asked. Who cares what his background was? He is the

11   executor of the estate, and he's bringing it on behalf of the

12   estate, and the estate says they own the copyright.

13        So -- there's so much. When we went into the very

14   first witness, we went into her background and what her mother

15   was like and whether they went to shows, whether they didn't go

16   to shows. All of that's well and good if you want to add fluff

17   to a case, but you have to do it understanding that you have to

18   do it within the time limits.

19        And if you want to waste time on that, that's fine.

20   I'm not criticizing you. If you want to put your case on --

21   that's fine if you want to put it on that way.

22        But you only have 70 more minutes left. And you only

23   have 474 minutes left. And I just don't want anybody coming in

24   at the end and saying, "Well, I didn't realize." When your

25   time's up, your time's up. So I just want to make sure

714

 1  everybody realizes that.

 2        And I know that you feel it's a complicated case and

 3  I may even understand that you think you're putting it on the

 4  best way you can, but I want you to understand that we gave you

 5  the time limits and it's not been put on very efficiently and I

 6  probably will not be giving any more time.  I just want to make

 7  sure everybody understands.  I don't want to catch anybody by

 8  mistake.

 9        I've mentioned this three or four times during the

10  case to try to help you out, to try to make sure you didn't use

11  all the time.  I've been trying to give you the times.  I've

12  been trying to tell you that you got to speed it up.

13        But, anyway, I just want to make sure everybody

14  understands that so we don't have any hurt feelings when I say

15  you can't cross-examine because you're out of time.

16        MR. KULIK:  Your Honor, just for the record, you have

17  been very, very clear and we all understand exactly what you're

18  saying.  But for the record, obviously, we have to interpose

19  our objection.

20        THE COURT:  I understand.

21        MR. KULIK:  We don't think ten hours, including

22  cross-examination, in a case like this is fair or reasonable.

23        THE COURT:  I understand that, counsel, and that

24  position is on the record and I appreciate that you have to put

25  that on the record.

1     The Court will tell you right now that up to this

2  time -- and we've used probably 11 hours -- everything that has

3  come under that 11 hours that is really necessary for this case

4  could have been done in 2 or 3 hours.  It really could have

5  been.

6     We have gotten into all kinds of background

7  information and things that really aren't relevant to this

8  case.  And that's okay if you want to do it, but it's not

9  necessary for the presentation of this case.

10     So that's why the Court described -- I'm just telling

11  you, because that's why the Court disagrees with you.  I

12  understand that you feel it is necessary.  And the Court

13  doesn't feel it's necessary.  I think both have been put on the

14  record so that you're protected.

15     MR. KULIK:  Your Honor, can I just use 20 more

16  seconds?

17     THE COURT:  Sure.

18     MR. KULIK:  I just -- I feel that the Court may not

19  be fully grasping some of the subtleties and complexities of

20  the case.  I believe -- we've only had two days of testimony.

21  I think we started late in the afternoon the day before.  I

22  think we've had quite a few witnesses that we've gone through.

23  Some of the things that Your Honor may feel are not relevant we

24  feel are relevant.

25     THE COURT:  Was it relevant, counsel -- and let me

1    interrupt you because 20 seconds have already gone, but let me

2    ask you, is it relevant that Janet Wolfe moved to -- what was

3    it?

4              MR. KULIK:  New York.

5              THE COURT:  No, no, no.  She moved back here to Ojai.

6              Is that relevant?  Is it relevant that she had to go

7    to these things with her mother?  Is it relevant that they're a

8    close-knit family?  The Court doesn't feel that that is

9    relevant for this case.

10             Anyway, so those are the things that -- is it -- how

11   relevant is it that there was a traffic accident and somebody

12   got hurt during the traffic accident?  How relevant is it if

13   somebody was sad because Randy Wolfe died?  Those are all

14   things if you want to bring them in, fine, but it's not

15   necessary for this case.

16             So go ahead, counsel.  I'm sorry.

17             MR. KULIK:  You know, the fact that Mr. Plant was in

18   an unfortunate accident on his way back from a Spirit show I

19   think is relevant, Your Honor.

20             THE COURT:  Well, I don't.

21             MR. KULIK:  That Janet Wolfe was able to testify that

22   she attended a lot of shows at which "Taurus" was played, we

23   had to lay a foundation for her doing that and --

24             THE COURT:  Counsel, you could have done that in one

25   or two questions, but it just went on and on and on.  As I

1    said, this thing could have been presented much more

2    efficiently than it was presented.

3            And the trouble is we just kept repeating questions.

4    And I think you'd admit it.  So many of the questions have been

5    repeated again and again.  We've already had the answer and

6    sometimes there is an objection that it's asked and answered

7    and it was asked and answered.  It just has dragged on almost

8    ad nauseam.

9            And I'll tell you for the record, if you have looked

10   at the jury -- this is an interesting case, but many times

11   you're losing the jury over there because I think that they,

12   you know, also felt that it is dragging on.

13           MR. KULIK:  Your Honor, again, in a case where access

14   is incredibly contested or independent creation is an issue, I

15   just think some of the subtleties may not be clear to the

16   Court.

17           But, anyway, thank you, Your Honor.

18           THE COURT:  Okay.

19           MR. KULIK:  Appreciate the time.

20           THE COURT:  And I wanted to make sure that you had a

21   right to put than on the record, so --

22           MR. MALOFIY:  Can I mention one thing?  And I don't

23   mean to belabor the point.

24           THE COURT:  Sure.

25           MR. MALOFIY:  Initially, when we tried this case,

718

1  defendants opened up issues of ownership of the copyright, the

2  validity of the Trust, unclean hands.  Access was heavily

3  disputed.  I think that's been completely knocked down and

4  debunked very clearly.

5          And so the issue was we -- when this case was opened,

6  there was many issues we had to resolve.  We still don't know

7  necessarily the Court's position or even defense counsel's

8  position on is Quinn Wolfe going to come in and try to make,

9  for the first 20 -- in 20 years, some kind of testimony or

10 argument which we don't know about.  There's a lot of things we

11 had to lay down in order to establish these facts.

12         So, respectfully, Your Honor, because this access was

13 heavily disputed, because there was the issue of Quinn, and

14 because there's been a dispute about the ownership, whether or

15 not the Trust owns the copyright, those are all things that

16 created a need to go into these issues.

17         THE COURT:  Counsel, that wasn't even an issue and it

18 won't be an issue until somebody disputes the fact that

19 Mr. Skidmore has already testified to, and that was done in two

20 questions, "Are you the executor of the estate," and, "Does the

21 estate own the intellectual property?"  Everything you've gone

22 into up till now had nothing to do with Quinn.

23         So I understand your problem if you say, you know,

24 we've got a lot that we thought we were going to go into that

25 we're not going to go into, but that hasn't been part of the

```
1    testimony that's come in so far.
2           Anyway, I just want to put everybody on notice so
3    that nobody is going to be surprised tomorrow or Monday or
4    whenever it is.
5           My understanding is you have an expert coming in
6    tomorrow?
7           MR. MALOFIY:  I wanted to address our next witnesses,
8    Your Honor, with you --
9           THE COURT:  Sure.
10          MR. MALOFIY:  -- because we are clipping through
11   this.
12          THE COURT:  Sure.
13          MR. MALOFIY:  We have Mr. Skidmore, then we have our
14   damages expert.
15          THE COURT:  Okay.
16          MR. MALOFIY:  He's flying in today.  He'd not going
17   to be here until 8:00.
18          THE COURT:  No problem.
19          MR. MALOFIY:  And that should wrap up our list for
20   plaintiff's case in chief.
21          THE COURT:  Okay.  Then I want defense to be ready to
22   proceed at that time.
23          MR. ANDERSON:  Absolutely, Your Honor.
24          MR. MALOFIY:  I would ask, would opposing counsel
25   stipulate the Trust owns the copyright?  Is that still an issue
```

720

```
 1    or is it off?

 2            MR. ANDERSON:  No.  It's absolutely clear the Trust

 3    does not own the copyright, and it's not until the last week

 4    that they claimed it did.

 5            There is an assignment, a 1967 assignment, from Randy

 6    California in the '67 songwriter agreement of the initial and

 7    renewal term of copyright.

 8            MR. KULIK:  We know that the copyright was terminated

 9    in 1996 when Randy Wolfe, as he had a right to do, terminated

10    the copyright, registered the copyright in his own name.

11            The only public record today, the only record, is

12    Randy Wolfe, and now the Trust is the owner of the copyright.

13            THE COURT:  Okay.  And, counsel, let me just --

14            MR. KULIK:  So it is an issue.

15            THE COURT:  Let me just help both -- well, it may or

16    may not be.  Let me just help you out.

17            Mr. Skidmore said that he is the executor and all of

18    the intellectual property of Randy Wolfe's is in that -- is in

19    that Trust.  As of now, that's the only evidence we have.

20            I'm not assuming that they have evidence otherwise or

21    not.  I -- but until they come up with evidence otherwise, it's

22    just not an issue.  That's where -- it's presumed to be in the

23    trust, like Mr. Skidmore said.

24            I don't know if you have some document that you're

25    going to pull out that says -- and if you do, I'm going to be
```

721

```
 1    surprised it wasn't divulged during discovery, but if you have
 2    some document that you're going to pull out and say, "This is
 3    the end of the Trust.  I've got a written document here that it
 4    was taken out of the Trust or was never put into the Trust" --
 5    but until that's an issue, it's not relevant.
 6            MR. ANDERSON:  If I could clarify, Your Honor.  The
 7    summary judgment order, in fact, reflects that the claim by the
 8    plaintiff is as a beneficial owner.  That's never been an issue
 9    in the case until a week ago.
10            MR. KULIK:  It's always been an issue.  Always been
11    an issue.
12            MR. ANDERSON:  Well, I don't want to take up
13    Your Honor's time.
14            THE COURT:  Well, I appreciate that.  We're going to
15    come back in tomorrow morning at 8:30 and we'll proceed at that
16    time.
17            MR. MALOFIY:  Thank you, Your Honor.
18            MR. ANDERSON:  Can I ask one question, Your Honor?
19            THE COURT:  What?
20            MR. ANDERSON:  There was a photograph that defense
21    counsel published yesterday that purported to depict the two
22    members of Heart and Mr. Plant talking to Mr. Andes, and I
23    raised -- and we raised that that had been altered and it was
24    different from the document that had been produced.
25            THE COURT:  It wasn't introduced into evidence.
```

722

1      MR. ANDERSON:  I know, but we -- my concern is it was

2   published to the jury, and if -- we filed this morning a short

3   declaration that -- well, it's my declaration so it's not that

4   short, but a declaration that shows the photograph we received,

5   which shows six people in that photograph.  The photograph that

6   they published to the jury only shows four.

7         And by omitting the two, it created the false

8   impression that Mr. Andes was talking to -- Mr. Plant was

9   talking to Mr. Andes, and it was joined with counsel's

10   statement to the jury --

11      THE COURT:  Counsel, it was excluded.  It was

12   excluded.  It's not in evidence in front of the jury.  It was

13   excluded, so I don't think it's an issue.

14        Now, if you want to make some issue that they tried

15   to prejudice the jury by showing it, make your motion and I'll

16   rule on it.  But as of now, it's not in evidence.

17      MR. ANDERSON:  Whether it was intentional or an

18   accident, what we asked in the papers this morning was some

19   kind of explanation to the jury.

20      THE COURT:  I'll take a look at your papers --

21      MR. ANDERSON:  Thank you.

22      THE COURT:  -- and I'll give them a chance to

23   respond.

24      MR. MALOFIY:  I have to respond to that.

25   Mr. Anderson is mischaracterizing something as altering.

723

```
 1          THE COURT:  Counsel, I'm sorry.  We could be here for
 2   the next six hours.  You don't have to answer it because I
 3   don't even -- I'm not even considering it now.  If he puts it
 4   in writing, I'll hear what you -- you have to oppose it and
 5   I'll make a decision.  But as of now, there is no picture in
 6   evidence.
 7          MR. MALOFIY:  Well, he said I altered something and I
 8   take great exception to that.
 9          THE COURT:  Court will be in recess.
10          MR. ANDERSON:  Thank you, Your Honor.
11          THE CLERK:  All rise.
12       (Evening recess taken 4:14 P.M.)
13                         --oOo--
14
15
16
17
18
19
20
21
22
23
24
25
```

724

CERTIFICATE


    I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date: JUNE 17, 2016


                    /s/  Cindy L. Nirenberg, CSR No. 5059

                         Official Court Reporter

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                           - - - -

5


6   MICHAEL SKIDMORE, AS TRUSTEE FOR  )
    THE RANDY CRAIG WOLFE TRUST,      )
7                                     )
                      PLAINTIFF,      )
8                                     )
        vs.                           )    No. CV 15-03462-RGK
9                                     )
    LED ZEPPELIN; JAMES PATRICK PAGE; )
10  ROBERT ANTHONY PLANT; JOHN PAUL   )
    JONES; SUPER HYPE PUBLISHING,     )
11  INC.; WARNER MUSIC GROUP CORP.,   )
    PARENT OF WARNER/CHAPPELL MUSIC,  )
12  INC.; ATLANTIC RECORDING          )
    CORPORATION; RHINO ENTERTAINMENT  )
13  COMPANY,                          )
                                      )
14                    DEFENDANTS.     )
    _____)

15

16           REPORTER'S TRANSCRIPT OF JURY TRIAL

17          DAY 4, VOLUME 1; PAGES 725 TO 848

18                FRIDAY, JUNE 17, 2016

19                     8:30 A.M.

20                LOS ANGELES, CALIFORNIA

21

22   _____

23        SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
            Official Reporter, U.S. District Court
24               255 East Temple Street
                 Los Angeles, CA  90012
25                  213.894.5949

726

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE
     RANDY CRAIG WOLFE TRUST:
4
          FRANCIS ALEXANDER, LLC
5         BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
          280 N. PROVIDENCE ROAD, SUITE 1
6         MEDIA, PENNSYLVANIA  19063
          215.500.1000
7
          KULIK GOTTESMAN & SIEGEL, LLP
8         BY:  GLEN L. KULIK, ATTORNEY AT LAW
          15303 VENTURA BOULEVARD, SUITE 1400
9         SHERMAN OAKS, CALIFORNIA  91403
          310.557.9200
10

11   FOR DEFENDANT LED ZEPPELIN:

12        PHILLIPS NIZER, LLP
          BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
13        666 FIFTH AVENUE
          NEW YORK, NEW YORK  10103
14        212.977.9700

15

     FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:
16
          LAW OFFICES OF PETER J. ANDERSON, PC
17        BY:  PETER J. ANDERSON, ATTORNEY AT LAW
          100 WILSHIRE BOULEVARD, SUITE 2010
18        SANTA MONICA, CALIFORNIA  90401
          310.260.6030
19
          PHILLIPS NIZER, LLP
20        BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
          666 FIFTH AVENUE
21        NEW YORK, NEW YORK  10103
          212.977.9700
22

23   ///

24   ///

25   ///
```

1    APPEARANCES OF COUNSEL (CONTINUED):

2

3    FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING
     CORPORATION, RHINO ENTERTAINMENT COMPANY:

4
           LAW OFFICES OF PETER J. ANDERSON, PC
5          BY:  PETER J. ANDERSON, ATTORNEY AT LAW
           100 WILSHIRE BOULEVARD, SUITE 2010
6          SANTA MONICA, CALIFORNIA  90401
           310.260.6030
7

8

9    ALSO PRESENT:

10         NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

11         BRAD COHEN, WARNER MUSIC GROUP

12         SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

13         DAN MORENO, TRIAL TECHNICIAN

14

15

16

17

18

19

20

21

22

23

24

25

*I N D E X*

**PLAINTIFF'S WITNESSES:**                                    **PAGE**

**MICHAEL SKIDMORE**
   DIRECT EXAMINATION (CONTINUED) BY MR. MALOFIY      729
   CROSS-EXAMINATION BY MR. ANDERSON                  735
   REDIRECT EXAMINATION BY MR. MALOFIY                751

**MICHAEL EINHORN**
   DIRECT EXAMINATION BY MR. MALOFIY                  757
   CROSS-EXAMINATION BY MR. ANDERSON                  780
   REDIRECT EXAMINATION BY MR. MALOFIY                788

**DEFENDANTS' WITNESSES:**                                   **PAGE**

**LAWRENCE FERRARA**
   DIRECT EXAMINATION BY MR. ANDERSON                 794

*E X H I B I T S*

| TRIAL EXHIBIT NUMBER: | MARKED FOR I.D. PAGE: | RECEIVED IN EVIDENCE PAGE: |
| --- | --- | --- |
| 61-A | -- | 806 |
| 451 | -- | 741 |
| 452 | -- | 744 |
| 453 | -- | 746 |
| 454 | -- | 747 |
| 455 | -- | 747 |
| 1XX | -- | 763 |
| 2016 | -- | 738 |
| 2070 | -- | 740 |
| 2092 | -- | 802 |
| 2405 | -- | 802 |
| 3031-00042 | -- | 733 |
| 450-00001 | -- | 730 |

729

```
 1                LOS ANGELES, CALIFORNIA; FRIDAY, JUNE 17, 2016

 2                            8:30 A.M.

 3                            - - - -

 4        (In the presence of the jury:)

 5             THE COURT:  Okay.  The record will reflect that the

 6   jurors are all present in their respective seats in the jury

 7   box.  The witness is on the witness stand.

 8        Ladies and gentlemen, I hope you had a pleasant evening,

 9   didn't think about this case over the night, came back ready to

10   go, bright-eyed and bushy-tailed, understanding that you have

11   the next two days off, and you can rest then, okay?  So let's

12   give it a hundred percent today.

13        Counsel, you may proceed.

14             MR. MALOFIY:  Thank you, Your Honor.

15             THE CLERK:  Real quickly, Mr. Skidmore, I'll just

16   remind you you're still under oath.

17             THE WITNESS:  Yes.

18             THE CLERK:  Thank you.

19                MICHAEL SKIDMORE, PREVIOUSLY SWORN,

20                  DIRECT EXAMINATION (CONTINUED)

21   BY MR. MALOFIY:

22   Q.   Sir, does the Randy Craig Wolfe Trust receive royalties

23   for the song "Taurus"?

24   A.   Yes.

25   Q.   I'm going to show you an exhibit, 450-00001.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00865**

730

```
1       Can we pull that up?

2            MR. ANDERSON:  No objection.

3            MR. MALOFIY:  May we publish that to the jury?  I've

4   shown it to opposing counsel.

5            MR. ANDERSON:  No objection, Your Honor.

6            THE COURT:  Yes.

7       (Exhibit was displayed on the screen.)

8            MR. MALOFIY:  Can we move it also into evidence, Your

9   Honor?

10            THE COURT:  Sorry?

11            MR. MALOFIY:  Can we also move it into evidence?

12   Thank you.

13            MR. ANDERSON:  I think it actually is already.

14            THE COURT:  Well, it'll be received if it's not.

15            MR. ANDERSON:  Thank you.

16       (Received in evidence, Trial Exhibit 450-0001.)

17   BY MR. MALOFIY:

18   Q.   Mr. Skidmore, do you know what this document is?

19   A.   Yes.  That's the superior court order authorizing the

20   Trust to be created for Bernice Pearl's benefit.

21   Q.   And what year was that?

22   A.   2002.

23   Q.   And when that happened?  What's your understanding of what

24   occurred?  And I can direct your attention to page -- I think

25   it's the third page.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00866**

731

```
 1        If we could scroll down three pages for Mr. Skidmore.
 2            MR. ANDERSON:  Objection, Your Honor, lacks
 3   foundation.
 4            THE COURT:  And the document speaks for itself.
 5   BY MR. MALOFIY:
 6   Q.   What's your understanding of what occurred with the 2002
 7   order from the court?
 8            MR. ANDERSON:  Objection, relevance.
 9            THE COURT:  Sustained.  The document speaks for
10   itself.  His understanding is not important.
11   BY MR. MALOFIY:
12   Q.   Did the doc- -- did the Trust eventually receive the
13   intellectual property and the copyright from "Taurus" pursuant
14   to the court order?
15   A.   Yes.
16   Q.   Did the money go to Quinn Wolfe, his son?
17   A.   No.
18            MR. ANDERSON:  Objection, Your Honor.  The document
19   speaks for itself, and relevance, lack of foundation.
20            THE COURT:  Sustained.  You can read the document, and
21   it's in evidence.
22            MR. MALOFIY:  With the Court's indulgence, one moment.
23            THE COURT:  Okay.
24            MR. MALOFIY:  We're pulling up our last document for
25   this witness, Your Honor.  One moment.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

732

```
 1            THE COURT:  Okay.

 2            MR. MALOFIY:  Your Honor, this is an exhibit from the

 3    amended complaint; however, we're not going to display the

 4    amended complaint.  This is just the copyright attached to it.

 5    I'm going to clear it with counsel.

 6            THE COURT:  Okay.

 7            MR. ANDERSON:  Objection, Your Honor, best evidence.

 8            THE COURT:  I don't know what it is.  Why don't you go

 9    ahead, and I'll make that ruling when I find out what it is.

10            MR. ANDERSON:  Can I describe it to Your Honor?

11            THE COURT:  I'm sorry?

12            MR. ANDERSON:  May I describe it to Your Honor?

13            THE COURT:  He can do that.  He's presenting it.

14            MR. MALOFIY:  Your Honor, this is from the

15    copyright -- United States Copyright Office.  It is the renewal

16    registration which Randy Craig Wolfe had filed in 1996, the

17    year before his death, for the song "Taurus," and he is the

18    copyright claimant identified by the United States Copyright

19    Office.

20            THE COURT:  Overruled.

21            MR. ANDERSON:  Your Honor?

22            THE COURT:  Yes.

23            MR. ANDERSON:  Actually, counsel, I believe, I'm sure

24    unintentionally, has mischaracterized the document.  It is a

25    printout from a website that summarizes information on the
```

733

```
 1    registration.  It is not the registration itself.

 2              THE COURT:  Is that correct, Counsel?

 3              MR. MALOFIY:  This is from the United States Copyright

 4    Office website, which it has all this information for the

 5    public.

 6              THE COURT:  Well, then, he can argue it to the jury at

 7    a later time.  It's going to be overruled.  You may introduce

 8    it.

 9              MR. ANDERSON:  Thank you, Your Honor.

10              MR. MALOFIY:  Thank you.

11        Exhibit 3031-00042, could we publish this and also move it

12    into evidence?

13              THE COURT:  Yes.

14              MR. MALOFIY:  Thank you, Your Honor.

15        I might have read that wrong.  Let me correct that.

16    3031-00042.

17              THE COURT:  Okay.

18              MR. MALOFIY:  Can we publish that --

19              THE COURT:  Yes.

20              MR. MALOFIY:  -- and admit it into evidence?  Thank

21    you.

22        (Received in evidence, Trial Exhibit 3031-00042.)

23        (Exhibit was displayed on the screen.)

24              MR. MALOFIY:  And for the benefit of the witness as

25    well as the benefit and orientation of the jury, can we expand
```

734

1   the center section?

2   Q.   Mr. Skidmore, do you know what this document is?

3   A.   Yes.  It's the renewal -- copy of the renewal registration

4   for the song "Taurus" by Randy California.

5   Q.   Who is the copyright claimant?

6   A.   Randy California.

7   Q.   What is the song title?

8   A.   "Taurus."

9   Q.   And when did Mr. California file this copyright renewal

10  with the copyright office?

11  A.   1996.

12  Q.   Was that roughly a year before his death?

13  A.   Yes.

14  Q.   Has anyone disputed the validity of the Trust?

15       MR. ANDERSON:  Objection, Your Honor, relevance.

16       THE COURT:  Sustained.

17  BY MR. MALOFIY:

18  Q.   Has anyone other than defense counsel ever disputed the

19  validity of the Trust?

20       MR. ANDERSON:  Objection.  First of all,

21  mischaracterizes the facts and the evidence.

22       THE COURT:  Sustained.  It's irrelevant.

23       MR. MALOFIY:  No further questions.

24       THE COURT:  Okay.  Cross.

25  ///

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        **CROSS-EXAMINATION**

2     BY MR. ANDERSON:

3     Q.    Good morning, Mr. Skidmore.

4     A.    Good morning.

5     Q.    By profession, you're a licensed custom broker, right?

6     A.    Correct.

7     Q.    And as a licensed custom broker, you deal in the import

8     and export of goods on behalf of other companies?

9     A.    I'm an intermediary between importers and the government.

10    Q.    Okay.  Are you a relative of Randy Wolfe?

11    A.    No.

12    Q.    Did you have any involvement at all in the creation of the

13    musical composition "Taurus"?

14    A.    No.

15    Q.    And is it correct that you became -- you know Randy Wolfe

16    because you were a journalist?

17    A.    Correct.

18    Q.    So you interviewed him?

19    A.    Numerous times.

20    Q.    And your practice was to record your interviews of Mr. --

21    of people generally that you're interviewing, correct?

22    A.    Not always.  We usually erase them afterwards.

23    Q.    Isn't it true that you were in the habit of recording your

24    interviews of artists such as Randy Wolfe and that you have

25    produced in this case none of your interviews, recorded

```
 1   interviews of Randy Wolfe?
 2   A.    I don't have any.
 3           MR. MALOFIY:  Argumentative.
 4           THE COURT:  I'm sorry?
 5           MR. MALOFIY:  Argumentative.
 6           THE COURT:  Sustained.
 7   BY MR. ANDERSON:
 8   Q.    Who is Quinn Wolfe?
 9   A.    I believe he's Randy's son.
10   Q.    And isn't it -- is it correct that Randy Wolfe was not
11   married when he passed away?
12   A.    That's my understanding.
13   Q.    I believe you testified that you saw Spirit perform at the
14   Rainbow Theatre in London in 1973; is that correct?
15   A.    Yes.
16   Q.    And do you recall that I asked you at your deposition to
17   identify all the songs that you remember Spirit performing?
18   A.    Yes.
19   Q.    And isn't it correct that you did not identify "Taurus" as
20   one of the songs that Spirit performed?
21   A.    That's correct.
22   Q.    And the next time you saw the band Spirit perform was at
23   Colchester University in Essex?
24   A.    I think it might have been the other way around.
25   Q.    Okay.  And you were unable -- I'm sorry.  When you
```

1  identified the songs that you remembered Spirit performing on

2  that occasion, those songs also did the include "Taurus,"

3  right?

4  A.   That's correct.

5       MR. ANDERSON:  If we could -- if I could ask for this

6  kind gentleman to pull up Exhibit 2016, which is the Petition

7  for Substituted Judgment in the superior court action, and it's

8  another filing in the same action that the stipulation was

9  filed in.

10      THE COURT:  Okay.

11      THE CLERK:  And are you asking for the entire document

12 to be --

13      MR. ANDERSON:  Yes, please.

14      THE COURT:  Counsel, only that part that is referred

15 to here in court will be received into evidence.  I don't know

16 if that is the entire document or not.

17      MR. ANDERSON:  There are exhibits that we don't need,

18 Your Honor.

19      THE COURT:  Then they should not come into evidence if

20 they're not going to be used.

21      MR. ANDERSON:  Then as soon as we -- what we would be

22 introducing would be the petition itself and Exhibit A.  The

23 other exhibits are unnecessary for our purpose.

24      THE COURT:  Okay.

25      MR. MALOFIY:  May I see it, Counsel?

738

```
 1              MR. ANDERSON:  Actually, Your Honor, there's one other

 2    page, which is the certification by the superior court, which

 3    is the very last page.

 4              THE COURT:  Okay.

 5              MR. MALOFIY:  Exhibit A?

 6              THE COURT:  Counsel, were these marked beforehand?

 7              MR. ANDERSON:  Yes, they were.

 8              THE COURT:  Okay.

 9              MR. ANDERSON:  And they were produced and --

10              THE COURT:  Okay.  No, I just asked if they were

11    marked beforehand.

12              MR. ANDERSON:  Okay.

13              THE COURT:  You may go ahead, Counsel.

14              MR. ANDERSON:  Thank you, Your Honor.  I just need

15    that page back.

16              THE COURT:  Okay.  It can be received.

17              MR. ANDERSON:  Okay.  Thank you very much, Your Honor.

18        (Received in evidence, Trial Exhibit 2016.)

19        (The exhibit was displayed on the screen.)

20    BY MR. ANDERSON:

21    Q.   Do you recognize the Exhibit 2016, the Petition for

22    Substituted Judgment?

23    A.   Yes.

24    Q.   And that's a filing in --

25              Counsel, could I have the first page back, please?  Thank
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00874**

739

1    you.

2        And that's a filing in the action that Bernice Pearl filed

3    in the superior court when Randy Wolfe was lost at sea?

4            MR. MALOFIY:  Objection.  The document speaks for

5    itself, Your Honor.

6            THE COURT:  Sustained.

7    BY MR. ANDERSON:

8    Q.   And you testified that the Trust receives royalties with

9    respect to the musical composition "Taurus," correct?

10   A.   Correct.

11   Q.   And you -- the Trust receives them from Hollenbeck Music?

12   A.   They come through an intermediary.

13   Q.   They come through an intermediary, but they are from

14   Hollenbeck Music, correct?

15   A.   Yes.  They are the administrator.

16           MR. ANDERSON:  Move to strike as nonresponsive.

17   Q.   Are the payments from Hollenbeck Music?

18           THE COURT:  He answered "yes."  That part will remain

19   in.

20           MR. ANDERSON:  Okay.  Thank you very much, Your Honor.

21       If we could call up Exhibit 2070.

22       I assume there's no objection?

23           MR. MALOFIY:  No objection.

24           THE COURT:  Okay.

25           MR. ANDERSON:  And move it into evidence, Your Honor.

740

```
 1              THE COURT:  Be received.
 2         (Received in evidence, Trial Exhibit 2070.)
 3         (Exhibit was displayed on the screen.)
 4    BY MR. ANDERSON:
 5    Q.    Do you recognize this document?
 6    A.    I can read it.  It says it's exclusive songwriter's and
 7    composer's agreement.
 8    Q.    And is this the document -- well, have you seen this
 9    before?
10    A.    I've got lots of documents in my collection.  I'm -- yes,
11    probably.
12    Q.    And do you have any reason to doubt that this is the
13    songwriter agreement entered into in 1967 between
14    Hollenbeck Music and Mr. Wolfe?
15    A.    I'm not a legal expert.
16              MR. MALOFIY:  Objection.
17              THE COURT:  Sustained.
18              MR. MALOFIY:  Objection.
19              THE COURT:  Sustained.
20              MR. ANDERSON:  If we can please call up Exhibit 451,
21    which is the Randy Craig Wolfe Trust.
22         Any objection?
23              MR. MALOFIY:  Is it just the Trust, or is it the
24    amendments attached thereto?
25              MR. ANDERSON:  It is just Exhibit 451, which is just
```

741

```
 1    the Trust.

 2              MR. MALOFIY:  One moment.

 3              THE COURT:  It'll be received.

 4              MR. ANDERSON:  Thank you, Your Honor.

 5         (Received in evidence, Trial Exhibit 451.)

 6         (Exhibit was displayed on the screen.)

 7    BY MR. ANDERSON:

 8    Q.   Is it your understanding, sir, that this is the agreement

 9    that Bernice Pearl -- excuse me, the Trust agreement that

10    Bernice Pearl used to create the Trust on whose behalf --

11              MR. MALOFIY:  Objection.

12    BY MR. ANDERSON:

13    Q.   -- you filed this action?

14              MR. MALOFIY:  Objection.

15              THE COURT:  Sustained.

16              MR. ANDERSON:  And I move to -- I believe that's

17    actually in evidence already, but I -- out of -- to err on the

18    side of caution, I would move it into evidence.

19              MR. MALOFIY:  It's only partially admitted, and we did

20    object to it the moment a question came out.  We object to this

21    document.

22              MR. ANDERSON:  This is the Trust agreement.

23              MR. KULIK:  It's an improper document.

24              THE COURT:  Excuse me, Counsel.  One attorney at a

25    time.
```

742

```
1        Counsel, what did you say?

2            MR. MALOFIY:  Our position is that we do object to it,

3    and we objected to it once a question was lodged.  Also, only

4    part of -- this is only part of the actual document itself,

5    and, therefore, it's misleading.

6            THE COURT:  It will be overruled.  You can bring in

7    the rest of it if you think it needs clarification at a later

8    time.

9    BY MR. ANDERSON:

10   Q.   If we can -- if I can draw your attention to page 2 of

11   Exhibit 451 --

12           MR. MALOFIY:  We object, Your Honor.

13   BY MR. ANDERSON:

14   Q.   -- Section 3.01.

15           THE COURT:  I don't know what we're talking about.

16   You're talking about this exhibit?

17           MR. ANDERSON:  Yes.  It's the --

18           THE COURT:  And you want to refer to something in this

19   exhibit?

20           MR. ANDERSON:  Yes.

21           THE COURT:  Okay.  Objection?

22           MR. MALOFIY:  Yeah, we do object.

23           THE COURT:  What grounds?

24           MR. MALOFIY:  It's a legal document.  He has no

25   factual knowledge of this.
```

743

```
1          THE COURT:  I think it's premature.  Overruled at this
2  time.
3  BY MR. ANDERSON:
4  Q.   If I can draw your attention to page 2, Section 3.01.  Do
5  you see the language, "Upon the death of Bernice Pearl, the
6  Trust shall terminate and the trustee shall distribute the
7  Trust estate as then constituted as follows:  If
8  Quinn Alexander Wolfe is then living, the trustee shall
9  distribute the entire Trust estate to him"?
10          MR. MALOFIY:  Objection.
11          THE COURT:  Sustained.  It speaks for itself, Counsel.
12          MR. ANDERSON:  It's foundational to the next question,
13  but I'll get back to it, Your Honor.
14          THE COURT:  Speaks for itself.  The document, it's in
15  evidence, it's in front of the jury, it speaks for itself.
16          MR. ANDERSON:  Thank you, Your Honor.
17      Next is Exhibit 452, if we could, which is the first
18  amendment to the Trust.  May we publish it, Your Honor?
19          THE COURT:  Yes.
20          MR. ANDERSON:  Thank you.
21      (Exhibit was displayed on the screen.)
22          MR. ANDERSON:  This was produced by plaintiff, and I
23  would move for its admission.
24          THE COURT:  It will be received.
25          MR. ANDERSON:  Thank you, Your Honor.
```

744

```
 1          (Received in evidence, Trial Exhibit 452.)

 2   BY MR. ANDERSON:

 3   Q.   Mr. Skidmore, is this the first amendment to the trust

 4   agreement that created the Trust on whose behalf you sued?

 5   A.   That's what it says.

 6   Q.   And if you look at Section 3.01, under this amendment, the

 7   Trust assets upon the death of Bernice Pearl go to

 8   Bernard Pearl.  Do you see that?

 9          MR. MALOFIY:  Objection.

10          THE COURT:  Sustained.  It speaks for itself, Counsel.

11          MR. ANDERSON:  I'm just trying --

12          THE COURT:  The jury can read the exhibit.  You can

13   ask him questions, but you don't read the exhibit in.  It's

14   already in front of the jury.  They can read it.

15          MR. ANDERSON:  Thank you, Your Honor.

16   Q.   Mr. Skidmore, do you have any knowledge as to who

17   Bernard Pearl is?

18   A.   I believe it's Bernice Pearl's brother.

19   Q.   Okay.  And do you have any information as to why

20   Bernice Pearl changed the Trust so that the Trust assets,

21   instead of going to Quinn Alexander Wolfe, Randy Wolfe's only

22   son, it would go to Bernice Pearl's brother?

23          MR. MALOFIY:  Objection, lack of foundation.

24          THE COURT:  Overruled.

25          THE WITNESS:  I have no idea.
```

745

```
 1   BY MR. ANDERSON:

 2   Q.   Isn't it true, sir, that Bernice Pearl -- trying to think

 3   of how to put this -- that it made a difference to

 4   Bernice Pearl that Quinn Wolfe was the illegitimate son of

 5   Randy Wolfe?

 6            MR. MALOFIY:  Objection.

 7            THE COURT:  Sustained.  Sustained.

 8       And you're not to assume anything that's said in a

 9   question is evidence, obviously.  You can say anything in a

10   question.

11       Sustained.

12            MR. ANDERSON:  May I read his deposition testimony to

13   that effect?

14            THE COURT:  No.  You can ask him questions if it's

15   relevant.  That's not relevant, and so you can ask your next

16   question, Counsel.

17   BY MR. ANDERSON:

18   Q.   You were --

19            THE COURT:  The question is, is there a valid trust

20   and what does that trust say.

21            MR. ANDERSON:  There is also the defense of unclean

22   hands, Your Honor, and the circumstances under which Quinn lost

23   his rights to the estate.

24            MR. MALOFIY:  Objection.

25            THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. ANDERSON:  The next exhibit is the second

 2   amended -- amendment to the Trust, which is Exhibit 453, if I'm

 3   reading this correctly.  May we publish it, Your Honor?

 4          THE COURT:  Yes.

 5          MR. ANDERSON:  Thank you.

 6      (Exhibit was displayed on the screen.)

 7          MR. ANDERSON:  And I would move for its admission.

 8          THE COURT:  It will be received.

 9          MR. ANDERSON:  Thank you, Your Honor.

10      (Received in evidence, Trial Exhibit 453.)

11   BY MR. ANDERSON:

12   Q.   Is this the amendment that made you -- or that, among

13   other things, made you the co-trustee with Bernice Pearl of the

14   Trust on whose behalf you sued?

15          MR. MALOFIY:  Objection, speaks for itself,

16   Your Honor.

17          THE COURT:  Overruled.

18      You can testify to the document.

19          THE WITNESS:  No, I don't believe it is, actually.

20          THE COURT:  Okay.

21   BY MR. ANDERSON:

22   Q.   If I can draw your attention -- okay.  Fine.  Thank you.

23      You are mentioned in this amendment, correct?

24   A.   Yeah, but not as a trustee or a beneficiary.

25   Q.   Thank you.
```

1      I won't ask him a question.  I'll just rely on the

2  document itself.

3      And the next document is the third amendment to the

4  Randy Craig Wolfe Trust, which has been marked as Exhibit 454.

5      May I publish that, Your Honor?

6          THE COURT:  Yes.

7          MR. ANDERSON:  Thank you.  And I would move for its

8  admission.

9          THE COURT:  Be received.

10     (Received in evidence, Trial Exhibit 454.)

11     (Exhibit was displayed on the screen.)

12  BY MR. ANDERSON:

13  Q.  If you look in Section 3.01, there is a reference to the

14  beneficiary being changed to Janet Patrice Wolfe.  Do you have

15  an understanding of who that is?

16  A.  Yes.  That's one of the daughters.

17  Q.  All right.  The next exhibit is the fourth amendment,

18  which is Exhibit 455.

19     May we publish that, Your Honor?

20         THE COURT:  Yes.

21         MR. ANDERSON:  And I would move for its admission.

22         THE COURT:  Yes.

23     (Received in evidence, Trial Exhibit 455.)

24     (Exhibit was displayed on the screen.)

25  ///

748

```
 1   BY MR. ANDERSON:

 2   Q.   Who is Marla Arin Randall?

 3   A.   She's another daughter of Bernice.

 4   Q.   Do you have any agreement to compensate Quinn Wolfe with

 5   respect to any recovery you have in this case?

 6          MR. MALOFIY:  Objection, irrelevant.

 7          THE COURT:  Overruled.

 8          THE WITNESS:  No.

 9   BY MR. ANDERSON:

10   Q.   Were you present in December of 1968 when Spirit performed

11   at the Denver Auditorium?

12   A.   No.

13   Q.   Are you familiar with the English compilation album,

14   The Rock Machine Turns You On?

15   A.   Yes.

16   Q.   Did you own that compilation album in the 1960s?

17   A.   Believe I did, yes.

18   Q.   And that's -- that compilation has the Spirit recording

19   "Fresh Garbage" on it?

20   A.   That's correct.

21   Q.   And it does not have "Taurus"; is that correct?

22   A.   That's correct.

23   Q.   And Spirit performed covers of the Beatles song.  It

24   per- -- Spirit, when it performed publicly, performed Beatles

25   songs; is that correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00884**

749

1    A.   Actually, that's incorrect.  They only played one Beatles

2    song in their entire career, the original band.

3    Q.   Did you go to every performance in the entire career of

4    Spirit?

5    A.   No.

6         MR. ANDERSON:  I would move to strike the answer as

7    speculation and lacking foundation.

8         THE COURT:  It'll be stricken with the exception that

9    he has said that they at least recorded one.

10        MR. ANDERSON:  Performed one.

11        THE COURT:  Or performed one.

12   BY MR. ANDERSON:

13   Q.   Do you recall testifying in your deposition that Spirit

14   performed covers of the Beatles song?

15   A.   Later on in the '70s, late '70s.  Different version of

16   Spirit.

17   Q.   Okay.  Was Randy Wolfe a member of this different version

18   of Spirit?

19   A.   Yes.

20   Q.   And did this different version of Spirit with Randy Wolfe

21   perform covers of the Beatles songs?

22   A.   Maybe one or two.

23   Q.   Okay.

24        If Your Honor would just bear with me.

25        Is it correct, sir, that when you became involved with

750

```
 1   Bernice Pearl, that you learned that there was a storage room

 2   full of recordings of Spirit and of Randy Wolfe?

 3          MR. MALOFIY:  Objection, Your Honor.  I apologize,

 4   could I have that read back?  I missed the first part.  My

 5   apology.

 6          THE COURT:  Why don't you state the question again,

 7   Counsel.

 8          MR. MALOFIY:  Thank you, Your Honor.

 9          MR. ANDERSON:  Absolutely.

10   Q.   You were dealing with Bernice Pearl prior to the time that

11   you became a trust -- a co-trustee with her of the Trust,

12   correct?

13   A.   Correct.

14   Q.   And did you learn that when Randy Wolfe passed away, he

15   left a storage room full of recordings of himself and Spirit

16   and possibly others?

17   A.   Correct.  Those are the tapes I used to release 12 albums

18   and 40 CDs.

19   Q.   Right.  And when you say "release," they were sold to the

20   public?

21   A.   Yes, by record labels.

22          MR. ANDERSON:  Thank you.

23       Thank you, Your Honor.  That's all the questions I have.

24          THE COURT:  Thank you, Counsel.

25       Redirect.
```

751

**REDIRECT EXAMINATION**

1

2    BY MR. MALOFIY:

3    Q.   Has Janet Wolfe, who took the stand earlier in this case,

4    ever disputed you as the trustee?

5    A.   No.

6         MR. ANDERSON:  Objection, relevance, Your Honor.

7         THE COURT:  Sustained.

8    BY MR. MALOFIY:

9    Q.   Has Marla Wolfe ever disputed you --

10        THE COURT:  Sustained, Counsel, if you're talking

11   about dispute of the Trust.  I just want to make sure you

12   understand the last ruling, and I don't want you to ask the

13   same question again.  So go ahead.

14        MR. MALOFIY:  I'm sorry.

15        THE COURT:  That's okay.

16   BY MR. MALOFIY:

17   Q.   Are you familiar with the fifth amendment of the Trust?

18   A.   Yes.

19   Q.   And is it accurate the fifth amendment of the Trust allows

20   that the assets of the Trust and its estate and income shall be

21   used for the purpose of providing musical instruments --

22        MR. ANDERSON:  Objection, Your Honor.  This is within

23   the motion in limine.

24        THE COURT:  Excuse me, Counsel.

25        MR. MALOFIY:  The door was opened.

752

```
1              THE COURT:  Counsel, just a second.  One at a time.
2         Objection why?
3              MR. ANDERSON:  It's within the motion in limine
4    relating to the Trust and its use of funds.  That was granted.
5    And we did not offer the fifth amendment.
6              MR. MALOFIY:  The fifth --
7              THE COURT:  Overruled.
8              MR. MALOFIY:  Thank you, Your Honor.
9    Q.   Is it accurate that the assets of the Trust, estate, and
10   its income shall be used for the purpose of providing musical
11   instruments and associated materials --
12             MR. ANDERSON:  Your Honor --
13             THE COURT:  Excuse me.  That is sustained, Counsel,
14   yes.  As to what the funds were used for was sustained, is a
15   subject of a motion in limine.  It was excluded.  You can't get
16   into that.
17             MR. MALOFIY:  On the narrow issue of opening the door
18   to the beneficiary, there was issue --
19             THE COURT:  Counsel, is this a question?
20             MR. MALOFIY:  No.  I'll ask my next question, Your
21   Honor.
22             THE COURT:  Okay.
23   BY MR. MALOFIY:
24   Q.   Is the beneficiary of the Trust Ventura County School
25   District?
```

753

```
1            MR. ANDERSON:  Objection, Your Honor.

2            THE COURT:  Sustained.  It has no relevancy what

3    they're using the Trust for other than if it's going to one of

4    the parties in this case.

5            MR. MALOFIY:  One second, Your Honor.

6            MR. ANDERSON:  Also, Your Honor, given that he is --

7    the question mischaracterizes the Trust, the document, I think

8    it's appropriate that the jury be instructed to ignore the

9    statement that counsel just made.

10           THE COURT:  Counsel, anytime I sustain an objection,

11   they're to ignore the question.  They know that.

12           MR. ANDERSON:  Thank you, Your Honor.

13           MR. MALOFIY:  Your Honor, if I may, briefly.

14           THE COURT:  Yes.

15           MR. MALOFIY:  The issue is --

16           THE COURT:  Oh, no.  We don't argue anything in front

17   of jury, Counsel, as far as legal issues.  You do that anytime

18   we take a break in the case.  We can do that outside the

19   presence of the jury.

20       It's very clear that the Court stated that anything as to

21   what the monies in the Trust are used for other than going to

22   the beneficiaries, what it's being used for or where it's being

23   sent or whatever, whoever's going to benefit from it was

24   excluded from this case.

25       So go ahead and ask your next question.
```

754

1        MR. MALOFIY:  The only issue I had was it was asked,

2    the beneficiary of the first, second, or third amendment, by

3    Mr. Anderson.

4        THE COURT:  Counsel, are you asking a question?  We

5    don't argue matters of law in front of the jury.

6        MR. MALOFIY:  I don't want to do that, Your Honor.

7        THE COURT:  Okay.

8    BY MR. MALOFIY:

9    Q.  When Mr. Anderson was asking you questions as far as the

10   beneficiaries, do you recall him asking questions of the first,

11   second, and third amendment?

12   A.  Yes.

13       MR. ANDERSON:  Objection, Your Honor.

14   BY MR. MALOFIY:

15   Q.  The fifth amendment, who's the beneficiary?

16       MR. ANDERSON:  Objection, Your Honor.

17       THE COURT:  Sustained.

18       MR. MALOFIY:  We move to admit the fifth amendment,

19   Your Honor.

20       MR. ANDERSON:  Objection, Your Honor.

21       THE COURT:  Based on what has already been presented

22   to the Court, sustained.  Under the rules that have been

23   already set out before the trial and motions in limine,

24   sustained.

25       MR. MALOFIY:  One moment, Your Honor.  With the

755

```
 1    Court's indulgence, one moment.
 2              THE COURT:  Yes.
 3    BY MR. MALOFIY:
 4    Q.   Sir, there was an accusation by defense counsel that you,
 5    in the opening, had unclean hands.  Can you show the jury your
 6    hands?  Can you do that?
 7              THE COURT:  Sustained.
 8         Counsel, there's no reason to be playing to the jury like
 9    this.  Ask a relevant question.
10              MR. MALOFIY:  That's it, Your Honor.
11              THE COURT:  Okay.
12              MR. ANDERSON:  No recross, Your Honor.
13              THE COURT:  Okay.  You may step down, sir.
14         Okay.  Next witness.
15              MR. MALOFIY:  One moment, Your Honor.  I have to
16    summons him from the hallway.
17              THE COURT:  Okay.
18         While we're waiting for the next witness, ladies and
19    gentlemen, just so you understand what's going on here, the
20    suit is that the Trust owns the property rights interest here.
21    What the Trust does with them afterwards is not relevant.  The
22    question is whether or not the Trust owns the property rights
23    or not.
24         (The witness entered the courtroom.)
25              THE CLERK:  Good morning.  Right here to be sworn,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

756

1   please.

2        Counsel, may I have the name of your witness, please?

3            MR. MALOFIY:  I'm sorry.  Oh, Dr. Michael Einhorn,

4   Ph.D. in economics here.

5            THE COURT:  Okay.  All we need is his name.

6            MR. MALOFIY:  I'm sorry.

7            THE CLERK:  Do you solemnly swear the testimony that

8   you are about to give in the matter now before the Court shall

9   be the truth, the whole truth, and nothing but the truth, so

10  help you God?

11           THE WITNESS:  I do.

12           THE CLERK:  Thank you.  You may be seated.  Up here.

13  Sorry.

14       May I please ask that you state your full name for the

15  record and spell your last name.

16           THE WITNESS:  Michael Allan Einhorn, E-i-n-h-o-r-n.

17           THE CLERK:  Thank you.

18           THE COURT:  Okay.  You may inquire, Counsel.

19           MR. MALOFIY:  I'm pulling a document, exhibits --

20           THE COURT:  Okay.

21           MR. MALOFIY:  -- with the Court's indulgence.

22       I'd thank the Court for a moment of time.  I'm looking for

23  a clean exhibit without writing on it.

24       Thank you for the Court's patience, and the jury.

25  ///

1    **MICHAEL EINHORN, CALLED AS A WITNESS BY THE PLAINTIFF,**

2                        **DIRECT EXAMINATION**

3    BY MR. MALOFIY:

4    Q.   Mr. Einhorn, thank you for being here.

5         Where do you live?

6    A.   I live in New Jersey.

7    Q.   Let me apologize.  Dr. Einhorn, correct?

8    A.   Correct.

9    Q.   All right.  Thank you.  And thank you for being here.  I

10   know you came in late last night; is that correct?

11   A.   Correct.

12   Q.   Now, can you tell me what your background is.

13   A.   I have a Ph.D. in economics from Yale University.  I

14   taught economics at Rutgers University.  I also taught as an

15   adjunct professor in music economics at Fordham University and

16   also in business at the Columbia University Graduate School of

17   Business.  And I worked in the music industry since 1997 on

18   various matters connected with licensing and litigation.

19   Q.   Now, did you have an opportunity -- and as it relates to

20   this case, did you have an opportunity -- let me strike that.

21        Have you done economic analysis for copyright cases in the

22   past?

23   A.   Yes, I have.

24   Q.   And how many of those analyses have you done?

25   A.   I'd say about, oh, 10 to 15.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

758

1  Q.   Have you ever testified at time of trial?

2  A.   I have.

3  Q.   Have you ever been precluded by a court?

4  A.   Never.

5  Q.   Is your Ph.D. in economics?

6  A.   My Ph.D. is in economics.  I also have a Bachelor of Arts

7  degree in economics from Dartmouth and a Master of Arts degree

8  in economics from Yale.

9  Q.   You can also read music and write music?

10  A.   I can play music, so I can read music enough to be able to

11  play a piano and a clarinet.

12  Q.   All right.  Now, how long have you been doing economic

13  analysis as it relates to copyright cases or the damages that

14  flow in and out from record companies?

15  A.   I joined Broadcast Music Incorporated in 1997, where I got

16  involved in licensing, and then I worked in litigation since

17  about 2001, 2002.

18       MR. MALOFIY:  I'd like to admit Dr. Einhorn as

19  plaintiff's expert for purposes of establishing damages in this

20  case.  Any objection?

21       THE COURT:  You may ask him questions as an expert,

22  Counsel.

23       MR. MALOFIY:  Thank you.

24  Q.   Can you tell me a little bit about your involvement in

25  this case and what, if anything, you reviewed to come to

759

1    your decisions.

2    A.    Yeah.  I reviewed 50,000 pages of documents that the

3    defendant provided for me to use on the activity of its

4    publishers, its producers, its artists, and the record labels

5    that all control some kind of income stream in this song.

6    Q.    Now, to be clear, did you receive all those documents at

7    one time?

8    A.    I received 40,000 sometime in early April -- early

9    February on a CD, and I received another 10,000 on Monday

10   night.

11   Q.    Now, were you hard at work this week and even last night

12   and this morning finishing certain schedules with the updated

13   information that defense counsel provided us, I believe, on

14   Monday night or Tuesday?

15           MR. ANDERSON:  Objection, Your Honor.

16           THE COURT:  Sustained.

17       It's irrelevant when you got the material on it.  You can

18   ask your next question.

19   BY MR. MALOFIY:

20   Q.    Did you initially put a report together based on not --

21   based on information that was provided at that time?

22   A.    I did.

23   Q.    And then did you recently have to amend those numbers with

24   exhibits that you have here today?

25   A.    Correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. MALOFIY:  All right.  I would like to show defense

2     counsel exhibits, if he has any objection.

3          MR. ANDERSON:  I've never seen this before,

4     Your Honor.  There was updated information provided last week,

5     but this particular document, I've never seen.  We got no

6     supplemental report.

7          MR. MALOFIY:  It was provided this week, information,

8     on Monday night before trial.

9          MR. ANDERSON:  That's -- actually, we updated as --

10    further requests as we received it, but what I'm saying is,

11    I've never seen this particular document.

12         THE COURT:  Do you need time to review it?

13         MR. ANDERSON:  I -- that would be great, yes, Your

14    Honor.

15         THE COURT:  Okay.  Well, you can spend the time to

16    review it, but let's move on to another area, then.  We'll get

17    back to this after you've reviewed it.

18         MR. ANDERSON:  Thank you.

19    BY MR. MALOFIY:

20    Q.   I'd like to go through and just explain to the jury what

21    you had to do to come to your determination of how much dam- --

22    or how many damages or how much the value of damages were in

23    this case.

24    A.   We have to understand the song makes its money through

25    various uses.  The use that you know most commonly is through

761

```
 1   sale of the record on which the song is recorded.  In this
 2   case, what we have to do is look at the revenues earned by the
 3   record label, which would be Atlantic Records or
 4   Rhino Entertainment, that would tell us how much money the
 5   record label made from the use of that song.  Every time you
 6   buy its track or a CD, you pay the label.  The record label
 7   then will parse that out to many costs, but there are three
 8   that are relevant in this case.
 9       First, they pay the artist.  Mr. Page and Mr. Plant both
10   got paid once the record label got paid for that song.
11       Second is the producer.  That's the person who puts the
12   track together, who may or may not be an artist on the track.
13   In this case, Mr. Page was the producer, but Mr. Plant was not.
14       And finally, and this is very, very important, the record
15   label itself does not own the song.  The person who owns the
16   song are the people who wrote the song, which is not the record
17   label.  So the record label also has to pay the people who
18   wrote the song.
19       Now, Mr. Page and Mr. Plant wrote the -- and -- wrote this
20   particular song, so they are the ultimate people who are
21   entitled to royalties for use of their song.  But they also
22   established some pass-through entities that you have learned
23   about that collected the revenue on behalf of them.  So the
24   record label paid these pass-through entities, and those
25   entities then passed it through to Mr. Page and Mr. Plant, who
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00897**

762

```
 1   were the original songwriters.

 2            THE COURT:  Okay.

 3   BY MR. MALOFIY:

 4   Q.   Did you have an opportunity to go through and summarize

 5   the label revenues from record sales in this case?

 6   A.   I did.

 7            MR. MALOFIY:  All right.  I have what I previously

 8   presented to counsel.  This is what -- the updated numbers we

 9   received just recently this week.  We're going to use this as

10   an exhibit.

11       Do you have an issue with it?

12            MR. ANDERSON:  Yes.

13       I'm sorry, I thought I was going to get an opportunity to

14   review this.

15            THE COURT:  Oh, excuse me.  You can review this either

16   through yourself or through your co-counsel on it while the

17   testimony's going on.

18       Okay, go ahead.

19            MR. MALOFIY:  I'm at the point where I'd like him to

20   go through the label revenues which were provided and produced

21   by defense counsel in this case.

22            THE COURT:  Okay.

23            MR. MALOFIY:  May I do that, Your Honor?

24            THE COURT:  Yeah.

25            MR. MALOFIY:  May I publish it to the jury?
```

```
 1              THE COURT:  Yes.

 2              MR. MALOFIY:  I'd move it for admission.

 3              THE COURT:  It will be received.

 4              THE CLERK:  What number are we calling it?

 5              MR. MALOFIY:  We're going to have to give it a fresh

 6   number, so let's call it 100,000 -- 100,000 -- just can we make

 7   it Exhibit 1XX.

 8              THE CLERK:  1XX.  Okay.

 9              MR. MALOFIY:  Thank you.

10        (Received in evidence, Trial Exhibit 1XX.)

11   BY MR. MALOFIY:

12   Q.   I'm not sure how clear that is.  Can you see that

13   document?

14   A.   I can.

15   Q.   Okay.  And can you read what's on there.

16   A.   We have -- remember I said the record label collects the

17   money for the song.  These are five ways the record label makes

18   money for this song.

19        They sell physical albums.  You go to the record store,

20   you buy the album.

21        They sell digital albums online.  You go to Amazon, you

22   can buy the album.

23        They sell digital singles online.  You can buy this

24   particular song if you go on Amazon.

25        They also sell, if you believe it, if you want it,
```

1  ringtones and ringbacks.  People walk around with their cell

2  phones and hear the song.

3      And finally, they sell streaming of the song on services

4  like Spotify.  Stream a song, you don't own the song if you're

5  the user.  You just listen to it and then hang up, and then you

6  don't have access to the song anymore unless you stream it

7  again.

8  Q.   Now, to be clear, record sales, physical albums, which was

9  indicated by defendants were 1.1, roughly, million dollars,

10  correct?

11 A.   Correct.

12 Q.   And the digital albums or downloads was 382,000 roughly;

13 is that correct?

14 A.   Correct.

15 Q.   And the digital singles download was roughly 1.1 million

16 as well, correct?

17 A.   Correct.

18 Q.   And the ringtones and ringbacks were 115,000, correct?

19 A.   Correct.

20 Q.   And the streaming was 334 -- well, I'd round it to

21 335,000; is that correct?

22 A.   Correct.  This is the most recent information that the

23 defendants provided on Monday night.

24 Q.   And so in total --

25          THE COURT:  I'm sorry, Counsel.  I'm going to ask you

```
 1   please to avoid talking about what -- this case should have

 2   been prepared long before trial.  There's no reason you didn't

 3   have this information long before trial.  To insinuate to the

 4   jury or anybody else that somebody is doing something wrong

 5   because I got it late or I'm under stress because I got

 6   something late is highly inappropriate.

 7        In discovery, you've had plenty of time to discover and to

 8   make motions to compel.  It apparently has not been done in

 9   this case.  It is not relevant when this came to the witness,

10   and so I'm going to ask you to avoid talking about this.  This

11   should have been in months ago.

12        Next question.

13             MR. MALOFIY:  Respectfully, it's only because they

14   were just --

15             THE COURT:  Counsel, next question.

16   BY MR. MALOFIY:

17   Q.   Now, if you go to total all those revenue streams

18   indicated by the defendants, what is that?

19   A.   3,042,498.

20   Q.   Now, I see something there on the column.  It says,

21   "Number of tracks, one-eighth" and has 12.5 percent.  Can you

22   tell the jury what that is and why it's there.

23   A.   Yes.  The numbers that I report in the left column are

24   numbers that were actually lifted off of defendant documents

25   without abridgment.  I just took what they gave me and ran with
```

766

1  it.

2      When they gave me those numbers, those numbers for the two

3  albums -- you'll notice that the numbers differ.  There's a

4  right column that's different than the left column from the

5  first two matters of the albums.  What they do is, they take

6  the revenues earned by an album and multiply it.  They prorate

7  it and divide it over the number of tracks.

8      Okay.  I never saw what that proration technology was,

9  what they used.  But as conservative as possible, being as

10 leaning to the defendant as possible, the ratio would be

11 one-eighth.  That is, there were -- there were eight tracks on

12 an album, on the most important album, and those eight tracks,

13 one of them is "Stairway to Heaven."

14      Now --

15          MR. ANDERSON:  Objection.

16          THE COURT:  Sustained.  As to whether or not that's

17 the most important part of the album?

18          MR. ANDERSON:  Yes.

19          THE COURT:  Sustained.

20 BY MR. MALOFIY:

21 Q.  Now, if you look there, if you multiply by the eight

22 tracks, what's the gross revenues that the label received for

23 physical albums of *Led Zeppelin IV* in the statutory period?

24          MR. ANDERSON:  Objection, relevance.

25          THE COURT:  Sustained.

767

```
1        MR. MALOFIY:  This goes to our damages, gross
2   revenues.
3   Q.    What is your opinion as an economist as to the gross
4   revenues attributable or encompassing the "Stairway to Heaven"
5   composition?
6   A.    Okay.  For physical albums, most conservatively,
7   8,931,000, as is reflected in the right column.
8   Q.    As far as digital albums, what is the number that you've
9   come to as an expert in this case?
10  A.    Most conservatively, 3,061,384.
11  Q.    For digital singles, what's the number that you have come
12  to in your expert opinion?
13  A.    That doesn't change.  That's a single.  It's not the
14  album.
15  Q.    And if you go to the next one down, ringtones and
16  streaming, it is also the same numbers, correct?
17  A.    Exactly so.  You only buy the particular song; you don't
18  buy the album.
19  Q.    Now, in the most conservative estimate and conclusion
20  based upon your analysis of this matter, you've come up with a
21  total label revenue that incorporates the "Stairway to Heaven"
22  composition at 13 -- 13,535,834 dollars; is that correct?
23  A.    Based on the numbers that the defense has given me, and
24  based on the most conservative assumption regarding proration,
25  that is the number, the dollar sign, of what works that came in
```

768

```
1    on that song or on that album for these record labels.
2    Q.    Now, has defendants ever produced an expert to dispute
3    your numbers?
4              MR. ANDERSON:  Objection, Your Honor.
5              THE COURT:  Sustained.
6    BY MR. MALOFIY:
7    Q.    Has there been any rebuttal of the accuracy of your
8    numbers?
9              MR. ANDERSON:  Objection, Your Honor.
10             THE COURT:  Overruled.  Overruled.  Overruled.
11        Did you take into consideration in your opinion any
12    rebuttal of your numbers?
13             THE WITNESS:  I have not heard, ever, any rebuttal of
14    these numbers.
15             THE COURT:  Okay.
16             MR. MALOFIY:  Thank you.
17   Q.    Now, in looking at additional monies that are attributable
18   to the "Stairway to Heaven" composition, did you also have an
19   opportunity to see and analyze a Rhino recording contract?
20   A.    I did.
21   Q.    And what did that Rhino recording contract -- what did
22   that Rhino recording contract indicate?
23             MR. ANDERSON:  Objection, Your Honor -- well,
24   withdrawn.
25             THE WITNESS:  Rhino Entertainment issued re-releases
```

769

```
 1   of several important Led Zeppelin albums, and to obtain rights

 2   to re-release the albums, they paid an advance to one of

 3   Led Zeppelin's pass-through entities.  That pass-through entity

 4   is called Super Hype.  And in the course of doing business,

 5   they paid to Super Hype advance dollars, they gave them a

 6   certain amount of money up front, for the right to release

 7   popular -- a popular live album and several popular non-live

 8   albums that contain "Stairway to Heaven."

 9   BY MR. MALOFIY:

10   Q.   How much was the amount of the advance in the statutory

11   period?

12          MR. ANDERSON:  Objection, Your Honor.  Lack of

13   foundation as to what he means by statutory period, and also

14   the document speaks for itself.

15          THE COURT:  Why don't we state the period you're

16   asking for, Counsel, between what period and what period.

17          MR. MALOFIY:  From three years before the filing of

18   the lawsuit till today.

19          THE COURT:  That doesn't help.  Why don't you give us

20   the dates of the filing of the lawsuit and three years before.

21          MR. MALOFIY:  May 31st, 2014, was the filing of the

22   lawsuit, so it would be -- '13, '12, '11 -- May 31st, 2011.

23          THE COURT:  Okay.  During that period of time.

24          THE WITNESS:  Well, I'm looking at the contract right

25   now.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  What happened was, after May 31st, 2011,

 3    Rhino paid Super Hype 10 million dollars for the right to

 4    re-release the Led Zeppelin live album that was recorded

 5    originally back in 2007.

 6              THE COURT:  Okay.

 7              THE WITNESS:  And I'm looking at the contents of that

 8    album.  That album had 17 songs.

 9              THE COURT:  I'm sorry, you've answered the question.

10        Next question.

11    BY MR. MALOFIY:

12    Q.   Did you say 10 million and then an additional 5 million?

13    A.   That's 10 million for the live.  Then they paid them an

14    additional 5 million for the rights to re-release several other

15    albums.

16    Q.   Now, to be clear, I just want to focus your testimony,

17    that's in addition to what we just discussed in the record --

18    the label revenues of 13.5 million, correct?

19    A.   Correct.

20    Q.   Now, is there also additional monies, publishing monies,

21    that was received pursuant to a contract which are within the

22    statutory period of May 31st, 2011, until today?

23              MR. ANDERSON:  Objection, Your Honor.  First of all,

24    it lacks foundation, but counsel's referring to the 2008

25    agreement, and the Court has already ruled that payments under
```

771

```
 1    the 2008 agreement are outside the --

 2            THE COURT:  Sustained.

 3            MR. ANDERSON:  -- statute of limitations.

 4            THE COURT:  Sustained.

 5            MR. MALOFIY:  My question's actually a little bit

 6    different.

 7            THE COURT:  Why don't you restate the question, then.

 8    BY MR. MALOFIY:

 9    Q.   Did you have an opportunity to look at the financial

10    statements of the monies that were passed through to Mr. Plant

11    and Mr. Page?

12    A.   Correct.

13    Q.   And when you reviewed those financial statements which

14    were admitted into evidence yesterday in part, did you have an

15    opportunity to see the income that was coming in, the expenses,

16    and what was left?

17    A.   Yes, I did.

18    Q.   And did the expenses wipe out all the income and leave a

19    net profit of zero?

20    A.   Correct.

21            MR. ANDERSON:  Objection, document speaks for itself,

22    and also counsel is talking about payments under the 2008

23    agreement.  They're publishing payments.  Outside the statute

24    of --

25            THE COURT:  Why don't we clarify what documents we're
```

772

1    talking about.

2         MR. MALOFIY:  These documents were used in Mr. Page's

3    testimony yesterday.  They're the financial --

4         THE COURT:  Counsel, your question, why don't you

5    clarify it for the witness so he can testify.

6    BY MR. MALOFIY:

7    Q.   Do you understand what documents I'm referring to?  And to

8    be particular, it is the financial statements, and I'll --

9    financial statements marked as D39243 to D39321.

10   A.   Yes.

11   Q.   Okay.  Did you have an opportunity to look at those?

12   A.   I did.

13   Q.   And did all the money that came into the -- into that

14   entity in 2015, year ending March 2015, if you look at the

15   second, third, I believe fourth page, does it indicate

16   6.6 million pounds going in, 6.6 million pounds going out, and

17   leaving a profit of zero?

18        MR. ANDERSON:  Your Honor, again, those are payments

19   under the 2008 --

20        THE COURT:  Understand.  Counsel, I understand your

21   objection, and --

22        MR. ANDERSON:  Thank you.

23        THE COURT:  Let me ask the witness.  We're referring

24   to any monies coming in and going out that you can attribute to

25   any re-release after 2011.  Some of those payments may have

773

```
 1    come in from -- they may be old payments coming in at all.
 2    Have you been able to distinguish what came in just during that
 3    time period?
 4            THE WITNESS:  Yes, I have.
 5            THE COURT:  Okay.  Then your question is, just during
 6    that time period.
 7    BY MR. MALOFIY:
 8    Q.   And what was -- what is your conclusion?
 9            THE COURT:  Excuse me, Counsel.
10            MR. ANDERSON:  The problem is, this gentleman doesn't
11    agree with Your Honor's ruling.  He is basing that answer on
12    his belief that the payments under the 2008 agreement --
13            THE COURT:  Counsel, you can get into that at
14    cross-examination.  What I've asked him is if he can tell us
15    and designate what money came in and went out solely based on
16    the re-release after 2011, not based on any prior obligations
17    or anything else, and he said he could.
18        So go ahead.
19            MR. ANDERSON:  Thank you, Your Honor.
20            THE WITNESS:  Yes.  According to state -- according to
21    the page I have in front of me, there was an invoice sent out
22    in between April 1st, 2014, and March 31st, 2015.  There is an
23    invoice here.
24            THE COURT:  Okay.  But keep in mind, it's not relevant
25    what the invoice said.  What's relevant is if you can show us
```

774

```
1   whether or not that invoice reflects only money that was

2   attributed to productions after 2011.  So we want to make sure

3   that the invoice doesn't encompass something from 10 years ago

4   or 15 years ago.  So the question is, can you do that?

5            THE WITNESS:  I believe that is correct, yes.

6            THE COURT:  Okay.  Go ahead, then.

7   BY MR. MALOFIY:

8   Q.   Please answer the question.  What, in your expert opinion

9   and analysis, were you able to determine the revenues received

10  from -- from, excuse me, May 31st, 2011, until today as it

11  relates to publishing?

12  A.   Well, I said first -- remember, I'm doing it, I said,

13  April 1st, 2014, to March 31st, 2015.  6.6 million pounds.

14           THE COURT:  Okay.

15  BY MR. MALOFIY:

16  Q.   And were all the expenses eat up -- did all the expenses

17  eat up that income?

18  A.   Correct.

19  Q.   And is that in addition to the 13.5 million, the

20  15 million revenues from Rhino, and -- this is in addition,

21  correct?

22  A.   Yes.

23  Q.   What's the total number if you add those up?

24  A.   Well, that's 6.6 million.

25           Now let me go to the previous year.  According to this
```

1    document, we have, for the period from April 1st, 2013, to

2    March 31st, 2014, we have an additional -- well, here it's a

3    very small amount.  The turnover is listed as 622.

4    Q.   Mr. Einhorn, perhaps I could direct your attention.  If we

5    go to the first document, D39247, that's the one we just

6    discussed where there was 6.6 million in, 6.6 million out,

7    leaving zero, correct?

8    A.   Correct.

9    Q.   I'd like to direct your attention to D39250.  Do you see

10   that?

11   A.   Yes.

12   Q.   It says related party disclosures, Succubus Music, and it

13   says Page next to it.  Sons of Einion, it says Plant next to

14   it.

15        Are the two numbers for Page and Plant respectively

16   2.3 million in 2014 and 2.3 million in 2014, in pounds?

17            MR. ANDERSON:  Objection, document speaks for itself.

18            THE COURT:  Overruled.

19            THE WITNESS:  I'm sorry, which Bates stamp is that

20   again, please?

21            MR. MALOFIY:  D39250.  We can pull it up for the --

22            THE WITNESS:  Yes.

23   BY MR. MALOFIY:

24   Q.   Am I -- is that accurate?

25   A.   It says royalties were paid to Page, 2.3 million.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

776

```
 1    Q.   Pounds, correct?

 2    A.   Pounds.

 3    Q.   Sterling.

 4    A.   Plant, 2.3 million.

 5    Q.   And that's in addition to what we just discussed, correct?

 6    A.   Right.  That tells you the distribution of the

 7    6.6 million.  There was one more payment made to Mr. Baldwin.

 8    Q.   Now, let me focus your attention on D39256.

 9    A.   Yes.

10    Q.   In this profit and loss from May 2012 to March 31st, 2013,

11    did 6.2 million dollars come in and 6.2 million dollars go out,

12    leaving a net profit of zero?

13    A.   Correct.  According to the invoice in front of me,

14    6.2 million pounds.

15    Q.   Pounds.  Thank you for the correction.

16    A.   6.2 million pounds.

17    Q.   Is that in the statutory period?

18    A.   That's within the statutory -- that's after May 31st,

19    2011, which is the statutory period.

20    Q.   And now I'd like to go to document 39259.  Do you see

21    that?

22    A.   Correct.

23    Q.   And it has also Page, Plant, and their respective

24    pass-through entities, Succubus and Sons of Einion.  Does it --

25    A.   Correct.  Page --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

777

```
1   Q.    You know what, I'm going to -- excuse me.

2         And does it indicate what they were paid, and is it

3   correct that this document states 2.3 million pounds for Page

4   from May 2012 to March 2013, and 2.1 million pounds for Plant?

5   A.    Correct.

6   Q.    And that's in addition to what we just discussed, correct?

7   A.    Correct.

8   Q.    Now, I'm going to move forward to --

9   A.    That's from April 1st, 2012, to March 31st, 2013.

10        THE COURT:  Next question.

11  BY MR. MALOFIY:

12  Q.    I'd like to direct your attention to D39266.  So you see

13  that?

14        Only because we're short on time --

15  A.    Yes.

16  Q.    -- I'm trying to rush through it a bit.  I apologize for

17  that.  So don't take it the wrong way.

18        Does it say 6.2 million pounds in in the period of year

19  ending March 31st, 2014?

20  A.    Correct.

21  Q.    And does it have 6.2 going out?

22  A.    Correct.

23  Q.    Okay.  And does it also indicate on 39269 that Page, by

24  and through his pass-through entity, and Plant, by and through

25  his pass-through entity, received 2.3 million pounds and
```

```
1    2.1 million pounds?

2    A.    Correct.

3    Q.    I'm almost done.

4          Correct me if I'm wrong.  So I think the numbers that we

5    just went through, if my memory serves me correctly, maybe you

6    can help me, is 3.5 million gross revenues from the label,

7    correct?

8    A.    13.5 million.

9    Q.    What did I say?

10   A.    You said 3.5.

11   Q.    Oh, that's a big mistake.  See?  Thank you for that

12   correction.

13         So the gross revenues from the label, 13.5 million,

14   correct?

15   A.    Correct.

16   Q.    Then we had an additional 15 million from the record deal

17   of Rhino Atlantic, correct?

18   A.    Correct.  Rhino with -- yes.  Rhino paid Succubus, the

19   pass-through entity for Led Zeppelin.

20   Q.    Let me just -- I just want to recap, because we already

21   went through that.  I want to close our case in chief.

22         So we have 13.5 million on the label, correct?

23   A.    Correct.

24   Q.    We have 15 million from the Rhino Atlantic deal, correct?

25   A.    Correct.
```

```
 1   Q.   We have an additional roughly 30 million from the
 2   publishing, correct?
 3   A.   Correct.
 4   Q.   And then we have roughly -- two, four, six -- six --
 5   that's about 58.5 million?
 6   A.   Correct.
 7   Q.   At any point, has anyone refuted your numbers?
 8            MR. ANDERSON:  Objection, Your Honor, lacks --
 9            THE COURT:  Sustained.
10   BY MR. MALOFIY:
11   Q.   Have you seen anything to rebut the conclusions which
12   you've drawn in this case thus far?
13            MR. ANDERSON:  Objection, Your Honor.
14            MR. MALOFIY:  Thus --
15            THE COURT:  Overruled.
16       Have you taken into consideration any rebuttal to what
17   you've said?
18            THE WITNESS:  I have not seen any rebuttal to what
19   I've said.
20            THE COURT:  Okay.  Next question.
21            MR. MALOFIY:  No further questions of this witness.
22   Oh, one last question.
23   Q.   Do you hold all your opinions to a reasonable degree of
24   professional certainty, and how confident are you in your
25   numbers?
```

```
1   A.   I hold my opinions to a reasonable degree of professional

2   certainty, and I'm very confident about these numbers.

3           MR. MALOFIY:  Thank you.

4           THE COURT:  Okay.  Thank you, Counsel.

5      Cross-examination.

6           MR. ANDERSON:  Thank you, Your Honor.

7                      CROSS-EXAMINATION

8   BY MR. ANDERSON:

9   Q.   Good morning, Dr. Einhorn.

10  A.   Good morning, Mr. Anderson.

11  Q.   Your Ph.D. is in economics, correct?

12  A.   Correct.

13  Q.   And you've testified in court about five times?

14  A.   Correct.

15  Q.   And all of those times you testified for the plaintiff?

16  A.   Correct.

17  Q.   And since 2000, approximately 80 percent of all of your

18  income comes from testifying in lawsuits; is that right?

19  A.   Correct.

20  Q.   You don't have an accounting background, do you?

21  A.   I am not an accountant.  I have a Ph.D. in economics.

22  Q.   Sorry, I thought you were --

23  A.   I have a Ph.D. in economics.

24  Q.   You know Mr. Malofiy from a case in which he sued Usher?

25  A.   I know Mr. Malofiy from a case in which he sued Usher.
```

781

1   Q.   And prior to being contacted by Mr. Malofiy, you had never

2   heard of "Taurus"; isn't that correct?

3   A.   Well, actually, his name is Mr. Malofiy.

4        MR. ANDERSON:  He told me I could pronounce it either

5   way, and I hope I'm not --

6        THE COURT:  Counsel, excuse me.

7        That wasn't the question to you.  Listen just to the

8   question and answer the question.

9        Next question.

10        MR. ANDERSON:  I think the -- yes, Your Honor.  Thank

11   you.

12        THE COURT:  Repeat your question.

13   BY MR. ANDERSON:

14   Q.   Had you ever heard of "Taurus" before being contacted by

15   plaintiff's counsel?

16   A.   No.

17   Q.   And had you ever heard of Randy Wolfe or Randy California

18   before plaintiff's counsel contacted you?

19   A.   No.

20   Q.   And just to be clear, you have no opinion one way or the

21   other whether, in fact, plaintiff's claim of copyright

22   infringement has any merit?

23        MR. MALOFIY:  Objection.

24        THE COURT:  Sustained.  He's not called as an expert

25   to testify in that area at all, Counsel.  He's not giving an

782

```
1    opinion.
2          MR. ANDERSON:  Yes.  I just want to make sure that
3    that's clear.
4          THE COURT:  Next question.
5          MR. ANDERSON:  Thank you, Your Honor.
6          THE WITNESS:  I'm sorry, could you repeat the
7    question, please?
8          THE COURT:  There was no question.
9    BY MR. ANDERSON:
10   Q.   There was no question pending.
11        And I apologize, I'm just -- given your testimony, there
12   was several questions I'm not going to ask you.
13        The payments that you referred to on the publishing side,
14   for example, I think it came to roughly 6 million dollars,
15   those payments were under a contract dated in 2008; isn't that
16   correct?
17   A.   In the numbers that I reported, I'm just reporting numbers
18   that were off sheets after May 31st, 2011.  I didn't refer back
19   to the contract.  These were numbers that were invoiced and
20   distributed after May 31st, 2011.
21   Q.   Isn't it true that at your deposition you testified that
22   the publishing side -- you've testified to the publishing side
23   payments reflected in the many pages of documents we've
24   provided that were paid under the 2008 contract?
25   A.   At the time of the deposition, I referred to the advances
```

```
 1   that were paid under the terms of the 2008 advance contract.

 2   Yeah, that is correct.

 3   Q.   Thank you.

 4        Do you have any reason to doubt that the payments that you

 5   were talking about on the publishing side today were payments

 6   under the 2008 contract?

 7             MR. MALOFIY:  Objection.

 8             THE COURT:  Overruled.

 9        You may answer.

10             THE WITNESS:  These were payments for the use of the

11   composition after May 31st, 2011.

12   BY MR. ANDERSON:

13   Q.   And those payments were made under a contract for the use

14   of the composition that was entered into in 2008, correct?

15             THE COURT:  If you know.

16             THE WITNESS:  There was a contract signed, as is

17   always the case, with a record deal.  At some point after the

18   contract were signed --

19             THE COURT:  I'm sorry.  Just listen to the question

20   and answer the question.

21             THE WITNESS:  They were made under the terms of a 2008

22   contract.

23   BY MR. ANDERSON:

24   Q.   Thank you, sir.

25        And those payments under the 2008 contract were for the
```

784

```
 1   entire Led Zeppelin catalog, include -- isn't that correct?
 2   A.    Correct.
 3   Q.    How many songs are in the catalog?
 4   A.    87 songs.
 5   Q.    Do you also agree that any payments made under the
 6   contract by the -- well, strike that.  Never mind.
 7        Do you agree that payments -- well, never mind.
 8   Withdrawn.
 9        Do you agree that, on the record side, payments of artist
10   royalties are a proper deduction in calculating profits?
11   A.    They are a proper deduction in calculating label profits
12   and a proper addition in calculating artist profits.
13   Q.    And are --
14        I move to strike the last part of it as nonresponsive.
15        THE COURT:  Last part will be stricken.
16   BY MR. ANDERSON:
17   Q.    Do you agree that payments -- publishing royalty payments
18   made by a company are proper deduction in the calculation of
19   that company's profits?
20   A.    Publishing reven- -- royalties are a proper deduction from
21   the label's profits.
22   Q.    And how about union royalties?  Are those a proper
23   deduction?
24   A.    Correct.
25   Q.    And do you agree that in the record business, when a
```

```
 1   record company releases product, it incurs expenses for the
 2   physical goods and the distributions of the physical goods, the
 3   records that it distributes?
 4           MR. MALOFIY:  Objection, vague and ambiguous.
 5   Referring to this one or someone else?
 6           THE COURT:  Why don't you state the question again,
 7   Counsel.
 8           MR. ANDERSON:  Yeah, I'll rephrase it.  Thank you,
 9   Your Honor.  Got off on the wrong foot on that one.
10   Q.  Do you agree that the costs of manufacturing are a proper
11   deduction by record companies in the calculation of profits?
12   A.  When the manufacturing costs are paid to an entity that is
13   not a defendant.
14   Q.  And do you agree that a distribution fee paid by a record
15   company for the distribution of its products is a proper
16   deduction?
17   A.  When the distribution fee is paid to an entity that is not
18   a defendant.
19   Q.  And in this case, from your review of the many documents
20   that were disclosed by defendants in this case, do you agree
21   that the manufacturing costs and the distribution fees that
22   were incurred by the corporate defendants in this case were not
23   paid to an entity that is a defendant in this case?
24           MR. MALOFIY:  Objection.
25           THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

786

```
 1            THE WITNESS:  That is my belief.

 2   BY MR. ANDERSON:

 3   Q.   And you recall that I took -- I had the pleasure of taking

 4   your deposition a few months ago?

 5   A.   Yes, I do.

 6   Q.   And do you recall testifying that you have no

 7   understanding of the applicable standard in determining whether

 8   overhead is deductible?

 9            MR. MALOFIY:  Objection.

10            THE COURT:  Overruled.

11            THE WITNESS:  As an economist, I can tell you what the

12   applicable standard is.  Overhead should not be deductible,

13   because --

14            THE COURT:  That's okay.  Your testimony is it should

15   not be deductible.  Okay.

16   BY MR. ANDERSON:

17   Q.   Do you agree that when Rhino re-released the Led Zeppelin

18   catalog within the statutory period that's been referred to,

19   someone at Rhino who was paid a salary was involved in that

20   process?

21   A.   I do.

22   Q.   And do you agree that indirect costs such as office space

23   and other overhead elements are deductible under some

24   circumstances?

25   A.   Not under the circumstances of an economist.
```

787

```
 1   Q.    So you don't believe they are deductible?

 2   A.    Overhead should not be deductible from profits which

 3   should be directly related to the infringement, and the costs

 4   of overhead are not directly related.

 5   Q.    And so it's your belief, if I understand correctly, that

 6   you do not accept that overhead is deductible if there's a

 7   reasonable allocation of overhead costs?

 8   A.    Precisely my position.

 9         MR. ANDERSON:  If you can bear with me for just a

10   second.  If I could just confer.

11         (Defense counsel conferred privately.)

12   BY MR. ANDERSON:

13   Q.    And you were paid to testify in this case; is that right?

14   A.    Yes, I was.

15   Q.    And I believe you testified that you worked at

16   Broadcast Music?

17   A.    I worked at Broadcast Music Incorporated.

18   Q.    And is Broadcast Music one of the three major

19   publishers -- excuse me, three major performing rights

20   societies in the United States?

21   A.    Broadcast Music Incorporated is a performing rights

22   society.

23   Q.    And you were fired from Broadcast Music, weren't you?

24   A.    I was asked to leave in January of 2011.

25         MR. ANDERSON:  Thank you.  That's all the questions I
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

788

```
1    have for this witness.
2              THE WITNESS:  I'm sorry, 2000.
3              MR. ANDERSON:  Oh, I'm sorry, I thought you were done.
4              THE WITNESS:  I was asked to leave in January 2000
5    because of a contract dispute.
6              THE COURT:  Okay.
7              MR. ANDERSON:  Thank you.  Those are all the questions
8    I have.
9              THE COURT:  Okay.  Redirect?
10             MR. MALOFIY:  Yeah, briefly.
11                      REDIRECT EXAMINATION
12   BY MR. MALOFIY:
13   Q.   Would you agree that expenses incurred by the label are
14   subtracted before payments to Page and Mr. Plant are made?
15             MR. ANDERSON:  Objection, lacks foundation.
16             THE COURT:  Overruled.
17             THE WITNESS:  Mr. Plant and Mr. Page are paid per the
18   terms of a contract that is entered at the time they -- they
19   agree to use -- they have -- they get paid along with other
20   costs.
21   BY MR. MALOFIY:
22   Q.   Thank you.
23        Now, did anything Mr. Anderson say or anything he
24   introduced in the questioning to you change your opinions in
25   any way?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

789

```
1    A.    No.

2    Q.    And are you still confident, highly confident in your

3    numbers and the opinions and the conclusions which you provided

4    this jury here today?

5    A.    That's exactly right.

6              MR. MALOFIY:  Thank you.  No further questions.

7              THE COURT:  Thank you, Counsel.

8         Anything in that area?

9              MR. ANDERSON:  No.  Thank you, Your Honor.

10             THE COURT:  Okay.  You're excused, sir.  Thank you

11   very much for coming in.  We appreciate it.  Have a good trip

12   back.

13        Next witness.

14             MR. MALOFIY:  No further questions.

15        Plaintiff rests its case in chief, but before we do so,

16   we'd like to reserve the right to do a final admission of the

17   exhibits which we used.  I don't want to take up the time now,

18   and I know we were supposed --

19             THE COURT:  Do that at the end of the case, and that

20   will be reserved, yes.

21             MR. MALOFIY:  Thank you, Your Honor.

22             MR. ANDERSON:  Your Honor, defendants have a motion.

23             THE COURT:  You can reserve that motion, and we'll

24   hear that at the next break.

25             MR. ANDERSON:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

790

```
1            THE COURT:  Let's go ahead and proceed with the
2    witnesses.
3        Counsel.
4            MR. ANDERSON:  Yes, Your Honor.
5        We will need a moment to bring in the piano for
6    Dr. Ferrara.
7            MR. MALOFIY:  We object.
8            THE COURT:  Counsel, it's part of your time.
9            MR. ANDERSON:  Okay.  Thank you.
10           THE COURT:  Okay.  I'm assuming you're talking about
11   just a couple of minutes?
12           MR. ANDERSON:  The piano is here, and so it should
13   just be a few minutes, but I --
14           THE COURT:  There's no reason for us to break, then.
15           MR. MALOFIY:  We object to the piano.  We had to file
16   motions to use any kind of instruments at time of trial.
17           THE COURT:  Overruled.
18           MR. ANDERSON:  It might make sense to take a break,
19   just because I don't want to keep -- if that's convenient to
20   the Court.
21           THE COURT:  Counsel, let's put on a witness.  I don't
22   want to waste jurors' time.  If you have to bring the piano in
23   and you want to bring it in at the next break, that's fine, but
24   let's go ahead with some witnesses.
25           MR. ANDERSON:  Thank you, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00926**

791

```
 1            MR. MALOFIY:  Oh, Your Honor?

 2            THE COURT:  Yes.

 3            MR. MALOFIY:  If Dr. Ferrara's up next, there's a

 4   serious conflict issue, which we did raise by motion and we

 5   want to discuss with you.

 6            THE COURT:  I don't know who the next witness will be.

 7   Let's find out.

 8            MR. ANDERSON:  Dr. Lawrence Ferrara.

 9            THE COURT:  Okay.

10         And you want what, Counsel?

11            MR. MALOFIY:  We filed an extensive sanctions motion

12   against defendants and Dr. Ferrara.

13            MR. ANDERSON:  Your Honor --

14            MR. MALOFIY:  -- for being --

15            THE COURT:  Okay.  Okay.  Counsel, I understand, and I

16   have your motion.  It's not something that should be coming in

17   in front of the jury.

18            MR. MALOFIY:  I'm sorry.

19            THE COURT:  And your objection is to his testifying?

20            MR. MALOFIY:  Yes.

21            THE COURT:  Overruled.

22            MR. MALOFIY:  As to a negative inference.

23            THE COURT:  Overruled.

24         Let's call -- bring in your next witness.

25         Or denied.  Let's bring in the next witness.
```

792

```
 1         MR. ANDERSON:  I understand.  He's coming right now,

 2   Your Honor.

 3       My apologies, Your Honor.  Didn't really expect plaintiff

 4   to rest so quickly.  But we do have him.

 5         THE COURT:  Okay.

 6       (Pause in the proceedings.)

 7         THE COURT:  Ladies and gentlemen, while we're waiting,

 8   do we have any Cleveland Cavaliers fans here?  Because I see

 9   some smiles, and I'm assuming that -- okay.

10         MR. ANDERSON:  Your Honor, apparently we're having

11   trouble locating Mr. Ferrara, who is in the building.

12         THE COURT:  Why don't you call your next witness.

13         MR. ANDERSON:  I would rather, Your Honor -- we'll

14   take the time.

15         THE COURT:  Well --

16         MR. ANDERSON:  I understand the clock is running, and

17   I apologize for that.  I --

18         THE COURT:  Okay.

19         MR. ANDERSON:  Not quite -- I don't quite understand

20   why he's not here.

21         THE COURT:  You have an indication that he will be

22   here?

23         MR. ANDERSON:  Yes.  No, my understanding is that he

24   was, you know, in the -- he was supposed to be here about half

25   an hour ago, but I'm not sure --
```

```
 1            THE COURT:  Still trying to get through security.
 2            MR. ANDERSON:  That could be, Your Honor.
 3            THE COURT:  Okay.  Well, then we'll take about 10
 4    minutes, and as soon as he gets in, if you -- well, if he gets
 5    in before the 10 minutes, let us know as soon as possible so we
 6    can get back into it.
 7            MR. ANDERSON:  Thank you, Your Honor.  I apologize.
 8            THE CLERK:  All rise.
 9        (Recess held from 9:51 a.m. to 10:07 a.m.)
10        (In the presence of the jury:)
11            THE COURT:  Okay.  The record will reflect that the
12    members of the jury are in their respective seats in the jury
13    box.
14        And ladies and gentlemen, if you've noticed, we stretched
15    it out a little bit more than 10 minutes, so we took the entire
16    15-minute break, so we're going to go from now until 11:30,
17    okay, and then we'll break for lunch at 11:30.
18        Counsel.
19            MR. ANDERSON:  Thank you, Your Honor.
20        The defendants call Dr. Lawrence Ferrara.
21            THE CLERK:  Good morning.  Right here to be sworn.
22            THE WITNESS:  Yes.
23            THE CLERK:  That's fine.  Can you please raise -- do
24    you solemnly swear that the testimony you are about to give in
25    the matter now before the Court shall be the truth, the whole
```

794

```
 1   truth, and nothing but the truth, so help you God?

 2            THE WITNESS:  I do.

 3            THE CLERK:  Thank you.  You may be seated.

 4       May I please ask that you state your full name for the

 5   record and spell your last name.

 6            THE WITNESS:  Lawrence Ferrara, F-e-r-r-a-r-a.

 7            THE CLERK:  Thank you.

 8            THE COURT:  Okay.  Counsel, you may inquire.

 9            MR. ANDERSON:  Thank you very much, Your Honor.

10       LAWRENCE FERRARA, CALLED AS A WITNESS BY THE DEFENDANTS,

11                        DIRECT EXAMINATION

12   BY MR. ANDERSON:

13   Q.   Good morning, Dr. Ferrara.

14        Where are you currently employed?

15   A.   I'm on the full-time faculty at New York University.

16   Q.   What's your title?

17   A.   I'm a full professor of music and director emeritus.

18   Q.   And what was your role, or what is your role, as a

19   full-time director?

20   A.   Well, my role as the director was to oversee about 400

21   faculty.  I had that role as department chair and then director

22   for 16 years.  With those 400 faculty that I led, we served

23   1,600 students who were majoring in music and performing arts

24   programs for the bachelor's, master's, or Ph.D. program.

25   Q.   What is a director emeritus?
```

795

```
1   A.   Director emeritus, or emeritus, is a meritorious honorary
2   title.
3        When I decided after 16 years that I'd like to return to
4   the full-time faculty, I notified the administration, and
5   literally in the last weeks of my role as the director, much to
6   my surprise, I was humbled by the fact that the administration
7   named me an honorary and ongoing title, "Director Emeritus."
8   Q.   And how often is that title awarded?
9   A.   At NYU it's rare.
10  Q.   And you're a full professor of music?
11  A.   That's right.
12  Q.   Are there other faculty ranks in music at NYU?
13  A.   Yes.  At the least, there are two.  There is a lecturer
14  and an assistant professor, and there are two senior ranks, and
15  that's associate professor and full professor.
16  Q.   And how does one get promoted, if you will, from a
17  associate professor to a full professor at NYU?
18  A.   It's a long process.  There are two key commissions that
19  make recommendations to the university.  The first is a
20  commission of six full professors from across the school in
21  diverse academic areas, and they go through all of the
22  materials.  They look particularly, among other things, at the
23  substance and the quality of publications, and then they need
24  to basically say to the university, yes, this person should be
25  promoted, and this person has achieved at international
```

1   recognition in their area of specialization.

2   Q.   And you achieved that position as full professor?

3   A.   I did.  And there's a second commission, and that

4   commission is external reviewers.  They are full professors

5   from universities outside NYU.  There are six to ten external

6   reviewers in a full professor review, and those are from

7   comparable Research 1 universities in the United States as well

8   as in Canada and usually in Europe.

9   Q.   And you passed the review of both commissions?

10  A.   Yes.  I was promoted to full professor in 1992.

11  Q.   Thank you.

12       Do you have a particular area of expertise?

13  A.   Yes.  Music theory and analysis.

14  Q.   And is music analysis the area of expertise that you

15  employed in this case?

16  A.   Yes, it is.

17  Q.   Are you a member of any professional associations?

18  A.   Yes.  I'm a member of the American Musicological Society,

19  the Society for Music Theory, and the New England Society for

20  Music Theory.

21  Q.   And have you written any books relating to music?

22  A.   Yes.  I have authored or co-authored three books, one of

23  which is in its fifth edition.

24  Q.   How about scholarly?  I'm sorry.  How about scholarly

25  articles in music?  Have you authored any of those?

797

```
 1    A.    Yes, about a dozen scholarly articles in peer-review

 2    journals.

 3    Q.    Do you sit on any editorial boards of any scholarly

 4    journals?

 5    A.    Yes.  I sit on an editorial board of a scholarly Journal

 6    in Music at the University of Illinois, published by University

 7    of Illinois Press, and I sit on a second editorial board of the

 8    scholarly Journal of Music at Indiana University, published by

 9    Indiana University Press.

10    Q.    Have you won or received any awards in connection with

11    your writing --

12    A.    Yes.

13    Q.    -- in the field of music?

14    A.    I received the Daniel Griffiths award for research at NYU.

15    That was in connection with a work of mine that was published

16    by Cambridge University Press in England.

17    Q.    And what is that award, the Daniel Craig --

18    A.    The Daniel Griffiths --

19    Q.    Griffiths.

20    A.    Yeah.  Daniel Griffiths award is given to one faculty

21    member.  A commission of professors across the school select

22    one work, one publication, that, in their opinion, was the best

23    of any faculty member in that year.  And so one person is named

24    a Daniel Griffiths award winner each year.

25    Q.    Thank you.
```

1    What is musicology?

2  A.   Musicology is essentially the systematic study of music.

3  There are three broad approaches.  There are subdivisions.  But

4  if you look at the definition of musicology in the Harvard

5  Dictionary of Music, it basically says that there is the first

6  basic approach, and that is historical musicology, which is the

7  study of the history of music; ethnomusicology, which is the

8  study of music in cultures; and the third, music theory and

9  analysis, which is the analysis of music.

10  Q.   And that last one, is that the analysis that you applied?

11  A.   Yes, it is.

12  Q.   Do you have any professional experience with music

13  copyright cases?

14  A.   Yes, I do.

15  Q.   And have you been engaged on behalf of both plaintiffs and

16  defendants in music copyright cases?

17  A.   Yes, I have.

18  Q.   Could you please identify for the jury some of the

19  artists, the writing or recording artists, on whose behalf

20  you've been engaged.

21  A.   Well, I've written analyses for Billy Joel, Paul

22  McCartney, Elton John, Marc Anthony, Enrique Iglesias, Bruce

23  Springsteen, Madonna, Lady Gaga, Katy Perry, Gloria Estefan,

24  Mariah Carey.  In country, Brad Paisley, Toby Keith.  In other

25  areas, other genres, I've written analyses for Jay Z, for

```
 1  Usher, for Ludacris, for Kanye West, for Dr. Dre, for Eminem,
 2  and others.  And I've also written analyses for great artists
 3  who have passed.  In particular, I've written analyses for and
 4  on behalf of Prince, the late Prince, the late Michael Jackson,
 5  the late James Brown, and the late Luther Vandross.
 6  Q.   Have you given any lectures about -- regarding the
 7  analysis of music in copyright infringement cases?
 8  A.   Yes.  Many.  Among them are five or six invited lectures
 9  on music in music copyright litigations at Columbia University
10  Law School.  In each of the last six years, I've been invited
11  to present a lecture on music and music copyright and music
12  copyright litigations at Harvard Law School.  I've done that
13  again now for the last six years.  I've also given three
14  papers, three presentations on this subject to the American
15  Musicological Society, and that's in the greater New York
16  chapter.
17  Q.   Thank you.
18       And have you been qualified to testify in federal
19  copyright infringement cases?
20  A.   Yes, I have.
21  Q.   What were the two compositions that you reviewed in
22  connection with this case?
23  A.   The first is the "Taurus" deposit copy.  It's a single
24  sheet of music.  The second is the composition that's embodied
25  in "Stairway to Heaven."
```

800

1   Q.   Could you please explain to the jury, basically, in

2   analyzing a musical composition in a federal copyright action,

3   how you approached that analysis.

4   A.   Yes.  Since this is an analysis of a composition, the

5   first step is to have transcriptions.  Once again, I was given

6   the transcription, the sheet music, of the "Taurus" deposit

7   copy.  In order to compare it to the composition in "Stairway

8   to Heaven," I created a transcription, 29 pages long, of the

9   music in "Stairway to Heaven," and, in keeping with

10  musicological practices, I did the comparison of those

11  transcriptions.

12  Q.   And what do you analyze when you analyze transcriptions?

13  A.   Musicologists, when doing an analysis of compositions and

14  comparing two compositions, analyze the structure, the harmony,

15  the rhythm, the melody, the lyrics, if there are any, as well

16  as other elements, and seek -- in that dissection and that

17  analysis, seek to understand what the similarities and the

18  dissimilarities are.

19  Q.   What do you mean by "dissection"?

20  A.   Dissection is the analysis of the component parts.

21  Literally not only looking at the melody and comparing the

22  melodies, comparing the harmonies, which are the chords, but

23  also in looking at the melodies very minutely; that is,

24  comparing two beats, three beats, four beats in one melody, to

25  two beats, three beats, four beats in the other melody as they

1    occur in corresponding parts of the melody.

2    Q.   Is there any scholarly source in musicology that describes

3    the analysis that you apply?

4    A.   Yes.  In terms of the analysis of compositions using the

5    score, the Grove Dictionary of Music, which is 29 volumes, and

6    its last printed edition has a very long entry on music

7    analysis, and what it says early on in the entry is that

8    Western music analysis takes, as its subject matter, the score,

9    and the score for musicologists is the sheet music.  It's

10   literally the transcription.  And accepts that that score, that

11   transcription, that sheet music, represents the final

12   composition that is analyzed.

13   Q.   Did you render a written report regarding your analysis of

14   the musical composition "Stairway to Heaven" and the "Taurus"

15   deposit copy?  Excuse me, "Taurus" deposit sheet.

16   A.   Yes, I did.  I in fact presented two reports:  A first

17   report on February 10th, 2016, that was my initial report, and

18   then a rebuttal report on June 1st, 2016.

19        MR. ANDERSON:  If we could please call up, just

20   initially just for identification, the two reports.

21        You may have to do it in sequence.  I'm not sure.

22        (Exhibit was displayed on the screen.)

23   BY MR. ANDERSON:

24   Q.   Can you identify -- and I believe that's Exhibit 2202.  If

25   you could please identify that the -- what you see on the

1    screen.

2    A.    Yes.  That is my initial report, dated February 10th,

3    2016.

4          MR. ANDERSON:  And if we could please pull up Exhibit

5    2405.

6       (Exhibit was displayed on the screen.)

7          THE WITNESS:  Yes.  That is my rebuttal report, dated

8    June 1st, 2016.

9          MR. ANDERSON:  Your Honor, I would move to admit both

10   of them.

11         THE COURT:  Okay.

12         MR. ANDERSON:  And I believe I misspoke.  The first

13   one is actually Exhibit 2092.

14         THE COURT:  Okay.  They will be received.

15         MR. ANDERSON:  Thank you.

16      (Received in evidence, Trial Exhibits 2092 and 2405.)

17   BY MR. ANDERSON:

18   Q.   Before we ask you to -- before we ask you to discuss the

19   analysis that you've done, could you briefly define for the

20   jury what you mean by melody.

21   A.   Yes.  A melody is a linear succession of notes and the

22   rhythmic durations of each of those notes, or pitches.

23   Q.   And what about pitch?  What is a pitch?

24   A.   A pitch is the highness or the lowness of a sound.  And in

25   a melody, pitches can go up.  You'll have to forgive my voice,

803

1    because I really don't have a voice, not a singing voice.  But

2    pitches going up is da-da-da-da-dum (singing).  That's one way.

3    Or pitches going down would be da-da-da-da-dum (singing).  And

4    the third possibility for pitches in a melody is to simply

5    repeat the same pitch, da-da-da-da-da-da-dum (singing).  Those

6    are the three possibilities.  Pitches go up in a melody, they

7    go down in a melody, or they repeat.

8    Q.    What is harmony?

9    A.    Harmony is the simultaneous sounding of pitches, and it

10   essentially is the analysis of chords, and when you're dealing

11   with more than one chord, we call those succession of chords a

12   chord progression.

13   Q.    Thank you.

14         If we could please pull up Exhibit 2058, the "Taurus"

15   deposit copy.

16         (Exhibit was displayed on the screen.)

17   BY MR. ANDERSON:

18   Q.    Have you seen this exhibit before?

19   A.    Yes.  This is the "Taurus" deposit copy that I was given.

20   Q.    And this is the sheet music that you compared to

21   "Stairway to Heaven"?

22   A.    That's correct.

23   Q.    What is a measure?

24   A.    A measure is a unit of musical time.  And if we take a

25   look, we've just had highlighted the first measure.  If you

804

```
1   take a look at your screen, the first measure has been
2   highlighted.  At the beginning of those two lines of music, you
3   see an uppercase C.  That stands for common time.  In common
4   time, or four-four time, there are four quarter beats per
5   measure, and so within each measure there's going to be four
6   beats in these quarter notes.
7        Now, the measures are demarcated by those vertical lines.
8   So right there is a vertical line.  That ends the first
9   measure.  This ends the second measure.  And if we could shrink
10  this so we can see all of -- that's great.  And the fourth
11  measure right at the very end, right there.  That's the fourth
12  measure I've just put a square on.
13       Going to the next line, this is measure five.  I've just
14  put a square green dot on there.  This is measure six.  This is
15  measure seven.  This is measure eight.
16       And then you see the double bar line with the double dots.
17  That's a repeat sign, and that tells you to go back to the
18  beginning and repeat those eight measures.
19  Q.   And in your analysis did you define or name the first
20  eight measures of the deposit copy?
21  A.   Yes.  The first eight measures I defined as Section A.
22  And in order to distinguish Section A in these planes, I call
23  that A1, and then as we go through the document you'll see that
24  at the bottom of the page there is a da capo sign.  Da capo is
25  Italian.  It means to the head, which means you gotta go back
```

805

```
 1   to the beginning.  And so in order to distinguish those first
 2   eight measures from the first time you play them from after the
 3   da capo, I call that A2.  And that's what you have.  This is
 4   attached to my Exhibit A to my February 10th report with my
 5   handwriting, Section A1 and then A2.  And if you take a look at
 6   the bottom of the page, I've just put a green dot there,
 7   da capo, to the head.  That tells you, as soon as you get to
 8   that double bar, you go back to the beginning and then you
 9   repeat these eight measures.
10   Q.   Are there any other repeats, or repeats of any other
11   portion of the "Taurus" deposit copy?
12   A.   Well, the B section -- and you see that's the next 10
13   measures.  The B section is repeated on the da capo.
14   Q.   And did you prepare a sound recording of the "Taurus"
15   deposit copy?
16   A.   Yes, I did.  I played the upper staff -- just put a dot
17   there -- with my right hand at the piano, and I played the
18   lower staff -- I put a dot right there -- with my left hand at
19   the piano, and I played through the entire document, including
20   with the repeats.
21        MR. ANDERSON:  Your Honor, if I may, we -- excuse me,
22   we'd like to play audio exhibit No. 1, which is Exhibit 61-A in
23   this case, and I believe it was -- it was previously played in
24   the opening.
25        THE COURT:  Okay.  You may publish it.  You may play
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    it.

 2            MR. ANDERSON:  Thank you.

 3        I think we're switching back from one -- from one device

 4    to the other.  Bear with us a second.

 5        (Audio playing.)

 6            THE WITNESS:  And if it's possible, while we're

 7    listening, to have the "Taurus" deposit copy on the screen --

 8    it's not.  Okay.  Because then I would have walked you through

 9    with -- with dots where we are.

10        Right now we're in Section A1.

11            THE COURT:  Excuse me.  There's no question pending

12    now.

13        (Audio continues to play.)

14            THE WITNESS:  We've gone back to the beginning.

15    That's a trill.  Now we go to Section B.

16        (Audio stops.)

17            THE WITNESS:  That last note was the coda, the ending.

18            MR. ANDERSON:  Your Honor, we would move to admit

19    that.

20            THE COURT:  Be received.

21            MR. ANDERSON:  Thank you.

22        (Received in evidence, Trial Exhibit 61-A.)

23    BY MR. ANDERSON:

24    Q.  In your comparative analysis of the "Taurus" musical

25    composition and "Stairway to Heaven," did you find any portion
```

807

1    of the "Taurus" musical composition that has relevant

2    similarities to "Stairway to Heaven"?

3    A.    I did.  And once again, if we could put back on the screen

4    the "Taurus" deposit copy, I'll be happy to show those sections

5    to you.

6          (Exhibit was displayed on the screen.)

7          THE WITNESS:  We have now in front of us the full

8    deposit copy.

9          If we can skip down first to Section B.  I've just put a

10   dot on Section B.  Section B starts right there, and -- there

11   it is.  All of the music experts are in agreement that there's

12   nothing in Section B that's at issue.  These are the last 10

13   measures in the deposit copy, Section B.  While some of us have

14   analyzed the structure, no one has suggested that any of the

15   expression, the melodies, the harmonies, whatever, are at issue

16   here.  So everyone has agreed that these last 10 measures are

17   not at issue.

18         On the other hand, going now back to the beginning, to the

19   top, we agree that it is in the first eight measures that there

20   is similarity.

21         Now, understand that, within the whole, just in terms of

22   the math, eight measures have some expression that's at issue.

23   Ten measures don't.  So, therefore, everybody agrees that about

24   60 percent of the "Taurus" deposit copy isn't at issue.  The

25   only question, then, is what section and what part of Section A

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

808

1    is at issue.

2         Now, in my opinion, what's at issue in Section A is the

3    lower staff.  I've just put dots on each of those measures.

4    And when I get to the piano later, I'll play that for you.

5         On the other hand, Dr. Stewart has found that the upper

6    melody also is at issue.  I disagree, and I'll explain why I

7    disagree and play those sections for you in a comparative

8    analysis with the "Stairway to Heaven" composition.  But for

9    now, what I have found, to answer your question, to be at issue

10   are the notes in these lower measures of the staff.

11   Q.   Is there any portion of "Stairway to Heaven" with relevant

12   similarities to "Taurus"?

13   A.   Yes.  The opening four measures of the guitar,

14   understanding that it's repeated, then, within the first 2

15   minutes and 14 seconds, five more times, and in each of those

16   repeats, it's no longer a solo guitar.  There are other

17   instruments playing.  And in two of those repeats, other

18   instruments and the solo vocalist.

19   Q.   Are there any portions of the first 2 minutes and 14

20   seconds of "Stairway to Heaven" that do not have any relevant

21   similarities to "Taurus"?

22   A.   Yes.  So within those six iterations, those six happenings

23   of the four measure guitar part, there are measures in between.

24   Dr. Stewart calls that Section B.  There are 16 of those

25   measures of Section B in the first 2 minutes and 14 seconds

809

```
 1    that no one has suggested has similarities to the "Taurus"
 2    deposit copy.
 3    Q.    What about the last 6 minutes of "Stairway to Heaven"?
 4    Does it have any relevant similarities?
 5    A.    The last 6 minutes of "Stairway to Heaven" -- it's an
 6    8-minute, 8-minute-2-second work.  No one has put in issue
 7    similarities past 2 minutes and 14 seconds.  So approximately
 8    the last 6 minutes of "Stairway to Heaven" has not been put in
 9    issue as having similarities to the "Taurus" deposit copy.
10    Q.    What are the similarities between the Section A of
11    "Taurus" that -- as you've described it, and "Stairway to
12    Heaven"?
13    A.    The similarities are limited.  It's a similarity, in fact.
14    It's a similarity of a common chromatic descending minor chord
15    progression.  And I think we drop the "progression" because
16    it's so long already, so I think just simply call it a
17    descending chromatic minor line progression.
18          That progression, that movement down, and I'll -- I'll
19    actually show it on a keyboard later, has been around for 300
20    years.  Now, it dates back to the 17th century, but in the 20th
21    century and before "Taurus," there were a large number of
22    popular musicians, artists, composers, that were also using it,
23    but in a way that is not exactly the same as 300 years ago.
24    And the difference is that the similarity's essentially going
25    from A down to F.  That is what you see in "Taurus," that is
```

1    what you have in "Stairway to Heaven," and that is what you

2    have in any number of works that predate "Taurus" and/or

3    "Stairway to Heaven" in the 20th century.  That's essentially

4    what is at issue.

5              MR. ANDERSON:  And if we can display a keyboard.

6         (Document was displayed on the screen.)

7              THE WITNESS:  Thank you.

8    BY MR. ANDERSON:

9    Q.    Absolutely.  Could you highlight on the keyboard the notes

10   of the descending chromatic line in "Taurus" and "Stairway."

11   A.    Yes.  So we're in the key of A minor, and so that's A.

12   Then moving down to the very next note, that's G sharp.  Moving

13   down to the very next note, that's G.  Moving down to the very

14   next note, that's F sharp.  And then moving down again to F.

15   That is a chromatic -- and if you'd leave that up for a moment,

16   that is a descending chromatic minor line progression.

17        Once again, what you heard from Dr. Stewart is that the

18   typical way to end that chromatic scale is to go one more

19   note -- and if you could do E, thank you -- that it actually

20   extends.  Well, that's true, but it's true for a group of opera

21   composers in Venice in the 1600s.

22        Henry Purcell wrote an opera -- he was in England -- that

23   Dr. Stewart acknowledges, that has something called "Dido's

24   Lament."  These Venetian opera composers in the 17th century

25   created a form called the lamento.  It's just the Italian for

```
 1   lament.  It's a sad song.  And it is absolutely correct that

 2   when they wrote their lamentos, they had this commonplace

 3   chromatic descending line.  They'd go down to E.  But there --

 4   there is where it is.  You can't now say that that is what's

 5   typical, because it isn't typical in the 20th century, 300

 6   years later.  What we in fact find is that any number of songs,

 7   and these are things that I attached to my report, songs that

 8   are referred to in the scholarship that I also cited in my

 9   report, they actually go down to F sharp.  I've just put a dot

10   on there, short of the F.  Others go down to F, just like

11   "Taurus" and "Stairway to Heaven."  And "Chim Chim Cher-ee," a

12   very well-known song from Mary Poppins, actually goes down to

13   D sharp.

14       So the idea that you can extract a practice in a very

15   specific song called the lamento from Venetian operas 300 years

16   ago and say that's typical, that's the norm, is completely

17   groundless.

18   Q.   You indicated that, if I understood correctly, that it's a

19   relevant similarity that both compositions have a descending

20   chromatic scale.  Is it a significant similarity?

21   A.   No.  In fact, not only is it common, a chromatic scale,

22   descending or ascending, is a musical building block.  This is

23   something that no one can possibly own.  It's a musical

24   building block.

25   Q.   And when you've described it as a relevant similarity, you
```

812

1    simply mean it's relevant to this case?

2    A.    That there's sufficient similarity.  One can easily look

3    at two works -- and we'll talk about some of these purported

4    pairs, a B and a C in different places.  That would be like

5    taking two words out of a short story, or even comparing two

6    paragraphs, and let's say the two words are "and the," and you

7    find "and the" in two completely different sentences, but you

8    say, oh, well, this is interesting, there's an "and the" here,

9    and there's an "and the" here.  That, I would not call a

10   relevant similarity.

11   Q.    And in comparing the "Taurus" deposit copy to the

12   "Stairway to Heaven" composition, did you have to cut the note

13   values or make any assumptions regarding the note values?

14   A.    I did.  If we could go back to the "Taurus" deposit copy

15   sheet.

16        (Exhibit was displayed on the screen.)

17        THE WITNESS:  The "Taurus" deposit copy, as I

18   mentioned, is in common time.  That's that uppercase C at the

19   beginning.  And all of the notes in the upper staff, and many

20   of the notes in the lower staff, are quarter notes.  The basic

21   pulse, that's a quarter note, that's a quarter note, quarter

22   note, quarter note, quarter note, quarter note, the basic

23   pulse -- and this is really important.  The basic pulse in the

24   "Taurus" deposit copy as it was written is quarter notes.  The

25   basic pulse in the guitar part in "Stairway to Heaven" is not

1    quarter notes. It's eighth notes. And so in order to have

2    them line up in my comparative transcriptions, which you have

3    to do, I had to cut in half the note values of all of the notes

4    from the Section A of "Taurus" that I was comparing to

5    "Stairway to Heaven." So quarter notes now become eighth

6    notes. And that's what you're supposed to do so that you can

7    line them up. But you can't, in having done that, forget that

8    the "Taurus" deposit copy, basic rhythm is not eighth notes.

9    The basic rhythm is quarter notes.

10             MR. ANDERSON: If we could please display Exhibit

11   2092-3, which is Attachment B to Dr. Ferrara's February 10th,

12   2016 initial report. And next, if we could also place the

13   "Taurus" deposit copy next to that.

14        (Exhibits displayed on the screen.)

15   BY MR. ANDERSON:

16   Q.   If you could display the Musical Example 1 from your

17   report, and if -- could you please explain what Musical

18   Example 1 tells us.

19   A.   Certainly.

20        (Document was displayed on the screen.)

21             THE WITNESS: So in carrying out that process that I

22   just described, cutting in half the notes so that you can

23   actually compare them, in the upper two staffs, all of the

24   notes -- this is 100 percent of the notes that Dr. Stewart puts

25   at issue. Everything in Section A is there in the upper two

814

1    staffs.  That's my Musical Example 1.  So that's the upper

2    melodic line where he finds melodies that I think are just

3    snippets that are pulling out, that are no more than fragments.

4        And then the bottom is the left hand that I played.

5    That's the lower part of the "Taurus" deposit copy.

6        So I've put both of those lines over "Stairway to Heaven."

7    You see that on the bottom.  That's the guitar part.  And I

8    also, and in my report, I highlighted in red the descending

9    chromatic notes.  And so you can see that there are five.  The

10   notes are A, G sharp, G, F sharp, F.  They're moving down.

11       MR. ANDERSON:  Thank you.

12       And with the Court's permission, if Dr. Ferrara could go

13   to the keyboard to describe and play some of the similarities

14   that are in issue in this case.

15       THE COURT:  Yes.

16       (The witness stepped down from the witness stand and,

17        using an electric piano for demonstrative purposes, as

18        noted herein by the reporter, testified further as

19        follows:)

20   BY MR. ANDERSON:

21   Q.   Dr. Ferrara, if you could please describe and play some of

22   the similarities and differences between Section A in "Taurus"

23   and the four measure guitar part in "Stairway to Heaven."

24   A.   Certainly.  And so I'm going to try to lean over so that

25   the microphone picks me up.

815

```
 1        I'm going to play the upper part for you first.  I'll play
 2   the entire four measures.  And this is all of Section A, both
 3   parts, nothing left out, in the deposit copy:  (Piano played.)
 4        And now right under that, the four measures of the guitar
 5   part in "Stairway to Heaven":  (Piano played.)
 6        And in answer to your question, in comparing them, I'm
 7   going to compare measure by measure.  We talked about
 8   dissection.  Because what counts in comparing a melody, for
 9   example, is the order of the pitches, the succession of the
10   pitches, which is the definition of melody.  It's a linear
11   succession of pitches and their rhythmic durations.  And what's
12   important about that is that it -- like words, it's the order
13   of the pitches or the order of the letters that create a word.
14        There are only seven letters in the musical alphabet:  A,
15   B, C, D, E, F, G.  After that, up the keyboard, they continue
16   to repeat:  A, B, C, D, E, F, G; A, B, C, D, E, F, G.  And so
17   what's going to be very important is to distinguish what the
18   succession of the notes are.
19        By way of example, think about the two words, treason --
20   "treason" and "senator."  There's seven letters.  They use
21   exactly the same letters.  Treason and senator, exactly the
22   same seven letters.  Does anybody think that they're the same
23   word?  No.  And why are they different words?  Because the
24   succession of the letters is different.  That's what creates
25   words.  That's what creates melodies.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

816

1    Within that context, let's think about the melody in the

2  upper part that Dr. Stewart has put in issue first.  Here it

3  is:  (Piano played.)  That's the first measure.

4    I'll play it one more time:  (Piano played.)

5    Here's the first measure of "Stairway":  (Piano played.)

6    Now, they're dramatically different.  First, they're

7  dramatically different in their rhythm, even after having

8  cutting in half the note values.  Because remember, melody is

9  also rhythmic duration.  Even after I cut those in half, we

10 have something that are not -- two notes that are not eighth

11 notes in that first measure in the upper line.  (Piano played.)

12 Those are not eighth notes, they're sixteenth notes.

13   So to say that there is a steady, even eighth note rhythm

14 in "Taurus" is wrong, even after you half the notes, because

15 you have sixteenth notes.  (Piano played.)  Da-da-da.  You

16 don't have any sixteenth notes in this "Taurus" part.  There,

17 you have eighth notes.  (Piano played.)

18   And you notice, even if you don't read music, if you take

19 a look, you can see, in the lower line -- (piano played) --

20 there's a lot of space in between the notes.  They go from

21 space, they skip lines and skip spaces.  So these are called

22 leaps.  (Piano played.)

23   On the other hand, if you take a look at the upper line in

24 "Taurus," these are all steps.  (Piano played.)

25   And here's something that's particularly important.  There

1    is a static top note in both lines in "Taurus," and it's this

2    E.  It is the fifth note in that first measure, and it's this:

3    (Piano played.)

4          And it's approached by A.  (Piano played.)

5          And then it goes on -- (piano played) -- again.

6          Whereas, we don't have that kind of static limited range

7    in "Stairway."

8          (Piano played while speaking:) It's not only leaps, but

9    it's spreading out so much higher, with big leaps.

10         You simply do not see those.

11         So if we continue, the second measure, upper notes in the

12   "Taurus," (piano played), compared to the second measure in

13   "Stairway," (piano played), they couldn't be more different.

14         You'll notice also that you have quarter note, stop,

15   (piano played), stop (piano played).

16         So you have quarter notes in the upper line in "Taurus,"

17   but no quarter notes in the "Stairway."

18         But now we go to the third measure, and you can easily

19   hear the difference.  (Piano played.)  That's the entire third

20   measure.  It's a trill.  The main note is written.  It's B.

21   (Piano played.)

22         That's compared to this in "Stairway":  (Piano played.)

23         "Taurus":  (Piano played).  Four beats, compared to

24   (piano played.)

25         And the final measure, (piano played), as compared to

1     (piano played).

2          They're different.

3          Let's take a look at the left -- the lower staff that I

4     played with my left hand in "Taurus."  Here's where you have

5     the similarities.  And these are the similarities that I duly

6     noted.  And if you'll listen, I'm going to play that lower part

7     all by itself.

8          This is "Taurus":  (Piano played.)

9          Now, the similarity is in these, (piano played while

10    singing) yum, yum, umms, moving down.  That's a chromatic scale

11    (piano played).  It's a musical building block.  It's not only

12    what they did 300 years ago, but what composers in all genres

13    do, is simply moving (piano played) up and down a scale.  And

14    that is similar to (piano played).  Here I'm playing, (piano

15    played while speaking), there's these notes moving down.

16         Let's think again about the rhythm.  The rhythm in the

17    lower staff of "Taurus," is it eighth notes?

18         (Piano played.)

19         No.  It's (piano played while speaking) quarter, eighth

20    eighth, quarter.  Eighth -- now you have eighth, eighth,

21    eighth, eighth, eighth, eighth, eighth, eighth, whole note.

22         That's not even remotely similar to all of the moving

23    eighth rhythms.  So even after I have the notes, it's still not

24    eighth to eighth.

25         And by the way, if it was -- let's say that "Taurus" was

819

```
 1   all eighth notes.  And it's not.  But let's say that it was all
 2   eighth notes.  (Piano played.)  Those are all eighth notes.
 3   (Piano played.)
 4        Mozart wrote that 250 years ago.  Those are arpeggios.
 5        This is a C chord:  (Piano played.)
 6        Mozart breaks it up into successive notes:  (Piano
 7   played.)
 8        That's an arpeggio:  (Piano played.)
 9        That's an arpeggio:  (Piano played.)
10        The upper line in "Taurus" doesn't have arpeggios.
11   (Piano played.)
12        Those are not arpeggios.  Those are mostly stepwise and
13   leaps, but not arpeggios.  The arpeggios in "Taurus" are in the
14   lower part, what I say, the part that's at issue.  This is a
15   breaking up of the chords.  (Piano played.)  But that breaking
16   up of the chords is so different than the breaking up of the
17   chords in the melody in "Stairway to Heaven."  (Piano played.)
18        And so what I found, in going right to the very end, what
19   I found is that, sure, they're both using a common, generic
20   descending line scale, but they are expressing them so
21   dramatically different.  And as you do the dissection that we
22   talked about before, you can hear, when you actually compare
23   one to the other, one to the other, when you actually debunk
24   the idea of a steady rhythm in the eighth notes -- and here's
25   something that is particularly poignant about the eighth note
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

820

1  rhythm "Stairway." All eighth notes. (Piano played while
2  speaking:) Ta-ta-ta-ta, ta-ta-ta-ta, all eighth notes,
3  ti-ti-ti. Now, listen, third measure, (piano played), da.
4      Wait a minute. We just had ti-ti-ti-ti, ti-ti-ti-ti,
5  da-da-da-lraum! We stopped. That stop is called a
6  syncopation. That's an abrupt interruption of the eighth note
7  pulse.
8      There is no syncopation, not just in Section A in the
9  "Taurus" deposit copy, there's no section -- there's no
10 syncopation in the whole "Taurus" deposit copy.
11     So this, (piano played), da!
12     And then we would -- we'd go back, (piano played while
13 singing), da-da-da, da-da-dum.
14     And finally, at the very end, Dr. Stewart suggests that
15 they both end on an A something. He calls it an A5 (piano
16 played), because it's not an A minor chord, in "Taurus," and a
17 A minor chord, which it is, in "Stairway" (piano played).
18     But in fact, that is called a cadence. The cadence is
19 very different.
20     The cadence in "Taurus" is: (Piano played.)
21     Here's the cadence in "Stairway": (Piano played.)
22     That sound alike?
23     (Piano played) compared to (piano played).
24     And the settling on the A, the A minor in "Stairway,"
25 happens on an off-beat (piano played), right there, "one, and."

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

821

```
 1    That's the A minor.

 2         Whereas, in the "Taurus" deposit copy, it has to wait all

 3    the way until a strong B3 (piano played).

 4         So, yes, do they both go to some form of A?  Of course,

 5    that's not significant.  We're in A minor.  You would expect it

 6    to go sometimes to A.  But the point is, that they do it in

 7    very different ways.

 8         For all of these reasons, I decided that not only are

 9    there no similarities in the upper line, it's so obviously

10    different, but in the lower line, sure there are similarities,

11    but those similarities are generic and commonplace and, in

12    fact, are found in prior works, that is, prior artworks, that

13    predate "Taurus" in popular music, as we will go through in the

14    coming minutes.

15         THE COURT:  Do you want the witness back on the

16    witness stand, Counsel?

17         MR. ANDERSON:  I believe there's just a few more.

18         THE COURT:  Okay.  Go ahead.

19         MR. ANDERSON:  Thank you, Your Honor.

20         MR. KULIK:  Your Honor, could we please have questions

21    and answers as opposed to a lecture?

22         THE COURT:  Oh, it's okay.

23         MR. ANDERSON:  I'm sorry, I didn't catch what the

24    Court said.

25         THE COURT:  You may ask your next question.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

822

```
 1            MR. ANDERSON:  Thank you.
 2   Q.   If we could concentrate on the portions of "Taurus" and
 3   "Stairway to Heaven" in which you found relevant harmonic
 4   similarities, and if I could please ask for Musical Example 8
 5   from your first report.
 6            (Document was displayed on the screen.)
 7            THE WITNESS:  Okay.  So what we have here --
 8   BY MR. ANDERSON:
 9   Q.   And the question is, could you please first explain what
10   Musical Example 8 is.
11   A.   Thank you.  Okay.
12            The top line is the lower line from "Taurus."  That's what
13   I say is at issue.  And what I did is, I put it up an octave so
14   that you can actually hear it right in the same range as
15   "Stairway to Heaven."
16   Q.   What do you mean by put it -- put it up an octave?
17   A.   Well, it's actually written here.  (Piano played.)  That's
18   the "Taurus" deposit copy.
19            But in order to more easily compare them, I brought the
20   whole thing, all of it, up an octave.  (Piano played.)  And so
21   now you can hear the "Taurus" lower staff melody in the same
22   range as the "Stairway to Heaven" melody.
23   Q.   And if you could please identify the relevant similarities
24   that you found.
25   A.   Once again, you can see that the eighth note rhythm
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

823

1    suggestion simply doesn't fly, because the first and the fourth

2    notes in "Taurus" that are highlighted in red are quarter

3    notes.  So there isn't an eighth note rhythm.  It's not a

4    ti-ti-ti-ti-ti-ti-ti-ti.  It's da, da-da, da.  Then you have

5    eighth notes, and then once again then you have a whole note.

6         Whereas, in "Stairway to Heaven," you have these steady

7    eighth notes (piano played), and the interruption with

8    (piano played), and then we've gone through essentially the

9    rest.

10        The other thing that we haven't --

11             THE COURT:  There's not a question pending now.

12        Next question, Counsel.

13             THE WITNESS:  Thank you.

14   BY MR. ANDERSON:

15   Q.   Just to clarify, could you explain or identify why these,

16   some of the notes are in red.

17   A.   Yes.  Once again, the red notes are the descending

18   (piano played) chromatic notes, that are in both, no question.

19   Q.   And the heading of this refers to four measure chord

20   progressions.  Could you explain that.

21   A.   Yes.  When we're analyzing chords, we not only analyze the

22   notes in the chords, but also the harmonic rhythm.  That is the

23   rate of chords that change.  After you have halved, cut in

24   half, the note values in the "Taurus" deposit copy, the chord

25   harmonic rhythm becomes the same in the first two measures.

1    So if you take a look, the chord symbols are those

2    letters.  That's a uppercase A with a smaller -- with a

3    lowercase M.  That's an A minor chord.  And then --

4    Q.   Could I -- I'm sorry to interrupt you, but if I could just

5    ask you if you could please identify and explain the chord

6    progression in the "Taurus" deposit copy, in that portion.

7    A.   Yes.  So in the "Taurus" deposit copy, that A minor chord

8    is this, (piano played), and what's happening below it is this,

9    (piano played).  And then, (piano played).  And that's

10   happening every two beats.  (Piano played while speaking: One,

11   two, three, four; one, two, three, four.

12   Q.   Is there any relevant similarity between that chord

13   progression and "Stairway to Heaven"?

14   A.   Yes.  That is the chromatic descending minor line

15   progression.  Here it is.  If -- I'm not using the melody now,

16   (piano played), I'm just playing block chords.

17       Here's the chord progression in "Stairway":  (Piano

18   played.)

19       It's actually not even.  It's just this:  (Piano played.)

20   There's a difference there.  It's a D chord.

21       But the point is, that there are similarities and

22   differences in the actual notes within the chords, but what is

23   the same after you have the notes, is the harmonic rhythm,

24   every two beats.

25       You'll notice, importantly, that I have an NC on the third

825

1    measure in the upper line.  That means no chord.  What's

2    written is, (piano played).  That's actually a diad.  It's not

3    a chord.  It's two notes.

4         And, on the other hand, there is a full chord that's

5    outlined, arpeggiated, in "Stairway to Heaven," (piano played),

6    F.

7    Q.   And could you please play Musical Example 8.

8    A.   Yes.

9         Here is the upper line:  (Piano played.)  That was

10   "Taurus."

11        Here is "Stairway":  (Piano played.)

12   Q.   Is the melody in Section A in the "Taurus" deposit copy

13   different or similar to the four measure -- the melody in the

14   four measure guitar part in "Stairway"?

15   A.   I think we've all heard that they're dramatically

16   different.

17   Q.   And if you can play any remaining notes that are the same.

18   A.   Yes.  We would have to -- what I've done is, I have -- and

19   I don't have -- if I can take a look at this screen.

20        Thank you so much.

21        What we're going to put on the screen for you right now is

22   simply X'ing out -- this is the same Musical Example 8 attached

23   to my first report, February 12th -- February 10th, I'm sorry,

24   and what we're going to do is, when notes are not the same,

25   when corresponding notes in the melodies and the harmonies,

826

1    when they're not the same, we're going to X them out.

2          MR. KULIK:  Your Honor, I'm going to move to strike

3    that.  There's no question pending.

4          THE COURT:  Sustained.

5      Next question, Counsel.

6    BY MR. ANDERSON:

7    Q.   Could you please, looking at Musical Example 8, go through

8    it and identify the notes that are not the same.

9    A.   Thank you.

10      If you take a look at measure one, we've just had an X,

11   there is no corresponding note in the upper part.

12      And we can continue.

13      The next note is the same.  So you see that, that second

14   note, the top space, that hasn't been X'd out, because it's the

15   same in both melodies.

16      Now we continue.

17      What is the same is the moving down of the chromatics.

18   Let's just go rapidly through that.

19      And all of these X notes are simply not the same.

20      What's left, without Xs, is the same.

21   Q.   And could you please play the --

22   A.   Okay.  So you'd like me to play what's left?

23   Q.   Well, let me ask you, is there anything else that you

24   would like to say that you believe is relevant to what you've

25   just done in terms of identifying the notes that are not the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  same?

2  A.  Sure.  I was just simply going to summarize all of those

3  Xs, but I can certainly make it more brief.

4      (Document was displayed on the screen.)

5      THE WITNESS:  There it is.  So all of these are the

6  X'd notes.  These are the notes that don't correspond.  That's

7  why the melodies sound different.  This is, empirically, this

8  note, this note, different.  X.  This note, this note, same.

9  No X.  One after the other.

10     Why one after the other?  Why not take two notes at the

11 beginning compared to two notes in the middle of the other?

12 Well, that would suggest that "treason" and "senator" are the

13 same word.

14 BY MR. ANDERSON:

15 Q.  Is there any -- oh, I'm sorry.

16 A.  Go ahead.

17     THE COURT:  No, no.  Next question.

18 BY MR. ANDERSON:

19 Q.  Is there any significant similarity between the melodic

20 notes that are the same in "Taurus" and "Stairway to Heaven"?

21 A.  There aren't.  And what you have now on the screen are all

22 of the notes that are the same, that remain.  And you can see

23 that we have five notes that are all red.  (Piano played.)

24 They're the same.  (Piano played.)  I duly note that in my

25 report.  But that's a chromatic descending line scale that has

```
 1    been used for 300 years.  And ending on F?  (Piano played.)
 2    Not in the Venetian operas, but yes, in contemporary and 20th
 3    century popular music before (piano played) "Taurus."
 4    Q.   And --
 5    A.   And then you have -- want to continue finishing the
 6    answer.  And then you have the single note, (piano played).
 7    That single note, (piano played).
 8         So you have (piano played), and then simply (piano
 9    played).
10         Now, when you strip away (piano played), what you have is
11    (piano played) and (piano played).
12    Q.   Can you estimate for us how many of the notes are
13    different in this portion.
14         Need to go back to --
15    A.   Yes.  Without taking the time to count them, I think
16    visually we can see that most of the notes are different.
17    Q.   And can you provide an example as to why the analysis of
18    the order or succession of pitches and the rhythmic durations
19    is relevant in a musicological analysis?
20    A.   Yes.
21         Think about this melody.  I'm simply going to play a
22    melody based on a C major chord, (piano played).  This is a C
23    major chord.  I'm just going to use the notes of that chord.
24    (Piano played.)
25         Again.  (Piano played.)
```

```
1        One more time.  (Piano played.)

2        Those are all the notes of a C major chord.

3        Now I'm going to change the order of the notes.  (Piano

4   played.)

5        Now, obviously, if someone got up and sang the "Star

6   Spangled Banner" and sang it this way, (piano played), outside

7   of the words, no one would know what they were singing.

8        (Piano played.)

9        The key here, the reason that those Xs are so important,

10  the reason that the succession of notes is so important, is

11  that it defines the melody.  (Piano played) as compared to

12  (piano played).

13       By the way, all of these notes --

14            THE COURT:  You've answered the question.

15            THE WITNESS:  Yeah, I should not go on.  Thank you.

16            THE COURT:  Go ahead, next question.

17  BY MR. ANDERSON:

18  Q.   And harmonic rhythm, is there anything else -- or what is

19  harmonic rhythm?

20  A.   As I stated earlier, it is the rate of change of chords.

21  Q.   And you've testified already that the ending the chromatic

22  scale at the F is not distinctive.  And are you aware -- and of

23  course you've also explained or mentioned that Dr. Stewart

24  thinks that's an important similarity, or the lack of going to

25  an F is an important similarity.
```

1    Have you done any research about chord progressions and

2  discussing the descending chromatic minor progression in

3  popular music?

4  A.   Yes, I have.

5  Q.   What research have you done?

6  A.   Well, first, my first book, co-authored book, is called

7  *Keyboard Harmony and Improvisation,* and certainly I know about

8  harmonization, chords and so forth.  It's a book about it.  But

9  in addition, with respect to this particular (piano played)

10  descending chromatic line, I have in my library at home any

11  number of books on chord progressions, on jazz theory and so

12  forth.  And in my first report, February 10th report, I cited

13  around five books that discuss the chromatic descending line

14  progression, (piano played.)

15    Not only in none of those books do they say it's supposed

16  to go to E (piano played) --

17        THE COURT:  Let me back you up.  There's no question

18  pending.

19    Next question.

20        THE WITNESS:  Thank you.  I'm sorry.

21  BY MR. ANDERSON:

22  Q.   Yeah, if you can wait.  I appreciate your enthusiasm.

23    Did any of those books state or suggest that there's a

24  typically descending chromatic minor progression that moves

25  from A to E in the key of A minor?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

831

1   A.   Actually, quite the opposite.  Not only do none of those

2   books suggest that you have to go down to E, (piano played),

3   but each of those, in some cases, they list a whole bunch of

4   songs, and they actually give you the descending chromatic

5   line.

6        Many of them -- and I mentioned this when I was on the

7   witness stand, many of them just go to here, (piano played), to

8   the F sharp.  Many of them, (piano played), go to the F.  Some

9   of them go, (piano played), down to the E, which Dr. Stewart

10  says is typical, and some of them, (piano played), go beyond.

11       The point is, nowhere is it stated that going to E,

12  (piano played), or avoiding that E is in any way typical.

13            MR. ANDERSON:  If we could call up the "Taurus"

14  deposit copy, Exhibit 2058.

15       (Exhibit was displayed on the screen.)

16  BY MR. ANDERSON:

17  Q.   I don't know if we can see it on this, but there's a date

18  at the top, December 22, 1967.

19       Did you do a search for music prior to December 22, 1967,

20  in connection with your analysis in this case?

21  A.   Yes, I did.

22  Q.   And why did you do that search?

23  A.   To find out, to discover, whether, in popular music, this

24  descending chromatic line, (piano played), and, in fact, in

25  general, and also just ending on F, (piano played), was in

832

```
 1    existence.

 2    Q.    And did you also do a search for music that was released

 3    prior to late 1971, when "Stairway to Heaven" was created?

 4    A.    Yes, I did.

 5    Q.    What do musicologists call -- do they have a term for this

 6    kind of a search?

 7    A.    Yes.  It's called a "prior art search."

 8    Q.    And what were the results of your prior art search?

 9    A.    I found any number of works.  I attached about 20 works

10    with transcriptions or the published sheet music to my first

11    report, and they contained a chromatic descending line

12    progression.

13    Q.    Thank you.

14          If we could please display Musical Example 3 from your

15    initial report.

16          (Document was displayed on the screen.)

17    BY MR. ANDERSON:

18    Q.    If you could please -- I'll let you grab that.

19    A.    Oh, great.  I'll just use it from here.

20    Q.    Thank you.

21          If you could please explain what is the significance or

22    meaning of Musical Example 3.

23    A.    This is from the Julie London 1957 recording of "The

24    Meaning of the Blues."  And you can see, because I have out --

25    I have highlighted in red the movement down.  It's down here.
```

833

```
1   (Piano played.)
2       Now, these notes in between, (piano played), da-da-dum,
3   da-da-dum, these are ornamental notes.  What we have is a
4   descent, (piano played), from A to F, and then it breaks.
5       The next long note moves up to A, (piano played).
6       So this is a descent from A to F, which is the number of
7   notes from A, (piano played), to F that is also the descent in
8   "Taurus" and in "Stairway to Heaven."
9   Q.   And is this example of prior art relevant to Dr. Stewart's
10  claim that the songs are similar because they don't go -- they
11  don't do what was done in Italy and 300 years ago?
12  A.   Yes, it is.
13  Q.   And could you please explain that.
14  A.   The reasons it's relevant is, this is just the first of
15  many examples of popular music in -- in this case, that predate
16  "Taurus," that don't go down to the E in the 1600s operas, but
17  stop at the F, (piano played), where "Taurus" and "Stairway"
18  stop.
19  Q.   And if we could please call up Musical Example 7 from your
20  first report, and once we have that, if you could please tell
21  me the significance of your Musical Example 7 in your
22  musicological analysis.
23  A.   Certainly.
24      (Document was displayed on the screen.)
25          THE WITNESS:  "More" was a big hit in 1963.  In the
```

834

1   middle section -- this is the Vic Dana recording.  In the

2   middle section, the -- "More" is a major key.  The middle

3   section goes to a minor key.  And this is often the case in

4   popular music and classical music.  And you can see the red

5   highlighted notes.  (Piano played.)  It's exactly the same five

6   notes that are moving down that we saw in my comparative of

7   "Taurus" and "Stairway to Heaven."  And then that chromatic

8   motion down stops, and it moves up (piano played).

9   BY MR. ANDERSON:

10  Q.   So if I understand correctly, the notes that are in red in

11  this 1963 recording also appear in "Stairway to Heaven" and

12  "Taurus" and also do not do what the Venetians did 300 years

13  ago?

14  A.   Yes, that's right.

15  Q.   If we could please call up -- well, let me ask you, are

16  there any other -- if we could keep that one just for a second.

17       Is there anything else in this example that you believe

18  that is relevant, or was that basically the point?

19  A.   Well, the chords that move down (piano played), the chords

20  are, again, similar, in some cases the same, in some cases

21  related, like they are between "Taurus" and "Stairway to

22  Heaven."

23  Q.   And you identified or referred to the chord progression in

24  "Taurus" and "Stairway to Heaven."  Is that a -- did you, in

25  your analysis, make any determination as to whether that chord

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

835

```
 1   progression is commonplace or was commonplace?
 2   A.   Well, first, again, the chord progression isn't identical,
 3   and what is the same, once again, can be found in other works.
 4   What is the same is a (piano played), essentially an upper
 5   chord that kind of remains and follows the (piano played)
 6   chromatic line down.  So, no, I don't see anything that is
 7   particularly significant about what is in the chord
 8   progressions.
 9   Q.   Okay.  And I understand from your report that you also
10   analyzed the 1963 song "How Insensitive" in your report?
11   A.   Yes, I did.
12   Q.   And how -- who wrote "How Insensitive"?
13   A.   Carlos Jobin.  Carlos Jobin, of course, is the great
14   bossa nova composer.  He composed "Girl from Impanema,"
15   "One Note Samba."  He also composed, in 1963, "How
16   Insensitive."
17   Q.   And did you include in your report any sheet music for
18   that composition?
19   A.   Yes.  I attached the published sheet music, the 1963
20   published sheet music of "How Insensitive" to my report.
21        MR. ANDERSON:  Could we please display that.
22        (Document was displayed on the screen.)
23        THE WITNESS:  Well, this is my transcription of the --
24   BY MR. ANDERSON:
25   Q.   The relevant portion?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

836

```
1    A.    Yes.

2    Q.    Okay.  And could you please point out to the jury the

3    descending -- point out to the jury what you believe is

4    significant about this song to this case.

5    A.    Certainly.  This is from the Astrud Gilberto recording in

6    1965, and what I did was to, once again, write out the chords,

7    (piano played), but I also wrote out the descending bass

8    (piano played).  And here the bass repeats, so we have

9    (piano played), and then it -- that's right at the F, just

10   like "Taurus" and "Stairway," and then it changes direction,

11   (piano played).  And so, (piano played), that, to me, is what

12   is significant.

13   Q.    And so it's another song prior to "Taurus" where it didn't

14   do what the Venetians did.  Is that one way of putting it?

15   A.    That is -- that's correct, yes.

16   Q.    Did you find any prior artworks that incorporate a

17   combination of a descending chromatic progression with

18   similarities in the melody that are relevant to your analysis

19   here?

20   A.    Yes, I did.

21   Q.    And what did you find?

22   A.    I found that there are prior artworks that not only

23   incorporate this (piano played) chord progression with these

24   (piano played) descending chromatic notes, but also that have

25   played on the guitar, like in "Stairway to Heaven," a melody
```

837

```
1    that has similarities.
2    Q.    And if we could please display your Musical Example 11
3    from your first report.
4         (Document was displayed on the screen.)
5    BY MR. ANDERSON:
6    Q.    And if you could please explain to us the significance of
7    this example.
8    A.    Certainly.  This is from the Johnny Mathis recording in
9    1960 of "My Funny Valentine."  It's a standard, a classic, and
10   it is right after the introduction.
11        So above this, (piano played), the voice is singing,
12   (piano played), "My funny valentine."  And the guitarist, like
13   in "Stairway," under the vocalist, is playing in a melody that
14   I think you'll immediately recognize:  (Piano played.)
15        So it's (piano played).  It's moving down.  And you can
16   see that it has just about the same chords, (piano played),
17   that are at issue in the two songs, and it goes immediately to
18   F.  But what it does have that is not in "Taurus" is not just
19   the arpeggios, (piano played), but has the arpeggios in the
20   range, in that upper range, (piano played), of "Stairway."
21        You don't have that range, you have this (piano played), a
22   static top, it's always going to the E, (piano played), E,
23   (piano played) E, in "Taurus."
24        But in "Stairway," (piano played), it's spread out.  Here,
25   it's spread out.  That is the greater similarity.
```

838

```
1    Q.   Okay.

2    A.   It's also eighth notes, as you can see, all eighth notes.

3    Q.   Right.

4    A.   I'm sorry, could you just bring that back, because there

5    was one more thing just to answer your question.

6         THE COURT:  No, there's no question pending.  Next

7    question.

8    BY MR. ANDERSON:

9    Q.   If we could look at Musical Example 11, was there anything

10   else that was significant in your analysis in this case?

11   A.   Forgive me for not mentioning it.  In exactly the same

12   place -- I'm going to put a dot on it.  This monitor, for some

13   reason, is not working.

14        So if you look at the lower line, this is the fifth chord

15   (piano played).

16        Remember what I said about what happens right at the same

17   place in "Stairway to Heaven."  It's all

18   ti-ti-ti-ti-ti-ti-ti-ti, and when we come to F, it does this,

19   (piano played), da.  It stops.  It does this exactly on the

20   same beat, (piano played), da.  And we've just had (piano

21   played while singing:) ti-ti-ti-ti-ti-ti-ti-ti,

22   ti-ti-ti-ti-ti-ti-ti-ti, ti-ti-ti-ti-ti-ti-ti-ti,

23   ti-ti-ti-ti-ti-ti-ti-ti, ti-ti -- now stop.  Right there.

24   Exactly in the same place.  Same chord, same beat.

25        Clearly, all of the things that I've just gone through
```

839

```
 1   suggest that this has some real melodic similarities to
 2   "Stairway to Heaven," and it's 1960, as you can see.
 3   Q.   If we could take a look at Musical Example 15 from your
 4   report, and if you could please explain to us the significance
 5   in your analysis of Musical Example 15.
 6   A.   Certainly.
 7        (Document was displayed on the screen.)
 8            THE WITNESS:  Musical Example 15 is the "Taurus" lower
 9   line, (piano played), placed over what I think I can safely
10   call an iconic guitar opening.  It's the opening of "Michelle"
11   by the Beatles.  (Piano played.)  That's the opening of
12   "Michelle."
13   BY MR. ANDERSON:
14   Q.   And what are the similarities that those two works have in
15   common?
16   A.   Even if you can't read music, if you take a look at the
17   range, the first red dotted or highlighted note, then you go to
18   the next notes, you can see that it goes to the E.
19        "Taurus":  (Piano played.)
20        "Michelle":  (Piano played.)
21        It has another note there, but it goes exactly to the same
22   note.
23        Here's the first beat in "Taurus":  (Piano played.)
24        Here's the first beat in "Michelle":  (Piano played.)
25        All the same notes.  The difference is, the chord is not
```

840

1    completely broken up.  (Piano played.)  It's played two notes

2    at once.

3         Now, here's the next note:  (Piano played.)  Identical.

4         Here's the next part in the first measure.  Here's

5    "Taurus":  (Piano played.)

6         Same two notes displayed together in "Michelle":  (Piano

7    played.)

8         In that first measure, the only difference is, in "Taurus"

9    the notes are broken up, but all of the notes, (piano played),

10   are in, (piano played).  And that continues.  It continues in

11   "Taurus," (piano played), as compared to (piano played).

12        Once again, all of those notes are in (piano played).

13   It's just that in "Michelle" they're not arpeggiated.  They're

14   not broken up.

15        The chord is broken up.  (Piano played.)  That's breaking

16   up the chord, but it's not arpeggiated, (piano played), like

17   that.  And then they both go to F (piano played).

18   Q.   So it's another example where they didn't follow -- the

19   Beatles didn't follow the Venetian view of 300 years ago?

20   A.   Yes and no.  I want to be clear about this.

21        In my opinion, that F, which is at the -- on the lower

22   staff, the F, (piano played), in my opinion, while I can

23   certainly hear it ringing at least to here, (piano played), I

24   don't hear it ringing here, (piano played), and so I consider

25   that another new low note, (piano played), which would break up

841

1    the chromatic line; therefore, it would end at F (piano

2    played).

3        On the other hand, Dr. Stewart says, no, in fact, this

4    moves (piano played) to E (piano played), like the Venetians.

5        And so what I would say to that is, if that's the way you

6    hear it, I can accept that.  The point is, that I hear it as

7    ending on F (piano played); he hears it as ending on E (piano

8    played), but everything else is the same.

9        What's particularly important again is (piano played) as

10   compared to (piano played).  Same upper notes, same notes.

11   There's so much similarity here between the 1965 "Michelle" and

12   the later "Taurus."

13   Q.   If I could just ask you briefly to -- you've referred to

14   chords being broken up, or arpeggiated.  If you look on the

15   Musical Example 15, in what you've described as the first

16   measure, there is a note in red, and then there are two notes

17   joined, and then if you look below that, in "Michelle," you see

18   two black dots right over each other.  Which is the chord?

19   A.   Thank you.

20       It's all three notes.  It's the first red note, (piano

21   played), combined with the next two notes, (piano played), and

22   they are the same.

23   Q.   And in "Michelle," the two notes are on the same line,

24   vert- -- hor- -- excuse me, vertical line.  In "Taurus,"

25   they're broken up.  Is that the arpeggiation you're referring

842

```
 1  to?
 2  A.   That's right.
 3  Q.   Okay.  So basically you've gone -- in "Michelle" you have
 4  the exact same notes, but they're played simultaneously.  In
 5  "Taurus" you have the exact same notes, but they're broken, the
 6  chord is broken.  Is that what you're saying?
 7  A.   It's more articulate than the way I said it.  Thank you.
 8  Q.   It's simpler for me to say it that way because I don't
 9  know what you know.
10  A.   Thank you.
11  Q.   If we can just sort of, as quickly as possible, go
12  through -- without rushing you, of course, go through some more
13  examples of prior art.
14       If we can look at Musical Example 17.
15       (Document was displayed on the screen.)
16  BY MR. ANDERSON:
17  Q.   And what is the significance of this musical example?
18  A.   This is "Music to Watch Girls By."  It was a big hit.  It
19  came out in April of 1967.  And I'll just play them.  I'll make
20  this very brief.
21       Here's "Taurus":  (Piano played.)
22       Here is the guitar part in the introduction of "Music to
23  Watch Girls By":  (Piano played.)
24       Once again, "Taurus":  (Piano played.)
25       "Music to Watch Girls By":  (Piano played.)
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1     And the reason they sound so much alike is because that

2   static upper note (piano played) is in both, while (piano

3   played) the chords move down in the commonplace chromatic chord

4   progression.

5   Q.   And if we could display Musical Example 18, which is, I

6   believe, the Johnny Rivers song, "Summer Rain."

7        What is the significance of this example?

8        (Document displayed on the screen.)

9        MR. KULIK:  Your Honor, I'm going to object to both

10  this example and the last one, because "Taurus" was written

11  before both of these sings.

12       THE COURT:  Overruled.  Used for comparison's sake

13  only.

14       MR. ANDERSON:  Thank you, Your Honor.

15       THE COURT:  Not introducing it for prior art.

16  Excuse me.  Are you?

17       MR. ANDERSON:  A general practice in this general time

18  period.  There is no evidence, for example, that "Taurus" was

19  written before "Summer Rain."  They're both referred to as --

20  and by the way, "Taurus" was December 22nd of 1967.  So the

21  chances are this was probably done before then.

22       THE COURT:  But it's being introduced just to show

23  there's similar notes and similar chords, not that "Taurus" is

24  infringing on anybody.

25       MR. ANDERSON:  Oh, absolutely not, Your Honor, no.

844

```
 1          MR. MALOFIY:  It would be irrelevant if that's the

 2   case, if it's not prior art.  There's no purpose of --

 3          THE COURT:  Overruled.

 4          MR. ANDERSON:  Thank you, Your Honor.

 5   Q.   And Dr. Ferrara, if you could please explain the

 6   significance, or the -- yes, the significance of Musical

 7   Example 18.

 8   A.   Sure.  This is played on a guitar.  It's right at the

 9   opening of the Johnny Rivers recording, and once again you'll

10   hear the immediate similarity.

11          This is "Taurus":  (Piano played.)

12          THE COURT:  Let me interrupt just for a second.

13   I want to make sure it's clear as to the last ruling.  You

14   can introduce it to show there are similarities in all kinds of

15   songs and it's a common practice.  You cannot introduce it to

16   show it's prior art to "Taurus" being written.  Okay.

17          MR. ANDERSON:  Thank you, Your Honor.

18          THE COURT:  Go ahead.

19          THE WITNESS:  Thank you.

20          Here is "Taurus":  (Piano played.)

21          And here is "Summer Rain," right from the beginning, the

22   guitar part:  (Piano played.)

23          That last time it moves from A (piano played) to F, which

24   is exactly the same movement down in "Taurus" and "Stairway to

25   Heaven."
```

845

```
 1   BY MR. ANDERSON:

 2   Q.   Okay.  If we can -- I just have a few questions about

 3   visual exhibit L to your report, which we're going to display.

 4   It appears to be, or is labeled, "What are You Doing for the

 5   Rest of Your" -- "Doing the Rest of Your Life?"

 6        (Document was displayed on the screen.)

 7   BY MR. ANDERSON:

 8   Q.   What is the significance of this visual exhibit to your

 9   report?

10   A.   I attached this because it is a very well-known song by

11   the great composer Michel Legrand, the film composer.  And as

12   you can see, what I did is, this is the published sheet music.

13   I circled the chords (piano played), which gives both the bass

14   (piano played) and the chord.  And it happens to be also in

15   A minor, just like "Taurus" and "Stairway to Heaven."

16        MR. ANDERSON:  If we could display from Dr. Stewart's

17   testimony yesterday, Exhibit 501-0001.

18        Would you like -- yes, if you can return to the witness

19   box, please.  Thank you.

20        (Exhibit was displayed on the screen.)

21        (The witness returned to the witness stand and

22         testified further as follows:)

23   BY MR. ANDERSON:

24   Q.   This is an exhibit that was -- yes, an exhibit that was

25   used by Dr. Stewart.  Have you reviewed this exhibit?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00981**

846

```
 1   A.    Yes.

 2   Q.    And I apologize.  If you could go down, please.

 3         Do you believe --

 4         Actually, go back up.

 5         Do you believe there's anything that's inaccurate in the

 6   page of this exhibit that we're looking at now?

 7   A.    I wouldn't be able to, at sight, let you know whether

 8   there are inaccuracies.

 9   Q.    Okay.  And if we can go to the next page.

10   A.    No.

11   Q.    I'm sorry, is there something on this page that, in your

12   view, is musicologically significant to the analysis that

13   either you or Dr. Stewart did in this case?

14   A.    Yes.  We can start with the lowest one that is currently

15   on the page, that's "Chim Chim Cher-e."  What Dr. Stewart did

16   is, he labeled, he put in green, when these songs actually go

17   to E.  But, in fact, I'll put a dot -- I just put a dot next to

18   the D sharp.  In fact, in "Chim Chim Cher-e" from Mary Poppins,

19   it moves down still further.  So it doesn't end at E like the

20   16th century Venetians, it goes one note further.  So this is

21   another exception to Dr. Stewart's rule based on Dr. Stewart's

22   own transcription.

23         And if we continue down, if you would, just scroll down,

24   let's take a look, okay, now, at "Cry Me a River."  "Cry Me a

25   River."  This is the Davy Graham guitar version in 1963.  And
```

847

1   as you can see, Dr. Stewart correctly writes A, G sharp, G, F

2   sharp, F.  Those are the five notes in "Taurus" and in

3   "Stairway to Heaven" that move down.

4       But notice the next note.  G.  That's correct, but that

5   ended the chromatic motion.  Not only does it go up from F to

6   G, from F to G isn't even chromatic.  It's a whole step.

7       So, in fact, what Dr. Stewart has confirmed is that the

8   chromatic movement in "Cry Me a River" is, in fact, from A to

9   F.

10          THE COURT:  Okay.  Ladies and gentlemen, it's 11:30,

11  so we're going to be breaking for lunch at this time.

12      Remember the admonishment not to discuss the case among

13  yourselves or with anybody else or form or express any opinions

14  about the matter until it's submitted to you and you retire to

15  the jury room.

16      Have a pleasant lunch.  We'll see you back in at 1:00

17  o'clock.  Not 1:30.  1:00 o'clock, okay.  We'll get started at

18  that time.  Thank you.

19          THE CLERK:  All rise.

20

21      (Lunch recess commenced at 11:30 a.m.)

22

23      (Afternoon proceedings under separate cover.)

24

25                      --o0o--

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00983**

848

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  JUNE 19, 2016

11

12

13

14                    /S/ SANDRA MACNEIL

15                 Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**00984**