# United States Court of Appeals
## For the Ninth Circuit

C.A. 16-56057

---

### Skidmore et al.

*Michael Skidmore, Trustee for the
Randy Craig Wolfe Trust
Plaintiff-Appellant*

v.

### Led Zeppelin *et al.*

*Defendants-Appellees*

---

# Plaintiff-Appellant Michael Skidmore's
## Excerpts of the Record
## Volume V of XI

---

(Music copyright infringement, on appeal from the final Order dated June 23, 2016 of the Honorable R. Gary Klausner, of the United States District Court for the Central District of California. The case was docketed in the Central District at 15-cv-03462)

---

### Francis Alexander, LLC
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyers for Appellant Skidmore*

## EXCERPTS OF THE RECORD: VOLUME V of XI
(985 – 1239)

06/17/2016   Transcript for June 17, PM (*Doc. No. 286*) ........................................................ 985

06/21/2016   Transcript for June 21, AM (*Doc. No. 279*)....................................................... 1103

849

1                UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3            HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4                              – – –

5

MICHAEL SKIDMORE, AS TRUSTEE FOR    )
6  THE RANDY CRAIG WOLFE TRUST,         )
                                        )
7                        PLAINTIFF,     )
                                        )
8             vs.                       ) No. CV 15–03462–RGK
                                        )
9  LED ZEPPELIN; JAMES PATRICK PAGE;    )
   ROBERT ANTHONY PLANT; JOHN PAUL      )
10 JONES; SUPER HYPE PUBLISHING,        )
   INC.; WARNER MUSIC GROUP CORP.,      )
11 PARENT OF WARNER/CHAPPELL MUSIC,     )
   INC.; ATLANTIC RECORDING             )
12 CORPORATION; RHINO ENTERTAINMENT     )
   COMPANY,                             )
13                                      )
                         DEFENDANTS.    )
14 _____)

15

16            REPORTER'S TRANSCRIPT OF JURY TRIAL

17            DAY 4, VOLUME II, PAGES 849–966

18                 FRIDAY, JUNE 17, 2016

19                      1:01 P.M.

20                LOS ANGELES, CALIFORNIA

21

22

23            CINDY L. NIRENBERG, CSR 5059, FCRR
               U.S. Official Court Reporter
24               255 East Temple Street
                 Los Angeles, CA 90012
25               *www.msfedreporter.com*

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

850

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE
     RANDY CRAIG WOLFE TRUST:
4
          FRANCIS ALEXANDER, LLC
5         BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
          280 N. PROVIDENCE ROAD, SUITE 1
6         MEDIA, PENNSYLVANIA  19063
          215-500-1000
7
          KULIK GOTTESMAN & SIEGEL, LLP
8         BY:  GLEN L. KULIK, ATTORNEY AT LAW
          15303 VENTURA BOULEVARD, SUITE 1400
9         SHERMAN OAKS, CALIFORNIA  91403
          310-557-9200
10

11

12   FOR DEFENDANT LED ZEPPELIN:

13        PHILLIPS NIZER, LLP
          BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
14        666 FIFTH AVENUE
          NEW YORK, NEW YORK  10103
15        212-977-9700

16
     FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:
17
          LAW OFFICES OF PETER J. ANDERSON, PC
18        BY:  PETER J. ANDERSON, ATTORNEY AT LAW
          100 WILSHIRE BOULEVARD, SUITE 2010
19        SANTA MONICA, CALIFORNIA  90401
          310-260-6030
20
          PHILLIPS NIZER, LLP
21        BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
          666 FIFTH AVENUE
22        NEW YORK, NEW YORK  10103
          212-977-9700
23

24

25
```

1   **APPEARANCES OF COUNSEL (CONTINUED):**

2

3   **FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING
    CORPORATION, RHINO ENTERTAINMENT COMPANY:**

4

5           LAW OFFICES OF PETER J. ANDERSON, PC
            BY:  PETER J. ANDERSON, ATTORNEY AT LAW
            100 WILSHIRE BOULEVARD, SUITE 2010
6           SANTA MONICA, CALIFORNIA  90401
            310-260-6030

7

8

9

10  ALSO PRESENT:

11          NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

12          BRAD COHEN, WARNER MUSIC GROUP

13          SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

14          KEVIN SEGAL, TRIAL TECHNICIAN

15          DAN MORENO, TRIAL TECHNICIAN

16

17

18

19

20

21

22

23

24

25

852

```
 1                        I N D E X

 2

 3    DEFENDANTS' WITNESSES:                    PAGE

 4    LAWRENCE FERRARA

 5        DIRECT BY MR. ANDERSON (RESUMED)     853

 6        CROSS BY MR. MALOFIY                 902

 7        REDIRECT BY MR. ANDERSON            932

 8

 9    JOHN BALDWIN

10        DIRECT BY MR. ANDERSON              935

11        CROSS BY MR. MALOFIY                942

12        REDIRECT BY MR. ANDERSON            953

13

14    ROBERT BALLOU MATHES

15        DIRECT BY MR. ANDERSON              954

16

17

18    FURTHER PROCEEDINGS                      PAGE

19    DISCUSSION HELD IN CHAMBERS              921

20

21                      E X H I B I T S

22    TRIAL EXHIBITS                  MARKED  ADMITTED

23    2704                                     917

24    2705                                     918

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

853

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, JUNE 17, 2016

 2                          1:01 P.M.

 3                          - - - - -

 4        (Jury in at 1:01 P.M.)

 5              THE COURT:  Okay.  The record will reflect that all

 6    the members of the jury are in their respective seats in the

 7    jury box.

 8              Let's have the witness back on the witness stand.

 9    And as you're taking the stand, remember you're still under

10    oath.

11              THE WITNESS:  Yes, Your Honor.

12              THE COURT:  And, counsel on direct, you may continue

13    your direct.

14              MR. ANDERSON:  Thank you very much, Your Honor.

15                       LAWRENCE FERRARA,

16                 having been previously duly sworn,

17                   testified further as follows:

18                      DIRECT EXAMINATION

19                          (RESUMED)

20    BY MR. ANDERSON:

21    Q.   Dr. Ferrara, when we left off, we were looking at the

22    first page of an exhibit that Dr. Stewart provided yesterday,

23    and if we can just step back for a second and talk about the

24    general structure of it and what it means.

25              Do you see that the -- if you look vertically along
```

854

```
 1    the -- well, actually, let me start it differently.
 2              Do you see under the heading "Other Art" a series of
 3    titles of works?
 4    A.    Yes, I do.
 5    Q.    And if you look vertically, do you see the letter A?
 6    A.    Yes.
 7    Q.    And is it your understanding that under this chart, what
 8    Dr. Stewart is conveying is that all of the prior art under the
 9    heading "Other Art" has the following series of notes:  A,
10    G-sharp, G, F-sharp, and F?
11    A.    Yes, that's correct.
12    Q.    Okay.  And is it, in fact, your opinion that all of the
13    prior art that Dr. Stewart identifies in this chart and the
14    "Taurus" deposit copy and "Stairway to Heaven" have this
15    sequence of A, G-sharp, G, F-sharp, and F?
16    A.    Yes.
17    Q.    And that, I take it, is a descending chromatic line?
18    A.    That's correct.
19    Q.    Now, if we look at, for example -- I think we stopped off
20    with -- or ended up with "Cry Me a River."  The next one is
21    "How Insensitive"?
22    A.    Yes.
23    Q.    And do you agree with Dr. Stewart's description of the
24    sequence of notes in "How Insensitive" after the F?
25    A.    Yes, I do.
```

855

```
1    Q.    Okay.  The next one is "To Catch a Shad."

2          Do you see that?

3    A.   Yes, I do.

4    Q.   Do you agree with Dr. Stewart's assertion about what note

5    follows the F in "To Catch a Shad"?

6    A.   I don't with respect to the guitar parts that I

7    transcribed and attached to my rebuttal report.

8    Q.   And what do you believe that note should be?

9    A.   After the end of the chromatic decent to the F, the next

10   and final note should be A.

11   Q.   And is A higher or lower than F?  Is it a continuation of

12   the descending chromatic line?

13   A.   No, it is not.  It is the end.  It's the cadence at the

14   very end.

15   Q.   So is "To Catch a Shad" another example of a work like

16   "Taurus" or "Stairway" where you had the five notes in a

17   descending chromatic line followed by something -- followed by

18   a break in the line?

19   A.   Yes.

20   Q.   Okay.  Thank you.

21          MR. ANDERSON:  That just disappeared.

22   BY MR. ANDERSON:

23   Q.   And I just want to make sure.  Could you -- I know I just

24   asked you about "How Insensitive," but could you explain the

25   descending chromatic pitches in "How Insensitive" as they're
```

856

1   presented by Dr. Stewart in his chart?

2   A.   Yes.  You can see on the screen that the descending

3   chromatic scale is the same as in "Taurus" and in "Stairway to

4   Heaven."  It moves from A to G-sharp to G to F-sharp to F, and

5   then it breaks off.  And that's correctly written by

6   Dr. Stewart.  It breaks off and actually leaps up to B-flat.

7            And so what is significant about that is that

8   Dr. Stewart has, like me, found that "How Insensitive" has a

9   descending chromatic scale like in "Taurus" and in "Stairway to

10  Heaven" that goes from A to F.

11  Q.   Is it your opinion that these examples we're talking about

12  are relevant to Dr. Stewart's assertion and opinion that it is

13  typical for a chromatic -- descending chromatic line to proceed

14  all the way to the sixth note he described?

15  A.   It is particularly important, significant, and related,

16  and that's because the example, the -- essentially, the

17  reference point that Dr. Stewart uses is the 1600s opera, where

18  the lament, or lamento, goes down to E.  It goes down to E.

19  This is important chromatically.  After the F, the very next

20  note is E.

21           But that is not the case here.  You can see very

22  clearly in "How Sensitive" -- and I talked about the same thing

23  in "Cry Me a River" -- it leaps up to B-flat and so, in fact,

24  this contradicts the norm, the typical.

25           To simply say that later on there is an E, well,

857

1   there are only seven letters.  What does that mean that later

2   on suddenly an E appears?  The point is that the E does not

3   appear chromatically after the F, as he has transcribed it.

4   Q.   Thank you.

5            MR. ANDERSON:  If we can go to the second page of

6   Dr. Stewart's chart.

7        *(The exhibit was displayed on the screen.)*

8   BY MR. ANDERSON:

9   Q.   And if you could please explain the descending chromatic

10  pitches in "Thoughts" as presented by Dr. Stewart in his chart.

11  A.   Yes.  Once again --

12           MR. MALOFIY:  Your Honor, this is also released well

13  after "Taurus" was written and released.  It's 1969.  If it

14  comes in for prior art or common, it wasn't --

15           THE COURT:  It's not coming in for prior art,

16  counsel, and I think -- I'm not too sure how relevant it is if

17  it's not the prior art.

18           MR. ANDERSON:  First of all, it was in Dr. Stewart's

19  chart yesterday, and so I just want him to respond to what

20  Dr. Stewart said.

21           THE COURT:  Did Dr. Stewart testify to this

22  particular one?

23           MR. MALOFIY:  No, he did not because of that issue.

24           THE COURT:  It will be sustained.

25           MR. MALOFIY:  Thank you.

858

```
 1          MR. ANDERSON:  Thank you, Your Honor.
 2   BY MR. ANDERSON:
 3   Q.   And if you look at the bottom, the last five songs
 4   beginning with "Summer Rain" --
 5   A.   Yes.
 6   Q.   -- if you can please explain the descending chromatic
 7   pitches in those songs beginning with "Summer Rain."
 8   A.   Certainly.  "Summer Rain" is another example of the same
 9   thing, as Dr. Stewart has written it out, A, G-sharp, G,
10   F-sharp, F.  The chromatic motion stops there and then he has
11   C major.
12          And so it is another example of A moving down to F,
13   not moving down to E.
14   Q.   And then on "More," the second one?
15   A.   This is still another example, A, G-sharp, G, F-sharp, F,
16   and you notice the very next note is F-sharp.  That's moving
17   up.  That has broken the descent.  This is a descending
18   chromatic scale.  He is saying that it's supposed to go from F
19   to E, but as he has correctly written, in "More" it goes from F
20   up to F-sharp, breaking the descent of the chromatic notes.
21          And, therefore, once again, he has, in fact,
22   demonstrated that the A chromatic movement down to F in
23   "Stairway to Heaven" and "Taurus" is, in fact, in "More."
24   Q.   And the next composition on Dr. Stewart's chart is "The
25   Meaning of the Blues."
```

859

```
 1            Could you please explain the descending chromatic

 2   pitches there?

 3   A.    Certainly.  I don't know why they are closer together.

 4   They're not closer together in beats or anything.  It may just

 5   be a typo.

 6            But that notwithstanding, this is exactly the same

 7   situation where it moves from A to G-sharp to G to F-sharp to F

 8   and it stops on F, then it leaps to D.  That is an interval or

 9   space of a third.  That's not chromatic.

10            And so, once again, Dr. Stewart has provided an

11   example that he would call atypical.  It doesn't move down to

12   E.

13   Q.   Now, if you look at "Night and Day," I have a couple of

14   initial questions for you.

15            Do you see that the second note as depicted by

16   Dr. Stewart in this chart, there's a capital A and a lower case

17   b.

18            What does that mean?

19   A.    Capital A lower case b is A-flat.

20   Q.   Can you explain why -- well, is there another way of

21   identifying an A-flat?

22   A.    Yes.  The other way of writing the very same note is

23   G-sharp.  A-flat and G-sharp are identical notes.  It is the

24   black note in between the A and the G.

25   Q.   And then if you go two notes to the right under "Night and
```

860

```
1    Day," two notes to the right of the A and B, you see a Gb.
2              Is that a G-flat?
3    A.   Yes, it is.
4    Q.   And is a G-flat a -- can it also be referred to in another
5    way?
6    A.   Yes, as an F-sharp.  It's once again the very same note.
7    Q.   And so is it correct that "Night and Day," like all these
8    other prior examples that -- well, like many of the other prior
9    examples, have the same notes of A, G-sharp, G, F-sharp, and F?
10   A.   That's correct.
11   Q.   Okay.  Even though on the chart he did, he has them as A,
12   Ab, G, Gb?
13   A.   A, A-flat, G, G-flat, F.
14   Q.   Thank you.
15             And could you please explain the descending chromatic
16   pitches in "Night and Day."
17   A.   Yes.  As transcribed and as charted by Dr. Stewart, once
18   again, he has exactly the same chromatic descending notes as in
19   "Taurus" and "Stairway," A, A-flat is G-sharp, G, G-flat is
20   F-sharp, F.
21             Thereafter, there is a leap to B-flat, and that ended
22   the chromatic descent.  Therefore, the chromatic descent is the
23   same five notes as "Stairway" and "Taurus" as charted -- as
24   transcribed by Dr. Stewart.
25   Q.   And on the last one, "One Note Samba," once again he has
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

861

```
 1    Ab, and that would be the equivalent of G-sharp?
 2    A.    That's correct.
 3    Q.    And could you please explain the descending chromatic
 4    pitches there?
 5    A.    Yes.  Here, we have A, A-flat is G-sharp, and so I'll give
 6    you the G-sharp and F-sharp spellings.  We have A, G-sharp, G,
 7    F-sharp, F, which is exactly the same as A, A-flat, G, G-flat,
 8    F.
 9          The point is that it moves the same way chromatically
10    down in those five notes as in "Stairway" and in "Taurus," as
11    charted by Dr. Stewart.
12          MR. ANDERSON:  If I may have just one moment.
13    (Counsel confer off the record.)
14          MR. ANDERSON:  Bear with me.  We'll come back to that
15    one in a bit.
16          Your Honor, the Court has properly excluded
17    Dr. Stewart's amended report because it deals with other
18    subjects.  There are --
19          MR. MALOFIY:  Objection.
20          THE COURT:  What's the question, counsel?
21          MR. ANDERSON:  There are two pages --
22          THE COURT:  I don't want you commenting on rulings
23    the Court may or may not have made.
24          MR. ANDERSON:  I apologize.
25          THE COURT:  It's not proper in front of the jury.
```

862

```
1              MR. ANDERSON:  I apologize.

2              THE COURT:  What's your question?

3              MR. ANDERSON:  Whether we may use a portion of his

4     amended report that does not deal with the sound recording.

5              THE COURT:  Objection?

6              MR. MALOFIY:  I'm not sure what he's referring to.

7              THE COURT:  Why don't you talk with him.  He's right

8     beside you.

9         (Counsel confer off the record.)

10             MR. ANDERSON:  Sorry, Your Honor.

11             THE COURT:  Um-hmm.

12             MR. MALOFIY:  That's fine.  No objection, Your Honor.

13             MR. ANDERSON:  Thank you.  Thank you, counsel.

14        (The exhibit was displayed on the screen.)

15             THE CLERK:  I'm sorry, counsel.  Is this just for

16    demonstrative purposes?

17             MR. ANDERSON:  Yes, it is.  Thank you.

18    BY MR. ANDERSON:

19    Q.   And this is -- what we're looking at is Example 3 and

20    Example 4.  Both are being displayed.

21             Do you recognize these?

22    A.   Yes, I do.

23    Q.   And where have you seen these before?

24    A.   These are from Dr. Stewart's amended report.

25    Q.   And Example 3 is labeled -- do you see this Section A,
```

863

```
 1    "Taurus" deposit copy lead sheet?
 2    A.   Yes, I do.
 3              MR. MALOFIY:  I have to make one objection,
 4    Your Honor.  It was presented to me not with writing all over
 5    it.  He said this was done afterwards, but now it's being
 6    presented with all these circles on it and --
 7              MR. ANDERSON:  I thought I -- I apologize.  I thought
 8    I explained to counsel that that writing that you noted --
 9              MR. MALOFIY:  Absolutely not.
10              MR. ANDERSON:  -- was --
11              MR. MALOFIY:  You said this was done after --
12              THE COURT:  Well, again, why don't the two of you
13    talk about it and then if there's an objection, that's fine.
14    But --
15         (Counsel confer off the record.)
16              MR. ANDERSON:  Okay.  That's fine.  We have a page
17    that doesn't have the writing.
18              THE COURT:  Okay.
19              MR. MALOFIY:  Thank you.
20              MR. ANDERSON:  Sure.
21    BY MR. ANDERSON:
22    Q.   So let's try this again without the handwriting.
23              And I believe that's a touch screen if you wanted to
24    add something.
25    A.   Thank you.
```

864

```
 1   Q.   So do you have an understanding of what Example 3 is?

 2   A.   Yes.  Dr. Stewart halved the time values of the "Taurus"

 3   deposit copy Section A, as I did, so that the basic pulse would

 4   be changed from quarter notes to eighth notes so that they

 5   could be compared with the eighth note rhythm in "Stairway to

 6   Heaven."

 7        And what you see there is four measures, which is all

 8   of Section A.  It's eight measures in the deposit copy, but the

 9   note values have been cut in half and so now there -- now there

10   are four measures.

11        That's placed right over Example 4 on that page in

12   Dr. Stewart's report, and Example 4 is the guitar part at the

13   opening of "Stairway to Heaven."

14        MR. ANDERSON:  If we can split the screen with

15   Example 3 on one side and the -- if you can just split the

16   screen with the two and the "Taurus" deposit copy on the other.

17   Thank you.

18        (Counsel and tech confer off the record.)

19        MR. ANDERSON:  That would trigger the markings and so

20   I don't want to hold things up for that.

21   BY MR. ANDERSON:

22   Q.   Do you recall the "Taurus" deposit copy?

23   A.   Yes, I do.

24   Q.   I know this makes it hard without being able to put it in

25   front of you, but I'm going to ask you, basically --
```

865

1      MR. ANDERSON:  And if you could put that back up.

2      TECHNICIAN:  Oh, that?  Sure.

3      MR. ANDERSON:  No, the -- well, there's the "Taurus"

4  deposit copy, but if we can go back to Example 3 and 4, please.

5      TECHNICIAN:  Sure.

6      *(The exhibit was displayed on the screen.)*

7  BY MR. ANDERSON:

8  Q.   Does Example 3 comport with the "Taurus" deposit copy,

9  other than the fact that you've -- that he has halved the

10 measures?

11 A.   The pitches comport, but the rhythmic durations in some

12 notes do not.

13     And the reason is that in the "Taurus" deposit copy,

14 you may recall that there are two staffs, there's an upper part

15 and a lower part.  They've been combined, put together, into

16 one staff in Example 3 by Dr. Stewart.

17     And that's perfectly okay to do, but when you do

18 that, you need to maintain the rhythmic durations and,

19 essentially, where the lines are different, where the upper

20 part is and where the lower part is.  That doesn't happen.

21     Just for example, the very first notes, you have two

22 notes literally at the beginning of Example 3.  The upper note

23 is an eighth note, just as it's written, in the upper staff,

24 but that lower note, which is an A, is a quarter note in the

25 lower staff.  This occurs in other places.

866

```
 1              What is important is that there are two lines going
 2   on in the deposit copy.  Those two lines functioning as two
 3   separate lines -- played together, but as two separate lines --
 4   are blurred in this transcription.
 5   Q.   And if we look at just -- excuse me -- Example 4, can you
 6   explain to us what Example 4 represents?
 7   A.   Example 4 is the four-measure guitar introduction in
 8   "Stairway to Heaven."
 9   Q.   And can you compare the melodies in Example 3 and Example
10   4 as presented by Dr. Stewart?
11   A.   Yes.  So without a keyboard, looking at these, the melody
12   at the top is that very same melody that I played at the
13   keyboard -- right at the beginning of my testimony at the
14   keyboard, and that is da-da-da-da-dum (singing).
15              And I talked about the fact that it's largely,
16   step-wise, very small intervals, spaces, between the notes,
17   whereas in "Stairway to Heaven," there are much bigger leaps
18   and there's much greater range.  I played those things at the
19   keyboard.
20              The pitches, once again, as I said earlier, that
21   Dr. Stewart has presented here are correct.  It's the rhythmic
22   durations that are sometimes lacking and the fact that the
23   separation of the two lines is blurred.
24              But point is that all of the dissimilarities that I
25   played at the piano and tried to demonstrate at the piano and
```

1    then we ultimately X'd out continue to fully obtain here.

2    Q.   Thank you.

3           MR. ANDERSON:  If we can go back to the "Taurus"

4    deposit copy.

5           MR. MALOFIY:  Are we able to save these, as the

6    exhibits are shown, for later?

7           THE COURT:  Right now, it has not been introduced

8    into evidence.

9           MR. ANDERSON:  They're just demonstratives.

10          THE COURT:  Okay.

11       *(The exhibit was displayed on the screen.)*

12   BY MR. ANDERSON:

13   Q.   So if we can add the X's that were just done in the last

14   demonstrative, the notes that don't appear in "Stairway to

15   Heaven."

16       *(The exhibit was displayed on the screen.)*

17          MR. MALOFIY:  Your Honor, I'm going to ask that the

18   witness actually testifies and marks things instead of counsel

19   just going through in a pre-programmed --

20          THE COURT:  He hasn't done it yet.  I don't know what

21   he's --

22          MR. MALOFIY:  He's doing it.  We see it on the

23   screen.

24          THE COURT:  Okay.  Okay.  It should be done by the --

25   by the expert.

868

1          MR. MALOFIY:  And this has been going on through --

2          THE COURT:  Excuse me, counsel.

3          MR. MALOFIY:  Yes.  Yes, Your Honor.

4          THE COURT:  It should be done by the expert.

5          MR. ANDERSON:  The expert has identified it on the

6    other chart.

7          THE COURT:  And you're having somebody else mark it

8    up now.  The expert is testifying, not the technician or

9    yourself.

10          MR. ANDERSON:  Okay.

11    BY MR. ANDERSON:

12    Q.   And so can you identify -- are you able, on that touch

13    screen, to X out all the notes that are not on the "Stairway

14    to" -- in "Stairway to Heaven" or would you prefer to mark the

15    ones that are?

16    A.   What I would prefer to do is have a split screen so that I

17    can accurately go back and forth.

18          But this continues to be an exercise that we did

19    earlier where, in fact, I had the "Taurus" deposit copy that

20    was reduced, halved, to four measures and all of the X's of the

21    notes that were different were provided and then, if you

22    recall, the X's disappeared and I played what was left.

23          THE COURT:  So you're saying this question is

24    repetitive?

25          THE WITNESS:  Yes, that's exactly right.

869

```
 1              MR. ANDERSON:  Okay.

 2              THE COURT:  I agree.

 3         (Laughter.)

 4    BY MR. ANDERSON:

 5    Q.   And if I can show counsel one other page, page 9 from

 6    Dr. Stewart's report that also deals with the -- also deals

 7    with the "Taurus" deposit copy.

 8              MR. MALOFIY:  No objection, Your Honor.

 9              THE COURT:  Okay.

10         (The exhibit was displayed on the screen.)

11    BY MR. ANDERSON:

12    Q.   And do you recognize this page?

13    A.   Yes.  This is page 9 from Dr. Stewart's amended report.

14    Q.   And do you see that there are brackets -- bracketed notes

15    AB, BC, and CF-sharp?

16    A.   Yes, I do.

17    Q.   Do you agree with Dr. Stewart's brackets and analysis in

18    "Taurus"?

19    A.   In "Taurus" -- well, what he's done in "Taurus" alone is

20    to simply bracket two notes, AB, BC, and CF-sharp.  That has no

21    meaning in and of itself.

22    Q.   Is there any musicological significance to the brackets

23    that he has indicated, the bold line and horizontal brackets

24    that he's indicated in Example 6 over -- excuse me -- under

25    "Taurus" and "Stairway"?
```

870

```
 1   A.   No, there isn't.  In fact, one can easily see that they're
 2   displaced, that is, that the AB starts at the beginning of the
 3   "Taurus" melody, AB, and it continues A, B, C, A, E.  It's a
 4   phrase that continues.  The AB being separated is very
 5   artificial.
 6   Q.   Is there -- in your opinion, is there a significance to
 7   the fact that the AB appear in different places in that
 8   measure?
 9   A.   That the AB in "Stairway" and "Taurus" appear in different
10   places?
11   Q.   Yes.  Thank you.
12   A.   Thanks.  Yes.  The -- once again, as I said a moment ago,
13   in "Taurus," it starts with the pitches AB.  In "Stairway,"
14   there are three pitches before that and then Dr. Stewart has
15   bracketed AB.  There's absolutely no significance.
16        There's only seven letters.  Of course you're going
17   to be able to bracket notes here and there, but they don't
18   correspond to the same places in the melody.
19        This would be analogous to suggesting that there's
20   significance in the fact that the word "absent," which begins
21   with AB, is connected to the word "crab," which has AB after
22   the first few letters.  That doesn't make any sense.
23        Yes, of course "absent" has an AB in it and "crab"
24   has an AB in it, but the point is that they don't line up.
25   They don't correspond.
```

871

1      The other big difference is in my report, I talked

2  about a contrapuntal melodic line.  Big word, but what it

3  simply means is that that single line in "Stairway to Heaven"

4  is actually two melodies going on at the same time.  The first

5  three notes, bop-bop-bom, and then that AB is really a two-note

6  phrase that hangs up there and then it continues down, and then

7  that BC that follows it is another two-note phrase, and then

8  the CF-sharp after.

9      These are the brackets in "Stairway."  They represent

10  correctly this counterpoint.  There's two things going on in a

11  single line.

12      That is not the case in "Taurus."  The notes that

13  Dr. Stewart has bracketed, the AB and the BC, are from the top

14  line in "Taurus."  There's no counterpoint within the top line

15  in "Taurus."

16      And he has basically surgically removed the AB.  That

17  doesn't just go AB and it stops, it's A, B, C, A, E (singing).

18  It's part of a larger phrase, whereas in "Stairway," that BC

19  stands out.  It is different.

20      And so not only do they not line up, like "absent"

21  and "crab," but, in fact, they don't establish in any way the

22  real meaningful difference, that there is this contrapuntal

23  line within "Stairway."  It doesn't exist in that upper line in

24  "Taurus."

25  Q.  I believe, if I caught that, that you said that the AB is

872

```
 1    part of a larger -- of a phrase -- I'm sorry -- AB is part of a

 2    sequence that includes A, B, E, C, A?

 3    A.    A, B, C, A, E.

 4    Q.    And does that sequence appear in both works, in --

 5    A.    It does not.

 6    Q.    Okay.  Which work does it appear in?

 7    A.    It appears in the "Taurus" deposit copy, the upper part.

 8    It does not appear in "Stairway."

 9    Q.    Thank you.

10          And if we could go to the second bracket.  Do you

11    agree with the second bracket -- well, first of all, do you

12    agree that B and C appear there in both works?

13    A.    I do.

14    Q.    Is there any musicological significance to the fact that B

15    and C appear at that point in both works?

16    A.    No, there isn't.  It's just pulling out a snippet and, in

17    fact, a B and a C that function very differently in the two

18    melodies.

19    Q.    How do they function differently in the two melodies?

20    A.    As per my testimony a moment ago, in "Stairway," there's a

21    contrapuntal line.  That BC stands out from the other notes

22    that are lower, whereas in the "Taurus" deposit copy, that's

23    not the case.  That upper line is a single line and the BC is

24    part of it.

25                THE COURT:  This is just what you already testified
```

873

```
 1    to, right?  Okay.  I agree --
 2              MR. ANDERSON:  I was a little slow on the uptake
 3    there, Your Honor.
 4              THE COURT:  There is a lot of repetitiveness going
 5    on.
 6              Go ahead.
 7    BY MR. ANDERSON:
 8    Q.   The BC in "Taurus" and the BC in "Stairway" in context, is
 9    there any significance to that portion of the transcriptions?
10    A.   If I were at the keyboard, I would play those BCs in
11    context and you would -- and since I can't sing it, you would
12    hear a very different melody before and after the BC in
13    "Taurus" and before and after the BC in "Stairway."
14              You can see it visually, but the key is that when you
15    actually hear them at the keyboard, you'll hear how different
16    they are.
17    Q.   And if we look at the third bracketed notes in Example 6,
18    which looks like C and F-sharp -- first of all, has he
19    correctly transcribed them?
20    A.   Yes.
21    Q.   And do you agree with his bracketing of them in those
22    cases -- in this case?
23    A.   Well, it's perfectly okay to bracket notes and say, "This
24    is a C and this is an F-sharp," but the question is, is it
25    meaningful.
```

874

1  Q.   And is it meaningful?

2  A.   It is not.

3  Q.   Why not?

4  A.   First, because the C to the F-sharp, in and of itself, is

5  a snippet.  The notes before and the notes after are

6  dramatically different.

7          And so this would be like taking a C and an F out of

8  a word that has different letters before and different letters

9  after and saying this is significant.  It isn't.

10          The other reason that it's not significant is part

11  of -- and this is not repetitive -- this is part of the point

12  that I was trying to make -- that I did make earlier, and that

13  is that the -- this transcription by Dr. Stewart of "Taurus"

14  has blurred the separate lines on the "Taurus" deposit copy.

15          In the AB and the BC, he's taken that from the upper

16  part in the "Taurus" deposit copy.  All of a sudden he goes to

17  the lower part here.  These are the lower notes.  That C and

18  F-sharp -- and you can see he's got it bracketed lower into the

19  notes -- is not from the upper staff, where the A and the B and

20  the B and the C are in "Taurus," it's from the lower staff.

21          And so he is mixing and matching.  He's just pulling

22  things out, but there's no meaning.

23  Q.   If -- thank you.  Thank you very much.

24          If we could pull up musical Example 1 from your June

25  rebuttal report.

875

1        (The exhibit was displayed on the screen.)

2    BY MR. ANDERSON:

3    Q.    And if you -- do you see that, sir?

4    A.    I do.

5    Q.    Could you explain what this is?

6    A.    Yes.  This is my transcription of two guitars playing at

7    the same time in a song called "To Catch a Shad."

8          My understanding is that it's an old English folk

9    song.  This was recorded by a folk group by the name of the

10   Modern Folk Quartet, released in 1963, prior to "Taurus."

11         And so I transcribed this four-measure chord

12   progression that the two guitars are playing.  They play one

13   like this at the very opening and they play one at this point

14   also, at 1 minute 44 seconds into the recording, and that's why

15   it says 1:44.

16         I've placed those measures over the very same

17   "Stairway to Heaven" four measures of guitar.  So you've got

18   four measures of guitars in "To Catch a Shad," 1963, and you

19   have four measures of "Stairway."

20         And because it requires the amount of space, it goes

21   to a second line.  So in that second line, even though you

22   don't have "To Catch a Shad" in the left margin and "Stairway

23   to Heaven," it's understood that the top line is "To Catch a

24   Shad," Measure 3, the bottom line is to "Stairway to Heaven,"

25   and it continues.

876

1    Q.    And what is the musicological significance of "To Catch a

2    Shad" in this case?

3    A.    "To Catch a Shad" is extraordinarily similar to "Stairway

4    to Heaven."

5          It not only has the movement down of the A, G-sharp,

6    G, F-sharp, F, it has it in the same harmonic rhythm.  Many of

7    the other songs have the same harmonic rhythm, in this case two

8    beats per chord in "Stairway to Heaven" and in "To Catch a

9    Shad."

10         But you can also see, even if you don't read music,

11   that these notes line up from the lower line to the upper line.

12   The melodies have many places where they connect, and, in fact,

13   they connect on the AB and the BC, we'll see in a moment.  So

14   that is significant.

15         In addition, "To Catch a Shad" ends on the A minor.

16   Now, that's not a significant point, but it's a point that

17   Dr. Stewart brings up, that at the end of the four measures in

18   "Taurus," he calls it an A5, and at the end of the four

19   measures in "Stairway to Heaven" it's an A minor.  Occurring in

20   different parts of the measure, but they do end with some kind

21   of A.  As you can see, "To Catch a Shad" ends with the A minor,

22   which is actually even closer because it's a full A minor

23   chord.

24         So there are just a huge number of similarities

25   between "To Catch a Shad" by the Modern Folk Quartet released

877

1    in 1963 and "Stairway to Heaven."  That static E high note

2    throughout "Taurus" is not here.  You have this opening up that

3    is so much more similar.

4    Q.    Thank you.

5          MR. ANDERSON:  I'm trying to determine if we can do

6    something without adding the handwriting that counsel was

7    concerned about.

8          *(Counsel and tech confer off the record.)*

9          MR. ANDERSON:  Okay.  So if -- I'm sorry.  If we

10   could please have the page -- Example 6 from Dr. Stewart's

11   report, which we saw a few moments ago, with the --

12   Dr. Ferrara's example of "To Catch a Shad," if we could have

13   those side by side.

14         *(The exhibit was displayed on the screen.)*

15   BY MR. ANDERSON:

16   Q.    Does that help you explain your opinion?

17   A.    Yes, it does.  Thank you.

18   Q.    And could you please tell us how it helps you.

19   A.    Certainly.  If we look at the bottom comparative that once

20   again is from Dr. Stewart's report, the -- it says "Taurus

21   Deposit Copy" and he has the AB bracketed and "Stairway" and

22   then he has the AB bracketed in a different place.

23         I'm going to, with my finger, put dots on the A.

24   That's the B.  (Indicating.)  Okay.  It's kind of close.

25         Those two notes, AB, are the same AB in the same

878

```
1    place as "Stairway." I've just put those dots down there. And
2    so the actual AB is in "To Catch a Shad" in the same place as
3    "Stairway." It's not in the same place in "Taurus." It's at
4    the beginning.
5              The BC. Here we are, BC.
6              I'm sorry. That's not very good. If you can remove
7    that. Thank you.
8              All right. That's the BC in "Stairway." Well, in
9    exactly the same place from the last eighth beat in "To Catch a
10   Shad" --
11             Do you want to bring this down a little bit so we can
12   see it? Good.
13             Exactly the same place, we have BC.
14             So the similarity between a B and a C occurring at
15   the same point between "Taurus" and "Stairway" also occurs in
16   "Stairway" and "To Catch a Shad," but more importantly, we also
17   have the AB occurring in exactly the same place in "To Catch a
18   Shad," 1963, and in "Stairway to Heaven."
19             And then finally, looking at the C and the F-sharp,
20   that bracket right there (indicating), that certainly occurs in
21   "Stairway."
22             If we can move this so that I can make a note to the
23   "Taurus." Just move it. Thank you.
24             If you will recall, I objected to this CF-sharp
25   because it's from a lower voice. Now, as it turns out, in
```

879

1    exactly the same place there's a C, it's right there

2    (indicating), and an F-sharp in a lower voice in "To Catch a

3    Shad."

4          Would I use that bracket?  No, because it's in a

5    different voice.  But using Dr. Stewart's method, one would.

6          So, in fact, the brackets -- there are three

7    brackets, AB, BC, and CF-sharp.  They all occur in "To Catch a

8    Shad" in exactly the same way they occur in "Stairway," but in

9    "Taurus" they don't, because the AB in "Taurus" is "absent" and

10   the AB in "To Catch a Shad" and in "Stairway to Heaven" is

11   "crab."  It's later in the word.  It's later in the melody.  In

12   fact, it's exactly at the same point.

13         So if one wants to do this kind of bracketing, in

14   fact, "To Catch a Shad" has more similarities in this

15   bracketing line with "Stairway to Heaven" than "Taurus" does

16   with "Stairway to Heaven."

17         And this is another reason why I found no relevant

18   similarities in that upper line in the "Taurus" deposit copy.

19   These are snippets that one can do with comparing a paragraph

20   to a paragraph or a melody to a melody.  They're not

21   significant.

22         THE COURT:  Next question, counsel.

23         MR. ANDERSON:  Thank you, Your Honor.

24   BY MR. ANDERSON:

25   Q.  Did you include an audio recording of "To Catch a Shad"

880

```
1   with your report?

2   A.   Yes, I did.

3            MR. ANDERSON:  Your Honor, if we could just play just

4   that one portion of the audio recording.

5            MR. MALOFIY:  One moment.  One moment, Your Honor.

6            THE COURT:  Sure.

7        (Counsel confer off the record.)

8            MR. MALOFIY:  The issue, Your Honor, is we've always

9   been comparing compositions in this case, not recordings, and

10  here we go comparing recordings.  We didn't have the

11  opportunity to do that in our situation, and we think it's

12  highly prejudicial and also irrelevant.

13           If it's a composition to composition, that's one

14  thing, but to take actual sound recordings and now we're mixing

15  apples and oranges, we think it's a little bit difficult.

16           THE COURT:  Well, the difference is one is being

17  alleged to have infringed a deposit copy.  This one is not

18  talking about infringement.

19           But, counsel, wouldn't it be better to have him play

20  it on the piano?

21           MR. ANDERSON:  If he's prepared to play it on the

22  piano.

23           THE WITNESS:  Certainly.

24           THE COURT:  I'm assuming you're prepared to play it

25  on the piano.
```

881

1          Okay.  So I'm going to -- I'm going to ask you to do

2   it that way, rather than playing the recording.

3          MR. ANDERSON:  Absolutely.  That's fine, Your Honor.

4          THE COURT:  The objection will be noted.

5          MR. MALOFIY:  One second.

6      *(Counsel confer off the record.).*

7          MR. MALOFIY:  We will withdraw the objection, Your

8   Honor.

9          THE COURT:  You can do it any way you want.

10         MR. MALOFIY:  That's fine.  On this one song.

11         MR. ANDERSON:  Okay.  So if we could please play "To

12  Catch a Shad" from approximately 1 minute and 43 seconds to 1

13  minute and 52 seconds.

14         MR. MALOFIY:  The only objection is that they play

15  the whole thing.  That's the issue that we have.

16         THE COURT:  Well, they can play -- they can put the

17  case on the way they wish, but I, again, think it's better --

18  rather than a composition with everybody else coming in to it,

19  I think he can play the notes and I think it's better that he

20  does it from the piano.

21         MR. MALOFIY:  We have no objection to the whole

22  composition, because we think it's taken out of context, Your

23  Honor.

24         THE COURT:  Do you want to play the whole

25  composition?

882

```
 1              MR. ANDERSON:  No.
 2              THE COURT:  Okay.  Then if you're just going to
 3    highlight certain notes on it, then you can do it on the piano.
 4              MR. ANDERSON:  Okay.
 5              THE COURT:  We like to hear you play anyway.
 6         (Laughter.)
 7              MR. ANDERSON:  That's absolutely fine, Your Honor.
 8              THE WITNESS:  With your permission.
 9              THE COURT: Yes.  Please.
10              THE WITNESS:  Shall I begin?
11              MR. ANDERSON:  Yes, please.
12         (Piano played by witness.)
13    BY MR. ANDERSON:
14    Q.   And that is 1 minute and 43 seconds to approximately 1
15    minute and 50 seconds of "To Catch a Shad"?
16    A.   It's about 1 minute 44 --
17              I don't think my microphone is on.
18              MR. PLANT:  Button in the middle.
19              He spoke.
20              THE WITNESS:  Thank you.  Okay.  It's on now.
21              It's approximately 1 minute 44 seconds to 1 minute 52
22    seconds in "To Catch a Shad."
23              MR. ANDERSON:  Thank you.
24              THE COURT:  Okay.  You can go back to the witness
25    stand now.
```

883

```
 1              THE WITNESS:  Thank you.

 2              MR. ANDERSON:  Thank you, Your Honor.

 3              If we can call up Example 5 on page 7 of

 4  Dr. Stewart's amended report.

 5              Any objection?

 6              MR. MALOFIY:  I'm sorry.  What was it?

 7              MR. ANDERSON:  Example 5 on page 7.

 8              MR. MALOFIY:  Let me just take a look.

 9              MR. ANDERSON:  Okay.  From Dr. Stewart's report.

10              MR. MALOFIY:  No objection.

11              MR. ANDERSON:  Thank you.

12  BY MR. ANDERSON:

13  Q.   And if you can please look at Example 5 and tell me what

14  your understanding is as to what this represents.

15  A.   This is a table graph in Dr. Stewart's amended report that

16  creates boxes for each eighth beat.

17              Remember that "Taurus," in the deposit copy, is

18  actually quarter notes, but they've been halved, and that's

19  perfectly okay, in this boxing.

20              And so what we have are the actual pitch names as

21  they occur on each eighth beat throughout the four measures in

22  "Taurus" deposit copy and the four measures of the guitar part

23  in "Stairway to Heaven."

24  Q.   Does Dr. Stewart's table graph properly represent the

25  melodies in Section A in "Taurus" and the four-measure guitar
```

884

```
 1    part in "Stairway to Heaven"?

 2    A.    No, they do not.

 3    Q.    Why not?

 4    A.    Melodies are based on pitches moving up and moving down.

 5    The pitches that are in Dr. Stewart's graphs not only do not

 6    provide the durations, so we don't know whether, for example,

 7    the A in "Taurus" lasts longer than that just eighth note.

 8            In fact, the A in "Stairway" continues for four

 9    boxes, but that's not there because rhythm durations have been

10    omitted.

11            Even more serious is the fact that the pitches here

12    do not tell us whether they're moving up, whether they're

13    moving down.  Is this a high A or is it a low A?

14            Let me give you an example.

15            It would be best to play it on a keyboard, but I

16    can --

17            THE COURT:  Well, let's wait until the next question.

18            MR. ANDERSON:  The next question actually probably

19    would also be best at the keyboard, but I defer to Your Honor.

20            THE COURT:  That's okay.  I don't care.

21            MR. ANDERSON:  Then let's (indicating).

22            THE WITNESS:  Thank you.

23    BY MR. ANDERSON:

24    Q.    If you can please explain your answer.

25    A.    Certainly.
```

885

```
 1            Okay.  Let me play this melody for you. (Piano
 2  played.)
 3            Once again. (Piano played.)
 4            One more time.  (Piano played.)
 5            One more time because I played a different note in
 6  the second time.  Once again.  (Piano played.)
 7            Now I'm going to play it with the same pitches.
 8            MR. MALOFIY:  Objection, Your Honor.  This is just
 9  a --
10            THE COURT:  No question pending right now.
11            MR. MALOFIY:  It's a narration.
12            THE COURT:  There's no question pending.
13            Next question, counsel.
14  BY MR. ANDERSON:
15  Q.   And if you could explain to -- explain to us the point
16  that you are making -- excuse me -- about the duration of
17  pitches being important in a musicological analysis.
18            THE COURT:  Okay.
19            THE WITNESS:  What I have just shown is that when you
20  don't specify in a melody whether you're going up or down with
21  pitches, this melody (piano played), E, D, C, D, E, E, E, this
22  is, for every purpose in the graphs that Dr. Stewart presents,
23  exactly the same as E, D, C. (Piano played.)
24            Everything is displaced. (Piano played.)
25            Those pitches, that pitch sequence, is identical.
```

886

```
 1    It's identical.  Why is it a different melody?  Because the
 2    pitches are high or low.  Dr. Stewart's graphs don't specify
 3    whether the pitches are high or low.
 4           So a melody that is so dissimilar as (piano played)
 5    can be graphed to be the same as (piano played), and they're
 6    very different melodies.
 7    BY MR. ANDERSON:
 8    Q.   Are you able to give us some examples -- play a few
 9    examples, where even though the graph shows the pitches as
10    being the same in "Taurus" and "Stairway to Heaven," if you
11    actually consider the duration of the pitches -- that is, the
12    notes -- that they sound different?
13    A.   I'd have to do that -- I'd have to do that with another
14    graphic and I don't -- and that would actually be coming back
15    to what I did earlier.
16           It would be --
17    Q.   Then I don't want to --
18    A.   -- Your Honor, repetitive.
19    Q.   If it's going to be repetitive, that's fine.
20           So do you need to be there or do you want to go back
21    to the witness box?
22    A.   Well, I would like to be here just for a moment longer,
23    with Your Honor's permission.
24           THE COURT:  Yes.
25           MR. ANDERSON:  Okay.  And the -- if we split the
```

887

1    screen, retaining the -- I guess it's the keyboard image, but

2    bringing back Dr. Stewart's table -- including Dr. Stewart's

3    table graph.

4        *(The exhibit was displayed on the screen.)*

5    BY MR. ANDERSON:

6    Q.   In his report, Dr. Stewart had said that no pitches are

7    heard in each of the first two measures of "Stairway to Heaven"

8    that are not found in the deposit copy lead sheet of "Taurus,"

9    and I believe he testified to the same thing yesterday.

10            Is that a meaningful similarity?

11   A.   No, it's not.

12   Q.   Why not?

13   A.   This would be like saying Book A and Book B written in

14   English all used the letters of the alphabet.

15            In fact, Measures 1 and 2 that you saw before in

16   "Michelle" and in the first two measures of "Taurus" have all

17   of the same pitches.

18            Once again, there are only seven pitches, and

19   Dr. Stewart doesn't identify, he doesn't distinguish not only

20   rhythms, but he doesn't distinguish whether we're talking about

21   a high E or a low A or a high D.

22            Since there's only seven pitches, of course it's easy

23   to say, "Well, all of the pitches in the first two measures in

24   one is found in the other.  That doesn't make any sense because

25   all of the pitches in this (piano played) are in this (piano

888

1    played).

2            They're both based on a C chord.

3            Does anybody think that (piano played) is the same

4    melody as (piano played)?

5            And the point is that using Dr. Stewart's

6    methodology, you could say that all of the pitches in the

7    racetrack melody are in the opening of the "Star-Spangled

8    Banner." That's meaningless.

9    Q.   Okay. Thank you.

10           Dr. Ferrara, could you please -- looking at the

11   screen and the keyboard, could you point out the notes that are

12   the descending chromatic scale at issue?

13   A.   Yes. It's this A, this G-sharp, this G, this F-sharp,

14   this F (indicating).

15   Q.   And those are a straight sequence of notes on a keyboard?

16   A.   That's right.

17   Q.   In his report, Dr. Stewart found a similarity between the

18   opening pitches in the upper treble clef staff in the "Taurus"

19   deposit copy and the vocal melody in "Stairway."

20           Do you recall that from reading his report?

21   A.   I do. It's on page 9 in his report.

22   Q.   And what are the -- do you feel that similarity is

23   significant?

24   A.   No, I don't.

25   Q.   Why not?

889

A.   What Dr. Stewart has pointed out is in the opening of
"Taurus," there is an ABC, ABC, okay?  ABC, that's Do Re Mi.

          And he then says, "And, by the way, when Robert Plant
opens the vocal melody in "Stairway to Heaven" -- this is
significant, according to Dr. Stewart -- "it starts with ABC."
The notes that Dr. Stewart then charts thereafter are
different, but he finds significance in ABC.

          And if we had on the screen the split screen, you
could see the chart that Dr. Stewart has and the notes in the
"Stairway to Heaven" score.

          The point is that in "Stairway to Heaven," that ABC
starts on what's called an upbeat.  It starts on beat four.
But the ABC in "Taurus" starts on beat one.

          Now, we've all heard somebody in a band counting off
one, two, three, four, and then da-da-da-da-deem bom-bom-bom
(singing).  That's the opening of "Taurus:" one, two, three,
four, da-da-da-bom-bom.

          What if I did one, two, three, da-da?  You'd say,
"Wait a minute.  You've made a mistake.  You came in too
early."  Well, that's what Robert Plant does.  He doesn't come
in too early, he comes in at a different place.

          So, first of all, the placement of the ABC is
different.  Moreover, the C in the "Taurus" deposit copy as
transcribed by Dr. Stewart is an eighth note:  Da-da-dum-bum --
it's just moving -- bum-bum (singing).

```
 1              But the C that's sung by Robert Plant is a quarter
 2    note.  And so, in fact, what we have is da-da-dum-bum-bum
 3    bum-bum-bum, compared to ba-da-dum ba-dum-bum (singing).  It's
 4    a different rhythm.  After the ABC, there are different notes.
 5    ABC is another example of the snippet surgically removed,
 6    absolutely meaningless.
 7              And what Dr. Stewart doesn't tell you is that, in
 8    fact, "My Funny Valentine" -- and I attached the published
 9    sheet music to "My Funny Valentine" to my February 10th
10    report -- guess what that begins with?  ABC, and it begins on
11    the beat just like the "Taurus" deposit copy:  One, two, three,
12    four, "My fun-ny," ABC (singing).
13              And so this is -- it's just a meaningless similarity.
14    These snippets, this upper line ABC, BC pairing, it's all
15    meaningless and --
16              THE COURT:  Next question.  Go ahead.
17              MR. ANDERSON:  Thank you, Your Honor.
18              If we can call up --
19    BY MR. ANDERSON:
20    Q.   Oh, you testified earlier today that one of the things
21    that you did in your analysis was to create a transcription of
22    the entirety of the "Stairway to Heaven"?  Composition.
23    A.   Yes.
24              MR. ANDERSON:  And if we can please call up side by
25    side page 2 from your "Stairway" transcription, along with the
```

891

1   "Taurus" deposit copy.

2        THE WITNESS:  That is page 2 of my 29-page

3   transcription of the composition embodied in "Stairway to

4   Heaven," and on the right, of course, is the "Taurus" sound

5   recording.

6   BY MR. ANDERSON:

7   Q.   Excuse me.  The --

8   A.   I'm sorry.  So sorry.  The "Taurus" deposit copy.

9   Q.   And if you could please identify the portions of each in

10  which these ABC pitches appear.

11  A.   Of course.

12       On page 9, Dr. Stewart -- if we can -- I'll put it

13  right here, and so if you could somehow highlight this.

14  It's -- yes.

15       It's -- these are the five notes that are charted on

16  page 9 in Dr. Stewart's report, A, B, C, A, E, and he's

17  comparing that -- now going to my transcription of the

18  composition in "Stairway to Heaven," the vocal part starts on

19  this third part right there.  See that (indicating)?

20       Perhaps we could enlarge that a little bit.  No, it's

21  the next line.

22       Right there.  That's it.

23       You can see, first of all, that this does not start

24  on the down beat.  "There's a lad-," as in "lady."  This starts

25  on the down beat (indicating).  This starts on what's called

892

```
 1   the up beat (indicating).
 2           But also, once again, this is a completely different
 3   melody, different rhythm, starting on a different beat.
 4   Q.   Thank you.
 5           Other than "My Funny Valentine," have you identified
 6   in your reports prior art that includes a vocal part that
 7   starts on ABC?
 8   A.   Yes.  In fact, the opera of Henry Purcell that Dr. Stewart
 9   also recognizes, Dido's Lament -- this is 1689 -- begins with
10   ABC.
11           It's in a three meter, so it's not one, two, three,
12   four, it's in three, but it begins with ABC, and that ABC is
13   over, obviously, the descending chromatic line progression.
14   Q.   In your analysis, did you analyze the structure of the
15   "Taurus" deposit copy and the "Stairway to Heaven" musical
16   composition?
17   A.   Yes, I did.
18   Q.   And could you just refresh our memory as to what you mean
19   by "structure"?
20   A.   Yes.  The structure is essentially the organization of
21   Sections in a song, and "Stairway to Heaven" is a song.
22           Structures are, after an introduction, a verse, a
23   chorus -- really, not a chorus in the traditional sense in
24   "Stairway to Heaven," so I call it a refrain.  "Ooh, she makes
25   me wonder" (singing), that coming-back section is a refrain
```

893

1    each time.  But there are six verses and five refrains in

2    "Stairway to Heaven."  That would all be structure.

3              And since "Taurus" deposit copy is obviously not a

4    song, it's -- there are no words, there are no lyrics, nothing

5    is sung, we couldn't call them verses and choruses, and so

6    Section A, Section B.

7    Q.   Okay.  Thank you.

8              MR. ANDERSON:  And if we could please call up the --

9    your chart of the structure of "Stairway to Heaven," Attachment

10   A to your initial report.

11       (The exhibit was displayed on the screen.)

12   BY MR. ANDERSON:

13   Q.   And we could, I suppose, play "Stairway to Heaven" so you

14   could explain that, but I would like to, in the interest of

15   time, possibly not do that.

16             Is it possible for you to explain the -- any

17   similarities or differences you found in the structure of the

18   "Taurus" deposit copy and "Stairway to Heaven" without playing

19   "Stairway to Heaven"?

20   A.   Yes.

21   Q.   Okay.  Could you please do that.

22   A.   Certainly.

23   Q.   And why don't we start with if you can please identify any

24   similarities you found in structure.

25   A.   Yes, I understand.  There aren't a lot of similarities.

894

1   You can -- you can see how different they are.

2   Q.   Well, let's go to differences.

3   A.   Okay.  One of the -- one of the main structural elements

4   in "Stairway to Heaven" is -- you see the introduction?  That's

5   when the guitar is -- Jimmy Page plays.

6        The first eight measures is two iterations of the

7   four-bar -- the four-measure phrase that's at issue.  Then the

8   next eight measures is something different, and no one has put

9   that at issue.

10       But the key is that all of those 16 measures and then

11  all of the 20 measures in Verse 1 and then continuing into the

12  interlude -- that's the full 2 minutes and 14 seconds -- it's

13  all based on four-measure phrases.  Four-measure phrases.

14       Now, Section A-1 is based on four-measure phrases and

15  it's one of the most common phrase structures around, but

16  Section B is nine measures.  It's not based on four-measure

17  phrases.

18       Now, we do get, nine measures later in portions of

19  "Stairway" that are not at issue, like Verse 2 and Verse 3 --

20  and that's not unusual, but the point is that in the section

21  that's at issue, the first 2 minutes and 14 seconds, it's all

22  four-measure phrases, whereas in "Taurus," the B sections are

23  nine measures.

24       And we went through that, "Taurus," and we show that

25  there's ten measures that everybody says is not at issue:  The

895

1    last measure is the coda, it's one measure; and then there's

2    nine measures that's Section B.  Those are huge differences.

3    Q.   In your February report, your initial report, did you

4    complete a quantitative and qualitative assessment of the

5    expression in "Stairway" that you found had relevant

6    similarities to the "Taurus" deposit copy?

7    A.   Yes, I did.

8    Q.   And, again, by "relevant," we're talking about things that

9    are just mentioned in this case or claimed in this case, as

10   opposed to being important or unimportant?

11   A.   "Relevant" means that there is sufficient similarity to

12   talk about it, rather than AB just surgically removed

13   somewhere.  You can do that with almost any two songs, find two

14   notes in a row that happen, like you can do comparing two

15   paragraphs with letters.

16   Q.   And what is a quantitative value assessment?

17   A.   A quantitative value assessment is an objective

18   measurement of the notes in an entire song or a portion of a

19   song that you want to identify.

20   Q.   And what is a qualitative value assessment?  Excuse me.

21   A.   Once you have established a certain percentage, this

22   portion of the song has relevant similarities to "Taurus," this

23   portion of "Stairway" has relevant similarities to "Taurus,"

24   you do that by simply counting the notes, and the software

25   allows you to do that.  You literally just highlight, you push

896

1    "Count Notes" in what's called Sibelius, and it counts the

2    notes for you.

3            And so once you've established that objective and

4    empirically verifiable measurement, then you -- your next task

5    is to think about qualitatively what are the important parts in

6    this case of "Stairway" and is the portion at issue, the

7    opening guitar, is that qualitatively important, are there

8    other parts that are qualitatively important.

9    Q.   And what was the result of your quantitative value

10   assessment of "Stairway," the objective one?

11   A.   In looking at the full 29-page transcription of "Stairway

12   to Heaven" and once again identifying those notes that are at

13   issue, I found that 2.3 percent of the notes in "Stairway to

14   Heaven" have relevant similarities to the "Taurus" deposit

15   copy.

16   Q.   And what was the result of your qualitative value

17   assessment?

18   A.   The qualitative value assessment in identifying

19   qualitatively important parts suggests that a purely

20   quantitative value would have to be increased if that was a

21   qualitatively important part.

22   Q.   And can you explain your analysis for us, please?

23   A.   Yes.  What I found was that there are four, in my opinion,

24   qualitatively important parts in the overall trajectory of

25   "Stairway to Heaven."  Certainly, the opening guitar part is

897

1    the first of those.

2           I also found that the fanfare -- which is very well

3    known and I hope we can play after for you, that the fanfare is

4    so extraordinary that it is also qualitatively important.

5           The fanfare is then followed by what many would

6    consider to be a legendary guitar solo.  And so we have the

7    fanfare, the guitar solo.

8           And this trajectory, this compositional trajectory,

9    is marked by an extraordinary explosion of complexity.  The

10   rhythm, the melodies, the textures, the thickness of the

11   textures just gets bigger and bigger and bigger and more

12   complex, and it literally then reaches a climactic moment in

13   Verse 6.

14          And in Verse 6, Robert Plant, who has not been

15   singing during the fanfare, not been singing during the guitar

16   solo, suddenly comes back in, but he is way up in register, "As

17   we wind on down the road, our shadow's taller than our soul,"

18   and so forth.

19          He sings, and under him, the guitars -- because the

20   guitars have been overdubbed and the drums and the bass --

21   there's so much complexity that that is qualitatively

22   important.

23          So those are the four parts, the opening guitar part,

24   the fanfare, the guitar solo, Verse 6.

25   Q.   Thank you.

898

1          Let me deal with one point before you continue and
2     then finish off.
3          You are -- you are a retained expert in this case,
4     correct?
5     A.   Yes.
6     Q.   And you are being compensated for your work?
7     A.   I am.
8     Q.   And how much have you been paid by the defendants in this
9     case for the work that you have done, the two reports, the
10    analyses, the testimony?
11    A.   The prior art search.  Certainly.  In 2015, I was paid a
12    little less than $18,000 for all of my work.  My hourly rate is
13    $395 an hour for that work.
14         And then in 2016, around -- let's see, I have to do
15    the math in my head -- a little -- maybe a little bit over
16    $59,000 or -- no, $56,000, but quite a bit.  And that is
17    through March.  It doesn't include particularly the work done
18    in May, the work in June that we're going through right now.
19         And my hourly for testifying, which is the case with
20    most of the experts that -- that I -- that I know, is higher
21    than my regular hourly.  So sitting here today, I'm making $475
22    an hour, as compared with the $395 that is my basic hourly.
23         So all of that, I've been paid approximately $77,000
24    so far, and I would say that we are probably talking about
25    between 18- and $20,000 in addition to that by the time we

899

```
 1  finish up today.

 2  Q.   The hourly rates that you've described, are they

 3  comparable to hourly rates of other experts in this

 4  field and -- in this field?

 5          MR. MALOFIY:  Objection.

 6          THE COURT:  Speculation.  Sustained.

 7  BY MR. ANDERSON:

 8  Q.   Do you have any information as to the hourly rates charged

 9  by other experts in the field?

10  A.   I do.

11          MR. MALOFIY:  Objection.

12          THE COURT:  Relevancy?

13          MR. ANDERSON:  Just to show that --

14          THE COURT:  Sustained.

15          MR. ANDERSON:  -- it's a comparable.  Okay.

16  BY MR. ANDERSON:

17  Q.   How many years have you been providing expert opinions in

18  music copyright matters?

19  A.   About 25 years.

20  Q.   And how many cases have you been retained as an expert

21  witness?  Can you estimate or --

22  A.   It would be difficult to estimate.  Most of the

23  analyses -- and I mentioned all of those artists early on in my

24  testimony -- most of those are not involved with anyone making

25  a formal claim.  Many of those are just brief analyses.
```

900

```
 1   Q.   Do you take every case that comes to your door as a
 2   possible case?
 3   A.   Well, I don't generally turn something down unless I am
 4   too busy.  I've turned quite a few things down in the last
 5   several weeks because this has been so busy.
 6            But just in general, if an individual calls or a
 7   motion picture company in terms of their film score, publishing
 8   company, record company, I don't tend to just turn it down out
 9   of hand unless my schedule at New York University or schedule
10   at -- for example, like this, would simply disallow it.
11   Q.   Have you ever provided sort of bad news to someone who
12   comes to you, that your opinion is not supportive of their
13   position?
14            MR. MALOFIY:  Objection.  Vague and ambiguous and
15   relevance.
16            THE COURT:  Overruled.
17            THE WITNESS:  Very frequently.  In fact, I think many
18   in the industry know that I often give bad news.
19            And the reason for that is --
20            THE COURT:  That's not a question now.
21            Counsel, next.
22   BY MR. ANDERSON:
23   Q.   And have there been situations, to your knowledge, where
24   you provided an initial opinion and someone else was hired in
25   your place?
```

901

```
 1    A.   Yes.
 2              MR. ANDERSON:  Your Honor, I was going to ask that we
 3    could play some of the prior art that has been described with
 4    the audio recordings that were -- portions of the audio
 5    recordings that were produced with Dr. Ferrara's report.
 6              Is that acceptable?
 7              MR. MALOFIY:  Your Honor, objection.
 8              THE COURT:  Sustained.  Under 403, I would not allow
 9    it in.
10    BY MR. ANDERSON:
11    Q.   And, Dr. Ferrara, are there any -- and if the answer is
12    no, that's fine, but are there any examples of prior art that
13    you haven't played so far that you're able at this point to
14    play at the piano, rather than have us call up the recordings
15    that were released of these prior art?
16    A.   Yes, very much so.  We --
17    Q.   That's fine.  You've answered.
18              MR. ANDERSON:  Your Honor, I would ask that
19    Dr. Ferrara be allowed to return to the piano and play portions
20    of the prior art.
21              THE COURT:  Counsel, as I said, it was excluded under
22    403, which means it's much more time-consuming that it is
23    relevant.  He's testified to it all, so -- but under 403, I
24    would exclude it.
25              MR. ANDERSON:  And I apologize, Your Honor.  I --
```

902

```
1              THE COURT:  No problem.

2              MR. ANDERSON:  I understood you to exclude the

3    playing of the sound recordings.  I'm talking about him playing

4    portions on the piano.

5              THE COURT:  The same grounds would be similar.  It

6    would be under 403.  It's much more time-consuming than it is

7    relevant --

8              MR. ANDERSON:  Okay.

9              THE COURT:  -- although we'd love to hear him play.

10       (Laughter.)

11             MR. ANDERSON:  Just bear with me for a second.

12             THE COURT:  Um-hmm.

13             MR. ANDERSON:  I believe those are all of the

14   questions I have for him.

15             THE COURT:  Okay.  Cross-examination.

16             MR. MALOFIY:  Yes.

17                            CROSS-EXAMINATION

18   BY MR. MALOFIY:

19   Q.   Sir, we know each other.  We often are on the other side

20   of the fence, correct?

21   A.   That's correct.

22   Q.   And you often represent the defendants, the industry, and

23   I represent the creatives, correct?

24             MR. ANDERSON:  Objection.  Relevance.

25             THE COURT:  Overruled.
```

903

1          Is that correct?

2          THE WITNESS:  I'm often engaged on behalf of

3   companies from the industry, yes, that's correct.

4   BY MR. MALOFIY:

5   Q.   And if you recall in your deposition just a week ago, we

6   went through all of the many cases where you were a testifying

7   expert and, in fact, every one of those, you were representing

8   either the majors -- either the record labels or the publishers

9   or major artists, correct?

10  A.   That's incorrect.

11  Q.   There was four that weren't, and they were the estates of

12  John Lennon and one of the Eagles, I believe, their estates;

13  isn't that correct?

14          There's three that weren't representing the

15  defendants?

16  A.   Well, first, counselor, the basis for this was an exhibit

17  that you handed me during my deposition, and as we went through

18  each entry, we found that there were a huge number of mistakes.

19  There were double entries for Repp v. Weber and others.

20          There were other entries where I had actually been

21  engaged on behalf of a plaintiff, Lennon, the John Lennon

22  estate, but you had it in a section of your exhibit that was my

23  representing --

24          THE COURT:  Let's go on to the next question,

25  counsel.

904

BY MR. MALOFIY:

Q.   Sir, isn't it true that all but four of those entries you represented the defendant?  And there was about 40 of them.

A.   Well, first of all, there weren't 40, and, secondly, once again, many of the entries that you had were repetitive, and so the number is actually less.

Q.   Well, it was somewhere between 35 you represented the defendants and a few you represented the plaintiff, correct?

A.   No, that's incorrect.

Q.   What's the number, sir?

A.   I haven't memorized your exhibit.  If you'd like to present it to me, I'll be very happy to walk it through.  I did that at my deposition and it became patently clear that there were many things on that exhibit that were repetitive.  You basically named the same case --

          THE COURT:  Well, let's see it.

          Do you want to show him the exhibit?

          MR. MALOFIY:  I will, but I'm going to move forward.

BY MR. MALOFIY:

Q.   Sir, you said you produced reports and analysis over 200 times in your deposition and not one was pro bono, correct?  Not one?

A.   Reports that are, in most cases, three to four or five pages, preliminary reports --

          MR. ANDERSON:  Objection.  Relevance.

905

```
 1   BY MR. MALOFIY:

 2   Q.    Sir, the --

 3   A.    And the answer is yes.

 4           MR. ANDERSON:  Relevance.

 5           THE COURT:  Okay.  Next question.

 6   BY MR. MALOFIY:

 7   Q.    The answer is yes, you never did a report pro bono,

 8   correct?

 9           MR. ANDERSON:  Objection.

10           THE COURT:  Sustained.  Irrelevant.

11   BY MR. MALOFIY:

12   Q.    Now, in this case, you indirectly were working for the

13   plaintiff and then you flipped to work for the defendant for

14   $100,000; isn't that correct?

15           MR. ANDERSON:  Objection.  Misstates the facts.

16           MR. MALOFIY:  No.

17   BY MR. MALOFIY:

18   Q.    Isn't that correct, sir?

19   A.    Absolu --

20           THE COURT:  Well, no.  Excuse me.  Excuse me.

21           First of all, it's argumentative.  Second of all, I

22   don't know if it's correct or not.

23           Have you worked -- did you work for the plaintiff

24   in -- for a time and then -- and now you're working for the

25   defendant?  When I say "working for," were you employed by the
```

906

```
 1    plaintiff at one time and then employed by the defendant?

 2              THE WITNESS:  No.

 3    BY MR. MALOFIY:

 4    Q.   Indirectly, sir.

 5    A.   No, not indirectly.  I was --

 6              THE COURT:  Okay.  The answer is no, you didn't.

 7              THE WITNESS:  The answer is no.

 8    BY MR. MALOFIY:

 9    Q.   Sir, it was at your deposition that it was disclosed that

10    you, in fact, worked for plaintiff's publisher and never

11    disclosed the fact that you had done a musical --

12              THE COURT:  Counsel, I'm sorry.  You can't testify

13    asking questions.  You can ask him a question, but what you're

14    trying to do is get testimony in front of the jury that the

15    witness hasn't testified to.  So just ask the question.

16    BY MR. MALOFIY:

17    Q.   Sir, isn't it true that you worked and did a musicological

18    analysis for Rondor Music?  Yes or no?

19    A.   Yes, and that is something that I freely said at my

20    deposition, it's not something that --

21    Q.   Sir --

22              MR. MALOFIY:  Strike the answer after "freely."

23    BY MR. MALOFIY:

24    Q.   Yes, you did, correct?

25              THE COURT:  No, no, no, counsel.  Let the Court run
```

907

1    the court, okay?  You're not the one to say, "You can only

2    answer yes," or, "You can only answer no."  That's for the

3    Court to decide.  He's answered the question.  It's relevant.

4    It stays in.

5             Next question.

6    BY MR. MALOFIY:

7    Q.   Sir, isn't Rondor Music an affiliate of Universal Music

8    Group, who administers the copyright on behalf of plaintiff?

9             MR. ANDERSON:  Objection.  Lacks foundation.

10             THE WITNESS:  The answer is in two parts.

11             THE COURT:  Overruled.

12             THE WITNESS:  The first is that in my deposition, I

13    said that Rondor Music, who called me some years ago, not about

14    the "Taurus" deposit copy, is a division of Universal.

15             As to the second part, I am not aware that Universal

16    has an interest in "Taurus."

17             THE COURT:  Okay.  Next question.

18    BY MR. MALOFIY:

19    Q.   Isn't it true that Rondor Music works with Universal and

20    you were hired by Universal?

21             THE COURT:  If you know.

22             THE WITNESS:  Well, I testified to that fact in my

23    deposition, that my understanding is Rondor Music is a division

24    of Universal Music Publishing Group.

25    ///

908

```
 1    BY MR. MALOFIY:
 2    Q.   Isn't it true that you never disclosed, prior to your
 3    deposition, that you had done a prior musicological analysis of
 4    the "Taurus" sound recording and the "Stairway to Heaven" sound
 5    recording?
 6             MR. ANDERSON:  Objection.  Argumentative.  Relevance.
 7             THE COURT:  Sustained on both grounds.
 8    BY MR. MALOFIY:
 9    Q.   Isn't it true you did not disclose the facts which you
10    relied upon or the facts which you did not consider in coming
11    to your opinions in this case?
12             MR. ANDERSON:  Same objections.
13             THE COURT:  Sustained.
14    BY MR. MALOFIY:
15    Q.   Sir, in your report, did you ever disclose the fact that
16    you initially looked at the "Taurus" sound recording?
17             MR. ANDERSON:  Objection.
18             THE COURT:  Sustained.
19    BY MR. MALOFIY:
20    Q.   Sir --
21             THE COURT:  Maybe you should listen to the Court when
22    it makes its ruling and understand -- rather than just asking
23    the same question over and over and over again -- when it's
24    been sustained, it's been sustained.
25             MR. MALOFIY:  I'll move forward.
```

909

```
 1              THE COURT:  Thank you.
 2   BY MR. MALOFIY:
 3   Q.   Sir, did you ever produce your prior report or your
 4   analysis or your communications that you had done prior to
 5   being retained by defendants?
 6              MR. ANDERSON:  Objection.  Relevance.
 7              THE COURT:  Overruled.
 8              MR. ANDERSON:  403.
 9              THE COURT:  Overruled.
10              THE WITNESS:  No, I have not.
11   BY MR. MALOFIY:
12   Q.   And to this day, even though you were -- there was a
13   subpoena and request for documents, those specific documents,
14   we still don't have them today, correct?
15              MR. ANDERSON:  Objection.  Relevance.
16              THE COURT:  Sustained.
17   BY MR. MALOFIY:
18   Q.   Did you have any opportunity to speak to Mr. Page and ask
19   him whether or not he was influenced by any of this prior art
20   which you just discussed?
21              MR. ANDERSON:  Objection.  Argumentative.  Relevance.
22              THE COURT:  Just a second.  Overruled.
23              It means you may answer it.
24              THE WITNESS:  Thank you.
25              No, I have not discussed any of the issues with
```

910

1    respect to prior art and so forth with Mr. Page.

2    BY MR. MALOFIY:

3    Q.   And the same answer would be if you asked Mr. Plant,

4    correct?

5    A.   No, I had not asked Mr. Plant.

6    Q.   And did you consider access in your analysis of

7    substantial similarity, because the greater the degree of

8    access, the lesser the degree of substantial similarity?

9            MR. ANDERSON:  Objection.

10           THE COURT:  Counsel, you're trying to instruct the

11   jury as to what you think the law says.  It's inappropriate.

12   Ask the question.  Do not try to testify and do not try to

13   instruct the jury on the law.

14           Ask the next question, please.

15   BY MR. MALOFIY:

16   Q.   Sir, did you consider access in your analysis of

17   substantial similarity?

18           THE COURT:  That's a great question.  Thank you.

19           THE WITNESS:  No, because access is not a

20   musicological issue.  We deal with the music.  We deal with the

21   composition.

22           THE COURT:  Okay.  You've answered the question.

23           Next question.

24           THE WITNESS:  Thank you.

25           MR. MALOFIY:  Thank you.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**01046**

911

```
 1    BY MR. MALOFIY:

 2    Q.   And do you have any facts to support whether or not

 3    Mr. Page heard any of the prior art which you had played?

 4              MR. ANDERSON:  Objection, Your Honor.  He's an expert

 5    witness, a musicologist.  Relevance.

 6              THE COURT:  Sustained.

 7    BY MR. MALOFIY:

 8    Q.   Out of the 65 prior art examples, isn't it true that the

 9    chromatic scale always goes to the E in those examples of the

10    prior art which you showed?

11              MR. ANDERSON:  Objection.  Argumentative.

12              THE COURT:  Overruled.

13              MR. ANDERSON:  Lacks foundation.

14              THE COURT:  Overruled.

15              THE WITNESS:  Well, first of all, 65 is absolutely

16    incorrect.  I don't know where the number comes from.  I

17    attached and analyzed approximately 20, and the answer is an

18    explicit and definite no.

19              Perhaps 5 or 6 of the 20 go down to E, which

20    Dr. Stewart says is the way you have to do it, which means the

21    other 15 avoided going to the E.

22              THE COURT:  Excuse me.  You're to --

23              THE WITNESS:  I'm sorry.  You're right.  Yes.  I

24    apologize.

25              THE COURT:  -- listen to the question and just answer
```

912

```
 1    the question, and if either side wants you to answer more or
 2    testify more, they'll ask questions.
 3              Go ahead.  Next question.
 4              THE WITNESS:  I'm sorry.
 5              THE COURT:  That's okay.
 6    BY MR. MALOFIY:
 7    Q.   Sir, can you play the "Taurus" composition on the guitar?
 8    A.   No.
 9    Q.   So you can't consider that the notes are ringing out as
10    it's being performed, correct?
11              MR. ANDERSON:  Objection.  Performance.
12              THE COURT:  Sustained.
13              This has nothing to do with it being played on the
14    guitar or not, it's whether or not the -- it's whether or not
15    the deposit copy was infringed or not.  It's not about whether
16    or not -- what guitar played or what guitar didn't play on the
17    deposit copy; it's just whether or not the deposit copy is
18    infringed.
19              Go ahead.
20    BY MR. MALOFIY:
21    Q.   Would you agree that much of the prior art is in a
22    different genre than "Taurus" and "Stairway to Heaven"?
23              MR. ANDERSON:  Objection.  Relevance.
24              THE COURT:  Overruled.
25              THE WITNESS:  Well, there's a -- there's a suggestion
```

```
1    or implication that the "Taurus" deposit copy is in a genre
2    that is in the same genre as "Stairway to Heaven."  I don't
3    know what the "Taurus" deposit copy genre is.
4              THE COURT:  You're saying you can't answer that,
5    then, because you don't know that.
6              Next question.
7    BY MR. MALOFIY:
8    Q.   Is that because it's not written on the sheet music?
9              MR. ANDERSON:  Objection.  Vague and ambiguous.
10             THE COURT:  Overruled.
11             THE WITNESS:  No, because it's not been realized in
12   some form in which one could say, "This is heavy metal, this is
13   blues rock," and so forth, the kinds of genres that are often
14   associated with Led Zeppelin.
15   Q.   Would that be able to be determined from the sound
16   recording?
17             MR. ANDERSON:  Objection.  Relevance.
18             THE COURT:  Sustained.  Wouldn't be relevant.
19   BY MR. MALOFIY:
20   Q.   Do you know exactly how much you were paid as of today?
21   Because I know at your deposition it was 79,000.
22             THE COURT:  Counsel, you're testifying again.  You
23   can ask him -- the first part of the question is proper, but
24   don't testify.
25             First part of the question is do you know exactly how
```

914

1    much you've been paid?

2              THE WITNESS:  Yes.  I testified to this and it wasn't

3    79,000, it was a little over 77,000 from 2015 and 2016 so far.

4              THE COURT:  Thank you.

5    BY MR. MALOFIY:

6    Q.   And today you're not sure where it stands, correct?

7    A.   I testified earlier that I believe it's somewhere between

8    18- and 20,000.  I haven't checked, but I think it's somewhere

9    in that area.

10             THE COURT:  Ladies and gentlemen, we're going to

11   break at this time because it is 2:30.

12             Remember the admonishment not to discuss the case

13   among yourselves or with anybody else or form or express any

14   opinions about the matter until it's submitted to you and you

15   retire to the jury room.

16             We'll see you back in in 15 minutes.  We'll be in

17   recess.

18             THE CLERK:  All rise.

19        *(Jury out at 2:32 P.M.)*

20        *(Recess 2:32 to 2:45 P.M.)*

21        *(Jury in at 2:45 P.M.)*

22             THE COURT:  Okay.  The record will reflect that all

23   the members of the jury are in their respective seats and the

24   witness is on the witness stand.

25             Counsel, you may go ahead with your

915

```
 1    cross-examination.  You've got about five minutes left on it.
 2              MR. MALOFIY:  Okay.
 3    BY MR. MALOFIY:
 4    Q.   Dr. Stewart -- excuse me.  Dr. Ferrara, you'd agree that
 5    Dr. Stewart is a qualified musicologist?
 6    A.   Yes, I do.
 7    Q.   And you'd agree that he's respected in the area of
 8    musicology?
 9    A.   I don't know that he is respected in the area of
10    musicology.  I don't know his publications.
11    Q.   Do you respect him as a musicologist?
12    A.   It don't know enough about his publications to suggest
13    that I respect him as a musicologist.
14    Q.   Let me move forward.
15              In your report, you had identified on page 8:
16              "Indeed, the two-part phrases in the upper melodic
17              line and the guitar arpeggios in 'Stairway' are the
18              most creative and memorable part in the repeating
19              three measures in the introduction in 'Stairway.'
20              That upper melodic line is absent in 'Taurus.'"
21              Do you recall that?
22    A.   Yes.
23    Q.   Did I read that correctly?
24    A.   I haven't memorized my report, but it certainly comports
25    with what I testified to earlier.
```

916

```
 1    Q.    And then again you stated, quote:
 2              "Within the upper melodic line in 'Stairway' there's
 3              another melodic line consisting of two-note phrases
 4              in the high part of the upper melodic line, from A to
 5              B landing on beat three in Measure 1, from B to C
 6              landing on beat one in Measure 2, and C to F-sharp
 7              landing on Beat 3 in Measure 2."
 8              Do you remember that?
 9    A.    Yes.  It's -- you were talking about exactly the same
10    thing.
11    Q.    Right.  And then again, you stated, quote:
12              "Within the upper melodic line in 'Stairway,' upper
13              consecutive eighth notes create a memorable series of
14              two-note melodic phrases that move from A to B, B to
15              C, and C to F-sharp."
16              Do you recall that?
17    A.    Yes, I do.
18    Q.    Do you recall in your deposition I showed you the "Taurus"
19    deposit copy?
20    A.    Yes, I do.
21    Q.    And do you recall that in your initial report, you failed
22    to analyze half the notes or the whole treble clef on -- in
23    Part A of the "Taurus" deposit copy?
24    A.    It's absolutely incorrect.  I did analyze the entire
25    deposit copy, including the upper line of the "Taurus"
```

```
 1   Section A.  We went through it in my testimony and I
 2   established --
 3              THE COURT:  Next question.
 4              THE WITNESS:  I'm sorry.  Thank you very much.
 5              THE COURT:  Next question.
 6              MR. MALOFIY:  I'd like to pull up Exhibit 2704.
 7              I believe this is already published and moved into
 8   evidence, but if it's not, I ask permission.
 9              THE COURT:  It will be received.  It can be
10   published.
11          (Trial Exhibit 2704 admitted into evidence.)
12              MR. MALOFIY:  All right.  Can we blow up the first
13   two staves, the treble and bass clef?
14   BY MR. MALOFIY:
15   Q.   And to be clear, if we look at this, you had circled the A
16   to B pair in the treble clef when I asked you to do so,
17   correct?
18   A.   That's correct.  When you asked me to do so, I simply
19   parroted what you asked me to do.
20   Q.   And that's right there (indicating), correct?
21   A.   That's correct.
22   Q.   And the B to C is right here (indicating), correct?
23   A.   That's correct.
24   Q.   And the C to F-sharp is right here (indicating), correct?
25   A.   In the lower voice, that's correct.
```

918

1    Q.    Right.  But it's the correct notes, sir, correct?

2    A.    Yes, they're the correct notes.

3    Q.    Okay.  Now, you would agree with me that I also asked you

4    to go to your example -- excuse me -- to 2705.

5          *(Counsel confer off the record.)*

6              MR. MALOFIY:  May we publish it to the jury and also

7    move it into evidence?

8              THE COURT:  Yes.

9          *(Trial Exhibit 2705 admitted into evidence.)*

10         *(The exhibit was displayed on the screen.)*

11   BY MR. MALOFIY:

12   Q.    All right.  And here, you also circled the A to B, B to C,

13   and C to F-sharp in "Taurus" and also the A to B, B to C, and C

14   to F-sharp in "Stairway to Heaven," correct?

15   A.    Once again, this is in my deposition.  I simply parroted

16   what Mr. Malofiy asked me to do.

17   Q.    Okay.  In your initial report, you didn't identify that

18   there was the AB, BC pair or the C to F pair contained in the

19   "Taurus" deposit copy, correct?

20   A.    That's because there isn't.  They don't line up.

21             And, once again -- well, no, I didn't, because they

22   don't line up and because any similarity is totally meaningless

23   and insignificant.

24   Q.    Now, if you take a paragraph and you take half of the

25   sentences out of that paragraph, it would have a different

919

```
 1    meaning, wouldn't it?
 2    A.   It's not -- it's not clear what you're asking.
 3    Q.   Well, you're talking about rearranging words or not having
 4    words in the right order.
 5           If you took two staves of music and you took 50
 6    percent of the music contained in those staves and failed to
 7    analyze it, it would have a different meaning, correct?
 8           MR. ANDERSON:  Objection.  Relevance.
 9           THE COURT:  Sustained.
10    BY MR. MALOFIY:
11    Q.   You didn't consider the AB or BC pair in the treble clef
12    in your analysis?
13           MR. ANDERSON:  Objection.  Asked and answered.
14           THE COURT:  Overruled.
15           THE WITNESS:  I didn't consider it because it's
16    meaningless.  It's absent in "crab" in different places.
17           THE COURT:  Okay.  Next question.
18    BY MR. MALOFIY:
19    Q.   If you go to the BC, it lines up at the same place and the
20    C to F-sharp, correct?
21    A.   It does, yes.  Two notes out of two very different musical
22    phrases, that's correct.
23    Q.   And it's just the AB which is slightly off here, correct?
24           MR. ANDERSON:  Objection.  Vague and ambiguous.
25           THE COURT:  Overruled.
```

920

```
 1          THE WITNESS:  I don't agree with "slightly off."
 2   It's quite off.
 3          And, once again, the BC I've already -- this is
 4   repetitive.  I've already earlier testified that the BC line
 5   up, but they line up in two very different phrases.  The notes
 6   before the BC in "Taurus" and after the BC in "Taurus" are
 7   different from the notes before BC and after BC in "Stairway."
 8   You're just surgically removing two notes that happen to occur.
 9          THE COURT:  Okay.  Next question.
10          MR. MALOFIY:  I'd like to play 529-V and 530-V, which
11   are the --
12          THE COURT:  Is it less than a minute, counsel?
13          MR. MALOFIY:  I believe they were admitted and moved
14   in.
15          THE COURT:  Is it less than a minute?
16          MR. MALOFIY:  Yes.
17          THE COURT:  Okay.  Because that's about what you have
18   left.  Okay.
19          MR. MALOFIY:  They're the pairs on the guitar.
20      (Counsel confer off the record.)
21          MR. ANDERSON:  I'm sorry.  I don't know what these
22   exhibits are.  I think they're among the ones that were
23   recently produced.  I have not --
24          MR. MALOFIY:  They were already played in court.
25          THE COURT:  At this time, we have a serious time
```

921

1    problem as far as conforming to the Court rules on it.

2         I'm going to ask counsel, one counsel from each side,

3    and the reporter to come back into chambers.  I'd like to talk

4    to you both.

5         Ladies and gentlemen, I'm going to have you excused

6    to go back to the jury room.

7         The audience can stand out there if you want.  It's

8    only going to be about five or ten minutes, okay?

9         Okay.  We'll be in short recess.

10        THE CLERK:  All rise.

11        *(Jury out at 2:55 p.m.)*

12        *(The following proceedings were held in chambers.)*

13        THE COURT:  The record will reflect we're in chambers

14   with counsel from the defense and the plaintiff on it.

15        And the reason we're coming in is to talk about what

16   we've talked about several times in the past, and that is that

17   the plaintiff has run out of time.  The Court has been generous

18   every day, giving you an extra five minutes and not cutting it

19   off, but we've definitely run out of time on it.

20        And as we indicated before, when you're through the

21   hours that we gave you, which was ten hours, and if it was not

22   presented efficiently and effectively, that I would not be

23   giving more time.

24        And that's where we are right now.  And I know there

25   is an objection and I want to give -- counsel, I want to give

922

1    you the chance to put your objection on the record.

2            MR. MALOFIY:  The objection is that when this case

3    opened up, there was many issues to be covered because there

4    was an issue of access, which was hotly disputed.  There was

5    the issue of ownership.  There was also the issue of the

6    validity of the Trust, unclean hands, and those issues made it

7    absolutely necessary to spend time on that, to establish that

8    the trustee was proper, that the Trust was valid, that the

9    ownership was owned by the Trust.  All of these things could

10   have been done by stipulation.

11           I think access is something that was hotly disputed,

12   but I think, clearly -- well, I think it was something that

13   needed to be -- spend time on because it is relevant to the

14   substantial similarity argument, as well.

15           It's our position that ten hours is very difficult to

16   put on a complicated case, and we're doing the best we can.

17           There's travel and arrangements that have to be made

18   of many experts through all over the country, and I think it's

19   prejudicial to limit a case strictly in ten hours.

20           The case-in-chief, we did get in in ten hours.  I'm

21   doing the best we can.  We had some tech issues, and I know

22   that's not the Court's fault, and we're doing the best we can

23   to put on the case as efficiently as possible.

24           We cut out many witnesses.  We didn't do Mr. Plant,

25   we didn't do Mr. John Paul Jones.  There's other additional

923

```
1   witnesses we wanted to put on, and we decided that in the
2   interest -- and also in deference to the Court's ruling and
3   also the Court's position, it would be best not to do that.
4           We feel -- it's plaintiff's position that it would be
5   highly prejudicial and also violate due process to not allow us
6   at least some leeway here, in light of the magnitude and the
7   significance of this case, and also that plaintiff's counsel
8   has been making best efforts to handle the case and address it
9   as soon as possible.
10          Our case was done in ten hours -- we did put on our
11  case-in-chief on in less than ten hours.  I think there was
12  also some time that -- it may be an accounting thing.  I think
13  we had about 20 minutes or 15 minutes left on our clock.
14          But, again, I would just respectfully request of this
15  Court some leeway in allowing us additional time, at least to
16  put on our -- to cross and rebut.  And it's not much.
17          THE COURT:  Okay.  I don't know if you have an
18  interest one way or the other on this.
19          MR. ANDERSON:  Yeah, there are a few things I'd like
20  to say.
21          Counsel has known what his case was for a long time,
22  including on April 25th, when the Court told us the time
23  limits, and we've adjusted to that.  We've -- you know, I think
24  we had -- I know we used a lot today, but we had, I think, only
25  used a couple of hours through this week.  And so counsel --
```

924

1    you know, if this case actually merited more time, he should

2    have done something after the Court advised us.

3          The other thing I want to say is the Court has been

4    very clear and has raised this issue several days over the last

5    few days.  And if -- and I am also, frankly, very surprised on

6    how the case -- the plaintiff's case was put on.  Plaintiff's

7    counsel had told me they expected to put their case on in six

8    hours, leaving four for cross, and every day it seemed to be

9    the same thing.  We were just talking -- or hearing about all

10   kinds of irrelevant stuff.

11         If -- we took the Court's ruling at the pretrial

12   conference in terms of the amount of time and the Court's very

13   kind and repeated admonitions seriously, and so -- and we dealt

14   with it.

15         THE COURT:  Okay.  Any response, if you like, and

16   then I'll make my ruling.

17         Go ahead.

18         MR. MALOFIY:  The response is that the case was

19   changed even up to the date of the pretrial as far as what the

20   issues were going to this trial.

21         Given that, we believe we did use our time

22   efficiently -- or as best we could in light of the

23   circumstances, and we've cut out many, many witnesses.  To not

24   allow us a little bit of leeway in getting additional time, it

25   would be prejudicial and violate due process and even be

925

```
 1   reversible error.

 2           And I don't want to step on the Court's toes, but I

 3   want to --

 4           THE COURT:  I understand.

 5           MR. MALOFIY:  -- I have to --

 6           THE COURT:  I want you to make your record.

 7           MR. MALOFIY:  -- make my record.

 8           And so I don't say that lightly.  And Your Honor has

 9   been very clear on stressing the time issues, and that's why we

10   did take it very seriously and try to cut it down as much as we

11   can.

12           We didn't put on certain witnesses even in our

13   case-in-chief because to this date, you know, we're not getting

14   clear answers from defendants.  Are they putting on Quinn

15   Wolfe?  Are they going to dispute ownership of the Trust?  What

16   evidence do they have as to unclean hands?  These are all

17   things that we had to establish, yes, and who Mick Skidmore

18   was, how he was involved, things that otherwise we wouldn't

19   even address.

20           And so there was a lot of issues that we did have to

21   go into.  And I am rushing a bit with Dr. Ferrara and it

22   results in, you know, getting objections that are sustained,

23   and I don't like that, but it put a time constraint which

24   hindered the -- the best that you -- well, that hindered

25   perhaps the -- getting testimony elicited in the best way.
```

926

1          And I don't want to -- I don't want to feel rushed,

2    and now we're at the point where it's in Your Honor's hands,

3    and I think I've made my record, and I ask the Court,

4    respectfully, for some leeway.

5          THE COURT:  Okay.  And I just want to make sure that

6    everybody had the opportunity to state what they wanted to and

7    get it on the record.

8          The Court's ruling is as follows and some comment on

9    it.

10          It was -- defense counsel was correct when he said

11    I've mentioned it several times.  The Court mentioned it at the

12    pretrial after reviewing all of the witnesses and potential

13    witnesses' statements.

14          The Court doesn't feel this is a complicated case.

15    Other than the fact that it's a publicity case, it's not a

16    complicated case.  There is no question in the Court's mind

17    that this can be done in a lot less than ten hours if counsel

18    wanted to.

19          And then several times at the beginning of the trial

20    and even during the trial, the Court has brought this up

21    because I was afraid we might get to this situation, to remind

22    people what the time was and how it was running faster than you

23    might think it was.

24          You're correct.  Defense counsel has, up until

25    yesterday, only used two hours, where the plaintiff used nine

927

1    hours.  The fact that the -- there are some things the defense

2    may bring up, you don't have to cover those until they bring it

3    up.  It's not an issue until they bring it up.

4            As far as the way the case was presented, introducing

5    several witnesses in this case -- if something goes down in the

6    Rose Bowl during the Rose Bowl game, you could call 100,000

7    witnesses or you can call one witness.  In this case, you've

8    called several witnesses to testify to accessibility that the

9    Court finds were repetitive.  You didn't have to call them all.

10           There is -- those witnesses that were called, there

11   were many questions that were irrelevant as far as this case is

12   concerned, such as their background, where they grew up, how

13   they knew people, if they liked people or they didn't.

14           It was just -- it's almost like we're -- that the

15   plaintiff was oblivious to the fact that there was time

16   restraints here.  And I know you weren't because you said you

17   weren't, but maybe you're oblivious to the fact that the Court

18   was going to exercise what it said, and then has to cut you off

19   at the end of ten hours if it was not efficiently presented.

20           During the case, evidence was introduced that the

21   Court had excluded that took up time that we had already

22   excluded on either motions in limine or -- and that was brought

23   up and argued again in front of the jury.

24           There was revisiting of rulings that the Court made

25   several times and redundant questions that came up.

928

```
 1            There were long gaps, as you know, with technology.
 2    But not only that, finding evidence -- and I know there's a
 3    dispute between the two of you, but that doesn't excuse it --
 4    finding evidence, long gaps in presenting the evidence because
 5    they couldn't be found or couldn't be identified or the other
 6    side hadn't seen it, long gaps of getting witnesses, walking
 7    outside the courtroom and trying to find witnesses.
 8            There were several times during the case where the
 9    plaintiff says, "Can we have a break" -- and that's okay -- "it
10    can be used against my time," which the Court did.
11            But there were a lot of gaps in the case where you
12    could have been presenting evidence that you didn't because we
13    just had a blank courtroom at the time because of the waiting
14    for witnesses or waiting for exhibits.
15            Because the Court finds that it really wasn't done --
16    efficiently presented so far -- and the way you present your
17    case, as I told you before, is completely up to you, but it has
18    to be within the time frames that the Court gave -- and because
19    of the fumbling of exhibits and witnesses and producing
20    evidence and not being presented efficiently, the Court feels
21    that there's really no excuse and no reason to give you more
22    time.
23            Now, that being said, being as lenient as I can and
24    over the objection, I'm sure, if he hasn't made it yet, of
25    defense counsel, I'm going to allow you ten minutes on each
```

929

```
 1    witness the defendants call for cross-examination.  There will

 2    be no rebuttal witnesses.

 3               MR. MALOFIY:  Understood.  Thank you, Your Honor.

 4               THE COURT:  Okay.  So I'm hoping that will help you

 5    out, because it's just -- I want to make sure that we make it

 6    as fair as possible.  Okay.

 7               MR. ANDERSON:  The defendants --

 8               MR. MALOFIY:  That's fair.

 9               Do I have a few more minutes to finish with --

10               THE COURT:  Two more minutes on this witness and

11    after that ten minutes per witness.

12               MR. MALOFIY:  Thank you, Your Honor.

13               THE COURT:  Okay?  Thank you very much.

14               MR. ANDERSON:  More than fair.

15               THE COURT:  And when you're -- when you're examining

16    the witness, counsel, when you get to 8 minutes, I'll give you

17    notice that you have another 2 minutes left.

18               MR. MALOFIY:  Okay.  Thank you, Your Honor.

19          (The following proceedings were held in open court.)

20               THE COURT:  Okay.  The record will reflect that all

21    members of the jury are in their respective seats in the jury

22    box.  The witness is on the witness stand.

23               And, ladies and gentlemen, I have to fill you in a

24    little bit.  As you have heard -- or at least heard alluded to,

25    there are time limits we gave both sides to present their case
```

```
 1   and the plaintiff has run past those time limits.

 2           And rather -- normally, you're cut off and you can't

 3   ask any more questions.  After you've used your time, you can't

 4   ask any more questions.  But rather than do that and being as

 5   lenient as we can and making sure we get as fair and honest

 6   presentation to the jurors as we can, I've allowed the

 7   plaintiff to use ten minutes of cross-examination on any

 8   witness the defense may call.  So I just wanted to let you know

 9   what's happened on it.

10           Counsel, you've got a couple more minutes on this

11   witness.  Go ahead.

12           MR. MALOFIY:  Thank you, Your Honor.  Appreciate it.

13           THE COURT:  Mm-hmm.

14           MR. MALOFIY:  Can we play 524-V, which was previously

15   played and I believe admitted into evidence.  It was "Stairway

16   to Heaven" Part A.

17       (Playing of videotape.)

18           MR. MALOFIY:  Now can we play 527-V, "Taurus" deposit

19   copy, bass clef.

20       (Playing of videotape.)

21           MR. MALOFIY:  Now can we play them in unison, as we

22   had done for our expert, Kevin Hanson.

23       (Playing of videotape.)

24   BY MR. MALOFIY:

25   Q.   Is it your testimony that you don't hear those as
```

931

```
 1   substantially similar?

 2   A.   First, "substantial similarity" is a legal term.  What I

 3   do hear, first, is only the lower staff in the "Taurus" deposit

 4   copy played by the guitarist.  The upper line is not there.

 5              MR. MALOFIY:  Your Honor --

 6              THE COURT:  Next question.

 7   BY MR. MALOFIY:

 8   Q.   Sir, do you find any similarities there?

 9   A.   Yes, indeed, the similarities that I've already

10   identified.  The similarities are a descending chromatic line

11   progression that is in the lower part of the "Taurus" deposit

12   copy.

13              THE COURT:  Okay.  Next question.

14   BY MR. MALOFIY:

15   Q.   Dr. Ferrara, you'd agree it's the same key?

16   A.   Yes.

17   Q.   You'd agree it's the same tempo?

18   A.   The way he's playing it?

19   Q.   "Taurus" can be any tempo.  It's not listed, correct?

20   A.   That's right, so you can't say it's the same tempo.

21   Q.   Well, the one you just heard is the same tempo, correct,

22   sir?

23              MR. ANDERSON:  Objection.  Relevance.

24              THE COURT:  Sustained.

25   ///
```

932

```
 1   BY MR. MALOFIY:

 2   Q.   Sir --

 3            THE COURT:  Last question, counsel.

 4   BY MR. MALOFIY:

 5   Q.   -- do you degree that there's harmony and melody that are

 6   similar in both pieces of work?

 7   A.   I do not agree at all that there is melody that is similar

 8   in both works.

 9            I do agree that the harmony is similar in both works,

10   but that harmony is commonplace.  No one can possibly

11   monopolize it.

12            THE COURT:  Okay.  Thank you, counsel.

13            MR. MALOFIY:  Thank you.

14            MR. ANDERSON:  Just briefly.

15            THE COURT:  Okay.

16                         REDIRECT EXAMINATION

17   BY MR. ANDERSON:

18   Q.   Counsel for the plaintiff asked you about Rondor

19   requesting your opinion.

20            Did you provide an opinion to Rondor?

21   A.   Yes, I did.

22   Q.   Did they file a lawsuit?

23            MR. MALOFIY:  Objection.  Speculative.

24            THE COURT:  Overruled.

25            THE WITNESS:  Not to my knowledge.
```

933

```
 1   BY MR. ANDERSON:

 2   Q.   The amount of money that -- I'm sorry.

 3        The expert witness fees that you've earned in this

 4   case, is it the -- in the range of the normal amount of

 5   compensation you receive as an expert witness?

 6             MR. MALOFIY:  Objection.

 7             THE COURT:  Overruled.

 8             THE WITNESS:  No, it's way in excess of what is

 9   usual.

10   BY MR. ANDERSON:

11   Q.   And why is that?

12   A.   Because at the beginning, the plaintiffs hired four music

13   experts who submitted reports and rebuttals, and I had to

14   respond to those.

15             MR. MALOFIY:  Objection.

16             THE COURT:  Sustained.  It required more work than a

17   lot of others.

18             THE WITNESS:  Thank you very much.  Yes.

19             THE COURT:  Next question.

20   BY MR. ANDERSON:

21   Q.   Have you ever been -- agreed to be engaged as an expert

22   witness in cases against record companies?

23   A.   Yes.

24   Q.   In cases against major record companies and major music

25   publishers?
```

934

```
 1   A.    Yes.
 2   Q.    And how do you decide whether to agree to a request to
 3   engage you as an expert witness?
 4              MR. MALOFIY:  Objection.
 5              THE WITNESS:  Whether or not --
 6              THE COURT:  Overruled.
 7              THE WITNESS:  Whether or not the musicological
 8   evidence supports the claim or not.
 9              THE COURT:  Thank you.
10              MR. ANDERSON:  Thank you, Your Honor.
11              Thank you, Dr. Ferrara.
12              THE COURT:  May this witness be excused?
13              MR. ANDERSON:  Yes, Your Honor.
14              THE COURT:  You're free to go.  Thank you very much
15   for coming in.
16              THE WITNESS:  Thank you very much, Your Honor.
17              THE COURT:  Mm-hmm.
18              Next witness.
19              MR. ANDERSON:  Yes, Your Honor.  Defendants call John
20   Paul Jones.
21              THE COURT:  Okay.
22              MR. ANDERSON:  Excuse me.  John Baldwin.
23              THE COURT:  If you can be sworn, please.
24              Sir, if you can be sworn in first.
25              THE WITNESS:  Oh, sorry.
```

935

```
 1              THE CLERK:  Please raise your right hand.

 2              Do you solemnly swear that the testimony you shall

 3     give in the cause now before this Court shall be the truth, the

 4     whole truth, and nothing but the truth, so help you God?

 5              THE WITNESS:  I do.

 6              THE CLERK:  Please be seated.  You can adjust the

 7     microphone as you need it.

 8              May I ask that you state your full name for the

 9     record and spell your last name.

10              THE WITNESS:  Yes.  My name is John Baldwin,

11     professionally known as John Paul Jones.

12                            JOHN BALDWIN,

13                     having been first duly sworn,

14                        testified as follows:

15                        DIRECT EXAMINATION

16     BY MR. ANDERSON:

17     Q.   Good afternoon, sir.

18              You are a member of Led Zeppelin?

19     A.   I am, yes.

20     Q.   And what was your role in Led Zeppelin?

21     A.   Mainly bass player, keyboard player, occasional

22     songwriter.

23     Q.   When did you first publicly perform music?

24     A.   When I was 14 years old.  I'm from a musical family.

25     Q.   And what was the context?  Where were you performing?
```

936

1   A.   Well, I was performing with my father's trio as a bass

2   player and also I was playing organ in church and I was choir

3   master, as well.

4   Q.   When did you first perform professionally?

5   A.   Professionally, I was in smaller bands when I was 16.  We

6   were doing local dances and then also American Air Force bases

7   often around the country in England.

8   Q.   When you were 17, were you a member of a band?

9   A.   Yes.  There was a fairly major band.  We had three Top 10

10  instrumental hits and toured in England, nowhere else.

11  Q.   What was the name of the band?

12  A.   It was named after the two stars.  They were Jet Harris

13  and Tony Meehan, who were, in fact, the rhythm section for

14  another band called The Shadows, which was a much bigger

15  affair.

16  Q.   Thank you.

17       And what did you do next in your career as a

18  professional musician?

19  A.   Tony Meehan, who was the drummer of that band, was also a

20  record producer, and I played on his sessions.

21       And I also became an arranger, a musical director for

22  Andrew Oldham and various other people and then started just

23  doing a lot of sessions.

24  Q.   Okay.  As a -- does being a session musician require

25  creativity?

937

```
 1   A.    Oh, yes.

 2   Q.    And can you explain why it does?

 3   A.    Well, especially in the rhythm section.  If you are a

 4   string player or trumpet player, you would have all the notes

 5   set out for you and you would pretty much play what's written.

 6         In the rhythm section, you had much more freedom, and

 7   you were just given charts which set out chord symbols, which

 8   were -- which gave you the harmony, and you would then

 9   improvise your parts.

10   Q.    Could you please tell us some of the recording artists

11   that -- or records that you were involved with as a session

12   musician or arranger prior to joining Led Zeppelin?

13   A.    Okay.  Well, I was musical director for Mickie Most.  That

14   was probably the most productive time.  That was arranging and

15   playing for Herman's Hermits, Donovan, Lulu.  I did "To Sir

16   With Love."  Herman's Hermit, I did "A Kind of Hush," "No Milk

17   Today."  Donovan, I did "Hurdy Gurdy Man," "Mellow Yellow," all

18   those arrangements.  I'm playing on them, too.

19   Q.    Did you work on any recordings by the Rolling Stones?

20   A.    Yes, I did.

21   Q.    Which ones?

22   A.    There was -- there was a song called "She's a Rainbow"

23   which had a string section on it and piano.  I did that.

24         THE COURT:  Okay.  Keep your voice up so we can hear

25   you.
```

938

```
 1              THE WITNESS:  Okay.  Sorry.
 2              THE COURT:  Next question.
 3    BY MR. ANDERSON:
 4    Q.    I don't know if you mentioned it.  Did you work on "A Kind
 5    of Hush" and on Dusty Springfield recordings?
 6    A.    That's right, yes.
 7    Q.    Did you work on the music for Goldfinger?
 8    A.    Yes.  Yes.  I was playing bass on Goldfinger and actually
 9    Jimmy was playing guitar.
10    Q.    By "Jimmy," you mean Jimmy Page?
11    A.    Jimmy Page, yes.  We sat next to each other.
12    Q.    Did you do any arranging or performing on recordings or
13    session work with the Yardbirds?
14    A.    Yes.  I did one -- one album.  Little Games I think it may
15    have been called.  That was when I was working with Mickie
16    Most, as well, when the Yardbirds were produced by Mickie Most
17    with just a few things.
18    Q.    And how did you come to be a member of Led Zeppelin?
19    A.    Well, I was doing a lot of work, and probably too much
20    work, and I think my wife could see the warning signs.
21              And she actually read that Jimmy Page was forming a
22    group.  He had left the Yardbirds and was forming a band, and
23    she said, "Call him up."  And so I did and I said, "Hi, Jim.
24    Do you need a bass player?"  And he went, "Yeah."
25         (Laughter.)
```

939

| | |
|---|---|
| 1 | THE WITNESS:  He was -- he said he was going up north |
| 2 | to -- to see a singer, to hear a singer, who he thought also |
| 3 | knew a drummer.  And the singer was Robert Plant and the |
| 4 | drummer was John Bonham. |
| 5 | BY MR. ANDERSON: |
| 6 | Q.  What year was Led Zeppelin formed? |
| 7 | A.  1968. |
| 8 | Q.  Did Led Zeppelin play in any countries before first |
| 9 | touring in the United States? |
| 10 | A.  Yes.  We played in Scandinavia. |
| 11 | Q.  Did Led Zeppelin play or perform in Denver in December of |
| 12 | 1968? |
| 13 | A.  Yes, we did.  It was the first show. |
| 14 | Q.  Who else was at -- what other group or groups were at the |
| 15 | show? |
| 16 | A.  Well, we were opening for Vanilla Fudge, and I understand |
| 17 | Spirit was there, too. |
| 18 | Q.  And how did you come to understand that Spirit was there? |
| 19 | A.  I think later on.  I think when this lawsuit came up. |
| 20 | Q.  Okay.  Have you ever seen Spirit perform? |
| 21 | A.  I didn't recall it, no. |
| 22 | Q.  Have you ever owned any Spirit albums? |
| 23 | A.  No. |
| 24 | Q.  Have you ever owned any Spirit singles? |
| 25 | A.  No. |

940

```
 1    Q.    Did you ever meet Randy California?

 2    A.    Not that I recall.

 3    Q.    Did you ever meet him under the name Randy Wolfe?

 4    A.    No.

 5    Q.    What were your musical tastes back in the late 1960s and

 6    '70s?

 7    A.    Some classical, but by then mainly jazz and rhythm and

 8    blues or soul music, as it was called in those days, Motown,

 9    Stax.

10    Q.    Other than as a member of Led Zeppelin for a performance,

11    did you ever go to rock concerts?

12    A.    No, I didn't.

13    Q.    Did Led Zeppelin perform at the Northern California Folk

14    Rock Festival in San Jose, California in May of 1969?

15    A.    Not that I recall.

16    Q.    Where were you when you first heard any version of what

17    became "Stairway to Heaven"?

18    A.    At an old rambling house in Surrey called Headley Grange.

19    Q.    Is that in England?

20    A.    Yes, it is, yes.

21    Q.    Do you recall when that was?

22    A.    No.

23    Q.    And what was your involvement when the musical composition

24    "Stairway to Heaven" was completed?

25    A.    Jimmy first played it to me on the acoustic guitar, and I
```

941

```
 1    was on the electric piano nearby.  And I think the idea was

 2    just to -- just to work on the song and figure out what went

 3    where, and I was helping him arrange it.

 4    Q.   Okay.  Where was "Stairway to Heaven" recorded?

 5    A.   I'm --

 6    Q.   Where was "Stairway to Heaven" recorded?

 7    A.   Oh.  At the Highland Studios in London.

 8    Q.   Do you know who Toby Roberts is?

 9    A.   I'm sorry?

10    Q.   Toby Roberts.

11    A.   Toby Roberts, yes.

12    Q.   And who was Toby Roberts?

13    A.   He was involved in the leasing of an aircraft, I think.

14    Q.   And when was that?

15    A.   I couldn't say.

16    Q.   Was it at the beginning of the formation of Led Zeppelin?

17    A.   No.  No.  We toured by car in those days.  The plane came

18    later.  It was a big reward.  So it must have been '74, '75

19    maybe.

20    Q.   Okay.

21         MR. ANDERSON:  Thank you.  That's all the questions I

22    have for you.

23         THE COURT:  Okay.  Cross.

24         MR. ANDERSON:  Oh, I'm sorry.  I have one more

25    question, if I may.
```

942

```
 1              THE COURT:  Yes.
 2              MR. ANDERSON:  Thank you.
 3  BY MR. ANDERSON:
 4  Q.   Counsel played an audio recording that purports to be you
 5  and your voice referring to Mr. Page and Mr. Plant coming back
 6  from Bron-Yr-Aur, and that related somehow to "Stairway to
 7  Heaven."
 8              Do you have any knowledge of "Stairway to Heaven" or
 9  what became "Stairway to Heaven" prior to hearing Mr. Page play
10  it for you at Headley Grange?
11  A.   No, I did not.
12  Q.   And -- okay.  Thank you.
13              THE COURT:  Okay.  Cross-examination, counsel.
14              MR. ANDERSON:  Thank you, Your Honor.
15              MR. MALOFIY:  Briefly.
16              THE COURT:  Sure.
17                        CROSS-EXAMINATION
18  BY MR. MALOFIY:
19  Q.   Do you recall every concert you were at in 1968?
20  A.   No.
21  Q.   Do you recall every concert you were at in 1969?
22  A.   Every concert?
23  Q.   Yeah.
24  A.   No.
25  Q.   How about 1970?
```

943

```
1    A.    No.

2    Q.    How about 1971?

3    A.    No.

4    Q.    All right.  Now, do you remember giving an interview in

5    the early '70s about Jimmy Page and Robert Plant coming back

6    from a cottage called Bron-Yr-Aur with a guitar intro and verse

7    for "Stairway to Heaven"?

8    A.    No.

9              MR. MALOFIY:  Please play 164-A.

10             THE CLERK:  What was the number?

11             MR. MALOFIY:  164-A.

12             My apologies.  100164 audio.

13        (Playing of audio tape.)

14             MR. MALOFIY:  Pause it.

15   BY MR. MALOFIY:

16   Q.    Do you recognize that person's voice?

17   A.    Yes, I do.

18   Q.    That's you, correct?

19   A.    Yes, it is.

20   Q.    All right.  Did you hear what the recording said?

21   A.    Yes.

22   Q.    All right.  And it said that they had come back from a

23   Welsh cottage with a guitar intro and a verse.

24             Did I hear that correctly?

25   A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

944

```
1    Q.   Okay.  Is your memory correct -- is your memory as
2    accurate today as it would have been in 1972?
3    A.   Yes.
4    Q.   It is?
5              THE COURT:  He already answered yes.
6    BY MR. MALOFIY:
7    Q.   Do you dispute that statement, sir?
8    A.   I was -- it sounds like I was guessing at the time.
9    Q.   So are you guessing today or you were guessing in 1972, a
10   year after it was written?
11             MR. ANDERSON:  Objection, Your Honor.  Argumentative.
12             THE COURT:  Sustained.
13   BY MR. MALOFIY:
14   Q.   Are you guessing today or do you know?
15             MR. ANDERSON:  Objection, Your Honor.  Argumentative.
16             THE COURT:  Overruled.
17             THE WITNESS:  I was guessing in 1972.
18   BY MR. MALOFIY:
19   Q.   So your memory is better today than in 1972?
20             THE COURT:  Asked and answered.
21             THE WITNESS:  No.  I do.
22        (Laughter.)
23             MR. MALOFIY:  I'd like to move that into evidence.
24   BY MR. MALOFIY:
25   Q.   One last thing.  In 19- --
```

945

```
 1            THE COURT:  Move what into evidence?

 2            MR. MALOFIY:  Oh, I think it was already moved into

 3   evidence.

 4            THE COURT:  I think it was, yeah.

 5            MR. MALOFIY:  Yeah.  Yeah, I believe it was.

 6   BY MR. MALOFIY:

 7   Q.   In 19- -- before you even played any show on U.S. soil as

 8   Led Zeppelin, you were familiar with the band Spirit by playing

 9   a portion of their music, "Fresh Garbage," correct?

10   A.   No.

11   Q.   You played the song -- you played a portion of the

12   composition "Fresh Garbage" as part of your live set, correct?

13   A.   Yes.

14   Q.   And you did that before you played your first show on U.S.

15   soil in -- December 26, 1968, correct?

16   A.   As I understand, yes.

17   Q.   Okay.  And you, in fact, learned of that piece of music, I

18   believe your testimony was, from the radio or the TV?

19   A.   Well, either the radio or the TV, yes.

20   Q.   Did any of the other members of Led Zeppelin introduce it

21   to you or did you learn of that song on your own?

22   A.   I can't recall.

23   Q.   Now, did you introduce that song to the band or did

24   someone else?

25   A.   I can't recall.
```

946

```
 1   Q.   And of the thousands of artists that you could have chose

 2   to cover their music, you covered a song by a relatively

 3   somewhat known band at that point called Spirit, correct?

 4            MR. ANDERSON:  Objection, Your Honor.  Lacks

 5   foundation.

 6            THE COURT:  Overruled.

 7            If you know.

 8            THE WITNESS:  What I did was just pick a two-bar bass

 9   riff which popped out of whatever -- however I heard it and

10   played that.  I didn't know who it was, what it was.  It was a

11   catchy little riff, it had a little quirky time thing, and it

12   caught my ear.

13   BY MR. MALOFIY:

14   Q.   Do you believe it was in your subconscious and you just

15   started playing it or do you have a --

16   A.   No.

17   Q.   You believe you -- you consciously copied that music,

18   correct?

19            MR. ANDERSON:  Objection, Your Honor.

20            THE COURT:  Sustained as to the question.

21   BY MR. MALOFIY:

22   Q.   Did you consciously lift the piece of -- the musical

23   composition of the bass riff in your song --

24            MR. ANDERSON:  Objection.

25   ///
```

947

```
 1    BY MR. MALOFIY:
 2    Q.    -- or the medley -- excuse me -- or the medley "As Long As
 3    I Have You"?
 4          MR. ANDERSON:  Objection, Your Honor.  It's
 5    argumentative, the phrase "lift."
 6          THE COURT:  Overruled.
 7          THE WITNESS:  I just took that two-bar bass riff.  I
 8    didn't know where it was from.  I just heard it.
 9    BY MR. MALOFIY:
10    Q.    Did Mr. Page ever tell you that he had -- he was a fan of
11    Spirit?
12    A.    No.
13    Q.    Did he ever share with you that he was a fan of Spirit in
14    the '60s during the time when the first four albums came out?
15    A.    No.
16    Q.    Did he ever share with you that he has six -- five albums
17    of Spirit in his collection today, which he bought during the
18    time?
19          MR. ANDERSON:  Objection.  Argumentative.
20    Mischaracterizes the testimony.
21          MR. MALOFIY:  I'll withdraw the question.
22          THE COURT:  Okay.
23    BY MR. MALOFIY:
24    Q.    Did Mr. Page ever tell you that he had five albums of
25    Spirit, one being a double album, in his record collection?
```

948

```
1              MR. ANDERSON:  Objection.  Relevance.
2              THE COURT:  Overruled.
3              Did he ever tell you that?
4              THE WITNESS:  No.
5   BY MR. MALOFIY:
6   Q.   Do you know anyone else that you're -- that you acquaint
7   with that has five or more albums of Spirit?
8   A.   No.
9   Q.   Did you ever ask Robert Plant if he has albums of Spirit?
10  A.   No.
11  Q.   Did you ever check your record collection to see if you
12  had any albums of Spirit?
13  A.   Yes.
14  Q.   And is the answer no?
15             MR. ANDERSON:  Objection.  Vague and ambiguous.
16             THE COURT:  No, he answered earlier.  He said he
17  didn't have any albums of Spirit.  This time he said, "Yes, I
18  have checked to see if I had any."
19             MR. MALOFIY:  Understood.  Thank you.
20  BY MR. MALOFIY:
21  Q.   Initially, when you were playing as a session musician,
22  you were playing other people's music, correct?
23  A.   Yes.
24  Q.   And in playing other people's music, they would give you
25  sheet music and you would follow it.  So your skill as a bass
```

949

```
1    guitarist or other multi-instrumentalist would be to put down

2    in recorded music to be distributed or to be sold, correct?

3              MR. ANDERSON:  Objection.  Compound.  Vague and

4    ambiguous and argumentative.

5              THE COURT:  You lost me on it, too.  Why don't you

6    state the question again.

7    BY MR. MALOFIY:

8    Q.   As a session musician, you would play sheet music or you

9    would play music for other people, correct?

10   A.   Correct, yes.

11   Q.   And this wasn't original compositions, these were

12   compositions of other people that you were playing for,

13   correct?

14   A.   Correct.

15   Q.   In doing so, you would agree that Led Zeppelin initially,

16   when it was first formed, had to jump on tour immediately,

17   correct?

18   A.   I'm sorry.  I didn't understand.

19   Q.   I'm sorry.  Let me restate it.

20             When Led Zeppelin was first formed, you immediately

21   went touring with Mr. Page, correct?

22   A.   Correct.

23   Q.   And is that because there was obligations, tour

24   obligations, that were still outstanding from his prior tour --

25             MR. ANDERSON:  Objection.  Lacks foundation.  Calls
```

950

1    for a conclusion.

2              THE COURT:  If you know.  If you know.

3    BY MR. MALOFIY:

4    Q.   -- from his prior band?  Excuse me.

5    A.   Yes, I did.

6    Q.   Okay.  And in doing so, did you have to come up with -- or

7    did you attempt to come up with new original material in a very

8    short period of time?

9    A.   Yes.

10   Q.   And in doing so, would you agree that you took covers and

11   you played those covers as part of your live sets often?

12             MR. ANDERSON:  Objection.  Vague and ambiguous.

13             THE COURT:  Overruled.

14             You may answer.

15             THE WITNESS:  Yes.

16   BY MR. MALOFIY:

17   Q.   And would you agree that all of the staple songs that you

18   were playing in late 1968 and early 1969 were covers of other

19   people's music?

20             MR. ANDERSON:  Objection.  Vague and ambiguous.

21             THE COURT:  Overruled.

22             THE WITNESS:  No.

23             THE COURT:  You got about two minutes.

24             MR. MALOFIY:  Yes.

25             538 very quickly.  Can we pull that up?

951

```
 1              I believe we used it already in this case, and I
 2    believe it was admitted.  If it's not, I ask for its admission.
 3              It's just a track list from Gonzaga, which we used in
 4    Mr. Page's depo- -- Mr. Page's testimony.
 5              THE COURT:  Is there any objection, counsel?
 6              MR. ANDERSON:  Still trying to call it up.  It's not
 7    one of the --
 8              MR. MALOFIY:  Would you like to take a look,
 9    Mr. Anderson?  We have it right here.
10              MR. ANDERSON:  Absolutely.
11         (Counsel confer off the record.)
12              MR. ANDERSON:  Relevance, Your Honor.  I do now know
13    what it is under a different exhibit number.
14              THE COURT:  Okay.  Overruled.
15              MR. MALOFIY:  May we publish it to the jury?
16              THE COURT:  Yes.
17         (The exhibit was displayed on the screen.)
18    BY MR. MALOFIY:
19    Q.   Sir, do I refer to you as Mr. Baldwin?  I'm not sure what
20    name you prefer.
21    A.   Mr. Jones will do.
22    Q.   Mr. Jones.
23              Mr. Jones, you'd agree that "Train Kept A-Rollin" was
24    a cover song that you performed?
25    A.   Yes.  I thought they were all Yardbirds songs.
```

952

```
1    Q.    Is that what you thought?

2    A.    Yes.

3    Q.    "I Can't Quit You."  Do you understand that's a cover

4    song?

5    A.    Yardbirds.

6    Q.    You believe it was the Yardbirds song?

7    A.    Yes.

8    Q.    "As Long As I Have You" with the "Fresh Garbage" melody

9    contained therein, did you understand that to be cover songs?

10          MR. ANDERSON:  Objection, Your Honor, to "Fresh

11   Garbage" melody.  I believe that is what counsel said.  It

12   misstates --

13          THE COURT:  Why don't you restate the question, but

14   this will be your last question.

15   BY MR. MALOFIY:

16   Q.    The other songs here, "As Long As I Have You," "Dazed and

17   Confused," "White Summer," and "How Many More Times," they were

18   all cover songs that you were performing with Led Zeppelin,

19   correct?

20   A.    Yardbirds songs, yes.

21   Q.    You believed them to be Yardbirds songs?

22   A.    Yes, I did.

23   Q.    Did Mr. Page ever tell --

24          THE COURT:  Counsel.  Counsel.

25          MR. MALOFIY:  Thank you, Your Honor.
```

953

```
1              THE COURT:  Any redirect?

2              MR. ANDERSON:  Just briefly, Your Honor.

3                    REDIRECT EXAMINATION

4  BY MR. ANDERSON:

5  Q.   Counsel asked you about session musicians and you -- and

6  playing other people's music.

7              As part of your work as a session musician in the

8  1960s, did you just play what was written on sheet music that

9  was given to you?

10 A.   Sometimes the parts were very concise with written --

11 written notes.  Other times, they would just be chord symbols

12 and then you would have to make up your own part, which, with

13 the rhythm section, happened quite a lot.

14 Q.   Okay.  And did you do a lot of session work in the rhythm

15 section?

16 A.   Yes, I did.  It was the whole rhythm section.

17 Q.   What do you mean by the "rhythm section"?

18 A.   Guitars, bass, drums.

19 Q.   Okay.  Thank you.

20             THE COURT:  Okay.  You may step down, sir.  You may

21 step down.

22             THE WITNESS:  Thank you.

23             THE COURT:  Any reason why this witness can't be

24 excused?

25             Okay.  You're free to go.  Thank you for coming in
```

954

```
 1    today, sir.
 2              Next witness.
 3              MR. ANDERSON:  Yes, Your Honor.  Defendants call Rob
 4    Mathes.
 5              THE CLERK:  Please raise your right hand.
 6              Do you solemnly swear that the testimony you shall
 7    give in the cause now before this Court shall be the truth, the
 8    whole truth, and nothing but the truth, so help you God?
 9              THE WITNESS:  So help me God.
10              THE CLERK:  You may be seated.
11              Let me ask that you state your full name for the
12    record and spell your last name.
13              THE WITNESS:  My name is Robert Ballou Mathes,
14    M-A-T-H-E-S.
15              THE COURT:  Okay.  You may inquire.
16              And keep your voice up so we can hear you.  Okay?
17              You may inquire.
18              MR. ANDERSON:  Thank you, Your Honor.
19                         ROBERT BALLOU MATHES,
20                      having been first duly sworn,
21                        testified as follows:
22                         DIRECT EXAMINATION
23    BY MR. ANDERSON:
24    Q.   Good afternoon, Mr. Mathes.
25              MR. MALOFIY:  Your Honor --
```

955

```
 1              THE COURT:  Yes.

 2              MR. MALOFIY:  -- we would only ask on what subjects

 3  he's going to be testifying to.

 4              MR. ANDERSON:  He is an expert witness, and there

 5  were -- there was an original and a -- an initial and a

 6  rebuttal expert report in writing provided to counsel.

 7              THE COURT:  That's fine.  As an expert in what area

 8  is what he's asking.

 9              MR. ANDERSON:  Primarily, the relative value or

10  importance, if you will, of the introductory portion of

11  "Stairway to Heaven" versus the other multiple components of

12  "Stairway to Heaven."

13              THE COURT:  Okay.  Okay.  Why don't you go ahead and

14  lay the foundation.

15              MR. ANDERSON:  Thank you, Your Honor.

16  BY MR. ANDERSON:

17  Q.   Mr. Mathes, what do you do for a living?

18  A.   I am an arranger, composer, music director, and a record

19  producer.

20  Q.   When did you first become involved in music?

21  A.   Say that again, please.

22  Q.   When did you first -- sorry, it's my fault.

23              When did you first become involved in music?

24  A.   My parents are Yale-trained classical musicians, and so

25  age four maybe.  They taught me my whole life.
```

956

```
1    Q.   Okay.  And how old were you when you first become --
2    became proficient at playing a musical instrument?
3    A.   I did study piano in -- you know, from four until now and
4    began playing the guitar in my teens.
5    Q.   Did you study music in school?
6    A.   I did.  I went to Berklee College of Music for two years
7    before becoming a professional musician.
8    Q.   What was your -- did you have an area of study -- a
9    specific area of study at the Berklee School of Music?
10   A.   I went in as a composition major with a guitar as my main
11   instrument, and I studied arranging, composing, songwriting,
12   jazz improvisation, courses like that.
13   Q.   Can you tell us just a little bit about the Berklee School
14   of Music?  I take it it's a music school, but is it a prominent
15   music school?
16   A.   It is.  It's very prominent.  It's in Boston and, you
17   know, it has alumni like Keith Jarrett and Chick Corea.  It was
18   primarily known as a jazz school, but when I went there, it
19   started to become much more involved in popular music in all
20   different styles.
21   Q.   And why did you leave the Berklee School of Music?
22   A.   I went on tour.  I became a professional musician with
23   Chuck Mangione, the jazz musician, in my early 20s.
24   Q.   And what time frame are we talking about?
25   A.   1984, '85, '86.  I was with him for five years.
```

957

1  Q.   What did you do next in your career?

2  A.   Soon after leaving Chuck, I started to meet a number of

3  producers in the New York City area and started arranging more

4  and more music, because it was my passion, and became a session

5  musician and music producer.

6  Q.   What does a music producer do?

7  A.   A music producer is essentially like a film director of

8  whatever project is at hand.  You're in charge of everything

9  that happens, the direction of the music, the people that are

10 playing on the record.  You're basically in charge of the

11 direction of that music-making.

12 Q.   And what is an arranger?  What does an arranger do?

13 A.   I've been asked this.  It's an interesting thing.  My --

14 an arranger does either one of two things.

15       The most common form of arranging is to take an

16 existing song and to recast it, new harmonies, new sounds.

17       The most popular arranger that most of us can name is

18 Nelson Riddle, who would take standard songs for Frank Sinatra

19 and reinvent them and come up with new arrangements.

20       The second thing an arranger does is they'll write

21 the string part or the brass part, the choral part.  They'll be

22 called in to do arrangements on top of compositions.

23 Q.   Could you identify for us or list for us some of the

24 recording artists with whom you've worked as a producer or

25 arranger?

958

```
1   A.   In the professional recording business, I've been an
2   arranger longer than a producer, so the names are more -- there
3   are more names in that category.
4            I've done arrangements for Elton John, Bruce
5   Springsteen, Aretha Franklin, Lou Reed, Beck, Bono, Yo-Yo Ma,
6   Luciano Pavarotti.
7            And as a record producer, I produced the last three
8   Sting records by the artist Sting.
9            Earlier on in my music production career, I produced
10  Vanessa -- a few Vanessa Williams records.  I've done a record
11  for Disney with Carly Simon, a track for Rod Stewart on his
12  standards project and others, so -- a record I'm very proud of
13  that -- an artist by the name of Bettye LaVette, and that's one
14  of my favorites.
15  Q.   Have you also served as a musical director?
16  A.   Yes, a lot.  I've been doing that for 20 years now.
17  Q.   What does a musical director do?
18  A.   In my case, a musical director is in charge of -- it's
19  normally for performances for television shows, for galas, and
20  you're in charge of everything.  You're basically the
21  conductor, the arranger.
22           In my case, because I'm a player, you also play piano
23  and guitar and lead the band on that instrument.  You are
24  responsible for the music that -- whatever particular program
25  you are musically directing.
```

959

1   Q.   How many programs have you musically directed?

2   A.   It could be as many as 200, but it's certainly more than a

3   hundred.

4   Q.   Could you identify for us some of the programs that you

5   musically directed?

6   A.   The one I've been doing the longest is the Songwriters

7   Hall of Fame in New York.  It's an award show every June.  I've

8   been doing that for 18 years.

9        I musically directed the Obama inaugural concert at

10  the Lincoln Memorial in 2008.  I musically directed Bono's ONE

11  charity concert at Carnegie Hall, a number of Sting

12  performances with our orchestra, and my most notable is

13  certainly my work for 12 years as the musical director for The

14  Kennedy Center Honors, a program on CBS every year during the

15  holidays.

16  Q.   Have you won any awards for your work as a musical

17  director?

18  A.   I've won an Emmy for my work as The Kennedy Center Honors

19  musical director in 2011 and was nominated five times.

20  Q.   And have you received any other nominations or awards?

21  A.   I've been nominated for a Grammy twice and some regional

22  awards, but that's it.

23  Q.   Okay.  As a record producer, musical director, and

24  arranger, are -- do you have to make decisions as to the

25  relative importance of various aspects of compositions that

960

```
 1    you're involved with?

 2    A.   Yes, absolutely.

 3    Q.   Were you asked to render an opinion in this case as to the

 4    importance of the introduction to "Stairway to Heaven" relative

 5    to the rest of the composition and recording of "Stairway to

 6    Heaven"?

 7    A.   I was.

 8    Q.   And what opinions did you reach?

 9    A.   Well, every -- any great song, you know, is made up of

10    gestures, of sections, and, you know, in an epic --

11    eight-minute epic like "Stairway," every gesture is important,

12    but none more than the whole, in my opinion.

13    Q.   And what do you mean by "gestures"?

14    A.   Well, most pop songs are verse, chorus, verse, chorus,

15    bridge, chorus.  They normally go between three and four

16    minutes.

17              I find "Stairway to Heaven" to be a case where it's

18    almost a suite of moments.

19              By musical gestures, I mean the addition of

20    instruments over a certain amount of time, the build in an

21    arrangement, this instrument comes in, that instrument comes

22    in, new harmonies come in here, a new vocal line; the growth of

23    a piece and the multiple sections that a piece has.

24    Q.   Are the -- what importance, if any, do you believe there

25    is in the lyrics of the musical composition "Stairway to
```

961

```
 1   Heaven"?
 2   A.    Extremely important.  I mean, any song's melody and lyric,
 3   incredibly important.
 4   Q.    Would you agree that "Stairway to Heaven" has a
 5   continuingly developing musical structure?
 6   A.    Absolutely.
 7   Q.    Could you tell us why you've come to that conclusion?
 8   A.    Well, if you look at the whole piece, it never stops
 9   growing.  It begins with the smallest gesture and just keeps
10   ramping up over an eight-minute time.
11          And in musical terms, it's like a giant crescendo
12   that never lets up, and it's probably the great example of that
13   kind of epic of the rock era.
14   Q.    And what we're talking about so far, that's reflected in
15   the composition itself?
16   A.    I believe so, yes.
17   Q.    If we could talk just briefly about the 1971 album --
18   excuse me -- the 1971 recording of "Stairway to Heaven."
19          Are there elements of the recording that you believe
20   are important when you compare the composition as a whole to
21   the -- just the introduction?
22   A.    Well, when I had to arrange it for The Kennedy Center
23   Honors, one of the big challenges was to give the correct
24   weight to all these gestures that come in, all these musical
25   moments, these riffs and hooks that come in over this
```

962

```
1    eight-minute span.
2            And it just -- again, it's almost like a this cell,
3    that cell, this cell, and it's like a growing organism that
4    never lets up.
5    Q.   You've just referred to an arrangement that you did for
6    The Kennedy Center Honors.
7            Could you please explain that?
8    A.   The Kennedy Center Honors is a program that happens every
9    year, and they honor five artists -- great artists in various
10   categories:  Ballet, film, acting, television, music.  And I've
11   musically directed it since 2003.
12           And in 2012, one of the five artists was
13   Led Zeppelin.  And the producer, Michael Stevens, had an idea
14   of how he wanted that to go, and the final piece was "Stairway
15   to Heaven," and it was up to me to arrange it.
16   Q.   Thank you.
17           And did you -- in arranging it, did you -- in your
18   opinion, does the arrangement reflect this continuing
19   developing musical structure and other elements you've
20   described?
21   A.   I certainly did my best.
22           MR. ANDERSON:  Your Honor, we would like to play
23   Exhibit 2106.
24           MR. MALOFIY:  If it's a video, we object, because
25   it's prejudicial.  If it's the audio, we do not.
```

963

```
 1              MR. ANDERSON:  It's the performance the gentleman is

 2    talking about.  It reflects the continuing growing --

 3    everything he's described.  It is a publicly available

 4    performance at the Kennedy Center.

 5              THE COURT:  He's already told us what it is.

 6              It's a video of the performance; is that correct?

 7              MR. MALOFIY:  Yes.  It's irrelevant.  It's

 8    prejudicial, also, because there's many famous people in there.

 9              THE COURT:  Because of what?  I'm sorry.

10              MR. MALOFIY:  Famous people in there.  It's

11    prejudicial and it's also irrelevant.

12              THE COURT:  Okay.  Overruled.

13              THE CLERK:  I'm sorry.  Can I get the number again?

14              MR. ANDERSON:  2106.

15        (Playing of video tape.)

16              THE COURT:  Let me interrupt for a second.  Can you

17    hold it for a second?

18              Counsel, I'm going to revisit the objection on it.

19              You can play the music from it, but other people that

20    are being shown on the screen and all would be immaterial.  So

21    I don't know if you can play just the music without the video.

22              MR. ANDERSON:  I'm sure we can --

23              THE COURT:  Okay.

24              MR. ANDERSON:  -- yes.

25              MR. MALOFIY:  Thank you, Your Honor.
```

964

```
 1        (Playing of audio tape.)

 2            MR. MALOFIY:  Objection, Your Honor.  It's not the

 3   original version.

 4        (Playing of videotape.)

 5            THE COURT:  Why don't we go ahead and cut it off.

 6            Okay.  It's -- you've had sufficient playing time on

 7   it, Counsel.

 8            MR. ANDERSON:  Your Honor, there is an allocation

 9   issue of the -- in the profits analysis that the jury may face.

10   This is our expert --

11            THE COURT:  Well, let me ask.

12            Counsel, your objection was?

13            MR. KULIK:  Your Honor, if they want to play --

14            THE COURT:  Counsel, the other counsel on it.

15            MR. MALOFIY:  The objection was a couple different

16   issues.  One, it's prejudicial.  It's irrelevant.  We have a

17   song that's not even the song at issue here being performed in

18   a completely form and song structure.

19            THE COURT:  Okay.  Counsel, how much more is left on

20   this?  Because you only have a couple minutes left.

21            MR. ANDERSON:  Four minutes left, Your Honor.  And if

22   I can just explain.

23            THE COURT:  No, you can play the extra four minutes

24   next week.

25            MR. ANDERSON:  Thank you, Your Honor.
```

965

```
 1            THE COURT:  But right now, it is 4 o'clock, ladies
 2   and gentlemen, and we're going to break.
 3            Like I always promised you, we're going to break
 4   right at 4 o'clock even if we're in the middle of a question.
 5            So we'll break at this time, and we'll come back
 6   in -- I know a lot of you are going to be disappointed about
 7   this, but we're going to come back in Tuesday, rather than
 8   Monday.  Monday we'll be dark.  Okay?  We have other matters we
 9   have to do, and it will be a full day, so we're going to bring
10   you back in Tuesday.
11            What time?
12            THE JURY:  8:30.
13            THE COURT:  8:30.  Be here about 8:15.  We'll get
14   started right at 8:30.
15            Remember the admonishment not to discuss the case
16   among yourselves or with anybody else or form or express any
17   opinions about the matter until it's submitted to you and you
18   retire to the jury room.
19            Have a pleasant weekend.  Have a pleasant three days
20   and we'll see you back in Tuesday.
21            We'll be in recess.
22        (Jury out at 4:00 P.M.)
23        (Evening recess taken 4:00 P.M.)
24                        --oOo--
25
```

966

1

2

3                              CERTIFICATE

4

5        I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date: JUNE 18, 2016

13

14

15

16

17                     /s/  Cindy L. Nirenberg, CSR No. 5059

18                             Official Court Reporter

19

20

21

22

23

24

25

1             **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

3     **HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE**

4                – – – –

5

6  **MICHAEL SKIDMORE, AS TRUSTEE FOR** )
    **THE RANDY CRAIG WOLFE TRUST,** )
7                           )
               **PLAINTIFF,** )
8                            )
      **vs.** )  **No. CV 15–03462–RGK**
9                            )
    **LED ZEPPELIN; JAMES PATRICK PAGE;** )
10  **ROBERT ANTHONY PLANT; JOHN PAUL** )
    **JONES; SUPER HYPE PUBLISHING,** )
11  **INC.; WARNER MUSIC GROUP CORP.,** )
    **PARENT OF WARNER/CHAPPELL MUSIC,** )
12  **INC.; ATLANTIC RECORDING** )
    **CORPORATION; RHINO ENTERTAINMENT** )
13  **COMPANY,** )
                            )
14            **DEFENDANTS.** )

15

16       **REPORTER'S TRANSCRIPT OF JURY TRIAL**

17      **DAY 5, VOLUME 1; PAGES 997 TO 1133**

18         **TUESDAY, JUNE 22, 2016**

19              **8:31 A.M.**

20         **LOS ANGELES, CALIFORNIA**

21

22    _____

23     **SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR**
       **Official Reporter, U.S. District Court**
24         **255 East Temple Street**
         **Los Angeles, CA  90012**
25          **213.894.5949**

1   **APPEARANCES OF COUNSEL:**

2


3   **FOR PLAINTIFF MICHAEL SKIDMORE AS TRUSTEE FOR THE**
    **RANDY CRAIG WOLFE TRUST:**
4
          FRANCIS ALEXANDER, LLC
5         BY:  FRANCIS MALOFIY, ATTORNEY AT LAW
          280 N. PROVIDENCE ROAD, SUITE 1
6         MEDIA, PENNSYLVANIA  19063
          215.500.1000
7
          KULIK GOTTESMAN & SIEGEL, LLP
8         BY:  GLEN L. KULIK, ATTORNEY AT LAW
          15303 VENTURA BOULEVARD, SUITE 1400
9         SHERMAN OAKS, CALIFORNIA  91403
          310.557.9200
10

11  **FOR DEFENDANT LED ZEPPELIN:**

12        PHILLIPS NIZER, LLP
          BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
13        666 FIFTH AVENUE
          NEW YORK, NEW YORK  10103
14        212.977.9700

15

16  **FOR DEFENDANTS JAMES PATRICK PAGE, ROBERT ANTHONY PLANT:**

          LAW OFFICES OF PETER J. ANDERSON, PC
17        BY:  PETER J. ANDERSON, ATTORNEY AT LAW
          100 WILSHIRE BOULEVARD, SUITE 2010
18        SANTA MONICA, CALIFORNIA  90401
          310.260.6030
19
          PHILLIPS NIZER, LLP
20        BY:  HELENE M. FREEMAN, ATTORNEY AT LAW
          666 FIFTH AVENUE
21        NEW YORK, NEW YORK  10103
          212.977.9700
22

23  ///

24  ///

25  ///

999

```
1    APPEARANCES OF COUNSEL (CONTINUED):

2

3    FOR DEFENDANTS WARNER/CHAPPELL MUSIC, INC., ATLANTIC RECORDING
     CORPORATION, RHINO ENTERTAINMENT COMPANY:
4
           LAW OFFICES OF PETER J. ANDERSON, PC
5          BY:  PETER J. ANDERSON, ATTORNEY AT LAW
           100 WILSHIRE BOULEVARD, SUITE 2010
6          SANTA MONICA, CALIFORNIA  90401
           310.260.6030
7

8

9    ALSO PRESENT:

10         NATHAN OSHER, WARNER/CHAPPELL MUSIC, INC.

11         BRAD COHEN, WARNER MUSIC GROUP

12         SCOTT DUVAL, SENIOR TECHNOLOGY CONSULTANT

13         DAN MORENO, TRIAL TECHNICIAN

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01105**

1000

```
 1                        I N D E X

 2   DEFENDANTS' WITNESSES:                          PAGE
```

```
 3   ROBERT BALLOU MATHES
        DIRECT EXAMINATION (CONTINUED) BY MR. ANDERSON   1001
 4      CROSS-EXAMINATION BY MR. MALOFIY                  1023
        REDIRECT EXAMINATION BY MR. ANDERSON             1033
 5
     TIMOTHY GARDNER
 6      DIRECT EXAMINATION BY ANDERSON                   1040
        CROSS-EXAMINATION BY MR. MALOFIY                 1059
 7      REDIRECT EXAMINATION BY MR. ANDERSON             1068

 8   DAVID WOIRHAYE
        DIRECT EXAMINATION BY MR. ANDERSON               1069
 9      CROSS-EXAMINATION BY MR. MALOFIY                 1084
        REDIRECT EXAMINATION BY MR. ANDERSON             1093
10
     JEREMY BLIETZ
11      DIRECT EXAMINATION BY MR. ANDERSON               1097

12   ROBERT ANTHONY PAGE
        DIRECT EXAMINATION BY MR. ANDERSON               1105
13      CROSS-EXAMINATION BY MR. MALOFIY                 1117
        REDIRECT EXAMINATION BY MR. ANDERSON             1127
14
     JAMES PATRICK PAGE
15      DIRECT EXAMINATION BY MR. ANDERSON               1128
```

```
16


17                     E X H I B I T S
     TRIAL EXHIBIT      MARKED FOR I.D.    RECEIVED IN EVIDENCE
18     NUMBER:             PAGE:                 PAGE:
```

```
19     51-A                 --                   1002

20     2014                 --                   1036

21     2412                 --                   1084

22     2961                 --                   1004

23     2962                 --                   1005

24     2963 (demonstrative) --                   1006

25     2964                 --                   1035
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    LOS ANGELES, CALIFORNIA; TUESDAY, JUNE 22, 2016

2                        8:31 A.M.

3                        -  -  -  -

4    (In the presence of the jury:)

5        THE COURT:  Okay.  The record will reflect that all

6    the members of the jury are in their respective seats in the

7    jury box; the witness is on the witness stand.

8        Ladies and gentlemen, I hope you had a pleasant weekend.

9    We gave you a three-day weekend because we thought it was too

10   hot for you to come in yesterday.  Hopefully you took advantage

11   of that and are ready to go.  We have another couple of days,

12   and we should -- this should be to you by tomorrow, anyway.

13       Ready to go?  You all rested?

14       Okay.  Counsel, you may inquire.

15       MR. ANDERSON:  Thank you, Your Honor.

16       THE CLERK:  And I'll remind you, you're still under

17   oath at this time.  Thank you.

18           **ROBERT BALLOU MATHES, PREVIOUSLY SWORN,**

19            **CALLED AS A WITNESS BY THE DEFENDANTS,**

20               **DIRECT EXAMINATION (CONTINUED)**

21   BY MR. ANDERSON:

22   Q.   Good morning, sir.

23   A.   Good morning.

24   Q.   Did you prepare a recording of yourself performing the

25   "Taurus" deposit copy on guitar?

1002

```
1    A.    I did.

2              MR. ANDERSON:  Your Honor, that's been marked already

3    as Exhibit 51-A, and we would move to admit it.  We can have it

4    played if Your Honor prefers.

5              THE COURT:  It will be -- I'm sorry?

6              MR. MALOFIY:  No objection.

7              THE COURT:  Okay.  It will be received.

8         And what did you say about playing it?  You want to play

9    it now?

10             MR. ANDERSON:  We can, Your Honor.  We don't need to,

11   I just wanted to admit it in evidence.

12             THE COURT:  Okay.

13        (Received in evidence, Trial Exhibit 51-A.)

14   BY MR. ANDERSON:

15   Q.    Sir, are you familiar with Dr. Ferrara's recorded

16   performance of his playing the "Taurus" deposit copy on piano?

17   A.    I am.

18             MR. ANDERSON:  Your Honor, that was played, but it

19   hasn't yet been admitted into evidence, so I'd move to admit

20   it.

21             THE COURT:  Okay.

22             THE CLERK:  Do we know that number?

23             MR. ANDERSON:  Yes, I'm sorry, it's Exhibit 61-A.

24             THE CLERK:  Thank you.

25             MR. ANDERSON:  The first one is 51-A.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01108**

1003

```
1   BY MR. ANDERSON:

2   Q.   Have you prepared a performance of a portion of the 1963

3   folk song "To Catch a Shad"?

4   A.   I have.

5        MR. ANDERSON:  Your Honor, we would like to first play

6   that so the witness can identify the portion he played.

7        MR. MALOFIY:  Objection.  This was never tendered and

8   we never received this evidence.

9        MR. ANDERSON:  It was a portion -- him playing a

10  portion of a recording that was on the witness list and

11  provided to counsel.

12       THE COURT:  And you're offering it for rebuttal?

13       MR. ANDERSON:  I'm sorry?

14       THE COURT:  You're offering it for rebuttal?

15       MR. ANDERSON:  Yes.

16       THE COURT:  Okay.  Overruled.  It may be played.

17    (Audio played.)

18       MR. ANDERSON:  Your Honor, we would move to admit that

19  as Exhibit 2951.

20       THE COURT:  2951?

21       MR. ANDERSON:  Yes, Your Honor.

22       MR. MALOFIY:  Your Honor, we would object on the

23  grounds that this is performance related and not -- is no way

24  related to the deposit copy of "To Catch a Shad" in any way,

25  shape or form.  Does not have a chromatic descending or
```

1    arpeggiated line.

2          THE COURT:  This is a playing of what song, Counsel?

3          MR. ANDERSON:  Your Honor, it was played by

4    Dr. Ferrara live.  It is a performance of the 1963 prior art

5    "To Catch a Shad" which Dr. Ferrara testified did have a

6    descending chromatic scale.

7          THE COURT:  Okay.  Overruled.

8        (Received in evidence, Trial Exhibit 2951;

9        subsequently corrected to Trial Exhibit 2961.)

10   BY MR. ANDERSON:

11   Q.   And Mr. Mathes, did you prepare a recording of the

12   "Taurus" deposit copy and "To Catch a Shad" playing

13   simultaneously?

14   A.   I did.

15         MR. ANDERSON:  Your Honor, I would ask leave to play

16   that.

17         THE COURT:  Same objections, Counsel?

18         MR. MALOFIY:  Same objections, yes.

19         THE COURT:  Okay.  It'll be noted.  Overruled.

20       You may play it.

21         MR. ANDERSON:  Thank you.

22       (Audio played.)

23         MR. ANDERSON:  And Your Honor, we would move to admit

24   that as Exhibit 2952.

25         THE COURT:  It will be received.  Over objection, it

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1005

```
 1   will be received.
 2           MR. ANDERSON:  Thank you.
 3       (Received in evidence, Trial Exhibit 2952;
 4       subsequently corrected to Trial Exhibit 2962.)
 5   BY MR. ANDERSON:
 6   Q.   Mr. Mathes, do you agree that playing those two over each
 7   other results in a harmonious sound?
 8   A.   I would agree.
 9   Q.   And could you explain why you agree to that -- you agree
10   to that?
11   A.   It is because this common chromatic pattern, harmony,
12   which is found in many songs, is found in "Taurus" and in
13   "To Catch a Shad."
14   Q.   Thank you.
15       On Friday we were discussing your opinions regarding the
16   relative importance of the beginning of "Stairway to Heaven" to
17   the other parts and as to "Stairway to Heaven" as a whole.
18       Have you -- are you familiar with Dr. Ferrara's structural
19   chart to -- of "Stairway to Heaven"?  Excuse me.
20   A.   I am, yes.
21           MR. ANDERSON:  And if we could call that up.  The
22   structural chart, not --
23           MR. DUVALL:  Dr. Ferrara?
24           MR. ANDERSON:  Yes.
25           MR. MALOFIY:  Objection.  I'm sorry, withdrawn.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01111**

```
 1    Thought it was a different exhibit.
 2            THE COURT:  Okay.
 3    BY MR. ANDERSON:
 4    Q.   And what we have done --
 5            And I've discussed this with counsel.  I believe he is
 6    going to object.
 7            We had this chart redone vertically and color coded.  Are
 8    you familiar with that, sir?
 9    A.   I am.
10    Q.   And in order to facilitate your discussion of that, I
11    would ask that we call up Exhibit 2953.
12            MR. MALOFIY:  We object to this if this is done by
13    counsel and not testified by Dr. Ferrara.
14            THE COURT:  Well, if it's not -- well, I don't know.
15    It's premature.  I've gotta find out what he's going to testify
16    to.
17            MR. ANDERSON:  It is the same information as
18    Dr. Ferrara's chart, but it's just done linearly and color
19    coded as a demonstrative.
20            THE COURT:  It can be received only for demonstrative
21    purposes, not into evidence.
22            MR. ANDERSON:  Okay.  Thank you.
23         (Received in Evidence for demonstrative purposes,
24         Trial Exhibit 2953; subsequently corrected to
25         Trial Exhibit 2963.)
```

1    (The document was displayed on the screen.)

2  BY MR. ANDERSON:

3  Q.   Now, if we could just scroll down that, and then if you

4  could, Mr. Mathes, confirm whether or not this demonstrative

5  sets forth the structural -- I'm sorry, the structure of

6  "Stairway to Heaven" as Dr. Ferrara depicted it in his exhibit.

7  A.   As you're going through it, yes, that is correct.

8  Q.   And do you agree that this depicts the -- accurately

9  depicts the structure of "Stairway to Heaven"?

10  A.   I do.

11  Q.   Now, sir, as a professional music director, arranger and

12  songwriter, you could please -- if we could go to the intro,

13  could you please tell me what in the intro, the introduction of

14  "Stairway to Heaven," is significant to your opinion as to the

15  relative importance of the beginning of "Stairway to Heaven" to

16  the rest of "Stairway to Heaven" and "Stairway to Heaven" as a

17  whole.

18  A.   Well, as I said I believe on Friday, every part of a good

19  song is important, but we begin with the -- with a very small

20  musical idea, which is this chromatic chord progression.  But

21  soon after, you hear the sound -- you hear a different sound.

22  It actually turns out to be recorders, which is almost a

23  Renaissance instrument.  Many people that study music will

24  learn the recorder early on.  And right after that, we go into

25  an entirely different section, a B Section.

1008

1   Q.    And could you describe the B Section.

2   A.    Well, the B Section, I can -- I can play it, if that's

3   okay.  The beginning section has that harmony (guitar played),

4   that chromatic harmony, but then we go into almost a slightly

5   brighter sound (guitar played).  And that, that continues,

6   during which these recorders that come in -- and there are four

7   of them.  And to describe the uniqueness of them, it's almost

8   like a choir.  In a choir you have soprano, alto, tenor and

9   bass, and the recorders are doing lines like a choir.  And it's

10  a very unique sound in that B Section.

11  Q.    And you said that the music almost became brighter.  Could

12  you explain how that is accomplished?

13  A.    Well, when we're young, we're taught that a minor chord

14  is sad, you know (guitar played), but a major chord

15  (guitar played) is happy.  We don't change key, but when we go

16  into the major chords (guitar played), it's slightly brighter.

17  It's not quite as mournful.

18  Q.    Thank you.

19        And you're referring to the introduction to "Stairway to

20  Heaven" in part B?

21  A.    Yes.

22  Q.    Okay.

23  A.    Yes.

24  Q.    And if you could, again, as a professional music director,

25  arranger and songwriter, explain if there's anything

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01114**

1009

```
1    significant in verse 1 to your opinions.
2    A.    Well, in popular music, it's often said that the song --
3    the song begins when you finally hear the sound of the human
4    voice, when the lyric comes in.  And the lead vocal comes in at
5    50 -- around 54 seconds, and we know we're in the midst of the
6    song, which is verse 1.
7    Q.    Okay.  Thank you.
8          The next structural section of "Stairway to Heaven" that's
9    identified by Dr. Ferrara and by you and in the chart is
10   labeled the "interlude."  Is there anything significant in the
11   interlude, significant to your opinions in this case?
12   A.    Well, in the interlude, the guitar part starts to play
13   almost in double time (guitar played).  It just plays faster,
14   sixteenth notes as opposed to eighth notes, building the
15   tension.  And the tempo through the entire song, there is this
16   sense of urgency that isn't obvious.  You don't start from this
17   tempo (indicating) and immediately go (indicating).  You know,
18   it's not like a drummer rushing in a club band.  It's very
19   slowly.  And you first really start to sense it a little bit in
20   that interlude.
21   Q.    I believe that you testified that one of the important
22   features of "Stairway to Heaven" is that it builds over time.
23   A.    Yes.
24   Q.    And so what you're describing, if I understand correctly,
25   is a continuation or part of that building?
```

```
1   A.    Yes.

2   Q.    And if we can look at the next section, the next section

3   identified as a structural part of "Stairway to Heaven," that's

4   the refrain 1.  And could you please tell us if there's

5   anything significant to your opinion in refrain 1.

6   A.    Well, refrain 1, you get -- you get a number of gestures

7   or musical events that happen that are important.  One is that

8   you first hear the sound of an electric 12-string guitar, which

9   is a -- which is a unique sound.  In the '60s there was a band

10  called The Byrds that used it a lot, but you didn't hear it in

11  this kind of strumming fashion.  And you also get the hook of

12  the song vocally.  The lead vocal is not spinning a lyric,

13  it's -- it's going into a hook, which is, "Ooh it makes me

14  wonder."  And you also get an electric piano coming in at the

15  same time.  And the harmonies change, also.

16  Q.    What is the importance, in your mind and to your opinions,

17  of the harmonies changing?

18  A.    Well, you know, we've come from the chords in the initial

19  part of the song (guitar played), and then (guitar played).

20  They're triadic harmonies.  They're slightly simpler than

21  (guitar played).  They're richer harmonies.  I wouldn't call

22  them jazz harmonies, but they're definitely -- they're

23  definitely different in the ear.  Ear picks that up

24  immediately.

25  Q.    Thank you.
```

```
 1        If we can now look at the next structural section, which
 2   is verse 2.  Is there anything that's significant to your
 3   opinions in verse 2?
 4   A.   Well, verse 2 is the first -- for me, what I find
 5   interesting about it, is the first time that Robert Plant
 6   speaks personally in this song.  It's a very interesting lyric.
 7   When you first hear the vocal, it's, "There's a lady who's sure
 8   all that glitters is gold, and she's buying a stairway to
 9   heaven."
10        This is not a typical love song.  It's almost like a
11   mythical tale he's telling.
12        But in verse 2, we hear, "There's a feeling I get when I
13   look to the west, and my spirit is crying for leaving," which
14   to me was always interesting, that it finally went into the
15   personal.
16        And there is a -- there's a -- very quickly, there's a
17   guitar line (guitar played).  We go into yet another chord
18   progression (guitar played) -- sorry -- (guitar played), and
19   that becomes the main chord progression for the remainder of
20   the verses.  In fact, that chord progression's used for four
21   verses.
22   Q.   In that verse 2, is there any change in the -- with
23   respect to the 12-string guitar?
24   A.   Well, the 12-string guitar becomes almost a lead voice
25   now, because it's doing that bom, bom, bom.  It's taking over
```

1012

```
1    that line underneath the lead vocal.  And the tempo is

2    pressing.  It's still pressing ahead.

3    Q.    Okay.  And what you've been describing, if I understand

4    correctly, is continual change and continual increase and

5    building?

6    A.    Yes.

7    Q.    And you've explained how that is accomplished musically?

8    A.    I think so, yes.

9    Q.    The next section is labeled "refrain 2."  Is there

10   anything in refrain 2 that is significant to your opinion?

11   A.    Well, there is -- when you hear certain pop songs like

12   "Billie Jean" or "All You Need Is Love," when the melody comes

13   back, when the chorus comes back, it's normally the same.

14   "Billie Jean is not my" (singing) -- you know, it's not the

15   same.  But what happens with this is, the melody keeps

16   spinning, and it's not just, umm -- ah -- (guitar played while

17   singing:) "It makes me wonder."  It doesn't stay in that zone.

18   The lead vocal keeps developing and singing almost like a blues

19   musician does.  A blues musician will take the building blocks

20   of the song and continually vary them as the song goes on, and

21   that happens in each refrain as well as the tempo pressing

22   forward.

23   Q.    And I apologize.  Verse 3, same question or --

24   A.    Verse 3, we don't add any instruments, but the tempo keeps

25   pressing, and we go into the refrain, and you get this sense
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01118**

1013

1  that the performances of the musicians, it's not that they're

2  playing louder, but as the song goes on, dynamic keeps, keeps

3  pushing also.  And that dynamics, if you're reading written

4  music and you see a "p", that means "piano," which is Italian

5  word for "quiet."  And then "forte" is the Italian word for

6  "loud."  It's almost like the whole song to me feels like it's

7  building from a "p" to an "f" in a sense.

8  Q.  Thank you.

9      If we go to the next section of "Stairway to Heaven,"

10  refrain 3, and if you could please tell me if there's anything

11  in refrain 3 that you believe, as a musical director, arranger

12  and songwriter, is significant to your opinions in this case.

13  A.  Well, the biggest thing is what happens at the very end of

14  it.  Through it, throughout it again, it's a variation on this

15  "Ooh, it makes me wonder" hook, vocal hook, that keeps coming

16  back.  But at the end of it, we get the entrance of John Bonham

17  on drums, the drummer of the band, who is seen as, you know,

18  one of the four great drummers of that time.

19  Q.  So am I correct that it's not until almost four minutes of

20  "Stairway to Heaven" that there are drums playing?

21  A.  Yes.  It comes in right after about four minutes, yes.

22  Q.  That decision, that creative element of not having the

23  drums come until basically halfway through the song, almost

24  four minutes, does that -- is that significant to your opinion

25  regarding the relative importance of the various portions of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01119**

1014

```
1    "Stairway to Heaven" to the introduction?
2    A.    Well, up to this point in the song, you get a sense that
3    it's growing, but when you hear the drums come in, it's
4    remarkably dramatic.  In fact, it's almost as dramatic in a
5    sense as when you first hear the lead vocal, which always is
6    striking.  You hear a lyric, you hear a voice, now you hear a
7    drummer coming in, filling into the next verse, and the song
8    takes a huge leap forward, in my mind, and the tempo really
9    presses.  I think by this time we're almost 10 -- 10 beats per
10   minute faster.
11   Q.    Okay.  Thank you.
12         And verse 4, is there anything in your mind that is
13   significant to your opinions in verse 4 of "Stairway to
14   Heaven"?
15   A.    Well, what I find interesting, and I don't have any
16   anecdotal knowledge of this, but there's a sense of the band
17   playing off each other.  And I don't know the answer to this
18   question, but I always felt that when you get the lyric, "If
19   there's a bustle in your hedgerow, don't be alarmed now," it's
20   almost the perfect lyric for the entrance of a drummer.  You
21   know, a drummer comes in -- you know, it'd almost be better for
22   us to play it than me trying to sound like the drums, but
23   (indicating) "If there's a bustle in your hedgerow," the band
24   is working together and we're really in a rock zone at this
25   point.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. ANDERSON:  With Your Honor's permission, if we can
 2    just play that portion, that small portion he's talking about
 3    of "Stairway to Heaven."
 4            MR. MALOFIY:  No objection, Your Honor.
 5            THE COURT:  Okay.
 6        (Audio played.)
 7    BY MR. ANDERSON:
 8    Q.    And could you explain what we just heard and how that is
 9    significant to your opinions.
10    A.    Well, the -- there are two things to my ears.  One is the
11    entrance of the drummer in a rock band.  It always transforms.
12    You finally get a beat, you know, and it -- that's when
13    "Stairway to Heaven" kind of starts to really become the staple
14    at rock radio.  It began as this kind of folk piece, and you
15    hear John Bonham come in, and it transforms it, and you --
16    and -- and again, the lead vocal is shifting.  It's not
17    (singing) da-da-da, da-da-da, da-da-da, "buying the
18    stairway" -- you know -- (singing) "If there's a bustle in your
19    hedgerow."  It goes into even bluesier territory.
20    Q.    Thank you.
21            And if we can go to, or if I can ask you about refrain 4
22    of "Stairway to Heaven."  Is there anything in refrain 4 that
23    you believe is significant to your opinions in this case?
24    A.    Well, it's pressing forward.  It's still -- the tempo is
25    increasing.
```

1    The main thing I noticed is that, in jazz music, a jazz

2  drummer hangs on the ride cymbal.  And just quickly, that's the

3  cymbal to his right, and it's ta, ta, ta-ta, ta.  So you listen

4  to Miles Davis or Dave Brubeck, most of the time the drummer's

5  on the ride cymbal.  But not in rock 'n' roll and pop.  Often

6  it's on the high hat, it's around the snare and the bass drum.

7  But John Bonham goes to playing on the ride cymbal, and it

8  makes these chords take, you know, (guitar played).  It almost

9  goes into an even more jazzy feel.  I use the word "jazz"

10  advisedly, but it gets a little bit more, you know, in that

11  zone.

12  Q.   Are there any instruments added in that portion or piece

13  of the structure of "Stairway to Heaven"?

14  A.   Yes.  You finally get electric bass, which is a big deal,

15  also.  The bass player and the drummer of the band are

16  important, and John Paul Jones goes to the electric bass at

17  that point.

18  Q.   Can you explain why they're important, why it's a big

19  deal?

20  A.   Well, in great rock music, the relationship between the

21  drummer and the bass player is important and unique.  Paul

22  McCartney, Ringo Starr, Bill Wyman, Charlie Watts.  John

23  Entwistle, Keith Moon were The Who, and, you know, Ringo Starr

24  and Paul McCartney was the Beatles.  And it's just, the

25  relationship between the bass player, because the bass is

```
1   playing at the bottom of the sound (indicating), and it's often

2   linked to the bass drum.  So when you finally hear a drummer

3   come in and then a bass player come in with him, it makes an

4   impact.

5   Q.   Thank you.

6        And then verse 5 of "Stairway to Heaven," is there

7   anything significant to your opinions in verse 5?

8   A.   Just a continuing pressing and development.  The band is

9   playing louder and stronger, and they're moving inexorably

10  towards the bridge.

11  Q.   And so let's go to the bridge.  Is there anything

12  significant to your opinions in the bridge?

13  A.   Well, what's interesting, in the very end of the verse, it

14  stops.  (Guitar played while singing:) "Your stairway lies on

15  the whispering wind."  It just stops, and we're in a whole new

16  zone.  D major (guitar played) coming from A minor (guitar

17  played) is bright.  We've heard it before, because we've heard

18  (guitar played), but now we -- (guitar played) -- we stop on

19  it, which prepares the next gesture.

20  Q.   And what is the next gesture?

21  A.   Well, when I arranged this song for the Kennedy Center

22  Honors, one of the challenges for me was to try to honor

23  this -- this thing that starts at zero and goes to 80, and I --

24  I -- I did it in this section by using trumpets, because I

25  always saw it as a fanfare of sorts, ba-ba-bah!  What is a
```

1    fanfare?  The beginning of Star Wars or Rocky, ba-ba-bah,

2    da-da-dah, da-da -- you associate fanfares with brass or

3    trumpets.  And it's got that kind of a (guitar played).  You

4    know, it's got a very intense brass-like sound, and I used -- I

5    used trumpets on it at the Kennedy Center.

6              MR. ANDERSON:  And so with Your Honor's permission, if

7    we can just play the fanfare from "Stairway to Heaven."

8              THE COURT:  Okay.

9              MR. ANDERSON:  Thank you.

10             MR. MALOFIY:  "Stairway to Heaven" version?

11             THE COURT:  Yeah.

12             MR. MALOFIY:  I mean, excuse me, Led Zeppelin version?

13             MR. ANDERSON:  Yeah.

14             MR. MALOFIY:  Okay.

15        (Audio played.)

16   BY MR. ANDERSON:

17   Q.   And in your opinion, is the fanfare important to

18   "Stairway to Heaven"?

19   A.   Very important.  I mean, it's the moment you realize this

20   is -- this is truly a -- a different song than you thought you

21   began with.  It's moving into forceful rock territory.  And at

22   this point, there have been so many sections, you almost don't

23   know where you're going.  The journey keeps moving on.  You

24   keep getting new ideas, and we're now at the -- you know, we're

25   well into five minutes, close to six minutes of music.

1019

1    Q.    And then the next section in the structural chart is the

2    guitar solo.  Is there anything in the guitar solo portion of

3    "Stairway to Heaven" that you believe is significant to your

4    opinions?

5    A.    Well, I had to teach that guitar solo as a guitar teacher

6    in my early 20s right before I got married, and it's very

7    difficult, and it's -- it could be -- I don't want to speak in

8    hyperbole here, but it's been called one of the most important

9    and significant guitar solos in the history of rock 'n' roll,

10   and it's blistering, and it kind of takes off again, throwing

11   the song flailing ahead.

12   Q.    Is it important to the -- what you've described as the

13   building momentum of "Stairway to Heaven"?

14   A.    Well, where we go, where we go after the guitar solo, is

15   even another peak, but the guitar solo is such a peak that you

16   almost think, you know, it can't go any further.  And -- and it

17   would be -- it would be -- it would be great to play a little

18   bit of it, because it's intense, and I can't, certainly, create

19   it on the guitar.

20         MR. ANDERSON:  With Your Honor's permission, we'll

21   play not the whole guitar solo, but a little bit of it.

22         THE COURT:  Okay.

23         MR. ANDERSON:  Thank you.

24      (Audio played.)

25         MR. ANDERSON:  Why don't we stop there.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1020

1    Q.    So, we've identified it.  So that's the portion of

2    "Stairway to Heaven" you're talking about?

3    A.    Yes.

4    Q.    And the next section, the next structural portion of

5    "Stairway to Heaven," is verse 6.  Is there anything

6    significant to your opinions in verse 6?

7    A.    Well, chord progression in the guitar solo is very simple.

8    It goes from A minor to F (guitar played), but in the verse we

9    get even simpler and with stops (guitar played).  And we get

10   the lead vocal now going a full octave above, and a vocal

11   section -- I feel like if this was the only vocal section

12   Robert Plant ever performed, it would still have an influence

13   on the history of rock in a sense, because so much comes out of

14   that high sound.  It's -- it's incredibly intense, I feel, and

15   it drives everything forward, and I would say it's the peak of

16   the song.

17   Q.    Is it important to the appeal and enduring popularity of

18   "Stairway to Heaven"?

19   A.    Absolutely.

20   Q.    The next section and last section of -- is called the

21   outro.  What's an outro?

22   A.    An outro is sometimes called a coda in classical music.

23   It's just the final section of a piece.

24   Q.    And is there anything significant in the outro to your

25   opinions in this case?

1021

```
1   A.   Well, right before the outro, you hear a line which is,
2   "When all is one and one is all, to be a rock and not to roll,"
3   which again is in this very cryptic mythological zone of the
4   lyric, and during that moment John Bonham, the drummer, is
5   flailing through and playing as active as he does, and it falls
6   out with the vocal holding the "roll" word over not a
7   slackening of things, but things start to pour out.  It gets
8   a little bit slower.  It's not as ferocious.  The chords
9   become more sustained.  We move from (guitar played) to
10  (guitar played), and you get a sense where this journey is
11  coming to an end.
12  Q.   Thank you, sir.
13       And then the song ends?
14  A.   Well, the song ends with one of my favorite gestures or
15  events that I admit I've used many times as an arranger, which
16  is to come back down to a single human voice.  No accompaniment
17  whatsoever.  "And she's buying a stairway to heaven," just the
18  lead vocal.  And from an arranger's standpoint, to be able to
19  pull off that growing organism, that huge crescendo and then to
20  come back down to a single pinpoint human voice is very, very
21  powerful, I think.
22  Q.   How many measures are there in "Stairway to Heaven"?
23  A.   I do not know that, but many.
24  Q.   It's labeled as 166 measures.  That's how --
25  A.   Okay, 166.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   That's what Dr. Ferrara concluded.  Do you have any reason

2  to doubt that?

3  A.   I have no reason to doubt that.

4  Q.   So if I can just ask you a few questions.

5       If we can look, on the one hand, the portion of the intro

6  that is a descending chromatic line, versus the portion that is

7  Part B, which is -- there's no claim that that was copied, is

8  Part B important to the appeal and enduring popularity of the

9  song?

10 A.   I would say everything is, but absolutely, yes.

11 Q.   And in looking at all the other parts that you've analyzed

12 and testified to today, are they important to the enduring

13 popularity of the song and its appeal?

14 A.   Well, it is an 8-minute epic composition that grows and

15 grows and grows and grows to 15 different sections of music.

16 Q.   And --

17 A.   That is "Stairway to Heaven" to me.

18 Q.   Sorry, I apologize.

19      Do you have an opinion as to whether each of these various

20 sections that you've identified, including the fanfare,

21 including other aspects of it, are equally as important to

22 "Stairway to Heaven" as the introduction is?

23 A.   Absolutely.  The whole -- every section is important.

24 Q.   And each section?

25 A.   Each section, yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. ANDERSON:  Okay.  Those are all the questions I
 2   have for you.  Thank you.
 3            THE COURT:  Thank you, Counsel.
 4         Cross-examination.
 5            MR. MALOFIY:  Yes.
 6                      CROSS-EXAMINATION
 7   BY MR. MALOFIY:
 8   Q.   Sir, let's see what we can agree on.
 9        Would you agree that "Stairway to Heaven" is a great song?
10   A.   Yes.
11   Q.   Would you agree it's one of the great rock 'n' roll songs
12   of all time?
13   A.   Yes.
14   Q.   Would you agree that it's instantly recognizable from the
15   first few seconds of the song?
16   A.   Yes.
17   Q.   Would you agree that it's one of the great songs in music
18   history?
19   A.   Yes.
20   Q.   Would you agree that a listener would not listen to
21   2 minutes and 14 seconds of a song if they weren't compelled by
22   those 2 minutes and 14 seconds?
23            MR. ANDERSON:  Objection, calls for speculation,
24   outside the scope of the direct.
25            THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1024

```
 1          THE WITNESS:  Can you repeat the question?
 2    BY MR. MALOFIY:
 3    Q.   Would you agree that a listener would not listen to
 4    2 minutes and 14 seconds of a song unless it was compelling?
 5    A.   I would agree with that.
 6    Q.   Would you agree that the introduction, specifically
 7    Part A, is an important song (sic) of "Stairway to Heaven"?
 8    A.   Certainly.  Yes.
 9    Q.   Would you agree that when you arranged "Stairway to
10    Heaven" for the Kennedy Honors, which we heard the first
11    2 minutes and 14 seconds, that you left out the B Section?
12    A.   I don't think so.  I would want to listen to it again to
13    be sure, but we -- we couldn't have left out the B Section to
14    the verse.
15    Q.   Sir, isn't it true, the first B Section, you omitted in
16    the Kennedy Honors performance?
17    A.   If you're sure of that, I'd like to hear it.  When we do
18    the Kennedy Center Honors, we often edit for television because
19    of time constraints.  I do not remember editing out the
20    B Section, but if you say that's the case, if we can hear it to
21    confirm that, I have no reason to think you're lying.
22    Q.   I will represent that to you, and if we have a moment, I
23    know we're short on time for cross-examination, I'll try to
24    play that for you at the end so you can confirm that for me.
25    A.   Sure.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01130**

```
1    Q.   You played that, didn't you, sir, the Kennedy Honors?

2    A.   I played -- I was one of the musicians, yes.

3    Q.   And you were on the stage performing that piece in front

4    of Mr. Jimmy Page, correct?

5    A.   I was, yes.

6    Q.   Did that make you proud?

7    A.   Certainly.  Yeah.

8    Q.   Were you excited?

9    A.   Yes.

10   Q.   And then you spent time with Mr. Jimmy Page at the

11   afterparty?

12   A.   I did.

13   Q.   And then last week you shook his hand and gave him a hug

14   before you left?

15            MR. ANDERSON:  Objection, Your Honor.

16            THE COURT:  Overruled.

17            THE WITNESS:  Yes.

18   BY MR. MALOFIY:

19   Q.   You have an appreciation and an emotional feeling towards

20   Jimmy Page, correct?

21            MR. ANDERSON:  Objection, vague and ambiguous.

22            THE COURT:  Overruled.

23            THE WITNESS:  Umm, I don't want to overstate it.  I

24   mean, I work with a lot of celebrities.  I've been fortunate,

25   very fortunate.  But Led Zeppelin was a fantastic group, and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   every honoree that we work with on the Kennedy Center Honors is

2   special, and so through the 12 years I've been with the show,

3   it's -- I'm always proud of it.

4   BY MR. MALOFIY:

5   Q.   Well, did you choose to perform "Stairway to Heaven"

6   because it's a great song at the Kennedy Honor Society?

7   A.   Yes.

8   Q.   And did you -- there was 87 songs in the catalog, correct,

9   of Led Zeppelin?

10  A.   Yes.

11  Q.   And you could have chose to pick any one of 87 songs,

12  correct?

13  A.   Yes.  We chose four, I believe.

14  Q.   Which four were they, sir?

15  A.   "Rock and Roll," "Whole Lotta Love," "Ramble on," and

16  "Stairway to Heaven."

17  Q.   Did you make the decision on what songs to play?

18  A.   It was the producer Michael Stevens and myself.

19  Q.   So it was in part your decision to choose those songs?

20  A.   Yes.

21  Q.   And you believe those songs represent Led Zeppelin, their

22  catalog of music of what is the best, correct?

23  A.   Well, I do tributes that are longer.  I often musically

24  direct the MusiCares show at the Grammy Awards, and there

25  you're afforded a lot more material, but in this case, because
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    you have five honorees, you're only really allowed four songs,

2    max.  I don't think those four songs represent their whole

3    catalog, but it certainly -- it certainly is a -- is a drip in,

4    you know, wa- -- a little bit.

5    Q.   Thank you.

6         How do I turn this on?  I apologize.  Thank you.

7         Sir, you can read and write music, correct?

8    A.   I can, yes.

9    Q.   You've identified the solo as being very important,

10   correct?

11   A.   Yes.

12   Q.   I'm going to show you what was previously marked as 2708

13   and used in this case.

14        May I approach the witness and hand it to him?

15        THE COURT:  Yes.

16        (Document was handed to the witness.)

17        (Document was displayed on the screen.)

18   BY MR. MALOFIY:

19   Q.   Sir, do you see that there?

20   A.   I do.

21   Q.   You would agree with me that these are not all the notes

22   of "Stairway to Heaven" on the deposit copy lead sheet,

23   correct?

24        MR. ANDERSON:  Objection, relevance.  And outside the

25   scope.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01133**

1028

```
 1              THE COURT:  And what, Counsel?

 2              MR. ANDERSON:  And outside the scope of the direct.

 3              THE COURT:  Sustained.

 4    BY MR. MALOFIY:

 5    Q.   Sir, you'd agree that the solo is not present anywhere in

 6    the deposit copy lead sheet?

 7              MR. ANDERSON:  Again, relevance.

 8              THE COURT:  Sustained.

 9    BY MR. MALOFIY:

10    Q.   Sir, you'd agree -- you talked about the different parts

11    of "Stairway to Heaven," correct?

12    A.   Yes.

13    Q.   Everything you talked about was performance related, not

14    compositional, correct?

15              MR. ANDERSON:  Objection.

16              THE COURT:  Overruled.

17              THE WITNESS:  Umm, I want to be -- rephrase it one --

18    one time, please.

19    BY MR. MALOFIY:

20    Q.   Much of your opinions were based on performance elements,

21    instrumentation, arrangement, when the drums came in; am I not

22    correct?

23    A.   You are correct.

24    Q.   All right.  And did you consider the deposit copy of

25    "Stairway to Heaven" to see whether or not the solo was present
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1029

```
 1    in the composition?
 2            MR. ANDERSON:  Objection, relevance.
 3            THE COURT:  Sustained.
 4    BY MR. MALOFIY:
 5    Q.    You would agree "Stairway to Heaven" has no chorus?
 6    A.    It has a refrain.
 7    Q.    No chorus, correct?
 8    A.    One could call it a chorus, but I would -- I think
 9    "refrain" is a better word, yeah.
10    Q.    Are you familiar with "To Catch a Shad"?
11    A.    I am.
12    Q.    You performed it, right?
13    A.    Yes.
14    Q.    Was that a performance or was that actually based on the
15    composition of that piece of music?
16            MR. ANDERSON:  Objection, vague and ambiguous.
17            THE COURT:  Overruled.
18            THE WITNESS:  It was a performance of the section of
19    that piece of music.
20    BY MR. MALOFIY:
21    Q.    I have "To Catch a Shad" deposit copy.  Have you ever seen
22    this?
23    A.    I have not.
24    Q.    Isn't it true there's no arpeggiated descending chromatic
25    line there?
```

```
1           MR. ANDERSON:  Objection, relevance.

2           THE COURT:  Sustained.

3    BY MR. MALOFIY:

4    Q.   Did you ever consider whether or not the "To Catch a Shad"

5    that you played was a performance of "To Catch a Shad" that was

6    done much later?

7           MR. ANDERSON:  Objection, relevance.

8           THE COURT:  Overruled.

9           THE WITNESS:  Umm, can you rephrase the question?

10   BY MR. MALOFIY:

11   Q.   You never looked at the initial composition of "To Catch a

12   Shad," did you?

13          MR. ANDERSON:  Objection, relevance and vague and

14   ambiguous.

15          THE COURT:  I'm sorry.  Looked at the initial what?

16          MR. MALOFIY:  Composition of the "To Catch a Shad."

17          THE COURT:  Overruled.

18      Did you ever look at it?

19          THE WITNESS:  No.

20   BY MR. MALOFIY:

21   Q.   You never looked to see whether or not an arpeggiated

22   descending line was present in the initial version of

23   "To Catch a Shad"?

24   A.   I see that the chromatic line is in here, yes.

25   Q.   It's not there, correct?
```

1031

```
1    A.    It is.

2    Q.    Is it an arpeggiated line, sir?

3    A.    No, it is not.

4    Q.    No, it's not.  And what you have here is just a straight

5    descending bass line with a melody, correct?

6          MR. ANDERSON:  Objection.  He's talking about the

7    deposit copy, not the prior art as performed.

8          THE COURT:  Counsel, sustained.

9          MR. ANDERSON:  Thank you.

10   BY MR. MALOFIY:

11   Q.    Is this the first time you actually saw the deposit copy

12   of "To Catch a Shad"?

13         MR. ANDERSON:  Objection, relevance.

14         THE COURT:  Sustained.

15       You have about a minute left, Counsel.

16   BY MR. MALOFIY:

17   Q.    Sir, isn't it true in your report you had said Johnson is

18   correct that the initial guitar part in "Stairway" is very

19   significant, but he is incorrect that it is the most important

20   single element of "Stairway to Heaven"?

21   A.    I'd like to see that to be sure, but that sounds like me.

22   Q.    And you would agree that the introduction or the initial

23   guitar part in "Stairway" is a very important part, correct?

24   A.    Every part of that song is important, I believe.

25   Q.    Sir, would you also agree in your report, paragraph 6, it
```

1032

```
 1   says both "Taurus" and "Stairway to Heaven" have a chord

 2   progression that is close, but not exactly the same, played by

 3   a steel-string acoustic guitar in an arpeggiated style, which

 4   is very common to that instrument?

 5          MR. ANDERSON:  Objection, relevance, outside the

 6   scope.

 7          THE COURT:  Overruled.

 8          THE WITNESS:  I'd love to see it to be sure that's

 9   what I said, but that sounds like me again.

10   BY MR. MALOFIY:

11   Q.   Isn't true that "To Catch a Shad" is in a completely --

12          THE COURT:  Last question, Counsel.

13      Go ahead.

14          MR. MALOFIY:  Yes.

15      Could we play "Catch a Shad" from the beginning, and I

16   have one question to it.  First --

17          THE COURT:  Counsel, you got one minute.  You can't

18   play it in one minute.

19          MR. MALOFIY:  Just a portion of it, Your Honor.

20      Play it from the beginning, please, cue it up.  Thank you.

21          THE COURT:  Counsel, you're through.  Thank you.

22      Next witness.

23          MR. ANDERSON:  Your Honor, I just have a few

24   questions.

25          THE COURT:  Yeah, as to -- as long as it's within the
```

1033

```
 1   cross-examination.

 2           MR. ANDERSON:  Absolutely.

 3           THE COURT:  Okay.

 4                    REDIRECT EXAMINATION

 5   BY MR. ANDERSON:

 6   Q.   Mr. Mathes, you testified in response to plaintiff's

 7   counsel that the introduction of "Stairway to Heaven" is

 8   recognizable.

 9        Do you have a view as to whether each of the parts,

10   including the parts that you identified earlier this morning,

11   are recognizable if heard alone?

12   A.   Yes.

13   Q.   Okay.

14   A.   I would agree with that.

15   Q.   For example, if you were changing radio stations and just

16   came upon any portion of "Stairway to Heaven," would you, in

17   your view, be able to recognize it?

18   A.   Again, I don't want to speak in hyperbole, but almost

19   every measure of that song is familiar and clear and important.

20   Q.   Counsel referred to performance elements of "Stairway to

21   Heaven."

22        Is everything that you described today included in the

23   sound recording of "Stairway to Heaven" that has been sold to

24   the public since 1971?

25   A.   Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1034

```
 1    Q.    And does that, those performance element -- excuse me,

 2    those performance elements include the performance by --

 3    performances by Mr. Jones, Mr. Plant, Mr. Bonham, Mr. Page?

 4    A.    Yes.

 5          MR. ANDERSON:  Thank you.

 6          THE COURT:  Okay.  You may step down.  And you can

 7    take your guitar with you.

 8       Okay.  Next witness, Counsel.

 9          MR. ANDERSON:  Your Honor, at this time I would ask to

10    move for the admission of three documents.

11       The certified copy of the order approving the 1967

12    exclusive songwriter agreement between Mr. Wolfe and

13    Hollenbeck, it's been marked as Exhibit 2060, and a certified

14    copy has been provided to the Court.

15          THE COURT:  Any objection?

16          MR. MALOFIY:  We would object that it's no foundation

17    and there's been no testimony to it.

18          THE COURT:  Sustained.

19          MR. ANDERSON:  It is a certified copy of a court

20    record, Your Honor.

21          THE COURT:  It's been sustained.

22       Next question.

23          MR. ANDERSON:  Next we would move to admit a certified

24    copy of the original registration of copyright in the musical

25    composition "Taurus" by Hollenbeck Music.
```

1035

```
 1          MR. MALOFIY:  Which exhibit?

 2          MR. ANDERSON:  It is -- we would mark it as Exhibit

 3   2953.  I have a --

 4          THE COURT:  Why don't you show it to him.

 5          MR. ANDERSON:  -- certified copy.

 6          MR. MALOFIY:  Thank you.

 7          MR. ANDERSON:  You're welcome.

 8          MR. MALOFIY:  Our only objection, Your Honor, is that

 9   this is only part of the record.  The other record is the

10   renewal in '96.  So we would just ask that those be presented

11   and admitted into evidence.

12          THE COURT:  You can introduce those after, yes.

13          MR. ANDERSON:  So it's admitted, Your Honor?

14          THE COURT:  Yes.

15          MR. ANDERSON:  Thank you.

16       (Received in evidence, Trial Exhibit 2953;

17        subsequently corrected to Trial Exhibit 2964.)

18          MR. ANDERSON:  And the third document is a certified

19   copy of the original registration of copyright in the musical

20   composition "Stairway to Heaven."  It is -- excuse me.  It is

21   Exhibit 2014.

22          THE COURT:  Okay.

23          MR. MALOFIY:  No objection.

24          THE COURT:  Okay.

25          MR. ANDERSON:  Thank you, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1036

```
1           (Received in evidence, Trial Exhibit 2014.)

2           THE COURT:  Counsel, so we keep it all together, do

3    you want to introduce that follow-up part?

4           MR. MALOFIY:  We would request -- I'm sorry, I missed

5    your --

6           THE COURT:  Do you want to introduce the follow-up

7    to -- the second part, that you wanted to introduce.

8           MR. MALOFIY:  Yes, Your Honor.  We would like to at

9    this time admit and ask the Court's permission to move into

10   evidence the renewal of 1996.

11          MR. ANDERSON:  Your Honor, as counsel previously moved

12   for the admission, and I believe the Court allowed the

13   admission, of a printout from the copyright office of

14   information as to that renewal claim, they have not marked as

15   an exhibit or produced the renewal itself.

16          MR. MALOFIY:  It's --

17          MR. ANDERSON:  Which was 28 years after.

18          MR. MALOFIY:  It's already moved into evidence, I

19   believe, from previous --

20          THE COURT:  It will be received.  It will be received.

21          MR. MALOFIY:  Thank you, Your Honor.

22          THE CLERK:  Could I have the number when you have a

23   chance, please?

24          MR. MALOFIY:  Yes.

25          MR. ANDERSON:  The only thing I would ask, Your Honor,
```

1037

```
1    is if we could actually have a copy of that --

2              THE COURT:  Sure.

3              MR. ANDERSON:  -- because they only used the summary

4    before.

5              THE COURT:  They'll provide a copy for you.

6              MR. ANDERSON:  And we call Tim Gardner as a witness.

7    Thank you, Your Honor.

8              MR. MALOFIY:  Your Honor, we're going to object to

9    Gardner.  He was never disclosed, he's not on the witness list,

10   and we have no information of him whatsoever.

11             THE COURT:  Okay.  Counsel?  Nor does the Court.

12             MR. ANDERSON:  Your Honor, both sides designated on a

13   joint exhibit -- joint witness list, Joan Hudson or other

14   person most knowledgeable testifying on behalf of Joan Hudson

15   Company, and Tim Gardner is here from England to testify on

16   behalf of Joan Hudson Company.  He is listed as witness 38 on

17   the joint witness list filed on April 24th.  And I suspect that

18   if I look, I will find him listed a second time, but on behalf

19   of one of the other parties, but at least that time.

20             THE COURT:  Just a second, let me take a look at it.

21             MR. ANDERSON:  Yes, Your Honor.  It's page 26.

22             THE COURT:  I've got it.

23             MR. MALOFIY:  May I respond?

24             THE COURT:  In just a second.  Let me look at it.

25             MR. MALOFIY:  Thank you, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1038

```
1              THE COURT:  Counsel?

2              MR. MALOFIY:  This is a UK entity.  We never received

3    any documents or information from this entity, never disclosed

4    who the PMK is, and I was just notified of it moments ago by

5    Mr. Anderson.  This is trial by surprise.

6              MR. ANDERSON:  Your Honor, I actually advised counsel

7    on Friday that Mr. Gardner would be called.

8              MR. MALOFIY:  No, no, no.

9              MR. ANDERSON:  If I could just explain, Your Honor.

10   The documents that counsel questioned Mr. Page and Mr. Einhorn

11   on, and which Mr. Einhorn testified about, are, in fact,

12   documents prepared by Mr. Gardner.  They're UK documents.  They

13   were produced in December, and he's their person most

14   knowledgeable.

15             THE COURT:  Are you calling him only to rebut the

16   testimony of their expert witness?

17             MR. ANDERSON:  Exactly.

18             THE COURT:  And nothing else?

19             MR. ANDERSON:  I believe that is 100-percent correct.

20             THE COURT:  Well, I can tell you it will be

21   100-percent correct.  You're going to be limited just to that,

22   to the rebuttal of that one witness as to what that witness

23   testified concerning Mr. Gardner's exhibit.

24             MR. ANDERSON:  Fine.

25             THE COURT:  And nothing else.
```

1    MR. ANDERSON:  Laying a foundation as to who he is.

2   Beyond that, it will just be rebuttal.

3    MR. MALOFIY:  Our position, Your Honor, is that this

4   was told moments ago at trial, and we object to it on the

5   grounds it's prejudicial and we --

6    THE COURT:  I understand.  I understand, and it will

7   be noted for the record, Counsel, but this is a rebuttal

8   witness, and I'm assuming, Counsel, you will be objecting if he

9   goes outside the scope of what I just said.

10    MR. MALOFIY:  Yes, Your Honor.

11    THE COURT:  Okay.

12    MR. ANDERSON:  Thank you, Your Honor.

13    (The witness entered the courtroom.)

14    THE CLERK:  Mr. Gardner, right here to be sworn,

15   please.  Please raise your right hand.

16    Do you solemnly swear the testimony that you are about to

17   give in the matter now before the Court shall be the truth, the

18   whole truth, and nothing but the truth, so help you God?

19    THE WITNESS:  I do.

20    THE CLERK:  Thank you.  You may be seated.

21    May I please ask that you state your full name for the

22   record and spell your last name.

23    THE WITNESS:  Timothy James Ferdley Gardner,

24   G-a-r-d-n-e-r.

25    THE COURT:  And Counsel, one more time, you're

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   permitted to go into any testimony that he has regarding the

2   documents that have already been testified to in court, but

3   nothing else.

4           MR. ANDERSON:  And the testimony of Mr. Einhorn, the

5   expert he's --

6           THE COURT:  Only as to the documents of Mr. Gardner's

7   that you referred to.

8           MR. ANDERSON:  Okay.  Thank you, Your Honor.

9           MR. MALOFIY:  Thank you, Your Honor.

10      **TIMOTHY GARDNER, CALLED AS A WITNESS BY THE DEFENDANTS,**

11                       **DIRECT EXAMINATION**

12  BY MR. ANDERSON:

13  Q.   Mr. Gardner, what do you do for a living?

14  A.   I'm a trust accountant and specialize in music industry

15  royalties and accounting for artists and writers.

16  Q.   Are you a member of any professional associations?

17  A.   Yes.  The Institute of the Chartered Accountants in

18  England and Wales.

19  Q.   And could you please summarize for the Court and the jury

20  your background.

21  A.   I grad- --

22          MR. MALOFIY:  If I may, we would just object to any

23  testimony as to -- that would fall into the sphere of expert

24  testimony.

25          THE COURT:  Sustained.

1041

```
1        MR. ANDERSON:  Yes.  He's not here as an expert

2   witness, Your Honor.

3        THE COURT:  Then you don't have to qualify him.

4        MR. MALOFIY:  Thank you.

5        THE COURT:  Why don't you go ahead and ask the next

6   question.

7        MR. ANDERSON:  Just to give background to what

8   Mr. Gardner does.

9   Q.   As a -- and I believe you said it was a member of the --

10  fellow of Institute of Chartered Accountants.  Is that

11  equivalent to being a CPA in the United States?

12  A.   Yes, it is.

13  Q.   And do you work on behalf of Joan Hudson & Company?

14  A.   I'm a consultant to Joan Hudson & Company.

15  Q.   And is it correct Joan Hudson & Company is the -- or are

16  the business managers of Mr. Plant and Mr. Page and others?

17       MR. MALOFIY:  Objection, Your Honor.  He said he's a

18  consultant to Joan Hudson & Company, which means he doesn't

19  work for that company.  We would ask he be precluded from

20  testimony.

21       THE COURT:  Overruled.

22       MR. MALOFIY:  I'm sorry?

23       THE COURT:  Overruled.

24  BY MR. ANDERSON:

25  Q.   Let me ask it this way.  On behalf of Joan -- your
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01147**

1  activities on behalf of Joan Hudson & Company, do you have

2  familiarity with the corporate filings of entities related to

3  the Led Zeppelin catalog?

4  A.   I do.

5  Q.   Okay.  If I could direct your attention --

6       If we could display what counsel, plaintiff, has marked, I

7  believe, as Exhibit D39243, what they base their exhibit

8  numbers on.

9       My apologies, Your Honor.

10           THE COURT:  Okay.

11           MR. ANDERSON:  That is the exhibit number that was

12  used when they examined Mr. Page.

13       (Exhibit was displayed on the screen.)

14  BY MR. ANDERSON:

15  Q.   Let's start with the first page.  Do you recognize the

16  first page?

17  A.   I do.

18  Q.   And are you familiar with the exhibit that was marked as

19  Exhibit D39243?

20  A.   I am, yes.

21  Q.   And have you reviewed that exhibit?

22  A.   I have, yes.

23  Q.   What does that exhibit consist of?

24  A.   It consists of the financial accounts for Flames of Albion

25  Music, Limited, which are required to be filed in the UK with

1043

```
 1   the Revenue and Customs, which is the UK equivalent of the

 2   IRS.

 3   Q.   And they are required by law in England?

 4   A.   Correct.

 5   Q.   And who are they filed with in England?

 6   A.   Revenue and Customs.

 7   Q.   Is that a governmental agency of the British Crown?

 8   A.   It is, yes.

 9   Q.   Is it equivalent to the Internal Revenue Service here?

10   A.   Yes, it is.

11   Q.   Did you participate in the preparation of this exhibit, of

12   the documents that have been combined into this exhibit?

13           MR. MALOFIY:  Objection, vague and ambiguous.

14           THE COURT:  Overruled.

15           THE WITNESS:  I assisted in the preparation of those

16   accounts, yes.

17   BY MR. ANDERSON:

18   Q.   Okay.  Were these annual financial reports reviewed before

19   they were filed?

20   A.   Yes, they were.  They were reviewed by Joan

21   Hudson & Company, myself, and an external firm of accountants,

22   Cook & Partners.

23   Q.   And is it required by English law to have a separate

24   accountant review them?

25   A.   No, it is not in this instance.
```

1044

```
1    Q.    Why was it done?

2    A.    Because the clients want to make sure that the accounts

3    are precisely correct.

4    Q.    And is it correct that this exhibit by plaintiffs --

5    excuse me, plaintiff's counsel, combines the annual financial

6    statements for two different companies?

7    A.    It is, correct.

8    Q.    What are the two companies?

9    A.    Flames of Albion Music, Limited, and Super Hype Tapes,

10   Limited.

11   Q.    What's the difference between the two companies?

12   A.    Flames of Albion collects money to the songwriters of the

13   song.  So for "Stairway to Heaven," that would be Mr. Page and

14   Mr. Plant.  And Super Hype, Limited, collects money for the

15   performers, so Led Zeppelin.  So that would not only be

16   Mr. Page and Mr. Plant, but also Mr. John Paul Jones and the

17   estate of Mr. John Bonham.

18   Q.    Is this the difference between money from the musical

19   composition versus money from the recording of Led Zeppelin

20   playing the musical composition?

21         MR. MALOFIY:  I'm sorry, could we repeat that last

22   question?  My apologies.

23         THE COURT:  Why don't you repeat it, Counsel.

24         MR. ANDERSON:  Yes.

25   Q.    You said -- you referred to the performance, that one of
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01150**

1045

1    the companies deals with the performance.  What did you mean by

2    that?

3    A.   It means that Flames of Albion collects money from Warner

4    Brothers Music for the composition, the song-writing.

5    Super Hype Tapes collects money from Atlantic Rhino for the

6    performers of the music.

7    Q.   And again, by performance, you're referring to recordings

8    of performances?

9    A.   That is correct.

10   Q.   Okay.

11       If we can -- are we able to go to a particular page?

12   Okay, thank you.  If we could go to -- bear with me for a

13   second -- page D39243.  I believe that's the first page.  And

14   if you could go to 39247, please.

15       Now, would it help you if I handed you a hard copy?

16   A.   Yes.

17   Q.   Okay.

18       Your Honor, may I approach?

19            THE COURT:  Yes.

20            MR. ANDERSON:  If I can find what I did with the hard

21   copy.

22       (Document was handed to the witness.)

23       (Document was displayed on the screen.)

24   BY MR. ANDERSON:

25   Q.   Okay.  We have displayed the page D39247, and you may need

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1046

```
1    to go a few pages earlier to -- or maybe you can tell from
2    this.  What is this page?
3    A.   This is a profit and loss accounts showing income to the
4    company and the expenses of the company.
5    Q.   And 39247.  And if you could go to page -- are you on that
6    page now?
7    A.   Yes.
8    Q.   Okay.  Do you see the reference to turnover?  What does
9    turnover mean?
10   A.   That means -- in this instance, it means advances from --
11   music publishing advances from Warner Brothers.
12   Q.   And Dr. Einhorn testified that the 6.6-million-pound
13   figure was revenue attributable to "Stairway to Heaven."  Was
14   his testimony correct?
15            MR. MALOFIY:  Objection, misstates his testimony.
16            THE COURT:  Why don't you state the question rather
17   than repeating testimony.
18            MR. ANDERSON:  Absolutely.
19   Q.   Is this figure of 6.6 million pounds on page D39247
20   revenue applicable or attributable to "Stairway to Heaven"?
21   A.   No, it is not.
22   Q.   And why is it not?
23   A.   Because it's -- it includes 87 songs, including
24   "Stairway to Heaven."  So there's many, many songs that that
25   advance is paid in respect of, not just "Stairway to Heaven."
```

1047

1    Q.    And you referred to an advance.  Is this a portion of an

2    advance that was paid?

3          MR. MALOFIY:  Objection.  The word "apportionment,"

4    that's for an expert to testify to, not for a fact witness.

5          THE COURT:  Overruled.

6          THE WITNESS:  This was an advance for 10 million

7    dollars, which was pursuant to an agreement from 2008, which I

8    understand has not been allowed by the Court.

9          MR. MALOFIY:  Objection to the statement --

10         THE COURT:  Last part will be stricken.

11         MR. MALOFIY:  Thank you.

12   BY MR. ANDERSON:

13   Q.    This payment of 6.6 million pounds, is it correct that it

14   is a payment under a 2008 agreement?

15   A.    It is correct.

16   Q.    Okay.  And is there any other reason why, that you think

17   of, why the figure of 6.6 million pounds is not attributable to

18   "Stairway to Heaven"?

19   A.    Because it includes other songwriters as well as Mr. Page

20   and Mr. Plant, and because it includes other compositions, as I

21   said earlier.

22   Q.    So, in summary, the 6.6-million-pound figure on this page

23   includes 86 other songs other than "Stairway to Heaven," was

24   paid under a 2008 agreement, and includes monies attributable

25   to, or the songwriting of John Paul Jones and the late

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1048

1    Mr. Bonham?

2    A.    That is --

3           MR. MALOFIY:    Objection, vague and ambiguous and

4    compound, Your Honor.

5           THE COURT:    And repetitive.

6           MR. MALOFIY:    Thank you.

7           THE WITNESS:    Sorry, Judge, did you say --

8           THE COURT:    It was sustained.

9       Next question.

10           MR. ANDERSON:    Thank you, Your Honor.

11       If we can please go to page 39256.

12       (Document was displayed on the screen.)

13    BY MR. ANDERSON:

14    Q.    And what is this page?

15    A.    Those are the financial statements for the period ending

16    31st of March 2013 for Flames of Albion Music, Limited.

17    Q.    And do you see the reference to turnover, six -- and I'll

18    just round it out to 6.2 million pounds?

19    A.    Yes.

20    Q.    Is that 6.2 million pounds attributable to "Stairway to

21    Heaven"?

22    A.    No.

23    Q.    And why is it not attributable to "Stairway to Heaven"?

24    A.    Because it includes 87 songs, including "Stairway to

25    Heaven," and includes other writers, not just Mr. Plant and

1049

```
 1    Mr. Page.

 2    Q.    Is it also a payment under a 2008 contract?

 3    A.    It is, yes.

 4    Q.    If we can go to page 39259.

 5          (Document was displayed on the screen.)

 6    BY MR. ANDERSON:

 7    Q.    And if you need to go a page earlier or anything to get

 8    the context for this, just please let me know, but can you tell

 9    from this page what this is?

10    A.    I can.

11    Q.    And what is it?

12    A.    The note related party disclosures shows the payments that

13    were made out of the aforementioned advances to Mr. Page and

14    Mr. Plant.

15    Q.    Were they paid directly to Mr. Page and Mr. Plant?

16    A.    No.  They were paid to their service companies.

17    Q.    Okay.  And let's start with the 2 point -- I'm sorry, 2.1.

18    Is that 2.1?  Can you explain to me, where it says Succubus

19    Music, Limited, J. Page, what that means, what the figure to

20    the right of it means.

21    A.    That figure just refers to the year-end balances.  I

22    believe we may be looking at the second section.

23    Q.    Okay.  Then if you look at the second section, there's a

24    reference to 2.4 million pounds.  Do you see that?

25    A.    Yes.
```

1050

1   Q.   And is that 2.4 million pounds attributable to

2   "Stairway to Heaven"?

3   A.   It's attributable to all the songs that Mr. Page, in this

4   instance, wrote that were included within the 10 million

5   dollars advance.  So a calculation was undertaken based upon on

6   Mr. Page's songwriting in relation to the songwriting within

7   the catalog of not only Mr. Page and Mr. Plant, but Mr. Bonham

8   and Mr. Jones.

9   Q.   So is it correct that the 2.4-million-dollar figure --

10           THE COURT:  I think it's pounds.

11           MR. ANDERSON:  My apologies, Your Honor, you're

12   absolutely right.

13           THE COURT:  You may want to explain the relationship

14   between pounds and dollars, also.

15           MR. ANDERSON:  I think that would be very helpful.

16   Thank you.

17   Q.   Mr. Gardner, what is the relationship between pounds and

18   dollars?  What do we mean by pounds?  Start with that.

19   A.   British pounds and U.S. dollars.  In these accounts, the

20   translation was at about a rate of 1.6.  So 10 million dollars

21   translated to about 6-million-and-something pounds in each

22   instance.

23   Q.   The pounds is the currency used in Great Britain?

24   A.   Correct.

25   Q.   And so, in preparing these documents, you did a

1051

```
1   calculation to translate the figures from dollars to pounds?
2   A.   That is correct.
3   Q.   Okay.  And I'll try to keep remembering that.  Thank you.
4        The figure of 2.4 million pounds for Succubus Music
5   Limited is -- if I understand correctly, is not attributable to
6   "Stairway to Heaven" because it includes 86 other songs and it
7   also is a payment under a 2008 agreement?
8   A.   That is correct.
9        MR. MALOFIY:  Objection.  Vague and ambiguous,
10  compound, and also asked and answered now more than once.
11       THE COURT:  It's been asked and answered, that's
12  correct.
13  BY MR. ANDERSON:
14  Q.   And -- actually, if we could stay on that page, there is a
15  payment of 2 point -- it looks like 2.2 million to Sons of
16  Einion.  Do you see that?
17  A.   I do.
18  Q.   And is that a payment that's attributable to "Stairway to
19  Heaven"?
20  A.   No.
21  Q.   Why is it not attributable to "Stairway to Heaven"?
22  A.   Because it includes all the songs out of the 87 songs that
23  Mr. Plant wrote.  Sons of Einion being Mr. Plant's company, and
24  Succubus being Mr. Page's company.
25  Q.   Okay.  If we could please go to D39266, and if you
```

1052

```
1   could -- we need to see the whole page.  Thank you.  If we
2   could scroll down.
3        And do you see the reference to turnover, 6.2 million?
4   A.   I do.
5   Q.   Is that figure attributable to "Stairway to Heaven"?
6   A.   No, it is not.
7   Q.   And why is it not?
8   A.   Because it includes compositions written by Mr. Bonham and
9   Mr. Jones, and it also includes the entire catalog of 87 works,
10  which includes "Stairway to Heaven" as one composition.
11  Q.   And is it the correct year?
12            MR. MALOFIY:  Objection, vague and ambiguous.
13            THE COURT:  Sustained.
14  BY MR. ANDERSON:
15  Q.   Okay.  And so it includes other writers, and it's a -- and
16  the entire catalog?
17  A.   It does.
18  Q.   And it's under the -- a payment under the 2008 agreement?
19  A.   That is correct.
20  Q.   Do these payments that are -- do the payments that are
21  reflected on this exhibit include the payments that have been
22  referred to as a -- in this case, as a 30-million-dollar
23  advance?
24            MR. MALOFIY:  Objection, vague and ambiguous.
25            THE COURT:  Why don't you restate the question,
```

```
 1   Counselor.

 2          MR. ANDERSON:  Sure.

 3   Q.   You've referred to advances that are -- were under the

 4   2008 agreement that are reflected in your accountings.  Are all

 5   of the advances paid reflected in these financial statements

 6   that you prepared?

 7          MR. MALOFIY:  Objection to whether or not he's

 8   familiar with those agreements or whether or not he just did

 9   the accounting of them.

10          THE COURT:  Sustained.

11   BY MR. ANDERSON:

12   Q.   Are you familiar with the 2008 agreement?

13   A.   I am.

14   Q.   And did it call for -- did it require, in the 2008

15   agreement, advance payments?

16   A.   It did.

17   Q.   And do the payments described in the financial statements

18   you prepared for Flames of Albion include the advance payments

19   that were paid under the 2008 agreement?

20   A.   They include the payments that were contractually due to

21   be made at those points in time, such they're reflected in the

22   accounts for that period of time that the accounts cover.

23   And --

24   Q.   Oh, I'm sorry.

25          THE COURT:  Next question.
```

1054

```
 1          MR. ANDERSON:   Thank you.
 2   Q.   And all of those payments generally were for the entire
 3   catalog of 86 or 87 songs?
 4   A.   They were.
 5   Q.   And all of those payments were for all of the writers that
 6   are on those songs, not just Mr. Page and Mr. Plant?
 7   A.   That is correct.
 8   Q.   Now, you started by saying that these accountings, or
 9   financial statements that have been merged into a single
10   exhibit, also include financial statements for Super Hype
11   Tapes.  And if we could talk briefly, I believe you said that
12   the distinction is that Super Hype Tapes refers to the
13   recording payments; is that correct?
14   A.   That is correct.
15   Q.   And the recording payments, were there advances paid
16   under -- with respect to the recording payments?
17   A.   There were.  In this period of time.
18   Q.   And how much were the advances?  Strike that.
19        Were the advances for -- attributable to "Stairway to
20   Heaven"?
21   A.   There were two -- two sets of advances paid in this period
22   of time.
23        The first advance was an advance of 10 million dollars
24   paid in respect of the band's 2007 performance at the O2 Arena
25   in London, and that was 10 million dollars.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        The second was a series of advances totaling 3 million
 2   dollars.  The relevant agreement states 5 million dollars, but
 3   only 3 million dollars of those have been paid.  And those
 4   advances are repayable against the royalties earned, in every
 5   instance, to the band before they get further payments from the
 6   record label, Rhino Atlantic.
 7   Q.   And -- excuse me.  And are those advances for the
 8   entire -- are they attributable to "Stairway to Heaven"?
 9   A.   The advance of 10 million dollars?  "Stairway to Heaven"
10   was a performance included at the O2 and in that product, so it
11   is one of I think maybe 17 performances embodied on the
12   product.
13        And in respect of the 3 million dollars, that was in
14   respect of the band's nine albums, of which one of those albums
15   is Led Zeppelin IV, and "Stairway to Heaven" is one of the
16   eight tracks on that album.
17   Q.   And were the advances paid with respect to all of the
18   performers on the records of Led Zeppelin?
19   A.   That is correct.  They are paid in respect of all of the
20   performers, specifically the estate of Mr. Bonham and
21   Mr. Jones.
22   Q.   So the advance payments related to compos- -- recordings
23   other than "Stairway to Heaven" and to recording artists other
24   than Mr. Page and Mr. Plant?
25   A.   That is correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1056

```
 1    Q.    Okay.  If I could ask you to look at Exhibit 2411.

 2          May I publish it, Your Honor?

 3                THE COURT:  Yes.

 4                MR. MALOFIY:  I just don't know what it is, that's

 5    all.

 6                THE COURT:  Why don't you show it to counsel.

 7                MR. ANDERSON:  Oh, absolutely.

 8          (Exhibit was displayed on the screen.)

 9                THE WITNESS:  Could you blow it up a little bit?

10                THE COURT:  Just a sec.

11                MR. MALOFIY:  I believe there is no foundation for

12    that.  It would have to come from the corporate defendants, not

13    from him.

14                THE COURT:  Okay.

15                MR. ANDERSON:  Actually, it's not a corporate

16    defendant document, but -- and I'll lay the foundation right

17    now, if I may.

18                THE COURT:  If you can, go ahead.

19                MR. ANDERSON:  Can we publish it, or should I hand it

20    to the witness?

21                THE COURT:  No, can't publish it unless it's received

22    into evidence.

23                MR. ANDERSON:  May I hand this to the witness?

24                MR. MALOFIY:  Your Honor, it's also not one of the

25    documents for purposes for rebuttal, which the Court had
```

1057

```
 1    indicated it would be a narrow rebuttal examination.
 2            MR. ANDERSON:  Your Honor, it's --
 3            THE COURT:  We'll find out.  I don't know what the
 4    document is.
 5        Are you saying, Counsel, that that relates to the
 6    documents that were introduced by the plaintiff?
 7            MR. MALOFIY:  No, it was not.
 8            THE COURT:  Counsel.
 9            MR. ANDERSON:  Two things, Your Honor.  It is based on
10    information -- it was prepared by Mr. Gardner.  It is based on
11    information in that exhibit, and it is in rebuttal to
12    Mr. Einhorn's testimony.
13            THE COURT:  You're not explaining the documents that
14    were introduced before, but in addition to?
15            MR. ANDERSON:  It is derived from those documents.
16            THE COURT:  Okay.  Sustained.
17            MR. MALOFIY:  Thank you.
18    BY MR. ANDERSON:
19    Q.   Based on your knowledge of the financial statements that
20    you have prepared on behalf of Flames of Albion and Super Hype
21    Tapes, do you have -- can you tell us what is the gross revenue
22    that Mr. Page has received with respect to "Stairway to
23    Heaven"?
24            MR. MALOFIY:  Objection, Your Honor.
25            THE COURT:  Overruled.
```

1058

```
 1              THE WITNESS:  My calculations --

 2              MR. MALOFIY:  This would call -- Your Honor, this

 3    would call for expert opinion and apportionment and everything

 4    that he's not qualified to do.

 5              THE COURT:  In the documents, what do the documents

 6    reflect that we have been talking about as far as payments to

 7    Mr. Page?

 8              MR. MALOFIY:  Your Honor, respectfully, they would

 9    have to apportion.  He can't do this.  He's not an expert.

10              THE COURT:  You heard the question.

11              THE WITNESS:  They reflect the income on "Stairway to

12    Heaven" to Mr. Page.

13              THE COURT:  Yes.

14              THE WITNESS:  Of course, the different sources of

15    income --

16              THE COURT:  No, we're not -- we're just asking, the

17    documents that you've been referring to, do they indicate how

18    much went to Mr. Page?

19              THE WITNESS:  Yes.

20              THE COURT:  How much?

21              THE WITNESS:  615,000 dollars.

22    BY MR. ANDERSON:

23    Q.   And the same question as to Mr. Plant.

24    A.   532,000 dollars.  And those amounts are before tax.  If

25    you take --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1059

```
 1          THE COURT:  Excuse me.  You've answered the question.
 2      Next question.
 3          MR. ANDERSON:  That's all the questions -- well, wait
 4   a second.  Let me just double-check.
 5   Q.   And just to confirm, those figures you gave are combined
 6   for both the publishing side, Flames, and the recording side,
 7   Super Hype?
 8          MR. MALOFIY:  Objection.
 9          THE COURT:  Overruled.
10          THE WITNESS:  That is correct.  All income.
11          MR. ANDERSON:  Thank you very much, Mr. Gardner.
12          THE COURT:  Okay.  Cross-examination.
13          MR. MALOFIY:  Yes.
14                      CROSS-EXAMINATION
15   BY MR. MALOFIY:
16   Q.   Sir, you indicated that you are the equivalent of a CPA in
17   the UK, correct?
18   A.   Correct.
19   Q.   Did you have any involvement in the 2008 agreement, the
20   publishing agreement?
21          MR. ANDERSON:  Objection.
22          THE WITNESS:  Negotiating that agreements?
23   BY MR. MALOFIY:
24   Q.   Any involvement in the negotiation of that agreement?
25   A.   No.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01165**

1  Q.   Did you have any involvement in considering what songs

2  were being paid for?

3         MR. ANDERSON:  Objection, relevance.

4         THE COURT:  Overruled.

5         THE WITNESS:  In connection with the negotiation of

6  the 2008 agreements?

7  BY MR. MALOFIY:

8  Q.   Correct.

9  A.   No.

10 Q.   Are you a Led Zeppelin fan?

11        MR. ANDERSON:  Objection, Your Honor, relevance.

12        THE COURT:  Overruled.

13        THE WITNESS:  I'm familiar with their work, but I

14 wouldn't call myself an avid fan.

15 BY MR. MALOFIY:

16 Q.   Would you agree that "Stairway to Heaven" is one of their

17 most important songs in their catalog?

18        MR. ANDERSON:  Objection, Your Honor, out- --

19        THE COURT:  Sustained.

20 BY MR. MALOFIY:

21 Q.   Sir, would you agree that the publishing agreement allows

22 for exploitation for roughly 10 years?

23        MR. ANDERSON:  Objection, vague and ambiguous.  It's

24 also the subject of the motion in limine, the 2008 --

25        THE COURT:  Sustained.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1061

```
 1        MR. ANDERSON:  Thank you.
 2   BY MR. MALOFIY:
 3   Q.   Do you agree that there is continuing exploitation based
 4   upon the 2008 publishing agreement which you testified to a
 5   moment ago?
 6        MR. ANDERSON:  Objection, Your Honor.
 7        THE COURT:  Sustained.
 8     All he testified to were the facts surrounding the
 9   documents that he had.  He didn't give expert opinions, nor can
10   he.
11   BY MR. MALOFIY:
12   Q.   Do you agree that in 2011 payments were received for
13   "Stairway to Heaven"?
14        MR. ANDERSON:  Objection, Your Honor.
15        THE COURT:  Do the documents you've been testifying to
16   show that?
17        THE WITNESS:  Income has been received since 2011 for
18   "Stairway to Heaven," yes.
19   BY MR. MALOFIY:
20   Q.   And would you agree that they were also received in 2012,
21   '13, '14 and '15?
22        MR. ANDERSON:  Objection, vague and ambiguous and --
23        THE COURT:  Overruled.
24     Testifying to the documents that you've been testifying
25   to, do they show that?
```

1062

```
 1              THE WITNESS:  They -- the income figures include an

 2      element of income for "Stairway to Heaven" based upon the

 3      testimony I gave earlier as it being one of 67 tracks that are

 4      pursuant to the monies that are being collected.

 5              THE COURT:  Okay.

 6      BY MR. MALOFIY:

 7      Q.   Are you able to prove any of these figures, or are we

 8      taking your word for the numbers that you're presenting?

 9              MR. ANDERSON:  Objection, Your Honor.

10              THE COURT:  Sustained.

11      BY MR. MALOFIY:

12      Q.   In looking at the revenues, isn't it true that the

13      publishing agreement was between Warner and Flames of Albion?

14              MR. ANDERSON:  Objection, relevance, and also

15      within -- by the publishing agreement, counsel means the 2008

16      agreement.  There is only one.

17              THE COURT:  You may testify to that.  You can ask --

18          Why don't you state the question again, Counsel.

19      BY MR. MALOFIY:

20      Q.   Isn't the publishing agreement between Warner and Flames

21      of Albion?

22      A.   They are two of the parties and -- yes.

23      Q.   And isn't it true that the agreement between Flames of

24      Albion and Mr. Plant and Mr. Page's company is not present in

25      that agreement?
```

1063

```
 1            MR. ANDERSON:  Objection, vague and ambiguous, and
 2   again is the 2008 agreement.
 3            THE COURT:  Overruled.
 4        If you know.
 5            THE WITNESS:  My recollection is that the individual
 6   songwriter's a party to that agreement as well as Flames of
 7   Albion.
 8   BY MR. MALOFIY:
 9   Q.   Isn't it true the payments which the individual publishing
10   companies of Page and Plant were received in 2011, '12, '13,
11   '14 and '15?
12            MR. ANDERSON:  Objection again.  This is the motion in
13   limine that was granted.
14            THE COURT:  Sustained.  No.  Overruled.
15        You may answer.
16            THE WITNESS:  Sorry, I don't understand the question.
17   BY MR. MALOFIY:
18   Q.   Isn't it true that Mr. Page and Mr. Plant received
19   payments in 2011, '12, '13 and '14 based on "Stairway to
20   Heaven" and the publishing that they had?
21            MR. ANDERSON:  Objection, vague and ambiguous, and
22   also it's the 2008 agreement.
23            THE COURT:  Overruled.
24            THE WITNESS:  They received -- the financial accounts
25   show that they received payments in the year ending March 2013,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01169**

```
 1   the year ending March 20- -- April 2012, and the year ending

 2   March 2015.  Not in the 2014 year end.

 3          THE COURT:  Okay.  Thank you.

 4   BY MR. MALOFIY:

 5   Q.  Isn't it true that they received payments in the year

 6   ending 2015 as well?

 7          MR. ANDERSON:  Objection.  It's also vague and

 8   ambiguous as to the nature of payments.

 9          THE COURT:  Do the documents you testified to show

10   that they received payments in 2015?

11          THE WITNESS:  They do show they received payments in

12   the 2015 accounts.

13          THE COURT:  Thank you.

14   BY MR. MALOFIY:

15   Q.  Isn't it true that these profit and loss statements which

16   you had just testified to are pass-through entities in that

17   there's no net profit at the end of the year?

18          MR. ANDERSON:  Objection, mischaracterizes the

19   testimony.

20          THE COURT:  It's calling for expert testimony.

21   Sustained.

22          MR. MALOFIY:  Court's indulgence.

23   Q.  Do you work for Joan Hudson & Company?

24          MR. ANDERSON:  Objection, vague and ambiguous.

25          THE COURT:  Overruled.
```

1065

```
1        Do you perform work for them?  Do you work for them?

2            THE WITNESS:  I'm a consultant to the firm, part-time

3    consultant to the firm.

4    BY MR. MALOFIY:

5    Q.   You're not employed by that firm, correct?

6    A.   No, I'm not.

7            THE COURT:  Do they pay you for consulting?

8            THE WITNESS:  Correct.

9            THE COURT:  Okay.

10           MR. MALOFIY:  With the Court's indulgence.

11           THE COURT:  Mm-hmm.

12   BY MR. MALOFIY:

13   Q.   You would agree that the recording contract for 15 million

14   was in 2012, correct?

15           MR. ANDERSON:  Objection, lacks foundation.

16           MR. MALOFIY:  He test- --

17           THE COURT:  Do the documents you testified to reflect

18   that one way or the other?

19           THE WITNESS:  That agreement was in 2012, yes.

20   BY MR. MALOFIY:

21   Q.   And would you agree that although they didn't receive all

22   the payments of 5 million, only 3 million, that they will

23   receive the payments, correct?

24   A.   No.  I'm -- they received 3 million.  I don't know whether

25   the balance of 2 million will be received.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01171**

1066

```
1    Q.    Understood.

2          Under the terms of the contract, they're supposed to

3    receive the additional 2 million, correct?

4                THE COURT:  If you know.

5                THE WITNESS:  There was an amendment afterwards which

6    left open whether the further 2 million would be received or

7    not.

8    BY MR. MALOFIY:

9    Q.    Didn't it reduce it just to 4 million?

10   A.    Reduced it from 5 million to 3 million, as I recall.

11   Q.    Not to 4 million?

12   A.    Five million to 3 million.  That's what I recall.

13   Q.    Isn't it true that the 10 million dollars for the 2007

14   concert was -- strike that.

15         Isn't it true that the 10 million dollars for the O2

16   concert that occurred in the UK was for one of 17 songs?

17               MR. ANDERSON:  Objection, lacks --

18   BY MR. MALOFIY:

19   Q.    Excuse me.  "Stairway to Heaven" was one of 17 songs?

20               MR. ANDERSON:  Objection, vague and ambiguous, lacks

21   foundation.

22               THE COURT:  Overruled.

23               THE WITNESS:  "Stairway" was one of the 17 songs on

24   the release of that -- the album release.

25
```

1067

```
 1   BY MR. MALOFIY:

 2   Q.   Isn't it true that all 10 million dollars has been

 3   received by Mr. Page and Mr. Plant?

 4           MR. ANDERSON:  Objection.

 5           THE COURT:  Sustained.

 6   BY MR. MALOFIY:

 7   Q.   Isn't it true pursuant to the Rhino Atlantic deal which

 8   you testified to, the 10 million dollars was received either

 9   through -- by Plant and Mr. Page or their pass-through entity?

10           MR. ANDERSON:  Objection, argumentative, lacks

11   foundation, calls for spec- --

12           THE COURT:  Overruled.

13      Well, the question is, again, do the documents that you

14   have been testifying to reflect that?  We don't want you to go

15   outside those documents.  If they do.

16           THE WITNESS:  The income from that project was not

17   just solely to Mr. Page and Mr. Plant.  It was also to

18   Mr. Baldwin, or to Mr. Jones, and the estate of John Bonham.

19           THE COURT:  Okay.  About a minute left, Counsel.

20           MR. MALOFIY:  No further questions, Your Honor.

21           THE COURT:  Okay.  Anything further?

22           MR. ANDERSON:  Briefly, Your Honor.

23           THE COURT:  Briefly, within the cross-examination.

24           MR. ANDERSON:  Absolutely, Your Honor.

25   ///
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1068

|   |   |
|---|---|
| 1 | **REDIRECT EXAMINATION** |
| 2 | BY MR. ANDERSON: |
| 3 | Q.   Mr. Gardner, I may have misheard, but I believe you |
| 4 | referred to income relating to -- that "Stairway to Heaven" was |
| 5 | one of 67 tracks.  Did you -- is that correct? |
| 6 | MR. MALOFIY:  Objection, misstates prior testimony. |
| 7 | THE COURT:  I think it does misstate.  Why don't you |
| 8 | rephrase the question. |
| 9 | MR. ANDERSON:  Okay.  Maybe I misheard. |
| 10 | Q.   How many recordings are in the Led Zeppelin catalog? |
| 11 | A.   It's -- there are nine albums, and I don't have the exact |
| 12 | number of recordings, but it is probably a similar number to |
| 13 | the compositions, which is 87. |
| 14 | Q.   Okay.  Thank you. |
| 15 | And the numbers, the payments that plaintiff's counsel was |
| 16 | asking you about, those included payments for the whole catalog |
| 17 | of -- that includes at least 87 works? |
| 18 | A.   The 3 million dollars does, yes. |
| 19 | Q.   And the payments that he was talking about or asking about |
| 20 | include other writers and other recordings? |
| 21 | A.   Yes. |
| 22 | Q.   Thank you. |
| 23 | And how many days a week are you physically present at |
| 24 | Joan Hudson & Company in London, England? |
| 25 | A.   Two days a week. |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01174**

```
 1            MR. ANDERSON:  Thank you, Your Honor.  Those are all
 2   the questions I have.
 3            THE COURT:  Okay.  You may step down.  Thank you very
 4   much for coming in.  You can be excused.
 5         Counsel, do you want to call your next witness?
 6            MR. ANDERSON:  Yes.  We call David Woirhaye.
 7            THE CLERK:  Good morning.  Right here to be sworn,
 8   please.  Please raise your right hand.
 9         Do you solemnly swear the testimony that you are about to
10   give in the matter now before the Court shall be the truth, the
11   whole truth, and nothing but the truth, so help you God?
12            THE WITNESS:  I do.
13            THE CLERK:  Thank you.  You may be seated.
14         May I please ask that you state your full name for the
15   record and spell your last name.
16            THE WITNESS:  Yes.  My first name is David.  My last
17   name is Woirhaye.  Last name is spelled W-o-i-r-h-a-y-e.
18            THE COURT:  Thank you.
19         You may inquire, Counsel.
20            MR. ANDERSON:  Thank you, Your Honor.
21         DAVID WOIRHAYE, CALLED AS A WITNESS BY THE DEFENDANTS,
22                          DIRECT EXAMINATION
23   BY MR. ANDERSON:
24   Q.   Mr. Woirhaye, what do you do for a living?
25   A.   I'm the CFO of Rhino Entertainment.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01175**

1070

1   Q.   And what is Rhino Entertainment?

2   A.   Rhino Entertainment is a record company.

3   Q.   Could you give us some examples of the recording artists

4   that Rhino works with.

5   A.   Yes.  Rhino works with the Eagles, Frank Sinatra, Grateful

6   Dead, The Doors, Led Zeppelin, legacy artists like that.

7   Q.   Did you go to college?

8   A.   Yes.

9   Q.   Where?

10  A.   University of Kansas.

11  Q.   And did you graduate?

12  A.   Yes, I did.

13  Q.   And what degree?

14  A.   I graduated with a degree in economics and business

15  administration.

16  Q.   When did you first start working at Rhino Entertainment?

17  A.   I first started working at Rhino Entertainment in the year

18  2006.

19  Q.   What was your initial position there?

20  A.   My initial position was a financial analyst.

21  Q.   And what did you do as a financial analyst at Rhino

22  Entertainment?

23  A.   I was responsible for sales reports, monthly, weekly,

24  daily sales reports, which was integral working with the sales

25  teams to make sure that they achieve their sales targets and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1071

```
1    objectives.
2    Q.   Did you work your way up from a financial analyst at
3    Rhino?
4    A.   Yes, I did.
5    Q.   And if you can just briefly tell us what positions you
6    went through and --
7    A.   Yes.  As I stated, I was a financial analyst, and then I
8    worked myself up into manager roles, in a director role, and
9    then senior director role, now CFO.
10   Q.   And was there a period of time that you weren't employed
11   at Rhino?
12   A.   Yes.  There was a two-year period, two-and-a-half-year
13   period I was not employed at Rhino.
14   Q.   And I take it you came back?
15   A.   Yes, I did.
16   Q.   And when was that?
17   A.   I came back in September 2015.
18   Q.   Have you been the CFO or -- and CFO, I take it, is chief
19   financial officer?
20   A.   Yes, that's correct.
21   Q.   And have you been the chief financial officer of Rhino
22   Entertainment since that time?
23   A.   That is correct.
24            THE COURT:  Ladies and gentlemen, it's 10:00 o'clock,
25   so we're going to be taking our 10:00 o'clock break at this
```

1072

```
1    time.
2         Remember the admonishment not to discuss the case among
3    yourselves or with anybody else or form or express any opinions
4    about the matter until it's submitted to you and you retire to
5    the jury room.  With that admonishment, we'll see you back in
6    in 15 minutes.  We'll take it up at that time.
7         We'll be in recess.
8              THE CLERK:  All rise.
9         Court is in recess.
10        (Recess held from 10:01 a.m. to 10:17 a.m.)
11        (In the presence of the jury:)
12             THE COURT:  Okay.  The record will reflect that all
13   the members of the jury are in their respective seats in the
14   jury box; witness is on the witness stand.
15        You may continue, Counsel.
16             MR. ANDERSON:  Thank you, Your Honor.
17   Q.   Sir, what are your duties and responsibilities as chief
18   financial officer of Rhino Entertainment?
19   A.   I'm responsible for all financial aspects of the company.
20   Q.   Have you heard the phrase "GAAP," G-A-A-P?
21   A.   Yes, I have.
22   Q.   What does that mean?
23   A.   Generally accepted accounting principles.
24   Q.   And do you apply generally accepted accounting principles
25   in your work at Rhino?
```

1073

```
 1    A.    Yes, we do.

 2    Q.    Were you asked to prepare a "Stairway to Heaven" profit

 3    and loss statement for Rhino and Atlantic Recording

 4    Corporation?

 5    A.    Yes, I was.

 6    Q.    And did you prepare that statement?

 7    A.    I prepared it, and I had help with an analyst as well.

 8    Q.    Thank you.

 9          If we can please call up Exhibit -- Plaintiff's Exhibit

10    1XX.  1XX.

11          (Mr. Anderson and tech conferred privately.)

12          (Exhibit was displayed on the screen.)

13              THE COURT:  Okay.

14    BY MR. ANDERSON:

15    Q.    Do you recognize -- I'm sorry, let me -- have you seen

16    Exhibit 1XX before?

17    A.    Yes, I have.

18    Q.    This is an exhibit that plaintiff used in the questioning

19    of Dr. Einhorn, and my first question to you is, do you see the

20    column over the bold number 3,042,498 dollars?

21    A.    Yes, I do.

22    Q.    Dr. Einhorn testified that these numbers come from Rhino

23    and Atlantic's profit and loss statement.

24          Do you recognize these numbers as coming from the profit

25    and loss statement that you prepared?
```

```
1   A.   Yes, I recognize some of those numbers, correct.

2   Q.   Are there errors in Dr. Einhorn's exhibit?

3   A.   Yes, I see a couple of errors.

4        MR. MALOFIY:  Objection.

5   BY MR. ANDERSON:

6   Q.   What are the errors --

7        THE COURT:  Excuse me, Counsel.

8        Is there an objection?

9        MR. MALOFIY:  He's not an expert.

10       THE COURT:  Is he designated?

11       MR. MALOFIY:  No.

12       MR. ANDERSON:  He hasn't been designated as an expert,

13  but the testimony is that these numbers come from his profit

14  and loss statement, and I'm asking if those numbers were

15  correctly stated.

16       THE COURT:  He can testify, but not as to whether or

17  not somebody made an error or not.  That's for the jury to

18  determine.  So he can testify to the documents themselves.

19       MR. ANDERSON:  Right, I understand, Your Honor.

20       MR. MALOFIY:  Thank you.

21  BY MR. ANDERSON:

22  Q.   Do you see -- are there any instances in that column I've

23  identified where Dr. Einhorn has misstated the numbers that are

24  in your profit and loss statement?

25  A.   Yes.  If you look at -- under physical albums in that
```

1   column where there is a number 11635, there is two commas

2   there, which doesn't represent a number that I provided.  It's

3   not a number that I'm even aware of that would be a right

4   number, because it has two commas in it.

5   Q.    And any other errors in that column?

6   A.    Yes.  Under digital singles download, there is a number

7   1109365, which is not the number that I've prepared or we've

8   prepared under the Rhino Entertainment profit and loss

9   statement.

10  Q.    If you could, if you could just put a dot next to the two

11  numbers --

12  A.    Yes.

13  Q.    -- so we're sure to follow it.

14        And are you telling me that Dr. Einhorn basically dropped

15  a digit off those numbers?

16  A.    It looks like there was a digit dropped, correct.

17  Q.    Okay.  And is the figure of 3,042,498 the total revenues

18  that Rhino and Atlantic received from May 11 -- actually, let

19  me restate that.

20        Is 3,042,498 the total revenues that Atlantic and Rhino

21  received for exploitation of "Stairway to Heaven" from May

22  31st, 2011, to the most recent accounting period?

23              MR. MALOFIY:  Objection, calls for expert opinion.

24              THE COURT:  Overruled.

25              THE WITNESS:  That is correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1076

1  BY MR. ANDERSON:

2  Q.   Okay.  And you arrived at that number by personally

3  reviewing the books and records of Rhino and Atlantic?

4  A.   That is correct.

5  Q.   Are you aware of any reason or justification for

6  multiplying that number times eight?

7          MR. MALOFIY:  Objection, expert testimony.

8          THE COURT:  Sustained.

9  BY MR. ANDERSON:

10  Q.   Is it consistent with the books and records of, that

11  you're aware of, of Rhino Entertainment to state that the total

12  revenues for "Stairway to Heaven" in that time period are

13  13,535,834 dollars?

14          MR. MALOFIY:  Objection, calls for expert testimony.

15          THE COURT:  Overruled.

16          THE WITNESS:  That is not the amount that would be

17  stated in our books and records.

18  BY MR. ANDERSON:

19  Q.   All right.  And if we look specifically, just quickly, at

20  the numbers to the right of the -- two of the ones that you

21  indicated with the little dots, that have now been removed, you

22  see the -- Dr. Einhorn attributes revenues to "Stairway to

23  Heaven" of 8.9 million for physical albums.  Do you see that?

24  A.   Yes, I do.

25  Q.   Is that correct?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A.    That calculation would not be correct, given the number

 2   here (indicating).  That number is 100,635.  Multiplied by

 3   eight would be 893,000, not 8.9 million.

 4           MR. ANDERSON:  Aside from this --

 5           MR. MALOFIY:  Object.

 6           THE COURT:  That's not expert testimony, Counsel.

 7   Overruled.

 8   BY MR. ANDERSON:

 9   Q.    Aside from his math being incorrect, is it consistent with

10   the books and records of Rhino and Atlantic to assert that they

11   received in this time period 8.9 million in revenue from --

12   attributable to "Stairway to Heaven"?

13           MR. MALOFIY:  Objection.  The books and records speak

14   for themselves.

15           THE COURT:  And you lost me on the question.  Why

16   don't you restate the question, Counsel.

17           MR. ANDERSON:  Sure.  Sure.

18   Q.    Dr. Einhorn attributes to "Stairway to Heaven" 8.9 million

19   dollars for the physical album sales.  Is that consistent with

20   the books and records of Rhino Entertainment --

21           MR. MALOFIY:  Objection.

22   BY MR. ANDERSON:

23   Q.    -- and Atlantic?

24           MR. MALOFIY:  Objection.  They speak for themselves.

25   Best evidence.
```

1078

```
1           THE COURT:  Overruled.

2           THE WITNESS:  No.  That is not the number that's in

3    the books and records at Rhino Entertainment.

4    BY MR. ANDERSON:

5    Q.   And what is the number that's in the books -- well,

6    actually, you know what, I'll get to that in a second, once I

7    have your profit and loss statement.

8           And then just the same question as to digital albums.  Is

9    the assertion by Dr. Einhorn of 3 million and change for -- in

10   revenues in this time period for digital albums, is that

11   consistent with the books and records of your company?

12   A.   No, that is not.

13   Q.   Okay.  If we could please call up Exhibit 2412.  And this

14   is a two-page document.

15          (Exhibit was displayed on the screen.)

16   BY MR. ANDERSON:

17   Q.   If you could just take a look at the first and then the

18   second page, and then my question is going to be if this is the

19   profit and loss statement that you testified you prepared.

20          If we could go to the second page, please.  Is that the

21   profit and loss statement that you prepared?

22   A.   That is correct.  This is the profit and loss statement

23   that we prepared, correct.

24   Q.   And if we're looking at the second page, what are the

25   total revenues that Rhino and Atlantic received from the
```

1079

```
 1   exploitation of "Stairway to Heaven" from May 31st, 2011, to
 2   the most recent accounting period?
 3   A.   The total revenues is represented here at 3,042,498.  U.S.
 4   dollars.
 5   Q.   Okay.  Thank you.
 6        And we've been talking about revenues, so let's talk about
 7   costs.  Were there costs associated with the generation of
 8   those revenues?
 9   A.   Yes, absolutely.
10   Q.   And does your profit and loss statement set forth the
11   costs that were associated with the generation of revenues with
12   respect to "Stairway to Heaven"?
13   A.   Yes, it does.
14   Q.   And if we could just go through them very quickly.  What
15   are -- is artist royalties a cost that was deducted?
16   A.   Yes, it was.
17   Q.   And what are artist royalties?
18   A.   Artist royalties are royalties owed to an artist, paid to
19   the royalty account for the sale of a download, a physical
20   album, and a single track download.
21   Q.   And publishing royalties, what are those?
22   A.   Publishing royalties are copyright royalties owed for the
23   musical composition and the use, and that is derived from sales
24   of physical albums, CDs, LPs and digital albums and single
25   track downloads as well.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   And I take it that you also deducted union royalties,

2    manufacturing, distribution and marketing costs?

3         MR. MALOFIY:  Objection.  Have the witness testify,

4    not Mr. Anderson.

5         THE COURT:  I'm sorry, I didn't -- I couldn't hear the

6    objection, Counsel.

7         MR. MALOFIY:  I would ask that the witness testify,

8    not Mr. Anderson.

9         THE COURT:  Sustained.

10        He's objecting to the questions being leading, so why

11   don't you rephrase the questions.

12        MR. ANDERSON:   Absolutely.

13   Q.   What other costs have you -- were deducted in the

14   preparation of the profit and loss statement for Atlantic and

15   Rhino?

16   A.   Yes.  Other costs that were deducted was manufacturing

17   costs, which is where I put my dot, distribution costs,

18   marketing, and overhead costs.

19   Q.   And how did you calculate -- or how were overhead costs

20   calculated?

21   A.   Overhead costs were calculated by looking at departments

22   that directly had an impact on the sale of "Stairway to

23   Heaven."  There is two kinds of costs.  You have a direct cost,

24   which would be direct labor, direct material, and then you have

25   overhead cost, where those are sometimes considered indirect

```
 1    costs, but those indirect costs do have a direct impact on the

 2    sale itself.  So we went through departments that had direct

 3    impacts on the sale of "Stairway to Heaven," included those

 4    departments, and we took the revenue from "Stairway to Heaven"

 5    and divided that into the total revenue of the company,

 6    multiplied that by the overhead costs per department, and that

 7    roughly came to 5 percent, and we applied the 5 percent to the

 8    revenue here.

 9    Q.   And what are the total revenues received by Rhino and

10    Atlantic from the exploitation of -- I'm sorry.  Strike that.

11         What are the total profits -- once we've deducted these

12    costs, what are the total profits received by Atlantic and

13    Rhino from the exploitation of "Stairway to Heaven" from May

14    31st, 2011, to the most recent accounting period?

15    A.   Yes.  The net profits derived is 868,000 dollars, which

16    I've put a dot next to.

17    Q.   Okay.  Now, let's talk just briefly about the revenues

18    attributable to the sale of an album that has "Stairway to

19    Heaven" and other recordings.

20         How did you include in your profit and loss statement the

21    revenues from the sale of albums to the revenues from

22    "Stairway to Heaven"?

23              MR. MALOFIY:  Objection, calls for expert testimony.

24    It's apportionment.

25              THE COURT:  Overruled.
```

1    THE WITNESS:  The way that we derived revenue for

2  "Stairway to Heaven" from album sales was looking at the

3  physical album, which you have CDs and LPs, looking at the

4  total revenue of each album generated, for physical and digital

5  albums as well.  We looked at the records or the albums that

6  had "Stairway to Heaven" on it, and we divided the number -- we

7  divided the revenue by the number of tracks.  So, for example,

8  *Led Zeppelin IV* has eight tracks; we divided one into eight.

9  BY MR. ANDERSON:

10  Q.   And do you believe that that allocation -- or, I'm sorry.

11  Do you believe that that attribution of album revenues of

12  "Stairway to Heaven" is a reasonable attribution?

13    MR. MALOFIY:  Object.  Objection, calls for expert

14  testimony.

15    THE COURT:  Sustained.

16  BY MR. ANDERSON:

17  Q.   Why did you use a per-track attribution?

18    MR. MALOFIY:  Same objection, Your Honor.

19    THE COURT:  Overruled.

20    THE WITNESS:  Given the consumers can buy single track

21  downloads on iTunes, given consumers can stream records on

22  Spotify, the consumer can access "Stairway to Heaven" whenever

23  they need and desire to.  The album sales themselves have seven

24  other tracks.  They have artwork that's picked out by the band

25  themselves, by artists that they are familiar with.  The album

```
 1   is a piece of art, and it's a full record that includes seven

 2   other tracks.  So to apportion anything other than one-eighth

 3   doesn't seem logical to me.

 4   BY MR. ANDERSON:

 5   Q.   Do albums -- do your records reflect that albums by

 6   Led Zeppelin that do not have "Stairway to Heaven" have

 7   comparable or higher or lower sales than the albums on which

 8   "Stairway to Heaven" appears?

 9            MR. MALOFIY:  Objection, vague and ambiguous.

10            THE COURT:  Sustained.

11   BY MR. ANDERSON:

12   Q.   Did you compare the album sales -- I'm sorry, the sales of

13   albums that have -- let me start again.

14        Do your records reflect the sales of albums by

15   Led Zeppelin with "Stairway to Heaven" and the sales of albums

16   by Led Zeppelin without "Stairway to Heaven"?

17   A.   In our books and records, yes, we have records that have

18   "Stairway to Heaven" revenue in it, and we have albums that

19   don't.  Yes, correct.

20   Q.   And are the sales comparable?

21   A.   Yes.

22            MR. ANDERSON:  Okay.  Thank you.  Those are all the

23   questions I have.

24            THE COURT:  Okay.  Cross-examination.

25            MR. MALOFIY:  Yes.
```

1084

```
1        THE CLERK:  Counsel, I'm sorry.  That last exhibit was
2   just for demonstrative?
3        MR. ANDERSON:  Oh, you know, I apologize.
4      I would move to admit that.  The last exhibit is marked on
5   the -- is marked as 2412.
6        THE COURT:  Okay.  Be received.
7        MR. ANDERSON:  And I'd move to admit it.
8      Thank you.
9      (Received in evidence, Trial Exhibit 2412.)
10                      CROSS-EXAMINATION
11  BY MR. MALOFIY:
12  Q.  You weren't with the company from 2013 March to September
13  2015, correct?
14  A.  That is correct.
15  Q.  So you weren't with the company when many of these
16  revenues were being accounted for with the company, correct?
17  A.  Correct.
18  Q.  Okay.  Now, the profit and loss statement which you
19  prepared in this case was for no other purpose but for
20  litigation, correct?
21  A.  The profit and loss statement that we prepared was for --
22  as the Court requested, yes.
23  Q.  Well, it was for purposes of litigation, correct?
24  A.  Correct.
25  Q.  Okay.  And it was requested by your counsel, correct?  Not
```

1085

```
1    by the Court.

2              MR. ANDERSON:  Objection, lacks foundation.

3              THE COURT:  Doesn't make any difference.

4         Sustained.

5    BY MR. MALOFIY:

6    Q.   Now, it wasn't audited by an independent auditor, was it?

7              MR. ANDERSON:  Objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  The financial -- or profit and loss

10   statement that we provided was not audited by financial

11   statement.  Our books and records at Rhino Entertainment are.

12   BY MR. MALOFIY:

13   Q.   But the financial statement, the P & L, which we presented

14   here, your counsel did, was not audited, correct, sir?

15   A.   Correct.

16   Q.   Did you review the underlying source material, or did the

17   analyst, Matt Dolan?

18   A.   The analyst was Marty Dolan, and he reviewed the

19   underlying detail to pull -- to pull the revenue and the cost.

20   I reviewed the data after he presented it.

21   Q.   So you didn't review the initial underlying data, it was

22   another person, correct?

23              MR. ANDERSON:  Objection, vague and ambiguous and

24   relevance.

25              THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1086

```
 1          THE WITNESS:  I looked -- I looked at certain aspects
 2    of the data, but there's -- certain parts of the data doesn't
 3    require me to get into the details that he needs to pull
 4    information.
 5    BY MR. MALOFIY:
 6    Q.   When Mr. Dolan presented you with certain numbers, you
 7    accepted them as he presented them to you, correct?
 8    A.   No.  No.  No, that's not correct.  When -- part of my role
 9    as a CFO is to ensure that we have, you know, fiscal
10    responsibility, so I do the due diligence and ensure that there
11    is precision in numbers.
12    Q.   Who audited your numbers?
13          MR. ANDERSON:  Objection, vague and ambiguous.
14          THE COURT:  Sustained.
15    BY MR. MALOFIY:
16    Q.   Did anyone review your numbers?
17          MR. ANDERSON:  Objection, vague and ambiguous.
18          THE COURT:  Overruled.
19       Well, as to -- why don't you clarify what you mean by his
20    numbers.
21    BY MR. MALOFIY:
22    Q.   Well, the numbers that you presented or that are presented
23    in the P & L in this case, did anyone review them other than
24    yourself, or are you the top of the ladder?
25    A.   I'm the top of the ladder.  But again, as I stated, our
```

1  financials at Rhino Entertainment are audited.

2  Q.   Your financials are audited, but the P & Ls presented in

3  this case were not, correct, sir?

4  A.   Right.

5          MR. ANDERSON:  Objection, asked and answered.

6  BY MR. MALOFIY:

7  Q.   The first time you saw the initial P & L presented in this

8  case, Exhibit 4419, was in November 2015; isn't that correct?

9          MR. ANDERSON:  Objection, vague and ambiguous, lacks

10 foundation.

11         THE COURT:  Overruled.

12         THE WITNESS:  I don't recall the first -- the first

13 time I looked at it.  Somewhere between October and November,

14 correct.

15 BY MR. MALOFIY:

16 Q.   Okay.  Now, you have no idea of the proration technique

17 used in coming to the P & L in this case, correct?

18         MR. ANDERSON:  Objection, vague and ambiguous.

19         THE COURT:  Overruled.

20      You understand the question?

21         THE WITNESS:  I'm sorry, could you restate that?

22 BY MR. MALOFIY:

23 Q.   Do you recall your deposition that occurred?  I believe my

24 co-counsel had deposed you in his office in Sherman Oaks?

25 A.   Yes, I do.

1088

```
1    Q.   And that was here in California; is that correct?

2    A.   That is correct.

3    Q.   Do you recall saying that you have no idea of the

4    proration technique for anything, and you assumed one-eighth?

5    A.   I -- I don't recall that.  If -- if that was stated, then,

6    you know, I know more information now, and I further understand

7    the prorations.

8    Q.   And you're not an expert, correct?

9              MR. ANDERSON:  Objection, vague and ambiguous.

10             THE COURT:  Sustained.

11        He's not qual- -- he's not testifying as an expert.

12   BY MR. MALOFIY:

13   Q.   When you say you used a one-eighth proration, or

14   one-eighth, was that based solely on a simple division, as you

15   testified, of the number of tracks on the album compared to

16   "Stairway to Heaven"?

17   A.   No.  That's not -- not correct.  We use a lot of thought,

18   and looking at the number of tracks that were on an album, but

19   we also looked at the fact that the consumer can purchase

20   "Stairway to Heaven" as a track download and stream it whenever

21   they wish and desire to.  So, again, to look at the album

22   itself and attribute anything more than the proration of the

23   tracks on the album doesn't seem logical to me.

24   Q.   Let me ask you this.  You did the proration at one divided

25   by eight, correct?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1089

```
1    A.    For Led Zeppelin IV, correct.

2    Q.    And you would agree that Led Zeppelin IV is a commingled

3    album?  In other words, it has more than one track on it,

4    correct?  Has eight tracks.

5    A.    That is correct.

6    Q.    As you sit here today, can you name the albums that has

7    "Stairway to Heaven" on them?

8    A.    Umm, yes, I can -- I can name a few of them.

9    Q.    All of them?

10   A.    I can name most of them, correct.

11   Q.    Okay.  Let's go.  Can you name them?

12   A.    Yes.  Led Zeppelin IV.  Mothership.  Celebration Day.  How

13   the West Was Won.  Song Remains the Same.  And a -- I guess

14   Led -- it's considered a complete album box or a deluxe edition

15   box set.

16   Q.    And on Led Zeppelin IV, "Stairway to Heaven" was

17   commingled with that, correct?

18         MR. ANDERSON:  Objection, vague and ambiguous.

19   BY MR. MALOFIY:

20   Q.    It was one of many albums -- excuse me, one of many songs

21   on that album.

22   A.    On Led Zeppelin IV?

23   Q.    Yes.  You just testified to it.  I don't think it's a

24   trick -- it's not a trick question.

25   A.    Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01195**

```
 1    Q.   Okay.  Mothership was also one of the other albums that
 2    were on that album.  One of other songs that were on that
 3    album, excuse me.
 4    A.   Yes, correct.
 5    Q.   And I believe you said How the West Was Won, that was also
 6    one song of many songs on that album, correct?
 7    A.   Correct.
 8    Q.   And you had mentioned -- did you say Swan Song?  Did I
 9    catch that one correctly?
10    A.   No.
11    Q.   What was it?
12    A.   Song Remains the Same.
13    Q.   I'm sorry.  Song Remains the Same?
14    A.   Mm-hmm.
15    Q.   That was one of many songs, correct?
16    A.   Yes, correct.
17    Q.   And Celebration, I think you mentioned that one as well,
18    correct?
19    A.   Yes.
20    Q.   And that was also on that album, but it was one song of
21    other songs, correct?
22    A.   Yes.
23    Q.   Okay.  Would you agree that these were commingled?  In
24    other words, "Stairway to Heaven" was one song of many songs on
25    those albums?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01196**

1091

```
1           MR. ANDERSON:  Objection, vague and ambiguous.

2           THE COURT:  Overruled.

3           THE WITNESS:  There was -- "Stairway to Heaven" was

4    present on all those records, correct.

5    BY MR. MALOFIY:

6    Q.   Okay.  Now, in looking at those numbers, did you just do a

7    division based upon the tracks that were on it?

8           MR. ANDERSON:  Objection, vague and ambiguous.

9           THE COURT:  Overruled.

10          THE WITNESS:  We took the revenue that is associated

11   with each one of those albums, and we prorated it by how many

12   tracks were on those records.

13   BY MR. MALOFIY:

14   Q.   Okay.  And coming -- let me go to your exhibit, which I

15   believe was -- we had it --

16       Excuse me.  Defense counsel?

17          MR. ANDERSON:  2412.

18          MR. MALOFIY:  Could I see that, or -- do you mind?

19          MR. ANDERSON:  It has some writing on it.

20          MR. MALOFIY:  Oh, I like your writing.

21          MR. ANDERSON:  It has some writing on it.

22          MR. MALOFIY:  Okay.  Do you have one for me?  I think

23   we have it pulled up.  Could we pull this up for Mr. --

24       Woirhaye?  Did I pronounce that correctly?

25          THE WITNESS:  Woirhaye, that's correct.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01197**

1092

```
 1          THE COURT:  You have about 2 minutes left on it.
 2          MR. ANDERSON:  Here you go, Counsel.
 3          MR. MALOFIY:  I have it.
 4   Q.   If we go to the costs here, you have manufacturing costs,
 5   209,000; is that correct?
 6   A.   That is correct.
 7   Q.   And you have -- and is that paid to an affiliate of
 8   Warner?
 9   A.   No, it's not.
10   Q.   Or Rhino?
11   A.   No, it's not.
12   Q.   And you have distribution costs of 134; is that correct?
13   A.   That is correct.
14   Q.   And you have marketing costs of 224,000; is that correct?
15   A.   222,000, correct.
16   Q.   I'm sorry.  And you have overhead costs of 150,000; is
17   that correct?
18   A.   Correct.
19   Q.   And you would agree that the marketing, overhead and
20   distribution costs are percentages, correct?
21   A.   No.  The marketing cost is -- is the actual cost incurred
22   from the -- in the -- from Rhino Entertainment for direct sales
23   related to the "Stairway to Heaven."
24   Q.   Now, how confident are you with those costs?
25   A.   Very confident.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.    Okay.   To blow up --

2         I have one more question, Your Honor.

3              THE COURT:  Okay.

4    BY MR. MALOFIY:

5    Q.    If you were to times the numbers by eight, that would give

6    you the total revenue for that album, correct?

7              MR. ANDERSON:  Objection, lacks foundation,

8    irrelevant.

9              THE COURT:  Overruled.

10             THE WITNESS:  You would have to go with more precision

11   than one over eight.  You have to go record by record in terms

12   of the tracks.

13             THE COURT:  Okay.

14        Counsel?

15             MR. ANDERSON:  Thank you, Your Honor.

16             THE COURT:  Redirect.

17                    **REDIRECT EXAMINATION**

18   BY MR. ANDERSON:

19   Q.    Counsel asked you whether this specific profit and loss

20   statement was prepared for this case.

21        In your business and in the course of your duties and

22   responsibilities as the chief financial officer of Rhino, do

23   you routinely prepare profit and loss statements?

24   A.    Yes, we do.

25   Q.    And was this profit and loss statement prepared in

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1094

```
1   accordance with those procedures and practices that you use

2   generally for the preparation of profit and loss statements?

3   A.   Absolutely.

4   Q.   And do I understand correctly that the figures that are

5   used in the profit and loss statement are all audited numbers?

6            MR. MALOFIY:  Objection, mischaracterizes his

7   testimony.

8            THE COURT:  Well, he's already testified that the

9   profit and loss statements are audited, but not this one.

10           MR. ANDERSON:   Right.

11  Q.   But the numbers come from audited financial statements,

12  correct?

13           MR. MALOFIY:  Ob- --

14           THE COURT:  Overruled.

15           THE WITNESS:  That is correct.

16  BY MR. ANDERSON:

17  Q.   And what does it mean to say that these are -- the numbers

18  come from audited financial statements?

19           MR. MALOFIY:  Objection.

20           THE COURT:  Sustained.  Calling for expert testimony.

21  BY MR. ANDERSON:

22  Q.   In the course of your business, do you deal with outside

23  auditors?

24  A.   Yes, we do.

25  Q.   As chief financial officer of Rhino, are you the point
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1095

```
 1   person for dealing with chief -- with outside auditors?
 2   A.   Yes, I am.
 3   Q.   Who are the outside auditors for Rhino Entertainment?
 4   A.   We have KPMG.
 5   Q.   And did KPMG audit the books and records from which you
 6   obtained the numbers that you used for the profit and loss
 7   statement?
 8        MR. MALOFIY:  Objection, Your Honor.
 9        THE COURT:  Overruled.
10        THE WITNESS:  We had Ernst & Young during part of this
11   period, and KPMG did the rest of it, yes.
12   BY MR. ANDERSON:
13   Q.   And counsel asked about other records, or other albums,
14   excuse me, that had "Stairway to Heaven" on it.  Were you
15   careful to apply the appropriate percentage or fraction to
16   determine "Stairway to Heaven" revenues in each case?
17        MR. MALOFIY:  Objection, Your Honor.
18        THE COURT:  Overruled.
19        THE WITNESS:  Yes.  I ensured that there's precision
20   in what we did, correct.
21   BY MR. ANDERSON:
22   Q.   And counsel referred to commingled albums or records.  Is
23   it your understanding that "Stairway to Heaven" is a separate
24   recording that is not commingled with others?
25   A.   Correct.  It can be purchased as a standalone single on
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01201**

```
 1   iTunes.

 2   Q.   And how confident --

 3            THE COURT:  Counsel, for the record, so the jury

 4   doesn't get confused, he's corrected commingled to say that it

 5   was on an album with other songs, and that's what he meant by

 6   "commingled" on his questions.

 7            MR. ANDERSON:  Thank you, Your Honor.

 8            THE COURT:  Next question.

 9   BY MR. ANDERSON:

10   Q.   How confident are you, sir, with the profit and loss

11   statement that you prepared?

12   A.   I'm very confident.

13            MR. ANDERSON:  Thank you.  That's all the questions I

14   have of this witness.

15            THE COURT:  You may step down.  Thank you very much

16   for coming in.

17       Next witness.

18            MR. MALOFIY:  Thank you, Your Honor.

19       Defendants call Jeremy Blietz.

20            THE CLERK:  Good morning.  Right here to be sworn,

21   please.  Please raise your right hand.

22       Do you solemnly swear the testimony that you are about to

23   give in the matter now before the Court shall be the truth, the

24   whole truth, and nothing but the truth, so help you God?

25            THE WITNESS:  I do.
```

```
 1            THE CLERK:  Thank you.  You may be seated.

 2        May I please ask that you state your full name for the

 3    record and spell your last name.

 4            THE WITNESS:  Sure.  Jeremy Blietz.  Last name is

 5    spelled B-l-i-e-t-z.

 6            THE CLERK:  Thank you.

 7        JEREMY BLIETZ, CALLED AS A WITNESS BY THE DEFENDANTS,

 8                      DIRECT EXAMINATION

 9    BY MR. ANDERSON:

10    Q.   Mr. Blietz, where do you work?

11    A.   I work at Warner/Chappell Music.

12    Q.   And what is your title there?

13    A.   I'm the vice president of administration.

14    Q.   What are your duties and responsibilities as

15    vice president of administration at Warner/Chappell?

16    A.   I oversee the copyright and royalties departments in the

17    United States.

18    Q.   And how long have you been at Warner/Chappell?

19    A.   Twenty-two years.

20    Q.   What is Warner/Chappell Music?

21    A.   Warner/Chappell is a music publisher that represents

22    songwriters and helps to protect their copyrights.  We handle

23    administrative matters, collect royalties, and make payments to

24    songwriters.

25    Q.   Do you handle renewals of copyrights?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1098

```
1   A.    Yes.  My copyright department does, yes.

2   Q.    And how many renewal copyrights have you handled, you and

3   your department handled?

4   A.    We have filed thousands.

5   Q.    Why are copyrights renewed?

6              MR. MALOFIY:  Objection.

7              THE COURT:  Sustained.

8   BY MR. ANDERSON:

9   Q.    How are copyrights renewed in your business?

10  A.    In the United States, copyrights are renewed by submitting

11  a copyright renewal form to the Library of Congress in the 28th

12  year of copyright.

13             MR. MALOFIY:  Objection, Your Honor.  This has nothing

14  to do with why this witness is here.  It goes to expert

15  testimony.  It goes to copyrights, not corporate designate --

16             THE COURT:  This witness has not been designated as an

17  expert.  This is a party witness, I'm assuming.

18             MR. ANDERSON:  Exactly, Your Honor.

19             THE COURT:  So you're going to ask him questions as

20  far as what he knows, what he's seen, what he's done, but not

21  his opinion on different things, okay?

22             MR. MALOFIY:  He was offered --

23             MR. ANDERSON:  Thank you, Your Honor.

24             MR. MALOFIY:  -- Your Honor, as a financial expert

25  for -- excuse me, a financial fact witness, designated witness,
```

```
1    for Rhino -- excuse me --

2            THE COURT:  Warner.

3            MR. MALOFIY:  Warner/Chappell, yeah, thank you.

4            MR. ANDERSON:  Warner/Chappell.

5            THE COURT:  Counsel, he is a party witness, and he can

6    testify.

7            MR. MALOFIY:  Thank you.

8    BY MR. ANDERSON:

9    Q.   Just to get back to -- you testified that copyrights are

10   renewed by filing a form.  Whose name goes on the form?

11           THE COURT:  If you're asking when he files them whose

12   name goes on the form --

13           MR. ANDERSON:  Exactly.

14           THE COURT:  He cannot testify as to an expert.  He can

15   testify what he does and what his company does.

16           MR. ANDERSON:  Your Honor, and thank you for that

17   clarification.  This whole line of questioning is --

18           THE COURT:  Okay.

19           MR. ANDERSON:  -- the practices and his knowledge.

20           MR. MALOFIY:  Objection, relevance.  Also, objection,

21   not designated.  He was not designated for this purpose.

22           THE COURT:  Overruled.

23           THE WITNESS:  At Warner/Chappell, the author's name

24   goes on the renewal certificate.  That's based on requirements

25   and regulations at the copyright office.
```

1  BY MR. ANDERSON:

2  Q.   And do you have to put the author's name -- do you, at

3  Warner/Chappell, put the author's name even if -- on the

4  renewal claim, even if the author does not own the renewal

5  copyright?

6  A.   That is correct.  It's regulation by the copyright office

7  that we put the author name.  That doesn't necessarily mean the

8  author owns the copyright.

9  Q.   And do you have --

10        MR. MALOFIY:  Your Honor --

11        THE COURT:  Sustained.  It will be stricken, Counsel.

12   You're asking him questions to testify as an expert.  He's

13  not an expert.  So why don't you go ahead with the testimony

14  without trying to get in that expert testimony.

15        MR. MALOFIY:  Thank you, Your Honor.

16        MR. ANDERSON:  Okay.  Again, he's testifying as a fact

17  witness as to what Warner/Chappell does.

18        MR. MALOFIY:  Your Honor, I have --

19        THE COURT:  Counsel, excuse me.  That's not a

20  question.  Will you ask your next question.

21        MR. ANDERSON:  Absolutely, Your Honor.

22  Q.   Do you have access to Warner/Chappell's files reflecting

23  whether a copyright infringement claim was filed against

24  "Stairway to Heaven"?

25  A.   Yes, I do.

1101

```
1    Q.   What are those files called?

2    A.   At Warner/Chappell they are called song files.

3    Q.   In the case of "Stairway to Heaven," how far back do those

4    files go?

5    A.   1972.

6    Q.   Did you search those files for any indication as to

7    whether Hollenbeck Music ever filed a copyright claim against

8    "Stairway to Heaven"?

9    A.   Yes, I did.

10        MR. MALOFIY:  Objection.  This is -- may I,

11   Your Honor?  This is far outside the scope of what he's

12   designated to testify to on the witness list, far outside.

13        THE COURT:  Overruled.  Overruled.  I've already ruled

14   on that, Counsel.  As a party witness, he can testify, but only

15   as to what he did.

16        MR. MALOFIY:  Understood, Your Honor.

17   BY MR. ANDERSON:

18   Q.   And in your search of the Warner/Chappell records, did you

19   find any indication that Hollenbeck Music ever filed a

20   copyright claim with respect to "Stairway to Heaven"?

21   A.   No, I did not.

22        THE COURT:  I think that the plaintiff wants to object

23   to that as hearsay, and it will be sustained.

24        MR. MALOFIY:  Thank you, Your Honor.

25   ///
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01207**

1102

```
1    BY MR. ANDERSON:

2    Q.   Are the song files kept in the normal course of business

3    at Warner/Chappell?

4    A.   Yes.  That's the normal course of business, to maintain

5    files at a song level.

6    Q.   In your review of the song files, was there any indication

7    of any lawsuit being filed with respect to "Stairway to Heaven"

8    by Hollenbeck Music?

9              MR. MALOFIY:  Objection.

10             THE COURT:  Sustained.

11             MR. ANDERSON:  And that's all the questions I have.

12        Well, wait a second.  Let me just double-check with

13   counsel.

14        (Defense counsel confer privately.)

15             MR. ANDERSON:  Thank you, Your Honor.  That's all the

16   questions we have for Mr. Blietz.

17             THE COURT:  Thank you, Counsel.

18             MR. MALOFIY:  With the Court's indulgence, one moment,

19   Your Honor.

20        (Plaintiff's counsel conferred privately.)

21             MR. ANDERSON:  Could I just ask one more question

22   before counsel --

23             THE COURT:  Yes, go ahead, Counsel.

24   BY MR. ANDERSON:

25   Q.   Mr. Blietz, from your own personal knowledge, are you
```

1   aware of any claim being filed with respect to "Stairway to

2   Heaven" other than this one?

3   A.    No, I'm not.

4         MR. ANDERSON:  Thank you.

5         THE COURT:  Thank you.

6         MR. MALOFIY:  No cross-examination.

7         THE COURT:  Okay.  You may step down.  Thank you very

8   much for coming in.

9       Next witness?

10        MR. ANDERSON:  Your Honor, absolutely, in just a

11  second.

12      I have, and I apologize, and I think we have some overlap

13  in exhibit numbers.  Should I correct that on the record now

14  or --

15        THE COURT:  We can do that now or later.  Doesn't make

16  any difference.

17        MR. ANDERSON:  Okay.  If I can just do that so I don't

18  forget.

19      I mistakenly identified three exhibits as -- four

20  exhibits, as 2951, 2952 and 2953.  If I may, I would ask that

21  they be marked and introduced and accepted into evidence as

22  2961, 2962, 2963 and 2964.

23      Now, let me just clarify.  2961 is Mr. Mathes' audio

24  recording of playing "To Catch a Shad."  2962 is the

25  simultaneous playing or recording of that composition and the

1104

```
 1    "Taurus" deposit copy.  2963 is the demonstrative structural

 2    chart that was based on Dr. Ferrara's chart.  And 2964 is, I

 3    believe, the "Taurus" -- oh, the "Taurus" Certificate of

 4    Copyright that was admitted.

 5           THE COURT:  Okay.  So you want to redesignate those,

 6    rather than 2951, to 2961?

 7           MR. ANDERSON:  Yes.  So would be 2961, -62, -63 --

 8           THE COURT:  Those have been admitted, received, other

 9    than 2963, which was only received for demonstrative purposes.

10           MR. MALOFIY:  That was our issue, Your Honor.

11           THE COURT:  Okay.

12           MR. MALOFIY:  Thank you.

13           THE COURT:  Okay.

14           MR. ANDERSON:  Thank you, Your Honor.

15       Defendants call Robert Plant.

16           THE CLERK:  Right here to be sworn.  Please raise your

17    right hand.

18       Do you solemnly swear the testimony that you are about to

19    give in the matter now before the Court shall be the truth, the

20    whole truth, and nothing but the truth, so help you God?

21           THE WITNESS:  I do.

22           THE CLERK:  Thank you.  You may be seated.

23       May I please ask that you state your full name for the

24    record and spell your last name.

25           THE WITNESS:  Yeah.  Robert Anthony Plant, P-l-a-n-t.
```

1105

```
 1              THE CLERK:  Thank you.
 2              THE COURT:  Thank you.
 3         You may inquire, Counsel.
 4              MR. ANDERSON:  Thank you very much, Your Honor.
 5     ROBERT ANTHONY PLANT, CALLED AS A WITNESS BY THE DEFENDANTS,
 6                      DIRECT EXAMINATION
 7   BY MR. ANDERSON:
 8   Q.   Mr. Plant, you've heard testimony during this trial about
 9   "Fresh Garbage."
10         How did you first learn of "Fresh Garbage"?
11   A.   In some period early in '68, there was a -- a compilation
12   album issued by CBS Records.  It was a kind of a budget
13   compilation which contained records by many of the artists
14   recording on Columbia at that time, and it was quite an unusual
15   thing to have such a cross section of contemporary American
16   music.
17   Q.   And you bought it?
18   A.   I did, yeah.
19   Q.   Okay.  Was "Taurus" on it?
20   A.   No.
21   Q.   Did you have any other albums?
22   A.   Yeah.  I had a bit of a mobile life at that time.  I had
23   left home when I was 17, and I was kind of moving between
24   locations, so I only had a few records at that time, but, yeah,
25   I -- I was carrying some around with me.
```

1106

```
1   Q.   Did you have any Spirit albums?

2   A.   No.

3   Q.   You've heard testimony about Mothers Club?

4   A.   Yeah.

5   Q.   What was Mothers Club?

6   A.   Well, Mothers Club was a kind of converted -- I think it

7   might have been a second floor or factory warehouse in

8   Birmingham.  Birmingham being the second city of the United

9   Kingdom, just about.  And at that time in the late '60s,

10  Birmingham had a reasonably prolific music scene.  Probably not

11  as big as Liverpool, but it was getting up there.  And this

12  club, I mean, maybe once or twice a week had bands coming

13  through, or entertainers on one level or another, and it was a

14  particularly good environment for us local musicians to hang

15  out, no matter what stage we were in the adventure.

16       We were kind of encouraged and welcomed there by the

17  owner, who had, earlier on in the '60s, had several kind of

18  dancehall locations around Birmingham.  So he was encouraging

19  us to all meet, hang out.  And it was a good thing, you know,

20  because in those days, there weren't too many places that were

21  too welcoming of people of a certain appearance and stuff.  It

22  was -- it was a very transitional time out in the dance floors

23  and on the dancehalls of Birmingham and Worcestershire and all

24  that stuff.

25       So I used to hang out there from time to time.  I used to
```

```
 1   go with my wife.  I used to go with John Bonham.  I used to
 2   meet up with members of different bands locally who were
 3   starting to make it at some level or another, either locally,
 4   internationally, or whatever it was.  It was kind of -- it was
 5   almost like a kind of a -- a clubhouse.
 6   Q.   Okay.  So did you regularly meet with your friends at
 7   Mothers Club?
 8   A.   Yeah.  It was -- it was a sort of place where we could all
 9   team up, and kind of gave us a feeling of camaraderie, and it
10   was a lot of interaction, a lot of exaggeration, and a lot of
11   exuberance.  It was great.
12   Q.   And did your wife regularly go with you as well?
13   A.   Yeah, she did.
14   Q.   Did you have a child at that time?
15   A.   Yeah, had a little girl.
16   Q.   So was this basically your night out with your wife?
17   A.   Outside the village, yeah.  This was a big deal, because
18   it was quite a journey and we had to secure a baby-sitter and
19   all that stuff.
20   Q.   Could you generally describe the layout of Mothers Club.
21   A.   Well, yeah.  It was a little part of Birmingham called
22   Erdington, and from what I can remember, I haven't been past
23   there for like 40-years plus, it had a kind of -- the main
24   street opened up to a lot, a pavement, and there was a little
25   door downstairs, that you'd go up some steps, round the
```

1108

```
1   security guy, and then at the top of the stairs, I think on the
2   left, there was a bar area, which, that's where we kind of
3   congregated.  And from there on, from the bar, there was a sort
4   of -- you could either go straight into the room itself where
5   the people were amassing, or you could go into the bar and have
6   a drink and team up with your pals.
7   Q.   Okay.  And did you and your wife go to Mothers Club
8   basically no matter who was performing?
9   A.   Yeah, because we knew that -- I mean, John Bonham's wife,
10  Pat, we'd just meet up there.  Because it was our own energy
11  field.  We were with our own age group of people.  Country pubs
12  tended to have people who were a bit older than us, who -- it
13  was nothing to really greatly to communicate with when you're
14  20 years old and you want to talk about plowing and bringing up
15  horses and stuff.
16  Q.   So --
17  A.   By hand.
18  Q.   I'm sorry?
19  A.   By hand.
20  Q.   When you went there to talk with your friends, did you
21  ever talk at the front, where the bands were performing?
22  A.   Well, no.  You know, the doors opened, and because it was
23  probably, in its own time, quite an auspicious place, there
24  would be many artists who kind of typified the underground
25  scene in Britain outside of the pop idiom, so there was a lot
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  of excitement about people coming through, and so you couldn't

2  get anywhere near the front, and that would be a pretty much of

3  a -- it would be quite a task to do that, yeah.

4  Q.  Would you -- and the bands that played, did they play with

5  speakers and --

6  A.  Yeah.  Everybody -- I think it was a house PA, to be

7  honest, and so the big speakers that most of the sound came out

8  of, or the singer, at least, would be either side of the stage,

9  like big bins, like the size of this here (indicating), but

10  obviously only about three or four foot high, with a tweeter on

11  the top, some kind of cone.  So it was pretty loud, yeah.

12  Q.  Is that another reason why you and your friends didn't

13  talk at the front of the room where the -- where Spirit -- or

14  the end of the room where Spirit was -- I'm sorry, my

15  apologies.

16      Is that another reason why you and your friends didn't --

17  talked in the bar area rather than where the performances were

18  going?

19  A.  Well, it was one reason, yeah, because you wouldn't barely

20  hear a word anybody was saying, number one.  But number two, as

21  our profiles would develop, and it was as much of a shock to us

22  as it was to people going in there to see bands, we became kind

23  of, umm, slightly polarized.  So we were better off up the back

24  with the owner of the club and with the people who we were

25  looking forward to seeing.

1110

```
 1        And I'd been playing in that area since 1963 and I was 15,
 2   so there were all sorts of -- it was a real kaleidoscope of
 3   different kinds of artists, people who were perhaps -- it was a
 4   good exaggerated gang of people.  So, you know, you can't
 5   really enjoy a repartee if you're too close to the noise.
 6        I wouldn't like to see people, to be honest, having a
 7   conversation right in front of me, either.
 8   Q.   While you're performing?
 9   A.   Yeah.  Even now.
10   Q.   So if I understand, because I may have interrupted, you
11   feel it would have been rude to talk in front of a performer?
12   A.   Well, you don't do that.
13   Q.   Can you estimate how many times you went to Mothers Club
14   back in the day?
15   A.   I couldn't tell you, but I suppose 40, 50.  You know, it
16   was a real sort of -- the place that you could fraternize, and
17   so it was really the best place to go in Birmingham at that
18   time for us.
19   Q.   Do you have a recollection, do you actually remember,
20   hearing Spirit perform at Mothers Club or seeing Spirit perform
21   at Mothers Club?
22   A.   No, I can't recall, actually, Spirit or anybody playing
23   there, with the passing of time.  I know that they did play
24   there, and I do know that night my wife and I were involved in
25   a big car wreck, and she had a fractured skull, and I had the
```

1111

```
1    front part of the windshield sort of buried in the top of my
2    head, which is interesting, and I was hospitalized.  We both
3    were.  And I don't remember a thing, no.
4    Q.   But you've seen newspaper accounts that you had been at
5    Mothers Club --
6    A.   Yeah.
7    Q.   -- and Spirit had performed there?
8    A.   Exactly, yeah.
9    Q.   And is it correct you don't dispute it, you just don't
10   know either way from memory?
11   A.   Exactly.
12   Q.   In the 1960s and '70s, could you read or write music?
13   A.   Not yet, I haven't learnt yet.
14   Q.   Okay.  To this day?
15   A.   But no.  No.
16   Q.   Back in the 1960s and '70s, could you play a guitar or
17   keyboards?
18   A.   No.  I was really -- and we've heard a lot of people
19   talking over the last week, but we all come from different
20   periods of time, but I was really into the singer as a singer
21   conceptually.  I was raised on Elvis and, you know, Buddy Holly
22   and Gene Vincent, Eddie Cochran, and, obviously, times were
23   changing and the musical trends were developing and becoming
24   something else, but I -- I didn't really try and pick up the
25   guitar, no.
```

```
 1   Q.   We've heard references, and I'm sure I'm not going to say

 2   this correctly, but we've heard references to Bron-yr-Aur.

 3   A.   Yeah.

 4   Q.   And how do you actually say that?

 5   A.   Bron-yr-Aur.

 6   Q.   And what is Bron-yr-Aur?

 7   A.   Well, Bron-yr-Aur is a little cottage in Snowdonia.

 8   Snowdonia is the -- in the northwestern part of -- from the

 9   Irish Sea of the Welsh coast, inland.  It's the most

10   mountainous part of northwest Wales.  And Bron-yr-Aur was a

11   little cottage that belonged to some friends of my mom and dad,

12   and when I was a kid, a little boy, I used to go with my

13   parents there.  And it was remarkable really, because everybody

14   lives in little boxes, but there you have this house just

15   balanced on the side of the little mountain, with no

16   electricity, no facilities, but was a very homely place.  It

17   was -- so, as -- through my childhood I went there a lot with

18   my mom and dad, and then, basically, slowly I became adolescent

19   and was allowed to go with the owner's children, and on and on

20   and on.  And it's still there now.

21   Q.   Okay.  I take it, since it had no electricity, you

22   couldn't play records there or --

23   A.   No, no records.

24   Q.   Where were you when you first heard any version of what

25   became "Stairway to Heaven"?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1113

```
1    A.    I was in Headley Grange near -- in Surrey, I think it is,
2    one evening, sitting with Jimmy Page.  We were recording in
3    this facility where you have a mobile truck which is modified,
4    like a big horse truck, and inside it you got a kind of mobile
5    recording studio.  And out of the side of the truck you can
6    take lines, microphone lines, which go into the house, and you
7    can position them in various places to get different kinds of
8    sounds.  So it gives you the freedom and facility to not to be
9    governed by time, as you would do in a normal studio here or in
10   a town or in a city, and it means that you can work whenever
11   you want to, however you want to, and on whatever you wish.
12        So sitting with Jimmy, we're just sitting by the fire and
13   ruminating and checking things out, was one thing, but we were
14   recording and doing lots of other -- visiting lots of other
15   bits and pieces randomly as we developed, you know, new stuff.
16   Q.    Could you tell me the circumstances under which -- could
17   you describe what happened or how you first heard specifically
18   of any music that became "Stairway to Heaven" at Headley
19   Grange.
20   A.    Well, as best I can remember, there were periods when I
21   wasn't actually active.  Maybe I'd go home for a bit, go to
22   London, go somewhere, but, so, on a musical level, I came in
23   and out of the whole idea of developing songs.  Because from my
24   angle as a singer, you either have a kernel of an idea which
25   you can latch on to and start developing a vocal and a melodic
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01219**

1114

1    aspect, or you have to wait a little bit to see whether or not

2    there's something there that can actually -- you can actually

3    (snaps finger), you know, hook up with.

4        So that particular evening, I sat with Jimmy by the fire,

5    and he began playing.  And I had this little couplet lyrically

6    that, if you like, in tempo, fitted into what he was playing.

7    So I just started developing that into two lines, then four

8    lines, and then on, slowly, opening it up.

9    Q.   What was the couplet?

10   A.   Oh, gosh.

11   Q.   Would you rather I not ask?

12   A.   "There's a lady who's sure all that glitters is gold, and

13   she's buying a stairway to heaven.  And when she gets there she

14   knows that the stores are all closed; with a word she can get

15   what she came for."  Now, and on from there.

16       I think the way that the mood of the place, everything

17   that fell from me, I was really trying to bring in that aspect

18   of Welsh, the beauty and the remoteness of the pastoral

19   Britain.  And I'd visited it previously on albums and -- like

20   "Ramble On" was a song that we played on the *Led Zeppelin II*.

21   And "That's the Way," was a song which was coming from the same

22   mind-set for me as a 22-year-old, 23-year-old kid.  So

23   "Stairway," I wanted to try and bring in some of the, umm, the

24   nature, the natural, old, almost unspoken Celtic reference into

25   a piece.  So as the song developed, it became more and more

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01220**

1115

```
1   evident that I could actually change and open up my
2   contribution.
3       Meanwhile, the guys were working on stuff with all -- you
4   know, between themselves and opening up the song and its
5   transition into something that was really flowering and that
6   was -- it was quite -- quite a thing as we moved on through the
7   song, to open it up and to turn around various parts of it and
8   see it develop into something I couldn't even imagine.
9   Q.   When you said the guys were working separately from you,
10  what guys do you mean?
11  A.   Jimmy, John Paul Jones and John Bonham, yeah.
12  Q.   Okay.
13  A.   I mean, you could cruise in and out.  There were songs
14  where you could immediately drop into, a melody line or
15  something like that.  I would go to my room a lot with a
16  notepad, and if I got an idea and I had a melody that was
17  sticking (snaps finger), just as I would do today, I could go
18  to -- because we all, each of us had a separate place.  It was
19  a residential thing, place.  So if I had an idea, I could then
20  go to the room and -- if I knew how the couplet was working, I
21  could return to that meter and -- but then again, I didn't want
22  to be around all the hubbub of other music, so I could separate
23  myself and see how it was developing, see where I could go.
24  Q.   Do I understand correctly that at Headley Grange, you and
25  the other members of Led Zeppelin were working on other songs
```

```
1   as well besides "Stairway to Heaven"?
2   A.   Oh, yeah.  Yeah.  And, umm, you know, it was really
3   quite -- very varied.  There was a track called "Misty Mountain
4   Hop," which again was talking about -- referring to the
5   mountains of Wales and the kind of atmosphere of.  I tried to
6   bring it into lyrical reference to something that actually was
7   far, far from the Celtic motherland, but -- and later, or maybe
8   it wasn't later, I don't know, maybe earlier, we had developed
9   an idea which I really -- I mean, it's one of the ideas that
10  really sticks with me despite it being 40-something years
11  later, was a song called "Battle of Evermore," and that also
12  was a sort of move back into the areas of Britain that I really
13  loved.  So I was able to bring that kind of feel of me into a
14  music which had so much dynamism, it was quite an amazing
15  palette on which to work.
16  Q.   And can you tell us, how long did it take for you to write
17  the lyrics for "Stairway to Heaven"?
18  A.   Well, it did start rolling pretty fast, and as it rolled,
19  it kind of buffered and it wasn't completely complete, and some
20  of the actual pitch, vocal pitch, didn't quite -- didn't end up
21  the way it has ended up.  It was -- I moved it around a bit,
22  and I also sang out of tune a lot, and -- because when you're
23  trying to get something right, you have to try to meld it round
24  a bit.  And then as the song develops, there's a -- there are
25  several different sections within it that require a different
```

1117

1   response, because the chords are different.

2   Q.   Okay.

3   A.   So, yeah, it had its own tempo and own momentum, and, I

4   don't know, it just -- then it galloped.

5   Q.   Okay.  Thank you.  One moment.

6          THE COURT:  Let me interrupt, because the question he

7   asked is, how long did it take you in total to write the words?

8          THE WITNESS:  Oh.  I can't tell you.  I don't know.  I

9   mean, because -- because the end is so tumultuous, it's such a

10  crescendo, I don't know whether we got to that.  I know we

11  didn't get to the solo section and the outro straightaway, so

12  it would be over a period of time.

13         THE COURT:  Okay.

14         MR. ANDERSON:  Thank you.  If I could just have one

15  moment.

16      (Defense counsel conferred privately.)

17         MR. ANDERSON:  Thank you, Your Honor.  That's all the

18  questions I have for Mr. Plant.

19         THE COURT:  Cross-examination.

20         MR. MALOFIY:  Yes.

21                        **CROSS-EXAMINATION**

22  BY MR. MALOFIY:

23  Q.   You testified to "Fresh Garbage," you becoming familiar

24  with it from an album you had; is that correct?

25  A.   Uh-huh.  Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01223**

1118

```
1    Q.   That's an album you purchased, correct?

2    A.   Yes.

3    Q.   And that's an album you purchased in London, correct?

4    A.   No.

5    Q.   No.  Where did you purchase it?

6    A.   I never lived in London.

7    Q.   Oh, I'm sorry.  Where did you -- in the UK?

8    A.   Yeah.

9    Q.   All right.  Would it be Birmingham?

10   A.   Could have been.  I mean, there were a lot of record shops

11   then.

12   Q.   I see.  Now, "Fresh Garbage" is a song that was by a band

13   Spirit, correct?

14   A.   Exactly, yeah.

15   Q.   And do you have an independent recollection of how many

16   times you played it live?

17   A.   In the Band of Joy --

18        MR. ANDERSON:  I'm sorry.  Argumentative, lacks

19   foundation.

20        THE COURT:  Overruled.

21      You may answer.

22        THE WITNESS:  Okay.

23      When I wrote that album, I was working with John Bonham in

24   the Band of Joy, which is the group that preceded, almost

25   preceded, Led Zep, so -- and we were trying to play the
```

1    underground clubs, the circuits, that were like psychedelic and

2    blues-based bands, and the riff on that album, *Rock Machine*

3    *Turns You On*, from "Fresh Garbage" was a great riff.

4         So I was also a really big fan of Garnet Mimms & The

5    Enchanters, and they had a track out called "As Long As I Have

6    You."

7         So in that Band of Joy, we created a medley which opened

8    up with Garnet Mimms, moved into the riff, went into some

9    Spacecake stuff, and then came out at the other end, back into

10   Garnet Mimms, and that kind of traveled with us, me and Bonzo,

11   into the rehearsals with the Yardbirds.

12   BY MR. MALOFIY:

13   Q.   Do you agree that you lifted other people's music as part

14   of your songwriting process of Led Zeppelin?

15            MR. ANDERSON:  Objection, Your Honor.

16            THE WITNESS:  Can you explain what that really means?

17            THE COURT:  Excuse me.

18            MR. MALOFIY:  Yes, I can.

19            THE COURT:  One second.  One person at a time.

20        The question was?

21   BY MR. MALOFIY:

22   Q.   Do you admit that you lifted other people's music in

23   coming -- as part of your songwriting process for Led Zeppelin?

24            MR. ANDERSON:  Objection.  It's, one, within a motion

25   in limine that was granted, and also -- and I can identify it

```
1   for you if Your Honor likes.  I believe it was -- actually, let

2   me not guess.

3           THE COURT:  You don't have to, Counsel.  It will be

4   sustained.

5           MR. ANDERSON:  Thank you.

6   BY MR. MALOFIY:

7   Q.  Sir, did Led Zeppelin use other people's music as their

8   kernel, as you said in your direct testimony, as your kernel of

9   an idea?

10          MR. ANDERSON:  Objection, Your Honor.

11          THE COURT:  Overruled.

12          THE WITNESS:  In -- in -- in sort of the nest of

13  rock 'n' roll and rhythm and blues, there's always been

14  cross-pollination without a doubt, yes.

15  BY MR. MALOFIY:

16  Q.  And would you agree that --

17  A.  We wouldn't have Little Richard, Larry Williams, the

18  Beatles, all the people who've actually been involved with

19  "Bony Maronie" or "Long Tall Sally" or, you know, "Short Fat

20  Fannie" and all that stuff.  It was all moving across space.

21          THE COURT:  Okay.  Next question.

22  BY MR. MALOFIY:

23  Q.  Do you agree that your first show on U.S. soil,

24  December 26, 1968, you opened for Spirit?

25  A.  No --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. ANDERSON:  Objection, Your Honor.  It's also
 2   beyond the scope of the direct.
 3          THE COURT:  It is beyond the scope of the direct.
 4   Sustained.
 5   BY MR. MALOFIY:
 6   Q.  Would you agree that as part of Led Zeppelin's kernel of
 7   an idea to come up with songs, that Jimmy Page had said, as far
 8   as his end goes, he always tried to bring something fresh to an
 9   idea that he used, "I always made sure to come up with some
10   variation.  In fact, I think in most cases" --
11          MR. ANDERSON:  Objection.  This is within the motion
12   in limine and --
13          THE COURT:  Sustained.  Sustained.
14   BY MR. MALOFIY:
15   Q.  Do you agree that the early sets of Led Zeppelin were all
16   cover songs?
17          MR. ANDERSON:  Beyond the scope, Your Honor.
18          THE COURT:  Overruled.
19          THE WITNESS:  We didn't have very many songs.  We had
20   an album and we had stuff that Jimmy used to feature when he
21   was in the Yardbirds with Keith Relf.  So we had a bit -- bits
22   and pieces of a *Led Zeppelin I*, which, I don't know when it
23   came out.  Some -- I think maybe December '68.  And we had
24   Yardbird stuff and we had the stuff that I brought from the
25   Band of Joy.  So, yeah, we were doing anything we could.  We
```

```
 1   also did a great version of a Ben E. King song called

 2   "We're Gonna Groove," which is really good.  I don't find that

 3   a problem.  I hear you going on about it a lot.

 4              THE COURT:  That's okay, there's no question.

 5         Next question.

 6   BY MR. MALOFIY:

 7   Q.   Is it your testimony that you independently created

 8   "Stairway to Heaven"?

 9   A.   Of course.

10   Q.   Did Mr. Page -- was it the first time here in court that

11   you learned that he had five Spirit albums which he bought in

12   the day?

13              MR. ANDERSON:  Objection, Your Honor, beyond the scope

14   of --

15              THE COURT:  Sustained.

16   BY MR. MALOFIY:

17   Q.   Did Mr. Page ever share with you that he was a fan of

18   Spirit when "Stairway to Heaven" was being written?

19   A.   No.

20              MR. ANDERSON:  Objection, Your Honor, beyond the

21   scope.

22              THE COURT:  Sustained.  It's outside the scope.

23   BY MR. MALOFIY:

24   Q.   You testified as to the creation of "Stairway to Heaven"

25   on your direct testimony.  Do you recall that?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Now, say that again, please?  Excuse me?  I beg your

2    pardon.  I --

3    Q.    Yes.  You testified as to the creation of "Stairway to

4    Heaven" in your direct testimony just a moment ago.  Do you

5    recall that?

6    A.    Yes, I do.

7    Q.    And in court today -- or excuse me.  During court you had

8    the opportunity to hear the interview where you, Mr. Page and

9    Mr. Jones were present, correct?

10            MR. ANDERSON:  Objection, Your Honor.  Again outside

11   the scope.

12            THE COURT:  Sustained.

13            MR. MALOFIY:  It goes to the creation, Your Honor.

14            THE COURT:  Sustained.

15            MR. MALOFIY:  Understood.

16   Q.    Did you ever, during that interview or after that

17   interview, did you ever correct Mr. Jones that his

18   representation was incorrect?

19            MR. ANDERSON:  Objection, Your Honor.  Again it's

20   outside the scope.

21            THE COURT:  Sustained.

22   BY MR. MALOFIY:

23   Q.    How many times have you hung out with Mr. Andes?

24            MR. ANDERSON:  Objection, Your Honor, outside the

25   scope.

1124

```
 1           THE COURT:  I don't know if it -- it may go --

 2           THE WITNESS:  You know --

 3           THE COURT:  I'm going to overrule it.  You may ask the

 4   question.

 5           THE WITNESS:  Well, I mean, I've seen the adventures

 6   in the last week.  I don't remember.  I've no recollection of

 7   mostly anybody I've ever hung out with, but -- I'm not trying

 8   to be funny, you know.  I mean, you're a hard-hitting guy, but

 9   I -- it's -- I don't remember anything like that.

10       I mean, you know, you meet -- and I heard what's been

11   going down.  You meet so many people in these environments that

12   pass by and through, I'm sure meritous, charming people, but in

13   the middle of all the chaos and the hubbub, how are you going

14   to remember one guy from another if you don't see him for 40

15   years?

16           THE COURT:  Next question.

17   BY MR. MALOFIY:

18   Q.  Besides "Fresh Garbage," can you name any other rock band

19   which you covered their music?

20           MR. ANDERSON:  Objection, outside the scope.

21           THE COURT:  Overruled.

22           MR. ANDERSON:  And argumentative.

23           THE COURT:  Overruled.

24           THE WITNESS:  Yeah.  The Yardbirds.  Well, not rock

25   band, because it's not as derivative as that.  We could move
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1125

1    into soul stuff.

2    BY MR. MALOFIY:

3    Q.   I'm saying rock specifically.

4    A.   Not rock.  I can't think of anything, but --

5    Q.   The Yardbirds was Mr. Page's old band, right?

6    A.   Well, he joined the Yardbirds, yeah, but it was already

7    there.

8             MR. MALOFIY:  I have the pictures, the photos,

9    Your Honor.  I'd like to present them to defense counsel and

10   show them to Mr. --

11            THE WITNESS:  Plant.

12            MR. MALOFIY:  -- Plant.

13            MR. ANDERSON:  Your Honor, these were already

14   excluded, and it's beyond the scope of the direct.  These are

15   the ones that are the subject of a pending motion as well, the

16   ones that were -- I don't want to go further.

17            THE COURT:  Is this the one about the people being

18   together?

19            MR. ANDERSON:  Yes, Your Honor.

20            THE COURT:  Okay.  Sustained.

21   BY MR. MALOFIY:

22   Q.   You have no recollection of being at Mothers Club and

23   meeting any member of Spirit, correct?

24   A.   Correct.

25   Q.   And you have no recollection of playing snooker with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01231**

1126

```
 1   Mark Andes or any member of Spirit after the Spirit show,
 2   correct?
 3   A.   I told you that I can't remember -- I mean, under the
 4   circumstances it's not a very good thing to be saying, but I
 5   did have a very bad car wreck, and I don't remember whether --
 6   I don't remember seeing Spirit, Captain Beefheart, you know.
 7          THE COURT:  So you don't remember much from that
 8   night.
 9          THE WITNESS:  It's very difficult to remember it,
10   really, yeah.  But, no, I didn't remember playing snooker.
11          THE COURT:  Next question.  Got about a minute left,
12   Counsel.
13          MR. MALOFIY:  Yes, Your Honor.
14      One moment.
15          THE COURT:  Mm-hmm.
16      (Plaintiff's counsel conferred privately.)
17          THE COURT:  There goes your minute, Counsel.  Do you
18   want one more question?
19          MR. MALOFIY:  Oh, yeah.
20          THE COURT:  Okay.
21   BY MR. MALOFIY:
22   Q.   Is your memory as good today about events that happened in
23   the past than it would have been years ago, closer to those
24   events?
25          MR. ANDERSON:  Objection.
```

```
 1            THE WITNESS:  Well, I don't remember now, and I didn't
 2    remember then.
 3            THE COURT:  Okay.
 4            MR. MALOFIY:  Fair enough.  Thank you.
 5            THE COURT:  Any re --
 6            THE WITNESS:  Okay, thanks.
 7            THE COURT:  Mr. Plant --
 8            THE WITNESS:  Oh, sorry.
 9            THE COURT:  We're not through yet.
10            THE WITNESS:  Oh.
11            THE COURT:  Any redirect?
12            MR. ANDERSON:  Just one question, Your Honor.
13                      REDIRECT EXAMINATION
14    BY MR. ANDERSON:
15    Q.   Mr. Plant, you referred to "Bonzo."  Who's Bonzo?
16    A.   John Bonham, yeah.
17    Q.   Thank you, sir.
18    A.   Okay.
19            THE COURT:  Now you can go.
20            THE WITNESS:  Oh, thanks.
21            THE COURT:  Thank you very much.
22        Next witness, Counsel.
23            MR. ANDERSON:  Your Honor, defendants call Jimmy Page.
24            THE COURT:  Okay.
25            THE CLERK:  Right here.  I'm going to swear you in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1128

1     again.

2              THE WITNESS:  Yeah, sure.

3              THE CLERK:  Okay.  That's fine.  Please raise your

4     right hand.

5         Do you solemnly swear that the testimony you are about to

6     give in the matter now before the Court shall be the truth, the

7     whole truth, and nothing but truth, so help you God?

8              THE WITNESS:  I do.

9              THE CLERK:  Thank you.  You may be seated.

10        May I please ask that you restate your name for the record

11    and spell your last name.

12             THE WITNESS:  Yes, indeed.  I'm James Patrick Page,

13    P-a-g-e.

14             THE COURT:  Counsel, you may inquire.

15             MR. ANDERSON:  Thank you, Your Honor.

16    **JAMES PATRICK PAGE, CALLED AS A WITNESS BY THE DEFENDANTS,**

17                          **DIRECT EXAMINATION**

18    BY MR. ANDERSON:

19    Q.   In the course of this trial, have you heard plaintiff's

20    counsel suggest to the jury that Led Zeppelin performed at the

21    Northern California Folk Rock Festival in San Jose, California,

22    in May of 1969?

23             MR. MALOFIY:  Objection, argumentative.

24             THE COURT:  Overruled.

25             THE WITNESS:  I have.

1129

```
 1   BY MR. ANDERSON:

 2   Q.    Did Led Zeppelin perform at the Northern California Folk

 3   Rock Festival?

 4   A.    No.  We played in Chicago.

 5          MR. ANDERSON:  Okay.  I would ask to -- if we could

 6   bring up Exhibit 2112.

 7       (Exhibit was displayed on the screen.)

 8   BY MR. ANDERSON:

 9   Q.    Do you recognize Exhibit --

10          MR. MALOFIY:  Objection.  This was never produced in

11   discovery.

12          MR. ANDERSON:  Yes, of course it was.

13          MR. MALOFIY:  I'll let it go, Your Honor.

14          THE COURT:  Okay.  Go ahead.

15          MR. ANDERSON:  Okay.  Thank you.

16   Q.    Do you recognize --

17   A.    Kinetic Playground.  Yeah, that was a venue in Chicago.

18   Q.    Okay.  And that's where Led Zeppelin was in on those days

19   in May of 1969?

20   A.    I believe so.

21   Q.    Do you recall during the course of this trial you heard

22   Larry Fuzzy Knight testify that he saw you in London in March

23   of 1973?

24   A.    Yes, I do.

25   Q.    Could that have happened?
```

```
 1   A.    No, it couldn't happen.

 2   Q.    Why not?

 3   A.    Basically, I don't live in London.  I mean, I didn't live

 4   in London in those days.  I lived in Sussex, a good sort of two

 5   hours drive from London.  And at that point of time that

 6   they're saying that I went to the Rainbow aftershow, or

 7   whatever it is, I mean, I just wasn't at any of the things that

 8   they're saying, but I remember we'd been doing a European tour

 9   and then we came off of the European tour -- this is

10   Led Zeppelin, came off the European tour, and then I retreated

11   to the countryside with my partner and our daughter, in a

12   relatively new house to us, too.  And we had somewhere in the

13   region of maybe three weeks off before going on a very, very

14   lengthy American tour.  And so basically where I was going to

15   be in that point of time would be at home with my partner and

16   daughter, who was about two years old at the time.

17   Q.    Okay.  And touring, you mentioned that.  When were you

18   touring in that time period, do you recall?

19   A.    Each side of that 1973.  There was a European tour, and

20   then -- and the point where they're saying that, you know, I

21   was there, I was actually in the countryside.  And as I say,

22   after that we were going to go off on a very long tour.  So it

23   was, you know, it was definitely the right thing to do, to be

24   with your wife at the time rather than being going anywhere

25   else.  So that's what I would have done.  I would have been at
```

1131

```
1   home.

2   Q.   Okay.  And at home in Sussex?

3   A.   Sussex, yeah.

4   Q.   I'd like to ask you questions about the creation of

5   "Stairway to Heaven."

6        What was your original concept for "Stairway to Heaven"?

7   A.   Okay.  The original concept that I had was for a piece of

8   music that would basically go through many moods and changes

9   and basically be like a reveal, as it was -- as it was come --

10  as it was opening up, building towards -- well, actually, it

11  would start -- it would start with the acoustic guitar, and

12  then it would have the electric piano, and there would be -- I

13  knew it was going to be a song, even though I'm thinking about

14  it as music, because Robert, Robert and I were working so in

15  sync with musical compositions in that time.  So basically it

16  was going to be something which opened up, and as I said,

17  there's going to be the acoustic guitar, the electric piano,

18  and then there would be electric 12 strings that would come on

19  underneath, blaring underneath the verses.  So basically the

20  thing is layering with extra instruments, and then it would go

21  through eventually to something that I always nicknamed the

22  fanfare, which I think we've heard before, that term, in the

23  court, and that would lead into the solo.  All the time this

24  whole thing is accelerating and getting more intense, it's

25  getting more intense, and then after the solo, then it would
```

1   come to the sort of grand finale, the climax of the whole

2   piece.

3       And, as I say, the idea of it was to basically start off

4   with something which was, you know, more whimsical, if you

5   like, but ending up with this huge sort of roll at the end,

6   and on the journey through it, the drums would come in

7   separately, and the bass, and et cetera, et cetera, electric 12

8   strings.

9           THE COURT:  Okay.  Ladies and gentlemen, it is 11:30,

10  so we're going to be breaking for lunch.

11      Remember the admonishment not to discuss the case among

12  yourselves or with anybody else or form or express any opinions

13  about the matter until it's submitted to you and you retire to

14  the jury room.

15      We'll be in recess.  See you back in at 1:00 o'clock.

16          THE CLERK:  All rise.

17      Court is in recess.

18

19      (Lunch recess commenced at 11:32 a.m.)

20

21      (Afternoon proceedings under separate cover.)

22

23                      --o0o--

24

25

1                        *CERTIFICATE*

2

3        *I hereby certify that pursuant to Section 753,*

4    *Title 28, United States Code, the foregoing is a true and*

5    *correct transcript of the stenographically reported proceedings*

6    *held in the above-entitled matter and that the transcript page*

7    *format is in conformance with the regulations of the*

8    *Judicial Conference of the United States.*

9

10   *Date:  JUNE 23, 2016*

11

12

13

14                */S/ SANDRA MACNEIL*

15               *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**01239**