# United States Court of Appeals
# For the Ninth Circuit

C.A. 16-56057

---

## Skidmore et al.

*Michael Skidmore, Trustee for the*
*Randy Craig Wolfe Trust*
*Plaintiff-Appellant*

v.

## Led Zeppelin *et al.*

*Defendants-Appellees*

---

# Plaintiff-Appellant Michael Skidmore's
# Excerpts of the Record
# Volume VII of XI

---

(Music copyright infringement, on appeal from the final Order dated June 23, 2016 of the Honorable R. Gary Klausner, of the United States District Court for the Central District of California. The case was docketed in the Central District at 15-cv-03462)

---

## Francis Alexander, LLC

Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyers for Appellant Skidmore*

# EXCERPTS OF THE RECORD: VOLUME VII of XI
(1540 – 1836)

06/13/2016   Order to Strike Electronically Filed Documents (*Doc. No. 233*) ..................... 1540

06/13/2016   Def. Opposition to Plaintiff Request to Reconsider Ruling Granting
Def. MIL No. 3 (*Doc. No. 239*) ......................................................................... 1541

06/13/2016   Def. Opposition to Sanctions and Preclusion of Dr. Ferrara (*Doc. No. 234*) .... 1545

06/12/2016   Plaintiff Request to Reconsider Ruling Granting
Def. MIL No. 3 (*Doc. No. 232*) ......................................................................... 1563

06/11/2016   Plt. Motion for Sanctions and Preclusion of Dr. Ferrara (*Doc. No. 230*) ......... 1575

06/07/2016   Excerpts from Decl. of Peter J. Anderson Re: Trial Brief (*Doc. No. 223*) ....... 1773

Declaration of Dr. Alexander Stewart ............................................................. 1776

Declaration of Erik Johnson ........................................................................... 1802

Declaration of Kevin Hanson .......................................................................... 1817

Declaration of Brian Bricklin .......................................................................... 1823

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| MICHAEL SKIDMORE | CASE NUMBER: |
|---|---|
| PLAINTIFF(S) | CV 15-03462-RGK (AGRx) |
| v. | |
| LED ZEPPELIN, et al. | **ORDER TO STRIKE ELECTRONICALLY FILED DOCUMENTS** |
| DEFENDANT(S). | |

The Court hereby **ORDERS** the documents listed below be **STRICKEN** for failure to comply with the Local Rules, General Order 10-07 and/or the Court's Case Management Order as indicated:

| 06/11/2016 | / | 230 | / | Motion for Sanctions |
|---|---|---|---|---|
| *Date Filed* | | *Doc. No.* | | *Title of Document* |
| 06/12/2016 | / | 231 | / | Motion for Reconsideration |
| *Date Filed* | | *Doc. No.* | | *Title of Document* |

- ☐ Document submitted in the wrong case
- ☐ Incorrect document is attached to the docket entry
- ☐ Document linked incorrectly to the wrong document/docket entry
- ☐ Incorrect event selected. Correct event is _____
- ☐ Case number is incorrect or missing.
- ☑ Hearing information is missing, incorrect, or not timely
- ☐ Local Rule 7.1-1 No Certification of Interested Parties and/or no copies
- ☐ Case is closed
- ☐ Proposed Document was not submitted as separate attachment
- ☐ Title page is missing
- ☐ Local Rule 56-1 Statement of uncontroverted facts and/or proposed judgment lacking
- ☐ Local Rule 56-2 Statement of genuine disputes of material fact lacking
- ☐ Local Rule 7-19.1 Notice to other parties of ex parte application lacking
- ☐ Local Rule 11-6 Memorandum/brief exceeds 25 pages
- ☐ Local Rule 11-8 Memorandum/brief exceeding 10 pages shall contain table of contents
- ☑ Other Motions are not timely. Memorandum of Points and Authorities on Docket Entry 230 exceed this Court's 20 page limit.

Note: Please refer to the court's Internet website at www.cacd.uscourts.gov for Local Rules, General Order 10-07 and applicable forms.

Dated: 06/13/2016 _____

By: *Gary Klausner* _____

U.S. District Judge / U.S. Magistrate Judge

*cc: Assigned District and/or Magistrate Judge*

1  Peter J. Anderson, Esq., Cal. Bar No. 88891
   E-Mail: pja@pjanderson.com
2  LAW OFFICES OF PETER J. ANDERSON
   A Professional Corporation
3  100 Wilshire Boulevard, Suite 2010
   Santa Monica, CA 90401
4  Tel: (310) 260-6030
   Fax: (310) 260-6040
5  Attorneys for Defendants
   JAMES PATRICK PAGE, ROBERT ANTHONY
6  PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
   MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
7  ATLANTIC RECORDING CORP., RHINO
   ENTERTAINMENT COMPANY and WARNER
8  MUSIC GROUP CORP.

9  Helene Freeman, Esq., admitted *pro hac vice*
   E-Mail:  hfreeman@phillipsnizer.com
10 PHILIPS NIZER LLP
   666 Fifth Avenue
11 New York, NY 10103-0084
   Tel: (212) 977-9700
12 Fax: (212) 262-5152
   Attorneys for Defendants
13 JAMES PATRICK PAGE, ROBERT ANTHONY
   PLANT and JOHN PAUL JONES

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17                   **WESTERN DIVISION**

18 MICHAEL SKIDMORE, *etc.*,            )  Case No. 2:15-cv-03462 RGK (AGRx)
                                        )
19          Plaintiff,                  )
                                        )
20     vs.                              )  DEFENDANTS' MEMORANDUM
                                        )  OF POINTS AND AUTHORITIES
21 LED ZEPPELIN, *et al.*,              )  IN OPPOSITION TO PLAINTIFF'S
                                        )  MOTION TO RECONSIDER
22          Defendants.                 )  RULING AS TO DEFENDANTS'
                                        )  MIL # 3
23 _____        )
                                           Date: June 14, 2016
24                                         Time: 9:00 a.m.

25                                         Courtroom of the Honorable
                                           R. Gary Klausner
26                                         United States District Judge

27

28

**01541**

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Although labeled a "Brief in Further Support" of his opposition to defendants' Motion in Limine No. 3, plaintiff Michael Skidmore unabashedly asks the Court to reconsider its tentative ruling that "the only *Taurus* recordings properly presented to the jury are those that are strictly limited to the *Taurus* musical composition as transcribed in the copyrighted 1967 transcription." Order (Doc. 202) at 1; Pltf's Mtn. (Doc. at 232) at 2.  His motion is a rehash of prior arguments, is based on conclusions that do not pass scrutiny and should be denied.

First, he makes the same arguments he made in his April 14, 2016 opposition to the Motion in Limine No. 4.  *See, e.g.,* Pltf's Oppn. (Doc. 169) at 5:15-17 (access; when Defendants take the stand, Plaintiff plans on playing Taurus, as distributed on Spirit's debut eponymous album Spirit, and asking them if they heard that song prior to writing Stairway to Heaven").  A motion to reconsider is not another chance to make arguments that did not sway the Court.

Second, Skidmore does not need to play a *Taurus* sound recording in order to ask Messrs. Page and Plant whether they heard *Taurus* before creating *Stairway to Heaven*.  <u>Indeed, Skidmore has asked, and presumably will ask again, whether they heard *Taurus* at concerts, even though Skidmore has no recordings of the concerts where they were present.</u>  Further, Messrs. Page and Plant already testified in their depositions that they had not heard *Taurus*.  Also, Skidmore can simply establish that he played *Taurus* at their depositions and ask them whether they heard it before 1971.  Further, as defendants have raised, any probative value of the *Taurus* sound recordings is greatly outweighed by the prejudice of playing for the jury a sound recording that is not copyrighted and which is different from the copyrighted *Taurus* deposit copy.  *See, e.g.,* Defs' MIL # 3 (Doc. 136) at 6-7.

Third, Skidmore does not need to play *Taurus* recordings to cross-examine defendants' experts.  They opined as to the *Taurus* deposit copy, and while they did discuss the *Taurus* sound recording in response to Skidmore's expert reports that

1

1   were based on the *Taurus* sound recordings, the Court ruled that Skidmore's expert

2   reports are inadmissible.  Order (Doc. 203).  As a result, defendants' experts' views

3   as to the *Taurus* sound recordings are moot.

4        Fourth, Skidmore argues that the *Taurus* sound recordings are relevant to

5   independent creation because of the supposed "high degree of similarity" with

6   recordings of *Stairway to Heaven*.  Pltf's Mtn. at 232: 9:8-11.  That, however, is just

7   Skidmore's prior and unsuccessful argument that non-copyrighted performance

8   elements of the unprotected *Taurus* sound recordings are relevant. In addition,

9   defendants have shown that Skidmore's own experts admit that the claimed

10   similarities – *e.g.*, both having acoustic guitars, reverb or finger-picking – were

11   commonplace in the 1960s.  *See, e.g.,* Defs Trial Brief (223) at 221-23.

12        Finally, Skidmore refers to his baseless claim that his consent was required

13   before defendants could retain Dr. Ferrara.  Not only is that claim frivolous, it is

14   irrelevant to the Court's ruling that "the only *Taurus* recordings properly presented

15   to the jury are those that are strictly limited to the *Taurus* musical composition as

16   transcribed in the copyrighted 1967 transcription."  Order (Doc. 202) at 1.

17        Skidmore's late motion to reconsider lacks merit and should be denied.

18

19   Dated: June 13, 2016

20                                      /s/ Peter J. Anderson

21                                  Peter J. Anderson, Esq.
LAW OFFICES OF PETER J. ANDERSON
A Professional Corporation
Attorney for Defendants

22                                  JAMES PATRICK PAGE, ROBERT
ANTHONY PLANT, JOHN PAUL JONES,
WARNER/CHAPPELL MUSIC, INC.,
SUPER HYPE PUBLISHING, INC.,
ATLANTIC RECORDING CORP., RHINO
ENTERTAINMENT COMPANY and
WARNER MUSIC GROUP CORP.

23

24

25

26

27

28

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Helene M. Freeman, Esq.
PHILLIPS NIZER LLP
Attorney for Defendants
JAMES PATRICK PAGE,
ROBERT ANTHONY PLANT and
JOHN PAUL JONES

3

1  Peter J. Anderson, Esq., Cal. Bar No. 88891
   E-Mail: pja@pjanderson.com
2  LAW OFFICES OF PETER J. ANDERSON
   A Professional Corporation
3  100 Wilshire Boulevard, Suite 2010
   Santa Monica, CA 90401
4  Tel: (310) 260-6030
   Fax: (310) 260-6040
5  Attorneys for Defendants
   JAMES PATRICK PAGE, ROBERT ANTHONY
6  PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
   MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
7  ATLANTIC RECORDING CORP., RHINO
   ENTERTAINMENT COMPANY and WARNER
8  MUSIC GROUP CORP.

9  Helene Freeman, Esq., admitted *pro hac vice*
   E-Mail:  hfreeman@phillipsnizer.com
10 PHILIPS NIZER LLP
   666 Fifth Avenue
11 New York, NY 10103-0084
   Tel: (212) 977-9700
12 Fax: (212) 262-5152
   Attorneys for Defendants
13 JAMES PATRICK PAGE, ROBERT ANTHONY
   PLANT and JOHN PAUL JONES

14

15                    **UNITED STATES DISTRICT COURT**

16                    **CENTRAL DISTRICT OF CALIFORNIA**

17                         **WESTERN DIVISION**

18  MICHAEL SKIDMORE, *etc.*,              )  Case No. 2:15-cv-03462 RGK (AGRx)
                                           )
19            Plaintiff,                   )
                                           )
20      vs.                                )  DEFENDANTS' MEMORANDUM
                                           )  OF POINTS AND AUTHORITIES
21  LED ZEPPELIN, *et al.*,                )  IN OPPOSITION SANCTIONS AND
                                           )  TO PRECLUDE; DECLARATION
22            Defendants.                  )
                                           )  Date: June 14, 2016
23  _____       )  Time: 9:00 a.m.

24                                            Courtroom of the Honorable
                                              R. Gary Klausner
25                                            United States District Judge

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.    INTRODUCTION**

Plaintiff Michael Skidmore's motion for sanctions is baseless, misstates the facts and law and is properly recognized as a last-minute and desperate attempt to interfere with defendants' defense of this action.

After this case was filed, defense counsel contacted Dr. Ferrara as a potential expert witness.  When told that Dr. Ferrara had been previously consulted by Universal Music Group ("Universal") and its affiliate, Rondor International ("Rondor"), regarding *Taurus* and *Stairway to Heaven*, defense counsel contacted Universal Music Group, which advised that it was not pursuing a claim and defense counsel could retain Dr. Ferrara.  <u>Skidmore concedes that neither he nor his counsel ever contacted, let alone retained, Dr. Ferrara.</u>  To the extent there was a conflict in defense counsel's retention of Dr. Ferrara, it was waived by the companies that consulted Dr. Ferrara, namely Universal Music Group and Rondor International.

Skidmore's motion must be denied.

**2.    SKIDMORE'S MOTION FOR SANCTIONS MUST BE DENIED**

    **(a)    The Applicable Standard**

Skidmore relies on cases as to, *e.g.*, the Court's general inherent powers, and fails to discuss the actual applicable standard.

Skidmore accuses Dr. Ferrara of a "conflict."  Instead of establishing a basis for that accusation, plaintiff cites defense counsel's statement that "<u>any conflict</u> was waived," as an admission that "there is no dispute that there was a conflict of interest."  Pltf's Mtn. (Doc. 230) at 16:9-15.  But, Dr. Ferrara is not a lawyer and rules of professional responsibility do not apply to him.  Skidmore's accusation of a lay person's "conflict" is simply misplaced.

Rather, the governing principal is that <u>counsel</u> is generally precluded from obtaining confidential information from another's expert witness.  *See, e.g.*, *Erickson v. Newmar Corp.*, 87 F.3d 298, 300 (9th Cir. 1996) ("In 'switching sides'

1

1    cases, courts may grant the original hiring party's motion to disqualify the expert

2    when it is determined that the expert is in possession of confidential information

3    received from the first client").  As shown below, defense counsel obtained the

4    consent of the company that consulted with Dr. Ferrara, to retain him for this case.

5    In short, defense counsel did exactly what he was supposed to do.

6        **(b)    Skidmore Lacks Standing to Raise's Any Objections by Universal**

7              **or Rondor to Defendant's Retention of Dr. Ferrara**

8        Skidmore does not, of course, claim that he or his counsel consulted Dr.

9    Ferrara on any matter, let alone regarding *Taurus* and *Stairway to Heaven*.  Rather,

10   he argues – without citation to any authority – that Universal, supposedly as

11   Skidmore's "publisher," "essentially stands in Plaintiff's shoes."  Pltf's Mtn. (Doc.

12   230) at 16:1-6.  That qualified assertion is untrue and does not give him standing.

13       Skidmore has shown no contractual relationship with Universal or Rondor.

14   Rather, Skidmore claims to have succeeded to Randy Wolfe's right to receive

15   royalties from Hollenbeck Music ("Hollenbeck") under Wolfe's 1967 Exclusive

16   Songwriter's and Composer's Agreement with Hollenbeck.  At most, Skidmore

17   stands in Wolfe's shoes under a contract with Hollenbeck.  Skidmore does not stand

18   in Hollenbeck's shoes and does not stand in the shoes of Universal and Rondor,

19   companies that Hollenbeck has, in turn, apparently contracted with.[1]

20   ///

21   _____

22   [1]    Skidmore's counsel has asserted that Hollenbeck, Universal and Rondor owe
     him fiduciary obligations.  But, he has no relationship at all with Universal and
23   Rondor, and the right to receive royalties from Hollenbeck does not create fiduciary
     obligations. *Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193, 205-06
24   (S.D.N.Y. 1997) (music publisher not a fiduciary); *Carter v. Goodman Group Music
     Publishers*, 848 F. Supp. 438, 445 (S.D.N.Y. 1994) (same); *Hope v. Genentech, Inc.*,
25   43 Cal.4th 375, 389-92, 181 P.3d 142 (2008) (contract to commercially exploit
26   scientific discovery in return for royalties did not create a fiduciary relationship);
     *Wolf v. Superior Court*, 107 Cal.App.4th 25, 30-31, 35, 130 Cal. Rptr. 2d 860 (2003)
27   (contract granting right to exploit copyrighted book in return for share of profits did
28   not create fiduciary relationship).

2

1  Accordingly, Skidmore has no standing to assert any objection by Universal
2  or Rondor to defendants' retention of Dr. Ferrara.

3  **(c)** **Universal and Rondor Consented to Defendants' Retention of Dr.**
4  **Ferrara**

5  In any event, it is undisputed that Universal and Rondor – the companies that
6  consulted with Dr. Ferrara – consented to defendants' retention of Dr. Ferrara.
7  Anderson Decl. at 6, ¶ 3.

8  **(d)** **Skidmore Was Provided a Full and Unfettered Opportunity to Ask**
9  **Dr. Ferrara What He Told Universal and Rondor, and Skidmore**
10  **Chose Not to Ask**

11  At Dr. Ferrara's deposition, Skidmore was provided and full and unfettered
12  opportunity to question Dr. Ferrara as to what he told Universal and Rondor.
13  Skidmore's counsel simply chose not to ask, despite Dr. Ferrara's offer.

14  The initial issue at the deposition was whether Universal and Rondor – in
15  addition to consenting to defendants' retention of Dr. Ferrara – also consented to Dr.
16  Ferrara's disclosure of his communications with Universal and Rondor.  To err on
17  the side of caution given that Universal and Rondor were not present at Dr. Ferrara's
18  deposition, their consent was obtained and Dr. Ferrara then confirmed he was "very
19  happy" to answer Skidmore's counsel's questions.  Anderson Decl. at 6, ¶ 5, at Exh.
20  1 at 91:18-23.  Skidmore's counsel simply chose not to ask Dr. Ferrara what he told
21  Universal and Rondor.  Anderson Decl. at 6:23-25.

22  **(e)** **Skidmore Ignores that Defendants Objected to His Overbroad**
23  **Discovery and He Never Challenged those Objections**

24  Skidmore argues that in response to his request for production as to, *e.g.,*
25  every document relating to *Taurus* or *Stairway to Heaven*, defendants did not
26  produce Dr. Ferrara's correspondence with Universal and Rondor before defendants
27  retained him.  However, that correspondence was never provided to defendants.
28  Anderson Decl. at 6, ¶ 4.

3

1    Further, Skidmore ignores that defendants timely objected to his request for

2 production, raising, *inter alia*, that they were overbroad.  Skidmore's argument is

3 proof of the peril of overbroad discovery requests: failing to describe the requested

4 documents with reasonable particularity unfairly leaves the responding party at risk

5 that the propounding party will "at any point in the litigation, . . . contend that the

6 documents it now wants fall within [the request's] unrestricted scope." *E.E.O.C. v.*

7 *McCormick & Schmick's Seafood Restaurants, Inc.*, No. WMN-08-0984, 2012 WL

8 380048, at *1 (D. Md. Feb. 3, 2012).

9    Skidmore cannot now exploit the overbreadth of his poorly-drafted requests,

10 to claim documents were not produced.

11    **(f)    Skidmore's Sensationalist Allegations that Universal Acted**

12            **Criminally Are Patently Absurd**

13    Skidmore accuses Hollenbeck and Universal of criminal conduct in

14 submitting corrections to its prior filings with the Copyright Office.  That is patently

15 absurd.  *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 167

16 n. 24 (2d Cir. 2003) (approving correction of registration's identification of

17 "author," decades later), *cert. denied* 541 U.S. 937 (2004).  That Skidmore may

18 disagree with the corrections does not make them a crime.

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

4

**3.     <u>CONCLUSION</u>**

Defendants' counsel did exactly what was appropriate when they learned that Dr. Ferrara had been consulted by Universal and Rondor: they obtained Universal and Rondor's consent to defendants' retention of Dr. Ferrara.  Skidmore's motion must be denied.

Dated: June 13, 2016

_____/s/ Peter J. Anderson_____
Peter J. Anderson, Esq.
LAW OFFICES OF PETER J. ANDERSON
A Professional Corporation
Attorney for Defendants
JAMES PATRICK PAGE, ROBERT
ANTHONY PLANT, JOHN PAUL JONES,
WARNER/CHAPPELL MUSIC, INC.,
SUPER HYPE PUBLISHING, INC.,
ATLANTIC RECORDING CORP., RHINO
ENTERTAINMENT COMPANY and
WARNER MUSIC GROUP CORP.


Helene M. Freeman, Esq.
PHILLIPS NIZER LLP
Attorney for Defendants
JAMES PATRICK PAGE,
ROBERT ANTHONY PLANT and
JOHN PAUL JONES

5

## DECLARATION OF PETER J. ANDERSON

I, Peter J. Anderson, declare and state:

1.      I am an attorney admitted to practice before this Court and all Courts of the State of California.  I have personal knowledge of the following facts and could competently testify to these facts if called upon to do so.

2.      I represent defendants James Patrick Page, Robert Plant, Warner/Chappell Music, Inc., Atlantic Recording Corp. and Rhino Entertainment Company in this action. This Declaration is submitted in support of their opposition to plaintiff's motion for sanctions.

3.      After being retained in this action, I learned that Dr. Ferrara had been consulted by Universal Music Publishing ("Universal") and Rondor International ("Rondor").  I spoke with in house counsel at Universal, who ultimately advised me that Universal and Rondor consented to me retaining Dr. Ferrara on behalf of defendants in this action.

4.      At no time did Dr. Ferrara provide to me any of the correspondence he had with Universal and Rondor in the course of their consultation with him.  To this day, I have never seen that correspondence or any report he provided them, if one was provided.

5.      In the course of plaintiff's deposition of Dr. Ferrara in this action on May 27, 2016, a break was taken and I contacted in house counsel for Universal and Rondor and asked whether they consented to Dr. Ferrara disclosing that they had consulted with him and his communications with Dr. Ferrara regarding their consultation.  He told me that they did not object to those disclosures, and I relayed that to Mr. Malofiy, and Dr. Ferrara offered to testify to the finding he relayed to Universal and Rondor.  However, Mr. Malofiy failed to ask those questions.

6.      Attached to this Declaration as Exhibit 1 are true and correct copies of pages from the transcript of Dr. Ferrara's May 27, 2016 deposition in this case and ///

1   which are marked to show the testimony cited in defendants' foregoing

2   Memorandum.

3       I declare under penalty of perjury that the foregoing is true and correct.

4   Executed on June 13, 2016.

5

6                                           /s/ Peter J. Anderson

7                                        PETER J. ANDERSON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

# EXHIBIT 1

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
- - - - - - - - - - - - - - - - - - x
MICHAEL SKIDMORE, as Trustee for      :
the Randy Craig Wolfe Trust,
                                      :   CONFIDENTIAL

        Plaintiff,                    :

                                      :
        -against-                     :      Case No.
                                             2:15-cv-03462
LED ZEPPELIN, JAMES PATRICK PAGE,     :    RGK (AGR)
ROBERT ANTHONY PLANT, JOHN PAUL
JONES, SUPER HYPE PUBLISHING, INC., : 
WARNER/CHAPPELL MUSIC, INC.,
ATLANTIC RECORDING CORPORATION,       :
RHINO ENTERTAINMENT COMPANY,
                                      :
        Defendants.
                                      :
- - - - - - - - - - - - - - - - - - x

            C O N F I D E N T I A L


        VIDEOTAPED DEPOSITION of LAWRENCE FERRARA,

Ph.D., taken by Plaintiff at the offices of Fink &

Carney Reporting and Video Services, 39 West 37th

Street, New York, New York  10018, on Friday, May

27, 2016, commencing at 4:21 o'clock p.m., before

Carol Mele and Linda A. Marino, Registered

Professional Shorthand (Stenotype) Reporters and

Notaries Public within and for the State of New

York.

**EXHIBIT 1**
**01554**

CONFIDENTIAL

Page 82

```
 1          Q      Your counsel had requested to take a

 2   break so you could address issues relating to your

 3   prior engagement in forming an opinion as to

 4   "Taurus" album recording as compared to "Stairway to

 5   Heaven" album recording.

 6                 My questions were:  Who retained you

 7   to produce that opinion prior to becoming retained

 8   by defendants?

 9          A      Rondor Music, which I understand is a

10   division of Universal Music Publishing Group.

11          Q      Who is it?

12          A      R-O-N-D-O-R Music.

13          Q      Rondor who?

14          A      Rondor Music.

15          Q      Which is a division, as you

16   understand, of who?

17          A      Universal Music Publishing Group, I

18   believe.

19          Q      Why were you retained by them?

20                 MR. ANDERSON:  Objection; calls

21            for speculation.

22          A      I was asked by Rondor Music Group to

23   complete an analysis.  They sent, as I recall, an

24   MP3 of the "Taurus" studio version because I did not
```

**EXHIBIT 1**
**01555**

CONFIDENTIAL

Page 83

1    have it in my library or I downloaded it from

2    iTunes.  I don't remember.  I did have "Stairway to

3    Heaven" in my iTunes library.

4              And I completed a preliminary analysis

5    of the two works at that time.  It was about 2013, I

6    think.  I'm just guessing.

7         Q    Was it before the lawsuit was filed in

8    this case or after?

9         A    I have no idea when this lawsuit was

10   filed, sir.

11        Q    Was it before anyone from defendants

12   reached out to you or after?

13        A    Before.

14        Q    You said you produced a preliminary

15   report?

16        A    I don't recall producing a report.

17             Normally what I would do -- but,

18   again, it's been too long -- normally, I would have

19   a telephone conversation and discuss my findings.

20        Q    Who did you have a telephone

21   conversation with?

22        A    I didn't recall earlier, but I

23   mentioned to Mr. Anderson the -- I believed the

24   first or the last name or both started with an "R,"

ZANARAS REPORTING & VIDEO
1.877.GO.DEPOS
**EXHIBIT 1**
**01556**

CONFIDENTIAL

Page 90

```
 1          Q     Do you have any communications by and
 2   between this individual about your analysis?
 3          A     Not that I recall, not -- I just don't
 4   recall.
 5          Q     Did you ever take any notes down when
 6   you did your analysis?  Any notes?
 7          A     To the best of my recollection, I just
 8   can't recall.  It's just been too long.
 9          Q     And you don't recall how much you got
10   paid specifically, right?
11                MR. ANDERSON:  Objection; vague
12           and ambiguous, mischaracterizes the
13           testimony.
14          Q     You said maybe it was two to three
15   hours, maybe it's $2,000.  This is all maybe.  You
16   don't know.
17          A     I don't know.
18          Q     Could have been $10,000, could have
19   been $5,000, you just don't know.
20          A     No, I can't imagine that it could be
21   five or ten thousand dollars because -- I'm very
22   happy to tell you what my filings are, because I do
23   remember what my findings are.
24          Q     We're going to get there.
```

**EXHIBIT 1**
**01557**

CONFIDENTIAL

Page 102

1    in engaging my services was, I don't know.

2         Q     Did they tell you who or what client

3    of theirs they were interested in when they asked to

4    you do that analysis?

5                    MR. ANDERSON:  Objection; vague

6             and ambiguous.

7         A     I do not recall.

8         Q     Did they tell you on behalf of which

9    entity or which group or why they were doing this

10   analysis?

11                   MR. ANDERSON:  Objection;

12            compound, vague and ambiguous, and asked

13            and answered?

14        A     No, I don't.

15        Q     Did they tell you it was because of

16   Lou Adler or any of his entities?

17                   MR. ANDERSON:  Objection; asked

18            and answered.

19        A     I don't know who Lou Adler is, I'm

20   sorry.

21        Q     Did they tell you it was because of

22   Ode Records or Hollenback Music?

23        A     I don't know those entities.

24        Q     At any time, as you sit here today,

CONFIDENTIAL

Page 103

1    did you ever become aware that Universal Music

2    Publishing Group were changing the copyrights or

3    attempting to change the copyrights in February of

4    this year to reflect a different owner of the

5    copyright in "Taurus"?

6              Did you ever know that, sir?

7         A    No.

8         Q    Did you ever see the documents from

9    Universal Music Publishing Group in February where

10   they attempted to change the copyright registration

11   for "Taurus"?

12             MR. ANDERSON:  Objection; asked

13             and answered.

14        A    No.

15        Q    Did counsel, Mr. Anderson ever tell

16   you that the copyright registrations for "Taurus"

17   were attempted to be changed by claiming that they

18   were improperly filed?

19             MR. ANDERSON:  Conversations

20             between me and the retained expert are

21             confidential.  You know that.  You

22             wouldn't allow any --

23             MR. MALOFIY:  I want to know

24             what facts he has.

EXHIBIT 1
01559

CONFIDENTIAL

Page 104

1           MR. ANDERSON:  You wouldn't

2           allow any examination of your experts at

3           all.

4           MR. MALOFIY:  Well, this is a

5           whole deeper level.  I want to know what

6           facts he was made aware of and if

7           there's a serious conflict and,

8           actually, something that he was never

9           aware of.

10          Q     You were never aware that Universal

11    Music Group is attempting to assert and interest in

12    this litigation, are you?

13          A     No.

14          MR. ANDERSON:  Objection; lacks

15          foundation --

16          MR. MALOFIY:  First --

17          MR. ANDERSON:  Wait, wait, wait,

18          wait.

19          MS. FREEMAN:  I'm not sure

20          that's true.

21          MR. ANDERSON:  Yeah, it

22          mischaracterizes the facts, lacks

23          foundation, and you got to slow down so

24          that -- both of you, so that I can

**EXHIBIT 1**
**01560**

CONFIDENTIAL

Page 105

1           object when he starts on these rants.

2           Q     As you sit here today, you were never

3    made aware that Universal Music Group was trying to

4    assert an interest, a financial interest, in

5    "Taurus;" is that correct?

6               MS. FREEMAN:  I'll object to the

7               form of the question.  I believe it

8               assumes facts that are not in evidence.

9           Q     It's correct sir?

10          A     It is correct, I am not aware of any

11   actions on the part of Universal Music Group.

12              MR. MALOFIY:  Please mark this

13              with exception.

14              MS. FREEMAN:  And put a red star

15              on it.

16              MR. MALOFIY:  I want to mark

17              this as well, and it's a request for

18              documentation; specifically, all your

19              communications with Rondor Music,

20              Universal Music Publishing Group and/or

21              Randall Routledge or anyone associated

22              in any way with your opinion that you

23              produced in regards to that matter,

24              inclusive of invoices, letters, e-mails,

CONFIDENTIAL

Page 108

1             MR. ANDERSON:  Yeah, well, we

2        don't --

3             MR. MALOFIY:  And if we don't

4        address them, I'm not gonna go over it

5        anymore.

6                  Please mark this.

7                  We're requesting it.  We're

8        entitled to have it.

9        Q     Did the Universal Music Group ever

10   tell you they were trying to assert any kind of

11   interest, either directly or indirectly, in "Taurus"

12   after your -- you were retained in litigation in

13   this case?

14        A     No.

15        Q     Did they ever tell you after January

16   of this year that they were working to file

17   documents with the copyright office to assert their

18   interest in "Taurus"?

19        A     No.

20        Q     Or assert an interest of an associate

21   or an affiliate?

22             MR. ANDERSON:  Objection; vague.

23        A     No.

24             MR. MALOFIY:  Please mark that

1  Francis Malofiy, Esq.
2  Francis Alexander, LLC
   280 N. Providence Rd. | Suite 1
3  Media, PA 19063
   T:  (215) 500-1000; F:  (215) 500-1005
4  E:  francis@francisalexander.com
5  *Attorney for Plaintiff*

6
   Glen L. Kulik, Esq. (SBN 082170)
7  Kulik Gottesman & Siegel LLP
   15303 Ventura Blvd., Suite 1400
8  Sherman Oaks, CA 91403
   T:  (310) 557-9200; F:  (310) 557-0224
9  E:  gkulik@kgslaw.com
10 *Attorney for Plaintiff*

11

12                **UNITED STATES DISTRICT COURT**

13           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14  MICHAEL SKIDMORE, as Trustee for       Case No. 15-cv-03462 RGK (AGRx)
15  the RANDY CRAIG WOLFE TRUST,
                                           Hon. R. Gary Klausner
16               Plaintiff,

17        v.                               **PLAINTIFF'S BRIEF IN FURTHER
                                           SUPPORT OF ADMISSIBILITY OF
18                                         TAURUS RECORDINGS**

19  LED ZEPPELIN; JAMES PATRICK
20  PAGE; ROBERT ANTHONY PLANT;            Filed concurrently with [Proposed]
    JOHN PAUL JONES; SUPER HYPE            Order
21  PUBLISHING, INC.; WARNER MUSIC
    GROUP CORP., Parent of                 Trial Date:    June 14, 2016
22  WARNER/CHAPPELL MUSIC, INC.;           Time:          9:00 a.m.
23  ATLANTIC RECORDING                     Courtroom:     850
    CORPORATION; RHINO
24  ENTERTAINMENT COMPANY,

25               Defendants.

26

27

28

---

                                      1
     PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on June 14, 2016, at 9:00 a.m., or as soon thereafter as this matter can be heard before the Honorable R. Gary Klausner of the United States District Court for the Central District of California, at 255 East Temple Street, Los Angeles, California, Courtroom 850, Plaintiff Michael Skidmore, Trustee for the Randy Craig Wolfe Trust, hereby asks the Court, based on newly discovered facts, to reconsider the Court's tentative motion in limine ruling not allow recordings of Taurus to be used and played at trial.

This motion is based on the attached memorandum of points and authorities in support thereof and all filings and pleadings in this action.

Dated:  June 12, 2016               FRANCIS ALEXANDER, LLC


                                    */s/ Francis Alexander Malofiy*
                                    Francis Alexander Malofiy
                                    Attorneys for Plaintiff

1  Francis Malofiy, Esq.
2  Francis Alexander, LLC
   280 N. Providence Rd. | Suite 1
3  Media, PA 19063
   T: (215) 500-1000; F: (215) 500-1005
4  E: francis@francisalexander.com
5  *Attorney for Plaintiff*

6  Glen L. Kulik, Esq. (SBN 082170)
7  Kulik Gottesman & Siegel LLP
   15303 Ventura Blvd., Suite 1400
8  Sherman Oaks, CA 91403
9  T: (310) 557-9200; F: (310) 557-0224
   E: gkulik@kgslaw.com
10 *Attorney for Plaintiff*

11

12              **UNITED STATES DISTRICT COURT**
            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
13

14 MICHAEL SKIDMORE, as Trustee for   |  Case No. 15-cv-03462 RGK (AGRx)
   the RANDY CRAIG WOLFE TRUST,
15                                     |  Hon. R. Gary Klausner
16         Plaintiff,
                                       |  **MEMORANDUM IN SUPPORT OF**
17         v.                          |  **PLAINTIFF'S BRIEF IN FURTHER**
                                       |  **SUPPORT OF ADMISSIBILITY OF**
18                                     |  **TAURUS RECORDINGS**
   LED ZEPPELIN; JAMES PATRICK
19 PAGE; ROBERT ANTHONY PLANT;
   JOHN PAUL JONES; SUPER HYPE         |
20 PUBLISHING, INC.; WARNER MUSIC      |  Filed concurrently with [Proposed]
   GROUP CORP., Parent of              |  Order
21 WARNER/CHAPPELL MUSIC, INC.;
22 ATLANTIC RECORDING               |  Trial Date: June 14, 2016
   CORPORATION; RHINO              |  Time:       9:00 a.m.
23 ENTERTAINMENT COMPANY,          |  Courtroom:  850
24
25         Defendants.
26
27 _____
28

---

3
PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

**01565**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Defendants filed a motion in limine with the Court, arguing that the Taurus sound recording should not be played to the jury. Their argument was that the appropriate *musicological* analysis should be limited to the deposit copy sheet music of Taurus, as compared to the sound recording of Stairway to Heaven. The Court tentatively agreed with Defendants and precluded the playing of the sound recording. However, there are two prongs that need to be proven: access and substantial similarity. Respectfully, it appears that the Court's ruling is limited to the Taurus recordings' relevance to the substantial similarity comparison, and does not consider that the Taurus recordings (album and live) are needed to prove access and rebut the affirmative defense of independent creation. Plaintiff now moves for reconsideration on three bases:

**First**, Plaintiff respectfully submits that the Court did not consider access when making its ruling. In cases relied upon by the Court that disregarded the album recordings, such as Newton v. Diamond and Williams v. Bridgeport Music (Blurred Lines case), **access was not in dispute between the parties**. However, in this case, Defendants deny having access to Taurus and thus access is a critical element to be proven. There is no way to be able to cross examine or question defendants Jimmy Page or Robert Plant on access without actually playing the Taurus album recording in open court and asking them "Isn't it true you heard this song by Spirit before writing Stairway to Heaven?" After all, defendant Jimmy Page owns the album Taurus is on, Taurus was played at shows where Led Zeppelin was present, Taurus is on the same side as the same album as the Spirit song Fresh Garbage that Led Zeppelin covered approximately 15 times live, Defendants Page and Plant attended several Spirit shows, and Taurus was on an album that peaked at 31 on the Billboard Top LP's chart and was listed for 32 weeks. The credibility of Defendants' denial that they had never heard Taurus is a dispute of fact for the jury to consider.

PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

Defendants certainly did not hear Taurus by going to the Copyright Office and pulling out the deposit transcription. They either heard the Taurus album version and/or heard it live at concert. If Plaintiff cannot even ask Defendants if they heard the song in question, Plaintiff is being prevented from establishing access, a basic element of the case. The fact of the matter is that the Taurus sound recording must be played to prove Plaintiff's access case.

**Second**, Plaintiff moves for reconsideration based on newly discovered evidence: Defendant's lead musicologist, Dr. Lawrence Ferrara, revealed during his deposition, under great pressure from Plaintiff's counsel, that he had previously conducted a musicological analysis of the Taurus album recording as compared to Stairway to Heaven for Plaintiff's publisher. Dr. Ferrara failed to disclose this salient and highly relevant fact in his expert report, nor did Defendants ever disclose this information. In fact defense counsel and Dr. Ferrara actively hid this information from Plaintiff. Plaintiff has filed a motion for sanctions for this improper conduct, and to preclude Dr. Ferrara from testifying. However, if Dr. Ferrara is to testify, it is imperative that Plaintiff be allowed to cross examine him based on this new evidence that he analyzed the Taurus sound recording—an analysis which was conducted by every Plaintiff and defense expert in this case.

**Third**, Defendants are advancing the related affirmative defense of independent creation of Stairway to Heaven, claiming that it was not based on any prior art. Plaintiff is entitled to present rebuttal evidence. Regardless of the strictly protectable compositional elements involved in the substantial similarity comparison, the overall similarity between the album recording of Taurus and Stairway to Heaven is a dispute of fact for the jury regarding whether Stairway to Heaven was truly independently created. Given that Spirit was a band that Led Zeppelin emulated and appreciated—even incorporating other Spirit compositions such as Fresh Garbage into their live sets, a song from the same side of the same album as Taurus—Plaintiff should be allowed to argue to the jury that the Taurus

PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

**01567**

and Stairway to Heaven album recordings' high degree of similarity rebut the affirmative defense of independent creation. Although the Court has tentatively ruled that the sound recordings are not relevant for the substantial similarity analysis, it does not logically flow that the Taurus album recording could not be used to prove access, rebut independent creation, and cross examine Dr. Ferrara.

## II.   FACTS

In Dr. Ferrara's expert report he steadfastly refuses to refer or mention the Taurus sound recording, maintaining that the deposit copy contains the only protectable expression. This is notable because the defense's other expert, Robert Mathes, did consider the Taurus sound recording in his report—as did Plaintiff's experts. This meant that Dr. Ferrara was allegedly the only expert in this case who did not find the sound recording of Taurus significant. However, on May 27, 2016, at Dr. Ferrara's deposition, it was revealed that Dr. Ferrara and Defendants had been concealing and hiding the fact that Dr. Ferrara had in fact done an analysis of the Taurus sound recording versus the Stairway to Heaven sound recording in 2013, for Plaintiff's publisher. Besides being a conflict, Dr. Ferrara failed to reveal in his expert report that he had in fact considered the Taurus sound recording in his analysis. Regardless of the Court's ruling that the deposit copy of Taurus controls the protectable expression at issue, Plaintiff is entitled to question Dr. Ferrara at trial regarding the sound recording, and how that influenced or did not influence his analysis in this case.

## III.   LEGAL STANDARD FOR RECONSIDERATION

Under Central District of California Local Rule 7-18 a motion for reconsideration is permitted when:

> "(a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been  known to the party moving for reconsideration at the time of such decision,  or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a

---

6

PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

1
2
manifest showing of a failure to consider material facts presented to the Court before such decision."

3
*See* CD Cal. Local Rule 7-18.

4
5
6
7
8
9
10
11
Reconsideration is warranted under LR 7-18(c) because the Court's ruling severely hinders Plaintiff's ability to establish access, and also hinders Plaintiff's ability to rebut Defendants' affirmative defense of independent creation. It is also warranted under LR 7-18(b) because Plaintiff was not aware that Dr. Ferrara had analyzed the Taurus sound recording, Defendants purposefully concealed and hid Dr. Ferrara's prior employment as an expert for Plaintiff's publisher, and concealed Dr. Ferrara's prior musicological opinions, conclusions, and things he relied upon— including the Taurus album recording.

12
13
14
IV.   APPLICATION – RECONSIDERATION AND VACATION OF THE MOTION IN LIMINE ORDER ON THE TAURUS SOUND RECORDING IS WARRANTED

15
16
17
18
19
20
21
22
23
24
Defendants filed a motion in limine with the Court, arguing that the Taurus sound recording should not be played to the jury. Their argument was that the appropriate analysis should be limited to the deposit copy sheet music of Taurus, as compared to the sound recording of Stairway to Heaven. The Court tentatively agreed with Defendants and precluded the playing of the sound recording. Respectfully, it appears that the Court's ruling is limited to the Taurus recordings' relevance to the substantial similarity comparison, and does not consider that the Taurus recordings (album and live) are needed to prove access and rebut the affirmative defense of independent creation. Plaintiff now moves for reconsideration on three bases:

25
26
27
28
**First**, Plaintiff respectfully submits that the Court did not consider access when making its ruling. In cases relied upon by the Court, such as Newton v. Diamond, and Williams v. Bridgeport Music that limited the playing of album sound recordings, **access was not in dispute between the parties**. However, in this case,

1    Defendants deny having access to Taurus and thus access is a critical element to be

2    proven. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000). There

3    is no way to be able to cross examine or question defendants Jimmy Page or Robert

4    Plant on access without actually playing the Taurus album recording in open court

5    and asking them "Isn't it true you heard this song by Spirit before writing Stairway

6    to Heaven?" After all, defendant Jimmy Page owns the album Taurus is on (see Doc.

7    No. 124-1, at p.11), Taurus was played at shows where Led Zeppelin was present

8    (Doc. No. 124-1, at p.63), Taurus is on the same side as the same album as the Spirit

9    song Fresh Garbage that Led Zeppelin covered approximately 15 times live (Doc.

10   No. 124-1, at p.347), defendants Page and Plant attended several Spirit shows before

11   writing Stairway to Heaven (Doc. No. 124-1, at p.20, 30, 320), and Taurus was on

12   an album that peaked at 31 on the Billboard Top LP's chart and was listed for 32

13   weeks (Doc. No. 225-1). The credibility of Defendants' denial of having heard

14   Taurus is a dispute of fact for the jury to consider.

15       Defendants certainly did not hear Taurus by going to the Copyright Office and

16   pulling out the deposit transcription. They either heard the Taurus album version

17   and/or heard Taurus live at concert. If Plaintiff cannot even ask Defendants if they

18   heard the song in question, Plaintiff is being prevented from establishing access, a

19   basic element of the case. The fact of the matter is that the Taurus sound recording

20   must be played to prove Plaintiff's access case.

21       **Second**, Plaintiff moves for reconsideration based on newly discovered

22   evidence: Defendant's lead musicologist, Dr. Lawrence Ferrara, revealed during his

23   deposition, under great pressure from Plaintiff's counsel, that he had previously

24   conducted a musicological analysis of the Taurus sound recording as compared to

25   Stairway to Heaven for Plaintiff's publisher. Dr. Ferrara failed to disclose this salient

26   and highly relevant fact in his expert report, nor did Defendants ever disclose this

27   information. In fact defense counsel and Dr. Ferrara actively hid this information

28   from Plaintiff. Plaintiff has a motion for sanctions pending for this improper

PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

conduct, and to preclude Dr. Ferrara from testifying. However, if Dr. Ferrara is to testify, it is imperative that Plaintiff be allowed to cross examine him based on the new evidence that he analyzed the Taurus sound recording—an analysis which was conducted by every Plaintiff and defense expert in this case. Dr. Ferrara's prior analysis of the Taurus sound recording could not have but helped influence his consideration and analysis in this case—which is why it was hidden and not disclosed by Defendants—and he must be questioned on this.

**Third**, Defendants are advancing the related affirmative defense of independent creation of Stairway to Heaven, claiming that it was not based on any prior art. Plaintiff is entitled to present rebuttal evidence. Regardless of the strictly protectable compositional elements involved in the substantial similarity comparison, the overall similarity between the album recording of Taurus and Stairway to Heaven is a dispute of fact for the jury regarding whether Stairway to Heaven was truly independently created. Given that Spirit was a band that Led Zeppelin emulated and appreciated—even incorporating other Spirit compositions such as Fresh Garbage into their live sets, a song from the same side of the same album as Taurus—Plaintiff should be allowed to argue to the jury that the Taurus and Stairway to Heaven album recordings' high degree of similarity rebut the affirmative defense of independent creation. Although the Court has tentatively ruled that the sound recordings are not relevant for the substantial similarity analysis, it does not logically flow that the Taurus album recording could not be used to prove access, rebut independent creation, and cross examine Dr. Ferrara.

## V.   REMEDY REQUESTED

Plaintiff respectfully requests that the tentative ruling restricting the playing of the sound recording be reconsidered on the basis that the Taurus sound recording is necessary to prove access, necessary to cross examine Dr. Lawrence Ferrara, and necessary to rebut independent creation.

1   Dated:  June 12, 2016                    FRANCIS ALEXANDER, LLC

2

3                                            */s/ Francis Alexander Malofiy*
                                             Francis Alexander Malofiy, Esq.
4                                            Attorney for Plaintiff

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

10
PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

**01572**

# CERTIFICATE OF SERVICE

Plaintiff hereby represents that PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF

ADMISSIBILITY OF TAURUS RECORDINGS has been served upon counsel by electronic filing:

Helene Freeman, Esquire
666 Fifth Avenue
New York, NY 10103-0084
T: (212) 841-0547
F: (212) 262-5152
E: hfreeman@phillipsnizer.com
*Attorneys for Defendants James Patrick Page, Robert Anthony Plant, and John Paul Jones (collectively with John Bonham (Deceased), professionally known as Led Zeppelin)*

Peter J. Anderson, Esquire
100 Wilshire Blvd. | Suite 2010
Santa Monica, CA 90401
T:(310) 260-6030
F: (310) 260-6040
E: pja@pjanderson.com
*Attorney for Defendants Super Hype Publishing, Inc., Warner Music Group Corp., Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company*

*****

*Respectfully submitted,*
Francis Alexander, LLC
*/s/ Francis Alexander Malofiy*
Francis Alexander Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis@francisalexander.com
*/d/ June 12, 2016*

11
PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

**01573**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
PLAINTIFF'S BRIEF IN FURTHER SUPPORT OF ADMISSIBILITY OF TAURUS RECORDINGS

1  Francis Malofiy, Esq.
2  Francis Alexander, LLC
   280 N. Providence Rd. | Suite 105
3  Media, PA 19063
   T: (215) 500-1000; F: (215) 500-1005
4  E: francis@francisalexander.com
5  *Attorney for Plaintiff*

6  Glen L. Kulik, Esq. (SBN 082170)
7  Kulik Gottesman & Siegel LLP
   15303 Ventura Blvd., Suite 1400
8  Sherman Oaks, CA 91403
   T: (310) 557-9200; F: (310) 557-0224
9  E: gkulik@kgslaw.com
10 *Attorney for Plaintiff*

11

12 **UNITED STATES DISTRICT COURT**

13 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  MICHAEL SKIDMORE, as Trustee for the RANDY CRAIG WOLFE TRUST, | Case No. 15-cv-03462 RGK (AGRx) |
| 15 | |
| 16                Plaintiff, | Hon. R. Gary Klausner |
| 17          v. | **PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL** |
| 18 | |
| 19  LED ZEPPELIN; JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; | |
| 20  JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC | Filed concurrently with Declaration of Francis Malofiy, [Proposed] Order |
| 21  GROUP CORP., Parent of | |
| 22  WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING | Trial Date:   June 14, 2016 |
| 23  CORPORATION; RHINO | Time:         9:00 a.m. |
| 24  ENTERTAINMENT COMPANY, | Courtroom:   850 |
| 25                Defendants. | |
| 26 | |
| 27 | |

28

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1

## TABLE OF CONTENTS

2                                                                          Page

3    MEMORANDUM OF POINTS AND AUTHORITIES ................................................1

4    MEMORANDUM OF POINTS AND AUTHORITIES ................................................1

5    I.       INTRODUCTION ..........................................................................1

6    II.      FACTUAL BACKGROUND ...........................................................4

7             A.       FERRARA'S DEPOSITION REVEALS SERIOUS
                        CONFLICT .......................................................................... 4
8
9             B.       ILLEGAL ATTEMPT TO CHANGE COPYRIGHT ...................... 12

              B.       ATTEMPT TO CHANGE COPYRIGHT ........................................ 12
10
     III.     APPLICATION ...............................................................................15
11
12            A.       FERRARA'S EMPLOYMENT WITH
                        ADLER/HOLLENBECK/RONDOR/ UNIVERSAL IS A
                        CLEAR AND UNDENIABLE CONFLICT WHICH
13                      PRECLUDES HIM SERVING AS AN EXPERT ........................... 15

14            B.       IT IS ILLEGAL TO FILE A FALSE COPYRIGHT
                        REGISTRATION.............................................................. 17
15
              C.       DEFENDANTS OBLIGATED TO REVEAL THIS
16                      INFORMATION; NO PRIVILEGE APPLIES ................................. 17

17            D.       SANCTIONS ARE WARRANTED .................................................. 23

18   IV.      CONCLUSION.................................................................................25

19

20

21

22

23

24

25

26

27

28

i

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on June 14, 2016, at 9:00 a.m. or as soon thereafter as this matter can be heard before the Honorable R. Gary Klausner of the United States District Court for the Central District of California, at 255 East Temple Street, Los Angeles, California, Courtroom 850, Plaintiff Michael Skidmore, Trustee for the Randy Craig Wolfe Trust, moves for sanctions to preclude Dr. Lawrence Ferrara from testifying at trial, or in the alternative to instruct the jury to draw a negative inference against his testimony.

Plaintiff just learned on May 27, 2016 at the deposition of Defendants' main musicologist expert Dr. Lawrence Ferrara that he has a serious conflict of interest in this action having previously worked for Plaintiff's publisher to perform a musicological analysis of Taurus; that Defendants and their counsel willfully withheld relevant information and documents in discovery that pertain both to the conflict; that defense counsel misleadingly stated and implied that they had no knowledge about this situation, but in fact they orchestrated the entire scenario and have conspired with Plaintiff's publisher (and fiduciary) since 2014 to undermine Plaintiff's lawsuit, including by inducing the publisher to file false documentation with the Copyright Office in 2016 in an effort to undermine Plaintiff's case.

Defendants, their counsel, and their expert have not produced any of the communications and other documentation relative to these facts, and by virtue of the foregoing, defendants' counsel have become witnesses in the case. Plaintiff does not know what consideration Defendants gave to Plaintiff's publisher as an inducement to conspire to undermine Plaintiff's case, nor has Plaintiff seen any documents or communications related to Dr. Ferrara's previous employment with Plaintiff's publisher. Plaintiff's counsel notified defense counsel that a motion would be filed on May 27, 2016.

/ / /

---

ii

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1      The motion is based on the attached Memorandum of Points and Authorities

2  and Declaration of Francis Malofiy, the Proposed Order, and all files and pleadings

3  in this action.

4

5  Dated:  June 11, 2016          FRANCIS ALEXANDER, LLC

6

7                           */s/ Francis Alexander Malofiy*

8                           Francis Alexander Malofiy

                               Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

---

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is a motion to sanction Defendants and defense counsel for concealing the fact that their lead musicological expert, Dr. Lawrence Ferrara, has a serious conflict of interest. Specifically, in 2013 he conducted a musicological analysis of the compositions of *Taurus* and *Stairway to Heaven* for Plaintiff's publisher, Hollenbeck Music Co., a conflict that Dr. Ferrara and defense counsel knew about but purposefully failed to disclose.

Plaintiff deposed Defendants' lead musicological expert Dr. Lawrence Ferrara ("Ferrara") on May 27, 2016 in New York. During that deposition, it was revealed for the first time that Ferrara did a musicological analysis for Plaintiff's publisher, Hollenbeck Music, of *Taurus* as compared to *Stairway to Heaven,* prior to this lawsuit being filed—though such information and the relevant documentation were never disclosed by Defendants in the action. At first Ferrara refused to reveal who had engaged him to do the analysis. After defense counsel obstructed the course of the deposition by repeatedly lodging frivolous objections, without any legal or factual merit, to conceal this serious conflict of interest, Plaintiff finally extracted from Dr. Ferrara that the analysis was commissioned on behalf of Plaintiff's publisher, Hollenbeck Music and Lou Adler (collectively "Hollenbeck"), by and through Rondor Music, a subsidiary of Universal Music Publishing Group ("Universal"). Rondor and Universal, along with Hollenbeck, administer intellectual property on behalf of Plaintiff.

Defense counsel, after feigning ignorance about what company had hired Dr. Ferrara, eventually began conclusorily claiming that this conflict of interest was waived. But when Plaintiff's counsel asked who could have possibly waived this conflict of interest if not Plaintiff (Rondor's name having not yet been revealed at this point), defense counsel coyly refused to identify the entity, only stating "I am as

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

uncomfortable as" Dr. Ferrara. When again asked who waived the conflict, defense counsel stated, "It's not my deposition." It is now apparent that defense counsel refused to answer because they were colluding with Plaintiff's publisher to hide this conflict and undermine Plaintiff's ownership and standing.

Hollenbeck and Defendants not only hid this conflict from Plaintiff, but earlier this year, just after the discovery cut-off date expired, but prior to the deadline for Defendants to file their summary judgment motion, Hollenbeck/Universal filed a false application with the Copyright Office to "correct" the renewal copyright registered by Randy Wolfe in 1996—after 20 years of doing nothing—contending that *Taurus* was a work-for-hire. There is absolutely no evidence to support this assertion. The Copyright Act imposes criminal sanctions for filing a false copyright registration. *See* 17 USC § 506(e). Universal/Hollenbeck then provided copies of their false application to Defendants, so they could use it in the summary judgment motion to argue that Plaintiff does not own Taurus or have standing to sue. After this Court rejected Defendants' work-for-hire argument, Defendants withdrew their argument that *Taurus* was a work for hire, tacitly admitting that it is factually and legally meritless. In essence, Hollenbeck and Defendants colluded to file a false registration (that they knew was baseless) to influence a dispute about a copyright's ownership currently pending before this Court. This backhanded and essentially fraudulent attempt to alter the *Taurus* copyright was illegal or, at a minimum, extraordinarily underhanded. Plaintiff only learned of this collusion at Dr. Ferrara's deposition.

What Hollenbeck was promised by Defendants for its cooperation is unknown because the evidence of their collaboration has been willfully concealed by Defendants, despite such communication being covered by Plaintiff's discovery requests. But it is clear that since at least 2014, they have worked together to try to undermine Plaintiff's case. It is notorious that the "in crowd" of major players in the

2

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

music industry stick together. That Plaintiff's own publisher would be actively conspiring with Defendants to defeat this lawsuit, illustrates the ethical bankruptcy prevalent in the industry. Plaintiff repeatedly served discovery requests on Defendants for all communications and correspondence regarding Adler and Hollenbeck, but Defendants produced nothing despite their duty to produce, and later supplement, the relevant documentation. Very assiduous and improper attempts to conceal Defendants' collusion with Hollenbeck, and the attempted manipulation of this litigation, have been made by all such parties.

At least indirectly, Ferrara was working for Plaintiff but is now working for Defendants. He has been paid over $80,000 by Defendant, and by the time of the filing of this motion, he has probably billed in excess of $100,000. This serious conflict was never disclosed to Plaintiff prior to Ferrara's deposition—and even then was only revealed after a prolonged dispute with defense counsel, who at first feigned ignorance about the information, then argued it was confidential in an effort to conceal the conflict and their part in it from Plaintiff. As of this moment, Plaintiff has not seen any correspondence/communications between Defendants' counsel and Universal or between Ferrara and Universal/Hollenbeck, the purported conflict waiver, or Ferrara's report prepared for Universal/Hollenbeck. All of these materials should have been disclosed in discovery long ago but were willfully withheld. Dr. Ferrara should be precluded, as the prejudice this has caused cannot be cured or undone at the last minute before trial.

Hollenbeck and Universal (its administrator) have been broadly conspiring with Defendants and defense counsel to sabotage Plaintiff's prosecution of this copyright infringement claim. Note that Hollenbeck/Universal, as Plaintiff's publisher, had fiduciary duties to Plaintiff which they not only disregarded but actively undermined. It also stands to reason that Hollenbeck's   attempts to undermine this lawsuit by divesting Plaintiff of standing (by virtue of claiming to the

3

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

Copyright Office that *Taurus* was a work for hire, and then presenting those documents in filings to this Court) were done for some sort of consideration from Defendants.

## II.    FACTUAL BACKGROUND

### A.    Ferrara's Deposition Reveals Serious Conflict

As explained in the Declaration of Francis Malofiy, Plaintiff deposed Ferrara on May 27, 2016. During that deposition that witness was asked if he had ever heard the song "Taurus" before:

| | |
|---|---|
| MR. MALOFIY: | Were you familiar with the work "Taurus" prior to becoming involved in this litigation? |
| DR. FERRARA: | No. |
| MR. MALOFIY: | Was your first -- |
| DR. FERRARA: | Actually, not no. I was aware of "Taurus" before this litigation. |
| MR. MALOFIY: | Why is that? |
| DR. FERRARA: | I think around three years ago, I was asked to complete an analysis -- it was preliminary -- of the "Taurus" studio version, not the "Taurus" deposit copy, and "Stairway to Heaven." And, so, if the question was "Taurus," then the answer is yes. Prior to this the "Taurus" deposit copy, the answer would be no. |

*See* Exhibit 1 – Ferrara Deposition, at p.58-59. This was news to Plaintiff's counsel as such information had not been disclosed in the Rule 26 disclosures, in any of Ferrara's expert reports and declaration, or by defense counsel. Intrigued by this new information, Plaintiff's counsel asked Ferrara who had retained him to perform such an analysis. This was immediately met by strenuous objections by defense counsel claiming that such information was privileged and confidential, an objection which Plaintiff later learned defense counsel knew was frivolous and false:

| | |
|---|---|
| MR. MALOFIY: | Who asked you to you do that? |
| MR. ANDERSON: | I have the same concern. You're talking about people |

4

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1                              who aren't present here. It seems to me that they may --

2     MR. MALOFIY:     I don't even know where we're going here.

3     MR. ANDERSON:    Yeah, but I think it's privileged.

4     MR. MALOFIY:     I don't know if it's privileged. I mean ...

5
6     MR. ANDERSON:    If he was consulted by counsel confidentially, then I think that's privilege.

7     MR. MALOFIY:     He hasn't even identified who it was

8  *See* Exhibit 1 – Ferrara Deposition, at p.59. It was later learned, Mr. Anderson knew

9  that Dr. Ferrara had not even spoken with counsel and this objection on privilege

10  was baseless. Defense counsel then claimed Ferrara's analysis was a "confidential

11  consultation" and further claimed that such an analysis was attorney "work product"

12  that Ferrara could not disclose. *Id.* at p.60-61.  Ferrara claimed:

13     DR. FERRARA:    I would have to get permission from the party
14                         who called to have done that. And so long as the
                             party who called says that it's not confidential,
15                         I'm happy to -- to let you know.

16  *Id.* at p.61. Ferrara later made it clear that he did not know of any contract or

17  provision which stated that this information was confidential. *Id.* at p.67. Sensing

18  that there was a serious issue, Plaintiff's counsel stated:

19     MR. MALOFIY:     I don't even know if this man can testify because he's not
20                          even disclosing whether there might or might not be a
21                         conflict.

22  *See* Exhibit 1 – Ferrara Deposition, at p.62. Defense counsel, apparently asserting

23  that his opinion can ameliorate conflicts, conclusorily stated "there's no conflict"—

24  despite the fact that Dr. Ferrara had not even told Plaintiff who had previously

25  employed his services. *Id.*

26       Plaintiff's counsel inquired whether Ferrara was retained by Lou Adler, the

27  owner of Hollenbeck Music and Plaintiff's publisher. Hollenbeck administers the

28  Taurus copyright on Plaintiff's behalf.  Ferrara stated, "No." Plaintiff, however, as

5

---

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

this motion explains, **later learned that Ferrara had indeed been hired by entities working on behalf of Adler**. Plaintiff's counsel explained why knowing who had previously hired Ferrara was important:

> He's done analysis of the sound recording of both these works prior to even becoming retained as an expert for defendants in this case and he's not even identifying who he was retained by. That's a serious issue of bias, it's a serious issue of prior work that was completed, serious issue of forming his opinions in this case, and I'm entitled to broach these issues.

*Id.* at p.64. Despite this, defense counsel kept objecting that even identifying who had retained Ferrara was somehow confidential, a nonsensical and inappropriate objection designed to prevent Plaintiff from ascertaining the truth in this matter. This was a deliberate attempt to conceal a serious conflict by defense counsel. When Plaintiff's counsel repeatedly asked defense counsel if he knew who had retained Ferrara, defense counsel coyly refused to answer, stating: "**It's not my deposition**." *Id.* at p.65. Defense counsel, however, had an affirmative duty to disclose this conflict, and also a duty to refrain from preventing the expert's deposition from going forward. Instead, they knowingly and erroneously asserted that Ferrara's past employer was confidential. *Id.* at p.69.

Defense counsel attempted to minimize this issue by claiming in the deposition that Plaintiff noting defense counsel's failure to disclose their main musicological expert's serious conflict was "making a mountain out of a mole hill." *Id.* at p.71. Plaintiff's counsel again asked Ferrara who had retained him, and Ferrara let slip that both defense counsel, Peter Anderson and Helene Freeman, were actually well aware of the company who had previously hired him:

| MR. MALOFIY: | Do you know who you spoke to at Company X that you won't identify? |
|---|---|
| DR. FERRARA: | I don't -- I don't recall the name, but I certainly recall the company. Perhaps Mr. Anderson or Ms. Freeman would -- I don't have the telephone number of that company. |

6

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

|   |   |   |
|---|---|---|
| 1 | | They're in California, and so |
| 2 | MR. MALOFIY: | Why would they know? Why would Ms. Freeman or Mr. Anderson know[?] |
| 3 | | |

*See* Exhibit 1 – Ferrara Deposition, at p.72-73. Yet, despite the seriousness of this issue, defense counsel Mr. Anderson continued to act as if he did know how to get in touch with Ferrara's previous employer. *Id.* at 74-75. Helene Freeman stated she had "no idea" how to contact this company, and Peter Anderson offered to search for a phone number on his iPhone. **As was established shortly thereafter in the deposition, in actuality defense counsel had previously had extensive contact with Ferrara's mystery employer (Plaintiff's publisher)**. Meanwhile, Ferrara furiously backtracked, absurdly trying to "unring the bell" and claim that defense counsel were ignorant of who his previous employer actually was:

|   |   |   |
|---|---|---|
| 13 | MR. ANDERSON: | Are you willing to take a break? If we'll take a break, I've got an iPhone, we can do a search for numbers or something like that. |
| 14 | | |
| 15 | MR. MALOFIY: | Let's take a break. |
| 16 | MS . FREEMAN: | I have no idea. |
| 17 | MR . MALOFIY: | Apparently, he thinks both you, Ms. Freeman, and Mr. Anderson know the name of the company in California that retained Mr. Ferrara -- Ferrara, excuse me, to analyze these two pieces of music, which was never disclosed except for today. I think it's a serious issue and needs to be disclosed. |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | THE WITNESS: | I'm not suggesting that -- |
| 22 | MR. MALOFIY: | Serious issue. |
| 23 | THE WITNESS: | -- either Mr. Anderson or Ms. Freeman know the company, I'm simply saying that the company is an established company and they might know, as you say – as Mr. Anderson said, they might know how to get the number. I don't have the number on me. |
| 24 | | |
| 25 | | |
| 26 | | |

*See* Exhibit 1 – Ferrara Deposition, at p.74-75. Immediately thereafter, defense counsel asserted that any conflict had been waived (an impossibility as Plaintiff was

7

---

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

**01585**

not even aware of the conflict before the deposition), implying that defense counsel indeed knew the company who had hired Ferrara:

| MR. MALOFIY: | Did you clear any conflicts prior to being retained in this case? |
|---|---|
| MR. ANDERSON: | I already told you any conflict was waived. The question really, Francis, is if you want to keep burning time on this or you want to let him -- |
| MR. MALOFIY: | It's a serious, serious issue. The conflict was waived, you said, Mr. Anderson? |
| MR. ANDERSON: | Waived. |
| MR. MALOFIY: | Waived. |
| MR. ANDERSON: | Waived. |
| MR. MALOFIY: | By who? |
| MR. ANDERSON: | **I am as uncomfortable as him**. |

*See* Exhibit 1 – Ferrara Deposition, at p.76 (emphasis added). Remarkably, despite defense counsel strenuously claiming that somehow an attorney work product privilege applied, Ferrara revealed that he *had not even been dealing with a lawyer* at the mystery company. *Id.* at p.79.

At this point, **defense counsel pulled Ferrara out of his deposition and improperly coached him for approximately 15 minutes**. It is unseemly that defense counsel so obviously instructed the deponent how to answer the questions. It reflects that defense counsel was attempting to contain the damage thus far revealed, and wanted to improperly manipulate Ferrara's answers.

Following the forced break Ferrara finally revealed his mystery employer as "Rondor Music, which I understand is a division of Universal Music Publishing Group." *Id.* at p.82.  Plaintiff does not believe that any phone call was made to Rondor during the break, which would mean that defense counsel's previous claims of confidentiality were not accurate.  Ferrara claimed that his contact was Randall

8

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1   Routledge, an officer at Rondor Music, who asked him to do the analysis in 2013.

2   *Id.* at p.84. Routledge is not an attorney and was the only individual Ferrara spoke

3   with at Rondor. *Id.* at p.92, 94-95. Defense counsel, as was revealed shortly

4   thereafter in the deposition, was in contact with Rondor and knew that no attorneys

5   were involved. In other words, the objection based on attorney "work product" was

6   knowingly inaccurate. Regardless of confidentiality, it is manifestly obvious that

7   such a serious conflict should have been revealed long ago—it should not have to be

8   pulled out during an expert deposition while the defense, and expert with the

9   conflict, posit frivolous objections to conceal the seriousness of the matter.

10      Finally, after nearly an hour of refusing to allow Plaintiff to fully question the

11  witness, Ferrara revealed that defense counsel—despite their and Ferrara's previous

12  attempts to feign ignorance about whether defense counsel knew who the company

13  was that had hired Ferrara—had in fact communicated with Rondor about a conflict:

14      MR. MALOFIY:       Did you clear any conflicts when you became engaged
15                         in this matter?

16      DR. FERRARA:       To the best of my recollection, sometime at least in mid
17                         2014, I don't remember exactly when, Ms. Helene
                           Freeman called me with respect to the Skidmore matter.
18                         I said to Ms. Freeman by telephone, it was a telephone
                           conversation, that I had already completed an analysis
19                         on behalf of Rondor and could she tell me whether
                           Rondor Music was involved in this issue, whereupon
20                         she said no. And I said: Well, I can't discuss my
21                         analysis, my findings, unless there's a clearance from
                           Rondor Music. And that was the end of that. **I then**
22                         **heard back some time later, either from Ms.**
                           **Freeman or from Mr. Anderson, that either**
23                         **Universal Music Publishing, you know, or Rondor**
24                         **waived any confidentiality, whereupon I was allowed**
                           **in a telephone conversation then, to the best of my**
25                         **recollection, essentially articulate what my findings**
26                         **were.** I mean, I remember what my findings are, but to
                           basically give them a bottom line.

27

28

9

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

MR. MALOFIY:        Were you told it was waived by counsel or did you actually get something from Rondor Music or Warner -- excuse me, Universal Music Publishing Group?

DR. FERRARA:        To the best of my recollection, I think the process was that perhaps Ms. Freeman asked Mr. Anderson to check, and one of them called to tell me them Rondor essentially -- I don't know if the right word is "waived," but Rondor gave permission for me to basically let them know what my analysis was and had no problem with my being engaged.

*See* Exhibit 1 – Ferrara Deposition, at p.95-96. There are several takeaways from this piece of testimony. **First**, even if there was some sort of confidentiality, defense counsel and  Ferrara were aware that Rondor had waived it in 2014—yet they falsely claimed this information was somehow confidential and attorney work product. **Second**, both Mr. Anderson and Ms. Freeman were intimately involved in contacting Rondor and allegedly obtaining permission for Defendants to use Ferrara. In addition, Dr. Ferrara is incoherently claiming that Ms. Freeman incorrectly told him that Rondor Music is not involved in this dispute (despite that as Plaintiff's publisher, they have an interest and were furthermore secretly working with Defendants to defeat this lawsuit). On the one hand, the defense's own expert is alleging that defense counsel told him there was no conflict, but on the other hand both Dr. Ferrara and Defendants are claiming that the any conflict was waived. It is troubling that the defense realized there was an expert conflict at the very beginning of Ferrara's employment with them—with an entity they knew was Plaintiff's publisher no less (as is shown in the next section)—but not only did Defendants not disclose the conflict, but attempted to hide it even after it was discovered by accident in the expert's deposition. Plaintiff had requested all such information in discovery, but Defendants never disclosed they had such information. Such information also had to be disclosed under Rule 26.

The fact that the conflict was not disclosed indicates that it was concealed by

10

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

defense counsel and Ferrara for a reason. The reasons appear obvious:  Ferrara is the go-to expert for major industry players. He gives them the opinions they want. He has done so literally hundreds of times, and even before his deposition in this case has already been paid $80,000, an amount that is probably now over $100,000. Defense counsel wanted the expert they knew would give them the opinion they wanted, and went to great lengths to hide disqualifying information about him. Ferrara, for his part, wanted over $80,000. Moreover, Defendants did not want to admit that their expert had done a musicological analysis of the sound recording of Taurus on behalf of Plaintiff's publisher, which they do not want introduced at trial. **Third**, Ferrara stated that he told defense counsel his prior conclusion based on the sound recordings of the two songs. Yet, these evaluations and conclusions were never disclosed in Ferrara's reports, or at any other time by defense counsel despite being requested in discovery.

Following this revealing piece of testimony, defense counsel *yet again* pulled Ferrara from the deposition to coach him, as Mr. Anderson was clearly unhappy with the answers given. *Id.* at p.97.  Ferrara then reentered the deposition room with a changed story, now claiming that that Ferrara had never told defense counsel what his conclusions were for Rondor about the Taurus sound recordings, and that the only communications Ferrara had with defense counsel about Rondor was where defense counsel told Ferrara that all conflicts were cleared. Ferrara is a professional expert who has served as an expert countless times for the music industry and knows the litigation process better than many lawyers. He and experienced defense counsel know that this coaching and hiding conflicts is improper.

Astounded at the blatant violation of the rules, Plaintiff's counsel observed:

MR. MALOFIY:     All right. I think it's pretty clear he [Mr. Anderson]
                 called you out so you could fix your testimony.

DR. FERRARA:     To answer you [sic] question, he called me out once
                 again to ask me what my recollection was.

11

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1    MR. MALOFIY:     I know. It's improper.

2  *See* Exhibit 1 –Ferrara Deposition, at p.100. After Ms. Freeman tried to justify the

3  blatant coaching of the witness as "correcting" his testimony, Mr. Malofiy stated:

4      That's called coaching and that's called improper conduct, in pulling a
5      witness out, telling him what to say, and putting him back in the room
       and having him testify as to what Mr. Anderson wanted him to say
6      when he [Mr. Anderson] could have called him in at the end [and
7      questioned him].

8  *Id.* at p.100-01. Although Plaintiff repeatedly asked for this documentation and

9  communication with and about Rondor, defense counsel adamantly refused to

10 produce it, citing a nonexistent privilege. Id. at p.105-109.

11      **B.    Illegal Attempt to Change Copyright**

12      Filing a false representation is subject to criminal sanction under the

13 Copyright Act. 17 USC § 506(e). Troublingly, on February 18, 2016, after the close

14 of discovery in this case, Plaintiff's publisher, Hollenbeck Music (using Universal

15 Music Publishing Group), attempted to alter the Taurus copyright by filing

16 documents with the Copyright Office erroneously claiming that it was a work for

17 hire—despite the copyright being registered in Randy Wolfe's name for the last

18 twenty years:

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

**Explanation of Correction:**

Randy California is an employee for hire of Hollenbeck Music Co. pursuant to agreement dated August 29, 1967.

Correspondence: Give name and address to which correspondence about this application should be sent.

Penny Castle / Universal Music Publishing Group
2100 Colorado Ave., Santa Monica, CA  90404

Phone 310-235-4854    Fax 310-235-4802    Email Penny.castle@umusic.com

Deposit Account: If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name Universal Music Publishing Group

Account Number DA-95025

Certification* I, the undersigned, hereby certify that I am the: (Check only one)
☐ author ☐ owner of exclusive right(s)
☐ other copyright claimant ☑ duly authorized agent of UMPG o/b/o Hollenbeck Music Co.
         Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name ▼ Penny A. Castle     Date ▼ February 18, 2016

Handwritten signature (X) ▼ _Penny A. Castle_

Certificate will be mailed in window envelope to this address:

Name ▼ Universal Music Publishing Group / ATTN: Penny Castle
Number/Street/Apt ▼ 2100 Colorado Avenue
City/State/ZIP ▼ Santa Monica, CA 90404

YOU MUST:
• Complete all necessary spaces
• Sign your application in Space F
SEND ALL ELEMENTS IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material
MAIL TO:
Library of Congress
Copyright Office
101 Independence Ave. S.E.
Washington, D.C. 20559-1205

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev: July 2002—20,000   Web Rev: July 2002   Printed on Recycled paper      U.S. Government Printing Office 2002-491-423/60,009

HOA 000039

Consider that, Universal Music Publishing Group, the same company that hired Dr. Ferrara to analyze Taurus in 2013 on behalf of Hollenbeck Music, tried to change the copyright and erase Plaintiff's ownership and standing on behalf of Hollenbeck Music. The Court considered these documents, but rejected that Taurus was a work for hire as a matter of law as there is copious evidence Taurus was created before any employment of Randy Wolfe by Hollenbeck Music. In light of the Court's

13

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

agreement with Plaintiff's position that the evidence in the record demonstrates that Plaintiff will be able to present evidence capable of proving Taurus is not a work for hire, Defendants completely abandoned this argument. To be clear, it is an unsupportable argument and always was so.

Given that Hollenbeck's attempt to change the Copyright occurred right as Defendants were filing summary judgment, and after discovery closed, it stretches credulity to its breaking point to conclude that Defendants were not coordinating with Adler/Hollenbeck/Rondor to attempt to incorrectly change Taurus ownership by making false filings with the Copyright Office to bolster Defendants' summary judgment motion. This was nothing less than an improper and illegal attempt to alter a copyright currently under litigation. *See* 17 USC 506(e). This backhanded and essentially fraudulent attempt to alter the Taurus copyright was illegal or, at a minimum, extraordinarily underhanded. Again, no such communications, although requested in discovery, have been disclosed between Defendants and Adler. Following the failure of Defendants' work for hire argument at summary judgment, they abandoned the argument as factually and legally meritless.

When Ferrara was asked whether he knew that Universal attempted to change the copyright for Taurus during this litigation, he professed ignorance. However, when he was asked if Mr. Anderson had ever told him that the copyright registrations for Taurus were attempting to be changed, Mr. Anderson immediately interposed an objection that "**Conversations between me and the retained expert are confidential**." Exhibit 1, at p.103. This tacitly admits there was such a conversation. It is obvious that Dr. Ferrara must have known that the company who hired him, and who defense counsel had obtained a "waiver" from to use him as an expert, was the same company changing the copyright to bolster Defendant's summary judgment work-for-hire argument. This is a huge conflict, indicates bias, and should have been answered.

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

Plaintiff is entitled to these communications. As explained below, Mr. Anderson's objection based on FRCP 26 is not correct. Conversations between counsel and an expert *related to providing the opinion* he is offering are indeed protected, but whether Mr. Anderson told Ferrara that someone was attempting to change the Taurus copyright is not remotely within the scope of that privilege as it does not concern Ferrara's expertise of musicological analysis. Plaintiff suspects Ferrara not only knew that attempts were being made to alter the Taurus copyright, and that Ferrara knew it was likely his prior employer, Rondor and Universal, doing so. Yet, Ferrara never disclosed that an entity (Plaintiff's publisher) that had previously employed him to analyze Taurus was attempting to illegally wrest ownership of Plaintiff's copyrights away from him.

## III. APPLICATION

### A. Ferrara's Employment with Adler/Hollenbeck/Rondor/ Universal Is a Clear and Undeniable Conflict Which Precludes Him Serving as an Expert

Federal courts have the inherent power to disqualify experts "if necessary to preserve public confidence in the fairness and integrity of the judicial system." *Koch Refining Co. v. Jennifer L. Boudreaux, M/V*, 85 F.3d 1178, 1181 (5th Cir.1996); *Campbell Industries v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir.1980) ("A district court is vested with broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial... including disqualifying expert testimony."); *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F.Supp. 1246, 1248 (E.D.Va.1991); *Paul v. Rawlings Sporting Goods*, 123 F.R.D. 271, 278 (S.D. Ohio 1988). "`The policy objectives favoring disqualification include preventing conflicts of interest and maintaining the integrity of the judicial process.'" *Koch*, 85 F.3d at 1182. (quoting *English Feedlot v Norden Labs., Inc.*, 833 F.Supp. 1498, 1504 (D.Col. 1993)). Conflicts must be affirmatively disclosed. *See Shadow Traffic Network v. Superior Court*, 24 Cal. App. 4th 1067, 1084-85 (Court of Appeal 1994).

15

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1    Dr. Ferrara, as an expert, is in effect an extension of the individual or entity he

2  has been retained by, Plaintiff's publisher. If, for instance, plaintiff Michael

3  Skidmore had retained Dr. Ferrara to compare Taurus and Stairway to Heaven,

4  Ferrara would be conflicted from serving as expert on this case for Defendants. In

5  fact, this essentially what has happened here. Dr. Ferrara served as an expert for

6  Plaintiff's publisher to analyze Taurus, who essentially stands in Plaintiff's shoes.

7  This alone precludes Ferrara from serving as an expert for Defendants, especially

8  given that it was not disclosed.

9    To be clear, there is no dispute that there was a conflict of interest. Defendants

10  admitted in the deposition of Dr. Ferrara that they believed there was a conflict and

11  had allegedly obtained a waiver:

12    MR. MALOFIY:    Did you clear any conflicts prior to being retained in this
13                    case?

14    MR. ANDERSON:   I already told you any conflict was waived. The question
                      really, Francis, is if you want to keep burning time on
15                    this or you want to let him --

16    MR. MALOFIY:    It's a serious, serious issue. The conflict was waived,
17                    you said, Mr. Anderson?

18    MR. ANDERSON:   Waived.

19    MR. MALOFIY:    Waived.

20    MR. ANDERSON:   Waived.

21    MR. MALOFIY:    By who?

22    MR. ANDERSON:   **I am as uncomfortable as him**.

23  *See* Exhibit 1 – Ferrara Deposition, at p.76 (emphasis added). However, despite

24  knowing that the conflict arose because of Plaintiff's involvement in the case

25  (because Dr. Ferrara's previously employer was Hollenbeck/Rondor acts as a

26  publisher and administrator for Plaintiff), they hid the conflict from Plaintiff, only

27  reluctantly revealing it at the 11th hour under pressure from Plaintiff's counsel.

28

16

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

**01594**

1
2
3
4
5

This is highly improper. As a sanction for not only using a conflicted expert, but also hiding that conflict, Dr. Ferrara should be precluded from testifying at trial. Defendants knew their lead expert was conflicted by virtue of his employment with Plaintiff's publisher, but hid this conflict so that they could use the services of Dr. Ferrara, a go-to industry expert.

6

**B.    It is Illegal to File a False Copyright Registration**

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Filing a false representation is subject to criminal sanction under the Copyright Act. 17 USC § 506(e). Universal Music Publishing Group, the same company that hired Dr. Ferrara to analyze Taurus in 2013 on behalf of Hollenbeck Music, tried to change the Taurus copyright's ownership and erase Plaintiff's ownership and standing also on behalf of Hollenbeck. Given that Hollenbeck's attempt to change the Copyright occurred right as Defendants were filing summary judgment, and after discovery closed, it stretches credulity to its breaking point to maintain that Defendants were not coordinating with Plaintiff's publisher (Adler and Hollenbeck and Rondor) to change the listed ownership of the Taurus copyright. This was nothing less than an improper and illegal attempt to alter a copyright currently under litigation. Note that Defendants have represented to the Court in April 2016, following denial of their summary judgment motion, that they are completely abandoning their work-for-hire argument, tacitly admitting that it is meritless. Yet Defendants nevertheless previously worked with Hollenbeck and Adler to attempt to file a false correction to the Taurus copyright to erroneously represent it is a work for hire and defeat the lawsuit on ownership and standing grounds! This underhanded and essentially fraudulent attempt to alter the Taurus copyright was illegal or, at a minimum, extraordinarily underhanded. Again, no such communications, although requested in discovery, have been disclosed.

26
27

**C.    Defendants Obligated to reveal this information; No Privilege Applies**

28

Under Rule 26(a)(2)(B), an expert must disclose facts or data he considered,

17

1   and must also disclose the assumptions he made in coming to his conclusion, under
2   Rule 26(b)(4(C). The test of a report under Rule 26(a)(2)(B) is "whether [it] is
3   sufficiently complete, detailed and in compliance with the Rules so that surprise is
4   eliminated, unnecessary depositions . . . avoided, and costs are reduced." *Elgas v.*
5   *Colorado Belle Corp.*, 179 F.R.D. 296, 299 (D. Nev. 1993). "A report is deficient if
6   it fails to include any of the underlying conclusions upon which the expert's ultimate
7   opinions are based." *In re Central Indus. Development Co.*, 427 B.R. 149, 156 (N.D.
8   Cal. 2009) (citing *Atkins v. County of Orange*, 372 F.Supp. 2d 377, 395 (S.D.N.Y.
9   2009)). In addition, under FRCP 45(g) the Court "may hold in contempt a person
10  who, having been served, fails without adequate excuse to obey the subpoena or an
11  order related to it." *Id.* Under FRCP 37(c)(1), the Court may impose appropriate
12  sanctions for failure to respond to document requests.

13          Despite the fact that Dr. Ferrara had analyzed the Taurus sound recording, he
14  did not reveal his prior analysis in his report, despite the fact that it must have helped
15  form his analysis in this case. Nor did he disclose in his report that he had been told
16  to disregard his prior analysis the Taurus and Stairway to Heaven. This is exactly the
17  sort of surprise that Rule 26 seeks to eliminate. One reason for the lack of disclosure
18  is that Defendants have been trying quite hard to keep the jury from hearing the
19  sound recording of Taurus, claiming that the deposit copy is all that the jury may
20  consider. Plaintiff argues that the jury may consider any and all protected musical
21  composition in the Taurus deposit copy that is embodied in the sound recording. Dr.
22  Ferrara's prior musicological analysis of the Taurus sound recording for Plaintiff's
23  publisher is quite relevant to how he came to his conclusions in this case.

24          Moreover, Plaintiff served a multitude of requests for documents and
25  subpoenas on Defendants and Dr. Ferrara (and their agents and attorneys) that
26  covered and requested information on this issue: that a prior analysis was made by
27  Plaintiff's publisher and Ferrara. Yet Defendants never produced any of the relevant

28

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1  documentation, nor provided a privilege log. These requests included Plaintiff's first

2  requests for production on October 13, 2015:

3
4  | 11 | 10. All Materials which mention, discuss or reflect any differences between |
   | 12 | Taurus and Stairway to Heaven. |
5

6
7  | 20 | 43. All text, visual representations, audio, recordings, data, media, or other |
   | 21 | material provided to any defendant by anyone relating to Stairway to Heaven or |
8  | 22 | Taurus, including any handwritten or original text, visual representations, audio, |
9  | 23 | recordings, data, media, or other material. |

10
11 | 1 | 45. All Materials comprising, reflecting, or evidencing any communications |
   | 2 | on the subject of Taurus. |
12

13
14 | 10 | 58. All Materials which evidence or reflect that Taurus lacks originality. |

15 See Exhibit 3. Requests served in early January 2016:

16 | 17 | 73. All Materials which evidence or discuss Lou Adler's involvement in the |
17 | 18 | writing, recording, or exploitation of Stairway to Heaven and Led Zeppelin IV. |
   | 19 | 74. All Materials which evidence or discuss Lou Adler's involvement in the |
18 | 20 | writing, recording, or exploitation of Taurus. |
19 | 21 | 75. All Materials which evidence or discuss Howard Frank's involvement in |
   | 22 | the writing, recording, or exploitation of Stairway to Heaven and Led Zeppelin IV. |
20 | 23 | 76. Produce all Materials related to Hollenbeck Music's involvement in the |
21 | 24 | exploitation of Stairway to Heaven or Led Zeppelin IV. |
22 | 25 | 77. Produce all Materials that evidence or reflect Ode Records' involvement |
   | 26 | in the exploitation of Stairway to Heaven or Led Zeppelin IV. |
23 | 27 | 78. All Materials which mention, discuss or relate to the songwriting credits |
24 | 28 | for Stairway to Heaven, Led Zeppelin IV, and/or Taurus. |
25

26
27 | 10 | 82. All Materials that evidence or reflect that any defendant in this case had |
28 | 11 | a copy of the recording of any version of "Taurus." |

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

> 135. All materials and communications you have concerning Lou Adler (including not limited to his entities such as Hollenbeck Music and Ode Records) and Howard Frank regarding Stairway to Heaven, Led Zeppelin IV, Spirit, Taurus, Randy California, the Randy Craig Wolfe Trust, and/or this litigation including phone records at any point in time, including after the filing of this lawsuit—this includes communications between Defendants' attorneys and agents and Lou Adler's attorneys and agents.
>
> 136. All materials and communications you have concerning Quinn Wolfe (and/or his representatives, attorneys, or agents) regarding Stairway to Heaven, Led Zeppelin IV, Spirit, Taurus, Randy California, the Randy Craig Wolfe Trust, and/or this litigation, including phone records at any point in time, including after the filing of this lawsuit—this includes communications between Defendants' attorneys and Wolfe's attorneys and agents.

> 150. All materials regarding the agreements, contracts, and correspondence by and between Defendants and Lou Adler, Hollenbeck Music, Ode Records, and their agents, attorneys, and representatives, in regards to any Spirit song, including but not limited to Fresh Garbage, and/or any portion of Fresh Garbage.

See Exhibit 4. And the requests served on Ferrara with his subpoena:

> **Document Production Requests**
>
> 1. All communications, documents, and things (including emails, faxes, notes, letters, audio/video files, and/or correspondence), including those from or exchanged with Peter Anderson, Helene Freedom, any employee or agent of the Law Offices of Peter J. Anderson, any employee or agent of Philips Nizer LLP, and/or Defendants (and entities they own and/or control), that regard:
>
>    a. Facts and/or data you considered in writing your reports and/or declarations for this lawsuit, or otherwise in forming opinions and conclusions regarding this lawsuit.
>
>    b. Facts and/or data you did not consider in writing your reports and/or declarations for this lawsuit, or otherwise in forming opinions and conclusions regarding this lawsuit.

20

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

*See* Exhibit 5. Dr. Ferrara revealed during his deposition that he and defense counsel had extensive communications with Plaintiff's publisher. **None of this was turned over**. Plaintiff also believes that Ferrara was made aware of the illegal attempt to change the copyright. When Ferrara was asked during the deposition whether he knew Universal attempted to change the copyright for Taurus during this litigation he professed ignorance. However, when he was asked if Mr. Anderson had ever told him that the copyright registrations for Taurus were attempting to be changed, Mr. Anderson immediately interposed an objection that "Conversations between me and the retained expert are confidential." Exhibit 1, at p.103. This tacitly admits there was such a conversation. It is obvious Ferrara must have known that the company who hired him, and who defense counsel had obtained permission from to use him as an expert, was the same company changing the copyright to bolster Defendants' summary judgment argument. Plaintiff is entitled to these communications and to question Ferrara. Plaintiff thus requests this production to be allowed to explore these topics during cross examination.

As discussed below this conduct warrants imposing sanctions on Defendant under the Court's inherent powers, Rule 45(g), and Rule 37(c)(1). Defendants withheld this conflict, withheld the prior analysis of Dr. Ferrara, and withheld the related communications. It appears that extensive communications were taking place between Adler/Hollenbeck/Rondor/Universal in light of the timing of the copyright "correction" filings, yet, none of this was disclosed.

**DEFENDANTS' OBJECTIONS ARE SPURIOUS**

At the deposition, Defendants objected on confidentiality grounds and privilege grounds to Dr. Ferrara discussing his previous musicological analysis of Taurus for Plaintiff's publisher, or producing any related documents. **First,** they claim that Ferrara does not have to reveal any communications or analysis with Rondor because it is confidential and/or attorney work product. **Second**, they claim

21

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1  that the expert does not have to reveal any communications with defense counsel,

2  claiming that under the 2010 revisions to Rule 26(b)(4)(C), communications by and

3  between an expert and counsel are privileged.

4      Neither objection is correct. **First**, Ferrara never worked with an attorney at

5  Rondor so no work-product privilege applies, and his testimony made it clear that he

6  did not even know if there was a confidentiality agreement. Regardless, this

7  information is highly relevant, and goes to bias and conflicts. It should have been

8  identified in a privilege log. At this late hour, there is no practical way to cure the

9  prejudice to Plaintiff from this nondisclosure, other than preclusion of Dr. Ferrara.

10  **Second,** Rule 26(b)(4)(C) indeed protects communications between counsel and an

11  expert, but only to the extent they are "required to provide [an expert] report." But

12  Rule 26 does not apply to tangential communications not required to provide an

13  expert report, such as whether the Taurus copyright ownership was attempted to be

14  altered, or about Dr. Ferrara's prior analysis. Rule 26(b)(4)(C)(iii) also makes it

15  clear that an expert must answer questions about assumptions the opposing party

16  provided. One such assumption Dr. Ferrara appears to have been provided by

17  defense counsel was to disregard and ignore his previous analysis of Taurus and

18  Stairway to Heaven for Plaintiff's publisher. Yet, defense counsel prevented him

19  from answering these critical questions. No privilege, either Rule-based or from

20  common law, covers these communications. The Court should order Ferrara to

21  produce all communications by and between counsel on the changing of the

22  copyrights. However, it is again noted that, at this late hour, there is no realistic way

23  to cure the prejudice to Plaintiff before trial, other than precluding Dr. Ferrara

24      Plaintiff suspects Ferrara not only knew that attempts were being made to

25  alter the Taurus copyright, but that Ferrara knew it was likely his prior employer,

26  Rondor and Universal, doing so. Yet, Ferrara never disclosed that an entity that had

27  previously employed him—and owed a fiduciary duty to Plaintiff—was improperly

28

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

attempting to wrest ownership of Plaintiff's copyrights away from him.

### D.    Sanctions Are Warranted

Given Defendants' highly unethical, bad-faith conduct sanctions should be imposed on Defendants. The basis for sanctions is the Court's inherent powers, Rule 45(g), Rule 37, and § 506(e). The sanction is that Dr. Ferrara should be precluded due to the failure of Defendants to disclose this known conflict and Defendants' blatant attempt to hide this conflict. Ferrara should be ordered to stop participating in this case in any way, effectively immediately. There is no way at this late hour to cure the prejudice, other than to preclude Dr. Ferrara from testifying.

In the alternative, the jury should be instructed that they can draw a negative inference that Dr. Ferrara's failure to disclose his prior analysis, failure to disclose communications with Rondor, and failure to disclose related documents, is indicative that any such analysis was harmful to Defendants' case. **Ferrara is an experienced litigation expert; he knew what he was doing and hiding was wrong**. Yet he nevertheless hid his prior analysis, failed to disclose the facts and assumptions he was given, did not accurately identify his prior compensation, and failed to indicate that he had previously worked with Plaintiff's publisher to analyze the songs under dispute. Rule 26(a)(2)(B) places a duty on the opposing party and their expert to disclose these facts to avoid surprise, but no disclosure was made.

It must be stressed that Defendants, defense counsel, Ferrara, and Plaintiff's publisher and administrator were at all times well aware of this conflict, but instead of affirmatively disclosing it as required, actively sought to conceal this conflict from Plaintiff. This is underhanded, unethical conduct, which was only inadvertently discovered at the 11th hour during Ferrara's deposition. There are two likely reasons Defendants tried to cover up this conflict. **First**, Ferrara's prior analysis of Taurus focused on the sound recordings of Taurus, which Defendants claim is irrelevant. Ferrara failed to disclose that he considered the Taurus sound recording during his

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

analysis for this case. Defendants hid this analysis and conflict because it would allow Plaintiff to ask Ferrara about his musicological analysis of the Taurus sound recording's composition, which they do not want played for the jury. **Second**, Ferrara is the go-to expert for major industry players like Led Zeppelin. He gives them the opinions they want. He has done so literally hundreds of times, and even before his deposition in this case has already been paid $80,000. Defense counsel wanted the expert they knew would give them the opinion they wanted, and went to great lengths to hide disqualifying information about him. Ferrara, for his part, wanted over $80,000. Defendants should not be permitted to profit from their underhandedness.

In addition, Plaintiff requests the fees and costs for Ferrara's deposition paid for by Defendants under 28 USC § 1927. An attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927; *Save the Peaks Coalition v. US Forest Service*, 683 F. 3d 1140 (9th Cir. 2012) (bad faith require to impose § 1927 sanctions). There is a strong basis for such sanctions given that (1) Defendants hid the conflict which would have precluded Dr. Ferrara from serving as an expert, and being deposed in the first place (not to mention all the rebuttal expert reports paid for by Plaintiff concerning Dr. Ferrara's opinions), thus vexatiously multiplying proceedings, and (2) defense counsel made obstructionist objections during Dr. Ferrara's deposition which prolonged the deposition. The requisite bad faith is established by Defendants working with entities they knew were Plaintiff's publishers, including having Hollenbeck file an essentially fraudulent copyright registration correction claiming Taurus was a work for hire, an argument that even Defendants have now abandoned. Bad faith is also established because defense counsel blatantly coached Dr. Ferrara and directed him how to answer questions

24

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

**01602**

1   during his deposition.

2   **IV.   CONCLUSION**

3        Plaintiff asks that Dr. Lawrence Ferrara be precluded from testifying at trial

4   due to the conflict of interest—that Dr. Ferrara analyzed Taurus for Plaintiff's

5   publisher—something that Defendants failed to disclose and actively concealed

6   since 2014. In the alternative, Plaintiff asks that the jury be permitted to draw a

7   negative inference that Dr. Ferrara's failure to disclose his prior analysis would be

8   damaging to his opinion in this case and Defendants' defense of this action.

9        Plaintiff stresses that any remedy granted by the Court should not delay the

10  trial. Plaintiff and witnesses have already cleared their schedules, made

11  nonrefundable travel plans, and spent tens of thousands of dollars for trial. Plaintiff

12  desires only those remedies that do not delay the trial.

13

14  Dated:  June 11, 2016                    FRANCIS ALEXANDER, LLC

15

16                                          */s/ Francis Alexander Malofiy*
17                                          Francis Alexander Malofiy, Esq.
                                            Attorney for Plaintiff
18

19

20

21

22

23

24

25

26

27

28

---

25

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

# CERTIFICATE OF SERVICE

Plaintiff hereby represents that Plaintiff's MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING has been served upon counsel by electronic filing:

Helene Freeman, Esquire
666 Fifth Avenue
New York, NY 10103-0084
T: (212) 841-0547
F: (212) 262-5152
E: hfreeman@phillipsnizer.com
*Attorneys for Defendants James Patrick Page, Robert Anthony Plant, and John Paul Jones (collectively with John Bonham (Deceased), professionally known as Led Zeppelin)*

Peter J. Anderson, Esquire
100 Wilshire Blvd. | Suite 2010
Santa Monica, CA 90401
T:(310) 260-6030
F: (310) 260-6040
E: pja@pjanderson.com
*Attorney for Defendants Super Hype Publishing, Inc., Warner Music Group Corp., Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company*

*****

*Respectfully submitted,*

Francis Alexander, LLC
*/s/ Francis Alexander Malofiy*
Francis Alexander Malofiy, Esquire
Attorney ID No.: 208494
280 N. Providence Road | Suite 105
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com
*/d/ June 11, 2016*

26

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR.
LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1　Francis Malofiy, Esq.
　　Francis Alexander, LLC
2　280 N. Providence Rd. | Suite 105
3　Media, PA 19063
　　T:  (215) 500-1000; F:  (215) 500-1005
4　E:  francis@francisalexander.com
5　*Attorney for Plaintiff*

6
7　Glen L. Kulik, Esq. (SBN 082170)
　　Kulik Gottesman & Siegel LLP
8　15303 Ventura Blvd., Suite 1400
　　Sherman Oaks, CA 91403
9　T: (310) 557-9200; F: (310) 557-0224
10　E: gkulik@kgslaw.com
　　*Attorney for Plaintiff*
11

12　　　　　　**UNITED STATES DISTRICT COURT**

13　　　**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14　MICHAEL SKIDMORE, as Trustee for | Case No. 15-cv-03462 RGK (AGRx)
15　the RANDY CRAIG WOLFE TRUST,

16　　　　　　　Plaintiff, | Hon. R. Gary Klausner

17　　　v. | **DECLARATION OF FRANCIS**
　　　　　　　　　　　　　　　　**MALOFIY IN SUPPORT OF**
18　　　　　　　　　　　　　　　　**PLAINTIFF'S MOTION FOR**
19　LED ZEPPELIN; JAMES PATRICK | **SANCTIONS AND TO PRECLUDE**
　　PAGE; ROBERT ANTHONY PLANT; | **DR. FERRARA FROM**
20　JOHN PAUL JONES; SUPER HYPE | **TESTIFYING AT TRIAL**
　　PUBLISHING, INC.; WARNER MUSIC
21　GROUP CORP., Parent of | Filed concurrently with Motion; and
22　WARNER/CHAPPELL MUSIC, INC.; | [Proposed] Order
　　ATLANTIC RECORDING
23　CORPORATION; RHINO | Trial Date:　　June 14, 2016
24　ENTERTAINMENT COMPANY, | Time:　　　　9:00 a.m.
　　　　　　　　　　　　　　　　Courtroom:　850
25　　　　　　　Defendants.

26

27

28

─────────────────────────────────────────

DECL. OF F. MALOFIY MOTION IN SUPPORT OF MOTION FOR SANCTIONS AND TO
PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

I, Francis Malofiy, declare:

1.      I am an attorney in the law firm of Francis Alexander, LLC, and I represent Plaintiff Michael Skidmore, as Trustee for the Randy Craig Wolfe Trust in the above-captioned matter.  I have personal knowledge of the facts recited below, and, if called as a witness, I could and would testify competently to the facts contained in this declaration.

2.      On May 27, 2016, Plaintiff deposed Defendant's lead musicological expert, Dr. Lawrence Ferrara. Attached as Exhibit 1 is a full and accurate transcript of that deposition.

3.      During that deposition it was revealed that Dr. Ferrara had previously analyzed the sound recording of Taurus as compared to the sound recording of Stairway to Heaven in 2013 for Rondor Music, a subsidiary of Universal Music Publishing Group.

4.      Based on filings that Universal Music Publishing Group made with Copyright Office in 2013 on behalf of Hollenbeck Music with respect to the Taurus copyright (attached as Exhibit 2), it is believed that Dr. Ferrara analyzed Taurus and Stairway to Heaven for Hollenbeck Music.

5.      Never at any point, until Plaintiff's counsel sedulously had to pull it out of Dr. Ferrara, was this conflict disclosed, nor was this highly relevant prior analysis of the songs in question. During the deposition defense counsel feigned ignorance as to who had hired Dr. Ferrara, despite having extensive contacts with Rondor.

6.      Discovery requests for this information were made by Plaintiff during discovery (attached as Exhibits 3 and 4), and also in the subpoena for Dr. Ferrara's deposition (attached as Exhibit 5). This information and conflict should also have been disclosed pursuant to Rule 26, as Dr. Ferrara considered it in coming to his opinions and conclusion.

7.      Universal Music, Rondor Music, and Hollenbeck administer the Taurus copyright on behalf of Plaintiff. Hollenbeck Music is a fiduciary for Plaintiff, and

owes it a duty of the utmost good faith and affirmative disclosure, and also owes it an implied covenant of good faith and fair dealing.

8.    During the deposition of Dr. Ferrara it became apparent that Hollenbeck has been secretly working with Defendants for years. Hollenbeck was explicitly noticed of the suit by Plaintiff in 2014 (attached as Exhibit 6).

9.    This cooperation with Defendants has manifested itself in two main ways, both attempts to undermine Plaintiff's case. As Hollenbeck is a fiduciary of Plaintiff, something which both defense counsel are well aware, this is highly improper.

10.    First, Hollenbeck and Defendants knew from the beginning of this case that Dr. Ferrara was conflicted from serving as an expert for Defendants but deliberately concealed this fact from Plaintiff. Defendants absurdly claimed that they had waived the conflict by obtaining permission from Rondor to use Dr. Ferrara. No such waiver could come from Rondor, Hollenbeck, or Defendants—any conflict had to be waived by Plaintiff.

11.    Second, Hollenbeck by and through Universal Music Publishing Group attempted to file copyright registration "corrections" to the Taurus copyright in February 2016, after discovery closed but immediately before Defendants' motion for summary judgment was due. Hollenbeck's "correction" was to erroneously assert to the Copyright Office that Taurus was a work for hire. This was nothing less than a deliberate and blatant attempt to defeat Plaintiff's lawsuit, an egregious breach of Hollenbeck's fiduciary duties. It was also illegal under 17 USC § 506(e).

12.    In addition, the correction to a copyright under litigation—apparently at the behest of Defendants—was false, as Taurus is not a work for hire. After this argument was denied at summary judgment, Defendants have told the Court they are completely abandoning it.

13.    Prior to Dr. Ferrara's deposition, Plaintiff had no evidence Defendant was working with Hollenbeck against Plaintiff. It is, however, apparent following

Dr. Ferrara's deposition that both Defendants and Hollenbeck (by and through Universal Music Publishing) have been working together to defeat Plaintiff's copyright action. This is highly improper.

14.     There is no practical way at this late hour to cure the prejudice Plaintiff has suffered due to the late disclosure. This warrants the preclusion of Dr. Ferrara, or at a minimum the jury be instructed that they may draw a negative inference his failure to disclose his prior analysis indicates that it would have been harmful to Defendants' case.

15.     Sanctions are also warranted under section 1927, for the bad faith multiplication of proceedings, and also under the Court's inherent powers. Plaintiff expended a good deal of money deposing Dr. Ferrara, including paying for his time. However, Defendants were concealing the fact that Dr. Ferrara has a major conflict which prevents him from serving as an expert in this case. Defendants also necessitated a re-deposition of Dr. Ferrara because, in bad faith, they lodged frivolous objections and refused to allow Dr. Ferrara to answer highly relevant questions. The cost and expense for Dr. Ferrara's deposition should be borne by Defendants.

16.     Plaintiff and his counsel reaffirm that they had no idea that Dr. Ferrara worked for Hollenbeck Music, Rondor Music, or Universal Music Publishing Group, and furthermore had no idea that Defendants were actively conspiring with Plaintiff's own publisher and fiduciary against him.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of June, 2016 at Los Angeles, California.


/s/ *Francis Alexander*
Francis Malofiy

---

DECL. OF F. MALOFIY MOTION IN SUPPORT OF MOTION FOR SANCTIONS AND TO
PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF F. MALOFIY MOTION IN SUPPORT OF MOTION FOR SANCTIONS AND TO
PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL


Case 2:15-cv-03462-RGK-AGR   Document 230-1   Filed 06/11/16   Page 6 of 157   Page ID #:6131

# Exhibit 1

CONFIDENTIAL

**Page 1**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
- - - - - - - - - - - - - - - - - x
MICHAEL SKIDMORE, as Trustee for  :
the Randy Craig Wolfe Trust,
                                   : CONFIDENTIAL
           Plaintiff,
                                   :
       -against-        :   Case No.
                            2:15-cv-03462
LED ZEPPELIN, JAMES PATRICK PAGE,  :  RGK (AGR)
ROBERT ANTHONY PLANT, JOHN PAUL
JONES, SUPER HYPE PUBLISHING, INC., :
WARNER/CHAPPELL MUSIC, INC.,
ATLANTIC RECORDING CORPORATION,    :
RHINO ENTERTAINMENT COMPANY,
                                   :
           Defendants.
- - - - - - - - - - - - - - - - - x
       C O N F I D E N T I A L

       VIDEOTAPED DEPOSITION of LAWRENCE FERRARA,
Ph.D., taken by Plaintiff at the offices of Fink &
Carney Reporting and Video Services, 39 West 37th
Street, New York, New York 10018, on Friday, May
27, 2016, commencing at 4:21 o'clock p.m., before
Carol Mele and Linda A. Marino, Registered
Professional Shorthand (Stenotype) Reporters and
Notaries Public within and for the State of New
York.

**Page 2**

```
1
2   A P P E A R A N C E S :
3     FRANCIS ALEXANDER LLC
        Attorneys for Plaintiff
4       280 N. Providence Road, Ste. 105
        Media, Pennsylvania 19063
5
6     BY:  FRANCIS ALEXANDER MALOFIY, Esq.
        Tel. (215) 500-1000
        francis@francisalexander.com
7
8
      PHILLIPS NIZER LLP
9       Attorneys for James Patrick
        Paige and Robert Plant
10      666 Fifth Avenue
        New York, New York  10103
11
      BY:  HELENE M. FREEMAN, Esq.
12      Tel. (212) 977-9700
        hfreeman@phillipsnizer.com
13
            -and-
14
      LAW OFFICES OF PETER J. ANDERSON
15      Attorneys for James Patrick
        Paige, Robert Plant, Warner/Chappell
16      Music, Inc., Rhino Entertainment
        Corporation and Atlantic Recording
17      Corp.
        100 Wilshire Boulevard, Ste. 2010
18      Santa Monica, California  90401
19    BY:  PETER J. ANDERSON, Esq.
        Tel. (310) 260-6030
20      pja@pjanderson.com
21
      ALSO PRESENT:
22
      Omar Melendez, Video Specialist
23    Alexander Stewart, Ph.D.
24
```

**Page 3**

```
1             I N D E X
2   Witness       Examination by:      Page
3   LAWRENCE FERRARA
4        Mr. Malofiy              6
5
6         E X H I B I T S
7   Deposition
    for Iden.      Description       Page
8
9   2700 Subpoena to Testify at a Deposition
         in a Civil Trial            12
10  2701 Invoices                    15
11  2702 Document entitled Jazzology      16
12  2703 Document entitled Ferrara Cases     29
13  2704 ("Taurus" deposit copy          57
14  2705 Musical Example 1          114
15  2706 Report                     128
16  2707 Transcription              131
17  2708 "Stairway to Heaven" deposit
18       copy, D000562 through D000565      153
19  2708 Policy, Academic Integrity
20       for Students at NYU          159
21
22  REQUESTS
23  Pages 69, 105, 108, 114
24
```

**Page 4**

```
04:21:08  1        THE VIDEOGRAPHER:  Good
04:21:08  2   afternoon.  We're now going on the
04:21:10  3   record.  The time is 4:21 p.m. on
04:21:14  4   May 27, 2016.  This is the videotaped
04:21:19  5   deposition of Lawrence Ferrara, Ph.D.,
04:21:22  6   in the matter of Michael Skidmore, as
04:21:26  7   trustee for the Randy Craig Wolfe Trust,
04:21:29  8   Plaintiffs, versus Led Zeppelin, James
04:21:32  9   Patrick Paige, Robert Anthony Plant,
04:21:37 10   John Paul Jones, Super Hype Publishing,
04:21:39 11   Inc., Warner Music Group Corp., parent
04:21:44 12   of Warner/Chappell Music, Inc., Atlantic
04:21:49 13   Recording Corporation and Rhino
04:21:50 14   Entertainment Company, Defendants.
04:21:53 15        This deposition -- excuse me --
04:21:55 16   under the jurisdiction of the United
04:21:57 17   States District Court, Central District
04:21:59 18   of California, Western Division.  This
04:22:02 19   deposition is being held at 39 West 37th
04:22:05 20   Street, New York, New York.  My name is
04:22:07 21   Omar Melendez and I'm the video
04:22:10 22   specialist, the court reporter is Carol
04:22:11 23   Mele, and we're representing Zanaras
04:22:13 24   Reporting, with offices located in
```

1 (Pages 1 to 4)

CONFIDENTIAL

---

Page 5

04:22:17 1    Philadelphia, Pennsylvania.
04:22:18 2         May I have an introduction from
04:22:20 3    counsel?
04:22:20 4         MR. MALOFIY:  Attorney Francis
04:22:21 5    Alexander Malofiy, with the law firm
04:22:24 6    Francis Alexander, representing the
04:22:26 7    plaintiff in this matter, Michael
04:22:27 8    Skidmore, as Trustee for the Randy Craig
04:22:27 9    Wolfe Trust.  With me here today is
04:22:31 10   Alexander Stewart.
04:22:33 11        MR. ANDERSON:  Peter Anderson
04:22:34 12   for defendants James Patrick Paige,
04:22:35 13   Robert Plant, Warner/Chappell Music,
04:22:38 14   Rhino Entertainment Company and Atlantic
04:22:41 15   Recording Corporation.
04:22:45 16        MS. FREEMAN:  Helene Freeman,
04:22:45 17   Phillips Nizer, co-counsel for Robert
04:22:52 18   Plant and James Patrick Paige.
04:22:54 19        THE VIDEOGRAPHER:  Will the
04:22:55 20   court reporter please swear in the
04:22:57 21   witness.
04:23:07 22   L A W R E N C E  F E R R A R A, Ph.D, called
04:23:07 23   as a witness, having been first duly
04:23:07 24   sworn by Carol Mele, a Notary Public

---

Page 6

04:23:07 1    within and for the State of New York, was
04:23:07 2    examined and testified as follows:
04:23:08 3    EXAMINATION BY MR. MALOFIY:
04:23:08 4         Q   All right.  We just met briefly a
04:23:14 5    second ago.  Couple of questions -- well, I know you
04:23:16 6    had your deposition taken a number of times,
04:23:18 7    correct?
04:23:18 8         A   Yes.
04:23:19 9         Q   All right.  How many times have you
04:23:20 10   had your deposition taken?
04:23:22 11        A   I would say at least 20.
04:23:23 12        Q   All right.  So you're familiar with
04:23:24 13   the normal admonitions, correct?
04:23:26 14        A   I am.
04:23:27 15        Q   All right.  I'll just give them to you
04:23:27 16   briefly.  This is a question/answer session.  I ask
04:23:31 17   questions, you have to answer those questions.  If
04:23:33 18   you don't understand a question I ask, please ask me
04:23:38 19   to restate or clarify my question.  If you
04:23:41 20   understand -- excuse me.  If you answer a question I
04:23:46 21   ask, the record is going to reflect you understood
04:23:49 22   the question.
04:23:57 23        You're not under the influence of any
04:23:59 24   alcohol or drugs or medication that would affect

---

Page 7

04:24:01 1    your memory or judgment here today, correct?
04:24:04 2         A   That's correct, I am not.
04:24:05 3         Q   Okay.  Did you understand all the
04:24:07 4    prior admonitions before the last one?
04:24:09 5         A   Yes, I did.
04:24:10 6         Q   Okay.  You understand your testimony
04:24:16 7    here has the same weight as if you were before a
04:24:19 8    judge and jury?
04:24:20 9         A   Yes, I do.
04:24:21 10        Q   Now, you had said that you were
04:24:24 11   deposed before.  How many times?
04:24:27 12        MR. ANDERSON:  Asked and
04:24:27 13        answered.
04:24:29 14        A   Around 20, I think.
04:24:30 15        Q   Okay.  And when was the last time you
04:24:35 16   had your deposition taken?
04:24:37 17        A   Two days ago.
04:24:38 18        Q   Okay.  And what was that for?
04:24:41 19        A   That was in the litigation Copeland,
04:24:45 20   C-o-p-e-l-a-n-d, versus Bieber, B-i-e-b-e-r, et al.
04:24:57 21        Q   In that case were you representing the
04:25:01 22   plaintiff or the defendant?
04:25:03 23        MR. ANDERSON:  Objection.
04:25:04 24        MS. FREEMAN:  Objection.

---

Page 8

04:25:05 1         MR. ANDERSON:  Vague and
04:25:05 2         ambiguous.
04:25:07 3         A   I was engaged on behalf of defendant.
04:25:09 4         Q   Who were the et al. involved as the
04:25:11 5    defendants?
04:25:12 6         A   I believe Usher is a co-defendant and
04:25:15 7    I'm not sure of the other co-defendants.
04:25:20 8         Q   What's the facts in that case --
04:25:23 9         MR. ANDERSON:  Objection,
04:25:23 10        lacks --
04:25:24 11        Q   -- as you understand them?
04:25:26 12        A   As I understand them, the plaintiff
04:25:30 13   believes that his song, "Somebody to Love," has been
04:25:35 14   infringed by a song that was recorded by Justin
04:25:39 15   Bieber with the same title.
04:25:44 16        Q   Did you produce an expert report in
04:25:47 17   that case?
04:25:48 18        A   Yes, I did.
04:25:49 19        Q   When was that produced?
04:25:52 20        A   I believe it was produced in April.
04:25:55 21        Q   April of what?
04:25:58 22        A   I don't recall it -- the middle of
04:26:00 23   April.
04:26:00 24        Q   Of this year?

2 (Pages 5 to 8)

CONFIDENTIAL

---

**Page 9**

```
04:26:01  1        A    Oh, yes.
04:26:02  2        Q    Okay.  Is it the case that came down
04:26:07  3   from the appellate court?
04:26:10  4        A    I don't know.
04:26:10  5        Q    Okay.  Is this the case that you were
04:26:15  6   unable to timely file the expert report because you
04:26:18  7   were busy putting the expert report together for
04:26:22  8   this case?
04:26:22  9             MR. ANDERSON:  Objection.
04:26:23 10        Q    Is that this case?
04:26:25 11             MR. ANDERSON:  Argumentative,
04:26:25 12   lacks foundation.
04:26:28 13        A    I was called as I recall in February
04:26:33 14   by the defendant's counsel and asked if I could
04:26:37 15   write a report, an initial report --
04:26:41 16             MR. ANDERSON:  Could I interject
04:26:42 17   and I apologize for doing this.  Since
04:26:44 18   those parties aren't here, your
04:26:45 19   discussions with them, I presume with
04:26:47 20   their counsel, presumably may be
04:26:50 21   privileged and I don't think anyone -- I
04:26:52 22   don't think Mr. Malofy wants to take
04:26:53 23   advantage of their absence and would
04:26:55 24   want to know any conversations that are
```

**Page 10**

```
04:26:57  1   privileged between you and the counsel
04:26:58  2   that retained you.
04:27:00  3             MR. MALOFY:  I don't know if
04:27:01  4   they are privileged.  I think they're --
04:27:02  5   they're the subject of a declaration
04:27:05  6   that was filed to support everything
04:27:06  7   he's saying.
04:27:09  8        A    That is what I was going to say.
04:27:09  9             THE WITNESS:  And -- and thank
04:27:09 10   you.
04:27:11 11             MR. ANDERSON:  Oh, that's fine.
04:27:11 12   I didn't have that.
04:27:12 13             THE WITNESS:  Thank you.
04:27:13 14        A    And as per my declaration, without
04:27:13 15   talking about conversations which I should not do,
04:27:15 16   as per my declaration, I believe I was contacted in
04:27:21 17   February, given 30 days sometime in March to submit
04:27:26 18   both an initial report and a rebuttal report.
04:27:28 19   Because of work that I was doing heavily in this
04:27:32 20   case, in fact, and other responsibilities at New
04:27:35 21   York University and so forth, I advised that I could
04:27:39 22   not do it and, in fact, suggested perhaps they --
04:27:43 23   they find another musicologist.  Instead, they
04:27:46 24   sought to get an extension from the judge of, I
```

**Page 11**

```
04:27:50  1   guess, about a month and -- and that extension was
04:27:53  2   granted and I submitted my report and rebuttal
04:27:57  3   around the middle of March.
04:27:58  4        Q    I see.  I think part of the
04:28:00  5   declaration was your efforts that you were -- spent
04:28:04  6   quite a bit of time doing the expert report in this
04:28:06  7   case, correct?
04:28:07  8        A    That is correct that I had spent a --
04:28:11  9   a large amount of time with respect to my initial
04:28:16 10   report in February and my rebutted report in March.
04:28:23 11        Q    Now, that's a very big report, your
04:28:25 12   initial report.  Correct statement?
04:28:27 13        A    That's correct.
04:28:27 14        Q    Have you ever written a report that
04:28:29 15   big?
04:28:30 16        A    Yes, I believe so.
04:28:31 17        Q    In what case?
04:28:36 18        A    In -- in Batiste -- and I don't --
04:28:39 19   Batiste v. Najm, N-a-j-m, that's T-Pain, a/k/a
04:28:42 20   T-Pain.  That report was considerably longer.  It is
04:28:52 21   possible that my report in Francis Scotti v.
04:28:54 22   Germanotta, and that is Lady Gaga is Germanotta,
04:29:00 23   that that report was at -- as long.
04:29:06 24        Q    How long is your report; do you know?
```

**Page 12**

```
04:29:09  1             MR. ANDERSON:  In this case?
04:29:10  2             MR. MALOFY:  Yeah, in this
04:29:11  3   case.
04:29:12  4        A    I don't remember.  And you're talking
04:29:18  5   about the -- when you asked me, you're not talking
04:29:20  6   about the visual exhibits.  You're talking about the
04:29:22  7   actual text?
04:29:24  8        Q    Yes.  Well, I'm actually referring to
04:29:26  9   both, but we can get into that later.  We do have
04:29:30 10   your report to be marked here.
04:29:37 11             MR. MALOFIY:  Twenty -- we're
04:29:37 12   just going to bop to 27.  So you know
04:29:47 13   what I'm going to do, I'm going to first
04:29:47 14   address the subpoena, so let's mark the
04:29:50 15   subpoena for Lawrence Ferrara as 2700.
04:29:53 16             (Subpoena to Testify at a
04:29:53 17   Deposition in a Civil Trial was marked
04:29:53 18   as Deposition Exhibit No. 2700 for
04:29:53 19   identification, as of this date.)
04:30:50 20        Q    Do you see that subpoena there?
04:30:51 21        A    Yes, I do.
04:30:53 22        Q    Did you receive that subpoena?
04:30:54 23        A    Yes, I did.
04:30:55 24        Q    When did you receive it?
```

3 (Pages 9 to 12)

CONFIDENTIAL

Page 13

04:30:56 1        A    Perhaps on Tuesday.  It was sent to me
04:31:00 2  by Mr. Anderson.
04:31:01 3        Q    Of this week?
04:31:02 4        A    Of this week, yes, Tuesday or
04:31:04 5  Wednesday, but certainly two or three days ago.
04:31:08 6        Q    Do you see any -- excuse me.  Did you
04:31:10 7  bring any documents responsive to this subpoena for
04:31:13 8  you to appear and testify?
04:31:15 9        MR. ANDERSON:  Dr. Ferrara has
04:31:16 10       provided me with documents.  Again, as I
04:31:20 11       indicated in the deposition of Mr.
04:31:22 12       Mathes, excuse me, earlier this week I
04:31:25 13       sent you written objections to the
04:31:28 14       subpoenas.  The -- I have copies for
04:31:33 15       you, however, of documents that are
04:31:36 16       being produced.  One is invoices with
04:31:42 17       attorney/client information redacted and
04:31:45 18       one is excerpts from works that are
04:31:50 19       cited in Dr. Ferrara's report.
04:31:53 20       MR. MALOFIY:  Is there anything
04:31:54 21       else?
04:31:55 22       MR. ANDERSON:  That's it.
04:31:55 23       MR. MALOFIY:  All right.  So
04:31:56 24  before we mark -- I'm sorry.  This is

Page 14

04:32:00 1  just one copy, correct?
04:32:02 2        MR. ANDERSON:  Yes, but I
04:32:03 3        brought extra copies, so I have a copy
04:32:05 4        already and I just handed Helene a copy.
04:32:09 5        MR. MALOFIY:  Okay.  Do we have
04:32:11 6  a copy for the witness?
04:32:12 7        MR. ANDERSON:  No, but --
04:32:14 8        MR. MALOFIY:  We have to make a
04:32:15 9  copy, then.
04:32:16 10       MR. ANDERSON:  But you don't
04:32:17 11  need to make three is what I'm trying to
04:32:18 12  say.
04:32:19 13       MR. MALOFIY:  Okay, so we just
04:32:19 14  make one extra copy.
04:32:20 15       MR. ANDERSON:  Yeah, except on
04:32:21 16  the excerpts we'll need extra copies of
04:32:24 17  that because I only have the one, one
04:32:27 18  for the court reporter and one for you.
04:32:28 19       MR. MALOFIY:  All right.  So
04:32:28 20  let's go off the record and let's make
04:32:31 21  copies real quick.
04:32:33 22       THE VIDEOGRAPHER:  The time is
04:32:37 23  4:33 p.m.  Off the record.
04:45:35 24       (Whereupon, at 4:33 o'clock

Page 15

04:45:35 1  p.m., a recess was taken to 4:46 o'clock
04:45:35 2  p.m.)
04:45:35 3        (The deposition resumed with all
04:45:35 4  parties present.)
04:46:06 5        THE VIDEOGRAPHER:  The time is
04:46:08 6  4:46 p.m.  On the record.
04:46:11 7        MR. MALOFIY:  All right.  Back
04:46:12 8  on the record.  The initial exhibit of
04:46:15 9  2700 was the subpoena.  We're going to
04:46:18 10  make 2701 the packet of invoices that
04:46:29 11  Dr. Ferrara produced here in response to
04:46:32 12  the subpoena.
04:46:43 13       (Invoices were marked as
04:46:43 14  Deposition Exhibit No. 2701 for
04:46:43 15  identification, as of this date.)
04:46:43 16       THE WITNESS:  Thank you.
04:46:50 17       MR. MALOFIY:  All right.
04:46:52 18  Peter?
04:46:53 19       MR. ANDERSON:  Thank you.  Oh, I
04:46:54 20  actually have -- that's one of the ones
04:46:55 21  I have, so either --
04:46:58 22       MR. MALOFIY:  Okay, great.  Do
04:46:58 23  you want one, Helene?
04:47:02 24       MS. FREEMAN:  I've got a copy of

Page 16

04:47:03 1  the invoices, if that's what you mean.
04:47:15 2        MR. MALOFIY:  And then we're
04:47:16 3  going to mark as this packet of --
04:47:19 4  L A W R E N C E   F E R R A R A, Ph.D.,
04:47:19 5  resumed and testified further as follows:
04:46:02 6  BY MR. MALOFIY:
04:47:19 7        Q    How would you describe this packet
04:47:22 8  which you produced, Dr. Ferrara?
04:47:24 9        A    These are the book covers, the
04:47:25 10  bibliographic page, if the bibliography information
04:47:31 11  was not on the cover and the pages in those books
04:47:36 12  that were referenced with respect to the descending
04:47:39 13  chromatic line progression.
04:47:44 14       Q    Okay.
04:47:45 15       MR. MALOFIY:  We'll mark that as
04:47:47 16  2702.
04:47:48 17       (Document entitled Jazzology was
04:47:48 18  marked as Deposition Exhibit No. 2702
04:47:48 19  for identification, as of this date.)
04:47:47 20       Q    Now, going back to 2700, the subpoena,
04:48:30 21  is there any other communications, documents or
04:48:34 22  things you exchanged by and between counsel?
04:48:40 23       A    I sent to counsel PDFs --
04:48:44 24       MR. ANDERSON:  It's a yes/no

4 (Pages 13 to 16)

CONFIDENTIAL

| | Page 17 |
|---|---|

04:48:48  1      question because then I may object
04:48:49  2      depending on what --
04:48:51  3          THE WITNESS:  I am sorry.
04:48:51  4      A   Yes.
04:48:53  5      Q   What are those things?
04:48:55  6          MR. ANDERSON:  And that's why I
04:48:55  7      object on the grounds of attorney/client
04:48:57  8      privilege and work product.  We have
04:48:59  9      produced the non-privileged documents
04:49:04 10      within the first category of the
04:49:05 11      subpoena.
04:49:09 12      Q   Let me go to number A, facts and data
04:49:12 13  you considered in writing your reports or
04:49:16 14  declarations for this lawsuit, did you produce all
04:49:20 15  those things?
04:49:21 16          MR. ANDERSON:  Objection --
04:49:22 17      A   Yeah --
04:49:22 18          MR. ANDERSON:  -- vague and
04:49:22 19      ambiguous.
04:49:23 20      A   Yeah, facts and data with respect to
04:49:33 21  my reports are in the reports themselves, not only
04:49:39 22  in the narratives and the examples, but, of course,
04:49:41 23  in the visual exhibits and in the audio exhibits.
04:49:47 24  Other facts or data that are not in the reports but

| | Page 18 |
|---|---|

04:49:51  1  that are cited in the report is what I brought,
04:49:55  2  the -- this packet of -- of portions of largely jazz
04:50:02  3  theory and chord progression books.
04:50:05  4      Q   Is there any reason why this wasn't
04:50:06  5  produced prior to your deposition here today if you
04:50:09  6  relied on it in any way?
04:50:12  7          MR. ANDERSON:  Objection, vague
04:50:13  8      and ambiguous as to what you mean by
04:50:15  9      "this."
04:50:21 10      A   This was sent to counsel on the basis
04:50:25 11  of the document production request.
04:50:27 12          MR. ANDERSON:  These are books
04:50:29 13      that are cited in his report.
04:50:30 14      Q   Okay.  In your report, is there any
04:50:32 15  reason why you didn't attach these?
04:50:34 16      A   No.
04:50:35 17      Q   Okay.
04:50:35 18      A   They are cited properly.
04:50:42 19      Q   Were you told to make any assumptions
04:50:43 20  in coming to your conclusions or were you made to
04:50:46 21  make -- or were you told to make any assumptions in
04:50:50 22  forming your opinions in this case?
04:50:51 23      A   Not to my --
04:50:52 24          MR. ANDERSON:  Objection --

| | Page 19 |
|---|---|

04:50:53  1          THE WITNESS:  I'm sorry.
04:50:54  2          MR. ANDERSON:  -- vague and
04:50:54  3      ambiguous and compound.
04:50:55  4      A   Not to my recollection.
04:50:57  5      Q   Okay.  Are you saying that there could
04:51:00  6  have been assumptions that you were told to make?  I
04:51:03  7  mean, when you say not to your recollection, do you
04:51:05  8  have a document, or communication, or an email which
04:51:09  9  would indicate or help you recall whether or not you
04:51:11 10  were told make certain assumptions is this case?
04:51:15 11          MR. ANDERSON:  Objection, vague
04:51:15 12      and ambiguous and compound.
04:51:17 13      A   I don't have to the best of my
04:51:19 14  knowledge any documents, emails, written
04:51:22 15  communications from defendants' counsel that -- that
04:51:28 16  would provide any assumptions as to what my findings
04:51:32 17  might be.
04:51:33 18      Q   Okay.  So to be clear, you said you
04:51:36 19  don't recall whether or not you were told to make
04:51:40 20  any assumptions?
04:51:43 21          MR. ANDERSON:  Objection,
04:51:43 22      mischaracterizes the testimony.
04:51:45 23      Q   Is that accurate or is that
04:51:45 24  inaccurate?

| | Page 20 |
|---|---|

04:51:46  1      A   What I said is --
04:51:48  2          MR. ANDERSON:  Objection, vague
04:51:48  3      and ambiguous.
04:51:49  4      A   What I said is to the best of my
04:51:50  5  recollection I don't recall anyone -- the only
04:51:53  6  people I've discussed this with are Helene Freeman
04:51:56  7  and Peter Anderson.  I don't remember them ever
04:51:59  8  saying anything to me with respect to you should
04:52:02  9  assume this, you should assume that or to in any way
04:52:07 10  try to sway my opinion.
04:52:18 11      Q   How much were you paid in this case,
04:52:18 12  about a hundred thousand dollars?
04:52:22 13          MR. ANDERSON:  Objection.
04:52:23 14      A   No.
04:52:23 15      Q   A little less?
04:52:26 16      A   As -- as per the invoices that I've
04:52:29 17  provided, there are several invoices, I think in
04:52:37 18  2015 about $17,000 and in 2016 about $60,000.  Those
04:52:44 19  are approximates.
04:52:46 20      Q   So the approximately $80,000 that you
04:52:51 21  were paid for your opinion, do you believe that
04:52:55 22  swayed your opinion in any way?
04:52:58 23          MR. ANDERSON:  Objection,
04:52:58 24      argumentative, vague and ambiguous.

5 (Pages 17 to 20)

CONFIDENTIAL

Page 21

```
04:53:00  1        A  No.
04:53:02  2        Q  Okay.  How much money do you make as a
04:53:06  3   university professor?
04:53:07  4            MR. ANDERSON:  Objection,
04:53:07  5        privacy.
04:53:09  6        A  My salary at NYU which is a private
04:53:14  7   university is confidential and I've never been asked
04:53:17  8   by any court to provide the dollar amount of my
04:53:20  9   compensation at New York University, and so I ask
04:53:22  10  that you honor that privilege.
04:53:24  11       Q  Well, I mean, it's my position I'm
04:53:29  12  entitled to know that because I'm entitled to know
04:53:32  13  how much money from this case or from testifying as
04:53:36  14  an expert compares to what you make in your usual
04:53:43  15  profession as a university professor.
04:53:45  16           MR. ANDERSON:  And the witness
04:53:46  17       declines to tell what you his
04:53:47  18       confidential personal compensation is.
04:53:49  19           MR. MALOFIY:  No, he said he
04:53:51  20       would like me to respect that and I'm
04:53:53  21       instructing him that I'd like him to
04:53:55  22       answer that question.
04:53:57  23       A  I am happy to provide approximate
04:54:01  24  percentages which I have been informed by other
```

Page 22

```
04:54:05  1   courts is -- is appropriate, that is, what
04:54:08  2   percentage of my overall compensation is -- consists
04:54:16  3   of testifying and -- and work as a music
04:54:21  4   copyright -- music expert as compared to my
04:54:24  5   compensation as a professor at New York University.
04:54:27  6   I'm more than happy to do that.
04:54:29  7        Q  Well, what's the percentage?
04:54:31  8        A  Well, as of last year because of
04:54:35  9   the -- because of the trial, not merely as extensive
04:54:38  10  as this, that was Fahmy, F-a-h-m-y, v. Jay Z, et
04:54:47  11  al., and that went to trial last October in Los
04:54:52  12  Angeles.  Because that went to trial which is not
04:54:58  13  often, I would say that for the first time in 2015
04:55:03  14  my salary, my compensation at New York University
04:55:08  15  for an entire calendar year, was about equal.  It
04:55:13  16  was about the first time that I would say that my
04:55:15  17  compensation in -- in this consultation that I do as
04:55:21  18  a music expert had equaled.
04:55:25  19           This year because of this litigation
04:55:30  20  and the year is not over, but we're about halfway
04:55:32  21  through, I can predict I think for the very first
04:55:37  22  time that -- that the compensation that I accrue
04:55:42  23  from this kind of work will be greater than my
04:55:46  24  compensation at the university.  It's a -- it's a
```

Page 23

```
04:55:50  1   first time and I think it will be anomalous simply
04:55:53  2   because of the -- of the extent of this -- of the
04:55:57  3   work in this particular case.
04:55:58  4        Q  So you believe it's going to be more
04:55:59  5   than -- you're going to make more money as an -- as
04:56:01  6   a paid expert rather as a university professor for
04:56:04  7   this year, 2016?
04:56:06  8        A  For this year, for the very first
04:56:09  9   time, and -- and I think probably the only time.
04:56:14  10       Q  When you say the only time, was last
04:56:17  11  year 50-50?
04:56:19  12       A  Last year was just about 50/50.  As
04:56:22  13  I -- as I recall, it got very, very close to my
04:56:27  14  university income.  This year, again, because
04:56:30  15  there's so much work in this case, there were five
04:56:32  16  music experts on the other side that -- who I had to
04:56:38  17  respond to, read their reports and so forth, because
04:56:41  18  of all the work in this case which is unusual, my
04:56:45  19  compensation is much greater.  I -- again, I can't
04:56:48  20  predict what will happen in the future, but based on
04:56:51  21  my experience I don't think this is going to be a
04:56:54  22  usual.  And, again, last year was also a trial and
04:56:58  23  over the last 20-plus years I think I've testified
04:57:02  24  at about five or six trials at most.  And so, it's
```

Page 24

```
04:57:04  1   actually rare that I testify at two trials two years
04:57:11  2   in a row.
04:57:13  3        Q  Was it more or less than 50 percent of
04:57:17  4   your total income last year, the income attributable
04:57:23  5   to being an expert?
04:57:24  6            MR. ANDERSON:  Objection.
04:57:25  7        A  I think it was very close.  I think it
04:57:27  8   was a little bit less, but I'm happy to say that it
04:57:30  9   was approximately 50 percent, my total compensation,
04:57:32  10  50 percent with this kind of work and 50 percent as
04:57:35  11  a professor at New York University.
04:57:38  12       Q  What's your average report?  What does
04:57:40  13  it cost?
04:57:40  14       A  It varies from report to report and --
04:57:43  15  on how much work is needed and -- and rebuttal
04:57:46  16  report.
04:57:46  17       Q  What's the range?
04:57:49  18           MR. ANDERSON:  Objection, lacks
04:57:50  19       foundation.
04:57:50  20       A  Yeah, there is no range.
04:57:52  21       Q  There's no range?
04:57:56  22       A  No.
04:57:57  23       Q  Do you work more for the industry, the
04:58:00  24  big record labels, or for individual artists?
```

6 (Pages 21 to 24)

CONFIDENTIAL

Page 25

04:58:06 1      MR. ANDERSON: Objection, vague
04:58:08 2  and ambiguous and compound.
04:58:13 3      A   I would say that the majority of the
04:58:17 4  calls that I receive with -- wish to engage my
04:58:23 5  services come from small and large publishing
04:58:27 6  companies, small and large record companies, the
04:58:31 7  larger motion picture companies, as well as
04:58:35 8  individuals. But if I were to be asked what is the
04:58:38 9  majority, I don't know there's any question that the
04:58:41 10 majority would be from publishers, record companies
04:58:44 11 and motion picture companies, but I do get a lot of
04:58:49 12 calls from individuals as well.
04:58:52 13     Q   Why don't you take those cases?
04:58:54 14     A   I do.
04:58:55 15     Q   Oh. When was the last time you had a
04:58:59 16 pro bono case to help out an artist?
04:59:02 17     MR. ANDERSON: Objection.
04:59:04 18     A   I can't recall having done a pro bono
04:59:05 19 case. I -- I can recall working with individuals
04:59:12 20 and -- and greatly reducing my -- my invoice, but,
04:59:16 21 no, I can't recall doing it completely for free.
04:59:20 22     Q   Let's be clear. You had about -- how
04:59:22 23 many reports have you produced in your career, 200,
04:59:25 24 about that?

Page 26

04:59:28 1      A   I don't know.
04:59:28 2      Q   Didn't you testify it was about 200,
04:59:31 3  20 years, 10 a year, something like that?
04:59:36 4      MR. ANDERSON: I believe that --
04:59:37 5  well, objection, mischaracterizes the
04:59:37 6  testimony, lacks foundation.
04:59:43 7      A   It would depend on what kind of report
04:59:45 8  we're talking about. That's ambiguous. If we're
04:59:47 9  talking about preliminary reports which could be
04:59:51 10 three, four, five pages which is most frequently
04:59:54 11 what I'm asked to do, then, certainly, it could be
04:59:59 12 10 a year. If we're talking about reports in
05:00:02 13 full-blown litigations, certainly not 10 a year.
05:00:05 14 That's not even close.
05:00:07 15     Q   Well, how many reports do you think
05:00:10 16 you've done in your lifetime?
05:00:12 17     MR. ANDERSON: Objection, vague
05:00:13 18 and ambiguous.
05:00:17 19     A   I would say the written reports that
05:00:23 20 are preliminary, three to five pages, I don't think
05:00:27 21 200 is -- is off mark. Large reports like this
05:00:32 22 not -- not nearly as much.
05:00:35 23     Q   So out of 200 reports, how many did
05:00:38 24 you do pro bono?

Page 27

05:00:40 1      MR. ANDERSON: Objection, asked
05:00:41 2  and answered.
05:00:41 3      A   I -- I answered that question.
05:00:43 4      Q   None?
05:00:44 5      A   That's correct.
05:00:44 6      Q   Okay. Let me remind you of some
05:00:56 7  testimony you had in the Timberland case in 2010.
05:00:59 8  You had indicated there you did 10 cases a year.
05:01:02 9  Does that sound accurate?
05:01:04 10     A   What -- you'll have to define cases
05:01:06 11 for me.
05:01:06 12     Q   Well, I believe it was your words. I
05:01:09 13 believe it was pages 17 to 19 of the deposition, you
05:01:13 14 had indicated that you do about 10 cases a year.
05:01:16 15 Does that sound about accurate?
05:01:18 16     MR. ANDERSON: Objection, vague
05:01:19 17 and ambiguous.
05:01:19 18     A   Again, you'll have to define cases. I
05:01:21 19 don't know what the context for that was. If you're
05:01:24 20 talking about full-blown litigations, I don't
05:01:26 21 think --
05:01:26 22     Q   Well, I don't know what full-blown
05:01:28 23 litigation as opposed to un-full-blown litigation
05:01:31 24 is.

Page 28

05:01:32 1      A   I'd be happy to --
05:01:33 2      MR. ANDERSON: Mr. Malofiy, if
05:01:35 3  you can make sure that he finishes
05:01:35 4  before you begin your question.
05:01:36 5      A   I would be happy to clarify that.
05:01:41 6  The -- by full-blown I mean wherein a claim has been
05:01:44 7  filed and -- and reports are exchanged and so forth.
05:01:48 8  I -- I don't think that that is 10 a year.
05:01:51 9      Q   How many do you think that is? So
05:01:53 10 when you refer to full-blown litigation, you're
05:01:57 11 referring to producing an expert report?
05:02:01 12     MR. ANDERSON: Objection,
05:02:01 13 mischaracterizes the testimony.
05:02:05 14     A   I -- I think that contradicts what I
05:02:07 15 said earlier.
05:02:08 16     Q   I'm sorry. Let's make it clear for
05:02:10 17 the record.
05:02:11 18     A   Sure. When I provide an expert
05:02:14 19 report, most often the hugest majority of the time
05:02:20 20 it is an internal report. It is for the party or
05:02:24 21 parties who engaged my services. It is most
05:02:27 22 frequently a three-, four-, five-page preliminary
05:02:31 23 report and, as far as I know, the -- the matter just
05:02:37 24 ends there. A full-blown report would be one in

7 (Pages 25 to 28)

CONFIDENTIAL

Page 29

05:02:42  1   which we have a much more extensive report, not as
05:02:47  2   big as the reports here, but very extensive and
05:02:52  3   the -- a claim has been filed with the federal
05:02:56  4   court. It would be my understanding that my report
05:02:59  5   has been exchanged. There has been an exchange
05:03:03  6   of -- of expert reports. I would have usually on
05:03:07  7   the same day received the expert report from the
05:03:10  8   other side followed by a rebuttal report most often.
05:03:16  9      Q   All right.
05:03:20 10         MR. MALOFIY:  Let me mark some
05:03:21 11   of these exhibits here,
05:03:23 12   twenty-seven-oh --
05:03:35 13         MR. ANDERSON:  Three.
05:03:37 14         MR. MALOFIY:  -- three.
05:03:37 15         (Document entitled Ferrara Cases
05:03:37 16   was marked as Deposition Exhibit No.
05:03:37 17   2703 for identification, as of this
05:03:37 18   date.)
05:04:02 19      Q   I have here a list entitled Ferrara
05:04:08 20   Cases. It's marked as 2703. I was able to cull
05:04:15 21   through and find about 38 cases and in 34 of them
05:04:25 22   you testified for the majors, the defendants?
05:04:29 23         MS. FREEMAN:  I'm sorry.
05:04:30 24   Objection to the form of the question.

Page 30

05:04:31  1   I don't know what you mean by majors.
05:04:34  2         MR. ANDERSON:  Objection, excuse
05:04:35  3   me, vague and ambiguous.
05:04:37  4      A   First of all -- well, most importantly
05:04:39  5   is I don't have a recollection of testifying. You
05:04:44  6   said testified. I don't have a recollection of
05:04:47  7   testifying for any number of these cases, for
05:04:51  8   example, Santelli v. Walt Disney Company.
05:04:56  9      Q   Let me -- let me correct my question.
05:04:57 10   Thank you.
05:04:58 11      A   Thank you.
05:04:58 12      Q   All right. You're absolutely correct.
05:04:58 13   I should have been more clear.
05:05:00 14         I put together a list of 38 cases, 34
05:05:04 15   of them for defendants where you've provided an
05:05:07 16   expert report or an opinion on behalf of these
05:05:12 17   defendants who are what I'll refer to as the majors
05:05:17 18   in the music industry.  Does that sound accurate?
05:05:23 19         MR. ANDERSON:  Wait a minute.
05:05:23 20   Excuse me.  It's ambiguous as to
05:05:25 21   whether -- I'd be happy to explain.
05:05:29 22         MR. MALOFIY:  No, just state
05:05:30 23   your objection.
05:05:31 24         MR. ANDERSON:  That's fine, but

Page 31

05:05:31  1   you keep doing this, but it's ambiguous,
05:05:33  2   excuse me, and vague.
05:05:36  3         MR. MALOFIY:  If he doesn't
05:05:37  4   understand a question, he can ask me to
05:05:39  5   clarify and he knows this.  He's done
05:05:40  6   this more than maybe all of us in this
05:05:43  7   room he's so good at it.
05:05:44  8         MR. ANDERSON:  Are you asking
05:05:44  9   him to adopt your definition of the
05:05:45 10   majors or are you --
05:05:46 11         MR. MALOFIY:  No, I'm not.
05:05:47 12         MR. ANDERSON:  Well, that's what
05:05:48 13   your question was.
05:05:50 14      A   That -- that was my point. I don't
05:05:54 15   know that all of the defendants are majors. And to
05:05:59 16   be perfectly honest, I recall perhaps in the
05:06:09 17   Slip-N-Slide I thought I might have been on the side
05:06:12 18   of Slip-N-Slide, but it's -- it's simply too long.
05:06:16 19   I don't remember. It's almost 10 years ago. And so
05:06:19 20   the point is that I don't know that TVT Records
05:06:22 21   is -- is a major, as you say, and so I don't know
05:06:27 22   necessarily that I'm -- I'm adopting your language.
05:06:30 23      Q   Well --
05:06:31 24      A   Some of these I recall, but some of

Page 32

05:06:34  1   these I do not recall.
05:06:36  2      Q   Let me go through them.  Number one,
05:06:38  3   Repp v. Lloyd Webber, Southern District of New York,
05:06:42  4   1994, do you recall being an expert for the
05:06:45  5   defendants?
05:06:45  6      A   I do.  I'm not quite sure why you have
05:06:49  7   it listed twice but -- because it's one case that
05:06:50  8   was ongoing.
05:06:52  9      Q   Okay.  Tisi versus Patrick --
05:06:57 10      A   Can you -- can you clarify why it's
05:07:00 11   listed twice, why it's enumerated twice?  It's one
05:07:04 12   case.
05:07:04 13      Q   It's listed twice in the different
05:07:06 14   dockets, so if it's one case thank you for
05:07:09 15   clarifying.  That's why I'm doing this.
05:07:10 16      A   Sure.  I appreciate that.  Thank you.
05:07:11 17      Q   So if you're telling me one and two is
05:07:13 18   one case, you would know better than anyone else
05:07:17 19   here.
05:07:17 20      A   Yes, I'm assuming I should not write
05:07:18 21   on the exhibit; is that correct?
05:07:21 22         MR. ANDERSON:  Correct.
05:07:23 23      Q   That's correct.
05:07:24 24      A   Thank you.

8 (Pages 29 to 32)

CONFIDENTIAL

Page 33

05:07:24  1       Q    Number three, Tisi versus Patrick,
05:07:27  2  Southern District of New York, 2000, and you were --
05:07:31  3       A    I think --
05:07:32  4       Q    -- you were a expert to provide an
05:07:34  5  expert opinion for the defendant, correct?
05:07:36  6       A    Yes.  In Tisi v, Patrick, I was.  I do
05:07:40  7  recall that.
05:07:40  8       Q    Davis v. Arnold, Southern District,
05:07:44  9  Mississippi, you were retained to provide an expert
05:07:47 10  opinion for the defendants, correct?
05:07:49 11       A    I do recall it now.  I didn't recall
05:07:52 12  it when I first looked, but now I do recall it, yes,
05:07:54 13  in Mississippi.
05:07:55 14       Q    In Newton v. Diamond, you were
05:07:57 15  retained to provide an expert opinion for the
05:08:00 16  defendants, Central District, California, 2002,
05:08:02 17  correct?
05:08:03 18       A    That's correct.
05:08:05 19       Q    Six on this list, Santelli versus Walt
05:08:09 20  Disney, Eastern District of Tennessee, 2002, you
05:08:13 21  were retained to provide an expert opinion for the
05:08:15 22  defendants, correct?
05:08:16 23       A    Yes.
05:08:19 24       Q    BMS Entertainment/Heat Music LLC

Page 34

05:08:24  1  versus Bridges, Southern District of New York, you
05:08:27  2  were retained to provide an expert opinion for the
05:08:30  3  defendants, correct?
05:08:30  4       A    Yes.
05:08:32  5       Q    Griffin v. J-Records, Eastern District
05:08:36  6  of Washington, 2005, you were retained by the
05:08:40  7  defendants to provide an expert report and opinion,
05:08:43  8  correct?
05:08:44  9       A    Yes.  When I first saw it, I didn't
05:08:46 10  recognize it, but now I do remember it.  Thank you.
05:08:49 11       Q    Johnson v. Gordon, case in 2004, I
05:08:57 12  guess there was some appellate activity.  Do you
05:09:00 13  recall that case?
05:09:01 14       A    I do.  Johnson v. Gordon, I did work
05:09:06 15  on behalf of Gordon.  The motion for summary
05:09:10 16  judgment by defendants was granted.  It was appealed
05:09:13 17  to the First Circuit and the appellate court, the
05:09:18 18  First Circuit upheld the lower court's dismissal of
05:09:22 19  the case.
05:09:22 20       Q    You were retained by the defendants,
05:09:24 21  correct?
05:09:24 22       A    That's correct.
05:09:25 23       Q    Lassin v. Island Def Jam Music Group,
05:09:29 24  Southern District of Florida, August 9, 2005, you

Page 35

05:09:33  1  were retained by the defendants to provide an expert
05:09:35  2  report and opinion, correct?
05:09:37  3       A    I vaguely remember that case, but I
05:09:39  4  have -- I have no reason to believe that I -- that
05:09:43  5  I -- that I was working for Lassin.  I don't recall
05:09:46  6  working for Lassin.
05:09:47  7       Q    Loussier versus Universal Music Group,
05:09:50  8  Southern District of New York, 2005, in that case
05:09:54  9  you were also retained for the experts, correct?
05:09:58 10       A    That's correct.
05:09:59 11       Q    Excuse me, for the defendants as an
05:10:00 12  expert?
05:10:01 13       A    That's correct.
05:10:02 14       Q    Johnson v. Arista Holding, Inc.,
05:10:05 15  Southern District of New York, 2005, you were
05:10:08 16  retained by the defendants to produce and provide an
05:10:12 17  expert report and opinion, correct?
05:10:15 18       A    I don't recall that case.  If you will
05:10:16 19  tell me the names of the songs involved, it would
05:10:20 20  probably help me.  I'm not suggesting that I was not
05:10:23 21  involved.  I just don't recall that.
05:10:25 22       Q    So you don't recall being involved --
05:10:28 23  being retained by Island Def Jam Music Group --
05:10:31 24       A    No, that's the wrong --

Page 36

05:10:32  1       Q    -- 2005, Central District --
05:10:33  2            MR. ANDERSON:  You just
05:10:33  3  jumped --
05:10:34  4            MR. MALOFIY:  Did I?
05:10:34  5       Q    My apologies.  Strike that.
05:10:36  6            You don't recall being involved in a
05:10:38  7  case in the Southern District of New York in 2005
05:10:44  8  where the defendant was Arista Holding?
05:10:46  9            MR. ANDERSON:  Arista.
05:10:48 10            MS. FREEMAN:  It's Arista.
05:10:50 11            MR. MALOFIY:  Thank you.
05:10:50 12       A    I don't recall that case.  I'm not
05:10:52 13  suggesting that I was not involved on behalf of
05:10:54 14  Arista Holding.  I -- again, sometimes the names
05:10:59 15  help, but I just don't remember the name Johnson.
05:11:02 16  If you have the names of the songs, they would
05:11:07 17  probably help me.
05:11:09 18       Q    Rondor Music -- excuse me.  Turino
05:11:12 19  versus Island Def Jam Music Group, 2005, Central
05:11:16 20  District of California, you were retained by the
05:11:19 21  defendants in that case, correct?
05:11:22 22       A    I don't recall Turino.
05:11:25 23       Q    Isn't that a case you lost?
05:11:28 24            MR. ANDERSON:  Objection.

9 (Pages 33 to 36)

CONFIDENTIAL

Page 37

```
05:11:29  1        A  Well, I don't --
05:11:30  2            MR. ANDERSON:  He's not a -- are
05:11:31  3        you suggesting he's a party?
05:11:33  4        A  I'm not a party, so I don't lose a
05:11:37  5    case.  If you could tell me, again, the names of the
05:11:39  6    songs, it would -- it would certainly help.
05:11:41  7        Q  Well, there was a Thomas Turino.  Does
05:11:44  8    that ring a bell?
05:11:45  9        A  No, it does not.
05:11:46 10        Q  Okay.  So you don't recall a case
05:11:47 11    where there was a case that the plaintiffs had won
05:11:50 12    in the Central District of California and you were
05:11:55 13    retained by Island Def Jam Music Group?
05:11:59 14        A  I -- I wasn't -- I'm not
05:12:00 15    suggesting that it isn't the case.  I just do not
05:12:04 16    recall.
05:12:04 17        Q  Peruvian folk music, does that ring a
05:12:09 18    bell?
05:12:10 19        A  No, it doesn't.
05:12:11 20        Q  Peruvian folk -- folk music?
05:12:13 21        A  No, it does not.
05:12:17 22        Q  Fourteen, Rondor Music Inetern, Inc.
05:12:19 23    v. TVT Records LLC 2006 case, do you recall where
05:12:27 24    you were retained as an expert for the defendants to
```

Page 38

```
05:12:31  1    give an expert report and opinion?
05:12:33  2        A  I don't recall.  I know that Rondor
05:12:34  3    Music, the plaintiff, is what you would call a
05:12:39  4    major.  It's part of Universal Music Publishing
05:12:43  5    Group, but I don't recall that case.  Again, not
05:12:47  6    suggesting that I was not involved, but if you have
05:12:48  7    the names of the songs it tends to help, the actual
05:12:51  8    titles of the songs.
05:12:53  9        Q  Jones v. Blige, Eastern District of
05:12:55 10    Michigan, 2006.
05:12:56 11        A  I do remember that and, yes, I did
05:12:58 12    work on behalf of -- of Mary J. Blige and other
05:13:02 13    defendants and that was dismissed.
05:13:04 14        Q  Sixteen, Slip-N-Slide Records v. TVT
05:13:07 15    Records, Southern District of Florida, 2007, were
05:13:12 16    you retained by the defense to provide an expert
05:13:15 17    report and opinion?
05:13:18 18        A  I recall Slip-N-Slide Records.  I
05:13:19 19    recall TVT Records.  If -- if your research suggests
05:13:25 20    that I worked on behalf of TVT Records, I'm not
05:13:28 21    suggesting that I didn't.  I just don't remember.
05:13:31 22        Q  Bridgeport Music, Inc. versus Justin
05:13:33 23    Combs, I guess, Publications or Publishing.  It
05:13:39 24    appears to be a case -- well, a 2007 case.  Do you
```

Page 39

```
05:13:47  1    have any recollection of that case being retained by
05:13:51  2    the defense?
05:13:52  3        A  I do.
05:13:52  4        Q  Okay.  And you provided an expert
05:13:55  5    report and opinion, correct?
05:13:57  6        A  I only provided a value assessment.
05:13:59  7    At the open of the trial, defendants admitted or
05:14:06  8    conceded the use of a sample.  The only report that
05:14:10  9    I submitted in that -- in that litigation was a
05:14:15 10    value assessment.  It -- it was not an issue of
05:14:19 11    liability because the sample was conceded at the
05:14:22 12    start of the trial.
05:14:23 13        Q  Initially, you came to the conclusion
05:14:25 14    that it wasn't a sample; isn't that right?
05:14:28 15        A  No, that's incorrect.
05:14:29 16        Q  Did you ever make an opinion whether
05:14:31 17    or not it was a sample or whether or not it was
05:14:33 18    something other than music that was copied?
05:14:36 19            MR. ANDERSON:  Objection, vague,
05:14:37 20        ambiguous and compound.
05:14:39 21        A  It's been almost 10 years, perhaps
05:14:41 22    more than 10 years since the actual report.  I'm
05:14:45 23    pretty sure I have a copy of my report.  And to the
05:14:47 24    best of my recollection, when I was first contacted,
```

Page 40

```
05:14:50  1    I found that there was a sample.  And much later,
05:14:57  2    very close, in fact, some months before the actual
05:15:03  3    trial, I was asked to write a brief value assessment
05:15:09  4    and -- which I did.  And literally, about three or
05:15:13  5    four weeks before the trial, much to my surprise, I
05:15:17  6    was asked to -- to testify.  To my surprise, one,
05:15:20  7    that it was going trial, but also because I had
05:15:24  8    found that there was a sample, but I was told that
05:15:26  9    the defendants were going to open the trial with a
05:15:29 10    concession that there was a sample, a sample that I
05:15:32 11    found, in fact, and that they undoubtedly conceded.
05:15:36 12    What they wanted from me was respect with respect
05:15:39 13    to the value of the sample in the -- the second work
05:15:46 14    and that was what my report and what I was hired to
05:15:49 15    do in that case.
05:15:51 16        Q  Did you find the sample or did they
05:15:53 17    give you the sample?
05:15:55 18            MR. ANDERSON:  Objection, vague
05:15:55 19        and ambiguous.
05:15:57 20        A  I was -- in fact, some years before to
05:16:00 21    the best of my recollection I was sent the original
05:16:05 22    work and the work by Notorious B.I.G.  It was --
05:16:10 23    this I remember.  It was "Ready to Die," a very
05:16:14 24    prophetic work, and whereupon I said, "Yes, there is
```

10 (Pages 37 to 40)

CONFIDENTIAL

## Page 41

05:16:18  1  a sample." And I didn't hear anything for a couple
05:16:22  2  of years.
05:16:24  3        Some months before the trial, I was
05:16:26  4  asked if I would -- given the sample that I -- that
05:16:34  5  I provided an analysis of, I was asked given the
05:16:38  6  sample, what is the value of the use of that sample
05:16:42  7  in defendant's song, "Ready to Die"? That is
05:16:46  8  exactly what my report provided. And, once again,
05:16:49  9  the defendants conceded that there was a sample at
05:16:52 10  the start of the trial as I understand it.
05:16:54 11        Q    So, initially, when you realized there
05:16:56 12  was a sample, did you put that in your initial
05:16:59 13  report that was tendered to the opposing side or did
05:17:03 14  you not address that issue?
05:17:05 15        A    I was not asked for any written report
05:17:08 16  with respect to the sample. As I do often, I gave
05:17:14 17  the party that called me bad news. Very often a
05:17:18 18  plaintiff will call, a potential plaintiff, and I'll
05:17:21 19  say, "Well, I don't think you have a case." Or a
05:17:23 20  potential defendant will call and I'll say, "Well,
05:17:25 21  believe it or not, there is a sample in there and I
05:17:27 22  think it needs to be -- it needs to be licensed," so
05:17:30 23  I gave an honest assessment. I said, "There is a
05:17:32 24  sample in my opinion," and I didn't expect to hear

## Page 42

05:17:34  1  back. The only reason I heard back in that case was
05:17:38  2  to do a value assessment.
05:17:43  3        Q    Did the defendants run through trial
05:17:45  4  right -- right up to the day of trial not disclosing
05:17:49  5  or admitting that there was a sample?
05:17:51  6        MR. ANDERSON: Objection, vague,
05:17:52  7        ambiguous and compound.
05:17:54  8        A    To the best of my recollection, they
05:17:58  9  opened with -- when they opened their -- their part
05:18:02 10  of the trial, they conceded. I don't know if that's
05:18:05 11  conceding -- well, they conceded that there was a
05:18:08 12  sample, yes, that's my understanding.
05:18:09 13        Q    That's pretty clever. All right.
05:18:13 14        Eighteen, Velez versus Sony Discos,
05:18:17 15  Southern District of New York, January 16, 2007,
05:18:18 16  you were hired by -- to provide an expert report and
05:18:23 17  opinion for the defendants, correct?
05:18:25 18        A    That's correct. I do remember that
05:18:26 19  and I do remember the -- the judge granting
05:18:30 20  defendants' motion for summary judgment.
05:18:32 21        Q    Nineteen, Bourne v. -- excuse me, 19,
05:18:35 22  Bourne Co. v. Twentieth Century Fox, Southern
05:18:40 23  District of New York, 2007, you were retained by the
05:18:42 24  defendants to provide an expert report and opinion,

## Page 43

05:18:47  1  correct?
05:18:48  2        A    Yes. Bourne Company is a publishing
05:18:51  3  company. Twentieth Century Fox, needless to say, is
05:18:53  4  what it is and that was a fair use case. And, once
05:18:56  5  again, defendants' motion for summary judgment was
05:18:59  6  granted.
05:19:01  7        Q    Sprockets, Inc. versus Mega TV and
05:19:04  8  Radio Productions, Inc., Southern District of New
05:19:06  9  York -- excuse me -- Southern District of Florida,
05:19:09 10  2007, do you recall being involved in that case and
05:19:14 11  being retained by the defendants to provide an
05:19:16 12  expert report and opinion?
05:19:19 13        A    I only -- only very vaguely. Mega TV
05:19:27 14  and Radio Productions is not a company that I --
05:19:30 15  that I know, but, again, I have -- I have no reason
05:19:33 16  to doubt that what you found is not accurate. I
05:19:36 17  just don't remember what that issue was.
05:19:38 18        Q    Lennon v. Premise Media Corp.,
05:19:41 19  Southern District of New York, 2008, were you
05:19:44 20  retained to provide an expert report and opinion for
05:19:47 21  the defendants?
05:19:47 22        A    No.
05:19:49 23        Q    Who were you retained to provide an
05:19:51 24  expert opinion for?

## Page 44

05:19:52  1        A    The estate of John Lennon.
05:19:54  2        Q    Was he the plaintiff in this case?
05:19:56  3        A    Yes, he was. The estate was.
05:20:05  4        Q    Twenty-two, Lessem v. Taylor, Southern
05:20:12  5  District of New York, 2007, do you recall being
05:20:14  6  retained by the defense to provide an expert report
05:20:17  7  and opinion?
05:20:18  8        A    I don't remember the songs, but I
05:20:20  9  remember the name Lessem and so based on your
05:20:23 10  research I have no reason to doubt that I was
05:20:26 11  engaged on behalf of Taylor.
05:20:28 12        Q    Pyatt v. Jean, 2009 -- I believe it
05:20:35 13  was 2000 -- it's either a 2008 or 2009 case.
05:20:39 14        A    Oh, yes.
05:20:40 15        Q    Do you recall that?
05:20:41 16        A    I do.
05:20:42 17        Q    You were retained by the defendants to
05:20:43 18  provide an expert report and opinion, correct?
05:20:48 19        A    Yes. That -- that was actually in the
05:20:51 20  Eastern District of New York and it went to trial
05:20:54 21  and the jury found on behalf of Jean, that's Wyclef
05:20:58 22  Jean, but found on behalf of Jean, yes.
05:21:02 23        Q    Okay. You testified in that case?
05:21:06 24        A    I did.

11 (Pages 41 to 44)

CONFIDENTIAL

Page 45

05:21:09 1      Q   Kernel Records v. -- excuse me --
05:21:09 2 Kernel Rescords Oy v. -- oh, I don't know.
05:21:20 3 Sometimes --
05:21:22 4      A   It's a typo. It's a typo. There's no
05:21:24 5 S.
05:21:24 6      Q   Kernel Records O-Y v. Molsey -- is
05:21:32 7 that supposed to be Moseley?
05:21:33 8      A   Tim -- Tim Moseley, yes.
05:21:34 9      Q   Okay. So another typo. Let's try
05:21:36 10 this one more time. Kernel Records v. Moseley --
05:21:42 11      A   Yes.
05:21:43 12      Q   -- Timberland --
05:21:44 13      A   Yes.
05:21:44 14      Q   -- 2009 case, Southern District of
05:21:47 15 Florida, do you recall that?
05:21:49 16      A   I do. Once again, defendants' motion
05:21:52 17 for summary judgment was granted.
05:21:53 18      Q   You were retained by the defendants to
05:21:55 19 provide an expert report and opinion, right?
05:21:57 20      A   Yes, I was.
05:21:57 21      Q   Twenty-five, Watt v. Butler --
05:22:03 22      A   W-a-t-t.
05:22:06 23      Q   -- Northern District of Georgia, 2010,
05:22:09 24 you were retained by the defendants to provide an

Page 46

05:22:12 1 expert report and opinion, correct?
05:22:13 2      A   Yes. As I recall, once again,
05:22:16 3 defendants' motion for summary judgment was -- was
05:22:20 4 granted. It might have even gone to the Appellate
05:22:22 5 Court and upheld there.
05:22:24 6      Q   Pharmacy records v. Nassar, you were
05:22:27 7 retained by the defendants to produce an expert
05:22:30 8 report and opinion, Eastern District of Michigan,
05:22:34 9 2010?
05:22:37 10      A   I don't recall either name. If
05:22:38 11 there's an a/k/a for Nassar, perhaps?
05:22:42 12      Q   I don't know.
05:22:43 13      MS. FREEMAN: Can I ask you not
05:22:43 14 to --
05:22:43 15      A   It's N-a-s-s-a-r.
05:22:46 16      MS. FREEMAN: I'm sorry. I'm
05:22:52 17 just having trouble because you keep
05:22:55 18 beating on the floor.
05:22:56 19      MR. MALOFIY: I'm beating on the
05:22:58 20 floor?
05:22:59 21      MS. FREEMAN: With your foot.
05:23:00 22      MR. MALOFIY: My foot tapping's
05:23:00 23 bothering you?
05:23:03 24      MS. FREEMAN: Yes.

Page 47

05:23:03 1      MR. MALOFIY: I didn't notice I
05:23:03 2 was even tapping.
05:23:05 3      MS. FREEMAN: Sorry. I didn't
05:23:05 4 mean to interrupt.
05:23:06 5      A   So to answer your question, I don't
05:23:07 6 remember either party. And if you can find the name
05:23:12 7 of the songs or the names of the songs that might
05:23:15 8 jolt my memory. I'm not suggesting that your --
05:23:17 9 that your research is wrong, but I can't confirm one
05:23:20 10 way or the other.
05:23:21 11      Q   Can you hear me, okay?
05:23:23 12      A   Yes, I can. Thank you.
05:23:25 13      Q   Adelaide Gail Zappa versus Rykodisc,
05:23:26 14 Southern District of New York, 2011, you were
05:23:31 15 retained by the defendants to produce an expert
05:23:34 16 report and opinion, correct?
05:23:36 17      A   Yes.
05:23:38 18      Q   Is that -- excuse me -- Zappa v.
05:23:41 19 Rykodisc, Inc., is this similar to earlier on where
05:23:44 20 it's the same case, or --
05:23:45 21      A   It's the same -- I'm sorry. It's the
05:23:46 22 same case. I'm sorry for talking over you.
05:23:48 23      Q   Okay. Straughter v. Raymond, Central
05:23:53 24 District of California, 2011, you were retained by

Page 48

05:23:55 1 the defendants to produce an expert report and
05:23:58 2 opinion, correct?
05:23:59 3      A   That's correct.
05:23:59 4      Q   Okay. Marino v. Usher, you were
05:24:02 5 retained by the defendants to produce an expert
05:24:05 6 report and opinion, correct?
05:24:07 7      A   That is correct.
05:24:09 8      Q   Pharmacy records v. Nassar, I think we
05:24:13 9 addressed that earlier on. I'm not sure if it's the
05:24:15 10 same case or a similar case. Do you have any
05:24:18 11 further information as to that?
05:24:20 12      A   I do not, but I see that they're both
05:24:24 13 what -- well, one is the Sixth Circuit in --
05:24:28 14      Q   One looks like it's the appeals and
05:24:29 15 the other looks like it's the trial.
05:24:31 16      A   Is Michigan part of the Sixth Circuit?
05:24:34 17      Q   I believe so.
05:24:35 18      A   Okay. Well, then it's the same case.
05:24:36 19 At least doubles, if not more that you've mentioned.
05:24:41 20      Q   Williams versus Bridgeport Music,
05:24:41 21 Inc., Southern District of New York, 2014, you were
05:24:44 22 retained by the defendants to produce an expert
05:24:47 23 report and opinion, correct?
05:24:52 24      A   I don't recall that at all. I don't

12 (Pages 45 to 48)

CONFIDENTIAL

Page 49

05:24:54  1  recall being -- being engaged by Bridgeport Music,
05:25:00  2  no. I think that might be a mistake. I -- I rather
05:25:05  3  doubt it because it's only two years. This is 2014,
05:25:07  4  so I don't think so. It's -- it's possible that I
05:25:11  5  was engaged by Williams, but -- but I don't know,
05:25:15  6  but I don't recall ever having been engaged by
05:25:18  7  Bridgeport Music, so at the -- at the very least it
05:25:20  8  shouldn't be listed. It's possible that I was
05:25:24  9  engaged on behalf of plaintiff, Williams, but I
05:25:28  10  don't recall.
05:25:28  11       Q    Fair enough. Batiste versus N-a-j-m.
05:25:33  12           MR. ANDERSON:  Najm.
05:25:34  13           MR. MALOFIY:  Najm?
05:25:36  14       Q    Eastern District, Louisiana, 2014?
05:25:41  15       A    This was a case that I mentioned early
05:25:43  16  on in my testimony today and, yes, I was engaged on
05:25:44  17  behalf of Najm.
05:25:45  18       Q    Defendants, correct?
05:25:46  19       A    Correct.
05:25:47  20       Q    All right. And Fahmy versus Jay Z,
05:25:52  21  Central District, 2015, California, you were
05:25:55  22  retained by the defendants, Jay Z, to produce an
05:25:59  23  expert report and opinion, correct?
05:26:01  24       A    That's correct.

Page 50

05:26:07  1       Q    Now, we have plaintiffs here. I have
05:26:10  2  four plaintiffs listed besides Lennon which you
05:26:14  3  already mentioned and I believe I also have Lennon
05:26:17  4  mentioned in this list.
05:26:20  5       A    Lennon was incorrectly listed along
05:26:22  6  with, what did we say, two or three others in the
05:26:25  7  first list, and of course you had two or three
05:26:28  8  doubles in the first list, so Lennon is properly
05:26:32  9  listed under plaintiffs. It's -- it's the John
05:26:35  10  Lennon estate.
05:26:36  11       Q    Now, Grover v. Austin, Second Circuit,
05:26:43  12  2008, were you involved in that case?
05:26:48  13       A    I think you said Grover. It's Glover.
05:26:50  14       Q    Sorry, Glover.
05:26:50  15       A    Glover, yes, I was engaged on behalf
05:26:52  16  of Glover. I think it went to the Second Circuit
05:26:56  17  and the Second Circuit found on behalf of Glover.
05:26:59  18       Q    Who is Glover?
05:27:01  19       A    Glover was an individual who -- who
05:27:10  20  sued. I believe the song was "Unpretty." It was
05:27:15  21  one of the, as you call, the majors. It was one of
05:27:17  22  the major publishing record companies for the
05:27:23  23  defendants. I worked on behalf of Glover, an
05:27:25  24  individual.

Page 51

05:27:25  1       Q    Jean v. Bug Music?
05:27:28  2       A    Yes, I worked on behalf of the
05:27:29  3  plaintiff.
05:27:30  4       Q    Plaintiff was a big superstar, Wyclef
05:27:33  5  Jean, correct?
05:27:35  6       A    Yes, that's correct.
05:27:36  7           MR. ANDERSON:  Can I just make
05:27:37  8  a -- just -- I would like just to object
05:27:39  9  to this document, Exhibit 2703, which
05:27:43  10  was prepared by Counsel -- excuse me --
05:27:44  11  in addition to the issues that were
05:27:46  12  raised by the witness in the statements,
05:27:50  13  gratuitous statements, like not going
05:27:53  14  for the little guy, I don't believe
05:27:55  15  belong in an exhibit prepared by
05:27:57  16  Counsel. I'm just saying that for the
05:27:58  17  record.
05:27:58  18           MR. MALOFIY:  Yeah, that
05:28:01  19  probably shouldn't have been there. It
05:28:02  20  was probably a draft copy, so, anyway, I
05:28:06  21  didn't mean it to be in there. That was
05:28:08  22  only for my own notes. I just realized
05:28:09  23  it myself, so that was my own notes in a
05:28:11  24  draft copy that somehow made it onto

Page 52

05:28:12  1  this exhibit.
05:28:14  2           MS. FREEMAN:  Which I didn't
05:28:15  3  see.
05:28:17  4           MR. MALOFIY:  Thank you for
05:28:18  5  pointing that out.
05:28:29  6       Q    Glover, was he a superstar or a famous
05:28:32  7  artist?
05:28:33  8       A    I don't recall. I don't recall the
05:28:34  9  name as an artist, as a singer, or a composer. I
05:28:38  10  honestly don't. It's -- it's been a while.
05:28:40  11       Q    Was it a successful artist --
05:28:43  12           MR. ANDERSON:  Objection, vague
05:28:43  13  and ambiguous.
05:28:44  14       Q    -- or musician, or writer of some
05:28:47  15  sort?
05:28:47  16           MR. ANDERSON:  Objection, vague,
05:28:48  17  ambiguous, compound.
05:28:49  18       A    Yeah. I -- I don't recall who Glover
05:28:51  19  was. In -- in fact, all that I recall was that I
05:28:55  20  was engaged by his attorney and I never spoke with
05:28:58  21  Mr. Glover or met Mr. Glover.
05:29:01  22       Q    Henley v. Charles Devore. Henley is
05:29:05  23  Don Henley, correct?
05:29:06  24       A    That's correct.

13 (Pages 49 to 52)

CONFIDENTIAL

Page 53

```
05:29:07  1        Q   So he's a superstar artist, correct,
05:29:09  2   from the Eagles?
05:29:10  3        MR. ANDERSON: Objection, vague
05:29:11  4        and ambiguous.
05:29:12  5        A   Don Henley was certainly a major
05:29:14  6   artist, yes, from the Eagles and also a solo career.
05:29:17  7        Q   And then I also have the Lennon case
05:29:18  8   here, Lennon v. Premise Media Corp., where you
05:29:23  9   testified on behalf of the estate of John Lennon,
05:29:25 10   correct?
05:29:26 11        A   That's correct.
05:29:27 12        Q   All right.  So correct me if I'm
05:29:29 13   wrong, but the three cases where you represented the
05:29:37 14   plaintiffs, at least -- excuse me -- the four cases
05:29:45 15   where you represented the plaintiff in producing an
05:29:49 16   expert report and opinion, three of those four were
05:29:52 17   for a superstar artist.
05:29:55 18        MR. ANDERSON: First, let me
05:29:56 19        just state my objections.  One, it's
05:29:58 20        vague and ambiguous.  I want to clarify,
05:29:59 21        first of all, that you're referring
05:30:02 22        specifically to the ones that are on
05:30:04 23        Exhibit 2703.  That's my understanding
05:30:06 24        of the question.
```

Page 54

```
05:30:09  1        MR. MALOFY: That's right.
05:30:12  2        MR. ANDERSON: With that
05:30:12  3        clarification, I think it's still vague
05:30:14  4        and ambiguous as to what you mean by
05:30:16  5        superstar, but go ahead.
05:30:18  6        A   Wyclef Jean is a major artist and
05:30:22  7   so -- Don Henley is a major artist, and, of course,
05:30:26  8   John Lennon was iconic, and this was on behalf of
05:30:33  9   his -- his wife, now his late wife as I understand
05:30:37 10   it, and his son, the John Lennon estate.
05:30:40 11        Q   As you sit here today, can you think
05:30:42 12   of any other plaintiffs other than the ones I've
05:30:45 13   listed that you were retained to produce an expert
05:30:49 14   report and opinion?
05:30:52 15        A   I have provided countless expert
05:30:58 16   reports on behalf of plaintiffs.  My understanding
05:31:03 17   is that some of them may have been exchanged, if not
05:31:07 18   most of them.  The -- what I'm very proud of is when
05:31:14 19   I write a report on behalf of a plaintiff, most
05:31:18 20   often the -- what you would call the major on the
05:31:21 21   other side as a potential defendant takes the
05:31:24 22   honesty and the accuracy of my work very seriously
05:31:29 23   and most of those are settled.
05:31:31 24        Q   Do you know what the percentage is or
```

Page 55

```
05:31:33  1   can you identify those cases as you sit here today?
05:31:37  2        MR. ANDERSON: Objection, vague,
05:31:37  3        ambiguous, compound.
05:31:38  4        A   On the basis of privilege and
05:31:40  5   confidentiality, I certainly cannot, but I can tell
05:31:44  6   you that any number of times a -- an executive at a
05:31:52  7   major company in talking about another case said,
05:31:56  8   "By the way, we" -- well, I don't think I'm breaking
05:32:02  9   privilege -- Kent Klavens who ran Famous Music as --
05:32:06 10   that's the music publishing arm or was of Paramount
05:32:10 11   and then the senior vice president of Universal
05:32:11 12   Music Publishing Group just a few years ago called
05:32:15 13   and we were talking about another matter.  And he
05:32:17 14   said, by the way, he had received a call from
05:32:24 15   someone else in Universal Music Publishing, not a
05:32:28 16   senior vice president, who said, "We received a
05:32:30 17   claim and musicologist's report."
05:32:32 18        Whereupon, Mr. Klavens told me who was
05:32:36 19   the musicologist.  He said, "Dr. Ferrara."
05:32:38 20        And he said to me he told that person,
05:32:42 21   "Settle it;" as he said, the ultimate compliment, so
05:32:47 22   that very often is the case.
05:32:52 23        MR. MALOFY: I'm almost done.
05:32:53 24        One more question.  I know you want to
```

Page 56

```
05:32:56  1   go.
05:32:56  2        Q   Let's be clear and I just want to wrap
05:32:59  3   this up.  I know the court reporter has to change
05:33:01  4   out.
05:33:02  5        Besides what I've listed here, can you
05:33:04  6   tell me specifically any other cases where you were
05:33:07  7   retained by the plaintiff by case number?
05:33:11  8        MR. ANDERSON: Objection, vague,
05:33:12  9        and ambiguous.
05:33:13 10        Q   Besides what's listed here.
05:33:14 11        A   Not by case number, no, because most
05:33:16 12   of them tend to be settled.
05:33:18 13        Q   All right.
05:33:22 14        THE VIDEOGRAPHER: The time is
05:33:30 15   5:34 p.m.  This marks the ending of Tape
05:33:34 16   One.  Off the record.
05:33:35 17        (Whereupon, at 5:34 o'clock
05:33:35 18   p.m., a recess was taken and Linda
05:33:35 19   Marino, RPR, CCR, took over the
05:33:35 20   proceedings.)
05:33:35 21        (The deposition resumed with all
05:33:35 22   parties present.)
05:49:00 23        THE VIDEOGRAPHER: The time is
05:49:25 24   5:49 p.m.  This marks the beginning of
```

14 (Pages 53 to 56)

CONFIDENTIAL

---

Page 57

05:49:28 1          Tape 2.  On the record.
05:49:30 2          L A W R E N C E   F E R R A R A ,  Ph.D.,
05:49:30 3     resumed and testified further as follows:
05:49:33 4          MR. MALOFIY:  I have "Taurus"
05:49:39 5     deposit copy in my hand, which I'm going
05:49:43 6     to mark as 2704.
05:49:47 7          Please let the record reflect
05:49:48 8     I'm handing it to the court reporter.
05:49:50 9          ("Taurus" deposit copy was
05:49:50 10    marked as Exhibit 2704, D040443, for
05:49:50 11    identification, as of this date.)
05:49:50 12    BY MR. MALOFIY:
05:50:08 13    Q    Are you familiar with this "Taurus"
05:50:11 14    deposit copy?
05:50:12 15    A    Yes.
05:50:12 16    Q    And why are you familiar with this
05:50:14 17    "Taurus" deposit copy?
05:50:16 18    A    This was part of the analysis that I
05:50:18 19    completed in my report dated February 10, 2016.
05:50:26 20    Q    When did you first see this "Taurus"
05:50:28 21    deposit copy?
05:50:30 22    A    I don't recall.
05:50:31 23    Q    How did you find this "Taurus" deposit
05:50:35 24    copy?

---

Page 58

05:50:36 1     A    To the best of my recollection, it
05:50:37 2     would have been provided to me by Mr. Anderson.
05:50:49 3     Q    Did you review the "Taurus" deposit
05:50:52 4     copy prior to coming to an opinion on this case?
05:50:55 5          MR. ANDERSON:  Objection; vague
05:50:56 6     and ambiguous.
05:51:01 7     A    Yes, of course.  My opinion has to do
05:51:04 8     with the "Taurus" deposit copy and "Stairway to
05:51:07 9     Heaven."
05:51:09 10    Q    Were you familiar with the work
05:51:13 11    "Stairway to Heaven" prior to becoming involved in
05:51:17 12    this litigation?
05:51:18 13    A    Yes.
05:51:19 14    Q    Were you familiar with the work
05:51:20 15    "Taurus" prior to becoming involved in this
05:51:25 16    litigation?
05:51:25 17    A    No.
05:51:26 18    Q    Was your first --
05:51:31 19    A    Actually, not no.  I was aware of
05:51:35 20    "Taurus" before this litigation.
05:51:41 21    Q    Why is that?
05:51:46 22    A    I think around three years ago, I was
05:51:51 23    asked to complete an analysis -- it was
05:51:57 24    preliminary -- of the "Taurus" studio version, not

---

Page 59

05:52:04 1     the "Taurus" deposit copy, and "Stairway to Heaven."
05:52:08 2          And, so, if the question was "Taurus,"
05:52:12 3     then the answer is yes.  Prior to this the "Taurus"
05:52:16 4     deposit copy, the answer would be no.
05:52:20 5     Q    Who asked you to you do that?
05:52:22 6          MR. ANDERSON:  I have the same
05:52:23 7     concern.  You're talking about people
05:52:24 8     who aren't present here.  It seems to me
05:52:27 9     that they may --
05:52:28 10         MR. MALOFIY:  I don't even know
05:52:29 11    where we're going here.
05:52:31 12         MR. ANDERSON:  Yeah, but I think
05:52:32 13    it's privileged.
05:52:32 14         MR. MALOFIY:  I don't know if
05:52:33 15    it's privileged.  I mean...
05:52:34 16         MR. ANDERSON:  If he was
05:52:35 17    consulted by counsel confidentially,
05:52:38 18    then I think that's privilege.
05:52:40 19         MR. MALOFIY:  He hasn't even
05:52:41 20    identified who it was.
05:52:44 21         MR. ANDERSON:  Was it --
05:52:44 22         MR. MALOFIY:  Wait.  You can't
05:52:46 23    ask the questions.
05:52:46 24    Q    You said three years ago you were

---

Page 60

05:52:48 1     retained to analyze a studio version of "Stairway to
05:52:50 2     Heaven," correct?
05:52:52 3     A    To the best of my knowledge, around
05:52:54 4     three years ago I was asked to complete a
05:52:58 5     preliminary analysis of the "Taurus," "Taurus"
05:53:02 6     studio version and "Stairway to Heaven."
05:53:05 7     Q    Who asked to you do that?
05:53:07 8          MR. ANDERSON:  And I think
05:53:07 9     that's privileged.
05:53:09 10         MR. MALOFIY:  It depends if it's
05:53:10 11    privileged.
05:53:10 12         MR. ANDERSON:  How does it
05:53:11 13    depend if it's privileged?
05:53:12 14         If he was --
05:53:13 15         MR. MALOFIY:  Because the
05:53:14 16    communications that -- this is
05:53:16 17    individual communications, not whether
05:53:17 18    or not he was asked to do something.  He
05:53:19 19    already identified he was asked to do
05:53:21 20    something.
05:53:22 21         MR. ANDERSON:  Right.  But what
05:53:23 22    I'm saying is if he's consulted
05:53:25 23    confidentially -- now, you can ask him
05:53:27 24    was it a confidential consultation.

15 (Pages 57 to 60)

CONFIDENTIAL

Page 61

05:53:29  1          MR. MALOFIY: Look, you're
05:53:30  2   interfering with my deposition. This
05:53:32  3   man obviously before he was retained had
05:53:34  4   done an analysis on the studio version
05:53:36  5   and "Stairway to Heaven" studio album
05:53:39  6   recording.
05:53:40  7        Q   Who asked to you do that?
05:53:41  8          MR. ANDERSON: Isn't that work
05:53:41  9   product of whoever asked him to do it?
05:53:44  10         MR. MALOFIY: No, it's not.
05:53:45  11       A   I would have to get permission from
05:53:46  12  the party who called to have done that. And so long
05:53:54  13  as the party who called says that it's not
05:53:57  14  confidential, I'm happy to -- to let you know.
05:53:59  15       Q   Was it defendants in this case?
05:54:01  16       A   No, no, it was definitely not
05:54:06  17  defendants in this case.
05:54:07  18       Q   And it was obviously not anyone on
05:54:09  19  plaintiff's side, correct?
05:54:11  20         MR. ANDERSON: Objection, vague
05:54:12  21  and ambiguous.
05:54:13  22       A   Yeah, I don't --
05:54:14  23       Q   Did anyone on plaintiff's side reach
05:54:17  24  out to you and ask you to do an analysis?

Page 62

05:54:20  1        A   No.
05:54:20  2          MR. ANDERSON: Objection; vague
05:54:20  3   and ambiguous.
05:54:20  4          MR. MALOFIY: I don't even know
05:54:21  5   if this man can testify because he's not
05:54:22  6   even disclosing whether there might or
05:54:22  7   might not be a conflict.
05:54:25  8          MR. ANDERSON: No, there's no
05:54:25  9   conflict.
05:54:26  10         MR. MALOFIY: Wait, wait. You
05:54:26  11  can't testify, Mr. Anderson.
05:54:26  12         With all due respect, this is a
05:54:28  13  serious issue. Now this man's saying
05:54:29  14  he's done an analysis on "Taurus" sound
05:54:32  15  recording and also on "Stairway to
05:54:33  16  Heaven" and he's failing to indicate who
05:54:37  17  asked him to do this or how he was
05:54:39  18  employed or for what reason.
05:54:41  19         MR. ANDERSON: He's telling you
05:54:41  20  that he'll do that if the people who
05:54:44  21  retained him --
05:54:45  22         MR. MALOFIY: No, no, no. I'm
05:54:46  23  going to ask my questions. This is a
05:54:48  24  serious issue.

Page 63

05:54:49  1        Q   You were retained by somebody to form
05:54:51  2   an opinion on this work, correct?
05:54:52  3        A   Yes.
05:54:52  4        Q   Was it a corporation or was it an
05:54:54  5   individual?
05:54:56  6        A   It was a corporation.
05:54:58  7        Q   Was it a major?
05:55:00  8          MR. ANDERSON: Objection; vague
05:55:00  9   and ambiguous as to what a "major" is.
05:55:03  10         And, again, I think -- my
05:55:05  11  concern, Mr. Malofiy, is that whoever
05:55:07  12  retained him, if they retained him
05:55:10  13  confidentially is not here to protect
05:55:11  14  their own privilege.
05:55:13  15       Q   Were you retained by Lou Adler?
05:55:15  16         MR. ANDERSON: Same objections.
05:55:17  17       A   No.
05:55:17  18       Q   Who were you retained by?
05:55:19  19         MR. ANDERSON: Same objections.
05:55:20  20  I think that's the work product of
05:55:22  21  someone who is not here.
05:55:23  22         MR. MALOFIY: He already
05:55:24  23  identified he's retained by someone.
05:55:26  24  That's an issue in this case. If the

Page 64

05:55:29  1   judge feels differently, he can -- it
05:55:31  2   will come out this is very much at
05:55:33  3   issue.
05:55:33  4          He's done analysis of the sound
05:55:36  5   recording of both these works prior to
05:55:39  6   even becoming retained as an expert for
05:55:41  7   defendants in this case and he's not
05:55:43  8   even identifying who he was retained by.
05:55:46  9   That's a serious issue of bias, it's a
05:55:48  10  serious issue of prior work that was
05:55:50  11  completed, serious issue of forming his
05:55:52  12  opinions in this case, and I'm entitled
05:55:54  13  to broach these issues.
05:55:55  14       Q   So, who retained you, sir?
05:55:58  15         MR. ANDERSON: But you're
05:55:58  16  talking about confidential information
05:56:00  17  from someone who is not in this room.
05:56:01  18         MR. MALOFIY: There's nothing
05:56:02  19  confidential about identifying who
05:56:04  20  retained him. He already said he came
05:56:05  21  to an opinion and conclusion.
05:56:07  22         MR. ANDERSON: Of course --
05:56:07  23  well, I don't agree with -- I think
05:56:07  24  you're mischaracterizing his testimony,

16 (Pages 61 to 64)

CONFIDENTIAL

Page 65

```
05:56:09  1   but I think you need to -- what my
05:56:12  2   suggestion would be is you give him the
05:56:15  3   opportunity to determine whether or
05:56:15  4   not --
05:56:17  5        MR. MALOFIY:  No.
05:56:18  6        MR. ANDERSON:  Fred,
05:56:19  7   Mr. Malofiy, please let me finish
05:56:21  8   talking.  I'm not interrupting you.
05:56:23  9        I think you need to give him the
05:56:24 10   opportunity to contact the third-party.
05:56:26 11        MR. MALOFIY:  Do you know who
05:56:27 12   the third-party is, Mr. Anderson?
05:56:28 13        MR. ANDERSON:  It's not my
05:56:29 14   deposition.
05:56:30 15        MR. MALOFIY:  See, this is the
05:56:30 16   issue I'm having here, sir:  You're
05:56:31 17   sitting here talking with long speaking
05:56:33 18   objections and I believe you probably
05:56:35 19   know who retained Mr. Ferrara, Dr.
05:56:39 20   Ferrara.  And Dr. Ferrara knows.  And
05:56:42 21   probably Helene Freeman knows.  And I'm
05:56:45 22   sitting here doing a deposition of this
05:56:46 23   man, paying a lot of money for it, and
05:56:49 24   you guys are playing with a stacked
```

Page 66

```
05:56:50  1   deck.
05:56:51  2        So, if this man was retained by
05:56:52  3   anyone associated with defendants, I'm
05:56:52  4   entitled to know that.  And I'm entitled
05:56:56  5   to know who that was.
05:56:58  6        MR. ANDERSON:  He was not
05:56:59  7   retained with anyone associated with the
05:57:00  8   defendants.  He's already testified to
05:57:02  9   that.
05:57:03 10        And he's made it very clear that
05:57:04 11   he can find out if whoever retained him
05:57:09 12   is willing to let that being disclosed.
05:57:11 13   That's my not my objection, it's not
05:57:14 14   yours.
05:57:14 15        Q   Sir, were you paid for your opinion
05:57:16 16   when you provided an opinion prior to being retained
05:57:18 17   in this case for this other person which you're
05:57:21 18   failing to identify?
05:57:22 19        A   It was a company and I'm certain that
05:57:24 20   I was paid.
05:57:25 21        Q   "Company X" you want to call it?
05:57:28 22        A   If you wish.
05:57:28 23        Q   You're not willing to reveal who
05:57:30 24   retained you to produce -- to provide an analysis
```

Page 67

```
05:57:32  1   before becoming engaged by defendants in this case?
05:57:35  2        A   I would like to.  I don't think
05:57:39  3   there's anything secret about it.  My understanding
05:57:42  4   is that I should get permission in order to do so.
05:57:45  5        But I was retained.  It was not by --
05:57:50  6   who, you said before?
05:57:51  7        Q   I don't know who you were retained by.
05:57:52  8        A   Adler?  You said Lou Adler.
05:57:53  9        Q   Lou Adler, Hollenback Music, Ode
05:57:55 10   Records?
05:57:55 11        A   No, Hollenback Music or Ode Records
05:57:59 12   and you mentioned -- any of the parties here,
05:58:02 13   Skidmore on behalf of the Randy Wolfe Estate, Warner
05:58:09 14   Music, any of these artists.  I was certainly not
05:58:12 15   retained on behalf of any of the parties in the
05:58:15 16   current litigation.
05:58:17 17        But I do recall being retained about
05:58:19 18   three years ago from another party asking me to do
05:58:22 19   an initial analysis, which I did.  I didn't -- and
05:58:26 20   I'm very happy to testify to it.  Again, I'd like to
05:58:31 21   have the opportunity to just double-check with that
05:58:34 22   company to make certain that I'm not breaking a
05:58:37 23   confidence, any kind of confidentiality.
05:58:39 24        Q   So, you'll agree to come back for a
```

Page 68

```
05:58:41  1   deposition -- so we can resume your deposition and
05:58:44  2   ask you questions then; correct, sir?
05:58:45  3        MR. ANDERSON:  No, that's not
05:58:47  4   what he's saying.
05:58:48  5        Q   Well, then, you're going to answer,
05:58:49  6   sir --
05:58:49  7        MR. ANDERSON:  No.
05:58:50  8        Q   -- because now this is getting carried
05:58:51  9   away.  You were involved in this matter, you
05:58:54 10   formed -- you were entitled to facts and information
05:58:56 11   prior to becoming retained in this case, and you're
05:58:59 12   refusing to answer who retained you and what
05:59:02 13   corporation retained you, and you're sitting here
05:59:06 14   providing an opinion in this case based on facts and
05:59:09 15   things that you were made aware prior to becoming
05:59:13 16   retained in this case and you're failing to disclose
05:59:15 17   who they were, how you were retained, and if there's
05:59:18 18   any bias or conflict.
05:59:19 19        MR. ANDERSON:  First of all, I
05:59:19 20   object to you harassing the witness and
05:59:22 21   your speeches directed to the witness.
05:59:25 22        Second of all, he already
05:59:26 23   testified as to what he reviewed.
05:59:28 24   There's no secret about what he
```

17 (Pages 65 to 68)

CONFIDENTIAL

Page 69

```
05:59:29  1    reviewed, he told you:  The "Taurus"
05:59:30  2    studio sound recording and "Stairway to
05:59:32  3    Heaven."
05:59:33  4         Now, if you want to give him --
05:59:34  5    maybe he can even reach someone now to
05:59:37  6    find out.  If you want to give him the
05:59:39  7    opportunity to make a phone call and
05:59:40  8    give himself comfort that he is free to
05:59:44  9    talk about it, I'm fine with that.
05:59:47 10         MR. MALOFIY:  Of course he has
05:59:48 11    to talk about it.
05:59:49 12    Q    Did you ever disclose this in your
05:59:49 13    report, that you were retained prior to being
05:59:49 14    retained by the defendants to produce an opinion in
05:59:49 15    this case -- to provide an opinion?
05:59:56 16         MR. ANDERSON:  Objection; the
05:59:57 17    report speaks for itself and you're
05:59:57 18    asking him to disclose confidential
05:59:57 19    information.
05:59:58 20         MR. MALOFIY:  No, no, no.  This
05:59:59 21    is a series, serious issue.
06:00:01 22         And please mark this on the
06:00:02 23    transcript.
06:00:04 24    Q    Did you ever disclose anywhere in your
```

Page 70

```
06:00:07  1    100-, 200-page report that you had been retained
06:00:10  2    prior to being retained by the defendants to come to
06:00:13  3    an opinion and do an analysis on the "Taurus" album
06:00:19  4    recording and the "Stairway to Heaven" album
06:00:24  5    recording?
06:00:24  6    A    No.
06:00:25  7         MR. ANDERSON:  Objection;
06:00:25  8    argumentative.
06:00:26  9    A    No.
06:00:27 10    Q    Do you think that was an oversight?
06:00:30 11    A    No, because it did not in any way
06:00:33 12    impact on my analysis in this -- in this litigation.
06:00:38 13    Q    Company X, which you're refusing to
06:00:40 14    identify --
06:00:41 15    A    Until I can get permission to
06:00:43 16    identify.  Again, I'm very happy to identify.
06:00:47 17    Q    Are you agreeable to come back for
06:00:49 18    further -- for further questioning once you
06:00:51 19    determine who that company is and whether or not you
06:00:53 20    have permission to disclose your communications with
06:00:55 21    them?
06:00:56 22         MR. ANDERSON:  We're not
06:00:56 23    agreeing to come back.
06:00:57 24         MR. MALOFIY:  I'm not asking
```

Page 71

```
06:00:58  1    you, Mr. Anderson, I'm asking this
06:00:59  2    witness.
06:01:00  3         MR. ANDERSON:  If you want to
06:01:01  4    allow him to try reaching someone,
06:01:03  5    that's fine.
06:01:04  6         MR. MALOFIY:  Do you represent
06:01:05  7    this man?
06:01:06  8         MR. ANDERSON:  He is my retained
06:01:07  9    witness and I am --
06:01:08 10         MR. MALOFIY:  Are you
06:01:08 11    representing him?
06:01:09 12         MR. ANDERSON:  -- acting as his
06:01:10 13    counsel to the extent that that's
06:01:12 14    necessary in terms of this deposition.
06:01:15 15         But he is my retained witness
06:01:17 16    and I am not coming back.  We're two
06:01:19 17    weeks away from trial, Helene's not
06:01:22 18    coming back, and Dr. Ferrara isn't
06:01:25 19    coming back.  If you want to give him
06:01:26 20    the opportunity -- first of all, you're
06:01:28 21    making a mountain out of a mole hill
06:01:30 22    because, as he said, the prior instance
06:01:32 23    does not change any of his opinions --
06:01:33 24         MR. MALOFIY:  Speaking
```

Page 72

```
06:01:33  1    objections has been going on and on.
06:01:35  2         MR. ANDERSON:  Just let me
06:01:35  3    finish.
06:01:36  4         MR. MALOFIY:  This is a serious,
06:01:36  5    serious, serious issue.
06:01:38  6         MR. ANDERSON:  Don't interrupt
06:01:39  7    me, please.
06:01:40  8         MR. MALOFIY:  Speaking
06:01:40  9    objections.
06:01:41 10         MR. ANDERSON:  If you want --
06:01:41 11    your making speeches and you're asking
06:01:45 12    questions and I'm responding to them.
06:01:47 13         Now, if you want to give him the
06:01:49 14    opportunity to make a phone call or
06:01:50 15    however he's going to do it, that's
06:01:53 16    fine, and we can deal with this now.
06:01:56 17    Q    Do you know who you spoke to at
06:01:57 18    Company X that you won't identify?
06:02:00 19    A    I don't -- I don't recall the name,
06:02:02 20    but I certainly recall the company.
06:02:05 21         Perhaps Mr. Anderson or Ms. Freeman
06:02:09 22    would -- I don't have the telephone number of that
06:02:12 23    company.  They're in California, and so --
06:02:14 24    Q    Why would they know?  Why would
```

18 (Pages 69 to 72)

CONFIDENTIAL

|  | Page 73 |
|---|---|
| 06:02:17 | 1 | Ms. Freeman or Mr. Anderson know -- |

Page 73

06:02:17  1      Ms. Freeman or Mr. Anderson know --
06:02:19  2      A    It's a company.
06:02:20  3      Q    What does the company do?
06:02:20  4      A    It's a publishing company.
06:02:22  5      Q    Is it called Warner Music Group?
06:02:24  6      A    No, absolutely not.
06:02:25  7      Q    Is it affiliated with Warner?
06:02:27  8      A    No.
06:02:27  9      Q    Warner Chapel?
06:02:29 10      A    No.
06:02:29 11      Q    Is it affiliated -- does it get any
06:02:30 12   money in any way from the exploitation of "Stairway
06:02:39 13   to Heaven"?
06:02:40 14      A    My understanding is no, not at all.
06:02:45 15           MR. ANDERSON:  The problem with
06:02:46 16   asking 60 questions is you're finally
06:02:48 17   going to get the information that he
06:02:50 18   doesn't feel comfortable giving you.
06:02:51 19   So, I would really --
06:02:52 20           MR. MALOFIY:  The cat is out of
06:02:53 21   the bag.
06:02:54 22           MR. ANDERSON:  Why not take a
06:02:55 23   ten-minute break and let him try and
06:02:57 24   make a phone call?

Page 74

06:02:58  1           Can you make a phone call?
06:02:58  2           THE WITNESS:  I don't have
06:02:59  3   telephone numbers, but perhaps --
06:03:03  4           MR. MALOFIY:  Mr. Anderson, do
06:03:03  5   you want to give him the telephone
06:03:05  6   number of the company?
06:03:07  7           Because, clearly, he's indicated
06:03:07  8   that both --
06:03:08  9           MR. ANDERSON:  Are you willing
06:03:09 10   to take a break?
06:03:10 11           If we'll take a break, I've got
06:03:10 12   an iPhone, we can do a search for
06:03:11 13   numbers or something like that.
06:03:13 14           MR. MALOFIY:  Let's take a
06:03:13 15   break.
06:03:15 16           MS. FREEMAN:  I have no idea.
06:03:17 17           MR. MALOFIY:  Apparently, he
06:03:18 18   thinks both you, Ms. Freeman, and
06:03:20 19   Mr. Anderson know the name of the
06:03:22 20   company in California that retained
06:03:23 21   Mr. -- Dr. Ferrara -- Ferrara, excuse
06:03:26 22   me, to analyze these two pieces of
06:03:30 23   music, which was never disclosed except
06:03:32 24   for today.  I think it's a serious issue

Page 75

06:03:34  1   and needs to be disclosed.
06:03:36  2           THE WITNESS:  I'm not suggesting
06:03:37  3   that --
06:03:37  4           MR. MALOFIY:  Serious issue.
06:03:38  5           THE WITNESS:  -- either
06:03:38  6   Mr. Anderson or Ms. Freeman know the
06:03:40  7   company, I'm simply saying that the
06:03:42  8   company is an established company and
06:03:44  9   they might know, as you say -- as
06:03:45 10   Mr. Anderson said, they might know how
06:03:48 11   to get the number.  I don't have the
06:03:49 12   number on me.
06:03:51 13      Q    Why would they ask you to do this
06:03:53 14   analysis?  What was the purpose?
06:03:56 15      A    To provide an opinion.
06:03:57 16      Q    Why?
06:03:57 17      A    I need to know if there's a conflict
06:04:00 18   in this case.
06:04:01 19      A    I understand.
06:04:01 20      Q    Did you clear any conflict?
06:04:04 21           Was there any conflict that you had to
06:04:05 22   clear?
06:04:08 23           MR. ANDERSON:  Do you want him
06:04:08 24   to take a break so that he can answer

Page 76

06:04:10  1   your questions?
06:04:11  2           MR. MALOFIY:  I want to ask him.
06:04:13  3      Q    Did you clear any conflicts prior to
06:04:15  4   being retained in this case?
06:04:17  5           MR. ANDERSON:  I already told
06:04:19  6   you any conflict was waived.
06:04:21  7           The question really, Francis, is
06:04:21  8   if you want to keep burning time on this
06:04:23  9   or you want to let him --
06:04:23 10           MR. MALOFIY:  It's a serious,
06:04:23 11   serious issue.
06:04:24 12           The conflict was waived, you
06:04:25 13   said, Mr. Anderson?
06:04:26 14           MR. ANDERSON:  Waived.
06:04:26 15           MR. MALOFIY:  Waived.
06:04:26 16           MR. ANDERSON:  Waived.
06:04:26 17           MR. MALOFIY:  By who?
06:04:28 18           MR. ANDERSON:  I am as
06:04:31 19   uncomfortable as him.
06:04:33 20           MR. MALOFIY:  Let me just say
06:04:33 21   two things:
06:04:33 22           Apparently, Mr. Anderson knows
06:04:35 23   who this company is; apparently, there's
06:04:36 24   a game being played here, and that game

19 (Pages 73 to 76)

CONFIDENTIAL

| | Page 77 |
|---|---|
| 06:04:39 1 | is that Dr. Ferrara produced a report |
| 06:04:42 2 | and was retained in this case and prior |
| 06:04:44 3 | to that he was retained and he also |
| 06:04:47 4 | analyzed and produced an opinion as to |
| 06:04:50 5 | the sound recording of "Taurus" and the |
| 06:04:53 6 | sound recording of "Stairway to Heaven;" |
| 06:04:55 7 | apparently, Mr. Anderson is not |
| 06:04:58 8 | revealing who the company is; |
| 06:05:00 9 | apparently, Mr. Anderson is speaking |
| 06:05:02 10 | more than the witness is; apparently, |
| 06:05:04 11 | he's already identified that these were |
| 06:05:06 12 | facts that he became aware of prior to |
| 06:05:08 13 | even becoming retained in this case. |
| 06:05:10 14 | It's a serious issue. |
| 06:05:12 15 | Another issue is it hasn't been |
| 06:05:15 16 | disclosed, it wasn't disclosed in the |
| 06:05:16 17 | report, it's an issue that could be a |
| 06:05:18 18 | conflict issue, it's an issue that could |
| 06:05:19 19 | also be a bias issue, and it's also an |
| 06:05:21 20 | issue where you just said that the |
| 06:05:22 21 | conflict was waived. |
| 06:05:24 22 | Now, apparently there's more |
| 06:05:26 23 | information that you have, Mr. Anderson, |
| 06:05:27 24 | than you're letting on to. And it's |

| | Page 78 |
|---|---|
| 06:05:31 1 | clear from Mr. Ferrara -- Dr. Ferrara's |
| 06:05:34 2 | statements here that you do, in fact, |
| 06:05:36 3 | have information about this company and |
| 06:05:37 4 | you do, in fact, have more than you're |
| 06:05:39 5 | letting on to. |
| 06:05:40 6 | Q   So, quite frankly, I think you need to |
| 06:05:43 7 | reveal who this company is, sir. |
| 06:05:45 8 | Are you going to do that or are you |
| 06:05:47 9 | not going to do that? |
| 06:05:48 10 | A   I am very happy to, but if you |
| 06:05:50 11 | would -- once again, I think Mr. Anderson's |
| 06:05:53 12 | suggestion is a good one. I would like to find out |
| 06:05:56 13 | the number, to speak to someone, and have that |
| 06:05:59 14 | clearance so that I'm not breaking any |
| 06:06:01 15 | confidentiality. I would -- |
| 06:06:02 16 | Q   Fair enough. |
| 06:06:03 17 | A   -- be very happy to do so. |
| 06:06:05 18 | Q   Does Mr. Anderson know the company? |
| 06:06:07 19 | A   I don't know. |
| 06:06:08 20 | Q   Were you retained -- |
| 06:06:09 21 | MR. ANDERSON:  If it's fair |
| 06:06:11 22 | enough, why don't we do it? |
| 06:06:13 23 | Q   Were you retained by this company by |
| 06:06:15 24 | and through Mr. Anderson? |

| | Page 79 |
|---|---|
| 06:06:16 1 | A   No. |
| 06:06:16 2 | MR. ANDERSON:  Objection; vague |
| 06:06:17 3 | and ambiguous. |
| 06:06:18 4 | Q   Were you dealing with Mr. Anderson |
| 06:06:19 5 | when dealing with this company? |
| 06:06:21 6 | MR. ANDERSON:  Objection; vague |
| 06:06:21 7 | and ambiguous. |
| 06:06:22 8 | A   No. |
| 06:06:22 9 | Q   Were you dealing with another lawyer? |
| 06:06:24 10 | A   No. |
| 06:06:25 11 | MR. ANDERSON:  Objection; vague |
| 06:06:25 12 | and ambiguous. |
| 06:06:25 13 | Q   How did this other company get ahold |
| 06:06:27 14 | of you? |
| 06:06:28 15 | MR. ANDERSON:  Okay, stop. |
| 06:06:28 16 | Everyone stop. |
| 06:06:28 17 | First of all, you made a long |
| 06:06:30 18 | speech and I want to clarify something. |
| 06:06:31 19 | There is no game planing or underhand |
| 06:06:35 20 | conduct as you've described and you're |
| 06:06:36 21 | making these accusations. |
| 06:06:38 22 | Dr. Ferrara was consulted by |
| 06:06:40 23 | someone else before he was consulted by |
| 06:06:42 24 | me and the conflict was waived. Now, |

| | Page 80 |
|---|---|
| 06:06:45 1 | it's not my work product objection that |
| 06:06:48 2 | that other entity that consulted with |
| 06:06:52 3 | him has to impose, and we just want to |
| 06:06:55 4 | give them the opportunity to waive it, |
| 06:06:57 5 | that's all. |
| 06:06:59 6 | So, we're going to take a break |
| 06:07:01 7 | right now, before the time runs out and |
| 06:07:03 8 | becomes impossible, and we're going to |
| 06:07:05 9 | see if they will assure Dr. Ferrara that |
| 06:07:08 10 | they have no problem with him disclosing |
| 06:07:11 11 | it. |
| 06:07:12 12 | Q   Did you produce a report in regards -- |
| 06:07:15 13 | MR. ANDERSON:  No.  We're taking |
| 06:07:16 14 | a break. |
| 06:07:17 15 | MR. MALOFIY:  Please let the |
| 06:07:17 16 | record reflect Mr. Anderson is forcing a |
| 06:07:20 17 | break and is not revealing -- |
| 06:07:22 18 | MS. FREEMAN:  Forcing. |
| 06:07:25 19 | MR. ANDERSON:  Okay, let's go. |
| 06:07:28 20 | MS. FREEMAN:  Oh, it's so |
| 06:07:29 21 | exciting.  You're forcing a break. |
| 06:07:32 22 | MR. ANDERSON:  Oh, now this is |
| 06:07:32 23 | just absurd, but... |
| 06:07:33 24 | THE VIDEOGRAPHER:  Are we going |

20 (Pages 77 to 80)

CONFIDENTIAL

Page 81

```
06:07:35  1          off the record?
06:07:36  2               MR. MALOFIY:  No, we can stay on
06:07:37  3      because I don't -- how long do you think
06:07:39  4      you'll be?
06:07:41  5          Please let the record reflect
06:07:42  6      Mr. Anderson has left the room with Dr.
06:07:45  7      Ferrara.
06:07:48  8               DR. STEWART:  So, look, I can
06:07:53  9      get a later fight --
06:07:55 10               THE VIDEOGRAPHER:  We're still
06:07:55 11      on the record.
06:07:55 12               MR. MALOFIY:  Hold on, we're
06:07:55 13      still on the record.
06:07:55 14          Let's go off.  I mean, we can go
06:07:57 15      off for now.  It's gonna be a minute.
06:07:57 16          You want to talk to me?
06:08:00 17               THE VIDEOGRAPHER:  The time is
06:08:01 18      6:07 p.m.
06:08:03 19          Off the record.
06:08:04 20          (Recess taken.)
06:20:32 21               THE VIDEOGRAPHER:  The time is
06:20:33 22      6:20 p.m.
06:20:35 23          On the record.
06:20:35 24          (Dr. Stewart not present.)
```

Page 82

```
06:20:38  1          Q   Your counsel had requested to take a
06:20:40  2      break so you could address issues relating to your
06:20:44  3      prior engagement in forming an opinion as to
06:20:53  4      "Taurus" album recording as compared to "Stairway to
06:20:57  5      Heaven" album recording.
06:21:00  6          My questions were:  Who retained you
06:21:02  7      to produce that opinion prior to becoming retained
06:21:06  8      by defendants?
06:21:08  9          A   Rondor Music, which I understand is a
06:21:12 10      division of Universal Music Publishing Group.
06:21:16 11          Q   Who is it?
06:21:17 12          A   R-O-N-D-O-R Music.
06:21:19 13          Q   Rondor who?
06:21:21 14          A   Rondor Music.
06:21:23 15          Q   Which is a division, as you
06:21:24 16      understand, of who?
06:21:25 17          A   Universal Music Publishing Group, I
06:21:28 18      believe.
06:21:34 19          Q   Why were you retained by them?
06:21:37 20               MR. ANDERSON:  Objection; calls
06:21:38 21          for speculation.
06:21:39 22          A   I was asked by Rondor Music Group to
06:21:43 23      complete an analysis.  They sent, as I recall, an
06:21:50 24      MP3 of the "Taurus" studio version because I did not
```

Page 83

```
06:21:54  1      have it in my library or I downloaded it from
06:21:58  2      iTunes.  I don't remember.  I did have "Stairway to
06:22:01  3      Heaven" in my iTunes library.
06:22:04  4          And I completed a preliminary analysis
06:22:06  5      of the two works at that time.  It was about 2013, I
06:22:11  6      think.  I'm just guessing.
06:22:14  7          Q   Was it before the lawsuit was filed in
06:22:16  8      this case or after?
06:22:17  9          A   I have no idea when this lawsuit was
06:22:20 10      filed, sir.
06:22:20 11          Q   Was it before anyone from defendants
06:22:23 12      reached out to you or after?
06:22:24 13          A   Before.
06:22:27 14          Q   You said you produced a preliminary
06:22:30 15      report?
06:22:31 16          A   I don't recall producing a report.
06:22:34 17          Normally what I would do -- but,
06:22:36 18      again, it's been too long -- normally, I would have
06:22:40 19      a telephone conversation and discuss my findings.
06:22:46 20          Q   Who did you have a telephone
06:22:48 21      conversation with?
06:22:50 22          A   I didn't recall earlier, but I
06:22:54 23      mentioned to Mr. Anderson the -- I believed the
06:22:59 24      first or the last name or both started with an "R,"
```

Page 84

```
06:23:03  1      and then I said:  Was it Routledge?
06:23:07  2          And I believe it was Randall
06:23:10  3      Routledge.  I think his last name is spelled
06:23:13  4      R-O-U-T-L-E-D-G-E.  I haven't spoken with him in a
06:23:18  5      long time, but he did send -- he did call me on
06:23:22  6      other issues over the years.
06:23:25  7          And, so, to the best of my
06:23:26  8      recollection, it was Randall Routledge at Rondor
06:23:31  9      Music who called, asked for a preliminary analysis
06:23:34 10      of the two works, which, again, I did.  And, to the
06:23:38 11      best of my recollection, we would have had a
06:23:40 12      telephone call conversation wherein I would have
06:23:43 13      relayed my findings.
06:23:45 14          Q   How do you spell his last name?
06:23:50 15          A   R-O-U-T-E-L -- and I'm not sure if
06:23:54 16      it's L-D-G-E or just L-E -- I'm sorry, L-E-D-G-E or
06:24:01 17      L-E-G-E.  I don't.  It's been a couple of years, I
06:24:05 18      think, since we've spoken.  But before that, he had
06:24:07 19      called me on our issues.
06:24:10 20          Q   R-O-U-T?
06:24:12 21          A   Routledge?
06:24:13 22          Q   Yes.
06:24:16 23          A   Yes.
06:24:16 24          Q   Why did he say he wanted to do this
```

21 (Pages 81 to 84)

CONFIDENTIAL

---

Page 85

06:24:19  1    analysis?

06:24:20  2            MR. ANDERSON:  Objection; vague,

06:24:21  3        ambiguous, calls for speculation.

06:24:24  4        A    I don't recall that he would have told

06:24:26  5    me.

06:24:26  6            And normally when a publisher calls

06:24:32  7    about a preliminary analysis -- not normally, but

06:24:35  8    most often, perhaps, they don't even tell me what

06:24:38  9    potential side they're on.  They basically say:

06:24:41 10    Song A, Song B.  Take for granted that Song A was

06:24:47 11    created before Song B.

06:24:49 12            There are even attorneys that do with

06:24:52 13    me as well:  This is Song A, this is Song B.  Accept

06:24:56 14    that Song A was created before Song B.  Please

06:24:59 15    provide a preliminary analysis.

06:25:02 16            I do it frequently.  And most often,

06:25:03 17    there is no written report, there's just a telephone

06:25:06 18    conversation thereafter.

06:25:08 19        Q    Let's not talk about most scenarios --

06:25:09 20        A    Sure.

06:25:09 21        Q    Let's talk about the two scenarios

06:25:12 22    that are before us right now.

06:25:14 23            What assumptions were you told to make

06:25:18 24    in coming to your opinions in this case?

---

Page 86

06:25:20  1            MR. ANDERSON:  Objection; asked

06:25:20  2        and answered.

06:25:22  3        Q    You said that you don't believe there

06:25:23  4    was any, but you were just saying that often they

06:25:26  5    tell you that -- when you're being retained not to

06:25:31  6    consider which work is represented by defendant or

06:25:37  7    plaintiff and just to consider that one was created

06:25:40  8    before the other.

06:25:41  9        A    Yes, absolutely.

06:25:42 10        Q    Were you told any facts or told to

06:25:44 11    assume any facts of what piece was created before

06:25:47 12    the other in this case or any other assumptions?

06:25:50 13            MR. ANDERSON:  Objection; vague,

06:25:51 14        ambiguous, mischaracterizes the

06:25:54 15        testimony.

06:25:54 16        A    First, my testimony is absolutely

06:25:56 17    consistent with respect to this case because I knew

06:26:01 18    when I was engaged with respect to Skidmore -- the

06:26:06 19    Led Zeppelin -- that "Taurus" was created first.

06:26:10 20    So, there was no assumption of that at all.  I knew

06:26:17 21    that it was created first.

06:26:22 22        Q    How much money did you get paid for

06:26:24 23    your opinion from Condor?

06:26:27 24            You got paid about $80,000 for your

---

Page 87

06:26:30  1    opinions in this case, right, with defendants in

06:26:32  2    this case?

06:26:33  3            So, how much were you paid by

06:26:35  4    Rondor -- excuse me -- Music?

06:26:39  5            MR. ANDERSON:  Objection;

06:26:39  6        argumentative.

06:26:41  7        A    Well, normally, I would spend two to

06:26:47  8    three hours at most on a preliminary analysis of two

06:26:52  9    works.  And, so, it might be in the area of a

06:26:57 10    thousand dollars for a preliminary analysis.  So, I

06:27:01 11    would say it was probably in that area if it was

06:27:04 12    like other works.  I don't recall.

06:27:06 13        Q    Earlier on, you said that preliminary

06:27:11 14    analysis usually consists of a three- to five-page

06:27:11 15    report?

06:27:12 16        A    No, that mischaracterizes and

06:27:14 17    completely misrepresents my testimony.

06:27:17 18        Q    If it does, I apologize.  I thought I

06:27:18 19    heard that --

06:27:20 20        A    No.

06:27:20 21        Q    -- so I said very often, that your

06:27:22 22    expert engagement involves initially preliminary

06:27:26 23    report of three to five pages.

06:27:28 24        A    You've just combined the word

---

Page 88

06:27:29  1    "analysis" with the word "preliminary report."

06:27:34  2            The first step is an analysis.  Very

06:27:37  3    often, I give bad news to a potential plaintiff.  I

06:27:42  4    say:  There's nothing here.  In my opinion, any

06:27:47  5    similarities are not protected as I understand the

06:27:50  6    term.

06:27:51  7            In that case, they wouldn't ask for a

06:27:53  8    written report, needless to say, because it's bad

06:27:58  9    news.  And ditto with respect to a potential

06:28:04 10    defendant.  If a potential defendant calls and I

06:28:07 11    complete a preliminary analysis, not to be confused

06:28:11 12    with a preliminary written report, and I give them

06:28:13 13    bad news, i.e., that:  In my opinion, I think -- if

06:28:19 14    it's a sample case, yes, there was a sample.  They

06:28:22 15    usually don't want that in a preliminary written

06:28:25 16    report.

06:28:25 17            So, it is not accurate to say that all

06:28:30 18    of my analyses can automatically be consigned to

06:28:36 19    preliminary reports.  It is only after that initial

06:28:39 20    analysis which is discussed on a telephone

06:28:42 21    conversation that then a particular party will get

06:28:46 22    back and say:  We would like you to put that in

06:28:49 23    writing.

06:28:50 24            That is just a percent, a percentage,

---

22 (Pages 85 to 88)

CONFIDENTIAL

---

**Page 89**

06:28:52  1    probably barely half, if not less than half, of such
06:28:57  2    analyses that would end up becoming a preliminary
06:29:00  3    report.
06:29:01  4         Q    Do you have -- did you receive that
06:29:05  5    from an e-mail from this gentleman over at Condor
06:29:08  6    Music?
06:29:11  7              MR. ANDERSON:  Objection.
06:29:11  8              MR. MALOFIY:  Rondor, excuse me.
06:29:13  9              MR. ANDERSON:  Yeah, but vague
06:29:13  10            and ambiguous as to what you mean by
06:29:15  11            "that."
06:29:17  12        Q    Did you receive an MP3 of the music
06:29:18  13   from this gentleman at Rondor Music?
06:29:21  14        A    I don't recall.
06:29:22  15             Most often, if a work is available on
06:29:27  16   iTunes, I actually prefer to download it myself so I
06:29:30  17   know that it is from, you know, the Spirit album and
06:29:33  18   so forth.  On the other hand, if it's a work that is
06:29:37  19   unavailable, if it's a demo and so forth, then it
06:29:41  20   will tend to be attached.
06:29:43  21             So, I don't recall whether or not I
06:29:46  22   would have downloaded it or not, I honestly don't.
06:29:49  23        Q    This individual e-mail you?
06:29:50  24        A    I don't recall, I don't recall.

---

**Page 90**

06:29:54  1         Q    Do you have any communications by and
06:29:55  2    between this individual about your analysis?
06:29:59  3         A    Not that I recall, not -- I just don't
06:30:02  4    recall.
06:30:02  5         Q    Did you ever take any notes down when
06:30:04  6    you did your analysis?  Any notes?
06:30:12  7         A    To the best of my recollection, I just
06:30:14  8    can't recall.  It's just been too long.
06:30:16  9         Q    And you don't recall how much you got
06:30:18  10   paid specifically, right?
06:30:21  11             MR. ANDERSON:  Objection; vague
06:30:22  12            and ambiguous, mischaracterizes the
06:30:25  13            testimony.
06:30:25  14        Q    You said maybe it was two to three
06:30:27  15   hours, maybe it's $2,000.  This is all maybe.  You
06:30:29  16   don't know.
06:30:30  17        A    I don't know.
06:30:31  18        Q    Could have been $10,000, could have
06:30:32  19   been $5,000, you just don't know.
06:30:34  20        A    No, I can't imagine that it could be
06:30:36  21   five or ten thousand dollars because -- I'm very
06:30:40  22   happy to tell you what my filings are, because I do
06:30:44  23   remember what my findings are.
06:30:46  24        Q    We're going to get there.

---

**Page 91**

06:30:47  1         A    Okay.
06:30:48  2              No, based on my findings I don't see
06:30:51  3    how it could have escalated to five and ten thousand
06:30:54  4    dollars, no.
06:30:56  5         Q    How many hours did you spend, exactly?
06:30:59  6              MR. ANDERSON:  Objection; vague
06:30:59  7            and ambiguous.
06:31:01  8         A    Again, I'm speculating based on
06:31:06  9    practice.  Probably between -- probably about three
06:31:09  10   hours, I would expect.
06:31:11  11        Q    How long were you retained by Rondor
06:31:14  12   Music?
06:31:16  13        A    Just the amount of time to complete
06:31:19  14   the initial analysis and to communicate by telephone
06:31:22  15   call, as I recall, to the best of my knowledge, my
06:31:26  16   findings.
06:31:27  17        Q    Did you have an invoice that you
06:31:29  18   presented to them or invoices?
06:31:33  19        A    I would have sent an invoice.  I don't
06:31:36  20   think I sent invoices, but I would have sent an
06:31:38  21   invoice.
06:31:39  22        Q    Did you have an agreement or a
06:31:39  23   contract with them --
06:31:41  24             MR. ANDERSON:  Objection.

---

**Page 92**

06:31:41  1         Q    -- outlining your responsibilities,
06:31:43  2    your duties, who your client is, and what you're
06:31:47  3    tasked to do?
06:31:48  4              MR. ANDERSON:  Vague and
06:31:48  5            ambiguous.
06:31:49  6              You mean a written contract?
06:31:51  7              MR. MALOFIY:  Yeah.
06:31:51  8         A    Normally, I don't receive a written
06:31:54  9    contract.  It's just an understanding of
06:31:56  10   confidentiality.
06:31:56  11             But, no, I don't -- it's rare that
06:31:58  12   even attorneys send me a retainer agreement, that
06:32:01  13   kind of thing; sometimes, but rare.
06:32:04  14        Q    Besides Randall Routledge, who else
06:32:07  15   did you speak to at Rondor Music in regards to your
06:32:12  16   being employed by them to produce an opinion on
06:32:14  17   their behalf?
06:32:15  18        A    To the best of my recollection, it was
06:32:17  19   only Mr. Routledge who I discussed this with.
06:32:20  20        Q    What's his title over there?
06:32:23  21        A    I don't know.
06:32:23  22        Q    What's he do?
06:32:24  23        A    He may be a vice president, but I
06:32:26  24   don't -- I'm just speculating.

---

23 (Pages 89 to 92)

CONFIDENTIAL

---

Page 93

06:32:30  1          MS. FREEMAN: Could I ask you
06:32:32  2   not to keep beating the floor with your
06:32:35  3   foot?
06:32:40  4          MR. MALOFIY: Is that bothering
06:32:41  5   you?
06:32:42  6          I didn't even know -- I'm
06:32:44  7   rocking in the chair a little bit.
06:32:47  8          MR. ANDERSON: It's a thumping.
06:32:49  9          MS. FREEMAN: It's like Thumper,
06:32:49 10   you know, in Bambi?
06:32:51 11          That's what I keep hearing. I
06:32:52 12   have very sensitive ears.
06:32:55 13          MR. MALOFIY: I don't know how
06:32:56 14   because he talks so loud, but, anyway,
06:32:59 15   I'll try not to do that. I was just
06:33:02 16   rocking on my chair. I apologize.
06:33:05 17          MR. ANDERSON: Thank you.
06:33:08 18     Q    Why were you told to do this analysis?
06:33:11 19          MR. ANDERSON: Objection; calls
06:33:12 20   for speculation, asked and answered.
06:33:15 21     A    As I testified earlier, normally --
06:33:19 22     Q    Let me just cut you off. I know you
06:33:21 23   already gave me this "normally" thing. What I want
06:33:23 24   to know specifically, do you know why you were

---

Page 94

06:33:25  1   retained by Rondor Music to do an analysis on the
06:33:29  2   song "Taurus" album recording to "Stairway to
06:33:32  3   Heaven" album recording?
06:33:32  4          Yes, you do, or no, you don't.
06:33:34  5     A    Yes, I do.
06:33:34  6     Q    Why?
06:33:35  7     A    Because they wanted me to provide a
06:33:37  8   musicological opinion as to whether or not there was
06:33:43  9   evidence of -- musicological support for a finding
06:33:49 10   of infringement.
06:34:04 11          MR. MALOFIY: I have to take a
06:34:05 12   two-minute break.
06:34:09 13          THE VIDEOGRAPHER: The time now
06:34:12 14   is 6:33 p.m.
06:34:15 15          Off the record.
06:34:16 16          (Recess taken.)
06:41:53 17          THE VIDEOGRAPHER: The time is
06:41:54 18   6:41 p.m.
06:41:58 19          On the record.
06:41:58 20     Q    Just to be clear, besides Randall
06:42:00 21   Routledge over at Rondor Music where you did a
06:42:04 22   preliminary analysis for them of the "Taurus" album
06:42:07 23   recording and the "Stairway to Heaven" album
06:42:10 24   recording, did you speak to anyone else?

---

Page 95

06:42:14  1     A    To the best of my recollection, no, I
06:42:16  2   only spoke with Randall Routledge.
06:42:19  3     Q    Okay.
06:42:20  4     A    There wouldn't be any reason to speak
06:42:22  5   with anyone else.
06:42:23  6     Q    And you don't have the dates of when
06:42:24  7   you were engaged and when your engagement finished,
06:42:27  8   correct?
06:42:29  9     A    I don't. But to the best of my
06:42:31 10   recollection, it's 2013.
06:42:32 11     Q    Did you have to clear any conflicts?
06:42:35 12          MR. ANDERSON: Objection; calls
06:42:35 13     for legal conclusion, vague and
06:42:36 14     ambiguous.
06:42:37 15     Q    Did you clear any conflicts when you
06:42:40 16   became engaged in this matter?
06:42:43 17     A    To the best of my recollection,
06:42:44 18   sometime at least in mid 2014, I don't remember
06:42:48 19   exactly when, Ms. Helene Freeman called me with
06:42:54 20   respect to the Skidmore matter. I said to
06:42:58 21   Ms. Freeman by telephone, it was a telephone
06:43:01 22   conversation, that I had already completed an
06:43:06 23   analysis on behalf of Rondor and could she tell me
06:43:15 24   whether Rondor Music was involved in this issue,

---

Page 96

06:43:20  1   whereupon she said no. And I said: Well, I can't
06:43:25  2   discuss my analysis, my findings, unless there's a
06:43:33  3   clearance from Rondor Music.
06:43:36  4          And that was the end of that. I then
06:43:38  5   heard back some time later, either from Ms. Freeman
06:43:45  6   or from Mr. Anderson, that either Universal Music
06:43:49  7   Publishing, you know, or Rondor waived any
06:43:53  8   confidentiality, whereupon I was allowed in a
06:43:56  9   telephone conversation then, to the best of my
06:44:01 10   recollection, essentially articulate what my
06:44:06 11   findings were. I mean, I remember what my findings
06:44:09 12   are, but to basically give them a bottom line.
06:44:14 13     Q    Were you told it was waived by counsel
06:44:16 14   or did you actually get something from Rondor Music
06:44:20 15   or Warner -- excuse me, Universal Music Publishing
06:44:22 16   Group?
06:44:23 17     A    To the best of my recollection, I
06:44:25 18   think the process was that perhaps Ms. Freeman asked
06:44:31 19   Mr. Anderson to check, and one of them called to
06:44:34 20   tell me that Rondor essentially -- I don't know if
06:44:40 21   the right word is "waived," but Rondor gave
06:44:45 22   permission for me to basically let them know what my
06:44:49 23   analysis was and had no problem with my being
06:44:53 24   engaged.

24 (Pages 93 to 96)

CONFIDENTIAL

| | Page 97 |
|---|---|

06:44:53  1      And, again, to this day, I don't know
06:44:56  2 whether Rondor was a potential defendant or
06:45:00  3 plaintiff. I do know that having gone through the
06:45:05  4 defendants here, which was read at the beginning of
06:45:07  5 my deposition, that I didn't hear Universal or
06:45:12  6 Rondor being named, so that's why I was able to say
06:45:16  7 when you asked was this a defendant, my
06:45:18  8 understanding is that Universal and its affiliates
06:45:22  9 are not a defendant.
06:45:24 10      MR. ANDERSON: I need to speak
06:45:25 11 very quickly to the witness.
06:45:28 12      MR. MALOFIY: What's it in
06:45:30 13 regards to, Mr. Anderson?
06:45:36 14      Is there a reason why you're
06:45:37 15 having him leave?
06:45:41 16      Let the record reflect counsel
06:45:43 17 is not responding as to why he has to
06:45:45 18 pull the witness out.
06:45:52 19      MS. FREEMAN: Oh, my God,
06:45:53 20 it's -- I don't believe the time.
06:46:02 21      THE VIDEOGRAPHER: Would you
06:46:02 22 like to go off the record again?
06:46:07 23      MR. MALOFIY: No, because it
06:46:08 24 just takes even longer.

| | Page 98 |
|---|---|

06:46:12  1      MS. FREEMAN: So, you're driving
06:46:13  2 back to Philadelphia, Francis?
06:46:17  3      MR. MALOFIY: Yeah.
06:46:18  4      MS. FREEMAN: You want to miss
06:46:19  5 the traffic, I take it.
06:46:21  6      MR. MALOFIY: No, I don't care,
06:46:21  7 it's just, you know...
06:46:23  8      MR. ANDERSON: Thank you,
06:46:24  9 counsel.
06:46:25 10      Q   Mr. Anderson just pulled you outside.
06:46:31 11      Why did you did he pull you outside?
06:46:34 12      A   I stand corrected. Mr. Anderson did
06:46:42 13 let me know that Rondor and/or Universal Music Group
06:46:48 14 gave permission that they waived -- whatever. They
06:46:52 15 gave permission for me to do the analysis on behalf
06:46:55 16 of the defendants in this case.
06:46:58 17      But he's quite right, I don't -- I
06:47:00 18 can't say that I recall ever discussing my analysis
06:47:03 19 with him. So, I misspoke and we're talking about
06:47:08 20 2014.
06:47:11 21      What I did -- what I was informed of
06:47:15 22 by Mr. Anderson was that Rondor or Universal Music
06:47:20 23 Group gave permission for me that there was no
06:47:23 24 conflict, gave permission for me to do an analysis

| | Page 99 |
|---|---|

06:47:26  1 on behalf of defendants in this instance.
06:47:30  2      Q   So, that's why Mr. Anderson pulled you
06:47:32  3 outside, to tell you where you made a mistake and
06:47:35  4 how to correct it; is that right?
06:47:37  5      MR. ANDERSON: Well --
06:47:38  6      Q   Is that right?
06:47:39  7      A   No.
06:47:40  8      Q   Is that what happened?
06:47:41  9      He pulled you outside. I just asked
06:47:42 10 you why he pulled you outside. He wanted to pull
06:47:45 11 you outside to correct your answer so that he'd be
06:47:47 12 correct when you came in here, right?
06:47:49 13      MR. ANDERSON: Objection.
06:47:49 14      Q   Is that what it was?
06:47:49 15      MR. ANDERSON: That
06:47:49 16 mischaracterizes what he just said.
06:47:53 17      A   Mr. Anderson when we walked out said:
06:47:55 18 Do you recall ever giving me any information about
06:48:02 19 the analysis that you completed for Rondor?
06:48:05 20      And I said: No, I don't.
06:48:10 21      And he said: What do you recall?
06:48:11 22      And I said: Actually, what I recall
06:48:13 23 is that I was simply given -- that you informed me
06:48:16 24 that I was given permission that Rondor had no

| | Page 100 |
|---|---|

06:48:21  1 problem or Universal had no problem with me
06:48:25  2 providing an opinion on behalf of defendants.
06:48:28  3      So, in fact, I did misspeak.
06:48:31  4      Q   So, that's why he pulled you out, to
06:48:34  5 correct your misstatement and so you could come back
06:48:36  6 in here and correct it.
06:48:38  7      MR. ANDERSON: Objection;
06:48:38  8 misstates testimony.
06:48:40  9      A   All right. I think it's pretty clear
06:48:41 10 he called you out so you could fix your testimony.
06:48:42 11      A   To answer you question, he called me
06:48:44 12 out once again to ask me what my recollection was.
06:48:47 13      Q   I know. It's improper?
06:48:48 14      MS. FREEMAN: I actually
06:48:49 15 disagree. I do believe that when an
06:48:51 16 attorney is conscious of incorrect
06:48:55 17 testimony that has been given, the
06:49:01 18 attorney has a duty as an officer of the
06:49:03 19 court, to correct the record.
06:49:05 20      Now, some attorneys desire to
06:49:08 21 create incorrect testimony. Others of
06:49:11 22 us are interested in having the accurate
06:49:13 23 and truthful testimony given.
06:49:16 24      MR. MALOFIY: That's called

25 (Pages 97 to 100)

CONFIDENTIAL

## Page 101

| 06:49:17 | 1 | coaching and that's called improper |
| 06:49:19 | 2 | conduct, in pulling a witness out, |
| 06:49:22 | 3 | telling him what to say, and putting him |
| 06:49:24 | 4 | back in the room and having him testify |
| 06:49:26 | 5 | as to what Mr. Anderson wanted him to |
| 06:49:29 | 6 | say when he could have called him in at |
| 06:49:31 | 7 | the end. |
| 06:49:32 | 8 | I don't want to entertain |
| 06:49:33 | 9 | anymore. I want to move forward. |
| 06:49:35 | 10 | Q   Why were you hired by Universal Music |
| 06:49:39 | 11 | Publishing to provide an opinion and an analysis? |
| 06:49:43 | 12 | MR. ANDERSON:  Objection; asked |
| 06:49:43 | 13 | and answered. I think that's the third, |
| 06:49:45 | 14 | maybe fourth time you've asked that same |
| 06:49:47 | 15 | exact question. |
| 06:49:48 | 16 | A   I don't know if -- |
| 06:49:48 | 17 | MR. MALOFIY:  He's never |
| 06:49:49 | 18 | answered it. That's the problem. |
| 06:49:50 | 19 | A   I don't know what the motives are. |
| 06:49:53 | 20 | If you ask me why I was hired, I was |
| 06:49:56 | 21 | hired -- |
| 06:49:57 | 22 | Q   I know that. |
| 06:49:57 | 23 | A   -- to provide an opinion, to do an |
| 06:49:58 | 24 | analysis and provide an opinion. What their purpose |

## Page 102

| 06:50:03 | 1 | in engaging my services was, I don't know. |
| 06:50:07 | 2 | Q   Did they tell you who or what client |
| 06:50:08 | 3 | of theirs they were interested in when they asked to |
| 06:50:15 | 4 | you do that analysis? |
| 06:50:16 | 5 | MR. ANDERSON:  Objection; vague |
| 06:50:17 | 6 | and ambiguous. |
| 06:50:18 | 7 | A   I do not recall. |
| 06:50:19 | 8 | Q   Did they tell you on behalf of which |
| 06:50:21 | 9 | entity or which group or why they were doing this |
| 06:50:25 | 10 | analysis? |
| 06:50:26 | 11 | MR. ANDERSON:  Objection; |
| 06:50:26 | 12 | compound, vague and ambiguous, and asked |
| 06:50:29 | 13 | and answered? |
| 06:50:30 | 14 | A   No, I don't. |
| 06:50:31 | 15 | Q   Did they tell you it was because of |
| 06:50:33 | 16 | Lou Adler or any of his entities? |
| 06:50:35 | 17 | MR. ANDERSON:  Objection; asked |
| 06:50:36 | 18 | and answered. |
| 06:50:37 | 19 | A   I don't know who Lou Adler is, I'm |
| 06:50:37 | 20 | sorry. |
| 06:50:39 | 21 | Q   Did they tell you it was because of |
| 06:50:41 | 22 | Ode Records or Hollenback Music? |
| 06:50:44 | 23 | A   I don't know those entities. |
| 06:50:46 | 24 | Q   At any time, as you sit here today, |

## Page 103

| 06:50:48 | 1 | did you ever become aware that Universal Music |
| 06:50:53 | 2 | Publishing Group were changing the copyrights or |
| 06:50:58 | 3 | attempting to change the copyrights in February of |
| 06:51:00 | 4 | this year to reflect a different owner of the |
| 06:51:03 | 5 | copyright in "Taurus"? |
| 06:51:05 | 6 | Did you ever know that, sir? |
| 06:51:07 | 7 | A   No. |
| 06:51:07 | 8 | Q   Did you ever see the documents from |
| 06:51:08 | 9 | Universal Music Publishing Group in February where |
| 06:51:11 | 10 | they attempted to change the copyright registration |
| 06:51:15 | 11 | for "Taurus"? |
| 06:51:16 | 12 | MR. ANDERSON:  Objection; asked |
| 06:51:17 | 13 | and answered. |
| 06:51:20 | 14 | A   No. |
| 06:51:20 | 15 | Q   Did counsel, Mr. Anderson ever tell |
| 06:51:22 | 16 | you that the copyright registrations for "Taurus" |
| 06:51:28 | 17 | were attempted to be changed by claiming that they |
| 06:51:31 | 18 | were improperly filed? |
| 06:51:34 | 19 | MR. ANDERSON:  Conversations |
| 06:51:35 | 20 | between me and the retained expert are |
| 06:51:38 | 21 | confidential. You know that. You |
| 06:51:41 | 22 | wouldn't allow any -- |
| 06:51:42 | 23 | MR. MALOFIY:  I want to know |
| 06:51:44 | 24 | what facts he has. |

## Page 104

| 06:51:45 | 1 | MR. ANDERSON:  You wouldn't |
| 06:51:46 | 2 | allow any examination of your experts at |
| 06:51:48 | 3 | all. |
| 06:51:48 | 4 | MR. MALOFIY:  Well, this is a |
| 06:51:49 | 5 | whole deeper level. I want to know what |
| 06:51:51 | 6 | facts he was made aware of and if |
| 06:51:53 | 7 | there's a serious conflict and, |
| 06:51:55 | 8 | actually, something that he was never |
| 06:51:56 | 9 | aware of. |
| 06:51:57 | 10 | Q   You were never aware that Universal |
| 06:51:58 | 11 | Music Group is attempting to assert interest in |
| 06:52:03 | 12 | this litigation, are you? |
| 06:52:04 | 13 | A   No. |
| 06:52:05 | 14 | MR. ANDERSON:  Objection; lacks |
| 06:52:05 | 15 | foundation -- |
| 06:52:05 | 16 | MR. MALOFIY:  First -- |
| 06:52:05 | 17 | MR. ANDERSON:  Wait, wait, wait, |
| 06:52:05 | 18 | wait. |
| 06:52:06 | 19 | MS. FREEMAN:  I'm not sure |
| 06:52:07 | 20 | that's true. |
| 06:52:08 | 21 | MR. ANDERSON:  Yeah, it |
| 06:52:08 | 22 | mischaracterizes the facts, lacks |
| 06:52:10 | 23 | foundation -- and you got to slow down so |
| 06:52:13 | 24 | that -- both of you, so that I can |

26 (Pages 101 to 104)

CONFIDENTIAL

Page 105

06:52:15  1         object when he starts on these rants.
06:52:17  2         Q    As you sit here today, you were never
06:52:19  3    made aware that Universal Music Group was trying to
06:52:22  4    assert an interest, a financial interest, in
06:52:25  5    "Taurus;" is that correct?
06:52:28  6         MS. FREEMAN:  I'll object to the
06:52:29  7    form of the question.  I believe it
06:52:31  8    assumes facts that are not in evidence.
06:52:33  9    Q    It's correct sir?
06:52:35  10        A    It is correct, I am not aware of any
06:52:37  11   actions on the part of Universal Music Group.
06:52:42  12        MR. MALOFIY:  Please mark this
06:52:43  13   with exception.
06:52:45  14        MS. FREEMAN:  And put a red star
06:52:46  15   on it.
06:52:54  16        MR. MALOFIY:  I want to mark
06:52:56  17   this as well, and it's a request for
06:52:58  18   documentation; specifically, all your
06:53:00  19   communications with Rondor Music,
06:53:03  20   Universal Music Publishing Group and/or
06:53:05  21   Randall Routledge or anyone associated
06:53:09  22   in any way with your opinion that you
06:53:11  23   produced in regards to that matter,
06:53:14  24   inclusive of invoices, letters, e-mails,

Page 106

06:53:20  1    checks you received or monies you
06:53:22  2    received, dates of when you were
06:53:27  3    retained, by who, and any notes or
06:53:31  4    opinions you had in your analysis.
06:53:34  5         Okay?
06:53:36  6         MR. ANDERSON:  You said okay.
06:53:37  7    We all hear what you're saying.
06:53:39  8         Q    Did you hear what I said?
06:53:40  9         A    Yes.
06:53:41  10        Q    I'm gonna call you back for that.
06:53:43  11   We'll re-subpoena you -- no, I don't have to
06:53:45  12   re-subpoena you, it's covered in the subpoena I
06:53:47  13   already provided to you.  We're gonna call you back
06:53:48  14   to do that.
06:53:48  15        MR. ANDERSON:  First, it's not
06:53:49  16   covered in the subpoena that you already
06:53:50  17   provided.
06:53:51  18        MR. MALOFIY:  It is.  It is.
06:53:53  19   All facts that he relied upon, facts
06:53:56  20   that he --
06:53:56  21        MR. ANDERSON:  He told you --
06:53:58  22        MR. MALOFIY:  Hold on.
06:53:58  23        MR. ANDERSON:  Go ahead.
06:53:58  24        MR. MALOFIY:  My opinion is

Page 107

06:53:58  1    very -- my subpoena is very clear.  It
06:54:01  2    was facts...
06:54:06  3         MS. FREEMAN:  You're not
06:54:07  4    interested in the facts.
06:54:08  5         MR. MALOFIY:  Facts and/or data
06:54:09  6    considered in writing your reports,
06:54:11  7    facts and/or data you did not consider
06:54:13  8    in writing your reports, and also your
06:54:15  9    compensation for your involvement in
06:54:17  10   this litigation, right?
06:54:19  11        MS. FREEMAN:  That, you have
06:54:20  12   gotten.
06:54:20  13        MR. ANDERSON:  First of all,
06:54:21  14   you've gotten the invoices relating to
06:54:24  15   compensation in this litigation.
06:54:26  16        Second of all, the witness has
06:54:30  17   already testified that the only thing he
06:54:32  18   relied on is a copy of "Stairway to
06:54:34  19   Heaven" sound recording and copy of the
06:54:36  20   "Taurus" studio album.  There's nothing
06:54:40  21   else.
06:54:40  22        MR. MALOFIY:  When he received
06:54:41  23   that and how he received it.  There's a
06:54:43  24   lot of issues here.

Page 108

06:54:44  1         MR. ANDERSON:  Yeah, well, we
06:54:46  2    don't --
06:54:46  3         MR. MALOFIY:  And if we don't
06:54:47  4    address them, I'm not gonna go over it
06:54:50  5    anymore.
06:54:51  6         Please mark this.
06:54:51  7         We're requesting it.  We're
06:54:53  8    entitled to have it.
06:54:54  9         Q    Did the Universal Music Group ever
06:54:56  10   tell you they were trying to assert any kind of
06:54:58  11   interest, either directly or indirectly, in "Taurus"
06:55:05  12   after your -- you were retained in litigation in
06:55:10  13   this case?
06:55:12  14        A    No.
06:55:13  15        Q    Did they ever tell you after January
06:55:17  16   of this year that they were working to file
06:55:22  17   documents with the copyright office to assert their
06:55:26  18   interest in "Taurus"?
06:55:27  19        A    No.
06:55:27  20        Q    Or assert an interest of an associate
06:55:34  21   or an affiliate?
06:55:36  22        MR. ANDERSON:  Objection; vague.
06:55:37  23        A    No.
06:55:37  24        MR. MALOFIY:  Please mark that

27 (Pages 105 to 108)

CONFIDENTIAL

---

Page 109

06:55:56  1    also as the end of that whole section.
06:56:00  2        Now, I have what we're going to
06:56:02  3    mark as...
06:56:12  4        (Discussion off stenographic
06:56:14  5    record.)
06:56:16  6    Q    If you look at the melodic lines here
06:56:21  7    in this is "Taurus" deposit copy, can you circle the
06:56:26  8    notes from A to B?
06:56:30  9        MR. ANDERSON:  Objection.
06:56:31 10    Q    The pair of notes from A to B in its
06:56:34 11    melodic line?
06:56:35 12        MR. ANDERSON:  Objection; vague,
06:56:36 13        ambiguous as to the use of the phrase
06:56:40 14        "pair of notes," and not sufficient.
06:56:43 15    A    Are you talking about the notes A and
06:56:44 16    B that start the treble clef, the first two notes of
06:56:49 17    the treble clef, A to B?
06:56:51 18    Q    Let me break it up -- let me take it
06:56:54 19    back.
06:56:55 20    A    Sure.
06:56:56 21    Q    I think I use the term "phrase" in
06:57:00 22    your expert report. So, I want to know what the
06:57:02 23    definition of a phrase in music is.
06:57:06 24    A    A phrase in music is often involved

Page 110

06:57:09  1    with a lyrical phrase or a melodic phrase and it
06:57:13  2    encompasses any number of notes that are coherent
06:57:17  3    within that phrase.
06:57:20  4    Q    Can you have a two-note phrase?
06:57:24  5    A    I'm sorry?
06:57:25  6    Q    Can you have a two-note phrase?
06:57:25  7    A    A two-note phrase.
06:57:25  8    Q    Yeah?
06:57:26  9    A    Yes.
06:57:27 10    Q    Okay. So, if we look at this "Taurus"
06:57:29 11    deposit copy and we look at the melodic lines as
06:57:33 12    represented in the score, we go from the beginning
06:57:35 13    and we go through part A.
06:57:37 14        If you look at it, you'd agree there's
06:57:39 15    a two-note phrase that goes from A to B, correct?
06:57:44 16        MR. ANDERSON:  Objection;
06:57:44 17        argumentative, vague and ambiguous.
06:57:48 18    A    I would call that a -- just a two-note
06:57:51 19    movement. I think that the phrase is actually much
06:57:55 20    longer. I think it's a four-measure phrase of which
06:57:58 21    the two-note -- you call it a subphrase, a two-note
06:58:03 22    phrase is a part. We're speaking the same language,
06:58:05 23    I understand.
06:58:07 24        So, the A to the B is a part of the

Page 111

06:58:09  1    melodic phrase, but I do not believe that A to B is
06:58:14  2    a distinctive -- that you can demarcate A to B as a
06:58:22  3    subphrase because, in fact, the actual phrase is A,
06:58:26  4    B, C, A. I mean, A, B -- to suggest that A to B is
06:58:34  5    discontinuing from the C cuts out the rest of the
06:58:38  6    movement --
06:58:39  7    Q    Maybe you didn't hear my question.
06:58:41  8    You'd agree that there are notes in the first
06:58:43  9    measure of "Taurus" that goes from A to B, correct?
06:58:46 10    A    Yes, but you called that a two-note
06:58:48 11    phrase. I would not consider the A to B in measure
06:58:51 12    one of the "Taurus" deposit copy to be a two-note
06:58:55 13    phrase. It's part of a three-note phrase in terms
06:58:58 14    of its direction, A, B, C, and then it changes
06:59:02 15    direction. But A, B would be -- I can't imagine the
06:59:06 16    musicological support for literally removing the C
06:59:13 17    at the very least from the A and the B.
06:59:15 18    Q    Let's break it down.
06:59:17 19        First note on the treble clef of on
06:59:20 20    the first measure's an A, correct?
06:59:23 21    A    Yes.
06:59:23 22    Q    Okay. Second note is a B, correct?
06:59:25 23    A    Yes.
06:59:25 24    Q    Okay. You'd agree that it goes from A

Page 112

06:59:27  1    to B between those two notes, the first and second
06:59:30  2    note of the treble clef in the first measure,
06:59:32  3    correct?
06:59:33  4    A    Yes.
06:59:34  5    Q    Okay. So, why don't we circle the A
06:59:36  6    and B in the first measure of the treble clef of the
06:59:39  7    "Taurus" deposit copy; can we do that?
06:59:41  8    A    Yes, with the understanding that it's
06:59:44  9    not a two-note phrase.
06:59:46 10    Q    Do you want to call it a two-note
06:59:47 11    pair?
06:59:48 12    A    No.
06:59:48 13    Q    How would you define those two notes?
06:59:48 14    A    Those two notes are scale degrees one
06:59:50 15    and two, which continue to scale degree three. It's
06:59:54 16    A, B, C.
06:59:55 17    Q    Well, I'm going to do it this way:
06:59:58 18    Please circle the A and the B in the first measures
07:00:02 19    of "Taurus" deposit copy. And write A to B so we
07:00:06 20    know what notes they are.
07:00:11 21    A    (Complies.)
07:00:13 22    Q    Now, you'd agree there's also a B and
07:00:16 23    C pair that moves from the second measure to the
07:00:20 24    third measure, correct?

28 (Pages 109 to 112)

CONFIDENTIAL

| Page 113 | |
|---|---|

07:00:22 1        MR. ANDERSON: Objection;
07:00:22 2     argumentative in reference to, and vague
07:00:25 3     and ambiguous in reference to a pair.
07:00:27 4     Q    Do you see where that's at?
07:00:29 5     It's on the treble clef?
07:00:31 6     A    Yes.
07:00:31 7     Q    It goes from B to C, correct?
07:00:32 8     A    It goes from B to C.  It's for the
07:00:34 9  fourth beat of measure two to the first two beats of
07:00:37 10 measure three.
07:00:38 11    Q    Let's circle that and write B to C.
07:00:42 12    A    (Complies.)
07:00:44 13    Q    And now if you go to the third and
07:00:48 14 fourth measures, you'll see in the base clef the
07:00:51 15 melodic line goes from C to F sharp, correct?
07:00:57 16    A    Yes.
07:00:57 17         Enharmonically it's spelled in the
07:01:01 18 deposit copy G flat, but that's the same note as F
07:01:05 19 sharp.
07:01:06 20    Q    That's right.  So, let's circle the C
07:01:08 21 to F sharp in the third to fourth measures.
07:01:12 22    A    I'm circling the actual notes C and G
07:01:16 23 flat with the understanding that G flat is just
07:01:18 24 another spelling of F sharp.

| Page 114 | |
|---|---|

07:01:20 1         Do you want plea to write C and G
07:01:22 2  flat, which is actually what is written, do you want
07:01:24 3  me to write C and F sharp, which would be the
07:01:24 4  enharmonic spelling?
07:01:25 5     Q    I would write it C to F sharp and you
07:01:28 6  can start and explain why it's the G flat.
07:01:34 7     A    I think my testimony clarifies that.
07:01:36 8     Q    I think so too.
07:01:38 9     A    So, I don't have to make this
07:01:39 10 cluttered.
07:01:42 11    Q    Can I see that?  Thank you.
07:01:48 12    A    You're welcome.
07:01:49 13         MR. MALOFIY: We're going to
07:02:07 14    mark this next exhibit as 2705.
07:02:30 15         (Musical Example 1 was marked as
07:02:30 16    Exhibit 2705 for identification, as of
07:02:30 17    this date.)
07:02:30 18    Q    I think you should recognize this
07:02:32 19 exhibit, correct?
07:02:33 20    A    Yes I do.
07:02:34 21    Q    And you recognize it because it was
07:02:36 22 contained in your report, correct?
07:02:37 23    A    That's correct.
07:02:38 24    Q    And it was contained in your report as

| Page 115 | |
|---|---|

07:02:40 1  exhibit -- Musical Example 1, excuse me.
07:02:43 2     A    That's correct.
07:02:43 3     Q    Now, if we look here, it says
07:02:46 4  four-measure chord progressions.  Two top lines
07:02:50 5  equals Section A in "Taurus" with note values
07:02:53 6  halved.
07:02:55 7         Do you see that?
07:02:56 8     A    I do.
07:02:56 9     Q    It says:  Lower two lines equals
07:02:58 10 measures one through four in "Stairway."
07:03:01 11         Correct?
07:03:01 12    A    Yes.
07:03:02 13    Q    Just for purposes of orientation,
07:03:05 14 could you write "Taurus" next to the two top staves
07:03:10 15 to indicate "Taurus" on the side of it?
07:03:16 16    A    I'll just put a bracket and write
07:03:18 17 "Taurus".
07:03:18 18    Q    I was thinking right here to make it
07:03:20 19 clear.
07:03:20 20    A    Sure, sure.
07:03:22 21         And you don't mind that I write
07:03:24 22 "Taurus" deposit copy.
07:03:24 23    Q    That's fine if that's what you're
07:03:27 24 analyzing here.

| Page 116 | |
|---|---|

07:03:31 1     A    This is what is being analyzed here.
07:03:48 2     Q    Got it?
07:03:51 3         And then on the bottom, can you write
07:03:52 4  "Stairway" or "STH", perhaps, in the lower two
07:03:59 5  staves to indicate "Stairway to Heaven"?
07:04:03 6     A    Yes.
07:04:04 7         You understand that the top staff in
07:04:08 8  the "Stairway," the top staff coming into the fourth
07:04:12 9  measure is the base.
07:04:14 10    Q    I understand that.
07:04:16 11    A    Okay, "STH."
07:04:25 12    Q    Okay.
07:04:27 13         Now, if we look at "Taurus" on the
07:04:28 14 top, I'd like to do the same exercise that we did
07:04:32 15 with Exhibit 2704.
07:04:37 16         Can you circle the A to B in the first
07:04:41 17 measure?
07:04:42 18    A    In "Taurus"?
07:04:43 19    Q    Yes.
07:04:45 20    A    Yes.
07:04:45 21    Q    Can you write A to B?
07:04:48 22    A    Yes.  Just A, B is okay or do you want
07:04:51 23 me to write A to B?
07:04:55 24    Q    A dash B or A to B?

CONFIDENTIAL

---

Page 117

07:04:57 1    A   Okay, A dash B.
07:04:58 2        Did you want dashes on this also?
07:05:00 3    Because I only wrote A, B in Exhibit 2704.
07:05:05 4    Q   I think either is fine, but it just
07:05:07 5    shows movement.
07:05:08 6    A   So, I'll put a dash -- I'm going back
07:05:10 7    to 2704 and adding dashes between the letters.
07:05:14 8    Q   Thank you.
07:05:15 9    A   It's my pleasure.
07:05:20 10       I just put A dash B above the first
07:05:23 11   two notes of the upper staff of the "Taurus" deposit
07:05:26 12   copy.
07:05:27 13   Q   And then there's also the B to C
07:05:30 14   that's evidenced there, correct?
07:05:32 15   A   Yes.
07:05:33 16       Would you like me to circle it and put
07:05:35 17   a B dash C there?
07:05:37 18   Q   Yes, I would.
07:05:47 19       MS. FREEMAN:  Sorry.
07:05:47 20   A   Yes?
07:05:48 21       MR. MALOFIY:  I just have to say
07:05:50 22   every now and then I might tap my foot,
07:05:51 23   you make a big deal of it.  But you just
07:05:53 24   went off like a siren over there or a

---

Page 118

07:05:55 1    foghorn.  And, you know, I wasn't going
07:05:57 2    to say anything --
07:05:58 3        MR. ANDERSON:  But that was only
07:06:00 4    once.
07:06:00 5        MR. MALOFIY:  I wasn't going to
07:06:00 6    say anything, but I just had to.  With
07:06:03 7    that being said, let me move forward.
07:06:05 8        And I'll try not to tap.
07:06:07 9    Q   Then can we go to C to F sharp and
07:06:10 10   circle those notes as well?
07:06:12 11       MR. ANDERSON:  I'm lost.  Could
07:06:15 12   you...
07:06:16 13   Q   Can we go an circle the C to the F
07:06:19 14   sharp?
07:06:20 15       MR. ANDERSON:  On the "Taurus".
07:06:21 16       MR. MALOFIY:  The "Taurus"
07:06:22 17   deposit copy as indicated on Exhibit
07:06:25 18   2705.
07:06:26 19       MR. ANDERSON:  Thank you, sir.
07:06:27 20   A   Once again, you'd like me to go to the
07:06:30 21   base clef to the lower staff and circle what is
07:06:32 22   spelled -- because that's the way it's spelled in
07:06:35 23   the deposit copy -- as C and G flat, understanding
07:06:38 24   that G flat is F sharp, and I'm going to write C

---

Page 119

07:06:42 1    dash F sharp, as I did on Exhibit 2704; is that
07:06:46 2    correct?
07:06:47 3    Q   Yes.
07:06:48 4        Two ways to say the same note,
07:06:50 5    correct?
07:06:50 6    A   That's right.  It's an enharmonic
07:06:54 7    spelling.
07:06:58 8        C dash F sharp.
07:07:00 9    Q   Now, if we go to the bottom two staves
07:07:03 10   which indicate "Stairway to Heaven," do you see that
07:07:05 11   on 2705?
07:07:07 12   A   Yes, I do.
07:07:08 13   Q   Can you circle the A to the B?
07:07:10 14   A   Yes, and that's starting on the second
07:07:15 15   half of beat two to beat three, the A to the B.
07:07:22 16       And, again, you'd like me to write the
07:07:24 17   letters above?
07:07:25 18   Q   Yes.
07:07:26 19   A   A dash B.
07:07:29 20   Q   And I would also like you to circle
07:07:32 21   the B to the C in the lower -- excuse me, strike
07:07:36 22   that.
07:07:37 23       I would also like you to circle in the
07:07:40 24   "Stairway to Heaven" staves the B to the C?

---

Page 120

07:07:46 1    A   Certainly.
07:07:47 2        This is from the second half of beat
07:07:50 3    four to the first beat of measure two, second half
07:07:57 4    of beat four in measure one to the first beat in
07:08:01 5    measure two.  I've circled B to C and I'm now
07:08:05 6    writing the letters B dash C.
07:08:07 7    Q   And now I'd like you to circle in the
07:08:11 8    "Stairway to Heaven" transcription here the C to the
07:08:15 9    F sharp.
07:08:18 10   A   Certainly.
07:08:19 11       And we're talking about the C on the
07:08:21 12   second half of beat two to the F sharp on beat three
07:08:27 13   in measure two.  I've just circled them and now I'm
07:08:31 14   writing C dash F sharp.
07:08:43 15   Q   Thank you.
07:09:39 16       MR. MALOFIY:  Give me a moment.
07:09:40 17   Thank you.  We're still on the clock, so
07:11:06 18   that's good.
07:11:07 19       MR. ANDERSON:  I just wanted to
07:11:08 20   mention, earlier today you said that for
07:11:09 21   Dr. Ferrara, we would be deemed to have
07:11:12 22   started at 12 o'clock --
07:11:12 23       MR. MALOFIY:  That's right.
07:11:13 24       MR. ANDERSON:  -- with a

---

30 (Pages 117 to 120)

CONFIDENTIAL

| | Page 121 |
|---|---|
| 07:11:13 1 | seven-hour limitation. It's now 7:12. |
| 07:11:17 2 | MR. MALOFIY: Well, there's also |
| 07:11:17 3 | time -- it's video time, not just |
| 07:11:20 4 | straight gross time. It's also how much |
| 07:11:21 5 | time's on the video. |
| 07:11:22 6 | MR. ANDERSON: I didn't |
| 07:11:22 7 | understand that. |
| 07:11:23 8 | MR. MALOFIY: I said we'll take |
| 07:11:25 9 | off the time starting -- |
| 07:11:27 10 | MR. ANDERSON: Yeah, everything |
| 07:11:28 11 | after 12. |
| 07:11:29 12 | MR. MALOFIY: Right. But |
| 07:11:30 13 | anything -- breaks in between his |
| 07:11:32 14 | testimony, for having to go outside or |
| 07:11:35 15 | for any other reason or for other |
| 07:11:37 16 | things, is not time on the clock, you |
| 07:11:38 17 | know. |
| 07:11:39 18 | MR. ANDERSON: Then I'm not |
| 07:11:40 19 | quite clear what you were committing |
| 07:11:42 20 | today. |
| 07:11:44 21 | MR. MALOFIY: For any time -- |
| 07:11:44 22 | the time starting late we'll take off |
| 07:11:47 23 | the clock, that's what I'm saying. But |
| 07:11:49 24 | then the time there, we have to count |

| | Page 122 |
|---|---|
| 07:11:51 1 | for the actual video time. |
| 07:11:53 2 | MR. ANDERSON: So, what you're |
| 07:11:53 3 | suggesting is that we add up the math, |
| 07:11:55 4 | this time after 12 o'clock, and then |
| 07:11:57 5 | Ferrara time after 12 o'clock? |
| 07:12:01 6 | MR. MALOFIY: No, I think you're |
| 07:12:02 7 | misunderstanding me. |
| 07:12:03 8 | MR. ANDERSON: Well, I think |
| 07:12:03 9 | it's clear on the record. You said that |
| 07:12:05 10 | we -- for calculating the 7 o'clock -- |
| 07:12:06 11 | the seven-hour limit that you believe |
| 07:12:08 12 | applies to a half-day deposition, that |
| 07:12:12 13 | you were going to start the seven hours |
| 07:12:14 14 | at noon. |
| 07:12:14 15 | MR. MALOFIY: I was going to |
| 07:12:15 16 | start the seven hours -- no, I was going |
| 07:12:16 17 | to start -- whatever time after -- let's |
| 07:12:21 18 | be clear. |
| 07:12:22 19 | We started Ferrara late for a |
| 07:12:24 20 | number of reasons, and because of that I |
| 07:12:26 21 | agreed to take that time off of his |
| 07:12:28 22 | deposition time that's running on the |
| 07:12:31 23 | clock. |
| 07:12:31 24 | MR. ANDERSON: Okay. So, yeah, |

| | Page 123 |
|---|---|
| 07:12:31 1 | we have -- |
| 07:12:31 2 | MR. MALOFIY: So, seven minus |
| 07:12:33 3 | whatever that time was when we started. |
| 07:12:35 4 | MR. ANDERSON: Well, I'm not -- |
| 07:12:35 5 | MR. MALOFIY: Excuse me. |
| 07:12:36 6 | MR. ANDERSON: I'm still not |
| 07:12:38 7 | quite following, but -- |
| 07:12:39 8 | MR. MALOFIY: Well, let's take a |
| 07:12:40 9 | break and we can address it. |
| 07:12:41 10 | MR. ANDERSON: Okay, fine. |
| 07:12:41 11 | MR. MALOFIY: Let me get to a |
| 07:12:43 12 | good breaking point, all right? How |
| 07:12:43 13 | about that? |
| 07:12:44 14 | MR. ANDERSON: Yeah, you seem to |
| 07:12:45 15 | be at a lull, so... |
| 07:12:46 16 | MR. MALOFIY: Yeah. |
| 07:12:46 17 | MR. ANDERSON: And you mentioned |
| 07:12:47 18 | the time. That's why I asked. |
| 07:12:49 19 | MR. MALOFIY: All right. And I |
| 07:12:49 20 | understand. I appreciate that. |
| 07:12:53 21 | MR. ANDERSON: Your welcome. |
| 07:12:54 22 | MS. FREEMAN: I think the air |
| 07:12:55 23 | has stopped. |
| 07:12:56 24 | MR. MALOFIY: I think it has. |

| | Page 124 |
|---|---|
| 07:12:57 1 | MS. FREEMAN: And it's gonna |
| 07:12:58 2 | going get really stuffy. |
| 07:13:03 3 | THE WITNESS: I can stay as late |
| 07:13:05 4 | as you need, Mr. Mollify. |
| 07:13:07 5 | MR. MALOFIY: I appreciate that. |
| 07:13:09 6 | Thank you. I don't want to stayed too |
| 07:13:12 7 | late. I'll try to wrap this up as fast |
| 07:13:15 8 | as I can. |
| 07:13:20 9 | THE VIDEOGRAPHER: Counsel, |
| 07:13:20 10 | would you like to take a break now so we |
| 07:13:22 11 | can may switch the tapes? |
| 07:13:25 12 | MR. MALOFIY: Sure, why don't we |
| 07:13:26 13 | do that? Because I'm looking for one |
| 07:13:28 14 | page and we can talk about that. |
| 07:13:30 15 | THE VIDEOGRAPHER: The time is |
| 07:13:31 16 | 7:13 p.m. -- |
| 07:13:31 17 | MS. FREEMAN: My God. |
| 07:13:32 18 | THE VIDEOGRAPHER: This marks |
| 07:13:33 19 | the ending of Tape 2. |
| 07:13:36 20 | Off the record. |
| 07:13:37 21 | (Recess taken.) |
| 07:30:17 22 | THE VIDEOGRAPHER: The time is |
| 07:30:18 23 | 7:30 p.m. This marks the beginning of |
| 07:30:21 24 | Tape 3. |

31 (Pages 121 to 124)

CONFIDENTIAL

Page 125

07:30:22  1      On the record.
07:30:24  2      Q   All right.  We have -- your report, do
07:30:29  3   you recall in doing your analysis that you had only
07:30:34  4   analyzed the base clef of "Taurus"?
07:30:38  5          MR. ANDERSON:  Objection; vague
07:30:38  6      and ambiguous as to which report.
07:30:42  7      A   You're talking about my initial report
07:30:44  8   with respect to the "Taurus" deposit copy?
07:30:49  9      Q   That's correct.
07:30:50 10      A   I analyzed the entirety of the deposit
07:30:53 11   copy, including in the structural analysis, and what
07:30:59 12   I found was that the only expression that was at
07:31:03 13   issue was in the lower clef or the base clef in the
07:31:09 14   "Taurus" deposit copy in the section that I call
07:31:12 15   Section A.
07:31:13 16          So, for example, I didn't find any
07:31:17 17   relevant similarity in the upper clef of the
07:31:21 18   "Taurus" deposit copy.  I still do not.  And I
07:31:25 19   certainly didn't find any similarity in the B
07:31:28 20   section.  And, to the best of my recollection, none
07:31:32 21   of plaintiff's experts found any relevant
07:31:35 22   similarities in the B section of the "Taurus"
07:31:38 23   deposit copy.
07:31:39 24          So, the answer is no, that's

Page 126

07:31:42  1   incorrect.  But the correct answer is I analyzed the
07:31:46  2   entire work and then I focused on those portions
07:31:49  3   that had similarities.  I found that portion to be
07:31:53  4   the lower clef, the base clef or the base clef
07:31:58  5   staff, in the deposit copy of the A section.
07:32:02  6      Q   By chance, do you have your initial
07:32:04  7   report in front of you?
07:32:06  8      A   No, you haven't given it to me.
07:32:09  9      Q   I may have a copy.  Hold on one
07:32:11 10   second.
07:32:12 11          Here, I think this is a complete copy.
07:32:15 12   We'll mark this as...
07:32:32 13          Here you go, I think that's a complete
07:32:35 14   copy.
07:32:37 15          MR. ANDERSON:  It's definitely
07:32:37 16      not a complete copy of the first
07:32:40 17      report --
07:32:40 18          MR. MALOFIY:  Oh, I'm sorry.
07:32:41 19          MR. ANDERSON:  It was just the
07:32:42 20      part you were holding.
07:32:44 21          MR. MALOFIY:  I believe it is,
07:32:44 22      but hold on.
07:32:45 23          THE WITNESS:  I can take a quick
07:32:46 24      look, if you want.

Page 127

07:32:47  1          MR. MALOFIY:  Take a quick look.
07:32:48  2          THE WITNESS:  Sure.
07:32:49  3          I don't want to mix them up with
07:32:51  4      exhibits, so I'm going to put them here,
07:32:52  5      if that's okay with you.
07:32:54  6          MR. MALOFIY:  Yes.
07:32:56  7      A   That was the declaration.  Here is the
07:33:15  8   report starting on Exhibit 1, Page 6.  Okay.  So,
07:33:20  9   let me just start there.  This was the report dated
07:33:23 10   February 10, yes.
07:33:37 11          I'm not going through every page, but
07:33:39 12   I'm going to just verify as quickly as I can.
07:34:18 13   Here's the melody, songs in their entirety and --
07:34:22 14          So, this -- up until this page is the
07:34:27 15   written part of my initial report.  It does not
07:34:32 16   include the visual exhibits.
07:34:35 17      Q   So, let's just take that.
07:34:38 18      A   And I'll put the declaration back on
07:34:40 19   top of it?
07:34:40 20      Q   Yeah, that's fine.
07:34:46 21          MR. MALOFIY:  Can we mark this
07:34:48 22      as Exhibit 2706.
07:34:49 23          MR. ANDERSON:  Do you want
07:34:49 24      the -- as a question, do you want the

Page 128

07:34:49  1   declaration on top, since it identifies
07:34:52  2   more than what you've attached?
07:34:54  3          MR. MALOFIY:  That's fine.  We
07:34:54  4      can have the declaration and the
07:34:56  5      actual -- you know what?  We can just
07:34:59  6      keep it to -- we can just keep his
07:35:05  7      report.
07:35:06  8          MR. ANDERSON:  It seems to be
07:35:07  9      cleaner.
07:35:07 10          MR. MALOFIY:  Yeah.
07:35:09 11          MR. ANDERSON:  Without the
07:35:09 12      visual exhibits.
07:35:11 13          MR. MALOFIY:  I apologize, I
07:35:12 14      might have a cop write right here.  Let
07:35:14 15      me see what I can do.  I think I
07:35:20 16      probably do have an extra one here.
07:35:22 17          MR. ANDERSON:  If I had a clean
07:35:23 18      one, I'd give it to you.  Mine's got
07:35:26 19      random markings.
07:35:27 20          (Report was marked as Exhibit
07:35:27 21      2706 for identification, as of this
07:35:27 22      date.)
07:35:51 23          (Discussion off the stenographic
07:35:53 24      record.)

CONFIDENTIAL

Page 129

07:35:54 1    Q   Do you see this?
07:35:55 2    A   Yes.
07:35:56 3    Q   What section is that referring to, do
07:35:58 4  you know, in your report where you left out how --
07:36:02 5  where the base clef was considered but the treble
07:36:06 6  clef was not?
07:36:07 7          MR. ANDERSON:  Objection; vague
07:36:08 8      and ambiguous.
07:36:09 9    A   That misrepresents my testimony,
07:36:11 10  Mr. Mollify.
07:36:12 11      So, once again, first, as per my --
07:36:21 12    Q   I think it's an example.  Is it
07:36:24 13  Example 1, or am I wrong?
07:36:31 14    A   I'm sorry, I think the question is not
07:36:34 15  clear, if you don't mind repeating the question.
07:36:37 16    Q   Yeah.
07:36:38 17      If you look at Musical Example 1...
07:36:45 18    A   So we are now skipping the first 17
07:36:49 19  pages, which is the initial body of the report, then
07:36:56 20  we're skipping the analysis of structure, which
07:37:00 21  also, of course, deals with the portions that you're
07:37:03 22  saying that I omitted, which, of course, I didn't
07:37:05 23  and that's clear in my previous answer --
07:37:08 24    Q   Let me ask you:  Is there a difference

Page 130

07:37:11 1  between Example 1 and Musical Example 1?
07:37:14 2    A   Example 1 and Musical Example 1?
07:37:17 3    Q   Yeah, is it the same?
07:37:18 4      Your report is very confusing.  I mean
07:37:20 5  just how it's labeled and how --
07:37:22 6    A   I don't use Example 1.
07:37:24 7    Q   It's just Musical Example 1, correct?
07:37:26 8    A   Yes.  I don't interchange "musical
07:37:29 9  example" and "example."  They're all -- if they're a
07:37:31 10  musical example, it says Musical Example 1, Musical
07:37:34 11  Example 2, and so forth.
07:37:37 12    Q   All right.
07:37:38 13    A   I'm sorry if that wasn't clear, but I
07:37:40 14  don't think there's any confusion with respect to
07:37:43 15  the numbering of the musical examples.
07:37:46 16    Q   And -- excuse me one second.  I have
07:37:58 17  mixed up my papers there.  Late in the day, right?
07:38:08 18          MR. ANDERSON:  Yeah, it's tough.
07:38:10 19          MR. MALOFIY:  It is.
07:38:13 20          THE WITNESS:  If I can be of any
07:38:15 21      assistance, if you tell me what you're
07:38:17 22      looking for --
07:38:19 23          MR. MALOFIY:  No, that's okay.
07:38:19 24      I appreciate it.

Page 131

07:38:20 1      Let me move forward to something
07:38:22 2  else because -- that's what I'm gonna
07:38:26 3  do.
07:38:27 4    Q   Did you do a transcription of the
07:38:29 5  sound recording of "Taurus"?
07:38:33 6    A   Yes.  In my rebuttal report, dated
07:38:38 7  March 12, I completed a transcription of the
07:38:42 8  entirety of the composition embodied in the "Taurus"
07:38:47 9  studio version.
07:38:49 10    Q   Okay.
07:38:51 11          MR. MALOFIY:  I'd like to mark
07:38:56 12      this as 2707.
07:39:00 13          (Discussion off the stenographic
07:39:25 14      record.)
07:39:26 15          (Transcription was marked as
07:39:26 16      Exhibit 2707 for identification, as of
07:39:26 17      this date.)
07:39:34 18    Q   This is your transcription, correct?
07:39:36 19    A   Well, it's part of it.
07:39:38 20    Q   Part of it.
07:39:40 21      Now, on the bottom there is that the A
07:39:42 22  part of or is that part of the A part of "Taurus"?
07:39:49 23    A   Yes, based on looking at the top, it
07:39:52 24  seems that it's just the last one, two, three, four,

Page 132

07:39:58 1  five, six, seven, the last seven measures of the
07:40:02 2  introduction of the "Taurus" studio version, my
07:40:06 3  transcription thereof.
07:40:08 4      And in the next section, you'll see it
07:40:10 5  says:  Section 1A starting at 45 seconds.
07:40:14 6      And, so, what you have there is eight
07:40:18 7  measures, which is the first iteration of Section A.
07:40:25 8  It's, of course, repeated then later in the piece
07:40:29 9  and that's transcribed later in this transcription,
07:40:33 10  of which this is only a page.
07:40:35 11    Q   If you go to Measure 23 --
07:40:37 12          MR. ANDERSON:  Can I just ask a
07:40:38 13      clarification?
07:40:39 14      Section 1A?
07:40:41 15      THE WITNESS:  A1.
07:40:42 16      MR. ANDERSON:  Okay.
07:40:42 17      THE WITNESS:  Did I say 1A?
07:40:42 18      MR. ANDERSON:  I may have
07:40:42 19  misheard.  I apologize.
07:40:44 20      THE WITNESS:  I wrote Section
07:40:46 21  A1.
07:40:46 22    A   Yes, the first iteration of Section A.
07:40:49 23    Q   Do you see Measures 23, 24, 25, and
07:40:54 24  26?

33 (Pages 129 to 132)

CONFIDENTIAL

## Page 133

07:40:56 1    A   Yes I do.

07:40:58 2    Q   Now, if you look at Measure 24, on the

07:41:04 3  guitar part...

07:41:05 4    A   Yes?

07:41:05 5    Q   What letter -- excuse me, what note is

07:41:18 6  the and of one?

07:41:23 7         MR. ANDERSON:  Objection; vague

07:41:23 8         and ambiguous.

07:41:25 9    A   The note in the acoustic guitar part

07:41:30 10 on and of one in Measure 24 is a C.

07:41:40 11   Q   That's correct.

07:41:41 12        Can you circle that and write C?

07:41:43 13   A   Yes.

07:42:02 14   Q   And you would agree that that note is

07:42:05 15 sustained, correct?

07:42:06 16   A   Yes, that note is tied over.

07:42:09 17   Q   And it's, in fact, tied over until

07:42:14 18 beat three, correct.

07:42:16 19   A   That's correct.

07:42:17 20   Q   Can you circle the tie-over to beat

07:42:23 21 three?

07:42:24 22   A   In other words, circle the C that it's

07:42:27 23 tied to --

07:42:28 24   Q   Yes.

## Page 134

07:42:28 1    A   -- on beat two?  Certainly.

07:42:43 2    Q   Now, doesn't it tie to beat three?

07:42:48 3    A   Well, the C that I just circled, the

07:42:53 4  second C that I just circled, which is iterated on

07:42:57 5  beat two ends at beat three, but there's no note on

07:43:03 6  beat three because it's not sounding anymore on beat

07:43:08 7  three.

07:43:08 8    Q   It ties to beat three, though,

07:43:11 9  correct?  You have a tie-on --

07:43:13 10   A   It ties to a quarter note on beat two,

07:43:16 11 the duration of which ends on beat three.

07:43:19 12   Q   Can you circle where the duration ends

07:43:22 13 on beat three?

07:43:24 14   A   May I put a check over it?

07:43:26 15        Because a circle might suggest it's a

07:43:29 16 note.  I'll just put a check where it ends; is that

07:43:32 17 all right, check over B3.

07:43:34 18   Q   That's fine.

07:43:35 19        MR. ANDERSON:  I have, I think,

07:43:36 20        a better of copy of that, if you want to

07:43:39 21        use that.

07:43:40 22        MR. MALOFIY:  This is fine.

07:43:41 23        THE WITNESS:  I mean, it's a

07:43:42 24        little fuzzy, but it's okay.

## Page 135

07:43:43 1         MR. MALOFIY:  Okay.

07:43:43 2    A   I'm putting a check over beat three in

07:43:47 3  Measure 24 in the acoustic guitar part to show that

07:43:51 4  at that point the C with the tied C stops sounding.

07:44:08 5    Q   Would you agree with me on beat three

07:44:15 6  there is an F sharp?

07:44:20 7    A   In the acoustic guitar part?

07:44:23 8    Q   Yes.

07:44:24 9    A   Yes.

07:44:24 10   Q   Can you circle the F sharp?

07:44:27 11   A   Yes, I can.

07:44:28 12        Do you want me to write the letter F

07:44:30 13 sharp --

07:44:30 14   Q   Yes.

07:44:31 15   A   -- as I did with the C?

07:44:32 16   Q   Yes.  Thank you.

07:44:46 17   A   You're welcome.

07:44:50 18   Q   Do you agree that in the "Taurus"

07:44:56 19 album recording and the "Stairway to Heaven" album

07:45:00 20 recording there is a similar harmony?

07:45:04 21        MR. ANDERSON:  Objection; vague

07:45:04 22        and ambiguous.

07:45:08 23   A   There is a similar harmony in the A

07:45:12 24 section of the "Taurus" studio version and the

## Page 136

07:45:22 1  opening four measures that are actually at issue

07:45:26 2  that then repeat for a total of six times in

07:45:30 3  "Stairway to Heaven."

07:45:32 4    Q   Well, to be clear, it's four measures

07:45:36 5  that, as you said, repeat six times.  You'd agree

07:45:40 6  that there's six A sections and two B sections in

07:45:46 7  the first two minutes and fourteen seconds of

07:45:48 8  "Stairway," correct?

07:45:50 9         MR. ANDERSON:  Objection; vague

07:45:50 10        and ambiguous.

07:45:52 11   A   You're talking about "Stairway" or the

07:45:54 12 "Taurus" sound recording?

07:45:56 13   Q   I mean "Stairway."

07:45:59 14   A   Well, let me first say that the

07:46:03 15 structure, in my opinion, of "Stairway to Heaven" is

07:46:08 16 an introduction and that's followed by a

07:46:15 17 four-measure interlude.  Part of that -- and then we

07:46:20 18 have verse one -- I'm sorry, not four-measure

07:46:24 19 interlude, it's an introduction and then verse one

07:46:28 20 and then there's a four-measure interlude, and that

07:46:32 21 takes us to two minutes and fourteen seconds.

07:46:34 22   Q   Do you consider the structure of

07:46:35 23 "Stairway to Heaven" album recording up to the point

07:46:38 24 of two minutes fourteen seconds, A, A, B, A, A, B,

34 (Pages 133 to 136)

CONFIDENTIAL

Page 137

07:46:43  1    A, A?
07:46:45  2        A   I do not.
07:46:54  3        Q   Do you think it's unreasonable to
07:46:56  4    identify the sections as A, A, B, A, A, B, A, A in
07:47:03  5    the "Stairway to Heaven" album recording up to the
07:47:07  6    two minutes and fourteen seconds?
07:47:10  7        A   I understand. I don't think the word
07:47:13  8    "unreasonable" is the proper word.
07:47:18  9            In my opinion, what I believe
07:47:23 10    Dr. Stewart is calling the B section is actually a
07:47:29 11    continuation. There is a change in the chord
07:47:35 12    progression in what he calls the B section, but the
07:47:39 13    arpeggiation in the guitar continues. And he also
07:47:45 14    does the same in the verse; that is, what he's
07:47:51 15    calling A, A, B in the verse, I would call the
07:47:56 16    verse. I don't see in the verse in the "Stairway to
07:48:01 17    Heaven" composition that -- so, a sufficiently
07:48:07 18    radical change in what's going on. Just because
07:48:10 19    it's changing the chord progression, the verse
07:48:17 20    continues, so, I wouldn't necessarily call it a B
07:48:20 21    section. I would call it the verse. I see the
07:48:26 22    verse as more true composed. I understand where
07:48:31 23    he's, you know, demarcating the B section, but I
07:48:34 24    wouldn't necessarily call it a separate B section.

Page 138

07:48:38  1            But just for arguments' sake, if were
07:48:40  2    to say that, yes, it is A, A, B -- and I don't think
07:48:43  3    that's correct; the word "unreasonable" is not
07:48:46  4    really the right word, but let's say I didn't say it
07:48:47  5    was correct, but let's simply say it is A, A, B for
07:48:50  6    argument's sake, what we'd be saying is that the
07:48:54  7    form is a common form, and A, A, B form is a common
07:49:00  8    form in songs.
07:49:02  9        Q   So, you don't believe it's A, A, B, A,
07:49:04 10    A, B, A, A first two minutes and fourteen seconds of
07:49:09 11    "Stairway." Tell me what you believe the form is.
07:49:12 12        A   I believe the form is an introduction
07:49:15 13    that then -- if you have my -- it would be really
07:49:23 14    helpful if I could literally -- you can make an
07:49:26 15    exhibit my "Stairway to Heaven" transcription, which
07:49:30 16    is probably Exhibit B in this report, so I can
07:49:34 17    actually show you what is going on.
07:49:38 18            But essentially, what you have are
07:49:41 19    four-measure phrases that we've already talked
07:49:45 20    about, and I believe that the four-measure phrase
07:49:50 21    structure is what is essentially building into the
07:49:54 22    introduction and the four-measure phrase structure
07:49:57 23    is what is essentially sustaining what Dr. Stewart
07:50:01 24    calls the B section.

Page 139

07:50:03  1        Q   I just want to be really specific.
07:50:05  2    Give me the structure, song structure, as you
07:50:08  3    understand it in your head.
07:50:10  4        A   Certainly. The introduction in
07:50:13  5    "Stairway to Heaven" is based on four-measure
07:50:16  6    phrases; the verse section -- that's verse one -- is
07:50:22  7    based on four-measure phrases; and then that's
07:50:27  8    followed by an interlude, which is at the end of the
07:50:32  9    two minutes and fourteen seconds, and that is a
07:50:35 10    four-measure phrase.
07:50:37 11        Q   So, you believe it's -- the structure
07:50:39 12    is four verse --
07:50:43 13        A   I'm sorry?
07:50:44 14        Q   You said there's verse one, which is a
07:50:47 15    four?
07:50:48 16        A   Measure.
07:50:48 17        Q   Measure?
07:50:50 18        A   Phrase structure.
07:50:51 19        Q   Phrase structure.
07:50:51 20            Which happens four times, did you say.
07:50:56 21        A   Let me go back to the exhibit that we
07:50:59 22    just had. I think that this will be the easiest
07:51:02 23    because I can show you visually.
07:51:03 24        Q   I just want to know what it is.

Page 140

07:51:06  1        A   Exactly. And I think this -- let me
07:51:06  2    just put this over here.
07:51:08  3        Q   Are you able to do it without your
07:51:09  4    notes?
07:51:10  5        A   Yes. But I think I'm going to be
07:51:12  6    speaking in terms that are -- look, it's simplest
07:51:19  7    here: This is Page 18 of Exhibit 1 on your Exhibit
07:51:26  8    2706.
07:51:28  9        Q   Just to be clear, I didn't ask you to
07:51:29 10    do it from your notes. I want to know it from your
07:51:32 11    head.
07:51:32 12        A   I understand.
07:51:33 13            MR. ANDERSON: What he's
07:51:33 14        demonstrating is from his head.
07:51:35 15        A   I've just charted so that you can
07:51:37 16    understand.
07:51:37 17        Q   I can understand.
07:51:39 18        A   Oh, you can?
07:51:40 19        Q   Yeah.
07:51:40 20        A   Oh, fine.
07:51:40 21        Q   I just want to know, the first part
07:51:42 22    you consider the intro, correct?
07:51:43 23        A   Yes.
07:51:43 24        Q   Then you consider verse one, which is

35 (Pages 137 to 140)

CONFIDENTIAL

Page 141

07:51:45 1    a four-measure part.
07:51:47 2         A    No, that's wrong.  That's why I
07:51:49 3    thought it would be helpful for you to see the
07:51:51 4    visual.
07:51:51 5         Q    All right.  Let's see it.
07:51:54 6         A    Here's the introduction.  It starts at
07:51:56 7    the beginning.  It consists of four four-measure
07:52:01 8    phrases.  So, it is a 16-measure introduction
07:52:05 9    consisting of four-measure phrases.
07:52:08 10             Verse one is 20 measures.  It consists
07:52:12 11   of four-measure phrases.  Within what I'm calling
07:52:16 12   verse one, Dr. Stewart says is actually an A, A, B,
07:52:22 13   and then -- within that verse.  I don't see --
07:52:24 14        Q    Maybe I'm -- let's break it down.  You
07:52:26 15   think there's an introduction, a verse one, an
07:52:29 16   interlude, a refrain one that takes you to two
07:52:34 17   minutes and fourteen seconds; is that accurate?
07:52:36 18        A    No, no, that's inaccurate.
07:52:39 19        Q    Okay.
07:52:39 20        A    That contradicts my testimony.
07:52:40 21             What I said is that you have -- it's
07:52:42 22   right here, that's why you wouldn't -- so you
07:52:43 23   wouldn't ask that question.
07:52:45 24        Q    You have an intro that goes zero to 54

Page 142

07:52:47 1    seconds.
07:52:47 2         A    Yes.
07:52:48 3         Q    You have a verse one that goes from 54
07:52:51 4    seconds to two minutes and one seconds, correct?
07:52:54 5         A    Yes.
07:52:54 6         Q    And then you have an interlude that
07:52:55 7    goes from two minutes and one seconds to two minutes
07:52:57 8    and fourteen seconds.
07:52:59 9         A    That's right.  So, that phrase is not
07:53:01 10   part of that.
07:53:02 11        Q    And you believe those two minutes and
07:53:02 12   fourteen seconds, you characterize it as what as a
07:53:07 13   whole?
07:53:07 14             Do you put it the first half?  First
07:53:09 15   quarter of the song?  What do you call it?
07:53:10 16        A    Quantitatively, it's the first quarter
07:53:13 17   of the song.  And, again, it consists of the intro,
07:53:15 18   verse one, and the interlude and --
07:53:19 19        Q    What would you call it?  If you were
07:53:21 20   in court, you'd say I call this the what?
07:53:23 21        A    It's the opening two minutes and
07:53:25 22   fourteen seconds of the song.
07:53:27 23        Q    Opening two minutes and fourteen
07:53:29 24   seconds.  Is that an accurate description?

Page 143

07:53:31 1         A    Well, yes, according to the running
07:53:33 2    time.
07:53:33 3         Q    Do you believe this opening two
07:53:34 4    minutes and fourteen seconds is an important part of
07:53:37 5    "Stairway to Heaven"?
07:53:38 6         A    I think it is an important part, yes.
07:53:41 7         Q    All right?
07:53:41 8         A    And I write that in my report.
07:53:43 9         Q    And you actually identify it
07:53:45 10   qualitatively as an important part of "Stairway to
07:53:48 11   Heaven," correct?
07:53:49 12        A    Yes, I do.
07:53:50 13        Q    Besides the intro in the first two
07:53:52 14   minutes and fourteen seconds, what else do you
07:53:55 15   identify as important parts of "Stairway to Heaven"?
07:53:59 16             I think you said the fanfare, correct?
07:54:03 17        A    May I, since it's here?
07:54:05 18        Q    We can just talk.
07:54:06 19        A    You don't want to hear it?
07:54:06 20             MS. FREEMAN:  I'd love to hear
07:54:08 21        it.
07:54:09 22        Q    I know this.  The D with a G with a G.
07:54:14 23        A    (Plays keyboard.)
07:54:14 24             It's three iterations: (demonstrates)

Page 144

07:54:15 1    on one; (demonstrates); and again (demonstrates),
07:54:20 2    that's the fanfare.
07:54:23 3         Q    You believe that a D with a G on it --
07:54:32 4    it's basically a D major chord with a G on it.  You
07:54:37 5    believe that's significant and important?
07:54:39 6         A    No, you've actually -- you're
07:54:42 7    inaccurate.  It's not a D with a G chord on it.
07:54:47 8         Q    It's a D to --
07:54:47 9         A    (Plays keyboard.)
07:54:48 10             That's not a D with a G on it.  First
07:54:49 11   of all, this is a D with an A and an E
07:54:53 12   (demonstrates), moving to a D chord (demonstrates),
07:54:55 13   and then going to the G that you're talking about.
07:54:57 14   But it's not just that, it's three, four,
07:55:01 15   (demonstrates), three, four (demonstrates).
07:55:11 16        Q    You believe that --
07:55:12 17        A    That whole section, that whole section
07:55:15 18   that moves down to C (demonstrates) and then it
07:55:18 19   moves back up (demonstrates), that's a herald.  It's
07:55:23 20   completely changes the texture in what came before,
07:55:26 21   it is absolutely an important memorable part, and it
07:55:30 22   ushers in the guitar solo.
07:55:34 23        Q    Do you believe that's an important
07:55:36 24   part?

36 (Pages 141 to 144)

CONFIDENTIAL

---

Page 145

```
07:55:36   1      A   Yes, I do.
07:55:37   2      Q   Do you believe it's more important
07:55:39   3   than the introduction?
07:55:40   4      A   I think that is equally memorable and
07:55:42   5   important.
07:55:43   6          MS. FREEMAN:  It's my favorite
07:55:44   7      part, Francis.
07:55:47   8          MR. MALOFIY:  It's not you,
07:55:47   9      Ms. Freeman.
07:55:50  10      Q   What about the solo?
07:55:51  11          MR. ANDERSON:  Objection; vague
07:55:51  12      and ambiguous.
07:55:52  13      A   Yeah, I understand.  You're talking
07:55:54  14   about the guitar solo that follows the fanfare.
07:55:57  15      Q   Yes.
07:55:58  16      A   That is one of the most memorable
07:56:00  17   parts.  It's staggering.  It really is staggering as
07:56:07  18   a composition.
07:56:08  19      Q   The fanfare and the solo are the two,
07:56:10  20   you believe -- hold on -- are very memorable parts?
07:56:14  21      A   I do, yes.
07:56:15  22      Q   And you also believe the introduction
07:56:17  23   is a memorable part of the song?
07:56:21  24      A   I do.
```

---

Page 146

```
07:56:21   1      Q   Do you believe that those three parts
07:56:25   2   of the song are qualitatively more important than
07:56:30   3   the other parts?
07:56:32   4      A   Well, not qualitatively more important
07:56:36   5   than a fourth part which I point out in my analysis
07:56:39   6   (demonstrates).
07:56:47   7          That's:  And we -- you know, and a
07:56:49   8   long and winding road -- shadows taller than our
07:56:53   9   soul.
07:56:54  10          That whole part when -- that's verse
07:56:57  11   six, after the fanfare, which is instrumental; after
07:57:00  12   the long guitar solo, which obviously is
07:57:04  13   instrumental; the rhythms are getting much more
07:57:08  14   complex, the texture is getting thicker and thicker,
07:57:13  15   and then, bang, we have Robert Plant come in way up
07:57:19  16   there singing, you know, about the winding road and
07:57:24  17   so forth.  That is a very significant point.
07:57:28  18      Q   The vamp at the end?
07:57:30  19      A   It's not a vamp.  It's a verse.  It's
07:57:32  20   verse six.
07:57:33  21      Q   And you believe that part also is
07:57:35  22   qualitatively important.
07:57:37  23      A   Yes, those are the four parts.
07:57:38  24      Q   Most important parts.
```

---

Page 147

```
07:57:38   1      A   Those are the four parts.
07:57:39   2      Q   Are you valuing any of those four
07:57:41   3   parts qualitatively more important than the others,
07:57:46   4   the other four parts that we're identifying?
07:57:48   5      A   This would be very subjective.
07:57:50   6   Subjectively, I think that last part, that verse
07:57:53   7   six.  If "Stairway to Heaven" just ended after the
07:57:58   8   amazing guitar solo, it would be a very different
07:58:02   9   song.  That coming back with Plant way up there,
07:58:05  10   it's just staggering compositionally.
07:58:10  11          And, so, I would have to say of the
07:58:12  12   four sections, that would be the most significant
07:58:15  13   for me, the most memorable, the most moving, the
07:58:19  14   most meaningful.  But that is subjective.
07:58:22  15      Q   What does "memorable" mean?
07:58:25  16      A   That as I go through it, through the
07:58:27  17   song in its entirety, and literally in that -- in
07:58:31  18   those seconds in the moment right after it, I'm not
07:58:34  19   talking three weeks later, a month later, right
07:58:38  20   then, that whole experience of the song and
07:58:41  21   time occurs, it's that that just kind of rivets.
07:58:45  22   That's what I mean.
07:58:46  23          But the first section --
07:58:47  24      Q   Does memorable mean you can remember
```

---

Page 148

```
07:58:51   1   it?
07:58:51   2      A   You mean memorize it?
07:58:54   3      Q   No, that you can remember it.
07:58:56   4      A   Memorable means, I think,
07:58:57   5   qualitatively important.  I think that's what you
07:59:00   6   said before.  I think that is the way I am
07:59:02   7   suggesting "memorable."
07:59:04   8      Q   Can you play the solo right now?
07:59:07   9      A   The what?
07:59:07  10      Q   Play the solo.
07:59:09  11      A   The guitar solo?
07:59:10  12      Q   Yeah.
07:59:12  13      A   I can probably play the beginning of
07:59:14  14   it, but this is --
07:59:15  15      Q   Let's try it.
07:59:17  16      A   -- it's a keyboard.
07:59:18  17      Q   Guitar solo.  It's the most memorable
07:59:19  18   part.  I want to see if you --
07:59:19  19          MS. FREEMAN:  On guitar?
07:59:20  20      A   If you let me just think...
07:59:33  21          It starts this way (demonstrates).
07:59:45  22          Yeah, this is it (demonstrates).
07:59:46  23          That's definitely the opening.  Here
07:59:49  24   we go (demonstrates).
```

---

37 (Pages 145 to 148)

CONFIDENTIAL

Page 149

| | | |
|---|---|---|
| 07:59:52 | 1 | And it continues (demonstrates). |
| 08:00:00 | 2 | Those are the two opening phrases. It |
| 08:00:03 | 3 | gets so complex after that. I can tell you that the |
| 08:00:06 | 4 | ending before verse six is (demonstrates). It's on |
| 08:00:10 | 5 | an F chord. |
| 08:00:12 | 6 | Q   Let's not go to verse six, let's play |
| 08:00:15 | 7 | it through. |
| 08:00:16 | 8 | A   That isn't verse six. I can't... |
| 08:00:18 | 9 | Q   You said it's the most memorable. |
| 08:00:20 | 10 | "Memorable" means you can remember it. |
| 08:00:22 | 11 | A   No, no, no. That's absolutely wrong. |
| 08:00:24 | 12 | Q   Well -- |
| 08:00:25 | 13 | A   Memorable does not mean memorize. |
| 08:00:26 | 14 | Q   Okay, well -- |
| 08:00:27 | 15 | A   That's almost silly. |
| 08:00:29 | 16 | Q   Well, I didn't say "memorize," I said |
| 08:00:31 | 17 | you can remember it, all right? |
| 08:00:32 | 18 | I'm asking you as you sit here today |
| 08:00:35 | 19 | can you remember the solo and play it through? |
| 08:00:37 | 20 | Yes, you can; no, you can't. |
| 08:00:39 | 21 | A   No, because memorable does not mean |
| 08:00:41 | 22 | memorize. |
| 08:00:41 | 23 | Q   I'm just asking -- |
| 08:00:41 | 24 | A   You just contradicted yourself. |

Page 150

| | | |
|---|---|---|
| 08:00:44 | 1 | Q   No, I did not. |
| 08:00:45 | 2 | A   Sure, you did. |
| 08:00:45 | 3 | Q   No. |
| 08:00:45 | 4 | A   You just said: I didn't say memorize. |
| 08:00:46 | 5 | Q   Look, can you play the solo? |
| 08:00:47 | 6 | Yes, you can, or no, you can't. |
| 08:00:49 | 7 | A   No, because I haven't memorized it. |
| 08:00:52 | 8 | Q   Okay, well -- |
| 08:00:52 | 9 | A   That doesn't mean it's not memorable. |
| 08:00:54 | 10 | You're basically combining memorable with memorize. |
| 08:00:58 | 11 | Q   I understand. |
| 08:00:59 | 12 | Do you know where the word "memorable" |
| 08:01:01 | 13 | comes from? |
| 08:01:02 | 14 | A   I don't know the etymology, no. |
| 08:01:04 | 15 | Q   I'm going to ask you again: Can you |
| 08:01:06 | 16 | play the solo straight through? |
| 08:01:08 | 17 | Yes, you can, or no, you can't. |
| 08:01:08 | 18 | A   Absolutely not, not straight through. |
| 08:01:10 | 19 | Q   And you can just play a couple of |
| 08:01:11 | 20 | notes of the solo, correct? |
| 08:01:12 | 21 | A   I think I played more than a couple of |
| 08:01:14 | 22 | notes. |
| 08:01:15 | 23 | Q   What, a measure? |
| 08:01:16 | 24 | A   No, actually more than. I think I |

Page 151

| | | |
|---|---|---|
| 08:01:17 | 1 | played maybe the first six measures or so. |
| 08:01:19 | 2 | Q   Let's try it again and tell me when |
| 08:01:20 | 3 | you can't -- when you can no longer play further. |
| 08:01:24 | 4 | A   I don't think I can play anything more |
| 08:01:26 | 5 | than that. |
| 08:01:27 | 6 | Q   I don't want you to go into the |
| 08:01:29 | 7 | section at the end. I want you to go through as far |
| 08:01:32 | 8 | as you can go. |
| 08:01:32 | 9 | A   I think I've gone through as much as I |
| 08:01:32 | 10 | can go. |
| 08:01:33 | 11 | Q   I'd like to you do it again. |
| 08:01:35 | 12 | A   This is the opening (demonstrates). |
| 08:01:38 | 13 | That's it. That's the opening two |
| 08:01:54 | 14 | phrases. That's about as far as I can go in the |
| 08:01:57 | 15 | beginning. |
| 08:01:57 | 16 | Q   Got anything else? |
| 08:01:58 | 17 | A   No, just the ending (demonstrates). |
| 08:02:00 | 18 | That's the ending of the guitar solo |
| 08:02:03 | 19 | over an F chord (demonstrates). |
| 08:02:06 | 20 | That's about it. That's what I can |
| 08:02:09 | 21 | play by memory. |
| 08:02:11 | 22 | Q   Okay. Did you analyze the "Stairway |
| 08:02:13 | 23 | to Heaven" deposit copy? |
| 08:02:16 | 24 | MR. ANDERSON: Objection: asked |

Page 152

| | | |
|---|---|---|
| 08:02:16 | 1 | and answered. |
| 08:02:18 | 2 | A   I did go through the "Stairway to |
| 08:02:20 | 3 | Heaven" deposit copy, yes. |
| 08:02:21 | 4 | Q   Would you agree with me that based on |
| 08:02:23 | 5 | your analysis of the album recording, it had about |
| 08:02:28 | 6 | eleven to twelve thousand notes of "Stairway to |
| 08:02:30 | 7 | Heaven"? |
| 08:02:31 | 8 | A   About 11,000 notes, yes. |
| 08:02:31 | 9 | Q   The "Taurus" deposit copy, you'd agree |
| 08:02:35 | 10 | with me, did not have nearly that many notes, |
| 08:02:37 | 11 | correct? |
| 08:02:38 | 12 | A   Yes, that's correct. |
| 08:02:39 | 13 | Q   It had about three or four hundred, |
| 08:02:40 | 14 | correct? |
| 08:02:41 | 15 | MS. FREEMAN: Actually, no. |
| 08:02:42 | 16 | MR. ANDERSON: The "Taurus" |
| 08:02:42 | 17 | deposit copy? |
| 08:02:45 | 18 | Q   I'm sorry, "Stairway to Heaven" |
| 08:02:47 | 19 | deposit copy. |
| 08:02:47 | 20 | A   Yeah, "Stairway to Heaven" deposit |
| 08:02:47 | 21 | copy. |
| 08:02:48 | 22 | MR. ANDERSON: You said "Taurus" |
| 08:02:50 | 23 | deposit copy -- |
| 08:02:51 | 24 | THE WITNESS: Oh, I'm sorry. |

38 (Pages 149 to 152)

CONFIDENTIAL

---

**Page 153**

08:02:52 1    MR. ANDERSON: -- so the record
08:02:53 2    is going to be unclear.
08:02:57 3        Could we clarify?
08:02:58 4        MR. MALOFIY: Yes.
08:02:58 5        MR. ANDERSON: Thank you.
08:02:59 6    Q    The "Stairway to Heaven" deposit copy
08:03:01 7    has about three or four hundred notes, correct?
08:03:05 8    A    I already answered that. I don't know
08:03:08 9    how many notes are in the "Stairway to Heaven"
08:03:10 10   deposit copy, but they are much less.
08:03:12 11       MR. MALOFIY: I'm going to mark
08:03:14 12       this as 2708.
08:03:51 13       ("Stairway to Heaven" deposit
08:03:51 14       copy, D000562 through D000565, was
08:03:51 15       marked as Exhibit 2708 for
08:03:51 16       identification, as of this date.)
08:03:51 17   A    I think we're in agreement, I just
08:03:53 18   haven't counted the number of notes.
08:03:55 19   Q    Okay. I don't expect you to count, I
08:03:56 20   just want you to look at it.
08:03:58 21       Can you show me where on the deposit
08:03:59 22   copy it indicates the solo?
08:04:05 23   A    A solo is not indicated.
08:04:07 24   Q    It's not on the deposit copy, correct?

**Page 154**

08:04:09 1    Nowhere.
08:04:13 2    A    Hold on.
08:04:25 3        That's correct.
08:04:26 4    Q    You'd agree with me that the fanfare
08:04:29 5    is also not in the deposit copy, correct?
08:04:32 6    A    That's correct, yes.
08:04:33 7    Q    Now, is guitar part A of "Stairway to
08:04:51 8    Heaven" --
08:04:53 9    A    I'm sorry, guitar part?
08:04:55 10   Q    A, as Jimmy Page defines it.
08:04:59 11       Did you talk to Jimmy Page?
08:05:00 12   A    No.
08:05:01 13   Q    Did you talk to Robert Plant?
08:05:02 14   A    No.
08:05:03 15   Q    Why not?
08:05:04 16       MR. ANDERSON: Objection;
08:05:04 17       argumentative.
08:05:05 18   A    I don't know why not. I've never had
08:05:07 19   the opportunity to speak with either of them.
08:05:09 20   Q    Don't you think it would be important
08:05:11 21   to talk to them and ask them how they wrote the song
08:05:14 22   or where it came from?
08:05:15 23       MR. ANDERSON: Objection;
08:05:15 24       argumentative.

**Page 155**

08:05:16 1    A    I think what is important is for me to
08:05:19 2    look at the finished composition and to compare it
08:05:25 3    with the "Taurus" deposit copy in the case of my
08:05:31 4    first report objectively. That's what I've been
08:05:34 5    instructed to do.
08:05:35 6    Q    I understand that. But don't think
08:05:38 7    after you produced your report it would have been
08:05:41 8    prudent to talk to Mr. Jimmy Page or Robert Plant to
08:05:44 9    determine how the song was written?
08:05:47 10   A    It wouldn't bear upon my analysis.
08:05:51 11   Q    Well...
08:05:51 12   A    You're talking about how the song was
08:05:54 13   written. I mean, that is a kind of a priori, it's
08:05:58 14   like the creative process, how the music was going
08:06:00 15   through.
08:06:01 16       My point is music analysis is an a
08:06:04 17   posteriori, it's after the fact. Once they've gone
08:06:08 18   through all those creative things, everything that
08:06:10 19   they have decided to do, then, as a music analyst, I
08:06:14 20   deal with the finished product.
08:06:17 21       Would it be wonderfully interesting to
08:06:21 22   sit down and speak with either of them or both of
08:06:22 23   them about their creative process? Of course.
08:06:24 24   Q    But you didn't do that?

**Page 156**

08:06:24 1    A    No, because it would not impact on my
08:06:26 2    analysis.
08:06:27 3    Q    I understand. But you didn't do that,
08:06:28 4    correct?
08:06:29 5    A    I've already answered that.
08:06:30 6    Q    Okay.
08:06:30 7        And you could have done that, correct?
08:06:32 8        MR. ANDERSON: Objection; call
08:06:33 9        for speculation.
08:06:35 10   Q    Did you attempt to reach out to
08:06:37 11   counsel to reach out to Jimmy Page or Robert Plant?
08:06:41 12   A    No.
08:06:41 13   Q    Did anyone tell you you couldn't speak
08:06:43 14   to them?
08:06:44 15   A    No.
08:06:45 16   Q    Are you making any opinion at the time
08:06:47 17   of trial or are you going to render any opinions as
08:06:49 18   to access; in other words, whether or not Jimmy Page
08:06:53 19   and Robert Plant had a reasonable possibility of
08:06:56 20   access to the work of Spirit, Randy California, or
08:07:00 21   the song "Taurus"?
08:07:03 22       MR. ANDERSON: Objection to the
08:07:03 23       extent it calls for work product and how
08:07:06 24       his opinions are used by counsel.

39 (Pages 153 to 156)

**01650**

CONFIDENTIAL

---

**Page 157**

08:07:09 1     A   I do not plan to make any statements
08:07:12 2  about access.
08:07:15 3     Q   Are you familiar with whether or not
08:07:20 4  Jimmy Page and Robert Plant had access to "Taurus"
08:07:23 5  or were familiar with Spirit's work?
08:07:26 6         MR. ANDERSON:  Objection; vague,
08:07:27 7     ambiguous, and compound.
08:07:30 8     A   I have read conflicting reports online
08:07:37 9  at the beginning, perhaps, of the process that there
08:07:42 10  was -- no, it was an interview.  Maybe it was
08:07:47 11  mentioned in one of the reports, maybe in February,
08:07:49 12  one of the reports of -- plaintiff reported that
08:07:53 13  there was some discussion.
08:07:57 14         I don't recall, but, no, I can't say
08:08:01 15  that I know any facts whatsoever about any alleged
08:08:06 16  access.
08:08:07 17     Q   You didn't read Robert Plant or Jimmy
08:08:09 18  Page or John Paul Jones' deposition where they talk
08:08:13 19  about access to Spirit, to Randy California, to
08:08:18 20  opening up for Spirit, for having the album, for
08:08:24 21  hanging out with them, playing Snooker in the UK,
08:08:28 22  crashing their car after the concert.  You don't
08:08:31 23  know any of the facts, right?
08:08:32 24         MR. ANDERSON:  Objection;

---

**Page 158**

08:08:33 1     argumentative and compound.
08:08:35 2     A   I'm not aware of those things.
08:08:36 3     Q   Did you know they were friends at one
08:08:38 4  point?
08:08:38 5         MR. ANDERSON:  Objection.
08:08:38 6         MS. FREEMAN:  Objection.
08:08:39 7     Q   The band Led Zeppelin, the individual
08:08:42 8  members, and also the band Spirit.
08:08:43 9         MR. ANDERSON:  Objection;
08:08:43 10     mischaracterizes the evidence.
08:08:45 11         MR. MALOFIY:  Does not.
08:08:46 12     A   I am not aware of that.
08:08:48 13     Q   Is there any reason why you failed to
08:08:50 14  look at the deposition of Robert Plant and John Paul
08:08:53 15  Jones and Jimmy Page?
08:08:55 16         MR. ANDERSON:  Objection; calls
08:08:56 17     for speculation.  He's also testified --
08:09:00 18     A   Normally, I don't.  Normally, I deal
08:09:02 19  with just the finished works.
08:09:06 20         In this case, the deposit copy, which
08:09:09 21  my understanding has the copyright protection, and
08:09:13 22  what I understood to be the infringing work, not the
08:09:18 23  deposit copy of "Stairway to Heaven," that that was
08:09:21 24  not the infringing work.  My understanding was the

---

**Page 159**

08:09:24 1  purportedly infringing work is the composition
08:09:27 2  embodied in the sound recording of "Stairway to
08:09:30 3  Heaven."
08:09:32 4     Q   Is the arpeggiated guitar that's so
08:09:40 5  present in the first two minutes and fourteen
08:09:42 6  seconds of "Stairway to Heaven" represented in the
08:09:45 7  deposit copy?
08:09:46 8         MS. FREEMAN:  Objection to the
08:09:47 9     form of the question.
08:09:48 10     A   No, it is not.
08:09:49 11     Q   Do you know why?
08:09:50 12     A   No, I do not.
08:09:51 13     Q   Do you have opinion as to why?
08:09:53 14     A   No, I do not.
08:09:56 15     Q   I'm going to show you what's been
08:09:58 16  marked as 2709 -- what we're going to mark as 2709,
08:10:03 17  excuse me.
08:10:03 18         (Policy, Academic Integrity for
08:10:03 19     Students at NYU was marked as Exhibit
08:10:03 20     2709 for identification, as of this
08:10:03 21     date.)
08:10:33 22         MS. FREEMAN:  Francis, I'm going
08:10:34 23  to have to go to the ladies' room.  I
08:10:36 24  thought we were going to be finished

---

**Page 160**

08:10:36 1  and --
08:10:38 2         MR. MALOFIY:  I'm pretty much
08:10:39 3  wrapping up.
08:10:40 4         MS. FREEMAN:  What's that?
08:10:40 5         MR. MALOFIY:  I'm pretty much
08:10:40 6  wrapping up in about fifteen minutes or
08:10:40 7  so.
08:10:43 8         MR. ANDERSON:  Can we have a
08:10:44 9  time count?
08:10:45 10         How much time is left?
08:10:48 11         THE VIDEOGRAPHER:  So far on
08:10:49 12  this tape, we've gone 40 minutes.
08:10:51 13         MR. ANDERSON:  So, I think you
08:10:52 14  have six minutes left.
08:10:54 15         MR. MALOFIY:  Twelve.
08:10:56 16         MR. ANDERSON:  No, we did the
08:10:56 17  math and it was --
08:10:58 18         MR. MALOFIY:  There were a lot
08:10:59 19  of interruptions and there's been a lot
08:11:01 20  of breaks.
08:11:02 21         MR. ANDERSON:  I'm just trying
08:11:02 22  to get an answer.  So?
08:11:04 23         MR. MALOFIY:  I'm going to need
08:11:05 24  about 15 minutes to finish up, so see

---

40 (Pages 157 to 160)

CONFIDENTIAL

---

Page 161

08:11:09  1    what you can do.
08:11:09  2        Q    Mr. Ferrara, Academic Integrity for
08:11:13  3    Students at NYU, are you familiar with that?
08:11:15  4        A    Yes, I am.
08:11:15  5        Q    All right.  What do you think about
08:11:17  6    people stealing other people's music?  Do you think
08:11:20  7    it's okay?
08:11:21  8        MR. ANDERSON:  Objection;
08:11:21  9        argumentative, irrelevant.
08:11:23 10        A    If there's an actual theft -- I don't
08:11:30 11    know exactly how you're defining "theft."
08:11:34 12        Q    It's not a trick question:  Do you
08:11:36 13    think stealing music is okay?
08:11:38 14        MR. ANDERSON:  Can you let him
08:11:40 15        finish his answer before you interrupt
08:11:40 16        him?
08:11:40 17        A    The word "stealing" is highly charged.
08:11:44 18    For example, if someone hears somebody play Mary Had
08:11:47 19    a Little Lamb and then decides they like that and go
08:11:50 20    into a practice room and play Mary Had a Little
08:11:52 21    Lamb, if you're calling that "stealing" or even
08:11:56 22    "copying," what I would say is that that copying of
08:12:00 23    Mary Had a Little Lamb is perfectly okay because the
08:12:04 24    person -- the first person who was playing Mary Had

---

Page 162

08:12:07  1    a Little Lamb can't monopolize Mary Had a Little
08:12:12  2    Lamb.
08:12:13  3        Q    My question is not a trick question,
08:12:15  4    it's more basic:  Do you think stealing someone
08:12:19  5    else's music is okay?
08:12:21  6        A    Again, you're going to have to then
08:12:23  7    clarify what you mean by "stealing."  I've just
08:12:26  8    given you an example.
08:12:28  9        Would you consider the example I gave
08:12:30 10    as "stealing"? because I don't understand.
08:12:33 11        Q    If it's someone else's music, I think
08:12:36 12    the question implies that someone else owns it,
08:12:39 13    okay?
08:12:39 14        A    And you're using the word "stealing."
08:12:41 15        What I would properly have to say
08:12:43 16    is if someone copied someone else's music but
08:12:47 17    that -- the music of the first person was not
08:12:50 18    monopolizable, it was not protectable, it was
08:12:54 19    common, then it would be perfectly okay with respect
08:12:57 20    to copyright to make that copy.
08:13:00 21        Q    Does this question confuse you?
08:13:03 22        You either think it's okay to steal
08:13:05 23    someone else's music or you don't think it's okay to
08:13:08 24    steal someone else's music.  I just want to know

---

Page 163

08:13:10  1    what side of the fence you're on.
08:13:12  2        MR. ANDERSON:  Objection;
08:13:12  3        argumentative, harassing the witness.
08:13:12  4        MR. MALOFIY:  It's a simple
08:13:12  5        question.  Anyone in the world should be
08:13:15  6        able to answer it.
08:13:16  7        MR. ANDERSON:  It's a stupid
08:13:17  8        question.
08:13:17  9        MR. MALOFIY:  Oh, okay.
08:13:19 10        A    Once again, if you're -- you need to
08:13:20 11    clarify what you mean by "steal."  I gave you two
08:13:23 12    examples --
08:13:24 13        Q    If that's your answer, that's your
08:13:26 14    answer.  I like it.
08:13:26 15        MR. ANDERSON:  And I just want
08:13:26 16        to clarify, what I mean -- and I
08:13:26 17        apologize if I offended counsel.  I
08:13:29 18        expect I did not, but it is not a
08:13:31 19        question that I believe would be allowed
08:13:33 20        in court.
08:13:34 21        It's grandstanding.  You don't
08:13:36 22        have a jury here and you have all this
08:13:38 23        time to ask him questions, an expert
08:13:40 24        questions, and you keep asking --

---

Page 164

08:13:41  1        MR. MALOFIY:  You're just taking
08:13:43  2        up my time with speaking objections that
08:13:44  3        go on and on.
08:13:45  4        MR. ANDERSON:  It's not a
08:13:45  5        speaking objection.  I'm making a
08:13:46  6        statement.
08:13:46  7        MR. MALOFIY:  You don't like the
08:13:47  8        question.  To me, it's the most basic
08:13:49  9        question that anyone in the world would
08:13:51 10        know the answer to except for an expert
08:13:52 11        that's bought and paid and is given 80
08:13:55 12        to 100 thousand dollars.
08:13:56 13        MS. FREEMAN:  That's your
08:13:57 14        grandstand for the jury.
08:13:58 15        Q    No, it's not.  Now, if you're confused
08:14:01 16    by that question, I love your answer.  I thinks it's
08:14:04 17    beautiful.  You're confused by the question.  Fair
08:14:07 18    enough.  I'll move forward.
08:14:09 19        A    I didn't say that I was confused, I
08:14:11 20    just asked you to clarify "steal."
08:14:12 21        Q    I understand.
08:14:13 22        MS. FREEMAN:  Francis --
08:14:14 23        MR. MALOFIY:  I don't want to --
08:14:14 24        MS. FREEMAN:  -- this is not

---

41 (Pages 161 to 164)

01652

CONFIDENTIAL

Page 165

08:14:15 1 like the money in your pocket.
08:14:18 2 MR. MALOFIY: I don't want to
08:14:18 3 entertain --
08:14:18 4 MS. FREEMAN: "Stealing" has a
08:14:19 5 different meaning and you have to
08:14:23 6 first --
08:14:24 7 MR. MALOFIY: I don't --
08:14:26 8 MS. FREEMAN: You have first
08:14:27 9 have to quantify what it is that has
08:14:29 10 value and it is owned and by whom.
08:14:32 11 MR. MALOFIY: I don't want to
08:14:32 12 entertain speaking objections. I want
08:14:35 13 to move forward.
08:14:36 14 MR. ANDERSON: It's not an
08:14:36 15 objection. My problem is that obviously
08:14:37 16 everyone would not condone stealing;
08:14:39 17 however, you're asking it in a copyright
08:14:43 18 infringement case where you're making
08:14:45 19 claims of stealing --
08:14:47 20 MR. MALOFIY: Oh, man.
08:14:47 21 MR. ANDERSON: -- so people are
08:14:48 22 asking you to clarify, that's all.
08:14:50 23 Q    Listen, if that question tricks you,
08:14:51 24 that's fine. I don't want to --

Page 166

08:14:54 1 MS. FREEMAN: Maybe Randy
08:14:55 2 California stole it.
08:14:56 3 MR. MALOFIY: Listen, I don't
08:14:57 4 want to entertain counsel. I don't want
08:14:58 5 to entertain the speaking objections.
08:15:00 6 It's been going on the whole day.
08:15:03 7 Q    Now, if you're confused by the
08:15:04 8 question, so be it.
08:15:05 9 Hold on, hold on. Stop.
08:15:06 10 A    Sure.
08:15:07 11 Q    Let me ask my question. I ask it
08:15:07 12 again at trial, you can think about it again, and
08:15:09 13 then maybe you'll have a better answer for the jury.
08:15:11 14 So, let me just move forward.
08:15:13 15 MS. FREEMAN: Are we done?
08:15:14 16 MR. MALOFIY: No.
08:15:14 17 MS. FREEMAN: I thought we were
08:15:15 18 done T.
08:15:16 19 MR. MALOFIY: No, we're not
08:15:16 20 done. I spent five minutes addressing
08:15:19 21 nonsense over here.
08:15:20 22 Q    Now, Academic Integrity for Students
08:15:23 23 at NYU, are you familiar with the policy?
08:15:24 24 A    Asked and answered, sir.

Page 167

08:15:25 1 Q    It says: Following are examples of
08:15:27 2 behaviors that compromise the academic and
08:15:30 3 intellectual community of NYU. It's not an
08:15:33 4 exhaustive list.
08:15:34 5 It goes on: One, plagiarism.
08:15:35 6 Presenting others' work without adequate
08:15:39 7 acknowledgment of its source, as though it were
08:15:41 8 one's own.
08:15:41 9 A    Sir, where are you?
08:15:43 10 Q    Right there, plagiarism.
08:15:44 11 MR. ANDERSON: Slow down for the
08:15:44 12 court reporter.
08:15:47 13 A    That's number one, plagiarism. Go
08:15:48 14 ahead.
08:15:49 15 Q    Plagiarism: Presenting others' work
08:15:51 16 without adequate acknowledgment of its source, as
08:15:54 17 though it was one's own. Plagiarism is a form of
08:15:59 18 fraud. We all stand on the shoulders of others, and
08:16:02 19 we must give credit to the creators of the works
08:16:05 20 that we incorporate into products that we call our
08:16:08 21 own.
08:16:08 22 Do you agree with that statement or do
08:16:10 23 you disagree with that statement?
08:16:13 24 A    I agree with that statement.

Page 168

08:16:15 1 And I want to make absolutely clear
08:16:17 2 that, for example, if I am giving an exam and a
08:16:21 3 student looks at another student's exam and sees
08:16:26 4 section one and doesn't know that this is section
08:16:30 5 one of the class and they need to put that at the
08:16:33 6 top of their page, that's not plagiarism, that's not
08:16:37 7 stealing, because simply copying the section number
08:16:40 8 is copying common information. If one reads in a
08:16:48 9 book that Columbus came to America in 1492, you
08:16:52 10 don't have to say I read Columbus came to America in
08:16:57 11 1492 because it's common information.
08:16:59 12 So, that is why I didn't -- that is
08:17:02 13 why I -- what I tried to get you to do is clarify
08:17:05 14 what you mean by "plagiarism," by what you mean by
08:17:08 15 "stealing." If you would consider taking that
08:17:12 16 statement Columbus came to America in 1492 and
08:17:16 17 said, well, you read that in this history book and
08:17:18 18 you're stealing it -- the point is I don't
08:17:21 19 understand how you're using "stealing."
08:17:23 20 I'm asking to you qualify how you're
08:17:25 21 using "stealing." I'm asking you to qualify
08:17:26 22 "plagiarism."
08:17:26 23 Q    All right.
08:17:26 24 A    Plagiarism is when you -- plagiarism

42 (Pages 165 to 168)

CONFIDENTIAL

Page 169

08:17:29  1   in the academic world is when you take original
08:17:35  2   expression from somebody else, not just simply
08:17:39  3   copying the section number or taking facts that are
08:17:43  4   ready available to everyone that are common.
08:17:48  5       Q   Let me go to the -- do you agree with
08:17:49  6   NYU's policy on plagiarism?
08:17:51  7           Yes, you did; no, you don't.
08:17:52  8       A   Yes, I do.
08:17:53  9       Q   Okay.
08:17:54 10       A   Once again, I've just qualified what
08:17:55 11   we mean "plagiarism."
08:17:57 12       Q   Well, it gives some examples here of
08:17:58 13   plagiarism.  And these aren't trick questions, you
08:18:00 14   know, what it means to steal music, what it means to
08:18:02 15   plagiarize someone else's work.  These are very
08:18:05 16   basic questions.
08:18:07 17           And it gives examples of plagiarism:
08:18:07 18   Sequence of words incorporated without quotation
08:18:09 19   marks.
08:18:10 20           Gives another example:  An
08:18:12 21   unacknowledged passage paraphrased from another's
08:18:15 22   work.
08:18:17 23           There's another examples:  Use of
08:18:17 24   ideas, sound recordings, computer data, or images

Page 170

08:18:21  1   created by others as though it were one's own.
08:18:24  2           Do you agree with the examples that
08:18:25  3   are identified here as plagiarism?
08:18:27  4       A   Absolutely, with the qualification a
08:18:30  5   sequence of words.  "They went to the park."  You
08:18:33  6   read "they went to the park" in a short story.  NYU
08:18:37  7   does not expect you to put quotes on that because
08:18:41  8   you read "they went to the park" in a short story.
08:18:45  9   That's a common phrase that no one can own, no one
08:18:49 10   can protect.
08:18:51 11           So, what you're missing in your use of
08:18:53 12   the word "steal," in your use of the word
08:18:56 13   "plagiarism," is the fact that there are things you
08:19:00 14   do not have to cite, that you do not have to quote
08:19:03 15   because no one can own them.
08:19:06 16       Q   All right.  Let me just finish.
08:19:07 17       A   That is Plagiarism 101 in the academic
08:19:12 18   world.
08:19:12 19       Q   Let me go -- and, again, I appreciate
08:19:14 20   the long response, but these are more pointed
08:19:17 21   questions.
08:19:17 22           Cheating:  Deceiving a faculty member
08:19:20 23   or other individual who assesses student performance
08:19:23 24   into believing that one's mastery of a subject or

Page 171

08:19:26  1   discipline is greater than it is by a range of
08:19:27  2   dishonest methods, including, but not limited to...
08:19:30  3           And it goes on to:  Submitting work --
08:19:32  4   papers, homework assignments, computer programs,
08:19:33  5   experimental results, artwork, et cetera -- that was
08:19:39  6   credited by another, substantially or in whole, as
08:19:43  7   one's own.
08:19:44  8           Do you agree with that?
08:19:45  9           MR. ANDERSON:  Objection.
08:19:46 10       A   Yeah, the words "substantially or in
08:19:48 11   whole" is particularly important.
08:19:49 12           MR. ANDERSON:  Objection.
08:19:50 13       Q   Do you agree with that statement by
08:19:51 14   NYU?
08:19:51 15           MR. ANDERSON:  Objection;
08:19:52 16           argumentative, also vague and ambiguous.
08:19:55 17       Q   Do you agree with NYU's academic and
08:19:58 18   policy as it relates to plagiarism and cheating?
08:20:02 19           Yes, you do; no, you don't.
08:20:04 20       A   Yes, I do.  I already qualified my
08:20:06 21   answers.
08:20:07 22       Q   Next thing, anywhere in your analysis,
08:20:09 23   in your Rule 26 expert report, your rebuttals, or
08:20:13 24   anywhere else did you identify a song "To Catch a

Page 172

08:20:19  1   Shad"?
08:20:20  2       A   No.
08:20:20  3       Q   Do you know what I'm talking about
08:20:22  4   when I say "To Catch a Shad"?
08:20:22  5       A   Yes, I do.
08:20:23  6       Q   When did you discover that song?
08:20:26  7       A   To the best of my recollection, in a
08:20:28  8   telephone conversation with Mr. Anderson, I was
08:20:31  9   asked to listen to "To Take a Shad" by Modern Folk
08:20:39 10   Quartet.  I downloaded it from iTunes from their
08:20:45 11   1963 album of the name of the group, and I listened
08:20:49 12   to it and I transcribed it.
08:20:55 13       Q   Did you transcribe it accurately?
08:20:58 14       A   I believe I did, yes.
08:21:00 15       Q   Did you produce it to your counsel
08:21:02 16   Mr. Anderson?
08:21:03 17       A   Yes, I did.
08:21:04 18       Q   When did you do that?
08:21:05 19       A   Let's see, a week ago?  At least a
08:21:17 20   week ago.  I'm not --
08:21:17 21       Q   When was the first time you heard the
08:21:18 22   song "To Catch a Shad"?
08:21:21 23       A   Perhaps -- well, I don't remember.  It
08:21:24 24   may have been a few weeks ago that I heard it.  The

43  (Pages 169 to 172)

CONFIDENTIAL

---

Page 173

08:21:27  1    transcription of it would have been sent to
08:21:30  2    Mr. Anderson perhaps a week ago, but it could be a
08:21:35  3    week weak and a half ago. I don't remember exactly.
08:21:38  4         Q    Did you disclose the song to
08:21:39  5    Mr. Anderson or did Mr. Anderson disclose the song
08:21:42  6    to you?
08:21:43  7         A    I've already answered that.
08:21:44  8    Mr. Anderson called me and asked me to please listen
08:21:49  9    to "To Catch a Shad" by Modern Folk Quartet, and,
08:21:55  10   once again, I looked it up and there it was in
08:21:59  11   iTunes off their album, the name of the group, 1963.
08:22:03  12        I downloaded it, I analyzed it, I
08:22:06  13   noticed that at the opening and then at one minute
08:22:09  14   44 seconds that the guitar -- section two guitars,
08:22:11  15   as I recall they're playing, that there was a
08:22:16  16   four-measure phrase that was obviously very close to
08:22:21  17   particularly the music in "Stairway to Heaven".
08:22:24  18        Q    Did you ever analyze the deposit copy
08:22:28  19   of "To Catch a Shad"?
08:22:29  20        A    No.
08:22:29  21        Q    You didn't?
08:22:30  22        A    No.
08:22:31  23        Q    Is it your testimony or do you believe
08:22:33  24   that it's substantially similar to "Stairway to

---

Page 174

08:22:35  1    Heaven"?
08:22:38  2         A    To the extent that I understand the
08:22:43  3    legal term "substantial similarity," I do not; that
08:22:47  4    is, I don't think that "Stairway to Heaven" --
08:22:54  5    because, obviously, "To Catch a Shad" came first.
08:22:58  6    It's 1963.
08:23:00  7         Do I think they're substantially
08:23:02  8    similar?  No for two reasons:  The first is given
08:23:06  9    how widely the similar expression in the two works
08:23:12  10   was and has been in that whole period, I think that
08:23:17  11   undermines a finding of copying; but more important,
08:23:25  12   that the similarities don't represent protected
08:23:32  13   expression.
08:23:32  14        The similarities, I don't see -- once
08:23:37  15   you filter out the common, unprotected expression, I
08:23:45  16   don't see enough left that would support a
08:23:51  17   musicological finding of the copying of protected
08:23:57  18   expression.  I certainly don't see anything in terms
08:24:00  19   of, like, a new arrangement of elements that would
08:24:06  20   make "To Catch a Shad" something that would be
08:24:09  21   protectable in terms of what is similar because it's
08:24:12  22   not completely similar.  There are differences
08:24:14  23   between it and --
08:24:16  24        Q    The part you find similar I imagine is

---

Page 175

08:24:18  1    descending --
08:24:18  2              MR. ANDERSON:  You keep cutting
08:24:20  3    him off.  Can you wait until he
08:24:20  4    finishes?
08:24:20  5              MR. MALOFIY:  I don't believe I
08:24:21  6    did cut him off.
08:24:22  7              THE WITNESS:  I was going to
08:24:23  8    finish a sentence or two, but it's okay.
08:24:24  9    Please go ahead.
08:24:26  10        Q    Do you believe the arpeggiate guitar
08:24:27  11   part in "To Catch a Shad" is substantially similar
08:24:32  12   to the arpeggiate guitar part that happens in the
08:24:36  13   first two minutes and fourteen seconds of "Stairway
08:24:38  14   to Heaven"?
08:24:39  15        A    My answer is in two parts:  The first
08:24:40  16   is no, I do not as I understand the term
08:24:43  17   "substantial similarity;" and, two, notably, it is
08:24:47  18   more similar to the guitar part in "Stairway to
08:24:50  19   Heaven" than the lower clef and combined with the
08:24:57  20   upper clef, if you wish, in the deposit copy of
08:25:01  21   "Taurus," let alone in the acoustic guitar part in
08:25:05  22   the "Taurus" studio version is to "Stairway to
08:25:08  23   Heaven."
08:25:09  24        Q    Did you consider Led Zeppelin's

---

Page 176

08:25:11  1    history of misappropriating music from other artists
08:25:16  2    and claiming it as their own in coming to any of
08:25:20  3    your opinions?
08:25:21  4              MS. FREEMAN:  Objection to the
08:25:22  5    form of the question, assumes a fact not
08:25:24  6    in evidence.
08:25:25  7              MR. ANDERSON:  Join.
08:25:26  8         A    No, I did not consider any history of
08:25:29  9    other works with respect to Led Zeppelin as a group.
08:25:34  10   I concentrated on what was at issue with these two
08:25:38  11   songs and then did the appropriate view of prior art
08:25:43  12   and scholarships and the books that I've cited and
08:25:46  13   so forth about essentially what's at issue, which is
08:25:49  14   this descending chromatic line progression.
08:25:52  15        Q    As you sit here today, are you
08:25:56  16   familiar of Led Zeppelin or the individual members
08:25:59  17   having to change credits on the albums to credit
08:26:02  18   other artists?
08:26:04  19             MR. ANDERSON:  Objection;
08:26:04  20   argumentative, lacks foundation, assumes
08:26:08  21   facts not in evidence, and, also, it's
08:26:10  22   within the pending motion in limine on
08:26:14  23   the subject.
08:26:16  24             THE WITNESS:  Am I allowed

---

44 (Pages 173 to 176)

CONFIDENTIAL

| Page 177 | Page 179 |

**Page 177**

```
08:26:18  1        answer it?
08:26:18  2             MR. ANDERSON:  Yes, if you
08:26:18  3        understand.
08:26:20  4        A    My understanding -- again, this would
08:26:23  5   not be something that I would take into account in
08:26:25  6   analysis of the two works at issue.
08:26:28  7        My understanding is that "Dazed and
08:26:32  8   Confused" was credited after the fact to Jake
08:26:36  9   Holmes.  And there's another song, I'm going to
08:26:44 10   love -- based on the Joan Baez song.
08:26:48 11        Q    "Babe, I'm Gonna Leave You"?
08:26:50 12        A    Thank you, "Babe I'm Gonna Leave You."
08:26:55 13        My understanding there was that the
08:26:56 14   writers in Led Zeppelin thought that it was a folk
08:26:58 15   song and discovered later that, in fact, it had
08:27:04 16   actually -- that it was a traditional song, as we
08:27:08 17   use the word "traditional," but, in fact, that it
08:27:12 18   had been written by a folk music writer prior to
08:27:15 19   Joan Baez and, in fact, that person held a copyright
08:27:19 20   on it, and I believe that person was then credited.
08:27:22 21        Those are the two instances that I'm
08:27:25 22   aware of.
08:27:32 23        Q    Those are the only two instances
08:27:34 24   you're aware of?
```

**Page 178**

```
08:27:35  1             MR. MALOFIY:  I'm sorry.
08:27:35  2             MR. ANDERSON:  I was just going
08:27:36  3   to say while you're thinking, if we
08:27:39  4   could have a time count.
08:27:41  5             THE VIDEOGRAPHER:  Right now
08:27:42  6   we're at 57 minutes on the tape.
08:27:45  7             MR. ANDERSON:  So, we're 11
08:27:46  8   minutes past the seven hours.
08:27:48  9             MR. MALOFIY:  I'll be done in
08:27:50 10   five minutes.
08:27:52 11             MS. FREEMAN:  You only have
08:27:53 12   three.
08:27:53 13             MR. MALOFIY:  I have three?
08:27:53 14             MS. FREEMAN:  57 minutes on the
08:27:54 15   tape.
08:27:55 16             MR. MALOFIY:  You want to give
08:27:56 17   me five minutes, Peter?
08:27:57 18             MR. ANDERSON:  Three minutes on
08:27:59 19   the tape, but I'm not going to -- you
08:28:01 20   didn't give me any time, but let's use
08:28:04 21   the three minutes on the tape.
08:28:08 22             THE WITNESS:  You're actually
08:28:08 23   over eight minutes.  You had 49 minutes
08:28:10 24   left -- or 46 minutes left.  You're
```

**Page 179**

```
08:28:10  1   actually over 11 minutes.
08:28:11  2             MR. MALOFIY:  Let me finish up a
08:28:13  3   couple questions.
08:28:13  4             THE WITNESS:  I'm happy to
08:28:15  5   answer any questions that you have sir,
08:28:15  6   but you didn't give me an opportunity to
08:28:17  7   say -- to provide an answer to your last
08:28:21  8   question.
08:28:21  9             MR. MALOFIY:  I'm sorry.  Go
08:28:23 10   ahead.  I don't even remember the last
08:28:23 11   question, so go ahead.
08:28:33 12        (Record read.)
08:28:34 13        A    Yes.
08:28:35 14        Q    Did you ever look to see what Led
08:28:37 15   Zeppelin's songwriting process was --
08:28:41 16             MR. ANDERSON:  Objection;
08:28:41 17   vague --
08:28:41 18        Q    -- to determine --
08:28:42 19             MR. ANDERSON:  Sorry.
08:28:42 20        Q    -- how they allegedly came up with
08:28:45 21   original material?
08:28:47 22             MR. ANDERSON:  Objection; vague
08:28:47 23   and ambiguous.
08:28:49 24        A    No.
```

**Page 180**

```
08:28:49  1        Q    And you didn't read the deposition of
08:28:51  2   Robert Plant or John Paul Jones or Jimmy Page to
08:28:54  3   determine how they actually went about writing
08:28:57  4   songs?
08:28:58  5             MR. ANDERSON:  I think asked and
08:28:59  6   answered.
08:28:59  7        A    Yeah, I believe I answered that.  No.
08:29:02  8        Q    Did you consider any admissions by
08:29:04  9   Robert Plant, Jimmy Page, or John Paul Jones in
08:29:11 10   coming to your opinions here today?
08:29:13 11             MS. FREEMAN:  Objection to the
08:29:13 12   form of the question; ambiguous, vague,
08:29:19 13   and I don't know what -- admissions as
08:29:23 14   to what, Francis?
08:29:25 15        A    I'm not aware of any admissions, and
08:29:29 16   so, therefore, they certainly could not have figured
08:29:31 17   into my analysis or opened --
08:29:35 18        Q    Do you believe access is an important
08:29:37 19   component to a copyright case?
08:29:40 20             MR. ANDERSON:  Objection; calls
08:29:40 21   for legal conclusion.
08:29:41 22        A    That was going to be my point:  I
08:29:43 23   don't consider access as a musicologist implementing
08:29:48 24   what I understand to be called the extrinsic
```

CONFIDENTIAL

Page 181

08:29:50 1    testifies. I deal with the works at issue and with
08:29:53 2    any related prior art.
08:29:55 3        Q    Have you ever considered access in
08:29:57 4    regards to forming your expert opinion?
08:29:59 5        A    Considered it a priori? I don't
08:30:01 6    recall.
08:30:02 7        Q    Do you dispute the qualifications of
08:30:04 8    Alexander Stewart to be able to opine as to
08:30:07 9    musicological opinion?
08:30:10 10        A    I don't dispute his qualifications to
08:30:12 11    opine.
08:30:13 12        Q    Do you dispute the qualifications of
08:30:17 13    Eric Johnson to opine on musicological opinion?
08:30:21 14        MR. ANDERSON:  Objection; lacks
08:30:22 15        foundation.
08:30:23 16        A    I don't know enough about Eric
08:30:25 17    Johnson.
08:30:26 18        Q    If I asked you the same question as it
08:30:28 19    relates to Kevin Hanson, would it be the same
08:30:31 20    answer?
08:30:31 21        A    Yes.
08:30:32 22        Q    And if I ask the same question as it
08:30:34 23    relates to Brian Bricklin, would it be the same
08:30:37 24    answer?

Page 182

08:30:37 1        A    Yes.
08:30:37 2        Q    Do you intend to offer any opinion as
08:30:39 3    to economic damages at time of trial?
08:30:42 4        MR. ANDERSON:  Objection to the
08:30:42 5        extent it calls for work product and how
08:30:47 6        counsel will use Dr. Ferrara's
08:30:50 7        testimony.
08:30:50 8        A    I haven't provided any findings with
08:30:53 9    respect to what an economist would do. As you know,
08:30:59 10    in a final section, the final attachment of my
08:31:04 11    initial report, there is a quantitative value
08:31:07 12    assessment. How defendants' counsel will ultimately
08:31:11 13    use that with respect to damages, I don't know.
08:31:15 14        Q    But to be clear, you don't intend to
08:31:18 15    offer any opinion as to the actual damages, the
08:31:24 16    dollar value of the damages at the time of trial,
08:31:27 17    correct?
08:31:28 18        MR. ANDERSON:  Same objections.
08:31:30 19        A    I have no idea what the dollars are,
08:31:32 20    so, no, this is something that I don't discuss.
08:31:35 21        What I have provided, again, is a
08:31:37 22    quantitative assessment of the number of notes that
08:31:40 23    are actually at issue. But nothing to do with
08:31:44 24    dollars.

Page 183

08:31:45 1        Q    Are you qualified to render an
08:31:47 2    economic damages opinion?
08:31:49 3        MR. ANDERSON:  Objection; calls
08:31:50 4        for a legal conclusion. That's the
08:31:53 5        judge's province. Also vague and
08:31:56 6        ambiguous.
08:31:57 7        A    I'm not quite sure what you mean by an
08:32:00 8    "economic" -- no, I don't know what that means.
08:32:02 9        Q    I'm not talking about quantitative or
08:32:05 10    qualitative analysis musicologically, I'm talking
08:32:05 11    strictly are you qualified to render economic
08:32:10 12    damages opinion?
08:32:13 13        MR. ANDERSON:  Objection; vague
08:32:14 14        and ambiguous.
08:32:16 15        A    To the extent that the economic
08:32:19 16    outcome has nothing to do with the quantitative
08:32:24 17    assessment at the end of my initial report, to the
08:32:28 18    extent that it has nothing to do, then the answer
08:32:31 19    would be that it has nothing to do with economics.
08:32:34 20        To the extent that the judge or
08:32:36 21    anybody else thinks that it does have something to
08:32:39 22    do, and I don't -- I'm not suggesting that I know
08:32:44 23    the rationale for that, but to the extent that that
08:32:47 24    would be the case, then I guess the answer would be

Page 184

08:32:49 1    yes, but that's outside my province.
08:32:51 2        Q    To be clear, you don't intend to say
08:32:54 3    the song is worth this or this part of infringement
08:32:56 4    is worth X amount of dollars. Your testimony is
08:33:00 5    going to be on the quantitative and qualitative
08:33:02 6    analysis based upon your musicological analysis, not
08:33:06 7    tying it directly to dollars cents, correct?
08:33:08 8        MR. ANDERSON:  Objection;
08:33:08 9        mischaracterizes the testimony, it's
08:33:11 10        vague and ambiguous.
08:33:12 11        A    I would not be directly tying any
08:33:15 12    analysis that I've given to dollars.
08:33:17 13        Q    Do you know who MJQ is?
08:33:19 14        A    No.
08:33:19 15        Q    Do you know who Modern Jazz Quartet
08:33:21 16    is?
08:33:23 17        A    Yes.
08:33:24 18        Q    Why?
08:33:24 19        A    Why do I know?
08:33:26 20        Q    Yeah?
08:33:27 21        A    It's -- I mean, I know the name of the
08:33:30 22    group.
08:33:34 23        Q    All right.
08:33:38 24        MS. FREEMAN:  Is that your next

46 (Pages 181 to 184)

CONFIDENTIAL

Page 185

08:33:39 1    gig, Francis?
08:33:46 2         MR. MALOFIY: Where are we at
08:33:47 3    with time?
08:33:48 4         MS. FREEMAN: Out. Out of time.
08:33:51 5         THE VIDEOGRAPHER: An hour and
08:33:51 6    three minutes.
08:33:54 7         THE WITNESS: Sixteen minutes
08:33:55 8    over.
08:33:55 9         MR. ANDERSON: You wanted 15
08:33:58 10   minutes. We've gone to 16, 17 minutes,
08:34:00 11   so we're done.
08:34:02 12        MR. MALOFIY: Well, we have to
08:34:02 13   actually suspend this deposition because
08:34:04 14   there's the whole issue of conflict,
08:34:06 15   there's the whole issue of these prior
08:34:09 16   report -- this prior opinion that was
08:34:12 17   never disclosed.
08:34:12 18        There's also the whole issue of
08:34:14 19   Dr. Ferrara providing a prior opinion
08:34:19 20   and being retained by a different music
08:34:22 21   group, which is at serious issue in this
08:34:25 22   case because they have and they are
08:34:28 23   attempting to assert financial and
08:34:31 24   economic interest in this case. And

Page 186

08:34:33 1    that is of deep and grave concern for
08:34:35 2    us. We will be raising that with the
08:34:37 3    Court and we do believe we're entitled
08:34:40 4    to all the documents, communications and
08:34:42 5    discovery related thereto.
08:34:44 6    Q    With that being said, I do notice that
08:34:47 7    in your invoices there's about $80,000.
08:34:50 8         Is there any amount that hasn't been
08:34:52 9    paid yet or any amount that hasn't been billed yet
08:34:55 10   and indicated in the invoices?
08:34:57 11        MR. ANDERSON: Objection,
08:34:57 12   compound.
08:34:58 13   A    Yes. Any hours that were spent
08:35:00 14   subsequent to my last invoice.
08:35:03 15   Q    Do you know how many there were?
08:35:04 16   A    I do not.
08:35:05 17   Q    Approximately?
08:35:06 18   A    No, but certainly today is going to
08:35:09 19   add a lot of hours.
08:35:10 20   Q    Besides today?
08:35:11 21   A    No -- well, there will be a good
08:35:16 22   amount of hours because I worked on looking at the
08:35:24 23   reports that were submitted on May 2.
08:35:29 24   Q    How many hours, you think?

Page 187

08:35:30 1    A    I don't know.
08:35:31 2    Q    Is it more than 20?
08:35:32 3    A    I don't recall.
08:35:33 4    Q    More than 50?
08:35:35 5    A    I can't imagine more than 50, no.
08:35:38 6    Q    You can supplement that answer.
08:35:42 7         MR. ANDERSON: Okay. I need you
08:35:42 8    to --
08:35:42 9    Q    Last thing on the piano. A to B, B to
08:35:45 10   C, C to F sharp, which you identify as the most
08:35:49 11   memorable and creative parts of "Stairway," that
08:35:51 12   ascending line, can you -- are you able to play
08:35:54 13   that?
08:35:55 14   A    You've mischaracterized my report. I
08:35:58 15   didn't say that those three paired notes are the
08:36:02 16   most memorable part of "Stairway," did I?
08:36:08 17   Q    Oh. You want to clarify?
08:36:11 18        I thought you said that was what was
08:36:13 19   memorable about the guitar part in what I'll define
08:36:17 20   as the first two minutes and fourteen seconds.
08:36:20 21   A    You just said "Stairway."
08:36:21 22   Q    I apologize. Let's focus on the first
08:36:25 23   two minutes and fourteen seconds. The first two
08:36:27 24   minutes fourteen seconds, the guitar arpeggio in

Page 188

08:36:29 1    "Stairway to Heaven," you identify the A to the B,
08:36:32 2    the B to the C, C to the F sharp as memorable and
08:36:35 3    creative.
08:36:36 4         Can you play those -- that note phrase
08:36:40 5    on the keyboard?
08:36:42 6    A    Yes.
08:36:42 7         We're leaving out, then, everything
08:36:44 8    else that's going on, all the parts that are not at
08:36:46 9    issue --
08:36:46 10   Q    Yeah.
08:36:47 11   A    We're leaving out the vocal melody.
08:36:48 12   We're just talking about the opening so
08:36:48 13   (demonstrating).
08:36:48 14        I'll use the pedal, if you don't mind
08:36:59 15   (demonstrating).
08:37:01 16        So, here we had (demonstrating) A, B,
08:37:03 17   which is that upper line.
08:37:05 18   Q    Let me just ask the question again
08:37:07 19   because I don't want you to do the -- I don't need
08:37:09 20   to you play the beginning, I just want you to play
08:37:11 21   the A to B, B to C, C to F sharp phrase that's
08:37:15 22   present in the "Stairway to Heaven" guitar
08:37:20 23   arpeggiation in the first two minutes and fourteen
08:37:22 24   seconds as you've identified in your report.

47 (Pages 185 to 188)

CONFIDENTIAL

Page 189

08:37:24 1    A   Okay.
08:37:25 2        MR. ANDERSON:  Objection; vague
08:37:25 3    and ambiguous and argumentative as to
08:37:28 4    use of the word "phrase."
08:37:30 5    A   You're misrepresenting what is in my
08:37:32 6    report.  What my report says is that it is because
08:37:35 7    it's a contrapuntal line, and if I were to play that
08:37:40 8    in isolation, as you just asked (demonstrating),
08:37:45 9    that's what you asked me to do, the point is
08:37:47 10   isolated that like that they're almost meaningless.
08:37:52 11       What is meaningful is what I was
08:37:54 12   trying to do and that is to play it within the
08:37:56 13   context of the overall part.
08:37:59 14   Q   I understand.  I just --
08:38:00 15       MR. ANDERSON:  No, no, you're
08:38:00 16   way past.
08:38:01 17       MR. MALOFIY:  I just want him to
08:38:03 18   play those notes without all the
08:38:05 19   editorializing.
08:38:07 20   Q   Can you play --
08:38:08 21       MS. FREEMAN:  No, let's just --
08:38:09 22   A   I just did.
08:38:10 23   Q   Without talking over it, that's all I
08:38:11 24   want.  Can you play the A to B --

Page 190

08:38:12 1        MR. ANDERSON:  No, no, we're
08:38:13 2    done.
08:38:13 3    Q   -- B to C --
08:38:14 4        MS. FREEMAN:  No, no --
08:38:14 5    Q   -- c to F sharp?
08:38:14 6        MS. FREEMAN:  Time up, time up.
08:38:15 7    Francis, you may have nowhere
08:38:17 8    you want to go, you may have nothing
08:38:17 9    that you want to do --
08:38:18 10       MR. ANDERSON:  No, this isn't
08:38:19 11   about that, this isn't about that.
08:38:21 12       Francis has stopped all of the
08:38:23 13   depositions last week right at seven
08:38:25 14   hours.  We've given him an extra 15 or
08:38:28 15   20 minutes.
08:38:28 16       And you know it's got to end,
08:38:30 17   Francis.  This deposition was supposed
08:38:32 18   to start at 12 noon --
08:38:34 19       MR. MALOFIY:  I took all the
08:38:35 20   time off for you.
08:38:36 21       MR. ANDERSON:  You delayed it
08:38:37 22   and, you know, now it is, by my
08:38:40 23   reckoning without my glasses, 8:40.  So,
08:38:44 24   look, we're done.

Page 191

08:38:46 1        MR. MALOFIY:  8:35.
08:38:48 2        MR. ANDERSON:  You've gotten
08:38:49 3    more than seven hours that you weren't
08:38:49 4    even intended.
08:38:50 5        MR. MALOFIY:  Well, to be clear,
08:38:51 6    I took off any time that we didn't start
08:38:55 7    when we intended to, and that is fair.
08:38:58 8        MS. FREEMAN:  That was an hour,
08:38:58 9    Francis.
08:38:59 10       MR. MALOFIY:  And we're
08:38:59 11   suspending this deposition because,
08:38:59 12   clearly, there's issues as I've already
08:39:01 13   identified, and we'll have to raise that
08:39:03 14   with the Court now.
08:39:07 15       MR. ANDERSON:  Good-bye, folks.
08:39:09 16       THE COURT:  The time is
08:39:09 17   8:38 p.m.  This marks the ending of Tape
08:39:14 18   3 and the testimony of today.
08:39:19 19       Off the record.
         20       (Whereupon, at 8:38 o'clock
         21   p.m., the deposition was concluded.)
         22
         23
         24

Page 192

1        C E R T I F I C A T E
2
3    STATE OF_____:
4    COUNTY/CITY OF_____:
5
6    Before me, this day, personally appeared
7    LAWRENCE FERRARA, Ph.D., who, being duly sworn,
8    states that the foregoing transcript of his/her
9    Deposition, taken in the matter, on the date, and at
10   the time and place set out on the title page hereof,
11   constitutes a true and accurate transcript of said
12   deposition.
13
14       _____
15       LAWRENCE FERRARA, Ph.D.
16
17   SUBSCRIBED and SWORN to before me this_____
18   day of _____, 2016, in the
19   jurisdiction aforesaid.
20
21   _____     _____
22   My Commission Expires    Notary Public
23
24

ZANARAS REPORTING & VIDEO
1.877.GO.DEPOS

CONFIDENTIAL

Page 193

```
 1          DEPOSITION ERRATA SHEET
 2   CASE CAPTION:  SKIDMORE vs. LED ZEPPELIN, et al.
     DEPONENT:  LAWRENCE FERRARA, Ph.D.
 3   DEPOSITION DATE: May 27, 2016

 4
     To the Reporter:
 5   I have read the entire transcript of my Deposition
     taken in the captioned matter or the same has been
 6   read to me.  I request for the following changes
     be entered upon the record for the reasons
 7   indicated.
     I have signed my name to the Errata Sheet and the
 8   appropriate Certificate and authorize you to
     attach both to the original transcript.
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22
23   SIGNATURE:_____ DATE:_____
24          LAWRENCE FERRARA, Ph.D.
```

Page 194

```
 1          C E R T I F I C A T E
 2   STATE OF NEW YORK )
                       ) ss.
 3   COUNTY OF NEW YORK )
 4          We, CAROL MELE and LINDA A.
 5   MARINO, Registered Professional Shorthand
 6   (Stenotype) Reporters and Notaries Public
 7   of the State of New York, do hereby
 8   certify that the foregoing Deposition of
 9   the Witness, LAWRENCE FERRARA, Ph.D taken
10   at the time and place aforesaid, is a
11   true and correct transcription of our
12   shorthand notes.
13          We further certify that we are
14   neither counsel for nor related to any
15   party to said action, nor in any wise
16   interested in the result or outcome
17   thereof.
18          IN WITNESS WHEREOF, we have
19   hereunto set our hands this 1st day of
20   June, 2016.
21   _____
22          CAROL MELE, RPR
23   _____
24          LINDA A. MARINO, RPR, CCR
```

49 (Pages 193 to 194)

CONFIDENTIAL

Page 194

1                 C E R T I F I C A T E

2   STATE OF NEW YORK   )
                         ) ss.
3   COUNTY OF NEW YORK )

4                    We, CAROL MELE and LINDA A.

5             MARINO, Registered Professional Shorthand

6             (Stenotype) Reporters and Notaries Public

7             of the State of New York, do hereby

8             certify that the foregoing Deposition of

9             the Witness, LAWRENCE FERRARA, Ph.D taken

10            at the time and place aforesaid, is a

11            true and correct transcription of our

12            shorthand notes.

13                   We further certify that we are

14            neither counsel for nor related to any

15            party to said action, nor in any wise

16            interested in the result or outcome

17            thereof.

18                   IN WITNESS WHEREOF, we have

19            hereunto set our hands this 1st day of

20            June, 2016.

21            _____

22            CAROL MELE, RPR

23            _____

24            LINDA A. MARINO, RPR, CCR

CONFIDENTIAL

Page 195

| **A** | | | | |
|---|---|---|---|---|
| **a** 1:12,19 2:2,2,2 | 41:12,15,17,18,19 | 84:4,9,11,15,17 | 116:21,22,22,23 | 144:8,9,10,10,11 |
| 3:9,9 5:22,22,22 | 41:19,21,23 42:2 | 84:21,23 85:4,6,7 | 116:24,24 117:1,1 | 144:11,12,17,19 |
| 5:23,24 6:4,6,8,11 | 42:5,8,11,18 43:2 | 85:10,10,13,14,15 | 117:3,6,6,9,10,15 | 145:1,4,13,16,18 |
| 6:14,16,18,20 7:2 | 43:2,4,13,14,22 | 85:17,20 86:9,16 | 117:17,20,23,24 | 145:21,23,24 |
| 7:5,7,9,14,17,19 | 44:1,3,8,13,14,16 | 87:7,8,9,10,14,16 | 117:24 118:20 | 146:4,5,7,17,19 |
| 8:3,6,6,12,14,18 | 44:19,24 45:4,4,4 | 87:20,24 88:3,7,9 | 119:6,12,13,14,15 | 146:19,19,23 |
| 8:20,22 9:1,4,13 | 45:8,11,13,16,20 | 88:10,11,12,14,14 | 119:19,19 120:1 | 147:1,5,8,16,19 |
| 9:15 10:5,8,14,18 | 45:22 46:2,10,15 | 88:15,20,21,24,24 | 120:10,16,24 | 148:2,4,9,11,13 |
| 11:1,6,8,8,9,11,13 | 47:5,12,17,21 | 89:2,14,15,18,19 | 122:12,19 123:8 | 148:16,16,20 |
| 11:14,16,18 12:4 | 48:3,7,10,12,16 | 89:24 90:3,7,17 | 123:11,15 124:10 | 149:8,11,13,15,21 |
| 12:16,17,21,23 | 48:18,24 49:2,15 | 90:20 91:1,8,13 | 125:7,10,15 126:5 | 149:24 150:2,4,7 |
| 13:1,4 14:3,4,6,8 | 49:15,19,24 50:5 | 91:19,22 92:6,8,8 | 126:8,9,11,13,16 | 150:9,14,18,19,21 |
| 15:1,24 16:4,4,4,9 | 50:13,15,19 51:2 | 92:12,18,21,23,23 | 126:23 127:1,7,18 | 150:21,23,24 |
| 16:23,24 17:4,12 | 51:4,6,8,20,23 | 93:7,8,21 94:5,7,7 | 127:24 128:14,17 | 151:4,9,12,17 |
| 17:17,20 18:10,16 | 52:6,6,8,9,9,10,11 | 94:9,11,21 95:1,4 | 129:2,9,14,18,24 | 152:2,8,12,20 |
| 18:18,23 19:4,8 | 52:18,24 53:1,5,5 | 95:9,17,21 96:2,8 | 130:2,6,8,9,13 | 153:8,17,23,23 |
| 19:13 20:1,4,12 | 53:6,11,17 54:6,6 | 96:12,17 97:2,7,9 | 131:4,6,7,19,21 | 154:2,6,7,9,10,12 |
| 20:14,15,16 21:1 | 54:7,15,19,19,21 | 97:14 98:12 99:3 | 131:22,23 132:7 | 154:14,18 155:1 |
| 21:2,6,6,15,23 | 55:4,6,6,12,14,15 | 99:7,17 100:11,18 | 132:10,12,22,22 | 155:10,12,13,13 |
| 22:3,5,8,18,24,24 | 55:16 56:11,18 | 101:2,16,19,23 | 133:1,4,9,10,13 | 155:16,19 156:1,5 |
| 23:6,6,8,12,21,22 | 57:2,2,2,15,18,22 | 102:7,14,19,23 | 133:16,19,22 | 156:12,15,19 |
| 24:2,7,8,11,14,20 | 58:1,7,13,17,19 | 103:4,7,14 104:4 | 134:1,3,9,10,10 | 157:1,8 158:2,12 |
| 24:22 25:3,11,14 | 58:22 60:1,3,4,24 | 104:7,13 105:4,10 | 134:14,14,15,15 | 158:18 159:10,12 |
| 25:15,18,18 26:1 | 61:11,16,22 62:1 | 105:14,17 106:9 | 134:16,20,23 | 159:14 160:8,18 |
| 26:3,7,12,13,19 | 62:7,12,23 63:3,4 | 107:18,23 108:14 | 135:2,2,7,9,11,15 | 160:19 161:4,10 |
| 27:3,5,8,10,14,18 | 63:6,6,7,9,17 64:9 | 108:19,23 109:8 | 135:17,20,23,23 | 161:12,17,19,20 |
| 28:1,5,6,8,14,18 | 64:9 65:22,23,24 | 109:10,15,15,17 | 135:23 136:2,6,11 | 161:20,23 162:1,1 |
| 28:22,24 29:1,3,8 | 66:19,19,22 67:2 | 109:20,23,24,24 | 136:14,16,20,24 | 162:3,6,14 163:4 |
| 29:19 30:4,5,6,11 | 67:8,11,22,24 | 110:1,1,4,5,6,7,7 | 136:24,24,24 | 163:7,10,18,22 |
| 30:14,19 31:4,14 | 69:7,21 70:6,9,11 | 110:9,13,15,15,18 | 137:1,1,2,4,4,4,4 | 164:4,5,19 165:4 |
| 31:21,24 32:4,6 | 70:15 71:21,21 | 110:18,18,20,21 | 137:4,4,7,10,11 | 165:17 166:10,13 |
| 32:10,16,20,24 | 72:4,14,19 73:2,2 | 110:21,22,24,24 | 137:15,15,17,20 | 166:24 167:9,13 |
| 33:3,4,6,11,18,23 | 73:4,4,6,8,10,14 | 111:1,2,2,2,3,4,4 | 137:24 138:2,2,5 | 167:17,24 168:2,8 |
| 34:4,9,14,22 35:3 | 73:22,24 74:1,10 | 111:4,9,10,10,11 | 138:5,7,7,7,7,9,9 | 168:24 169:8,10 |
| 35:10,13,18,24 | 74:11,12,14,24 | 111:12,13,14,15 | 138:9,10,10,10,12 | 170:4,4,6,8,9,17 |
| 36:6,12,22,23 | 75:15,17,19,24 | 111:17,20,21,22 | 139:4,9,13,14,16 | 170:22,24 171:1 |
| 37:1,2,3,4,4,4,7,8 | 76:10,24 77:1,14 | 111:23,24 112:4,5 | 139:18,21 140:1,5 | 171:10,20,24,24 |
| 37:9,10,11,14,17 | 77:17,19 78:10,12 | 112:8,9,10,12,14 | 140:12,15,18,20 | 172:2,4,5,7,7,9,14 |
| 37:19,21 38:2,3 | 78:17,19 79:1,8 | 112:16,18,19,21 | 140:23 141:1,2,6 | 172:17,19,19,19 |
| 38:11,18,24,24 | 79:10,17 80:6,12 | 112:22 113:3,6,8 | 141:8,12,12,15,16 | 172:22,23,24 |
| 39:3,6,6,8,9,14,15 | 80:14,16,21 81:9 | 113:12,16,22 | 141:18,20 142:2,3 | 173:2,2,3,7,9,15 |
| 39:17,21,23 40:1 | 81:15 82:1,9,9,12 | 114:7,9,12,20,23 | 142:5,9,12,16,21 | 173:19,20,22 |
| 40:3,8,9,10,10,12 | 82:14,15,17,22 | 115:2,5,8,12,16 | 143:1,6,8,12,17 | 174:2,5,11,16,19 |
| 40:20,23 41:1,1,9 | 83:4,9,13,14,16 | 115:16,20 116:1,6 | 143:19,22,22,23 | 174:20 175:8,11 |
| | 83:16,19,20,23 | 116:11,16,18,20 | 144:3,3,4,4,6,7,7 | 175:15 176:5,8,9 |

CONFIDENTIAL

177:4,12,14,16,18
177:19 178:4
179:2,13,24 180:7
180:15,19,22,23
181:5,5,10,16,21
182:1,8,10,11,19
182:21 183:4,7,15
184:11,14,17,19
184:21 185:19,20
186:13,16,18,19
186:21,21 187:1,3
187:5,9,14,21
188:1,6,11,16,21
189:1,5,7,22,24
192:1,11 194:1,4
194:10,24
**a/k/a** 11:19 46:11
**A1** 132:15,21
**able** 29:20 97:6
140:3 163:6 181:8
187:12
**about** 10:15 11:1
12:5,6,6 20:12,18
20:18 22:15,16,20
23:12,24 25:22,24
26:2,8,9,12 27:14
27:15,20 29:21
40:4 55:7,13 59:7
64:16,19 67:3,17
68:24 69:9,11
78:3 83:5 85:7,19
85:21 86:24 90:2
91:9 98:19 99:18
109:15 120:11
123:13 124:14
125:7 136:11
138:20 144:13
145:10,14 146:16
151:14,20 152:5,8
152:13 153:7
155:12,23 157:2
157:15,19 160:6
160:24 161:5
166:12 172:3
176:13 180:3

181:16 183:9
186:7 187:19
188:12 190:11,11
**above** 117:10
119:17
**absence** 9:23
**absolutely** 30:12
73:6 86:9,16
144:21 149:11
150:18 168:1
170:4
**absurd** 80:23
**academic** 3:19
159:18 161:2
166:22 167:2
169:1 170:17
171:17
**Accept** 85:13
**access** 156:18,20
157:2,4,16,19
180:18,23 181:3
**according** 143:1
**account** 177:5
**accrue** 22:22
**accuracy** 54:22
**accurate** 19:23
27:9,15 30:18
43:16 88:17
100:22 141:17
142:24 192:11
**accurately** 172:13
**accusations** 79:21
**acknowledgment**
167:7,16
**acoustic** 133:9
135:3,7 175:21
**acting** 71:12
**action** 194:15
**actions** 105:11
**activity** 34:12
**actual** 12:7 38:7
39:22 40:2 111:3
113:22 122:1
128:5 161:10
182:15

**actually** 12:8 15:20
24:1 44:19 58:19
89:16 96:14 99:22
100:14 104:8
110:19 114:2
136:1 137:10
138:17 141:12
143:9 144:6
150:24 152:15
177:16 178:22
179:1 180:3
182:23 185:13
**add** 122:3 186:19
**adding** 117:7
**addition** 51:11
**address** 12:14
41:14 82:2 108:4
123:9
**addressed** 48:9
**addressing** 166:20
**Adelaide** 47:13
**adequate** 167:6,16
**Adler** 63:15 67:8,8
67:9 102:16,19
**admissions** 180:8
180:13,15
**admitted** 39:7
**admitting** 42:5
**admonitions** 6:13
7:4
**adopt** 31:9
**adopting** 31:22
**advantage** 9:23
**advised** 10:21
**affect** 6:24
**affiliate** 108:21
**affiliated** 73:7,11
**affiliates** 97:8
**aforesaid** 192:19
194:10
**after** 83:8,12 88:19
108:12,15 121:11
122:4,5,17 146:11
146:11 147:7,18
149:3 155:7,17

157:22 177:8
**afternoon** 4:2
**again** 13:10 23:14
23:19,22 27:18
36:14 37:5 38:5
41:8 43:5,15
45:16 46:2 63:10
67:20 70:16 78:11
83:18 84:10 91:8
97:1,22 100:12
118:20 119:16
129:11 142:17
144:1 150:15
151:2,11 162:6
163:10 166:12,12
169:10 170:19
173:10 177:4
182:21 188:18
**against-** 1:5
**ago** 6:5 7:17 13:5
31:19 55:12 58:22
59:24 60:4 67:18
172:19,20,24
173:2,3
**AGR** 1:6
**agree** 64:23 67:24
110:14 111:8,24
112:22 133:14
135:5,18 136:5
152:4,9 154:4
167:22,24 169:5
170:2 171:8,13,17
**agreeable** 70:17
**agreed** 122:21
**agreeing** 70:23
**agreement** 91:22
92:12 153:17
**ahead** 54:5 106:23
167:14 175:9
179:10,11
**ahold** 79:13
**air** 123:22
**al** 7:20 8:4 22:11
193:2
**album** 61:5 70:3,4

82:4,5 89:17 94:2
94:3,22,23 107:20
135:19,19 136:23
137:5 152:5
157:20 172:11
173:11
**albums** 176:17
**alcohol** 6:24
**Alexander** 2:3,5,23
5:5,6,10 181:8
**all** 6:4,9,12,15 7:3
13:23 14:19 15:3
15:7,17 17:14
23:18 29:9 30:4
30:12 31:6,15
42:13 48:24 49:20
52:19 53:12,21
56:13,21 62:12
68:19,22 71:20
73:14 79:17 80:5
86:20 88:17 90:15
100:9 104:3
105:18 106:7,19
107:13,16 123:12
123:19 125:2
130:9,12 134:17
141:5 143:7
144:11 149:17
155:18 161:5
163:22 165:22
167:18 168:23
170:16 184:23
186:4 188:8
189:18,23 190:12
190:19
**alleged** 157:15
**allegedly** 179:20
**allow** 71:4 103:22
104:2
**allowed** 96:8
163:19 176:24
**almost** 31:19 39:21
55:23 149:15
189:10
**alone** 175:21

CONFIDENTIAL

Page 197

**along** 50:5
**already** 14:4 50:3
  60:19 63:22 64:20
  66:8 68:22 76:5
  77:11 93:23 95:22
  106:13,16 107:17
  138:19 153:8
  156:5 171:20
  173:7 191:12
**also** 2:21 23:22
  35:9 40:7 50:3
  53:6,7 62:15 77:3
  77:19,19 107:8
  109:1 112:22
  117:2,13 119:20
  119:23 121:2,4
  129:21 137:13
  145:22 146:21
  154:5 158:8,17
  171:16 176:21
  183:5 185:18
**am** 6:14 7:2 17:3
  21:23 71:9,16
  76:18 78:10
  105:10 129:13
  148:6 158:12
  161:4 168:2
  176:24
**amazing** 147:8
**ambiguous** 8:2
  17:19 18:8 19:3
  19:12 20:3,24
  25:2 26:8,18
  27:17 30:3,20
  31:1 39:20 40:19
  42:7 52:13,17
  53:4,20 54:4 55:3
  56:9 58:6 61:21
  62:3 63:9 79:3,7
  79:12 85:3 86:14
  89:10 90:12 91:7
  92:5 95:14 102:6
  102:12 109:13
  110:17 113:3
  125:6 129:8 133:8

135:22 136:10
145:12 157:7
171:16 179:23
180:12 183:6,14
184:10 189:3
**America** 168:9,10
168:16
**amount** 11:9 21:8
91:13 184:4 186:8
186:9,22
**an** 5:2 8:16 9:15
10:18,24 19:8
21:14 22:15 23:5
24:5 25:16 28:11
28:18,20 29:5
30:15,16 33:4,9
33:15,21 34:2,7
35:1,11,16 37:24
38:1,16 39:4,10
39:16 41:5,23
42:16,24 43:11,20
43:23 44:6,18
45:19,24 46:7,11
47:15 48:1,5,22
49:22 50:19,23
51:15 52:9 53:15
54:13 55:6 58:4
58:23 61:4,24
62:14 63:2,4,24
64:6,21 66:16,24
67:19 68:14 69:14
69:15 70:3,3,10
74:12 75:8,15
77:4,17,18,19
82:3,23,23 83:24
88:2 89:5,12
91:17,19,20,22
92:9,16 94:1
95:22 98:24 100:2
100:15,18 101:11
101:11,23,23,24
105:4 108:20,20
108:21 111:20
118:13 119:6
128:16 129:12

135:6 136:16,19
138:12,14 139:8
141:12,15,15,24
142:6,24 143:4,6
143:10 144:11,11
144:21,23 149:5
151:19 155:16
157:10 160:22
161:10 162:8
163:23 164:10
165:14 167:3
168:2 169:20
179:6,7 180:18
182:9 183:1,7
185:5 190:14
191:8
**analyses** 88:18 89:2
**analysis** 41:5 57:18
58:23 60:5 61:4
61:24 62:14 64:4
66:24 67:19 70:3
70:12 75:14 82:23
83:4 84:9 85:1,7
85:15 87:8,10,14
88:1,2,11,20 90:2
90:6 91:14 93:18
94:1,22 95:23
96:2,23 98:15,18
98:24 99:19
101:11,24 102:4
102:10 106:4
125:3,11 129:20
146:5 152:5
155:10,16 156:2
171:22 177:6
180:17 183:10
184:6,6,12
**analyst** 155:19
**analyze** 60:1 74:22
151:22 173:18
**analyzed** 77:4
116:1 125:4,10
126:1 173:12
**analyzing** 115:24
**and** 1:16,19,20,21

2:9,16 4:13,21,23
5:14,18 6:1,2 7:8
7:12,15,18 8:1,6
9:14,17,21,23
10:1,9,9,14,18,20
10:21,22 11:1,1,2
11:2,10,18,22
12:4 13:8,17 14:4
14:18,20 16:2,5
16:11,22 17:6,8
17:12,18,20,22,23
18:3,8 19:2,3,12
19:12 20:3,7,18
20:24 21:7,9,16
21:20 22:3,3,11
22:20 23:1,9,9,17
23:22,22,24 24:10
24:14,15,15 25:2
25:2,5,6,11,20,20
26:18 27:2,17
28:7,7,7,23 29:2
29:21,21 30:3
31:2,5,15,19,21
32:17 33:2 34:7
34:17 35:2,16,17
37:12 38:1,11,12
38:13,17 39:4,5
39:20,23 40:1,4,4
40:11,14,14,19,22
40:24 41:1,8,18
41:20,21,24 42:7
42:16,19,24 43:4
43:4,7,10,12,14
43:20 44:7,9,18
44:20,21 45:19
46:1,5,8 47:6,16
48:1,6,14,23
49:16,20,23 50:3
50:7,17 52:13,20
53:4,6,7,16,20
54:4,6,7,8,10,14
54:22,23 55:4,11
55:13,13,17,20
56:2,9,18 57:3,16
58:6,8 59:1,2 60:6

60:8 61:5,12,18
61:21,24 62:3,15
62:16 63:9,10
64:7,12,21 65:18
65:20,20,21,23
66:4,10,19 67:12
67:19 68:1,10,11
68:12,13,14,16,17
68:20 69:2,7,17
69:22 70:3,4,19
71:9,16,18 72:1
72:11,12,16,23
73:23,23 74:18
75:1,8 76:24 77:2
77:2,3,4,5,19,24
78:3,13,24 79:3,7
79:12,18,20,24
80:3,7,8,17 83:4
83:19 84:1,2,7,10
84:15 85:6,16
86:2,7 87:9,16
88:9,10,12,22
89:10,17,19 90:1
90:9,12 91:3,7,14
92:2,4 93:20
94:23 95:6,7,13
95:23 96:1,4,19
96:23 97:1,8
98:19 99:3,20,21
99:22 100:5,6,23
101:1,3,4,11,13
101:24 102:6,12
102:12,13,18
103:13,20 104:6,7
104:11,23 105:14
105:17 106:3
107:8,19,23 108:3
109:14,15 110:1
110:11,13,17
111:14,17 112:1,6
112:15,18,19,22
113:2,3,11,13,13
113:22 114:1,3,5
114:6,21,24
115:16,21 116:3

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 117:7,13,16,22 | 171:17,18 172:11 | 59:21 60:8,12,21 | 156:22 157:6,24 | 180:6,7 |
| 118:1,8,9,21,23 | 172:12 173:3,8,9 | 61:8,20 62:2,8,11 | 158:5,9,16 160:8 | **answers** 171:21 |
| 118:24 119:14,16 | 173:10,13 174:10 | 62:19 63:8,16,19 | 160:13,16,21 | **Anthony** 1:7 4:9 |
| 119:20 120:5,7,11 | 174:23 175:13,17 | 64:15,22 65:6,12 | 161:8,14 163:2,7 | **any** 6:23 9:24 13:6 |
| 120:13 122:4,20 | 175:19 176:2,11 | 65:13 66:6 68:3,7 | 163:15 164:4 | 13:7 16:21 18:4,6 |
| 123:9,17,19 124:1 | 176:12,12,12,21 | 68:19 69:16 70:7 | 165:14,21 167:11 | 18:14,19,21 19:14 |
| 124:14 125:6,11 | 177:7,9,15,19,20 | 70:22 71:1,3,8,12 | 171:9,12,15 172:8 | 19:16,20 20:9,22 |
| 125:18,20 126:2 | 179:23 180:1,5,13 | 72:2,6,10,21 73:1 | 172:16 173:2,5,5 | 21:8 25:9 30:7 |
| 127:13,18 128:4 | 180:15 181:1,22 | 73:15,22 74:4,9 | 173:8 175:2 176:7 | 39:1 41:15 48:10 |
| 129:8,23 130:1,2 | 182:5 183:5,14,22 | 74:19 75:6,10,23 | 176:19 177:2 | 54:12 55:6 56:6 |
| 130:5,9,11,16 | 184:5,10 185:5,20 | 76:5,13,14,16,18 | 178:2,7,18 179:16 | 67:12,14,15,23 |
| 132:4,6,9,23 | 185:22,23,24 | 76:22 77:7,9,23 | 179:19,22 180:5 | 68:18 70:11 71:23 |
| 133:6,8,10,12,14 | 186:1,3,4,10 | 78:18,21,24 79:2 | 180:20 181:14 | 73:11,12 75:20,21 |
| 133:17 135:19,22 | 187:11,20,23 | 79:4,6,11,15 | 182:4,18 183:3,13 | 76:3,6 78:14 86:4 |
| 135:24 136:6,7,10 | 188:2,23 189:3,3 | 80:13,16,19,22 | 184:8 185:9 | 86:10,11,12 88:4 |
| 136:16,17,19,20 | 189:7,12 190:16 | 81:6 82:20 83:23 | 186:11 187:7 | 90:1,5,6 95:4,11 |
| 136:20,21 137:6 | 190:22 191:7,10 | 85:2 86:1,13 87:5 | 189:2,15 190:1,10 | 95:15 96:7 99:18 |
| 137:13 138:2,7,10 | 191:13,18 192:9 | 89:7,9 90:11 91:6 | 190:21 191:2,15 | 102:16,24 103:22 |
| 138:20,22 139:7,9 | 192:10,11,17 | 91:24 92:4 93:8 | **Anderson's** 78:11 | 104:2 105:10,22 |
| 139:9 140:1 | 193:7,8 194:4,6 | 93:17,19 95:12 | **Angeles** 22:12 | 106:3 108:10 |
| 141:13,17 142:4,6 | 194:10,11 | 96:6,19 97:10,13 | **anomalous** 23:1 | 110:2 121:15,21 |
| 142:7,8,11,11,17 | **and-** 2:13 | 98:8,10,12,22 | **another** 10:23 45:9 | 125:16,19,21 |
| 142:18,18,21,23 | **and/or** 98:13 | 99:2,5,13,15,17 | 55:7,13 67:18 | 130:14,20 147:2 |
| 143:4,8,9,14 | 105:20 107:5,7 | 100:7 101:5,12 | 77:15 79:9 113:24 | 156:16,17 157:1 |
| 144:1,5,11,13,18 | **Anderson** 2:14,19 | 102:5,11,17 | 168:3 169:20,23 | 157:15,15,23 |
| 144:21 145:4,12 | 5:11,11 7:12,23 | 103:12,15,19 | 171:6 177:9 | 158:13 176:2,8 |
| 145:19,22 146:7,7 | 8:1,9 9:9,11,16 | 104:1,14,17,21 | **another's** 169:21 | 178:20 179:5 |
| 146:8,14,15,16,21 | 10:11 12:1 13:2,9 | 106:6,15,21,23 | **answer** 6:17,20 | 180:8,15 181:2 |
| 147:11,17,20 | 13:22 14:2,7,10 | 107:13 108:1,22 | 21:22 47:5 59:3,4 | 182:2,8,15 184:11 |
| 149:1,19 150:19 | 14:15 15:19 16:24 | 109:9,12 110:16 | 68:5,12 75:24 | 186:8,9,13 191:6 |
| 151:2 152:1 | 17:6,16,18 18:7 | 113:1 118:3,11,15 | 99:11 100:11 | 194:14,15 |
| 154:21 155:2,22 | 18:12,24 19:2,11 | 118:19 120:19,24 | 125:24 126:1 | **anybody** 183:21 |
| 156:7,19,23 157:4 | 19:21 20:2,7,13 | 121:6,10,18 122:2 | 129:23 160:22 | **anymore** 101:9 |
| 157:7 158:1,8,14 | 20:23 21:4,16 | 122:8,24 123:4,6 | 161:15 163:6,13 | 108:5 134:6 |
| 158:15,21 159:5 | 24:6,18 25:1,17 | 123:10,14,17,21 | 163:14 164:10,16 | **anyone** 9:21 20:5 |
| 160:1,17,19 | 26:4,17 27:1,16 | 125:5 126:15,19 | 166:13 175:15 | 32:18 61:18,23 |
| 161:19,19,20 | 28:2,12 29:13 | 127:23 128:8,11 | 177:1 179:5,7 | 66:3,7 83:11 |
| 162:14 163:15,16 | 30:2,19,24 31:8 | 128:17 129:7 | 181:20,24 183:18 | 94:24 95:5 105:21 |
| 163:22,24 164:3 | 31:12 32:22 36:2 | 130:18 132:12,16 | 183:24 187:6 | 156:13 163:5 |
| 164:11,11 165:5 | 36:9,24 37:2 | 132:18 133:7 | **answered** 7:13 27:2 | 164:9 |
| 165:10,10 166:12 | 39:19 40:18 42:6 | 134:19 135:21 | 27:3 86:2 93:20 | **anything** 13:20 |
| 166:24 167:2,18 | 49:12 51:7 52:12 | 136:9 140:13 | 101:13,18 102:13 | 20:8 41:1 67:3 |
| 168:1,2,3,4,5,16 | 52:16 53:3,18 | 145:11 151:24 | 102:18 103:13 | 118:2,6 121:13 |
| 168:17 169:13,17 | 54:2 55:2 56:8 | 152:16,22 153:1,5 | 152:1 153:8 156:5 | 151:4,16 174:18 |
| 170:19 171:3,16 | 58:2,5 59:6,12,16 | 154:16,23 156:8 | 166:24 173:7 | **anyway** 51:20 |

CONFIDENTIAL

Page 199

93:14
**anywhere** 69:24
171:22,24
**apologies** 36:5
**apologize** 9:17
87:18 93:16
128:13 132:19
163:17 187:22
**apparently** 74:17
76:22,23 77:7,9
77:10,22
**appealed** 34:16
**appeals** 48:14
**appear** 13:8
**appeared** 192:6
**appears** 38:24
**appellate** 9:3 34:12
34:17 46:4
**applies** 122:12
**appreciate** 32:16
123:20 124:5
130:24 170:19
**appropriate** 22:1
176:11 193:8
**approximate** 21:23
**approximately**
20:20 24:9 186:17
**approximates**
20:19
**April** 8:20,21,23
11:3
**are** 9:24 10:4 13:15
13:18 16:9 17:5
17:21,24 18:1,12
18:13,18 19:5
20:6,17,19 26:20
28:7 30:17 31:8
31:10,15 37:2
53:22 54:23 57:13
57:16 65:24 70:17
71:10 74:9 78:8,8
80:24 85:12,22
88:5 90:22,23
96:12 97:9 100:22
101:19 103:20

104:12 105:8
109:15 110:2
111:8 112:14,20
129:18 136:1
138:18 140:3,6
145:19,20 146:2
146:13,23 147:1,2
149:2 153:9,10
156:16,17,24
157:3 161:3
165:21 166:15,23
167:1,9 169:3,4
169:15 170:3,13
170:20 174:22
176:15 177:21,23
182:19,23 183:1
183:11 185:2,22
187:12,15 188:8
194:13
**area** 87:9,11
**aren't** 9:18 59:8
169:13
**argument's** 138:6
**argumentative**
9:11 20:24 70:8
87:6 110:17 113:2
154:17,24 158:1
161:9 163:3
171:16 176:20
189:3
**arguments'** 138:1
**Arista** 35:14 36:8,9
36:10,14
**arm** 55:10
**Arnold** 33:8
**around** 7:14 11:3
58:22 60:3
**arpeggiate** 175:10
175:12
**arpeggiated** 159:4
**arpeggiation**
137:13 188:23
**arpeggio** 187:24
**arrangement**
174:19

**art** 176:11 181:2
**articulate** 96:10
**artist** 25:16 52:7,9
52:11 53:1,6,17
54:6,7
**artists** 24:24 67:14
176:1,18
**artwork** 171:5
**as** 1:2 4:6 5:8,23
6:2 7:7 8:4,11,12
9:13 10:14,16
11:23 12:15,18,19
13:10 15:13,15
16:3,5,15,18,19
18:8 19:16 20:16
20:16 21:2,13,15
22:3,4,5,8,9,10,17
23:5,5,6,12,13
24:10 25:7,7,12
26:22 27:23 28:23
28:23 29:1,2,16
29:17,20 30:17,20
31:21 35:11 37:24
41:10,16 46:2
48:11 50:21 52:9
52:9 54:4,9,11,21
55:1,9,21 57:3,6
57:10,11 61:13
63:9 64:6 68:23
71:11,22,22 75:9,9
76:18,19 77:4
79:20 82:3,4,15
82:23 85:13 88:5
89:10 91:15 93:21
94:8 97:17 100:18
101:5 102:24
105:2,17 109:1,3
109:13 110:11
111:2 113:18
114:14,15,16,24
118:10,17,23
119:1 124:3,4,7,8
125:6 126:12
127:12,12,22,24
128:20,21 129:11

131:12,15,16
135:15 136:5
137:4,22 139:2
142:12,12 143:10
143:15 145:17
147:16 149:18
151:7,8,9,9,14,14
153:12,15,16
154:10 155:19
156:17 159:13,16
159:16,19,20
162:10 167:7,16
170:1,3 171:6,18
173:15 175:16
176:2,9,15 177:16
180:13,23 181:8
181:18,22 182:2,9
182:15 187:10,20
188:2,24 189:3,8
191:12
**ascending** 187:12
**ask** 6:16,18,18,21
21:9 31:4 46:13
59:23 60:23 61:24
62:23 68:2 75:13
76:2 88:7 93:1
100:12 101:20
129:24 132:12
140:9 141:23
150:15 154:21
163:23 166:11,11
181:22 188:18
**asked** 7:12 9:14
12:5 21:7 25:8
26:11 27:1 40:3,6
41:4,5,15 58:23
59:5 60:4,7,18,19
61:7,9 62:17
82:22 84:9 86:1
93:20 96:18 97:7
99:9 101:12,14
102:3,12,17
103:12 123:18
151:24 164:20
166:24 172:9

173:8 180:5
181:18 189:8,9
**asking** 31:8 67:18
69:18 70:24 71:1
72:11 73:16
149:18,23 163:24
165:17,22 168:20
168:21
**assert** 104:11 105:4
108:10,17,20
185:23
**assesses** 170:23
**assessment** 39:6,10
40:3 41:23 42:2
182:12,22 183:17
**assignments** 171:4
**assistance** 130:21
**associate** 108:20
**associated** 66:3,7
105:21
**assume** 20:9,9
86:11
**assumes** 105:8
176:5,20
**assuming** 32:20
**assumption** 86:20
**assumptions** 18:19
18:21 19:6,10,16
19:20 85:23 86:12
**assure** 80:9
**at** 1:15,18 3:9,20
4:19 6:11 10:20
11:23 12:16 14:24
21:6,9 22:5,14,24
23:24,24 24:1,11
31:7 39:7,11 41:9
48:19,24 49:7,7
53:14 55:6,11
56:17 64:2 72:17
73:14 83:5 84:8
86:20 87:8 89:5
89:13 92:15 94:21
95:18 97:4 101:6
102:24 104:2
109:6 110:10,11

CONFIDENTIAL

Page 200

110:14 111:17
113:4 116:13
120:22 122:14
123:15 125:12
129:17 131:23
132:5 133:2 134:5
135:4 136:1 139:8
141:6 146:18
151:7 153:20
155:2 156:16
157:9 158:3,14
159:19 161:3
166:12,23 168:3,5
172:19 173:13,13
176:10,13 177:6
178:6 181:1 182:3
182:16,23 183:17
185:2,21 186:22
188:8 190:13,18
191:20 192:9
194:10
**Atlantic** 1:8 2:16
4:12 5:14
**attach** 18:15 193:8
**attached** 89:20
128:2
**attachment** 182:10
**attempt** 156:10
**attempted** 103:10
103:17
**attempting** 103:3
104:11 185:23
**attorney** 5:4 52:20
100:16,18
**attorney/client**
13:17 17:7
**attorneys** 2:3,9,15
85:12 92:12
100:20
**attributable** 24:4
**audio** 17:23
**August** 34:24
**Austin** 50:11
**authorize** 193:8
**automatically**

88:18
**available** 89:15
169:4
**Avenue** 2:10
**average** 24:12
**aware** 58:19 68:15
77:12 103:1 104:6
104:9,10 105:3,10
158:2,12 177:22
177:24 180:15
**away** 68:9 71:17

**B**

**B** 3:6 85:10,11,13
85:14 109:8,10,16
109:17 110:15,24
111:1,2,4,4,4,9,11
111:14,15,17,22
112:1,6,16,18,19
112:22 113:7,8,11
116:16,21,22,23
116:24,24 117:1,3
117:10,13,17
119:13,15,19,21
119:24 120:5,6
125:19,22 136:6
136:24,24 137:4,4
137:10,12,15,20
137:23,24 138:2,5
138:7,9,10,16,24
141:12 187:9,9
188:1,2,16,21,21
189:24 190:3
**B-i-e-b-e-r** 7:20
**B.I.G** 40:22
**B3** 134:17
**Babe** 177:11,12
**back** 15:7 16:20
42:1,1 67:24
70:17,23 71:16,18
71:19 88:22 96:5
98:2 100:5 101:4
106:10,13 109:19
117:6 127:18
139:21 144:19

147:9
**bad** 41:17 88:3,8
88:13
**Baez** 177:10,19
**bag** 73:21
**Bambi** 93:10
**band** 158:7,8
**bang** 146:15
**barely** 89:1
**base** 113:14 116:9
118:21 125:4,13
126:4,4 129:5
**based** 23:20 44:9
68:14 91:2,8
131:23 139:5,7
152:4 177:10
184:6
**basic** 162:4 164:8
169:16
**basically** 85:9
96:12,22 144:4
150:10
**basis** 18:10 55:4
**Batiste** 11:18,19
49:11
**be** 9:20 12:10 19:17
19:18 22:23 23:1
23:4,21 25:8,10
25:22 26:9,11
28:1,5,24 29:4
30:21 31:16 38:24
41:22,22 45:7
49:2,8 51:21 56:2
56:12 59:4 62:7
65:2 75:1 77:17
77:19 78:17 81:4
81:15 87:9 88:11
88:18 89:20 90:20
92:23 94:20 95:4
99:11 103:17
111:12,15 114:3
120:21 122:18
123:15 126:3
128:8 130:20
136:4 138:6,13

139:1,22 140:5,9
141:3 147:5,8,12
153:2 154:20
155:21 158:22
159:24 162:19
163:5,19 166:8
173:2 174:20
177:5 178:9
180:22,24 181:8
181:19,23 182:14
183:19,24,24
184:2,5,11 186:2
186:21 191:5
193:6
**bear** 155:10
**beat** 113:9 119:15
119:15 120:2,3,4
120:4,12,12
133:18,20 134:1,2
134:5,5,6,6,8,10
134:11,13 135:2,5
**beating** 46:18,19
93:2
**beats** 113:9
**beautiful** 164:17
**became** 77:12
95:16
**because** 9:6 10:19
14:17 17:1 21:12
22:8,9,12,19 23:2
23:14,17 32:7
39:11 40:7 46:17
49:3 56:11 60:15
62:5 68:8 70:11
71:22 74:7 81:3
82:24 86:17 88:8
90:21,22 93:14
94:7 97:23 102:15
102:21 111:3
114:21 117:3
118:22 122:20
124:13 131:2
134:6,15 137:18
139:23 149:21
150:7 156:1

161:23 162:10
168:7,11 170:7,15
174:5,21 185:13
185:22 186:22
188:19 189:6
191:11
**become** 103:1
**becomes** 80:8
**becoming** 58:11,15
64:6 67:1 68:11
68:15 77:13 82:7
89:2
**been** 5:23 8:13 19:6
21:7,24 28:6 29:3
29:5,5 30:13
31:17 39:21 49:6
51:19 52:10 54:17
58:2 70:1 72:1
77:15 83:18 84:17
90:8,18,19 100:17
155:4,7 159:15
160:19 166:6
172:24 173:1
174:10 177:18
186:8,9 193:5
**before** 1:18 7:4,7
7:11 13:24 28:4
40:2,5,20 41:3
58:20 61:3 67:1,6
79:23 80:7 83:7
83:11,13 84:18
85:11,14,22 86:8
86:11 144:20
148:6 149:4
161:15 192:6,17
**begin** 28:4
**beginning** 56:24
97:4 110:12
124:23 141:7
148:13 151:15
157:9 188:20
**behalf** 8:3 30:16
34:15 36:13 38:12
38:20 44:11,21,22
49:9,17 50:15,17

CONFIDENTIAL

Page 201

50:23 51:2 53:9
54:8,16,19 67:13
67:15 92:17 95:23
98:15 99:1 100:2
102:8
**behaviors** 167:2
**being** 4:19 13:16
24:5 32:4 35:22
35:23 36:6 39:1
43:10,11 44:5
49:1,1 66:12,16
67:17 69:13 70:2
76:4,24 86:5
92:16 96:23 97:6
116:1 118:7
185:20 186:6
192:7
**believe** 8:6,20
10:16 11:16 20:21
23:4 26:4 27:12
27:13 35:4 41:21
44:12 48:17 50:3
50:20 51:14 65:18
82:18 84:2 86:3
97:20 100:15
105:7 111:1
122:11 126:21
137:9 138:9,11,12
138:20 139:11
142:11 143:3
144:3,5,16,23
145:2,20,22 146:1
146:21 163:19
172:14 173:23
175:5,10 177:20
180:7,18 186:3
**believed** 83:23
**believes** 8:13
**believing** 170:24
**bell** 37:8,18
**belong** 51:15
**besides** 50:2 56:5
56:10 92:14 94:20
143:13 186:20
**best** 19:13 20:4

**break** 73:23 74:10
74:11,15 75:24
80:6,14,17,21
82:2 94:12 109:18
111:18 123:9
124:10 141:14
**breaking** 55:8
67:22 78:14
123:12
**breaks** 121:13
160:20
**Brian** 181:23
**Bricklin** 181:23
**Bridgeport** 38:22
48:20 49:1,7
**Bridges** 34:1
**brief** 40:3
**briefly** 6:4,16
**bring** 13:7
**broach** 64:13
**brought** 14:3 18:1
**Bug** 51:1
**building** 138:21
**burning** 76:8
**busy** 9:7
**but** 12:9 13:5 14:2
14:7,10 17:22,24
22:20 23:20 24:8
25:8,11,20 29:2
30:24 31:1,18,24
32:7 33:12 34:10
35:3 36:15 38:5,6
40:7,8 43:15 44:8
44:22 47:9 48:12
49:5,5,6,9 53:13
54:5 55:5 59:12
60:21 64:15 65:1
67:5,17 71:15
72:20 74:3 78:10
80:23 83:17,22
84:5,18 85:7 86:4
89:9 91:20 92:11
92:13,23 93:14
95:9 96:12,21
98:17 111:1,10,15

113:18 117:4,23
118:3,6 121:12,23
123:7 126:1,22
127:11 129:5
130:13 134:5,24
137:12,23 138:1,4
138:5,18 140:5
144:14 147:14,23
148:14 153:10
155:6,24 156:3
157:14 162:16
163:18 170:20
171:2 173:2
174:11 175:8
177:17 178:19,20
179:6 182:14,23
183:23 184:1
186:18
**Butler** 45:21
**by** 1:15 2:5,11,19
3:2 5:24 6:3 8:14
8:14 9:14 13:2
16:6,22 18:8 21:8
21:24 28:6 29:8
30:1 34:6,16,20
35:1,16,23 36:20
37:13 38:16 39:1
40:22 42:16,23
43:11 44:6,17
45:18,24 46:7
47:15,24 48:5,22
49:1,5,6,22 51:10
51:12,15 52:20
54:4 55:8,14 56:7
56:7,11 57:12
58:2 59:17 63:1
63:15,18,23 64:8
66:2 67:1,5,7
69:14 70:2 76:17
78:23,23 79:22,23
82:8,19,22 86:6
87:3 89:10 90:1
91:11,14 92:16
94:1 95:21 96:13
98:22 101:10

103:17 106:3
126:6 136:16
139:8 151:21
156:24 162:7
163:11 164:16,17
165:10 166:7
168:14,14,14
170:1 171:1,6,13
172:9 173:9
177:18 180:8
183:7 185:20
190:22

C

**c** 1:12 2:2 5:22 16:4
57:2 111:4,5,14
111:16 112:16,23
113:7,8,11,15,20
113:22 114:1,3,5
117:13,17 118:9
118:13,23,24
119:8,21,24 120:5
120:6,8,11,14
133:10,12,22
134:3,4 135:4,4
135:15 144:18
187:10,10 188:2,2
188:21,21 190:3,5
192:1,1 194:1,1
**C-o-p-e-l-a-n-d**
7:20
**calculating** 122:10
**calendar** 22:15
**California** 1:1 2:18
4:18 33:16 36:20
37:12 47:24 49:21
72:23 74:20
156:20 157:19
166:2
**call** 38:3 41:18,20
50:21 54:20 55:14
66:21 69:7 72:14
73:24 74:1 84:5
84:12 91:15
106:10,13 110:18

Second column:

39:24 40:21 42:8
58:1 60:3 84:7,11
90:7 91:15 92:18
95:1,9,17 96:9,17
125:20 172:7
**better** 32:18 134:20
166:13
**between** 10:1 16:22
90:2 91:9 103:20
112:1 117:7
121:13 130:1
174:23
**bias** 64:9 68:18
77:19
**bibliographic**
16:10
**bibliography** 16:10
**Bieber** 7:20 8:15
**big** 11:11,15 24:24
29:2 51:4 117:23
**billed** 186:9
**bit** 11:6 24:8 93:7
**Blige** 38:9,12
**BMS** 33:24
**body** 129:19
**bono** 25:16,18
26:24
**book** 16:9 168:9,17
**books** 16:11 18:3
18:12 176:12
**bop** 12:12
**both** 10:18 12:9
48:12 64:5 74:8
74:18 83:24
104:24 155:22
193:8
**bothering** 46:23
93:4
**bottom** 96:12 116:3
119:9 131:21
**bought** 164:11
**Boulevard** 2:17
**Bourne** 42:21,22
43:2
**bracket** 115:16

ZANARAS REPORTING & VIDEO
1.877.GO.DEPOS

01668

CONFIDENTIAL

110:21 112:10
125:14 137:15,20
137:21,24 142:15
142:19,20 156:8
167:20
**called** 5:22 9:13
41:17 55:12 61:12
61:13 73:5 84:9
84:19 95:19 96:19
100:10,11,24
101:1,6 111:10
173:8 180:24
**calling** 137:10,15
141:11 161:21
**calls** 25:4,12 82:20
85:3,6 88:10
93:19 95:12
137:12 138:24
156:23 158:16
180:20 182:5
183:3
**came** 9:2 39:13
64:20 99:12
144:20 154:22
168:9,10,16 174:5
179:20
**can** 12:9 22:21
25:19 28:3 31:4
32:10,10 46:13
47:6,11,12 51:7
54:11 55:1,5 56:5
60:23 62:5 64:1
66:11 68:1 69:5
70:15 72:16 74:1
74:12 75:24 81:2
81:8,14 88:18
104:24 109:7
110:4,6 111:2
112:7 114:6,11
116:3,16,21 118:9
118:13 119:13
123:9 124:3,8,11
124:14 126:23
127:12,21 128:4,5
128:6,15 130:20

132:12 133:12,20
134:12 135:10,11
138:14,16 139:23
140:15,17,18
143:18 147:24
148:3,8,13 149:3
149:10,17,19,20
150:5,6,15,17,19
151:3,4,8,10,14
151:20 153:21
160:8 161:1,14
166:12 170:9,10
170:15 175:3
187:6,12 188:4
189:20,24
**can't** 23:19 25:18
25:21 47:9 59:22
62:11 90:8,20
96:1 97:20 98:18
111:15 149:8,20
150:6,17 151:3
157:14 162:1
187:5
**cannot** 55:5
**CAPTION** 193:2
**captioned** 193:5
**car** 157:22
**care** 98:6
**career** 25:23 53:6
**Carney** 1:16
**Carol** 1:19 4:22
5:24 194:4,22
**carried** 68:8
**case** 1:5 7:21 8:8,17
9:2,5,8,10 10:20
11:7,17 12:1,3
18:22 19:10 20:11
21:13 23:3,15,18
25:16,19 27:7
32:7,12,14,18
34:11,13,19 35:3
35:8,18 36:7,12
36:21,23 37:5,10
37:11,15,23 38:5
38:24,24 39:1

40:15 41:19 42:1
43:4,10 44:2,13
44:23 45:14 47:20
47:22 48:10,10,18
49:15 50:12 53:7
55:7,22 56:7,11
58:4 61:15,17
63:24 64:7,12
66:17 67:1 68:11
68:14,16 69:15
75:18 76:4 77:2
77:13 83:8 85:24
86:12,17 87:1,2
88:7,14 98:16
108:13 155:3
158:20 165:18
180:19 183:24
185:22,24 193:2
**cases** 3:12 25:13
27:8,10,14,18
29:15,20,21 30:7
30:14 53:13,14
55:1 56:6
**cat** 73:20
**Catch** 171:24 172:4
172:22 173:9,19
174:5,20 175:11
**category** 17:10
**CCR** 56:19 194:24
**Central** 1:1 4:17
33:16 36:1,19
37:12 47:23 49:21
**cents** 184:7
**Century** 42:22 43:3
**certain** 19:10 66:19
67:22
**certainly** 13:5
26:11,13 37:6
53:5 55:5 67:14
72:20 120:1,10
125:19 134:1
139:4 174:18
180:16 186:18
**Certificate** 193:8
**certify** 194:8,13

cetera 171:5
**chair** 93:7,16
**chance** 126:6
**change** 56:3 71:23
103:3,10 137:11
137:18 176:17
**changed** 103:17
**changes** 111:14
144:20 193:6
**changing** 103:2
137:19
**Chapel** 73:9
**characterize**
142:12
**charged** 161:17
**Charles** 52:22
**charted** 140:15
**cheating** 170:22
171:18
**check** 96:19 134:14
134:16,17 135:2
**checks** 106:1
**chord** 18:3 115:4
137:11,19 144:4,7
144:12 149:5
151:19
**chromatic** 16:13
176:14
**circle** 109:7 112:5
112:18 113:11,20
116:16 117:16
118:10,13,21
119:13,20,23
120:7 133:12,20
133:22 134:12,15
135:10
**circled** 120:5,13
134:3,4
**circling** 113:22
**Circuit** 34:17,18
48:13,16 50:11,16
50:17
**cite** 170:14
**cited** 13:19 18:1,13
18:18 176:12

Civil 3:9 12:17
**claim** 28:6 29:3
55:17
**claiming** 103:17
176:2
**claims** 165:19
**clarification** 54:3
132:13
**clarifies** 114:7
**clarify** 6:19 28:5
31:5 32:10 53:20
79:18 153:3 162:7
163:11,16 164:20
165:22 168:13
187:17
**clarifying** 32:15
**class** 168:5
**clean** 128:17
**cleaner** 128:9
**clear** 19:18 25:22
28:16 30:13 56:2
66:10 75:20,22
76:3 78:1 94:20
95:11,15 100:9
107:1 115:19
121:19 122:9,18
129:15,23 130:13
136:4 140:9 168:1
182:14 184:2
191:5
**clearance** 78:14
96:3
**clearly** 74:7 191:12
**clef** 109:16,17
111:19 112:2,6
113:5,14 118:21
125:4,13,13,17
126:4,4,4 129:5,6
175:19,20
**clever** 42:13
**client** 92:2 102:2
**clock** 120:17
121:16,23 122:23
**close** 23:13 24:7
26:14 40:2 173:16

CONFIDENTIAL

**cluttered** 114:10
**Co** 42:22
**co-counsel** 5:17
**co-defendant** 8:6
**co-defendants** 8:7
**coaching** 101:1
**coherent** 110:2
**Columbus** 168:9,10
  168:16
**combined** 87:24
  175:19
**combining** 150:10
**Combs** 38:23
**come** 25:5 64:2
  67:24 70:2,17,23
  100:5 146:15
**comes** 150:13
**comfort** 69:8
**comfortable** 73:18
**coming** 18:20 58:4
  71:16,18,19 85:24
  116:8 147:9 176:2
  180:10
**commencing** 1:18
**Commission**
  192:22
**committing** 121:19
**common** 138:7,7
  162:19 168:8,11
  169:4 170:9
  174:15
**communicate**
  91:14
**communication**
  19:8
**communications**
  16:21 19:15 60:16
  60:17 70:20 90:1
  105:19 186:4
**community** 167:3
**companies** 25:6,6,7
  25:10,11 50:22
**company** 1:9 4:14
  5:14 30:8 43:2,3
  43:14 55:7 66:19

66:21 67:22 70:13
  70:19 72:18,20,23
  73:2,3,4 74:6,20
  75:7,8,8 76:23
  77:8 78:3,7,18,23
  79:5,13
**compare** 155:2
**compared** 22:4
  82:4
**compares** 21:14
**compensation** 21:9
  21:18 22:2,5,14
  22:17,22,24 23:19
  24:9 107:9,15
**complete** 58:23
  60:4 82:23 88:11
  91:13 126:11,13
  126:16
**completed** 57:19
  64:11 83:4 95:22
  99:19 131:7
**completely** 25:21
  87:17 144:20
  174:22
**complex** 146:14
  149:3
**Complies** 112:21
  113:12
**compliment** 55:21
**component** 180:19
**composed** 137:22
**composer** 52:9
**composition** 131:8
  137:17 145:18
  155:2 159:1
**compositionally**
  147:10
**compound** 19:3,12
  25:2 39:20 42:7
  52:17 55:3 102:12
  157:7 158:1
  186:12
**compromise** 167:2
**computer** 169:24
  171:4

**conceded** 39:8,11
  40:11 41:9 42:10
  42:11
**conceding** 42:11
**concentrated**
  176:10
**concern** 59:7 63:11
  186:1
**concert** 157:22
**concession** 40:10
**concluded** 191:21
**conclusion** 39:13
  64:21 95:13
  180:21 183:4
**conclusions** 18:20
**condone** 165:16
**Condor** 86:23 89:5
**conduct** 79:20
  101:2
**confidence** 67:23
**confidential** 1:3
  21:7,18 60:24
  61:14 64:16,19
  69:18 103:21
**confidentiality** 55:5
  67:23 78:15 92:10
  96:8
**confidentially**
  59:17 60:23 63:13
**confirm** 47:9
**conflict** 62:7,9
  68:18 75:17,20,21
  76:6,12 77:18,21
  79:24 98:24 104:7
  185:14
**conflicting** 157:8
**conflicts** 76:3 95:11
  95:15
**confuse** 162:21
**confused** 88:11
  164:15,17,19
  166:7 177:8
**confusing** 130:4
**confusion** 130:14
**conscious** 100:16

**consider** 86:6,7
  107:7 111:11
  136:22 140:22,24
  162:9 168:15
  175:24 176:8
  180:8,23
**considerably** 11:20
**considered** 17:13
  107:6 129:5 181:3
  181:5
**consigned** 88:18
**consistent** 86:17
**consisting** 141:9
**consists** 22:2 87:14
  141:7,10 142:17
**constitutes** 192:11
**consultation** 22:17
  60:24
**consulted** 59:17
  60:22 79:22,23
  80:2
**contact** 65:10
**contacted** 10:16
  39:24
**contained** 114:22
  114:24
**context** 27:19
  189:13
**continuation**
  137:11
**continue** 112:15
**continues** 137:13
  137:20 149:1
**contract** 91:23 92:6
  92:9
**contradicted**
  149:24
**contradicts** 28:14
  141:20
**contrapuntal** 189:7
**conversation** 83:19
  83:21 84:12 85:18
  88:21 95:22 96:9
  172:8
**conversations** 9:24

10:15 103:19
**cop** 128:14
**Copeland** 7:19
**copied** 39:18
  162:16
**copies** 13:14 14:3
  14:16,21
**copy** 3:13,18 14:1,3
  14:4,6,9,14 15:24
  39:23 51:20,24
  57:5,9,14,17,21
  57:24 58:4,8 59:1
  59:4 107:18,19
  109:7 110:11
  111:12 112:7,19
  113:18 115:22
  117:12 118:17,23
  125:8,11,14,18,23
  126:5,9,11,14,16
  134:20 151:23
  152:3,9,17,19,21
  152:23 153:6,10
  153:14,22,24
  154:5 155:3
  158:20,23 159:7
  162:20 173:18
  175:20
**copying** 161:22,22
  168:7,8 169:3
  174:11,17
**copyright** 22:4
  103:5,10,16
  108:17 158:21
  162:20 165:17
  177:19 180:19
**copyrights** 103:2,3
**Corp** 2:17 4:11
  43:18 53:8
**corporation** 1:8
  2:16 4:13 5:15
  63:4,6 68:13
**correct** 6:7,13 7:1,2
  11:7,8,12,13 14:1
  27:5 30:9,12
  32:21,22,23 33:5

CONFIDENTIAL

33:10,17,18,22
34:3,8,21,22 35:2
35:9,10,13,17
36:21 39:5 42:17
42:18 43:1 44:18
46:1 47:16 48:2,3
48:6,7,23 49:18
49:19,23,24 51:5
51:6 52:23,24
53:1,10,11,12,17
60:2 61:19 63:2
68:2 95:8 99:4,11
99:12 100:5,6,19
105:5,9,10 110:15
111:9,20,22 112:3
112:24 113:7,15
114:19,22,23
115:2,11 117:14
119:2,5 125:9
126:1 130:7
131:18 133:11,15
133:18,19 134:9
136:8 138:3,5
140:22 142:4
143:11,16 150:20
152:11,12,14
153:7,24 154:3,5
154:6 156:4,7
182:17 184:7
194:11
**corrected** 98:12
**cost** 24:13
**could** 9:14,16 10:21
19:5 26:9,11 37:5
77:17,18 82:2
90:18,18,20 91:3
93:1 95:23 100:5
100:10 101:6
115:14 118:11
138:14 153:3
156:7 173:2 178:4
180:16
**couldn't** 156:13
**counsel** 5:3 9:14,20
10:1 16:22,23

18:10 19:15 51:10
51:16 59:17 71:13
82:1 96:13 97:16
98:9 103:15 124:9
156:11,24 163:17
166:4 172:15
182:6,12 194:14
**count** 121:24
153:19 160:9
178:4
**counted** 153:18
**countless** 54:15
**COUNTY** 194:3
**COUNTY/CITY**
192:4
**couple** 6:5 41:1
84:17 150:19,21
179:3
**course** 17:22 50:7
54:7 58:7 64:22
69:10 129:21,22
132:8 155:23
**court** 1:1 4:17,22
5:20 9:3 14:18
21:8 29:4 34:17
46:5 56:3 57:8
100:19 142:20
163:20 167:12
186:3 191:14,16
**court's** 34:18
**courts** 22:1
**cover** 16:11
**covered** 106:12,16
**covers** 16:9
**Craig** 1:3 4:7 5:8
**crashing** 157:22
**create** 100:21
**created** 85:11,14
86:7,11,19,21
170:1
**creative** 155:14,18
155:23 187:11
188:3
**creators** 167:19
**credit** 167:19

176:17
**credited** 171:6
177:8,20
**credits** 176:17
**cull** 29:20
**current** 67:16
**cut** 93:22 175:6
**cuts** 111:5
**cutting** 175:2

### D

**D** 1:12 3:1 143:22
144:3,4,7,8,10,11
144:12
**D000562** 3:18
153:14
**D000565** 3:18
153:14
**D040443** 57:10
**damages** 182:3,13
182:15,16 183:2
183:12
**dash** 116:24 117:1
117:6,10,17 119:1
119:8,19 120:6,14
**dashes** 117:2,7
**data** 17:12,20,24
107:5,7 169:24
**date** 12:19 15:15
16:19 29:18 57:11
114:17 128:22
131:17 153:16
159:21 192:9
193:3,23
**dated** 57:19 127:9
131:6
**dates** 95:6 106:2
**Davis** 33:8
**day** 29:7 42:4 97:1
130:17 166:6
192:6,18 194:19
**days** 7:17 10:17
13:5
**Dazed** 177:7
**deal** 72:16 117:23

155:20 158:18
181:1
**dealing** 79:4,5,9
**deals** 129:21
**Deceiving** 170:22
**decided** 155:19
**decides** 161:19
**deck** 66:1
**declaration** 10:5,14
10:16 11:5 127:7
127:18 128:1,4
**declarations** 17:14
**declines** 21:17
**deemed** 120:21
**deep** 186:1
**deeper** 104:5
**Def** 34:23 35:23
36:19 37:13
**defendant** 7:22 8:3
33:5 36:8 41:20
54:21 86:6 88:10
88:10 97:2,7,9
**defendant's** 9:14
41:7
**defendants** 1:10
4:14 5:12 8:5
29:22 30:15,17
31:15 32:5 33:10
33:16,22 34:3,7
34:16,20 35:1,11
35:16 36:21 37:24
38:13 39:7 40:9
41:9 42:3,17,24
43:11,21 44:17
45:18,24 46:7
47:15 48:1,5,22
49:18,22 50:23
61:15,17 64:7
66:3,8 67:1 69:14
70:2 82:8 83:11
87:1 97:4 98:16
99:1 100:2
**defendants'** 19:15
42:20 43:5 45:16
46:3 182:12

**defense** 38:16 39:2
44:6
**define** 27:10,18
112:13 187:19
**defines** 154:10
**defining** 161:11
**definitely** 61:16
126:15 148:23
**definition** 31:9
109:23
**degree** 112:15
**degrees** 112:14
**delayed** 190:21
**demarcate** 111:2
**demarcating**
137:23
**demo** 89:19
**demonstrates**
143:24 144:1,1,12
144:12,15,15,18
144:19 146:6
148:21,22,24
149:1,4 151:12,17
151:19
**demonstrating**
140:14 188:13,15
188:16 189:8
**depend** 26:7 60:13
**depending** 17:2
**depends** 60:10
**DEPONENT** 193:3
**deposed** 7:11
**deposit** 3:13,17
57:5,9,14,17,21
57:23 58:3,8 59:1
59:4 109:7 110:11
111:12 112:7,19
113:18 115:22
117:11 118:17,23
125:8,10,14,18,23
126:5 151:23
152:3,9,17,19,20
152:23 153:6,10
153:13,21,24
154:5 155:3

CONFIDENTIAL

Page 205

158:20,23 159:7
173:18 175:20
**deposition** 1:14 3:7
3:9 4:5,15,19 6:6
6:10 7:16 12:17
12:18 13:11 15:3
15:14 16:18 18:5
27:13 29:16 56:21
61:2 65:14,22
68:1,1 71:14 97:5
122:12,22 157:18
158:14 180:1
185:13 190:17
191:11,21 192:9
192:12 193:1,3,5
194:8
**depositions** 190:13
**descending** 16:12
175:1 176:14
**describe** 16:7
**described** 79:20
**description** 3:7
142:24
**desire** 100:20
**determine** 65:3
70:19 155:9
179:18 180:3
**Devore** 52:22
**Diamond** 33:14
**did** 7:3,5 8:16,18
12:22,23,24 13:6
17:14 26:23 27:8
34:14 36:4 38:11
39:16 40:4,16,16
41:12,13 42:3
44:24 50:6 57:20
57:23 58:3 61:23
67:19 69:12,24
70:11 75:20 76:3
79:13 80:12 82:24
83:2,20 84:5,5,10
84:24 86:22 89:4
89:12 90:5,6 91:5
91:17,22 92:15
94:21,24 95:11,15

96:14 98:11,11,12
98:21 100:3 102:2
102:8,15,21 103:1
103:6,8,15 106:8
107:7 108:9,15
116:14 117:2
119:1 131:4
132:17 135:15
139:20 150:1,2
151:22 152:2,10
154:11,13 156:10
156:13 158:3
160:16 163:18
169:7 171:24
172:6,13,14,15,17
172:18 173:4,5,18
175:6,24 176:8,11
179:14 180:8
187:16 189:22
**didn't** 10:12 18:15
26:2 33:11 34:9
38:21 41:1,24
47:1,3 51:21 52:2
67:19 83:22 93:6
97:5 111:7 121:6
125:16,19 129:22
138:4 140:9
149:16 150:4
155:24 156:3
157:17 164:19
168:12 173:21
178:20 179:6
180:1 187:15
191:6
**Die** 40:23 41:7
**difference** 129:24
**differences** 174:22
**different** 32:13
103:4 147:8 165:5
185:20
**differently** 64:1
**directed** 68:21
**direction** 111:14,15
**directly** 108:11
184:7,11

**disagree** 100:15
167:23
**discipline** 171:1
**disclose** 68:16
69:12,18,24 70:20
173:4,5
**disclosed** 66:12
74:23 75:1 77:16
77:16 185:17
**disclosing** 42:4
62:6 80:10
**discontinuing**
111:5
**Discos** 42:14
**discover** 172:6
**discovered** 177:15
**discovery** 186:5
**discuss** 83:19 96:2
182:20
**discussed** 20:6
88:20 92:19
**discussing** 98:18
**discussion** 109:4
128:23 131:13
157:13
**discussions** 9:19
**dishonest** 171:2
**dismissal** 34:18
**dismissed** 38:13
**Disney** 30:8 33:20
**dispute** 181:7,10,12
**distinctive** 111:2
**District** 1:1,1 4:17
4:17 32:3 33:2,8
33:16,20 34:1,5
34:24 35:8,15
36:1,7,20 37:12
38:9,15 42:15,23
43:8,9,19 44:5,20
45:14,23 46:8
47:14,24 48:21
49:14,21
**ditto** 88:9
**division** 1:1 4:18
82:10,15

**do** 7:9 10:15,22
11:24 12:9,13,20
12:21 13:6 14:5
15:22 19:7 20:21
21:2 22:6,17
24:23 25:11,14
26:11,15,24 27:14
28:9 32:1,4,6 33:6
33:11,12 34:10,12
34:14 37:15,23
38:11,24 39:3
40:15 41:16 42:2
42:18,19 43:10
44:5,15,16 45:15
45:16 48:10,12
54:24 58:7 59:5
60:7,18,19 61:7,9
61:24 62:17,20
65:11 67:4,17,18
70:3,10 71:6
72:15,17 73:3
74:4,12 75:13,23
78:2,4,8,9,17,22
81:3 83:17 84:14
84:24 85:12,16
89:4 90:1,22 92:3
92:22 93:15,18,24
94:1,4,5 97:3
98:15,24 99:18,21
100:15 101:23
102:4,7 106:14
111:1 112:7,10,17
113:4 114:1,2,20
115:7,8 116:14,22
119:10,12 124:13
125:2,18 126:6
127:23,24 128:15
128:16 129:1,3
131:3,4 132:23
133:1 135:12,18
136:22 137:2,3
140:3,10 142:14
142:15 143:3,12
143:14 144:23
145:1,2,21,24

146:1 150:12
151:11 155:5,19
155:24 156:3
157:1 159:11,12
159:13,14 161:1,5
161:6,12 162:4
167:22,22 168:13
169:5,8 170:2,14
170:14 171:8,13
171:17,19,20
172:3,5,18 173:23
174:3,7 175:10,16
180:18 181:7,12
182:2,9,23 183:16
183:18,19,22
184:13,15,19
186:3,6,15,16
188:19 189:9,12
190:9 194:7
**dockets** 32:14
**document** 3:11,12
16:17 18:11 19:8
29:15 51:9
**documentation**
105:18
**documents** 13:7,10
13:15 16:21 17:9
19:14 103:8
108:17 186:4
**does** 24:12 27:9,15
30:18 37:7,9,17
37:21 60:12 71:23
73:3,11 78:18
87:18 127:15
137:14 147:15,24
149:13,21 158:11
162:21 170:7
183:21
**doesn't** 31:3 37:19
73:18 134:2 150:9
168:4
**doing** 9:17 10:19
11:6 25:21 31:1
32:15 65:22 102:9
125:3

CONFIDENTIAL

Page 206

**dollar** 21:8 182:16
**dollars** 20:12 87:10
  90:21 91:4 164:12
  182:19,24 184:4,7
  184:12
**Don** 52:23 53:5
  54:7
**don't** 6:18 8:22 9:4
  9:21,22 10:3
  11:18 12:4 14:10
  19:13,19 20:5,7
  23:21 25:9,13
  26:1,20 27:19,20
  27:22 28:8 30:1,5
  30:6 31:14,19,20
  31:21 35:5,18,21
  35:22 36:6,12,15
  36:22 37:1,4,10
  37:14 38:2,5,21
  41:19 42:10 43:17
  44:8 45:2 46:10
  46:12 47:5 48:24
  48:24 49:4,5,6,10
  51:14 52:8,8,10
  52:18 55:8 57:22
  59:10,14 61:22
  62:4 64:23 67:2,7
  72:6,19,19,22
  74:2 75:11 78:19
  78:22 81:3 83:2
  83:16 84:17 85:4
  85:8 86:3 87:12
  88:15 89:14,21,22
  89:24,24 90:3,9
  90:16,17,19 91:2
  91:19 92:8,11,21
  92:24 93:13 94:4
  95:6,9,18 96:20
  97:1 98:6,17
  99:20 101:8,16,19
  102:1,14,19,23
  106:11 108:2,3
  112:5 114:9
  115:21 124:6,12
  127:3 129:15

130:6,8,14 137:7
  137:16 138:2,9
  141:13 143:19
  150:14 151:4,6
  153:8,19 154:18
  154:20 155:6
  157:14,22 158:18
  161:10 162:10,23
  163:21 164:7,23
  165:2,7,11,24
  166:3,4 168:10,18
  169:7 171:19
  172:23 173:3
  174:4,12,14,16,18
  175:5 179:10
  180:13,23 181:5
  181:10,16 182:13
  182:14,20 183:8
  183:22 184:2
  187:1,3 188:14,19
  188:19
**done** 25:18 26:16
  31:5 55:23 61:4
  61:12 62:14 64:4
  156:7 166:15,18
  166:20 178:9
  185:11 190:2,24
**double-check** 67:21
**doubles** 48:19 50:8
**doubt** 43:16 44:10
  49:3
**down** 9:2 90:5
  104:23 111:18
  141:14 144:18
  155:22 167:11
**download** 89:16
**downloaded** 83:1
  89:22 172:10
  173:12
**Dr** 13:9,19 15:11
  16:8 55:19 65:19
  65:20 71:18 74:21
  77:1 78:1 79:22
  80:9 81:6,8,24
  120:21 137:10

138:23 141:12
  182:6 185:19
**draft** 51:20,24
**driving** 98:1
**drugs** 6:24
**due** 62:12
**duly** 5:23 192:7
**duration** 134:11,12
**duties** 92:2
**duty** 100:18

───────────

**E**
**E** 1:12 2:2,2 3:1,6
  5:22,22,22 16:4,4
  16:4 57:2,2,2
  144:11 192:1,1
  194:1,1
**e-mail** 89:5,23
**e-mails** 105:24
**Eagles** 53:2,6
**earlier** 13:12 28:15
  47:19 48:9 83:22
  87:13 93:21
  120:20
**early** 49:15
**ears** 93:12
**easiest** 139:22
**Eastern** 33:20 34:5
  38:9 44:20 46:8
  49:14
**economic** 182:3
  183:2,8,11,15
  185:24
**economics** 183:19
**economist** 182:9
**editorializing**
  189:19
**efforts** 11:5
**eight** 132:6 178:23
**Eighteen** 42:14
**either** 15:21 44:13
  46:10 47:6 75:5
  96:5,6 108:11
  117:4 154:19
  155:22 162:22

**elements** 174:19
**eleven** 152:6
**else** 13:21 32:18
  55:15 79:23 92:14
  94:24 95:5 107:21
  131:2 143:14
  151:16 162:12
  169:2 171:24
  183:21 188:8
**else's** 162:5,11,16
  162:23,24 169:15
**email** 19:8
**emails** 19:14
**embodied** 131:8
  159:2
**employed** 62:18
  92:16
**encompasses** 110:2
**end** 89:2 96:4 101:7
  109:1 139:8
  146:18 151:7
  183:17 190:16
**ended** 147:7
**ending** 56:15
  124:19 149:4
  151:17,18 191:17
**ends** 28:24 134:5
  134:11,12,16
**engage** 25:4
**engaged** 8:3 28:21
  44:11 49:1,5,6,9
  49:16 50:15 52:20
  67:1 86:18 95:7
  95:16 96:24
**engagement** 82:3
  87:22 95:7
**engaging** 102:1
**enharmonic** 114:4
  119:6
**Enharmonically**
  113:17
**enough** 49:11 78:16
  78:22 164:18
  174:16 181:16
**entered** 193:6

**entertain** 101:8
  165:3,12 166:4,5
**Entertainment** 1:9
  2:16 4:14 5:14
**Entertainment/H...**
  33:24
**entire** 22:15 126:2
  193:5
**entirety** 125:10
  127:13 131:8
  147:17
**entities** 102:16,23
**entitled** 3:11,12
  16:17 21:12,12
  29:15,19 64:12
  66:4,4 68:10
  108:8 186:3
**entity** 80:2 102:9
**enumerated** 32:11
**equal** 22:15
**equaled** 22:18
**equally** 145:4
**equals** 115:5,9
**Eric** 181:13,16
**Errata** 193:1,7
**escalated** 91:3
**Esq** 2:5,11,19
**essentially** 96:10,20
  138:18,21,23
  176:13
**established** 75:8
**estate** 44:1,3 50:10
  53:9 54:10 67:13
**et** 7:20 8:4 22:10
  171:5 193:2
**etymology** 150:14
**even** 26:14 46:4
  47:2 59:10,19
  62:4,6 64:6,8 69:5
  77:13 85:8,12
  92:12 93:6 97:24
  161:21 179:10
  191:4
**ever** 11:14 20:7
  39:16 49:6 69:12

CONFIDENTIAL

Page 207

| | | | | |
|---|---|---|---|---|
| 69:24 90:5 98:18 | **excuse** 4:15 6:20 | 47:15 48:1,5,22 | 17:24 68:10,14 | 193:3,24 194:9 |
| 99:18 103:1,6,8 | 13:6,12 30:2,20 | 49:23 53:16 54:13 | 77:12 86:10,11 | **Ferrara's** 13:19 |
| 103:15 108:9,15 | 31:2 35:11 36:18 | 54:15 64:6 87:22 | 103:24 104:6,22 | 78:1 182:6 |
| 173:18 179:14 | 42:21 43:9 45:1 | 103:20 109:22 | 105:8 106:19,19 | **few** 55:12 172:24 |
| 181:3 | 47:18 51:10 53:14 | 163:23 164:10 | 107:2,4,5,7 | **fifteen** 160:6 |
| **every** 117:22 | 74:21 87:4 89:8 | 171:23 181:4 | 157:15,23 169:3 | **Fifth** 2:10 |
| 127:11 | 96:15 115:1 | **experts** 23:16 35:9 | 176:21 | **fight** 81:9 |
| **everyone** 79:16 | 119:21 123:5 | 104:2 125:21 | **faculty** 170:22 | **figured** 180:16 |
| 165:16 169:4 | 130:16 133:5 | **Expires** 192:22 | **Fahmy** 22:10 49:20 | **file** 9:6 108:16 |
| **everything** 10:6 | 159:17 | **explain** 30:21 114:6 | **failed** 158:13 | **filed** 10:6 28:7 29:3 |
| 121:10 155:18 | **executive** 55:6 | **exploitation** 73:12 | **failing** 62:16 66:18 | 83:7,10 103:18 |
| 188:7 | **exercise** 116:14 | **expression** 125:12 | 68:16 | **filings** 90:22 |
| **evidence** 94:9 | **exhaustive** 167:4 | 169:2 174:9,13,15 | **fair** 43:4 49:11 | **filter** 174:15 |
| 105:8 158:10 | **exhibit** 12:18 15:8 | 174:18 | 78:16,21 164:17 | **final** 182:10,10 |
| 176:6,21 | 15:14 16:18 29:16 | **extension** 10:24 | 191:7 | **finally** 73:16 |
| **evidenced** 117:14 | 32:21 51:9,15 | 11:1 | **familiar** 6:12 57:13 | **financial** 105:4 |
| **exact** 101:15 | 52:1 53:23 57:10 | **extensive** 22:9 29:1 | 57:16 58:10,14 | 185:23 |
| **exactly** 41:8 91:5 | 114:14,16,19 | 29:2 | 157:3,5 161:3 | **find** 10:23 29:21 |
| 95:19 140:1 | 115:1 116:15 | **extent** 23:2 71:13 | 166:23 176:16 | 40:16 47:6 57:23 |
| 161:11 173:3 | 117:3 118:17 | 156:23 174:2 | **famous** 52:6 55:9 | 66:11 69:6 78:12 |
| **exam** 168:2,3 | 119:1 127:8,22 | 182:5 183:15,18 | **fanfare** 143:16 | 125:16,19 174:24 |
| **examination** 3:2 | 128:20 131:16 | 183:20,23 | 144:2 145:14,19 | **finding** 94:9 174:11 |
| 6:3 104:2 | 138:15,16 139:21 | **extra** 14:3,14,16 | 146:11 154:4 | 174:17 |
| **examined** 6:2 | 140:7,7 153:15 | 128:16 190:14 | **far** 28:23 151:7,14 | **findings** 19:16 |
| **example** 3:14 30:8 | 159:19 | **extrinsic** 180:24 | 160:11 | 83:19 84:13 90:23 |
| 114:15 115:1 | **exhibits** 12:6 17:23 | | **fast** 124:7 | 91:2,16 96:2,11 |
| 125:16 129:12,13 | 17:23 29:11 127:4 | **F** | **favorite** 145:6 | 96:11 182:8 |
| 129:17 130:1,1,2 | 127:16 128:12 | **F** 1:12 5:22 16:4 | **February** 9:13 | **fine** 10:11 30:24 |
| 130:2,6,7,9,9,10 | **expect** 41:24 91:10 | 57:2 113:15,18,21 | 10:17 11:10 57:19 | 69:9 71:5 72:16 |
| 130:10,11 161:18 | 153:19 163:18 | 113:24 114:3,5 | 103:3,9 127:10 | 115:23 117:4 |
| 162:8,9 168:2 | 170:7 | 118:9,13,24 119:1 | 157:11 | 123:10 127:20 |
| 169:20 | **experience** 23:21 | 119:8 120:9,12,14 | **federal** 29:3 | 128:3 134:18,22 |
| **examples** 17:22 | 147:20 | 135:6,10,12 149:5 | **feel** 73:18 | 140:20 165:24 |
| 130:15 163:12 | **experimental** 171:5 | 151:19 187:10 | **feels** 64:1 | **finish** 65:7 72:3 |
| 167:1 169:12,17 | **expert** 8:16 9:6,7 | 188:2,21 190:5 | **fence** 163:1 | 160:24 161:15 |
| 169:23 170:2 | 11:6 21:14 22:4 | 192:1 194:1 | **Ferrara** 1:14 3:3,12 | 170:16 175:8 |
| **except** 14:15 74:23 | 22:18 23:6 24:5 | **F-a-h-m-y** 22:10 | 4:5 12:15 13:9 | 179:2 |
| 164:10 | 28:11,18 29:6,7 | **fact** 10:20,22 40:2 | 15:11 16:8 29:15 | **finished** 95:7 155:2 |
| **exception** 105:13 | 30:16 32:4 33:4,5 | 40:11,20 52:19 | 29:19 55:19 65:19 | 155:20 158:19 |
| **excerpts** 13:18 | 33:9,15,21 34:2,7 | 78:2,4 100:3 | 65:20,20 71:18 | 159:24 |
| 14:16 | 35:1,12,17 37:24 | 111:3 133:17 | 74:21,21 77:1 | **finishes** 28:3 175:4 |
| **exchange** 29:5 | 38:1,16 39:4 | 155:17 170:13 | 78:1 79:22 80:9 | **Fink** 1:15 |
| **exchanged** 16:22 | 42:16,24 43:12,20 | 176:5 177:8,15,17 | 81:7 120:21 122:5 | **firm** 5:5 |
| 28:7 29:5 54:17 | 43:24 44:6,18 | 177:19 | 122:19 161:2 | **first** 5:23 12:13 |
| **exciting** 80:21 | 45:19 46:1,7 | **facts** 8:8 17:12,20 | 185:19 192:7,15 | 17:10 22:13,16,21 |

CONFIDENTIAL

Page 208

23:1,8 30:4 33:12
34:9,17,18 39:24
50:7,8 53:18,21
57:20 58:18 68:19
71:20 79:17 83:24
86:16,19,21 88:2
104:16 106:15
107:13 109:16
111:8,19,20 112:1
112:2,6,18 113:9
116:16 117:10
120:3,4 126:16
129:11,18 132:7
132:22 136:7,14
138:10 140:21
142:14,14,16
143:13 144:10
147:23 151:1
155:4 159:5
161:24 162:17
165:6,8 172:21
174:5,8 175:13,15
187:20,22,23
188:23
**five** 23:15,24 26:10
26:20 87:23 90:21
91:3 132:1 166:20
178:10,17
**five-page** 28:22
87:14
**fix** 100:10
**flat** 113:18,23,23
114:2,6 118:23,24
**floor** 46:18,20 93:2
**Florida** 34:24 38:15
43:9 45:15
**focus** 187:22
**focused** 126:2
**foghorn** 118:1
**folk** 37:17,20,20
172:9 173:9
177:14,18
**folks** 191:15
**followed** 29:8
136:16 139:8

**following** 123:7
167:1 193:6
**follows** 6:2 16:5
57:3 145:14
**foot** 46:21,22 93:3
117:22
**for** 1:2,21 2:3,9,15
3:7,20 4:7 5:8,12
5:17 6:1 7:18 9:7
9:17 12:15,18
13:7,14 14:6,18
14:18 15:14 16:19
17:14 20:21 22:13
22:15,21 23:6,8,8
24:23,24 25:21
27:11,19 28:16,20
29:17,22 30:7,7
30:15 32:4,14
33:5,10,15,21
34:2,15 35:5,6,9
35:11 37:24 41:1
41:15 42:17,20
43:5,20,24 45:17
46:3,11 47:22
50:22 51:14,16,22
52:4 53:17 57:10
62:18 64:6 65:23
66:15,17 67:24
69:17 70:17,18
74:12,24 81:15
82:21 84:9 85:3
85:10 86:22,24
87:10 88:7 93:20
94:9,22 95:13
96:22 98:15,23,24
99:19 103:11,16
105:17 106:10
107:9 111:16
113:8 114:16
115:13 120:20
121:14,15,15,21
122:1,10,19
124:13 125:16
128:21 130:22
131:16 136:2

138:1,5 141:3
147:13 153:15
155:1 156:9,23
157:20,20,20
158:17 159:18,20
161:2,18 164:10
164:14 166:13,22
167:11 168:2
174:8 180:21
182:5 183:4,23
186:1 190:20
193:6,6 194:14
**forcing** 80:16,18,21
**foregoing** 192:8
194:8
**form** 29:24 63:1
105:7 138:7,7,7,8
138:11,12 159:9
167:17 176:5
180:12
**formed** 68:10
**forming** 18:22
64:11 82:3 181:4
**forth** 10:21 23:17
28:7 89:18,19
130:11 146:17
176:13
**forward** 101:9
118:7 131:1
164:18 165:13
166:14
**found** 40:1,8,11
43:16 44:21,22
50:17 125:12,21
126:3
**foundation** 9:12
24:19 26:6 104:15
104:23 176:20
181:15
**four** 26:10 40:5
50:2 53:14,16
115:10 120:3,4
131:24 136:1,4
139:12,15,20
141:7 144:14,15

146:23 147:1,2,4
147:12 152:13
153:7
**four-** 28:22
**four-measure**
110:20 115:4
136:17,18,20
138:19,20,22
139:5,7,10 141:1
141:7,9,11 173:16
**fourteen** 37:22
136:7,21,24 137:6
138:10 139:9
141:17 142:8,12
142:22,23 143:4
143:14 159:5
175:13 187:20,23
187:24 188:23
**fourth** 101:14
113:9,14,21 116:8
146:5
**Fox** 42:22 43:3
**Francis** 2:3,5 5:4,6
11:21 76:7 98:2
145:7 159:22
164:22 180:14
185:1 190:7,12,17
191:9
**francis@francisa...**
2:6
**frankly** 78:6
**fraud** 167:18
**Fred** 65:6
**free** 25:21 69:8
**Freeman** 2:11 5:16
5:16 7:24 15:24
20:6 29:23 36:10
46:13,16,21,24
47:3 52:2 65:21
72:21 73:1 74:16
74:18 75:6 80:18
80:20 93:1,9
95:19,21 96:5,18
97:19 98:1,4
100:14 104:19

105:6,14 107:3,11
117:19 123:22
124:1,17 143:20
145:6,9 148:19
152:15 158:6
159:8,22 160:4
164:13,22,24
165:4,8 166:1,15
166:17 176:4
178:11,14 180:11
184:24 185:4
189:21 190:4,6
191:8
**frequently** 26:10
28:22 85:16
**Friday** 1:17
**friends** 158:3
**from** 5:2 9:3 10:24
13:18 19:15 21:13
21:13 22:23 24:14
25:5,10,12 29:7
40:12 53:2,6
55:14 61:11 64:17
67:18 71:17 73:12
78:1 83:1,11
86:23 89:5,5,13
89:17 96:3,5,6,14
103:8 109:8,10
110:12,15 111:5,9
111:17,24 112:23
113:7,8,15 120:2
140:10,10,14
142:3,7 150:13
154:22 169:2,21
172:10,10 176:1
**front** 126:7
**full-blown** 26:13
27:20,22 28:6,10
28:24
**further** 16:5 48:11
57:3 70:18,18
151:3 194:13
**future** 23:20
**fuzzy** 134:24

CONFIDENTIAL

**G**

**G** 113:18,22,23
114:1,6 118:23,24
143:22,22 144:3,4
144:7,10,13
**Gaga** 11:22
**Gail** 47:13
**game** 76:24,24
79:19
**gave** 41:16,23
93:23 96:21 98:14
98:15,23,24 162:9
163:11
**gentleman** 89:5,13
**Georgia** 45:23
**Germanotta** 11:22
11:22
**get** 10:24 12:9
25:11 61:11 67:4
70:15 73:11,17
75:11 79:13 81:9
86:22 88:21 90:24
96:14 123:11
124:2 160:22
168:13
**gets** 149:3
**getting** 68:8 146:13
146:14
**gig** 185:1
**give** 6:15 38:1
40:17 65:2,9 69:4
69:6,8 71:19
72:13 74:5 80:4
88:3,12 96:12
120:16 128:18
139:2 167:19
178:16,20 179:6
**given** 10:17 41:4,5
99:23,24 100:17
100:23 126:8
162:8 164:11
174:8 184:12
190:14
**gives** 169:12,17,20
**giving** 73:18 99:18

168:2
**glasses** 190:23
**Glover** 50:13,14,15
50:16,17,18,19,23
52:6,18,21,21
**go** 14:20 17:12 32:2
54:5 56:1 80:19
81:14,14 97:22
106:23 108:4
110:12,13 113:13
118:9,13,20 119:9
121:14 126:13
132:11 139:21
147:16 148:24
149:6 151:6,7,8
151:10,14 152:2
159:23 161:19
164:3 167:13
169:5 170:19
175:9 179:9,11
190:8
**God** 97:19 124:17
**goes** 110:15 111:9
111:24 113:7,8,15
141:24 142:3,7
167:5 171:3
**going** 4:2 6:21 10:8
12:12,13,13 15:9
16:3,20 23:4,5,21
40:7,9 51:13 57:5
59:11 62:23 68:5
72:1,15 73:17
78:8,9 80:6,8,24
90:24 109:2
112:17 114:13
117:6 118:1,5,24
122:13,15,16
124:2 127:4,11,12
137:18 138:17
140:5 144:13
150:15 153:2,11
155:14 156:17
159:15,16,22,24
160:23 162:6
166:6 175:7 177:9

178:2,19 180:22
184:5 186:18
188:8
**gone** 46:4 97:3
151:9 155:17
160:12 185:10
**gonna** 81:15 106:10
106:13 108:4
124:1 131:2
177:11,12
**good** 4:1 31:7 78:12
120:18 123:12
186:21
**Good-bye** 191:15
**Gordon** 34:11,14
34:15
**got** 15:24 23:13
74:11 86:24 90:9
104:23 116:2
128:18 151:16
190:16
**gotten** 107:12,14
191:2
**grandstand** 164:14
**grandstanding**
163:21
**granted** 11:2 34:16
43:6 45:17 46:4
85:10
**granting** 42:19
**gratuitous** 51:13
**grave** 186:1
**great** 15:22
**greater** 22:23 23:19
171:1
**greatly** 25:20
**Griffin** 34:5
**gross** 121:4
**grounds** 17:7
**group** 4:11 34:23
35:7,23 36:19
37:13 38:5 55:12
73:5 82:10,17,22
96:16 98:13,23
102:9 103:2,9

104:11 105:3,11
105:20 108:9
172:11 173:11
176:9 184:22
185:21
**Grover** 50:11,13
**guess** 11:1 34:12
38:23 183:24
**guessing** 83:6
**guitar** 133:3,9
135:3,7 137:13
144:22 145:14
146:12 147:8
148:11,17,19
151:18 154:7,9
159:4 173:14
175:10,12,18,21
187:19,24 188:22
**guitars** 173:14
**guy** 51:14
**guys** 65:24

**H**

**H** 3:6
**had** 6:6,10 7:10,16
11:8 22:18 23:16
25:15,22 27:7,8
27:14 37:11 40:7
50:7 55:14 61:3
70:1 75:21 82:1
84:11,18 95:22
96:23 99:24 100:1
106:4 118:6 125:3
126:3 128:17
139:22 152:5,13
154:18 156:19
157:4 161:18,20
161:23,24 162:1
177:15,18 178:23
188:16
**half** 89:1,1 119:15
120:2,3,12 142:14
173:3
**half-day** 122:12
**halfway** 22:20

**halved** 115:6
**hand** 57:5 89:18
**handed** 14:4
**handing** 57:8
**hands** 194:19
**hanging** 157:21
**Hanson** 181:19
**happen** 23:20
**happened** 99:8
**happens** 139:20
175:12
**happy** 21:23 22:6
24:8 28:1,5 30:21
61:14 67:20 70:16
78:10,17 90:22
179:4
**harassing** 68:20
163:3
**harmony** 135:20,23
**has** 7:7 8:13 13:9
28:6 29:3,5,5 56:3
58:7 69:10 72:1
80:3 81:6 97:17
100:17,18 103:24
107:16 123:23,24
153:7 158:21
165:4,9 174:10
183:16,18,19
190:12 193:5
**hasn't** 59:19 77:15
186:8,9
**have** 5:2 6:9,17
11:14 12:9 13:14
14:3,5,8,17 15:20
15:21 17:8 19:6,8
19:13 21:24 25:23
27:10,18 29:1,6
29:19 30:5,6,13
31:17 32:6 35:4,4
36:16 38:6 39:1
39:23 41:19 43:15
43:15 44:10 46:4
48:10 50:1,1,3
51:19 53:7 54:15
54:17 57:4 58:2

CONFIDENTIAL

Page 210

59:6 61:11,12 67:21 70:20 72:22 74:2,16 75:11 77:23 78:3,4,13 80:10 83:1,2,9,18 83:20 84:11,12 85:4 89:4,22 90:1 90:18,18 91:3,17 91:19,20,22 93:12 94:11 95:6,11 101:6 106:11 107:11 108:8 109:2 110:4,6 114:9 117:21 120:21 121:24 123:1 125:2 126:6 126:9 128:4,14,16 130:16 132:6,18 134:9,19 136:18 138:13,18 141:21 141:24 142:3,6 146:15 147:11 152:10 155:7,19 156:7 157:8 159:13,23 160:8 160:14 162:6,15 163:22,22 165:5,8 165:9 166:13 168:10 170:14,14 172:24 173:1 178:4,11,13 179:5 180:16 181:3 182:19,21 183:21 185:12,22 190:7,8 191:13 193:5,7 194:18

**haven't** 84:4 126:8 150:7 153:18 182:8

**having** 5:23 25:18 46:17 49:6 65:16 97:3,15 100:22 101:4 121:14 157:20 176:17

**he** 21:19,19 28:3

31:3,4,5 44:2,3 52:6 55:13,14,19 55:20,20,21 59:16 59:19 60:14,18,18 60:19 61:3 62:17 63:22 64:1,8,20 64:20 66:6,11 68:22,23,24 69:1 69:5,8,10 71:8,15 71:22 73:17 74:17 75:24 77:3,3,12 79:23 84:5,5,18 84:24,24 85:4 92:22,23 93:14 97:17 98:11 99:9 99:10,10,16,21 100:4,10,11 101:6 103:24 104:6,8 105:1 106:19,20 106:21 107:17,22 107:23 137:12,13 175:3

**he'd** 99:11

**he'll** 62:20

**he's** 10:7 31:5,7 37:2,3 53:1 60:22 62:5,14,16,19 63:23 64:4,7 66:8 66:10 68:4 72:15 74:7 77:11 98:17 101:17 137:14,23 140:13 158:17

**head** 139:3 140:11 140:14

**hear** 41:1,24 47:11 97:5 106:7,8 111:7 143:19,20

**heard** 42:1 87:19 96:5 172:21,24

**hearing** 93:11

**hears** 161:18

**Heaven** 3:17 58:9 58:11 59:1 60:2,6 61:5 62:16 69:3 70:4 73:13 77:6

82:5 83:3 94:3,23 107:19 116:5 119:10,24 120:8 135:19 136:3,15 136:23 137:5,17 138:15 139:5 143:5,11,15 147:7 151:23 152:3,7,18 152:20 153:6,9,13 154:8 158:23 159:3,6 173:17 174:1,4 175:14,19 175:23 188:1,22

**heavily** 10:19

**held** 4:19 177:19

**Helene** 2:11 5:16 14:4 15:23 20:6 65:21 95:19

**Helene's** 71:17

**help** 19:9 25:16 35:20 36:15,17 37:6 38:7

**helpful** 138:14 141:3

**Henley** 52:22,22,23 53:5 54:7

**herald** 144:19

**here** 5:9 7:1,7 9:18 12:10 15:11 18:5 29:2,11,19 32:19 50:1 53:8 54:11 55:1 56:5,10 59:8 59:11 63:13,21 65:16,17,22 67:12 68:13 76:24 78:2 88:4 97:4 99:12 100:6 102:24 105:2 107:24 109:6 115:3,18,24 116:1 120:8 126:11,13 127:4,7 128:14,16 140:2,7 141:22 143:17 148:23 149:18 163:22 166:21

169:12 170:3 176:15 180:10 188:16

**Here's** 127:13 141:6

**hereby** 194:7

**hereof** 192:10

**hereunto** 194:19

**hfreeman@philli...** 2:12

**highly** 161:17

**hill** 71:21

**him** 21:21,21 31:9 60:23 61:9 62:17 62:21 63:12,12 64:20 65:2,9 66:11 69:4,6,18 71:4,11,19 72:13 73:23 74:5 75:23 76:2,9,19 80:3,10 84:4 97:15 98:19 101:3,3,4,5,6 161:14,16 163:23 175:3,6 189:17 190:14

**himself** 69:8

**hired** 40:14 42:16 101:10,20,21

**his** 8:13 18:13 21:17 52:20 54:9 54:9,9,10 64:11 64:24 71:12,23 84:3,14 92:20 102:16 121:13 122:21 128:6 140:14 156:24 161:15 181:10

**his/her** 192:8

**history** 168:17 176:1,8

**hold** 81:12 106:22 126:9,22 145:20 154:2 166:9,9

**holding** 35:14 36:8 36:14 126:20

**Hollenback** 67:9,11 102:22

**Holmes** 177:9

**homework** 171:4

**honest** 31:16 41:23

**honestly** 52:10 89:22

**honesty** 54:22

**honor** 21:10

**hour** 185:5 191:8

**hours** 87:8 90:15 91:5,10 122:13,16 178:8 186:13,19 186:22,24 190:14 191:3

**how** 6:9 7:11 11:24 16:7 20:11 21:2 21:13 24:15 25:22 26:15,23 28:9 57:23 60:12 62:17 68:17 75:10 79:13 81:3 84:14 86:22 87:3 90:9 91:3,5 91:11 93:13 99:4 107:23 112:13 121:4 123:12 129:4 130:5,5 153:9 154:21 155:9,12,14 156:23 160:10 161:11 168:19,20 174:9 179:20 180:3 182:5,12 186:15,24

**however** 13:15 72:15 165:17

**hugest** 28:19

**hundred** 20:12 152:13 153:7

**Hype** 1:7 4:10

---

**I**

**I** 1:12,12 3:1,6,6 5:2 6:5,11,14,16 6:18,20 7:2,5,9,14

CONFIDENTIAL

Page 211

| | | | | |
|---|---|---|---|---|
| 8:3,6,12,18,20,22 | 44:8,10,10,12,16 | 93:15,16,21,22,23 | 137:23 138:2,4,12 | 177:20 178:2,13 |
| 9:4,13,13,14,16 | 44:24 45:2,16,20 | 94:5,11 95:1,9,18 | 138:14,16,20 | 179:10 180:5,7,7 |
| 9:17,19,21,21 | 46:2,10,12,13 | 95:20,22 96:1,1,4 | 139:1,22,23,24 | 180:13,22,24 |
| 10:3,4,8,12,15,16 | 47:1,1,3,5,9,12 | 96:8,11,11,17,20 | 140:1,5,9,10,12 | 181:1,5,10,16,18 |
| 10:16,19,21,21,24 | 48:8,12,12,17,24 | 97:1,3,5,6,10,20 | 140:17,21 141:2 | 181:22 182:8,13 |
| 11:2,4,4,8,16,18 | 48:24 49:2,2,2,4,4 | 98:5,6,12,17,17 | 141:13,21 142:20 | 182:19,20,21 |
| 12:4,21,23 13:10 | 49:5,6,8,9,15,16 | 98:18,19,21,21 | 143:6,8,12,16,17 | 183:8,22,22,24 |
| 13:12,14 14:2,3,4 | 50:1,3,3,13,15,16 | 99:9,20,20,22,22 | 143:22 145:1,4,13 | 184:11,19,21,21 |
| 14:17 15:19,21 | 50:20,23 51:2,7,8 | 99:23,24 100:3,9 | 145:21,24 146:5 | 186:6,16,22 187:1 |
| 16:23 17:1,3,6 | 51:14,20,22 52:2 | 100:13,14,15 | 147:6,11,16,22 | 187:3,5,7,14,16 |
| 18:1 19:6,13 20:1 | 52:8,8,9,18,18,19 | 101:8,9,13,16,19 | 148:4,5,6,6,13,18 | 187:18,22 188:19 |
| 20:4,5,7,17 21:9 | 52:19,20 53:7,20 | 101:20,20,22 | 149:3,8,16,16 | 188:19,20 189:7 |
| 21:11,23,24 22:13 | 54:3,9,15,19 55:5 | 102:1,7,14,19,23 | 150:1,4,7,11,14 | 189:11,14,14,17 |
| 22:16,17,21,21,22 | 55:5,8,24 56:2,3 | 103:23 104:5,24 | 150:21,21,24,24 | 189:22,23 190:19 |
| 23:1,9,13,13,16 | 57:4,18,22 58:19 | 105:7,10,16 106:8 | 151:4,4,6,7,9,9,14 | 191:6 192:1,1 |
| 23:19,19,21,23 | 58:22,22 59:6,10 | 106:11,12 109:2 | 151:20 152:2 | 193:5,6,7 194:1,1 |
| 24:1,7,7 25:3,4,8 | 59:12,14,15,18 | 109:21,21,22 | 153:8,8,17,17,19 | **I'd** 21:21 28:1 |
| 25:9,11,14,18,19 | 60:4,8 61:11,22 | 110:18,19,20,23 | 153:19 154:18 | 30:21 67:20 |
| 25:19,21 26:1,4 | 62:4 63:10,20 | 111:1,4,11,15 | 155:1,6,13,19 | 116:14 120:7 |
| 26:19,20 27:3,3 | 64:23,23 65:1,9 | 114:5,7,8,9,11,18 | 156:3 157:1,8,14 | 128:18 131:11 |
| 27:12,12,18,20,22 | 65:18 66:20 67:2 | 114:20 115:8,18 | 157:14,15 158:12 | 143:20 151:11 |
| 28:5,6,8,8,14,14 | 67:2,4,5,7,14,17 | 115:21 116:10 | 158:18,18,22 | **I'll** 6:15 30:17 |
| 28:14,18,23 29:6 | 67:19,19 68:19 | 117:3,4,10,18,21 | 159:12,14,23 | 41:18,20 93:15 |
| 29:19,20 30:1,5,6 | 70:15 71:9,16 | 117:22 118:1,5,6 | 160:13 161:4,10 | 105:6 115:16 |
| 30:13,14 31:14,16 | 72:19,19,20,22 | 119:1,12,20,23 | 161:22 162:9,10 | 117:6 118:8 124:7 |
| 31:17,17,19,20,21 | 73:19 74:2,16,24 | 120:19 121:6,8 | 162:11,15,24 | 127:18 134:16 |
| 31:24 32:1,6,16 | 75:11,17,19 76:2 | 122:6,8,15,16,20 | 163:11,14,15,16 | 164:18 178:9 |
| 32:20 33:3,6,6,11 | 76:5,18 78:6,10 | 123:18,19,20,22 | 163:16,17,17,18 | 187:19 188:14 |
| 33:11,12,12 34:9 | 78:11,12,15,19 | 123:24 124:3,5,6 | 163:19 164:16,16 | **I'm** 4:21 8:7 12:8 |
| 34:9,10,11,14,14 | 79:18 81:3,8,14 | 124:8 125:10,12 | 164:19,19,19,21 | 12:13,13 13:24 |
| 35:3,3,4,4,5,5,5 | 82:9,17,22,23,24 | 125:14,16,18,18 | 164:23 165:2,7,11 | 14:11 19:1 21:11 |
| 35:18,20,21 36:4 | 83:1,2,2,4,5,9,16 | 126:1,2,3,9,11,13 | 165:12,24 166:3,4 | 21:12,20 22:6 |
| 36:12,13,14,15,22 | 83:17,18,22,22,23 | 126:21,23 127:3 | 166:11,17,20 | 24:8 26:11 28:16 |
| 37:1,4,14,14,15 | 84:1,2,3,4,10,12 | 127:12 128:13,13 | 167:24 168:1,2,10 | 29:23 31:11,22,22 |
| 38:2,2,5,6,11,11 | 84:17,17 85:4,16 | 128:15,15,15,17 | 168:12,13,13,18 | 32:6,15,20 35:20 |
| 38:18,18,20,21,21 | 86:17,18,20 87:7 | 129:12,13,14,22 | 169:8 170:19 | 36:12 37:4,14 |
| 38:23 39:3,6,9,23 | 87:10,12,18,18,18 | 129:22 130:4,6,8 | 171:20,20 172:4,5 | 38:20 39:22 46:16 |
| 39:24 40:1,3,4,5,7 | 87:21 88:3,3,5,10 | 130:13,16,20,24 | 172:8,10,11,12,14 | 46:16,19 47:8,21 |
| 40:8,10,14,20,21 | 88:12,13 89:14,16 | 131:7 132:12,17 | 172:14,17,23,24 | 47:22 48:9 51:16 |
| 40:23,24 41:1,3,4 | 89:16,21,21,22,24 | 132:18,19,20 | 173:3,10,12,12,12 | 53:12 54:18 55:8 |
| 41:4,5,5,10,15,16 | 89:24 90:3,3,7,17 | 133:1 134:3,4,14 | 173:15 174:2,3,4 | 55:23 57:5,8 |
| 41:16,19,21,23,23 | 90:20,22 91:2,10 | 134:19,19,23 | 174:7,10,14,15,18 | 60:22 61:14 62:22 |
| 41:24 42:1,10,18 | 91:15,19,19,20,20 | 135:11,15 136:13 | 174:24 175:5,5,7 | 64:12 65:8,16,21 |
| 42:19 43:13,14,15 | 92:8,11,19,21,23 | 137:2,7,7,9,15,16 | 175:16,16 176:8 | 66:3,4,19 67:20 |
| 43:15,15,16 44:8 | 93:1,6,11,11,13 | 137:20,21,21,22 | 176:10,24 177:5 | 67:22 69:9 70:16 |

CONFIDENTIAL

70:24 71:1 72:12
75:2,7 78:14 83:6
84:15,16 90:21
91:8 92:24 93:6
102:19 104:19
106:10 108:4
110:5 112:17
113:22 117:6
118:11,24 120:5
120:13 121:18,23
123:4,6 124:13
126:18 127:4,11
127:12 129:14
130:13 131:2
135:2 136:18
139:13 140:5
141:11,14 147:18
149:18,23 150:15
152:18,24 153:11
154:9 158:2
159:15,22 160:2,5
160:21,23 164:5
168:20,21 172:3
172:20 177:9,11
177:12,21 178:1
178:19 179:4,9
180:15 183:7,9,10
183:22
**I've** 15:24 20:6,16
21:7 23:23 54:12
56:5 74:11 120:5
120:13 140:15
151:9 154:18
155:4 156:5 162:7
169:10 173:7
176:12 184:12
191:12
**i.e** 88:13
**iconic** 54:8
**idea** 74:16 83:9
182:19
**ideas** 169:24
**Iden** 3:7
**identification**
12:19 15:15 16:19

29:17 57:11
114:16 128:21
131:16 153:16
159:20
**identified** 59:20
60:19 63:23 77:11
170:3 188:24
191:13
**identifies** 128:1
**identify** 55:1 66:18
70:14,16,16 72:18
137:4 143:9,15
171:24 187:10
188:1
**identifying** 64:8,19
147:4
**if** 6:17,19,20 7:7
9:14 10:3 16:1,10
18:5 25:8 26:8,12
27:19 28:2 31:3
32:14,17 35:18
36:16 37:5 38:6
38:19,19 41:4
42:10 46:10 47:6
48:9,19 53:12
54:17 59:2,14,16
60:10,13,14,22
62:5,20 63:12,24
66:2,11,22 68:17
69:4,6 71:3,19
72:10,13 74:11
75:17 76:8 78:10
78:21 80:9 84:15
87:11,18 88:10,13
89:1,15,18,19
96:20 101:16,20
104:6 108:3 109:6
110:10,14 113:13
115:3,23 116:13
119:9 126:24
127:5 128:17
129:15,17 130:9
130:13,20,21
132:11 133:2
134:20 138:1,13

138:14 142:19
147:7 148:18,20
161:10,18,21
162:11,16 163:10
163:13,17 164:15
165:23 166:7
168:2,8,15 175:20
177:2 178:3
181:18,22 188:14
189:7
**images** 169:24
**imagine** 90:20
111:15 174:24
187:5
**impact** 70:12 156:1
**implementing**
180:23
**implies** 162:12
**important** 143:4,6
143:10,15 144:5
144:21,23 145:2,5
146:2,4,22,24
147:3 148:5
154:20 155:1
171:11 174:11
180:18
**importantly** 30:4
**impose** 80:3
**impossible** 80:8
**improper** 100:13
101:1
**improperly** 103:18
**in** 3:9 4:6,24 5:7,20
7:19,21 8:8,16,20
9:13 10:16,17,19
10:20,22 11:6,10
11:10,17,18,18,21
12:1,2,17 13:11
13:19 15:11 16:11
17:13,21,22,23,23
17:24 18:1,6,13
18:14,20,21,22
20:9,11,17,18,22
21:14 22:11,13,17
22:17 23:3,15,18

23:20 24:2 25:23
26:12,16 27:7,7
28:24 29:21 30:18
31:6,16 32:13
33:6,13,14 34:11
35:8 36:6,7,7,21
37:12 39:9,9 40:2
40:11,13,15,20
41:7,12,21,24
42:1 43:10 44:2
44:19,23 48:13
49:16 50:4,6,8,12
51:11,12,15,21,23
52:19,19 53:15
55:7,15 57:5,19
58:11,15 61:15,17
63:24 64:7,12,17
66:17 67:1,4,15
68:9,11,14,16
69:12,14,24 70:11
70:12,12 71:14
72:23 73:12 74:20
75:18 76:4 77:2
77:13,16 78:2,4
80:12 82:3 83:1,3
83:7 84:4 85:24
85:24 86:12 87:1
87:1,9,11 88:4,7
88:13,15,22 92:15
93:7,10 95:16,18
95:24 96:8 97:12
98:16 99:1,12
100:3,6,22 101:2
101:4,6 102:1,3
103:3,5,9 104:11
105:4,8,22,23
106:4,12,16 107:4
107:6,8,9,15
108:11,12,12,18
109:7,10,21,23,24
110:12 111:3,8,11
111:13 112:2,6,18
113:2,3,14,17,21
114:22,24 115:5
115:10 116:4,7,16

116:18 117:3
118:22 119:21,23
120:4,4,7,13
121:13 125:3,11
125:13,13,14,17
125:19,22 126:5,7
127:13 129:4,23
130:17 131:6,8
132:4,8,9 133:9
133:10,17,22
135:2,3,7,18,23
136:2,6,15 137:4
137:9,11,12,13,14
137:15,16,16,18
138:8,16 139:3,4
140:6 142:20
143:8,13 144:20
144:22 146:5,15
147:17,17,17,18
151:14 153:9,17
154:5 155:3
156:18 157:11,11
157:21 158:20
159:2,5,6 160:6
163:5,20 164:9
165:1,17 168:8,9
168:10,16,17
169:1 170:6,8,11
170:12,17 171:6
171:10,22,23
172:7 173:10,17
174:9,10,18,21
175:11,12,15,18
175:20,21,21
176:2,6,21,22
177:5,14,15,17,19
178:9 180:9 181:3
182:10 185:21,24
186:7,10 187:19
187:24 188:22,23
188:24 189:5,8
192:9,18 193:5
194:15,16,18
**inaccurate** 19:24
141:18 144:7

CONFIDENTIAL

**Inc** 1:7,8 2:16 4:11
  4:12 35:14 37:22
  38:22 43:7,8
  47:19 48:21
**include** 127:16
**including** 125:11
  171:2
**inclusive** 105:24
**income** 23:14 24:4
  24:4
**incorporate** 167:20
**incorporated**
  169:18
**incorrect** 39:15
  100:16,21 126:1
**incorrectly** 50:5
**indicate** 19:9 62:16
  115:15 116:5
  119:10
**indicated** 13:11
  27:8,14 74:7
  118:17 153:23
  186:10 193:7
**indicates** 153:22
**indirectly** 108:11
**individual** 24:24
  50:19,24 60:17
  63:5 89:23 90:2
  158:7 170:23
  176:16
**individuals** 25:8,12
  25:19
**industry** 24:23
  30:18
**Inetern** 37:22
**influence** 6:23
**information** 13:17
  16:10 48:11 64:16
  68:10 69:19 73:17
  77:23 78:3 99:18
  168:8,11
**informed** 21:24
  98:21 99:23
**infringed** 8:14
**infringement** 94:10

165:18 184:3
**infringing** 158:22
  158:24 159:1
**initial** 9:15 10:18
  11:9,12 15:8
  41:12 67:19 88:19
  91:14 125:7 126:6
  127:15 129:19
  182:11 183:17
**initially** 39:13
  41:11 87:22
**instance** 71:22 99:1
**instances** 177:21,23
**Instead** 10:23
**instructed** 155:5
**instructing** 21:21
**instrumental**
  146:11,13
**Integrity** 3:19
  159:18 161:2
  166:22
**intellectual** 167:3
**intend** 182:2,14
  184:2
**intended** 191:4,7
**interchange** 130:8
**interest** 104:11
  105:4,4 108:11,18
  108:20 185:24
**interested** 100:22
  102:3 107:4
  194:16
**interesting** 155:21
**interfering** 61:2
**interject** 9:16
**interlude** 136:17,19
  136:20 139:8
  141:16 142:6,18
**internal** 28:20
**interrupt** 47:4 72:6
  161:15
**interrupting** 65:8
**interruptions**
  160:19
**interview** 157:10

**into** 12:9 116:8
  138:21 151:6
  161:20 167:20
  170:24 177:5
  180:17
**intro** 140:22 141:24
  142:17 143:13
**introduction** 5:2
  132:2 136:16,19
  138:12,22 139:4
  141:6,8,15 145:3
  145:22
**invoice** 25:20 91:17
  91:19,21 186:14
**invoices** 3:10 13:16
  15:10,13 16:1
  20:16,17 91:18,20
  105:24 107:14
  186:7,10
**involved** 8:4 35:19
  35:21,22 36:6,13
  38:6 43:10 50:12
  58:11,15 68:9
  95:24 109:24
**involvement** 107:9
**involves** 87:22
**iPhone** 74:12
**irrelevant** 161:9
**is** 4:3,4,19,20,22
  5:9 6:16,21 8:6
  9:2,5,10 10:8 11:8
  11:20,22,22,24
  13:16,18,20,24
  14:11,22 15:5
  16:21 18:1,4,14
  19:10,23,23 20:1
  20:4 21:6,7,18
  22:1,1,1,2,12,20
  23:18,19,21 24:15
  24:20 25:8 26:10
  26:21,21 27:24
  28:8,9,20,20,21
  30:5 31:20,21,21
  32:17,21 38:3
  40:24 41:6,7,21

41:23 43:2,3,4,14
  43:16 45:6 47:9
  47:18,19 48:7,13
  48:16 49:3 50:8
  50:18 52:22 54:6
  54:7,17,18,24
  55:22 56:14,23
  58:21 59:3 60:16
  60:22 62:12,23
  63:9,11,13,21
  64:2,17 65:2,12
  65:15 66:12 67:4
  68:8 69:8,21
  70:19 71:8,15
  72:4 73:5,7,11,14
  73:16,20 75:8
  76:7,23 77:1,7,8,9
  77:10,15 78:7,12
  79:19 80:16,17,22
  81:17,21 82:9,11
  82:15 84:3 85:13
  85:13,17 86:6,16
  88:2,17,19,20,24
  89:15,17,18 90:15
  92:2 93:4 94:14
  94:17 96:21 97:8
  97:14,17 99:4,6,8
  99:14,23 100:16
  102:19 104:4,11
  105:5,10 106:18
  106:18,24 107:1
  107:18 109:7,23
  109:24 110:19,22
  110:24 111:1,3,4
  111:22 113:23
  114:2,2 116:1,1,9
  116:22 117:4
  118:21,24 119:1
  120:2 121:16
  122:3 124:15,22
  125:24 126:1,11
  126:21 127:7,14
  129:3,12,14,19,24
  130:3,4,19 131:18
  131:21,22 132:6,7

132:10 133:5,10
  133:14,16 134:4
  134:16,22 135:6
  135:20,23 136:15
  137:8,10,10,11,14
  138:2,3,5,6,7,7,11
  138:12,16,17,21
  138:21,23,23
  139:5,6,8,9,12,14
  139:24 140:7,14
  140:24 141:8,10
  141:12,17,21
  142:9,24 143:4,6
  144:11,21 145:4
  145:16,17,23
  146:11,12,14,17
  146:21 147:14
  148:6,14,22 149:4
  151:12 153:2,23
  154:5,7 155:1,1
  155:13,16,16
  158:13 159:1,4,10
  160:10 161:13,17
  161:22,23 162:3,5
  162:16 163:18
  164:11,24 165:9
  165:10,15 167:17
  168:4,8,12,12,13
  168:18,24 169:1
  170:13,17 171:1,1
  171:11 173:23
  174:4,8,21,24
  175:11,15,16,17
  175:22 176:13
  177:7 180:18
  182:11,20,21
  184:3,4,4,13,16
  184:24 185:21
  186:1,8,18 187:2
  188:17 189:5,6,6
  189:9,11,11,12
  190:22 191:7,16
  194:10
**Island** 34:23 35:23
  36:19 37:13

CONFIDENTIAL

Page 214

**isn't** 36:23 37:15 39:14 61:8 71:18 149:8 190:10,11
**isolated** 189:10
**isolation** 189:8
**issue** 39:10 41:14 43:17 62:13,24 63:24 64:3,9,10 64:11 65:16 69:21 72:5 74:24 75:4 76:11 77:14,15,17 77:18,18,19,20 95:24 125:13 136:1 176:10,13 177:6 181:1 182:23 185:14,15 185:18,21 188:9
**issues** 51:11 64:13 82:2 84:6,19 107:24 191:12
**it** 8:20,22 9:2 10:22 11:20 12:24 13:1 13:22 18:6 22:15 23:1,13 24:3,7,7,8 24:13,14 25:21 26:2,7,11 27:12 27:13 28:16,20,20 28:21 29:4 31:7 32:7 33:11,12,12 34:9,10,10,16 35:19 37:6,6,9,15 37:19,21 38:7,23 39:10,10,14,17,17 40:7,22,23 41:10 41:21,22,22 43:4 44:12,20 46:4 49:3,7 50:16,20 50:21 51:19,21,23 51:24 52:11 54:10 55:21 57:8 58:1 58:23 59:8,20,21 60:10,12,24 61:9 61:15,16,18 63:4 63:4,6,7 64:1 65:23 66:10,19,21

67:3,5,20 69:9,11 70:11 72:15 73:5 73:7,11,11 77:15 77:16 78:22 80:4 80:11 82:11 83:1 83:1,5,7,11 84:1,2 84:8 85:16 86:21 87:9,11,11,18 88:17,19 89:16,17 89:19,22 90:14,20 91:3 92:18 95:21 96:13 97:12,23 98:5 99:4,14 100:6 101:18 102:15,21 104:21 105:7,10,15 106:18,18 107:1 107:23 108:4,7,8 109:18,18 110:1 110:14,21 111:14 111:18,24 112:10 112:17 113:7,8 114:5,21,21,24 115:3,9,15,18 116:2 117:4,16,23 123:9,24 126:8,19 126:21 127:15,19 128:1,6,6,8,18 129:12 130:3,10 130:19,24 131:19 131:20,23 132:4 134:2,8,10,14,16 137:20,21,24 138:2,4,5,13 139:3,24 140:3,10 140:10 141:3,5,6 141:7,8,10,14 142:12,14,15,17 142:19 143:6,9,14 143:21 144:3,4,7 144:10,18,21,21 145:17 147:8,16 147:18 148:1,2,3 148:14,15,21,22 149:1,2,7,10,17

149:19 150:7 151:2,11,13,20 152:5,13 153:20 153:22 154:10,20 154:22 155:2,7,10 155:21 156:1,23 157:10,10 159:10 160:17 162:12,18 162:18,19 163:6 163:14,18 165:9 165:10,17 166:2,8 166:11,12 167:1,5 167:7,17 168:18 169:12,14,14,17 170:1 171:1,3,18 172:10,12,12,13 172:15,23,24 173:1,2,10,10,12 173:12,23 174:23 175:17 176:2 177:1,14,15,16,17 177:20 181:5,18 181:19,22,23 182:5 183:18,19 183:21 184:7 187:2 189:6,12,23 190:21,22
**it's** 16:24 21:11 22:24,24 23:4,24 29:20 30:20 31:1 31:18,18,19 32:7 32:10,11,11,13,14 36:10 38:4 39:21 44:13 45:4,4 46:15 47:20,21,21 48:9,14,15,18 49:3,4,4,8 50:9,9 50:13 52:10,10 53:19 54:3 59:13 59:15 60:10,13 61:10,13 64:9 65:13 66:13 73:2 73:4 74:24 76:10 77:14,17,18,19,24 78:21 80:1,20

81:15 83:18 84:16 84:17 88:8,14 89:18,19 90:8,15 92:9,11 93:8,9 95:10 97:20 98:7 100:9,13 105:9,17 106:12,15 110:20 111:13 112:8,15 113:5,8,17 114:6 117:9 118:22 119:6 121:1,3,4 122:9 124:1 126:15 129:12 130:5,7,18 131:19 131:24 132:8 133:17,22 134:6 134:15,23,24 136:4,19 137:3,19 138:9 139:11 140:6 141:21 142:16,21 143:17 143:24 144:4,7,8 144:14,14,19 145:2,6,8,17 146:19,19,19 147:10,21 148:16 148:17 149:4,9 150:9 153:24 155:13,17 161:7 161:12 162:4,11 162:22,23 163:4,7 163:21 164:4,8,15 164:16 165:14 166:6 167:3 168:11 173:24 174:6,21 175:8 176:21 184:9,21 189:7 190:16
**iterated** 134:4
**iteration** 132:7,22
**iterations** 143:24
**its** 97:8 109:10 111:14 147:17 167:7,16
**itself** 69:17

**iTunes** 83:2,3 89:16 172:10 173:11

---

**J**

**J** 2:14,19 38:12
**J-Records** 34:5
**Jake** 177:8
**Jam** 34:23 35:23 36:19 37:13
**James** 1:6 2:9,15 4:8 5:12,18
**January** 42:15 108:15
**Jay** 22:10 49:20,22
**jazz** 18:2 184:15
**Jazzology** 3:11 16:17
**Jean** 44:12,21,22 44:22 51:1,5 54:6
**Jimmy** 154:10,11 155:8 156:11,18 157:4,17 158:15 180:2,9
**Joan** 177:10,19
**John** 1:7 4:10 44:1 50:9 53:9 54:8,10 157:18 158:14 180:2,9
**Johnson** 34:11,14 35:14 36:15 181:13,17
**Join** 176:7
**jolt** 47:8
**Jones** 1:7 4:10 38:9 158:15 180:2,9
**Jones'** 157:18
**judge** 7:8 10:24 42:19 64:1 183:20
**judge's** 183:5
**judgment** 7:1 34:16 42:20 43:5 45:17 46:3
**jumped** 36:3
**June** 194:20

CONFIDENTIAL

**jurisdiction** 4:16
  192:19
**jury** 7:8 44:21
  163:22 164:14
  166:13
**just** 6:4,15 12:12
  14:1,4,13 23:12
  28:23 30:22 35:21
  36:2,15 37:15
  38:21 43:17 46:17
  51:7,8,8,16,22
  53:19 55:12 56:2
  67:21 72:2 76:20
  77:20 80:3,23
  83:6 84:16 85:17
  86:4,7 87:24
  88:24 90:3,7,8,19
  91:13 92:9,24
  93:15,22 94:20
  97:24 98:7,10
  99:9,16 110:18
  113:23 115:13,16
  116:22 117:4,10
  117:21,23 118:6
  120:13,19 121:3
  126:19 127:9,12
  127:17 128:5,6
  130:5,7 131:24
  132:12 134:3,4,16
  137:18 138:1
  139:1,22,24 140:2
  140:9,15,21
  143:18 144:14
  147:7,10,21
  148:20 149:23,24
  150:4,19 151:17
  153:17,20 158:19
  160:21 162:7,24
  163:15 164:1,20
  166:14 169:2,10
  170:16 178:2
  187:21 188:12,18
  188:20 189:8,14
  189:17,21,22
**Justin** 8:14 38:22

**K**

**keep** 31:1 46:17
  76:8 93:2,11
  128:6,6 163:24
  175:2
**Kent** 55:9
**Kernel** 45:1,2,6,10
**Kevin** 181:19
**keyboard** 143:23
  144:9 148:16
  188:5
**kind** 22:23 24:10
  26:7 67:23 92:13
  108:10 147:21
  155:13
**Klavens** 55:9,18
**knew** 86:17,20
**know** 6:5 9:4,24
  10:3,12 11:24
  12:12 21:12,12
  25:9 26:1 27:19
  27:22 28:23 30:1
  31:15,20,21 32:18
  38:2 42:10 43:15
  45:2 46:12 49:5
  54:24 55:24 56:3
  59:10,14 61:14
  62:4 65:11,19
  66:4,5 67:7 72:17
  72:24 73:1 74:19
  75:6,9,10,17
  78:18,19 89:17,17
  90:16,17,19 92:21
  93:6,10,13,22,24
  93:24 96:7,20,22
  97:1,3 98:7,13
  100:13 101:16,19
  101:22 102:1,19
  102:23 103:6,21
  103:23 104:5
  109:22 112:20
  118:1 121:17
  128:5 129:4
  137:23 139:24
  140:10,21 143:22

146:7,16 150:12
  150:14 153:8
  154:18 157:15,23
  158:3 159:11
  161:11 162:24
  164:10 168:4
  169:14 172:3
  180:13 181:16
  182:9,13 183:8,22
  184:13,15,19,21
  186:15 187:1
  190:16,22
**knowledge** 19:14
  60:3 91:15
**knows** 31:5 65:20
  65:21 76:22

**L**

**L** 1:12 5:22 16:4
  57:2
**L-D-G-E** 84:16
**L-E** 84:16
**L-E-D-G-E** 84:16
**L-E-G-E** 84:17
**labeled** 130:5
**labels** 24:24
**lacks** 8:10 9:12
  24:18 26:6 104:14
  104:22 176:20
  181:14
**ladies'** 159:23
**Lady** 11:22
**Lamb** 161:19,21,23
  162:1,2
**language** 31:22
  110:22
**large** 11:9 25:5,6
  26:21
**largely** 18:2
**larger** 25:7
**Lassin** 34:23 35:5,6
**last** 7:4,15 22:8,11
  23:10,12,22,23
  24:4 25:15 83:24
  84:3,14 131:24

132:1 147:6 179:7
  179:10 186:14
  187:9 190:13
**late** 54:9 121:22
  122:19 124:3,7
  130:17
**later** 12:9 40:1 81:9
  96:5 132:8,9
  147:19,19 177:15
**law** 2:14 5:5
**Lawrence** 1:14 3:3
  4:5 12:15 192:7
  192:15 193:3,24
  194:9
**lawsuit** 17:14 83:7
  83:9
**lawyer** 79:9
**least** 6:11 48:19
  49:7 53:14 95:18
  111:17 172:19
**leave** 97:15 177:11
  177:12
**leaving** 188:7,11
**Led** 1:6 4:8 86:19
  158:7 175:24
  176:9,16 177:14
  179:14 193:2
**left** 81:6 129:4
  160:10,14 174:16
  178:24,24
**legal** 95:13 174:3
  180:21 183:4
**Lennon** 43:18 44:1
  50:2,3,5,8,10 53:7
  53:8,9 54:8,10
**less** 20:15 24:3,8
  89:1 153:10
**Lessem** 44:4,9
**let** 17:12 27:6 29:10
  30:9,9 32:2 53:18
  57:7 61:14 65:7
  66:12 72:2 73:23
  76:9,20 80:15
  81:5 93:22 96:22
  97:16 98:13

109:18,18 118:7
  123:11 127:9
  128:14 129:24
  131:1 136:14
  139:21 140:1
  148:20 161:14
  166:11,14 169:5
  170:16,19 175:21
  179:2 188:18
**let's** 12:14 14:20,20
  25:22 28:16 45:9
  56:2 74:14 80:19
  81:14 85:19,21
  111:18 113:11,20
  122:17 123:8
  127:17 138:4,5
  141:5,14 148:15
  149:6,6 151:2
  172:19 178:20
  187:22 189:21
**letter** 133:5 135:12
**letters** 105:24 117:7
  119:17 120:6
**letting** 77:24 78:5
**level** 104:5
**liability** 39:11
**library** 83:1,3
**licensed** 41:22
**lifetime** 26:16
**like** 21:20,21 26:3
  26:21 48:14,15
  51:8,13 67:2,20
  74:13 78:12 87:12
  88:22 93:9 97:22
  116:14 117:16,24
  118:20 119:16,20
  119:23 120:7
  124:10 131:11
  151:11 155:14
  161:19 163:14
  164:7 165:1
  174:19 189:10
**limine** 176:22
**limit** 122:11
**limitation** 121:1

CONFIDENTIAL

**limited** 171:2
**Linda** 1:19 56:18 194:4,24
**line** 16:13 96:12 109:11 113:15 176:14 187:12 188:17 189:7
**lines** 109:6 110:11 115:4,9
**list** 29:19 30:14 33:19 50:4,7,8 167:4
**listed** 32:7,11,13 49:8 50:2,5,9 54:13 56:5,10
**listen** 165:23 166:3 172:9 173:8
**listened** 172:11
**literally** 40:4 111:16 138:14 147:17
**litigation** 7:19 22:19 27:23,23 28:10 39:9 58:12 58:16,20 67:16 70:12 104:12 107:10,15 108:12
**litigations** 26:13 27:20
**little** 20:15 24:8 51:14 93:7 134:24 161:19,20,23 162:1,1
**LLC** 2:3 33:24 37:23
**Lloyd** 32:3
**LLP** 2:8
**located** 4:24
**long** 11:23,24 31:18 61:12 65:17 79:17 81:3 83:18 84:5 90:8 91:11 146:8 146:12 170:20
**longer** 11:20 97:24 110:20 151:3

**look** 61:1 81:8 109:6 110:10,11 110:14 115:3 116:13 126:24 127:1 129:17 133:2 140:6 150:5 153:20 155:2 158:14 179:14 190:24
**looked** 33:12 173:10
**looking** 124:13 130:22 131:23 186:22
**looks** 48:14,15 168:3
**Los** 22:11
**lose** 37:4
**lost** 36:23 118:11
**lot** 25:11 65:23 107:24 160:18,19 186:19
**Lou** 63:15 67:8,9 102:16,19
**loud** 93:14
**Louisiana** 49:14
**Loussier** 35:7
**love** 8:13 143:20 164:16 177:10
**lower** 34:18 115:9 116:4 118:21 119:21 125:13 126:4 175:19
**lull** 123:15
**lyrical** 110:1

**M**

**M** 2:11
**made** 18:20 51:24 66:10 68:15 79:17 99:3 104:6 105:3
**major** 31:21 38:4 50:22 53:5 54:6,7 54:20 55:7 63:7,9 144:4

**majority** 25:3,9,10 28:19
**majors** 29:22 30:1 30:17 31:10,15 50:21
**make** 14:8,11,14,20 15:10 18:19,21,21 19:6,10,19 21:2 21:14 23:5 28:3 28:16 39:16 51:7 67:22 69:7 72:14 73:24 74:1 85:23 114:9 115:18 117:23 138:14 157:1 162:20 168:1 174:20
**making** 71:21 72:11 79:21 156:16 164:5 165:18
**Malofiy** 2:5 3:4 5:4 5:5 6:3 9:22 10:3 12:2,11 13:20,23 14:5,8,13,19 15:7 15:17,22 16:2,6 16:15 21:19 28:2 29:10,14 30:22 31:3,11 36:4,11 46:19,22 47:1 49:13 51:18 52:4 54:1 55:23 57:4 57:12 59:10,14,19 59:22 60:10,15 61:1,10 62:4,10 62:22 63:11,22 64:18 65:5,7,11 65:15 69:10,20 70:24 71:6,10,24 72:4,8 73:20 74:4 74:14,17 75:4 76:2,10,15,17,20 80:15 81:2,12 89:8 92:7 93:4,13 94:11 97:12,23 98:3,6 100:24

101:17 103:23 104:4,16 105:12 105:16 106:18,22 106:24 107:5,22 108:3,24 114:13 117:21 118:5,16 120:16,23 121:2,8 121:12,21 122:6 122:15 123:2,5,8 123:11,16,19,24 124:5,12 126:18 126:21 127:1,6,21 128:3,10,13 130:19,23 131:11 134:22 135:1 145:8 153:4,11 158:11 160:2,5,15 160:18,23 163:4,9 164:1,7,23 165:2 165:7,11,20 166:3 166:16,19 175:5 178:1,9,13,16 179:2,9 185:2,12 189:17 190:19 191:1,5,10
**man** 61:3 62:5 65:23 66:2 71:7 165:20
**man's** 62:13
**many** 6:9 7:11 25:23 26:15,23 28:9 91:5 152:10 153:9 186:15,24
**March** 10:17 11:10 131:7
**Marino** 1:19 48:4 56:19 194:5,24
**mark** 12:14 13:24 16:3,15 26:21 29:10 57:6 69:22 105:12,16 108:6 108:24 109:3 114:14 126:12 127:21 131:11 153:11 159:16

**marked** 12:10,17 15:13 16:18 29:16 29:20 57:10 114:15 128:20 131:15 153:15 159:16,19
**markings** 128:19
**marks** 56:15,24 124:18,23 169:19 191:17
**Mary** 38:12 161:18 161:20,23,24 162:1
**mastery** 170:24
**material** 179:21
**math** 122:3 160:17
**Mathes** 13:12
**matter** 4:6 5:7 28:23 55:13 68:9 95:16,20 105:23 192:9 193:5
**may** 1:17 4:4 5:2 9:20 17:1 54:17 59:9 92:23 124:11 126:9 132:18 134:14 143:17 172:24 186:23 190:7,8 193:3
**maybe** 31:6 69:5 90:14,15,15 101:14 111:7 141:14 151:1 157:10,11 166:1 166:13
**me** 4:15 5:9 6:18,20 12:5 13:1,6,10,12 17:12 20:8 21:20 27:6,11 29:10 30:3,9,9,20 31:2,4 32:2,17 35:11,19 36:17,18 37:5 40:12 41:17 42:21 43:9 45:1 47:11 47:18 51:10 53:12 53:14,18 55:18,20

CONFIDENTIAL

Page 217

56:6 58:2 59:8
65:7 67:18 72:2,7
74:22 75:12 76:20
79:24 81:16 84:5
84:19 85:5,8,13
87:4 89:8 92:12
93:22,23 94:7
95:19,23 96:15,20
96:22 98:13,15,23
98:24 99:18,23
100:1,11,12
101:20 103:20
109:18,18 114:3
115:1 116:23
117:16 118:7,20
119:16,21 120:16
122:7 123:5,11
126:8 127:9
128:15 129:24
130:16,21 131:1
133:5 135:5,12
136:14 138:11
139:2,21 140:1
147:13 148:20
151:2 152:4,10
153:21 154:4
155:1 159:17
164:8 166:11,14
169:5 170:16,19
173:8,8 178:17,20
179:2,6 188:18
189:9 192:6,17
193:6
**mean** 16:1 18:8
19:7 21:11 28:6
30:1 47:4 51:21
54:4 59:15 81:14
89:10 92:6 96:11
111:4 130:4
134:23 136:13
147:15,22,24
148:2 149:13,21
150:9 155:13
162:7 163:11,16
168:14,14 169:11

183:7 184:21
**meaning** 165:5
**meaningful** 147:14
189:11
**meaningless** 189:10
**means** 148:4
149:10 169:14,14
183:8
**measure** 111:9,11
112:2,6,23,24
113:9,10 116:9,17
120:3,4,5,13
132:11 133:2,10
135:3 139:16,17
150:23
**measure's** 111:20
**measures** 112:18
113:14,21 115:10
132:1,7,23 136:1
136:4 141:10
151:1
**Media** 2:4 43:18
53:8
**medication** 6:24
**Mega** 43:7,13
**Mele** 1:19 4:23
5:24 194:4,22
**Melendez** 2:22 4:21
**melodic** 109:6,11
110:1,11 111:1
113:15
**melody** 127:13
188:11
**member** 170:22
**members** 158:8
176:16
**memorable** 144:21
145:4,16,20,23
147:13,15,24
148:4,7,17 149:9
149:10,13,21
150:9,10,12
187:11,16,19
188:2
**memorize** 148:2

149:13,16,22
150:4,10
**memorized** 150:7
**memory** 7:1 47:8
151:21
**mention** 120:20
**mentioned** 48:19
49:15 50:3,4
67:12 83:23
123:17 157:11
**merely** 22:9
**met** 6:4 52:21
**methods** 171:2
**Michael** 1:2 4:6 5:7
**Michigan** 38:10
46:8 48:16
**mid** 95:18
**middle** 8:22 11:3
**might** 19:17 31:17
46:4 47:7 49:2
62:6,7 75:9,10
87:9 117:22
128:14 134:15
**mind** 115:21
129:15 188:14
**Mine's** 128:18
**minus** 123:2
**minute** 30:19 81:15
173:13
**minutes** 136:7,21
136:24 137:6
138:10 139:9
141:17 142:4,7,7
142:11,21,23
143:4,14 159:5
160:6,12,14,24
166:20 175:13
178:6,8,10,14,17
178:18,21,23,23
178:24 179:1
185:6,7,10,10
187:20,23,24
188:23 190:15
**misappropriating**
176:1

**mischaracterized**
187:14
**mischaracterizes**
19:22 26:5 28:13
86:14 87:16 90:12
99:16 104:22
158:10 184:9
**mischaracterizing**
64:24
**misheard** 132:19
**misrepresenting**
189:5
**misrepresents**
87:17 129:9
**miss** 98:4
**missing** 170:11
**Mississippi** 33:9,13
**misspeak** 100:3
**misspoke** 98:19
**misstatement** 100:5
**misstates** 100:8
**mistake** 49:2 99:3
**misunderstanding**
122:7
**mix** 127:3
**mixed** 130:17
**MJQ** 184:13
**Modern** 172:9
173:9 184:15
**mole** 71:21
**Mollify** 124:4
129:10
**Molsey** 45:6
**moment** 120:16
147:18
**money** 21:2,13 23:5
65:23 73:12 86:22
165:1
**Monica** 2:18
**monies** 106:1
**monopolizable**
162:18
**monopolize** 162:1
**month** 11:1 147:19
**months** 40:2 41:3

**more** 22:6 23:4,5
24:3,23 29:1
30:13 31:6 39:22
45:10 48:19 55:24
77:10,22 78:4
128:2 137:22
145:2 146:2,4,13
147:3 150:21,24
151:4 162:4,15
170:20 174:11
175:18 187:2,4,5
191:3
**Moseley** 45:7,8,10
**most** 23:24 26:10
28:19,21 29:8
30:54 54:18,19,23
56:11 85:8,16,19
87:8 89:15 145:16
146:24 147:12,13
147:13,14 148:17
149:9 164:8
187:10,16
**motion** 25:7,11
34:15 42:20 43:5
45:16 46:3 176:22
**motives** 101:19
**mountain** 71:21
**move** 101:9 118:7
131:1 164:18
165:13 166:14
**movement** 110:19
111:6 117:5
**moves** 112:23
144:18,19
**moving** 144:12
147:13
**MP3** 82:24 89:12
**Mr** 3:4 5:4,11 6:3
7:12,23 8:1,9 9:9
9:11,16,22 10:3
10:11 12:1,2,11
13:2,9,11,20,22
13:23 14:2,5,7,8
14:10,13,15,19
15:7,17,19,22

CONFIDENTIAL

Page 218

16:2,6,15,24 17:6
17:16,18 18:7,12
18:24 19:2,11,21
20:2,13,23 21:4
21:16,19 24:6,18
25:1,17 26:4,17
27:1,16 28:2,2,12
29:10,13,14 30:2
30:19,22,24 31:3
31:8,11,12 32:22
36:2,4,9,11,24
37:2 39:19 40:18
42:6 46:19,22
47:1 49:12,13
51:7,18 52:4,12
52:16,21,21 53:3
53:18 54:1,2 55:2
55:18,23 56:8
57:4,12 58:2,5
59:6,10,12,14,16
59:19,21,22 60:8
60:10,12,15,21
61:1,8,10,20 62:2
62:4,8,10,11,19
62:22 63:8,11,16
63:19,22 64:15,18
64:22 65:5,6,7,11
65:12,13,15,19
66:6 68:3,7,19
69:10,16,20 70:7
70:22,24 71:1,3,6
71:8,10,12,24
72:2,4,6,8,10,21
73:1,15,20,22
74:4,4,9,14,17,19
74:21 75:4,6,10
75:23 76:2,5,10
76:13,14,15,16,17
76:18,20,22 77:7
77:9,23 78:1,11
78:18,21,24 79:2
79:4,6,11,15
80:13,15,16,19,22
81:2,6,12 82:20
83:23 85:2 86:1

86:13 87:5 89:7,8
89:9 90:11 91:6
91:24 92:4,7,19
93:4,8,13,17,19
94:11 95:12 96:6
96:19 97:10,12,13
97:23 98:3,6,8,10
98:12,22 99:2,5
99:13,15,17 100:7
100:24 101:5,12
101:17 102:5,11
102:17 103:12,15
103:19,23 104:1,4
104:14,16,17,21
105:12,16 106:6
106:15,18,21,22
106:23,24 107:5
107:13,22 108:1,3
108:22,24 109:9
109:12 110:16
113:1 114:13
117:21 118:3,5,11
118:15,16,19
120:16,19,23,24
121:2,6,8,10,12
121:18,21 122:2,6
122:8,15,24 123:2
123:4,5,6,8,10,11
123:14,16,17,19
123:21,24 124:4,5
124:12 125:5
126:15,18,19,21
127:1,6,21,23
128:3,8,10,11,13
128:17 129:7,10
130:18,19,23
131:11 132:12,16
132:18 133:7
134:19,22 135:1
135:21 136:9
140:13 145:8,11
151:24 152:16,22
153:1,4,5,11
154:16,23 155:8
156:8,22 157:6,24

158:5,9,11,16
160:2,5,8,13,15
160:16,18,21,23
161:2,8,14 163:2
163:4,7,9,15
164:1,4,7,23
165:2,7,11,14,20
165:21 166:3,16
166:19 167:11
171:9,12,15 172:8
172:16 173:2,5,5
173:8 175:2,5
176:7,19 177:2
178:1,2,7,9,13,16
178:18 179:2,9,16
179:19,22 180:5
180:20 181:14
182:4,18 183:3,13
184:8 185:2,9,12
186:11 187:7
189:2,15,17 190:1
190:10,19,21
191:1,2,5,10,15
**Ms** 5:16 7:24 15:24
29:23 36:10 46:13
46:16,21,24 47:3
52:2 72:21 73:1
74:16,18 75:6
80:18,20 93:1,9
95:19,21 96:5,18
97:19 98:1,4
100:14 104:19
105:6,14 107:3,11
117:19 123:22
124:1,17 143:20
145:6,9 148:19
152:15 158:6
159:8,22 160:4
164:13,22,24
165:4,8 166:1,15
166:17 176:4
178:11,14 180:11
184:24 185:4
189:21 190:4,6
191:8

**much** 20:11 21:2
21:13 23:15,19
24:15 26:22 29:1
40:1,5 64:2 86:22
87:3 90:9 110:19
121:4 146:13
151:9 153:10
160:2,5,10
**music** 1:8 2:16 4:11
4:12 5:13 22:3,4
22:18 23:16 30:18
33:24 34:23 35:7
35:23 36:18,19
37:13,17,20,22
38:3,4,22 39:18
48:20 49:1,7 51:1
55:9,10,12,15
67:9,11,14 73:5
74:23 82:9,10,12
82:14,17,22 84:9
87:4 89:6,12,13
91:12 92:15 94:1
94:21 95:24 96:3
96:6,14,15 98:13
98:22 101:10
102:22 103:1,9
104:11 105:3,11
105:19,20 108:9
109:23,24 155:14
155:16,19 161:6
161:13 162:5,11
162:16,17,23,24
169:14 173:17
176:1 177:18
185:20
**musical** 3:14
114:15 115:1
129:17 130:1,2,7
130:8,10,10,10,15
**musician** 52:14
**musicological** 94:8
94:9 111:16
174:17 181:9,13
184:6
**musicologically**

183:10
**musicologist** 10:23
55:19 180:23
**musicologist's**
55:17
**must** 167:19
**my** 4:20 6:19 10:14
10:16 11:2,9,10
11:21 17:21 18:23
19:4,13,16 20:4
20:10 21:6,8,11
22:2,4,14,14,16
22:23 23:13,18,21
24:9 25:4,20,20
28:21 29:4,4 30:9
31:14 36:5 39:23
39:24 40:5,6,14
40:21 41:8,24
42:8,12 46:22
47:8 49:16 51:22
51:23 53:19,23
54:16,22 57:5,19
58:1,7 60:3 61:2
62:23 63:10 65:1
65:13 66:13,13
67:3 70:12 71:8
71:15 73:14 80:1
82:6 83:1,3,19
84:7,11,13 86:16
87:17 88:4,13,18
90:7,22,23 91:2
91:15,15 92:18
93:16 95:1,9,17
96:2,2,9,10,11,17
96:22,23 97:5,7
97:19 98:18
100:12 102:1
106:24 107:1
111:7 114:7 117:9
117:22 124:17
125:7,20 127:15
129:9,11,23
130:17 131:6
132:2 136:15
137:9 138:13,15

CONFIDENTIAL

Page 219

141:20 143:8 145:6 146:5 155:3 155:10,16 156:1 158:21,24 162:3 164:2 165:15 166:11 171:20 172:7 175:15 177:4,7,13 180:17 180:22 182:10 183:17 184:1 186:14 187:14 189:5,6 190:22,23 192:22 193:5,7
**myself** 51:23 89:16

**N**

**N** 1:12,12 2:2,4 3:1 5:22 16:4 57:2
**N-a-j-m** 11:19 49:11
**N-a-s-s-a-r** 46:15
**Najm** 11:19 49:12 49:13,17
**name** 4:20 36:15 44:9 46:10 47:6 52:9 72:19 74:19 83:24 84:3,14 172:11 173:11 184:21 193:7
**named** 97:6
**names** 35:19 36:14 36:16 37:5 38:7 47:7
**narratives** 17:22
**Nassar** 46:6,11 48:8
**nearly** 26:22 152:10
**necessarily** 31:22 137:20,24
**necessary** 71:14
**need** 14:11,16 65:1 65:9 75:17 78:6 97:10 124:4 160:23 163:10

168:5 187:7 188:19
**needed** 24:15
**needless** 43:3 88:8
**needs** 41:22,22 75:1
**neither** 194:14
**never** 21:7 52:20 74:23 101:17 104:8,10 105:2 154:18 185:17
**new** 1:17,17,21 2:10,10 4:20,20 6:1 10:20 21:9 22:5,14 24:11 32:3 33:2 34:1 35:8,15 36:7 42:15,23 43:8,19 44:5,20 47:14 48:21 174:19 194:2,3,7
**news** 41:17 88:3,9 88:13
**Newton** 33:14
**next** 114:14 115:14 132:4 171:22 184:24
**Nineteen** 42:21
**Nizer** 2:8 5:17
**no** 1:5 12:18 14:7 15:14 16:18 18:16 20:14 21:1,19 24:20,21,22 25:21 29:16 30:22,22 31:11 35:4,24 37:9,19,21 39:15 43:15,22 44:10 45:4 49:2 56:11 58:17,19 59:4 61:10,16,16 62:1 62:8,8,22,22,22 63:17 65:5 67:11 68:3,7,24 69:20 69:20,20 70:6,9 70:11 73:6,8,10

73:14 74:16 79:1 79:8,10,19 80:10 80:13 81:2 83:9 85:17 86:20 87:16 87:20 90:20 91:2 91:4 92:11 94:4 95:1 96:1,23 97:23 98:6,23 99:7,20,24 100:1 102:14 103:7,14 104:13 106:11 108:14,19,23 112:12 122:6,16 125:24 126:8 130:23 134:5 141:2,18,18 144:6 148:3 149:11,11 149:11,20,21 150:1,3,6,7,14,17 150:24 151:3,17 152:15 154:12,14 156:1,12,15 157:10,14 159:10 159:12,14 160:16 164:15 166:16,19 169:7 170:9,9,15 171:19 172:2 173:20,22 174:8 175:16 176:8 179:24 180:7 182:19,20 183:8 184:14 186:18,21 187:5 189:15,15 189:21 190:1,1,4 190:4,10
**non-privileged** 17:9
**none** 27:4 125:20
**nonsense** 166:21
**noon** 122:14 190:18
**nor** 194:14,15
**normal** 6:13
**normally** 83:17,18 85:6,7 87:7 92:8 93:21,23 158:18

158:18
**Northern** 45:23
**not** 6:23 7:2 8:7 10:15,22 12:5 16:11 17:21,24 18:23 19:4,7,9,19 22:9,12,20 26:13 26:14,22,22 29:1 31:11 32:1,6,20 35:20,20 36:12,13 37:2,4,9,14,15,21 38:5,6,20 39:10 39:17,17 41:14,15 41:21 42:4 43:14 43:16 46:13 47:8 48:9,12,19 51:13 54:17 55:15 56:11 58:19,24 60:17,18 61:10,13,16,18 62:5,7 63:13,21 64:7,17 65:4,8,13 66:6,13,13,23 67:5,14,22 68:3 70:11,19,22,24 71:16,17,23 73:6 73:14,22 75:2 77:7 78:9,14 80:1 80:17 81:24 82:24 84:15 85:7,19 86:5 88:5,11,17 89:1,21,22 90:3,3 93:2,15 94:8 97:9 97:17 102:7 104:19 105:8,10 106:15 107:3,7 108:4 109:14 111:1,11 112:9 118:8 121:3,16,18 123:4,6 125:18 126:16 127:11,15 129:6,14 134:6 136:18 137:2 138:3 142:9 144:7 144:10,14 145:8 146:4,19 147:18

149:6,13,21 150:1 150:9,18,18 152:10 153:23,24 154:5,15,18 156:1 156:18 157:1,3 158:2,11,13,22,24 159:10,12,14 161:12 162:3,17 162:18 163:18,18 164:4,15,24 165:14,16 166:19 167:3 168:6,6 169:2 170:7,14,14 171:2 172:20 174:3,22 175:16 176:5,8,21 177:5 178:19 180:15,16 183:7,9,22 184:6 184:11 186:16 188:8
**notably** 175:17
**Notaries** 1:21 194:6
**Notary** 5:24 192:22
**note** 111:19,22 112:2 113:18 115:5 119:4 133:5 133:9,14,16 134:5 134:10,16 188:4
**notes** 51:22,23 90:5 90:6 106:3 109:8 109:10,14,15,16 110:2 111:8 112:1 112:13,14,20 113:22 117:11 118:10 140:4,10 150:20,22 152:6,8 152:10 153:7,9,18 182:22 187:15 189:18 194:12
**nothing** 64:18 88:4 107:20 182:23 183:16,18,19 190:8
**notice** 47:1 186:6
**noticed** 173:13

CONFIDENTIAL

Page 220

**Notorious** 40:22
**now** 4:2 7:10 11:11
  16:20 33:11,12
  34:10 50:1,11
  54:9 60:23 62:13
  68:8 69:4,5 72:13
  72:16 77:22 79:24
  80:7,22 81:15
  85:22 94:13
  100:20 109:2
  112:22 113:13
  115:3 116:13
  117:22 119:9
  120:5,7,13 121:1
  124:10 129:18
  131:21 133:2
  134:2 148:8 154:7
  164:15 166:7,22
  178:5 190:22
  191:14
**nowhere** 154:1
  190:7
**number** 6:6 17:12
  30:7 32:2 33:1
  55:6 56:7,11
  72:22 74:6 75:11
  75:12 78:13 110:2
  122:20 153:18
  167:13 168:7
  169:3 182:22
**numbering** 130:15
**numbers** 74:3,13
**NYU** 3:20 21:6
  159:19 161:3
  166:23 167:3
  170:6 171:14
**NYU's** 169:6
  171:17

───────────

**O**

**O** 1:12
**o'clock** 1:18 14:24
  15:1 56:17 120:22
  122:4,5,10 191:20
**O-Y** 45:6

**object** 17:1,7 51:8
  68:20 105:1,6
**objection** 7:23,24
  8:9 9:9 17:16
  18:7,24 19:11,21
  20:2,13,23 21:4
  24:6,18 25:1,17
  26:5,17 27:1,16
  28:12 29:24 30:2
  30:23 36:24 39:19
  40:18 42:6 52:12
  52:16 53:3 55:2
  56:8 58:5 61:20
  62:2 63:8 66:13
  69:16 70:7 79:2,6
  79:11 80:1 82:20
  85:2 86:1,13 87:5
  89:7 90:11 91:6
  91:24 93:19 95:12
  99:13 100:7
  101:12 102:5,11
  102:17 103:12
  104:14 108:22
  109:9,12 110:16
  113:1 125:5 129:7
  133:7 135:21
  136:9 145:11
  151:24 154:16,23
  156:8,22 157:6,24
  158:5,6,9,16
  159:8 161:8 163:2
  164:5 165:15
  171:9,12,15 176:4
  176:19 179:16,22
  180:11,20 181:14
  182:4 183:3,13
  184:8 186:11
  189:2
**objections** 13:13
  53:19 63:16,19
  65:18 72:1,9
  164:2 165:12
  166:5 182:18
**objectively** 155:4
**obviously** 61:3,18

146:12 165:15
  173:16 174:5
**occurs** 147:21
**October** 22:11
**Ode** 67:9,11 102:22
**of** 1:1,14,15,21 2:14
  4:5,6,12,16,18 6:1
  6:5,6,23 8:3,7,21
  8:22,24 9:23 10:5
  10:19,24 11:3,4,6
  11:9 12:19 13:3,4
  13:11,15 14:16
  15:8,10,15,20,24
  16:3,19 17:7,10
  17:22 18:2,2,2,11
  19:13 20:4 21:8
  22:2,3,8,8,9,19,23
  23:2,2,2,2,18 24:3
  24:10 25:3,11
  26:7,23 27:6,13
  28:19 29:6,6,11
  29:17,21,24 30:4
  30:5,6,7,14,15,16
  31:6,9,15,18,24
  31:24 32:3 33:2
  33:20 34:1,6,15
  34:18,24 35:8,15
  35:19 36:7,13,16
  36:20 37:5,12
  38:4,7,8,9,12,12
  38:15,20 39:1,7,8
  39:10,12,23,24
  40:13,21 41:2,5,6
  41:6,10 42:4,8,10
  42:15,23 43:8,9
  43:19 44:1,5,11
  44:20,21,22 45:14
  45:23 46:8 47:7,7
  47:14,24 48:16,21
  49:9,17 50:7,16
  50:17,21,21,23
  51:2 52:14 53:9,9
  53:16,21,24 54:7
  54:8,12,16,17,18
  54:18,19,22,23

55:4,6,10 56:12
  56:15,24 57:11,18
  58:1,7,19,24 60:1
  60:3,5 61:9 63:20
  64:4,5,9,10,11,22
  65:22,23 67:12,13
  67:14,15,15,23
  68:19,22 69:10
  71:14,20,21,23
  72:22 73:12,20
  74:6,19,22 77:5,6
  77:12 79:14,17
  82:10,16,24 83:5
  84:7,10,11,17
  86:11,20 87:8,9
  87:14,23 88:18
  89:1,12 90:7
  91:13,15 92:9,13
  92:18 94:9,10,22
  95:1,6,9,17,23
  96:4,9,17,19 97:4
  98:16,21 99:1
  100:2,16,18,21
  102:3,8,15,16,21
  103:3,4 104:2,6,9
  104:24 105:7,10
  105:11,24 106:2
  107:13,16,18,19
  107:24 108:10,16
  108:20 109:1,10
  109:13,14,16,23
  110:2,20,24 111:5
  111:9,12,13,14,19
  112:2,6,6,19
  113:9,9,24 114:16
  115:13,15 117:11
  117:11,23 119:15
  120:2,3,4,12
  122:20,20,21
  124:19,23 125:4
  125:10,17,20,21
  125:22 126:5,7,16
  127:15,19 128:21
  129:19,20,21,22
  130:15,20 131:4,5

131:7,8,16,19,20
  131:22,22,22
  132:1,2,7,8,10,22
  133:6,10 134:11
  134:20,20 135:24
  136:2,7,15,17,22
  136:24 138:10
  139:8 140:7 141:7
  141:9,11 142:10
  142:15,17,17,22
  143:4,10,15
  144:11 145:16,23
  146:2 147:2,11,20
  147:21 148:13
  150:19,20,21
  151:18 152:5,6
  153:16,18 154:7
  154:19 155:3,13
  155:22,22,23
  156:17,19,20
  157:9,11,12,12,23
  158:2,12,14,23
  159:2,6,9,20
  160:19,20 161:22
  162:17 163:1
  165:19 167:1,3,7
  167:16,17,18,19
  168:5,6 169:12,17
  169:18,23 170:5
  170:11,12,24
  171:1 172:7,11,11
  173:1,11,19
  174:11,17,17,19
  174:19,21 175:13
  175:20 176:1,2,5
  176:8,11,16 177:6
  177:22,24 180:1
  180:12,15 181:7
  181:12 182:3,10
  182:16,16,22,22
  183:17 184:3,4,21
  185:4,14,15,18
  186:1,19,22
  187:11,16 189:4
  189:13 190:12

CONFIDENTIAL

191:17,18 192:3,4
192:8,11,18 193:5
194:2,3,7,7,8,11
194:19
**off** 14:20,23 26:21
56:16 81:1,14,15
81:19 93:22 94:15
97:22 109:4
117:24 121:9,22
122:21 124:20
128:23 131:13
173:11 175:3,6
190:20 191:6,19
**offended** 163:17
**offer** 182:2,15
**office** 108:17
**officer** 100:18
**offices** 1:15 2:14
4:24
**often** 22:13 28:19
29:8 41:16,17
54:20 55:22 85:8
85:16 86:4 87:21
88:3 89:15 109:24
**oh** 9:1 10:11 15:19
25:15 44:14 45:2
80:20,22 97:19
126:18 140:18,20
152:24 163:9
165:20 187:17
**okay** 7:3,6,15,18
9:2,5 14:5,13
15:22 16:14 18:14
18:17 19:5,18
21:2 27:6 32:9
37:10 39:4 44:23
45:9 47:11,23
48:4,18 79:15
80:19 91:1 95:3
106:5,6 110:10
111:22,24 112:5
116:11,12,22
117:1 122:24
123:10 127:5,8
130:23 131:10

132:16 134:24
135:1 141:19
149:14 150:8
151:22 153:19
156:6 161:7,13,23
162:5,13,19,22,23
163:9 169:9 175:8
187:7 189:1
**Omar** 2:22 4:21
**omitted** 129:22
**on** 1:17 4:2,3 8:3
13:1 14:15 15:6,8
16:11 17:2,7 18:6
18:10 23:16,20
24:15 26:7 29:6
30:16 31:17 32:21
33:19 34:15 36:13
38:12,20 44:9,11
44:21,22 46:18,19
47:19 48:9 49:9
49:16,16 50:15,17
50:23 51:2 53:9
53:22 54:8,16,19
54:20 55:4 57:1
58:4 61:4,18,23
62:14,15 63:2
67:13,15 68:14
69:22 70:3,12
72:1,1 75:12 76:8
77:24 78:5 81:2
81:11,12,13,23
84:5,19 85:9 87:8
87:13 88:20 89:15
89:18 91:2,8
92:16 93:16 94:1
94:19 95:23 98:15
99:1 100:2 102:8
105:1,11,15
106:22 107:18
111:19,19 113:5
115:15 116:3,13
117:2 118:15,17
119:1,11,14
120:11,12,17
121:5,16 122:9,22

125:1 126:2,9,22
127:8,18 128:1
131:21,23 133:2
133:10 134:1,4,5
134:6,10,11,13
135:5 137:18
138:17 139:5,7
140:7 144:1,3,4,7
144:10 145:20
148:19 149:4
152:4 153:21,24
154:2 156:1
160:11 163:1
164:3,3 166:6,9,9
167:5,18 169:6
170:7 171:3
176:10,17,22
177:10,20 178:6
178:14,18,21
181:13 184:5
186:22,23 187:9
187:22 188:5,8
192:9,10
**once** 41:8 43:4
45:16 46:2 70:18
78:11 100:12
118:4,20 129:11
155:17 163:10
169:10 173:10
174:14
**one** 7:4 13:16,18
14:1,14,17,18
15:20,23 28:24
32:2,7,11,14,17
32:18 40:6 45:10
47:9 48:13,14
50:21,21 53:19
55:24 56:16 78:12
86:7 96:19 111:12
112:14 115:10
120:4 124:13
126:9 128:16,18
130:16 131:24
133:6,10 136:18
136:19 139:6,14

140:24 141:10,12
141:15,16 142:3,4
142:7,18 144:1
145:16 157:11,12
158:3 167:5,13
168:4,5,8 170:9,9
170:15 173:13
**one's** 167:8,17
170:1,24 171:7
**ones** 15:20 53:22
54:12
**ongoing** 32:8
**online** 157:8
**only** 14:17 17:21
20:5 23:9,10 39:6
39:8 42:1 43:13
43:13 49:3 51:22
88:19 92:19 95:2
107:17 117:3
118:3 125:3,12
132:10 177:23
178:11
**onto** 51:24
**open** 39:7 40:9
**opened** 42:9,9
180:17
**opening** 136:1
142:21,23 143:3
148:23 149:2
151:12,13 157:20
173:13 188:12
**opine** 181:8,11,13
**opinion** 20:10,21
20:22 30:16 33:5
33:10,15,21 34:2
34:7 35:2,17 38:1
38:17 39:5,16
41:24 42:17,24
43:12,20,24 44:7
44:18 45:19 46:1
46:8 47:16 48:2,6
48:23 49:23 53:16
54:14 58:4,7 62:2
64:21 66:15,16
68:14 69:14,15

70:3 75:15 77:4
82:3,7 86:23 88:4
88:13 92:16 94:8
100:2 101:11,23
101:24 105:22
106:24 136:15
137:9 156:16
159:13 181:4,9,13
182:2,15 183:2,12
185:16,19
**opinions** 18:22
64:12 71:23 85:24
87:1 106:4 156:17
156:24 176:3
180:10
**opportunity** 65:3
65:10 67:21 69:7
71:20 72:14 80:4
154:19 179:6
**opposed** 27:23
**opposing** 41:13
**or** 6:19,24,24 7:1
7:22 13:4,5 16:21
17:13,24 18:20,21
19:8,8,9,9,19,23
20:9 21:13 23:24
24:3,24 28:20
30:16 31:10 38:23
39:7,17,17,17
40:4,16 41:13,19
41:21 42:5 44:13
47:7,10,20 48:10
50:6,7 52:6,9,14
52:14,21 54:24
55:10 60:18 62:6
62:17,18 63:4
65:3 67:11 68:18
70:19 72:14,21
73:1 74:13 75:6
76:9 78:8 79:19
83:1,8,12,24,24
84:16,16 86:6,10
86:12 89:21,22
90:21 91:18,22
94:4,8 96:6,7,14

CONFIDENTIAL

Page 222

96:15 97:2,5
98:22 100:1 102:2
102:9,9,16,22
103:2 105:21
106:1,3 108:11,20
108:21 110:1
116:4,22,24
117:24 121:14,15
125:13 126:4
129:13 131:22
136:11 150:6,17
151:1 152:13
153:7 154:22
155:8,22 156:11
156:17,18,20
157:3,5,17,18
160:6 161:21
162:23 167:22
169:3,24 170:23
170:24 171:6,10
171:23 173:5,23
175:8 176:16
178:24 180:2,2,9
180:17 183:9,20
184:3 186:9
190:14 193:5
194:16
**order** 67:4
**orientation** 115:13
**original** 40:21
169:1 179:21
193:8
**other** 8:7 10:20
16:21 17:24 21:24
23:16 29:8 38:12
39:18 47:10 48:15
54:12,12,21 56:6
66:17 79:13 80:2
84:6 86:8,12,12
87:12 89:18
121:15,15 133:22
146:3 147:4
156:18 161:6
170:23 176:1,9,18
**others** 50:6 100:21

147:3 167:18
170:1
**others'** 167:6,15
**our** 84:19 146:8
167:20 194:11,19
**out** 25:16 26:23
52:5 56:4 61:24
64:2 66:11 69:6
71:21 73:20 78:12
80:7 83:12 97:18
99:17 100:4,10,12
101:2 111:5 129:4
146:5 156:10,11
157:21 174:15
185:4,4 188:7,11
192:10
**outcome** 183:16
194:16
**outlining** 92:1
**outside** 98:10,11
99:3,9,10,11
121:14 184:1
**over** 22:20 23:23
47:22 56:19 84:6
89:5 92:20 94:21
108:4 117:24
133:16,17 134:14
134:17 135:2
140:2 151:19
166:21 178:23
179:1 185:8
189:23
**overall** 22:2 189:13
**oversight** 70:10
**own** 51:22,23 63:14
167:8,17,21 170:1
170:9,15 171:7
176:2
**owned** 165:10
**owner** 103:4
**owns** 162:12
**Oy** 45:2

─── **P** ───

**P** 2:2,2

**p.m** 1:18 4:3 14:23
15:1,2,6 56:15,18
56:24 81:18,22
94:14,18 124:16
124:23 191:17,21
**packet** 15:10 16:3,7
18:2
**page** 1:6 3:2,7
16:10 124:14
127:8,11,14
132:10 140:7
154:10,11 155:8
156:11,18 157:4
157:18 158:15
168:6 180:2,9
**pages** 3:23 16:11
26:10,20 27:13
87:23 129:19
**paid** 20:11,21 23:6
66:15,20 86:22,24
87:3 90:10 164:11
186:9
**Paige** 2:9,15 4:9
5:12,18
**pair** 109:10,14
112:11,23 113:3
**paired** 187:15
**papers** 130:17
171:4
**Paramount** 55:10
**paraphrased**
169:21
**parent** 4:11
**park** 170:5,6,8
**part** 11:4 38:4 42:9
48:16 57:18
105:11 110:13,22
110:24 111:13
126:20 127:15
131:19,20,22,22
131:22 133:3,9
135:3,7 136:17
140:21 141:1
142:10 143:4,6,10

144:21,24 145:7
145:23 146:5,10
146:21 147:6
148:18 154:7,9
174:24 175:11,12
175:18,21 184:3
187:16,19 189:13
**particular** 23:3
88:21
**particularly** 171:11
173:17
**parties** 9:18 15:4
28:21 56:22 67:12
67:15
**parts** 143:15
145:17,20 146:1,3
146:23,24 147:1,3
147:4 175:15
187:11 188:8
**party** 28:20 37:3,4
41:17 47:6 61:12
61:13 67:18 88:21
194:15
**passage** 169:21
**past** 178:8 189:16
**Patrick** 1:6 2:9,15
4:9 5:12,18 32:9
33:1,6
**Paul** 1:7 4:10
157:18 158:14
180:2,9
**paying** 65:23
**PDFs** 16:23
**pedal** 188:14
**pending** 176:22
**Pennsylvania** 2:4
5:1
**people** 20:6 59:7
62:20 161:6
165:21
**people's** 161:6
**per** 10:14,16 20:16
129:11
**percent** 24:3,9,10
24:10 88:24

**percentage** 22:2,7
54:24 88:24
**percentages** 21:24
**perfectly** 31:16
161:23 162:19
**performance**
170:23
**perhaps** 10:22 13:1
31:16 39:21 46:11
72:21 74:3 85:8
96:18 116:4 157:9
172:23 173:2
**period** 174:10
**permission** 61:11
67:4 70:15,20
96:22 98:14,15,23
98:24 99:24
**person** 55:20 66:17
161:24,24 162:17
177:19,20
**personal** 21:18
**personally** 192:6
**Peruvian** 37:17,20
**Peter** 2:14,19 5:11
15:18 20:7 178:17
**Ph.D** 1:15 2:23 4:5
5:22 16:4 57:2
192:7,15 193:3,24
194:9
**Pharmacy** 46:6
48:8
**Philadelphia** 5:1
98:2
**Phillips** 2:8 5:17
**phone** 69:7 72:14
73:24 74:1
**phrase** 109:13,21
109:23,24 110:1,1
110:3,4,6,7,15,19
110:20,22 111:1,3
111:11,13,13
112:9 138:20,22
139:10,18,19
142:9 170:9
173:16 188:4,21

CONFIDENTIAL

Page 223

189:4
**phrases** 138:19
139:6,7 141:8,9
141:11 149:2
151:14
**piano** 187:9
**picture** 25:7,11
**piece** 86:11 132:8
**pieces** 74:22
**pja@pjanderson...**
2:20
**place** 192:10
194:10
**plagiarism** 167:5
167:10,13,15,17
168:6,14,22,24,24
169:6,11,13,17
170:3,13,17
171:18
**plagiarize** 169:15
**plaintiff** 1:4,15 2:3
5:7 7:22 8:12
38:3 41:18,18
44:2 49:9 51:3,4
53:15 54:19 56:7
86:7 88:3 97:3
157:12
**plaintiff's** 61:19,23
125:21
**plaintiffs** 4:8 37:11
50:1,2,9 53:14
54:12,16
**plan** 157:1
**planing** 79:19
**Plant** 1:7 2:9,15 4:9
5:13,18 146:15
147:9 154:13
155:8 156:11,19
157:4,17 158:14
180:2,9
**play** 148:8,10,13
149:6,19 150:5,16
150:19 151:3,4,21
161:18,20 187:12
188:4,20,20 189:7

189:12,18,20,24
**played** 76:24
150:21 151:1
**playing** 65:24
157:21 161:24
173:15
**Plays** 143:23 144:9
**plea** 114:1
**please** 5:20 6:18
57:7 65:7 69:22
72:7 80:15 81:5
85:14 105:12
108:6,24 112:18
173:8 175:9
**pleasure** 117:9
**pocket** 165:1
**point** 31:14,20
123:12 135:4
136:23 146:5,17
155:16 158:4
168:18 180:22
189:9
**pointed** 170:20
**pointing** 52:5
**policy** 3:19 159:18
166:23 169:6
171:18
**portion** 126:3
**portions** 18:2 126:2
129:21
**position** 21:11
**possibility** 156:19
**possible** 11:21 49:4
49:8
**posteriori** 155:17
**potential** 41:18,20
54:21 85:9 88:3,9
88:10 97:2
**practice** 91:9
161:20
**predict** 22:21 23:20
**prefer** 89:16
**preliminary** 26:9
26:20 28:22 58:24
60:5 83:4,14 84:9

85:7,15 87:8,10
87:13,22 88:1,11
88:12,15,19 89:2
94:22
**Premise** 43:18 53:8
**prepared** 51:10,15
**present** 2:21 15:4
56:22 59:8 81:24
159:5 188:22
**presented** 91:18
**Presenting** 167:6
167:15
**president** 55:11,16
92:23
**presumably** 9:20
**presume** 9:19
**pretty** 39:23 42:13
100:9 160:2,5
**previous** 129:23
**prior** 7:4 18:5 58:4
58:11,15 59:3
64:5,10 66:16
68:11,15 69:13
70:2 71:22 76:3
77:2,12 82:3,7
176:11 177:18
181:2 185:15,16
185:19
**priori** 155:13 181:5
**privacy** 21:5
**private** 21:6
**privilege** 17:8
21:10 55:4,9
59:18 63:14
**privileged** 9:21
10:1,4 59:13,15
60:9,11,13
**pro** 25:16,18 26:24
**probably** 23:9
35:20 36:17 51:19
51:20 65:18,21
87:11 89:1 91:9,9
128:16 138:16
148:13
**problem** 73:15

80:10 96:23 100:1
100:1 101:18
165:15
**proceedings** 56:20
**process** 96:18
155:14,23 157:9
179:15
**produce** 8:16 17:14
35:16 46:7 47:15
48:1,5,22 49:22
54:13 66:24 69:14
80:12 82:7 92:16
172:15
**produced** 8:19,20
13:16 15:11 16:8
17:9 18:5 25:23
77:1,4 83:14
105:23 155:7
**producing** 28:11
53:15 83:16
**product** 17:8 61:9
63:20 80:1 155:20
156:23 182:5
**production** 18:11
**Productions** 43:8
43:14
**products** 167:20
**profession** 21:15
**Professional** 1:20
194:5
**professor** 21:3,15
22:5 23:6 24:11
**programs** 171:4
**progression** 16:13
18:3 137:12,19
176:14
**progressions** 115:4
**proper** 137:8
**properly** 18:18
50:8 162:15
**prophetic** 40:24
**protect** 63:13
170:10
**protectable** 162:18
174:21

**protected** 88:5
174:12,17
**protection** 158:21
**proud** 54:18
**provide** 19:16 21:8
21:23 28:18 33:4
33:9,15,21 34:2,7
35:1,16 38:16
42:16,24 43:11,20
43:23 44:6,18
45:19,24 66:24
69:15 75:15 85:15
94:7 101:11,23,24
179:7
**provided** 13:10
20:17 30:15 39:4
39:6 41:5,8 54:15
58:2 66:16 106:13
106:17 182:8,21
**Providence** 2:4
**providing** 68:14
100:2 185:19
**province** 183:5
184:1
**prudent** 155:8
**Public** 1:21 5:24
192:22 194:6
**Publications** 38:23
**publisher** 85:6
**publishers** 25:10
**publishing** 1:7 4:10
25:5 38:4,23 43:2
50:22 55:10,12,15
73:4 82:10,17
96:7,15 101:11
103:2,9 105:20
**pull** 97:18 98:11
99:10
**pulled** 98:10 99:2,9
99:10 100:4
**pulling** 101:2
**purportedly** 159:1
**purpose** 75:14
101:24
**purposes** 115:13

CONFIDENTIAL

Page 224

**put** 30:14 41:12
88:22 105:14
115:16 117:6,10
117:16 127:4,18
134:14,16 140:2
142:14 168:5
170:7
**putting** 9:7 101:3
135:2
**Pyatt** 44:12

**Q**

**Q** 6:4,9,12,15 7:3,6
7:10,15,18,21 8:4
8:8,11,16,19,21
8:24 9:2,5,10 11:4
11:11,14,17,24
12:8,20,22,24
13:3,6 16:7,14,20
17:5,12 18:4,14
18:17,19 19:5,18
19:23 20:11,15,20
21:2,11 22:7 23:4
23:10 24:3,12,17
24:21,23 25:13,15
25:22 26:2,15,23
27:4,6,12,22 28:9
28:16 29:9,19
30:9,12 31:23
32:2,9,13,17,23
33:1,4,8,14,19,24
34:5,11,20,23
35:7,11,14,22
36:1,5,18,23 37:7
37:10,17,20,22
38:9,14,22 39:4
39:13,16 40:16
41:11 42:3,13,21
43:7,18,23 44:2,4
44:12,15,17,23
45:1,6,9,12,14,18
45:21,23 46:6,12
47:11,13,18,23
48:4,8,14,17,20
49:11,14,18,20

50:1,11,14,18
51:1,4 52:6,11,14
52:22 53:1,7,12
54:11,24 56:2,10
56:13 57:13,16,20
57:23 58:3,10,14
58:18,21 59:5,24
60:7 61:7,15,18
61:23 63:1,4,7,15
63:18 64:14 66:15
66:21,23 67:7,9
67:24 68:5,8
69:12,24 70:10,13
70:17 72:17,24
73:3,5,7,9,11
75:13,16,20 76:3
78:6,16,18,20,23
79:4,9,13 80:12
82:1,11,13,15,19
83:7,11,14,20
84:14,20,22,24
85:19,21 86:3,10
86:22 87:13,18,21
89:4,12,23 90:1,5
90:9,14,18,24
91:5,11,17,22
92:1,14,20,22
93:18,22 94:6,20
95:3,6,11,15
96:13 98:10 99:2
99:6,8,14 100:4,9
100:13 101:10,22
102:2,8,15,21,24
103:8,15 104:10
105:2,9 106:8,10
108:9,15,20 109:6
109:10,18,21
110:4,6,8,10
111:7,18,22,24
112:5,10,13,17,22
113:4,7,11,13,20
114:5,8,11,18,21
114:24 115:3,9,13
115:18,23 116:2
116:10,12,19,21

116:24 117:4,8,13
117:18 118:9,13
119:3,9,13,18,20
120:7,15 125:2,9
126:6,9 127:17,20
129:1,3,12,16,24
130:3,7,12,16
131:4,10,18,20
132:11,23 133:2,5
133:11,14,17,20
133:24 134:2,8,12
134:18 135:5,8,10
135:14,16,18
136:4,13,22 137:3
138:9 139:1,11,14
139:17,19,24
140:3,9,17,19,21
140:24 141:5,14
141:19,24 142:3,6
142:11,19,23
143:3,7,9,13,18
143:22 144:3,8,16
144:23 145:2,10
145:15,19,22
146:1,18,21,24
147:2,15,24 148:3
148:8,10,12,15,17
149:6,9,12,14,16
149:23 150:1,3,5
150:8,11,15,19,23
151:2,6,11,16,22
152:4,9,13,18
153:6,19,24 154:4
154:7,10,13,15,20
155:6,11,24 156:3
156:6,10,13,16
157:3,17 158:3,7
158:13 159:4,11
159:13,15 161:2,5
161:12 162:3,11
162:21 163:13
164:15,21 165:23
166:7,11,22 167:1
167:10,15 168:23
169:5,9,12 170:16

170:19 171:13,17
171:22 172:3,6,13
172:15,18,21
173:4,18,21,23
174:24 175:10,24
176:15 177:11,23
179:14,18,20
180:1,8,18 181:3
181:7,12,18,22
182:2,14 183:1,9
184:2,13,15,18,20
184:23 186:6,15
186:17,20,24
187:2,4,6,9,17,22
188:10,18 189:14
189:20,23 190:3,5
**qualification** 170:4
**qualifications**
181:7,10,12
**qualified** 169:10
171:20 183:1,11
**qualify** 168:20,21
**qualitative** 183:10
184:5
**qualitatively**
143:10 146:2,4,22
147:3 148:5
**quantify** 165:9
**quantitative**
182:11,22 183:9
183:16 184:5
**Quantitatively**
142:16
**quarter** 134:10
142:15,16
**Quartet** 172:10
173:9 184:15
**question** 6:18,19,20
6:22 17:1 21:22
25:9 27:3 28:4
29:24 30:9 31:4
31:13 47:5 53:24
55:24 59:2 76:7
100:11 101:15
105:7 111:7

127:24 129:14,15
141:23 159:9
161:12 162:3,3,12
162:21 163:5,8,19
164:8,9,16,17
165:23 166:8,11
176:5 179:8,11
180:12 181:18,22
188:18
**question/answer**
6:16
**questioning** 70:18
**questions** 6:5,17,17
59:23 62:23 68:2
72:12 73:16 76:1
82:6 163:23,24
169:13,16 170:21
179:3,5
**quick** 14:21 126:23
127:1
**quickly** 97:11
127:12
**quite** 11:6 32:6
78:6 98:17 121:19
123:7 183:7
**quotation** 169:18
**quote** 170:14
**quotes** 170:7

**R**

**R** 2:2 5:22,22,22,22
16:4,4,4,4 57:2,2
57:2,2 83:24
192:1 194:1
**R-O-N-D-O-R**
82:12
**R-O-U-T** 84:20
**R-O-U-T-E-L**
84:15
**R-O-U-T-L-E-D-...**
84:4
**radical** 137:18
**Radio** 43:8,14
**raise** 191:13
**raised** 51:12

CONFIDENTIAL

Page 225

**raising** 186:2
**ran** 55:9
**Randall** 84:2,8
  92:14 94:20 95:2
  105:21
**random** 128:19
**Randy** 1:3 4:7 5:8
  67:13 156:20
  157:19 166:1
**range** 24:17,20,21
  171:1
**rants** 105:1
**rare** 24:1 92:11,13
**rather** 23:6 49:2
**rationale** 183:23
**Raymond** 47:23
**re-subpoena**
  106:11,12
**reach** 61:23 69:5
  156:10,11
**reached** 83:12
**reaching** 71:4
**read** 23:17 97:4
  157:8,17 168:10
  168:17 170:6,8
  179:12 180:1
  193:5,6
**reads** 168:8
**ready** 40:23 41:7
  169:4
**real** 14:21
**realized** 41:11
  51:22
**really** 73:19 76:7
  124:2 138:4,13
  139:1 145:17
**reason** 18:4,15 35:4
  42:1 43:15 44:10
  62:18 95:4 97:14
  121:15 158:13
**reasonable** 156:19
**reasons** 122:20
  174:8 193:6
**rebuttal** 10:18 11:2
  24:15 29:8 131:6

**rebuttals** 171:23
**rebutted** 11:10
**recall** 8:22 9:13
  19:9,19 20:5
  23:13 25:18,19,21
  31:16,24 32:1,4
  33:7,11,11,12
  34:13 35:5,18,21
  35:22 36:6,12,22
  37:10,14,16,23
  38:2,5,18,19
  43:10 44:5,15
  45:15 46:2,10
  48:24 49:1,6,10
  52:8,8,18,19
  57:22 67:17 72:19
  72:20 82:23 83:16
  83:22 85:4 87:12
  89:14,21,24,24
  90:3,4,8,9 91:15
  98:18 99:18,21,22
  102:7 125:3
  157:14 173:15
  181:6 187:3
**receive** 12:22,24
  25:4 89:4,12 92:8
**received** 29:7 55:14
  55:16 106:1,2
  107:22,23
**recess** 15:1 56:18
  81:20 94:16
  124:21
**reckoning** 190:23
**recognize** 34:10
  114:18,21
**recollection** 19:4,7
  20:5 30:5,6 39:1
  39:24 40:21 42:8
  58:1 84:8,11 90:7
  92:18 95:1,10,17
  96:10,17 100:12
  125:20 172:7
**record** 4:3 6:21
  14:20,23 15:6,8
  24:24 25:6,10

28:17 50:22 51:17
  56:16 57:1,7
  80:16 81:1,5,11
  81:13,19,23 94:15
  94:19 97:16,22
  100:19 109:5
  122:9 124:20
  125:1 128:24
  131:14 153:1
  179:12 191:19
  193:6
**recorded** 8:14
**recording** 1:8 2:16
  4:13 5:15 61:6
  62:15 64:5 69:2
  70:4,5 77:5,6 82:4
  82:5 94:2,3,23,24
  107:19 131:5
  135:19,20 136:12
  136:23 137:5
  152:5 159:2
**recordings** 169:24
**records** 31:20
  37:23 38:14,15,18
  38:19,20 45:6,10
  46:6 48:8 67:10
  67:11 102:22
**red** 105:14
**redacted** 13:17
**reducing** 25:20
**refer** 28:10 30:17
**reference** 113:2,3
**referenced** 16:12
**referring** 12:8
  28:11 53:21 129:3
**reflect** 6:21 57:7
  80:16 81:5 97:16
  103:4
**refrain** 141:16
**refusing** 68:12
  70:13
**regards** 80:12
  92:15 97:13
  105:23 181:4
**Registered** 1:19

194:5
**registration** 103:10
**registrations**
  103:16
**related** 181:2 186:5
  194:14
**relates** 171:18
  181:19,23
**relating** 82:2
  107:14
**relayed** 84:13
**relevant** 125:17,21
**relied** 18:6 106:19
  107:18
**remember** 12:4
  20:7 31:19 34:10
  35:3 36:15 38:11
  38:21 40:23 42:18
  42:19 43:17 44:8
  44:9 47:6 83:2
  90:23 95:18 96:11
  147:24 148:3
  149:10,17,19
  172:23 173:3
  179:10
**remind** 27:6
**removing** 111:16
**render** 156:17
  183:1,11
**repeat** 136:2,5
**repeated** 132:8
**repeating** 129:15
**report** 3:15 8:16
  9:6,7,15,15 10:18
  10:18 11:2,6,10
  11:10,11,12,14,20
  11:21,23,24 12:10
  13:19 18:1,13,14
  24:12,14,14,16
  26:7 28:11,19,20
  28:23,24 29:1,4,7
  29:8 30:16 34:7
  35:2,17 38:1,17
  39:5,8,22,23
  40:12,14 41:8,13

41:15 42:16,24
  43:12,20 44:6,18
  45:19 46:1,8
  47:16 48:1,6,23
  49:23 53:16 54:14
  54:19 55:17 57:19
  69:13,17 70:1
  77:1,17 80:12
  83:15,16 85:17
  87:15,23 88:1,8
  88:12,16 89:3
  109:22 114:22,24
  125:2,6,7 126:7
  126:17 127:8,9,15
  128:7,20 129:4,19
  130:4 131:6
  138:16 143:8
  155:4,7 171:23
  182:11 183:17
  185:16 187:14
  188:24 189:6,6
**reported** 157:12
**reporter** 4:22 5:20
  14:18 56:3 57:8
  167:12 193:4
**Reporters** 1:20
  194:6
**Reporting** 1:16
  4:24
**reports** 17:13,21,21
  17:24 23:17 25:23
  26:9,12,15,19,21
  26:23 28:7 29:2,6
  54:16 88:19 107:6
  107:8 157:8,11,12
  186:23
**Repp** 32:3
**represent** 71:6
  174:12
**represented** 53:13
  53:15 86:6 110:12
  159:6
**representing** 4:23
  5:6 7:21 71:11
**request** 18:11

CONFIDENTIAL

105:17 193:6
**requested** 82:1
**requesting** 108:7
**REQUESTS** 3:22
**Rescords** 45:1,2
**research** 38:19
44:10 47:9
**respect** 11:9 16:12
17:20 20:8 21:20
40:12 41:16 62:12
86:17,18 88:9
95:20 125:8
130:14 162:19
176:9 182:9,13
**respond** 23:17
**responding** 72:12
97:17
**response** 15:11
170:20
**responsibilities**
10:20 92:1
**responsive** 13:7
**rest** 111:5
**restate** 6:19
**result** 194:16
**results** 171:5
**resume** 68:1
**resumed** 15:3 16:5
56:21 57:3
**retained** 10:2 33:9
33:15,21 34:2,6
34:20 35:1,9,16
35:23 36:20 37:13
37:24 38:16 39:1
42:23 43:11,20,23
44:6,17 45:18,24
46:7 47:15,24
48:5,22 49:22
54:13 56:7 60:1
61:3 62:21 63:1
63:12,12,15,18,23
64:6,8,14,20
65:19 66:2,7,11
66:16,24 67:5,7
67:15,17 68:11,12

68:13,16,17 69:13
69:14 70:1,2 71:8
71:15 74:20 76:4
77:2,3,13 78:20
78:23 82:6,7,19
86:5 91:11 94:1
103:20 106:3
108:12 185:20
**retainer** 92:12
**reveal** 66:23 78:7
**revealing** 77:8
80:17
**review** 58:3
**reviewed** 68:23
69:1
**RGK** 1:6
**Rhino** 1:9 2:16
4:13 5:14
**rhythms** 146:13
**right** 6:4,9,12,15
13:23 14:19 15:7
15:17 29:9 30:12
39:14 42:4,4,13
45:19 49:20 53:12
54:1 56:13 60:21
80:7 85:22 87:1
90:10 96:21 98:17
99:4,6,12 100:9
107:10 113:20
115:18 119:6
120:23 121:12
123:12,19 125:2
128:14 130:12,17
134:17 138:4
141:5,22 142:9
143:7 147:18,19
148:8 149:17
157:23 161:5
167:10 168:23
170:16 178:5
184:23 190:13
**ring** 37:8,17
**rivets** 147:21
**road** 2:4 146:8,16
**Robert** 1:7 2:9,15

4:9 5:13,17
146:15 154:13
155:8 156:11,19
157:4,17 158:14
180:2,9
**rocking** 93:7,16
**Rondor** 36:18
37:22 38:2 82:9
82:13,14,22 84:8
87:4 89:8,13
91:11 92:15 94:1
94:21 95:23,24
96:3,7,14,20,21
97:2,6 98:13,22
99:19,24 105:19
**room** 31:7 64:17
81:6 101:4 159:23
161:20
**Routledge** 84:1,3,8
84:21 92:14,19
94:21 95:2 105:21
**row** 24:2
**RPR** 56:19 194:22
194:24
**Rule** 171:23
**run** 42:3
**running** 122:22
143:1
**runs** 80:7
**Rykodisc** 47:13,19

――――――――――

S

**S** 2:2 3:6 45:5
**said** 7:10 19:18
20:1,4 21:19
28:15 30:6 40:24
41:23 50:13 55:7
55:14,16,19,20,21
59:24 64:20 67:6
67:8 71:22 75:10
76:13 77:20 83:14
84:1 86:3 87:13
87:21 90:14 95:20
96:1,1 99:16,17
99:20,21,22 106:6

106:8 118:7
120:20 121:8
122:9 136:5
139:14 141:21
143:16 148:6
149:9,16 150:4
152:22 168:17
186:6 187:18,21
192:11 194:15
**sake** 138:1,6
**salary** 21:6 22:14
**same** 7:7 8:15 29:7
47:20,21,22 48:10
48:18 59:6 63:16
63:19 101:14
110:22 113:18
116:14 119:4
130:3 137:14
181:18,19,22,23
182:18 193:5
**sample** 39:8,11,14
39:17 40:1,8,10
40:10,13,16,17
41:1,4,6,6,9,12,16
41:21,24 42:5,12
88:14,14
**Santa** 2:18
**Santelli** 30:8 33:19
**saw** 34:9
**say** 6:11 10:8 14:12
19:7 22:13,16
23:10 24:8 25:3
26:19 31:21 41:19
41:20 43:3 50:6
75:9 76:20 84:24
85:9 87:11 88:4,8
88:17,22 97:6
98:18 101:3,6
117:21 118:2,6
119:4 132:17
136:14 138:2,4,4
138:5 139:20
142:20 147:11
149:16 150:4
157:14 161:22

162:15 164:19
168:10 172:4
178:3 179:7 184:2
187:15
**saying** 10:7 19:5
20:8 51:16 60:22
62:13 68:4 75:7
86:4 106:7 121:23
129:22 138:6
**says** 61:13 115:3,9
130:10 132:5
141:12 167:1
189:6
**scale** 112:14,15
**scenarios** 85:19,21
**scholarships**
176:12
**score** 110:12
**Scotti** 11:21
**search** 74:12
**second** 6:5 40:13
50:11,16,17 68:22
107:16 111:22
112:1,23 119:14
120:2,3,12 126:10
130:16 134:4
**seconds** 132:5
136:7,21,24 137:6
138:10 139:9
141:17 142:1,4,4
142:7,8,12,22,24
143:4,14 147:18
159:6 173:14
175:13 187:20,23
187:24 188:24
**secret** 67:3 68:24
**section** 109:1 115:5
125:14,15,20,22
126:5 129:13 132:4
132:5,7,14,20,22
135:24 137:10,12
137:21,23,24
138:24 139:6
144:17,17 147:23
151:7 168:4,4,7

CONFIDENTIAL

Page 227

169:3 173:14 182:10
**sections** 136:6,6 137:4 147:12
**see** 11:4 12:20 13:6 48:12 52:3 57:20 65:15 80:9 91:2 103:8 113:4,14 114:11 115:7 119:10 128:15 129:1 132:4,23 137:16,21 141:3,5 141:13 148:18 160:24 172:19 174:14,16,18 179:14
**seem** 123:14
**seems** 59:8 128:8 131:24
**sees** 168:3
**send** 84:5 92:12
**senior** 55:11,16
**sensitive** 93:12
**sent** 13:1,13 16:23 18:10 40:21 82:23 91:19,20,20 173:1
**sentence** 175:8
**separate** 137:24
**sequence** 169:18 170:5
**series** 69:21
**serious** 62:13,24 64:9,10,11 69:21 72:4,5,5 74:24 75:4 76:10,11 77:14 104:7 185:21
**seriously** 54:22
**services** 1:16 25:5 28:21 102:1
**session** 6:16
**set** 192:10 194:19
**Settle** 55:21
**settled** 54:23 56:12
**seven** 122:13,16

123:2 132:1,1 178:8 190:13 191:3
**seven-hour** 121:1 122:11
**several** 20:17
**Shad** 172:1,4,9,22 173:9,19 174:5,20 175:11
**shadows** 146:8
**sharp** 113:15,19,21 113:24 114:3,5 118:9,14,24 119:1 119:8 120:9,12,14 135:6,10,13 187:10 188:2,21 190:5
**she** 95:23 96:1
**Sheet** 193:1,7
**short** 170:6,8
**shorthand** 1:20 194:5,12
**should** 10:15 20:8,9 30:13 32:20 67:4 114:18 163:5
**shoulders** 167:18
**shouldn't** 49:8 51:19
**show** 135:3 138:17 139:23 153:21 159:15
**shows** 117:5
**side** 23:16 29:8 31:17 41:13 54:21 61:19,23 85:9 115:15 163:1
**SIGNATURE** 193:23
**signed** 193:7
**significant** 144:5 146:17 147:12
**silly** 149:15
**similar** 47:19 48:10 135:20,23 173:24 174:8,9,21,22,24

175:11,18
**similarities** 88:5 125:22 126:3 174:12,14
**similarity** 125:17 125:19 174:3 175:17
**simple** 163:4
**simplest** 140:6
**simply** 23:1 31:18 75:7 99:23 138:5 168:7 169:2
**since** 9:17 39:22 84:18 128:1 143:17
**singer** 52:9
**singing** 146:16
**sir** 64:14 65:16 66:15 68:2,6 78:7 83:10 103:6 105:9 118:19 166:24 167:9 179:5
**siren** 117:24
**sit** 54:11 55:1 102:24 105:2 149:18 155:22 176:15
**sitting** 65:17,22 68:13
**six** 23:24 33:19 132:1 136:2,5,6 146:11,20 147:7 149:4,6,8 151:1 160:14
**Sixteen** 38:14 185:7
**Sixth** 48:13,16
**Skidmore** 1:2 4:6 5:8 67:13 86:18 95:20 193:2
**skipping** 129:18,20
**Slip-N-Slide** 31:17 31:18 38:14,18
**slow** 104:23 167:11
**small** 25:5,6
**Snooker** 157:21

**so** 6:12 10:21 11:16 12:12,14 13:23 14:3,13,19 15:21 19:18 20:20 21:9 23:4,15,17,24 26:23 28:7,9 31:7 31:19,21 32:14,17 35:22 37:4,10 41:11,22 44:9 45:9 47:5 48:17 49:4,4,7 50:8 51:20,23 53:1,12 54:7 55:21 59:2 61:12 64:14 66:2 67:4,24 68:1 72:23 73:19 75:24 78:6,14,17 80:6 80:20 81:8 82:2 84:7 86:20 87:3,9 87:10,21 88:17 89:16,18,19,21 93:14 97:6 98:1 98:19 99:2,11 100:3,4,5,10 104:23,24 109:22 110:10,24 112:5 112:19 113:20 114:8,9 117:6 120:17 122:2,24 123:2,15 124:10 125:16,24 127:4,8 127:14,17 129:11 129:18 130:11 132:6 137:17,20 138:9,16 139:11 140:15 141:8,22 142:9 146:17 147:11 149:3 151:1 153:1 159:4 160:7,11,13,22,24 165:21 166:8,14 168:12 170:11 176:13 178:7 179:11 180:16 182:20 185:11

**solo** 53:6 144:22 145:10,14,19 146:12 147:8 148:8,10,11,17 149:19 150:5,16 150:20 151:18 153:22,23
**some** 27:6 29:10 31:24,24 34:12 40:2,20 41:3 52:14 54:17 96:5 100:20 157:13 169:12
**somebody** 8:13 63:1 161:18 169:2
**somehow** 51:24
**someone** 55:15 63:21,23 64:17 69:5 71:4 78:13 79:23 161:18 162:4,11,12,16,16 162:23,24 169:15
**something** 26:3 39:18 60:18,20 74:13 79:18 96:14 104:8 131:1 174:20 177:5 182:20 183:21
**sometime** 10:17 95:18
**sometimes** 36:14 45:3 92:13
**son** 54:10
**song** 8:13,14 41:7 50:20 85:10,10,10 85:11,13,13,14,14 94:2 139:2 142:15 142:17,22 145:23 146:2 147:9,17,20 154:21 155:9,12 156:21 171:24 172:6,22 173:4,5 177:9,10,15,16 184:3

CONFIDENTIAL

Page 228

**songs** 35:19 36:16
 37:6 38:7,8 44:8
 47:7,7 127:13
 138:8 176:11
 180:4
**songwriting** 179:15
**Sony** 42:14
**sorry** 13:24 17:3
 19:1 28:16 29:23
 46:16 47:3,21,22
 50:14 84:16
 102:20 110:5
 117:19 126:18
 129:14 130:13
 136:18 139:13
 152:18,24 154:9
 178:1 179:9,19
**sort** 52:15
**sought** 10:24
**soul** 146:9
**sound** 27:9,15
 30:18 62:14 64:4
 69:2 77:5,6
 107:19 131:5
 136:12 159:2
 169:24
**sounding** 134:6
 135:4
**source** 167:7,16
**Southern** 32:3 33:2
 33:8 34:1,24 35:8
 35:15 36:7 38:15
 42:15,22 43:8,9
 43:19 44:4 45:14
 47:14 48:21
**speak** 78:13 92:15
 94:24 95:4 97:10
 154:19 155:22
 156:13
**speaking** 65:17
 71:24 72:8 77:9
 110:22 140:6
 164:2,5 165:12
 166:5
**speaks** 69:17

**specialist** 2:22 4:22
**specific** 139:1
**specifically** 53:22
 56:6 90:10 93:24
 105:18
**speculating** 91:8
 92:24
**speculation** 82:21
 85:3 93:20 156:9
 158:17
**speech** 79:18
**speeches** 68:21
 72:11
**spell** 84:14
**spelled** 84:3 113:17
 118:22,22
**spelling** 113:24
 114:4 119:7
**spend** 87:7 91:5
**spent** 11:5,8 166:20
 186:13
**Spirit** 89:17 156:20
 157:19,20 158:8
**Spirit's** 157:5
**spoke** 52:20 72:17
 95:2
**spoken** 84:4,18
**Sprockets** 43:7
**ss** 194:2
**stacked** 65:24
**staff** 116:7,8 117:11
 118:21 126:5
**staggering** 145:17
 145:17 147:10
**Stairway** 3:17 58:8
 58:11 59:1 60:1,6
 61:5 62:15 69:2
 70:4 73:12 77:6
 82:4 83:2 94:2,23
 107:18 115:10
 116:4,5,8 119:10
 119:24 120:8
 135:19 136:3,8,11
 136:13,15,23
 137:5,16 138:11

138:15 139:5
143:5,10,15 147:7
151:22 152:2,6,18
152:20 153:6,9,13
154:7 158:23
159:2,6 173:17,24
174:4 175:13,18
175:22 187:11,16
187:21 188:1,22
**stand** 98:12 167:18
**star** 105:14
**start** 39:12 41:10
109:16 114:6
122:13,16,17
127:9 190:18
191:6
**started** 83:24
120:22 122:19
123:3
**starting** 119:14
121:9,22 127:8
132:5
**starts** 105:1 141:6
148:21
**state** 1:21 6:1 30:22
53:19 192:3 194:2
194:7
**statement** 11:12
164:6 167:22,23
167:24 168:16
171:13
**statements** 51:12
51:13 78:2 157:1
**states** 1:1 4:17
192:8
**staves** 115:14 116:5
119:9,24
**stay** 81:2 124:3
**stayed** 124:6
**Ste** 2:4,17
**steal** 162:22,24
163:11 164:20
169:14 170:12
**stealing** 161:6,13
161:17,21 162:4,7

162:10,14 165:4
165:16,19 168:7
168:15,18,19,21
**stenographic** 109:4
128:23 131:13
**Stenotype** 1:20
194:6
**step** 88:2
**Stewart** 2:23 5:10
81:8,24 137:10
138:23 141:12
181:8
**STH** 116:4,11
**still** 54:3 81:10,13
120:17 123:6
125:18
**stole** 166:2
**stop** 79:15,16 166:9
**stopped** 123:23
190:12
**stops** 135:4
**story** 170:6,8
**straight** 121:4
150:16,18
**Straughter** 47:23
**Street** 1:17 4:20
**strictly** 183:11
**strike** 36:5 119:21
**structural** 125:11
**structure** 129:20
136:15,22 138:21
138:22 139:2,2,11
139:18,19
**student** 168:3
170:23
**student's** 168:3
**Students** 3:20
159:19 161:3
166:22
**studio** 58:24 60:1,6
61:4,5 69:2 82:24
107:20 131:9
132:2 135:24
175:22
**stuffy** 124:2

**stupid** 163:7
**subject** 10:5 170:24
176:23
**subjective** 147:5,14
**Subjectively** 147:6
**submit** 10:17
**submitted** 11:2
39:9 186:23
**Submitting** 171:3
**subphrase** 110:21
111:3
**subpoena** 3:9 12:14
12:15,16,20,22
13:7 15:9,12
16:20 17:11
106:12,16 107:1
**subpoenas** 13:14
**SUBSCRIBED**
192:17
**subsequent** 186:14
**substantial** 174:3
175:17
**substantially** 171:6
171:10 173:24
174:7 175:11
**successful** 52:11
**such** 89:1
**sued** 50:20
**sufficient** 109:14
**sufficiently** 137:17
**suggest** 111:4
134:15
**suggested** 10:22
**suggesting** 35:20
36:13 37:3,15
38:6,21 47:8 75:2
122:3 148:7
183:22
**suggestion** 65:2
78:12
**suggests** 38:19
**summary** 34:15
42:20 43:5 45:17
46:3
**Super** 1:7 4:10

CONFIDENTIAL

Page 229

| | | | | |
|---|---|---|---|---|
| **superstar** 51:4 52:6 | 136:21 141:16 | 125:14,18,22 | 22:3 30:5,7 | 21:10,12,20,21,22 |
| 53:1,17 54:5 | **taking** 80:13 164:1 | 131:5,8,22 132:2 | **testimony** 7:6 | 22:1,6,10,11,12 |
| **supplement** 187:6 | 168:15 169:3 | 135:18,24 136:12 | 19:22 26:6 27:7 | 22:13,16,16,17,22 |
| **support** 10:6 94:9 | **talk** 69:9,11 81:16 | 152:9,16,22 155:3 | 28:13 49:16 64:24 | 22:22,22 23:16 |
| 111:16 174:16 | 85:19,21 124:14 | 156:21 157:4 | 86:15,16 87:17 | 24:1,8 25:3,4,9,24 |
| **supposed** 45:7 | 143:18 154:11,13 | 175:21,22 | 90:13 100:8,10,17 | 26:3,4,19 27:3,9 |
| 190:17 | 154:21 155:8 | **Taylor** 44:4,11 | 100:21,23 114:7 | 27:14,15,19 28:3 |
| **sure** 8:7 28:3,18 | 157:18 | **Tel** 2:6,12,19 | 121:14 129:9 | 28:5,8,8,9,14 29:4 |
| 32:6,16 39:23 | **talked** 138:19 | **telephone** 72:22 | 141:20 173:23 | 30:18 31:14,14,15 |
| 48:9 84:15 85:20 | **talking** 10:15 12:4 | 74:3,5 83:19,20 | 182:7 184:4,9 | 31:20,20,22 32:7 |
| 104:19 109:20 | 12:5,6 26:8,9,12 | 84:12 85:17 88:20 | 191:18 | 32:16,21 33:7 |
| 115:20,20 124:12 | 27:20 47:22 55:7 | 91:14 95:21,21 | **text** 12:7 | 34:13 35:3,4,4,5,8 |
| 127:2 150:2 | 55:13 59:7 64:16 | 96:9 172:8 | **texture** 144:20 | 35:18,20,21 36:5 |
| 166:10 183:7 | 65:8,17 98:19 | **tell** 21:17 35:19 | 146:14 | 36:12,13,21,23 |
| **surprise** 40:5,6 | 109:15 120:11 | 37:5 55:5 56:6 | **than** 22:6,23 23:5 | 37:8,11,15,17 |
| **suspend** 185:13 | 125:7 136:11 | 85:8 86:5 90:22 | 24:3 31:6 32:18 | 38:2,5,6,11,13,20 |
| **suspending** 191:11 | 144:13 145:13 | 95:23 96:20 99:3 | 39:18,22 54:12 | 38:21 39:1,8,9,9 |
| **sustained** 133:15 | 147:19 155:12 | 102:2,8,15,21 | 77:10,24 78:4 | 39:14,14,18 40:1 |
| **sustaining** 138:23 | 172:3 183:9,10 | 103:15 108:10,15 | 89:1 128:2 145:3 | 40:7,8,8,10,10,11 |
| **sway** 20:10 | 188:12 189:23 | 130:2 138:11 | 146:2,5,8 147:3 | 40:14,15 41:4,4,6 |
| **swayed** 20:22 | **talks** 93:14 | 149:3 151:2 | 150:21,24 151:5 | 41:7,9,12,13,14 |
| **swear** 5:20 | **taller** 146:8 | 156:13 | 171:1 175:19 | 41:17 42:1,5,11 |
| **switch** 124:11 | **tap** 117:22 118:8 | **telling** 32:17 62:19 | 187:2,4,5 191:3 | 42:18 43:4,10,14 |
| **sworn** 5:24 192:7 | **tape** 56:15 57:1 | 101:3 | **thank** 10:9,13 | 43:15,16,17 44:10 |
| 192:17 | 124:19,24 160:12 | **ten** 90:21 91:3 | 15:16,19 30:10,11 | 44:15,19,19,23 |
| | 178:6,15,19,21 | **ten-minute** 73:23 | 32:14,16,24 34:10 | 45:7,15 47:7,8,9 |
| **T** | 191:17 | **tend** 56:12 89:20 | 36:11 47:12 52:4 | 47:18 48:7,9,11 |
| **T** 1:12 3:6 166:18 | **tapes** 124:11 | **tendered** 41:13 | 93:17 98:8 114:11 | 48:12,19,24 49:2 |
| 192:1,1 194:1,1 | **tapping** 47:2 | **tends** 38:7 | 117:8 118:19 | 49:4,8,15 50:12 |
| **T-Pain** 11:19,20 | **tapping's** 46:22 | **Tennessee** 33:20 | 120:15,17 124:6 | 51:11,16,18,21,23 |
| **take** 9:22 25:13 | **tasked** 92:3 | **term** 88:6 109:21 | 135:16 153:5 | 51:24 52:5,19,19 |
| 73:22 74:10,11,14 | **Taurus** 3:13 57:4,9 | 174:3 175:16 | 177:12 | 53:21,22 54:2,13 |
| 75:24 80:6 82:1 | 57:13,17,20,23 | **terms** 71:14 111:13 | **that** 6:24 7:10,18 | 54:17 55:6,20,22 |
| 85:10 90:5 94:11 | 58:3,8,15,20,24 | 140:6 174:18,21 | 7:19,21 8:8,13,14 | 57:18 58:21 59:5 |
| 98:5 109:18 121:8 | 59:1,2,3 60:5,5 | **testified** 6:2 16:5 | 8:17,19 9:2,5,10 | 59:9 60:7,16 61:7 |
| 121:22 122:21 | 62:14 69:1 70:3 | 23:23 29:22 30:6 | 9:24 10:2,6,8,12 | 61:8,12,13 62:20 |
| 123:8 124:10 | 77:5 82:4,24 | 44:23 53:9 57:3 | 10:19,21 11:1,5,8 | 62:20 63:11 64:10 |
| 126:23 127:1,17 | 86:19 94:2,22 | 66:8 68:23 93:21 | 11:8,14,20,21,22 | 66:4,5,9,10,12,19 |
| 169:1 172:9 177:5 | 103:5,11,16 105:5 | 107:17 158:17 | 11:23,23 12:9,20 | 67:4,21,22 68:15 |
| **taken** 1:15 6:6,10 | 107:20 108:11,18 | **testifies** 181:1 | 12:22 13:15,18 | 69:8,9,13 70:1,10 |
| 7:16 15:1 56:18 | 109:7 110:10 | **testify** 3:9 12:16 | 14:17 15:10 16:12 | 70:19 71:13 72:18 |
| 81:20 94:16 | 111:9,12 112:7,19 | 13:8 24:1 26:2 | 16:15 17:24 18:1 | 72:22 73:17 74:8 |
| 124:21 192:9 | 115:5,14,15,17,22 | 40:6 62:5,11 | 18:13 19:5,6,15 | 74:13,20 75:3,7 |
| 193:5 194:9 | 116:13,18 117:11 | 67:20 101:4 | 19:15,23,23 20:9 | 75:21,24 76:24 |
| **takes** 54:21 97:24 | 118:15,16 125:4,8 | **testifying** 21:13 | 20:16,20,21 21:10 | 77:1,3,11,12,17 |

CONFIDENTIAL

Page 230

| | | | | |
|---|---|---|---|---|
| 77:18,20,23 78:2 | 135:3,4,18 136:1 | 183:21,22,23,23 | 149:15 151:13,13 | 34:18,19,20 35:1 |
| 78:8,9,13,14 80:1 | 136:2,5,6,14,17 | 183:23 184:12,24 | 151:14,18,20,20 | 35:9,11,16,19,19 |
| 80:2,2,9 82:7 83:5 | 136:20 137:14,17 | 185:16 186:1,2,6 | 152:12 154:3,6 | 35:24 36:7,8,14 |
| 84:18 85:4,10,12 | 138:2,6,13,19,20 | 186:6,8,9,13,23 | 155:4 159:4 | 36:15,16,16,20 |
| 85:14,22 86:3,4,5 | 139:9,21,22 140:6 | 187:6,11,13,15,18 | 163:13,13 164:11 | 37:5,5,11,12,15 |
| 86:7,19,20,21 | 140:15 141:13,16 | 188:4,8,17 189:6 | 164:13 165:22,24 | 37:24 38:3,7,7,7,8 |
| 87:11,13,16,19,21 | 141:17,20,21,23 | 189:7,10,10,12 | 167:13 168:6,6 | 38:16 39:2,7,7,8,8 |
| 88:7,13,15,17,19 | 141:24 142:3,6,9 | 190:9,11,11 191:3 | 170:9 183:4 184:1 | 39:11,11,12,13,22 |
| 88:21,22,24 89:2 | 142:10,24 143:8 | 191:6,7,8,13 | 188:8,21 189:9,23 | 39:23 40:2,5,9,9 |
| 89:4,11,17,18 | 144:3,13,14,16,17 | 192:8 194:8,13 | the 1:3,15,21 4:1,2 | 40:13,13,13,13,16 |
| 90:3,20 91:17 | 144:17,18 145:4 | that's 7:2 10:11 | 4:3,4,6,7,16,16,21 | 40:17,21,21,22 |
| 92:11,12 93:4,15 | 145:14,16 146:1 | 11:11,13,19 13:22 | 4:22 5:5,6,8,19,19 | 41:3,4,5,6,6,9,10 |
| 95:22 96:4,4,6,18 | 146:10,17,21 | 15:20 16:1 17:6 | 5:20 6:1,13,21,22 | 41:10,13,16,17 |
| 97:3,5,8 98:13,14 | 147:4,6,6,9,12,14 | 26:8,14 27:5 | 6:23 7:3,4,7,15,19 | 42:1,3,4,8,10,17 |
| 98:18,22,23 99:4 | 147:16,17,20,21 | 30:24 31:12 32:15 | 7:21,22 8:4,4,7,8 | 42:19,19,23 43:11 |
| 99:6,8,11,14,15 | 147:21 148:3,6 | 32:23 33:18 34:22 | 8:12,15,22 9:2,3,5 | 43:21 44:1,2,3,6,8 |
| 99:19,23,23,24,24 | 149:3,3,8 150:9 | 35:10,13,24 39:15 | 9:6,7,14 10:1,5,9 | 44:9,17,19,21 |
| 100:15,17 101:14 | 151:5 152:4,10 | 42:10,12,13,18 | 10:13,24 11:3,4,6 | 45:18,24 46:4,7 |
| 101:22 102:4 | 153:8 154:4 155:6 | 44:21 48:3 49:24 | 12:5,6,6,14,14 | 46:18,19 47:6,7,7 |
| 103:1,6,16,17,21 | 155:13,18,24 | 51:6 52:24 53:11 | 13:11,13,14 14:6 | 47:7,10,15,20,21 |
| 104:8,10,24,24 | 156:3,5,7 157:9 | 53:23 54:1 55:10 | 14:16,17,18,20,22 | 47:21 48:1,5,9,13 |
| 105:3,5,8,22,23 | 157:12,15 158:12 | 59:18 60:9 63:20 | 14:22,23 15:3,5,5 | 48:14,15,15,16,18 |
| 106:10,14,16,19 | 158:23,23 160:4 | 63:24 64:9 66:13 | 15:6,8,8,9,10,12 | 48:22 49:7,7,22 |
| 106:20 107:11,17 | 161:3,19,21,22,22 | 68:3 71:5,13 | 15:16,20 16:1,9,9 | 50:6,8,9,16,17,20 |
| 107:23 108:16,24 | 162:12,17,20 | 72:15 80:5 93:11 | 16:10,11,11,12,20 | 50:21,21,22,22 |
| 109:1,16 110:2,3 | 163:19 164:2,9,16 | 97:6 99:2 100:4 | 17:3,7,9,10,10,21 | 51:2,11,12,12,14 |
| 110:15,18,19 | 164:19 165:9,15 | 100:24 101:1,13 | 17:22,22,23,23,24 | 51:16 52:8 53:2,6 |
| 111:1,2,4,8,9,10 | 165:23 167:2,20 | 101:18 104:20 | 18:1,2,10,11 19:1 | 53:7,9,13,13,14 |
| 111:24 112:7,8,23 | 167:20,22,23,24 | 113:4,18,20 | 19:13,22 20:4,5 | 53:15,22,24 54:10 |
| 113:11,23 114:7 | 168:2,4,5,9,12,12 | 114:23 115:2,23 | 20:16,20 21:8,16 | 54:12,18,20,20,20 |
| 114:11 115:7,21 | 168:15,17 169:3,4 | 115:23 117:14 | 22:7,9,9,13,16,20 | 54:21,22,24 55:4 |
| 116:7,10,14 118:3 | 170:2,7,9,13,14 | 118:22 119:6,14 | 22:21,22,24 23:2 | 55:8,10,11,14,19 |
| 118:7,24 119:1,10 | 170:17,24 171:5,8 | 120:18,23 121:23 | 23:2,2,8,9,10,16 | 55:21,22 56:3,7 |
| 119:22 120:20 | 171:13 172:6,18 | 122:22 123:18 | 23:18,20,23 24:4 | 56:14,14,15,16,19 |
| 121:7 122:3,9,11 | 172:24 173:7,13 | 125:9,24 126:13 | 24:17,23,23 25:3 | 56:21,23,23,24 |
| 122:12,20,21 | 173:14,15,16,24 | 127:5,20 128:3 | 25:3,6,8,9,15 26:5 | 57:1,7,8,18 58:1,3 |
| 123:3,13,20 124:5 | 174:2,3,4,10,10 | 129:23 130:23 | 26:19 27:7,13,19 | 58:8,10,14,24 |
| 124:13,14 125:3 | 174:12,16,19,20 | 131:2 132:9 | 28:6,13,17,19,19 | 59:1,2,3,3,4,6,23 |
| 125:12,12,14 | 175:12 176:12 | 133:11,19 134:18 | 28:20,23,23 29:2 | 60:3,5,15 61:4,12 |
| 126:3,3 127:7,17 | 177:5,7,13,14,15 | 136:16 138:3 | 29:3,3,7,7,7,22,22 | 61:13 62:20 63:20 |
| 129:3,9,21,22 | 177:16,17,19,20 | 139:6,7 141:2,2 | 29:24,24 30:17,18 | 63:24 64:4 65:2,9 |
| 130:13 131:21,22 | 177:21 179:5 | 141:18,22 142:9 | 31:9,15,16,17,20 | 65:10,12,15 66:7 |
| 131:24 133:12,14 | 180:7,22 182:13 | 144:2,5,10,19,23 | 32:4,13,21 33:5 | 67:12,13,15,15,21 |
| 133:14,16,22 | 182:20,22 183:8 | 146:7,10 147:22 | 33:10,15,21 34:2 | 68:20,21 69:1,6 |
| 134:3,4,16,20,21 | 183:15,18,19,20 | 148:5,23 149:11 | 34:6,15,17,17,17 | 69:14,16,22 70:2 |

CONFIDENTIAL

Page 231

| | | | | |
|---|---|---|---|---|
| 70:3,4 71:13,20 | 112:23 113:5,8,9 | 137:4,5,5,7,8,10 | 163:1,3,5 164:7,8 | 192:9,10,10,18 |
| 71:22 72:13,19,20 | 113:13,14,14,17 | 137:11,12,12,13 | 164:9,10,14,17 | 193:4,5,5,5,6,6,6 |
| 72:22 73:3,12,15 | 113:18,20,21,22 | 137:14,14,15,15 | 165:1 166:5,6,7 | 193:7,7,8 194:7,8 |
| 73:17,20,21 74:2 | 113:23 114:3,6 | 137:16,16,19,19 | 166:13,23 167:2 | 194:9,10,16 |
| 74:5,6,19,19 75:2 | 115:14,15 116:3,4 | 137:21,21,23 | 167:11,18,19,19 | theft 161:10,11 |
| 75:5,6,7,11,11,14 | 116:7,8,8,8,9,13 | 138:3,4,6,11,12 | 168:5,5,7,18 | their 9:20,23 23:17 |
| 76:7,12 77:5,5,8 | 116:14,16,16 | 138:20,21,22,24 | 169:1,3,5 170:2,4 | 42:9,9 63:14 |
| 77:10,16,20 78:13 | 117:7,10,11,11,13 | 139:2,4,6,8,8,11 | 170:5,6,8,12,12 | 92:17 101:24 |
| 78:18 79:24 80:4 | 118:13,13,15,16 | 139:21,22 140:21 | 170:13,17,20 | 108:17 127:13 |
| 80:7,15,24 81:1,5 | 118:20,21,22,23 | 140:22 141:3,6,7 | 171:10 172:7,11 | 155:23 157:22 |
| 81:6,10,11,13,17 | 119:4,9,13,13,14 | 142:14,15,16,17 | 172:11,21,21,24 | 168:6 172:10 |
| 81:17,19,21,21,23 | 119:15,15,16,21 | 142:17,18,20,21 | 173:4,5,11,11,13 | 173:11 176:2 |
| 82:24 83:5,7,23 | 119:21,21,23,24 | 142:22 143:1,13 | 173:14,17,18 | theirs 102:3 |
| 83:23,24 84:6,7 | 119:24 120:2,3,4 | 143:13,16,22 | 174:2,2,8,9,9,12 | them 6:15 8:11,12 |
| 84:10,10 85:21 | 120:6,7,8,8,11,11 | 144:2,13,20,22 | 174:14,15,17,24 | 9:19 20:7 29:21 |
| 86:8,12,14,18 | 120:12,17 121:5,9 | 145:3,10,14,14,16 | 175:7,10,12,12,15 | 30:15 32:2 54:17 |
| 87:9,24 88:1,2,5 | 121:16,22,23,24 | 145:19,19,19,22 | 175:16,18,19,19 | 54:18 56:12 70:21 |
| 89:12,17,18 90:7 | 122:1,3,9,10,11 | 145:23 146:2,3,11 | 175:20,21,22 | 72:12 80:4 82:19 |
| 90:12 91:13,14,15 | 122:13,16,22 | 146:12,13,14,16 | 176:4,5,11,12,16 | 88:12 91:18,23 |
| 92:18 93:2,7 94:1 | 123:18,22 124:3,9 | 146:18,18,23 | 176:17,22,23,24 | 92:16 94:22 96:12 |
| 94:13,13,15,17,17 | 124:11,15,15,18 | 147:1,3,4,7,11,12 | 177:6,8,10,13,17 | 96:19,20,22 108:4 |
| 94:19,22,23 95:1 | 124:19,20,22,22 | 147:13,13,13,16 | 177:21,23 178:5,6 | 120:13 127:3,4 |
| 95:6,9,17,20 96:4 | 124:23 125:1,4,8 | 147:18,20,23 | 178:8,14,19,21,21 | 154:19,21,21 |
| 96:9,17,18,21 | 125:10,10,11,12 | 148:6,8,9,10,11 | 178:22 179:4,10 | 155:22,23 156:14 |
| 97:3,4,11,16,18 | 125:13,13,13,14 | 148:13,17,23 | 180:1,11,12,24 | 157:21 170:15 |
| 97:20,21,22 98:5 | 125:17,17,19,20 | 149:2,3,9,19 | 181:1,7,12,18,19 | themselves 17:21 |
| 98:15,16 99:19 | 125:22,22,24 | 150:5,12,14,16,20 | 181:22,23 182:4 | then 14:9 16:2 17:1 |
| 100:17,18,19,22 | 126:1,1,4,4,4,5,5 | 151:1,6,7,12,13 | 182:10,15,15,16 | 26:11 48:18 53:7 |
| 101:4,7,13,18,19 | 126:16,19,23 | 151:14,17,18,18 | 182:16,19,22 | 55:11 59:3,18 |
| 103:2,3,4,8,10,16 | 127:2,7,7,9,13,14 | 151:22 152:2,5,9 | 183:4,15,15,16,17 | 68:2,5 84:1 88:21 |
| 103:20 104:22 | 127:16,18,24,24 | 152:16,24 153:1,6 | 183:17,18,20,20 | 89:19 96:4,9 |
| 105:6,7,11 106:12 | 128:4,4,11,23 | 153:9,18,21,22,24 | 183:23,23,24,24 | 111:14 116:3 |
| 106:16 107:4,14 | 129:5,5,14,15,18 | 154:4,5,19,21 | 184:3,5,9,21,21 | 117:13,22 118:9 |
| 107:16,17,19 | 129:19,19,20,21 | 155:2,3,3,9,12,14 | 185:5,7,14,15,18 | 121:18,24 122:4 |
| 108:9,17 109:1,6 | 130:3,15,15,17,20 | 155:14,17,20 | 186:2,4,10,22 | 126:2 129:19 |
| 109:7,10,13,13,15 | 131:4,7,8,8,13,21 | 156:16,20,21,22 | 187:9,10,15,19,20 | 132:8 136:2,17,19 |
| 109:16,16,17,21 | 131:21,22,23,24 | 157:9,9,11,12,20 | 187:22,23,24 | 136:20 138:13 |
| 109:22 110:11,12 | 132:1,1,2,4,7,8,15 | 157:21,22,23 | 188:1,1,2,2,2,5,8 | 139:7 140:24 |
| 110:12,19,21,22 | 132:17,20,22 | 158:7,7,8,10,14 | 188:11,12,14,18 | 141:13 142:6 |
| 110:24,24,24 | 133:2,6,9,9,20,22 | 158:19,20,21,22 | 188:19,20,21,22 | 144:13,18 146:15 |
| 111:3,5,5,5,8,11 | 134:3,3,11,12,23 | 158:22,24,24 | 188:23 189:4,9,12 | 155:19 161:19 |
| 111:12,15,16,17 | 135:3,4,4,7,10,12 | 159:1,2,4,5,6,8,9 | 189:13,18,24 | 162:6,19 166:13 |
| 111:17,17,19,20 | 135:15,18,19,23 | 159:23 160:11,16 | 190:12,19 191:14 | 173:13 176:11 |
| 112:1,2,2,5,6,6,6 | 135:24,24 136:7 | 161:17,23,24 | 191:16,16,17,18 | 177:20 183:18,24 |
| 112:8,18,18,18,23 | 136:11,14,22,23 | 162:9,12,14,17,17 | 191:19,21 192:8,9 | 188:7 |

CONFIDENTIAL

Page 232

| | | | | |
|---|---|---|---|---|
| **theory** 18:3 | 194:17 | 26:15,20 27:21 | 19:10 20:6,9,11 | 138:16 139:22 |
| **there** 12:20 13:20 | **thereto** 186:5 | 28:8,9,14 33:3 | 21:13 22:10,17,19 | 140:1,2,7 142:20 |
| 16:21 18:4,14 | **these** 16:9 18:12,15 | 41:19,22 48:8 | 22:19,23 23:2,3,7 | 143:3,22 144:11 |
| 19:5 20:17 23:15 | 29:11 30:7,16 | 49:2,4 50:13,16 | 23:8,14,15,18,21 | 147:5 148:14,21 |
| 24:20 27:8 28:24 | 31:24 32:1 64:5 | 54:3,11 55:8 | 24:10 26:21 29:17 | 148:22 151:12 |
| 29:5 34:12 37:7 | 64:13 67:14 74:22 | 58:22 59:12,18 | 31:1,5,6,6 32:15 | 153:12,16 158:20 |
| 37:11 40:1,8,10 | 77:11 79:21 105:1 | 60:8 63:10,20 | 33:19 40:23 44:2 | 159:20 160:12 |
| 40:24 41:9,11,21 | 169:13,15 170:20 | 64:23 65:1,9 67:2 | 45:10 47:19 49:3 | 162:21 163:22 |
| 41:21,23 42:5,11 | 176:10 185:15 | 70:10 74:24 78:6 | 49:15 50:4 51:9 | 164:24 168:4,17 |
| 46:5 51:19,21 | **they** 10:4,22,23,23 | 78:11 81:3 83:6 | 52:1 54:8 56:3,15 | 176:14 177:4 |
| 62:6 75:21 79:19 | 18:18 36:16 40:11 | 84:3,18 88:13 | 56:24 57:11,13,16 | 182:20 184:3,3 |
| 85:12,17 86:3,20 | 40:12,16 42:8,9 | 91:20 96:18 100:9 | 57:18,20,23 58:4 | 185:13,16,21,24 |
| 88:14 90:24 92:20 | 42:10,11 59:9 | 101:13 109:21 | 58:12,15,20 59:3 | 190:10,11,17 |
| 94:8 95:4 97:14 | 63:12 68:17 72:24 | 110:19,20 114:7,8 | 60:16 61:2,15,17 | 191:11,17 192:6 |
| 98:23 111:8 | 75:9,10,13 80:9 | 114:18 117:4 | 62:5,12,13,17,23 | 192:17 194:19 |
| 117:14,17,24 | 80:10 82:23 85:8 | 122:6,8 123:22,24 | 63:2,24 64:2,7,12 | **Thomas** 37:7 |
| 121:24 127:9 | 85:9 86:4 88:7,14 | 126:11,13 128:15 | 64:17 65:15,22 | **those** 6:17 9:18 |
| 129:24 130:17 | 94:7 98:14,14 | 129:12,14 130:14 | 66:2,17,17 67:1 | 16:11 17:5,15 |
| 131:21 132:6 | 102:2,3,3,8,9,15 | 134:19 137:3,7 | 68:8,9,11,14,16 | 20:18 25:13 53:16 |
| 135:6,20,23 | 102:21 103:10,17 | 138:2 139:22 | 69:12,15,20,22 | 54:23 55:1 102:23 |
| 137:11 146:16 | 108:10,15,16 | 140:1,5 141:15 | 70:12,12 71:1,7 | 112:1,13,14 |
| 147:9,20 157:9,13 | 112:20 153:10 | 143:6,16 145:4 | 71:14 72:4,16 | 118:10 126:2 |
| 158:13 160:18 | 154:21 155:19 | 147:6 148:4,5,6 | 75:13,18 76:4,8 | 142:11 146:1,23 |
| 167:10 170:13 | 157:18 158:3 | 148:20 150:21,24 | 76:23 77:2,13 | 147:1,2,18 149:2 |
| 173:10,15 174:22 | 161:19 168:5 | 151:4,9 153:17 | 78:3,7,23 79:5,13 | 155:18 158:2 |
| 177:13 182:11 | 170:5,6,8 179:20 | 154:20 155:1,6 | 80:22 83:8,9 | 177:21,23 187:15 |
| 186:8,15,21 | 180:3,16 185:22 | 160:13 161:5,6,13 | 84:24 85:13,13,24 | 188:4 189:18 |
| **there's** 23:15 24:21 | 185:22 | 162:4,11,22,23 | 86:12,17 87:1,2 | **though** 134:8 167:7 |
| 25:9 45:4 46:11 | **they're** 10:4,5 | 166:12 174:4,7,10 | 89:5,13,23 90:2 | 167:17 170:1 |
| 62:8 64:18 67:3 | 48:12 72:23 85:9 | 180:5 186:24 | 90:15 92:19 93:18 | **thought** 31:17 |
| 68:17,24 75:17 | 130:9,9 173:15 | **thinking** 115:18 | 93:23 95:16,24 | 87:18 141:3 |
| 76:23 77:22 85:17 | 174:7 189:10 | 178:3 | 97:1,7 98:16 99:1 | 159:24 166:17 |
| 88:4 96:2 104:7 | **they've** 155:17 | **thinks** 74:18 | 102:9 103:4 104:4 | 177:14 187:18 |
| 107:20,23 110:14 | **thicker** 146:14,14 | 164:16 183:21 | 104:12 105:12,17 | **thousand** 20:12 |
| 112:22 117:13 | **thing** 92:13 93:23 | **third** 101:13 | 107:10,15 108:6 | 87:10 90:21 91:3 |
| 121:2 130:14 | 107:17 171:22 | 112:24 113:13,21 | 108:13,16 109:7 | 152:6 164:12 |
| 134:5 136:6,20 | 187:9 | **third-party** 65:10 | 110:10 112:17 | **three** 13:5 14:11 |
| 139:14 141:15 | **things** 16:22 17:5 | 65:12 | 114:9,14,17,18 | 26:10,20 29:13,14 |
| 160:19 161:10 | 17:15 68:15 76:21 | **this** 4:4,15,18 5:7 | 116:1 117:2 120:2 | 33:1 40:4 50:6,7 |
| 169:23 177:9 | 121:16 155:18 | 6:16 8:24 9:5,8,10 | 122:4 124:7,18,23 | 53:13,16 58:22 |
| 185:14,15,18 | 158:2 170:13 | 9:17 10:19 11:6 | 126:11,12 127:9 | 59:24 60:4 67:18 |
| 186:7 191:12 | **think** 7:14 9:21,22 | 12:1,2,19 13:3,4,7 | 127:14,14,21 | 87:8,23 90:14 |
| **thereafter** 85:18 | 10:4 11:4 20:17 | 13:12,24 15:15 | 128:21 129:1 | 91:9 112:15 |
| **therefore** 180:16 | 22:21 23:1,9,21 | 16:3,7,19 17:14 | 131:12,17,18 | 113:10 119:15 |
| **thereof** 132:3 | 23:23 24:7,7 | 18:2,4,9,10,22 | 132:9,10 134:22 | 120:12 131:24 |

CONFIDENTIAL

Page 233

133:18,21 134:2,5
134:6,7,8,11,13
135:2,5 143:24
144:14,15 146:1
147:19 152:13
153:7 178:12,13
178:18,21 185:6
187:15
**three-** 28:22 87:14
**three-note** 111:13
**through** 3:18 22:21
29:21 32:2 42:3
78:24 97:3 110:13
115:10 127:11
147:16,16 149:7
149:19 150:16,18
151:7,9 152:2
153:14 155:15,18
**Thumper** 93:9
**thumping** 93:8
**tie** 134:2
**tie-on** 134:9
**tie-over** 133:20
**tied** 133:16,17,23
135:4
**ties** 134:8,10
**Tim** 45:8,8
**Timberland** 27:7
45:12
**time** 4:3 7:15 11:6
11:9 14:22 15:5
22:13,16,22 23:1
23:9,9,10 25:15
28:19 45:10 56:14
56:23 76:8 80:7
81:17,21 83:5
84:5 91:13 94:13
94:17 96:5 97:20
101:14 102:24
121:3,3,4,9,16,21
121:22,24 122:1,4
122:5,17,21,22
123:3,18 124:15
124:22 143:2
147:21 156:16

160:9,10 163:23
164:2 172:21
178:4,20 182:3,16
185:3,4 190:6,6
190:20 191:6,16
192:10 194:10
**time's** 121:5
**timely** 9:6
**times** 6:6,9 7:11
55:6 136:2,5
139:20
**Tisi** 32:9 33:1,6
**title** 8:15 92:20
192:10
**titles** 38:8
**to** 3:9,17 6:15,17,19
6:21 8:13 9:6,22
9:24 10:6,8,17,24
11:9 12:8,10,12
12:12,13,13,16
13:1,7,8,13 14:8
14:11,11 15:1,9
15:11 16:3,12,20
16:23 17:12,20
18:5,8,10,19,20
18:20,21,23 19:4
19:6,7,13,16,18
19:19 20:4,8,8,9
20:10 21:8,12,12
21:14,17,20,21,23
22:4,6,11,12 23:4
23:5,13,16,17,21
24:5,8,14 25:4,8
25:16 26:11,20
27:10,13,18,23
28:1,5,10,11
29:20,24 30:17,20
30:21 31:4,9,15
33:4,9,15,21 34:2
34:7,17 35:1,4,16
37:24 38:7,16,24
39:13,23 40:3,5,6
40:6,6,9,13,14,20
40:23 41:7,13,16
41:22,22,24 42:2

42:4,8,16,24 43:3
43:11,16,20,23
44:6,10,17,20
45:7,18,24 46:4,7
46:14 47:4,5,15
47:19 48:1,5,11
48:22 49:22 50:16
51:8,9,11,21
53:20,22 54:4,13
55:20,24 56:2,3
56:12 57:6,8 58:1
58:2,4,4,7,8,11,11
58:15,23 59:1,3,5
59:8 60:1,1,3,4,6
60:7,18,19 61:5,7
61:9,11,12,14,14
61:24,24 62:15,16
62:17,23 63:1,9
63:13 64:5,13,21
65:1,3,9,10 66:4,5
66:8,12,16,18,21
66:23,24,24 67:2
67:4,18,20,20,20
67:21,22,24 68:5
68:10,11,12,15,16
68:20,21,23 69:2
69:4,5,6,7,8,11,13
69:14,15,18 70:2
70:2,2,4,13,15,16
70:17,20,23 71:3
71:4,13,19 72:12
72:13,14,15,17
73:13,17 74:5,10
74:22 75:1,11,13
75:15,17,21,24
76:2,3,8,9 77:3,4
77:6,12,24 78:5,6
78:8,9,10,12,13
78:13,17 79:18
80:3,3,4,6,8 81:16
81:16 82:1,2,3,4,4
82:7,7,22 83:2,12
83:23 84:7,10,24
85:23,24 86:5,7
86:10,17,18 87:7

87:14,23 88:3,8,9
88:11,17,18,22
89:10,16,20 90:7
90:14,22,24 91:3
91:13,14,15,18
92:3,15,15,16,18
93:2,15,18,24
94:1,2,2,7,8,11,20
94:23,24 95:1,4,9
95:11,17,20,20
96:9,12,17,19,19
96:22 97:1,6,10
97:11,13,17,17,22
98:2,4,15,24 99:3
99:4,10,11 100:4
100:11,12,19,20
101:3,5,5,8,9,11
101:23,23 102:3
103:3,4,10,17,23
104:5,11,23 105:3
105:6,16,23
106:11,13,14
107:14,18 108:8
108:10,16,17
109:2,8,10,13,17
109:22 110:15,24
111:1,2,4,4,9,11
111:12 112:1,10
112:15,17,19,23
113:2,3,7,8,9,11
113:13,15,21,21
114:1,3,5,9,13
115:14,15,18
116:5,5,14,16,21
116:23,23,24
117:7,13,16,21
118:2,5,6,8,9,9,13
118:20,20,21,24
119:4,9,10,13,15
119:15,16,20,21
119:23,24,24
120:3,4,5,7,8,8,12
120:19,21 121:14
121:24 122:12,13
122:15,17,21

123:11,14 124:6,7
124:10 125:6,8,20
126:3,8 127:3,4
127:12 128:6,8,18
129:3 130:14
131:1,11 132:11
133:20,23 134:2,8
134:10,20 135:3
135:12,19 136:3,4
136:15,21,23,23
137:3,5,5,16
138:2,15 139:1,5
139:21,24 140:3,5
140:9,9,10,21
141:3,16,24 142:4
142:7 143:1,5,10
143:15,19,20
144:8,12,13,18
147:7,11 148:18
149:6 150:15
151:6,7,11,23
152:2,6,6,18,20
153:2,6,9,11,13
153:19,20 154:7
154:11,13,19,21
154:21 155:1,2,5
155:8,8,8,19,21
156:10,10,11,11
156:14,17,18,20
156:22 157:1,4,19
157:19,19 158:13
158:22,23 159:2,6
159:8,13,15,16,23
159:23,23,24
160:22,23,24
162:6,6,15,20,20
162:22,23,24
163:6,10,16,23
164:8,10,12,20,23
165:2,5,9,11,13
165:22,24 166:4,5
167:19 168:1,5,9
168:10,10,13,13
168:16,20,21
169:4,5,14,14

CONFIDENTIAL

Page 234

170:5,6,7,8,14,14
171:2,3,18,24
172:4,7,9,9,9,12
172:15,22 173:1,4
173:6,8,9,9,16,17
173:19,24,24
174:2,4,5,20
175:7,11,12,14,18
175:18,22,22
176:2,4,9,17,17
177:8,9,18 178:3
178:16,19 179:4,6
179:7,7,14,18
180:2,10,11,14,19
180:22,24 181:4,8
181:8,8,10,13,19
181:23 182:2,3,4
182:9,13,14,14,15
182:23 183:1,11
183:15,16,17,18
183:19,20,21,23
184:2,2,5,7,12
185:10,12,23
186:4,14,18 187:8
187:9,9,10,12,17
188:1,1,2,2,19,20
188:20,21,21,21
188:22 189:3,7,9
189:12,12,17,24
190:3,5,8,9,16,18
191:5,7,13 192:17
193:4,6,7,8,8
194:14,15
**today** 5:9 7:1 18:5
49:16 54:11 55:1
74:24 102:24
105:2 120:20
121:20 149:18
176:15 180:10
186:18,20 191:18
**together** 9:7 30:14
**told** 18:19,21 19:6
19:10,19 40:8
55:18,20 69:1
76:5 85:4,23

86:10,10 93:18
96:13 106:21
**too** 31:18 83:18
90:8 114:8 124:6
**took** 56:19 190:19
191:6
**top** 115:4,14 116:7
116:8,14 127:19
128:1 131:23
168:6
**total** 24:4,9 136:2
**tough** 130:18
**traditional** 177:16
177:17
**traffic** 98:5
**transcribe** 172:13
**transcribed** 132:9
172:12
**transcript** 69:23
192:8,11 193:5,8
**transcription** 3:16
120:8 131:4,7,15
131:18 132:3,9
138:15 173:1
194:11
**treble** 109:16,17
111:19 112:2,6
113:5 129:5
**trial** 3:9 12:17 22:9
22:11,12 23:22
39:7,12 40:3,5,7,9
41:3,10 42:3,4,10
44:20 48:15 71:17
156:17 166:12
182:3,16
**trials** 23:24 24:1
**trick** 161:12 162:3
169:13
**tricks** 165:23
**tried** 168:13
**trouble** 46:17
**true** 104:20 137:22
192:11 194:11
**Trust** 1:3 4:7 5:9
**trustee** 1:2 4:7 5:8

**truthful** 100:23
**try** 20:10 45:9 71:4
73:23 93:15 118:8
124:7 148:15
151:2
**trying** 14:11 105:3
108:10 160:21
189:12
**Tuesday** 13:1,4
**Turino** 36:18,22
37:7
**TV** 43:7,13
**TVT** 31:20 37:23
38:14,19,20
**twelve** 152:6
160:15
**Twentieth** 42:22
43:3
**Twenty** 12:11
**Twenty-five** 45:21
**twenty-seven-oh**
29:12
**Twenty-two** 44:4
**twice** 32:7,11,11,13
**two** 7:17 13:5 14:17
24:1,1 32:17 49:3
50:6,7 71:16
74:22 76:21 83:5
84:10 85:21 87:7
87:8 90:14 109:16
112:1,13,14,15
113:9,9 115:4,9
115:14 116:4
117:11 119:4,9,15
120:3,5,12,13
131:24 134:1,5,10
136:6,7,21,24
137:6 138:10
139:9 141:16
142:4,7,7,11,21
142:23 143:3,13
145:19 149:2
151:13 159:5
163:11 173:14
174:8,9 175:8,13

175:15,17 176:10
177:6,21,23
187:20,23,23
188:23
**two-minute** 94:12
**two-note** 110:4,6,7
110:15,18,21,21
111:10,12 112:9
112:10
**tying** 184:7,11
**typo** 45:4,4,9

**U**

**UK** 157:21
**ultimate** 55:21
**ultimately** 182:12
**un-full-blown**
27:23
**unable** 9:6
**unacknowledged**
169:21
**unavailable** 89:19
**unclear** 153:2
**uncomfortable**
76:19
**under** 4:16 6:23
50:9
**underhanded**
79:19
**undermines** 174:11
**understand** 6:18,20
7:3,6 8:11,12 31:4
41:10 54:9 75:19
82:9,16 88:5
110:23 116:7,10
121:7 123:20
137:7,22 139:3
140:12,16,17
145:13 150:11
155:6 156:3
162:10 164:21
168:19 174:2
175:16 177:3
180:24 189:14
**understanding**

29:4 42:12 53:23
54:16 67:3 73:14
92:9 97:8 112:8
113:23 118:23
158:21,24 177:4,7
177:13
**understood** 6:21
158:22
**undoubtedly** 40:11
**United** 1:1 4:16
**Universal** 35:7 38:4
55:11,15 82:10,17
96:6,15 97:5,8
98:13,22 100:1
101:10 103:1,9
104:10 105:3,11
105:20 108:9
**university** 10:21
21:3,7,9,15 22:5
22:14,24 23:6,14
24:11
**unless** 96:2
**Unpretty** 50:20
**unprotected** 174:15
**unreasonable**
137:3,8 138:3
**until** 70:15 127:14
133:17 175:3
**unusual** 23:18
**up** 42:4 56:3 89:2
109:18 122:3
124:7 127:3,14
130:17 136:23
137:5 144:19
146:15 147:9
157:20 160:3,6,24
164:2 173:10
179:2,20 190:6,6
**upheld** 34:18 46:5
**upon** 106:19
155:10 184:6
193:6
**upper** 117:11
125:17 175:20
188:17

CONFIDENTIAL

Page 235

**us** 31:6 85:22
100:22 136:21
186:2
**use** 39:8 41:6 43:4
109:13,21 130:6
134:21 169:23
170:11,12 177:17
178:20 182:6,13
188:14 189:4
**used** 156:24
**Usher** 8:6 48:4
**ushers** 144:22
**using** 162:14
168:19,21
**usual** 21:14 23:22
**usually** 29:6 87:14
88:15

———————
**V**
**v** 11:19,21 22:10
30:8 32:3 33:6,8
33:14 34:5,11,14
34:23 35:14 37:23
38:9,14 42:21,22
43:18 44:4,12
45:1,2,6,10,21
46:6 47:18,23
48:4,8 50:11 51:1
52:22 53:8
**vague** 8:1 17:18
18:7 19:2,11 20:2
20:24 25:1 26:17
27:16 30:3 31:2
39:19 40:18 42:6
52:12,16 53:3,20
54:3 55:2 56:8
58:5 61:20 62:2
63:8 79:2,6,11
85:2 86:13 89:9
90:11 91:6 92:4
95:13 102:5,12
108:22 109:12
110:17 113:2
125:5 129:7 133:7
135:21 136:9

145:11 157:6
171:16 179:17,22
180:12 183:5,13
184:10 189:2
**vaguely** 35:3 43:13
**value** 39:6,10 40:3
40:13 41:6 42:2
165:10 182:11,16
**values** 115:5
**valuing** 147:2
**vamp** 146:18,19
**varies** 24:14
**Velez** 42:14
**verify** 127:12
**verse** 136:18,19
137:14,15,16,16
137:19,21,22
139:6,6,12,14
140:24 141:10,12
141:13,15 142:3
142:18 146:10,19
146:20 147:6
149:4,6,8
**version** 58:24 60:1
60:6 61:4 82:24
131:9 132:2
135:24 175:22
**versus** 4:8 7:20
32:9 33:1,19 34:1
35:7 36:19 38:22
42:14 43:7 47:13
48:20 49:11,20
**very** 11:11 22:21
23:8,13,13 24:7
29:2 40:2,23
41:17 43:13 49:7
54:18,22 55:22
64:2 66:10 67:20
70:16 78:10,17
87:21 88:2 90:21
93:12 97:11 107:1
107:1 111:17
130:4 145:20
146:17 147:5,8
169:15 173:16

**vice** 55:11,16 92:23
**video** 1:16 2:22
4:21 121:3,5
122:1
**VIDEOGRAPH...**
4:1 5:19 14:22
15:5 56:14,23
80:24 81:10,17,21
94:13,17 97:21
124:9,15,18,22
160:11 178:5
185:5
**videotaped** 1:14
4:4
**view** 176:11
**visual** 12:6 17:23
127:16 128:12
141:4
**visually** 139:23
**vocal** 188:11
**vs** 193:2

———————
**W**
**W** 5:22 16:4 57:2
**W-a-t-t** 45:22
**wait** 30:19 59:22
62:10,10 104:17
104:17,17,18
175:3
**waive** 80:4
**waived** 76:6,12,14
76:15,16 77:21
79:24 96:7,13,21
98:14
**walked** 99:17
**Walt** 30:8 33:19
**want** 9:24 15:23
53:20 55:24 56:2
66:21 69:4,6 71:3
71:19 72:10,13
74:5 75:23 76:2,8
76:9 79:18 80:3
81:16 88:15 93:23
98:4 101:8,9
103:23 104:5

105:16 109:22
112:10 114:1,2
116:22 117:2
124:6 126:24
127:3,23,24
134:20 135:12
139:1,24 140:10
140:21 143:19
148:18 151:6,7
153:20 162:24
163:15 164:23
165:2,11,12,24
166:4,4 168:1
178:16 187:17
188:19,20 189:17
189:24 190:8,9
**wanted** 40:12 84:24
94:7 99:10 101:5
120:19 185:9
**wants** 9:22
**Warner** 4:11 67:13
73:5,7,9 96:15
**Warner/Chappell**
1:8 2:15 4:12
5:13
**was** 6:1 7:15,18,19
8:3,14,19,20 9:13
10:6,8,16,19 11:1
11:5,20,23 12:17
13:1 15:1,9 16:11
16:17 18:10 22:10
22:15,16 23:10,12
23:22 24:3,7,8,9
25:15 26:2 27:12
27:13,19 29:16,20
31:13,14 32:8
33:6 34:12,16,16
35:5,20 36:8,13
37:7,11 38:6,13
39:9,10,11,17,17
39:18,24 40:1,3,6
40:7,8,8,10,12,14
40:14,20,21,22,23
41:3,5,9,12,13,15
42:1,5,11 43:4,5

43:17 44:2,3,3,10
44:13,19 45:17,20
46:3,3 47:2 49:5,8
49:15,16 50:5,15
50:19,20,20,21
51:4,10,20,21,23
52:6,11,19,19,20
53:5 54:8,8 55:10
55:18 56:18 57:9
57:18 58:18,19,22
58:23 59:2,16,20
59:21 60:4,14,18
60:19,24 61:3,15
61:16,18 62:17
63:4,4,6,7 64:8,10
66:2,5,6,19,20
67:5,5,14 70:10
74:23 75:14,21
76:6,12 77:2,3,21
79:22,23,24 82:22
83:5,7,7,9,11 84:1
84:2,8 85:10,14
86:4,7,11,18,19
86:20,21 87:11,11
88:14 90:14 92:18
93:15 94:8 95:21
95:24 96:4,8,13
96:18,23 97:2,4,6
97:7 98:21,22,23
99:14,23,24
100:12 101:20,20
102:1,15,21 104:6
104:8 105:3 107:2
114:15,21,24
115:18 118:3
122:15,16 123:3
125:12,12,13
126:19 127:7,9
128:20 129:5,6
131:15 138:5
153:14 155:9,12
155:14 157:10,10
157:10,13 158:23
158:24 159:19
160:17 161:24

CONFIDENTIAL

Page 236

162:17,18,18
164:19 167:17
171:5 172:8,21
173:10,15,16
174:10 175:7
176:10 177:8,13
177:14,16,20
178:2 179:15
180:22 185:16
187:18,18 189:11
190:17 191:8,21
**Washington** 34:6
**wasn't** 18:4 39:14
77:16 118:1,5
130:13
**Watt** 45:21
**way** 18:6 20:9,22
47:10 55:8,14
70:11 73:12
105:22 112:17
118:22 146:15
147:9 148:6,21
189:16
**ways** 119:4
**we** 6:4 12:9,9 13:24
14:5,8,13 17:8
29:1 48:8 50:1,6
55:8,13,16 68:1
72:16 74:12 78:22
80:3,24 81:2,14
84:11 88:22 99:17
106:7 108:1,3
110:10,11,12,13
112:5,7,19 115:3
116:13,14 118:9
118:13 119:9
120:21 121:24
122:3,10,19 123:1
123:3,9 124:10,12
124:14 125:2
127:21 128:3,5,6
129:18 136:17
139:21 143:18
146:7,15 148:24
153:3 159:24

160:8,16 166:15
166:17 167:18,19
167:20,20 169:11
177:16 178:3
185:2,12 186:2,3
188:16 191:6,7
194:4,13,13,18
**we'd** 138:6
**we'll** 14:16 16:15
74:11 106:11
121:8,22 126:12
191:13
**we're** 4:2,23 12:11
15:9 16:2 22:20
26:8,8,12 59:11
70:22 71:16 80:6
80:8,13 81:10,12
90:24 98:19
106:13 108:7,7
109:2 110:22
114:13 120:11,17
129:20 147:4
153:17 159:16
166:19 178:6,7
185:11 186:3
188:7,11,12 190:1
190:24 191:10
**we've** 84:18 138:19
160:12 185:10
190:14
**weak** 172:20 173:3
**Webber** 32:3
**Wednesday** 13:5
**week** 13:3,4,12
172:19 173:2,3
190:13
**weeks** 40:5 71:17
147:19 172:24
**weight** 7:7
**welcome** 114:12
123:21 135:17
**well** 6:5 12:8 21:11
22:7,8 25:7,12
26:5,15 27:12,22
30:4 31:12,23

37:1,7 38:24
41:19,20 42:11
48:13,18 55:8
64:23 68:5 85:13
87:7 96:1 99:5
104:4 105:17
108:1 112:17
118:10 121:2
122:8 123:4,8
131:19 134:3
136:4,14 143:1
146:4 149:12,14
149:16 150:8
155:11 168:17
169:12 172:23
185:12 186:21
191:5
**went** 22:11,12
44:20 50:16
117:24 170:5,6,8
180:3
**were** 7:7,10,21 8:4
9:5,7 11:5 15:13
16:12 18:19,20,21
19:6,10,19 20:11
20:21 23:15 25:8
33:2,4,9,14,21
34:2,6,20 35:1,9
35:15 36:20 37:12
37:24 38:15 40:9
42:16,23 43:19,23
44:17 45:18,24
46:6 47:14,24
48:4,21 49:21
50:12 51:11 53:16
54:13 55:13 56:6
58:10,14 59:24
63:1,15,18 66:15
67:7 68:9,10,15
68:17,17 69:13
77:11 78:20,23
79:4,9 82:6,19
85:23 86:4,10
87:3 91:11 93:18
93:24 95:7 96:11

96:13 101:10
102:3,9 103:2,17
103:18 104:10
105:2 106:2
108:10,12,16
121:19 122:13
126:20 138:1
142:19 157:5
158:3 159:24
160:18 166:17
167:7 170:1
186:13,15,23
189:7
**weren't** 191:3
**West** 1:16 4:19
**Western** 1:1 4:18
**what** 7:18 8:21
10:8 11:17 12:13
14:11 16:1 17:2,5
18:1,8 19:16 20:1
20:4 21:14,17
22:1 23:20 24:12
25:8 26:7,11
27:10,19,22 28:14
30:1,17 31:12
38:3 40:12,14,14
41:6,8 43:4,16,17
48:13 50:6 54:4
54:18,20,24 56:5
60:21 62:18 63:9
65:1 68:4,12,23
68:24 73:3 75:14
83:17 85:8,23
86:11 89:10 90:22
90:23 92:2 93:11
93:23 96:10,11,22
98:21,21 99:8,14
99:16,21,22
100:12 101:3,5,19
101:24 102:2
103:24 104:5
106:7,8 109:2,22
112:20 114:2
115:23 116:1
118:21 121:19,23

122:2 125:11
128:2,5,15 129:3
130:21 131:2
132:6 133:5,5
137:9,12,14 138:6
138:11,17,18,21
138:23,23 139:24
140:13 141:11,21
142:12,15,19,20
143:14 144:20
145:10 147:15,22
148:5,9 150:23
151:20 155:1,4
158:22 159:16
161:1,5,22 162:7
162:15 163:1,11
163:16 165:9
168:13,14,14
169:10,14,14
170:11 172:3
174:21 176:10
179:14 180:13,14
180:24 182:9,19
182:21 183:7,8
187:18,19 189:5,6
189:9,11,11
**what's** 8:8 22:7
24:12,17 56:10
92:20,22 97:12
137:18 159:15
160:4 176:13
**whatever** 98:14
122:17 123:3
**whatsoever** 157:15
**when** 7:15 8:19
12:5,24 19:7
23:10 25:15 28:10
28:18 33:12 34:9
39:24 41:11 42:9
54:18 57:20 66:16
79:5 83:9 85:6
86:5,18 90:5 95:6
95:7,15,19 97:7
99:12,17 100:15
101:6 102:3 105:1

CONFIDENTIAL

Page 237

106:2 107:22
123:3 146:10
151:2,3 168:24
169:1 172:4,6,18
172:21 191:7
**where** 30:15 36:8
37:11,23 47:19
53:8,13,15 56:6
59:11 77:20 94:21
99:3 103:9 113:4
129:4,5 134:12,16
137:22 150:12
153:21 154:22
157:18 165:18
167:9 185:2
**wherein** 28:6 84:12
**WHEREOF**
194:18
**whereupon** 14:24
40:24 55:18 56:17
96:1,8 191:20
**whether** 19:9,19
30:21 39:16,17
60:17 62:6 65:3
70:19 89:21 94:8
95:24 97:2 156:18
157:3
**which** 10:15 16:8
19:8 21:6,24
22:12 23:18 26:9
26:10 29:1 40:4
50:2 51:9 52:2
57:5 66:17 67:19
70:13 74:23 82:9
82:15 84:10 86:6
88:20 97:4 102:8
102:9 110:20
112:15 114:2,3
119:10 125:6
129:19,20,22
132:7,10 134:4,11
138:15 139:8,14
139:20 140:24
146:5,11,12
158:20 176:13

185:21 187:10
188:17
**while** 52:10 178:3
**who** 8:4 23:16
28:21 30:17 43:23
50:18,19,19 52:18
55:9,16,18 59:5,8
59:20 60:7 61:7
61:12,13 62:16,20
63:18,21 64:8,14
64:17,19 65:11,19
66:5,23 67:6,7
68:12,17 70:19
72:17 76:17,23
77:8 78:7 82:6,11
82:13,16 83:20
84:9 92:2,14,19
102:2,19 106:3
161:24 170:23
184:13,15 192:7
**whoever** 61:9 63:11
66:11
**whole** 104:5 109:1
142:13 144:17,17
146:10 147:20
166:6 171:6,11
174:10 185:14,15
185:18
**whom** 165:10
**why** 17:6 18:4,15
25:13 32:6,10,11
32:15 57:16 58:21
72:24,24 73:22
75:13,16 78:22
82:19 84:24 93:18
93:24 94:6 97:6
97:14,17 98:11
99:2,10 100:4
101:10,20 102:9
112:5 114:6
123:18 124:12
141:2,22 154:15
154:18 158:13
159:11,13 168:12
168:13 184:18,19

**widely** 174:9
**wife** 54:9,9
**will** 5:19 22:23 23:1
23:20 35:18 41:18
41:20 64:2 80:9
88:21 89:20
139:22 182:6,12
186:2,21
**Williams** 48:20
49:5,9
**willing** 66:12,23
74:9
**Wilshire** 2:17
**winding** 146:8,16
**wise** 194:15
**wish** 25:4 66:22
175:20
**with** 4:24 5:5,9
6:12 8:15 9:19,19
11:9 13:10,16
15:3 16:12 17:20
20:6,8 24:10 25:4
25:19 29:3 40:9
40:12 41:16 42:9
46:21 50:6 52:20
54:2 56:21 57:13
57:16 58:8,10,14
61:2 62:12 64:23
65:17,24 66:3,7,7
67:21 69:9 70:20
72:16 73:7,15
79:4,5,9 80:2,10
81:6 83:21,24
84:4 85:12 86:17
86:18 87:1 88:1,9
88:12 91:23 92:19
93:2 95:2,5,19
96:23 98:19 100:1
105:13,19,22
108:17 110:1
112:8 113:23
115:5 116:15
118:6 120:24
125:8 127:3,5
129:21 130:14

135:4,5,15 143:22
143:22 144:3,4,7
144:10,11 147:9
147:20 150:10
152:4,10 154:4,19
155:3,20,22 157:3
157:5,21 158:19
161:3 162:19
164:2 166:23
167:22,23,24
169:5 170:2,4
171:8,13,17 172:8
175:19 176:9,10
179:20 181:1,1
182:8,13,23
183:16,19 185:3
186:2,6 191:14
**within** 1:21 6:1
17:10 110:3
141:11,13 176:22
189:12
**without** 10:14
128:11 140:3
167:6,16 169:18
189:18,23 190:23
**witness** 3:2 5:21,23
10:9,13 14:6
15:16 17:3 19:1
21:16 51:12 68:20
68:21 71:2,9,15
74:2 75:2,5 77:10
97:11,18 101:2
107:16 124:3
126:23 127:2
130:20 132:15,17
132:20 134:23
152:24 163:3
175:7 176:24
178:22 179:4
185:7 194:9,18
**Wolfe** 1:3 4:7 5:9
67:13
**won** 37:11
**won't** 72:18
**wonderfully** 155:21

**word** 87:24 88:1
96:21 137:7,8
138:3,4 150:12
161:17 162:14
170:12,12 177:17
189:4
**words** 27:12 133:22
156:18 169:18
170:5 171:10
**work** 10:19 17:8
22:3,23 23:3,15
23:18 24:10,15,23
34:14 38:12 40:13
40:22,22,24 54:22
58:10,14 61:8
63:2,20 64:10
80:1 86:6 89:15
89:18 126:2
156:20,23 157:5
158:22,24 159:1
167:6,15 169:15
169:22 171:3
182:5
**worked** 38:20
50:23 51:2 186:22
**working** 25:19 35:5
35:6 108:16
**works** 13:18 64:5
83:5 84:10 87:9
87:12 158:19
167:19 174:9
176:9 177:6 181:1
**world** 163:5 164:9
169:1 170:18
**worth** 184:3,4
**would** 6:11,24 9:23
16:7 19:9,16
21:20 22:13,16
25:3,10 26:7,19
28:5,24 29:4,6
32:18 35:19 36:16
37:6,6 38:3 41:4
51:8 54:20 58:2
59:4 61:11 65:2
67:2 72:22,24,24

CONFIDENTIAL

Page 238

73:19 75:13 78:11
78:12,15 83:17,18
84:11,12 85:4
87:7,11 88:22
89:2,22 91:10,19
91:20 97:21
110:18 111:11,15
112:13 114:3,5
117:16,18 119:20
119:23 120:21
124:10 133:14
135:5 137:15,21
138:13 141:3
142:19 147:5,8,11
147:12 152:4
154:20 155:7,21
156:1 161:22
162:9,15,19
163:19 164:9
165:16 168:15
173:1 174:16,19
174:20 177:4,5
181:19,23 182:9
183:19,24,24
184:11
**wouldn't** 88:7 95:4
103:22 104:1
137:20,24 141:22
141:23 155:10
**wrap** 56:2 124:7
**wrapping** 160:3,6
**write** 9:15 32:20
40:3 54:19 112:19
113:11 114:1,3,5
115:14,16,21
116:3,21,23
118:24 119:16
128:14 133:12
135:12 143:8
**writer** 52:14 177:18
**writers** 177:14
**writing** 17:13 88:23
107:6,8 120:6,14
180:3
**written** 11:14 13:13

19:14 26:19 41:15
85:17 88:8,12,15
92:6,8 114:2
127:15 155:9,13
177:18
**wrong** 35:24 47:9
53:13 129:13
141:2 149:11
**wrote** 117:3 132:20
154:21
**Wyclef** 44:21 51:4
54:6

---

**X**

**x** 1:2,11 3:1,6 66:21
70:13 72:18 184:4

---

**Y**

**yeah** 12:2 14:15
17:17,20 24:20
51:18 52:18 59:12
61:22 89:9 92:7
98:3 104:21 108:1
110:8 121:10
122:24 123:14,16
127:20 128:10
129:16 130:3,18
140:19 145:13
148:12,22 152:20
171:10 180:7
184:20 188:10
**year** 8:24 22:8,15
22:19,20 23:7,8
23:11,12,14,22
24:4 26:3,12,13
27:8,14 28:8
103:4 108:16
**years** 23:23 24:1
26:3 31:19 39:21
39:22 40:20 41:2
49:3 55:12 58:22
59:24 60:4 67:18
84:6,17
**yes** 6:8 7:5,9 8:18
9:1 11:16 12:8,21

12:23 13:4 14:2
17:4 32:20 33:6
33:12,23 34:4,9
38:11 40:24 42:12
43:2 44:3,14,19
44:22 45:8,11,13
45:20 46:2,24
47:12,17 49:16
50:15 51:2,6 53:6
57:15 58:7,13
59:3 63:3 84:22
84:23 86:9 88:14
94:4,5 106:9
110:9 111:10,21
111:23 112:4,8
113:6,16 114:20
115:12 116:6,19
116:20,22 117:15
117:18,20 119:3
119:12,14,18
127:6,10 129:2
130:8 131:6,23
132:22 133:1,4,13
133:16,24 135:8,9
135:11,14,16
138:2 140:5,23
142:2,5 143:1,6
143:12 145:1,15
145:21 146:23
149:20 150:6,17
152:3,8,12 153:4
154:6 161:4 169:7
169:8 171:19,20
172:5,14,17 177:2
179:13 181:21
182:1 184:1,17
186:13 188:6
**yes/no** 16:24
**yet** 186:9,9
**York** 1:17,17,22
2:10,10 4:20,20
6:1 10:21 21:9
22:5,14 24:11
32:3 33:2 34:1
35:8,15 36:7

42:15,23 43:9,19
44:5,20 47:14
48:21 194:2,3,7
**you** 6:5,9,15,17,18
6:19,20,21 7:3,6,7
7:10,10,15,21
8:11,16 9:5,6 10:1
10:2,10,13 11:5
11:14,24 12:5,12
12:20,22,24 13:6
13:6,8,13,15
14:10,18 15:16,19
15:23 16:1,7,8,22
17:13,14 18:5,8
18:15,19,20,21
19:5,6,7,7,9,9,18
19:18,19 20:8,9
20:11,20,21 21:2
21:10,14,17 23:4
23:10 24:23 25:13
25:15,22,23 26:2
26:15,24 27:6,7,8
27:8,13,14 28:3,4
28:9,10 29:22
30:1,5,10,11 31:1
31:8,10,21 32:4,6
32:10,10,14,16,18
32:24 33:2,4,9,14
33:20 34:1,6,10
34:12,20,24 35:9
35:15,18,22 36:2
36:6,11,16,20,23
37:3,5,10,12,23
37:24 38:3,6,16
38:24 39:4,13,16
40:16,17 41:11,12
41:14,19 42:16,23
43:10,16,19,23
44:5,15,17,23
45:15,18,24 46:6
46:13,17,23 47:6
47:11,12,14,22,24
48:4,10,21 49:21
50:2,7,12,13,21
52:4 53:8,13,15

54:4,11,11,13,20
54:24 55:1,1,6,24
56:5,6 57:13,16
57:20,23 58:3,10
58:14 59:5,5,22
59:24,24 60:7,23
61:7,14,24,24
62:10,19 63:1,15
63:18 64:14 65:1
65:2,8,9,11,18,24
66:15,16,21,22,24
67:6,7,8,12 68:2,9
68:9,10,12,13,15
68:17,20 69:1,4,6
69:12,13,24 70:1
70:10,17,18,19
71:1,3,6,10,19
72:10,13,17,17,18
73:18 74:1,5,9,18
75:9,13,20,21,23
76:3,6,8,9,12
77:20,23 78:2,4,6
78:8,8,10,20,23
79:4,9,14,17
80:12 81:3,16
82:2,6,15,19
83:12,14,14,20
84:14 85:23 86:3
86:3,4,5,10,22,24
87:3,13 88:22
89:4,4,10,12,17
89:23 90:1,5,6,9,9
90:14,15,19,22
91:5,11,17,17,22
91:22 93:1,5,10
93:17,18,22,22,24
93:24 94:4,4,21
94:24 95:6,7,11
95:15,15 96:7,13
96:14 97:7,21
98:4,7,8,10,11,11
99:2,3,3,9,10,10
99:11,12,18,19,21
99:23 100:4,5,10
100:10,11 101:10

CONFIDENTIAL

Page 239

| | | | | |
|---|---|---|---|---|
| 101:20 102:2,4,8 | 143:16,19 144:3,4 | 182:14 183:1,7,11 | 48:19 79:20 87:24 | **Z** 22:10 49:20,22 |
| 102:15,21,24 | 144:16,23 145:2,8 | 184:2,13,15 185:9 | 101:14 107:14 | **Zanaras** 4:23 |
| 103:1,6,8,16,21 | 145:20,22 146:1,7 | 186:15,24 187:6,7 | 128:2 144:6 | **Zappa** 47:13,18 |
| 103:21 104:1,10 | 146:16,21 147:2 | 187:10,12,12,17 | 187:14 188:24 | **Zeppelin** 1:6 4:8 |
| 104:12,23,24 | 147:24 148:2,3,5 | 187:18,21 188:1,4 | 191:2 | 86:19 158:7 176:9 |
| 105:2,2,22 106:1 | 148:8,18,20 149:3 | 188:14,19,20,20 | **your** 6:6,10 7:1,6 | 176:16 177:14 |
| 106:1,2,4,6,8,10 | 149:9,10,17,18,18 | 189:8,9,20,24 | 7:16 9:18 11:5,11 | 193:2 |
| 106:11,12,13,13 | 149:19,20,20,24 | 190:7,8,8,9,16,20 | 11:24 12:10 17:13 | **Zeppelin's** 175:24 |
| 106:16,21 107:7 | 150:2,4,5,6,6,12 | 190:21,22 191:3 | 18:5,14,20,22 | 179:15 |
| 107:11 108:10,12 | 150:15,15,17,17 | 193:8 | 19:7 20:21,22 | **zero** 141:24 |
| 108:15 109:6,7,15 | 150:19 151:3,3,6 | **you'd** 110:14 111:8 | 21:14 24:4,12 | |
| 110:4,6,14,21 | 151:7,8,11,22 | 111:24 112:22 | 25:23 26:16 27:12 | **0** |
| 111:2,7,10 112:10 | 152:4,22 153:5,19 | 118:20 119:16 | 28:4 30:23 31:9 | |
| 112:13 113:4,13 | 153:20,21 154:11 | 136:5 142:20 | 31:13,22 38:19 | **1** |
| 114:1,2,5,11,18 | 154:13,20 155:7 | 152:9 154:4 | 41:12 44:9 46:21 | **1** 3:14 114:15 115:1 |
| 114:21 115:7,14 | 155:24 156:3,7,10 | **you'll** 27:10,18 | 47:5,8,9 58:18 | 127:8 129:13,17 |
| 115:21 116:3,7,16 | 156:13,13,16,17 | 67:24 81:4 113:14 | 66:15 68:1,21 | 130:1,1,2,2,6,7,10 |
| 116:21,22 117:2,8 | 157:3,17,22 158:3 | 132:4 166:13 | 69:12,24 70:20 | 140:7 |
| 117:16,23,23 | 158:13 159:11,13 | **you're** 6:12,23 12:4 | 72:11 76:1 82:1,2 | **10** 26:3,12,13 27:8 |
| 118:1,12,19 | 159:15 160:13 | 12:5,6 23:5 27:19 | 85:24 86:23,24 | 27:14 28:8 31:19 |
| 119:10,13,20,23 | 161:1,3,5,6,12,14 | 28:10 30:12 32:17 | 87:21 90:2,6 92:1 | 39:21,22 57:19 |
| 120:7,15,17,20 | 161:15 162:4,7,8 | 53:21 59:7 61:1 | 92:2,2,15 93:2 | 127:10 |
| 121:16,19 122:9 | 162:9,21,22,23 | 64:15,24 65:16 | 95:7 99:11 100:5 | **10,000** 90:18 |
| 122:11,13 123:14 | 163:10,11,11,21 | 66:17,23 68:5,11 | 100:10 104:2 | **100** 2:17 164:12 |
| 123:17 124:4,6,10 | 163:22,24 164:7 | 68:13,16 69:17 | 105:18,22 106:4 | **100-** 70:1 |
| 125:3,3 126:6,7,8 | 164:20 165:5,8,22 | 70:13 71:20 72:11 | 107:6,8,8,9 | **10018** 1:17 |
| 126:13,20,24 | 165:23 166:12,23 | 73:16 77:24 78:4 | 108:12 109:22 | **101** 170:17 |
| 127:5,23,24 128:5 | 167:9,22,23 168:9 | 79:20 80:21 86:5 | 114:22,24 123:21 | **10103** 2:10 |
| 128:18 129:1,4,4 | 168:13,14,14,15 | 92:2 97:14 98:1 | 125:2,3 126:6 | **105** 2:4 3:23 |
| 129:15,17,24 | 168:16,17,20,21 | 106:7 107:3 | 129:4 130:4 | **108** 3:23 |
| 130:21 131:4 | 168:24 169:1,5,7 | 114:12 115:23 | 131:18 139:3 | **11** 178:7 179:1 |
| 132:6,11,23 133:2 | 169:7,13 170:2,5 | 122:2,6 125:7 | 140:3,7,10,10 | **11,000** 152:8 |
| 133:12,14,20 | 170:7,8,13,14 | 129:21 130:21 | 152:5 155:7 | **114** 3:14,23 |
| 134:9,12,20 135:5 | 171:8,13,17,19,19 | 135:17 136:11 | 163:13,13 164:13 | **12** 3:9 120:22 |
| 135:10,12,16,18 | 171:24 172:3,6,13 | 144:6,13 145:13 | 164:16 165:1 | 121:11 122:4,5 |
| 136:5,22 137:3,23 | 172:15,18,21 | 150:10 155:12 | 170:11,12 171:22 | 131:7 190:18 |
| 138:9,11,13,14,17 | 173:4,6,18,21,23 | 161:11,21 162:6 | 171:23,23 172:15 | **128** 3:15 |
| 138:18 139:2,11 | 174:15,24 175:2,3 | 162:14 163:1,10 | 173:23 176:3 | **131** 3:16 |
| 139:14,20,23 | 175:10,20,24 | 164:1,15,17 | 179:7 180:10 | **1492** 168:9,11,16 |
| 140:3,9,15,18,22 | 176:15,15 177:2 | 165:17,18 166:7 | 181:4 184:4,6,24 | **15** 3:10 160:24 |
| 140:24 141:3,14 | 177:11,12,12 | 168:18,19,20 | 186:7 188:24 | 185:9 190:14 |
| 141:16,21,22,22 | 178:11,16,19,23 | 170:11 177:24 | **yours** 66:14 | **153** 3:18 |
| 141:24 142:3,6,11 | 179:5,6,14 180:1 | 178:3,22,24 189:5 | **yourself** 149:24 | **159** 3:20 |
| 142:12,14,15,19 | 180:8,18 181:3,7 | 189:15 | | **16** 3:11 42:15 |
| 142:19 143:3,9,14 | 181:12,18 182:2,9 | **you've** 26:16 30:15 | **Z** | 185:10 |

CONFIDENTIAL

**16-measure** 141:8
**17** 27:13 129:18
  185:10
**17,000** 20:18
**18** 140:7
**19** 27:13 42:21
**19063** 2:4
**1963** 172:11 173:11
  174:6
**1994** 32:4
**1A** 132:5,14,17
**1st** 194:19

---

**2**

**2** 57:1 124:19
  130:11 186:23
**2,000** 90:15
**2:15-cv-03462** 1:6
**20** 6:11 7:14 26:3
  141:10 187:2
  190:15
**20-plus** 23:23
**200** 25:23 26:2,21
  26:23
**200-page** 70:1
**2000** 33:2 44:13
**2002** 33:16,20
**2004** 34:11
**2005** 34:6,24 35:8
  35:15 36:1,7,19
**2006** 37:23 38:10
**2007** 38:15,24
  42:15,23 43:10
  44:5
**2008** 43:19 44:13
  50:12
**2009** 44:12,13
  45:14
**2010** 2:17 27:7
  45:23 46:9
**2011** 47:14,24
**2013** 83:5 95:10
**2014** 48:21 49:3,14
  95:18 98:20
**2015** 20:18 22:13

49:21
**2016** 1:18 4:4 20:18
  23:7 57:19 192:18
  193:3 194:20
**212** 2:12
**215** 2:6
**23** 132:11,23
**24** 132:23 133:2,10
  135:3
**25** 132:23
**26** 132:24 171:23
**260-6030** 2:19
**27** 1:18 4:4 12:12
  193:3
**2700** 3:9 12:15,18
  15:9 16:20
**2701** 3:10 15:10,14
**2702** 3:11 16:16,18
**2703** 3:12 29:17,20
  51:9 53:23
**2704** 3:13 57:6,10
  116:15 117:3,7
  119:1
**2705** 3:14 114:14
  114:16 118:18
  119:11
**2706** 3:15 127:22
  128:21 140:8
**2707** 3:16 131:12
  131:16
**2708** 3:17,19
  153:12,15
**2709** 159:16,16,20
**280** 2:4
**29** 3:12

---

**3**

**3** 124:24 191:18
**30** 10:17
**310** 2:19
**34** 29:21 30:14
**37th** 1:16 4:19
**38** 29:21 30:14
**39** 1:16 4:19

---

**4**

**4:21** 1:18 4:3
**4:33** 14:23,24
**4:46** 15:1,6
**40** 160:12
**44** 173:14
**45** 132:5
**46** 178:24
**49** 178:23

---

**5**

**5,000** 90:19
**5:34** 56:15,17
**5:49** 56:24
**50** 24:3,9,10,10
  187:4,5
**50-50** 23:11
**50/50** 23:12
**500-1000** 2:6
**54** 141:24 142:3
**57** 3:13 178:6,14

---

**6**

**6** 3:4 127:8
**6:07** 81:18
**6:20** 81:22
**6:33** 94:14
**6:41** 94:18
**60** 73:16
**60,000** 20:18
**666** 2:10
**69** 3:23

---

**7**

**7** 122:10
**7:12** 121:1
**7:13** 124:16
**7:30** 124:23

---

**8**

**8:35** 191:1
**8:38** 191:17,20
**8:40** 190:23
**80** 164:11
**80,000** 20:20 86:24
  186:7

---

**9**

**9** 34:24
**90401** 2:18
**977-9700** 2:12



# Exhibit 2

FORM CA 1
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

| TX | TXU | PA | PAU | VA | VAU | SR | SRU | RE |

Effective Date of Supplementary Registration

(MONTH)          (DAY)          (YEAR)

DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY

**A** Basic Instructions

TITLE OF WORK:

Taurus

REGISTRATION NUMBER OF BASIC REGISTRATION:        YEAR OF BASIC REGISTRATION:
Re 725-888                                         1996

NAME(S) OF AUTHOR(S):                              NAME(S) OF COPYRIGHT CLAIMANT(S):

Randy California                                   Randy California

**B** Correction

LOCATION AND NATURE OF INCORRECT INFORMATION IN BASIC REGISTRATION:
Line Number . 1. & 3 . . . Line Heading or Description . Renewal, Claimant, & Author . . . . . . . . . . . . . . . . . . . . . . . . . .

INCORRECT INFORMATION AS IT APPEARS IN BASIC REGISTRATION:
   1. Randy California claiming as author
   3. Randy California

CORRECTED INFORMATION:
1. Hollenbeck Music employer for hire of Randy California claiming as:
   Proprietor of copyright in a work made for hire
3. Hollenbeck Music employer for hire of Randy California
EXPLANATION OF CORRECTION: (Optional)
   Randy California is an employee for hire of Hollenbeck Music Co. pursuant to
   agreement dated August 29, 1967.

**C** Amplification

LOCATION AND NATURE OF INFORMATION IN BASIC REGISTRATION TO BE AMPLIFIED:
Line Number . . . . . . . . . . . . Line Heading or Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

AMPLIFIED INFORMATION:

EXPLANATION OF AMPLIFIED INFORMATION: (Optional)

CONFIDENTIAL

HOA 000024

UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

| TX | TXU | PA | PAU | VA | VAU | SR | SRU | RE |

Effective Date of Supplementary Registration

(MONTH)          (DAY)          (YEAR)

DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY

**Ⓐ**
**Basic Instructions**

TITLE OF WORK:   Tauras

REGISTRATION NUMBER OF BASIC REGISTRATION:   Eu 35222

YEAR OF BASIC REGISTRATION:   1968

NAME(S) OF AUTHOR(S):   Randy California

NAME(S) OF COPYRIGHT CLAIMANT(S):   Hollenbeck Music Co.

**Ⓑ**
**Correction**

LOCATION AND NATURE OF INCORRECT INFORMATION IN BASIC REGISTRATION:
Line Number .... 3 . ..... Line Heading or Description .. Author(s) ...........................

INCORRECT INFORMATION AS IT APPEARS IN BASIC REGISTRATION:
Randy California

CORRECTED INFORMATION:
Hollenbeck Music Co. employer for hire of Randy California

EXPLANATION OF CORRECTION: (Optional)
Randy California is an employee for hire of Hollenbeck Music Co.
pursuant to agreement dated August 29, 1967.

**Ⓒ**
**Amplification**

LOCATION AND NATURE OF INFORMATION IN BASIC REGISTRATION TO BE AMPLIFIED:
Line Number ............ Line Heading or Description ...............................

AMPLIFIED INFORMATION:

EXPLANATION OF AMPLIFIED INFORMATION: (Optional)

CONFIDENTIAL

HOA 000025

01710

Case: 16-56287, 03/15/2017, ID: 10362366, DktEntry: 15-7, Page 174 of 299

Copyright Office fees are subject to change. For current fees, check the Copyright Office website at *www.copyright.gov*, write the Copyright Office, or call (202) 707-3000.



**Form CA**
For Supplementary Registration
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

| TX | TXU | PA | PAU | VA | VAU | SR | SRU | RE |
|----|-----|----|----|----|-----|----|-----|----|

EFFECTIVE DATE OF SUPPLEMENTARY REGISTRATION

Month   Day   Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**A**

Title of Work ▼

**TAURAS**

Registration Number of the Basic Registration ▼
EU 35222

Year of Basic Registration ▼
1968

Name(s) of Author(s) ▼
Randy California

Name(s) of Copyright Claimant(s) ▼
Hollenbeck Music Co.

**B**

Location and Nature of Incorrect Information in Basic Registration ▼
Line Number  3          Line Heading or Description  Authors

Incorrect Information as It Appears in Basic Registration ▼
Randy California

Corrected Information ▼
Hollenbeck Music Co., employer for hire of Randy California

Explanation of Correction ▼
Please see explanation in Continuation section.

**C**

Location and Nature of Information in Basic Registration to be Amplified ▼
Line Number  2          Line Heading or Description  Title

Amplified Information and Explanation of Information ▼

Also Known As: "TAURUS"

MORE ON BACK ▶   • Complete all applicable spaces (D-G) on the reverse side of this page.
                 • See detailed instructions.   • Sign the form at Space F.

DO NOT WRITE HERE
Page 1 of_____ pages

**01711**

Case 2:15-cv-03462-RGK-AGR   Document 230-1   Filed 06/11/16   Page 107 of 157   Page ID #:6232

Case: 16-56287, 03/15/2017, ID: 10362366, DktEntry: 15-7, Page 175 of 299

FORM CA RECEIVED

FORM CA

FUNDS RECEIVED DATE

EXAMINED BY

CORRESPONDENCE ❏

REFERENCE TO THIS REGISTRATION ADDED TO
BASIC REGISTRATION ❏ YES ❏ NO

FOR
COPYRIGHT
OFFICE
USE
ONLY

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

Continuation of: ☑ Part B *or* ❏ Part C

**Explanation of Correction:**

Randy California is an employee for hire of Hollenbeck Music Co. pursuant to agreement
dated August 29, 1967.

**Correspondence:** Give name and address to which correspondence about this application should be sent.

Penny Castle / Universal Music Publishing Group
2100 Colorado Ave., Santa Monica, CA  90404

Phone ▶ 310-235-4854            Fax ▶ 310-235-4802            Email ▶ Penny.castle@umusic.com

**Deposit Account:** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▶ Universal Music Publishing Group

Account Number ▶ DA-95025

**Certification\*** I, the undersigned, hereby certify that I am the: (Check only one)

❏ author
❏ other copyright claimant
❏ owner of exclusive right(s)
☑ duly authorized agent of   UMPG o/b/o Hollenbeck Music Co.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name ▼ Penny A. Castle                 Date ▼ February 18, 2016

Handwritten signature (X) ▼   *Penny A. Castle*

Certificate
will be
mailed in
window
envelope
to this
address:

Name ▼ Universal Music Publishing Group / ATTN: Penny Castle

Number/Street/Apt ▼ 2100 Colorado Avenue

City/State/ZIP ▼ Santa Monica, CA 90404

**YOU MUST:**
• Complete all necessary spaces
• Sign your application in Space F

**SEND ALL ELEMENTS
IN THE SAME PACKAGE:**
1. Application form
2. Nonrefundable filing fee in check or
   money order payable to *Register of
   Copyrights*

**MAIL TO:**
Library of Congress
Copyright Office
101 Independence Avenue S.E.
Washington, D.C. 20559-3000

Fees are subject to
change. For current
fees, check the
Copyright Office
website at
www.copyright.gov,
write the Copyright
Office, or call
(202) 707-3000.

\*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection
with the application, shall be fined not more than $2,500.

Rev: July 2002—20,000   Web Rev: July 2002   Printed on recycled paper

U.S. Government Printing Office: 2002-491-423/60,009

01712

Case: 16-56287, 03/15/2017, ID: 10362366, DktEntry: 15-7, Page 176 of 299

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at *www.copyright.gov*, write the Copy-
right Office, or call (202) 707-3000.



**Form CA**
For Supplementary Registration
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER



| TX | TXU | PA | PAU | VA | VAU | SR | SRU | RE |
|----|-----|----|----|----|----|----|----|----|

EFFECTIVE DATE OF SUPPLEMENTARY REGISTRATION

Month   Day   Year

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**A**

Title of Work ▼
**TAURUS**

Registration Number of the Basic Registration ▼
RE 725-888

Year of Basic Registration ▼
1996

Name(s) of Author(s) ▼
Randy California

Name(s) of Copyright Claimant(s) ▼
Randy California

**B**

Location and Nature of Incorrect Information in Basic Registration ▼

Line Number   1 & 3          Line Heading or Description   Renewal Claimant & Author

Incorrect Information as It Appears in Basic Registration ▼

1. Randy California claiming as author;  3. Randy California

Corrected Information ▼

Please see corrected information in Continuation section.

Explanation of Correction ▼

Please see explanation in Continuation section.

**C**

Location and Nature of Information in Basic Registration to be Amplified ▼

Line Number _____   Line Heading or Description _____

Amplified Information and Explanation of Information ▼

**MORE ON BACK ▶**   • Complete all applicable spaces (D-G) on the reverse side of this page.
• See detailed instructions.   • Sign the form at Space F.

**DO NOT WRITE HERE**
Page 1 of _____ pages

Case: 16-56287, 03/15/2017, ID: 10362366, DktEntry: 15-7, Page 177 of 299

| FORM CA RECEIVED | FORM CA |
|---|---|
| FUNDS RECEIVED DATE | |
| EXAMINED BY | FOR COPYRIGHT OFFICE USE ONLY |
| CORRESPONDENCE ❑ | |
| REFERENCE TO THIS REGISTRATION ADDED TO BASIC REGISTRATION  ❑ YES  ❑ NO | |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

Continuation of: ☑ Part B or ❑ Part C

**Corrected information:**

1. Hollenbeck Music Co., employer for hire of Randy California claiming as: Proprietor of copyright in a work made for hire.

3. Hollenbeck Music Co., employer for hire of Randy California.

**Explanation of Correction:**

Randy California is an employee for hire of Hollenbeck Music Co. pursuant to agreement dated August 29, 1967.

**Correspondence:** Give name and address to which correspondence about this application should be sent.

Penny Castle / Universal Music Publishing Group
2100 Colorado Ave., Santa Monica, CA  90404

Phone 310-235-4854    Fax 310-235-4802    Email Penny.castle@umusic.com

**Deposit Account:** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name  Universal Music Publishing Group

Account Number  DA-95025

**Certification\*** I, the undersigned, hereby certify that I am the: (Check only one)

❑ author   ❑ owner of exclusive right(s)
❑ other copyright claimant  ☑ duly authorized agent of  UMPG o/b/o Hollenbeck Music Co.
　　　　Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name ▼ Penny A. Castle          Date ▼ February 18, 2016

Handwritten signature (X) ▼   *Penny A Castle*

| | | YOU MUST: |
|---|---|---|
| Certificate will be mailed in window envelope to this address: | Name ▼ Universal Music Publishing Group / ATTN: Penny Castle | • Complete all necessary spaces • Sign your application in Space F |
| | Number/Street/Apt ▼ 2100 Colorado Avenue | SEND ALL ELEMENTS IN THE SAME PACKAGE: 1. Application form |
| | City/State/ZIP ▼ Santa Monica, CA 90404 | 2. Nonrefundable filing fee in check or money order payable to *Register of Copyrights* |

MAIL TO:
Library of Congress
Copyright Office
101  Independence Avenue, S.E.
Washington D.C. 20559-6000

Fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov or call (202) 707-3000.

\*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev: July 2002 —20,000  Web Rev: July 2002  Printed on recycled paper                      U.S. Government Printing Office: 2002-491-423/60,009

**01714**

# Exhibit 3

1    Francis Malofiy, Esq.
2    Francis Alexander, LLC
     280 N. Providence Rd. | Suite 105
3    Media, PA 19063
4    T: (215) 500-1000; F: (215) 500-1005
     E: francis@francisalexander.com
5
6    Glen L. Kulik, Esq.
     Kulik Gottesman & Siegel LLP
7    15303 Ventura Blvd., Suite 1400
     Sherman Oaks, CA 91403
8    T: (310) 557-9200; F: (310) 557-0224
9    E: gkulik@kgslaw.com
10
11   Attorneys for Plaintiff

12               UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14   MICHAEL SKIDMORE, as Trustee for      Case No. 15-cv-03462 RGK (AGRx)
     the RANDY CRAIG WOLFE TRUST,
15                                         Hon. R. Gary Klausner
16                  Plaintiff,
                                           **PLAINTIFF'S FIRST DEMAND
17         v.                              FOR PRODUCTION OF
                                           DOCUMENTS TO DEFENDANT
18   LED ZEPPELIN; JAMES PATRICK           SUPER HYPE PUBLISHING, INC.**
19   PAGE; ROBERT ANTHONY PLANT;
20   JOHN PAUL JONES; SUPER HYPE
     PUBLISHING, INC.; WARNER MUSIC
21   GROUP CORP., Parent of
     WARNER/CHAPPELL MUSIC, INC.;
22   ATLANTIC RECORDING
23   CORPORATION; RHINO
24   ENTERTAINMENT COMPANY,
25                  Defendants.
26
27
28
     {00255828;1}

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO DEFENDANT SUPER HYPE PUBLISHING, INC.

01716

1  PROPOUNDING PARTY:        Plaintiff Michael Skidmore, Trustee

2  RESPONDING PARTY:         Defendant Super Hype Publishing, Inc.

3  SET NUMBER:               One

4

5  TO DEFENDANT SUPER HYPE PUBLISHING, INC. AND ITS COUNSEL OF

6  RECORD:

7        You are hereby requested to produce the following documents, in the manner

8  provided by Rule 34 of the Federal Rules of Civil Procedure, within 30 days after

9  service of this request, at the law offices of Francis Alexander, LLC, 280 N.

10 Providence Rd, Suite 105, Media, PA 19063.  The documents should be produced

11 according to the definitions and instructions listed below.

12                              **<u>Definitions</u>**

13       The words listed below shall have the following meanings, unless the context

14 requires otherwise.

15       1.     The term "plaintiff" or "defendant" means that party and, when

16 applicable, the party's agents, representatives, officers, directors, employees,

17 partners, corporate parent, subsidiaries, or affiliates.

18       2.     The term "Person" means any natural person or business entity,

19 regardless of form.

20       3.     The terms "You" and "Your" mean Super Hype Publishing, Inc. and its

21 agents, representatives, attorneys, experts, and other persons acting or purporting to

22 act on Super Hype Publishing Inc.'s behalf.

23       4.     The term "Material" means all documents, electronically stored

24 information, or tangible things. The term is synonymous with and equal in scope to

25 the terms "documents," "electronically stored information," and "tangible things" in

26 Federal Rule of Civil Procedure 34(a)(1). A draft or non-identical copy of a

27 document, electronically stored information, or a tangible thing, is a separate item

28 within the meaning of this term.

{00255828;1}

2

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

1        (a)  <u>Document</u>.  The term "document" means all materials within the
2    full scope of Rule 34 of the Federal Rules of Civil Procedure including, but not
3    limited to, all writings, drawings, graphs, charts, e-mails and attachments,
4    electronically stored information, correspondence, memoranda, notes, diaries,
5    minutes, statistics, letters, telegrams, contracts, reports, studies, checks, statements,
6    tags, labels, invoices, brochures, periodicals, telegrams, receipts, returns, summaries,
7    pamphlets, books, offers, notations of any sort of conversations, working papers,
8    applications, indices, worksheets, photographs, microfiche, microfilms, videotapes,
9    recordings, and electronic, mechanical, magnetic, optical records or representations
10   of any kind, (including without limitation, computer files and programs, tapes,
11   cassettes, disks and CDs and data compilations from which information can be
12   obtained) including metadata, and all drafts, notes, preparatory materials or copies
13   that contain any commentary, notations, or other changes that do not appear on the
14   original or another copy of the document produced.

15       (b)  <u>Electronically Stored Information</u>.  The term "electronically
16   stored information" means electronic information that is stored in a medium from
17   which it can be retrieved and examined. It includes, but is not limited to, all
18   electronic files that are electronically stored.

19       (i)  "Electronic file" includes, but is not limited to, the
20   following: voicemail messages and files; e-mail messages and files; deleted filed;
21   temporary files; system-history files; Internet or web-browser generated information
22   stored in textual, graphical, or audio format , including history files, caches, and
23   cookies; compute activity logs; metadata; spreadsheets, Power Points, databases, and
24   other data or data compilations.

25       (ii)  "Electronic information system" refers to a computer
26   system or network that contains electronic files and electronic storage.

27       (iii)  "Electronic storage" refers to electronic files contained on
28   magnetic, optical, or other storage media, such as hard drives, flash drives, DVDs,

{00255828;1}                                    3
PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01718

1     CDs, tapes, cartridges, floppy diskettes, smart cards, and integrated-circuit cards.

2            (c)     <u>Tangible thing</u>. The term "tangible thing" means a physical

3     object that is not a document or electronically stored information.

4       5.     The terms "communication" or "communications" means without

5     limitation, every manner or means of statement, utterance, notation, disclaimer,

6     transfer or exchange of information of any nature whatsoever, by or to whomever,

7     whether oral or written or whether face-to-face, by telephone, mail, electronic mail,

8     personal delivery or otherwise, including, but not limited to, letters, correspondence,

9     conversations, memoranda, dialogue, discussions, meetings, interviews,

10    consultations, agreements and other understandings.

11      6.     The term "relating" means concerning, referring, describing,

12    evidencing, or constituting, either directly or indirectly.

13      7.     The term "Taurus" refers to all versions of the song Taurus written by

14    Randy Craig Wolfe (aka Randy California) registration number EU0000035222 and

15    renewal number RE0000725888.

16      8.     References to "Stairway to Heaven" shall mean all versions of the

17    musical work with the copyright registration number EU0000301137 and renewal

18    registration number RE0000819939.

19      9.     References to "Led Zeppelin IV" shall mean the untitled fourth album

20    by the band Led Zeppelin.

21     10.     References to "Randy California" shall mean Randy Craig Wolfe

22    whether known by that name or any other name.

23                       **Instructions**

24      1.     Respond to each production separately by listing the materials and by

25    describing them as defined above. If the material is numbered or labeled for

26    production, in each response provide both the information that identifies the material

27    and the material's number or label.

28

{00255828;1}                 4

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

**01719**

2.     Produce all documents and tangible things in the forms as they are kept in the ordinary course of business, or organize and number or label them to correspond with the categories in the discovery request.

3.     Produce all electronically stored information on a CD, DVD or hard drive. Documents stored in electronic form of any kind must be produced in electronic form, with associated text files (full-text extraction from the native files for electronically stored information).

4.     Files attached to responsive, non-privileged electronically stored information must be produced as consecutively numbered Bates ranges.

5.     For electronically stored information, identify every source containing potentially response information that you are not searching or producing.

6.     If objecting to a request for production, state the objection with particularity, providing specific grounds for the objection.

7.     For any Materials that you assert are privileged, protected, or otherwise exempt from discovery, provide the following:

a.     The specific grounds for the claim of privilege, protection, or other exemption;

b.     The type of material being withheld, and, if the material is electronically stored information, the file format of the material;

c.     The subject matter of the material;

d.     The date of the material;

e.     The name, job title, and address of the author of the material;

f.     The name, job title, and address of each addresses of the material;

g.     The name, job, title, and address of each person who received, was copied on, or otherwise saw all, part, or a summary of the material;

h.     The name, job title, and address of the custodian of the material and the material's current location.

{00255828;1}                           5

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01720

8.    For any Materials that you claim have been destroyed, no longer exist, or cannot be located, provide all of the following:

    a.    A statement identifying the material;

    b.    A statement of how and when the material ceased to exist or when it could no longer be located;

    c.    The reasons for the material's destruction, nonexistence or loss;

    d.    State the date of the document;

    e.    Describe the nature of the document;

    f.    The identity, address, and job title of each person having knowledge about the destruction, nonexistence or loss of the material;

    g.    The identity of any other materials evidencing the destruction, nonexistence or loss of the material or any facts about thee nonexistence or loss.

9.    Each document request shall be construed to impose upon you the continuing duty to supplement or correct each response, in accordance with Fed. R. Civ. P. 26(e), in the event that information bearing upon the request is subsequently discovered.

10.    The originals of all documents produced in copy form shall be made available for inspection.

### Document Requests

Responding defendant shall produce the following:

1.    All Materials that support Your contention that Stairway To Heaven "was created independently from and without knowledge of plaintiff's claimed work" as alleged in the Second Affirmative Defense in Your Answer to First Amended Complaint.

2.    All Materials which mention, refer, or relate to Randy Wolfe or Randy California.

3.    All Materials which mention, refer, or relate to the band Spirit.

4.    All Materials which mention, refer, or relate to Taurus.

{00255828;1}    6

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01721

5. All Materials which evidence, discuss, or refer to the authorship, origin, or creation of Stairway to Heaven.

6. All Materials which evidence or reflect the dates on which any part of Stairway to Heaven was written.

7. All Materials which evidence or reflect copyright registrations for any version of Stairway to Heaven.

8. All Materials which evidence or reflect copyright registrations for any version of Led Zeppelin IV.

9. All Materials which mention, discuss, or reflect any similarities between Taurus and Stairway to Heaven.

10. All Materials which mention, discuss or reflect any differences between Taurus and Stairway to Heaven.

11. All Materials which evidence or reflect that the bands Led Zeppelin and Spirit were present at the same location or event at the same time.

12. All Materials that support Your contention that "Plaintiff's claims and/or remedies . . . are barred by the failure to comply with the Copyright Act of 1909 as alleged in the Fourth Affirmative Defense in Your Answer to First Amended Complaint.

13. All Materials that support Your contention that "the conduct of which plaintiff complains constitutes fair use" as alleged in the Fourth Affirmative Defense in Your Answer to First Amended Complaint.

14. All Materials that support Your contention that "Plaintiff's claims . . . are barred by the applicable statutes of limitations" as alleged in the Tenth Affirmative Defense in Your Answer to First Amended Complaint.

15. All Materials that support Your contention that "Plaintiff, Plaintiff's predecessors, Randy Wolfe and/or the owners of the copyright in the musical composition Taurus, abandoned any copyright in the allegedly-infringed work," as

{00255828;1}                                     7
PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01722

1    alleged in the Eleventh Affirmative Defense in Your Answer to First Amended

2    Complaint.

3    16.    All Materials that support Your contention that "Plaintiff's claims

4    and/or remedies . . . are barred by the doctrine of waiver" as alleged in the Twelfth

5    Affirmative Defense in Your Answer to First Amended Complaint.

6    17.    All Materials that support Your contention that "the conduct of which

7    [Plaintiff] complains was impliedly and/or expressly licensed" as alleged in the

8    Thirteenth Affirmative Defense in Your Answer to First Amended Complaint.

9    18.    All Materials that support Your contention that "Plaintiff's claims are

10   barred by the doctrine of estoppel" as alleged in the Fourteenth Affirmative Defense

11   in Your Answer to First Amended Complaint.

12   19.    All Materials that support Your contention that "Plaintiff, Plaintiff's

13   predecessors, Randy Wolfe and/or the owners of the copyright in the musical

14   composition *Taurus* ratified the conduct of which plaintiff complains" as alleged in

15   the Fifteenth Affirmative Defense in Your Answer to First Amended Complaint.

16   20.    All Materials that support Your contention that "Plaintiff does not have

17   standing to assert the claims he asserts" as alleged in the Sixteenth Affirmative

18   Defense in Your Answer to First Amended Complaint.

19   21.    All Materials that support Your contention that "Plaintiff's claims

20   and/or the relief Plaintiff asserts, or both, are barred by the doctrine of unclean hands,

21   as alleged in the Seventeenth Affirmative Defense in Your Answer to First Amended

22   Complaint.

23   22.    Copies of all different versions of Stairway to Heaven as performed or

24   recorded by Led Zeppelin at any time.

25   23.    A copy of each version of Stairway to Heaven as performed or recorded

26   by Led Zeppelin which was deposited with the Copyright Office, including without

27   limitation the remastered versions and any derivative versions.

28

{00255828;1}                                8
PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01723

24.     All Materials which inspired any of the defendants to write Stairway to Heaven.

25.     All Materials on which Stairway to Heaven was based or from which it was derived.

26.     All recordings of Stairway to Heaven including but not limited to Master and demo versions, finished and unfinished versions, in any format and medium and file type.

27.     All Materials which mention, discuss, summarize or reflect any revenue generated from the exploitation of Stairway to Heaven from all sources and in all mediums during the period 1970 to 2010.

28.     All Materials which mention, discuss, summarize or reflect any expenses incurred in connection with the exploitation of Stairway to Heaven in all mediums during the period 1970 to 2010.

29.     All Materials which mention, discuss, summarize or reflect any profits generated by the exploitation of Stairway to Heaven in all mediums during the period 1970 to 2010.

30.     All Materials which mention, discuss, summarize or reflect any revenue generated from the exploitation of Stairway to Heaven from all sources and in all mediums during the period 2011 to the present.

31.     All Materials which mention, discuss, summarize or reflect any expenses incurred in connection with the exploitation of Stairway to Heaven in all mediums during the period 2011 to the present.

32.     All Materials which mention, discuss, summarize or reflect any profits generated by the exploitation of Stairway to Heaven in all mediums during the period 2011 to the present.

33.     All financial statements, balance sheets, profit participation statements, profit and loss statements, and similar financial records, which refer, pertain or apply to Stairway in Heaven.

{00255828;1}

9

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01724

34. All Materials which evidence, reflect or constitute agreements to which any of the defendants in this case has ever been party which relate in any way to Stairway to Heaven or Led Zeppelin IV.

35. All Materials which mention, discuss or reflect who wrote any part of Stairway to Heaven.

36. All Materials which mention, discuss or reflect when any part of Stairway to Heaven was written.

37. All Materials which mention, discuss or reflect the date on which Stairway to Heaven was first recorded.

38. All Materials which mention, discuss or reflect the date on which Stairway to Heaven was first performed in public by Led Zeppelin.

39. All Materials which mention, discuss or reflect any dates on which any defendant listened to a recording of Taurus.

40. All Materials which mention, discuss or reflect any dates on which any defendant was present when Taurus was performed.

41. All Materials which mention, discuss or reflect the locations at which any defendant was present when Taurus was performed.

42. All Materials, including handwritten notes, from which any defendant created Stairway to Heaven.

43. All text, visual representations, audio, recordings, data, media, or other material provided to any defendant by anyone relating to Stairway to Heaven or Taurus, including any handwritten or original text, visual representations, audio, recordings, data, media, or other material.

44. All versions and drafts of materials containing or comprising any and all text, visual representations, recordings or other material of Stairway to Heaven or "Taurus," including all preliminary text, visual representations, audio, recordings, data, media, or other material.

{00255828;1}

10

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01725

45.   All Materials comprising, reflecting, or evidencing any communications on the subject of Taurus.

46.   All Complaints filed in any court or administrative tribunal which pertain in any way to Stairway to Heaven.

47.   All Materials which evidence or reflect any agreement between defendants with one another and/or with any third party concerning copyrights for Stairway to Heaven or Led Zeppelin IV.

48.   All Materials constituting or reflecting communications between any defendant with any writer, producer, engineer, record executive, manager, or editor about Stairway to Heaven or Taurus.

49.   All Materials reflecting or relating to any business plans or projections relating to Stairway to Heaven or Led Zeppelin IV.

50.   All Materials discussing, reflecting or relating to efforts to exploit Stairway to Heaven within three years of the date this lawsuit was filed up to and including today.

51.   All Materials reflecting or relating to the existence, past or present, of any agreement between Randy California (or Randy Wolfe) and any defendant.

52.   All reports, records, studies, and other Materials relating to Stairway to Heaven, including revenue projections, cost projections, and product plans or proposals.

53.   All records or receipts of expenses incurred in connection with the writing or original recording by Led Zeppelin of Stairway to Heaven.

54.   All financial statements, profit-and-loss statements, net-income statements, balance sheets, financial forecasts, projections, internal memoranda, ledgers, journals, bookkeeping entries, and business plans relating to Stairway to Heaven."

{00255828;1}                                      11
PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

**01726**

55.     All Materials which reflect or evidence that Randy California or plaintiff granted any defendant permission to use any aspect of Taurus, or of any other songs written or performed by any member of Spirit.

56.     All Materials evidencing or reflecting that any defendant wrote or recorded Stairway to Heaven with a grant of permission from Randy California, Plaintiff, or any member of Spirit.

57.     Produce all Materials which evidence or reflect that plaintiff or Randy California misrepresented any facts or omitted any facts in communications with the Copyright Office.

58.     All Materials which evidence or reflect that Taurus lacks originality.

59.     All Materials which evidence or reflect that Stairway to Heaven lacks originality.

60.     All Materials which evidence or reflect that Taurus is in the public domain.

61.     All Materials which evidence or reflect that Taurus was distributed to the public without restriction.

62.     All Materials which evidence or reflect any action by any person to challenge, change, correct, or modify any of the credits in connection with the writing or recording of Stairway to Heaven or Led Zeppelin IV.

63.     Materials sufficient to show the relationship at any time between 1970 to the present between Warner Music Group Corp., Super Hype Publishing, Inc., Warner/Chappell Music, Inc., Atlantic Recording Corporation, Rhino Entertainment Company, and Led Zeppelin.

64.     Materials sufficient to show the date on which Stairway to Heaven was first released as a single.

65.     Materials sufficient to show the date on which Led Zeppelin IV was first released.

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01727

66.     All Materials which constitute contracts or agreements in connection with the writing, recording, or original release of Stairway to Heaven.

67.     All of the different versions of Led Zeppelin IV, including all packing and accompanying written material sometimes referred to as "liner notes."

68.     All Materials which evidence or discuss James Patrick Page's involvement in the writing, recording, and/or exploitation of Stairway to Heaven and Led Zeppelin IV.

69.     All Materials which evidence or discuss Robert Plant's involvement in the writing, recording, and/or exploitation of Stairway to Heaven and Led Zeppelin IV.

70.     All Materials which evidence or discuss John Paul Jones' involvement in the writing, recording, or exploitation of Stairway to Heaven and Led Zeppelin IV.

71.     All Materials which evidence or discuss John Bonham's involvement in the writing, recording, or exploitation of Stairway to Heaven and Led Zeppelin IV.

72.     All Materials which evidence or discuss Peter Grant's involvement in the writing, recording, or exploitation of Stairway to Heaven and Led Zeppelin IV.

73.     All Materials which evidence or discuss Lou Adler's involvement in the writing, recording, or exploitation of Stairway to Heaven and Led Zeppelin IV.

74.     All Materials which evidence or discuss Lou Adler's involvement in the writing, recording, or exploitation of Taurus.

75.     All Materials which evidence or discuss Howard Frank's involvement in the writing, recording, or exploitation of Stairway to Heaven and Led Zeppelin IV.

76.     Produce all Materials related to Hollenbeck Music's involvement in the exploitation of Stairway to Heaven or Led Zeppelin IV.

77.     Produce all Materials that evidence or reflect Ode Records' involvement in the exploitation of Stairway to Heaven or Led Zeppelin IV.

78.     All Materials which mention, discuss or relate to the songwriting credits for Stairway to Heaven, Led Zeppelin IV, and/or Taurus.

{00255828;1}

13

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

01728

79.     All Materials which mention or reflect any credits for the production, ownership, engineering, musicians, studios, art, artist, royalties, for Stairway to Heaven or Led Zeppelin IV.

80.     The Articles of Incorporation for Warner Music Group Corp.; Super Hype Publishing, Inc.; Warner/Chappell Music, Inc.; Atlantic Recording Corporation; and Rhino Entertainment Company.

81.     All Materials which evidence, discuss or reflect James Patrick Page, Robert Plant, John Paul Jones, and/or John Bonham creating, writing, or composing Stairway to Heaven.

82.     All Materials that evidence or reflect that any defendant in this case had a copy of the recording of any version of "Taurus."

83.     All Materials evidencing or reflecting that James Patrick Page, Robert Plant, John Paul Jones, and/or John Bonham toured, performed, or played in concerts with Randy California (or Randy Wolfe) or the band Spirit.

84.     All Materials evidencing or reflecting any communications between any member of the band Led Zeppelin any member of the band Spirit.

85.     All Materials evidencing or reflecting any statements, public or private, made by James Patrick Page, Robert Plant, John Paul Jones, John Bonham, Peter Grant, or any other defendant, about the band Spirit, Randy California, or Taurus.

86.     All Materials summarizing or reflecting concert revenues that were earned in whole or in part from exploitation of Stairway to Heaven or Led Zeppelin IV.

87.     All Materials summarizing or reflecting money that was earned from the exploitation of Stairway to Heaven or Led Zeppelin IV through sales of CDs, radio play, songwriting royalties, production royalties, sync licenses, television airplay, and otherwise.

88.     All Materials evidencing or reflecting that any defendant incorporated portions of Taurus into the song Stairway to Heaven.

{00255828;1}

14

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.

89.     All Materials reflecting any occasion on which any defendant or third party has issued a cease and desist notice to any person or entity regarding a purported unauthorized use of Stairway to Heaven.

90.     All insurance policies and declaration pages for insurance coverage which will or may provide any defendant with a defense and/or indemnity in connection with the claims brought in this action.

DATED: October 13, 2015                 KULIK GOTTESMAN & SIEGEL LLP


                                        By    /s/ Glen L. Kulik
                                              Glen L. Kulik
                                              Attorneys for Plaintiff
                                              MICHAEL SKIDMORE, as Trustee
                                              for the RANDY CRAIG WOLFE
                                              TRUST

{00255828;1}                              15
                PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
                         TO SUPER HYPE PUBLISHING, INC.

01730

## PROOF OF SERVICE

I, Patricia L. Struntz, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18, and am not a party to the within action; my business address is 15303 Ventura Boulevard, Suite 1400, Sherman Oaks, California 91403.

On October 13, 2015, I served the foregoing document described as: **PLAINTIFF'S FIRST DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANT SUPER HYPE PUBLISHING, INC.** on all interested parties by enclosing a true and correct copy thereof in an envelope which was then sealed and addressed as follows:

> *Attorneys for Defendants James Patrick Page; Robert Anthony Plant, John Paul Jones; Warner/Chappell Music, Inc.; Super Hype Publishing, Inc.; Atlantic Recording Corp.; Rhino Entertainment Company and Warner Music Group Inc.*:
> Peter J. Anderson, Esq. (CSB: 88891)
> LAW OFFICES OF PETER J. ANDERSON
> 100 Wilshire Boulevard, Suite 2010
> Santa Monica, California 90401
> Tel.: (310) 260-6030; Fax: (310) 260-6040
> email: pja@pjanderson.com

☒   **BY PERSONAL SERVICE:** [C.C.P.§ 1011] -- I caused such envelope to be hand delivered to the addressee(s) and to be left with the addressee(s), the office receptionist, or the person apparently in charge.

Executed on October 13, 2015, at Sherman Oaks, California.

☐   **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒   **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Patricia L. Struntz
Type or print name

Signature

{00255828;1}

PLAINTIFFS FIRST DEMAND FOR PRODUCTION OF DOCUMENTS
TO SUPER HYPE PUBLISHING, INC.


# Exhibit 4

1   Francis Malofiy, Esquire
2   Francis Alexander, LLC
    280 N. Providence Rd. | Suite 105
3   Media, PA 19063
    T:  (215) 500-1000; F:  (215) 500-1005
4   E:  francis@francisalexander.com
5
6   Glen L. Kulik, Esq.
    Kulik Gottesman & Siegel LLP
7   15303 Ventura Blvd., Suite 1400
    Sherman Oaks, CA 91403
8   T:  (310) 557-9200; F:  (310) 557-0224
9   E:  gkulik@kgslaw.com
10
    Attorneys for Plaintiff
11

12                UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14  MICHAEL SKIDMORE, as Trustee for       Case No. 15-cv-03462 RGK (AGRx)
    the RANDY CRAIG WOLFE TRUST,
15                                          Hon. R. Gary Klausner
16              Plaintiff,
17        v.                                **PLAINTIFF'S SECOND DEMAND
                                            FOR PRODUCTION OF
18  LED ZEPPELIN; JAMES PATRICK            DOCUMENTS TO DEFENDANTS
    PAGE; ROBERT ANTHONY PLANT;           JAMES PATRICK PAGE; ROBERT
19  JOHN PAUL JONES; SUPER HYPE           ANTHONY PLANT; JOHN PAUL
20  PUBLISHING, INC.; WARNER MUSIC        JONES; SUPER HYPE
    GROUP CORP., Parent of                PUBLISHING, INC.; WARNER
21  WARNER/CHAPPELL MUSIC, INC.;          MUSIC GROUP CORP.,
22  ATLANTIC RECORDING                    WARNER/CHAPPELL MUSIC,
    CORPORATION; RHINO                     INC.; ATLANTIC RECORDING
23  ENTERTAINMENT COMPANY,                 CORPORATION; RHINO
24                                          ENTERTAINMENT COMPANY**
25              Defendants.
26
27
28  {00255828;1}                          1
    PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
    JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
    PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
    ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

PROPOUNDING PARTY:      Plaintiff Michael Skidmore, Trustee

RESPONDING PARTY:       Defendants James Patrick Page; Robert Anthony
                        Plant; John Paul Jones; Super Hype Publishing,
                        Inc.; Warner Music Group Corp., Parent Of
                        Warner/Chappell Music, Inc.; Atlantic Recording
                        Corporation; Rhino Entertainment Company

SET NUMBER:             Two


TO DEFENDANTS JAMES PATRICK PAGE; ROBERT ANTHONY PLANT;

JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC

GROUP   CORP.,   WARNER/CHAPPELL   MUSIC,   INC.;   ATLANTIC

RECORDING   CORPORATION;   RHINO   ENTERTAINMENT   COMPANY

AND THEIR COUNSEL OF RECORD:

You are hereby requested to answer the following requests for documents,

under oath, in the manner provided by Rule 34 of the Federal Rules of Civil

Procedure, within 30 days of the date of service hereof.

### Definitions

The words listed below shall have the following meanings, unless the context

requires otherwise.

1.     The term "plaintiff" or "defendant" means that party and, when

applicable, the party's agents, representatives, officers, directors, employees,

partners, corporate parent, subsidiaries, or affiliates.

2.     The term "Person" means any natural person or business entity,

regardless of form.

3.     The terms "You" and "Your" mean collectively, and/or individually,

Defendants James Patrick Page; Robert Anthony Plant; John Paul Jones; Super Hype

{00255828;1}                                2

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

01734

1   Publishing, Inc.; Warner Music Group Corp., Warner/Chappell Music, Inc.; Atlantic
2   Recording Corporation; and, Rhino Entertainment Company and their agents,
3   representatives, attorneys, experts, and other persons acting or purporting to act on
4   their behalf.

5       4.      The terms "communication" or "communications" means without
6   limitation, every manner or means of statement, utterance, notation, disclaimer,
7   transfer or exchange of information of any nature whatsoever, by or to whomever,
8   whether oral or written or whether face-to-face, by telephone, mail, electronic mail,
9   personal delivery or otherwise, including, but not limited to, letters, correspondence,
10  conversations, memoranda, dialogue, discussions, meetings, interviews,
11  consultations, agreements and other understandings.

12      5.      The term "Taurus" refers to all versions of the song Taurus written by
13  Randy Craig Wolfe (aka Randy California) registration number EU0000035222 and
14  renewal number RE0000725888, and/or any portion of that song.

15      6.      References to "Stairway to Heaven" shall mean all versions of the
16  musical work with the copyright registration number EU0000301137 and renewal
17  registration number RE0000819939, or any sound recordings or other copyright
18  registrations related to Stairway to Heaven.

19      7.      References to "Led Zeppelin IV" shall mean the untitled fourth album
20  by the band Led Zeppelin.

21      8.      References to "Fresh Garbage" shall mean the song by Spirit, and any
22  portion of that song.

23      9.      References to "Randy California" shall mean Randy Craig Wolfe
24  whether known by that name or any other name.

25                          **Requests for Documents**

26      Responding Defendant shall produce the following:

27      91.     All materials relating to the "guitar pieces" defendant James Patrick

28  {00255828;1}                                3

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

01735

Page has publicly represented that he had in his possession (see Amended Complaint at ¶52) that became the music for Stairway to Heaven, including any cassette tapes, vinyl albums, or any recordings audio or visual of any type.

92.    Provide all recordings, multi-track, and any other format, from the recording sessions at Rolling Stones Mobile Studio, Headley Grange (East Hampshire), January 1971 and Island Studios (London), November 1970-January 1971 which comprise the album, Led Zeppelin IV.

93.    Provide the super 8 camera footage in its' entirety, captured from John Bonham's super 8 camera utilized at Headley Grange during the Led Zeppelin IV recording sessions at Headley Grange (East Hampshire).

94.    Provide ALL Master Tapes from the Headley Grange sessions, including any recorded with The Rolling Stones Mobile Studio, or other recoding medium.

95.    Provide master tape labeled (partially) as: Led Zeppelin, Master, 19129, Side 1, 10 June 71  5 – 71, 93-1006, Morgan Recording Studios Limited, 169-171 High Road, Willesden, London N.W.10.

- Black Dog
- Rock and Roll
- Battle Of Evermore
- Stairway To Heaven

96.    Provide master tape labeled (partially) as: Led Zeppelin, LZ IV 4, Master, 19129, Side 2, 10 June 71, 93-1007, Morgan Recording Studios Limited, 169-171 High Road, Willesden, London N.W.10

- Misty Mountain Hop
- Four Sticks
- Going To California
- When The Levee Breaks

{00255828;1}                                   4

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

01736

97.    Provide any and ALL promotion copies issued by Atlantic Records for Led Zeppelin IV Zofo in all countries and territories issued.

98.    Provide Atlantic Sampler – PR 175, Led Zeppelin "Stairway To Heaven" EP, 45RPM, Stereo b/w Mono, Excerpts from Atlantic LP SD 7208.

99.    Provide Australian EP Acoustically Led Zeppelin, Atlantic Records Catalogue # EPA-228.

100.    All materials reflecting and/or memorializing settlement agreements by and between Defendants and third parties concerning disputes over credit and/or compensation for musical works or sound recordings or audiovisual or artistic material as it relates to Led Zeppelin and its respective members James Patrick Page, Robert Anthony Plant, John Paul Jones, and John Bonham.

101.    All materials reflecting and/or memorializing settlement agreements concerning previous lawsuits against Defendants for copyright ownership or copyright infringement by Led Zeppelin and its respective members James Patrick Page, Robert Anthony Plant, John Paul Jones, and John Bonham.

102.    All materials concerning litigation between Defendants and third parties regarding disputes over credit, compensation, licensing, or interests in musical works, sound recordings, audiovisual works, or other artistic material as it relates to Led Zeppelin and its respective members James Patrick Page, Robert Anthony Plant, John Paul Jones, and John Bonham.

103.    All materials concerning litigation between Defendants and third parties regarding disputes over copyright ownership, infringement, licensing, or other interests as it relates Led Zeppelin and its respective members James Patrick Page, Robert Anthony Plant, John Paul Jones, and John Bonham.

104.    All materials concerning any deposition Defendants have given or taken as it relates to Led Zeppelin and its respective members and their intellectual property.

{00255828;1}                                  5
PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

01737

105. All materials regarding where Jake Holmes (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants or asserted any rights or interests in his song Dazed and Confused against Led Zeppelin and its song Dazed and Confused, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

106. All materials regarding where Anne Bredon (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of her copyright interests) corresponded with Defendants, or asserted any rights or interests in her song Babe, I'm Gonna Leave You against Led Zeppelin and its song Babe I'm Gonna Leave You, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

107. All materials regarding where Howlin' Wolf (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song How Many More Times against Led Zeppelin and its song How Many More Times, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

108. All materials regarding where Bert Jansch (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Blackwaterside against Led Zeppelin and its' song Black Mountain Side, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

109. All materials regarding where the band Traffic (and/or its agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of

his copyright interests) corresponded with Defendants, or asserted any rights or interests in its song Dear Mr. Fantasy against Led Zeppelin and its song Your Time is Gonna Come, as identified in the chart in paragraph 10 of the Amended Complaint— or asserted any rights against Led Zeppelin for any reason whatsoever.

110. All materials regarding where Eddie Cochran (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Nervous Breakdown against Led Zeppelin and its' song Communication Breakdown, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

111. All materials regarding where Willie Dixon (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song You Need Love against Led Zeppelin and its song Whole Lotta Love, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

112. All materials regarding where Howlin' Wolf (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Killing Floor against Led Zeppelin and its song The Lemon Song, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

113. All materials regarding where Willie Dixon (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Bring It On Home against Led Zeppelin and its song Bring It On

{00255828;1}

7

1   Home, as identified in the chart in paragraph 10 of the Amended Complaint—or
2   asserted any rights against Led Zeppelin for any reason whatsoever.

3       114.   All materials regarding where Bobby Parker (and/or his agents,
4   representatives, attorneys, heirs, successors in interests, or recipients of transfers of
5   his copyright interests) corresponded with Defendants, or asserted any rights or
6   interests in his song Watch Your Step against Led Zeppelin and its' song Moby Dick,
7   as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any
8   rights against Led Zeppelin for any reason whatsoever.

9       115.   All materials regarding where Moby Grape (and/or his agents,
10  representatives, attorneys, heirs, successors in interests, or recipients of transfers of
11  his copyright interests) corresponded with Defendants, or asserted any rights or
12  interests in his song Never against Led Zeppelin and its song Since I've Been Loving
13  You, as identified in the chart in paragraph 10 of the Amended Complaint—or
14  asserted any rights against Led Zeppelin for any reason whatsoever.

15      116.   All materials regarding where Bukka White (and/or his agents,
16  representatives, attorneys, heirs, successors in interests, or recipients of transfers of
17  his copyright interests) corresponded with Defendants, or asserted any rights or
18  interests in his song Shake 'Em On Down against Led Zeppelin and its song Hats
19  Off, as identified in the chart in paragraph 10 of the Amended Complaint—or
20  asserted any rights against Led Zeppelin for any reason whatsoever.

21      117.   All materials regarding where anyone corresponded with Defendants
22  regarding the Led Zeppelin song In My Time of Dying regarding Led Zeppelin and
23  its respective members claiming writing credit, as identified in the chart in paragraph
24  10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any
25  reason whatsoever.

26      118.   All materials regarding where Sleepy John Estes (and/or his agents,
27  representatives, attorneys, heirs, successors in interests, or recipients of transfers of

28  {00255828;1}                                    8

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

01740

his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Drop Down Mama against Led Zeppelin and its song Custard Pie, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

119.   All materials regarding where Ritchie Valens or his mother (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Oooh My Head against Led Zeppelin and its song Boogie with Stu, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

120.   All materials regarding where Blind Willie Johnson (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Nobody's Fault But Mine against Led Zeppelin and its song Nobody's Fault But Mine, as identified in the chart in paragraph 10 of the Amended Complaint—or asserted any rights against Led Zeppelin for any reason whatsoever.

121.   All materials regarding where Robert Johnson (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Travelling Riverside Blues against Led Zeppelin and its song The Lemon Song—or asserted any rights against Led Zeppelin for any reason whatsoever.

122.   All materials regarding where Bert Jansch (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song The Waggoner's Lad against Led Zeppelin and its song Bron-Y-Aur Stomp—or asserted any rights against Led Zeppelin for any reason whatsoever.

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

123.   All materials regarding where Memphis Minne and Kansas Joe McCoy (and/or their agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of their copyright interests) corresponded with Defendants, or asserted any rights or interests in their song When the Levee Breaks against Led Zeppelin and its song When the Levee Breaks—or asserted any rights against Led Zeppelin for any reason whatsoever.

124.   All materials regarding where Blind Boy Fuller (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song I Want Some of Your Pie against Led Zeppelin and its song Custard Pie—or asserted any rights against Led Zeppelin for any reason whatsoever.

125.   All materials regarding where Blind Willie Johnson (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Jesus Gonna Make Up My Dying Bed against Led Zeppelin and its song In My Time of Dying—or asserted any rights against Led Zeppelin for any reason whatsoever.

126.   All materials regarding where Josh White (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Jesus Make Up My Dying Bed aka In My Time of Dying against Led Zeppelin and its song In My Time of Dying—or asserted any rights against Led Zeppelin for any reason whatsoever.

127.   All materials regarding where Sleepy John Estes (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song The Girl I Love, She Got Long Curly Hair against Led Zeppelin

{00255828;1}                                    10

and its song The Girl I Love She Got Long Black Wavy Hair—or asserted any rights against Led Zeppelin for any reason whatsoever.

128. All materials regarding where Bobby Parker (and/or his agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of his copyright interests) corresponded with Defendants, or asserted any rights or interests in his song Watch Your Step against Led Zeppelin and its song Moby Dick—or asserted any rights against Led Zeppelin for any reason whatsoever.

129. All materials regarding where The Small Faces (and/or its agents, representatives, attorneys, heirs, successors in interests, or recipients of transfers of its copyright interests) corresponded with Defendants, or asserted any rights or interests in its song You Need Loving against Led Zeppelin and its song Whole Lotta Love—or asserted any rights against Led Zeppelin for any reason whatsoever.

130. All materials pertaining to the changing the credits and royalty statements on any Led Zeppelin song whether or not as the result of litigation.

131. All materials as it relates to any change in authorship, production, or arrangement of any Led Zeppelin song/album, including how the song/album was originally distributed to the public in form of album covers, liner notes, text on records, or any other pertinent materials, *and then* how it was subsequently changed when distributed to the public in the form of album covers, liner notes, text on records, or any other pertinent materials.

132. All materials as it relates to any change in authorship, production, or arrangement of any Led Zeppelin song/album, including how the song/album was originally registered or submitted to any governmental body including the Copyright Office, *and then* how it was subsequently changed when registered or submitted to any governmental body including the Copyright Office.

133. All materials where Led Zeppelin and its respective members admit, acknowledge, or discuss copying or taking music or artistic expression from another

{00255828;1}                                                11

1   without providing credit or compensation.

2      134.  All materials where Led Zeppelin and its respective members admit,

3   acknowledge, or discuss other members of Led Zeppelin copying or taking music or

4   artistic expression from another without providing credit or compensation.

5      135.  All materials and communications you have concerning Lou Adler

6   (including not limited to his entities such as Hollenbeck Music and Ode Records)

7   and Howard Frank regarding Stairway to Heaven, Led Zeppelin IV, Spirit, Taurus,

8   Randy California, the Randy Craig Wolfe Trust, and/or this litigation including

9   phone records at any point in time, including after the filing of this lawsuit—this

10  includes communications between Defendants' attorneys and agents and Lou

11  Adler's attorneys and agents.

12     136.  All materials and communications you have concerning Quinn Wolfe

13  (and/or his representatives, attorneys, or agents) regarding Stairway to Heaven, Led

14  Zeppelin IV, Spirit, Taurus, Randy California, the Randy Craig Wolfe Trust, and/or

15  this litigation, including phone records at any point in time, including after the filing

16  of this lawsuit—this includes communications between Defendants' attorneys and

17  Wolfe's attorneys and agents.

18     137.  All materials and communications you have concerning Mary Quinting

19  (and/or her representatives, attorneys, or agents) regarding Stairway to Heaven, Led

20  Zeppelin IV, Spirit, Taurus, Randy California, the Randy Craig Wolfe Trust, and/or

21  this litigation, including phone records at any point in time, including after the filing

22  of this lawsuit—this includes communications between Defendants' attorneys and

23  agents and Quinting's attorneys and agents.

24     138.  All materials regarding any time when Defendants or a third party

25  asserted copyright interests, rights or protection, or other intellectual property rights,

26  interests, or protection (be it federal, state, common law, and/or equitable) in

27  Stairway to Heaven—including but not limited to cease and desist letters—and

28  {00255828;1}                                  12

including but not limited to all materials concerning the use of Stairway to Heaven in audiovisual works, any licensing of the song, and DMCA takedown notices.

139.   All materials authorizing the use and/or exploitation of Stairway to Heaven in any form or medium, including but not limited to contracts, agreements, and licenses.

140.   All materials where you authorized the use and/or exploitation of Stairway to Heaven in any form or medium.

141.   All materials regarding the authorization of the use and/or exploitation of Stairway to Heaven, or any part of Stairway to Heaven, in any form or medium, in audiovisual productions such as movies and commercials.

142.   All materials regarding where you have claimed any part of Stairway to Heaven is not afforded copyright protection or is not protectable intellectual property.

143.   All materials regarding where you have claimed any part of Stairway to Heaven is subject to fair use.

144.   All materials regarding the use of Stairway to Heaven in Wayne's World at any point, and Defendants' objections thereto, including but not limited to threatened legal action and court proceedings.

145.   All materials regarding the use of Stairway to Heaven in Almost Famous at any point, and Defendants' objections thereto, including but not limited to threatened legal action and court proceedings.

146.   All materials regarding any time when Defendants or a third party asserted copyright interests, rights or protection, or other intellectual property rights, interests, or protection (be it federal, state, common law, and/or equitable) in Led Zeppelin IV—including but not limited to cease and desist letters—and including but not limited to all materials concerning the use of Led Zeppelin IV in audiovisual works, any licensing of the song, and DMCA takedown notices.

{00255828;1}                                    13

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

147.   All materials regarding any occasion when third parties sought permission to use Stairway to Heaven commercially, or for any other reason, and Defendants' responses to such requests.

148.   All materials relating to Led Zeppelin's use, performance, and/or exploitation of Spirit's song Fresh Garbage, and/or any portion of Fresh Garbage, at any point in time, either live or recorded.

149.   All material relating to Led Zeppelin recording Fresh Garbage, and/or any portion of Fresh Garbage, for inclusion in any Led Zeppelin album, especially Led Zeppelin I and Led Zeppelin II, including but not limited to the multi track, master recording, individual tracks, outtakes, alternate versions, rehearsals, practice sessions, and unused materials.

150.   All materials regarding the agreements, contracts, and correspondence by and between Defendants and Lou Adler, Hollenbeck Music, Ode Records, and their agents, attorneys, and representatives, in regards to any Spirit song, including but not limited to Fresh Garbage, and/or any portion of Fresh Garbage.

151.   Any materials, contracts, agreements, and correspondence by and between Peter Grant, Richard Cole, or any other managers, agents, or representatives of Led Zeppelin and its members, and Lou Adler, Hollenbeck Music, and Ode Records, and their agents, representatives, and attorneys.

152.   All materials regarding the song Taurus, and/or any portion thereof, by Spirit.

153.   All materials regarding the song Taurus by Spirit, acquired before May 31, 2014.

154.   Any materials relating to the creation of Stairway

155.   All materials regarding any awards, accolades, prizes, polls, achievement, and/or other honors that the band Led Zeppelin or its members received with respect to Stairway to Heaven or Led Zeppelin IV, including but not limited to

{00255828;1}                                              14

Billboard, Grammys, Soundscan, Magazine Polls/Lists, Radio Plays, and the like.

156.   All statements from Defendants regarding Stairway to Heaven in any medium, print, audio, visual, or multimedia.

157.   All materials from Headley Grange during the time of the recording of Stairway to Heaven and Led Zeppelin IV, including notes, documents, audio, and video.

158.   All materials relating to any statements by Andy Johns or any person involved in the recording or production of Stairway to Heaven and/or Led Zeppelin IV.

159.   All materials relating to the robbery of Defendants, or any authorized or unauthorized taking from any person or location, of any type of media and/or recordings Stairway to Heaven and Led Zeppelin IV, including multi-tracks, master recordings, individual tracks, outtakes, alternate versions, rehearsals, practice sessions, and unused materials.

160.   All materials and communications of any type regarding any correspondence (including social media such as Facebook, Instagram, Twitter) you and/or your attorneys have had with any journalist, news source, writer, author, reporter, YouTuber, vlogger, or blogger with regards to Taurus and Stairway to Heaven, including but not limited to the Howard Stern Show, ABC (and their affiliates), NBC (and their affiliates), CBS (and their affiliates), and cable programs, regardless of time period.

161.   Any and all materials regarding Defendants being notified of this lawsuit or of a potential claim relating to Taurus, including by friends, family members, or other third parties.

162.   All materials which identify the location, tracking, placement, and storage of Stairway to Heaven's multi track recording and master recording.

163.   All materials, including the inventory, relating to the Led Zeppelin

storage facility near Heathrow Airport with respect to Stairway to Heaven and Led Zeppelin IV—including but not limited to the multi tracks, tapes, and master recordings.

164.   All materials, including the archive ledgers and copy books, related to the archive in James Patrick Page's basement with respect to Stairway to Heaven and Led Zeppelin IV—including but not limited to the multi tracks, tapes, and master recordings.

165.   All materials, including the archive ledgers and copy books, related to tape storage (sometimes called a tape store) kept by John Paul Jones, including but not limited to in his basement, with respect to Stairway to Heaven and Led Zeppelin IV—and including but not limited to the multi tracks, tapes, and master recordings.

166.   All deposits of Stairway to Heaven, Led Zeppelin IV, and Taurus submitted to or requested from the Copyright Office—any and all versions of the songs and album—including for renewal registrations.

167.   All copyright registrations for Taurus.

168.   All materials relating to any Stairway to Heaven ringtone, including any licensing agreements, contracts, and how the content of the ringtone was decided, recorded, and produced.

169.   All materials relating to any income stream for Stairway to Heaven or Led Zeppelin IV, including but not limited to merchandizing, memorabilia, concert revenues, books, speaking events, signing events, promotional events, social media revenue, and product sales.

170.   Any and all materials supporting any claim, defense, or factual argument by Defendants.

171.   All materials relating in any way to discussions, correspondence, inquiries, and information that Defendants have had or acquired in regards to this lawsuit, the creation of Stairway to Heaven, Spirit, the creation of Taurus, and/or

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

1   Randy California with the following:

2   ▪ David Lewis

3   ▪ Led Zeppelin's Producers/Engineers/Staff

4   ▪ Led Zeppelin's managers/agents/staff

5   ▪ Spirit's producers/Engineers/Staff

6   ▪ Third Party producers/Engineers/staff

7   ▪ Peter Grant or his heirs, estate, and/or trusts

8   ▪ Richard Cole

9   ▪ Lou Adler

10  ▪ Atlantic Recording Corporation

11  ▪ Broadcast Music, Inc.

12  ▪ Robert Lamont Coit

13  ▪ James E. Cox

14  ▪ John "Jay" Ferguson

15  ▪ Donald O. Hurley

16  ▪ Irving Music

17  ▪ John Paul Jones

18  ▪ James Patrick Page

19  ▪ Robert Anthony Plant

20  ▪ John Bonham and/or his heirs, estate, or trust

21  ▪ David F. Peterson

22  ▪ Harold S. Pittman

23  ▪ Mary Quinting

24  ▪ Rhino Entertainment Company

25  ▪ William Ruhlman

26  ▪ Michael Skidmore

27  ▪ Sony Music Entertainment

28  {00255828;1}                                17

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

1        ▪ Super Hype Publishing, Inc.
2        ▪ Warner/Chappell Music, Inc.
3        ▪ Warner Music Group Corp.
4        ▪ Quinn Wolfe
5        ▪ Road Crew and Tech:
6           • Clive Coulson
7           • Henry "The Horse" Smith
8           • Sandy McGregor
9           • Kenny Pickett
10          • Joe Jammer
11       ▪ 1970s Road crew:
12          • Raymond Thomas
13          • Brian Condliffe
14          • Benji Le Fevre
15          • Mick Hinton
16          • Ian "Iggie" Knight
17          • Kirby Wyatt
18          • Rusty Brutshe
19          • Donny Kretzchmar
20          • Alan Branton
21          • Joe Crowley
22          • Tim Marten
23          • Andy Ledbetter
24       ▪ Personal Assistants:
25          • Rick Hobbs
26          • Phil Carlo
27          • Brian Gallivan
28   {00255828;1}                                    18

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

- Dave Northover
- John Bindon
- Dennis Sheehan
- Dave Moulder
- Rex King
- Bill Harry
- B.P. Fallon
- Danny Goldberg

▪ Other Staff:
- Joan Hudson
- Steven Weiss
- Larry Badgley

▪ Misc Individuals:
- Vanilla Fudge
  - Musicians, staff, members, agents, attorneys,
  - Carmen Appice

▪ Any historian, putative historian, collector, fanzines, blog, reporter, or someone knowledgeable about Led Zeppelin

172.   All materials identified and referenced in Defendants' initial disclosures.

173.   All material regarding all Stairway to Heaven compositions submitted to the Copyright Office, as identified in Defendants' initial disclosures, and identified as being located in the offices of Peter Anderson, Esquire.

174.   All material regarding all Taurus compositions submitted to the Copyright Office, as identified in Defendants' initial disclosures, and identified as being located in the offices of Peter Anderson, Esquire.

175.   All materials evidencing the loss or destruction of any materials requested in Document Requests 1-173, including police reports or insurance claims.

{00255828;1}                                  19

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

1

2   DATED:  January 8, 2016          FRANCIS ALEXANDER, LLC

3

4                                   By ___/s/ Francis Malofiy_____

5                                       Francis Malofiy
                                        Attorneys for Plaintiff
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   {00255828;1}                        20

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE
PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.;
ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

# CERTIFICATE OF SERVICE

Plaintiff hereby represents that Plaintiff's Second Request for Production of Documents on James Patrick Page; Robert Anthony Plant; John Paul Jones; Super Hype Publishing, Inc.; Warner Music Group Corp., Parent Of Warner/Chappell Music, Inc.; Atlantic Recording Corporation; Rhino Entertainment Company has been served upon counsel by personal service:

Helene Freeman, Esquire
666 Fifth Avenue
New York, NY 10103-0084
T: (212) 841-0547
F: (212) 262-5152
E: hfreeman@phillipsnizer.com
*Attorneys for Defendants James Patrick Page, Robert Anthony Plant, and John Paul Jones (collectively with John Bonham (Deceased), professionally known as Led Zeppelin)*

Peter J. Anderson, Esquire
100 Wilshire Blvd. | Suite 2010
Santa Monica, CA 90401
T:(310) 260-6030
F: (310) 260-6040
E: pja@pjanderson.com
*Attorney for Defendants Super Hype Publishing, Inc., Warner Music Group Corp., Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company*

*****

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Alexander Malofiy*
Francis Alexander Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis@francisalexander.com
*/d/ January 8, 2016*

{00255828;1}

1

PLAINTIFF'S SECOND DEMAND FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORP., WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY

01753

# Exhibit 5

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| Michael Skidmore, etc | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   15-cv-3462 RGK AGR |
| Led Zeppelin et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                          Larwrence Ferrara

_____
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Fink & Carney<br>39 W. 37th St<br>New York, NY 10018 | Date and Time:<br><br>05/27/2016 12:00 pm |
|---|---|---|
| | The deposition will be recorded by this method:   Stenography and audiovisual means | |

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:   Please see attached document, incorporated here by reference.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   _____05/16/2016_____

| CLERK OF COURT | |
|---|---|
| | OR |
| _____ | /s/ Francis Malofiy<br>_____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Michael Skidmore
_____ , who issues or requests this subpoena, are:

Francis Malofiy, 280 N. Providence Road, Suite 1, Media, PA 19063; francis@francisalexander.com; (215) 500-1000

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**01755**

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  15-cv-3462 RGK AGR

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Document Production Requests**

1.    All communications, documents, and things (including emails, faxes, notes, letters, audio/video files, and/or correspondence), including those from or exchanged with Peter Anderson, Helene Freedom, any employee or agent of the Law Offices of Peter J. Anderson, any employee or agent of Philips Nizer LLP, and/or Defendants (and entities they own and/or control), that regard:

    a.    Facts and/or data you considered in writing your reports and/or declarations for this lawsuit, or otherwise in forming opinions and conclusions regarding this lawsuit.

    b.    Facts and/or data you did not consider in writing your reports and/or declarations for this lawsuit, or otherwise in forming opinions and conclusions regarding this lawsuit.

    c.    Your compensation for your involvement in this lawsuit.

2.    All musical transcriptions of Taurus and Stairway to Heaven, including but not limited to those acquired by you, provided to you and those created by you.

3.    Any and all audio recordings of Taurus and Stairway to Heaven, or any portion of those songs, in your possession, custody, access, and control, including but not limited to those acquired by you, provided to you, or created by you.

4.    Any and all audio recordings of any other song, or any portion of song, in your possession, custody, access, and control, including but not limited to those acquired by you, provided to you, or created by you that relate to this lawsuit.

5.    All documents and things (including notes, summaries, recordings) that relate to the expert reports and declarations produced by Plaintiff in this lawsuit, including the expert reports, declarations, and related material of Alexander Stewart, Brian Bricklin, Erik Johnson, Kevin Hanson, and Denny Somach.

6.    All documents and things (including notes, summaries, recordings) that relate to any prior art you considered in coming to your opinions in this lawsuit,

including, but not limited to those in your reports and declarations.

7.    All expert reports you have prepared in the last four years.

8.    Any and all documents (including audio of any kind) you considered in coming to your opinions or in writing your reports concerning any other claim—formal or informal—that Led Zeppelin or a member of Led Zeppelin copied, borrowed, lifted, or based their music on the work of other artists without giving credit to those artists.

9.    Any and all documents (including audio of any kind) you considered in coming to your opinions or in writing your reports concerning any time Led Zeppelin, a member of Led Zeppelin, or an entity that owns a song originally authored by Led Zeppelin (or a member of Led Zeppelin) changed the credits of a song.

10.    Any and all documents (including interviews and magazine articles, as well as audio of any kind) you considered in coming to your opinions or in writing your reports concerning any time Led Zeppelin, a member of Led Zeppelin, or an entity that owns a song originally authored by Led Zeppelin (or a member of Led Zeppelin) that changed the credits of the song.

NOTICE OF SUBPOEANS TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

NOTICE OF SUBPOEANS TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION



Case 2:15-cv-03462-RGK-AGR   Document 230-1   Filed 06/11/16   Page 156 of 157   Page ID #:6281

# Exhibit 6



**FRANCIS ALEXANDER LLC**

July 29, 2014

Mr. Louis L. Adler
3969 Villa Costera 1
Malibu, CA 90265-5151

RE:   NOTICE OF LAWSUIT: SKIDMORE V. ZEPPELIN | 14-CV-3089
Michael Skidmore, as Trustee for the Randy Craig Wolfe Trust v. Led Zeppelin; James Patrick Page;
Robert Anthony Plant; John Paul Jones; Super Hype Publishing, Inc.; Warner Music Group Corporation;
Warner/Chappell Music, Inc.; Atlantic Recording Corporation; Rhino Entertainment Company

Dear Mr. Adler,

I am the attorney for the Randy Craig Wolfe Trust. As you may have seen in recent media reports, the Trust has sued Led Zeppelin for the infringing use of Randy's song "Taurus" in "Stairway to Heaven." Pursuant to 17 U.S.C. § 501(b), I am required to notify you that the above captioned lawsuit has been filed; the Complaint is attached.

Several months ago, and prior to filing the lawsuit, I reached out to you to raise the possibility of Hollenbeck Music joining the suit. My call was received by your associate Howard Frank who—as it was explained to me—is the attorney who actively manages your and Hollenbeck's affairs. I was surprised that he had little interest in the suit and remarked that, at some point, you and he had both considered a suit, but decided to not pursue the claim.

Given that the friends and family of the band have united behind the cause, I was hoping that you would make a similar gesture. Now that the suit has been filed, I am again reaching out to see if you are interested in coming on as a plaintiff. I see that Mr. Frank has publicly indicated that Hollenbeck does not think the suit has merit[1], and I am asking you to reconsider that position in light of the obvious similarities between the two songs.

I note that the lawsuit contains some strong language regarding the contracts between Hollenbeck and Randy, however, perhaps these issues can be worked out. If you are not amenable to supporting this suit, please let me know.

With every good wish, I am,

Francis Malofiy, Esquire
*Encl.: Complaint*

---

[1] http://www.businessweek.com/articles/2014-05-15/led-zeppelins-stairway-to-heaven-vs-dot-spirits-taurus-a-reckoning

280 N. PROVIDENCE ROAD · SUITE 105 · MEDIA, PA 19063 · T: 215.500.1000 · F: 215.500.1005
LAW@FRANCISALEXANDER.COM · WWW.FRANCISALEXANDER.COM

**CONFIDENTIAL**                                                                 **HOA 000037**

**01762**

1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| MICHAEL SKIDMORE, as Trustee for the RANDY CRAIG WOLFE TRUST, | Case No. 15-cv-03462 RGK (AGRx) |
| Plaintiff, | Hon. R. Gary Klausner |
| v. | **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL** |
| LED ZEPPELIN; JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORP., Parent of WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY, | Date:  June 14, 2016<br>Time:  9:00 a.m.<br>Courtroom:   850 |
| Defendants. | |

ALTERNATIVE [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND
TO PRECLUDE DR. FERRARA FROM TESTIFYING AT TRIAL

**01763**

## ORDER RE: RE: MOTION FOR SANCTIONS

The Court having considered the MOTION TO COMPEL AND SANCTION of Plaintiff Michael Skidmore, as Trustee for the Randy Craig Wolfe Trust, the opposition and reply papers and the oral argument at the hearing on the Motion, the Court rules as follows:

**IT IS HEREBY ORDERED**

That Plaintiff's Motion be and hereby is GRANTED and that Dr. Ferrara is precluded from testifying at trial because of

- Dr. Ferrara's conflict of interest in having previously worked for Plaintiff's publisher on the exact subject material in dispute for this case,
- Defendants' failure to disclose a known conflict,
- Defendants' failure to provide documents requested by Plaintiff,
- Defendants' attempt to conceal the conflict,
- Defendants' coaching of a witness, and Defendants' frivolous objections:

Defendants are ordered under § 1927 to pay the costs and fees for the deposition of Dr. Ferrara, including Dr. Ferrara's expert witness fee because of

- Defendants' bad faith failure to disclose a known conflict,
- Defendants' failure to provide documents requested by Plaintiff,
- Defendants' attempt to conceal the conflict,
- Defendants' coaching of a witness, and
- Defendants' frivolous objections:

Defendants and Dr. Lawrence Ferrara are ordered to produce by Wednesday, June 15, 2016:

- Any and all communications (and related documents) between Dr. Ferrara and Rondor Music, Universal Music Publishing Group, and/or Hollenbeck Music concerning Taurus and/or Stairway to Heaven, or the instant lawsuit.
- Any and all communications (and related documents) between Dr. Ferrara and Defendants and defense counsel concerning Dr. Ferrara's previous engagement

1

ALTERNATIVE [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. FERRARA FROM TESTIFYING AT TRIAL

01764

1    with Rondor Music, Universal Music Publishing Group, and/or Hollenbeck

2    Music concerning Taurus and/or Stairway to Heaven.

3    -    Any and all communications (and related documents) between

4    Defendants/defense counsel and Rondor Music, Universal Music Publishing

5    Group, and/or Hollenbeck Music concerning Taurus and/or Stairway to Heaven,

6    especially concerning Dr. Ferrara's previous engagement to analyze the Taurus

7    sound recording versus the Stairway to Heaven sound recording.

8

9    Dated:

10

11    _____

12    The Honorable R. Gary Klausner
      United States District Judge

13

2

1

2

3

4

5

6

7

8

9         **UNITED STATES DISTRICT COURT**

10     **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12 MICHAEL SKIDMORE, as Trustee for     Case No. 15-cv-03462 RGK (AGRx)
the RANDY CRAIG WOLFE TRUST,

13                        Hon. R. Gary Klausner

14            Plaintiff,

                       **ALTERNATIVE [PROPOSED]**
15      v.                    **ORDER GRANTING PLAINTIFF'S**
                       **MOTION FOR SANCTIONS AND**
16 LED ZEPPELIN; JAMES PATRICK     **TO PRECLUDE DR. LAWRENCE**
PAGE; ROBERT ANTHONY PLANT;    **FERRARA FROM TESTIFYING AT**
17 JOHN PAUL JONES; SUPER HYPE     **TRIAL**
PUBLISHING, INC.; WARNER MUSIC
18 GROUP CORP., Parent of
WARNER/CHAPPELL MUSIC, INC.;
19 ATLANTIC RECORDING
CORPORATION; RHINO               Date:  June 14, 2016
20 ENTERTAINMENT COMPANY,        Time:  9:00 a.m.
                       Courtroom:   850
21           Defendants.

22

23

24

25

26

27

28

---

ALTERNATIVE [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND
TO PRECLUDE DR. FERRARA FROM TESTIFYING AT TRIAL

## ALTERNATIVE ORDER RE: MOTION FOR SANCTIONS

The Court having considered the MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL of Plaintiff Michael Skidmore, as Trustee for the Randy Craig Wolfe Trust, the opposition and reply papers and the oral argument at the hearing on the Motion, the Court rules as follows:

**IT IS HEREBY ORDERED**

That Plaintiff's Motion be and hereby is GRANTED and that:

- The jury will be instructed that they are permitted to draw a negative inference that had Dr. Ferrara and Defendants disclosed Dr. Ferrara's prior musicological analysis on behalf of Plaintiff's publisher, that his opinions and conclusion, his related communications, and the documents and things he relied upon, would have been damaging to Defendants' position.

- Plaintiff is permitted to introduce the album recording of Taurus at time of trial, and to cross Dr. Ferrara with it, as his initial musicological analysis and opinions were based solely on the Taurus album recording.

Dated:

_____
The Honorable R. Gary Klausner
United States District Judge

1

1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11
12

MICHAEL SKIDMORE, as Trustee for the RANDY CRAIG WOLFE TRUST,

13

Plaintiff,

14

v.

15
16

LED ZEPPELIN; JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORP., Parent of WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY,

17
18
19
20
21
22

Defendants.

23
24

Case No. 15-cv-03462 RGK (AGRx)

Hon. R. Gary Klausner

**[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL**

Date:  June 14, 2016
Time:  9:00 a.m.
Courtroom:   850

25
26
27
28

---

ALTERNATIVE [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. FERRARA FROM TESTIFYING AT TRIAL

<u>**ORDER RE: RE: MOTION FOR SANCTIONS**</u>

The Court having considered the MOTION TO COMPEL AND SANCTION of Plaintiff Michael Skidmore, as Trustee for the Randy Craig Wolfe Trust, the opposition and reply papers and the oral argument at the hearing on the Motion, the Court rules as follows:

**IT IS HEREBY ORDERED**

That Plaintiff's Motion be and hereby is GRANTED and that Dr. Ferrara is precluded from testifying at trial because of

- Dr. Ferrara's conflict of interest in having previously worked for Plaintiff's publisher on the exact subject material in dispute for this case,

- Defendants' failure to disclose a known conflict,

- Defendants' failure to provide documents requested by Plaintiff,

- Defendants' attempt to conceal the conflict,

- Defendants' coaching of a witness, and Defendants' frivolous objections:

Defendants are ordered under § 1927 to pay the costs and fees for the deposition of Dr. Ferrara, including Dr. Ferrara's expert witness fee because of

- Defendants' bad faith failure to disclose a known conflict,

- Defendants' failure to provide documents requested by Plaintiff,

- Defendants' attempt to conceal the conflict,

- Defendants' coaching of a witness, and

- Defendants' frivolous objections:

Defendants and Dr. Lawrence Ferrara are ordered to produce by Wednesday, June 15, 2016:

- Any and all communications (and related documents) between Dr. Ferrara and Rondor Music, Universal Music Publishing Group, and/or Hollenbeck Music concerning Taurus and/or Stairway to Heaven, or the instant lawsuit.

- Any and all communications (and related documents) between Dr. Ferrara and Defendants and defense counsel concerning Dr. Ferrara's previous engagement

1

ALTERNATIVE [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. FERRARA FROM TESTIFYING AT TRIAL

01769

1   with Rondor Music, Universal Music Publishing Group, and/or Hollenbeck

2   Music concerning Taurus and/or Stairway to Heaven.

3   -   Any and all communications (and related documents) between

4   Defendants/defense counsel and Rondor Music, Universal Music Publishing

5   Group, and/or Hollenbeck Music concerning Taurus and/or Stairway to Heaven,

6   especially concerning Dr. Ferrara's previous engagement to analyze the Taurus

7   sound recording versus the Stairway to Heaven sound recording.

8

9   Dated:

10

11   _____

12   The Honorable R. Gary Klausner
    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL SKIDMORE, as Trustee for the RANDY CRAIG WOLFE TRUST,<br><br>          Plaintiff,<br><br>     v.<br><br>LED ZEPPELIN; JAMES PATRICK PAGE; ROBERT ANTHONY PLANT; JOHN PAUL JONES; SUPER HYPE PUBLISHING, INC.; WARNER MUSIC GROUP CORP., Parent of WARNER/CHAPPELL MUSIC, INC.; ATLANTIC RECORDING CORPORATION; RHINO ENTERTAINMENT COMPANY,<br><br>          Defendants. | Case No. 15-cv-03462 RGK (AGRx)<br><br>Hon. R. Gary Klausner<br><br>**ALTERNATIVE [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL**<br><br><br>Date:  June 14, 2016<br>Time:  9:00 a.m.<br>Courtroom:   850 |

---

ALTERNATIVE [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND
TO PRECLUDE DR. FERRARA FROM TESTIFYING AT TRIAL

## ALTERNATIVE ORDER RE: MOTION FOR SANCTIONS

The Court having considered the MOTION FOR SANCTIONS AND TO PRECLUDE DR. LAWRENCE FERRARA FROM TESTIFYING AT TRIAL of Plaintiff Michael Skidmore, as Trustee for the Randy Craig Wolfe Trust, the opposition and reply papers and the oral argument at the hearing on the Motion, the Court rules as follows:

**IT IS HEREBY ORDERED**

That Plaintiff's Motion be and hereby is GRANTED and that:

- The jury will be instructed that they are permitted to draw a negative inference that had Dr. Ferrara and Defendants disclosed Dr. Ferrara's prior musicological analysis on behalf of Plaintiff's publisher, that his opinions and conclusion, his related communications, and the documents and things he relied upon, would have been damaging to Defendants' position.

- Plaintiff is permitted to introduce the album recording of Taurus at time of trial, and to cross Dr. Ferrara with it, as his initial musicological analysis and opinions were based solely on the Taurus album recording.

Dated:

_____
The Honorable R. Gary Klausner
United States District Judge

1

ALTERNATIVE [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS AND TO PRECLUDE DR. FERRARA FROM TESTIFYING AT TRIAL

1   Peter J. Anderson, Esq., Cal. Bar No. 88891
    E-Mail: pja@pjanderson.com
2   LAW OFFICES OF PETER J. ANDERSON
    A Professional Corporation
3   100 Wilshire Boulevard, Suite 2010
    Santa Monica, CA 90401
4   Tel: (310) 260-6030
    Fax: (310) 260-6040
5   Attorneys for Defendants
    JAMES PATRICK PAGE, ROBERT ANTHONY
6   PLANT, JOHN PAUL JONES, WARNER/CHAPPELL
    MUSIC, INC., SUPER HYPE PUBLISHING, INC.,
7   ATLANTIC RECORDING CORP., RHINO
    ENTERTAINMENT COMPANY and WARNER
8   MUSIC GROUP CORP.

9   Helene Freeman, Esq., admitted *pro hac vice*
    E-Mail: hfreeman@phillipsnizer.com
10  PHILIPS NIZER LLP
    666 Fifth Avenue
11  New York, NY 10103-0084
    Tel: (212) 977-9700
12  Fax: (212) 262-5152
    Attorneys for Defendants
13  JAMES PATRICK PAGE, ROBERT ANTHONY
    PLANT and JOHN PAUL JONES

14

15                **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17                    **WESTERN DIVISION**

| 18 | MICHAEL SKIDMORE, *etc.*, | ) | Case No. 2:15-cv-03462 RGK (AGRx) |
| 19 | Plaintiff, | ) | |
| 20 | vs. | ) | DECLARATION *RE* DOCUMENTS CITED IN DEFENDANTS' TRIAL BRIEF |
| 21 | LED ZEPPELIN, *et al.*, | ) | |
| 22 | Defendants. | ) | Date: June 14, 2016 |
| 23 | | ) | Time: 9:00 a.m. |

24                          Courtroom of the Honorable
                            R. Gary Klausner
25                          United States District Judge

26

27

28

### DECLARATION OF PETER J. ANDERSON

I, Peter J. Anderson, declare and state:

1.      I am an attorney admitted to practice before this Court and all Courts of the State of California.  I have personal knowledge of the following facts and could competently testify to these facts if called upon to do so.

2.      I represent defendants James Patrick Page, Robert Plant, Warner/Chappell Music, Inc., Atlantic Recording Corp. and Rhino Entertainment Company in this action. This Declaration is submitted to provide recent documents cited in defendants' Trial Brief.

3.      Attached to this Declaration as Exhibit 1 is a true and correct copy of Dr. Alexander Stewart's new report provided by plaintiff on May 2, 2016.

4.      Attached to this Declaration as Exhibit 2 is a true and correct copy of Erik Johnson's new report provided by plaintiff on May 2, 2016.

5.      Attached to this Declaration as Exhibit 3 is a true and correct copy of Kevin Hanson's new report provided by plaintiff on May 2, 2016.

6.      Attached to this Declaration as Exhibit 4 is a true and correct copy of Brian Bricklin's new report provided by plaintiff on May 2, 2016.

7.      On May 17, 2016, I took the deposition of Dr. Alexander Stewart.  As of the filing of defendants' Trial Brief, I have not received any changes or corrections to the transcript of his deposition.  Attached to this Declaration as Exhibit 5 are true and correct copies of pages from the transcript of his deposition and which contain the testimony cited in defendants' Trial Brief.  Exhibit 2058 referenced at page 142 of his transcript is the 1967 *Taurus* deposit copy.

8.      On May 18, 2016, I took the deposition of Erik Johnson.  As of the filing of defendants' Trial Brief, I have not received any changes or corrections to the transcript of his deposition.  Attached to this Declaration as Exhibit 6 are true and correct copies of pages from the transcript of his deposition and which contain the testimony cited in defendants' Trial Brief.

1

9.     On May 18, 2016, I took the deposition of Kevin Hanson.  As of the filing of defendants' Trial Brief, I have not received any changes or corrections to the transcript of his deposition.  Attached to this Declaration as Exhibit 7 are true and correct copies of pages from the transcript of his deposition and which contain the testimony cited in defendants' Trial Brief.

10.     The deposition of Brian Bricklin was noticed and a subpoena issued for May 18, 2016, but that morning plaintiff's counsel told me that Mr. Bricklin had been hospitalized and could not appear for his deposition.

11.     Attached to this Declaration as Exhibit 8 is a true and correct copy of D. Begault, H. Heisse & C. Peltier, *Forensic Musicology – An Overview*, cited in defendants' Trial Brief.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 7, 2016.

_____/s/ Peter J. Anderson_____
PETER J. ANDERSON

2

# EXHIBIT 1

**Alexander Stewart, Ph.D.**
**Professor of Music**
**University of Vermont**

**April 30, 2016**

**Re: "Taurus" and "Stairway To Heaven"**

1. I am Professor of Music, Director of Latin American and Caribbean Studies, and Jazz Studies Coordinator at the University of Vermont. I have contributed to numerous peer-reviewed journals and other publications and I am author of a book published by University of California Press. My work encompasses extensive music transcriptions, musicological analysis, historical research, and other scholarly activities, particularly in popular music. I earned a Ph.D. in Music (Ethnomusicology Concentration) from the Graduate Center of the City University of New York (CUNY) and a Master of Music in Jazz and Commercial Music from Manhattan School of Music. During 2006-7 I was a Fulbright scholar researching traditional and popular music in Mexico. As an active professional musician I have performed with leading musicians in jazz and popular music for more than thirty years. I have provided expert opinions and analysis on music copyright matters for over twelve years.

2. I have been asked to compare the songs "Taurus" (T) by Randy California of the group Spirit and "Stairway To Heaven" (STH) by Jimmy Page and Robert Plant. I downloaded the recordings of T and STH from iTunes and purchased the sheet music to STH from musicnotes.com. I was also provided six live versions and a demo of "Taurus" and additional guitar sheet music to STH by attorney Francis Alexander Malofiy. and was provided copies of the copyright deposit lead sheets of both T (dated 1967 and identified as Eu35222) and STH (dated 1972 and marked Eu301137). These recordings, sheet music to STH, and transcriptions of the relevant parts of the recordings of ST, and copyright deposit lead sheets have been identified and submitted prior to this report. I will also reference reports dated February 10 and rebuttals dated March 14, 2016 by defendants' experts Lawrence Ferrara and Rob Mathes.

3. The first part of this report will reference only the protectable expression in "Taurus" as represented in the deposit copy lead sheet. This is the same procedure used by defense's expert, Dr. Ferrara in his first report and **all references to "Taurus" in this section rely exclusively on the "Taurus" lead sheet** and make no reference to the numerous recorded examples of the work. As will be seen below, even though compared with the recordings of T, this lead sheet is missing compositional elements, **this analysis further strengthens the case for**

**EXHIBIT 1**
**3**

**01777**

2

**copying of substantial musical expression from "Taurus."** For the second part of this report I will discuss the **compositional** elements contained in the recorded embodiments of "Taurus."[1] I will strictly adhere to the Court's instructions to refrain from examining any elements that could be considered  performance practices and will focus exclusively on compositional musical expression. In a third part of this report I will address the so-called prior art raised by the defense's experts and some of the issues raised in their rebuttals to my first report. Finally, since access is being contested in this case, I will discuss probative musicological similarities that speak directly to the issue of access.

---

[1] For example, my analysis showed that nearly 80% of the notes in the guitar melodies closely match in their pitch sequence and metric placement and that they are set to the same rhythms.

**EXHIBIT 1**
4
**01778**

3

**PART I**
**Comparison of Composition of "Taurus" as Represented in Lead Sheet Deposit Copy and "Stairway" Composition**

4. Following Dr. Ferrara's methodology of comparing only the "Taurus" deposit copy lead sheet with the sheet music and studio recording of "Stairway" I continue to find substantial similarity between these works. Both compositions prominently feature a musical passage that contains substantially similar musical expression. This passage (labeled Section "A" in the analysis below) appears four times in the lead sheet of "Taurus." In "Stairway" the passage appears six times, at measures 1, 5, 17, 21, 33, and 37 or, in the recording, at 0:00, 0:13, 0:53, 1:06, 1:47, and 2:00. In three of the six appearances in STH (the first, second, and sixth), it is heard instrumentally (without vocals). The third, fourth, and fifth iterations of the passage in STH contain a vocal part which is sung over these guitar passages. The deposit copy lead sheet of T does not indicate any instrumentation, vocals, or tempo (the speed at which music is played) and is depicted in two staves or lines of music. Both works are placed in the key of A minor. As discussed further below, these "A" section passages are clearly the most important musical expression in both works. Before discussing this musical expression in further detail, this report will examine the general structure or form of each work.

**Structure/form**

**"Stairway to Heaven"**
PART I
0:00    A (instrumental)
0:13    A (instrumental)
0:26    B (instrumental)
0:53    A vocal
1:06    A vocal
1:20    B vocal
1:47    A vocal
2:00    A (instrumental variation; double-time)

PART II
2:14    vamp 1 (two chord) interlude
2:39    C
2:51    C
3:06    vamp 1 (two chord) interlude
3:29    C
3:41    C
3:56    vamp 1 (two chord) interlude
4:19    $C^1$ (drums enter)
4:30    $C^1$
4:45    vamp 1 (two chord) interlude
5:07    $C^1$
5:18    $C^1$

**EXHIBIT 1**
**5**
**01779**

4

| 5:34 | Instrumental interlude |
| 5:55 | vamp 2 (three chord) guitar solo |
| 6:44 | vocal re-enters over vamp 2 |

**Section descriptions**

| A | 4-measure verse with descending A minor guitar pattern |
| B | 8-measure "bridge" |
| Vamp 1 | 2-chord progression (essentially Amin – D) |
| C | 4-measure verse melody from A section over descending C major pattern |
| C[1] | 4-measure variation of verse melody over descending C major pattern Vamp |
| Vamp 2 | 3-chord progression (Amin – G – F) |

**"Taurus" (deposit copy)**

A
A
B
A
A
B

**Section descriptions**[2]

| A | 4-measure verse with descending A minor pattern |
| B | 7-measure "bridge" |

5.      As can be seen in the above analysis, the structure of Part I of "Stairway to Heaven" is nearly identical to that of "Taurus." The A sections in both songs are four measures long. They are repeated (AA) and separated by a longer B section or bridge. The deposit copy of "Taurus" contains a repeat of the A section before moving into the B section. At the end of the B section a Da Capo repeat has been notated which indicates a return to the beginning of the composition and the entire form is repeated. The only difference is that "Stairway" repeats two additional A Sections at the end of the AAB form. The overall form of both songs thus can be represented as:

| T | AABAAB |
| STH (Part I) | AABAABAA |

6. In example 1 below I replicate the first eight measures (Section A) of "Taurus" as found in the lead sheet. No instruments are indicated in the lead sheet.

---

[2] The lengths of these passages provided here assume a halving of the notational values as discussed further below. That this operation can be considered standard musicological is confirmed by the fact that Defendant's expert has done exactly the same thing in his analysis.

**EXHIBIT 1**
**6**
**01780**

5

Example 1       Section A "Taurus"



7. Following standard musicological procedure, in order to facilitate comparison I have halved the notational values and rendered the above example with the basic rhythmic unit represented as an eighth note rather than a quarter note. This procedure yields a transcription that embodies every note of the eight measures of Section A in "Taurus" in four rather than eight measures.  This does nothing to change the fundamental composition, in fact, examples 1 and 2 can be said to represent exactly the same musical expression. As Dr. Ferrara points out, in this procedure the "internal relationships [are] maintained exactly" (Ferrara Report, February 10, 2016, Attachment B, pp.1-2). "This halving of the value of the notes facilitates a comparative transcription of the respective portions of 'Stairway' and 'Taurus' that share similarities…and is in keeping with standard musicological practice." Note that Ferrara represents Section A in this manner in his first musical example and in every subsequent example that contains "Taurus" (Examples 8, 10, 15, 17, and 19).

Example 2       Section A "Taurus" with note values halved
                (exactly as presented in Ferrara Musical Example 1)



8. From this point forward Dr. Ferrara's analysis fails to consider the entirety of the musical composition found in the "Taurus" deposit copy lead sheet. Almost all of his subsequent analysis relies exclusively on the notes found in the bass clef staff of the lead sheet.

EXHIBIT 1
7
01781

6

Example 2 above (and Ferrara's Example 1) contains 38 notes: 21 in the treble clef and 17 in the bass clef. His analysis **omits more than half the notes – 55.3% to be precise**. No explanation is offered for this omission. Clearly, comparing less than half the notes found in the composition of "Taurus" with the full number of notes in "Stairway" will yield very different results than an analysis that includes all of the compositional expression contained in the deposit copy lead sheet. My analysis below offers a corrective to this faulty methodology.

9. Example 3 below provides a full rendering of "Taurus." All the notes are placed on a single staff as they often are in "Stairway" (see, for example, Dr. Ferrara's transcription in example 1, his transcription in Visual Exhibit B, the guitar and tablature notation in Visual Exhibit C on page 135 in the pdf of his report, and my transcription in Visual Exhibit C of my original report). In my examples and subsequent analysis, as does Dr. Ferrara in much of his analysis, I use the "enharmonic equivalents," for the A flats and G flats in "Taurus" – G sharps and F sharps respectively.[3] Indeed, these would be the more common spellings of these pitches in the key of A minor.

Example 3        Section A "Taurus" Deposit Copy Lead Sheet



10. Example 4 also represents "Stairway" in a similar manner on a single staff.

Example 4.        Section A "Stairway"



11. While it could be argued that the above renderings do not account for notes (especially in the descending chromatic bass) that are sustained for somewhat longer values, this representation exactly follows the guitar tablature notation in the sheet music in Dr. Ferrara's Visual Exhibit C on page 135 in the pdf of his report. This sheet music provides an instruction to the performer "Let ring." It is safe to presume that any competent guitarist would follow this practice in both of these compositions and allow the notes on different strings to ring, thus producing a similar effect.

---

[3] "Enharmonic equivalents" are simply different spellings of the same pitch class or sound. For Dr. Ferrara's use of the same procedure see the harmonic analysis in Attachment B, Musical Example 1 and throughout.

**EXHIBIT 1**

**8**

**01782**

12. The following table graphically presents the four measures found in Section A and depicts the steady eighth-note figurations in these passages. Since both songs are in the same key, the actual pitches can be easily compared without transposition. Each measure of the four-measure passage contains four beats and each of these four beats is subdivided in two, for a total of 32 positions or eighth-note "slots" (4x2x4). Musicians typically count this pattern as "**one**-and-**two**-and-**three**-and-**four**-and" with each number indicating a beat and the word "and" signifying the eighth-note subdivision halfway in between each beat.

Example 5        Themes in Section A of "Taurus" (deposit copy) and "Stairway to Heaven"

|  | MEASURE 1 | | | | | | | | MEASURE 2 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BEAT | 1 | + | 2 | + | 3 | + | 4 | + | 1 | + | 2 | + | 3 | + | 4 | + |
| TAURUS |  | B | CE | AC | E | C/B | EA | BC | C | C | AE | EC | D | C | EC | AC |
|  | A |  |  |  | G# |  |  |  | G |  |  |  | F# |  |  |  |
| STAIR-WAY |  | C | E | A | B | E | C | B | C | E | C | C |  | D | A | F# |
|  | A |  |  |  | G# |  |  |  | G |  |  |  | F# |  |  |  |

|  | MEASURE 3 | | | | | | | | MEASURE 4 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BEAT | 1 | + | 2 | + | 3 | + | 4 | + | 1 | + | 2 | + | 3 | + | 4 | + |
| TAURUS | BC |  |  |  |  |  |  |  | D |  | D | A | E |  |  |  |
|  | F |  |  |  |  |  |  |  | D |  |  |  | A |  |  |  |
| STAIR-WAY | E | C | A | C |  | E | C | A | G | A | A |  |  |  |  |  |
|  | F |  |  |  |  |  |  |  | B | A | A |  |  | A | F | E |

13. **No pitches are heard in each of the first two measures of STH that are not found in the deposit copy lead sheet of Taurus.** In other words, **100%** of the pitches heard during the first sixteen eighth-note slots are also found in the lead sheet version of the composition Taurus. In the first measure of Taurus and in Stairway A, B, C, E, and G# are found. The second measure of both songs is comprised entirely of C, E, A, D, G, and F#.

14. Another way of putting this is that out of the first 43 notes in these songs (25 in Taurus and 18 in Stairway) **not a single** different pitch is heard.

15. Moreover, in the first measure the relative proportions of the pitches is almost exactly the same. A, C, and E each comprise 21.5% of the pitches in the first measure of Taurus. These same pitches, A, C, and E, each comprise 22% of the pitches in the first measure of Section A in "Stairway." The pitch B occurs somewhat more frequently in "Taurus" – 28.5% as opposed to 22% in "Stairway." A fifth pitch, G#, is found once in Section A in each composition. In the second measure the pitches C, E, A, D, G, and F# are the only pitches used. In both songs C is the most common pitch in this measure.

**EXHIBIT 1**
9
**01783**

**Pitch inventory 1st measure**

| "Taurus" 14 pitches total | | | "Stairway" 9 pitches total | | |
|---|---|---|---|---|---|
| pitch | occurrences[4] | % | pitch | occurrences | % |
| A | 3 | 21.5 | A | 2 | 22 |
| B | 4 | 28.5 | B | 2 | 22 |
| C | 3 | 21.5 | C | 2 | 22 |
| E | 3 | 21.5 | E | 2 | 22 |
| G# | 1 | 7 | G# | 1 | 11 |

**Pitch inventory 2nd measure**

| "Taurus" 14 pitches total | | | STH  9 pitches total | | |
|---|---|---|---|---|---|
| pitch | occurrences[5] | % | pitch | occurrences | %[6] |
| C | 6 | 43 | C | 3 | 33 |
| E | 3 | 21.5 | E | 1 | 11 |
| A | 2 | 14 | A | 1 | 11 |
| D | 1 | 7 | D | 1 | 11 |
| G | 1 | 7 | G | 1 | 11 |
| F# | 1 | 7 | F# | 2 | 22 |

16. Melody and Pitch Sequence. I agree with Dr. Ferrara about what makes the melody and pitch sequence distinctive, namely "the two-note phrases in the upper melodic line in the guitar arpeggios in 'Stairway,'" which he describes repeatedly as "the most creative and memorable part in the repeating 3-measures in the Introduction in 'Stairway.'" As will be seen, because he has failed to consider the musical expression of the deposit copy lead sheet in its entirety (leaving out more than 55% of the notes), he is in error when he goes on to state that that these characteristics are "absent in 'Taurus'" (Ferrara Report, p. 8 paragraph 16).

17. Dr. Ferrara's "memorable series of two-note melodic phrases that move from 'a' to 'b' (landing on beat 3 in measure 1), 'b' to 'c' (landing on beat 1 of measure 2), and 'c' to 'f#' (landing on beat 3 of measure 2)" (Ferrara Report, February 10, 2016, Attachment D – Analysis of Melody, p3) **are strongly present in the deposit copy lead sheet of "Taurus," most of them placed on exactly the same beats.** In Example 6 below these note pairs are bracketed. The first two pitches in the "Taurus" lead sheet are a to b; This pair also occurs two other times. The pair b to c is present twice in Taurus and one of the occurrences **is in exactly the same spot** landing on beat 1 in measure 2.  The third significant pair mentioned by Dr. Ferrara, c to f# is also found in the "Taurus" lead sheet deposit copy **also placed exactly the same** (landing on beat 3 in measure 2. The only difference is that the c to f# is heard in the lower voice in "Taurus."

---

[4] Two A's are played simultaneously on the first beat of "Taurus"

[5] Two F#'s are played simultaneously on the third beat of the second measure of "Stairway."

[6] Because of rounding to nearest half percent, percentages may not total exactly 100.

**EXHIBIT 1**
**10**
**01784**

Example 6                    "Most creative and memorable" part of "Stairway" melody also found in "Taurus"



Example 7 provides the other occurrences of these two consecutive notes in the "Taurus" deposit copy and "Stairway." As can be seen, in "Taurus" a to b occurs an additional two times and b to c one other time. Clearly, these pairs of notes are present and important within the composition of "Taurus" as well as "Stairway."

Example 7.     Other occurrences of the two note pairs in "Taurus"



18. Vocal Melody. The vocal melody in "Stairway" that is placed over these A Sections is similar to the melody found in the treble clef staff of the "Taurus" deposit copy lead sheet. In STH, this melody, which establishes the subject matter of the song and contains the words "stairway to heaven," is arguably the most important vocal theme in "Stairway."

Taurus          A B C  A E
Stairway        A B C CA B ("There's a lady who's sure…")

The melody of STH is set to three phrases that climb successively to three higher pitches: C, D, and E. The melody in "Taurus" also works its way upward through these same pitches.

19.  Harmony. The underlying harmonic structure contains a descending chromatic bass line. While a related structure has a long history in Western music (sometimes referred to as

EXHIBIT 1
11
01785

10

the "Lament" ground bass), many composers through the ages have found original and creative ways to use this foundational pattern. The setting of the passage in T is exemplar of such creativity and contains original musical expression. By way of comparison I would note as one example that many thousands of songs have been set to twelve-bar blues. Substantial and original expression contained therein remains protectable despite this commonality. As will be seen in my analysis below, both "Taurus" and STH depart from the traditional sequence in similar and significant ways.

20.  The chromatic version of the traditional sequence moves through six pitches from the tonic (do) to the important harmonic goal on the fifth degree of the scale (sol). In an unusual variation, both T and STH avoid reaching this important goal on the last pitch of the sequence (the fifth degree or E). In addition to not incorporating the entire six-pitch sequence (A G# G F# F E), both T and STH use the first five pitches in exactly the same way. As the bass line descends chromatically from A to F#, each pitch is held for two beats duration before lingering on F for four beats in the third measure. In both songs the movement to the final pitch of the sequence, the fifth degree of the scale E, is not arrived at directly and is only suggested near the end of the fourth measure.

21. The following is a harmonic analysis of the two passages based on the deposit copy lead sheet of "Taurus." While there are slight differences in the details, Dr. Ferrara and I are essentially in agreement that the basic harmonies are the same through the first four chords (See Dr. Ferrara's analysis in Attachment B of his original report). For example, he analyzes the fourth chord as F# half diminished. This chord could also be described as D7/F#.[7]

| T | Amin | Amin/G# (G#$^0$) | Amin/G (C/G) | D$^7$/F# | F5[8] | D5  A5 |
| STH | Amin | Amin/G# (G#$^0$) | Amin/G (C/G) | D/F# | Fmaj7 | G  A |

As can be seen, the harmonies are almost identical until the final measure. A comparison of the cadences will be found later in this report.

**Rhythms and metric placement**

22.    Rhythm. The descending chromatic line described above is set to identical rhythm and metric placement – every two beats until arriving on F in measure 3 which is held for four beats in both works. Most important, both passages are treated with a nearly continuous eighth-note figurations. During the critical first two measures there is a steady flow of eighth notes in both the deposit copy of "Taurus" and in "Stairway."

_____

[7] D$^7$/F# is frequently used as a substitute for F#$^7$ half diminished. For example, the esteemed jazz mentor, Barry Harris suggests that students always think of F#$^7$ half diminished as D$^7$/F#.
[8] The trill, or rapid alternation between two notes, in measure 3 of the deposit copy suggests that the pitch C (the fifth) over the F in the bass is equally present for all intents and purposes as the B throughout this measure.

**EXHIBIT 1**
**12**

23. Other art. In his original report, Dr. Ferrara offers examples of so-called prior art (some of which were published *after* "Taurus") that he maintains contain many of the similarities found in "Taurus" and "Stairway." I rebutted these claims in my previous report and, rather than repeat it here, I have included much of this material below in Section III. My discussion here will focus exclusively on the analysis of the deposit copy lead sheet and its bearing on the comparisons with Dr. Ferrara and Mr. Mathes' examples of other art. As I have pointed out above, since he ignores one of the two staves in the deposit copy (the entire treble clef staff) his comparison is missing approximately 55% of the notes in the deposit copy. If he had included these notes he could not have concluded that these "creative and memorable" note pairs are not found in "Taurus." It must be noted that **none of the examples of so-called prior art provided by Dr. Ferrara contain these three-note pairs.**

24. Moreover, none of the examples cited by Dr. Ferrara contain exactly the pitch same collections in their first two measures as do "Taurus" and "Stairway."

25. **Conclusions Part I.**  Limiting my comparison and analysis of these works to the deposit copy lead sheet of "Taurus" and the sheet music and transcriptions of "Stairway" has only confirmed and strengthened my prior work regarding substantial similarity. These similarities comprise the melodic and harmonic structure along with what defendants' expert has described as "the most creative and memorable part in the repeating three-measures" – the three pairs of notes A to B, B to C, and C to F#. Two of these pairs of notes are metrically placed exactly the same in both compositions. Further, the pitch collections in these passages match exactly – out of 43 notes not a single different pitch is heard in the first two measures. The relative occurrences of these pitches are also very similar. The rhythms and metric placement are the same: the first two measures are also set to the same regularly flowing stream of sixteen successive eighth notes. Finally, Dr. Ferrara's and my analyses of the harmonies of these two passages are essentially the same. In other words, the melodic material is set to the same harmonies and very similar rhythms. This musical expression is important to both songs both quantitatively and qualitatively. The passages are repeated four times in "Taurus" and six times in "Stairway" and appear at the beginning of both works. By setting them as the first musical sounds the listener hears, they make an immediate and lasting impression. Finally, "Taurus" and "Stairway" are much more similar to each other than either is to the numerous examples of so-called prior art cited by defendants' experts.

**EXHIBIT 1**
**13**
**01787**

12

**PART II**
**Comparison of the Compositions of "Taurus" and "Stairway" as Embodied in Recordings and/or Sheet Music**

26. As stated above, Section II of this report compares "Taurus" and "Stairway" by focusing on compositional elements embodied in the recordings of "Taurus." Any element that could be considered part of the performance is filtered out.

27. In addition to the substantial similarities discussed above, the composition embodied in recordings of "Taurus" features a prominent guitar melody in Section A that is only partially represented in the "Taurus" deposit copy lead sheet and contains certain obvious similarities to the guitar melody heard in Section A of "Stairway." This is somewhat typical of lead sheets, and any competent performer might be expected to fill in missing parts. In this case (and as is commonly true), the "missing" notes are not really missing and can be easily referenced in the numerous recordings of T. The following table graphically presents these four measures and depicts the steady eighth-note figurations heard in the acoustic guitar in these passages. Since both songs are in the same key, the actual pitches can be easily compared without transposition. As in the table in example 5 each measure of the four-measure passage contains four beats and each of these four beats is subdivided in two. Musicians typically count this pattern as "**one**-and-**two**-and-**three**-and-**four**-and" with each number indicating a beat and the word "and" signifying the eighth-note subdivision halfway in between each beat. Placing these notes in a grid is intended to facilitate comparison especially for the layperson who may not read musical notation. For the sake of clarity, the chart indicates the most important information – the pitch and where each note is placed rhythmically and metrically – but not necessarily how long each note is sustained (which varies according to how long the performer lets the strings ring). These passages are labeled as acoustic guitar passages solely with the intention of giving them a descriptive identifier. No claim is made as to this expression being protectable simply because it is sounded on the same instrument. The melodic similarities would be evident regardless of the instruments on which they were performed.

Example 8.        Acoustic guitar themes in "Taurus" and "Stairway to Heaven"

| | MEASURE 1 | | | | | | | | MEASURE 2 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BEAT | 1 | + | 2 | + | 3 | + | 4 | + | 1 | + | 2 | + | 3 | + | 4 | + |
| TAURUS | | C | ECB | | | C | ECB | | | C | ECB | | | C | ECB | |
| | A | | | A | G# | | | G# | G | | | G | F# | | | F# |
| STAIR- | | C | E | A | B | E | C | B | C | E | C | C | F# | D | A | F# |
| WAY | A | | | | G# | | | | G | | | | F# | | | |

EXHIBIT 1
14

01788

| | | | MEASURE 3 | | | | | | | | MEASURE 4 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BEAT | 1 | + | 2 | + | 3 | + | 4 | + | 1 | + | 2 | + | 3 | + | 4 | + |
| TAURUS | | C | ECB | | AB | | AB | | | | | | | | | |
| | F | | | F | | F | | F | D | | | D | A | | | G |
| STAIR- | E | C | A | C | | E | C | A | G | A | A | | | | | |
| WAY | F | | | | | | | | B | A | A | | | A | F | E |

28. Most of the similarities occur during the first 18 notes. The first measure is almost identical, the second measure contains only two different pitches, and the first two slots of the third measure contain the same pitches. With two slight re-orderings, swapping CE for EC, 14 of the first 18 eighth-note positions or slots (78%) contain the same pitches. Since these pitches, C and E, are both present in T (on the second and fourth beats), and they are chord tones in A minor they are virtually interchangeable (A minor = A, C, E). While there are two B's in the first measure of both songs, the two B's in STH are heard in the top part. The second B in STH moves to a C/G on the first beat of the second measure. During the first 18 notes, then the, basic melodic sequence is virtually the same.

29. The final cadences of these passages also contain important similarities. The resolution of STH comes at the beginning of the fourth measure while in T the resolution generally also comes in the fourth measure, but on the third beat. The cadence in STH (essentially G major to A minor) contains the following pitches (as can be seen in measure 24 of the STH sheet music).

Stairway
D   E
B   C
G   A
B   A

The cadence in T generally resolves to A on the third beat of the fourth measure. Melodically, the same movement from G to A occurs at the end of the measure leading into the next A section.

Taurus
D   A  (GA)
D   E
A   A
A   B
D   A

EXHIBIT 1
15
01789

14

Example 9 provides a transcription of this cadence from T at 1:47. [9]

Example 9.      "Taurus" cadence (1:47)



30.      While there are differences between these two cadences, both A sections return to the tonic in the fourth measure. Most important, the melodic movement from flat-7 to 1 (G to A) is exactly the same in both songs, although in "Taurus" it happens at the end of measure four rather than at the beginning of the measure.

31. Both works also feature sustained notes, or "pads" that double the chromatic descending bass line as can be seen below. In both compositions these parts are introduced after the first iteration of Section A.

Example 10. "Pads" in "Taurus" and "Stairway to Heaven"



---

[9] The fourth measure of the "Taurus" Section A contains slight variations. My analysis will focus on the third iteration (1:37) of the A section as representative.

**EXHIBIT 1**
**16**

15

32. Structure /Form. The structure of the studio version of "Taurus" is essentially the same as in the deposit copy lead sheet discussed in paragraph 5 above except for an atmospheric introduction played in more or less free time (rubato). Like the lead sheet, the live versions do not contain this introduction. Interestingly, most of the live versions of "Taurus" extend the form by repeating the AAB form an additional time as in AABAABAAB.

33. The form of many of the live versions is therefore even more similar to the form of Part I of "Stairway" in that **they also feature six iterations of Section A**.

Form – Live versions "Taurus" dated 7/10/67, 7/31/67, and 8/8/67.
Taurus      AABAABAAB
Stairway   AABAABAA

34.   Significance. The passages at issue are clearly important, easily the *most* important musical expression in both songs. In "Taurus" the segments comprise the central musical themes heard in the work. Although in the studio version of T a long introduction is heard, in live versions, there was no introduction and the song began  with the main theme heard in the acoustic guitar. Similarly, in STH the passages open  the song, and have acquired iconic status. Instantly recognizable, countless aspiring  guitarists and other instrumentalists have learned these parts in their early programs of study.

35.   Conclusions Part II. In summary, important musical expression in Taurus and Part I of STH is substantially similar. These similarities should be obvious to the average listener  and become explicit under musicological analysis. There is no doubt that the  creators of "Stairway to Heaven" drew upon the musical expression central to  "Taurus." These similarities include the signature themes of both songs, in particular the acoustic  guitar passages I have labeled section "A." Nearly 80% of the pitches of the first  eighteen notes match, along with their rhythms and metric placement. These passages also contain what defendant's expert has described as "the most creative and memorable part in the repeating three-measures" –  three pairs of notes in the melody, two of which have similar placement rhythmically and metrically. The  harmonic setting of these A sections feature the same chords during the first three measures and an unusual variation on the traditional chromatic descending bass line in the fourth measure. While the cadence is delayed slightly in T, each passage ends by moving from flat-7 to 1 (G to A). Moreover, these passages in Section A are supported by  similar "pads" or background lines that are introduced after the first iteration of Section A. The passages are overlayered by vocal melodies in STH and  prominent keyboard parts in T that begin the same way. In my professional opinion, these similarities, both individually and in the aggregate, preclude the possibility of coincidence or independent creation.

**EXHIBIT 1**
17
**01791**

**PART IIIA**
**Responses to Ferrara and Mathes**

36. My original report stated that while other works use similar descending minor harmonic patterns, both "Taurus" and "Stairway" were unusual in their avoidance of the typical final pitch of this sequence, the fifth or E in the key of A minor. Indeed, most of the examples provided by Ferrara, including the Purcell, the Chopin, the Ellington, (Visual Exhibits D, E, and H); "Chim Chim Cher-ee" (Musical Example 4), "Walkin' My Baby Back Home" (Musical Example 6), "Spring Is Near" (Musical Example 9), "Cry Me a River" (Musical Example 13), "Michelle" (Musical Example 14-15), all arrive at the fifth degree of the scale. Some, such as "What Are You Doing the Rest of Your Life" (Visual Exhibit L), after a slight detour, reach a sustained fifth before returning to the beginning of the sequence.

37. "A Taste of Honey" (Musical Example 12), "Music to Watch Girls By" (Musical Examples 16-17) and "More" (Visual Exhibit G and Musical Example 7) never even arrive at the flat 6 and only contain the first four notes of the descending sequence.

38. Some of his examples, such as "How Insensitive" (Musical Example 5), "Night and Day," and "One Note Samba," (Visual Exhibits F, I., and K respectively) and feature only a chromatic bass line and the chords or harmonies above them are very different from those found in "Taurus" and "Stairway."

39. Quite a few (e.g., "More" and "Summer Rain") also are in major keys and, as Dr. Ferrara points out represent temporary "'tonicization' (i.e., momentary change of the 'tonic' or key tone) of a minor key" (p. 31, paragraph 26).

40. Many of Ferrara's examples (e.g., Purcell, Visual Exhibit D and "Meaning of the Blues," Musical Example 3) also have very different durations and harmonic rhythms for the progression.

41. Dr. Ferrara provides examples of what he claims are "melodic similarities" between the guitar parts in section A of "Taurus" and "Stairway" and the guitar parts of several other songs that predate "Taurus." Once again it is essential to note that, since he is not using a complete and accurate transcription of the guitar part in "Taurus" (as recognized by defendant's other expert Mathes), these comparisons are fundamentally flawed. Still, once again "Taurus" and "Stairway" are much more similar to each other than either is to any of these examples. Musical Example 11 (an arrangement for Johnny Mathis of "My Funny Valentine") is very different rhythmically and in durations and in the guitar part contains no pitches except arpeggiated chord tones. The Beatles version of a "Taste of Honey" (Musical Example 12) and Davey Graham's recording of "Cry Me a River" (Musical Example 13) are also

**EXHIBIT 1**
**18**
**01792**

different rhythmically and melodically (containing triplet arpeggios). It is also important to note that the recording of "Summer Rain" (Musical Examples 18 and 19) postdates several of the live versions of "Taurus" and more properly belongs with the songs in the next section of Dr. Ferrrara's report that discusses songs released after "Taurus."

42. Since "Summer Rain" and the next three examples postdate "Taurus," they do nothing to undermine the originality of the guitar passage in "Taurus." Moreover, they are less similar to either "Taurus" or "Stairway" than these two works are to each other. "Ice Cream Dream" (Musical Example 20) does not contain the essential second tone of the progression at all (#7 or G# in the key of A minor). Moreover, Ferrara's analysis and transcription are incorrect. The first chord of the song is G minor, not A minor meaning that he does not even get the correct key in his transcription. "Thoughts" (Musical Example 21) and "And She's Lonely" (Musical Example 22), like the standard progressions in paragraph 17 of this report, arrive at the fifth degree of the progression (E in the key of A minor).

43. Mr. Mathes' report is colored by effusive praise and hyperbole regarding Led Zeppelin and its individual members. Adjectives such as "unrivaled," "inimitable," "incredible," "gorgeous," "wonderful," and "monumental," "extremely particular and very special" and "completely unique and beautifully so" do little to further impartial analysis of the musical expression at issue. Given Led Zeppelin's well known history of having appropriated from other works perhaps he should adopt a more cautious and neutral tone in his appraisal of their creative accomplishments. In any event, much of his report reads more like an article in a fan magazine. "John Paul Jones was not only a great Bass player, but Zeppelin's secret weapon from an arrangement standpoint." Robert Plant's "artistry became the model for all Rock singers" and "Jimmy's" "legendary" solo made "rock history." Such comments draw into question his ability to offer objective analysis and appraisal of the issues in this case.

44. I also find his constant use of the term "line cliché" (which he attributes to his training at Berklee College of Music) not particularly informative. Many of the other elements in "Stairway," in particular the two and three-chord vamps, could also be considered clichés. Still, he recognizes that the guitar passages at issue in this case are more than clichés and contain "special" elements. While he is correct in saying that the passage in "Stairway" ascends higher than the line in "Taurus," he does not directly compare the pitches note-for-note as I have in my analysis which shows that nearly 78% or 14 of the first 18 eighth-note slots contain the same pitches. Much of the higher range of "Stairway" is due to mere octave displacement (placing the same pitch class at a higher octave), not because of the introduction of new pitches to the sequence.

**EXHIBIT 1**
**19**

**01793**

18

## PART IIIB
### Response to Rebuttal Reports

45. In paragraph 5 of the Ferrara Rebuttal, there seems to be confusion over the ways we use the term the term "transcription." I use the term in the sense of a rendering of a sound recording in musical notation. In an attempt to avoid confusion (which may not have been entirely successful) I consistently use the terms "deposit copy lead sheet," "deposit copy" or "lead sheet" when referring to the document EU3522. Dr. Ferrara is correct in a technical sense that it too is a "transcription" of a performance, but to my knowledge we do not have specific information regarding its source and creation. Indeed, Dr. Ferrara refers to his own "transcription" of the "Taurus Studio Version" which he includes as Visual Exhibit B in his Rebuttal. I think Dr. Ferrara understood the distinction between the "deposit copy lead sheet" and the "transcription" of the "Taurus" studio recording and that my criticism was based on his exclusive reliance on the former in his analysis.

46. Ferrara Rebuttal discussion of harmony (at pages 6, 7 and Rebuttal Attachment B). As for the creative and original way the harmonic pattern and descending chromatic line are used in these works, I stand by my original analysis. The chords and pattern used in "Taurus" and "Stairway" do not simply use five-sixths of a common pattern. They come to rest on the fifth pitch (F) for exactly the same duration and they both avoid the movement to the fifth degree (E) and expected movement through the fifth or dominant before resolving back to the tonic (A).

47. The examples mentioned by Dr. Ferrara do NOT avoid the fifth degree (E) or sixth note of the pattern. Some, such as "Cry Me a River" arrive at the fifth degree (E) after a slight detour and this song sustains an E7 chord for two beats in the fourth measure,

48. Similarly, "How Insensitive," after briefly deferring its arrival, also come to rest on the final pitch of the sequence (E) in order to cadence back to A minor. Moreover, the harmonies placed over this chromatic line are very different from those found in "Taurus" and "Stairway."

49. I am somewhat puzzled by Dr. Ferrara's citing of "Michelle" since in his own report he shows the progression moving to E7 or the final note of the pattern for an entire measure (examples 14 & 15).

50. "Meaning of the Blues" has a very different harmonic rhythm and passes through the F very quickly after only one beat rather than sustain it for a full measure.

51. For their first three measures, "Taurus" and "Stairway" share exactly the same pitches and durations in the chromatic line as well as nearly identical harmonies. None of the examples cited by Dr. Ferrara approach this level of similarity.

**EXHIBIT 1**
**20**
**01794**

52. In Paragraphs 22 and 23 at page 8 of the Ferrara Rebuttal, Dr. Ferrara chastises me for supposedly omitting duration in my comparison and only providing a pitch sequence. My chart does not merely portray pitches. As I carefully explain, each box in the table represents an eighth note. The numbers 1 to 4 in the top row indicate the four beats in each measure. The placement of each pitch is clearly indicated, and as I have taken great care to note, the pitch sequences in both "Taurus" and "Stairway" are set to the same rhythms. The most important part of the note is its beginning which places it in a metric framework. The actual amount of time each note in the guitar passages is sustained is somewhat difficult to notate since many of the guitar strings are allowed to ring out and with reverb and other effects in the recording it is not always easy to perceive exactly where the note ends. Indeed, the guitar tablature notation in the Stairway sheet music contains the instruction to "let ring" and a performance instruction at the bottom of the first page indicates that the "open first string is not played but rings sympathetically" (See Visual Exhibit C in the Ferrara Report dated February 10, 2016). Although we might quibble over a very few notes, I essentially have no argument with Dr. Ferrara's transcriptions of "Taurus Studio Version" and agree with him that many of the notes are allowed to ring out (although not with quite the regularity that he depicts). Their rhythmic metrical placement is the same as mine as regards a regular stream of eighth notes. In other words, every note that is placed in the same column is sounded at the same time in each composition and set to the same rhythmic placement.

53. While it is true that pitch sequences that are set to different rhythms and meters may sound quite different, similar pitch sequences that are set to similar rhythms and meters will almost invariably sound alike. Dr. Ferrara several times offers as an example the pitch sequences of "Rock of Ages" and "Rudolph the Red-Nosed Reindeer." What makes the first seven pitches of these songs sound dissimilar is their setting to radically different rhythms and metric schemes. "Rock" is in 3/4 (like a waltz) and "Rudolph" is in 4/4 or common time.  In each of these works, the phrases begin and end on different beats. By way of contrast, the pitch sequences in I describe in "Taurus" and "Stairway" are set to exactly the same rhythms, meter, and the phrases begin and end on the same beats. This is the whole point of my chart or table in Example 1 of my original report and Examples 5 and 7 of this report.

54. Further, my chart is based on the transcriptions of "Taurus" and "Stairway" contained in my visual exhibits B and C and is intended facilitate comparison as well as to help laypersons who do not read music to comprehend the sequence of pitches *and their placement in time*.

55. As for Dr. Ferrara's criticism that my report fails to discuss "Stairway" in its entirety (Ferrara Rebuttal paragraphs 31-35 at pages 11 and 12, I have thoroughly analyzed the portion of each work that contains substantial similarities: Part I of "Stairway" and the portion of "Taurus" represented in the deposit copy lead sheet and live recordings. In general terms I have discussed the quantitative and qualitative value of the musical expression held in common.

56. Most of Dr. Ferrara's discussion of prior art merely replicates the analysis and discussion contained in his previous report.

**EXHIBIT 1**
21
**01795**

20

57. **I believe it is very significant that Dr. Ferrara agrees that there are similarities in these two works and that "there are qualitative grounds for *increasing* [italics original] the 2.23% strictly *quantitative* value of the music in "Stairway" that is similar to the "Taurus Studio Version."**

57. **I am in total agreement with Dr. Ferrara when he goes on to describe "this similar music" as "one of the most memorable parts in "Stairway."** Please note, however, that like my report, his analysis also does not offer a final assessment of the quantitative *and* qualitative value of this similar expression.

58. Ferrara Rebuttal Attachment A. Form Generally speaking, analysis of formal structure in music attempts to identify and denote similar passages pf music. Sections that contain similar harmonies and melodic structures are assigned the same letter.  Dr. Ferrara's analysis of the form glosses over the fact that the guitar passages at issue are four measures in length and are repeated in each work four times in the studio version of "Taurus" and six times in "Stairway" and numerous live versions of "Taurus." I believe that my analysis more effectively conveys the form and these basic repetitions. Indeed, the deposit copy lead sheet of "Taurus" clearly indicates an AABAAB form. Since we are discussing the guitar passages in "Stairway" it also makes more sense to clearly indicate where each iteration appears. Dr. Ferrara's analysis of form in Attachment A of his Rebuttal, while not incorrect, obfuscates these structural appearances.

**EXHIBIT 1**
**22**
**01796**

### PART IV
### Probative similarities: Discussion of peripheral elements

59. Because access is contested in this matter, it would seem to me that a discussion of non-protectable elements is relevant as long as they have a probative value in indicating whether or not copying occurred and they are clearly identified as NOT being potential copyright infringements. It is my understanding that such evidence has often proved important in infringement cases. For example, sometimes arbitrary and meaningless computer code is hidden in software or fictitious phone numbers and addresses inserted in telephone directories in order to provide incriminating evidence should copying occur. I believe this evidence is considered purely for its probative value and nothing more. **In some cases where access is not at issue (for example, in the recent "Blurred Lines" case or in Newton v Diamond), it would not be necessary to consider this kind of evidence.** Clearly, if members of Led Zeppelin copied musical expression from Spirit, it would have been most likely taken directly from the widely disseminated recording of "Taurus" or from live performances. What follows is a partial listing of probative similarities – similarities that indicate copying but that, taken by themselves, do not necessarily rise to the level of plagiarism of protectable expression.

60. Besides the melodic, harmonic, rhythmic, and structural musical expression examined in Parts I and II above, certain elements related to style, texture, and performance also indicate copying. While I disagree with the notion that some of the elements discussed below (for example, instrumentation, orchestration, and tempo) must always be regarded *strictly* as performance elements, for the sake of clarity I have confined my discussion of these elements to this section.

61. First, **a very significant detail that is strongly suggestive of copying is the rapid, double-time finger picking that is heard in the guitar in the same spot in both the live versions of "Taurus" and in "Stairway."** These rhythmically dense variations on the Section A guitar passage occur in the sixth and final iteration of the passage in STH at measure 32 in the transcription (**2:00 in the recording**) in "Stairway" and in the later iterations of the passage in the live versions of "Taurus." For example, in the version dated July 31, 1967 the double-time fingerpicking of the guitar part occurs at almost exactly the same spot as in "Stairway" (the sixth and final iteration at **1:58 in the recording**). In the version dated August 8, 1967 the double-time fingerpicking also occurs in the sixth and final iteration (because this version is performed at a slower tempo it occurs at 2:30 in the recording). It is very likely that anyone who heard Spirit perform "Taurus" live experienced this variation to the guitar passage. In my opinion, **to consider it mere coincidence that the same technique is used by Randy California and Jimmy Page for these guitar passages in the same spot in their recordings of both these works stretches credulity to the breaking point.**

67. Tempo, Orchestration/Instrumentation, and Style. As mentioned above, matters such as tempo and orchestration might also be considered as part of the compositional strategies of the composer. Indeed, many movements within classical works are identified by their tempos: allegro, andante, vivace, etc. or by the instruments they are performed on (for example, Piano Sonata,

**EXHIBIT 1**
**23**

**01797**

22

Violin Concerto, etc.). While it is true that these compositions would retain their identity even if a performer chose to play them at a different tempo or on a different instrument, clearly the composers saw these elements as important to their compositions.  In the case at hand, it is significant that the realizations of the studio versions of "Taurus" and "Stairway" are set to almost exactly at the same tempo as seen below. The difference between these two tempos (around 1%) would be imperceptible to the vast majority of listeners. The sheet music and lead sheets to "Stairway" in Dr. Ferrara's Visual Exhibit C in his first report contains the following indications of tempo: "Slowly," (twice) "Moderately," and more precisely "Slowly" (quarter note equal to 72 BPM).

Tempos
Taurus  (Studio version)          ~72
Stairway (Part I)                       ~73

68. Though not protectable in and of themselves, tempo and instrumentation could be considered compositional elements, as confirmed in these notations and in the historical concerns of composers to have their compositions performed not only with the right notes and rhythms, but also at the correct tempo and on the proper instrument.

69. Instrumentation and orchestration are closely related to style in music. For example, listeners typically associate a pedal steel guitar strongly with country music (or Hawaiian), a distorted guitar with rock, violins and other orchestral instruments with classical, saxophone with jazz, and acoustic guitar with folk. Clearly in the works at issue in this case, the composers made intentional choices to use instruments associated with classical and folk music. "Taurus" uses a Renaissance and Baroque era instrument, the harpsichord, as well as flute, strings, and acoustic guitar. "Stairway" features acoustic guitar along with Renaissance and Baroque era recorders (a type of end blown flute). The guitar sheet music (with the tablature) in Dr. Ferrara's Exhibit C contains the explicit instructions at the beginning: "Chamber Folk to Heavy Rock." The term "chamber" is an obvious reference to classical music,[10] and I think that the term "chamber folk" neatly encapsulates the style of both these works.

70. Another probative similarity between the recordings of T and STH is the overall texture and orchestration. Both songs feature acoustic guitars on the main theme of the passage discussed immediately above. This acoustic guitar part is the signature theme in both songs. The passages at issue also are supported by sustained chords or "pads" using string or recorder sounds. The descending chromatic line is doubled by string or recorder sounds in both songs (after the first iteration of the signature theme in STH and after the second iteration in T).  Example 10 provides transcriptions of these two parts. In both works the composers have chosen to orchestrate these passages similarly using recorders or strings.

---

[10] "Chamber music is a form of classical music that is composed for a small group of instruments—traditionally a group that could fit in a palace chamber or a large room." https://en.wikipedia.org/wiki/Chamber_music

EXHIBIT 1
24
01798

23

Example 10. String and recorder parts in "Taurus" and "Stairway to Heaven"



71. The presence of acoustic guitar, strings, recorder/flute sounds, and harpsichord as well as the noticeable absence of bass and drums (and other instruments characteristic of the rock idiom) lend both works a decidedly "classical" style,  particularly evoking a Renaissance atmosphere.

72. In both songs, the descending bass line is doubled by instruments with very similar sounds – a cello in T and a bass recorder in STH. This thickening of the  texture, occurring after the initial exposition of the theme, contributes to the gradual  build in intensity.

73.  Other important similarities provide additional evidence of copying. In  both songs the passages are set to "pads" or sustained strings or flute sounds. In T  these pads are heard in the first, second and third iterations of the passage. The  pads in STH occur in the second, fourth, fifth, and sixth iterations (see measures 5,  21, 33, and 37 in the transcription of STH). While the pads contain some different  pitches, in both songs they begin with the same sustained pitch as the highest note, E. The top note of any vertical sonority is almost always the most prominent.

74. I believe these similarities are indicative of copying. Besides the substantial similarities in melody, harmony, rhythm, and form outlined in the first two sections of this report, aspects of the recordings have clear probative value in establishing copying beyond a reasonable doubt. **In particular, an extremely telling detail is the shift to the double-time fingerpicking guitar passage that happens in the later iterations of this passage in many of the live versions of "Taurus" and exactly in the same place in two of them: the sixth and final iteration of the passage** (versions from 7/31/1967 and 8/8/1967)**.** None of the other art cited by defendants' experts (some of which was created after "Taurus") is as similar to "Taurus" and "Stairway" as they are to each other. The preponderance of the evidence, in my professional opinion, indicates that "Stairway" copies substantial protectable musical expression from "Taurus."

EXHIBIT 1
25
01799

24

Respectfully submitted,

Alexander Stewart, Ph.D.
Professor of Music
University of Vermont

**EXHIBIT 1**
**26**
**01800**

# EXHIBIT 2

### MASTER MUSICIAN – LISTEN, ANALYZE AND PERFORM *STAIRWAY TO HEAVEN* AND *TAURUS*

### PART A: ANALYSIS PERTAINING TO A COMPARISON OF THE DEPOSIT COPY OF *TAURUS* AND THE COMPOSITION *STAIRWAY TO HEAVEN* AS EMBODIED IN THE SOUND RECORDING

I was retained as an expert in this case to listen to and analyze *Taurus* and *Stairway to Heaven,* to perform both pieces as a master musician and faithfully replicate the original recordings for the purpose of creating multitrack facsimiles. I also created a full transcription of *Taurus* and incorporated by reference the corresponding audio for both *Taurus* and *Stairway to Heaven,* for use to the extent the court allows. I also participated in recording the deposit copy of *Taurus.*

**To be clear, I include references to the composition *Taurus* as embodied in the sound recordings should they be allowed to be introduced for whatever reason; however, the focus of <u>PART A</u> of my report centers on a comparison of the deposit copy of *Taurus* and the composition of *Stairway to Heaven* as it is embodied in the sound recording.**

I am proficient on the following instruments (years of experience in parentheses):

- Drums/percussion (40 years)
- Electric Bass (35 years)
- Guitar (35 years)
- Piano/keyboards (30 years)
- Voice (40 years)
- Saxophone (35+ years)

I was engaged to play the following instruments on the *Taurus* and *Stairway to Heaven* re-recordings:

- Drums
- Electric Bass
- Electric Piano
- Other Keyboards
- Percussion

I was also asked to then analyze both pieces of work, *Stairway to Heaven* and *Taurus*, from a performance and compositional perspective and to provide a complete transcription of *Taurus* which is attached.

It is my understanding that I will also testify and perform at time of trial.

**EXHIBIT 2**
**27**
**01802**

## QUALIFICATIONS

**University Professor**
- I have also been a professor of music on the University level for 17 years, beginning in 1999, the year that I graduated Summa Cum Laude from Temple University's esteemed Esther Boyer College of Music. I have taught music theory, ear training, styles and analysis, improvisation, pedagogy, private lessons and have coached large and small ensembles in multiple genres. I am currently an Adjunct Assistant Professor on the faculty of The University of the Arts where I have been teaching since 2006. Please see my attached CV for further clarification.

**Master Musician/Session Musician.**
- As a master musician/session musician I am required to perform, create, analyze  and address all aspects of music creation at the highest level. My services are in  demand as a result of years of cultivating a discriminating musical ear and the ability to execute musical ideas in innumerable genres on a variety of instruments.  I have recorded, performed and toured with world-renowned musicians in the genres of jazz, classical, pop, rock and other styles. My credits include releases on Interscope Records, Blue Note, Argo/Decca, Sony Publishing, and performances on television including "Late Night with Conan O'Brien." I also have extensive experience as a musician, recording engineer and producer at premier studios in Philadelphia, New York and Los Angeles. Please see my attached CV for further clarification.

I was retained as an expert in this case to listen to and analyze *Taurus* and *Stairway to Heaven,* to perform both pieces as a master musician and faithfully replicate the original recordings for the purpose of creating multitrack facsimiles. I also created a full transcription of *Taurus* and incorporated by reference the corresponding audio for both *Taurus* and *Stairway to Heaven.* I submitted an Expert Report in this case along with an Expert Declaration which contained rebuttal of defendants' reports (Ferrara and Mathes). I then submitted a Supplemental Declaration produced to answer dispute regarding the deposit copy in Taurus and if after further consideration of defendants expert reports, rebuttals, and declarations if my conclusions or opinions in my reports or declarations change. I had stated with conviction that they did not. I now submit this Amended Report as required by the Court.

I note at the outset that all experts in this case—except Ferrara—analyzed both the deposit copy and the recordings to render a full and complete analysis and opinion. This means that 5 of the six experts involved in this case (on both sides plaintiff and defendant) used the same method where as one defense expert Ferrara used a different method. It should be noted that even defendants experts conflict each other on the proper analysis. The difference between the methodology used by Dr. Ferrara in coming to his musicological opinions as compared to mine and the other experts in this case, is that Dr. Ferrara had taken a narrow—fishbowl approach— of solely considering the deposit copy of Taurus as compared to the sound recording of Stairway to Heaven. My analysis (and that of the other experts), had taken a holistic approach in considering both the recordings of Taurus along with the deposit copy.

Page **2** of 6

**EXHIBIT 2**
**28**
**01803**

Moreover, there is no dispute among the experts that the intro of *Stairway to Heaven* is qualitatively one of the most memorable parts of the composition. Furthermore, Dr. Ferrara in his Expert Report affirms that it is similar to *Taurus*.

> **"Some parts in a musical composition can be more qualitatively valuable than other music in the same composition. For example, if <u>the music in "Stairway" that is similar to "Taurus" includes one or more of the most memorable parts of "Stairway"</u> …"**

(Ferrara Report; Attachment F – Value Assessment; Paragraph 12)

Additionally, Mathes in his Rebuttal Report confirms that I am correct:

> <u>**Johnson is correct that the initial guitar part in Stairway is very significant, but he is incorrect that it is the most important single element of Stairway to Heaven.**</u>

(Mathes Rebuttal Report; Paragraph 14)

The audio attached by Mathes in his Report further indicate that his analysis and comparison of Taurus to Stairway was consistent with Plaintiff's Experts analysis. (Mathes Report; Paragraph 25. Mathes Audio Exhibits to his Report)

Mathes Rebuttal further states that "Stewart says that 80% of the pitches are the same. With the same underlying line cliché, this would be expected." However, it should be noted that the descending melodic line encompasses only a portion of what is substantially similar. The harpsichord part of *Taurus* (as represented in the deposit copy) contains six notes that correspond exactly to the melody of *Stairway to Heaven*. This fact doesn't address the striking similarity of the guitar parts on the recordings. Furthermore, the bass clef part on the deposit copy of Taurus strongly suggests the guitar part which although is not fully represented, is present represented and defined in the deposit copy.

## <u>Composition Is The Part Of The Song Which Remains The Same From Performance To Performance</u>

"A musical composition's copyright protects the generic sound that would necessarily result from any performance of the piece," <u>Newton v. Diamond</u>, 204 F. Supp. 2d 1244, 1259 (C.D. Cal. 2002). In other words, the composition is that part of the song that remains constant from performance to performance to performance. Here, there is no dispute among any musicological expert that the compositional element that remains unchanged from each and every performance of Taurus is the compositional elements embodied in the performance of the guitar.

The compositional elements embodied in the guitar in Taurus are the compositional elements of the song which remain constant from performance to performance to performance. Please note that I am not suggesting that performance elements are protectable. Rather, what I am saying—and what is undisputed—is that the composition is that part of the song which remains unchanged from each and every performance of Taurus. And, the part of the song which remains unchanged from each and every performance of Taurus—from performance to performance to performance is the composition embodied in the guitar.

**EXHIBIT 2**
**29**
**01804**

Why do we know this? Because we have recordings of Taurus which span roughly 30 years. In each and every performance of Taurus, the compositional element which remains unchanged are the compositional elements embodied in the guitar part.

Here is a list of every recording of Taurus that was produced in discovery and from what I am told known to exist. The list is in chronological form, except that the Taurus Album Recording is listed first:

| | | |
|---|---|---|
| a. | Taurus – Album Recording (11/10/1967): | Audio Exhibit 32 |
| b. | Taurus – Live at the Ash Grove (7/10/1967): | Audio Exhibit 33 |
| c. | Taurus – Live at the Ash Grove (7/31/1967): | Audio Exhibit 34 |
| d. | Taurus – Live at the Ash Grove (8/8/1967): | Audio Exhibit 35 |
| e. | Taurus – Demo Recording (8/1967): | Audio Exhibit 36 |
| f. | Taurus – Live at Kaleidoscope (4/5/1968): | Audio Exhibit 37 |
| g. | Taurus – Live at The Time Coast (1992): | Audio Exhibit 38 |
| h. | Taurus – Live Acoustic (7/30/1996): | Audio Exhibit 39 |

In each of the above 8 recordings of Taurus, the composition which remains unchanged— regardless of performance—is the guitar part and the composition embodied therein. This cannot be disputed.

This is true regardless if one listens to the very first recording of Taurus (7/10/1967)(Audio Exhibit 33) or the very last recording of Taurus (1996)(Audio Exhibit 39).

**Individual Performances And Instrumentation Are Not Protectable Compositional Elements Of A Song**

Nothing in my musicological analysis considered or factored the individual performances of Taurus or the instrumentation as these aspects of music are not protectable. For this reason, those aspects were discarded in rendering my opinions.

For example, the Taurus Album Recording (Audio Exhibit 32) contains individual performance aspects and instrumentation that are not—and never were—part of the composition or compositional elements of Taurus.

These separate instruments that make up the Taurus Album Recording (Audio Exhibit 32), which were re-recorded for purposes of this case are as follows:

| | | |
|---|---|---|
| a. | Acoustic Guitar | (Audio Exhibit 22) |
| b. | Cello 1 | (Audio Exhibit 23) |
| c. | Cello 2 | (Audio Exhibit 24) |
| d. | Cymbal | (Audio Exhibit 25) |
| e. | Flute | (Audio Exhibit 26) |
| f. | Harpshichord/Piano | (Audio Exhibit 27) |
| g. | String Bass | (Audio Exhibit 28) |
| h. | Viola | (Audio Exhibit 29) |
| i. | Violins | (Audio Exhibit 30) |

Many of these instruments are only heard in the Taurus Album Recording (Audio Exhibit 32). For example: Cello 1; Cello 2, Flute; Viola; and Violins.

These instruments and the parts that they are playing are "performance elements" not "compositional elements" of the song Taurus. These "performance" and "instrumentation"

**EXHIBIT 2**
**30**
**01805**

aspects of Taurus are really nothing more than an orchestral introduction to Taurus and accompaniment for purposes of the Album Recording, which are not protectable. Moreover, the "performance" and "instrumentation" aspects of the Taurus Album Recording and the other recordings of Taurus which are not protectable compositional elements of Taurus are identified below (by striking them out):

|     |     |     |
| --- | --- | --- |
| a. | Acoustic Guitar | (Audio Exhibit 22) |
| ~~b.~~ | ~~Cello 1~~ | ~~(Audio Exhibit 23)~~ |
| ~~c.~~ | ~~Cello 2~~ | ~~(Audio Exhibit 24)~~ |
| ~~d.~~ | ~~Cymbal~~ | ~~(Audio Exhibit 25)~~ |
| ~~e.~~ | ~~Flute~~ | ~~(Audio Exhibit 26)~~ |
| f. | Harpshichord/Piano | (Audio Exhibit 27) |
| g. | String Bass | (Audio Exhibit 28) |
| ~~h.~~ | ~~Viola~~ | ~~(Audio Exhibit 29)~~ |
| ~~i.~~ | ~~Violins~~ | ~~(Audio Exhibit 30)~~ |

The only time this orchestral introduction and accompaniment appear is on the Taurus Album Recording. It is not part of the composition of Taurus that must remain unchanged from performance to performance. For that reason, those performance and instrumentation elements must be discarded in coming to a musicological opinion. (I note that I took the liberty to also strike the Cymbal from my analysis even though this can be heard in other performances of Taurus because it too should not be considered part of the composition).

**This leaves the protectable composition elements of Taurus which are embodied in the:**

|     |     |     |
| --- | --- | --- |
| **a.** | **Acoustic Guitar** | **(Audio Exhibit 22)** |
| **b.** | **Harpshicord/Piano** | **(Audio Exhibit 27)** |
| **c.** | **String Bass** | **(Audio Exhibit 28)** |

Regardless if one listens to the Taurus - Album Recording (1968)(Audio Exhibit 32), or the last known performance of Taurus, Taurus – Live Acoustic (7/30/1996), it is the composition of the guitar which is the salient feature, which is represented in the deposit copy.

## STAIRWAY TO HEAVEN

### Familiarity with Led Zeppelin and *Stairway to Heaven*

- I obtained my first copy of "Led Zeppelin IV," the album that contains *Stairway to Heaven* at the age of 10. Since then I have listened to the album countless times. *Stairway to Heaven* was an unavoidable staple on FM radio and my turntable throughout my formative years.  Despite my lifelong admiration for Led Zeppelin I must admit that the revelations of their unattributed "borrowing" of lyrics and music from prior artists is disappointing and alarming. *Whole Lotta Love, Dazed and Confused* and *Babe I'm Gonna Leave You* are just a few of the well-known examples of this unfortunate practice. However, to this musician, the most egregious of these violations is the lifting of substantial musical information contained in the deposit copy of *Taurus* and its repurposing in the most iconic portions of *Stairway to  Heaven.*

### Analysis

- *Stairway to Heaven* begins with one of the most iconic musical introductions in

Page **5** of 6

**EXHIBIT 2**
**31**
**01806**

the history of popular music. The arpeggiated guitar chord sequence in the introduction, which also underlies parts of the verses, is arguably the primary defining musical element of the entire recording and composition, even when considered in the context of the extended and complex form of the entire song.  As the song progresses the musical elements begin to stray from the initial  statement, eventually abandoning the distinct arpeggiated guitar. Despite this fact the initial guitar arpeggios are certainly the "Name That Tune" part of the  recording, surest to lead to a positive identification of the song.

### Recording Process

- In the reconstruction of *Stairway to Heaven* I was tasked with identifying and re-creating the exact electric bass, drum set and electric piano parts as played on the original recording. I recorded each instrument individually, faithfully re-   creating each instruments' parts. Great care was taken to capture tones,  articulations, dynamics and overall performances that mimicked those contained  on the original recording. Performances were executed while listening to the  original *Stairway to Heaven* recording for reference.

**Comparative Analysis of Original
*Stairway to Heaven* to Re-Recorded *Stairway  to Heaven***

- In my opinion, the performances on the reconstruction of *Stairway to Heaven* are virtually identical to the original. Every nuance was considered and analyzed in  an effort to impart not only the pure musical information but also the *je ne sais  quoi* that gives *Stairway to Heaven* its particular character and mood. If the re-  creation and the original are synchronized, a simple A-B comparison will confirm these assertions. Furthermore, I incorporate by reference the audio files which constitute the re-recording of *Taurus* and *Stairway to Heaven,* both of which I was heavily involved in creating. Even the most discriminating listener will agree that these are faithful re-creations, held to the highest level of professional musical certainty.

**<u>TAURUS</u>**

### Familiarity with Spirit and *Taurus*

- As a performing and recording musician for nearly 40 years I have had occasion  to listen to a staggering amount of music. Over the course of my career I have  become somewhat familiar with the music of "Spirit," especially the selection  *Taurus*, largely due to its undeniable similarity to *Stairway to Heaven*. I am now  especially familiar with every detail of the recording, having transcribed it note  for note.

### Analysis

- The deposit copy of *Taurus* contains two basic elements: a melodic line in the treble clef and a partially arpeggiated sequence of notes in the bass clef. Chords and accompaniment that are not, strictly speaking, completely revealed in the deposit copy are easily inferred by any musician charged with interpreting the printed music.

**EXHIBIT 2**

**32**

**01807**

**Recording Process**

- I was responsible for recording an acoustic guitar performing only the notes contained in the deposit copy of *Taurus,* as well as what I consider to be reasonable, conservative interpretations of the deposit copy, using musical elements contained therein.
- I was also, in terms of the re-creation on the recording of *Taurus,* responsible for re-creating the harpsichord, strings and percussion. We took great care to listen to the original recording through various monitoring sources to obtain the clearest possible audio image of the recorded content. We then proceeded to perform the individual parts, one at a time, while listening to the original recording for reference.

**Comparative Analysis of Original *Taurus* to Re-Recorded *Taurus***

- The re-creation of *Taurus* is virtually identical to the original. Production values, instrumentation and performances were identified and analyzed, allowing for a faithful reproduction of the original recording.


**COMPARATIVE STUDY OF TAURUS AND STAIRWAY TO HEAVEN**

- The first three pitches of the vocal melody of *Stairway to Heaven* that correspond to the lyric "There's a la[dy]"are identical to the first three notes of the deposit copy of *Taurus,* despite being offset rhythmically by one beat.  As the melody of *Stairway to Heaven* progresses other striking similarities emerge:

  - The words "all that glitt[ers]" in *Stairway to Heaven* are melodically identical to the deposit copy of *Taurus* during the equivalent part of the phrase in *Taurus.*
  - Equivalent similarities are found during the remainder of Part I in both A  and B vocal parts (words and portions of words in ***bold italics*** indicate  melodies from *Stairway to Heaven* that correspond to the deposit copy of *Taurus*):

    ***There's a la****dy who's sure **all that gli****tters is gold  And she's buying a stairway to heaven.
    **When she gets** there she knows, *if the stores* are all closed
    With a word she can get what she came for.
    Ooh, ooh, and she's buying a stairway to heaven.

**EXHIBIT 2**
**33**
**01808**

*There's a sign* on the wall *but she wants* to be sure 'Cause you know sometimes words have two meanings.  *In a tree* by the brook, *there's a song*bird who sings, Sometimes all of our thoughts are misgiven.

Ooh, it makes me wonder,  Ooh,
it makes me wonder.

*There's a feel*ing I get *when I look* to the west,  And my spirit is crying for leaving.
*In my thoughts* I have seen *rings of smoke* through the trees,
And the voices of those who stand looking.

Ooh, it makes me wonder,  Ooh, it
really makes me wonder.

*And it's whis*pered that soon, *if we all* call the tune,  Then the piper will lead us to reason.
*And a new* day will dawn *for those* who stand long,
And the forests will echo with laughter.

- Significant portions of the melodic content of *Stairway to Heaven* correspond almost exactly and, at times, exactly, with the deposit copy of *Taurus,* calling into question the originality of *Stairway to Heaven.*

- The guitar introduction of *Stairway to Heaven* is substantially similar to the deposit copy of *Taurus*.  Nearly all the pitches contained in one are contained in the other.  The rhythms are substantially similar. In my opinion, this opening guitar part for *Stairway to Heaven* is its calling card and most distinctive compositional element and it corresponds closely with many parts of the deposit copy of *Taurus*. If even the slightest reasonable interpretative liberties are taken when reading the deposit copy one can easily arrive at a piece of music that even further calls to mind the compositional elements found in the guitar part of *Stairway to Heaven* as embodied in the sound recording.

- Of the musical parts I was asked to replicate from *Stairway to Heaven*, none were recognized as far as songwriting credit is concerned. The electric bass and  keyboard parts, created and performed by John Paul Jones, were not, insofar as I  am aware, included in the songwriting credit. The same is true for the drum set  part, created and performed by John Bonham.

- If *Stairway to Heaven* is stripped down to the bare elements that received songwriting credit, the listener is left with two parts:

Page **8** of **6**

**EXHIBIT 2**
**34**
**01809**

- o an arpeggiated guitar part, the signature element, which bears substantial similarity to the deposit copy of Taurus. and
- o a vocal melody that bears significant resemblance to the treble clef in the deposit copy of *Taurus*, followed by a series of riffs, chord progressions and solos.

- The most essential, elemental portion of *Stairway to Heaven* exhibits substantial similarity to the equivalent portion of the deposit copy of *Taurus*.  Furthermore, crucial melodies found in *Stairway to Heaven* appear to be directly mined from music that is found in the deposit copy of *Taurus*.

**When analyzing the deposit copy of TAURUS it becomes clear that many of the harmonies and actual pitches present in the compositional elements as played on acoustic guitar (and embodied in the sound recording) are contained therein. The deposit copy lead sheet clearly contains compositional elements embodied within the recording.**

**The deposit copy of TAURUS contains ample musical information to lead directly to the signature acoustic guitar part as found on the sound recording**.

**PART B: ANALYSIS PERTAINING TO A COMPARISON OF THE <u>COMPOSITIONAL ELEMENTS EMBODIED IN THE SOUND RECORDING OF <i>TAURUS</i></u> AND THE <u>COMPOSITION <i>STAIRWAY TO HEAVEN</i> AS EMBODIED IN THE SOUND RECORDING</u> AND RESPONSES TO FERRARA AND MATHES**
.

*The guitar introduction of Stairway to Heaven is, in mood, tempo and specific pitch information, strikingly similar, and in many ways, identical to the arpeggiated guitar part in Taurus.  In my opinion, this opening guitar part for Stairway to Heaven is its calling card. The same is true for the arpeggiated guitar in Taurus. Therefore, in my opinion, the primary identifying element for Stairway to Heaven is, in every relevant manner, a near replica of the arpeggiated guitar in Taurus, also its primary musical element.*

*Having completed reviewing the expert reports of Ferrara and Mathes I am compelled to respond to a number of issues, some methodological, some factual and some simple matters of interpretation. Some of the assertions, especially in the case of Lawrence Ferrara, are not only factually inaccurate but disingenuous in their presentation. I will address the objectionable statements and claims below.*

<u>**REBUTTAL TO LAWRENCE FERRARA'S EXPERT REPORT**</u>

As a trained musician and educator I can say without reservation that, having listened to and analyzed sound recordings of both *Taurus* and *Stairway to Heaven*, any claim of a lack of access to or awareness of *Taurus* in its recorded form is simply impossible to believe. Based on the information contained in the deposit copy alone I am highly suspicious. But when the

Page **9** of 6

**EXHIBIT 2**
**35**
**01810**

compositional elements as embodied in the sound recordings of both selections are compared I find it impossible that Led Zeppelin had no knowledge or exposure to *Taurus*. The common elements defy explanation through coincidence or prior art, period.

Many of Ferrara's claims about the supposed lack of similarity between *Taurus* and *Stairway* employ comparisons of the **deposit copy** of *Taurus* with **transcriptions of the recording** of *Stairway* from "Led Zeppelin IV." This is a simple "apples to oranges" fallacy of comparison. When the pure musical data is considered in context of its **compositional** musical elements (apples to apples) the introduction of *Taurus* is not only **strikingly similar** to *Stairway* but, for the purposes of this discussion, nearly identical for three crucial measures and **strikingly similar** for six of eight of the initial measures, which are iterated numerous times.

These opening statements are more than mere introductions. They are crucial, indispensable calling cards for each of the pieces. I would argue that if the first eight measures of both *Taurus* and *Stairway* are not only *strikingly similar* but *essential to the identification* of each piece one must at least submit that these portions bear not only *structural* but *essential* similarity. Analogously, if two homes are built with identical foyers and great rooms on the first floor, one would likely describe them as bearing significant structural similarities, even if the upstairs bed/bath configurations are vastly different.

Furthermore, the first, second, third, and seventh, eighth and ninth pitches of the melody of *Stairway* correspond exactly to the harpsichord part in both the deposit copy and the recording of *Taurus*, although the first three notes of the melody of *Stairway* occur one beat earlier, a minor point in the overall context of this comparison. The similarities between the compositional elements (disregarding performance elements) of *Taurus* and *Stairway to Heaven* are significant and at times striking.

Moreover, I strongly object to the idea that extrinsic evidence is somehow limited to this kind of pseudo-mathematical reduction. In the case of comparing *Taurus* and *Stairway* it is imperative to consider the combination of all of the features of the contested musical territory, including the following obvious commonalities between the two compositions and recordings, specifically the crucial "name that tune" 8 bar initial musical statement:

- Many common pitches
- Same key
- Strikingly similar rhythm
- Nearly identical articulation
- Strikingly similar stylistic qualities
- Nearly identical tempo
- Identical primary instrumentation (both crucial parts played on acoustic guitar)
- Identical phrase length of crucial initial eight-bar statements

Ferrara oversimplifies the commonalities between *Taurus* and *Stairway* by attributing any similarities to the mutual use of the "minor line cliché," words used to describe a particular musical device found in music for centuries. While both *Taurus* and *Stairway* exhibit features that can partially be described in this fashion, this common element represents only a small portion of the

Page **10** of

EXHIBIT 2
36
01811

elements that *Stairway* borrows (steals) from *Taurus.*  I will provide further clarification below.

Ferrara also claims that no significant structural similarities exist between *Taurus* and *Stairway.* While this might be true when considering the entirety of each composition, the initial eight-measure statements as compositional elements bear something *beyond* striking similarities to each other.

Ferrara also asserts that no significant harmonic similarities exist between *Taurus* and *Stairway,* yet the lion's share of his arguments are based upon **a harmonic similarity**, the "minor line cliché." If no significant harmonic similarities exist then why present a panoply of visual and audio evidence of examples of harmonic information that is common to the crucial, disputed portions of *Taurus* and *Stairway?*  This writer finds it baffling. Ferrara asserts that arpeggios and minor line clichés are simply commonplace musical devices, freely available to all with no strings attached and without preferential usage rights. This is preposterous in the context I've presented above and will continue to present below.

Ferrara claims that no significant rhythmic similarities exist between *Taurus* and *Stairway.* He cites the deposit copy of *Taurus* and the fact that he was required to "halve the note values" to properly compare the two pieces. It is at this point that I detect a hint of disingenuousness. This is what he, in other parts of his report, cites as "standard musicological practice." Ferrara cites the transcription of the *recording* of *Stairway* numerous times throughout his report but seems only to acknowledge the deposit copy of *Taurus* while ignoring the recording. If we are seeking a true comparison of facts it is only fair to compare like items, i.e. the *recording* to *recording* or *deposit copy* to *deposit copy*. I will proceed on this basis in the event that the court should see fit to introduce the compositional elements of *Taurus* as embodied in the sound recording.

Despite the supposed notational issue (lacking in completeness) of the *Taurus* deposit copy (a niggling objection) a simple side-by-side analysis of the musical composition elements done be listening and analyzing of both these selections exposes Ferrara's argument for what it is: obfuscation through minutia. It must be noted that defendants nor their experts are not confused as to the proper comparison of the musical elements to compare, consider, and analyze. It is the acoustic guitar musical composition that must be compared in the two works. It should be noted that defendants expert (Mathes) took the time to play and compare the seminal parts to both works and produced them as audio exhibits in his initial reports (Mathes Audio Excerpt 1 Stairway Guitar Parts – Contrast). They are nearly identical rhythmically in much the same way that an English yard is equal to 0.9144 meters. It is a difference of nomenclature, not substance—or confusion of what is being compared.

Ferrara states that on the basis of a quantitative analysis, "2.23% of the music in 'Stairway' embodies music that is similar, although not meaningfully similar, to 'Taurus'." I have already partially explained why, in my opinion, Ferrara grossly underestimates the degree and significance of similarity between *Taurus* and *Stairway*. From the perspective of qualitative analysis he submits that there are "grounds for *increasing* the 2.23% qualitative value of the descending line of notes in 'Stairway' that is similar to 'Taurus'." He then proceeds to explain that the lyrical composition is not quantified here, etc., thereby skewing, presumably in favor of his argument, the data.

In attachment F. 2., paragraph 7., Ferrara explains that his quantitative analysis was easily

**EXHIBIT 2**
**37**
**01812**

accomplished by analyzing the score that he created with "Sibelius," a music notation program. The result of this analysis is the mystifying 2.23% similarity metric which, according to my calculation, equals 9.5667 seconds of music.  Ferrara's grossly undersized percentage still yields an impressive *nearly 10 seconds* of what even he would describe as *similar material*.  Furthermore, Ferrara states in attachment F. 1., paragraph 2 that 18 measures in *Stairway* out of 166 contain similarities to *Taurus,* which is equivalent to 10.8% of the composition. While Ferrara does also point out that these measures also contain differences, he consistently underestimates and downplays the obvious similarities between the two pieces throughout his report.

As far as I understand, "Sibelius" does not offer the ability to quantify all of the elements listed above. As a result I find the mathematical reduction supplied by Mr. Ferrara to be of little or no value or relevance.

In the section of his report that follows, Ferrara digs into the qualitative aspect of his analysis and states the following:

> *"Some parts in a musical composition can be more qualitatively valuable than other music in the same composition. For example, if the music in "Stairway" that is similar to "Taurus" includes one or more of the most memorable parts of "Stairway", such a qualitative finding would increase the purely 2.23% quantitative value."*

The first eight measures of *Stairway* constitute eight of the most recognizable measures of rock music *ever written or recorded.* I believe this fact helps to meet Mr. Ferrara's burden of "if" as stated above.  To refer to these crucial eight measures as merely introductory material ignores not only obvious, but subjective, perception, but also testable extrinsic qualities as presented musically in the aggregate.

Ferrara states at least eight different times that the fifth bar of *Taurus* contains only the pitch of "f" which is untrue by either of his arbitrarily cited benchmarks, the deposit copy or the recording. Since the *Stairway* transcription is so frequently cited by Mr. Ferrara it is fair, in this context, to use the recording of *Taurus* for comparison. With that in mind, Ferrara's assessment of the fifth bar of *Taurus* is incorrect.

As stated above, Ferrara consistently compares the deposit copy of *Taurus* to the *transcription* of *Stairway.* It is important to note that the deposit copy of *Stairway* bears little resemblance to any transcriptions published after the fact. For example, *MUSICAL EXAMPLE 8* from ATTACHMENT B compares the deposit copy of *Taurus* in a staff directly above a transcription of *Stairway.* This is not only unacceptable but deceiving.

Here are a few more examples of spurious comparisons and assertions:
- "How Insensitive" (Audio Exhibit 1, Track 05) contains a descending bass line but markedly different chords
- "Michelle," "Music to Watch Girls Go By" and "Summer Rain"(Audio Exhibit 1, Tracks 12, 13 and 14, respectively) contain a minor line cliché but no other similarities
- In ATTACHMENT E. 3., paragraph 5, Ferrara refers to "memorable guitar fanfares" that occur during the bridge and guitar solo of *Stairway.* Surely he must recognize that the opening eight measures of *Stairway* constitute the *most*

memorable guitar part of the entire composition and that it is this portion that bears striking similarity to *Taurus.*


## REBUTTAL TO ROBERT MATHES EXPERT REPORT

Mathes states in his report that in preparing for his report he "carefully listened to and studied the recording of *Taurus…* " He also submitted an audio example of him performing *Taurus.* While he may have mostly abided by a literal interpretation of the deposit copy of the written music he obviously ignored the recording he so carefully studied. The performance barely halfway corresponds to the recording of *Taurus.* The rhythm is incorrect as compared to the recording. Furthermore, Mathes performs a transcription of the **recording** of *Stairway,* so a fair comparison must include **not** a performance of the deposit copy of *Taurus* but a rendering of the guitar part as **performed** on the recording. There is absolutely no dispute as to what is being referred and what musical compositional elements need to be compared given that defendants' expert Mathes has already performed the relevant parts in his initial report. (Mathes Audio Excerpt 1 Stairway Guitar Parts – Contrast). For Mathes to submit a different audio recording for purposes of the Summary Judgment motion is telling.

(I will not address the minor line cliché in my assessment of Mathes' report as I have adequately addressed said issues in my comments on the report above submitted by Mr. Ferrara.)

Mathes makes a point of distinguishing the guitar part in *Taurus* by referring to a "cluster" of notes that isn't present in *Stairway.* While this might be partially true, he ignores the obvious and numerous striking similarities that exist in favor of hyper-focusing on one small musical element. Furthermore, his highlighting of this signature guitar part strongly implies that it is not only a significant compositional element but one that bears significant similarity to the equivalent portion of *Stairway to Heaven*. If notable dissimilarities existed between the two compositions as embodied in the recordings he wouldn't be forced to magnify a "cluster" of pitches to make his point.

In summary, Mr. Mathes clearly expresses his admiration for Led Zeppelin but does not make a compelling argument in support of his opinions.


## PART C: PROBATIVE FACTS AND ISSUES OF ACCESS & COPYING

Musical elements are present in the composition of *Taurus* as embodied in the sound recording that are certainly germane to any discussion regarding *Stairway to Heaven* relating to access. As I understand it the members of Led Zeppelin involved in this case deny having had any exposure to *Taurus,* whether sound recording or live performance.  If this be the case this writer finds the existence of significant fundamental similarities between *Taurus* and *Stairway to Heaven* to defy explanation.

In classical music, instrumentation is, more often than not, an essential compositional element. To

Page **13** of

EXHIBIT 2
39
01814

suggest that instrumentation in the case of *Taurus* and *Stairway to Heaven* simply represents a performance element is, in my opinion, incorrect. Furthermore, since the instrumentation employed in both selections imparts a renaissance flavor I would assert that the mood that emerges as a result of the instrumentation qualifies as a compositional element.

It must be noted that the mood in the "A" and "B" sections of both *Taurus* and *Stairway to Heaven* is nearly identical.  *Taurus* uses stringed instruments to create a sustained harmonic background while *Stairway to Heaven* uses recorders, but notable similarities of texture and mood can be perceived without much effort.

The tempo of the two selections is nearly identical as is the rhythmic pulse.

Most significantly, acoustic guitar is the instrument of choice for the most crucial passage of both *Taurus* and *Stairway to Heaven.* The most crucial compositional elements, as embodied in the sound recordings of both selections, are strikingly similar and, at times, nearly identical, and are orchestrated the same way.

Copying seems the only logical explanation for the similarities between *Taurus* and *Stairway to Heaven.* Comparisons between the deposit copy and compositional elements as embodied in the sound recording of *Taurus* and the compositional elements of *Stairway to Heaven* reveal, in the aggregate, a panoply of notable, significant and at times, striking similarities that, although not always rising to the level of copyright infringement individually, certainly indicate a large measure of familiarity and copying on the part of Led Zeppelin.

/s/  Erik Johnson

Erik Johnson

May 2, 2016

Page **14** of

**EXHIBIT 2**
**40**
**01815**

# EXHIBIT 3

**MASTER MUSICIAN – LISTEN, ANALYZE AND PERFORM *TAURUS* AND *STAIRWAY TO HEAVEN***

I, Kevin Hanson, have been retained as an expert in this case to analyze *Taurus* and *Stairway to Heaven*, to perform both pieces as a master musician and execute the pieces. I performed both the deposit copy lead sheet of *Taurus* and the composition as embodied in the sound recording of *Taurus*, in the event that the court should allow such information to be presented at trial. I also performed, on the guitar, the compositional elements embodied in the sound recording of *Stairway to Heaven.*

I am an accomplished musician, proficient on electric and acoustic guitars, bass, drums, keyboards and vocals. I was engaged to play the following instruments on the *Taurus* and *Stairway to Heaven* re-recordings:

- Electric 6 and 12 string guitars
- Acoustic guitars
- Recorder parts via MIDI.

I was also asked to analyze both *Taurus and Stairway to Heaven* from compositional, performance and production perspectives.

It is my understanding that I will also perform at time of trial.

**QUALIFICATIONS**

**Master Musician/Session Musician**

I am a guitarist, songwriter, producer, teacher, and university professor with 35 years of playing experience and 25 years of teaching experience. I have performed and recorded extensively with both major label and independent bands, toured throughout the US and internationally, and have both studied and taught the guitar on a focused, in-depth level.  I have played on hundreds of both major label and independent recordings for 20 years, in genres including rock, jazz, blues, gospel, hip hop, R+B and classical. I teach university courses on songwriting and on the form and structure of songs. This requires a profound understanding of song composition, arrangement, instrumentation, production and performance.

**STAIRWAY TO HEAVEN**

**Familiarity with Led Zeppelin and *Stairway to Heaven***

I have heard *Stairway to Heaven* my entire life.  The song was still hugely popular in 1972, the year of my birth. Led Zeppelin's music, in particular Led Zeppelin IV, was a significant part of

1

EXHIBIT 3
41

01817

my musical upbringing. It was played on the radio, on our home stereo system and at many social functions. I began learning Led Zeppelin's guitar riffs when I began playing guitar at age 10 and

still use the guitar parts from *Stairway to Heaven* as teaching tools and songwriting topics in my current teaching positions.

### Comparative Analysis of Original *Stairway to Heaven* to Re-Recorded *Stairway to Heaven*

The re-recorded version of *Stairway to Heaven* was performed and recorded to sound identical to the original. All of the guitar parts were emulated with great specificity in terms of instrumentation, sound, performance feel and energy. The main theme and all of the riffs, chords, guitar solo, and other solo lines are all played note-for-note in the re-recorded version, performed to a high level of musical accuracy.

### <u>TAURUS</u>

### Familiarity with Spirit and Taurus

I first heard of the band Spirit through an article discussing the similarities of the song *Taurus* and *Stairway to Heaven*. When I first heard *Taurus*, I was shocked at the similarities. I am deeply acquainted with the music of Led Zeppelin and, regrettably, with the multiple accusations levied at the band for their habit of borrowing the music of others without properly crediting the original artists. These stories are common knowledge in the music industry, with the example of *Stairway to Heaven* and its remarkable similarity to *Taurus* being the most notable.

### <u>COMPARATIVE ANALYSIS OF COMPOSITIONAL ELEMENTS AS EMBODIED IN THE DEPOSIT COPY LEAD SHEET OF *TAURUS* AND THE SOUND RECORDINGS OF *TAURUS* AND *STAIRWAY TO HEAVEN*</u>

*(Please note: I have included below analysis of compositional elements embodied in the sound recordings of both pieces. Furthermore, when considering the protectable elements in the Taurus sound recording, such as the harmony and pitches, it is evident to me that these elements are based on and represented in Taurus deposit copy.)*

- The deposit copy lead sheet of *Taurus* contains a significant portion of the pitch and rhythm information that is found in the compositional elements that are played on acoustic guitar and embodied in the sound recording(s) of *Taurus*. Most of the pitches that are played on the acoustic guitar are contained in the

deposit copy lead sheet.

- Significant similarities exist between the deposit copy lead sheet of *Taurus* and the composition of *Stairway to* Heaven as embodied in the sound recording. Additionally, many of the compositional elements of the initial guitar figure of *Taurus* as embodied in the sound recording are virtually identical to those found in *Stairway to Heaven*: the key, the tempo, the feel, the chord progression, the pitches and duration of the melody and the instrumentation are strikingly similar and much of the two pieces are identical.

- Addressing the issue of access and probative evidence, it is my opinion that the similarities of the main themes, as performed on acoustic guitar, cannot be explained away through mere coincidence.

- *Taurus* was performed in a ballad-like tempo on a steel string acoustic guitar in the key of A minor, as was *Stairway to Heaven.*
- *Taurus* begins with an arpeggiated A minor figure in 8th notes on the notes A, C, and E, as does *Stairway to Heaven*. The rhythm of the figures is identical up until the last measure.
- The bass notes of the guitar figure of *Taurus* descend chromatically from the tonic down to the b6 degree, as does *Stairway to Heaven.*
- *Taurus'* opening figure begins on the 4th string at the 7th fret with the third finger and on the 3rd string at the 5th fret with the first finger, as does *Stairway to Heaven*.

- Both selections are performed at virtually the same tempo with the same feel, articulation and style.

- The chord progression is virtually identical for the first 5 chord changes

- The phrasing of the two figures is virtually identical.  Groups of four 8th notes descending over five chords that finally resolve to the tonic

- When the audio tracks of the two figures are isolated and matched at the same tempo, they are almost indistinguishable.  I incorporate by reference the audio exhibits.

- *Taurus* and *Stairway to Heaven* are similar both from a listening standpoint and from a compositional standpoint. From a listening standpoint, the main guitar themes of both songs are strikingly similar in tempo, key, melody, melodic shape, rhythm, phrasing, instrumentation, and mood.

3

**EXHIBIT 3**

**43**

**01819**

- From a performance standpoint, *Taurus* and *Stairway to Heaven* are played at a nearly identical position on the guitar fretboard.  Both figures begin on the same strings in the same position with the same fingerings.

- For a reasonably skilled guitarist there are many ways to play one chord.  For an A minor triad, there are at least 20 different inversions that are common and easily accessible.  When the instrument's range beyond one octave is taken into consideration, this number is increased substantially.  In comparing the video exhibits "*Taurus* - left hand" and "*Stairway to Heaven* - left hand", one can see that the triads in both examples begin in the same position in the same octave.  I incorporate by reference the four video exhibits of *Taurus* and *Stairway to Heaven.*

- The chord progression for the main theme of STH is not uncommon.  It has been used in many jazz standards, show tunes, and orchestral works.  The following elements from *Stairway to Heaven* and *Taurus* are almost completely in common:
  - Actual melodic material;
  - Rhythmic placement of many of the notes of the deposit copy as well as the guitar part;
  - Nearly identical performance, in tempo, style and articulation.

This sets *Stairway to Heaven* apart from a song like "Chim Chim Cher-ee", which does feature a chromatically descending bass line, but functions simply to move the harmony beneath an entirely different melody.  It is also a medium-fast waltz.  *Stairway to Heaven*'s similarities to Taurus are in the actual guitar part itself, not just a harmonic device.  *Stairway to Heaven* also differs from what many mistakenly consider to be the same chromatic descending line.  A song such as "Ice Cream Dream" by The Cartoones does not follow this chromatic bass line.  The first interval is a whole step, which by definition is not chromatic.  To compare the main guitar theme of *Stairway to Heaven* to a song like Davey Graham's version of "Cry Me a River" is also not a proper comparison.  Though the chromatic bass movement is intact for a brief moment, Graham's usage of it is a loose interpretation of the original vocal melody.  The brief section in question is also performed in a different time signature, 12/8, which gives it a completely different feel from *Taurus* or *Stairway to Heaven.*

- To further illustrate, some common jazz standards, "My Funny Valentine" (Rodgers and Hart), "It Don't Mean a Thing If It Ain't Got That Swing" (Duke Ellington) and "In Walked Bud" (Thelonius Monk) all feature a chromatically descending bass line underneath a minor chord.  The aforementioned songs differ greatly from *Taurus* and *Stairway to Heaven* because the melodies of *Taurus* and *Stairway to Heaven* are intimately linked to the composition and performance of the main guitar theme.  It is my opinion that *Taurus* was the single greatest influence on the composition of *Stairway to Heaven.*

4

**EXHIBIT 3**

**44**

**01820**

I have additionally provided video of me playing the acoustic guitar part of *Taurus* and *Stairway to Heaven:*

Video Exhibit 1:   Taurus—Left Hand
Video Exhibit 2:   Taurus—Right Hand
Video Exhibit 3:   Stairway to Heaven—Left Hand
Video Exhibit 4:   Stairway to Heaven—Right Hand

I offer these opinions to a reasonable degree of professional and musical certainty. I am being compensated at $175 per hour for this report and $350 for trial testimony.

Executed this 2nd day of May, 2016, at Philadelphia, Pennsylvania

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Kevin Hanson
Kevin Hanson

5

**EXHIBIT 3**
**45**

**01821**

# EXHIBIT 4

Brian Bricklin
147 Hilldale Rd.
Lansdowne, PA 19050

**Brian Bricklin - Expert Report**

**Music Producer, Audio Engineer, Songwriter, Band Member**

SUBMITTED TO;

FRANCISALEXANDER MALOFIY

FOR THE LAW FIRM FRANCIS ALEXANDER,

LLC 280 N. PROVIDENCE RD.

MEDIA, PA 9063

T: (215) 500-1000  F: (215) 500-1005

E: francis@francisalexander.com

Re: "Taurus" vs. "Stairway To Heaven"

### *INTRODUCTION*

I, Brian Bricklin, having expert knowledge regarding the matters described, herein,  declare as follows: I am a music producer, audio engineer, performing arts school and studio owner,  college instructor, musician, band member, song writer and live sound engineer. I am over the age of 18 and competent to testify as to the matters stated herein. I am submitting this amended report in consideration of the Court's April 25, 2016 order.

I have  been retained by Plaintiff in this action to render my opinion and expertise regarding the following items:

1.    Recreating the Taurus and Stairway to Heaven sound recordings.

2.    Creating combinations of recordings of the deposit copies of "Taurus" (T) and Stairway to Heaven (STH).

3.    Compare and contrast the compositions of T written  by Randy California and STH by Robert Plant and Jimmy Page.

4.    Render my opinion as to whether Led Zeppelin employed a songwriting process and what that consisted of.

5.    Identify the individual components of each individual recorded version of each song and if there are similarities in their studio production that preclude independent creation.

### *MATERIALS REVIEWED*

- Led Zeppelin's Discovery Production D0001-0606
- Taurus – Audio
- Stairway to Heaven – Audio
- Deposition of James Patrick Page and exhibits
- Deposition of John Paul Jones and exhibits
- Deposition of Robert Anthony Plant and exhibits

1

**EXHIBIT 4**

**46**

- The case docket and filings

**ANALYSIS**

**Part 1 – Creation of Stairway to Heaven and Taurus Sound Re-Recordings**

I was initially presented two audio files by the plaintiff's attorney, 1. Stairway to Heaven by Led Zeppelin and 2. Taurus by Spirit. I supervised the recreation of multi-track recordings of these two songs so that the individual instrument stems can be isolated for presentation at trial to help in comparing the compositions of Taurus and Stairway to Heaven. In this section I describe how I completed those tasks.

I am aware of the Court's order that performance based elements of the song may not be considered in my analysis. The Court said in its order: "Plaintiff's experts naturally relied on the *Taurus* sound recording to determine the melody, rhythm and other protected elements of the musical composition as played on the guitar. In doing so, however, Plaintiff's experts impermissibly analyzed unprotected elements not embodied in the musical composition (e.g., flute, recorder, fretboard positioning). Therefore, Plaintiff's expert reports are inadmissible in their present condition because they considered unprotected elements contained only in the sound recording. If Plaintiff wishes to introduce expert testimony at trial, it must submit reports completely purged of any reliance on the unprotected performance elements in the sound recording."

To avoid confusion I want to make clear that the purpose of this section of my report describing my recreation of the two T and STH sound recordings is to faithfully reproduce the sound recordings so that the songs can be accurately compared, not to compare unprotected elements. Accurate reproduction of the two sound recordings will facilitate the task of comparing the protected compositional elements of the two songs by allowing those unprotected elements to be easily identified and stripped away if necessary.

***Stairway to Heaven vs. Taurus***

On my initial comparison of T vs. STH, the very first thing that struck me was that both songs feature a single acoustic guitar, picking identical arpeggios upon their entrance. Jimmy Page has commented in interviews that initially he allegedly composed just the acoustic guitar introduction to the song, and the song built from the introduction. The surrounding instrumental accompaniment on both T, and STH, is initially sparse.  T has a background of orchestral strings, flute and then harpsichord (keyboard), STH, recorder(s) and then electric piano (keyboard). Both songs feature similar production and in order to expand on how musical accompaniment and the recording studio "process" can brand a recording, one must have an understanding of how music is produced and "captured" in modern recording studios since music has been distributed for profit.

When a song is recorded by an artist or band, there are usually two other key personnel:

1. Producer:

The producer is akin to a director in the motion picture industry, i.e., the vision for the recording project is in the hands of the producer. The producer generally makes all decisions as to what is recorded, which performances are kept or deleted.  The producer also works closely with the recording engineer as to how

2

**EXHIBIT 4**

**47**

**01824**

each instrument or vocal is recorded, which microphone or, other recording equipment, is used to capture the performances. The producer often has final say on the final blend of the instrumentation (mixing) and how the final recordings fits in to a "running order" for an album, i.e. the song order."

2. The Recording Engineer:

The recording engineer is responsible for placing microphones to capture acoustic instruments or vocals, routing direct signals to a recording console, setting up and getting volume levels set for the performers to hear each other. Setting volume levels and tone for the items being recorded.  Maintaining the equipment in the recording studio as well as anything technical the producer or artist/band requests during the recording session.

It is important to note that all of Led Zeppelin's recordings, including STH, were produced by band member Jimmy Page. This means, as stated above, he alone was responsible for the final say in regard to the final recorded product that Led Zeppelin commercially released. In addition to producing STH, Jimmy Page, along with band member Robert Plant, are credited as the alleged composers of the song.

The song T, by Spirit, was produced by Lou Adler with the band members of Spirit. Lou was not a member of the band Spirit. It's important to note, in regards to the song T, I am told that the surviving band members of Spirit, Jay Ferguson and Mark Andes, state that the band was not happy with the introduction of the final version of the song. In its final commercial release, T contains 45 seconds of orchestral music at the top of the song that the band members did not like, including Randy California, T's author. This introduction was added to the song by Lou Adler and it was not a part of Randy's original composition. In essence, to compare STH and T, it is important to start 45 seconds into the commercially released version of T as this is how the author intended it to be. In fact, all recorded live performances of the song T, by Spirit, did not contain this additional orchestral introduction.

Both songs are presented, in their final commercially released versions, with very  similar production and mixing techniques. In recording studios, since the time when Les Paul  invented the technology behind multitrack recording, musicians record instrumentation, vocals  and any other elements, to individual "tracks" on a master multitrack recorder. (Since both these songs were recorded before digital technology was the standard, these songs were  recorded on multitrack tape recorders.) Multitrack recorders allow each instrument, or element,  to be recorded on to individual tracks of a recorder. These tracks will play back individually, or collectively, and can be blended at different volume levels and tone control after a live performance has been captured. In addition, a performance can be played back while another performance is captured over the existing one. This process is commonly referred to as overdubbing.

In order to deconstruct each song at a musical "organic" level, since the multitrack tapes were not available to me for comparison, I faithfully rerecorded each song. Utilizing a skill called critical listening, I was able to discern and identify each musical instrument and component, and recreate the multitrack recordings utilizing master studio musicians performing each part. I recorded the songs using digital multitrack recording software called Avid Pro Tools, the audio elements are illustrated on the next page in Images A and B. (Software – Audacity for images only)

**EXHIBIT 4
48**



Image A:  Recreated Multitrack recording of STH



**EXHIBIT 4**
**49**

Image B.:  Recreated Multitrack recording of T

This process allowed me to isolate the components of both T and STH to further evaluate
individual musical performances of the compositions that make up each recording.  The
following images show each song's discreet elements:

- Acoustic Guitar
- Bass
- Drums
- Electric 12 Strings
- Electric Piano
- End Guitar
- Les Pauls
- Recorders
- Slide
- Solo

Image C:  STH Recreated Isolated Audio Tracks

- Acoustic Guitar
- Cello 1
- Cello 2
- Cymbal
- Flute
- Harpsichord
- String Bass
- Viola
- Violins

Image D:  T Recreated Isolated Audio Tracks

After a song is recorded, "mixing" is the process where recording engineers, often, with
producers, adjust the individual volume level and tone of each recorded track after it has been
recorded to create a stereo "master." This master is then duplicated for commercial release.
Additionally, effects such as reverb, which could be compared to the sound created as if the
musician was performing in a basketball gym, or arena, can be applied during the mixing
process. When using reverb, the resulting sound "appears" far away and the duration of the
sound is longer than if the musician was performing in a small room. Both T and STH feature
acoustic guitars "bathed" in reverb.  The following audio exhibits demonstrate the use of reverb
to create a mystic, dreamlike quality. The resulting effect is like each note of the guitar has a
"whispering tail."

**Audio Exhibit 7: Stairway to Heaven (0 seconds – 25 seconds)**
**Audio Exhibit 8: Taurus (45 seconds – 1minute, 13 seconds)**

5

**EXHIBIT 4**
**50**

It's obvious to me the songs were both intended to inspire a haunting, melodramatic feel. From the first guitar notes, verbatim guitar arpeggios lull the listener along… Since both songs feature a single guitar, playing a musical composition that in both cases are fingered virtually the same on the guitar, the combined resulting effect, reverb with acoustic guitar, is identical.

**Part 2 – Combinations of Taurus and Stairway to Heaven**

I also recreated the recordings of T and STH using the deposit copy of T and the deposit copy of STH. Then I made multiple combinations, including the T deposit copy merged with the protectable elements of the T sound recording, the STH deposit copy merged with the protectable elements of the STH sound recording. Those combination versions were then further combined against each other to illustrate the protectable similarities between T and STH.

See new audio exhibits attached and/or submitted with this report.

**Part 3 – The Similarity of the Compositions of Taurus and Stairway to Heaven**

As identified in the expert reports of Alexander Stewart, Erik Johnson, and Kevin Hanson, the deposit copy lead sheet of T and sound recording of STH have many similarities which are protectable. In the T sound recording the guitar, harpsichord/piano, and bass are the instruments that embody the compositional elements of T represented in the deposit copy of T, as explained the report of Erik Johnson. Other such instruments which are performance related have been excluded from the analysis.

In addition to recreating the multitrack recordings of STH and T, I recorded exact replicas of each songs' first 8 measures at a consistent 78 beats per minute, as played by master guitarist Kevin Hanson. These exhibits only compare the composition of T and STH and do not consider unprotected elements unique to a sound recording such as flute, recorder, fretboard positioning.

> **Audio Exhibit 9:  8 measures of STH from note 1 of the acoustic guitar, repeated multiple times**
> **Audio Exhibit 10:  8 measures of T from note 1 of the acoustic guitar, repeated multiple times**
> **Audio Exhibit 11:  8 measures of STH and T played together from note 1 of the acoustic guitar, repeated multiple times**

When listening to Audio Exhibit 11, and considering merely the underlying composition of the songs that are represented in the deposit copy of T, it is clear that it appears as one piece of music.  The compositions of T and STH therein are beyond a reasonable doubt one in the same.

Both songs contain a musical composition that are almost identical. The four-measure piece appears four times in T at 0:44, 0:58, 1:36, and 1:50. In STH the piece also appears four times, at 0:00; 0:12; 0:52, and 1:06. These sections are in the same key (A minor) and contain a descending chromatic bass line, both feature a similar slow tempo and a single acoustic guitar.

**EXHIBIT 4**
**51**

Again, I am not considering unprotected elements unique to the sound recording, but only the underlying composition of T.

**Part 4 - Songwriting Process**

The following report contains my analysis and conclusions based on thorough review of substantial material, music, interviews, critical listening as well as recording recreations of the multitrack tape recordings of both the song T and STH.

As a songwriter I have had songs featured in major motion pictures like Bill and Ted's Excellent Adventure (Orion Pictures) and Election (MTV Paramount), many TV and radio commercials, as well as signed two times to major labels (A&M, Hybrid/Sire).

There are multiple ways that a song can "come to life." For instance, in some cases there are people who write lyrics, melody and music as well teams where one person writes the music and the other the lyrics. All of these scenarios can exist within a band too. There is also a process known as "jamming." This is where multiple musicians are creating things "on the spot" in a live performance situation (with or without an audience). A simple musical phrase may be introduced by one person which then inspires another person to expand on it. All of this happening in "real time." Many times, if a bona fide song is created from a jam session, credit is given to all of the participating musicians. Other times one person might present a completed, or almost completed song to "the group" and often only the person or persons who were involved in the genesis of the song are credited. In addition, many songwriters will acknowledge they were inspired by another artist, sometimes an older artist in a specific genre as the inspiration for their NEW creation. In many cases the songwriter has only been "inspired" by a previous work, but doesn't "lift" verbatim lyric, melody or music. Unfortunately, there are cases where a previous work doesn't inspire and is instead used verbatim and put forth as a new original creation. In almost all cases songwriters usually follow a process for their works that is repeated as they hone their "craft."

*Led Zeppelin's Songwriting Process*

Based on my expert experience, listening to Led Zeppelin's songs, listening to songs upon which Led Zeppelin based their songs, and the deposition testimony of the individual defendants, I conclude that Led Zeppelin utilized two primary songwriting methods. The first was where a band member, usually Jimmy Page and/or Robert Plant, would present a song to the band. In these cases, only Page and/or Plant would be credited. The second is where the band would jam and the resulting creation would usually be credited to all members of the band and always at least three members. It is my expert opinion that both songwriting processes heavily involved

**EXHIBIT 4**
**52**

the use of other artists' work, especially in the first four Led Zeppelin albums. I am aware that the Court has tentatively ruled that prior "claims accusing Led Zeppelin of copying" are not admissible, however, my opinion is based upon Mr. Page and Mr. Plant's own statements that they relied upon prior art in creating their music and the musical similarities between the songs.

Take, for example, the song Dazed and Confused from Led Zeppelin I when contrasted with Jake Holmes 1967 song titled similarly, Dazed and Confused.

> **Audio Exhibit 1:  Dazed and Confused by Led Zeppelin**
> **Audio Exhibit 2:  Dazed and Confused by Jake Homes (1967)**

It is obvious that Led Zeppelin made some additions to the song Dazed and Confused by Jake Holmes, but by no means is it a new and unique creation.  When originally released on Led Zeppelin I, Dazed and Confused was credited to Jimmy Page alone and Jake Holmes wasn't acknowledged at all.  It's clear that they incorporated Jake Holmes's original creation in their version of the song.  This is the start of a systematic process the band used for years while creating their music and it became their core songwriting technique; incorporate existing material by other writers verbatim, or add a slight modification or alteration, and then present it as a unique and NEW creation.

Another song, from Led Zeppelin II, Whole Lotta of Love, further illustrates this type of songwriting process, which in my opinion is pervasive in Led Zeppelin's music. Led Zeppelin's version is derived from two other songs: You Need Love performed by Muddy Waters, and You Need Loving by The Small Faces. It's apparent that parts of each of these songs (times listed next to each audio exhibit marker) were incorporated into their recording of Whole Lotta Love. However, the song was originally uncredited to any other songwriters other than the members of Led Zeppelin.

> **Audio Exhibit 3:  Whole Lotta Love by Led Zeppelin**
> **Audio Exhibit 4: Muddy Waters' You Need Love (1962) (10 seconds – 28 seconds)**
> **Audio Exhibit 5:  The Small Faces' You Need Loving (1966) (25 seconds – 48 seconds)**

After hearing testimony from Jimmy Page, John Paul Jones, and Robert Plant, in January of 2016, it is evident to me that their songwriting process included using previous musical compositions and incorporating them into their songs.  In many cases they took sole credit for Led Zeppelin's songs and presented them as unique, NEW creations. There are many more examples of this songwriting process used by Led Zeppelin, including Babe, I'm Gonna Leave You (originally written by Anne Bredon), Black Mountain Side (originally written by Bert Jansch), Bring It On Home (originally written by Willie Dixon), and Since I've Been Loving You (originally written by Moby Grape).  This is far from a complete list. This demonstrated songwriting process by Led Zeppelin is unfortunately more akin to "lifting" verbatim sections of music and lyrics without attribution and presenting it as a new, unique creation.

Both Jimmy Page and Robert Plant have admitted, in various publications and interviews, that Led Zeppelin did indeed lift and copy the work of other artists to varying degrees without giving creidt. Jimmy Page did so in an interview with Brad Tolinski for Guitar World in December 1993, and  Robert Plant did so in an NPR interview with Robert Plant on Fresh Air with Terry Gross in 2004.

*Led Zeppelin's Familiarity with Spirit*

From listening to live recordings of Led Zeppelin from their first tour of America in 1968, reading and listening to interviews with Jimmy Page, and from hearing first hand Jimmy Page talk about playing a piece from Spirit's song Fresh Garbage in their early live sets, it's clear the band was aware of and thought highly enough of Spirit to include Spirit's music in their own live shows.

**Audio Exhibit 6: Live performance of Led Zeppelin playing Fresh Garbage 1-10-1969**

This recording is significant as it shows Led Zeppelin were aware, and held in high regard, Sprit's music. In addition, I have seen significant evidence and to my knowledge unrefuted evidence that Spirit and Led Zeppelin played the same shows in the late 1960s and 1970s and I have also been told that Mark Andes and Jay Ferguson testified that at least one festival Led Zeppelin immediately followed Spirit on stage and that the band members interacted backstage. I also heard Jimmy Page testify that he owns the eponymous Spirit album which contains the song Taurus, although he claims he does not know when he acquired it.

**Part 5 – Stairway to Heaven Could Not Have Been Created Independently from Taurus**

I also note based upon by my analysis in Part A, and by comparing the sound recordings and sonic landscape, production techniques, and engineering methods, that there is no possibility that STH was created independently from T.

I hold these opinions with a reasonable degree of professional and musical certainty. I am being compensated at the rate $175 per hour for this report and $350 for trial. I have testified previously in Marino v. Usher (11-cv-06811 E.D. Pa.).

/s/ Brian Bricklin
Brian Bricklin

May 2, 2016

**EXHIBIT 4
54**

**01831**

Following is a list of songs, originally, or as of yet, uncredited, to songwriters who created unique music or lyrics, which were then incorporated into Led Zeppelin's repertoire and albums. All, either in part, or whole. Led Zeppelin's version is followed by the original unique creations:

**Black Mountain Side (1969) Led Zeppelin**
      **Black Waterside (Bert Jansch, 1966)**

**How Many More Times (1969) Led Zeppelin**
      **No Place to Go (a.k.a. How Many More Years)(Howlin' Wolf)(1959)**
      **Rosie (Alexis Korner Blues Inc.)(1967)**
      **Steal Away (Alexis Korner Blues Inc. & Robert Plant)(1968)**
      **The Hunter (Albert King)(1967)**

**Babe I'm Gonna Leave You (1969) Led Zeppelin**
      **Babe I'm Gonna Leave You (Anne Bredon)(1962)**

**The Lemon Song (1969) Led Zeppelin**
      **Killin' Floor (Howlin' Wolf)(1964)**
      **Traveling Riverside Blues (Robert Johnson)(1937)**

**Bring it on Home (1969) Led Zeppelin**
      **Traveling Riverside Blues (Robert Johnson)(1937)**
**Hats Off to (Roy) Harper (1970) Led Zeppelin**
      **Em on Down (Bukka White)(1937)**

**Since I've Been Loving You (1970) Led Zeppelin**
      **Never (Moby Grape)(1968)**

**Bron-Y-Aur Stomp (1970) Led Zeppelin**
      **The Waggoner's Lad (Bert Jansch)(1966)**

**When the Levee Breaks (1971) Led Zeppelin**
      **When the Levee Breaks (Memphis Minnie & Kansas Joe McCoy)(1929)**

**Custard Pie (1975) Led Zeppelin**
      **Drop Down Mama (Sleepy John Estes)(1935)**
      **I Want Some of Your Pie (Blind Boy Fuller)(1940)**

**In My Time of Dying (1975) Led Zeppelin**
      **Jesus Gonna Make Up my Dying Bed (a.k.a. In my Time of Dying) (Josh White)(1933)**
      **Jesus Make up My Dying Bed (Blind Willie Johnson)(1927)**

**Boogie with Stu (1975) Led Zeppelin**
      **Ooh, My Head (Ritchie Valens)(1957)**

**Nobody's Fault but Mine (1976) Led Zeppelin**
      **Ooh, My Head (Ritchie Valens)(1957)**

**White Summer-Black Mountain Side (1969) Led Zeppelin**
      **White Summer (Yardbirds)(1969)**
      **She Moved Thro' the Fair (Davy Graham) (1963)**

1

**EXHIBIT 4**
**55**

**The Girl I Love She Got Long Black Wavy Hair (1969) Led Zeppelin**
      **The Girl I Love She Got Long Curly Hair (Sleepy John Estes)(1927)**
      **Watch Your Step (Bobby Parker)(1961)**

**Your Time Is Gonna Come Led Zeppelin**
      **Dear Mr. Fantasy (Traffic) (1967)**

**Communication Breakdown (1969) Led Zeppelin**
      **Nervous Breakdown (Eddie Cochran)**

10

**EXHIBIT 4**
**56**

**Professional Experience:**

2/1/16 – Present
Future Sonics Inc.        Director of Client Services
Oversee all client relation operations for the premier and leading ear monitor manufacturer.

12/1/2002 – 11/1/15
Music Training Centers, Inc.:  Owner / Director
Engineer and produce original content for Live Performance programs including, fully staged musical theater productions and original song masters.

4/1/2013 – Present
Philadelphia Phillies:   Game Day Audio Engineer
Oversee all broadcast audio elements for game day production. Duties include audio mixing utilizing digital and analog equipment, including stadium audio software and RF components.

7/1/2003 – Present
Philadelphia Eagles:    Game Day Audio Engineer
Oversee all broadcast audio elements for game day production. Duties include audio mixing utilizing digital and analog equipment, including stadium audio software and RF components.

3/1/2009 – 2011
Antoinette Westphal College of Media Arts and Design, Music Industry
Drexel University        Adjunct Faculty
Courses taught:
- Production Company Management
  - Managing a freelance audio engineering career as a business
- Survey of Modern Production Technique
  - Complete history of recording devices, audio engineering and production techniques utilized from the advent of "magnetic" recording

2000 - 2002
Philadelphia Music Conference:        Executive Director
Oversaw all aspects of the annual International Music Conference. More than 25,000 people attended this 3-day event that included panels, workshops, day and nighttime artist showcases, as well as a daily trade show. Responsible for all budget, accounting, and administrative aspects as well as sales, marketing, publicity, Internet, sponsorship and advertising operations of the conference. Created content/text for all PMC brochures, conference directories and ad campaigns in addition to overseeing, editing and approving all graphic artwork, recorded audio and print media. The conference was the subject of a multi-part Comcast CN8 television special, Studio C. (I created and co-produced these programs.)

1970 - Present
                            Musician
Multi-instrumentalist: guitar, bass, drums, and vocals. Professional guitarist since the age of 10 with performances all over the world including: USA (Madison Square Garden, Spectrum, Tower Theatre, Mann Music Center…), Canada, Holland, and Ireland as well as numerous album credits. Featured in "Guitar for the Practicing Musician."   Expert level knowledge of

**EXHIBIT 4**
**57**

amplification, amp modelers, effects and all
forms of processing equipment for instruments and sound reinforcement.

1980 – Present
Songwriter, Performer
Co-founding member of the band Bricklin that was signed to A&M records and recently of the band Martin's Dam, signed to Hybrid/Sire. Writer or co-writer of numerous songs in movies and television advertisements including: "Bill & Ted's Excellent Adventure," MTV/Paramount movie "Election," ABC, NBC, CBS, FOX and ESPN, as well as internationally aired television commercials.

1985 - Present
Freelance recording engineer

Experienced with Avid Pro Tools®, SSL, Neve, API, Mackie, Korg, Roland, Studer, Alesis, Otari, Antares, etc.; all major brand software and recording equipment. Major and independent label credits.

1990 - 1995
Freelance audio engineer for television
Partial credits include: NFL and College football, professional boxing (Mike Tyson, "Bone Crusher" Smith, Michael Moore…), MDA Jerry Lewis telethon (Aretha Franklin), Merv Griffin game show "Ruckus," numerous entertainment specials (PBS Ted Koppel, "World without Walls," "Country Quest," "Seriously Phil," starring Phil Collins…).

1999 - 2002
Sonic Foundry:        Content developer
Created end user audio content (loop libraries) for a software product called "Acid."

Partial list of studios worked in:
Power Station, Avatar, Effenel, Sony, Master Disc, Unique, New York, NY; Wisselloord Studios, Amsterdam, Holland; Range Recording Studios, Studio 4; Sigma Sound; Indre, Meatlocker, Sonic; The Warehouse; 3rd Story; The Dome, Kajem, (in and around) Philadelphia, PA; Rumbo, Skip Saylor, A&M Studios, Los Angeles, CA; Gateway Mastering, Maine; Numerous Mobile Production Trucks; Northwest Mobile;
Generic; EJ Stewart, Sheffield

Partial list of Producer/Engineers worked with:
Kevin Killen (Peter Gabriel, U2, Elvis Costello…), 2 time Grammy winner; Neil Dorfsman (Sting, Paul McCartney, Dire Straits…), Bob Clearmountain (Brian Adams, Bruce Springsteen, Tears for Fears…), Bill Dresher (Rick Springfield, Bangles), Phil Nicolo (Dishwala, Sean Lennon, Anthrax…), Bob Ludwig, Rick Nowels, Bootsy Collins

Affiliations:
Member:  ASCAP
National Academy of Recording Arts and Sciences:
Three times elected to the Board of Governors, National Academy of Recording Arts & Sciences (Grammy Foundation)
Chairperson, MusiCares Committee

**EXHIBIT 4**
**58**

Chairperson, Special Event Committee
Three times appointed to the craft committee for the Grammy category: "Best Engineered Recording, Non-Classical

**EXHIBIT 4**
**59**