# Nos. 16-56057 & 16-56287

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

_____

## MICHAEL SKIDMORE,
### AS TRUSTEE FOR THE RANDY CRAIG WOLFE TRUST
#### PLAINTIFF, APPELLANT AND APPELLEE

vs.

## LED ZEPPELIN, *ET AL.*
#### DEFENDANTS AND APPELLEES
#### AND

## WARNER/CHAPPELL MUSIC, INC.,
#### DEFENDANT, APPELLEE AND APPELLANT

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
HON. R. GARY KLAUSNER, DISTRICT JUDGE, CASE NO.15-cv-03462 RGK (AGRx)

_____

## COMBINED ANSWERING AND OPENING BRIEF

_____

PETER J. ANDERSON, ESQ.
LAW OFFICES OF PETER J. ANDERSON,
A PROFESSIONAL CORPORATION
100 WILSHIRE BOULEVARD, SUITE 2010
SANTA MONICA, CA 90401
TEL.: (310) 260-6030
ATTORNEY FOR DEFENDANTS AND APPELLEES
JAMES PATRICK PAGE *ET AL.* AND
DEFENDANT, APPELLEE AND APPELLANT
WARNER/CHAPPELL MUSIC, INC.

HELENE M. FREEMAN, ESQ.
PHILLIPS NIZER LLP
666 FIFTH AVENUE
NEW YORK, NY 10103-0084
TEL: (212) 977-9700
ATTORNEY FOR DEFENDANTS AND APPELLEES
JAMES PATRICK PAGE, ROBERT ANTHONY
PLANT AND JOHN PAUL JONES

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1., counsel for defendants and appellees Atlantic Recording Corporation, Rhino Entertainment Company, Super Hype Publishing, Inc., and Warner Music Group Corp., and defendant, appellee and appellant Warner/Chappell Music, Inc., confirms that these corporate parties are owned and controlled, directly or indirectly, by AI Entertainment Holdings LLC, a privately held corporation and affiliate of Access Industries, Inc., also a privately held corporation. No publicly held corporation owns 10% or more of the stock of these corporate parties, AI Entertainment Holdings LLC or Access Industries, Inc.

Dated: June 2, 2017      _____/s/ Peter J. Anderson_____
             Peter J. Anderson, Esq.
             Law Offices of Peter J. Anderson
             A Professional Corporation
             Attorney for Defendants and Appellees
             JAMES PATRICK PAGE,
             ROBERT ANTHONY PLANT,
             JOHN PAUL JONES,
             ATLANTIC RECORDING CORPORATION,
             RHINO ENTERTAINMENT COMPANY,
             SUPER HYPE PUBLISHING, INC., and
             WARNER MUSIC GROUP CORP.
             and
             Defendant, Appellee and Appellant
             WARNER/CHAPPELL MUSIC, INC.

## TABLE OF CONTENTS

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT .......................................3

STATEMENT OF ISSUES PRESENTED.............................4

    Skidmore's Appeal .....................................................4

    Warner/Chappell's Appeal ..........................................6

STATEMENT OF THE CASE ..............................................7

1.    BACKGROUND FACTS................................................7

    (a)    In 1967, Lou Adler's Ode Records Released the First Spirit Album and His Hollenbeck Music Registered a Copyright in the Musical Composition *Taurus* .........................................7

    (b)    In December 1968, Ode Records Released Spirit's Breakthrough Album, *The Family that Plays Together*, which Spirit Toured to Support and which Did Not Include *Taurus* .......................................8

    (c)    Led Zeppelin, a UK Band, Was Formed in 1968 and its Members Were Never Present When Spirit Performed *Taurus*...........................9

    (d)    *Stairway to Heaven*, Released on Led Zeppelin's Fourth Album in 1971, Was Written by Jimmy Page and Robert Plant and Contains a Descending Chromatic Scale ..............................................9

    (e)    Despite the Success of 1971's *Stairway to Heaven*, Hollenbeck Music, Wolfe and—After Wolfe's Death in 1997—the Trustees Never Sued, Until Skidmore Sued in 2014 ........................................12

2.    THE ACTION BELOW ................................................12

    (a)    Skidmore's 2014 Filing of this Action................................12

    (b)    The District Court's Rulings on Defendants' Motion for Summary Judgment ...........................................13

(c)    The District Court's Pretrial Conference and Rulings on Motions *in Limine* ............................................................................14

(d)    The District Court Allowed Skidmore to Provide New Rule 26 Expert Disclosures on the Eve of Trial .............................................15

(e)    The Jury Trial ...........................................................................16

        (1)    Skidmore's Case ........................................................16

        (2)    Defendants' Case .......................................................22

                i.    *Defendants' Witnesses* ....................................22

                ii.    *The District Court's Grant of Skidmore's Request for Additional Time to Cross-Examine Defendants' Witnesses* ........................................................27

        (3)    Skidmore's Preparation of the District Court's Jury Instructions ...............................................................28

        (4)    The Jury's Verdict .....................................................28

        (5)    The Entry of Judgment and the Amended Judgment, and Skidmore's Decision Not to File any Post-Trial Motions ........29

        (6)    The Court's Denial of Warner/Chappell's Motion for Attorneys' Fees and Additional Costs ......................................29

        (7)    Skidmore's and Warner/Chappell's Consolidated Appeals...............................................................29

SUMMARY OF ARGUMENT ..............................................................30

ARGUMENT ...............................................................................33

1.    SKIDMORE'S APPEAL...............................................................33

    (a)    Skidmore Waived this Court's Review of the Grant of Summary Judgment to Three of the Defendants .................................................33

(b)   The District Court Did Not Abuse its Discretion by Requiring that Skidmore Prove Substantial Similarity Between *Stairway to Heaven* and the 1967 Copyrighted *Taurus* Deposit Copy ..................34

    (1)   The District Court Properly Recognized the Distinction Between Musical Compositions and Sound Recordings and that the Uncopyrighted Spirit Recordings Are Irrelevant........34

    (2)   Skidmore Fails to Identify Any Compositional Elements in the Spirit Recordings that Were Excluded at Trial ..................36

    (3)   The 1909 Act Did Not Expand Protection of Copyrighted Musical Compositions to Include Sound Recordings...............37

        i.   *Section 1(e) of the 1909 Act Did Not Extend Music Composition Copyrights to Sound Recordings* ..............37

        ii.   *The 1909 Act Has Never Been Interpreted to Extend Composition Copyright Protection to Sound Recordings* ....................................................................39

    (4)   Federal Statutory Copyright Is Not a Registered Common Law Copyright .......................................................................41

    (5)   A Registered Copyright Protects the Work as Registered, Not an Amalgam of Versions Performed Over Time ..............42

        i.   *Skidmore Offers No Case Law Supporting His Copyrighted Work-as-an-Amalgam Argument*...............42

        ii.   *Under Established Law, the Registered Work Is the Copyrighted Work*.........................................................43

            a.   Deposit Copies Establish the Copyrighted Work ..................................................................43

b.  The Fact that the *Stairway to Heaven* Recording
    —as the Alleged Infringement—Was Relevant
    Does Not Make *Taurus* Recordings Relevant......46

c.  New Versions of a Copyrighted Work Do
    Not Expand that Work's Copyright
    Protection.............................................................47

d.  Trying to Trivialize Deposit Copies, Skidmore
    Ignores the Law and Practice that Deposit
    Copies of Unpublished Works Are Retained.......47

(6)  The District Court Did Not Abuse its Discretion by
     Excluding the *Taurus* Sound Recordings .................................49

     i.   *The* Taurus *Deposit Copy Is the Work Protected by*
          *the Copyright that Skidmore Sued Upon* ........................49

     ii.  *Skidmore Presented No Evidence that the 1967*
          Taurus *Copyright Protects Anything Beyond the*
          Taurus *Deposit Copy* .......................................................50

     iii. *The District Court Did Not Abuse its Discretion by*
          *Excluding the Recordings of Spirit Under FRE 403* ......52

     iv.  *Skidmore's Parade of Horribles*....................................54

(7)  The Claimed Error Is Harmless ...............................................55

     i.   *Skidmore Admitted that the Experts' Trial*
          *Performances and Recordings Are Correct*
          *Renditions of the Copyrighted* Taurus *Deposit*
          *Copy*................................................................................56

     ii.  *Skidmore's Musicologist Concluded that the* Taurus
          *Deposit Copy Strengthened Skidmore's Claim* ..............56

(c) There Is No Merit to Skidmore's Alternative Argument that Spirit's Recordings of *Taurus* Were Relevant to Proving Access...................................................................................57

    (1) The Jury's Finding of Access Moots Skidmore's Argument ......................................................................57

    (2) The District Court Did Not Abuse its Discretion in Limiting Use of the *Taurus* Sound Recordings to Prove Access .........................................................................57

(d) Skidmore Fails to Establish Reversible Error in the District Court's Jury Instructions .................................................58

    (1) Skidmore's Argument that the Jury Should Have Been Instructed on the Inverse Ratio Rule Lacks Merit ...................59

        *i. The Point is Moot Because Skidmore Failed to Prove Copying of Protectable Expression* .....................59

        *ii. The District Court Acted Within its Discretion by Not Giving an Inverse Ratio Rule Instruction* ................60

    (2) There Also Is No Merit to Skidmore's Complaint that the District Court Did Not Instruct the Jury on Copyrightable Selections-and-Arrangements ...................................................62

        *i. Skidmore Waived the Claimed Error* .............................63

        *ii. Skidmore Neither Claimed Nor Presented Evidence of a Copyrightable Selection and Arrangement* .............64

        *iii. The Claimed Error Is Harmless* .....................................66

    (3) Skidmore's Challenge of the District Court's Instructions on Originality Also Fails.........................................................67

        *i. The District Court Did Not Abuse its Discretion* ..........67

    *ii. Skidmore's Argument Exposes a Fatal Defect in His Claim: Incorporating Unprotected Material in a Work Does Not Make the Unprotected Material Protected* ........................................................................68

    *iii. Skidmore Waived the Claimed Error* .............................70

    *iv. The Claimed Error Is Harmless* ....................................70

(e) The District Court Correctly Ordered the Playing of the Audio Exhibits Requested by the Jury through its Foreperson......................70

  (1) The District Court Properly Handled the Jury's Question........71

  (2) Skidmore Failed to Timely Object that One Juror Referred to Another Recording...................................................72

  (3) The Claimed Error Was Harmless ...........................................72

(f) The District Court Did Not Abuse its Discretion in Setting Trial Time Limits, Which it Extended at Skidmore's Request...................73

  (1) Skidmore Failed to Timely Object, Failed to Make an Offer of Proof and Agreed that the District Court's Ruling on His Request for More Time Was Fair......................73

  (2) This Court Cannot Disturb the District Court's Factual Findings that Ten Hours Per Side Was Sufficient and that Skidmore Wasted His Allotted Time.................................74

  (3) Rather than Being "Inflexible," the District Court Gave Skidmore More Time ...............................................................76

  (4) Skidmore Fails to Show that the Time Limit Caused Him Harm ................................................................................76

(g)    Skidmore Misstates the Law and Facts in Claiming that
       Defendants and Their Musicologist Acted Improperly.......................77

       (1)    Skidmore Fails to Even Try to Establish that the District
              Court Erred in Striking His Motion ..........................................77

       (2)    Neither Hollenbeck Music, Skidmore Nor Skidmore's
              Counsel Ever Consulted Dr. Ferrara.........................................78

       (3)    Skidmore's Consent Was Not Required ...................................78

       (4)    Defendants and Dr. Ferrara Did Not Conceal the Prior
              Consultation ..............................................................................80

       (5)    Dr. Ferrara Did Not Receive Any Confidential Information....80

2.    WARNER/CHAPPELL'S APPEAL.......................................................82

      (a)    The District Court's Denial of Warner/Chappell's Motion for
             Attorneys' Fees......................................................................82

             (1)    The District Court's Application of the *Fogerty* Factors..........82

                    i.    *The District Court Agreed that Defendants' Success*
                          *on the Merits Favored the Award of Attorneys'*
                          *Fees* ..............................................................................83

                    ii.   *The District Court Erred on the Law in Concluding*
                          *that Considerations of Frivolousness and Objective*
                          *Unreasonableness Cut in Skidmore's Favor* .................84

                          a.    The Jury's Verdict Did Not Establish that
                                Skidmore's Claims and Positions Were
                                Reasonable.........................................................84

                          b.    The Denial of Summary Judgment Also Did
                                Not Establish that Skidmore's Claims and
                                Positions Were Reasonable .................................85

          c.     A Finding of Reasonableness Does Not "Militate Against an Award of Attorney's Fees" ................................................................. 86

        *iii.*   *The District Court Erred on the Law and Failed to Consider Evidence in Concluding that Motivation Cut Strongly Against the Award of Attorneys' Fees* ....... 87

        *iv.*   *The District Court Relied on an Error of Law in Concluding that the Need for Compensation and Deterrence Only Slightly Favored the Award of Fees* ................................................................. 88

     (2)   The District Court Erred by Reducing Skidmore's Outrageous Litigation Misconduct to Just a New *Fogerty* Factor ........................................................... 89

     (3)   The District Court's Denial of Attorneys' Fees Did Not Further the Policies of the Copyright Act ................................. 91

  (b)   The Denial of Warner/Chappell's Motion for Full Costs .................. 93

3.    CONCLUSION ........................................................... 93

ADDENDUM ..................................................................... 98

  The Constitutional Grant of Power *Re* Copyright ........................................ 99

  Act of May 31, 1790 ........................................................... 100

    Section 3 ........................................................... 100

    Section 4 ........................................................... 100

  Act of Feb. 3, 1831 ........................................................... 102

    Section 4 ........................................................... 100

  Copyright Act of 1909 ........................................................... 104

    Section 1 ........................................................... 100

    Section 3 ........................................................... 100

Section 10 ........................................................................100

Section 11 ........................................................................100

Section 12 ........................................................................100

Section 13 ........................................................................100

Section 213 ......................................................................100

Section 214 ......................................................................100

Copyright Office Regulations under the Copyright Act of 1909 ...............111

37 C.F.R. § 202.8 .............................................................100

37 C.F.R. § 202.15a ..........................................................100

Copyright Act of 1976 ..........................................................113

Section 101 ......................................................................100

Section 102 ......................................................................100

Section 103 ......................................................................100

Section 303 ......................................................................100

Section 408 ......................................................................100

Section 502 ......................................................................100

Section 503(b) ..................................................................100

Section 505 ......................................................................100

Section 704 ......................................................................100

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*ABC Music Corp. v. Janov*, 186 F. Supp. 443 (S.D. Cal. 1960)..............................39

*ABKCO Music, Inc. v. LaVere*, 217 F.3d 684 (9th Cir. 2000)................... 39, 41, 49

*Aeolian Co. v. Royal Music Roll Co.*, 196 F. 926 (W.D.N.Y. 1912).......................40

*Aliotti v. R. Dakin & Co.,* 831 F.2d 898 (9th Cir.1987) .........................................70

*Amarel v. Connell*, 102 F.3d 1494 (9th Cir. 1996) ..................................................77

*American Empire Surplus Lines Ins. Co. v. Care Centers, Inc.*,

    484 F. Supp. 2d 855 (N.D. Ill. 2007)...................................................................81

*Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994) ...............70

*Arizona v. Johnson*, 351 F.3d 988 (9th Cir. 2003)..................................................70

*Batts v. Adams*, No. CV 10-8123-JFW (RZx), 2011 U.S. Dist. LEXIS

    161402 (C.D. Cal. 2011) .....................................................................................66

*Benay v. Warner Bros. Entm't*, 607 F.3d 620 (9th Cir. 2010)................................60

*Berkla v. Corel Corp.*, 302 F.3d 909 (9th Cir. 2002) .............................................93

*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884).............................69

*Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193 (S.D.N.Y. 1997) .............79

*Capitol Records v. Mercury Records Corp.*, 221 F.2d 657

    (2d Cir. 1955) ......................................................................................................40

*Classic Concepts, Inc. v. Linen Source, Inc.*, 716 F.3d 1282

    (9th Cir. 2013) ....................................................................................... 34, 36, 77

*Clem v. Lomeli*, 566 F.3d 1177 (9th Cir. 2009) ......................................................66

*Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005) ........................................................66

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) .....................................87

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147

    (1st Cir. 1994)......................................................................................................44

*Dowling v. United States*, 473 U.S. 207 (1985)................................................ 35, 39

*Elder v. Holloway*, 984 F.2d 991 (9th Cir. 1993) ....................................64

*Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996) .........................81

*Fahmy v. Jay Z*, No. 207CV05715CASPJWX, 2015 WL 5680299

   (C.D. Cal. Sept. 24, 2015) ....................................................................53

*Fantasy, Inc. v. Fogerty*, 94 F.3d 553 (9th Cir. 1996).......................... 82, 83, 86, 88

*Feiman v. City of Santa Monica*, 656 F. App'x 870 (9th Cir. 2016)............... 74, 76

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340

   (1991)................................................................... 59, 60, 64, 65, 67, 69

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) .......................................... 83, 86, 92

*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003)....................................85

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072

   (9th Cir. 2006) ........................................................................... 60, 65

*General Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500

   (9th Cir. 1995) ....................................................................................73

*Goldstein v. California*, 412 U.S. 546 (1973)........................................... 38, 39, 41

*Hampton v. Paramount Pictures Corp.*, 279 F.2d 100 (9th Cir. 1960)...................87

*Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197 (9th Cir. 1989) ............68

*Jerome v. Twentieth Century Fox Film Corp.*, 67 F. Supp. 736

   (S.D.N.Y. 1946), *aff'd*, 165 F.2d 784 (2d Cir. 1948)..........................40

*Johnson v. Gordon*, 409 F.3d 12 (1st Cir. 2005) .....................................68

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146

   (9th Cir. 2010) ....................................................................................55

*Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016) ....................... 89, 90

*KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF(RS),

   2008 WL 5245484 (N.D. Cal. Dec. 17, 2008) .....................................46

*Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209 (9th Cir. 1998)...........................44

*La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir. 1995)...............................41

*Link v. Wabash R. Co.*, 370 U.S. 626 (1962)..........................................................91

*Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718

   (9th Cir. 1984) ....................................................................................................40

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936

   (9th Cir. 2011) ....................................................................................................58

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001)...........88

*Mattel, Inc. v. MGA Entm't, Inc.*, 705 F.3d 1108 (9th Cir. 2013) ................... 82, 92

*Matthew Bender & Co. v. W. Pub. Co.*, 240 F.3d 116 (2d Cir. 2001).....................89

*Merrell v. Tice*, 104 U.S. 557 (1881).......................................................................44

*Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012).....................................................56

*Monotype Corp. PLC v. Int'l Typeface Corp.*, 43 F.3d 443

   (9th Cir. 1994) ............................................................................................ 73, 76

*Narell v. Freeman*, 872 F.2d 907 (9th Cir. 1989)...................................... 59, 60, 64

*National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*,

   692 F.2d 478 (7th Cir. 1982) .............................................................................45

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051

   (9th Cir. 2008) ....................................................................................................66

*New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576

   (2d Cir. 1989) .....................................................................................................88

*Newton v. Diamond*, 204 F. Supp. 2d 1244 (C.D. Cal. 2002), *aff'd*,

   388 F.3d 1189 (9th Cir. 2004)...........................................................................42

*Newton v. Diamond*, 388 F.3d 1189 (9th Cir. 2004) ................................. 34, 35, 53

*Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F. Supp. 2d 514

   (S.D.N.Y. 2005).................................................................................................45

*Nom Music, Inc. v. Kaslin*, 227 F. Supp. 922 (S.D.N.Y. 1964), *aff'd*,

   343 F.2d 198 (2d Cir. 1965) ..............................................................................40

*Norris v. Sysco Corp.*, 191 F.3d 1043 (9th Cir. 1999).............................................34

*Nutrivita Labs., Inc. v. VBS Distribution Inc.*, No. CV-1301635,

    2016 WL 595834 (C.D. Cal. Jan. 27, 2016).........................................................83

*Overman v. Loesser*, 205 F.2d 521 (9th Cir. 1953) .................................................59

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017)............................82

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014) .......... 6, 44, 87, 89

*RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940).........................................40

*Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).............................................45

*Rice v. Fox Broad. Co.,* 330 F.3d 1170 (9th Cir. 2003) ................................... 59, 60

*Rose v. Bourne, Inc.*, 176 F. Supp. 605 (S.D.N.Y. 1959), *aff'd*,

    279 F.2d 79 (2d Cir. 1960) ..................................................................................79

*Rosette v. Rainbo Record Mfg. Corp.*, 354 F. Supp. 1183 (S.D.N.Y. 1973),

    *aff'd*, 546 F.2d 461 (2d Cir. 1976).......................................................................40

*Russell v. Price*, 612 F.2d 1123 (9th Cir. 1979) .....................................................47

*Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003) .................................... 62, 64, 66, 68

*Scentsy, Inc. v. B.R. Chase, LLC*, 942 F. Supp. 2d 1045 (D. Idaho 2013),

    *aff'd in part, rev'd in part and remanded sub nom. Scentsy, Inc. v.*

    *Harmony Brands, LLC*, 585 F. App'x 621 (9th Cir. 2014)..................................46

*Schwarz v. Secretary of Health & Human Serv.,* 73 F.3d 895

    (9th Cir. 1995) ................................................................................... 82, 87, 91

*Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316 (9th Cir. 1986) ........................................55

*Sells v. Wamser*, 158 F.R.D. 390 (S.D. Ohio 1994) ................................................81

*Shinseki v. Sanders*, 556 U.S. 396 (2009).................................................................56

*Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158 (C.D. Cal. 2016)................59

*Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989) .................................................39

*Skidmore v. Led Zeppelin*, 106 F. Supp. 3d 581 (E.D. Pa. 2015)...........................13

*Smith v. Jackson*, 84 F.3d 1213 (9th Cir. 1996).......................................................68

*Stewart v. Abend*, 495 U.S. 207 (1990) ...................................................................79

*Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004) .................................. 17, 24, 62, 84

*Sylvestre v. Oswald*, No. 91 CIV. 5060 (JSM), 1993 WL 179101

  (S.D.N.Y. May 18, 1993) ....................................................................46

*Telink, Inc. v. United States*, 24 F.3d 42 (9th Cir. 1994)........................................87

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477

  (9th Cir. 2000) ................................................................... 45, 50, 59, 60

*Tobeler v. Colvin*, 749 F.3d 830 (9th Cir. 2014) .......................................................3

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869

  (9th Cir. 2005) ....................................................................................93

*Unistrut Corp. v. Power*, 280 F.2d 18 (1st Cir. 1960).............................................44

*Van Cleef v. Aeroflex Corp.*, 657 F.2d 1094 (9th Cir. 1981)..................................66

*Viva Video, Inc. v. Cabrera*, 9 F. App'x 77 (2d Cir. 2001) ....................................89

*W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970 (9th Cir. 2012) .......................36

*Washingtonian Pub. Co. v. Pearson*, 306 U.S. 30 (1939) ................................ 46, 48

*White-Smith Music Pub. Co. v. Apollo Co.*, 209 U.S. 1 (1908)................. 37, 38, 44

*Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004 JAK,

  2014 WL 7877773 (C.D. Cal. Oct. 30, 2014) .....................................51

*Williams v. Bridgeport Music, Inc.*, No. LACV1306004JAKAGRX,

  2015 WL 4479500 (C.D. Cal. July 14, 2015) ............................... 51, 53

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101

  (9th Cir. 2001) ....................................................................................74

**STATE CASES**

*Capitol Records, Inc. v. Erickson*, 2 Cal. App. 3d 526, 82 Cal. Rptr. 798

  (Ct. App. 1969)...................................................................................50

*Hope v. Genentech, Inc.*, 43 Cal. 4th 375, 181 P.3d 142 (2008).......................79

*Wolf v. Superior Court*, 107 Cal. App. 4th 25, 130 Cal. Rptr. 2d 860 (2003).........79

## FEDERAL STATUTES

Constitution, Art. I, § 8, cl. 8 ....................................................................44

### 1790 Act

1 Stat. 124 (May 31, 1790) § 3 .................................................................43

1 Stat. 124 (May 31, 1790) § 4 .................................................................43

### 1831 Act

4 Stat. 36, ch. 16, § 4 (Feb. 3, 1831).......................................................43

### 1909 Act

17 U.S.C. § 1 ............................................................................................38

17 U.S.C. § 3 ............................................................................................47

17 U.S.C. § 10 ..........................................................................................35

17 U.S.C. § 11 ..........................................................................................35

17 U.S.C. § 12 .................................................................................... 43, 49

17 U.S.C. § 13 .................................................................................... 35, 43

17 U.S.C. § 214 ........................................................................................48

### 1976 Act

17 U.S.C. §§ 101 *et seq*............................................................................3

17 U.S.C. § 101 ........................................................................................65

17 U.S.C. § 102 ........................................................................................35

17 U.S.C. § 103 ........................................................................... 47, 68, 69

17 U.S.C. § 303 ........................................................................................41

17 U.S.C. § 408 ........................................................................................44

17 U.S.C. § 502 ........................................................................................92

17 U.S.C. § 503 ........................................................................................92

17 U.S.C. § 505 .................................................................................. 82, 93

17 U.S.C. § 704 ........................................................................................48

United States Code

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 2111 ................................................................................55


**STATE STATUTES**

California Civil Code § 980 ................................................................50


**OTHER AUTHORITIES**

Compendium of U.S. Copyright Office Practices (3d ed. 2014)............................68

H.R. Rep. No. 60-2222, 60th Cong., 2d Sess. (1909).............................................39

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976).............................................48

*Harvard Dictionary of Music* (Don Michael Randel ed., 4th ed. 2003)..................10

Report of the Register on the General Revision of the

   U.S. Copyright Law (1961) .......................................................... 45, 48


**RULES**

Federal Rule of Appellate Procedure 4....................................................................3

Federal of Appellate Procedure 28 ................................................................ 34, 77

Federal Rule of Civil Procedure 51 ......................................................... 64, 69-70

Federal Rule of Evidence 403................................................................. 34, 52, 53


**TREATISES**

Alfred M. Shafter, *Musical Copyright* (2d ed. 1939) .............................................45

H. Walls, *The Copyright Handbook* (1963)............................................................40

Horace G. Ball, *The Law of Copyright & Literary Property* (1944)......................40

M. Nimmer & D. Nimmer, *Nimmer on Copyright*

(2017)..................................................................... 35, 39, 47, 48, 60, 79

Ronald S. Rosen, *Music & Copyright* (2008)........................................24

## REGULATIONS

<u>1909 Act</u>

37 C.F.R. 202.8 .......................................................................40

37 C.F.R. 202.15a .....................................................................40

<u>1976 Copyright Act</u>

37 C.F.R. § 202.3 .....................................................................55

**INTRODUCTION**

Plaintiff Michael Skidmore appeals from the Judgment entered after trial and the jury's unanimous verdict that *Stairway to Heaven* and an obscure 1967 instrumental composition, *Taurus*, are not substantially similar under this Circuit's extrinsic test. Skidmore had a full and fair trial and the jury's verdict is amply supported by the record, was clearly correct and must be respected.

Skidmore's infringement claim focused on two-and-a-half measures of a four-measure passage at the beginnings of *Stairway to Heaven* and *Taurus*. Those measures include, in their normal order, five descending notes of a musical scale in half-steps—*i.e.*, a chromatic scale—which is what some listeners find similar from the "quick listen" that Skidmore claims is determinative. OB at 10. At trial, however, defendants' musicologist testified that other than sharing a centuries-old descending chromatic scale used in numerous popular songs, the two compositions are completely different. Skidmore's musicologist acknowledged the substantial differences and that a descending chromatic scale is commonplace. But he testified that typically six notes of the public domain descending chromatic scale are used and that *Taurus*' use of only five notes of the scale is a unique variation. He also pointed to other claimed similarities, which defendants' musicologist discounted. Ultimately, the jury credited the testimony of defendants' musicologist and found no substantial similarity in protected expression.

1

Unable to challenge the jury's verdict on a matter of expert credibility, Skidmore resorts to challenging the District Court's rulings. Conceding that *Stairway to Heaven* and *Taurus* are dissimilar, Skidmore argues that the copyrighted *Taurus* composition is "more dissimilar" to *Stairway to Heaven* than the uncopyrighted recordings of performances of *Taurus* he wanted to play at trial. The District Court correctly applied the law and did not abuse its discretion in requiring that Skidmore prove substantial similarity between *Stairway to Heaven* and the copyrighted *Taurus* musical composition. Skidmore argues that the District Court erred by excluding evidence and jury instructions on the issue of access, but the jury found access, so his arguments are not only wrong, but moot. He complains that the jury was not instructed on copyrightable selections-and-arrangements, but he waived the issue by failing to object and the evidence did not warrant the instruction. In accusing the District Court of imposing "inflexible" time limits, Skidmore ignores that he requested and received additional time that he told the District Court was fair, and he never made an offer of proof as to any additional evidence he would present. Finally, the District Court also did not abuse its discretion in denying Skidmore's factually and legally unsupported motion to exclude defendants' musicologist.

The Judgment and Amended Judgment are properly affirmed.

2

Also, Warner Chappell Music, Inc. ("Warner/Chappell") appeals from the District Court's Order denying its motions for attorneys' fees and additional costs. In narrowly denying those motions, the District Court found that defendants prevailed on the merits and Skidmore committed extensive litigation misconduct. But the District Court erred in applying the *Fogerty* factors and by treating litigation misconduct as another *Fogerty* factor rather than an independent basis to award attorneys' fees. As a result, the denial of fees and additional costs did not further the purposes of the Copyright Act and should be reversed.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction of the action below pursuant to 28 U.S.C. Section 1331 and 17 U.S.C. Sections 101 *et seq.* Skidmore timely appealed on July 23, 2016. XI–ER–2757; Fed. R. App. P. 4(a)(1)(A).

The District Court's August 8, 2016 Order denying Warner/Chappell's motions for attorneys' fees and additional costs (1–SER–3) is final and appealable. *Tobeler v. Colvin*, 749 F.3d 830, 832 (9th Cir. 2014). Warner/Chappell timely appealed on September 6, 2016. 1–SER–1; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction pursuant to 28 U.S.C. Section 1291.

3

## <u>STATEMENT OF ISSUES PRESENTED</u>

### <u>Skidmore's Appeal</u>

Skidmore's appeal from the Judgment and Amended Judgment presents the following issues:

1.    Whether Skidmore waived any challenge to the grant of summary judgment to three defendants, by not mentioning that ruling in his Opening Brief.

2.    Whether the District Court abused its discretion by requiring that Skidmore prove copying of the copyrighted *Taurus* musical composition.

3.    Whether the copyright registered in a musical composition under the Copyright Act of 1909 protects that copyrighted work or, as Skidmore contends, also protects sound recordings and the various versions of musical compositions embodied in those sound recordings over time.

4.    Whether the District Court abused its discretion by excluding at trial uncopyrighted sound recordings of *Taurus* that contain performance elements that under established law must be disregarded in determining whether the registered copyright in the *Taurus* musical composition was infringed.

5.    Whether it was an abuse of discretion for the District Court not to instruct the jury on the inverse ratio rule in the absence of evidence establishing a

high degree of access and, if so, whether the issue is moot given that the inverse ratio rule does not change that Skidmore had to establish substantial similarity in protectable expression, which the jury found he had not done.

6.      Whether Skidmore waived his objection that the jury was not instructed on copyrightable selections-and-arrangements and, if not, whether the District Court abused its discretion given that the evidence did not warrant the instruction and whether the claimed error was harmless.

7.      Whether the District Court abused its discretion by, as required by this Circuit's law, identifying for the jury unprotectable elements in a musical composition.

8.      Whether the District Court abused its discretion by playing the expert recording requested by the jury's foreperson during deliberations, rather than the misleading expert recording initially identified by another jury, and, if so, whether the claimed error was waived.

9.      Whether the District Court abused its discretion by, based on its experience and the parties' witness summaries, providing each side with ten hours of trial examination of witnesses, which the District Court extended at Skidmore's request even though it found as a matter of fact that Skidmore had not efficiently

used the time allotted, and without Skidmore ever making an offer of proof as to any evidence he would have submitted if additional time had been provided.

10.     Whether the District Court abused its discretion in not excluding or otherwise sanctioning defendants' musicologist.

### Warner/Chappell's Appeal

Warner/Chappell's appeal from the Order denying its motion for attorneys' fees and additional costs presents the following issues:

1.     Whether the District Court's determination that two *Fogerty* factors cut in Skidmore's favor was based on a mistake of law, namely that no one could have sued for *Stairway to Heaven*'s alleged infringement of the *Taurus* musical composition until *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014).

2.     Whether the District Court erred in concluding that the jury's verdict against Skidmore and the District Court's denial of summary judgment established that Skidmore's claims and positions were reasonable.

3.     Whether the District Court erred in treating Skidmore's litigation misconduct as another *Fogerty* factor rather than an independent basis on which to award attorneys' fees and additional costs.

4.     Whether the District Court's denial of attorneys' fees and additional costs for the successful defense of Skidmore's claims on the merits furthered the purposes of the Copyright Act.

Pertinent constitutional provisions, statutes and regulations appear in the attached Addendum.

## STATEMENT OF THE CASE

**1.     BACKGROUND FACTS**

**(a)     In 1967, Lou Adler's Ode Records Released the First Spirit Album and His Hollenbeck Music Registered a Copyright in the Musical Composition _Taurus_**

In 1967, Ode Records, Inc. ("Ode Records"), owned by prominent manager, music publisher and record producer, Lou Adler, signed the band Spirit to a recording contract. I–ER–118. At the same time, Adler's Hollenbeck Music Co. ("Hollenbeck Music") entered into written Exclusive Songwriter Agreements with the band's members, including Randy Wolfe, professionally known as Randy California.     In his 1967 Songwriter Agreement, Wolfe "irrevocably and absolutely" assigned to Hollenbeck "all original musical compositions [by Wolfe], together with all world-wide copyrights and renewals and extensions thereof, . . . ." Exh. 2070 at ¶¶ 1-3, 3(c), 6 (references to "Exh." are to admitted trial exhibits within defendants' motion to transmit exhibits).

7

In 1967 or early 1968, Ode Records released its first Spirit album, titled *Spirit*, which included the recording of a performance of an instrumental musical composition titled *Taurus*. II–ER–306:25-307:3, 317:15-19; III–ER–448:15-18. The *Taurus* recording was never released as a single, so it was not played on the radio. III–ER–447:12-19, 448:21-22.

In December 1967, Hollenbeck Music registered its copyright in the musical composition *Taurus* with the United States Copyright Office, as an unpublished work. Exh. 2964. Using the Copyright Office's form, which directed it to deposit "one complete copy of the work . . ." (*id.* at 2), Hollenbeck Music submitted one page of sheet music bearing the copyright notice "Hollenbeck Music Co. (c) 1967" (the "*Taurus* deposit copy"). Exh. 2058. The *Taurus* deposit copy is stamped with the Copyright Office's copyright registration number, Eu 35222. *Id.*

**(b)** **In December 1968, Ode Records Released Spirit's Breakthrough Album, *The Family that Plays Together*, which Spirit Toured to Support and which Did Not Include *Taurus***

In December 1968, Ode Records released the Spirit album *The Family that Plays Together*, which was Spirit's breakthrough album. II–ER–318:17-319:7. Spirit "toured in support" of that and its subsequent albums, meaning that at concerts Spirit performed songs from its most current album, plus Spirit's most

well-known or "tent-pole" songs, which did not include *Taurus*. II–ER–319:8-22, 320:25-321:1.

**(c)** **Led Zeppelin, a UK Band, Was Formed in 1968 and its Members Were Never Present When Spirit Performed *Taurus***

In 1968, Jimmy Page, Robert Plant, John Paul Jones and John Bonham, all of whom resided in the United Kingdom, formed the musical group Led Zeppelin. V–ER–1074:18-1075:7.

Led Zeppelin and Spirit never toured together. II–ER–325:10-16. They performed on the same day and location only three times and Spirit once performed at a club in Birmingham, England, where Robert Plant and his wife regularly met friends. In each instance, Spirit was touring in support of albums that did not include *Taurus* and there is no evidence that any member of Led Zeppelin was ever present during any performance of *Taurus*. *See below* at 61-62.

**(d)** ***Stairway to Heaven*, Released on Led Zeppelin's Fourth Album in 1971, Was Written by Jimmy Page and Robert Plant and Contains a Descending Chromatic Scale**

In late 1971, Atlantic Records released Led Zeppelin's fourth album, which is untitled but known as Led Zeppelin IV. Many of the album's recordings became rock-and-roll standards, including *Stairway to Heaven*, which was written by

9

Jimmy Page and Robert Plant (III–ER–694:17-22) and which Skidmore describes as "one of the greatest songs ever written" (XI–ER–2723, ¶ 56).

The beginning of *Stairway to Heaven* includes a commonplace chord progression in the key of A minor, with the lowest note of each chord descending in half-steps, or chromatically, and the chords arpeggiated or "broken" so that their constituent notes are played separately. This descending chromatic scale, also known as a minor line cliché, is a common musical device—on a piano, it is simply playing the white and black keys in order from right to left—as are arpeggios.[1] A descending chromatic scale "tug[s] at the heartstrings" and appears "in dramatic ballads like 'What Are You Doing For The Rest Of Your Life', 'My Funny Valentine', 'Round Midnight', 'In A Sentimental Mood', 'Masquerade', [and] 'Meaning Of The Blues', just to mention a few." Exh. 2405 at 4, 28.

Many compositions that predate *Taurus*—including *Michelle* by The Beatles, one of Wolfe's favorite groups (II–ER–323:13-15, 329:5-9)—use a

---

[1] A musical scale is a series "of pitches arranged in order from lowest to highest or from highest to lowest," and the two principal scales in Western music are the diatonic scale (consisting of seven pitches, separated by a full tone) and the chromatic scale (consisting of all twelve pitches, separated by a semi-tone or half-step). A pitch is a tone without regard to duration, and a pitch with a specified duration is a note. Three or more pitches sounding simultaneously are called chords and an arpeggio is "[a] chord whose pitches are sounded successively, . . . rather than simultaneously." *Harvard Dictionary of Music* (Don Michael Randel ed., 4th ed. 2003) (definitions of "scales," "pitches," "chords" and "arpeggio").

descending chromatic scale, and there is one in *Taurus* as well. IV–ER–762:3-15. Other than the descending chromatic scale, however, *Stairway to Heaven* and *Taurus* are very different, including that *Stairway to Heaven* has an ascending line played concurrently with the descending chromatic scale, and the pitches of the "broken" chords are ordered differently in the two compositions. In the following transcription of the first four measures of *Taurus* and *Stairway to Heaven*, the red pitches are the descending chromatic scale, with the duration of the *Taurus* deposit copy's notes halved to correspond with the notes in *Stairway to Heaven*:

Top two lines = Section A in "Taurus" with note values halved

Lower two lines = Measures 1-4 in "Stairway"



Exh. 2092-3 at 2; IV–ER–949:10-950:10.

(e) **Despite the Success of 1971's *Stairway to Heaven*, Hollenbeck Music, Wolfe and—After Wolfe's Death in 1997—the Trustees Never Sued, Until Skidmore Sued in 2014**

Neither Hollenbeck Music nor Wolfe ever asserted a claim that *Stairway to Heaven* infringed the copyright in *Taurus*. After Wolfe went missing in 1997, he was declared dead and, from 2002 until her death in 2009, his mother was the trustee or co-trustee of the Randy Craig Wolfe Trust (the "Trust"). II–ER–292:21-24; Exh. 450. She also never asserted a claim.

Skidmore, who became a co-trustee of the Trust in 2006, also did not assert a claim, until he filed the action below on May 31, 2014, forty-three years after the 1971 release of *Stairway to Heaven*. XI–ER–2893.

## 2. THE ACTION BELOW

### (a) Skidmore's 2014 Filing of this Action

In 2014, Skidmore, as trustee of the Trust, filed the action below in the Eastern District of Pennsylvania, where neither Skidmore nor any of the defendants reside or have offices.

Skidmore's first amended complaint asserted claims for direct, contributory and vicarious infringement of the 1967 copyright that Hollenbeck Music registered in the *Taurus* musical composition, which was renewed in 1996. Skidmore also

12

asserted a claim he labeled "Right of Attribution—Equitable Relief—Falsification of Rock n' Roll History." XI–ER–2713.

Skidmore initially alleged that the Trust owns the registered *Taurus* composition copyright, but, when defendants moved to dismiss or transfer the action, Skidmore switched to claiming that because the Trust receives royalties under the 1967 Songwriter Agreement, it has standing to sue as a beneficial owner of Hollenbeck Music's copyright in the *Taurus* composition. 3–SER–638-643; 17 U.S.C. § 501(b).

 The District Court in Pennsylvania granted defendants' motion to transfer the action to the Central District of California. *Skidmore v. Led Zeppelin*, 106 F. Supp. 3d 581, 589-90 (E.D. Pa. 2015).

### (b)     The District Court's Rulings on Defendants' Motion for Summary Judgment

After the case was transferred and discovery was completed, defendants moved for summary judgment. The District Court agreed that Skidmore failed to present any evidence that John Paul Jones, Super Hype Publishing and Warner Music Group had infringed and granted them summary judgment. I–ER–135. The District Court also concluded that Skidmore's "Falsification of Rock 'n Roll History" claim is "legally baseless." I–ER–135-136. However, the District Court

found triable issues on Skidmore's copyright infringement claims against the remaining defendants.

(c)     **The District Court's Pretrial Conference and Rulings on Motions _in Limine_**

At the April 25, 2016 pretrial conference and after reviewing the parties' summaries of each witnesses' expected testimony, the District Court found that providing each side with ten hours of witness examination at trial was appropriate. The District Court confirmed that if a side used its time "efficiently and effectively and the interest of justice calls for more time," the District Court would provide it, and had done so once before.   I–ER–89:1-92:7.   Skidmore did not object or otherwise suggest that ten hours was inappropriate.  I–ER–108:7-20.

The District Court also provided tentative rulings on motions _in limine_, explaining that "tentative" meant "you can't get into that unless the Court changes its mind."  I–ER–92:8-14.   The District Court granted defendants' motion to exclude recordings of Spirit performing _Taurus_ and expert testimony based on those recordings.   I–ER–93:15-17; IX–ER–2327, VIII–ER–2114, 2072.   The District Court also granted defendants' motion to exclude evidence that the Trust is a charitable organization and uses its funds to buy musical instruments for needy

14

children, subjects on which Skidmore had successfully resisted all discovery and which would have been unduly prejudicial. I–ER–94:6-7; 3–SER–618-21.

As a preview of Skidmore's litigation misconduct at trial, immediately following that pretrial conference, he and his counsel spoke to the press in front of the courthouse and, in statements broadcasted to the public, stated that "[i]f money is won in this case, it's to be used to buy musical instruments for children who are in need in Ventura County." 1–SER–79:13-80:2.

### (d) The District Court Allowed Skidmore to Provide New Rule 26 Expert Disclosures on the Eve of Trial

Following the final pretrial conference, the Court issued its Order on the parties' motions *in limine*. VIII–ER–1866. Recognizing that Skidmore's expert reports were inadmissible because they considered unprotected elements in recordings of Spirit performing *Taurus*, the District Court gave Skidmore a second chance by amending its Order to allow him to submit before trial new expert reports as to the *Taurus* musical composition. I–ER–114.

In his new report, Skidmore's musicologist stated that Skidmore's infringement claim is even stronger if based on the copyrighted *Taurus* deposit copy. VII–ER–1777-1778. But, his and Skidmore's other experts' new reports again claimed similarities between *Stairway to Heaven* and recordings of Spirit's

15

performances of *Taurus*. This time, Skidmore's experts argued that the Spirit recordings proved defendants' access because *Stairway to Heaven* and the recordings share a similar "sonic landscape" due to performance elements such as acoustic guitars, reverb and "Baroque instruments," namely a harpsichord in Ode Records' studio recording of *Taurus* and woodwind recorders in *Stairway to Heaven*. At their depositions, however, Skidmore's experts admitted they conducted no research to determine the extent to which the claimed performance elements appear in popular music in the 1960s-1970s, and admitted those elements were commonplace. 3–SER–575:3-576:26.

    **(e)**    <u>**The Jury Trial**</u>

        **(1)**    **Skidmore's Case**

In his case in chief, Skidmore called as witnesses Wolfe's sister (Janet Wolfe, II–ER–279-97); the two surviving original members of Spirit (Jay Ferguson, II–ER–299-333, 341-370, and Mark Andes, II–ER–390-421, III–ER–427-467); by deposition testimony, a person who claimed to have seen Mr. Plant at a club in Birmingham, England, on a night that Spirit performed (Michael Ware, II–ER–375-377, 387-389); a Spirit "historian" (Bruce Pates, III–ER–468-478); Jimmy Page (III–ER–478-566, 606-707); a later member of Spirit (Larry Knight, III–ER–707-716); a master guitarist (Kevin Hanson, IV–ER–724-771); a

16

musicologist (Dr. Alexander Stewart, IV–ER–771-837); Skidmore (IV–ER–837-846, 865-891); and a damages expert (Dr. Michael Einhorn, IV–ER–891-925).

As to the issue of substantial similarity under the extrinsic test—the issue on which the jury sided with defendants and which requires analytic dissection by experts, *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004)—Skidmore's master guitarist, Hanson, performed the *Taurus* deposit copy as he interpreted it, and played recordings of his performances of the beginnings of the *Taurus* deposit copy and *Stairway to Heaven*. IV–ER–739:6-740:5, 743:22-744:4, 753:8-754:1, 767:7-19; Exh. 525V. He also testified that defendants' experts, in their recordings, correctly performed the *Taurus* deposit copy. IV–ER–764:23-765:3; Exh. 51A, 61A.

Hanson testified that, "[f]rom a musicological standpoint," the beginnings of the two compositions are substantially and strikingly similar. IV–ER–755:22-756:2. But under cross-examination he admitted that he never completed college; has never taken a class on comparative musicological analysis; does not have a degree in musicology; has never authored any publications in the field of musicology; is not a member of any musicological society; is not a musicologist; and is, instead, a friend of Skidmore's counsel. IV–ER–760:7-762:2. He also admitted that the descending minor chromatic scale in *Taurus* and *Stairway to*

17

*Heaven* is a commonplace musical device, was not invented by Wolfe and appears in, for example, earlier songs such as *Michelle* by The Beatles, *Cry Me a River*, *My Funny Valentine* and *A Taste of Honey*. IV–ER–762:3-15. In addition, he admitted that the chords in *Taurus* and *Stairway to Heaven* and a series of eighth notes are both commonplace. IV–ER–764:8-10, 765:4-11.

Skidmore's musicologist, Dr. Stewart, testified to what he described as five significant similarities between the beginnings of the *Taurus* deposit copy and *Stairway to Heaven*. IV–ER–777:2-18, 778:6-15.

First, Dr. Stewart found similarity in the presence of a descending minor chromatic scale and the associated chords. IV–ER–779:10-16. He admitted that a chromatic scale is just the musical scale consisting of all 12 pitches, which, on a piano, are the white and black keys, and "certainly there are numerous songs that use chromatic scales." IV–ER–788:19-789:14. He also admitted that songs commonly include a descending chromatic scale. But he testified songs "typically" use six pitches of the chromatic scale descending "all the way to the E"—that is, A to G# to G to F# to F to E—"before they go back to the beginning again." IV–ER–786:9-787:7. He found a similarity between *Taurus* and *Stairway to Heaven* because, unlike the six pitches from A to E in the 17th century aria, *Dido's Lament*, the descending chromatic scale in *Taurus* and *Stairway to Heaven*

18

is only five pitches of that scale, from A to F. IV–ER–790:8-791:11. On cross-examination, he admitted that his report cited no publication supporting his testimony that descending chromatic scales go from A to E. IV–ER–833:6-13. As to the chords, he admitted they appear in other compositions and that "breaking" them into arpeggios is common in 1960s music and not a substantial similarity. IV–ER–831:2-22.

Second, Dr. Stewart found similarity because the first four pitches of the descending chromatic scale are two beats each, with four beats on the fifth pitch. IV–ER–779:17-19, 812:12-20. However, the pitches in the descending chromatic scale in *Taurus* are actually twice the number of beats as those in *Stairway to Heaven* and the beats are similar only if the *Taurus* deposit copy's notes are halved. Exh. 2058, 2092b at 1. Dr Stewart did not claim that the similarity resulting from halving the notes is unique or original.

Third, he found similarity in that among the nineteen notes in the first two measures of *Stairway to Heaven* and the twenty-nine notes in the first two measures of *Taurus*, an A is followed by a B, a B is followed by a C and a C is followed by an F#. He deemed these to be three "pairs" of pitches—A to B, B to C and C to F#—present in both works. IV–ER–779:20-780:1. Under cross-examination, however, he admitted that these two-note sequences are

commonplace and that in *Taurus* and *Stairway to Heaven* they are in different melodies and preceded and followed by different notes. IV–ER–814:7-821:18; Exh. 509.

Fourth, Dr. Stewart found similarity in rhythm because both works have successive eighth notes. IV–ER–780:2-9. The *Taurus* deposit copy, however, has successive quarter notes, so the claimed similarity is only a series of notes of equal duration. Exh. 2058. Further, under cross-examination Dr. Stewart agreed it is commonplace for compositions to include a series of eighth notes. IV–ER– 814:25-815:6.

Fifth, he found similarity in that the beginning of the compositions have the same pitch "collection," that is, the same pitches irrespective of sequence or duration. IV–ER–780:10-13. But under cross-examination he testified that the pitches are in different orders in the two works, *e.g.*, in their first measures the pitches in *Taurus* are A-B-C-A-E-C/B-A-B but, in *Stairway to Heaven*, they are C-E-A-B-E-C-D (IV–ER–815:17-816:8) or, as Dr. Stewart transcribed that sequence, C-E-A-B-E-C-B (Exh. 509).

He also testified that the combination of all five of these claimed similarities did not appear in the prior art noted by defendants' musicologist and is unique. IV–ER–781:4-12.

In addition, Dr. Stewart found a similarity in that the vocal melody of *Stairway to Heaven*'s first verse begins with three pitches—A-B-C—that can be found in the introduction of *Taurus*. IV–ER–783:24-784:7. He also testified that the structure of the beginnings of the compositions is similar but different. IV–ER–782:17-783:23.

Dr. Stewart admitted that other than the similarities he found in the introductions and the first three notes of *Stairway to Heaven*'s first verse, *Taurus* and *Stairway to Heaven* are very different compositions. IV–ER–826:16-827:18.

Finally, as part of Skidmore's direct examination, Dr. Stewart repeatedly sought to rebut the expert report and deposition testimony of defendants' musicologist, Dr. Ferrara. IV–ER–797:8-798:20, 800:16-802:24, 803:21-804:19, 805:20-807:3, 812:1-10.

Defendants moved for judgment as a matter of law, which the District Court took under submission and never decided. IV–ER–925:22-24; VI–ER–1279:18-1281:12.

### (2)    Defendants' Case

### i.    *Defendants' Witnesses*

In their case in chief, defendants called at trial one of the surviving members of Spirit (Ferguson, II–ER–371-374); defendants' musicologist (Dr. Lawrence Ferrara, IV–ER–929-983, V–ER–989-1070); John Baldwin (professionally known as John Paul Jones, V–ER–1070-1090); a master guitarist and arranger (Robert Mathis, V–ER–1090-1101, 1107-1140); a damages witness for the individual defendants (Timothy Gardner, V–ER–1145-1175); a damages witness for Rhino Entertainment Company and Atlantic Recording Corporation (David Woirhaye, V–ER–1175-1202); a Warner/Chappell witness (Jeremy Blietz, V–ER–1202-1209); Mr. Plant (V–ER–1210-1233); and Mr. Page (V–ER–1233-1338, VI–ER–1244-1267).

As to the issue of substantial similarity in protected expression, defendants' musicologist, Dr. Ferrara, testified to his extensive qualifications and experience (IV–ER–930:13-935:19), the analytical methodology he employed (IV–ER–936:1-937:12) and certain musical terms (IV–ER–938:18-939:12).  His written report (Exh. 2092-1-21) and a recording of him playing the *Taurus* deposit copy (Exh. 61A) were admitted into evidence and provided to the jury, and he demonstrated his opinions by playing a piano in the courtroom (*e.g.,* IV–ER–950:12-957:14).

22

Dr. Ferrara testified that *Taurus* and *Stairway to Heaven* are very different compositions that both include a descending chromatic scale, which, on a piano, is simply playing the white and black keys from right to left. He testified, and provided or played prior art confirming, that the descending chromatic scale is a musical device going back centuries, is present in numerous compositions predating *Taurus*, is not in fact typically A to E, and instead often stops short of E. IV–ER–944:11-947:24; Exh. 2092-3 at 1-18, 20-22; Exh. 2092-5 at 4-17. Dr. Ferrara provided so many examples of prior art undercutting Skidmore's claim, that the District Court precluded defendants from offering additional examples on the ground their probative value was outweighed by the time to play them. IV–ER–967:17-981:15, V–ER–1037:11-1038:9. Dr. Ferrara also found no significant similarity in the structures of the two compositions. VI–ER–1028:18-1031:2; Exh. 2092-2.

As to Skidmore's experts, Dr. Ferrara testified that Hanson's "mash-up" of the recordings of his performance of *Taurus* and *Stairway to Heaven* includes only *Taurus*' bass clef, thereby omitting all the different notes that appear in *Taurus*' treble clef. V–ER–1066:18-1067:4; *see above* at 11.

To demonstrate that Dr. Stewart's reliance on pitches without regard to duration is misplaced, Dr. Ferrara played songs that have the same pitch sequences

23

but with different durations and, as a result, sound completely different. V–ER– 1019:13-1022:6; *see also Swirsky*, 376 F.3d at 848 n. 13 ("pitch sequence may break music down beyond recognition"); Ronald S. Rosen, *Music & Copyright* 153 n. 9 (2008) (similarity in pitch sequences, which are identical in *Rock of Ages* and *Rudolph, the Red-Nosed Reindeer*—C-D-C-A-F-D-C—"is of no musical significance")*.* Dr. Ferrara also testified that Dr. Stewart's chart not only shows that the pitch sequences in *Taurus* and *Stairway to Heaven* are different (Exh. 509), but omits the additional differences that the pitches are going in opposite directions or to pitches an octave apart (V–ER–1019:3-1022:6; IV–ER–964:17-965:12).

As for Dr. Stewart's claimed five similarities that he testified do not appear in prior art, Dr. Ferrara showed that the claimed similarities either do not exist or are musicologically insignificant.

Regarding Dr. Stewart's first claimed similarity of a supposedly shortened descending chromatic scale and its associated chords, Dr. Ferrara testified that while the 17th century *Dido's Lament* uses six pitches descending from A to E, that is not "typical" in more current prior art, which uses pitches descending from A to F. IV–ER–946:17-947:17, 966:1-967:12. He also testified to errors in the exhibit that Dr. Stewart used to claim that none of Dr. Ferrara's prior art went from A to F, and Dr. Ferrara showed that multiple examples of prior art include—like

*Taurus* and *Stairway to Heaven*—five pitches descending from A to F rather than from A to E.  IV–ER–981:16-983:9; V–ER–989:21-997:11; Exh. 501-0001.  As to chords, Dr. Ferrara, like Hanson and Dr. Stewart, testified that the chords in the two compositions are commonplace.  In addition, Dr. Ferrara demonstrated that the three chords that are similar in the beginnings of *Taurus* and *Stairway to Heaven* are arpeggiated or "broken" differently, so that their constituent notes are in different orders.  IV–ER–955:10-17.  Thus, in the lower line in *Taurus*, which breaks the chords into individual notes, and *Stairway to Heaven*:

- the A minor chord, comprised of A, C and E, is broken as A, E and down to C in *Taurus*, but, in *Stairway to Heaven*, is broken as A, C, E and up to A;

- the G-sharp augmented chord, comprised of G#, C and E, is broken as G#, E and down to C in *Taurus*, but, in *Stairway to Heaven*, is broken as G#—with an added B simultaneously—then E, C and up to B; and

- the C/G chord, comprised of G, C and E, is broken as G, C and E down to C in *Taurus*, but, in *Stairway to Heaven*, is broken as G and C simultaneously, then E, C and up an octave to C.

Exh. 509, 2058.

As for Dr. Stewart's second claimed similarity in the beats of the pitches in the descending chromatic scale, Dr. Ferrara testified that the duration of the pitches

in the *Taurus* deposit copy is twice as long as in *Stairway to Heaven*, and there is no musicologically significant similarity in rhythm in the two compositions. IV–ER–948:11-949:9; Exh. 2092-4.

As for Dr. Stewart's third claimed similarity of three "pairs" of notes, Dr. Ferrara testified they are not musicologically significant because each "pair" is just two notes picked out of completely different musical sequences, like picking "ab" out of "crab" and "absent" (V–ER–1005:5-1010:22), and appear in prior art (V–ER–1012:1-1015:21; Exh. 2961). Also, Dr. Stewart picked the "pairs" out of *Stairway to Heaven*'s treble clef but, as to *Taurus*, picked a combination of pitches from *Taurus*' treble and bass clefs. Exh. 2705.

As for Dr. Stewart's fourth claimed similarity in rhythm because of successive eighth notes, Dr. Ferrara—in addition to raising that the *Taurus* deposit copy has quarter notes, not eighth notes—demonstrated that while the beginning of *Stairway to Heaven* has successive notes of equal duration ending in an abrupt stop called "syncopation," the beginning of *Taurus* has notes of different durations and no syncopation. IV–ER–958:9-959:9, 955:21-956:13.

Dr. Ferrara likened Dr. Stewart's fifth claimed similarity in "pitch collection," to arguing that two books in English are substantially similar because they include the same letters of the alphabet. Dr. Ferrara pointed out that just as

the presence of the same letters in "senator" and "treason" does not make those words substantially similar, the presence of the same pitches—without regard to sequence and duration—is not a substantial similarity. IV–ER–951:19-23. He also raised that the first two measures of *Taurus* and The Beatles' *Michelle*, which predates *Taurus*, have the same "pitch collections" too. V–ER–1023:6-1024:8.

Finally, Dr. Ferrara testified that the pitch sequence A-B-C in the introduction of *Taurus* and a verse in *Stairway to Heaven* is not musicologically significant because A-B-C is just do-re-me; A-B-C starts on beat one in *Taurus* but on beat four in *Stairway to Heaven*; the duration of the notes is different in the two compositions; and A-B-C appears in many other works, including *My Funny Valentine*, which also has a descending chromatic scale. V–ER–1024:17-1028:13.

### ii. *The District Court's Grant of Skidmore's Request for Additional Time to Cross-Examine Defendants' Witnesses*

During Skidmore's cross-examination of Dr. Ferrara, Skidmore used up the last of his ten hours allotted by the District Court. Skidmore asked for "a little bit of leeway" and the District Court, after making the factual finding that Skidmore had wasted his allotted time, gave him an additional ten minutes of cross-examination for each of defendants' witnesses, with no rebuttal witnesses. Skidmore responded, "That's fair." V–ER–1057:13-1065:12. Yet, when

27

defendants rested, Skidmore requested leave to call two rebuttal witnesses. He failed to identify them or make an offer of proof, and his request was denied. VI–ER–1268:11-1269:2.

### (3) Skidmore's Preparation of the District Court's Jury Instructions

Prior to trial, the parties filed with the District Court the jury instructions they agreed upon and those in dispute. After the parties rested, the District Court tasked Skidmore's counsel to prepare the jury instructions it intended to give and then identified those instructions and the District Court's changes. VI–ER–1283:5-1309:10. Although Skidmore prepared the instructions, he did not object to the omission of an instruction as to copyrightable selections-and-arrangements and did not object to the instructions as to the copyright requirement of originality. *Id.*

### (4) The Jury's Verdict

During deliberations, the jury asked to again hear Skidmore's recordings of his master guitarist, Hanson, playing the beginnings of the *Taurus* deposit copy and *Stairway to Heaven*. VI–ER–1496. The eight-person jury then returned its unanimous verdict, finding, *inter alia*, that the two compositions are not substantially similar under the extrinsic test. VI–ER–1497.

28

**(5)     The Entry of Judgment and the Amended Judgment, and Skidmore's Decision Not to File any Post-Trial Motions**

Following the jury's verdict, the District Court entered Judgment in favor of the defendants who successfully defended the case at trial.  I–ER–45.  That Judgment omitted the defendants who had obtained summary judgment and they were added in the District Court's Amended Judgment.  I–ER–1.

Skidmore filed no motions challenging the verdict or judgments.

**(6)     The Court's Denial of Warner/Chappell's Motion for Attorneys' Fees and Additional Costs**

Warner/Chappell bore all defendants' attorneys' fees and costs, except for those the Phillips Nizer firm charged the individual defendants.  Warner/Chappell timely filed a motion for attorneys' fees and a motion for additional, non-taxable costs.  After those motions were briefed (1–SER–8-162), the District Court denied them, without a hearing (1–SER–3).

**(7)     Skidmore's and Warner/Chappell's Consolidated Appeals**

Skidmore appealed from the Judgment and the Amended Judgment, and Warner/Chappell appealed from the Order denying attorneys' fees and additional costs.  XI–ER–2757; 1–SER–1.  By Order filed on November 7, 2016 and

amended on November 15, 2016, this Court granted Warner/Chappell's opposed motion to consolidate the two appeals.

## SUMMARY OF ARGUMENT

Substantial evidence supports the jury's verdict and Skidmore's appeal has absolutely no merit.

Skidmore sued on a federal copyright in the *Taurus* musical composition that Hollenbeck Music deposited with the Copyright Office when Hollenbeck Music registered that copyright in 1967. Skidmore misreads statutes and cases to advocate against black-letter copyright law that the copyright registered in a work protects only the copyrighted work and that federal copyright does not extend to sound recordings created prior to February 15, 1972. He ridicules the District Court for limiting his attempt to use pre-1972 sound recordings of Spirit performing *Taurus* ostensibly to prove access. But since the jury found access, his objection is moot, and in any event his experts admitted they had no basis for their pronouncements that *Stairway to Heaven* and those recordings have a similar "sonic landscape" probative of access.

Neither is there any merit to Skidmore's challenge of the District Court's jury instructions. He argues that the District Court should have instructed the jury on this Circuit's inverse ratio rule. But he did not prove the high degree of access

required to trigger that rule and his objection is moot because no amount of access will establish copyright infringement if, as the jury found here, there is no substantial similarity in protectable expression. He complains that the jury was not instructed that copyright can lie in an original selection and arrangement of unprotected elements. But he objected to defendants' correct selection-and-arrangement instruction, he failed to raise the District Court's omission of the instruction and he failed to present evidence of an original selection and arrangement. His complaint that the jury was not properly instructed on originality highlights a fatal defect in his claim: he continues to contend that copyright lies in public domain elements such as the descending notes of the chromatic scale.

In addition, Skidmore complains that when the jury asked to hear his expert's recording of the *Taurus* deposit copy, the District Court did not direct the playing of his expert's misleading recording of only the lower clef with the descending chromatic scale. Skidmore omits that the District Court played what the jury foreperson requested, that no other juror objected and that, when polled, all jurors agreed on their verdict. There was no error.

Skidmore also challenges the District Court's trial time limitations as improper and inflexible. Yet, he did not object when the District Court set them, he never made an offer of proof as to any evidence he would offer if he had

31

additional time, he wasted the time he was allotted and, when the District Court nevertheless granted his request for extra time, he admitted that its ruling was fair.

Finally, Skidmore misrepresents the facts and law in claiming that he had the right to object to defendants' retention of their musicologist after the company that initially consulted him—which is neither Skidmore's publisher nor his fiduciary—agreed defendants could engage him.

The Judgment and Amended Judgment should be affirmed.

As for its appeal, Warner/Chappell respectfully submits that the District Court erred in denying the motions for attorneys' fees and additional expenses. The District Court properly concluded that defendants' victory on the merits as well as other *Fogerty* factors cut in favor of granting the motions. But the District Court's ruling that three *Fogerty* factors did not cut decisively in Warner/Chappell's favor is expressly based on errors of law or the record, including the incorrect legal conclusion that until 2014 laches was an absolute bar to the infringement claim. In addition, after correctly finding that Skidmore engaged in extensive litigation misconduct, the District Court erred on the law by treating Skidmore's outrageous conduct as just another *Fogerty* factor, instead of an independent ground recently identified by the Supreme Court for the award of attorneys' fees in copyright cases.

32

As a result of the errors, the District Court's denial of attorneys' fees and additional costs for the successful defense of Skidmore's copyright claim failed to further the purposes of the Copyright Act. That most important consideration is served by compensating Warner/Chappell for confirming the limits of copyright and ensuring that *Stairway to Heaven* remains available to the public, rather than enjoined and all copies confiscated and destroyed, as Skidmore sought.

## ARGUMENT

### 1.    SKIDMORE'S APPEAL

Skidmore does not dispute that the jury's finding of non-infringement is supported by substantial evidence, and he fails to overcome the presumption that the District Court's rulings and the judgments it entered are correct.

### (a)    Skidmore Waived this Court's Review of the Grant of Summary Judgment to Three of the Defendants

Skidmore's notice of appeal refers to the District Court's Amended Judgment, which added John Paul Jones, Super Hype Publishing and Warner Music Group as prevailing defendants. XI–ER–2757; I–ER–1. But his Opening Brief states he is appealing only from the Judgment (OB at 12), and nowhere mentions the Amended Judgment or the grant of summary judgment in those defendants' favor. As a result, Skidmore waived his appeal from the Amended

Judgment and the District Court's summary judgment ruling in favor of Mr. Jones,

Super Hype Publishing and Warner Music Group. Fed. R. App. P. 28(a)(5);

*Classic Concepts, Inc. v. Linen Source, Inc.*, 716 F.3d 1282, 1285 (9th Cir. 2013).

**(b)     The District Court Did Not Abuse its Discretion by Requiring that Skidmore Prove Substantial Similarity Between *Stairway to Heaven* and the 1967 Copyrighted *Taurus* Deposit Copy**

Skidmore's first argument is that the District Court erred by requiring that he

prove substantial similarity between *Stairway to Heaven*, on the one hand, and the

1967 copyrighted *Taurus* deposit copy—rather than Ode Record's 1967 Spirit

album's recording of *Taurus* and bootleg recordings of Spirit's live performances

of *Taurus*—on the other hand. This Court "review[s] the district court's

evidentiary determinations, including those under Federal Evidence Rule 403, for

abuse of discretion." *Norris v. Sysco Corp.*, 191 F.3d 1043, 1047 (9th Cir. 1999).

Each of Skidmore's arguments lacks merit.

**(1)     The District Court Properly Recognized the Distinction Between Musical Compositions and Sound Recordings and that the Uncopyrighted Spirit Recordings Are Irrelevant**

Musical compositions and sound recordings are separate works (*Newton v.

Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004)) and the 1909 Act treated them

very differently.

First, under the 1909 Act, sound recordings were not subject to federal copyright until February 15, 1972, and then only prospectively. *Dowling v. United States*, 473 U.S. 207, 211 n. 4 (1985).

Second, while musical compositions—referred to as "musical works"— could be protected under the 1909 Act, copyright did not adhere upon fixation in tangible form, as under the current Copyright Act. 17 U.S.C. § 102(a). Instead, the 1909 Act provided that a work was copyrighted either by publishing copies with the required notice or by registering the work as unpublished and depositing a copy of the work. 17 U.S.C. §§ 10-13. Because sound recordings were not copies of a musical composition, "to claim copyright in a musical work under the 1909 Act, the work had to be reduced to sheet music or other manuscript form." 2 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.05[A] (2017).

Here, Skidmore did not and could not sue on a copyright in Ode Records' 1967 recording of *Taurus* or in the bootleg recordings of Spirit's performances. Instead, Skidmore claimed infringement of the musical composition copyright that Hollenbeck Music registered in 1967 by deposit of sheet music, namely the *Taurus* deposit copy. That registered composition copyright protects "only . . . the song's compositional elements" "on the score" and does not extend to the performance elements. *Newton*, 388 F.3d at 1993-94.

35

Accordingly, the District Court properly required that Skidmore prove substantial similarity between *Stairway to Heaven* and the *Taurus* deposit copy, not the recordings of Spirit's performances.

### (2) Skidmore Fails to Identify Any Compositional Elements in the Spirit Recordings that Were Excluded at Trial

In arguing that he should have been allowed to compare *Stairway to Heaven* to the "compositional" elements of recordings of Spirit's performances of *Taurus*, Skidmore repeatedly asserts that the 1967 copyrighted *Taurus* deposit copy is "more dissimilar" to *Stairway to Heaven* than are those recordings. OB at 11, 19, 21, 40. Yet, nowhere in his Opening Brief does he identify any compositional differences between the copyrighted *Taurus* deposit copy and the recordings of Spirit performing *Taurus*.

As a result, an initial defect in Skidmore's argument is that he fails to establish that the exclusion of the recordings prevented him from proving supposedly protected compositional elements not present in the *Taurus* deposit copy. He is properly deemed to have waived his first argument. *Classic Concepts*, 716 F.3d at 1285; *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 979 (9th Cir. 2012) ("We will not do an appellant's work for it, either by manufacturing its legal arguments, or by combing the record on its behalf for factual support").

36

(3)     **The 1909 Act Did Not Expand Protection of Copyrighted Musical Compositions to Include Sound Recordings**

Even if the Court reaches the merits of Skidmore's first argument, he is flat wrong on the law.

Skidmore advises this Court that in adopting the 1909 Act, Congress reacted to *White-Smith Music Pub. Co. v. Apollo Co.*, 209 U.S. 1 (1908), by expanding "the scope of protectable compositional expression in a musical work" to include piano rolls and sound recordings.  OB at 30-31.  Based on that premise, Skidmore argues that the registered 1967 copyright he sued upon protects not just the registered work—the 1967 *Taurus* deposit copy—but also versions of the composition as embodied in Ode Records' studio recording and bootleg recordings of Spirit's concert performances.  Skidmore's premise is incorrect.

i.     *Section 1(e) of the 1909 Act Did Not Extend Music Composition Copyrights to Sound Recordings*

In *White-Smith*, the owner of copyrights in musical compositions sued the manufacturer of perforated rolls of paper that allowed player pianos to play the musical compositions.  *White-Smith*, 209 U.S. at 8-11.  The then-applicable copyright act gave the copyright proprietor the exclusive right to publish or sell copies of the copyrighted work.  209 U.S. at 9.  *White-Smith* held that (1) piano

37

rolls are mechanical devices rather than unauthorized "copies within the meaning of the copyright act" (209 U.S. at 15-18) and (2) as a result, the unauthorized manufacture of piano rolls did not violate the exclusive right to publish or sell copies of musical compositions performed by those piano rolls (209 U.S. at 18).

*White-Smith* also observed that it was up to Congress to address that "the use of these perforated rolls, in the absence of statutory protection, enables the manufacturers thereof to enjoy the use of musical compositions for which they pay no value."  209 U.S. at 18.  "After pointedly waiting for the Court's decision in *White-Smith* . . ." (*Goldstein v. California*, 412 U.S. 546, 565 (1973)), Congress addressed that issue not—as Skidmore advises this Court—by "expand[ing] the scope of copyright protection" to piano rolls and recordings of musical compositions (OB at 30-31), but instead by adding in the 1909 Act a new exclusive right to authorize those devices.

In quoting the 1909 Act's Section 1(e), Skidmore omits its introductory language to argue that the Section identified new copyrightable subject matter.  OB at 30-31.  Actually, Section 1 lists the copyright owner's "exclusive right[s] . . . ."  17 U.S.C. § 1.  While Section 1(a) repeats the same exclusive right to publish and copy that *White-Smith* found did not protect musical compositions from unauthorized use in piano rolls, Section 1(e) identified a new exclusive right to use

38

a musical composition in "any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: . . . ." Section 1(e) also adopted U.S. copyright law's first compulsory license provision, limiting that new exclusive right to one recording of the composition. 17 U.S.C. § 1(e); H.R. Rep. No. 60-2222, 60th Cong., 2d Sess. 6, 7 (1909); *ABC Music Corp. v. Janov*, 186 F. Supp. 443, 445-46 (S.D. Cal. 1960); 2 *Nimmer on Copyright* § 8.04[A].

Congress made clear in its Report on the 1909 Act that "[i]t is not the intention of the committee to extend the right of copyright to the mechanical reproductions themselves, but only to give the composer or copyright proprietor the control, in accordance with the provisions of the bill, of the manufacture and use of such devices." H.R. Rep. No. 60-2222 at 9. That is exactly how this Court has interpreted Section 1(e). *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 688 (9th Cir. 2000).

> ii.     *The 1909 Act Has Never Been Interpreted to Extend*
> *Composition Copyright Protection to Sound Recordings*

The Courts, the Register of Copyrights and commentators have uniformly interpreted the 1909 Act as declining to extend copyright protection to sound recordings. *Dowling*, 473 U.S. at 211; *Goldstein*, 412 U.S. at 566; *Silverman v. CBS Inc.*, 870 F.2d 40, 43 n. 2 (2d Cir. 1989); *Lone Ranger Television, Inc. v.*

*Program Radio Corp.*, 740 F.2d 718, 720-21 (9th Cir. 1984); *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 660-61 (2d Cir. 1955); *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 89 (2d Cir. 1940); *Aeolian Co. v. Royal Music Roll Co.*, 196 F. 926, 927 (W.D.N.Y. 1912); *Jerome v. Twentieth Century Fox Film Corp.*, 67 F. Supp. 736, 742 (S.D.N.Y. 1946), *aff'd*, 165 F.2d 784 (2d Cir. 1948); Copyright Office Reg., 37 C.F.R. 202.15a(b) (1909 Act); H. Walls, *The Copyright Handbook* 105 (1963).

Not only are pre-February 15, 1972 sound recordings unprotected by federal law, but recordings are not even "copies" of musical compositions. *Capitol Records*, 221 F.2d at 660; *Nom Music, Inc. v. Kaslin*, 227 F. Supp. 922, 926 (S.D.N.Y. 1964), *aff'd*, 343 F.2d 198 (2d Cir. 1965); *Rosette v. Rainbo Record Mfg. Corp.*, 354 F. Supp. 1183, 1190, 1192 n. 8 (S.D.N.Y. 1973), *aff'd*, 546 F.2d 461 (2d Cir. 1976). That also was the view of the Register of Copyrights. *Rosette*, 354 F. Supp. at 1192 n. 8 ("A phonograph record or other sound recording is not considered a copy of the compositions recorded on it, and is not acceptable for copyright registration"), *quoting* 37 C.F.R. 202.8(b) (1909 Act); *see also* Horace G. Ball, *The Law of Copyright & Literary Property* 450-51 (1944) (same).

Indeed, when a panel of this Court concluded that sales of recordings constituted publication of the recorded musical compositions (*La Cienega Music*

*Co. v. ZZ Top*, 53 F.3d 950, 952–53 (9th Cir. 1995)), Congress acted quickly to amend the Copyright Act to reject *La Cienega*, which this Court then held misstated the prior law. *ABKCO*, 217 F.3d at 689, 689-91; 17 U.S.C. § 303(b).

The sound recordings of Spirit's performances of *Taurus* are not copies of the *Taurus* musical composition and are not protected by the 1967 registered *Taurus* composition copyright that Skidmore sued upon. Accordingly, the District Court properly required that Skidmore prove substantial similarity between *Stairway to Heaven* and the 1967 copyrighted *Taurus* deposit copy.

### (4)  Federal Statutory Copyright Is Not a Registered Common Law Copyright

Skidmore asserts that under the 1909 Act, "[u]pon registration with the Copyright Office, the common law copyright protection then became a federal copyright" and "[t]here is no indication that registering the common law copyright could in anyway result in the limitation of the scope of copyright." OB at 20. However, the 1909 Act did not provide for registration of common law copyrights and, instead, statutory and common law copyrights were completely divorced. Indeed, most states did not even have common law copyright. *Goldstein*, 412 U.S. at 558. Furthermore, the scope of federal statutory copyright is determined by federal law, not by the law of those states that did have common law copyright.

(5)     **A Registered Copyright Protects the Work as Registered,
Not an Amalgam of Versions Performed Over Time**

Skidmore also argues that the District Court erred in excluding recordings of Spirit's performances because the musical composition protected by the 1967 copyright is an amalgam of how *Taurus* was "consistently" played over time.  OB at 30-31.  Again, Skidmore is simply wrong.

i.      *Skidmore Offers No Case Law Supporting His Copyrighted Work-as-an-Amalgam Argument*

As the only support for his assertion that "[t]he composition of a musical work is defined as those parts of a work consistently played the same," Skidmore cites *Newton v. Diamond*, 204 F. Supp. 2d 1244 (C.D. Cal. 2002), *aff'd,* 388 F.3d 1189 (9th Cir. 2004).  OB at 31.  That case directly contradicts Skidmore's assertion.

Skidmore relies on the District Court's statement that "[a] musical composition's copyright protects the generic sound that would necessarily result from any performance of the piece."  OB at 31, *quoting* 204 F. Supp. 2d at 1249.  But the District Court—in distinguishing between composition and sound recording copyrights—confirmed that a composition copyright only protects "the generic sound" of the "music in written form," irrespective of the performer's

42

voice or instrument, and not the "sound produced by the performer's rendition of the musical work." *Id.* at 1249-50. As a result, the one case that Skidmore cites confirms that a composition copyright protects a specific work, not an amorphous amalgam of performances over time.

ii. **Under Established Law, the Registered Work Is the Copyrighted Work**

Established copyright law forecloses Skidmore's argument that a copyrighted musical composition is defined not by the registered deposit copy but by how the composition is performed over time.

a. **Deposit Copies Establish the Copyrighted Work**

It is axiomatic that registration of a copyright in a deposited work confers copyright in that deposited work.

Thus, the 1790 and 1831 Acts required a pre-publication identification of the title of the work registered for copyright, followed by the deposit of "a copy of the same . . . ." 1 Stat. 124 §§ 3-4 (May 31, 1790); 4 Stat. 36, ch. 16, § 4 (Feb. 3, 1831). Under the 1909 Act, copyright in an unpublished work could only be obtained "by the deposit, with claim of copyright, of <u>one complete copy of such work</u> . . . ," and copyright by publication with notice was followed by deposit of "two complete copies <u>of the best edition thereof</u> . . . ." 17 U.S.C. §§ 12-13. While

43

the 1976 Act differs in that copyright adheres upon creation, the copyright still is registered by depositing a copy of the work. 17 U.S.C. § 408(a)-(b). Limiting a copyright to a particular work for a limited time is moored in the Constitution's grant to Congress of the power to provide authors "for limited Times . . . the exclusive Right to their . . . Writings." Constitution, Art. I, § 8, cl. 8.

For over a hundred years, courts have treated deposit copies as the copyrighted works. *Petrella*, 134 S. Ct. at 1977 ("the certificate <u>and the original work</u> must be on file with the Copyright Office before a copyright owner can sue for infringement"); *White-Smith*, 209 U.S. at 15-16, 17 (federal copyright law "has provided for the making and filing of a tangible thing, against the publication and duplication of which it is the purpose of the statute to protect the composer"); *Merrell v. Tice*, 104 U.S. 557, 561 (1881) (deposit copies enable others "to ascertain precisely what was the subject of copyright"); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1211 (9th Cir. 1998) ("to obtain a copyright registration, an applicant must deposit . . . a 'copy' or 'copies' of the work"); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161-62 (1st Cir. 1994) (deposit requirement provides "Copyright Office with sufficient material to identify the work in which the registrant claims a copyright [and] prevent[s] confusion about which work the author is attempting to register"); *Unistrut Corp. v. Power*, 280 F.2d 18, 23 (1st Cir. 1960) (copyright infringement claim failed

absent evidence that allegedly copied elements were in deposit copy); *Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F. Supp. 2d 514, 520 (S.D.N.Y. 2005) ("[A] copyright does not encompass designs that vary in essential respects from what was presented to the Copyright Office. Otherwise, the purposes of the deposit requirement would be nullified."); *see also* Report of the Register on the General Revision of the U.S. Copyright Law 72 (1961) (purposes of deposit requirement include "to identify the work being registered"); Alfred M. Shafter, *Musical Copyright* 35 (2d ed. 1939) (copyrighted "music must appear on music paper, or ruled paper [deposited with the Copyright Office], so that it may be read").

Skidmore relies on cases dealing with allegedly inadequate registrations or deposits and none of those cases change that the *Taurus* deposit copy registered for copyright under the 1909 Act is the copyrighted work. *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 482-83 (7th Cir. 1982) (Congress had power to provide in the 1976 Act for the "secret" deposit of test questions with the Copyright Office); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) (under 1976 Act, registration is not a requirement for subject matter jurisdiction); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486-87 (9th Cir. 2000) (argument that subject matter jurisdiction absent because deposit copy was incomplete, defeated by jury's finding that deposit copy was complete);

45

*Washingtonian Pub. Co. v. Pearson*, 306 U.S. 30, 41-42 (1939) (copyright obtained by publication with notice not invalidated by failure to promptly deposit a copy after publication); *Scentsy, Inc. v. B.R. Chase, LLC.*, 942 F. Supp. 2d 1045, 1050-51 (D. Idaho 2013) (under 1976 Act provision permitting deposit of identifying portions of sculptural or other unwieldy works, copyright that attached on creation not lost for elements omitted from identifying portions), *aff'd in part, rev'd in part and remanded sub nom. Scentsy, Inc. v. Harmony Brands, LLC*, 585 F. App'x 621 (9th Cir. 2014); *Sylvestre v. Oswald*, No. 91 CIV. 5060 (JSM), 1993 WL 179101, at *1-2 (S.D.N.Y. May 18, 1993) (1976 Act registration of copyright in songs on cassette recording not invalidated by failure to note title of song); *KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF(RS), 2008 WL 5245484, at *9-10, 10 n. 7 (N.D. Cal. Dec. 17, 2008) (under 1976 Act, deficiency in deposit did not deprive court of subject matter jurisdiction, but might invalidate copyright).

> **b.    The Fact that the *Stairway to Heaven* Recording —as the Alleged Infringement—Was Relevant Does Not Make *Taurus* Recordings Relevant**

Skidmore argues that since defendants' musicologist analyzed the composition in the publicly released recording of *Stairway to Heaven* as the "finished composition," Skidmore should have been allowed to introduce

recordings of Spirit's performance of *Taurus* as the "finished" version of *Taurus*. OB at 35. Skidmore compares apples to oranges. The publicly released recording of *Stairway to Heaven* is the allegedly infringing work and the *Taurus* deposit copy is the allegedly infringed work, so they are what Dr. Ferrara was required to analyze.

### c. New Versions of a Copyrighted Work Do Not Expand that Work's Copyright Protection

It also is black-letter copyright law that changing a copyrighted work does not change the protected portions of that work. Instead, a change to a work would at most result in a new work whose protection is strictly limited to the additional protectable expression. *Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1979); 17 U.S.C. § 3; 17 U.S.C. § 103(b); 1 *Nimmer on Copyright* § 3.04[A]. As a result, the protection afforded by the copyright in the *Taurus* deposit copy that Skidmore sued upon is not changed by Spirit's performances of different versions of *Taurus*.

### d. Trying to Trivialize Deposit Copies, Skidmore Ignores the Law and Practice that Deposit Copies of Unpublished Works Are Retained

Skidmore tries to trivialize deposit copies by arguing they are for "archival" purposes only. *E.g.,* OB at 32.

47

Since <u>published</u> works are by definition available to the public, the importance of deposits of published works as proof of the copyrighted work is "attenuated." 2 *Nimmer on Copyright* § 7.17[A]; *Washingtonian*, 306 U.S. at 38-39, 39 n. 3 (Register's confirmation that some deposit copies returned to copyright claimants undercut importance of deposits in identifying copyrighted works).

However, because copyrighted <u>unpublished works</u> cannot be identified by resort to publicly distributed copies, Congress and the Register have protected deposit copies of unpublished works. The 1909 Act prohibited the Register from destroying deposits of "unpublished work[s]" unless the Register provided prior "specific notice to the copyright proprietor . . . ." 1909 Act, 17 U.S.C. § 214. Despite that authorization, the Register retained "unpublished works . . . for the full copyright term." Report of the Register at 80-81. Recognizing "the unique value and irreplaceable nature of unpublished deposits," in adopting the 1976 Act Congress prohibited "their intentional destruction during their copyright term, unless a facsimile reproduction has been made." H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 172 (1976); 17 U.S.C. § 704(d).

The longstanding requirements and Copyright Office practice of preserving deposit copies of unpublished works to ensure a record of the copyrighted work is further confirmation that the registered copyright is in the deposit copy.

**(6)    The District Court Did Not Abuse its Discretion by Excluding the *Taurus* Sound Recordings**

The District Court also was well within its discretion when it excluded the uncopyrighted recordings of Spirit's performances.

*i.      The* **Taurus** *Deposit Copy Is the Work Protected by the Copyright that Skidmore Sued Upon*

The District Court correctly concluded that Skidmore's claim to copyright lay only in the copyrighted *Taurus* deposit copy.

Skidmore expressly sued on the copyright that Hollenbeck Music registered in December 1967 and renewed in 1996 (XI–ER–2719, ¶ 34), and the *Taurus* deposit copy is what Hollenbeck Music deposited with the Copyright Office as the "complete copy of" the copyrighted work. Exh. 2964, 2058; 17 U.S.C. § 12.

Further, there is no federal copyright in the pre-1972 recordings of Spirit's performances (*see above* at 39-41) and Skidmore did not claim common law rights in those recordings because he does not own them. Also, common law copyright in the *Taurus* musical composition was lost in 1967 when Hollenbeck Music registered it under the 1909 Act. *ABKCO*, 217 F.3d at 688. As a result, any common law copyright in the recordings would protect only against copying of the sounds fixed in them, which Skidmore does not claim occurred here. *Capitol*

49

*Records, Inc. v. Erickson*, 2 Cal. App. 3d 526, 537, 82 Cal. Rptr. 798, 805-06 (Ct.

App. 1969); Cal. Civ. Code § 980(a)(2).

> ii.      ***Skidmore Presented No Evidence that the 1967* Taurus *Copyright Protects Anything Beyond the* Taurus *Deposit Copy***

Skidmore relies on *Three Boys*, 212 F.3d 477, and the *Blurred Lines* case,

*Williams v. Bridgeport Music, Inc.*, Case No. LA CV13-06004 (C.D. Cal.), to

argue that a copyright plaintiff may present evidence that the copyrighted musical

composition protects more than what appears in the deposit copy.  OB at 33-34,

39-40.  Neither case helps Skidmore.

If commercial recordings were excluded or played for the jury in *Three*

*Boys*, no one objected and this Court had no occasion to rule on the issue.  Further,

in *Three Boys*, the plaintiff's expert "testified that the deposit copy included all of

the song's essential elements such as the title hook, chorus, and pitches [and] even

played the deposit copy for the jury on the keyboard."  212 F.3d at 486.  As a

result, that case does not support playing recordings at trial that are different from

the copyrighted deposit copy.

In *Williams*, the copyright owners argued, as does Skidmore, that "the

copyrighted compositions consist of 'the recorded work as performed by [the

musicians].'" *Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004 JAK, 2014 WL 7877773, at *9 (C.D. Cal. Oct. 30, 2014). But *Williams* rejected that argument and correctly concluded that deposit copies "are deemed to define the scope of copyrighted compositions." *Id.* at *10.

Later, the District Court in *Williams* did allow the copyright owners' expert to testify at trial that a musician would interpret the sheet music deposited with the Copyright Office as implying additional music the expert claimed is similar to the allegedly infringing composition. *Williams v. Bridgeport Music, Inc.*, No. LACV1306004JAKAGRX, 2015 WL 4479500, at *8 (C.D. Cal. July 14, 2015). That suspect ruling is currently challenged on appeal to this Court. *Williams v. Gaye*, Nos. 15-56880, 16-55089, 16-55626. In any event, that ruling is not relevant here.

Although Skidmore repeatedly complains that the District Judge limited performances of the *Taurus* deposit copy to its exact notes, actually the District Judge distinguished between the *Taurus* deposit copy and different or additional music in the recordings of Spirit's performances. *E.g.*, IV–ER–734:22-736:9. The District Court properly barred Skidmore's master guitarist, Hanson, from performing *Taurus* with, as Hanson described them, "additional notes . . . not as the deposit copy would be read" (IV–ER–736:1-3), while leaving the interpretation

51

of the deposit copy to Hanson, allowing him to perform, and use recordings of him performing, the *Taurus* deposit copy the way he interpreted it (IV–ER–739:6-740:5, 743:22-744:4, 753:8-754:1, 767:7-19).

### iii. The District Court Did Not Abuse its Discretion by Excluding the Recordings of Spirit Under FRE 403

The District Court plainly did not abuse its discretion in ruling that any probative value of the recordings of Spirit's performances was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury. *E.g.*, III–ER–596:1-597:3, 605:1-23; Fed. R. Evid. 403.

As for probative value of the recordings of Spirit performances, the recordings are not copyrighted, are not owned by Skidmore or the Trust and are not the work whose registered copyright Skidmore alleged was infringed. They are irrelevant to the substantial similarity analysis. *See above* at 34-48.

Skidmore argues that his experts should have been allowed to play Ode Records' studio recording of *Taurus* to identify the "compositional elements . . . embodied and represented in the deposit copy." OB at 39-40. But if the studio recording's compositional elements are the same as the *Taurus* deposit copy then the studio recording adds nothing except the risk of confusion and prejudice. *See below* at 53. Skidmore also again relies on *Williams*, but there the District Court

allowed edited recordings to be used to demonstrate compositional elements that an expert testified were implied by the deposit copy. 2015 WL 4479500 at *8. This Court need not dwell on that dubious ruling because Skidmore's expert performed and recorded the *Taurus* deposit copy as he interpreted it.

As for the risk of prejudice, allowing Skidmore to use Spirit recordings would have imposed on the jury the mind-numbingly complex task of identifying any compositional elements in those recordings that are not in the 1967 *Taurus* deposit copy, identifying all performance elements of those recordings, disregarding those compositional and performance elements and then determining whether whatever remains is substantially similar. *Newton*, 388 F.3d at 1193-94; *Fahmy v. Jay Z*, No. 207CV05715CASPJWX, 2015 WL 5680299, at *14 (C.D. Cal. Sept. 24, 2015) (on claim for infringement of musical composition copyright, "[p]resenting the sound recordings at trial carries a significant risk of confusing and misleading the jury"). Playing the recordings would have certainly confused and misled the jury, while also significantly increasing trial testimony and time.

The District Court's Rule 403 ruling is well founded in law and fact and is entitled to great deference.

### iv.       *Skidmore's Parade of Horribles*

Skidmore predicts "wide-ranging and unprecedented" consequences if he loses.  OB at 42.  His predictions ring hollow.

 Skidmore argues that affirming would mean pre-1978 recordings can never be played at the trial of a claim for infringement of a musical composition copyright.  OB at 42-43.   However, each case turns on its own facts and a sound recording might be admissible as secondary proof of a lost deposit copy (*see below* at 54-55) or if its probative value is not outweighed by the risk of prejudice.

Skidmore complains that affirming the Judgment "would divest copyright protection from massive amounts of expression and completely upend a century of case law interpreting the 1909 Act."  OB at 43-44.  That is nonsense.  The District Court's ruling properly limited the registered *Taurus* copyright to the protection afforded by copyright law.  *See above* at 34-36, 37-49.

Skidmore argues that limiting copyright to the copyrighted deposit copy risks havoc if the deposit copy is lost.  OB at 44-45.  But, that was Congress' decision to make, and Congress and the Register have acted to avoid or reduce the risk of lost deposits.  *See above* at 47-48.  Also, subject to the usual requirements for admitting secondary evidence of a writing, the content of a lost deposit copy

can be proven by secondary evidence. *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986).

Finally, Skidmore argues that requiring the deposit of sheet music imposes a great financial burden on songwriters. OB at 45-46. That, again, was Congress' decision to make, and songwriters readily complied. Moreover, since the current law allows the deposit of a recording to register both the music copyright and the sound recording copyright (37 C.F.R. § 202.3(b)(iv)), Skidmore's argument applies, if at all, to composition copyrights obtained prior to the 1976 Act. Changing the law now would not help those songwriters one whit.

### (7) The Claimed Error Is Harmless

Furthermore, the claimed error in excluding recordings of Spirit performing *Taurus* was harmless.

Traditionally, this Circuit has presumed prejudice from an error and imposed on appellee the burden of showing the error was harmless. *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1159 (9th Cir. 2010). However, in an administrative case the Supreme Court held that 28 U.S.C. Section 2111 "express[es] a congressional preference for determining 'harmless error' without the use of presumptions . . . ," and there is no "relevant distinction between the manner in which reviewing courts treat civil and administrative cases." *Shinseki v.*

*Sanders*, 556 U.S. 396, 407-08 (2009); *Molina v. Astrue*, 674 F.3d 1104, 1119 n. 11 (9th Cir. 2012). Accordingly, Skidmore should bear the burden of proving he was substantially prejudiced by the errors he claims the District Court committed. However, even if defendants bear the burden of proving the claimed errors were harmless, they carry that burden.

### i. *Skidmore Admitted that the Experts' Trial Performances and Recordings Are Correct Renditions of the Copyrighted* **Taurus** *Deposit Copy*

At trial, Skidmore's master guitarist performed the *Taurus* deposit copy as he interpreted it and testified that the recordings played at trial of his and defendants' experts' performances of the deposit copy are correct renditions of that musical composition. *See above* at 17; IV–ER–764:23-765:3. Even if the District Court erred—which it did not—in excluding recordings of Spirit's performances, that claimed error was harmless because Skidmore admits the jury heard the copyrighted *Taurus* composition.

### ii. *Skidmore's Musicologist Concluded that the* **Taurus** *Deposit Copy Strengthened Skidmore's Claim*

Skidmore argues that playing recordings of Spirit performing *Taurus* would have presented a stronger case for him because those recordings are not as "dissimilar" to *Stairway to Heaven* as the copyrighted *Taurus* deposit copy. OB at

19, 21, 40.  Skidmore's musicologist, however, stated that the *Taurus* deposit copy "further strengthens the case for copying of substantial musical expression from 'Taurus.'"  VII–ER–1777-1778.  For that additional reason, the claimed error in excluding the recordings of Spirit was harmless.

**(c)**     **There Is No Merit to Skidmore's Alternative Argument that Spirit's Recordings of *Taurus* Were Relevant to Proving Access**

      **(1)**     **The Jury's Finding of Access Moots Skidmore's Argument**

Skidmore argues that the District Court should have allowed him to try to prove access by playing recordings of Spirit's performance of *Taurus*.  The jury, however, found access (VI–ER–1497), so this alleged error is both moot and harmless.

      **(2)**     **The District Court Did Not Abuse its Discretion in Limiting Use of the *Taurus* Sound Recordings to Prove Access**

On the issue of access, the District Court allowed Skidmore to play recordings of Spirit's performance of *Taurus* for Mr. Page outside the jury's presence and, with the jury present to gauge his credibility, ask him whether he had heard the recordings.  III–ER–568:7-574:22, 591:17-592:8, 20-25, 596:14-602:1, 606:16-612:12.  Skidmore's interest in access was a ruse: he never asked that question and instead impermissibly sought to establish similarity in performance

elements.  III–ER–612:13-619:22.  In any event, the District Court was within its discretion in limiting the use of *Taurus* recordings to prove access.

Skidmore's experts claimed that recordings of Spirit performing *Taurus* had performance elements similar to Led Zeppelin's recorded performance of *Stairway to Heaven*, such as the use of an acoustic guitar.  But before trial, Skidmore's experts admitted they did no research to determine the extent to which the performance elements appeared in popular music of the time and that the performance elements were commonplace.  *See above* at 15-16.  Any value of the recordings as probative of access—and defendants contend there was none—was decidedly outweighed by the confusion and prejudice that would have resulted from playing the Spirit recordings at trial.  *See above* at 53.

### (d) <u>Skidmore Fails to Establish Reversible Error in the District Court's Jury Instructions</u>

Skidmore also challenges the District Court's jury instructions.  This Court reviews the District Court's formulation of jury instructions for abuse of discretion and reviews *de novo* whether the instructions misstate the law.  *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 941 (9th Cir. 2011).

**(1)    Skidmore's Argument that the Jury Should Have Been Instructed on the Inverse Ratio Rule Lacks Merit**

*i.    The Point is Moot Because Skidmore Failed to Prove Copying of Protectable Expression*

Skidmore complains that the District Court did not instruct the jury as to the inverse ratio rule. That rule only helps a plaintiff raise an inference of copying and is irrelevant to the issue Skidmore lost at trial: whether protected material was copied.

Evidence of access plus substantial similarity may "create an inference of copying." *Overman v. Loesser*, 205 F.2d 521, 523 (9th Cir. 1953); *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989). Under the inverse ratio rule, "a high degree of access" may lower the substantial similarity required in order to trigger that inference. *Rice v. Fox Broad. Co.,* 330 F.3d 1170, 1178 (9th Cir. 2003), *quoting Three Boys*, 212 F.3d at 485.

However, no copyright claim can succeed without "copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). As a result, "it is well established that when there is no similarity between the protectible elements of two works, there can be no finding of copyright infringement, even under the inverse ratio rule." *Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1172 n. 9 (C.D. Cal. 2016); *Benay v.*

*Warner Bros. Entm't*, 607 F.3d 620, 625 (9th Cir. 2010) (inverse ratio rule applied, but no similarity in protected expression); *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1081–82 (9th Cir. 2006) (same); *Narell*, 872 F.2d at 910, 910-11 (copyright claim failed despite defendant's admitted copying); 4 *Nimmer on Copyright* § 13.03[D] (even if high degree of access, absence of copying protected expression "still dooms the infringement suit").

Instructing the jury on the inverse ratio rule would not have changed the outcome because the jury found no substantial similarity of original expression. VI–ER–1498:9-13.

### ii. *The District Court Acted Within its Discretion by Not Giving an Inverse Ratio Rule Instruction*

The District Court also did not abuse its discretion in declining to instruct the jury on the inverse ratio rule.

The inverse ratio rule applies only if the evidence establishes "a high degree of access . . . ." *Rice,* 330 F.3d at 1178, *quoting Three Boys*, 212 F.3d at 485. Here, Skidmore admits that access was "hotly contested." OB at 71. He cited Led Zeppelin's concert performances of a medley of songs that included a bass "riff" similar to the bass riff in Spirit's *Fresh Garbage*; that Led Zeppelin performed at a concert and music festivals where Spirit also performed; that Spirit performed once

60

at a Birmingham club that Mr. Plant frequented; that Mr. Page was quoted in articles praising Spirit and bought their later albums; and that his current collection of thousands of records—nearly a half-century after he and Mr. Plant wrote *Stairway to Heaven*—includes Spirit's first album.

However, Led Zeppelin's members knew of *Fresh Garbage* because, unlike *Taurus, Fresh Garbage* was played on the radio (III–ER–557:25-558:4; III–ER–447:12-19, 448:21-22) and was on a United Kingdom compilation album (V–ER–1211:8-1212:2). Skidmore presented no evidence as to the extent of sales of Spirit's first album. At the December 26, 1968 concert in Denver, Colorado, Led Zeppelin performed first, followed by Vanilla Fudge and then Spirit, and no one claimed Led Zeppelin was present when Spirit performed. II–ER–365:16-25. While Led Zeppelin and Spirit were among dozens of bands that performed at the Atlanta International Pop Festival and the Seattle Pop Festival in 1969, they did so separately, and the evidence is that Led Zeppelin and Spirit performed on separate days at the Texas Pop Festival and that Led Zeppelin did not perform at the Northern California Pop Festival, both also in 1969. II–ER–366:1-10; III–ER–454:3-12, 457:6-16; V–ER–1076:13-15; V–ER–1234:19-1235:4; Exh. 319. Spirit performed in 1970 at a Birmingham club where Mr. Plant and his wife frequently met friends (V–ER–1212:3-1214:15), but Spirit did not perform *Taurus* that night or at a concert a few days later. II–ER–313:3-15, 367:23-368:10, 417:5-12,

61

433:20-434:6, 458:19-461:1; Exh. 2114.  Further, in all of these instances Spirit was touring in support of albums that did not include *Taurus* and performed its "tent-pole songs," which did not include *Taurus*.  II–ER–319:8-22, 320:25-321:1. Indeed, out of more than a hundred Spirit concerts prior to *Stairway to Heaven*, Spirit's two surviving members could only recall two instances, one only faintly, where Spirit performed *Taurus*.  II–ER–321:4-18, III–ER–462:20-463:1; *see also* 3–SER–628-637.  Importantly, no witness testified that any member of Led Zeppelin was ever present when *Taurus* was performed.

The evidence fell far short of the "high degree of access" required to trigger the inverse ratio rule.  *Cf. Swirsky*, 376 F.3d at 845, 845 n. 3 (high degree of access where, *inter alia,* both the plaintiffs' and the defendants' records were mastered by the same person, produced by the same person and produced and distributed by the same companies).

### (2) There Also Is No Merit to Skidmore's Complaint that the District Court Did Not Instruct the Jury on Copyrightable Selections-and-Arrangements

"[A] combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship."  *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003).  Copyright in a

selection and arrangement is "a thin copyright that protects against only virtually identical copying." *Id.* at 812.

Skidmore does not contend that the *Taurus* musical composition is a compilation work comprised of a protected selection and arrangement of public domain elements. Rather, he argues that pieces his experts culled from the compositions and claimed to be substantially similar constitute the copying of a protectable selection and arrangement. His argument fails on multiple scores.

### i.     *Skidmore Waived the Claimed Error*

Before the final pretrial conference, defendants proposed a selection-and-arrangement instruction that correctly stated the law, but Skidmore objected to it. VIII–ER–2032-2034. Further, Skidmore's proposed instruction misstated the law and failed to require the selection of numerous elements arranged originally and copied virtually identically. VIII–ER–1968-1970. Skidmore never withdrew his objection to defendants' correct instruction and never corrected his incorrect one. Accordingly, he forfeited his objection that a correct instruction was not given.

In addition, Skidmore prepared the jury instructions to be given to the jury, yet he never raised that a selection-and-arrangement instruction was not included. VI–ER–1283:5-1309:10. Whether or not Skidmore purposefully remained silent as insurance against the adverse verdict ultimately rendered, he was uniquely

situated to see that there was no selection-and-arrangement instruction and he failed to object to its omission.  Fed. R. Civ. P. 51(c); *Elder v. Holloway*, 984 F.2d 991, 998 (9th Cir. 1993) (Kozinski, J., dissenting) (Rule 51 precludes parties from "sandbag[ging]" the trial judge to get "two bites at the apple").   Accordingly, Skidmore waived any objection to the instruction not being given.

### ii.        *Skidmore Neither Claimed Nor Presented Evidence of a Copyrightable Selection and Arrangement*

Skidmore includes the entire trial transcript in his Excerpts of Record and a word search confirms that nowhere at trial did he, his experts or his counsel ever mention selection and arrangement.  Rather, Skidmore relies on his musicologist's assertion that the "combination" of all five of the claimed similarities he identified is "unique."   IV–ER–781:4-12.   However, that two works allegedly share unprotectable elements does not mean that the unprotectable elements in the plaintiff's work constitute a protected selection and arrangement.  If that were so, every book would be an infringement of every other book that has, for example, "and the," "their" and "The End."   Instead, the unprotected elements in the plaintiff's work must be selected and arranged in an original way to create a new, original work.  *Feist*, 499 U.S. at 348; *Satava*, 323 F.3d at 811; *Narell*, 872 F.2d at 911-13 (no copying of protected expression despite presence of multiple public domain phrases in two otherwise different books).

Rather than present evidence of unprotected elements "selected, coordinated, or arranged 'in such a way' [in *Taurus*] as to render the work as a whole original" (*Feist*, 499 U.S. at 358, *quoting* 17 U.S.C. § 101 (definition of compilation)), Skidmore relied on unprotected and disjointed elements supposedly appearing in both compositions. Thus, his musicologist referred to the presence of the descending chromatic scale, a "collection" inventorying pitches in no particular order, commonplace eighth notes and the following minimal fragments he plucked out of altogether different musical sequences:

- the pitches A to B appearing in the sequences <u>A-B</u>-C-A-E-C-B in *Taurus* and A-C-E-<u>A-B</u>-E in *Stairway to Heaven*;

- the pitches B to C appearing in the sequences A-<u>B-C</u>-C in *Taurus* and C-<u>B-C</u>-E in *Stairway to Heaven*;

- the pitches C to F# appearing in the sequences E-<u>C-F#</u>-C-E-C in *Taurus* and C-<u>C-F#</u>-D-A-F# in *Stairway to Heaven*; and

- the pitches A to B to C appearing in the sequences <u>A-B-C</u>-A-E in *Taurus* and <u>A-B-C</u>-C-A-B in *Stairway to Heaven*.

VII–ER–1785. Instead of a selection and arrangement of public domain elements that "render [*Taurus*] as a whole original" (*Feist*, 499 U.S. at 358), these are random fragments of two compositions divorced from their very different contexts. *Funky Films*, 462 F.3d at 1078 (claim failed because "significant differences and

few real similarities"); *Batts v. Adams*, No. CV 10-8123-JFW (RZx), 2011 U.S. Dist. LEXIS 161402, at * 16-17, 17 n. 7 (C.D. Cal. 2011) (rejecting Dr. Stewart's attempt to rely on a laundry list of claimed similarities in unprotected elements).

Moreover, Dr. Stewart's admission that the pitches appear in a different order and rhythm in the two compositions negated any claim that they were selected and arranged in the same way, let alone in the required "virtually identical" way. *Satava*, 323 F.3d at 812; IV–ER–815:17-816:5.

The evidence did not warrant a selection-and-arrangement instruction.

### iii.     *The Claimed Error Is Harmless*

A failure to properly instruct a jury is harmless if "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009), *quoting Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005).  The test is, considering everything presented, "whether the jury was misled in any way and whether it had (an) understanding of the issues and its duty to determine those issues." *Van Cleef v. Aeroflex Corp.*, 657 F.2d 1094, 1099 (9th Cir. 1981), *quoting Houston v. Herring*, 562 F.2d 347, 349 (5th Cir. 1977); *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1065 (9th Cir. 2008).

Here, the jury instructions covered originality (*see below* at 67-68) and Skidmore—while never claiming a protectable selection and arrangement—presented Dr. Stewart's claimed five similarities. The jury was adequately informed and, for good reason, believed defendants' evidence. The claimed error was harmless.

### (3) Skidmore's Challenge of the District Court's Instructions on Originality Also Fails

In arguing that the District Court erred in instructing the jury as to originality, Skidmore mischaracterizes both the instructions and the law.

### i. *The District Court Did Not Abuse its Discretion*

The District Court instructed the jury that copyright protects an author's original expression in a work, which means the expression independently created by the author "by use of at least some minimal creativity." VI–ER–1521. That is the law. *Feist*, 499 U.S. at 348.

The District Court also instructed the jury that "[a]n original work may include or incorporate elements taken from prior works or works from the public domain," but that those elements "are not considered original parts and not protected by copyright." VI–ER–1521. That also is the law. *Feist*, 499 U.S. at

348; 17 U.S.C. § 103(b) (copyright "extends only to the material contributed by the author [and not] the preexisting material employed in the work").

In addition, the District Court instructed the jury that copyright "does not protect ideas, themes or common musical elements, such as descending chromatic scales, arpeggios or short sequences of three notes." VI–ER–1518. That instruction also is correct. *Satava*, 323 F.3d at 811 ("expressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law"); *Smith v. Jackson*, 84 F.3d 1213, 1216 n. 3 (9th Cir. 1996) ("common or trite" musical elements not protected); *Johnson v. Gordon*, 409 F.3d 12, 21-22 (1st Cir. 2005) (descending diatonic scale is commonplace); Compendium of U.S. Copyright Office Practices §§ 313.4(B) (three notes not copyrightable) & 802.5(A) (chromatic scales and arpeggios are "common property musical material" in the public domain) (3d ed. 2014). Further, an instruction identifying unprotectable elements is required. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 208 (9th Cir. 1989).

ii. **Skidmore's Argument Exposes a Fatal Defect in His Claim: Incorporating Unprotected Material in a Work Does Not Make the Unprotected Material Protected**

Skidmore argues that Wolfe, by including unprotected elements in the *Taurus* musical composition, conferred copyright protection on those unprotected

68

elements. OB at 60-61 (claiming the District Court erred by instructing jury that public domain elements included in a work "are not considered original parts") & 60-61) (Wolfe's use of five pitches of the descending chromatic scale made those five pitches "an original compositional element"). Skidmore challenges black-letter copyright law.

While an author may include in his work elements from prior works or the public domain, those elements are not protected by the author's copyright. *Feist*, 499 U.S. at 361 (preexisting material used by author does not "ow[e] its origin" to that author), *quoting Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884); 17 U.S.C. § 103(b); *see above* at 47. Adding Shakespeare's *Hamlet* to a new work does not confer exclusive rights in *Hamlet*. Similarly, including a portion of public domain material—*e.g.*, the portion of the chromatic scale included in *Taurus*—does not make that portion original. Otherwise, one could omit "la" from "do-re-mi-fa-sol-la" or omit one act from *Hamlet* and copyright the remaining portion.

The District Court correctly instructed the jury that unprotected elements did not become protected by their use in *Taurus*.

### iii.    *Skidmore Waived the Claimed Error*

Skidmore also failed to object to these instructions when the District Court directed Skidmore's counsel to include them.   VI–ER–1283:5-1309:10; Fed. R. Civ. P. 51(c).   Accordingly, Skidmore waived his objections to these instructions too.

### iv.    *The Claimed Error Is Harmless*

The claimed error did not substantially prejudice Skidmore because the alleged similarities are not original to Wolfe and are not protected by copyright. *See above* at 22-27, 47, 62-66, 67-69; *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994) ("the party claiming infringement may place '*no* reliance upon any similarity in expression resulting from' unprotectable elements . . . . Otherwise, there would be no point to the extrinsic test"), *quoting Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir.1987).

### (e)    <u>The District Court Correctly Ordered the Playing of the Audio Exhibits Requested by the Jury through its Foreperson</u>

Skidmore argues that the District Court erred in responding to a jury question.  The District Court has wide discretion in handling jury questions and its response is reviewed for abuse of discretion.  *Arizona v. Johnson*, 351 F.3d 988, 993, 994 (9th Cir. 2003).

### (1)   The District Court Properly Handled the Jury's Question

During deliberations, the jury asked to hear the recordings of Skidmore's master guitarist, Hanson, performing the beginnings of the *Taurus* deposit copy and *Stairway to Heaven*. VI–ER–1496. As to *Taurus*, Hanson played at trial (1) a recording of the beginning of *Taurus* (Exh. 525V) and (2) a recording of only the bass clef of the beginning of *Taurus* with the descending chromatic scale, omitting the treble clef's notes that are dissimilar to *Stairway to Heaven* and, as a result, emphasizing the descending scale common to both compositions (Exh. 527V). *See above* at 11, 23. Intent on having the jury hear only the misleading recording of the *Taurus* bass clef, Skidmore misrepresented to the District Court that the other recording was never played at trial. VI–ER–1405:4-1406:19, 1409:21-1410:5, *but see* III–ER–431:7-432:18.

To resolve which recording to play, the District Judge asked the jury foreperson. After another juror said "Bass clef," the foreperson answered "[t]he full copy," and the full copy was played. The District Court asked if that answered the jury's question, the foreperson thanked the District Court and the other jurors remained silent. VI–ER–1410:16-1413-10.

In characterizing this as a disagreement between two jurors, Skidmore omits that one was the jury foreperson. OB at 25-26, 66-67. Further, the other juror did

not disagree with the foreperson or speak up when the District Court asked if the recordings played had answered the jury's question. It is clear from the transcript that the one juror either agreed with or deferred to the jury foreperson, or at a minimum that the District Court acted within its discretion in concluding that to be the case. Also, after returning their verdict, each juror confirmed it represented his or her individual verdict. VI–ER–1416:1-24.

### (2)    Skidmore Failed to Timely Object that One Juror Referred to Another Recording

Had Skidmore raised at the time that one juror referred to the recording of the *Taurus* bass clef, the District Court could have inquired. But Skidmore did not raise it (VI–ER–1411:10-1413:11) and, as a result, waived the claimed error.

### (3)    The Claimed Error Was Harmless

Since *Taurus*'s bass clef is included in the recording of Hanson performing both clefs, nothing was lost by playing Hanson's recording of both clefs. Accordingly, playing the recording of the bass clef would have added nothing to the deliberations and, instead, only would have confused the jury by omitting the very different music in the treble clef.

**(f)      The District Court Did Not Abuse its Discretion in Setting Trial Time Limits, Which it Extended at Skidmore's Request**

Skidmore complains about the amount of time the District Court gave each side at trial.  "This court reviews issues relating to the management of trial for an abuse of discretion."  *General Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995).  The party objecting to an order limiting trial time "must show there was harm incurred as a result."  *Monotype Corp. PLC v. Int'l Typeface Corp.*, 43 F.3d 443, 451 (9th Cir. 1994).

**(1)      Skidmore Failed to Timely Object, Failed to Make an Offer of Proof and Agreed that the District Court's Ruling on His Request for More Time Was Fair**

At the final pretrial conference, the District Court provided each side with ten hours of witness examination at trial.  Skidmore did not object.  I–ER–108:6-20.

When Skidmore ran out of time during defendants' case in chief, he made no offer of proof as to any additional testimony he would offer and he requested only "a little bit of leeway in getting additional time, . . . ."  IV–ER–1060:15-1062:4. The District Court gave Skidmore an additional ten minutes to cross-examine each of defendants' witnesses, without rebuttal witnesses, and Skidmore agreed "[t]hat's fair."  V–ER–1064:23-1065:12; *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259

F.3d 1101, 1108-09 (9th Cir. 2001) ("unequivocal concession" in district court waives objection).

After defendants rested, Skidmore asked for leave to call two rebuttal witnesses, but he failed to identify them and failed to make an offer of proof, and his request was denied. VI–ER–1268:11-1269:2.

Skidmore cannot complain on appeal because he "did not object when the district court imposed its time limit at the final pretrial conference, he did not make an offer of proof when time expired for the presentation of his case, . . ." (*Feiman v. City of Santa Monica*, 656 F. App'x 870, 871 (9th Cir. 2016)), and he specifically approved as "fair" the District Court's grant of an additional ten minutes per defense witness, without rebuttal witnesses.

### (2) This Court Cannot Disturb the District Court's Factual Findings that Ten Hours Per Side Was Sufficient and that Skidmore Wasted His Allotted Time

Skidmore cites no evidence to undercut the District Court's factual finding that ten hours of witness trial examination per side was sufficient and reasonable. I–ER–88:23-89:90:19.

Also, the District Court found that Skidmore wasted his time (V–ER–1062:8-1064:22), and that finding is well-supported by the record. For example,

Skidmore caused substantial trial delays by his gamesmanship of listing as trial exhibits every deposition and document in the case—including every filing on the District Court's docket, from *pro hac vice* applications to motions *in limine*—and then re-numbering his exhibits immediately before trial (1–SER–188 to 2–SER–569; III–ER–661:8-12, 656:16-657:3); he failed to have his next witnesses ready to take the stand and repeatedly waived time (II–ER–374:18-375:3, III–ER–478:8-17, 716:9-13); he presented duplicative testimony as to inconsequential matters, such as Wolfe serving as one of two back-up guitarists for Jimi Hendrix (II–ER–283:7-285:15, 303:9-15, 396:3-397:11); and he called three witnesses who added nothing of substance: Ware, who testified that Mr. Plant was at a club the night Spirit performed, which Mr. Plant never disputed (V–ER–1216:19-1217:11); Pates, who testified to being a fan of Spirit and believed Wolfe consulted a lawyer (III–ER–469:10-478:4); and Knight, who testified that several years after *Stairway to Heaven* was released he was at a party where Mr. Page supposedly indicated he liked Spirit (III–ER–711:4-714:17), which Mr. Page admitted (III–ER–487:18-20). *See also* IV–ER–848:2-855:4.

Skidmore also concedes that he spent substantial time in his case in chief trying to rebut evidence that he expected defendants would offer in their defense. OB at 71. His says he anticipated running out of time to call rebuttal witnesses (*id.*), but that makes no sense: had he not spent that time in his case in chief he

would have had it for his rebuttal. He simply chose as a trial tactic to anticipate defendants' case and, in doing so, he wasted time rebutting evidence defendants never presented.

The District Court's factual findings as to the reasonableness of the time limits and that Skidmore wasted time are properly respected on appeal.

### (3)    Rather than Being "Inflexible," the District Court Gave Skidmore More Time

Rather than "impos[ing] rigid, inflexible time limits" (OB at 18), the District Court provided Skidmore additional time throughout the trial (IV–ER–848:6-9, V–ER–1057:17-19), and provided him ten additional minutes of cross-examination of each defense witness, without rebuttal witnesses, a ruling Skidmore stipulated was "fair" (V–ER–1064:23-1065:8).

### (4)    Skidmore Fails to Show that the Time Limit Caused Him Harm

Skidmore also cannot establish that the District Court's time limitations caused him any harm. *Monotype*, 43 F.3d at 451. He failed to make an offer of proof at trial (*Feiman*, 656 F. App'x at 871) and he is to blame for not properly using the allotted time (*see above* at 74-76). He complains that he was unable to put on rebuttal witnesses, but he admits that he put on his rebuttal evidence in his

case in chief (OB at 71), which included his musicologist's rebuttal to Dr. Ferrara (IV–ER–797:8-798:20, 800:16-802:24, 803:21-804:19, 805:20-807:3, 812:1-10).

There is no merit to Skidmore's criticism of the District Court's trial management.

**(g)** **Skidmore Misstates the Law and Facts in Claiming that Defendants and Their Musicologist Acted Improperly**

Finally, Skidmore complains that the District Court erred by not excluding Dr. Ferrara for a supposed conflict of interest. Rulings allowing expert witnesses are reviewed for abuse of discretion. *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996).

**(1)** **Skidmore Fails to Even Try to Establish that the District Court Erred in Striking His Motion**

Skidmore ignores that the District Court struck his motion to exclude Dr. Ferrara, as improperly noticed and violating the court's page limitation. I–ER–85. Having failed to establish in his Opening Brief that the District Court erred in striking his motion, Skidmore waived his argument that it should have been heard and granted. Fed. R. App. P. 28(a)(5); *Classic Concepts*, 716 F.3d at 1285.

**(2)** **Neither Hollenbeck Music, Skidmore Nor Skidmore's Counsel Ever Consulted Dr. Ferrara**

Even if the Court considers Skidmore's argument that his stricken motion should have been considered and granted, his motion lacked any merit.

Skidmore does not claim that he or his counsel ever consulted Dr. Ferrara on anything. Instead, Skidmore argued that Dr. Ferrara was consulted on behalf of Skidmore's "fiduciary and publisher, Hollenbeck Music." OB at 80. But Hollenbeck Music never consulted Dr. Ferrara. Instead, Rondor International ("Rondor"), a division of Universal Music Group ("Universal"), asked Dr. Ferrara to compare *Taurus* and *Stairway to Heaven*, and then consented to defendants' retention of Dr. Ferrara. VII–ER–1551:6-14, 1555:6-18.

**(3)** **Skidmore's Consent Was Not Required**

Skidmore argues that only he could consent to defendants' retention of Dr. Ferrara because Hollenbeck Music is supposedly Skidmore's "fiduciary and publisher." OB at 81-82. Skidmore fails to establish any relationship between Rondor or Universal, on the one hand, and Hollenbeck Music, on the other hand, and he produced no agreement between himself and any of them. Further, his bare assertion that Hollenbeck Music is his "fiduciary and publisher" plainly is not so.

Instead, Hollenbeck Music is the owner of the *Taurus* musical composition copyright because Wolfe's 1967 Songwriter Agreement transferred to Hollenbeck Music both the initial and renewal copyrights in the *Taurus* composition, and Wolfe lived to renew. Exh. 2070 at ¶¶ 1-3, 3(c), 6; *Stewart v. Abend*, 495 U.S. 207, 212, 219 (1990); 3 *Nimmer on Copyright* § 9.06[B]; *Rose v. Bourne, Inc.*, 176 F. Supp. 605, 610 (S.D.N.Y. 1959) (renewal copyright belongs to author's assignee even though renewal registered in author's name), *aff'd*, 279 F.2d 79 (2d Cir. 1960). Skidmore, by claiming standing as beneficial owner, admitted at the outset of the case that Hollenbeck Music owns the copyright. *See above* at 13; I–ER– 134; VIII–ER–2027.

Further, Hollenbeck Music's payment of royalties to Skidmore pursuant to the 1967 Songwriter Agreement does not create a fiduciary relationship. *Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193, 205-06 (S.D.N.Y. 1997); *Hope v. Genentech, Inc.*, 43 Cal. 4th 375, 389-92, 181 P.3d 142, 152-54 (2008); *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 30-31, 35, 130 Cal. Rptr. 2d 860, 863-65, 867 (2003).

### (4) Defendants and Dr. Ferrara Did Not Conceal the Prior Consultation

There also is no substance to Skidmore's accusation that Rondor's consultation of Dr. Ferrara was concealed. OB at 84. Skidmore argues defendants did not respond to a request for production, but Skidmore omits that he late-served the request in violation of the District Court's scheduling order and defendants timely objected. VII–ER–1549:1-10. Also, Dr. Ferrara responded to Rondor by telephone, so there was no written report to produce. VII–ER–1632-33. Further, Dr. Ferrara readily testified at his deposition both that Rondor asked for his opinion and—once defense counsel confirmed that Universal did not object to the disclosure—that he was "very happy to tell" Skidmore's counsel what he told Rondor. VII–ER–1634. Skidmore's counsel, presumably deducing that Dr. Ferrara also told Rondor there is no infringement, chose not to ask that question at deposition or trial.

### (5) Dr. Ferrara Did Not Receive Any Confidential Information

Neither did Dr. Ferrara receive any confidential information from Rondor. He was merely asked to compare *Taurus* and *Stairway to Heaven*, neither of which is secret. VII–ER–1555:19-1556:5; *Erickson v. Newmar Corp.*, 87 F.3d 298, 300

80

(9th Cir. 1996) (to disqualify an expert, the moving party must show "that the expert is in possession of confidential information received from the first client").

Skidmore argues that an expert may be excluded even in the absence of his receipt of confidential information. OB at 80. But the two cases Skidmore cites are easily distinguished. *Sells v. Wamser*, 158 F.R.D. 390, 391-92, 393-94 (S.D. Ohio 1994) (both sides retained employees of the same engineering firm); *American Empire Surplus Lines Ins. Co. v. Care Centers, Inc.*, 484 F. Supp. 2d 855, 856 (N.D. Ill. 2007) (defendant objected to plaintiff's retention of defendant's expert in related lawsuit). Here, Dr. Ferrara was not retained by Skidmore, and Rondor consented to defendants' retention.

Dr. Ferrara was consulted by Rondor, which consented to defendants' retention of Dr. Ferrara, and no confidential information was exchanged. Skidmore's motion to disqualify was a tactical maneuver without substance and the District Court did not abuse its discretion in declining to grant the motion.

The Judgment and Amended Judgment should be affirmed.

## 2.     WARNER/CHAPPELL'S APPEAL

### (a)     The District Court's Denial of Warner/Chappell's Motion for Attorneys' Fees

Warner/Chappell respectfully submits that the District Court erred in denying attorneys' fees.

The decision to deny attorneys' fees under the Copyright Act is reviewed for abuse of discretion, "but any elements of legal analysis and statutory interpretation . . . are reviewable *de novo*, . . . ." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 665 (9th Cir. 2017), *quoting Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 556 (9th Cir. 1996). The District Court abuses its discretion if its decision "is based on an inaccurate view of the law or a clearly erroneous finding of fact." *Id.*, *quoting Schwarz v. Secretary of Health & Human Serv.,* 73 F.3d 895, 900 (9th Cir. 1995).

### (1)     The District Court's Application of the *Fogerty* Factors

The Copyright Act authorizes the award of attorneys' fees to the prevailing party. 17 U.S.C. § 505. "The most important factor in determining whether to award fees under the Copyright Act, is whether an award will further the purposes of the Act." *Mattel, Inc. v. MGA Entm't, Inc.*, 705 F.3d 1108, 1111 (9th Cir. 2013). "That aim is furthered when defendants 'advance a variety of meritorious

copyright defenses.'" *Id.*, *quoting Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994).

The District Court—without considering whether its ruling furthered the purposes of the Copyright Act—identified the following *Fogerty* factors: "(1) 'the degree of success obtained on the claim'; (2) 'frivolousness'; (3) 'motivation'; (4) 'objective reasonableness of factual and legal arguments'; and (5) 'need for compensation and deterrence.'" 1–SER–4, *quoting Nutrivita Labs., Inc. v. VBS Distribution Inc.*, No. CV-1301635, 2016 WL 595834, at *4 (C.D. Cal. Jan. 27, 2016). The District Court concluded that the degree of success, Skidmore's litigation misconduct—which is not a *Fogerty* factor, *see below* at 89-90—and, only slightly, compensation favored awarding attorneys' fees, while frivolousness, objective unreasonableness and motivation cut against that award. 1–SER–6. However, the District Court erred on the law and the record, and all of the *Fogerty* factors favor awarding attorneys' fees.

### i. The District Court Agreed that Defendants' Success on the Merits Favored the Award of Attorneys' Fees

Skidmore conceded and the District Court correctly concluded that since defendants "prevailed on the merits at trial, . . . the degree of success favors granting attorney's fees." 1–SER–4; *Fantasy*, 94 F.3d at 556.

>   ii.    *The District Court Erred on the Law in Concluding that*
>          *Considerations of Frivolousness and Objective*
>          *Unreasonableness Cut in Skidmore's Favor*

It is a fundamental truism than no one owns musical scales. Yet, Skidmore based his case on the shared presence of five pitches of the chromatic scale, arguing that omitting a sixth pitch resulted in copyrightable subject matter. His claim was unreasonable and the District Court erred on the law in ruling otherwise.

>   a.    **The Jury's Verdict Did Not Establish that**
>         **Skidmore's Claims and Positions Were**
>         **Reasonable**

In concluding that Skidmore's claims and positions were neither frivolous nor objectively unreasonable, the District Court's Order states that "the jury did not determine that Plaintiff's claim impermissibly relied on public domain elements or performance aspects of the musical composition." 1–SER–4. Yet, that was exactly what Skidmore did, and tries to do now. Further, as a matter of law, the jury's verdict that the works are not extrinsically substantially similar necessarily means it found Skidmore's claimed similarities are not protected expression. *Swirsky*, 376 F.3d at 845 (infringement requires "substantial similarity to *protected* elements of the copyrighted work").

The District Court also noted that the jury found access and that Skidmore owns the *Taurus* composition copyright. 1–SER–4. Aside from the fact those findings are attributable to Skidmore's litigation misconduct (*see below* at 89-91), they do not change that Skidmore unreasonably based his claim of substantial similarity on public domain material and the uncopyrighted recordings of Spirit performances.

> **b.** **The Denial of Summary Judgment Also Did Not Establish that Skidmore's Claims and Positions Were Reasonable**

The District Court's Order indicates that Skidmore's claim could not have been frivolous because defendants' motion for summary judgment was denied. 1–SER–4. However, the District Court granted summary judgment to three defendants because Skidmore—after keeping them in the case for nearly two years—did not even try to establish a claim against them. I–ER–135.

Further, the denial of summary judgment to the remaining defendants did not prove the reasonableness of Skidmore's claim or positions because the District Court improperly relied on the same reports from Skidmore's experts that it rejected as ignoring the *Taurus* deposit copy. I–ER–114, 132-134. In denying fees, the District Court dismissed that point by stating that, pursuant to *Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003), its summary judgment ruling "focused

85

only on the content—not the admissibility—of Plaintiff's expert reports, . . . ." 1–SER–4-5. But, in *Fraser* the hearsay statements in the plaintiff's diary attached to her deposition raised a triable issue because she could have testified to those statements at trial. 342 F.3d at 1036-37. Here, the content of the expert reports that Skidmore filed in opposition to defendants' summary judgment motion was inadmissible even if testified to at trial because those reports improperly relied only on the uncopyrighted Spirit recordings. I–ER–114. Summary judgment should have been granted to all defendants.

### c. A Finding of Reasonableness Does Not "Militate Against an Award of Attorney's Fees"

The District Court concluded that its finding that Skidmore's claims and positions were not frivolous or objectively unreasonable "militate[s] against an award of attorney's fees." 1–SER–5. To the extent the District Court meant Skidmore's claims and positions were extremely reasonable, that conclusion is not "well-founded in the record . . . ." *Fantasy,* 94 F.3d at 560. And to the extent the District Court required a high showing of objective unreasonableness before awarding fees to prevailing defendants, that is an error of law. *Fogerty,* 510 U.S. at 520-21; *Fantasy,* 94 F3d at 555.

### iii. *The District Court Erred on the Law and Failed to Consider Evidence in Concluding that Motivation Cut Strongly Against the Award of Attorneys' Fees*

The District Court also erred on the law and the record in concluding that Skidmore asserted a 43-year-old copyright claim not in the hope of extorting a massive settlement but, instead, because he was "equitably prevented from bringing suit" until 2014, when "the Supreme Court eliminated the equitable defense of laches in copyright claims . . . ." 1–SER–5, *citing Petrella,* 134 S. Ct. 1967. That is "an inaccurate view of the law." *Schwarz*, 73 F.3d at 900.

The long-established law in this Circuit was that laches only precludes relief for past copyright infringements. *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 105 (9th Cir. 1960). The possibility of laches being a complete bar to prospective relief was not recognized in this Circuit until the unique circumstances of *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001), which acknowledged that "such an application of laches may be unusual." *Id.* at 954, *citing Telink, Inc. v. United States*, 24 F.3d 42, 45 n. 3, 46 n. 5 (9th Cir. 1994) ("Laches is rarely justified if the claim is filed" within statute of limitations; appropriate only in "rare case").

Further, in the Second Circuit—where some of the defendants are located and where Wolfe and then Skidmore could have sued—laches was limited to

87

equitable relief and did not bar damages. *New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576, 585 (2d Cir. 1989). In other Circuits, laches was not even a partial defense. *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797 (4th Cir. 2001).

The District Court's conclusion that the factor of motivation cut against awarding attorneys' fees is based "on an inaccurate view of the law." *Schwarz,* 73 F.3d at 900. That conclusion also directly conflicts with the District Court's finding of Skidmore's extensive litigation misconduct (*see below* at 90; *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980)) and, as a result, is not "well-founded in the record . . . ." *Fantasy,* 94 F.3d at 560.

> ### iv. The District Court Relied on an Error of Law in Concluding that the Need for Compensation and Deterrence Only Slightly Favored the Award of Fees

Warner/Chappell showed that because Skidmore asserted a forty-three-year-old claim, insurance coverage was denied and Warner/Chappell incurred the cost of successfully defending his claim. The District Court correctly found that the interest of compensation cut in favor of awarding attorneys' fees and that Skidmore failed to establish an inability to pay. 1–SER–6.

However, in concluding that the interest of deterring stale and meritless claims did not apply, the District Court relied on the same mistaken view that laches barred the claim until the 2014 decision in *Petrella*. 1–SER–5-6; *see above* at 87-88. The District Court also added that it found "Plaintiff's claim was not meritless" (1–SER–6), but that finding is flawed (*see above* at 84-86).

### (2) The District Court Erred by Reducing Skidmore's Outrageous Litigation Misconduct to Just a New *Fogerty* Factor

In moving for fees, Warner/Chappell raised that "a court may order fee-shifting [under the Copyright Act] because of a party's litigation misconduct, whatever the reasonableness of his claims or defenses." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1988-89 (2016). The literal and reasonable interpretation of *Kirtsaeng* is that litigation misconduct is not a new *Fogerty* factor, but rather an independent basis to award attorneys' fees to the prevailing party. That interpretation is consistent with the case cited by the Supreme Court. *Id.*, *citing Viva Video, Inc. v. Cabrera*, 9 F. App'x 77, 80 (2d Cir. 2001) ("bad faith in the conduct of the litigation is a valid ground for an award of fees"), *quoting Matthew Bender & Co. v. W. Pub. Co.*, 240 F.3d 116, 125 (2d Cir. 2001).

The District Court, however, treated Skidmore's litigation misconduct as a sixth *Fogerty* factor. 1–SER–6. Diluting litigation misconduct to one of six

factors, is contrary to *Kirtsaeng*'s confirmation that under the Copyright Act attorneys' fees may be awarded "because of a party's litigation misconduct, . . . ." *Kirtsaeng*, 136 S. Ct. at 1988-89.

That error of law is prejudicial because the District Court found Skidmore engaged in ongoing and multiple examples of litigation misconduct, and that finding is clearly correct. As examples of Skidmore's misconduct, the District Court cited Skidmore's offering of his and his counsel's hands to the jury, mocking the unclean hands defense; Skidmore's violation of the Order *in limine* prohibiting mention of the Trust's supposed charitable purpose—and violation of California Rule of Professional Responsibility 5-120(A)—by stating to the media that any recovery would be used to buy musical instruments for children in need in Ventura County; and following that violation with another, eliciting from Skidmore's first witness at trial her testimony to the Trust's supposed charitable purpose. 1–SER–6; *see also* IV–ER–887:17-891:9.

The examples of Skidmore's litigation misconduct also include Skidmore's use at trial of a 1980s photograph cropped to create the false impression that Robert Plant was speaking to the former Spirit member, Andes, as supposed proof they had a "relationship over the years" (III–ER–434:15-436:22; Exh. 535; 1–SER–178-187), and Skidmore's violation of the Order *in limine* barring evidence

of payments the individual defendants received under a 2008 contract as outside the Copyright Act's three-year statute of limitations (IV–ER–906:20-909:18, 918:13-919:22; 1–SER–80:3-16). *See also* 1–SER–170. While Skidmore is properly charged with his counsel's misconduct (*Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962)), Skidmore admitted that he "carefully reviewed this lawsuit at all stages" (1–SER–51:24-25) and he was present throughout the trial and witnessed his counsel's misconduct first hand.

In denying attorneys' fees, the District Court misinterpreted the law by treating Skidmore's litigation misconduct as a sixth *Fogerty* factor rather than a separate and compelling basis to award attorneys' fees.

### (3) The District Court's Denial of Attorneys' Fees Did Not Further the Policies of the Copyright Act

By the District Court's count, whether to award attorneys' fees to Warner/Chappell was a close call, with defendants' degree of success and Skidmore's litigation misconduct "solidly" in favor of the fee award, compensation and deterrence "slightly" in favor, and frivolousness, objective unreasonableness and motivation "strongly" against. 1–SER–6. But that three-to-three conclusion "is based on an inaccurate view of the law [and] clearly erroneous finding[s] of fact." *Schwarz,* 73 F.3d at 900; *see above* at 84-91.

Further, the Order does not even mention "[t]he most important factor," namely, "whether an award will further the purposes of the Act." *Mattel*, 705 F.3d at 1111. The denial of attorneys' fees did not further those purposes.

"[C]opyright law ultimately serves the purpose of enriching the general public through access to creative works, . . . ." *Fogerty*, 510 U.S. at 526-27. "That aim is furthered when defendants 'advance a variety of meritorious copyright defenses'" (*Mattel*, 705 F.3d at 1111, *quoting Fogerty,* 510 U.S. at 527), and here defendants' successful defense ensured that *Stairway to Heaven* would not be, as Skidmore requested, enjoined, impounded and destroyed. XI–ER–2743 at (f); 17 U.S.C. §§ 502-03.

Also, "it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible." *Fogerty,* 510 U.S. at 527. By successfully preventing Skidmore from monopolizing musical building blocks, defendants confirmed the limits of copyright and ensured the availability of those building blocks for others to use. *Mattel*, 705 F.3d at 1111 (although plaintiff's claim was reasonable, fees properly awarded to defendant because its "contribution to the state of the law in the field of copyright in a case of this magnitude and notoriety was important").

Warner/Chappell respectfully submits that the District Court's Order denying attorneys' fees should be reversed and the case remanded with instructions that the District Court award Warner/Chappell its attorneys' fees.

**(b)** **The Denial of Warner/Chappell's Motion for Full Costs**

"Whether the district court applied the correct legal standard is reviewed *de novo*[, while the] denial of costs is . . . reviewed for an abuse of discretion." *Berkla v. Corel Corp.*, 302 F.3d 909, 917 (9th Cir. 2002).

The Copyright Act provides that "the court in its discretion may allow the recovery of full costs . . ." (17 U.S.C. § 505), which include otherwise non-taxable costs. *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 884-86 (9th Cir. 2005). Apparently assuming that Warner/Chappell's motion for additional costs stood or fell with the attorneys' fees motion, the District Court denied both in a single Order. 1–SER–3. Accordingly, for the same reasons specified above as to the fees motion, the denial of additional costs should be reversed.

**3.** **CONCLUSION**

Defendants respectfully submit that the District Court's Judgment and Amended Judgment should be affirmed and that the District Court's Order denying

Warner/Chappell's motions for attorneys' fees and additional costs should be reversed with instructions to grant those motions. In addition, and including because Skidmore continues to advance frivolous arguments and misstate the law—*see, e.g., above* at 37-41, 41, 42-43, 68-69—defendants should recover their costs and attorneys' fees on appeal.

Dated: June 2, 2017                          _____/s/ Peter J. Anderson_____
                                             Peter J. Anderson, Esq.
                                             Law Offices of Peter J. Anderson
                                             A Professional Corporation
                                             Attorney for Defendants and Appellees
                                             JAMES PATRICK PAGE,
                                             ROBERT ANTHONY PLANT,
                                             JOHN PAUL JONES,
                                             ATLANTIC RECORDING CORPORATION,
                                             RHINO ENTERTAINMENT COMPANY,
                                             SUPER HYPE PUBLISHING, INC., and
                                             WARNER MUSIC GROUP CORP.
                                             and
                                             Defendant, Appellee and Appellant
                                             WARNER/CHAPPELL MUSIC, INC.


                                             Helene M. Freeman, Esq.
                                             PHILLIPS NIZER LLP
                                             Attorney for Defendants-Appellees
                                             JAMES PATRICK PAGE,
                                             ROBERT ANTHONY PLANT
                                             and JOHN PAUL JONES

**Form 8.**  **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 16-56057

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated ⬚
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☒ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is 19,623 words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant /s/ Peter J. Anderson   Date June 2, 2017

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

## STATEMENT OF RELATED CASE

The following case pending in this Court is within this Court's Circuit Rule 28-2.6(c): *Pharrell Williams et al. v. Frankie Christian Gaye et al.*, Nos. 15-56880, 16-55089, 16-55626, insofar as it raises the issue whether the deposit copy accompanying the registration of copyright in a musical composition under the Copyright Act of 1909, 17 U.S.C. §§ 1 *et seq.*, constitutes the copyrighted work protected by the registered copyright.

Dated: June 2, 2017                    _____/s/ Peter J. Anderson_____

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this Answering and Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF System on June 2, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system

Dated: June 2, 2017          _____/s/ Peter J. Anderson_____

# **ADDENDUM**

## <u>The Constitutional Grant of Power *Re* Copyright</u>

U.S. Const. Art. I, § 8:

The Congress shall have Power . . .

> To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries; . . . .

## Act of May 31, 1790

1 Stat. 124 (May 31, 1790):

AN ACT for the encouragement of learning, by securing the copies of maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned.

. . .

§ **3.** *And be it further enacted*, That no person shall be entitled to the benefit of this act, in cases where any map, chart, book or books, hath or have been already printed and published, unless he shall first deposit, and in all other cases, unless he shall before publication deposit a printed copy of the title of such map, chart, book or books, in the clerk's office of the district court where the author or proprietor shall reside: And the clerk of such court is hereby directed and required to record the same forthwith, in a book to be kept by him for that purpose, in the words following, (giving a copy thereof to the said author or proprietor, under the seal of the court, if he shall require the same). "District of _____ to wit: *Be it remembered*, that on the _____ day of _____ in the _____ year of the independence of the United States of America, A. B. of the said district, hath deposited in this office the title of a map, chart, book or books, (as the case may be) the right whereof he claims as author or proprietor, (as the case may be) in the words following, to wit: [here insert the title] in conformity to the act of the Congress of the United States, intituled 'An act for the encouragement of learning, by securing the copies of maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned.' C. D. clerk of the district of _____." For which the said clerk

shall be entitled to receive sixty cents from the said author or proprietor, and sixty cents for every copy under seal actually given to such author or proprietor as aforesaid. And such author or proprietor shall, within two months from the date thereof, cause a copy of the said record to be published in one or more of the newspapers printed in the United States, for the space of four weeks.

§ 4. *And be it further enacted*, That the author or proprietor of any such map, chart, book or books, shall, within six months after the publishing thereof, deliver, or cause to be delivered to the Secretary of State a copy of the same, to be preserved in his office.

101

## Act of Feb. 3, 1831

4 Stat. 36, ch. 16 (Feb. 3, 1831):

AN ACT to amend the several acts respecting copyrights.

. . .

§ 4. *And be it further enacted*, That no person shall be entitled to the benefit of this act, unless he shall, before publication, deposit a printed copy of the title of such book, or books, map, chart, musical composition, print, cut, or engraving, in the clerk's office of the district court of the district wherein the author or proprietor shall reside, and the clerk of such court is hereby directed and required to record the same thereof forthwith, in a book to be kept for that purpose, in the words following (giving a copy of the title, under the seal of the court, to the said author or proprietor, whenever he shall require the same:) "District of _____ to wit: Be it remembered, that on the _____ day of _____ anno Domini, _____ A. B., of the said district, hath deposited in this office the title of a book, (map, chart, or otherwise, as the case may be,) the title of which is in the words following, to wit: (here insert the title;) the right whereof he claims as author (or proprietor as the case may be;) in conformity with an act of Congress, entitled 'An act to amend the several acts respecting copyrights.' C. D., clerk of the district." For which record, the clerk shall be entitled to receive, from the person claiming such right as aforesaid, fifty cents; and the like sum for every copy, under seal, actually given to such person or his assigns. And the author or proprietor of any such book, map, chart, musical composition, print, cut, or engraving, shall, within three months from the publication of said book, map, chart, musical composition, print, cut, or engraving, deliver or cause to be delivered a copy of the same to the clerk of said district. And it shall be the duty of the clerk of each district court, at least once in

every year, to transmit a certified list of all such records of copyright, including the titles so recorded, and the dates of record, and also all the several copies of books or other works deposited in his office according to this act, to the Secretary of State, to be preserved in his office.

**Copyright Act of 1909**

17 U.S.C. §§ 1 *et seq.* (Mar. 4, 1909):

### § 1. Exclusive rights as to copyrighted works

Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

(a)  To print, reprint, publish, copy, and vend the copyrighted work;

(b)  To translate the copyrighted work into other languages or dialects, or make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; to arrange or adapt it if it be a musical work; to complete, execute, and finish it if it be a model or design for a work of art;

(c)  To deliver, authorize the delivery of, read, or present the copyrighted work in public for profit if it be a lecture, sermon, address or similar production, or other nondramatic literary work; to make or procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, delivered, presented, produced, or reproduced; and to play or perform it in public for profit, and to exhibit, represent, produce, or reproduce it in any manner or by any method whatsoever. The damages for the infringement by broadcast of any work referred to in this subsection shall not exceed the sum of $100 where the infringing broadcaster shows that he was not aware that he was infringing and that such infringement could not have been reasonably foreseen; and

(d)  To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of

any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever; and

(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: *Provided,* That the provisions of this title, so far as they secure copyright controlling the parts of instruments serving to reproduce mechanically the musical work, shall include only compositions published and copyrighted after July 1, 1909, and shall not include the works of a foreign author or composer unless the foreign state or nation of which such author or composer is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States similar rights. And as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof; and the copyright proprietor may require, and if so the manufacturer shall furnish, a report under oath on the 20th day of each month on the number of parts of instruments manufactured during the previous month serving to reproduce mechanically said musical work, and royalties shall be due on the parts manufactured during any month upon the 20th of the next succeeding month. The payment of the royalty provided for by this section shall

free the articles or devices for which such royalty has been paid from further contribution to the copyright except in case of public performance for profit. It shall be the duty of the copyright owner, if he uses the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit action, or proceeding for any infringement of such copyright.

In case of failure of such manufacturer to pay to the copyright proprietor within thirty days after demand in writing the full sum of royalties due at said rate at the date of such demand, the court may award taxable costs to the plaintiff and a reasonable counsel fee, and the court may, in its discretion, enter judgment therein for any sum in addition over the amount found to be due as royalty in accordance with the terms of this title, not exceeding three times such amount.

The reproduction or rendition of a musical composition by or upon coin-operated machines shall not be deemed a public performance for profit unless a fee is charged for admission to the place where such reproduction or rendition occurs.

(f) To reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording: *Provided,* That the exclusive right of the owner of a copyright in a sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form that directly or indirectly recaptures the actual sounds fixed in the recording: *Provided further,* That this right does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording; or to reproductions made by transmitting organizations exclusively for their own use.

. . .

## § 3.   Protection of component parts of work copyrighted; composite works or periodicals

The copyright provided by this title shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright. The copyright upon composite works or periodicals shall give to the proprietor thereof all the rights in respect thereto which he would have if each part were individually copyrighted under this title.

. . .

## § 10.  Publication of work with notice

Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section 22 of this title.

## § 11.  Registration of claim and issuance of certificate

Such person may obtain registration of his claim to copyright by complying with the provisions of this title, including the deposit of copies, and upon such compliance the Register of Copyrights shall issue to him the certificates provided for in section 209 of this title.

## § 12.  Works not reproduced for sale

Copyright may also be had of the works of an author, of which copies are not reproduced for sale, by the deposit, with claim of copyright, of one complete copy of such work if it be a lecture or similar production or a dramatic, musical, or dramatico-musical composition; of a title and description, with one print taken

from each scene or act, if the work be a motion-picture photoplay; of a photographic print if the work be a photograph; of a title and description with not less than two prints taken from different sections of a complete motion picture, if the work be a motion picture other than a photoplay; or of a photograph or other identifying reproduction thereof, if it be a work of art or a plastic work or drawing. But the privilege of registration of copyright secured hereunder shall not exempt the copyright proprietor from the deposit of copies under sections 13 and 14 of this title, where the work is later reproduced in copies for sale.

## § 13. Deposit of copies after publication; action or proceeding for infringement

After copyright has been secured by publication of the work with the notice of copyright as provided in section 10 of this title, there shall be promptly deposited in the Copyright Office or in the mail addressed to the Register of Copyrights, Washington, District of Columbia, two complete copies of the best edition thereof then published, or if the work is by an author who is a citizen or subject of a foreign state or nation and has been published in a foreign country, one complete copy of the best edition then published in such foreign country, which copies or copy, if the work be a book or periodical, shall have been produced in accordance with the manufacturing provisions specified in section 16 of this title; or if such work be a contribution to a periodical, for which contribution special registration is requested, one copy of the issue or issues containing such contribution; or if the work belongs to a class specified in subsections (g), (h), (i) or (k) of section 5 of this title, and if the Register of Copyrights determines that it is impracticable to deposit copies because of their size, weight, fragility, or monetary value he may permit the deposit of photographs or other identifying reproductions in lieu of copies of the work as published under such rules and regulations as he may prescribe with the approval of the Librarian of Congress; or

if the work is not reproduced in copies for sale there shall be deposited the copy, print, photograph, or other identifying reproduction provided by section 12 of this title, such copies or copy, print, photograph, or other reproduction to be accompanied in each case by a claim of copyright. No action or proceeding shall be maintained for infringement of copyright in any work until the provisions of this title with respect to the deposit of copies and registration of such work shall have been complied with.

. . .

### § 213.  Disposition of articles deposited in office[2]

Of the articles deposited in the copyright office under the provisions of the copyright laws of the United States, the Librarian of Congress shall determine what books and other articles shall be transferred to the permanent collections of the Library of Congress, including the law library, and what other books or articles shall be placed in the reserve collections of the Library of Congress for sale or exchange, or be transferred to other governmental libraries in the District of Columbia for use therein.

### § 214.  Destruction of articles deposited in office remaining undisposed of; removal of by author or proprietor; manuscripts of unpublished works[3]

Of any articles undisposed of as above provided, together with all titles and correspondence relating thereto, the Librarian of Congress and the Register of Copyrights jointly shall, at suitable intervals, determine what of these received during any period of years it is desirable or useful to preserve in the permanent files of the copyright office, and, after due notice as hereinafter provided, may within their discretion cause the remaining articles and other things to be

---

[2]  Initially, 17 U.S.C. § 59.

destroyed: *Provided,* That there shall be printed in the Catalog of Copyright Entries from February to November, inclusive, a statement of the years of receipt of such articles and a notice to permit any author, copyright proprietor, or other lawful claimant to claim and remove before the expiration of the month of December of that year anything found which relates to any of his productions deposited or registered for copyright within the period of years stated, not reserved or disposed of as provided for in this title. No manuscript of an unpublished work shall be destroyed during its term of copyright without specific notice to the copyright proprietor of record, permitting him to claim and remove it.

---

[3]     Initially, 17 U.S.C. § 60.

## Copyright Office Regulations under the Copyright Act of 1909

Copyright Office Reg., 37 C.F.R. §§ 201 *et seq.*

### § 202.8

(a)  This class includes published or unpublished musical compositions in the form of visible notation (other than dramatico-musical compositions), with or without words, as well as new versions of musical compositions, such as adaptations or arrangements, and editing when such editing is the writing of an author. The words of a song, when unaccompanied by music, are not registrable in Class E.

(b)  A phonorecord, such as a disc, tape, or other reproduction of a sound recording, is not considered a copy of the musical composition or the literary or dramatic work recorded on it, and is not acceptable as a deposit copy for copyright registration of the musical composition or the literary or dramatic work. Concerning the registration of copyright claims in sound recordings as works in themselves (as distinct from the musical compositions or the literary or dramatic works recorded), see 202.15a.

. . .

### § 202.15a Sound Recordings (Class N)

(a)  This class includes published sound recordings, i.e., works that result from the fixation of a series of musical, spoken, or other sounds. Common examples include recordings of music, drama, narration, or other sounds, as published in the form of phonorecords such as discs, tapes, cartridges, cassettes, player piano rolls, or similar material objects from which the sounds can be reproduced either directly or with the aid of a machine or device. Registration for sound recordings is made in Class N.

111

(b)   Only those sound recordings fixed and published on or after February 15, 1972, are eligible for registration. A sound recording is fixed when the complete series of sounds constituting the work is first produced on a final master recording that is later reproduced in published copies.

(c)   Sound recordings registrable in Class N do not include a soundtrack that is an integrated part of a motion picture. Registration for motion pictures, including an integrated soundtrack, is made in Class L or M; 202.15.

(d)   Registration for sound recording in Class N does not cover the musical composition or the literary or dramatic work of which a rendition is recorded. A claim of copyright in the recorded musical composition is to be registered separately in Class E; see 202.8. A claim of copyright in the recorded literary or dramatic work is to be registered separately in Class A, B, C, or D, whichever is appropriate; sec 202.4, 202.5, 202.6, and 202.7.

## Copyright Act of 1976

17 U.S.C. §§ 101 *et seq.*

### § 101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

. . .

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

### § 102. Subject matter of copyright: In general

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

(8) architectural works.

113

(b)    In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

## § 103.  Subject matter of copyright: Compilations and derivative works

(a)    The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

(b)    The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.  The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

. . .

## § 303.  Duration of copyright: Works created but not published or copyrighted before January 1, 1978

(a)    Copyright in a work created before January 1, 1978, but not theretofore in the public domain or copyrighted, subsists from January 1, 1978, and endures for the term provided by section 302. In no case, however, shall the term of copyright in such a work expire before December 31, 2002; and, if the work is published on or before December 31, 2002, the term of copyright shall not expire before December 31, 2047.

(b)    The distribution before January 1, 1978, of a phonorecord shall not for any purpose constitute a publication of any musical work, dramatic work, or literary work embodied therein.

. . .

## § 408.  Copyright registration in general

(a)    Registration Permissive.—At any time during the subsistence of the first term of copyright in any published or unpublished work in which the copyright was secured before January 1, 1978, and during the subsistence of any copyright secured on or after that date, the owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim by delivering to the Copyright Office the deposit specified by this section, together with the application and fee specified by sections 409 and 708. Such registration is not a condition of copyright protection.

(b) Deposit for Copyright Registration.—Except as provided by subsection (c), the material deposited for registration shall include--

(1)    in the case of an unpublished work, one complete copy or phonorecord;

(2)    in the case of a published work, two complete copies or phonorecords of the best edition;

(3)    in the case of a work first published outside the United States, one complete copy or phonorecord as so published;

(4)    in the case of a contribution to a collective work, one complete copy or phonorecord of the best edition of the collective work.

Copies or phonorecords deposited for the Library of Congress under section 407 may be used to satisfy the deposit provisions of this section, if they are accompanied by the prescribed application and fee, and by any additional identifying material that the Register may, by regulation, require. The Register

shall also prescribe regulations establishing requirements under which copies or phonorecords acquired for the Library of Congress under subsection (e) of section 407, otherwise than by deposit, may be used to satisfy the deposit provisions of this section.

(c)    Administrative Classification and Optional Deposit.—

(1)    The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the copies or phonorecords to be deposited in the various classes specified. The regulations may require or permit, for particular classes, the deposit of identifying material instead of copies or phonorecords, the deposit of only one copy or phonorecord where two would normally be required, or a single registration for a group of related works. This administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title.

(2) Without prejudice to the general authority provided under clause (1), the Register of Copyrights shall establish regulations specifically permitting a single registration for a group of works by the same individual author, all first published as contributions to periodicals, including newspapers, within a twelve-month period, on the basis of a single deposit, application, and registration fee, under the following conditions:

(A)    if the deposit consists of one copy of the entire issue of the periodical, or of the entire section in the case of a newspaper, in which each contribution was first published; and

(B)    if the application identifies each work separately, including the periodical containing it and its date of first publication.

(3)    As an alternative to separate renewal registrations under subsection (a) of section 304, a single renewal registration may be made for a group of works by the same individual author, all first published as contributions to periodicals, including newspapers, upon the filing of a single application and fee, under all of the following conditions:

(A)    the renewal claimant or claimants, and the basis of claim or claims under section 304(a), is the same for each of the works; and

(B)    the works were all copyrighted upon their first publication, either through separate copyright notice and registration or by virtue of a general copyright notice in the periodical issue as a whole; and

(C)    the renewal application and fee are received not more than twenty-eight or less than twenty-seven years after the thirty-first day of December of the calendar year in which all of the works were first published; and

(D)    the renewal application identifies each work separately, including the periodical containing it and its date of first publication.

(d)    Corrections and Amplifications.—The Register may also establish, by regulation, formal procedures for the filing of an application for supplementary registration, to correct an error in a copyright registration or to amplify the information given in a registration. Such application shall be accompanied by the fee provided by section 708, and shall clearly identify the registration to be corrected or amplified. The information contained in a supplementary registration augments but does not supersede that contained in the earlier registration.

(e)    Published Edition of Previously Registered Work.—Registration for the first published edition of a work previously registered in unpublished form may

117

be made even though the work as published is substantially the same as the unpublished version.

(f)　　Preregistration of works being prepared for commercial distribution.—

(1)　　Rulemaking.--Not later than 180 days after the date of enactment of this subsection, the Register of Copyrights shall issue regulations to establish procedures for preregistration of a work that is being prepared for commercial distribution and has not been published.

(2)　　Class of works.--The regulations established under paragraph (1) shall permit preregistration for any work that is in a class of works that the Register determines has had a history of infringement prior to authorized commercial distribution.

(3)　　Application for registration.--Not later than 3 months after the first publication of a work preregistered under this subsection, the applicant shall submit to the Copyright Office--

(A)　　an application for registration of the work;

(B)　　a deposit; and

(C)　　the applicable fee.

(4)　　Effect of untimely application.--An action under this chapter for infringement of a work preregistered under this subsection, in a case in which the infringement commenced no later than 2 months after the first publication of the work, shall be dismissed if the items described in paragraph (3) are not submitted to the Copyright Office in proper form within the earlier of—

(A)　　3 months after the first publication of the work; or

(B)　　1 month after the copyright owner has learned of the infringement.

118

## § 502.  Remedies for infringement: Injunctions

(a)    Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

(b)    Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person.  The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.

. . .

## § 503.  Remedies for infringement: Impounding and disposition of infringing articles

. . .

(b)    As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phonorecords found to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.


. . .

## § 505.  Remedies for infringement: Costs and attorney's fees

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an

officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

. . .

## § 704.  Retention and disposition of articles deposited in Copyright Office

(a)    Upon their deposit in the Copyright Office under sections 407 and 408, all copies, phonorecords, and identifying material, including those deposited in connection with claims that have been refused registration, are the property of the United States Government.

(b)    In the case of published works, all copies, phonorecords, and identifying material deposited are available to the Library of Congress for its collections, or for exchange or transfer to any other library. In the case of unpublished works, the Library is entitled, under regulations that the Register of Copyrights shall prescribe, to select any deposits for its collections or for transfer to the National Archives of the United States or to a Federal records center, as defined in section 2901 of title 44.

(c)    The Register of Copyrights is authorized, for specific or general categories of works, to make a facsimile reproduction of all or any part of the material deposited under section 408, and to make such reproduction a part of the Copyright Office records of the registration, before transferring such material to the Library of Congress as provided by subsection (b), or before destroying or otherwise disposing of such material as provided by subsection (d).

(d)    Deposits not selected by the Library under subsection (b), or identifying portions or reproductions of them, shall be retained under the control of the Copyright Office, including retention in Government storage facilities, for the longest period considered practicable and desirable by the Register of Copyrights and the Librarian of Congress. After that period it is within the joint discretion of

the Register and the Librarian to order their destruction or other disposition; but, in the case of unpublished works, no deposit shall be knowingly or intentionally destroyed or otherwise disposed of during its term of copyright unless a facsimile reproduction of the entire deposit has been made a part of the Copyright Office records as provided by subsection (c).

(e)     The depositor of copies, phonorecords, or identifying material under section 408, or the copyright owner of record, may request retention, under the control of the Copyright Office, of one or more of such articles for the full term of copyright in the work. The Register of Copyrights shall prescribe, by regulation, the conditions under which such requests are to be made and granted, and shall fix the fee to be charged under section 708(a) if the request is granted.