

**FRANCIS ALEXANDER** LLC

JANUARY 3, 2019

Office of the Clerk
James R. Browning Courthouse
U.S. Court of Appeals, Ninth Circuit
95 Seventh Street
San Francisco, CA 94103-1526

> RE: SKIDMORE V. LED ZEPPELIN | NO. 16-56057
> Appellant Skidmore's Letter of Supplemental Authority on the Legislative
> Histories of the 1909 and 1976 Copyright Acts, Pursuant to FRAP 28(j), In
> Support of His Petition for Rehearing

To the Clerk,

Following Defendants' response, Plaintiff has obtained the legislative histories for the 1909 and 1976 Copyright Acts to assist in deciding the petition for rehearing.

**First,** the 1909 Act history does not address the scope of copyright, reinforcing Plaintiff's position that it does not do so because the common law already protected the entire work from "the moment of creation." Plaintiff Pet., at p.13.

**Second**, the 1976 Act history definitively supports Plaintiff's position. Defendants erroneously claim in their response that common law copyright was not real. Def. Brief, at p.2. Yet, as explained by Congress, all states had "equivalent" legal and equity rights known as common law copyright:

> Instead of a dual system of *"**common law copyright**"* for unpublished works and statutory copyright for published works, which has been the system in effect in the United States since the first copyright statute in 1790, the bill adopts a single system of Federal statutory copyright from creation. Under section 301 a work would obtain statutory protection as soon as it is "created" or, as that term is defined in section 101, when it is "fixed in a copy or phonorecord for the first time*." **Common law copyright protection**_ for works coming within the scope of the statute would be abrogated ...

HR Rep. No.94-1476, at p.129-31 (1976).

Defendants also claim that unenforceable compendiums from 1973 and 2017 state that the deposit controls the scope of the copyright under both the 1909 ***and 1976 Acts***. Def. Brief, at p.5-6. The compendiums are wrong.

The 1976 Act history is unequivocal that a work is given "statutory protection" by Section 301 *as created/fixed—not* by a later deposit. It is critical to understand that Section 301 **continued**

Page 2

the longstanding policy under the 1909 Act/common law of protecting works from "moment of creation." The 1976 Act federalized the process, but did not alter its core essence.

If Congress and the courts contemplated that the deposit determined scope under either Act—in contradiction of their ***express statements*** that a work is protected as created—they would have plainly stated that in the last 110 years.

Respectfully, I am,

Francis Malofiy, Esquire

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing APPELLANT SKIDMORE'S LETTER OF SUPPLEMENTAL AUTHORITY ON THE 1909 AND 1976 COPYRIGHT ACTS LEGISLATIVE HISTORIES, PURSUANT TO FRAP 28(J), IN SUPPORT OF HIS PETITION FOR REHEARING has been served upon all counsel of record identified below via electronic filing. I further certify that the total word count of the body of this letter is 350 words.

Helene Freeman, Esquire
666 Fifth Avenue
New York, NY 10103-0084
T: (212) 841-0547
F: (212) 262-5152
E: hfreeman@phillipsnizer.com
*Attorneys for Defendants James Patrick Page, Robert Anthony Plant, and John Paul Jones (collectively with John Bonham (Deceased), professionally known as Led Zeppelin)*

Peter J. Anderson, Esquire
100 Wilshire Blvd. | Suite 2010
Santa Monica, CA 90401
T:(310) 260-6030
F: (310) 260-6040
E: pja@pjanderson.com
*Attorney for Defendants Super Hype Publishing, Inc., Warner Music Group Corp., Warner/Chappell Music, Inc., Atlantic Recording Corporation, and Rhino Entertainment Company*

*****

*Respectfully submitted,*

FRANCIS ALEXANDER, LLC
*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Alfred Joseph Fluehr, Esquire
280 N. Providence Rd. | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com
*Law Firm / Lawyers for Michael Skidmore*

*/d/ January 3, 2019*

# 1909 Act History

The House Report 1 on the Copyright Act of 1909

TO AMEND AND CONSOLIDATE THE ACTS RESPECTING COPYRIGHT.

FEBRUARY, 1909.--Committed to the Committee of the Whole House on the state of the Union and ordered to be printed.

MR CURRIER, from the Committee on Patents, submitted the following

## REPORT.

[To accompany H.R. 28192]

The Committee on Patents, to whom was referred House bill 28192, respectfully report that they have had the same under consideration and recommend that it do pass.

For years men familiar with the copyright laws of this country have urged the necessity of a complete revision. In a notable address on "Our archaic copyright laws," delivered before the Maine State Bar Association By Hon. Samuel J. Elder, a distinguished member of the Boston bar, he said:

The whole system, in the light of an interpretation by the courts, call for a revision, The courts are more and more called upon to consider these questions. And besides this, the reproduction of various things which are the subject of copyright has enormously increased. The wealth and business of the country and the methods and means of duplication have increased immeasurably. The law requires adaptation to these modern conditions. It is no longer possible to summarize it in a few sections covering everything copyrightable, It should be revised so that protection to the honest literary worker, artist, or designer shall be simple and certain.

The pressing need of a revision of the copyright laws was urged by the President in his message to Congress in December, 1905, He said:

Our copyright laws urgently need revision, They are imperfect in definition, confused and inconsistent in expression; they omit provision for many articles which, under modern reproductive processes, are entitled to protection; they impose hardships upon the copyright proprietor which are not essential to the fair protection of the public; they are difficult for the courts to interpret and impossible for the Copyright Office to administer with satisfaction to the public. Attempts to improve them by amendment have been frequent, no less than 12 acts for the purpose having been passed since the Revised Statutes. To perfect them by further amendment seems impracticable. A complete revision of them is essential. Such a revision, to meet modern conditions, has been found necessary in Germany, Austria, Sweden, **[2]**and other foreign countries, and bills embodying it are pending in England and the Australian colonies. It has been urged here, and proposals for a commission to undertake it have, from time to time, been pressed upon the Congress.

The inconveniences of the present conditions being so great, an attempt to frame appropriate legislation has been made by the Copyright Office, which has called conferences of various interests especially and practically concerned with the operation of the copyright laws. It has secured from them suggestions as to the changes necessary; it has added from its own experience and investigation, and it has drafted a bill which embodies such of these changes and additions as, after full discussion and expert criticism, appeared to be sound and safe, In form this bill would replace the existing insufficient and inconsistent laws by one general copyright statute. It will be presented to the Congress at the coming session. It deserves prompt consideration.

Mr. Thorvald Solberg, register of copyrights, in the introduction to his book on Copyright in Congress, gives reason for a revision of the copyright law, as follow:

It is doubtful if the enactment of further merely partial or temporizing legislation will afford satisfactory remedies for the insufficiencies and inconsistencies of the present laws. The subject should be dealt with as a whole, and the insufficient and antiquated laws, now in force be replaced by one consistent, liberal, and adequate statute.

The laws as they stand fail to give the protection required, are difficult of interpretation, application, and administration, leading to misapprehension and misunderstanding, and in some directions are open to abuses.

The laws respecting copyrights must now be gathered from a large number of acts. Fourteen acts relating to copyrights have been passed since the Revised Statutes of 1873.

The first copyright statute ever passed in this country was passed by the legislature of Connecticut in 1783 at the solicitation of Noah Wesbter, who desired copyright protection for his spelling book. It is said that Mr. Webster then traveled from State to State and induced 12 of the 13 States--all except Delaware--to enact similar statutes. When the convention met and framed the Constitution of the United States copyright laws existed in 12 of the 13 States, but the requirements for the registration of copyrights differed greatly, making it burdensome to an author seeking to protect his work. The need of a law which would be effective in all the States was so apparent that a provision was incorporated in the Constitution, as follows:

Congress shall have power *** to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries. (Constitution, Art. I, par. 8.)

Congress and the courts have always given a liberal construction to the word "writings." Mr. Justice Miller, in delivering an opinion of the Supreme Court in the case of Burrow-Giles Lithograph Company *v.* Sarony (111 U.S.), says:

The first Congress of the United States, sitting immediately after the formation of the Constitution, enacted that the "author or authors of any map, chart, book, or books, being a citizen or resident of the United States, shall have the sole right and liberty of printing, reprinting, publishing, and vending the same for the period of fourteen years from the recording of the title thereof in the clerk's office, as afterwards directed." (1 Stat. L., 124. 1.)

This statute not only makes maps and charts subjects of copyright, but mentions them before books in the order of designation. The second section of an act to amend this act, approved April 29, 1802 (2 Stat. L., 171), enacts that from the 1st day of January thereafter, he who shall invent and design, engrave, etch, or work, or from his own works shall cause to be designed and engraved, etched, or worked, any historical or other print or prints shall have the same exclusive right for the term of fourteen years from recording the title thereof as prescribed by law.

**[3]**By the first section of the act of February 3, 1831 (4 Stat. L., 436), entitled "An act to amend the several acts respecting copyright," musical compositions and cuts, in connection with prints and engravings, are added, and the period of protection is extended to twenty-eight years. The caption or title of this act uses the word "copyright" for the first time in legislation of Congress.

The construction placed upon the Constitution by the first act of 1790 and the act of 1802 by the men were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of nearly a century it is almost conclusive.

The Sarony case involved the right to make copies or photographs, and Mr. Justice Miller held that photographs were protected by the act of 1802. In referring to the acts of 1790, 1802, and 1831, he says:

These statutes certainly answer the objection that books only, or writing in the limited sense of a book and its author, are within the constitutional provision. Both these words are susceptible of more enlarged definition than this. An author in that sense is "he to whom anything owes its origin; originator; maker; one who completes a work of science or literature." (Worcester.) So, also, no one would now claim that the word "writing" in this clause of the Constitution, though the only word used as to subjects in regard to which authors are to be secured, is limited to the actual script of the author and excludes books and all other printed matter. By "writings" in that clause is meant the literary production of those authors, and Congress very properly has declared these to include all forms of writing, printing, engraving, etching, etc., by which the ideas in the mind of the author are given visible expression. The only reason why photographs were not included in the extended list in the act of 1802 is probably that they did not exist, as photography as an art was then unknown, and the scientific principle on which it rests and the chemicals and machinery by which it is operated have all been discovered long since that statute was enacted.

* * * * *

We entertain no doubt that the Constitution is broad enough to cover an act authorizing copyright of photographs, so far as they are representatives of original intellectual conceptions of the author.

As a result of the President's message previously referred to, Mr. Herbert Putnam, Librarian of Congress, issued invitations to those having an affirmative interest in copyright legislation to attend a conference for the purpose of formulating a copyright bill. Several conferences were held, two in the year 1905 and one or two in the year 1906. As a result of these conferences a bill was drawn which was introduced in the House and Senate by the chairmen of the two Committees on Patents, respectively. The Senate and House Committees on Patents, sitting conjointly, gave public hearings on June 6, 7, 8, and 9, 1906, and on December 7, 8, 10, and 11 of the same year. Both committees reported amended bills, but no action was taken by either the House or the Senate.

In the first session of this Congress the bills were reintroduced, in the House on December 2, 1907, by the chairman of the House Committee on Patents, and on December 16, 1907, in the Senate by the Chairman of the Senate Committee on Patents. Senator Kitteredge and Representative Barchfeld also introduced bills for a general revision of the copyright laws, and public hearings on these bills by the committees on patents, sitting conjointly, were held on March 26, 27, and 28, 1908. Later in the session bills were also introduced by Representative Washburn and Representative Sulzer. The attempt was made to produce a consistent, logical, and satisfactory statute which would meet the demands of all people interested in copyright property. Everybody who desired to be heard [4]was heard, and all suggestions and proposals of any interest were given careful consideration. As the hearings progressed the necessity for many amendments to any of the bills became evident, and new bills were from time to time drafted and introduced.

House bill 28192, which the committee voted unanimously to favorably report, differs in many respects from any of the bills previously introduced. Your committee believe that in all its essential features it fairly meets and solves the difficult questions with which the committee had to deal, although it is altogether probable that further discussion may show the need of amendments perfecting some of the sections.

Subsection (*a*) of section 1 adopts without change the phraseology of section 4952 of the Revised Statutes, and this, with the insertion of the word "copy," practically adopts the phraseology of the first copyright act Congress ever passed -- that of 1790. Many amendments of this were suggested, but the committee felt that it was safer to retain without change the old phraseology which has been so often construed by the courts.

Paragraph (*b*) in the section contains certain new legislative features, but is consistent with the existing law as construed by the courts.

Paragraph (*c*) is new, but is believed to be a wise provision, and it needs no explanation.

There has been a good deal of discussion regarding subsection (*d*) of section 1. This section is intended to give adequate protection to the proprietor of a dramatic work. It is usual for the author of a dramatic work to refrain from reproducing copies of the work for sale, He does not usually publish his work in the ordinary acceptation of the term, and hence in such cases never receives any royalty on copies sold. His compensation comes solely from public representation of the work. It has sometimes happened that upon the first production of a dramatic work a stenographer would be present and would take all the words down and would then turn the manuscript over to some one who had hired him to do the work or sell it to outside parties. This manuscript would then be duplicated and sold to persons who, without any authority whatever from the author, would give public performances of the work. It needs no argument to demonstrate how great the injustice of such a proceeding is, for under it the author's rights are necessarily greatly impaired. If an author desires to keep his dramatic work in unpublished form and give public representations thereof only, this right should be fully secured to him by law. We have endeavored to so frame this paragraph as to amply secure him in these rights.

Subsection (*e*) of section 1 of the bill, which deals with the reproduction of music by mechanical means has been the subject of more discussion and has taken more of the time of the committee than any other provision in the bill. Many propositions looking to a solution of this question have been submitted and discussed, and much difficulty has been experienced in reaching an agreement, but the paragraph as it now stands in the bill is believed by the members of the committee to be a fair and just solution of the whole question. In speaking of this matter a well-informed writer says:

It is not a theoretical question, as it was twenty years ago, but an intensely live issue affecting the livelihood of many people and the soundness of investments aggregating many millions of dollars.

[5]Not only in the United States but in England and nearly all the countries of Europe this question is troubling the courts and the legislative bodies. No legislative body in the world has as yet taken such advanced ground in the line of securing the rights of composers in the matter of reproduction by mechanical means of their music as is contemplated by this bill. Several of the leading countries of the world have provided by law that anyone may with perfect freedom

and without any compensation to the composer reproduce by mechanical means copyrighted music. Only one country, so far as your committee is informed, has by legislation placed any restriction upon such use of copyrighted music, and that is Germany. In 1901 the German musical copyright law was passed, Section 22 of that law reads as follows:

The sale of disks, plates, cylinders, strips, and other parts of instruments which serve mechanically to reproduce musical compositions is permitted--

Except when the rendition--

in respect to dynamic power, duration of tone, and tempo is in a manner similar to a personal performance.

That covers only the reproduction of music by an instrument like the Metrostyle, by which the individual expression of the performer is given in the mechanical reproduction. It in no way affects the reproduction of such music by phonographs, graphophones, or the ordinary piano-playing instruments, for in these instruments the production is purely mechanical. Austria, in 1895, enacted a law which provides that--

The manufacture and public use of instruments for mechanical reproduction of music records shall be no infringement of copyright music.

England, in 1906, enacted into law the bill known as the "T. P. O'Connor bill," which provides that--

The expressions "pirated copies" and plates shall not for the purposes of this act be deemed to include perforated musical rolls.

We are not aware that any other countries have passed laws regarding this matter, In France, however, it has been judicially decided that while the reproduction of a musical composition by means of a talking machine is no violation of a composer's right, the words of a song may not be reproduced. Only one country in the world, so far as we know, now prohibits, without the consent of the composer, the reproduction of music on a phonograph or similar machine, and that is Italy. This is the result not of legislation, but is based upon a decision of a court, not the court of last resort, although pending a decision by such court of last resort the decision is effective.

In 1883 a conference was held at Berne, Switzerland, by those affirmatively interested in copyright legislation, and in 1884 there was held at Berne the first international conference for the protection of the rights of authors. At this meeting representatives were present from Austria, Belgium, Costa Rica, France, Germany, Great Britain, Haiti, Italy, the Netherlands, Salvador, Sweden and Norway, and Switzerland, and as the result of their deliberations there was prepared a "Draft convention for the creation of a general union for the protection of the rights of authors;" and in 1886, at another conference held in Berne, the final text of the Berne convention was agreed to and signed by the representatives of Belgium, France, Germany, Great Britain, Haiti, Italy, Liberia, Spain, Switzerland, **[6]** and Tunis, In 1896 there was a further international conference regarding this matter held in Paris which modified the text of the Berne convention, and at this conference Belgium, France, Germany, Italy, Luxemburg, Monaco, Montenegro, Spain, Switzerland, and Tunis were represented.

Last year another conference was held at Berlin, and the following signatory states were represented: Belgium, Denmark, France, Germany, Great Britain, Italy, Japan, Luxemburg, Monaco, Norway, Spain, Sweden, Switzerland, and Tunis. The United States has never been a party to any of these conventions, although at the Berlin conference this country, with a number of others, had delegates present to make observations, but with no power to vote or take part in the discussions. A new convention was there agreed upon and signed by the representatives of the states of the countries belonging to the copyright union. Article 13 of that convention recommends for adoption by the countries of the union the granting to authors of musical works of the exclusive right to control the reproductions of their compositions by mechanical means, but provides that--

The limitations and conditions relative to the application of this article shall be determined by the domestic legislation of each country in its own case; but all limitations and conditions of this nature shall have an effect strictly limited to the country which shall have adopted them.

And it is further provided in that article that the provision shall have no retroactive effect. The provision has no effect whatever in any country of the union until that country decides to pass the necessary legislation.

Your committee have felt that justice and fair dealing, however, required that when the copyrighted music of a composer was appropriated for mechanical reproduction the composer should have same [*sic*] compensation for its use and that the composer should have the further right of forbidding, if he so desired, the rendition of his copyrighted

music by the mechanical reproducers. How to protect him in these rights without establishing a great music monopoly was the practical question the committee had to deal with. The only way to effect both purposes, as it seemed to the committee, was, after giving the composer the exclusive right to prohibit the use of his music by the mechanical reproducers, to provide that if he used or permitted the use of his music for such purpose then, upon the payment of a reasonable royalty, all who desired might reproduce the music.

The Constitution of the United States provides, Article I, section 8--

Congress shall have the power--

To promote the progress of science and useful arts by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries.

It will be noticed that the language of this authority limits the power of Congress by several conditions. The object of all legislation must be (1) to promote science and the useful arts; (2) by securing for limited times to authors the exclusive right to their writings; (3) that the subjects which are to be secured are "the writings of authors." It will be seen, therefore, that the spirit of any act which Congress is authorized to pass must be one which will promote the progress of science and the useful arts, and unless it is **[7]**designed to accomplish this result and is believed, in fact, to accomplish this result, it would be beyond the power of Congress.

The enactment of copyright legislation by Congress under the terms of the Constitution is not based upon any natural right that the author has in his writings, for the Supreme Court has held that such rights as he has are purely statutory rights, but upon the ground that the welfare of the public will be served and progress of science and useful arts will promoted by securing to authors for limited periods the exclusive rights to their writings. The Constitution does not establish copyrights, but provides that Congress shall have the power to grant such rights if it thinks best. Not primarily for the benefit of the author, but primarily for the benefit of the public, such rights are given. Not that any particular class of citizens, however worthy, may benefit, but because the policy is believed to be for the benefit of the great body of people, in that it will stimulate writing and invention, to give some bonus to authors and inventors.

In enacting a copyright law Congress must consider, as has been already stated, two questions: First, how much will the legislation stimulate the producer and so benefit the public; and, second, how much will the monopoly granted be detrimental to the public. The granting of such exclusive rights, under the proper terms and conditions, confers a benefit upon the public that outweighs the evils of the temporary monopoly.

It was at first thought by the committee that the copyright proprietors of musical compositions should be given the exclusive right to do what they pleased with the rights it was proposed to give them to control and dispose of all rights of mechanical reproduction, but the hearings disclosed that the probable effect of this would be the establishment of a mechanical-music trust. It became evident that there would be serious danger that if the grant of right was made too broad, the progress of science and useful arts would not be promoted, but rather hindered, and that powerful and dangerous monopolies might be fostered which would be prejudicial to the public interests. This danger lies in the possibility that some one company might secure, by purchase or otherwise, a large number of copyrights of the most popular music, and by controlling these copyrights monopolize the business of manufacturing the selling music producing machines, otherwise free to the world.

The main object to be desired in expanding copyright protection accorded to music has been to give to the composer an adequate return for the value of his composition, and it has been a serious and a difficult task to combine the protection of the composer with the protection of the public, and to so frame an act that it would accomplish the double purpose of securing to the composer an adequate return for all use made of his composition and at the same time prevent the formation of oppressive monpolies, which might be founded upon the very rights granted to the composer for the purpose of protecting his interests.

It appeared that some years ago contracts were made by one of the leading mechanical reproducing establishments of the country with more than 80 of the leading music publishing houses in this country. Some of these contracts were filed with the committee and show that under them the reproducing company acquired the rights for mechanical **[8]**reproduction in all the copyrighted music which the publishing house controlled or might acquire and that they covered a period of at least thirty-five years, with the possibility of almost indefinite extension. These contracts were made in anticipation of a decision by the courts that the existing law was broad enough to cover the mechanical reproduction, and one consideration on the part of the reproducing company was an agreement that that company would cause suit to be brought which would secure a decision of the Supreme Court of the United States.

Later on another set of contracts were prepared, based upon the passage by Congress of a law which would give such rights. The case brought in accordance with this agreement, the White-Smith Music Publishing Company *v.* The Apollo Company -- The Apollo Company being engaged in the sale of piano players and of perforated rolls of music -- was decided by the Supreme Court of the United States on February 28, 1908. Mr. Justice Day delivered the opinion of the court. In passing on the question he said:

These perforated rolls are parts of a machine which, when duly applied and properly operated in connection with the mechanism to which they are adapted, produce musical tones in harmonious combination. But we can not think that they are copies within the meaning of the copyright act.

It may be true that the use of these perforated rolls, in the absence of statutory protection, enables the manufacturers thereof to enjoy the use of mechanical compositions for which they pay no value. But such considerations properly address themselves to the legislative and not to the judicial branch of the Government.

Not only would there be a possibility of a great music trust in this country and abroad, but arrangements are being actively made to bring it about. The Company Fonotipia, of Milan, Italy, is perhaps the largest music-publishing company in the world, and has a practical monopoly of the business of producing music by mechanical means in Italy. This company is now taking steps to form an international trust, and a copy of a contract between this company and a leading publishing house of Berlin, Germany, has been filed with the committee. Under this contract the publishing firm gives to the Company Fonotipia the exclusive right of undertaking for all countries the mechanical musical productions of all the musical copyrights it may own for a term of twenty years upon the payment to the publishing house of a royalty of 4 per cent of the net price at which the company sells the devices which reproduce the music by mechanical means; and the Company Fonotipia binds itself to bring suits to establish this monopoly in the countries of the Berne Union, and it is agreed between the parties to this contract that no suit shall be brought in Germany until after the termination of the Berlin conference of 1906, in order that public opinion should not be excited until after the convention had been agreed upon. At the time this contract was made, in 1905, it was expected that there would be a conference in Berlin in 1906.

One of the most distinguished of American composers, speaking of this probable monopoly, said:

Let our people pay tax upon the oil, sugar, and tobacco they consume; let them render unto the trusts the things which the trusts exact, but let us keep music free from a trust.

A condition of affairs which would limit the market for what the composer has to sell to one customer might be quite as injurious to the composer as it would be to the public.

It was this situation that your committee had in view when they sought to formulate a law which would give to the composer the exclusive right to prohibit the reproduction of his music by mechanical means on the part of anybody if he desired, to secure to him adequate compensation from all reproducers if he did not desire to exercise this exclusive right to prohibit and to prevent the establishment of a great trade monopoly. We fully believe that all this will be secured under the provisions of subsection (*e*).

It is not the intention of the committee to extend the right of copyright to the mechanical reproductions themselves, but only to give the composer or copyright proprietor the control, in accordance with the provisions of the bill, of the manufacture and use of such devices. It is not the intention of the committee to grant to citizens or subjects of foreign countries any rights under the proposed copyright law which such countries do not give to American authors and composers; and for that reason, in this paragraph, which refers to musical compositions, we have the proviso that the rights given shall not include the works of a foreign author or composer unless the foreign state or nation of which such author or composer is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States similar rights; and in section 8 of the bill we provide for reciprocity regarding copyrights generally, excepting only, in the last-named provision, an alien who is domiciled within the United States at the time of the first publication of his work.

The exception regarding the public performance of a musical composition upon coin-operated machines in a place where an admission fee is not charged is understood to be satisfactory to the composers and proprietors of musical copyrights. A representative of one of the largest musical publishing houses in the country stated that the publisher finds the so-called "penny parlor" of first assistance as an advertising medium.

A suggestion has been made that a compulsory license in copyright legislation would be unconstitutional. The great weight of opinion, however, is the other way, It is true that Congress could not legislate a man's existing rights out of

existence, for thereby it would impair the obligation of a contract; but in this case Congress is creating a new property right, and in creating new rights Congress has the power to annex to them such conditions as it deems wise and expedient. The Supreme Court of the United States, in the case of *Wheaton & Donaldson v. Peters & Griggs (8 Peters, 592),* uses this language:

This right, as has been shown, does not exist at common law; it originated, if at all, under the acts of Congress. No one can deny that when the legislature are about to vest an exclusive right in an author or an inventor, they have the power to prescribe the conditions on which such right shall be enjoyed; and that no one can avail himself of such right who does not substantially comply with the requisitions of the law.

Section 2 is new in phraseology, although substantially the same provision is found in section 4967 of the Revised Statutes. It was thought best by the committee to insert the provision in this form in order that it might be perfectly clear that nothing in the bill was intended to impair in any way the common-law rights in respect to this kind of work.

Section 3 does away with the necessity of taking a copyright on the contributions of different persons included in a single publication, but in express terms we provide that it shall not extend the duration or scope of any copyright nor do we intend to make copyrightable anything which has fallen into the public domain.

Section 4 is declaratory of existing law. It was suggested that the word "works" should be substituted for the word "writings," in view of the broad construction given by the courts to the word "writings," but it was thought better to use the word "writings," which is the word found in the Constitution. It is not intended by the use of this word to change in any way the construction which the courts have given to it.

Section 5 refers solely to a classification made for the convenience of the copyright office and those applying for copyrights.

Section 6 reenacts existing law and permits the copyrighting of abridgments and new versions of works, or works republished with new matter, but provides that such copyright shall give no exclusive right to the use of the original works or in any way extend the copyright on such original works.

The first clause in section 7 is inserted in order to make it clear that the original text of any work which has fallen into the public domain can not be copyrighted, and the proviso in that section is inserted for the reason that the Government often desires to make use in its publications of copyrighted material, with the consent of the owner of the copyright, and it has been regarded heretofore as necessary to pass a special act every time this was done, providing that such use by the Government should not be taken to give to anyone the right to use the copyrighted material found in the government publication. It was thought best, instead of being obliged to resort every little while to a special act, to have some general legislation on this subject.

The first part of section 8 makes no change in existing law. The proviso in the section is new and relates to copyright on the work of an author who is a citizen or subject of a foreign state. Subsection (*a*) is intended to give to a foreign author actually domiciled in the United States at the time of first publication of his work all the rights we give to our own citizens, even though he be a citizen of a foreign state which does not give to citizens of the United States the benefit of their copyright laws. The act of March 3, 1891, provided for an international agreement regarding copyrights. Under the provisions of this act the citizen or subject of a foreign state or nation was given the right to copyright here when such state or nation gave to citizens of the United States the benefit of their copyright laws; and subsection (*b*) is intended, with some slight modifications, to be declaratory of the provisions of the act of March 3, 1891.

Section 9 points out the preliminaries which must be complied with in order to obtain copyright. Under existing law the filing of title and deposit of copies on or before the date of first publication are conditions precedent, and any failure to comply with them works a forfeiture of the copyright. It is proposed under this bill to so change this as to have the copyright effective upon the publication with notice, and other formalities become conditions subsequent. The exception regarding books seeking an ad interim term will be discussed in connection with section 21 of the bill.

Section 10 explains the method of obtaining registration of the claim to copyright and what must be done before the register of copyrights can issue to the claimant a certificate of registration.

Section 11 refers to copyright on works of which copies are not reproduced for sale, and deals with what shall be deposited as copies. It provides, however, that if the work is later reproduced in copies for sale, the copies themselves must be deposited. If the work be a photograph, the proprietor need not file a copy of the photograph, but merely a

photographic print. If it be a work of art or a plastic work, he need not file a copy of that, but simply a photograph or an identifying reproduction thereof.

Sections 12 and 13 deal with the deposit of copies, and should be considered together. They materially alter the existing law, which provides that in order to make the copyright valid there must be deposited two complete copies of the book or other article not later than the date of first publication. The failure of a shipping clerk to see that the copies go promptly forward to Washington may destroy a copyright of great value, and many copyrights have been lost because by some accident or mistake this requirement was not complied with. The committee felt that some modification of this drastic provision, under which the delay of a single day might destroy a copyright, might well be made. The bill reported by the committee provides that there shall be "promptly" deposited in the copyright office, or in the mail, addressed to the register of copyrights, two complete copies of the best edition then published, and that no action or proceeding shall be maintained for the infringement of copyright in any work until the provisions with respect to the deposit of copies and the registration of such work shall have been complied with.

If the works are not promptly deposited, we provide that the register of copyrights may at any time after publication of the work, upon actual notice, require the proprietor of the copyright to deposit, and then in default of deposit of copies of the work within three months from any part of the United States, except an outlying territorial possession of the United States, or within six months from any outlying territorial possession of the United States, or from any foreign country, the proprietor of the copyright shall be liable to a fine of $ 100 and to pay to the Library of Congress twice the amount of the retail price of the best edition of the work, and the copyright shall become void. It was suggested that the forfeiture of the copyright for failure to deposit copies was too drastic a remedy, but your committee feel that in many cases it will be the only effective remedy: certainly the provision for compelling the deposit of copies by the imposition of a fine would be absolutely unavailing should the copyright proprietor be the citizen or subject of a foreign state.

Section 14 changes existing law in one respect. Section 4961 of the Revised Statutes provides that when such articles are delivered to the postmaster he "shall, if requested, give receipt therefor; and when so delivered he shall mail it to its destination." The provision in the bill adds that he shall forward "without cost to copyright claimant."

Section 15 is known as the "manufacturing section." In order to afford protection to American typographers, Congress some years ago enacted a law providing that in case of a book, photograph, chromo, or lithograph the two copies of the same required to be delivered to the Librarian of Congress should be printed from type set within the limits of the United States, or from plates made therefrom, or from negatives or from drawings on stone made within the limits of the United States. No penalty whatever was affixed to the failure to comply with this requirement. The applicant for a copyright simply stated that his book was so printed. This statement was not made under oath nor did he ever indicate where the work was done. It was found that this statute did not in all cases afford adequate protection and it was claimed that books were copyrighted which had not been manufactured in compliance with this provision.

On April, 28, 1904, the House passed a bill which required the applicant for a copyright to make an affidavit setting forth that the two copies to be deposited had been made in compliance with the statute, and provided that any violation of the act or the making of a false affidavit as to having complied with the conditions shall be deemed a misdemeanor, punishable by fine, and that all rights under the copyright shall be forfeited. That bill was favorably reported by the Senate committee, but failed to be reached.

It was felt by your committee that if there was reason, as we think there was, for the requirement that the book should be printed from type set in this country, there was just as much reason for a requirement that the book should be printed and bound in this country and that the ordinary illustrations produced by lithographic process and photo-engraving process and separate lithographs or photo-engravings should be made in this country. That protection to the men engaged in the work of setting type, making plates, printing and binding books is given by this section, which also carries the penalty provision for knowingly making a false affidavit as to compliance with these provisions, An exception, so far as lithographs and photo-engravings are concerned, is made in case "the subjects represented are located in a foreign country."

It was contended with much force in the hearings before the committee that the color scheme in lithographs to illustrate a scientific work, particularly a work on surgery, must be worked out under the eye of the author, It was further said that a lithograph reproducing a painting must be worked out in front of the painting, and that possibly the same theory would apply to a lithograph of scenery or any lithograph intended to accurately represent the color scheme of any object. The committee finally decided to leave this matter as it is now found in the bill, although it was contended that the exception might well be confined to lithographs illustrating a scientific work or reproducing a work of art.

Sections 16 and 17 are intended to make effective section 15.

Sections 18 and 19 refer to the copyright notice. The notice now required by law, which must be very strictly followed in order to prevent forfeiture of the copyright, is as follows:

Entered according to act of Congress in the year----, by A. B., in the office of the Librarian of Congress, at Washington; or, at his option, the word "Copyright," together with the year the copyright was entered, and the name of the party by whom it was taken out; thus: "Copyright, 18--, by A. B."

The bill as originally introduced provided that the notice of copyright should consist of the word "Copyright," or of some abbreviation thereof, accompanied in every case by the name of the copyright proprietor, or, in case it was a work of art, etc., by the proprietor's initials, monogram, etc.; that in case of a book or other printed publication the notice should be on its title-page or the page immediately following. If it was a map, work of art, drawing, plasticwork, photograph, or a print, notice should be upon some accessible portion of the work itself, or on the margin, back, base, or pedestal, etc. No date was required, not even the year in which the copyrights was secured, in case of a book or anything else. Serious objections were made to the elimination of the date. It was said that the public would have no means of ascertaining whether the copyright had expired and that the public was entitled to that knowledge.

Your committee felt that in case of books or printed publications, including dramatic and musical works, the year in which the copyright began should be stated in the notice, and we have provided for the insertion of the date in the notice in all such works. Your committee did not feel that it was necessary to have the date printed on works of art, etc. Artists have always objected to the copyright notice which they were obliged to put on the pictures, because it was considered a disfigurement, and we have retained substantially the provision of the original bill regarding the notice in such cases. The original bill provided that when the rights of public performance were desired the notice should include the statement "rights of public performance reserved." Since the right of public performance is as clearly incidental to the general right as is the right of translation or dramatization and is so treated in the bill, specific notice of it seems as little requisite as in the case of other subsidiary rights.

Section 20 makes a material change in existing law. Under existing law notice of copyright must be printed in every copy of every edition of a book. If any copy of any edition published by authority of the proprietor of the copyright by accident or mistake gets out without the copyright notice, the whole copyright is lost. More copyrights have been lost under this drastic provision of the law than in any other way. Your committee believe than an unintentional failure to comply with this requirement in the case of a single book ought not to have attached to it the penalty involved in the forfeiture of the copyright, and this bill provides that--

Where the copyright proprietor has sought to comply with the provisions of this act with respect to notice, the omission by accident or mistake of the prescribed notice from a particular copy or copies shall not invalidate the copyright or prevent recovery for infringement against any person who, after actual notice of the copyright, begins an undertaking to infringe it, but shall prevent the recovery of damages against an innocent infringer who has been misled by the omission of the notice; and in a suit for infringement no permanent injunction shall be had unless the copyright proprietor shall reimburse to the innocent infringer his reasonable outlay innocently incurred if the court, in its discretion, shall so direct.

If the notice is omitted by accident or mistake so as to lead an innocent party to think he had a right to reproduce the book or other copyrighted matter and begins to do so, then no damages shall be recovered against him if he has been misled by the omission of the notice, and until he has actual notice in a suit for infringement no permanent injunction shall be had without reimbursement to the innocent infringer for his outlay if the court shall so direct.

Section 21 gives to authors of books written in the English language an ad interim term, which can not in any case endure more than sixty days. By the act approved March 3, 1905, the proprietor of a book published abroad in a foreign language was, under certain conditions, given twelve months after the first publication in such foreign country to deposit copies and comply with the other conditions regarding copyright.

After the passage of the act of 1905 English authors felt that some such rights should be given them. Section 21 was inserted for that purpose. This bill modifies the act of March 3, 1905, which relates to books of foreign origin in a foreign language, so that until such works are translated and published in English here, they may obtain copyright for the full term by the deposit of one copy in such foreign language bearing notice of copyright within thirty days after publication abroad. This change is made for the reason that it is believed that greater benefit might accrue by according general protection to such works, thus promoting projects for translations into English which under the general clause would later be produced within the United States in order to gain copyright here as works in English.

Section 22 provides for an extension of the ad interim term so that it will endure for the full term provided in the act upon compliance with all the provisions of this act as to deposit of copies, registration, filing of affidavits, etc.

Section 23 deals with the term of the copyright. Under existing law the copyright term is twenty-eight years, with the right of renewal by the author, or by the author's widow or children if he be dead, for a further term of fourteen years. The act of 1790 provided for an original term of fourteen years, with the right of renewal for fourteen years. The act of 1831 extended the term to its present length. It was urged before the committee that it would be better to have a single term without any right of renewal, and a term of life and fifty years was suggested. Your committee, after full consideration, decided that it was distinctly to the advantage of the author to preserve the renewal period. It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right.

The present term of twenty-eight years, with the right of renewal for fourteen years, in many cases is insufficient. The terms, taken together, ought to be long enough to give the author the exclusive right to his work for such a period that there would be no probability of its being taken away from him in his old age, when, perhaps, he needs it the most. A very small percentage of the copyrights are ever renewed. All use of them ceases in most cases long before the expiration of twenty-eight years, In the comparatively few cases where the work survives the original term the author ought to be given an adequate renewal term. In the exceptional case of a brilliant work of literature, art, or musical composition it continues to have a value for a long period, but this value is dependent upon the merit of the composition. Just in proportion as the composition is meritorious and deserving will it continue to be profitable, provided the copyright is extended so long; and it is believed that in all such cases where the merit is very high this term is certainly not too long.

Your committee do not favor and the bill does not provide for any extension of the original term of twenty-eight years, but it does provide for an extension of the renewal term from fourteen years to twenty-eight years; and it makes some change in existing law as to those who may apply for the renewal. Instead of confining the right of renewal to the author, if still living, or to the widow or children of the author, if he be dead, we provide that the author of such work, if still living, may apply for the renewal, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or, in the absence of a will, his next of kin. It was not the intention to permit the administrator to apply for the renewal, but to permit the author who had no wife or children to bequeath by will the right to apply for the renewal.

In the case of composite or cyclopedic works, to which a great many authors contribute for hire and upon which the copyright was originally secured by the proprietor of the work, it was felt that the proprietor of such work should have the exclusive right to apply for the renewal term. In some cases the contributors to such a work might number hundreds and be scattered over the world, and it would be impossible for the proprietor of the work to secure their cooperation in applying for the renewal.

Section 24 deals with the extension of copyrights subsisting when this act goes into effect and has the same provision regarding those who may apply for the extension of the subsisting term to the full term, including renewal, as is found in the preceding section regarding renewals generally.

Section 25 deals with the matter of civil remedies for infringement of a copyright. Subsection (*a*) is merely declaratory of existing law. The provision in subsection (*b*) that in proving profits the plaintiff shall be required to prove sales only, etc., is taken from the existing law relating to trade-marks. The provision that the copyright proprietor may have such damages as well as the profits which the infringer shall have made is substantially the same provision found in section 4921 of the Revised Statutes relating to remedies for the infringement of patents. The courts have usually construed that to mean that the owner of the patent might have one or the other, whichever was the greater. As such a provision was found both in the trade-mark and patent laws, the committee felt that it might be properly included in the copyright laws. The provision that in lieu of actual damages and profit such damages shall be awarded as shall appear to the court just, not exceeding the sum of $ 5,000, is a modification of existing law, decreasing instead of increasing the amount which may be obtained in this way. There have been actions brought under existing law where the penalty would have been $ 30,000, and under the law now in force regarding certain infringements it is provided that the damages shall not be less than $ 250 nor more than $ 10,000. The special limitation as to the amount of damages which may be recovered in case of a newspaper reproduction of a copyrighted photograph is made because such reproduction

has little permanent value or usefulness and a reproduction in this form does not damage the copyright proprietor to as great an extent as would the reproduction and sale of copies of the photograph in a different form.

The first subdivision of the section is, with a slight change of phraseology, reenactment of existing law. The second subdivision is, as to most of the articles covered, a reenactment of existing law, but is broadened so as to cover some reproductions not now enumerated in the statutes, like plastic works of a scientific or technical character, and books, pamphlets, etc. The third subdivision is new, and is intended to give adequate protection against infringement of the new right of copyright given by subsection (c) of section 1. The fourth is a substantial reenactment of existing law, which provides that the damages for an infringement of any dramatic or musical composition shall be not less than $ 100 for the first performance and $ 50 for every subsequent performance, but we have modified this provision in the bill by fixing the damages for an infringing performance of a purely musical composition at $ 10.

The existing law in most cases applies the penalty only to copies found in the possession of the infringer, but in the case of a painting, statue, or statuary the words are "for every copy of the same in his possession or by him sold or exposed for sale." In subdivisions first and second we have inserted in addition to the words found in existing law the word "made." It often happens that a willful infringer has sold all the infringing copies and none are found in his possession. The plaintiff may be able to prove, however how many the infringer has made.

Subsections (c) and (d) constitute new legislation, but it is believed that some legislation of this kind is necessary in dealing with infringers.

Subsection (e) deals with the mechanical reproduction of music where such reproduction is unauthorized, and further provides that in the absence of a license agreement the person who intends to mechanically reproduce a copyrighted musical composition shall give notice of such intention to the copyright proprietor, and provides for damages in case of his failure to do so.

That part of the section which provides that "rules and regulations for practice and procedure under this section shall be prescribed by the Supreme Court of the United States" is borrowed from the bankruptcy act.

Section 26 confers upon the courts the power to enforce all remedies provided in the bill

Section 27 is inserted to prevent a multiplicity of actions.

Section 28 provides that a willful infringement for profit of a copyright shall be a misdemeanor. Such an infringement when affecting a dramatic work or musical composition is a misdemeanor under existing law and punishable by imprisonment for a term not exceeding one year, with no alternative sentence. This section, as we have it in the bill, applies to all copyrights, but materially modifies the sentence which may be imposed by adding an alternative sentence, as follows:

Or by a fine of not less than one hundred dollars nor more than one thousand dollars, or both, in the discretion of the court.

The existing law provides that any person publicly performing a dramatic or musical composition without the consent of the proprietor of the copyright shall be liable for damages of not less than $ 100 for the first and $ 50 for every subsequent performances and this prohibition covers cases of public performance where the performance is not for profit. We have provided in this section that where the public performance is given by public schools, etc., for educational or charitable purposes and not for profit it may be done without subjecting those who give the performance to any suit for damages, and we further provide that the music used for the performance may be rented, borrowed, or obtained from public libraries or other public schools, etc.

Section 29 imposes a penalty for the fraudulent use of copyright notice on a work not copyrighted or any fraudulent alteration of copyright notice.

Section 30 prohibits the importation into the United States of any article bearing a false notice of copyright or of any piratical copies of any work copyrighted in the United State.

Section 31 prohibits the importation into the United States of any piratical copies or of any copies whatever which have not been produced in accordance with the manufacturing provisions specified in this act, but that except as regards piratical copies the prohibition shall not apply in certain cases, viz:

(a) To works in raised characters for the use of the blind. This is a reenactment of existing law.

(*b*) To foreign newspapers or magazines containing copyright matter, upon certain conditions. This is a substantial reenactment of existing law.

(*c*) To the authorized edition of a book in a foreign language of which only a translation has been copyrighted in this country. This, too, is the substantial reenactment of existing law.

Subdivisions first and third of subsection (*d*) can be considered together. Prior to the act of March 3, 1891, works by foreign authors could not be copyrighted in this country unless the authors resided here at the date of publication, and hence the right of importation into this country was without limitation or restriction so far as the copyright laws were concerned. Under the provisions of that act the right to take out a copyright in this country was given to foreign authors. That act as originally drawn provided that no books except for colleges and institutions of learning could be imported into this country without the consent of the copyright proprietor, and that even for such institutions of learning only in limited numbers. A compromise was made, and the bill as enacted into law excepted from the prohibition of importation articles named in paragraphs 512 to 516, inclusive, of the McKinley bill. All these articles, which include books for libraries, institutions of learning, etc., were and ever since have been on the free list in the tariff bills. In addition to these exceptions, the act of March 3, 1891, excepted from the prohibition of importation two copies of a book at any one time by any person, for use and not for sale, upon payment of the tariff duty.

Another exception, found in that law but not made in this bill, was that of books, engravings, etc., printed and bound and manufactured more than twenty years before the date of importation. The American copyright proprietors and publishers insisted that this was an illogical exception and that no books copyrighted in this country ought to be imported without the consent of the copyright proprietor here. On the other hand, those interested in libraries and in institutions of learning objected to any change in the existing law, which gave them rights of importation. The committee sought to find a fair middle ground between these conflicting interests. The right of importation for individual use is confined by the provision in the bill to books by foreign authors, and the number which may be imported at any one time is reduced from two to one; and the privilege heretofore accorded to libraries and institutions of learning, etc., to import was changed so that they could import only one book in any one invoice, but no further restriction, such as is applied to importation for individual use, was placed upon the importations for libraries, etc. They are still permitted to import a book by a foreign author or a foreign reprint of a book by an American author. Your committee believe that this is a fair and equitable solution of this rather troublesome question.

Subdivision second, which refers to importation of copyrighted books, etc., for the United States Government, is reenactment of existing law and is, of course, without any restriction. Subdivision fourth changes in some respects the existing law. The law now provides that books or libraries or parts of libraries and other household effects of persons or families from foreign countries, if actually used abroad by them not less than one year and not intended for any other person or persons nor for sale, are not prohibited importation and are on the free list in the tariff bill.

Section 32 is a new provision referring to seizures of articles of prohibited importation and permits the return in certain cases to the country of export of books which can not be admitted under the provisions of this act.

Section 33 is, with some change of phraseology, the reenactment of a provision found in the act of March 3, 1891.

Section 34 is declaratory of existing law.

Section 35 provides that suits may be instituted in the district of which the defendant or his agent is an inhabitant, or in which either of them may be found. The new provision "or in which he may be found" was inserted for the reason that to limit the institution of actions to the district of which the defendant is an inhabitant would fail to reach the case of an infringer of the copyright of dramatic works or of city directories, etc., Who travels from State to State and whose real habitation it might be difficult to locate.

Section 36 practically reenacts section 4966 of the Revised Statutes, as amended by the act of January 6, 1897, except for one important change. The act of January 6, 1897, provides that the defendants, or any or either of them, may make a motion in any other circuit in which he or they may be engaged in performing or representing a dramatic or musical composition to dissolve or set aside an injunction. That provision has been omitted in this bill for reasons which are well stated in a report to the American Bar Association of its committee of copyright:

For some reason the act of 1897 provided (and this provision has repeated) that where a defendant was brought before a circuit court in the district where the violation of the injunction was alleged to have been committed, that he might not only excuse his contempt, if he could, but he might also, at the same time and before the same court, move to dissolve the original injunction. If the court was satisfied that, although the defendant was in contempt of the original

injunction, the original injunction should never have been granted, the court hearing the motion for contempt was given the power to dissolve the original injunction, and thus reverse the decision of the original trial court, not on appeal, but on a motion from the defendant remote from the place of the original trial, in the absence of the evidence presented at the original trial, before a different judge, in a different court, and under circumstances and conditions which would make it quite impossible that the judge asked to dissolve the injunction could have as complete, intelligent, and satisfactory a comprehension of the situation as the original court which granted the injunction.

Section 37 is a reenactment of a provision found in the act of January 6, 1897, with the ommission of the words "to dissolve."

Section 38 is a reenactment of section 699 of the Revised Statutes.

Section 39 is a reenactment of section 4968 of the Revised Statutes, except that the time limit for the bringing of proceedings is made three years instead of two.

Section 40 reenacts section 972 of the Revised Statutes. The provision for full costs, which is found in the existing law, is necessary in view of the provisions of section 968 of the Revised Statutes, for under that statute when a plaintiff brings an action in a circuit court and recovers less than the sum or value of $ 500, exclusive of costs, in a case which can not be brought there unless the amount in dispute, exclusive of costs, exceeds said sum or value, he shall not be allowed, but at the discretion of the court shall be adjudged to pay, costs. This section further provides that the court may award to the prevailing party a reasonable counsel fee as part of the costs.

Section 41 is not intended to change in any way existing law, but simply to recognize the distinction, long established, between the material object and the right to produce copies thereof. The concluding clause in the section, that "nothing in this act shall be deemed to forbid prevent, or restrict the transfer of any copy of a work copyrighted under this act the possession of which has been lawfully obtained," is inserted in order to make it clear that there is no intention to enlarge in any way the construction to be given to the word "vend" in the first section of the bill. Your committee feel that it would be most unwise to permit the copyright proprietor to exercise any control whatever over the article which is the subject of copyright after said proprietor has made the first sale.

Section 42 deals with the matter of the transfer of the copyright. Some doubt has been expressed as to the right to convey a copyright in mortgage. Your committee saw no reason why such a right should not be recognized.

Section 43 refers to assignment executed in foreign countries. It was thought better in such case to provide that the assignment should be acknowledged before a consular officer or secretary of legation of the United Stated and that the certificate of such acknowledgement should be made prima facie evidence of the execution of the instrument.

Section 44 provides for the recording of such assignments and makes such record constructive notice.

Section 45 provides for the issuing of a certificate under the seal of the copyright office.

Section 46 allows the purchaser of the copyright to substitute his name for the name of the author in the notice, and is new legislation.

Section 47 reenacts, with slight change of phraseology, section 4948 of the Revised Statutes.

Section 48 reenacts existing law, but increases the salary of the register of copyrights, which is now at the rate of $ 3,000 per annum, to $ 4,000 and the assistant register of copyrights from $ 2,500 per annum to $ 3,000 per annum, and specifically authorizes by law the librarian to appoint such subordinate assistants to the register as may from time to time be authorized by law.

Section 49 is new legislation and provides for the deposit of all moneys received by the register and a monthly report of the same and permits the register to deposit in the Treasury annually any sums received which it has not been possible to apply as copyright fees or to return to the remitters.

Section 50 changes existing law by providing that the bond now given by the register of copyrights to the librarian shall be given to the United States.

Section 51 simply provides for the making and printing of an annual report.

Section 52 continues in use the present seal of the copyright office.

Section 53 provides for the making of rules and regulations and does not confer upon the register any judicial functions.

Section 54 provides for the keeping of record books and to make entry in said books of all deposits of copies or works.

Section 55 is an administrative section covering the work of the copyright office under this act, and provides for the form and issuance of a certificate and that said certificate shall be deemed in any court as prima facie evidence of the facts stated therein.

Section 56 provides for fully indexing all copyright registrations and assignments and the printing at periodic intervals of a catalogue of the titles of articles deposited and registered, and such catalogues of copyright entries and the index volumes shall be deemed in any court as prima facie evidence of the facts stated therein as regards any copyright registration. The section further provides that the register of copyrights, if he deem it expedient, may then destroy the original manuscript and catalogue cards.

Section 57 provides for the distribution to the collectors of customs and to the postmasters of all offices receiving foreign mails copies of such catalogues, and provides for the sale to parties desiring them of copies of such catalogues. All money derived from such sales must, under this section, be accounted for and paid into the Treasury of the United States.

Section 58 provides that the public may have the right to inspect the record books and works deposited in the copyright office and may make copies of entries made in such record books.

Section 59 provides for a transfer of books and other articles not needed in the copyright office to certain government libraries.

Section 60 is inserted for the following reason: The Librarian of Congress states that the volume of the copyright deposits is now enormous and more than 200,000 articles a year are now being added to the great accumulation. Many of these articles are valuable to the library and are used by it. The rest remain in the cellar, and the accumulations there number two millions of articles. There are many articles there that would be useful in other government libraries. Some might be used in exchange for other articles. The remainder are a heavy charge upon the Government for storage and care, without any corresponding benefit.

The impression that the deposited articles are a part of the record and are necessary evidence of the thing copyrighted is not well founded. In the last thirty-eight years there have been only five cases in which articles deposited have been taken into court, and it is said that in none of these cases was there any necessity for such use of the deposited article. It is believed by your committee that the suggestions of the Librarian of Congress embodied in these two sections are wise ones and that the rights of all parties interested are carefully safeguarded.

Section 61 provides for fees. Under existing law the fee for recording title, etc., is 50 cents and the fee for the certificate, if called for, is also 50 cents. Section 61 provides for the issuing of a certificate as a matter of course and makes the fee just what it would be under existing law if the certificate was called for[.]

It was felt by your committee that this fee of $ 1 would be a burden to photographic establishments, which applied for many thousand copyrights, and so we provided that in the case of photographs the entire fee should be 50 cents unless a certificate was requested. Under existing law the fee for recording and certifying any instrument was $ 1. The provision in the present bill makes that fee depend upon the length of the instrument. Certain other fees, for search, etc., are new, as is the fee for recording notice required to be furnished by the provisions of the bill regarding the reproduction of music by mechanical means. The proviso regarding one registration fee in case of several volumes of any work is new, but is believed to be in the interest of the public.

Section 62 places an interpretation and construction upon the use of certain words.

Section 63, the repealing clause, allows action now pending in the courts of the United States or action which may be hereafter instituted for any infringement of a copyright committed before the passage of this act to be instituted, and in both such cases to be prosecuted to a conclusion in the manner heretofore provided by law.

1. The Senate also adopted this Report. S. Rep. No. 1108, 60th Cong., 2d Sess. (1909).

# 1976 Act History

94TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
2d Session } { No. 94-1476

# COPYRIGHT LAW REVISION

SEPTEMBER 3, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. KASTENMEIER, from the Committee on the Judiciary, submitted the following

# REPORT

## together with

## ADDITIONAL VIEWS

### [To accompany S. 22]

The Committee on the Judiciary, to whom was referred the bill (S. 22) for the general revision of the copright law, title 17 of the United States Code, and for other purposes, having considered the same, report favorably thereon with an amendment in the nature of a substitute and recommend that the bill as amended do pass.

The amendments are as follows:

Strike all after the enacting clause and insert in lieu thereof the following:

SEC. 101. Title 17 of the United States Code, entitled "Copyrights", is hereby amended in its entirety to read as follows:

## TITLE 17—COPYRIGHTS

Chapter | Sec.
--- | ---
1. Subject Matter and Scope of Copyright | 101
2. Copyright Ownership and Transfer | 201
3. Duration of Copyright | 301
4. Copyright Notice, Deposit, and Registration | 401
5. Copyright Infringement and Remedies | 501
6. Manufacturing Requirement and Importation | 601
7. Copyright Office | 701
8. Copyright Royalty Commission | 801

### Chapter 1.—SUBJECT MATTER AND SCOPE OF COPYRIGHT

Sec.
101. Definitions.
102. Subject matter of copyright : In general.
103. Subject matter of copyright : Compilations and derivative works.
104. Subject matter of copyright : National origin.
105. Subject matter of copyright : United States Government works.
106. Exclusive rights in copyrighted works.
107. Limitations on exclusive rights : Fair use.
108. Limitations on exclusive rights : Reproduction by libraries and archives.
109. Limitations on exclusive rights : Effect of transfer of particular copy or phonorecord.
110. Limitations on exclusive rights : Exemption of certain performances and displays.
111. Limitations on exclusive rights : Secondary transmissions.
112. Limitations on exclusive rights : Ephemeral recordings.

## PURPOSE

The purpose of the proposed legislation, as amended, is to provide for a general revision of the United States Copyright Law, title 17 of the United States Code.

## STATEMENT

The first copyright law of the United States was enacted by the First Congress in 1790, in exercise of the constitutional power "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" (U.S. Constitution, Art. I, sec. 8). Comprehensive revisions were enacted, at intervals of about 40 years, in 1831, 1870, and 1909. The present copyright law, title 17 of the United States Code, is basically the same as the act of 1909.

Since that time significant changes in technology have affected the operation of the copyright law. Motion pictures and sound recordings had just made their appearance in 1909, and radio and television were still in the early stages of their development. During the past half century a wide range of new techniques for capturing and communicating printed matter, visual images, and recorded sounds have come into use, and the increasing use of information storage and retrieval devices, communications satellites, and laser technology promises even greater changes in the near future. The technical advances have generated new industries and new methods for the reproduction and dissemination of copyrighted works, and the business relations between authors and users have evolved new patterns.

Between 1924 and 1940 a number of copyright law revision measures were introduced. All these failed of enactment, partly because of controversy among private interests over differences between the Berne Convention and the U.S. law. After World War II, the United States participated in the development of the new Universal Copyright Convention, becoming a party in 1955.

In that year, the movement for general revision of the U.S. copyright law was revived and the legislative appropriations act for the next 3 years provided funds for a comprehensive program of research and studies by the Copyright Office as the groundwork for such revision. There followed a period of study which produced 35 published monographs on most of the major substantive issues in copyright revision, and culminated in 1961 in the "Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law."

Between 1961 and 1964 there were numerous meetings and discussions under the auspices of the Copyright Office, participated in by representatives of a wide range of interests affected by the copyright law. Gradually a draft bill for general revision took shape, and toward the end of the 88th Congress, on July 20, 1964, it was introduced in both Houses. The 1964 revision bill was introduced in the House of Representatives, as H.R. 11947, and in the Senate by request, as S. 3008.

No further legislative action was taken on the revision bill during the 88th Congress, but before the opening of the 89th Congress the

129

The provisions of subsection (d), requiring recordation of transfers as a prerequisite to the institution of an infringement suit, represent a desirable change in the law. The one- and three-month grace periods provided in subsection (e) are a reasonable compromise between those who want a longer hiatus and those who argue that any grace period makes it impossible for a bona fide transferee to rely on the record at any particular time.

Under subsection (f) of section 205, a nonexclusive license in writing and signed, whether recorded or not, would be valid against a later transfer, and would also prevail as against a prior unrecorded transfer if taken in good faith and without notice. Objections were raised by motion picture producers, particularly to the provision allowing unrecorded nonexclusive licenses to prevail over subsequent transfers, on the ground that a nonexclusive license can have drastic effects on the value of a copyright. On the other hand, the impracticalities and burdens that would accompany any requirement of recordation of nonexclusive licenses outweigh the limited advantages of a statutory recordation system for them.

## SECTION 301. FEDERAL PREEMPTION OF RIGHTS EQUIVALENT TO COPYRIGHT

*Single Federal system*

Section 301, one of the bedrock provisions of the bill, would accomplish a fundamental and significant change in the present law. Instead of a dual system of "common law copyright" for unpublished works and statutory copyright for published works, which has been the system in effect in the United States since the first copyright statute in 1790, the bill adopts a single system of Federal statutory copyright from creation. Under section 301 a work would obtain statutory protection as soon as it is "created" or, as that term is defined in section 101, when it is "fixed in a copy or phonorecord for the first time." Common law copyright protection for works coming within the scope of the statute would be abrogated, and the concept of publication would lose its all-embracing importance as a dividing line between common law and statutory protection and between both of these forms of legal protection and the public domain.

By substituting a single Federal system for the present anachronistic, uncertain, impractical, and highly complicated dual system, the bill would greatly improve the operation of the copyright law and would be much more effective in carrying out the basic constitutional aims of uniformity and the promotion of writing and scholarship. The main arguments in favor of a single Federal system can be summarized as follows:

1. One of the fundamental purposes behind the copyright clause of the Constitution, as shown in Madison's comments in The Federalist, was to promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various States. Today, when the methods for dissemination of an author's work are incomparably broader and faster than they were in 1789, national uniformity in copyright protection is even more essential than it was then to carry out the constitutional intent.

2. "Publication," perhaps the most important single concept under the present law, also represents its most serious defect.

Although at one time, when works were disseminated almost exclusively through printed copies, "publication" could serve as a practical dividing line between common law and statutory protection, this is no longer true. With the development of the 20th-century communications revolution, the concept of publication has become increasingly artificial and obscure. To cope with the legal consequences of an established concept that has lost much of its meaning and justification, the courts have given "publication" a number of diverse interpretations, some of them radically different. Not unexpectedly, the results in individual cases have become unpredictable and often unfair. A single Federal system would help to clear up this chaotic situation.

3. Enactment of section 301 would also implement the "limited times" provision of the Constitution, which has become distorted under the traditional concept of "publication." Common law protection in "unpublished" works is now perpetual, no matter how widely they may be disseminated by means other than "publication"; the bill would place a time limit on the duration of exclusive rights in them. The provision would also aid scholarship and the dissemination of historical materials by making unpublished, undisseminated manuscripts available for publication after a reasonable period.

4. Adoption of a uniform national copyright system would greatly improve international dealings in copyrighted material. No other country has anything like our present dual system. In an era when copyrighted works can be disseminated instantaneously to every country on the globe, the need for effective international copyright relations, and the concomitant need for national uniformity, assume ever greater importance.

Under section 301, the statute would apply to all works created after its effective date, whether or not they are ever published or disseminated. With respect to works created before the effective date of the statute and still under common law protection, section 303 of the statute would provide protection from that date on, and would guarantee a minimum period of statutory copyright.

*Preemption of State law*

The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law. The declaration of this principle in section 301 is intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection.

Under section 301(a) all "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 are governed exclusively by the Federal copyright statute if the works involved are "works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103." All corresponding State laws, whether common law or statutory, are preempted and abrogated. Regardless of when the work was cre-

ated and whether it is published or unpublished, disseminated or undisseminated, in the public domain or copyrighted under the Federal statute, the States cannot offer it protection equivalent to copyright. Section 1338 of title 28, United States Code, also makes clear that any action involving rights under the Federal copyright law would come within the exclusive jurisdiction of the Federal courts. The preemptive effect of section 301 is limited to State laws; as stated expressly in subsection (d) of section 301, there is no intention to deal with the question of whether Congress can or should offer the equivalent of copyright protection under some constitutional provision other than the patent-copyright clause of article 1, section 8.

As long as a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain. On the other hand, section 301(b) explicitly preserves common law copyright protection for one important class of works: works that have not been "fixed in any tangible medium of expression." Examples would include choreography that has never been filmed or notated, an extemporaneous speech, "original works of authorship" communicated solely through conversations or live broadcasts, and a dramatic sketch or musical composition improvised or developed from memory and without being recorded or written down. As mentioned above in connection with section 102, unfixed works are not included in the specified "subject matter of copyright." They are therefore not affected by the preemption of section 301, and would continue to be subject to protection under State statute or common law until fixed in tangible form.

The preemption of rights under State law is complete with respect to any work coming within the scope of the bill, even though the scope of exclusive rights given the work under the bill is narrower than the scope of common law rights in the work might have been.

Representatives of printers, while not opposed to the principle of section 301, expressed concern about its potential impact on protection of preliminary advertising copy and layouts prepared by printers. They argued that this material is frequently "pirated" by competitors, and that it would be a substantial burden if, in order to obtain full protection, the printer would have to make registrations and bear the expense and bother of suing in Federal rather than State courts. On the other hand, these practical problems are essentially procedural rather than substantive, and the proposal for a special exemption to preserve common law rights equivalent to copyright in unpublished advertising material cannot be justified. Moreover, subsection (b), discussed below, will preserve other legal grounds on which the printers can protect themselves against "pirates" under State laws.

In a general way subsection (b) of section 301 represents the obverse of subsection (a). It sets out, in broad terms and without necessarily being exhaustive, some of the principal areas of protection that preemption would not prevent the States from protecting. Its purpose is to make clear, consistent with the 1964 Supreme Court decisions in *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U.S. 225, and *Compco Corp.* v. *Day-Brite Lighting, Inc.*, 376 U.S. 234, that preemption does not extend to causes of action, or subject matter outside the scope of the revised Federal copyright statute.

132

The numbered clauses of subsection (b) list three general areas left
unaffected by the preemption: (1) subject matter that does not come
within the subject matter of copyright; (2) causes of action arising
under State law before the effective date of the statute; and (3) viola-
tions of rights that are not equivalent to any of the exclusive rights
under copyright.

The examples in clause (3), while not exhaustive, are intended to
illustrate rights and remedies that are different in nature from the
rights comprised in a copyright and that may continue to be protected
under State common law or statute. The evolving common law rights
of "privacy," "publicity," and trade secrets, and the general laws of
defamation and fraud, would remain unaffected as long as the causes
of action contain elements, such as an invasion of personal rights or a
breach of trust or confidentiality, that are different in kind from copy-
right infringement. Nothing in the bill derogates from the rights of
parties to contract with each other and to sue for breaches of contract;
however, to the extent that the unfair competition concept known as
"interference with contract relations" is merely the equivalent of copy-
right protection, it would be preempted.

The last example listed in clause (3)—"deceptive trade practices
such as passing off and false representation"—represents an effort to
distinguish between those causes of action known as "unfair competi-
tion" that the copyright statute is not intended to preempt and
those that it is. Section 301 is not intended to preempt common
law protection in cases involving activities such as false labeling,
fraudulent representation, and passing off even where the subject
matter involved comes within the scope of the copyright statute.

"Misappropriation" is not necessarily synonymous with copyright
infringement, and thus a cause of action labeled as "misappropriation"
is not preempted if it is in fact based neither on a right within the
general scope of copyright as specified by section 106 nor on a right
equivalent thereto. For example, state law should have the flexibility
to afford a remedy (under traditional principles of equity) against a
consistent pattern of unauthorized appropriation by a competitor of
the facts (i.e., not the literary expression) constituting "hot" news,
whether in the traditional mold of *International News Service* v. *Asso-
ciated Press*, 248 U.S. 215 (1918), or in the newer form of data updates
from scientific, business, or financial data bases. Likewise, a person
having no trust or other relationship with the proprietor of a com-
puterized data base should not be immunized from sanctions against
electronically or cryptographically breaching the proprietor's security
arrangements and accessing the proprietor's data. The unauthorized
data access which should be remediable might also be achieved by the
intentional interception of data transmissions by wire, microwave
or laser transmissions, or by the common unintentional means of
"crossed" telephone lines occasioned by errors in switching.

The proprietor of data displayed on the cathode ray tube of a com-
puter terminal should be afforded protection against unauthorized
printouts by third parties (with or without improper access), even
if the data are not copyrightable. For example, the data may not be
copyrighted because they are not fixed in a tangible medium of ex-
pression (i.e., the data are not displayed for a period or not more than
transitory duration).

Nothing contained in section 301 precludes the owner of a material embodiment of a copy or a phonorecord from enforcing a claim of conversion against one who takes possession of the copy or phono-record without consent.

A unique and difficult problem is presented with respect to the status of sound recordings fixed before February 12, 1972, the effective date of the amendment bringing recordings fixed after that date under Federal copyright protection. In its testimony during the 1975 hearings, the Department of Justice pointed out that, under section 301 as then written:

> This language could be read as abrogating the anti-piracy laws now existing in 29 states relating to pre-February 15, 1972, sound recordings on the grounds that these statutes pro-scribe activities violating rights equivalent to * * * the exclu-sive rights within the general scope of copyright. * * *" Cer-tainly such a result cannot have been intended for it would likely effect the immediate resurgence of piracy of pre-Febru-ary 15, 1972, sound recordings.

'The Department recommended that section 301(b) be amended to exclude sound recordings fixed prior to February 15, 1972 from the effect of the preemption.

The Senate adopted this suggestion when it passed S. 22. The result of the Senate amendment would be to leave pre-1972 sound recordings as entitled to perpetual protection under State law, while post-1972 recordings would eventually fall into the public domain as provided in the bill.

The Committee recognizes that, under recent court decisions, pre-1972 recordings are protected by State statute or common law, and that should not all be thrown into the public domain instantly upon the coming into effect of the new law. However, it cannot agree that they should in effect be accorded perpetual protection, as under the Senate amendment, and it has therefore revised clause (4) to establish a future date for the pre-emption to take effect. The date chosen is February 15, 2047, which is 75 years from the effective date of the statute extending Federal protection to recordings.

Subsection (c) makes clear that nothing contained in Title 17 annuls or limits any rights or remedies under any other Federal statute.

### SECTION 302. DURATION OF COPYRIGHT IN WORKS CREATED AFTER EFFECTIVE DATE

*In general*

The debate over how long a copyright should last is as old as the oldest copyright statute and will doubtless continue as long as there is a copyright law. With certain exceptions, there appears to be strong support for the principle, as embodied in the bill, of a copyright term consisting of the life of the author and 50 years after his death. In particular, the authors and their representatives stressed that the adoption of a life-plus-50 term was by far their most important legislative goal in copyright law revision. The Register of Copyrights now regards a life-plus-50 term as the foundation of the entire bill.

Under the present law statutory copyright protection begins on the date of publication (or on the date of registration in unpublished