# Nos. 16-56057 & 16-56287

DATE OF DECISION: SEPTEMBER 28, 2018
JUDGES PAEZ AND IKUTA AND DISTRICT JUDGE VITALIANO

---

In the

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Michael Skidmore as Trustee for the Randy Craig Wolfe Trust, *Plaintiff, Appellant, and Appellee*

v.

Led Zeppelin, et al., *Defendants and Appellees*
and

Warner/Chappell Music, Inc., *Defendant, Appellee, and Appellant*

*On Appeal from the United States District Court for the Central District of California, Hon. R. Gary Klausner, Case No.15-cv-0462 RGK (AGRx)*

**BRIEF AMICUS CURIAE**

**OF THE**

**PROFESSOR SEAN M. O'CONNOR and INSTITUTE FOR INTELLECTUAL PROPERTY AND SOCIAL JUSTICE (IIPSJ)**

**IN SUPPORT OF PLAINTIFF-APPELLANT**

SEAN M. O'CONNOR, ESQ.
CENTER FOR THE PROTECTION OF IP
3301 FAIRFAX DR., ARLINGTON VA 22201
TEL.: (703) 993-8937

LATEEF MTIMA
STEVEN D. JAMAR
INSTITUTE FOR INTELLECTUAL PROPERTY
AND SOCIAL JUSTICE, INC.
707 MAPLE AVE., ROCKVILLE MD 20850
TEL.: (202) 806-8012

# CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and 29(c), *amici* Sean M. O'Connor and Institute for Intellectual Property and Social Justice ("IIPSJ"), a 501(c)(3) non-profit corporation incorporated in Maryland, make the following disclosure:

1. Sean M. O'Connor, law professor and musician-composer, submits this brief in his individual capacity and not as part of any corporation or trade association.
2. IPSJ is not a publicly held corporation or other publicly held entity.
3. IIPSJ has no parent corporations.
4. No publicly held corporation or other publicly held entity owns 10% or more of IIPSJ.
5. IIPSJ is not a trade association.

DATED: July 1, 2019.

Respectfully,

SEAN M. O'CONNOR, Esq.
and
LATEEF MTIMA,
STEVEN D. JAMAR
    IIPSJ

By /s/ Sean M. O'Connor
SEAN M. O'CONNOR
*Attorneys for Amici*

- ii -

# TABLE OF CONTENTS

**Page**

STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)   1

CONSENT OF THE PARTIES   1

STATEMENT OF INTEREST   1

SUMMARY OF ARGUMENT   3

ARGUMENT   5

I. Protectable Expression in a Musical Work Extends to All Original Aspects and Not Just a "Main" or "Lead" Melody Line   5

II. Restricting the Scope of Musical Works to Lead Sheet Deposit Copies is Manifestly Unjust as it Locks in Western Formal Music Notation Bias and Enables Inequitable Misappropriation   7

III. The Range of Written Notation Forms Reveals the Problem With Restricting the Scope of Copyrighted Works to "Lead Sheet" Deposits   12

IV. The Court En Banc Should Reverse the Panel and Allow the Full Range of Evidence as to the Scope of Wolfe's Composition   16

A.   The Copyright Office's pre-1980s Registration Deposit Policy Did Not Circumscribe the Copyright in *Taurus*.   18

B.   The Copyright Office Could Have and Should Have Accepted Phonorecordings as Deposit Copies of Musical Compositions Before the 1980s.   20

C.   Restricting Copyright Protection to a Lead Sheet or Sheet Music Deposit Perpetuates Traditions of Copyright Injustice   26

# TABLE OF AUTHORITIES

**Page(s)**

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl.
8                                                                      22

## STATUTES

17 U.S.C.

§ 203                                                        11 (note 2)

Copyright Act of 1790                                              21-
22

Act of Feb. 3, 1831, 21st Cong., 2d Sess., 4 Stat. 436 (Feb. 3, 1831)        22

Copyright Act of 1909                              9, 17, 18, 21, 24, 25
§ 1(e)                                                               2

§§ 9-11
18


Act of January 6, 1897, 44th Cong., 2d Sess., 29 Stat. 481(694?) (Jan.
6, 1897)                                                    18, 19,
22

## RULES & REGULATIONS

Federal Rules of Evidence 702-
04                                                                      6


Federal Rule of Appellate Procedure

29(a) ........................................................................................ 1

29(c)(5) .................................................................................... 1

32(a)(5)-
(7) ........................................................................................... 32

**CASES**

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267 (6th Cir.
2009) ..................................................................................... 19

*Goldstein v. California*, 412 U.S. 546
(1973) ................................................................................... 23

*Mattel, Inc. v. MGA Entertainment, Inc.*, 616 F.3d 904 (9th Cir.
2010) ...................................................................................... 5

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir.
1930) ...................................................................................... 5

*Swirsky v. Carey,* 376 F.3d 841 (9th Cir. 2004) ..................... 5-
6

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000) ... 5, 6,
19

*Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338 (9th Cir. 1981) .............................................................................. 19-
20

*White-Smith Music Publishing Co. v. Apollo Co.*, 209 U.S. 1 (1908) ... 21-
23

# SECONDARY SOURCES

Keith Aoki, *Distributive Justice and Intellectual Property: Distributive and Syncretic Motives in Intellectual Property Law* 40 U.C. DAVIS L. REV. 717 (2007) .......... 8

Robert Brauneis, *Musical Work Copyright for the Era of Digital Sound Technology: Looking Beyond Composition and Performance*, 17 TUL. J. TECH. & INTELL. PROP. 1 (2014) .......... 24

Michael Cooper, *Have We Been Playing Gershwin Wrong for 70 Years*, N.Y. TIMES (Mar. 2, 2016 at C1) .......... 28

K.J. Greene, Copyright*, Culture & Black Music: A Legacy of Unequal Protection,* 21 HASTINGS COMM. & ENT. L.J. 339 (1999) .......... 8

Vernon Silver, *Rock Riff Rip-Off*, BLOOMBERG BUSINESSWEEK (Jun. 20, 2019). .......... 30

Hal Leonard Corp., R&B FAKE BOOK: 375 RHYTHM & BLUES SONGS (1999) .......... 14

Andrew Marantz, *The Teen-Age Hitmaker From Westchester County*, THE NEW YORKER (Aug. 19, 2016) .......... 25

Peter Menell, *Property, Intellectual Property, and Social Justice: Mapping the Next Frontier*, 5 BRIGHAM-KANNER PROP. RTS. CONF. J. 147 (2016) .......................................................................... 7

Lateef Mtima, *Copyright and Social Justice in the Digital Information Society: "Three Steps" Toward Intellectual Property Social Justice*, 53 HOUSTON L. REV. 459, 482-84 (2015) .......................................................................... 26

Lateef Mtima and Steven D. Jamar, *Fulfilling the Copyright Social Justice Promise: Digitizing Textual Information*, 55 N.Y.L. REV. 77 (2010/11) .......................................................................... 7

Smokey Robinson Interviewed by Howard Stern on "The Howard Stern Show" on SiriusXM on September 30, 2014, http://blog.siriusxm.com/2014/10/01/smokey-robinson-tells-howard-theres-some-good-music-being-made-today-man-on-the-stern-show/; https://www.youtube.com/watch?v=PedzBpDNJrI (on composing music and exploitation of composers in the music business) .......................................................................... 8

## STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)

None of the counsel for the parties authored this brief. The parties have not contributed any money that was intended to fund the preparation or submission of the brief. No persons other than amici curiae or their counsel contributed money that was intended to fund the preparation or submission of the brief.

## CONSENT OF THE PARTIES

Pursuant to FRAP 29(a), Appellees and Appellants have consented to Sean M. O'Connor and IIPSJ's filing of this brief.

## STATEMENT OF INTEREST

Sean M. O'Connor, law professor and musician-composer, is an expert in his field with an interest in a properly functioning copyright system that supports social justice and the well-being of musicians and composers who contribute greatly to the creative economy in the United States and worldwide.

The Institute for Intellectual Property and Social Justice promotes social justice in the field of intellectual property law and practice, both domestically and globally. Through core principals of access, inclusion, and empowerment, intellectual property social justice advances the social policy objectives that underlie intellectual property protection: the broadest stimulation of creative and

innovative endeavor and the widest dissemination of creative works and innovative accomplishments for the greater societal good.

## SUMMARY OF ARGUMENT

The decision of the appellate panel ("Panel") improperly restricts composers to the "lead sheet" deposit copy for determining the scope of the composition. Such deposit copies were intended as placeholders or indicia for the work and not as comprehensive notations of the full composition. The panel erred in ruling that phonorecordings of Randy Craig Wolfe's full composition of *Taurus* were properly disallowed by the trial court. On rehearing en banc, this Court should rule that phonorecordings, or other contemporaneous documentation, of a composition should be allowed as evidence of the scope of the copyrighted work with appropriate evidentiary qualifications.

The Copyright Office's former policy of requiring written music deposits contravened the 1909 Act and also discriminated against traditionally marginalized composers. A specific method of notating music privileges the kinds of music for which that notation was developed. This is particularly evident in the case of European classical music staff notation. Composers not fluent in this specific form of musical notation—especially those who work in aural musical traditions, or are from disadvantaged communities or backgrounds and thus did not enjoy access to formal music education—have been routinely discriminated against when the copyright system has been incorrectly construed

to require the use of such notation. Such misapplication of the law has historically been used to deny protection to works that contain creative musical expression but which have not been documented by their composers in the written notation method received from the European classical musical tradition.

American copyright embraces all kinds of creative expression, howsoever such expression might be documented. Intellectual property social justice requires that everyone be included, empowered, and provided the ability to express themselves and to profit therefrom, even if the music does not arise out of or comport with European classical music traditions and mechanisms. The Panel ruling improperly disenfranchises the many great popular music composers who were not in a position to accurately notate their full works before the Copyright Office allowed phonorecordings of musical works to be submitted as deposit copies for the underlying composition and not just for the sound recording the phonorecording also embodies. Social justice requires this ruling to be reversed.

# ARGUMENT

## I. PROTECTABLE EXPRESSION IN A MUSICAL WORK EXTENDS TO ALL ORIGINAL ASPECTS AND NOT JUST A "MAIN" OR "LEAD" MELODY LINE

The copyright in a musical work extends to the protectable aspects of the composition. Where the composition contains both protectable and unprotectable elements, the copyright extends only to the protectable ones. *Mattel, Inc. v. MGA Entertainment, Inc.,* 616 F.3d 904 (9th Cir. 2010). Protectable aspects include discrete elements such as original melodic lines, harmonic lines, and percussive parts, as well as an original combination of these and other elements, even if some of the elements are individually not protectable. *Swirsky v. Carey,* 376 F.3d 841 (9th Cir. 2004). For example, the standard 12 bar blues chord progression is not itself protectable, but a particular original expression of it combined with other elements can be. Exactly where the line between protectable expression and nonprotectable expression is to be drawn is largely a matter of fact to be decided by the jury. *Id.*; *Three Boys Music Corp. v. Bolton,* 212 F.3d 477 (9th Cir. 2000). *See also Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir. 1930) (literary works).

A subsequent composer presumptively violates the copyright in a prior, underlying work when her work is substantially similar with respect to its use of protectable expression taken from the first work. *Three Boys Music Corp. v. Bolton,* 212 F.3d 477 (9th Cir. 2000). In the Ninth Circuit, the substantial similarity inquiry is bifurcated into extrinsic and intrinsic evaluations. *Swirsky v. Carey,* 376 F.3d 841 (9th Cir. 2004). Because music is a complex domain with many attributes unknown to the layperson, expert testimony is required under the extrinsic test. *Id.* Under the Ninth Circuit's approach, musicological experts testify as to the scope of protection, including which elements are not protectable as musical *scènes à faire*, as well as which aspects are original either as individual musical elements or combinations thereof. *Id.* If experts find protectable expression, the question of infringement goes to the jury. *Id.* When experts disagree about what is original or excludable, resolution of these issues is not one of law for the court, but rather is a question of fact for the jury. Fed. R. Evid. 702-04; *Swirsky v. Carey,* 376 F.3d 841 (9th Cir. 2004); *Three Boys Music Corp. v. Bolton,* 212 F.3d 477 (9th Cir. 2000).

## II. RESTRICTING THE SCOPE OF MUSICAL WORKS TO LEAD SHEET DEPOSIT COPIES IS MANIFESTLY UNJUST AS IT LOCKS IN WESTERN FORMAL MUSIC NOTATION BIAS AND ENABLES INEQUITABLE MISAPPROPRIATION

The panel's ruling has the unintended consequence of perpetuating injustice against a wide range of our most creative composers who by choice or circumstance were unable to transcribe their works into Western musical notation. Intellectual property social justice is based on principles of access, inclusion, and empowerment. *See e.g.* Peter Menell, *Property, Intellectual Property, and Social Justice: Mapping the Next Frontier,* 5 Brigham-Kanner Prop. Rts. Conf. J. 147 (2016); Lateef Mtima and Steven D. Jamar, *Fulfilling the Copyright Social Justice Promise: Digitizing Textual Information,* 55 N.Y.L. Rev. 77, 80-84 (2010/11). In this case, the jury should be allowed to experience the full composition by Wolfe as part of the intrinsic infringement determination.

Allowing the jury to undertake such a determination based on the phonorecording or other contemporaneous documentation of Wolfe's complete composition would advance copyright social justice by preventing musicological bias against aural traditions from improperly denying copyright protection to creative elements by composers in these traditions. Reversing the panel's ruling would correct long-standing traditions within the field of denying protection to

the creative output of marginalized creators and of the resulting misappropriation of their work. *See, e.g.,* K.J. Greene, *Copyright, Culture & Black Music: A Legacy of Unequal Protection,* 21 Hastings Comm. & Ent. L.J. 339 (1999); Keith Aoki, *Distributive Justice and Intellectual Property: Distributive and Syncretic Motives in Intellectual Property Law* 40 U.C. Davis L. Rev. 717, 755 -62 (2007). *See also,* Smokey Robinson Interviewed by Howard Stern on "The Howard Stern Show" on SiriusXM on September 30, 2014, http://blog.siriusxm.com/2014/10/01/smokey-robinson-tells-howard-theres-some-good-music-being-made-today-man-on-the-stern-show/; https://www.youtube.com/watch?v=PedzBpDNJrI (on composing music and exploitation of composers in the music business) (around the 10th minute).

Allowing cultural bias to categorically deny copyright protection to aural musical expression discourages the participation of marginalized creators and communities in the copyright regime. Allowing all of the credible evidence of the scope of a copyright work would avoid such distortion of copyright and instead affirm the rights of marginalized creators to protection for their work.

Another equally important and damaging aspect of cultural bias that has disfavored marginalized artists was the longstanding Copyright Office policy to require written music notation for copyright registration and Library of Congress

deposits—which in practice was taken to mean the formal written music staff notation originally developed in Europe for sacred and secular classical music traditions ("European staff notation"). This mode of deposit and registration was not mandated by the Copyright Act of 1909 under which *Taurus* was registered (see Part IV below). In fact, the Copyright Office did allow deposit of player piano rolls for a period in the 1920s and 30s for registration of musical composition copyrights. Conversation of Howard Abrams with Marybeth Peters, Former Register of Copyrights on October 19, 2016. Nonetheless, from some time after the 1930s and before the 1980s, written music deposits were required for musical compositions. Phonorecordings of course were deposited for sound recording copyrights starting in 1973 when federal protection for them was first adopted.

The form-of-deposit discrimination problem arose because many of our nation's most gifted (and internationally acclaimed) composers who worked outside of the European classical or formal music tradition—albeit squarely within emerging twentieth century Western popular music genres—were not fluent in European staff notation. Nor was this mode of notation seen as particularly relevant to the aural music traditions in which they composed. Randy Craig Wolfe was one of these composers—as were Marvin Gaye, Robert

Johnson, Hank Williams, Jimi Hendrix, Irving Berlin, Michael Jackson, Elvis Presley, Glenn Campbell, and many other American music innovators. This technical limitation had little impact on their ability to convey their compositions to other musicians to perform, as many musicians in the new pop, jazz, country, and other indigenous American genres also were not fluent in European staff notation. Such musicians, like the composers themselves, played by ear and by watching as others played.[1]

At least two categories of problems resulted from the disconnect between the Copyright Office deposit policy and the inability of many American composers to read and write European staff notation. First, in many cases, these composers were not in a position to inscribe their compositions in such notation, and consequently were forced to rely on others where lead sheets or sheet music was deemed required. In many such cases, music publishers assigned an employee trained in European staff notation to transcribe a recorded performance of the composition. The transcriber would transcribe what she considered the

---

[1] We use "aural" here instead of "oral" because we focus on this "playing by ear" nature of these popular composers' methods of learning, playing, and composing music directly to performances on instruments. By contrast, "oral" connotes folk and other traditions in which senior musicians directly instruct junior musicians in how to play particular songs as a means of preservation and transmission across generations.

main melody and chords of the song. The result might or might not accurately represent the actual melody and chords composed, and might include or omit other important, original elements of the composition. If courts construed the composition as limited to that which could reasonably be interpreted from the lead sheet or sheet music inscribed by someone other than the composer—and in many cases with no direct involvement by the composer—then only an incomplete version of the composition would receive copyright protection.

Second, leaving composition transcription (and related copyright formalities) to a manager, record label, or music publisher created a moral hazard. We now know that a significant number of composers suffered harm by not having works registered in their own name or by having works registered with "co-authors" who played no actual role in composing the work. As the historical record reveals, many marginalized composers, especially those of color and outside both the European staff notation tradition and communities which offered better access to legal representation and information, were exploited badly in the twentieth century.[2]

---

[2] When Congress added termination rights under Section 203 of the Copyright Act of 1976, the provision was largely motivated by narratives of such exploitation.

American copyright law should be interpreted and applied to prevent misuse of the law in furtherance of misappropriation schemes. Reversing the panel's ruling could help mitigate decades of copyright abuse and may be a harbinger of changes that can curtail and discourage practices that undermine our fundamental objectives of copyright social utility and justice.

## III. THE RANGE OF WRITTEN NOTATION FORMS REVEALS THE PROBLEM WITH RESTRICTING THE SCOPE OF COPYRIGHTED WORKS TO "LEAD SHEET" DEPOSITS

There are various methods of written music notation—e.g., European staff notation, guitar tablature notation—and various categories within each method. The three main categories of European staff notation are based on the detail or completeness of the notation written. A full score, which orchestral conductors use, includes separate staves for each instrument scored. *See, e.g.,* O'Connor/IIPSJ Amicus Brief Exhibit A. Composers trained in European staff notation generally use this form, scoring simultaneous parts for various instruments, such as stringed instruments, woodwinds, brass, and percussion.

A published "short score," commonly referred to as "commercial sheet music" (or "sheet music") occupies a middle ground. It does not purport to score

all of the instrument parts expressly written by the composer. It instead creates a new arrangement of the composition that focuses on only some elements, often those that can reasonably be played by two hands on a keyboard by a beginning to intermediate musician. *See, e.g.,* O'Connor/IIPSJ Amicus Brief Exhibit B. Such sheet music typically contains a treble clef that shows the melody and some harmony and a bass clef that shows chords and perhaps a bass line. If the composition contains a vocal melody, then that is generally scored in an extra treble clef above the piano staves or on the treble clef piano stave. In many cases, the abbreviated names of chords, e.g., "A7," is notated above the top staff for chordal accompaniment on guitar, banjo, ukulele, etc., but generally with no additional notation as to the voicing of that chord (see below), or as to the rhythm to use when playing the chord. The chord name simply appears above the staff at the point when the accompanist should start playing it, and implicitly ends only when another chord name appears.

Sheet music for popular music is rarely one and the same with the actual composition unless the composer wrote the music as that exact two-handed piano part—e.g., sheet music of Scott Joplin's piano rags. In order to make the music easier for the amateur musician to play or sing, commercial sheet music often presents songs in a different key from the original composition, with different

notes and often simpler chords, and with integral parts written by the composer omitted (such as lead or bass guitar parts, horn parts, etc.). Additional factors such as articulation—i.e., how the notes should be played such as staccato, legato, accented, etc.,—are most often not specified in this type of notation. Thus, such sheet music is rarely a good instantiation of the full composition.

Lead sheets, the third category of European staff notation, are the most stripped down, abstracted versions of compositions. They often contain a single treble clef showing the main melody with chord names given along the top as they are in sheet music. Sometimes lead sheets include other notable parts such as a bass line, or give performance directions such as "moderate swing." *See, e.g.,* O'Connor/IIPSJ Amicus Brief Exhibit C. Lead sheets are designed to be used by professional performers who know how to interpret and extrapolate from them and they function as a kind of shorthand for composers. For example, popular music "fake books" compile standard show tunes, jazz standards, or pop standards, etc., in lead sheet form so that musicians already familiar with the song can "fake it" with just melody and chords in live performances, especially where they take requests from the audience. *E.g.,* Hal Leonard Corp., *R&B Fake Book: 375 Rhythm & Blues Songs* (1999). Occasionally, and significantly, a lead sheet

will contain an additional element such as a bass line that is considered exceptionally important for the song.

No musician believes that modern pop song compositions consist only of the single melody (and lyrics) plus basic chord indications that a lead sheet typically shows. The composition as notated in shorthand on the lead sheet is not limited to what is inscribed within the four corners of the lead sheet. The composition as actually composed includes melody, harmonies, chord progressions, rhythms, and many other stylistic elements.

Thus, even the most constrained reading of lead sheets to determine the scope of the copyrighted composition must include interpretation of rhythms and harmonic voicings as integral elements. For example, the chord symbol alone, written over the staff with no other indications, does not tell the performer how to play it. She must interpret it in conjunction with the written melody line and any performance indications, and perhaps her knowledge of the actual composition, to play it as the composer composed it. The frequency of playing the chord (e.g, "eight-to-the-bar"), the rhythm (e.g., swing), the voicing (i.e., the order of stacking the tones comprising it),[3] and playing method (e.g., "Travis

---

[3] Chords generally contain three or more notes "stacked" together from low to high tones. A root major chord is three tones: the first, third, and fifth notes of

picking" on guitar) must all be interpreted from the lead sheet. These elements can be integral to the composition. Thus, not only *can* professional performers and musicologists interpret key, tempo, time signature, style/genre terms, and the written notes, but they also *must* so interpret simply to transform this shorthand into a viable composition.

## IV. THE COURT EN BANC SHOULD REVERSE THE PANEL AND ALLOW THE FULL RANGE OF EVIDENCE AS TO THE SCOPE OF WOLFE'S COMPOSITION

The Panel considered a dispute as to the extent to which deposited lead sheets constrains the assessment of substantial similarity. The roots of this dispute stem from the now long-abandoned policy of the Copyright Office to accept only written notations of musical compositions for purposes of copyright registration—widely taken to mean European staff notation. As discussed above, where a composer was not fluent in such notation, her publisher or record label

---

the major scale played simultaneously. Minor chords use a flatted or minor third in place of the major third. Other kinds of chords generally add extra tones beyond the first, third, and fifth. For example, the dominant 7th chord adds the dominant or flatted seventh tone of the scale to a major chord. On a keyboard the default approach is to play chords in order of their tones as described above. On other popular instruments such as guitar, the standard chord form may be quite different, and indeed there may be multiple "standard" ways to play a single chord on that instrument.

would typically have shorthand lead sheets prepared and submitted to secure registration, such as was done for *Taurus*. These were known to be artificial exercises that did not capture the full complexity of the actual musical composition.

An illustration is in order. A former bandleader for famed soul singer and composer Marvin Gaye bandleader, McKinley Jackson, sometimes wrote lead sheets for publishing and copyright purposes. He explains that these transcriptions might track the lead singer's part from a phonorecording as the sole melody line for the entire composition even where that part had switched to harmony during periods in which a background singer was instead singing the lead lyric/melody. Thus, the lead sheet would—from a copyright perspective— erroneously leave out sections of the main melody, inadvertently substituting harmony parts instead. Brief Amicus Curiae of the Institute for Intellectual Property and Social Justice, Musician and Composers, and Law, Music, and Business Professors in Support of Appellees, *Williams v. Gaye*, 885 F.3d. 1150 (9th Cir. 2018).

The Copyright Office should have accepted phonorecording deposits under the 1909 Copyright Act, particularly where the composer did not read and write European staff notation and where there were no generally accepted,

effective, alternate systems. Notwithstanding, it began accepting phonorecordings as deposit copies for musical compositions by the 1980s. As there was no compelling justification for the pre-1980s policy, and given its inadvertent discriminatory effect, there is no reason to revive it as a means by which to preclude Wolfe from establishing the full scope of the *Taurus* composition.

Lead sheet deposits required by the Copyright Office merely documented the fact of the composition of a copyrightable work; under the Copyright Act of 1909, Pub. L. 60-349, 35 Stat. 1075 (Mar. 4, 1909), the copyright attached to the entire composition as composed when either published or registered. Consequently, there is no legal basis for excluding evidence of the full composition that Wolfe wrote, and the Panel's ruling was reversible error.

## A. The Copyright Office's pre-1980s Registration Deposit Policy Did Not Circumscribe the Copyright in *Taurus*.

Under the 1909 Act, copyright protection was established by publication or registration of the work. *Id.* at §§ 9-11. Because performance rights had been added to the composer's bundle of exclusive rights in 1897, infringement of the copyright in a musical work was no longer limited to copying physical copies of

- 18 -

the music. Act of January 6, 1897, 29 Stat. 481 (Jan. 6, 1897). Unauthorized, non-fair use performance infringed rights in the musical composition. It did not matter whether musicians performed the music by ear, or from sheet music purchased legally, or from lead sheets or other notation created to recall the work to the mind of the performers. The performance rights in a musical work were not confined to its embodiment in any form or written notation.

In the present case, the deposit copy of the work is significantly different from what Wolfe actually composed and fixed in the phonorecording. The deposited lead sheet represents only a very limited notation of a work with multiple parts (guitars, keyboards, bass, percussion, etc.) composed by in the aural tradition by Wolfe. Given the manner and medium in which he composed, the phonorecording provides the most accurate document of his composition. Some courts have allowed phonorecordings as evidence of the music composition in cases such as this, where the composer composed in the studio to a phonorecording. *See Three Boys Music Corp. v. Bolton,* 212 F.3d 477 (9th Cir. 2000); *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 276 (6th Cir. 2009).

Regardless of the validity of the prior copyright registration policy, that policy had no bearing on the vesting of copyright protection. *Twentieth Century-*

*Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1342 (9th Cir. 1981). The publication or registration of the work was the act by which copyright in the underlying composition vested, but it should not be confused with constituting the scope of the protected work itself. While it might seem to make sense that these written notations should define the "copy" of the work, that would mean that a simplified two-handed piano part version of a new symphonic work prepared for the amateur market, or a shorthand placeholder lead sheet used to identify the work solely for registration, would limit copyright to only what was notated for these constrained purposes. This does not make any sense. For a symphonic work, it is likely that the composer, or his or her publisher, instead submitted a fully scored version of the work to the Copyright Office for registration. In that case, the deposit copy could be the definitive version of the work—even though prior publication of simplified sheet music may have already vested copyright in the work. For composers like Wolf, writing a full score in European staff notation may not have been possible. The lead sheet prepared as a pro forma step by his publisher does not accurately captured the full scope of his composition. Only the phonorecording—his medium of choice for composition and recordation of that composition—did this.

### B. The Copyright Office Could Have and Should Have Accepted

**Phonorecordings as Deposit Copies of Musical Compositions Before the**

**1980s.**

Under the Copyright Act of 1909, the limitation of a "copy" of a musical composition to human readable notation systems under the Copyright Act of 1790, as interpreted by the Supreme Court in *White-Smith Music Publishing Co. v. Apollo Co.,* 209 U.S. 1 (1908)*,* was explicitly broadened to include "any system of notation or any form of record in which the thought of an author might be recorded and from which it may be read or reproduced." Copyright Act of 1909 § 1(e). Following this, the Copyright Office for a time allowed deposits for registration and for the Library of Congress in the form of player piano rolls. For reasons not fully known and not linked to any further change in the statute, at some point (in the 1930s we believe) the Copyright Office began requiring written notation deposits, before again allowing deposits of phonorecordings for musical compositions beginning in the 1980s, and again not linked to statutory changes.

Despite the express language in the 1909 Act allowing for musical composition copies to include "any form of record in which the thought of an author might be recorded and from which it may be . . . reproduced," courts were divided on whether the publication of a phonorecording could act as publication

of a musical composition under federal law, or only as publication of a sound recording under various state laws. The issue for the Copyright Office, as well as for the courts ruling against publications of phonorecordings as publications of musical compositions, seemed to arise from a lingering sense that *White-Smith* still governed as a matter of *constitutional* interpretation of the Intellectual Property Clause ("IP Clause"), U.S. Const. art. I, § 8, cl. 8, to require a narrow sense of "writings" as the subject matter for federal copyright protection.

The issue in *White-Smith* concerned infringement by copying and not by performance. The plaintiff did not sue the purchasers of player piano rolls who were using them to privately or publicly perform the copyrighted compositions. Public performances would have been prima facie actionable under the 1897 amendments. Instead, White-Smith sued Apollo as the maker of the rolls on the theory that Apollo was producing infringing copies of the compositions, which themselves had been registered through deposit of European staff notation. The *White-Smith* Court, however, did not decide what constituted "writings" under the IP Clause for purposes of registering copyrights. This was not an issue because copies of musical compositions for this purpose under the 1790 Act, as amended by the Copyright Act of 1831 adding musical compositions as copyrightable subject matter, Act of Feb. 3, 1831, 21st Cong., 2d Sess., 4 Stat.

436 (Feb. 3, 1831), was limited to written or printed music notation. The question instead was what constituted copies for *infringement* purposes. Had the case been brought against purchaser-performers as infringement of performance rights, the outcome may have been different. But being brought as it was on the basis of the rolls as manufactured and distributed by Apollo as infringing copies of the written musical composition, the Court was constrained by a copyright system that had defined the copy of a musical composition as a thing that was to be read by humans, and thus an infringing copy of that would also have to be something that could be read by humans. An infringing *performance* could have been a different matter, but that was not before the Court.

But in *Goldstein v. California*, 412 U.S. 546 (1973), the Supreme Court expressly held that phonorecordings could be within the constitutional category of "writings" under the IP Clause. The Court wrote that

> although the word "writings" might be limited to script or printed material, it may be interpreted to include any physical rendering of the fruits of creative intellectual or aesthetic labor. . . . [citations omitted] Thus, recordings of artistic performances may be within the reach of [the Intellectual Property Clause].

*Id*. at 561. The *Goldstein* Court held that *White-Smith* had decided only what could be infringing copies of the musical composition under the *statute* in force at the time, and had not excluded phonorecordings as writings under the IP

Clause. Perforce the phonorecording of the musical composition satisfies the constitutional requirement of a writing and as discussed above, meets the 1909 Act statutory language as well.

By the mid-twentieth century, relatively high fidelity recording devices had also become much more affordable, especially with the advent of the compact cassette, and centered around only a few basic platforms. This allowed more composers who were not fluent in European staff notation, or who did not find it helpful for their genre, to document their compositions in a more natural and accurate way. *See* Robert Brauneis, *Musical Work Copyright for the Era of Digital Sound Technology: Looking Beyond Composition and Performance*, 17 TUL. J. TECH. & INTELL. PROP. 1 (2014). Simple tricks with such devices even enabled them to create limited multi-track recordings to demonstrate different instrument parts played simultaneously for more complex compositions.

In the 1980s, the Copyright Office promulgated its new policy to accept phonorecordings as deposits for musical compositions. It was a welcome change for many, including one of the Authors of this Brief, and allowed composers to register their compositions in the manner best suited for their aural process of composing, documenting, sharing, and analyzing their works.

Today, in key genres of popular music, composers work exclusively with digital music tools—creating, manipulating, and sending digital music files back and forth amongst composers, producers, and musicians to create a composition that is purely aural and digital. Even paper sheet music notation itself is becoming an archaic, possibly obsolescent, format for at least some forms of music. *See, e.g.,* Andrew Marantz, *The Teen-Age Hitmaker From Westchester County*, THE NEW YORKER (Aug. 19, 2016). Furthermore, instrumental timbre choices, such as sticks or brushes on drums, were once seen by some as stylistic performance components. Modern pop composers now consider these textures central compositional elements in their works. *Id*.

Randy Wolfe was such a composer and we can only truly understand and analyze his compositions through the format in which he worked—analog multi-track phonorecordings. The Copyright Office should have accepted phonorecordings as registration deposits throughout the entire period in which the 1909 Act was in effect. Neither Wolfe nor other composers should today be penalized by restricting evidence of their compositions to a stripped-down lead sheet deposit created to comply with an extra-statutory administrative practice, especially where that deposit does not match the work composed by the author in the studio.

**C. Restricting Copyright Protection to a Lead Sheet or Sheet Music Deposit Perpetuates Traditions of Copyright Injustice**

Composers not fluent in European staff notation, composers who work in aural traditions and genres where such notation is not very helpful, and composers from disadvantaged backgrounds have routinely been discriminated against by a copyright system at times improperly administered so as to extend protection to only certain kinds of privileged works. This misapplication of copyright law contravenes the social objectives of the law. *See* Lateef Mtima, *Copyright and Social Justice in the Digital Information Society: "Three Steps" Toward Intellectual Property Social Justice,* 53 Houston L. Rev. 459, 482-84 (2015). Excluding the best evidence for what Wolfe actually composed—the phonorecording of the work—perpetuates these discriminatory practices and traditions by penalizing him for working in a genre and at a time when it was difficult for marginalized composers to protect their interests.

Nineteenth and early twentieth century notions of musical composition and copyright embraced by those in the musical establishment combined with the Copyright Office registration deposit policy to discriminate against composers and performers who expressed their music outside the nineteenth century European formal written notation tradition. What counted as "music" and was

thus protectable was that which could be fit into European classical or popular music traditions—even as Americans were created exciting new musical genres and styles—and could be communicated through notation systems developed in medieval and early modern times for disseminating and systematizing music in Christian religious or classical music traditions. But by the end of the twentieth century, vast amounts of commercially popular music were being produced by composers and performers who did not use European staff notation in any systematic way. This was because they were not fluent in that format and because they did not perceive it to be a necessary or even helpful means of communicating their music.

Modern composers and performers in multicultural music genres who do use European staff notation have developed work-arounds to communicate their intentions by adding written comments such as "swing feel" or "shuffle" or "medium funk beat" that approximate the desired rhythm and phrasing to the staff notations of their compositions. But even with these adjustments, the notation still only provides an approximation of the music and not the actual composition. Anyone who has heard a computer program play sheet music instantly hears the difference between a technically accurate computer rendition of the notated tones and that of the same music as performed by humans. *Compare, e.g.*, algorithmic

audio preview of the commercial sheet music for Marvin Gaye's seminal soul classic *Got To Give It Up available at* http://www.musicnotes.com/sheetmusic/mtd.asp?ppn=MN0065460 (last visited Jul. 1, 2019) *with* Gaye's recording of *Got To Give It Up* (Tamla 1977).

Aural composers such as Wolfe often compose direct to phonorecordings for pop, rock, Soul, or hip hop combos which include guitars, electric bass, keyboards, drum kits, auxiliary percussion like cowbells, vocals, etc. Beethoven and Gershwin wrote orchestrated compositions for solo instruments, small ensembles, and full symphony orchestras. They included a full set of instrumental parts and not just chord indications, melodies, and words for all of their compositions. If Gershwin could notate for old-fashioned car squeeze bulb horns as he did in "An American in Paris," *see, e.g.*, Michael Cooper, *Have We Been Playing Gershwin Wrong for 70 Years*, N.Y. TIMES (Mar. 2, 2016 at C1), and to which presumably the copyright in that composition extends, why could Wolfe not also enjoy protection for his rock orchestral composition? The answer seems to turn solely on whether the composer is fluent in European staff notation and can thus transcribe his composition accurately into it. That is unjust. It disfavors those outside that particular music tradition.

To the extent that the Court is concerned whether a phonorecording captures all and only a particular author's work is an evidentiary matter. In other words, there may be situations in which other musicians composed their own parts for a songwriting composer's core melody and chord changes. Thus, allowing a final commercial phonorecording as evidence of that songwriter's composition may be overinclusive as to the scope of the songwriter's musical work. Thus, appropriate testimony and documentary evidence is warranted to ensure that any claims as to the scope and content of a particular author's contribution to the underlying musical work represented are accurate.

Finally, this Brief addresses only the lead sheet deposit copy issue. It does not opine as to the merits of other aspects of this litigation. Such other issues may favor or disfavor the plaintiff-appellant.

This Court can help remedy this legacy of discrimination by reversing the Panel's ruling that the lead sheet deposit copy fully delineates the scope and content of *Taurus*. So many composers, particularly those who created original and inherently American music art forms such as jazz, country, bluegrass, R&B, and rock and roll, were not fluent in European staff notation, even as they were musicians and composers of the first rank. Their compositions lived and breathed for them in the phonorecording they made that would either be released

- 29 -

commercially or used to "sell" the song to other producers or performers who would then cut a cover of the composition to release as a sound recording. If placeholder lead sheets prepared by music publishers with little to no involvement of the composer, or simplified published sheet music for the amateur home market, are allowed to determine the scope of copyright protection in a composition, the creative contributions of some of our nation's greatest innovators will be denied protection in deference to received nineteenth century European traditions inapt to uniquely American creativity. *See, e.g.*, Vernon Silver, *Rock Riff Rip-Off*, BLOOMBERG BUSINESSWEEK (Jun. 20, 2019).

## CONCLUSION

For the foregoing reasons the Court en banc should reverse the Panel's ruling that the scope of a copyrighted musical work in strictly delineated by the contents of the deposit copy submitted as part of registering that work.

DATED: July 1, 2019.

Respectfully submitted,

/s/ Sean M. O'Connor
SEAN M. O'CONNOR

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(A)(5)-(7) AND CIRCUIT RULE 32-1

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 5,880 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief substantively complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirement of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14 point Times New Roman.

DATED: July 1, 2019.

SEAN M. O'CONNOR,
By /s/ Sean M. O'Connor

**CERTIFICATE OF SERVICE FOR DOCUMENTS FILED USING CM/ECF**

I hereby certify that on July 1, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Sean M. O'Connor

SEAN M. O'CONNOR

EXHIBIT A

Example of full score



# Ludwig van Beethovens Werke.

## Vollständige kritisch durchgesehene überall berechtigte Ausgabe.

### Mit Genehmigung aller Originalverleger.

## Serie 1.

# SYMPHONIEN

## für grosses Orchester.

## PARTITUR.

№ 1. C dur, Op. 21.

„ 2. D dur, „ 36.

„ 3. Es dur, „ 55.

„ 4. B dur, „ 60.

№ 5. C moll, Op. 67.

„ 6. F dur, „ 68.

„ 7. A dur, „ 92.

„ 8. F dur, „ 93.

№ 9. D moll, Op. 125.

# № 9.

## Leipzig, Verlag von Breitkopf & Härtel.

*Die Resultate der kritischen Revision dieser Ausgabe sind Eigenthum der Verleger.*

# NEUNTE SYMPHONIE
## mit Schlusschor über Schiller's Ode an die Freude
### von
# L. van BEETHOVEN.

Beethovens Werke.

Serie 1. No 9.

Dem König Friedrich Wilhelm III. von Preussen gewidmet.

## Op. 125.



Original-Verleger: B. Schott's Söhne in Mainz.

B.9.

Stich und Druck von Breitkopf & Härtel in Leipzig.

EXHIBIT B

Example of commercial sheet music for *Got To Give It Up*

# GOT TO GIVE IT UP

Words and Music by
MARVIN GAYE



© 1977 (Renewed 2005) JOBETE MUSIC CO., INC.
All Rights Controlled and Administered by EMI APRIL MUSIC INC.
All Rights Reserved   International Copyright Secured   Used by Permission

musicnotes.com

Available at *musicnotes.com*

EXHIBIT C

*Got To Give It Up* lead sheet deposit (first page)

